1
ANDREW JANZ (SBN 287672)*
City Attorney
2
CITY OF FRESNO
2600 Fresno Street
3
Fresno, CA 93721
Telephone: (559) 621-7500
4
Facsimile: (559) 457-1084
* Application for admission pro hac vice
5
forthcoming
6
Attorney for Plaintiff
CITY OF FRESNO
7

8

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile:  (415) 848-7230

9

10

11

Attorneys for Plaintiffs
CITY OF FRESNO; CITY OF EUREKA; CITY
OF SOUTH LAKE TAHOE; COUNTY OF
SACRAMENTO; COUNTY OF MONROE;
MONROE COUNTY AIRPORT AUTHORITY

12
LYNDSEY OLSON (MN Lic. #0332288)*
Saint Paul City Attorney
13
Lyndsey.olsen@ci.stpaul.mn.us
KELSEY MCELVEEN (MN Lic. #0396744)*
14
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
15
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
16
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
17
Telephone:  (651) 266-8710
Facsimile  (651) 298-5619
18
* Application for admission pro hac vice
forthcoming
19

20
Attorneys for Plaintiff
CITY OF SAINT PAUL

MELISSA C. ALLISON (MA Bar No. 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL
(MA Bar No. 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500
* Application for admission pro hac vice
forthcoming

Attorneys for Plaintiffs
COUNTY OF MONROE
MONROE COUNTY AIRPORT AUTHORITY

21

22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

23
CITY OF FRESNO, et al,

24
                    Plaintiffs,

25
v.

26
SCOTT TURNER, et al,

27
                    Defendant.

28

Case No. 3:25-cv-07070-RS


**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION**

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................................. i

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I.     INTRODUCTION ............................................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................................. 2

      A.    Defendants Unilaterally Impose New Conditions on Federal Grant Funds ...................... 2

      B.    Plaintiffs Confront Harm and Uncertainty Under Defendants' Unlawful Federal
           Grant Conditions ................................................................................................................. 6

III.   LEGAL STANDARD ......................................................................................................... 9

IV.   ARGUMENT ...................................................................................................................... 10

      A.    Plaintiffs Have Standing to Challenge the Federal Grant Conditions .............................. 10

      B.    Plaintiffs Are Likely to Succeed on the Merits ................................................................ 10

           1.    The Federal Grant Conditions Are Unconstitutionally Vague .............................. 10

           2.    The Federal Grant Conditions Violate the Separation of Powers Doctrine ........... 12

                a.    Congress Has Not Authorized the HUD Grant Conditions ...................... 13

                b.    Congress Has Not Authorized the DOT Grant Conditions ....................... 14

                c.    Congress Has Not Authorized the HHS Grant Conditions ....................... 15

                d.    Congress Has Not Authorized the EAP Grant Conditions ....................... 16

                e.    The Federal Grant Conditions Are Not Germane to the Programs at
                     Issue ......................................................................................................... 17

                f.    The Federal Grant Conditions Violate the Tenth Amendment .................. 18

           3.    The Federal Grant Conditions Violate the APA ................................................... 19

                a.    Imposing the Federal Grant Conditions is a Final Agency Action ........... 19

                b.    The Federal Grant Conditions Are in Excess of Statutory
                     Jurisdiction .............................................................................................. 19

                c.    The Federal Grant Conditions are Arbitrary and Capricious .................... 21

            4.    Courts Have Found Similarly Situated Plaintiffs Are Likely to Succeed on
               the Merits and Have Enjoined Application of the Federal Grant Conditions ........ 23

      C.    Plaintiffs Will Suffer Irreparable Harm If the Conditions Are Not Enjoined .................. 23

      D.    The Balance of Equities Weighs in Plaintiffs' Favor, and a Preliminary Injunction
           Is in the Public Interest .................................................................................................... 25

V.    CONCLUSION ................................................................................................................... 25

RENNE PUBLIC LAW GROUP
Attorneys at Law

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ........................................................................................25

5

*Arizona v. Yellen*,
   34 F.4th 841 (9th Cir. 2022) ...........................................................................................10

6

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006)...................................................................................................11, 13

7

8

*State ex rel. Becerra v. Sessions*,
   284 F. Supp. 3d 1015 (N.D. Cal. 2018) ..........................................................................19

9

*Bennett v. Spear*,
   520 U.S. 154 (1997)..........................................................................................................19

10

11

*Bostock v. Clayton Cnty., Georgia*,
   590 U.S. 644 (2020)............................................................................................................8

12

13

*California v. Bernhardt*,
   472 F. Supp. 3d 573 (N.D. Cal. 2020) ............................................................................21

14

*California v. Env't Prot. Agency*,
   72 F.4th 308 (D.C. Cir. 2023)..........................................................................................21

15

16

*Chicago Women in Trades v. Trump*,
   No. 25-C-2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025)........................................23

17

*Chicago Women in Trades v. Trump*,
   No. 25-cv-02005, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025) ...............................12, 23

18

19

*City & Cnty. of San Francisco v. Barr*,
   965 F.3d 753 (9th Cir. 2020) .............................................................................................1

20

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ...........................................................................10, 12, 13

21

22

*City & Cnty. of San Francisco v. Trump*,
   No. 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025), opinion
   clarified, No. 25-CV-01350-WHO, 2025 WL 1358492 (N.D. Cal. May 9, 2025)......................23

23

24

*City of Los Angeles v. Barr*,
   941 F.3d 931 (9th Cir. 2019) ........................................................................................1, 13

25

26

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)..........................................................................................................10

27

28

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS

**TABLE OF AUTHORITIES** (Continued)                                    Page(s)

*Cnty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................................17, 18

*Cunningham v. Neagle*,
   135 U.S. 1 (1890)..............................................................................................................1

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019)................................................................................................10, 22

*Diemert v. City of Seattle*,
   No. 2:22-cv-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025) .............................22

*Erringer v. Thompson*,
   371 F.3d 625 (9th Cir. 2004) ......................................................................................20

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)....................................................................................................21

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) ........................................................................................9

*Fort Stewart Schs. v. Fed. Labor Rels. Auth.*,
   495 U.S. 641 (1990)....................................................................................................20

*Geo Group, Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ........................................................................................9

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)................................................................................................11, 12

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*,
   73 F.4th 657 (9th Cir. 2023) ......................................................................................21

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)....................................................................................................12

*Martin Luther King, Jr. Cnty. v. Turner*,
   No. 2:25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3, 2025) ............................23

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ......................................................................................25

*Moranski v. Gen. Motors Corp.*,
   433 F.3d 537 (7th Cir. 2005) ......................................................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................................21, 22

*N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*,
   817 F.2d 149 (1st Cir. 1987)........................................................................................7

RENNE PUBLIC LAW GROUP
Attorneys at Law

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS

**TABLE OF AUTHORITIES** (Continued)    Page(s)

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)................................................................................................19

*Ohio v. En'v't Prot. Agency*,
    603 U.S. 279 (2024)................................................................................................21

*Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018).....................................................................19

*Printz v. United States*,
    521 U.S. 898 (1997)................................................................................................18

*Religious Sisters of Mercy v. Azar*,
    513 F. Supp. 3d 1113 (D.N.D. 2021)......................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995)..................................................................................................6

*S. Educ. Found. v. United States Dep't of Educ.*,
    No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025)..........................23

*San Francisco A.I.D.S. Found. v. Trump*,
    No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025) .........................23

*South Dakota v. Dole*,
    483 U.S. 203 (1987)..........................................................................................15, 17

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ..................................................................................18

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ..................................................................................9

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024) .................................................................................25

*Yesler Terrace Cmty. Council v. Cisneros*,
    37 F.3d 442 (9th Cir. 1994) ....................................................................................20

**Federal Statutes**

5 U.S.C.
    § 553........................................................................................................................20
    § 704........................................................................................................................19
    § 706(2)..............................................................................................................19, 20

RENNE PUBLIC LAW GROUP
Attorneys at Law

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS

**TABLE OF AUTHORITIES** (Continued)                                    Page(s)

23 U.S.C.
  § 119 .................................................................................................................14
  § 124 .................................................................................................................14
  § 133 .................................................................................................................14
  § 148 .................................................................................................................14
  § 149 .................................................................................................................14
  § 167 .................................................................................................................14
  § 175 .................................................................................................................14
  § 176 .................................................................................................................14
  § 503(c)(4) .......................................................................................................14

42 U.S.C.
  § 247c ...............................................................................................................15
  § 254b ...............................................................................................................15
  § 300ff et seq ...................................................................................................16
  § 603 ...................................................................................................................4
  § 623 ...................................................................................................................4
  § 5307(b)–(c) .....................................................................................................7
  § 9604(k) .......................................................................................................7, 16

49 U.S.C.
  § 5334(k)(1) ......................................................................................................20
  § 6703 ...............................................................................................................14

**Federal Regulations**

14 C.F.R. pt. 11 ....................................................................................................20

24 C.F.R. § 5.106 .................................................................................................20

24 C.F.R. § 10.1 ...................................................................................................20

49 C.F.R. § 601.22(a) ...........................................................................................20

**Constitutional Provisions**

U.S. Const. Article I, § 8.......................................................................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs urgently seek a temporary restraining order to prevent the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Transportation ("DOT"), including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), Federal Aviation Administration ("FAA"), the U.S. Department of Health and Human Services ("HHS"), and the U.S. Environmental Protection Agency (EPA) (collectively, "Defendants"), from enforcing unlawful and unauthorized conditions imposed on critical federal grant programs.  These vague and sweeping conditions implementing the President's executive orders and policies (the "Federal Grant Conditions")[1] threaten hundreds of millions of dollars in essential funding that Plaintiffs depend on to provide core public services and maintain vital transportation infrastructure.  By imposing these unlawful conditions without statutory authority or compliance with required procedures, Defendants have exceeded their constitutional and statutory authority, disregarded the separation of powers, violated the Tenth Amendment's anti-commandeering principle, and flouted the requirements of the Administrative Procedure Act.  *See* U.S. Const. art. I, § 8; *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890); *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

Plaintiffs face multiple imminent deadlines that will result in the loss of substantial federal funding unless they agree to accept the unlawful Federal Grant Conditions.  The most imminent deadline will have already passed by the filing of this motion.  On or about August 18, 2025, HUD notified the City of Fresno by email that it had approximately 3 days to remove all references to "equity," "environmental justice," and "transgender", and agree to the other conditions.  Skei Decl. ¶ 13.  Fresno has since responded to HUD, informing the agency that it filed this action on August 20, 2025, and explained that it is not possible to provide an adequate response within timeframe provided.

Additionally, FAA Plaintiffs must decide in the next weeks whether to accept recently issued grant agreements, which require assuring compliance with the unlawful Federal Grant Condition, or

---

[1] The Federal Grant Conditions refers collectively to the HUD Grant Conditions, DOT Grant Conditions, HHS Grant Conditions, and EPA Grant Conditions as defined in Plaintiffs' Complaint.

RENNE PUBLIC LAW GROUP
Attorneys at Law

forgo millions of previously allocated federal funds. Partida Delgado Decl. ¶ 14; Dickinson Decl. ¶¶ 13–14; Moore Decl. ¶ 10. These imminent deadlines, together with others discussed below, require immediate injunctive relief.

Plaintiffs cannot comply with Defendants' vague and unauthorized conditions without exposing themselves to substantial legal liability or forgoing critical federal funding. The risk to Plaintiffs is not hypothetical—it strikes at the core of their ability to provide essential services to their communities. Because Plaintiffs are likely to succeed on the merits of their claims, face irreparable injury absent immediate relief, and seek to preserve the status quo against plainly unlawful executive overreach, Plaintiffs respectfully request this Court grant a temporary restraining order enjoining Defendants from imposing or enforcing the Federal Grant Conditions or any materially similar terms or conditions to any federal funds received by or awarded to Plaintiffs, directly or indirectly, while this case proceeds.

## II.    STATEMENT OF FACTS

### A.    Defendants Unilaterally Impose New Conditions on Federal Grant Funds

Following President Trump's inauguration, he issued a series of EOs directing executive agencies to impose new conditions on federal grants. These EOs include EO No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing), EO No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (Defending Women from Gender Ideology Extremism), EO No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity), EO No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) (Enforcing the Hyde Amendment), and Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (Improving Oversight of Federal Grantmaking). Pursuant to these EOs and other policy directives, multiple agencies, including Defendants, have revised the terms of their grant programs.[2]

In or around April 2025, HUD issued revised General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs that expressly require recipients of HUD grant funding to comply with all existing and future EOs, including those enumerated above. *See* Request for Judicial Notice ("RJN"), Ex. A, General Administrative, National,

---

[2] The conditions discussed below are representative of those imposed across various grant programs administered by Defendants. Plaintiffs' Complaint addresses additional conditions in greater detail.

RENNE PUBLIC LAW GROUP
Attorneys at Law

and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs.  HUD's revised grant policies were followed by public statements affirming the agency's commitment to the President's agenda.  On or about May 15, 2025, Defendant Turner stated that "HUD is carrying out President Trump's EOs, mission, and agenda," by "[a]lign[ing] all programs, trainings, and grant agreements with the President's EOs, removing diversity, equity, inclusion (DEI)."  RJN, Ex. B, Press Release No. 25-059, HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days.

In June 2025, HUD distributed a revised HUD-424B Assurances and Certifications form.  The HUD-424B form is a required certification document for applicants and recipients of HUD grants, including those under the Community Development Block Grant ("CDBG"), HOME Investment Partnerships Program ("HOME"), and Emergency Solutions Grants ("ESG") Program.  The revised HUD-424B form includes a new condition that was not included in the FY 2024 or FY 2025 Notices of Funding Opportunity ("NOFO") and is not authorized by the statutory provisions governing CDBG, HOME, ESG, or other HUD programs that require the form.  Specifically, the revised form requires recipients to assure that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws."  *See* RJN, Ex. C, Applicant and Recipient Assurances and Certifications (HUD-424B).  Recipients of HUD grants were already required to comply with all federal anti-discrimination laws.  The legal effect of the new DEI-related language prohibiting recipients from "prompt[ing]" DEI policies is unclear.  The apparent intended effect is to discourage recipients from adopting any policies or programs this Administration might label as "DEI."

DOT has similarly revised its grant agreements and grant assurances attached to each agreement.  The FTA, FHWA, and FAA have all incorporated language into grant conditions requiring compliance with the EOs.  *See e.g.*, RJN, Ex. D,  FTA Master Agreement (April 25, 2025), Ex. E, FHWA Competitive Grant Program General Terms and Conditions (April 22, 2025).

These new conditions obligate grantees to certify that they do not operate any DEI programs, do not "promote" "gender ideology" or "elective abortion," and are required to cooperate with federal immigration enforcement, and to acknowledge the application of certain criminal immigration enforcement statutes.  In some instances, DOT agencies have retroactively applied these new conditions

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  to grants applied for and allocated prior to the issuance of the revised policies.  For example, in May

2  2025—mid-way through FY 2025—, the FAA updated its FY2025 Grant Agreement Template to require

3  "Pursuant to Section (3)(b)(iv), Executive Order 14173, Ending Illegal Discrimination and Restoring

4  Merit-Based Opportunity" to certify "that it does not operate any programs promoting diversity, equity,

5  and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.  *See* RJN, Ex.

6  F, Federal Aviation Administration FY2025 Grant Agreement Template.  Additionally, in April 2025, the

7  FAA issued revised AIP Grant Assurances for Airport Sponsors that require sponsors to assure

8  compliance with all EOs, specifically referencing EO 14151, Ending Radical and Wasteful Government

9  DEI Programs and Preferencing, EO 14168, Defending Women from Gender Ideology Extremism and

10  Restoring Biological Truth to the Federal Government, and EO 14173, Ending Illegal Discrimination and

11  Restoring Merit-Based Opportunity.  *See* RJN, Ex. G, FAA Airport Improvement Program Grant

12  Assurance for Airport Sponsors.

13      Furthermore, the Secretary of Transportation, Sean Duffy, sent a letter to transportation agencies

14  nationwide asserting, among other things, that policies "designed to achieve so-called [DEI] goals[]

15  presumptively violate[] Federal law" and that DOT "must ensure that discrimination based on [protected

16  status] does not exist" in funded programs.  RJN, Ex. P, Letter from Sean Duffy, DOT Secretary, to All

17  Recipients of DOT Funding (April 24, 2025) ("April Duffy Letter").

18      Similarly, HHS has attached unlawful Federal Grant Conditions to its grants, including grants

19  from the Health Resources and Services Administration (HRSA), Substance Abuse and Mental Health

20  Services Administration (SAMHSA), and Centers for Disease Control and Prevention (CDC).  These

21  grants fund include health and welfare programs, 42 U.S.C. § 603 (TANF); *id*. § 623 (Title IV-B); foster

22  care and adoption assistance, *id*. § 670 (Title IV-E); social services, *id*. § 1397 (Title XX); low-income

23  primary care, *id*. 254b (Health Center Program); HIV/AIDS treatment, *id*. § 300ff (Ryan White); *id*. §

24  247c; and substance abuse and mental health treatment, *e.g.*, *id*. § 290ee-1.

25      In April 2025, HHS updated its Grants Policy Statement ("HHS GPS") to add conditions

26  implementing President Trump's EOs as to new and modified awards, including "supplements to

27  award[s] [and] competing and non-competing continuations."  RJN Ex. H, HHS Grants Policy Statement

28  at 3.  The HHS GPS requires recipients to certify "[t]hey do not, and will not during the term of this

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS

financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" and defines those terms consistent with the EOs. *Id.* at 19. Several HHS operating divisions and agencies issued requirements expressly incorporating the HHS GPS or adding similar conditions. *See, e.g.*, RJN Ex. I, SAMHSA FY2025 Standard Terms and Conditions at 2. SAMHSA also updated its NOFO Application Guide to state that "[a]ll activities proposed in your application and budget narrative must be in alignment with the current [EOs]." Ex. J, FY2025 SAMHSA NOFO Application Guide at 31. It also states that "[f]unds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens." *Id.*

HRSA issued award notices that require recipients to "compl[y] with Title IX . . . including the requirements set forth in [the Gender Ideology Order] . . . ." Lutz Decl. , Ex. A at 3. The recipient must agree these requirements are "material terms" on which payments "are predicated" and that "a knowing false statement relating to Recipient's compliance . . . may subject Recipient to liability under the [FCA] . . . and/or criminal liability." *Id.*

The EPA has attached similar unlawful conditions. For example, on April 3, 2025, EAP issued an updated General Terms and Conditions that requires recipients agree "its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]" and that "the recipient certifies that it does not operate any programs promoting Diversity, Equity and Inclusion that violate any applicable Federal anti-discrimination laws." RJN, Ex. K, EPA General Terms and Conditions.

The DOJ has likewise issued statements confirming this administration's overbroad interpretation of "DEI" that conflicts with current law. In a February 5, 2025, letter to DOJ Attorney General Pam Bondi stated that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities, characterizing such programs as discriminatory if they "divide individuals based on race or sex." The letter suggests this may include race- or gender-based affinity groups or even teaching about racial history. *See* RJN, Ex. L, Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025). A second letter from Attorney General Bondi to grant recipients, issued on July 29, 2025, purports to clarify the application of federal antidiscrimination laws to DEI programs for entities receiving federal funds. However, contrary to established legal precedent, the letter states that entities

RENNE PUBLIC LAW GROUP
Attorneys at Law

that promote DEI training programs that include discussions of inherent bias, white privilege, or toxic masculinity violate federal law.  The letter instructs entities to "[m]onitor their parties that receive federal funds to ensure ongoing compliance, including reviewing program materials." *Id.*, Ex. M, Letter from Pam Bondi, Attorney General, to all Federal Agencies (Jul. 29, 2025).  If this requirement, to condition federal funding on the content of program materials, were enforced, it would be a violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995).

Additionally, in May 2025, the Deputy Attorney General issued a letter indicating that the DOJ will invoke the FCA to pursue funding recipients engaged in what it characterizes as "civil rights fraud"—including DEI initiatives.  Along with starting an initiative to "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds," the letter states that DOJ "strongly encourages" private FCA lawsuits against funding recipients. RJN, Ex. N,  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025).

Finally, on August 7, 2025, President Trump issued another EO titled, Improving Oversight of Federal Grantmaking, requiring that discretionary grant awards "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or other "anti-American values."  Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (Improving Oversight of Federal Grantmaking).  Local government entities that distribute federal funds to subrecipients cannot condition these funds on a certification that these organizations do not "promote" so-called "anti-American values" without engaging in unconstitutional viewpoint discrimination.

**B.    Plaintiffs Confront Harm and Uncertainty Under Defendants' Unlawful Federal Grant Conditions**

Defendants' unilateral implementation of the Federal Grant Conditions has produced a patchwork of ambiguous and contradictory mandates, creating substantial confusion and liability for Plaintiffs.  To start, the EOs themselves are directed only at federal agencies and do not impose legal obligations on state or local entities.  However, many of the Federal Grant Conditions require Plaintiffs to "comply with" or "certify alignment with" all EOs, without explaining how to interpret or implement these

requirements.  The uncertainty is compounded by Defendants' failure to define key terms used in their various orders, statements, and modified grant documents.

Moreover, many of the federal grant programs that now prohibit DEI initiatives are governed by statutes that expressly emphasize equitable investment in underserved and marginalized communities. Title 42 U.S.C. § 3608(e)(5) imposes a mandatory duty on HUD to affirmatively further fair housing by identifying and remedying past patterns of segregation and discrimination.  *See N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 154–55 (1st Cir. 1987).  The Housing and Community Development Act of 1974, which established CBDG grants, provides funds appropriated for "special purpose grants" may include, among other things, grants to "historically Black colleges" and provides that the Secretary "shall" make grants to institutions of higher education "for the purpose of providing assistance to economically disadvantaged and minority students who participate in community development work study programs and are enrolled in" qualifying degree programs.  42 U.S.C. § 5307(b)–(c).  The statute establishing the EPAs Brownfields and Land Revitalization Program directs the EPA to weigh community involvement and equity considerations in awarding grants, requiring consideration of "the extent to which a grant would address or facilitate the identification and reduction of threats to the health or welfare of children, pregnant women, minority or low-income communities, or other sensitive populations."  *Id*. § 9604(k)(6)(C)(x).

Additionally, 49 C.F.R. Part 26 requires recipients of DOT funds to implement Disadvantaged Business Enterprise ("DBE") programs designed to eliminate barriers to contracting opportunities and promote the meaningful participation of socially and economically disadvantaged businesses.  Similarly, 14 C.F.R. Part 23 establishes the Airport Concession Disadvantaged Business Enterprise ("ACDBE") program, which ensures that disadvantaged business enterprises receive equitable access to airport concession contracts.  Defendants' newly imposed Federal Grant Conditions directly contradict these statutory mandates, making it impossible for local governments to comply simultaneously with both the law governing their federal grants and the current administration's Federal Grant Conditions.

Another source of confusion is the ambiguous and unexplained changes to grant documents.  For example, the updated April 2025 AIP Grant Template removes sexual orientation and gender identity from its non-discrimination clause, leaving only "creed and sex."  *See* RJN, Ex, G at §  30.  The prior

-7-

version, often incorporated into third-party AIP contracts, includes the protections for sexual orientation and gender identity.  *See* RJN, Ex. O, Federal Aviation Administration Airport Improvement Program Grant Assurance for Airport Sponsors (2022) at § 30.  This change raises questions as to whether protections that previously were required are now prohibited under the EOs.  It is also unclear, under these new assurances, whether Plaintiffs can assure contractors operating under already-executed grant and loan agreements comply with the Modified Grant Assurances.  Regardless, modifying the AIP Grant Template does not change the law, which recognizes sexual orientation and gender identity as protected categories.  *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020) (recognizing transgender as a protected category under Title VII).

These conflicts have left Plaintiffs in an impossible position, forced to choose between forgoing vital federal funding necessary to provide essential services and infrastructure or exposing themselves to significant legal liability.

These deadlines to receive many of these funds are imminent.  For example, on or around August 18, 2025, the City of Fresno received an email from HUD stating "that the Department is questioning the accuracy of the City of Fresno's certification that the Community Development Block Grant ("CDBG") funds described in its Fiscal Year 2025 Consolidated Plan/Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders."  *See* Skei Decl., Ex. A.  In the email, HUD explained that it had identified language in Fresno's 2025 Consolidated Plan/Action Plan "that is not consistent with" the EOs.  *Id.*  Specifically, HUD directed Fresno to remove or replace all references to "equity," "environmental justice," "transgender," and agree to other Federal Grant Conditions.  HUD directed Fresno to take these actions by **12:00 pm EDT Thursday, August 21, 2025**, and provided that "failure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan."

Federal grant application and award processes are continuous and often demand prompt responses to secure funding.  For example, on August 5, 2025, the City of Fresno was awarded a Brownfields and Land Revitalization RFL grant for $1,750,000.[3]  Clark Decl. ¶ 9.  For an RFL grant, the recipient

---

[3] The City had previously been awarded a $1,000,000 Brownfields RFL grant. The August 5, 20205 award was a modification that added an additional $750,000 to the grant amount.

RENNE PUBLIC LAW GROUP
Attorneys at Law

demonstrates its commitment to carry out the award by either drawing down funds within 21 days after the EPA award or amendment mailing date. Accordingly, Fresno has until **August 26, 2025**, to either accept the award and the associated unlawful Federal Grant Conditions or forgo the $1,750,000. *Id.*

Similarly, on August 14, 2025, the City of Fresno received an additional Grant Offer and Agreement letter from the FAA for an ATP grant. Partida Delgado Decl. ¶ 14. The Grant Offer included the 2025 FAA Grant Assurances, which, as discussed above, incorporate the unlawful Federal Grant Conditions, as "provisions" purportedly "applicable" to grant agreements. *Id.*, Ex. C at 64. The Grant Offer stated, "You may not make any modification to the text, terms or conditions of the grant offer," and provided that the offer will expire and the FAA will not be obligated to pay any part of the costs of the designated ATP project unless the offer has been fully executed and finalized **by August 29, 2025**. *Id.*

As set forth in the supporting declarations and in the Complaint, Plaintiffs currently rely on federal grant funding, have been allocated grant funds, have applications pending, and/or intend to seek additional grant funding. Accordingly, Plaintiffs require immediate injunctive relief to prevent the imposition and enforcement of the unlawful Federal Grant Conditions and preserve the status quo pending resolution of this action.

## III.    LEGAL STANDARD

"To obtain a preliminary injunction, a plaintiff must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[T]he legal standards applicable to TROs and preliminary injunctions are 'substantially identical.'" *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (per curiam) (quoting *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). Where "the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023).

RENNE PUBLIC LAW GROUP
Attorneys at Law

IV.  **ARGUMENT**

A.  **Plaintiffs Have Standing to Challenge the Federal Grant Conditions**

Plaintiffs have standing because they face concrete, particularized, and imminent injuries as a direct result of the unlawful Federal Grant Conditions.  To establish standing, a plaintiff must show it has suffered or will suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

Courts have repeatedly recognized that "[a] loss of funds promised under federal law satisfies Article III's standing requirement."  *City & Cnty. of San Francisco v. Trump ("San Francisco")*, 897 F.3d 1225, 1235 (9th Cir. 2018) (cleaned up); *see also Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019) ("[L]os[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III . . . ."); *Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022) ("States have standing when an allegedly unconstitutional funding offer is made to them, and they do not need to first violate a condition of an allegedly unconstitutional contract . . . .").

Here, Plaintiffs have been awarded millions of dollars in federal grant funding, including significant funds allocated for renovating and maintaining safe and functional airports.  This funding, which in many cases has already been allocated, budgeted, and spent, is now conditioned on compliance with vague and contradictory Federal Grant Conditions that were not authorized by the governing statutes and, with the exception of the most recent grant awards, were not disclosed in the relevant NOFOs.  Plaintiffs must either accept these unlawful and ambiguous conditions and the legal liability that comes with them or suffer the loss of critical federal funding that in many cases has already been awarded and budgeted for essential public projects.  This imminent harm is only redressable by declaratory and injunctive relief prohibiting Defendants from enforcing the Federal Grant Conditions against Plaintiffs.  Accordingly, Plaintiffs easily satisfy the requirements for standing.

B.  **Plaintiffs Are Likely to Succeed on the Merits**

1.  **The Federal Grant Conditions Are Unconstitutionally Vague**

Plaintiffs are likely to succeed in demonstrating that the Federal Grant Conditions violate the Fifth Amendment's vagueness doctrine by imposing opaque prohibitions that leave Plaintiffs without fair

RENNE PUBLIC LAW GROUP
Attorneys at Law

notice of their legal obligations and confer unbridled enforcement discretion on Defendants.  A government-imposed requirement is unconstitutionally vague under the Fifth Amendment if it either (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or (2) fails to "provide explicit standards for those who apply" the requirement, thereby encouraging "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). The Federal Grant Conditions fail on both counts.  Additionally, "if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981).  (emphasis added).  When determining the ambiguity of conditions on federal grants, the Court evaluates "whether [a recipient]…would clearly understand…the obligations of the [conditions]." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

The Federal Grant Conditions are vague and ambiguous in requiring recipients to "comply" with the EOs.  However, none of these EOs directly impose requirements on grant recipients.  Nor could they, as EOs bind only executive agencies, officers, and employees—not private parties or state and local governments.  Accordingly, it is nonsensical to require Plaintiffs to comply with the EOs, and unclear what requirements the Federal Grant Conditions purport to impose on grant recipients.

Moreover, the specific implementation of the EOs by Defendants employs vague language susceptible to arbitrary enforcement, forcing grant recipients to guess at what conduct is prohibited.  For example, the Federal Grant Conditions provide no guidance on what "programs promoting [DEI] initiatives" allegedly violate "Federal anti-discrimination law," nor do they define the terms "illegal DEI and DEIA policies" or explain which policies, programs, or activities fall within their scope.  While some guidance from Defendants purports to require only certification of compliance with existing federal nondiscrimination law, the EOs, statements from executive department heads, and the actual enforcement of the Federal Grant Conditions against Plaintiffs, shows Defendants are broadly interpreting the law to prohibit essentially all DEI programs, contrary to past practice and previous rulings from courts that have addressed the issue.

Further, the Federal Grant Conditions regarding immigration enforcement (which incorporate EO 14218) fail to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what activities agencies will deem to

-11-

RENNE PUBLIC LAW GROUP
Attorneys at Law

violate the prohibition.  Similarly, the immigration enforcement conditions in the DOT Agreements fail to define the terms "cooperate," "cooperating," "impeding," and "enforcement" with respect to "Federal immigration law."

Furthermore, the definition of "gender ideology" put forth in EO 14168 and adopted in the Federal Grant Conditions is idiosyncratic and embeds an ideological assertion into a regulatory definition, which risks viewpoint discrimination.  Similarly, the phrase "elective abortion" used in EO 14182 lacks any scientific or legal meaning.  The scope of both conditions is further muddied by the undefined and ambiguous term "promote," which lacks any objective standard for local entities to apply.

Each Condition thus requires a person of ordinary intelligence to guess at what is prohibited.  *See Grayned*, 408 U.S. at 108.  Conversely, this vagueness grants Defendants unchecked discretion to decide what conduct amounts to promoting DEI, gender ideology, elective abortions, or unlawful immigration. These vague conditions—set against the backdrop of threatened FCA enforcement—force recipients to self-censor by "steer[ing] far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (cleaned up).  Indeed, one court, addressing an essentially identical condition prohibiting DEI programs, held that its meaning "is left entirely to the imagination," forcing grant recipients into the "perhaps impossible position" of altering their behavior "or risk making a certification that will be deemed false . . . ." *Chicago Women in Trades v. Trump*, No. 25-cv-02005, 2025 WL 933871, at *8 (N.D. Ill. Mar. 27, 2025).  Each of these conditions suffers from the same vagueness defect.  Accordingly, Plaintiffs are likely to succeed on the merits of this claim.

### 2. The Federal Grant Conditions Violate the Separation of Powers Doctrine

"[U]nless and until Congress confers power on" them, agencies have "literally . . . no power to act . . . ." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  No statute gives Defendants the power to impose conditions on federal grants remotely approaching those at issue here.  Rather than implement Congress's will, Defendants are attempting to condition duly appropriated funds on compliance with the President's policy agenda.  But the President lacks "his own constitutional powers" to add new conditions to federal funds.  *San Francisco*, 897 F.3d at 1234 (cleaned up).  Defendants' actions therefore usurp Congress's "power of the purse" and violate bedrock separation of powers principles.  *Id.* at 1231.  The Constitution "exclusively grants the power of the purse to Congress, not the

RENNE PUBLIC LAW GROUP
Attorneys at Law

President." *Id.* Accordingly, there is no inherent executive authority to place conditions on the receipt of federal funds—any such authority must be given to the executive by the legislature. *See City of Los Angeles v. Barr*, 941 F.3d at 945 (agency grant conditions imposed without statutory authority were "ultra vires"). When Congress attaches conditions to federal funds, it must do so "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (cleaned up). Absent an express delegation of congressional authority, the President's power to impose conditions on grants "is at its lowest ebb." *San Francisco*, 897 F.3d at 1233 (cleaned up).

### a.     Congress Has Not Authorized the HUD Grant Conditions

Congress has established by statute various grant programs administered by HUD, acting through its Office of Community Planning and Development ("CPD"). Several of these programs are codified in title 42 of the U.S. Code and were created (or later reauthorized) by the Housing and Community Development Act of 1974, Pub. L. 93 383, 88 Stat. 633; the Cranston Gonzalez National Affordable Housing Act of 1990, Pub. L. 101 625, 104 Stat. 4079; the Stewart B. McKinney Homeless Assistance Act of 1987, Pub. L. 100 77, 101 Stat. 482, as amended by the HEARTH Act of 2009, Pub. L. 111 22, 123 Stat. 1663; and the AIDS Housing Opportunity Act of 1990, Pub. L. 101 625.

Section 5303 of title 42 authorizes the HUD Secretary to provide annual CDBG grants on a formula basis to states, cities, and counties to develop viable urban communities by providing housing and a suitable living environment, and by expanding economic opportunities, principally for low- and moderate-income persons. *See* 42 U.S.C. § 5303(a). CDBG recipients must, among other things, develop a consolidated plan, ensure that at least 70 percent of expenditures benefit low and moderate income residents, and comply with environmental review procedures. *See id*. § 5304.

Section 12741 authorizes the HUD Secretary to award HOME formula grants to participating jurisdictions for the purpose of increasing the number of families served with safe, sanitary, and affordable housing and expanding the long-term supply of affordable housing. *See* 42 U.S.C. § 12741. HOME imposes specific conditions on recipients, including matching fund requirements, long-term affordability periods, and a minimum 15 percent set aside for community housing development organizations ("CHDOs"). *See id*. §§ 12745, 12750, 12771.

Section 11372 authorizes the HUD Secretary to award ESG grants, which support emergency

shelter, homelessness prevention activities, and rapid rehousing to help individuals and families quickly regain stable housing.  *See* 42 U.S.C. § 11374.  Any local government receiving assistance may distribute all or a portion of such assistance to private nonprofit organizations providing assistance to homeless individuals, public housing agencies, or local redevelopment authorities.  *Id*. § 11373.

Section 12903 authorizes the HUD Secretary to allocate HOPWA funds by formula and through competitive awards to states, metropolitan areas, and nonprofit organizations to provide housing assistance and supportive services for low income persons living with HIV/AIDS and their families.  *See* 42 U.S.C. §§ 12901; 12903.  HOPWA recipients must ensure that funds primarily benefit eligible persons and comply with planning, reporting, and affordability period requirements.  *See id*. §§ 12904–12906.

None of these statutory requirements prohibits DEI initiatives, promoting "gender ideology," "elective abortions," or mandates local participation in the enforcement of federal immigration laws, or authorizes the President or the HUD Secretary to impose such conditions.

**b.    Congress Has Not Authorized the DOT Grant Conditions**

Congress has been explicit about the purposes and conditions of each DOT grant program.  For FTA programs codified in 49 U.S.C. ch. 53—including urbanized area formula grants (§ 5307), fixed guideway capital investment grants (§ 5309), state-of-good-repair grants (§ 5337), and bus and bus facility grants (§ 5339)—the statutory requirements relate to eligible transit purposes, operational capacity, long-term asset maintenance, and project performance.  None contains any restriction on DEI-related activities or any mandate to facilitate federal immigration enforcement.  Congress annually appropriates funds for these programs through legislation such as the Consolidated Appropriations Acts for fiscal years 2021 through 2024, but has never attached or authorized such conditions.

FHWA grant programs likewise are created and governed by specific statutory authorizations, including programs like Safe Streets and Roads for All (§ 24112 of the Infrastructure Investment and Jobs Act ("IIJA")) and formula programs under the Federal-Aid Highway Program (23 U.S.C. §§ 119, 133, 148, 149, 167, 175, 176), as well as specialized programs like the Bridge Investment Program (23 U.S.C. § 124), the Culvert Aquatic Organism Passage Program (49 U.S.C. § 6703), and the Advanced Transportation Technology and Innovation program (23 U.S.C. § 503(c)(4)).  The statutory criteria for these programs address transportation safety, mobility, environmental performance, and infrastructure

RENNE PUBLIC LAW GROUP
Attorneys at Law

-14-

condition—not immigration enforcement or the prohibition of DEI.  While certain notices of funding opportunity (NOFOs) for FHWA programs, such as the FY 2024 SS4A NOFO, have encouraged equity-related considerations, neither those NOFOs nor their underlying statutes authorize DOT to condition eligibility on the absence of DEI initiatives or cooperation with immigration enforcement.

FAA airport grant programs, including the Airport Improvement Program ("AIP") (49 U.S.C. ch. 471) and the Airport Infrastructure Grants ("AIG") program under the IIJA, also impose statutorily defined assurances related to safety, capacity, environmental compliance, and nondiscriminatory public use.  Congress has authorized the DOT Secretary to require certain written assurances for these grants, but has not authorized the addition of unrelated ideological or immigration-enforcement related conditions.  Reauthorization acts, such as the FAA Reauthorization Acts of 2018 and 2024, likewise do not prohibit DEI or mandate immigration-enforcement cooperation.

In sum, across all relevant operating administrations—FTA, FHWA, and FAA—Congress has been precise in defining both the purposes for which federal transportation funds may be used and the conditions recipients must meet.  Those statutory conditions are comprehensive, specific, and limited to program-related requirements.  Under the Spending Clause, only Congress may impose new conditions on the receipt of federal funds, and such conditions must be unambiguously stated and germane to the program's objectives.  *See South Dakota v. Dole ("South Dakota")*, 483 U.S. 203, 206–08 (1987). Where, as here, Congress has spoken and has not authorized the conditions now asserted through executive order, the Executive Branch lacks authority to impose them unilaterally.

### c.    Congress Has Not Authorized the HHS Grant Conditions

Congress has established by statute various grant programs administered by HHS.  *See* 42 U.S.C. §§ 247c(b)–(c) (High-Impact HIV Prevention and Surveillance Program),254b (HCP program), 300ff et seq. (RWHA program).  The High-Impact HIV Prevention and Surveillance Program, authorized under 42 U.S.C. §§ 247c(b)–(c), provides federal grants to support public health initiatives aimed at preventing and controlling HIV, with an emphasis on high-impact interventions for populations most at risk. Recipients are required by statute to report on program effectiveness to the Secretary of Health and Human Services.  The HCP Program, established under 42 U.S.C. § 254b, authorizes grants to public or private nonprofit organizations that serve medically underserved areas or populations. Recipients must

RENNE PUBLIC LAW GROUP
Attorneys at Law

provide comprehensive primary care services regardless of patients' ability to pay, maintain a patient-majority governing board, comply with federal standards for health care and administration, and submit annual reports and financial statements.  The RWHA Program, codified at 42 U.S.C. § 300ff et seq., authorizes grants to states, cities, and community-based organizations to provide core medical and support services to individuals living with HIV/AIDS who are uninsured or underinsured. Recipients must coordinate with local planning councils to identify unmet needs, develop comprehensive service plans, ensure funds do not supplant existing local resources, and report annually on expenditures, service delivery, and health outcomes.

None of these statutory requirements prohibits DEI initiatives, promoting "gender ideology," "elective abortions," or mandates local participation in the enforcement of federal immigration laws, or authorizes the President or the HHS Secretary to impose such conditions.

### d.    Congress Has Not Authorized the EAP Grant Conditions

Congress authorized the EPA to award assessment grants, cleanup grants, revolving loan fund ("RLF") grants, and job training grants.  *See* 42 U.S.C. §§ 9604(k)(2)–(6).  The RLF program (§ 9604(k)(3)) allows eligible entities to establish loan funds for cleanup activities at brownfield sites. Congress specified eligible activities and prohibited uses.  Funds may not pay penalties or fines, satisfy federal cost-share requirements, cover cleanup at sites where the recipient is a potentially responsible party under CERCLA § 107, or cover compliance costs under other federal environmental laws except those associated with cleanup.  *Id.* § 9604(k)(5)(B).  Grant and loan agreements must require compliance with all applicable federal and state laws and a 20% non-federal match unless EPA waives it for hardship. Id. § 9604(k)(10)(B).  Statutory ranking criteria require consideration of community involvement and equity, including meaningful participation in cleanup and reuse decisions and the extent to which projects address threats to sensitive populations, such as children, pregnant women, and minority or low-income communities.  *Id.* § 9604(k)(6)(C)(x).

No statute authorizes Defendants to impose restrictions on federal grants that effectively prohibit all forms of DEI initiatives, demand cooperation with immigration enforcement, ban gender inclusivity, or restrict discussions of lawful abortion.  Conversely, Congress has only specified conditions directly related to the core purposes of the programs it funds, emphasizing that such broad restrictions are

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    unwarranted and beyond Defendant's legal authority.

2         e.        **The Federal Grant Conditions Are Not Germane to the Programs at Issue**

3

4         These Federal Grant Conditions are especially problematic because they exceed even Congress'

5    power to condition federal funds.  The Spending Clause only permits Congress to impose "reasonable

6    conditions relevant to federal interest in the project and to the over-all objectives thereof."  *South Dakota*,

7    483 U.S. at 207 (cleaned up).  Accordingly, any Federal Grant Conditions must have some "nexus" with

8    the purpose of the grant funds at issue.  *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532

9    (N.D. Cal. 2017).  The same nexus requirement applies to Executive Branch–imposed conditions.  *Id*.

10        There is no nexus at all between the challenged Federal Grant Conditions and the federal interest

11   in the grant funds here.  The DEI-related condition prohibits recipients from using funds to "promote"

12   diversity, equity, and inclusion mandates, policies, or programs.  However, HUD's CDBG, HOME

13   Investment Partnerships, ESG, and HOPWA programs are designed to fund affordable housing, prevent

14   homelessness, provide community infrastructure, and deliver services to vulnerable populations—

15   activities that frequently require outreach to historically underserved communities.  The DEI condition is

16   untethered to these statutory purposes and invites enforcement based on ideological disagreement rather

17   than project compliance.  Likewise, FTA's fixed guideway capital investment, urbanized area formula,

18   state-of-good-repair, and bus facility grants, which support infrastructure projects, vehicle purchases, and

19   system maintenance, have no connection to limitations on DEI-related expenditures.  The same is true for

20   FHWA's roadway safety, bridge repair, aquatic ecosystem restoration, and transportation technology

21   programs, and FAA's airport improvement and infrastructure grants; the DEI restriction bears no

22   relationship to engineering, safety, environmental, or aviation objectives.  Similarly, the HHS grants,

23   which are intended to support public health programs and services, and the EPA grants, which are

24   intended to fund environmental protection and remediation efforts, have no nexus to the DEI conditions.

25        The Federal Grant Conditions related to immigration enforcement, which prohibit subsidizing or

26   promoting illegal immigration or supporting sanctuary policies, are equally unrelated to these grant

27   programs.  HUD's housing programs have no statutory mandate to enforce immigration laws, and

28   immigration policy has no bearing on the delivery of housing or infrastructure projects.  The absence of

RENNE PUBLIC LAW GROUP
Attorneys at Law

-17-

any nexus is even more apparent with FTA, FHWA, and FAA grants, whose purposes are to construct, maintain, and improve transit, highway, and aviation systems.  As *Cnty. of Santa Clara v. Trump* held, immigration enforcement has no connection to programs focused on transportation, health, or housing. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 532.

Neither the HHS grants nor the EPA grants have any relation to the immigration conditions, either. HHS grants are designed to fund health care, social services, and public health initiatives, while EPA grants support environmental protection, remediation, and infrastructure for clean air, water, and land. These statutory purposes are wholly distinct from immigration enforcement, and nothing in the governing statutes suggests that Congress intended to condition health or environmental funding on immigration policy compliance.

The Federal Grant Condition that bars the use of funds to promote "gender ideology" as defined in E.O. 14168 is also unrelated to the grants at issue.  HUD's housing programs are tasked with meeting fair housing obligations, preventing homelessness, and addressing community needs; this ideological restriction has nothing to do with the provision of shelter or compliance with the Fair Housing Act. Transportation and aviation programs are concerned with building and maintaining infrastructure, not regulating gender identity policy.  Similarly, the prohibition on using grant funds to fund or promote "elective abortions," as set out in E.O. 14182, is entirely unrelated to the purposes of the federal grant programs at issue.  Across all programs, the Federal Grant Conditions are unconnected to the purposes of the federal programs and instead impose broad social policy restrictions divorced from the statutory objectives Congress enacted.  Their enforcement would exceed even Congress's conditional spending authority, let alone the Executive's.

### f.    The Federal Grant Conditions Violate the Tenth Amendment

The Immigration Enforcement Condition also violates the Tenth Amendment because it imposes a coercive condition intended to commandeer local officials into enforcing federal immigration practices and law.  The Tenth Amendment prohibits the federal government from "commandeering" state and local officials to help enforce federal law.  *See Printz v. United States*, 521 U.S. 898 (1997).  The Ninth Circuit has held that forcing state and local governments to assist with federal immigration enforcement would violate the Tenth Amendment.  *United States v. California*, 921 F.3d 865, 888–91 (9th Cir. 2019).  And

-18-

the federal government cannot do indirectly through coercive grant conditions what it could not do

directly. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). Yet that is exactly what

Defendants are doing—holding a gun to recipients' heads to force them to use local resources to

cooperate with federal officials in enforcing immigration law. *See id*. at 581. Accordingly, just as the

Immigration Enforcement Condition is impermissibly coercive under the Spending Clause, it also

violates the Tenth Amendment's anti-commandeering principles. *Religious Sisters of Mercy v. Azar*, 513

F. Supp. 3d 1113, 1151 (D.N.D. 2021) ("The Spending Clause's coercion backstop is closely linked to

the Tenth Amendment concept that the federal government may not commandeer the states to enact or

administer a federal regulatory program" (cleaned up)).

### 3. The Federal Grant Conditions Violate the APA

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and

"capricious," "not in accordance with law," "contrary to constitutional right," "in excess of statutory

jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2). Plaintiffs are

likely to prevail in showing that Defendants' imposition of the unlawful Federal Grant Conditions

violates each of these requirements.

### a. Imposing the Federal Grant Conditions is a Final Agency Action

As a threshold matter, imposing new conditions on recipients is a "final agency action" subject to

review under the APA. *See* 5 U.S.C. § 704. Final agency actions "mark the consummation of the

agency's decisionmaking process" and are those "by which rights or obligations have been determined,

or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned

up). As several courts have held in similar cases, the decision to impose new conditions on federal grants

satisfies both tests because it "articulate[s] that certain funds" will "require adherence to the" new

conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds

if the recipient declines to accept the conditions. *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015,

1031–32 (N.D. Cal. 2018); *see also Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health &*

*Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).

### b. The Federal Grant Conditions Are in Excess of Statutory Jurisdiction

As discussed above, the Federal Grant Conditions are "in excess of statutory jurisdiction," "not in

-19-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   accordance with law," and "contrary to constitutional right," because Congress has not authorized

2   Defendants to impose the Federal Grant Conditions and they do not derive from a previous congressional

3   delegation of authority.  *See* Section IV(B)(2).

4        In reversing longstanding policies without explanation, Defendants failed to observe the

5   procedure required by law.  *See* 5 U.S.C. § 706(2)(D); *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495

6   U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own

7   regulations").  HUD, DOT, and its operating administrations have adopted regulations requiring those

8   agencies to proceed by notice-and-comment rulemaking for certain matters.  *See* 24 C.F.R. § 10.1 ("It is

9   the policy of [HUD] to provide for public participation in rulemaking with respect to all HUD programs

10  and functions, including matters that relate to . . . grants . . . ."); 49 C.F.R. § 601.22(a) (FTA regulations);

11  14 C.F.R. Part 11 (FAA).  FTA is also subject to statutory notice-and-comment requirements for certain

12  conditions pertaining to the FTA grants.  *See* 49 U.S.C. § 5334(k)(1) (FTA Administrator must "follow

13  applicable rulemaking procedures under [5 U.S.C. § 553, the APA's notice-and-comment requirement]

14  before [FTA] issues a statement that imposes a binding obligation on recipients of Federal assistance

15  under this chapter"); *id.* § 5334(k)(2) (defining "binding obligation" as "a substantive policy statement,

16  rule, or guidance document issued by [FTA] that grants rights, imposes obligations, produces significant

17  effects on private interests, or effects a significant change in existing policy").

18       Here, the Federal Grant Conditions purport to impose binding obligations that substantively

19  change existing law and policies, including existing federal nondiscrimination laws (Title VI),

20  immigration verification requirements (PRWORA), gender identity regulations (24 C.F.R. § 5.106

21  (mandating equal access to CPD programs in accordance with gender identity)), and abortion (Hyde

22  Amendment).  *See, e.g.*, *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994)

23  ("Substantive rules . . . create rights, impose obligations, or effect a change in existing law pursuant to

24  authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (a rule is

25  substantive, i.e., "legislative," inter alia, if there is no "adequate legislative basis for enforcement action"

26  without the rule, or if the rule "effectively amends a prior legislative rule").  However, Defendants failed

27  to comply with the notice-and-comment requirements set forth in their own regulations and in 49 U.S.C.

28  § 5334(k)(1) when they imposed the new Federal Grant Conditions.

1

RENNE PUBLIC LAW GROUP
Attorneys at Law

**c.     The Federal Grant Conditions are Arbitrary and Capricious**

Furthermore, the Federal Grant Conditions are arbitrary and capricious because they fail the basic requirement that agency action be "reasonable and reasonably explained." *Ohio v. En'v't Prot. Agency*, 603 U.S. 279, 292 (2024) (cleaned up).  To satisfy this requirement, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor simply ignore "an important aspect of the problem . . . ."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. ("State Farm")*, 463 U.S. 29, 43 (1983).  While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Here, Defendants have not satisfied any of these requirements.

First, "an agency must defend its actions based on the reasons it gave when it acted, not with post hoc rationalizations." *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) (cleaned up).  Here, as discussed, Defendants neither followed required notice-and-comment procedures nor contemporaneously articulated reasons for imposing the new Federal Grant Conditions.  Even taking at face value the after-the-fact explanations scattered through various administration communications, they do not supply a reasoned, non-arbitrary basis for the Federal Grant Conditions.

As to the Federal Grant Conditions related to immigration enforcement, HUD Secretary Scott Turner stated that the President ordered the changes, describing the Secretary's "responsibility to effectively implement" EO 14173 and promising senior leadership review to "ensure that HUD programs are compliant" with that order.  *See* U.S. Dep't of Hous. & Urban Dev., Letter to Grantees and Stakeholders (Apr. 4, 2025), https://www.hud.gov/sites/dfiles/PA/documents/2025-04-04-HUD-Grantee-and-Stakeholder-Letter.pdf.  "[A]n executive order," however, "is not 'law,'" *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023), and agency compliance with such an order does not exempt it from the APA's requirements of "reasoning, deliberation, and process," nor permit "flip-flop[s]" "on the whims of each new administration." *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020).  Invoking a presidential directive does not relieve an agency of its duty to grapple with "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including defining critical terms,

-21-

assessing statutory authority, addressing programmatic impacts, and considering reliance interests.  The Turner Letter does none of this.

Similarly, HUD's Gender Ideology condition is unexplained in light of the Department's own binding regulations, which mandate "[e]qual access" to covered programs according to participants' self-identified gender.  24 C.F.R. § 5.106(b)–(c).  Neither the Turner Letter nor HUD's April 2025 press release addresses this conflict or offers a policy justification for discarding the prior interpretation.

The communications from DOT's Secretary, Sean Duffy, do not fare any better.  Duffy's April 24 letter asserts that policies "designed to achieve so-called [DEI] goals[] presumptively violate[] Federal law" and that DOT "must ensure that discrimination based on [protected status] does not exist" in funded programs.  RJN, Ex. P, April Duffy Letter.  However, that statement is not a reasoned explanation for what the Federal Grant Conditions actually impose, that recipients certify they do not operate any DEI program that DOT deems impermissible—federally funded or not.  The Duffy Letter also does not acknowledge, much less explain, its departure from several court decisions holding that affinity groups and other DEI programs premised on racial, gender, or other classifications and open to all comply with equal protection and federal nondiscrimination law.  *See, e.g., Diemert v. City of Seattle*, No. 2:22-cv-1640, 2025 WL 446753, at *17–18 (W.D. Wash. Feb. 10, 2025) (affinity groups "open to any City employee" did not violate equal protection); *cf. Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540–41 (7th Cir. 2005) (recognition of affinity groups based on common social identity did not violate Title VII).

None of these communications provides the kind of contemporaneous, evidence-based reasoning the APA demands.  They do not show that the agencies "considered the relevant factors" or "articulated a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43; *see also Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (explaining that the requirement of reasoned decisionmaking ensures agencies provide genuine justifications subject to judicial and public scrutiny, and that accepting contrived reasons would render judicial review an "empty ritual").  Instead, they reflect bare assertions of presidential direction or political preference, untethered to statutory authority or the agencies' missions, and are therefore arbitrary and capricious.  Plaintiffs are likely to succeed in establishing that attaching the Federal Grant Conditions exceeded the agencies' statutory jurisdiction, violated the Constitution, was arbitrary and capricious, and failed, when required, to observe required

RENNE PUBLIC LAW GROUP
Attorneys at Law

procedure in violation of the APA.

 **4. Courts Have Found Similarly Situated Plaintiffs Are Likely to Succeed on the Merits and Have Enjoined Application of the Federal Grant Conditions**

 Since President Trump issued the EOs directing federal agencies to impose new conditions on grant funding and terminate funding for noncompliance, numerous plaintiffs, including states, cities, and nonprofit organizations, have filed lawsuits seeking to enjoin the implementation of these directives. Courts across the country have granted temporary restraining orders and preliminary injunctions to halt enforcement of these unlawful conditions while litigation proceeds. *See, e.g,. Chicago Women in Trades v. Trump*, No. 25-C-2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025); No. 25-cv-02005, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025); *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025), opinion clarified, No. 25-CV-01350-WHO, 2025 WL 1358492 (N.D. Cal. May 9, 2025); *S. Educ. Found. v. United States Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3, 2025); No. 2:25-CV-814, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025).

 The plaintiffs in these cases, like Plaintiffs here, are recipients of federal grant funds who rely on those funds to carry out public programs and services, and who are now faced with the threat of defunding or vague compliance requirements imposed without statutory authorization. Because courts in each of these cases found that such plaintiffs were likely to succeed on the merits of those claims, it is likewise likely that Plaintiffs here—who raise the same core legal theories—are also likely to prevail.

 **C. Plaintiffs Will Suffer Irreparable Harm If the Conditions Are Not Enjoined**

 Plaintiffs are being compelled to agree to vague, ambiguous, and unlawful conditions at the risk of incurring financial penalties, or giving up funds they were already awarded and, in many cases, accounted for in budget and project planning. Loss of those funds at issue would result in immediate, irreparable, and reverberating harms to Plaintiffs—including upending their budgets and forcing Plaintiffs to divert resources from other public services. Furthermore, Plaintiffs are facing a series of imminent deadlines requiring them to either accept the unlawful federal grant conditions or forgo

RENNE PUBLIC LAW GROUP
Attorneys at Law

-23-

1   millions of dollars in federal funding, thereby necessitating immediate injunctive relief.

2          For example, the City of Fresno was given just 3 days' notice to remove all references to

3   "equity," "environmental justice," and "transgender" from its CDBG grant application and to provide

4   multiple assurances including that "[t]he City of Fresno shall not use grant funds to promote 'gender

5   ideology,' as defined in Executive Order 14168, Defending Women from Gender Ideology Extremism

6   and Restoring Biological Truth to the Federal Government" by **August 21, 2025**, or risk losing out on

7   critical federal funding.  Skei Decl. ¶ 13.  Additionally, Fresno must also execute an FAA grant

8   agreement by **August 29, 2025**, and a Brownfields and Land Revitalization revolving loan fund grant

9   agreement by **August 26, 2025**.  Partida Delgado Decl. ¶ 14; Clark Decl. ¶ 9.

10         Similarly, the City of St. Paul must finalize its Innovative Finance and Asset Concession

11  ("IFAC") grant agreement by **September 3, 2025**.  Monroe County is subject to multiple FAA grant

12  agreement deadlines on **August 27, 28, and 29, 2025** (Moore Decl. ¶ 10), while the City of South Lake

13  Tahoe must execute its FAA grant agreement by September 16, 2025.  Dickinson Decl. ¶ 13–14.  These

14  impending deadlines force Plaintiffs into the unconstitutional choice of surrendering their rights or losing

15  vital federal funding streams, underscoring the need for immediate injunctive relief.

16         Additionally, FAA's fiscal year ends on **September 30, 2025**.  If the FAA does not issue

17  reimbursements for grant funds already allocated and awarded pursuant to the EOs and Federal Grant

18  Conditions, Plaintiffs stand to lose out on millions of dollars in federal funding that has already been

19  spent in reliance on the availability of reimbursement.  Partida Delgado Decl. ¶ 7–10.  The timing of this

20  deadline thus places Plaintiffs in an untenable position of either submitting to unlawful conditions or

21  facing severe financial harm from the loss of funds critical to their ongoing airport operations.

22         Transportation projects require years of planning and, often, years to complete.  Without

23  injunctive relief, Plaintiffs will need to divert resources from other projects to compensate or plan around

24  the uncertainty of whether they can accept federal funds, straining their resources and putting other

25  projects in jeopardy.  *See, e.g.*, Barfield Decl. ¶ 10; Darrow Decl. ¶ 16–17.  Without these funds, planned

26  projects may become too expensive to undertake, requiring them to be modified or cancelled.  *See, e.g.*,

27  Barfield Decl. ¶ 10; Darrow ¶ 16–17.  As a result of potential loss and uncertainty surrounding these

28  grants, Plaintiffs will face dire consequences for their transportation infrastructure and resident safety.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-24-

For example, without prompt access to the previously allocated FAA funds to which these unlawful conditions have been attached, Fresno would need to cancel major aspects of the planned rehabilitation of its airport, which is already underway, including the construction of a new air traffic control tower.

### D. The Balance of Equities Weighs in Plaintiffs' Favor, and a Preliminary Injunction Is in the Public Interest

The equities and public interest, which merge when the government is a party, tip sharply in Plaintiffs' favor. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). Plaintiffs face immediate and irreparable harm from the enforcement of grant conditions that threaten vital funding for public programs and services. By contrast, the federal government's interest in imposing these new conditions before the legality of its actions has been adjudicated is minimal. Preserving Plaintiffs' constitutional rights, and preventing the government from enforcing potentially unlawful conditions, clearly serves the public interest. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up).

Whatever interest the Executive may have in introducing new grant conditions at this stage of the grant cycle, and in enforcing them during the pendency of this litigation, that interest pales in comparison to the constitutional and programmatic harms Plaintiffs will suffer if forced to either sign assurances to comply with vague and likely unlawful conditions or forgo federal funding for essential services. As the Ninth Circuit has recognized, "[b]y establishing a likelihood that [the government's] policy violates the U.S. Constitution," Plaintiffs have also "established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Accordingly, the balance of equities and the public interest decisively support interim relief here.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order enjoining Defendants from imposing or enforcing the Federal Grant Conditions or any materially similar terms or conditions to any federal funds received by or awarded to Plaintiffs, directly or indirectly. Immediate relief is necessary to preserve the status quo, prevent irreparable harm to Plaintiffs and their residents, and uphold the constitutional and statutory limits on executive authority.

RENNE PUBLIC LAW GROUP
Attorneys at Law

Dated:  August 21, 2025

RENNE PUBLIC LAW GROUP

By:    /s/ Jonathan V. Holtzman
    JONATHAN V. HOLTZMAN

Attorneys for Plaintiffs
City of Fresno; City of Eureka; City of South
Lake Tahoe; County of Sacramento; County of
Monroe; and Monroe County Airport Authority

Dated:  August 21, 2025

SAINT PAUL CITY ATTORNEY'S OFFICE

By:    /s/ Lyndsey Olson
    LYNDSEY OLSON *
    KELSEY MCELVEEN *
    * Application for admission pro hac vice
    forthcoming

Attorneys for Plaintiff
City of Saint Paul

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS

RENNE PUBLIC LAW GROUP
Attorneys at Law

1

**ECF ATTESTATION**

2

I, JONATHAN V. HOLTZMAN, am the ECF user whose identification and password are being

3

used to file this PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

4

MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A

5

PRELIMINARY INJUNCTION. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other

6

above-named signatories concur in this filing.

7

8

Dated:  August 21, 2025                                                RENNE PUBLIC LAW GROUP

9

10

By: _____ */s/ Jonathan V. Holtzman* _____

11

JONATHAN V. HOLTZMAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION CASE NO. 3:25-cv-07070-RS