

EXHIBIT D

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

**For Federal Transit Administration Agreements authorized by**
**49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by**
**the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface**
**Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act**
**(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy**
**for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other**
**federal laws that FTA administers.**

**FTA MA(33)**
**April 25, 2025**

http://www.transit.dot.gov

# TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Preface ............................................................................................................................... 1

   Statutory Authorities ....................................................................................................... 1

   Purpose of this Master Agreement ................................................................................. 1

Generally Applicable Provisions ........................................................................................ 3

     Section 1.      Terms of this Master Agreement and Compliance. .................................. 3

     Section 2.      Definitions. ............................................................................................... 4

     Section 3.      Implementation. ..................................................................................... 12

     Section 4.      Ethics, Political Activity, Disqualification, and Certain Criminal Activity. ............... 19

     Section 5.      Federal Assistance. ................................................................................ 27

     Section 6.      Non-Federal Share. ................................................................................ 28

     Section 7.      Payments to the Recipient. .................................................................... 30

     Section 8.      Records and Reports Related to the Award and the Underlying Agreement. ............ 41

     Section 9.      Record Retention and Access to Sites of Performance. ......................... 47

     Section 10.     Completion, Audit, Settlement, and Closeout. ....................................... 48

     Section 11.     Right of the Federal Government to Terminate. ..................................... 50

     Section 12.     Civil Rights. ........................................................................................... 51

     Section 13.     Planning. ................................................................................................ 59

     Section 14.     Private Enterprise. ................................................................................. 60

     Section 15.     Preference for United States Products and Services. ............................. 61

     Section 16.     Procurement. .......................................................................................... 62

     Section 17.     Patent Rights. ......................................................................................... 68

     Section 18.     Rights in Data and Copyrights. .............................................................. 69

     Section 19.     Use of Real Property, Equipment, and Supplies. ................................... 72

     Section 20.     Transit Asset Management. .................................................................... 77

     Section 21.     Insurance. ............................................................................................... 77

     Section 22.     Relocation and Real Property. ................................................................ 78

     Section 23.     Construction. .......................................................................................... 79

     Section 24.     Employee Protections. ........................................................................... 80

     Section 25.     Early Systems Work Agreement. ............................................................ 82

     Section 26.     Environmental Protections. .................................................................... 84

     Section 27.     State Management and Monitoring Systems. .......................................... 87

     Section 28.     Charter Service. ..................................................................................... 87

Section 29.    School Bus Operations. .................................................................................. 88

Section 30.    Geographic Information and Related Spatial Data. ..................................... 88

Section 31.    Federal "$1 Coin" Requirements. ............................................................... 89

Section 32.    Public Transportation Safety. ..................................................................... 89

Section 33.    Motor Carrier Safety. .................................................................................. 89

Section 34.    Safe Operation of Motor Vehicles. ............................................................ 90

Section 35.    Substance Abuse. ........................................................................................ 91

Section 36.    Protection of Sensitive Security and Other Sensitive Information. ............ 92

Section 37.    Special Notification Requirements for States. ............................................ 92

Section 38.    Freedom of Information. .............................................................................. 93

Section 39.    Disputes, Breaches, Defaults, and Litigation. ............................................ 94

Section 40.    Amendments to the Underlying Agreement. ............................................... 95

Section 41.    FTA's Transit Award Management System (TrAMS). ................................ 95

Section 42.    Information Obtained through Internet Links. ............................................ 96

Section 43.    Severability. ................................................................................................ 96

Special Provisions for Specific Programs ................................................................................ 97

Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs. ....................................................................... 97

Section 45.    Special Provisions for the State Safety Oversight Grant Program. ............. 99

Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program. ......... 99

Section 47.    Special Provisions for the TIFIA and RRIF Programs. .............................. 100

Section 48.    Special Provisions for the Joint FTA–FRA Program. ................................ 101

Appendix A Tribal Transit Program—Applicable Provisions ................................................ 103

## UNITED STATES DEPARTMENT OF TRANSPORTATION
## FEDERAL TRANSIT ADMINISTRATION

## MASTER AGREEMENT

## PREFACE

### Statutory Authorities

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)    Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

    (1)    The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

    (2)    The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

    (3)    The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

    (4)    The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)    Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)    Title 23, United States Code (Highways).

(d)    Other federal legislation that FTA administers, as FTA so determines.

### Purpose of this Master Agreement

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

(a)    FTA Grant Agreement, including an FTA Grant Agreement for an award of federal assistance under the Tribal Transit Program;

(b)    FTA Cooperative Agreement; or

(c)    Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of Credit, Master Credit Agreement for a Project overseen by FTA, or State Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein, FTA and the Recipient agree as follows:

## GENERALLY APPLICABLE PROVISIONS

**Section 1.    Terms of this Master Agreement and Compliance.**

(a)    The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)    To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)    FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)    FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

    (1)    FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

    (2)    This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

    (3)    Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)    As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

3

(f)     Each provision of this Master Agreement must be interpreted in context with all other provisions of this Master Agreement and the Underlying Agreement. If a single provision is read apart from the rest of this Master Agreement or the Underlying Agreement, that provision might not convey the extent of the Recipient's responsibility to comply with the requirements of this Master Agreement and the Underlying Agreement.

(g)     This Master Agreement does not have an Expiration Date. This Master Agreement continues to apply to the Recipient and its Underlying Agreement, until modified or superseded by a more recently enacted or issued applicable federal law, regulation, requirement, or guidance, or Amendment to this Master Agreement or the Underlying Agreement.

**Section 2.     Definitions.**

(a)     *List of Definitions*. In addition to the definitions provided in 49 U.S.C. § 5302, as amended, or in previous legislation if circumstances may require, the Recipient agrees that the following definitions apply:

(1)     *Application* means the request for federal assistance submitted that is signed and dated by the Applicant or an official authorized to act on the behalf of the Applicant, and includes all explanatory, supporting, and supplementary documents filed with FTA by or on behalf of the Applicant, and has been reviewed by FTA staff and addresses FTA's comments and concerns. An application for federal assistance in the form of a Grant or Cooperative Agreement must be submitted in FTA's Transit Award Management System (TrAMS).

(2)     *Approval*, unless FTA determines otherwise in writing, means a written statement of an authorized federal official transmitted electronically or in typewritten hard copy expressly permitting the Recipient to take or omit an action in connection with its Underlying Agreement, and signed by a federal official authorized to permit the Recipient to take or omit an action that may not be taken or omitted without the Federal Government's permission. Approval does not mean permission to take or omit a similar action other than the specific action for which approval was given and does not include an oral permission or interpretation, which has no legal force, authority, or effect. For purposes of this Master Agreement, the definition of "approval" also applies to "concurrence" and "waiver."

(3)     *Associated Transit Improvement* means, with respect to a Project or an area to be served by a Project, an activity that is designed to enhance transit service or use and that is physically or functionally related to transit facilities.

4

(4)     *Award* means the Scope of Work that FTA has approved when FTA agreed to provide federal assistance. The Award also includes the requirements of all documents, terms, and conditions incorporated by reference and made part of the Underlying Agreement, which may be a Grant or Cooperative Agreement.

(5)     *Award Budget* [formerly, *Approved Project Budget*] means the budget for all the Projects encompassed by the FTA Award. In contrast, Project Budget means the budget allocated for a single Project contained within an Award that FTA or a pass-through entity approves during the federal award process or in subsequent amendments to the FTA Award. It may include the federal and non-federal share or only the federal share, as determined by FTA or the pass-through entity. For legal and other purposes, FTA reserves the right to consider information other than that displayed electronically or on paper in the "Award Budget" to determine the scope of the Award, eligible Project activities, and other terms used in connection with the Award.

(6)     *Common Rules* means any one or more of the following:

   (i)     U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, which incorporates by reference U.S. Office of Management and Budget (OMB) regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200;

   (ii)    U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," former 49 CFR Part 18; and

   (iii)   U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-profit Organizations," former 49 CFR Part 19.

(7)     *Concurrence* has the same meaning as the definition of Approval in this section of this Master Agreement.

(8)     *Cooperative Agreement* means an instrument that the Federal Government uses to award federal assistance to the Recipient to support each specific Project and related activities described in the Underlying Agreement in which, consistent with 31 U.S.C. § 6305, the Federal Government takes an active role and retains substantial control. An FTA Cooperative Agreement consists of three parts:

    (i)    The FTA Award, consisting of the amount of federal assistance FTA is providing to support each specific Project and related activities, and a description of each Project as set forth in the Application submitted to FTA in TrAMS or on paper if permitted;

    (ii)    The Terms and Conditions incorporated by reference and made part of the Cooperative Agreement consisting of the following documents, irrespective of whether electronic or in typewritten hard copy, including:

        (A)    The most recent Federal Transit Administration Master Agreement, which applies to this Cooperative Agreement;

        (B)    The current Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA; and

        (C)    Any Award notification containing special conditions or requirements if issued; and

    (iii)    The Execution of the Cooperative Agreement by the Recipient.

(9)    *Designated Recipient* means an entity designated, in accordance with the planning process under 49 U.S.C. §§ 5303 and 5304, by the governor of a state, responsible local officials, and publicly owned operators of public transportation, to receive and apportion amounts under 49 U.S.C. § 5336 to urbanized areas of 200,000 or more in population; or a state or regional authority, if the authority is responsible under the laws of a state for a Capital Project and for financing and directly providing public transportation.

(10)    *Disability* has the same meaning as in section 3(1) of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12102.

(11)    *Federal Assistance* means a type of federal funding that the Recipient receives through the Underlying Agreement.

(12)    *Federal Award Identification Number* has the same meaning as "Project No." in previous Grant Agreements and Cooperative Agreements with FTA.

(13)    *Federal Government* means the United States of America and any of its executive departments or agencies.

(14)    *Federal Guidance* includes any federal document or publication signed by an authorized federal official providing official instructions or advice about a federal program that is not defined as a "federal requirement" and applies to

6

entities other than the Federal Government. Federal Guidance also may apply to the Federal Government, and may take the form of a:

(i)     Federal directive;

(ii)    Federal circular;

(iii)   Federal order;

(iv)    Federal published policy;

(v)     Federal administrative practice;

(vi)    Federal guideline;

(vii)   Federal guidance document;

(viii)  Letter signed by an authorized federal official; or

(ix)    Similar document.

(15)  *Federal Requirement* means:

(i)     An applicable federal law, regulation, or executive order;

(ii)    An applicable provision of the Underlying Agreement, including any Special Condition, Requirement, Provision, or Condition of Award;

(iii)   This Master Agreement;

(iv)    A later Master Agreement after FTA and the Recipient have entered into the Underlying Agreement; or

(v)     Another applicable federal mandate.

(16)  *Federal Transit Administration (FTA)* is an operating administration of the Department of Transportation (U.S. DOT). Any reference to the "Urban Mass Transportation Administration" (also referred to as "UMTA") refers to the "Federal Transit Administration" or "FTA" when appearing in any records of the United States.

(17)  *Federal Transit Administrator* is the head of the Federal Transit Administration.

(18)  *Federally Recognized Indian Tribe* means an Indian tribe that is federally recognized by the Bureau of Indian Affairs of the U.S. Department of the

Interior in accordance with the provisions of the Federally Recognized Indian Tribe List Act of 1994, as amended, 25 U.S.C. § 5130.

(19)  *Fiscal Year*, as used in this Master Agreement, means "federal fiscal year," which begins on October 1 of each calendar year and ends on September 30 of the next calendar year.

(20)  *Governor* means the governor of a state, the mayor of the District of Columbia, or the chief executive officer of a territory of the United States and includes the designee thereof.

(21)  *Grant Agreement* means a legal instrument that the Federal Government uses to award federal assistance to the Recipient to support each specific Project and related activities described in the Underlying Agreement in which, consistent with 31 U.S.C. § 6304, the Federal Government does not take an active role and does not retain substantial control. An FTA Grant Agreement consists of three parts:

    (i)  The FTA Award, consisting of the amount of federal assistance FTA is providing to support each specific Project and related activities, and a description of each Project as set forth in the Application submitted to FTA in TrAMS or on paper if permitted;

    (ii)  The Terms and Conditions incorporated by reference and made part of the Grant Agreement consisting of the following documents, irrespective of whether electronic or in typewritten hard copy, including:

        (A)  The most recent "Federal Transit Administration Master Agreement, which applies to this Grant Agreement;

        (B)  The current Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA; and

        (C)  Any Award notification containing special conditions or requirements if issued; and

    (iii)  The Execution of the Grant Agreement by the Recipient.

(22)  *Indian Tribe* means the Recipient or Subrecipient that receives "Tribal Transit Program" assistance authorized by 49 U.S.C. § 5311(c)(1) to support its Underlying Agreement.

(23)   *Internal Controls* means a process, implemented by a Recipient or Subrecipient, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) effectiveness and efficiency of operations, (b) reliability of reporting for internal and external use, and (c) compliance with applicable laws, regulations, and requirements.

(24)   *Local Government Authority* includes (a) a political subdivision of a state; (b) an authority of at least one state or political subdivision of a state; (c) an Indian tribe; and (d) a public corporation, board, or commission established under the laws of a state.

(25)   *Low-Income Individual*, for purposes of 49 U.S.C. § 5311(j)(1)(A)(iii), means an individual whose family income is at or below 100 percent of the poverty line, as that term is defined in section 673(2) of the Community Services Block Grant Act, 42 U.S.C. § 9902(2), including any revision required under that section, for a family of the size involved.

(26)   *Master Credit Agreement* means a conditional agreement to extend one or more loans to a Recipient under the Transportation Infrastructure Finance and Innovation Act (TIFIA) of 1998, as amended, 23 U.S.C. §§ 601 – 609, or the Railroad Rehabilitation and Improvement Financing (RRIF) program, 45 U.S.C. §§ 821 – 823, and also means the type of Underlying Agreement used for the TIFIA or RRIF loans.

(27)   *Non-Federal Funds* or *Non-Federal Share* includes the following sources of funding or in-kind property or services used to match the federal assistance awarded for the Grant or Cooperative Agreement:

   (i)     Local funds;

   (ii)    Local in-kind property or services;

   (iii)   State funds;

   (iv)    State in-kind property or services;

   (v)     Other federal funds for which the federal statute authorizing a program specifically provides that federal funds made available for that program can be applied to the cost sharing requirements of other federal programs.

(28)   *Non-Tribal Service Provider*, for purposes of 49 U.S.C. § 5311(j)(2), means a non-tribal provider of public transportation that connects residents of tribal

lands with surrounding communities, improves access to employment or healthcare, or otherwise addresses the mobility needs of tribal members.

(29)   *Project* means the public transportation improvement activities eligible for federal assistance in an application to FTA and/or in an FTA Award.

(30)   *Public Transportation*, has the same meaning as "transit" or "mass transportation," and, consistent with the definition at 49 U.S.C. § 5302, means regular, continuing shared- ride surface transportation services that are open to the general public, or open to a segment of the general public defined by age, disability, or low income, but does not include:

  (i)    Intercity passenger rail transportation provided by Amtrak or a successor thereof as described in 49 U.S.C. chapter 243;

  (ii)   Intercity bus service;

  (iii)  Charter service;

  (iv)   School bus service;

  (v)    Sightseeing service;

  (vi)   Courtesy shuttle service for patrons of one or more specific establishments; or

  (vii)  Intra-terminal or intra-facility shuttle services.

(31)   *Recipient* or *Direct Recipient* means a non-federal entity that receives a federal award directly from a federal awarding agency to carry out an activity under a federal program. The term "Recipient" does not include a Subrecipient.

(32)   *Scope of Work* means the purpose of the Grant Agreement or Cooperative Agreement and the activities and approaches required to carry out a Project. The scope of work consists of various components, including the Award Budget, beneficiaries, locations, and other aspects identified in the approved application. FTA reserves the right to consider other information in determining the scope of the Project or the "scope of work of a Grant Agreement or Cooperative Agreement" when "scope" is used for other purposes. See the latest edition of the FTA Master Agreement.

(33)   *Split Letter* (sometimes referred to as a suballocation letter or government subapportionment letter) means a letter in which a Designated Recipient of Urbanized Area Formula Grant Program funding authorized by 49 U.S.C.

§ 5307, a Designated Recipient of Formula Grants for Enhanced Mobility of Seniors and Individuals with Disabilities authorized by 49 U.S.C. § 5310, a Designated Recipient of the State of Good Repair Formula Grants, 49 U.S.C. § 5337, agrees to a reassignment or reallocation of that federal assistance to one or more direct Recipients.

(34)    *Subagreement* or *Subgrant* means an agreement through which the Recipient awards federal assistance to its Subrecipient(s) to support or stimulate any of the Recipient's or Subrecipient's Projects or related activities supported under the Award, the accompanying Underlying Agreement, or Amendments thereto, but does not include a third party contract, third party subcontract, or lease.

(35)    *Subrecipient* or *Subgrantee* means any entity or person that receives federal assistance provided by an FTA Recipient instead of FTA directly, but does not include a Third Party Contractor, Third Party Subcontractor, or Lessee.

(36)    *Third Party Agreement* includes agreements or arrangements supported in whole or in part with federal assistance awarded to a Recipient by FTA, including a subagreement with a subrecipient, a third party contract, a third party subcontract, a lease, or similar arrangement or agreement as FTA may recognize.

(37)    *Third Party Contract* means a legal instrument by which a Recipient or Subrecipient purchases property or services needed to carry out the Grant Agreement or Cooperative Agreement. This does not include an instrument describing a transaction that meets the definition of a federal Award, Grant, Cooperative Agreement, Subaward, or Subagreement.

(38)    *Third Party Participant* means each participant in the Recipient's Project, except for FTA and the Recipient, whose work under the Project is supported with FTA funding, eligible non-federal share dedicated to the Project, or is dedicated as an in-kind contribution eligible for non-federal share. A Third Party Participant may be a Subrecipient, Third Party Contractor, Third Party Subcontractor, Lessee, or Similar Participant in the Recipient's Project (for example, a partner in a joint development venture).

(39)    *Third Party Subcontract* means a subcontract entered into by the Third Party Contractor with a Third Party Subcontractor, or a Third Party Subcontractor with another Third Party Subcontractor at any tier, and is supported in whole or in part with the federal assistance originally derived from FTA, or non-federal share dedicated to the Recipient's Underlying Agreement.

11

(40)   *Underlying Agreement* means a specific Grant Agreement, Cooperative Agreement, or, with respect to TIFIA or RRIF assistance, a specific Loan Agreement, Line of Credit Agreement, or Loan Guarantee Agreement that incorporates the terms of this Master Agreement, in each case including any amendments thereto, supported with federal assistance appropriated or made available under the authorized program.

(41)   *Unique Entity Identifier* has two meanings:

(i)    A Recipient's or a Subrecipient's unique entity identifier for purposes of the "System of Award Management" (SAM), which currently is the DUNS Number; but

(ii)   For FTA purposes, FTA assigns a separate Recipient/Vendor ID as a "unique entity identifier," which is a four-digit number and is displayed on the Grant Agreement and the Cooperative Agreement following the heading "Recipient ID."

(42)   *Waiver* has the same meaning as the definition of Approval in this section of this Master Agreement.

(b)   *Application of Definitions*. The Recipient also agrees that the definitions in section 2(a) above apply throughout this Master Agreement.

## Section 3.    Implementation.

(a)   *Effective Date*. The Effective Date of Recipient's Underlying Agreement is the date when the authorized FTA official signs the Underlying Agreement.

(b)   *Description of Each Project*. The "Description of Each Project" in the "Executive Summary" of the "FTA Award" section of the Recipient's Underlying Agreement often provides only a brief description of each Project and related activities to be undertaken by the Recipient; therefore, the Recipient agrees to perform the work described in the terms of its Underlying Agreement, including all the documents and information incorporated by reference and made part of that Underlying Agreement.

(c)   *Prompt Implementation*. After receiving notice that the FTA official signed the Underlying Agreement, the Recipient agrees to undertake promptly each Project and related activities described in the Underlying Agreement.

(d)   *Completion Dates*. The Recipient agrees to complete each Project within the time periods specified in the Underlying Agreement and all activities must be completed by the Award's end date, unless FTA agrees in writing to extend the end date. Unless FTA determines otherwise in writing, interim milestone dates and other completion

12

dates applicable to the Award are good faith estimates and are not intended to be firm contractual requirements. However, FTA and the Recipient agree that milestone dates and other completion dates for Full Funding Grant Agreements, Small Starts Grant Agreements or other specific agreements in which FTA expressly states that the milestone dates or other completion dates for the Underlying Agreement are firm dates that may be enforced.

(e)     *The Recipient's Capacity*. To carry out its Underlying Agreement, the Recipient agrees to maintain:

   (1)     Sufficient legal, financial, technical, and managerial capacity, and adequate functional capacity to:

      (i)     Plan, manage, and complete its responsibilities outlined in the Underlying Agreement;

      (ii)     Use the Project property;

      (iii)     Carry out the safety and security aspects of the Underlying Agreement;

      (iv)     Comply with the terms and conditions of the Underlying Agreement, the Recipient's annual Certifications and Assurances to FTA, and applicable federal laws, regulations, and requirements; and

      (v)     Follow applicable federal guidance, except as the Federal Government determines otherwise in writing.

   (2)     Strong internal controls to assure that it is managing its Award in compliance with federal laws, regulations, requirements, and the terms and conditions of the Underlying Agreement including, but not limited to:

      (i)     Amendments or revisions to its Award Budget;

      (ii)     Salaries and wages of the Recipient's and Subrecipient's personnel;

      (iii)     Protection of personally identifiable information and other sensitive information; and

      (iv)     Other matters that must be in compliance with federal laws, regulations, requirements, and the terms and conditions of the Underlying Agreement.

(f)     *U.S. DOT Administrative Requirements*. The Recipient agrees to comply with the following U.S. DOT regulations (Common Rules) to the extent applicable:

(1)     *Requirements Applicable On or After December 26, 2014.* The following requirements apply to the Award, the accompanying Underlying Agreement, and any Amendments thereto signed by an authorized FTA official on or after December 26, 2014 as follows:

    (i)     U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, which incorporates by reference U.S. OMB regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200, and which applies to an Award, the accompanying Underlying Agreement, and any Amendments to any Underlying Agreement with a state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization; and

    (ii)    Except as FTA determines otherwise in writing, U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, and subparts A through E of U.S. OMB regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200, apply to a private for-profit entity; notably, the Cost Principles of Part 31 of the Federal Acquisition Regulation, which permits the payment of profits or fees for work under procurement contracts, generally will not apply to private for-profit entities.

(2)     *Requirements Applicable Before December 26, 2014.* The following requirements apply to the Award, the accompanying Underlying Agreement, and any Amendments thereto signed by an authorized FTA official before December 26, 2014, as follows:

    (i)     For a state, local government, or Indian tribal government, U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," former 49 CFR Part 18;

    (ii)    For an institution of higher education or a nonprofit organization, U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education; Hospitals, and Other Non-Profit Organizations," former 49 CFR Part 19; or

    (iii)   For a private for-profit organization, U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Agreements with

Institutions of Higher Education, Hospitals, and Other Non-profit Organizations," former 49 CFR Part 19.

(g)     *Application of Federal, State, and Local Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with all applicable federal requirements and follow applicable federal guidance. All standards or limits are minimum requirements when those standards or limits are included in the Recipient's Underlying Agreement or this Master Agreement. At the time the FTA official awards federal assistance to the Recipient in support of the Underlying Agreement, the federal requirements and guidance that apply then may be modified from time to time, and will apply to the Recipient or the accompanying Underlying Agreement, except as FTA determines otherwise in writing.

(h)     *The Recipient's Responsibility to Comply with Federal Requirements*. Irrespective of involvement by any other entity in the Underlying Agreement:

(1)     *General*. The Recipient agrees to comply with all federal requirements that apply to itself and the Underlying Agreement.

(2)     *Primary Responsibility for Compliance*.

(i)     The Recipient, as the Direct Recipient of federal assistance, agrees that it is ultimately responsible for full compliance with federal requirements related to itself, its Award, the accompanying Underlying Agreement, and any Amendments thereto, even though:

(A)     A Third Party Participant provides property or services to support a Project or related activities implementing the Award, the accompanying Underlying Agreement, any Amendments thereto; or

(B)     Another entity or person is involved with the Award, the accompanying Underlying Agreement, or any Amendments thereto.

(ii)     FTA and the Recipient agree that if FTA makes an Award to a Recipient other than the Designated Recipient as defined under 49 U.S.C. § 5302, the Designated Recipient is not a party to the Award or the Underlying Agreement and is not responsible for compliance with federal requirements related to the Underlying Agreement. However, if FTA makes an Award to a Designated Recipient, then that Designated Recipient is responsible for compliance with federal requirements related to its Underlying Agreement. FTA and the Recipient further agree to the terms of the

15

Designated Recipient's Split Letter, Suballocation Letter, or Government Subapportionment Letter attached in TrAMS, including the amounts allocated by the Designated Recipient to each Direct Recipient, and the commitment to comply with the associated transit improvement requirement as stated in that letter.

(iii)    Apart from other oversight and reviews FTA may conduct, the Recipient agrees that FTA is expressly authorized to conduct oversight of the Recipient's and its Subrecipients' compliance with federal requirements for safety and security, procurement (including Buy America requirements), management, and finance.

(i)    *The Recipient's Responsibility to Extend Federal Requirements to Third Party Participants*. In certain circumstances, the Recipient's compliance with specific federal requirements depends on compliance by its Third Party Participant(s) with those federal requirements, and therefore:

(1)    *General*. The Recipient agrees to ensure that its Third Party Participant(s) will comply with applicable federal requirements, and follow applicable federal guidance.

(2)    *The Recipient as a "Pass-Through" Entity*. If the Recipient is providing a subaward to a Subrecipient to carry out all or part of its Award, the Recipient agrees to obtain the agreement of each Subrecipient to comply with U.S. DOT's administrative requirements, as set forth above.

(3)    *Performance of the Recipient's Responsibilities*. If a Third Party Participant is expected to fulfill any responsibilities typically performed by the Recipient, the Recipient agrees to ensure that the Third Party Participant will carry out the Recipient's responsibilities in compliance with federal requirements, and provide enough information to each Third Party Participant so that it understands that it will be expected to follow federal guidance.

(4)    *Risk*. As provided in 2 CFR Part 1201, which incorporates by reference 2 CFR Part 200, the Recipient agrees to evaluate the risk involved before awarding a subagreement to any entity.

(5)    *Third Party Agreements*. To comply with federal requirements, the Recipient agrees to enter into a written Third Party Agreement with each Third Party Participant in its Underlying Agreement and must include all appropriate provisions stating the Third Party Participant's responsibilities to assure the Recipient's capability to comply with applicable federal requirements and

16

guidance and specifying the responsibilities that the Third Party Participant will fulfill on the Recipient's behalf.

(6)     *Notice to Third Party Participants*. The Recipient agrees to include notice in each Third Party Agreement that:

(i)     Federal requirements that apply to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto may change due to changes in federal law, regulation, other requirements, or guidance, or changes in the Recipient's Underlying Agreement including any information incorporated by reference and made part of that Underlying Agreement; and

(ii)    Applicable changes to those federal requirements will apply to each Third Party Agreement and parties thereto at any tier.

(j)     *Changed Circumstances*. The Recipient agrees that changed circumstances may occur that may impact the Recipient's ability to comply with the terms and conditions of the Underlying Agreement.

(1)     *Types of Changes*. Certain circumstances can cause significant changes in performance of a Project or related activities or adversely affect the Recipient's ability to carry out its Underlying Agreement, such as:

(i)     A change in federal requirements or guidance;

(ii)    A change in state, territorial, local, or tribal requirements;

(iii)   A change in the Recipient's circumstances, including:

(A)     Its legal, financial, technical, or managerial capacity;

(B)     Its continuing control of Project property; or

(C)     Another similar situation; and

(iv)    Any current or prospective legal matter with potentially serious consequences, including a major dispute, default, breach, or litigation, or knowledge that the Recipient's principal, official, employee, agent, or a Third Party Participant, or other person has submitted a false claim under the False Claims Act, 31 U.S.C. § 3729, et seq., or has committed a criminal or civil violation of law pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving federal assistance; suspension, debarment, or other similar administrative or enforcement action against the Recipient or any

Third Party Participant; or any matter or situation, including any other change or legal action that may adversely affect the Federal Government's interest in a Project or related activities.

(2)   *Notice*. In the circumstances described above, the Recipient agrees to provide immediate written notice to the:

    (i)   FTA Regional Counsel for the Region in which the Recipient operates public transportation or implements the Underlying Agreement;

    (ii)   FTA Headquarters Manager that administers the Underlying Agreement; or

    (iii)   FTA Chief Counsel.

(k)   *Conflict Between Federal Requirements and State, Territorial, Local, or Tribal Requirements*. FTA and the Recipient understand that a federal requirement may conflict with a state, territorial, local, or tribal requirement, and agree that the Recipient must comply with each applicable federal requirement that pre-empts the conflicting state, territorial, local, or tribal requirement.

(1)   *Compliance with State, Territorial, Local or Tribal Requirements*. Unless otherwise pre-empted by a federal requirement, FTA and the Recipient agree that:

    (i)   FTA expects the Recipient to comply with applicable state, territorial, local, and tribal requirements; and

    (ii)   FTA does not require the Recipient to take any action involving the Underlying Agreement that would violate a state, territorial, local, or tribal requirement that conflicts with a federal requirement.

(2)   *When a Conflict Arises*. When a federal requirement conflicts with a state, territorial, local, or tribal requirement:

    (i)   The Recipient must notify FTA immediately in writing if compliance with the federal requirement would violate a state, territorial, local, or tribal requirement, or require the Recipient to violate a state, territorial, local, or tribal requirement.

    (ii)   The Recipient must make appropriate arrangements with FTA to proceed with its responsibilities as set forth in the Underlying Agreement, or terminate the Underlying Agreement expeditiously, if necessary.

18

(l)     *No Federal Government Commitment or Liability to Third Parties*. Except as the Federal Government expressly consents in writing, the Recipient agrees that:

    (1)     The Federal Government does not and shall not have any commitment or liability related to the Underlying Agreement, to any Third Party Participant at any tier, or to any other person or entity that is not a party (FTA or the Recipient) to the Underlying Agreement; and

    (2)     Notwithstanding that the Federal Government may have concurred in or approved any Solicitation or Third Party Agreement at any tier that may affect the Underlying Agreement, the Federal Government does not and shall not have any commitment or liability to any Third Party Participant or other entity or person that is not a party (FTA or the Recipient) to the Underlying Agreement.

**Section 4.     Ethics, Political Activity, Disqualification, and Certain Criminal Activity.**

(a)     *Standards of Conduct*. At a minimum, the Recipient agrees to, and assures that its Subrecipients will, establish and maintain written Standards of Conduct covering conflicts of interest that:

    (1)     Apply to the following individuals who have a present or potential financial interest, or other significant interest, such as a present or potential employment interest in the selection, award, or administration of a third party contract or subcontract:

        (i)     The Recipient or its Subrecipients' officers, employees, board members, or agents engaged in the selection, award, or administration of any third party agreement;

        (ii)    The immediate family members or partners of those listed above in section 4(a)(1)(i) of this Master Agreement; and

        (iii)   An entity or organization that employs or is about to employ any person that has a relationship with the Recipient or its Subrecipient listed above in sections 4(a)(1)(i) and (ii) of this Master Agreement;

    (2)     Prohibit those individuals listed above in section 4(a)(1) from:

        (i)     Engaging in any activities involving the Recipient's or any of its Subrecipients' present or potential Third Party Participants at any tier, including selection, award, or administration of a third party agreement in which the individual has a present or potential financial or other significant interest; and

     (ii)    Accepting a gratuity, favor, or anything of monetary value from a present or potential Third Party Participant in the Recipient's Underlying Agreement, unless the gift is unsolicited and has an insubstantial financial or nominal intrinsic value; and

    (3)    Establish penalties, sanctions, or other disciplinary actions for violations, as permitted by state or local law or regulations, that apply to those individuals listed above in section 4(a)(1) and the Recipient's or Subrecipient's Third Party Participants.

(b)    *Bonus or Commission*. The Recipient affirms that it has not paid, and agrees that it will not pay, any bonus or commission to obtain federal assistance for any Project or related activities supported under the Underlying Agreement.

(c)    *Lobbying Restrictions*. The Recipient agrees that neither it nor any Third Party Participant will use federal assistance to influence any officer or employee of a federal agency, member of Congress or an employee of a member of Congress, or officer or employee of Congress on matters that involve the Underlying Agreement, including any extension or modification, according to the following:

    (1)    *Laws, Regulations, Requirements, and Guidance*. This includes:

     (i)    The Byrd Anti-Lobbying Amendment, 31 U.S.C. § 1352, as amended;

     (ii)    U.S. DOT regulations, "New Restrictions on Lobbying," 49 CFR Part 20, to the extent consistent with 31 U.S.C. § 1352, as amended; and

     (iii)    Other applicable federal laws, regulations, requirements, and guidance prohibiting the use of federal assistance for any activity concerning legislation or appropriations designed to influence the U.S. Congress or a state legislature; and

    (2)    *Exception*. If permitted by applicable federal law, regulations, requirements, or guidance, such lobbying activities described above may be undertaken through the Recipient's or Subrecipient's proper official channels.

(d)    *Political Activity*. The Recipient agrees to comply with:

    (1)    The Hatch Act, 5 U.S.C. chapter 15, which limits the political activities of state and local government agencies supported in whole or in part with federal assistance, including the political activities of state and local government officers and employees whose principal governmental

employment activities are supported in whole or in part with federal assistance;

(2)     U.S. Office of Personnel Management regulations, "Political Activity of State or Local Officers or Employees," 5 CFR Part 151; and

(3)     49 U.S.C. § 5323(*l*)(2) and 23 U.S.C. § 142(g), which limits the applicability of the Hatch Act, as follows:

(i)     The Hatch Act does not apply to nonsupervisory employees of a public transportation system, or any other agency or entity performing related functions, based upon the Award of federal assistance under 49 U.S.C. chapter 53 or 23 U.S.C. § 142(a)(2); but

(ii)    Notwithstanding the preceding section 4(e)(3)(ii) of this Master Agreement, the Hatch Act does apply to a nonsupervisory employee if imposed for a reason other than the Award of federal assistance to its employer under 49 U.S.C. chapter 53 or 23 U.S.C. § 142(a)(2).

(e)     *False or Fraudulent Statements or Claims*.

(1)     *Civil Fraud*. The Recipient acknowledges and agrees that:

(i)     Federal laws, regulations, and requirements apply to itself and its Underlying Agreement, including the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. § 3801, et seq., and U.S. DOT regulations, "Program Fraud Civil Remedies," 49 CFR Part 31.

(ii)    By executing the Underlying Agreement, the Recipient certifies and affirms to the Federal Government the truthfulness and accuracy of any claim, statement, submission, certification, assurance, affirmation, or representation that the Recipient provides to the Federal Government.

(iii)   The Federal Government may impose the penalties of the Program Fraud Civil Remedies Act of 1986, as amended, and other applicable penalties if the Recipient presents, submits, or makes available any false, fictitious, or fraudulent information.

(2)     *Criminal Fraud*. The Recipient acknowledges that 49 U.S.C. § 5323(*l*)(1) authorizes the Federal Government to impose the penalties under 18 U.S.C. § 1001 if the Recipient provides a false, fictitious, or fraudulent claim, statement, submission, certification, assurance, or representation in

connection with a federal public transportation program under 49 U.S.C. chapter 53 or any other applicable federal law.

(f)     *Trafficking in Persons*.

   (1)     *Legal Authorities*. The Recipient agrees to comply and assures the compliance of each Subrecipient, with federal requirements and guidance, including:

      (i)     Section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended, 22 U.S.C. § 7104(g); and

      (ii)     The terms of this section 4(f), which have been derived from U.S. OMB regulatory guidance, "Award Term for Trafficking in Persons," 2 CFR Part 175, per U.S. OMB's direction.

   (2)     *Definitions*. The Recipient agrees that for purposes of this section 4(f):

      (i)     *Employee* means either an individual who is employed by the Recipient or a Subrecipient, and is participating in a Project or related activities as set forth in the Underlying Agreement, or another person who is participating in a Project or related activities as set forth in the Underlying Agreement and is not compensated by the Recipient, including, but not limited to, a volunteer, or an individual whose services are contributed by the Recipient or Third Party Participant as an in-kind contribution toward the cost sharing requirements of the Recipient's Underlying Agreement.

      (ii)     *Forced labor* means labor obtained by recruitment, harboring, transportation, provision, or other means of obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

      (iii)     *Private entity* means any entity other than a state, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR § 175.25, and includes a for-profit organization, or a nonprofit organization, including any nonprofit organization of higher education, hospital, or tribal organization other than one included in the definition of Indian Tribe at 2 CFR § 175.25(b).

      (iv)     *Severe forms of trafficking in persons* has the meaning given at section 103 of the TVPA, as amended, 22 U.S.C. § 7102.

(v)     *Commercial sex act* has the meaning given at section 103 of the TVPA, as amended, 22 U.S.C. § 7102.

(vi)    *Coercion* has the meaning given at section 103 of the TVPA, as amended, 22 U.S.C. § 7102.

(3)     *Provisions Applicable to All Recipients*. The Recipient agrees to, and assures that its Subrecipients will:

(i)     *Provide Information*. Inform FTA immediately of any information it receives from any source alleging a violation of the prohibitions listed in section 4(f)(4) of this Master Agreement; and

(ii)    Subagreement Provision. Include the following provision in any subagreement it enters into with a private entity as defined above in section 4(f)(2)(iii) of this Master Agreement:

*XXX agrees that it and its employees that participate in the Recipient's Award, may not:*

*Engage in severe forms of trafficking in persons during the period of time that the Recipient's Award is in effect,*
*Procure a commercial sex act during the period of time that the Recipient's Award is in effect, or*
*Use forced labor in the performance of the Recipient's Award or subagreements thereunder.*

(4)     *Provisions Applicable to a Private Entity Recipient*. If the Recipient is a private entity, it agrees that:

(i)     *Prohibitions*. It, its employees, its Subrecipients, and its Subrecipients' employees that participate in the Underlying Agreement will not:

(A)     Engage in severe forms of trafficking in persons during the period of time that the Recipient's Underlying Agreement is in effect;

(B)     Procure a commercial sex act during the period of time that the Recipient's Underlying Agreement is in effect; or

(C)     Use forced labor in the performance of the Recipient's Underlying Agreement or subagreements.

(ii)    *Termination of Federal Assistance*. Section 106(g) of the TVPA, as amended, 22 U.S.C. § 7104(g), and U.S. OMB regulatory guidance, "Award Term for Trafficking in Persons," 2 CFR Part 175, provide FTA the right to unilaterally terminate the Underlying Agreement for a violation of that Act without penalty to the Federal Government, if FTA determines that the private entity Recipient or its Subrecipient:

    (A)    Has violated a prohibition described above in section 4(g)(4)(i) of this Master Agreement; or

    (B)    Has an employee whose conduct is determined to have violated a prohibition described above in section 4(g)(4)(i) of this Master Agreement because that employee's conduct is either:

        a.    Associated with the performance of the Recipient's Underlying Agreement; or

        b.    Imputed to the Recipient or Subrecipient using the standards of due process for conduct of an individual to an organization provided in:

            i.    U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR Part 1200; or

            ii.    U.S. OMB regulatory guidance, "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR Part 180.

(5)    *Provisions Applicable to a Recipient That is Not a Private Entity*. A Recipient that is not a private entity agrees that section 106(g) of the TVPA, as amended, 22 U.S.C. § 7104(g), and U.S. OMB regulatory guidance, "Award Term for Trafficking in Persons," 2 CFR Part 175, provides FTA the right to unilaterally terminate the Underlying Agreement, without penalty to the Federal Government, for a violation of that Act if FTA determines that:

(i)    A private entity that is the Subrecipient of the Recipient is determined to have engaged in severe forms of trafficking in persons during the period of time that the Recipient's Underlying Agreement is in effect; procured a commercial sex act during the period of time that the Recipient's Underlying Agreement is in effect; or used forced labor in

the performance of the Recipient's Underlying Agreement or subagreements thereunder; or

(ii)    An employee of a private entity that is the Subrecipient has engaged in severe forms of trafficking in persons during the period of time that the Recipient's Underlying Agreement is in effect; procured a commercial sex act during the period of time that the Recipient's Underlying Agreement is in effect; or used forced labor in the performance of the Recipient's Underlying Agreement or subagreements thereunder, and whose conduct described above is associated with the performance of the Recipient's Underlying Agreement; or is imputed to the Subrecipient using the standards for due process to impute the conduct of an individual to an organization as provided in U.S. OMB regulatory guidance, "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR Part 180, and U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR Part 1200.

(6)    *Remedies Other Than Termination of Federal Assistance*. The Recipient agrees that FTA's right to terminate federal assistance as provided in the TVPA and in sections 4(f)(4)(ii) and 4(f)(5) are in addition to all other remedies for noncompliance available to the Federal Government under this Master Agreement.

(g)    *Federal Tax Liability and Recent Felony Convictions*.

(1)    *Transactions Prohibited*.

(i)    The Recipient agrees that, prior to entering into any Third Party Agreement with any private corporation, partnership, trust, joint-stock company, sole proprietorship, or other business association, the Recipient will obtain from the prospective Third Party Participant a certification that the Third Party Participant—

(A)    Does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and

(B)    Was not convicted of the felony criminal violation under any Federal law within the preceding 24 months.

25

(ii)    If the prospective Third Party Participant cannot so certify, the Recipient agrees to refer the matter to FTA and not to enter into any Third Party Agreement with the Third Party Participant without FTA's written approval.

(2)    *Flow-Down*. The Recipient agrees to require all Third Party Participants to flow this requirement down to participants at all lower tiers, without regard to the value of any subagreement.

(h)    *Debarment and Suspension*. The Recipient agrees to the following:

(1)    It will comply with the following requirements of 2 CFR Part 180, subpart C, as adopted and supplemented by U.S. DOT regulations at 2 CFR Part 1200.

(2)    It will not enter into any "covered transaction" (as that phrase is defined at 2 CFR §§ 180.220 and 1200.220) with any Third Party Participant that is, or whose principal is, suspended, debarred, or otherwise excluded from participating in covered transactions, except as authorized by—

(i)    U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR Part 1200;

(ii)    U.S. OMB regulatory guidance, "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR Part 180; and

(iii)    Other applicable federal laws, regulations, or requirements regarding participation with debarred or suspended Recipients or Third Party Participants.

(3)    It will review the U.S. GSA "System for Award Management – Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs," if required by U.S. DOT regulations, 2 CFR Part 1200.

(4)    It will ensure that its Third Party Agreements contain provisions necessary to flow down these suspension and debarment provisions to all lower tier covered transactions.

(5)    If the Recipient suspends, debars, or takes any similar action against a Third Party Participant or individual, the Recipient will provide immediate written notice to the:

(i)    FTA Regional Counsel for the Region in which the Recipient is located or implements the Underlying Agreement;

26

(ii)    FTA Headquarters Manager that administers the Grant or Cooperative Agreement; or

(iii)    FTA Chief Counsel.

**Section 5.**    **Federal Assistance.**

(a)    *Total Federal Assistance Awarded and Obligated*. The Recipient agrees that FTA's responsibility to provide federal assistance for its Underlying Agreement is up to the amount shown in the Underlying Agreement, as modified by any Amendments thereto, which is equal to the smallest of: (1) the maximum amount permitted by federal law or regulation, or (2) the "Total FTA Amount Awarded and Obligated," as stated in the Underlying Agreement. FTA's responsibility to provide federal assistance is limited to the amounts listed in the most recent Award Budget identified in the Underlying Agreement and may not exceed the federal share of the actual eligible expenses incurred for participation in the Award.

(b)    *Basis of Federal Assistance*. The Recipient agrees that the "Total FTA Amount Awarded and Obligated" stated in the Underlying Agreement and modified by any Amendments thereto is calculated based on the Net Project Cost or on another basis as set forth below:

    (1)    "*Net Project Cost*." The Recipient agrees that if federal law or regulation requires an Underlying Agreement to be financed based on its "Net Project Cost," as defined in 49 U.S.C. § 5302:

        (i)    FTA will provide federal assistance for a percentage of the portion of the "Total Award Budget" that the Recipient cannot reasonably finance from its revenues, which is the "Net Project Cost;"

        (ii)    FTA will use the amount of the "Total Award Budget" stated on the Underlying Agreement to calculate the "Total FTA Amount Awarded and Obligated;" and

        (iii)    In TrAMS, the amount stated as the "Total Award Budget" on the Underlying Agreement is actually the "Net Project Cost," as defined in 49 U.S.C. § 5302.

    (2)    *Other Basis for FTA Participation*. The Recipient agrees that if federal law or FTA permits an Underlying Agreement to be financed on a basis other than its "Net Project Cost," as defined in 49 U.S.C. § 5302, or under previous authorizing legislation:

(i)     FTA will provide federal assistance for all or part of the cost of the Underlying Agreement that is eligible for federal assistance;

(ii)    In some instances, FTA has discretion to determine the amount of federal assistance to provide for each specific Project or related activities; and

(iii)   FTA will use the amount stated in the Underlying Agreement as the "Total Award Budget" to calculate the "Total FTA Amount Awarded and Obligated."

(c)     *Award Budget*. The Recipient agrees to prepare an Award Budget that, after FTA has provided its approval, will be incorporated by reference and made part of the Underlying Agreement.

(1)     *Restrictions*. The Recipient agrees that it will not incur costs eligible for FTA participation under the Award or withdraw federal assistance for eligible costs incurred unless those costs are consistent with the Award Budget.

(2)     *Amendments to the Award Budget*. To the extent specified in applicable FTA program management guidance, the Recipient agrees that it must obtain prior FTA approval in writing before amending its Award Budget or transferring federal assistance for the Award if the transfer is not expressly authorized by federal law, regulation, or guidance. An Award of additional federal assistance will require an amended Award Budget.

(3)     *Revisions to the Award Budget*. To the extent specified in applicable FTA program management guidance, the Recipient may revise the Award Budget without prior FTA written approval. The Recipient agrees that all other Award Budget revisions will require prior FTA approval in writing.

(4)     *Unexpended Federal Assistance*. The Recipient agrees to inform FTA promptly if it believes it will have unexpended federal assistance after the period of performance for the Award ends.

**Section 6.     Non-Federal Share.**

(a)     *Amount*. The Recipient agrees to provide the amount of non-federal share specified in the Underlying Agreement. Except to the extent that FTA has provided its written consent permitting the Recipient to defer payment of the non-federal share required by the Underlying Agreement, the Recipient agrees to provide its proportionate amount of the non- federal share no later than the time it draws down the federal share to pay eligible costs.

(b)    *Duty to Obtain*. The Recipient agrees to complete all proceedings necessary to provide the non-federal share and to notify FTA of any changed circumstances adversely affecting its ability to pay the non-federal share, including a description of the actions it has taken or will take to ensure adequate resources to provide the non-federal share, and a re-affirmation of its commitment to provide the non-federal share.

(c)    *Permissible Sources*. The Recipient agrees that the following are permissible sources of the non-federal share for the Award:

   (1)    Undistributed cash surpluses;

   (2)    A replacement or depreciation cash fund or reserve; and

   (3)    New capital.

(d)    *Restricted Sources*. Because sources of non-federal share differ among FTA's public transportation assistance programs, FTA will specify in an FTA circular or otherwise whether the following sources may be used as the non-federal share for a specific Award under that program:

   (1)    Program income generated by a Project or related activities supported by a prior Grant or Cooperative Agreement, which is a form of undistributed cash surplus;

   (2)    Advertising revenues;

   (3)    Concession revenues;

   (4)    Revenues from a service agreement from a state or local social service agency or a private social service organization;

   (5)    Third party in-kind contributions;

   (6)    Proceeds from the issuance of revenue bonds pursuant 49 U.S.C. § 5323(e);

   (7)    Transportation development credits (formerly toll revenue credits) pursuant to 23 U.S.C. § 120(i);

   (8)    Revenue from Value Capture pursuant to 49 U.S.C. § 5323(s);

   (9)    Federal assistance made available for the Federal Lands Highway Program authorized under 23 U.S.C. § 204; or

(10)    Federal assistance derived from other federal programs whose enabling laws permit their funds to be used as the non-federal share.

(e)    *Prohibited Sources*. Except as permitted by federal laws, regulations, requirements, or guidance, or approved in writing by FTA, the Recipient agrees that it will not provide any non-federal share for the Underlying Agreement derived from:

(1)    Farebox revenues from providing public transportation services using facilities and equipment acquired with federal assistance for the Award;

(2)    Program income derived from the use of facilities or equipment acquired with federal assistance for the Award, except if expressly permitted by federal laws, regulations, requirements, or FTA guidance; or

(3)    Other federal funds not authorized for use as non-federal share by federal law, regulation, requirements, or guidance.

(f)    *Reductions or Refunds*.

(1)    *Reductions*. The Recipient agrees that if it reduces the non-federal share of eligible costs required for the Award, then at the same time it must reduce the proportionate amount of federal assistance for the Award.

(2)    *Refunds*. The Recipient agrees that if it accepts a refund of the non-federal share of eligible costs provided through the Underlying Agreement, then at the same time it must provide the Federal Government an amount of that refund proportionate to the federal contribution.

**Section 7.    Payments to the Recipient.**

(a)    *Conditions for Accessing Federal Assistance*. To seek or obtain federal assistance for the costs of implementing the Award, the Recipient agrees that:

(1)    It must execute the Underlying Agreement and any Amendments thereto;

(2)    It must receive and file a properly signed document seeking payment for the expense, such as a voucher or other appropriate record, and a properly detailed description of the relationship of the expense to the Award;

(3)    It must identify all sources of federal assistance from which the payment is derived;

(4)    It must provide FTA with all financial and progress reports required to date; and

(5)     If the Recipient must provide a non-federal share, unless FTA has stated otherwise in writing that the Recipient may defer the non-federal share:

(i)     The Recipient will not request or obtain more federal assistance than justified by the eligible non-federal share it has provided;

(ii)    The Recipient will not cause the proportion of federal assistance available for the Award at any time to exceed the percentage of federal assistance authorized and documented in the Underlying Agreement; and

(iii)   When combined with federal payments, the Recipient will be able to demonstrate that the non-federal share will be adequate to cover all eligible costs incurred in support of the Award.

(b)     *Eligible Costs.* Except as the Federal Government determines otherwise in writing, the Recipient agrees, and will obtain the agreement of each Subrecipient, to seek and obtain federal assistance only for the eligible costs of the Award that are:

(1)     Consistent with the Description of Each Project, the Award Budget, this Master Agreement, and the Underlying Agreement and any Amendments thereto;

(2)     Necessary to carry out the Award;

(3)     Reasonable for the property or services acquired for use in the Project;

(4)     The actual net costs, which consist of the price paid minus reductions of the costs incurred, such as any refunds, rebates, or other items of value, but excluding program income;

(5)     Incurred for work performed after the Effective Date of the:

(i)     Award;

(ii)    Pre-award authority that FTA has provided; or

(iii)   Letter of No Prejudice;

(6)     Satisfactorily documented;

(7)     Consistent with federally approved accounting principles and procedures, including requirements for indirect costs, consistent with the applicable U.S. DOT Common Rules; and

    (8)      Consistent with applicable U.S. DOT Common Rules and other applicable federal law, regulations, requirements, and guidance.

(c)    *Ineligible Costs*. The Recipient agrees that, except as the Federal Government determines otherwise in writing, FTA will exclude ineligible costs incurred in connection with the Award or otherwise, such as:

    (1)      A cost the Recipient has incurred before the Effective Date of the Award as documented in the Underlying Agreement or any Amendments thereto that is not accompanied by FTA's written approval, including, but not limited to, pre-award authority or a Letter of No Prejudice, and permitted by applicable federal law, regulation, guidance, or the Underlying Agreement or any Amendments thereto;

    (2)      A cost not included in the most recent Award Budget;

    (3)      A cost for property or services received in connection with any third party agreement lacking any FTA approval or concurrence in writing that is required;

    (4)      An ordinary governmental or operating cost not applicable to the Award, as prohibited by 49 U.S.C. § 5323(h)(1);

    (5)      A profit or fee for services provided by the Recipient or any of its Subrecipients in implementing the Award; or

    (6)      A cost that is ineligible for FTA participation as provided in applicable federal law, regulation, requirement, or guidance.

(d)    *Bond Interest and Other Financing Costs – Limited Eligibility*. The Recipient agrees that bond interest and other financing costs are allowable costs to the extent permitted by applicable federal law, regulation, requirement, or guidance. FTA's share of interest and financing costs that implement the Award will be limited to an amount that does not exceed the most favorable financing terms reasonably available at the time of borrowing, except as the Federal Government determines otherwise in writing.

(e)    *Payment Procedures Based on the Type of Federal Assistance Awarded*. The Recipient agrees that:

    (1)      All payments in connection with the Award will be made through electronic methods.

    (2)      Payment procedures for a Recipient differ based upon the type of federal assistance that is awarded.

(3)    FTA determines which electronic system it will use to make payments to the Recipient as follows:

    (i)    For Grants and other types of federal assistance, FTA will use the Electronic Clearinghouse Operation Web System (ECHO-Web), Automated Clearing House (ACH) payment method, except as provided below in sections 7(e)(3)(ii) and (iii) of this Master Agreement;

    (ii)    For Cooperative Agreements, FTA will use the DELPHI eInvoicing System or DELPHI Mark View System if the Recipient is granted a waiver (see the following section 7(g) of this Master Agreement for more information about payments for cooperative agreements and section 7(g) of this Master Agreement for information about accessing and using the DELPHI eInvoicing System); and

    (iii)    For Grants requiring more detailed review of supporting documentation before receiving federal assistance and as determined by the FTA Manager for the Underlying Agreement, FTA will use the DELPHI eInvoicing System (see the following section 7(g) of this Master Agreement for more information about accessing and using the DELPHI eInvoicing System).

(f)    *Payment Procedures Using ECHO*. The Recipient agrees that if payment is made through ECHO-Web using an ECHO Control Number, it will comply with the "FTA ECHO-Web User Manual," April 2016, and it will withdraw federal assistance only to pay the eligible costs of implementing the Award.

    (1)    *Major Withdrawals*. When a single withdrawal will exceed $50,000,000, the Recipient agrees to notify the appropriate FTA Regional or Program Office at least three (3) days before the withdrawal is anticipated.

    (2)    *Immediate Use*. The Recipient agrees that it will not withdraw federal assistance until needed for immediate payment of those expenses and will use that federal assistance to pay for expenses that implement the Award no later than three (3) days after receipt, except as an authorized official of the Federal Government permits otherwise in writing.

    (3)    *Limits*. The Recipient agrees that it will not withdraw more than the sum of federal assistance the Federal Government has awarded or the current available balance for its Award, the accompanying Underlying Agreement, and any Amendments thereto, whichever is less.

(4)     *Control*. The Recipient agrees to provide for the control and accountability of all federal assistance for its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(5)     *Reporting*. Unless an authorized FTA official determines otherwise in writing, the Recipient agrees to report its cash payments and balances promptly.

(6)     *Penalties*. If the Recipient fails to comply with this section of this Master Agreement, it agrees that it may incur or be subjected to penalties, including, but not limited to, the following:

(i)     *Access to ECHO-Web*. The Federal Government may revoke or suspend the Recipient's ECHO Control Number and access to the ECHO-Web if the Federal Government determines that:

(A)     Fraud, waste, mismanagement, or abuse exists in the Recipient's use and application of federal assistance;

(B)     The Recipient has failed to use federal assistance it withdrew to pay costs incurred that implement the Underlying Agreement within three (3) days of withdrawing that federal assistance;

(C)     The Recipient has failed to return withdrawn but unspent federal assistance to the Federal Government within a reasonable time;

(D)     The Recipient has failed to establish procedures to minimize the time between advances of federal assistance and payments of costs incurred that implement the Underlying Agreement;

(E)     The Recipient has been awarded Federal assistance through a Cooperative Agreement with FTA and will use the eInvoicing or DELPHI Mark View System as its payment method instead of the ECHO-Web System (see section 7(g)); or

(F)     For Grants requiring a more detailed review of supporting documentation before receiving federal assistance, and as determined by the FTA Manager for the Award, the Recipient will use eInvoicing (see section 7(g)).

(ii)    *Interest*. The Recipient agrees to pay interest to the Federal Government on any federal assistance withdrawn prematurely,

irrespective of whether the federal assistance has been deposited in an interest-bearing account.

(A) *A State or State Instrumentality*. If the Recipient is a state or state instrumentality, it agrees to pay interest calculated as provided in section 5(b) of the Cash Management Improvement Act of 1990, as amended, 31 U.S.C. § 6503(b), and U.S. Department of Treasury (U.S. Treasury) regulations, "Rules and Procedures for Efficient Federal-State Funds Transfers," 31 CFR Part 205.

(B) *Other than a State or State Instrumentality*. If the Recipient is not a state or state instrumentality, it agrees to pay prejudgment common law interest determined by the Federal Government, as authorized by joint U.S. Treasury and U.S. Department of Justice (joint U.S. Treasury and U.S. DOJ) regulations, "Standards for the Administrative Collection of Claims," 31 C.F.R. § 901.9(i). The Federal Government may determine the amount of interest due, based on the amount of interest the Recipient demonstrates it earned on its premature withdrawals of federal assistance, the amount of interest based on the "Treasury tax and loan account" rate prescribed under 31 U.S.C. § 3717 for debts owed to the United States, or an amount of interest as the Federal Government otherwise determines.

(7) *ECHO System*. If the Recipient is authorized to receive payments provided through ECHO-Web, FTA does not generally review the drawdown when made; however, FTA may review the drawdown at a later time, and subject that drawdown to an audit under a financial oversight review, a triennial review, or another audit.

(g) *Payment Procedures for a Cooperative Agreement*. A Recipient of federal assistance through a Cooperative Agreement must use the DELPHI eInvoicing System to obtain federal payments for costs incurred that implement the Underlying Agreement, unless a waiver is granted.

(1) *Standard Procedures*. To make and receive payments through the DELPHI eInvoicing System, the procedures below must be followed:

(i) *Access to the DELPHI eInvoicing System*. To access the DELPHI eInvoicing System, the Recipient:

(A)    Must have internet access to register and submit payment requests through the DELPHI eInvoicing System;

(B)    Should contact its FTA Manager for the Underlying Agreement to obtain the required DELPHI User access form and approval;

(C)    Must complete the required form that the FAA, Enterprise Service Center's (ESC) Help Desk uses to verify the Recipient's identity, and present it to a Notary Public for verification;

(D)    Return that form, completed and notarized, to:
DOT Enterprise Services Center
FAA Accounts Payable, AMZ-100
PO Box 25710
Oklahoma City, OK 73125;
and

(E)    Should contact its FTA Manager for the Underlying Agreement with any changes to its system profile information.

(ii)    *Payment Requests*. The Recipient must submit each payment request electronically through the DELPHI eInvoicing System, unless a waiver is granted; use of the DELPHI eInvoicing System requires the FTA Manager for the Underlying Agreement to review all supporting documentation before authorizing payment.

(iii)    *Additional Information*. The U.S. DOT DELPHI eInvoicing System website at http://www.dot.gov/cfo/delphi-einvoicing-system.html displays additional information, including the access form and training materials a Recipient may need.

(iv)    *Federal Responsibilities*. When FTA so requests, the Federal Aviation Administration (FAA) will make payments to FTA Recipients electronically. On behalf of FTA, FAA/ESC must process payment requests to a Recipient of federal assistance documented in its Cooperative Agreement with FTA, and will deposit that federal assistance with the Recipient's financial institution (Note: FTA no longer issues paper checks).

(2)    *Waiver Requests*. On a case-by-case basis, U.S. DOT Financial Management officials may waive the requirement for a Recipient to register and use the DELPHI eInvoicing System.

(i)    *The Recipient's Responsibilities*. If the Recipient seeks a waiver from the requirement to use the DELPHI eInvoicing System:

    (A)    It must notify U.S. DOT and FTA by downloading the waiver request form, which can be obtained on the U.S. DOT eInvoicing website at http://www.dot.gov/cfo/delphi-einvoicing-system.html, and notifying its FTA Manager for the Underlying Agreement that it has requested a waiver from using the DELPHI eInvoicing System;

    (B)    It must send its waiver request to the Director of the Office of Financial Management, U.S. Department of Transportation, Office of the Secretary (OST), Office of Financial Management, B-30, 1200 New Jersey Avenue SE, Washington DC 20590-0001 DOTElectronicInvoicing@dot.gov; and

    (C)    If it obtains a waiver from the use of the DELPHI eInvoicing System, then payment will be made using the DELPHI Mark View System, and the Recipient should submit all invoices and any supporting documentation directly to:

        a.    FTAinvoices@faa.gov (Note: no more than 10 MB of data can be transmitted at one time. For invoices greater than 10MB, split into multiple emails and notate in the subject Email 1 of 4, 2 of 4, etc.); or

        b.    DOT/FAA (FTA Account)
            6500 South MacArthur Blvd.
            AMZ-150, HQ Room 272
            PO Box 26904
            Oklahoma City, OK 73125-69041

(ii)    *Federal Responsibilities*. FTA and U.S. DOT have the following responsibilities:

    (A)    The Director, OST, Office of Financial Management, will confirm or deny the waiver request within approximately 30 days.

    (B)    If the request is granted, then payments will be made after receipt of the required FTA reporting forms, provided the Recipient has complied with the U.S. DOT Common Rules and this Master Agreement.

(iii) *DELPHI eInvoicing System or DELPHI Mark View System*. If the Recipient receives payments provided through the DELPHI eInvoicing System or DELPHI Mark View System, the Recipient must submit a request for payment with adequate supporting documentation for FTA to determine that:

(A) It has complied and is complying with the Underlying Agreement;

(B) It has made and is making adequate progress toward completion of the Award; and

(C) It has satisfied FTA that the federal assistance requested is needed for the eligible purposes of the Award in that requisition period.

(iv) *Reimbursement*. After it has demonstrated satisfactory compliance with this section, FTA may reimburse the federal share of the Recipient's apparent allowable costs incurred or to be incurred in the requisition period if those apparent allowable costs are consistent with the Award Budget, and those apparent allowable costs do not exceed the maximum amount of federal assistance that may be paid through the federal fiscal year of that requisition.

(h) *Safeguarding Federal Assistance*. The Recipient agrees to deposit all federal assistance it receives in a financial institution and in an insured account whenever possible, and understands that FTA encourages it to use financial institutions owned at least fifty (50) percent by minority group members.

(i) *The Recipient's Duty to Pay Eligible Costs*. When accompanied by appropriate documentation, the Recipient agrees to pay the eligible costs incurred that implement the Award when due, using the available federal assistance provided for the Award and the non- federal share.

(j) *Effect of Federal Payments*. The Recipient agrees that any federal payment made for a cost incurred that is supported by its Underlying Agreement does not constitute the Federal Government's final decision about the eligibility of the cost for payment with federal assistance provided through the Underlying Agreement, or a waiver of any violation of any federal law, regulation, requirement, guidance, the Underlying Agreement or this Master Agreement.

(k) *Revocation of Federal Assistance*. The Federal Government may revoke the unexpended portion of federal assistance for the Award after the Award has been made and executed.

(l)     *Final Cost Determination*. The Recipient acknowledges that the Federal Government will not make a final determination about the eligibility of any cost until the audit of the Award and Underlying Agreement has been completed.

(m)     *Closeout*. The Recipient agrees that closeout of the Award will not alter:

   (1)     The Recipient's obligation to return any amounts it owes the Federal Government for later refunds, corrections, or other similar actions; and

   (2)     The Federal Government's right to disallow costs and recover federal assistance based on a later audit or other review.

(n)     *Notification*. If the Federal Government determines that the Recipient is not entitled to any portion of federal assistance paid, the Federal Government will notify the Recipient in writing.

(o)     *Recovery of Improper Payments*. Unless prohibited by federal law or regulation, the Federal Government may recover any federal assistance necessary to satisfy any outstanding monetary claims it may have against the Recipient.

(p)     *Program Income*. The Recipient agrees that it may use its program income derived from a Project receiving federal assistance through the Underlying Agreement as FTA permits. In determining the total amount of program income a Recipient has earned from its Project, those costs incident to earning program income that have not been charged to the Award may be deducted from the Recipient's gross income.

   (1)     *During the Period of Performance*. The Recipient may use program income earned during the period of performance of the Underlying Agreement as follows:

      (i)      The Recipient may retain the income for other capital or operating public transportation expenses. If the Recipient chooses not to use program income for current or future FTA Grants or Cooperative Agreements or for other purposes ineligible for federal participation, then the amount of program income used for purposes ineligible for federal participation will be deducted from the total allowable costs to determine the net allowable costs.

      (ii)     For each Public Transportation Innovation, Technical Assistance, Workforce Development Project or Enhanced Mobility of Seniors and Individuals with Disabilities project, or related activities, the Recipient may add program income to the Award.

(iii)    Depending on federal statutory or regulatory restrictions, the Recipient may use the program income for the non-federal share for a future public transportation Project that will receive federal assistance provided by FTA.

(2)    *After the Award Period*. Except as FTA determines otherwise in writing, the Recipient has no obligation to the Federal Government regarding the disposition of program income earned after the end of the period of performance of the Award (i.e., after the ending date of the final Federal Financial Report).

(q)    *Profits*. The Recipient and Subrecipient may earn or keep the profits it may derive as a result of an Award, but the Recipient agrees that any such profits must be used in a manner consistent with the provisions of this Master Agreement or applicable federal guidance.

(r)    *Excess Payments, Disallowed Costs, Refunds, Claims, Debts, Interest, Penalties, Administrative Charges, and Other Amounts Owed to the Federal Government*.

(1)    *The Recipient's Responsibility to Pay*. The Recipient agrees that after receiving notice of specific amounts due, it will pay the amount it owes the Federal Government for:

(i)    Excess federal payments for disallowed costs;

(ii)    Refunds due and amounts recovered from third parties or other sources;

(iii)    Federal claims or debts;

(iv)    Interest assessed;

(v)    Penalties;

(vi)    Administrative charges; or

(vii)    Other amounts it owes the Federal Government.

(2)    *Amount of Interest Due*. The amount of interest to be assessed depends on the procedures used to pursue payment:

(i)    *The Debt Collection Act*. When the Federal Government uses the procedures of the Debt Collection Act of 1982, as amended, 31 U.S.C. § 3701, et seq., to collect claims or debts owed by the Recipient for any reason authorized under that Act (including excess

40

payments and disallowed costs), the Recipient agrees that the amount of interest it will owe will be determined by the Joint U.S. Treasury and U.S. DOJ regulations, "Standards for the Administrative Collection of Claims," 31 CFR Part 900, specifically 31 C.F.R. § 901.9(a) – (g), or common law interest authorized by 31 C.F.R. § 901.9(i), as the Federal Government determines.

(ii)    *Other Collection Processes*. When the Federal Government uses methods or procedures other than those described in 31 U.S.C. § 3701, et seq., to recover money(ies) the Recipient owes the Federal Government, the Recipient agrees that common law interest will be due as authorized by Joint U.S. Treasury and U.S. DOJ regulations, "Standards for the Administrative Collection of Claims," 31 C.F.R. § 901.9(i), but interest for premature withdrawals of federal assistance by states or state instrumentalities will be calculated as required under Section 5(b) of the Cash Management Improvement Act of 1990, as amended, 31 U.S.C. § 6503(b), and U.S. Treasury regulations, "Rules and Procedures for Efficient Federal-State Funds Transfers," 31 CFR Part 205.

(s)    *De-obligation of Federal Assistance*. The Recipient agrees that the Federal Government may de-obligate federal assistance the Recipient has not spent both before and after closeout of the Award.

**Section 8.    Records and Reports Related to the Award and the Underlying Agreement.**

(a)    *Records*. The Recipient agrees to maintain satisfactory records of each Project and activities related in whole or in part to its Award, the accompanying Underlying Agreement, and any Amendments thereto to the extent FTA requires, including, but not limited to:

(1)    *Financial Records*. Accurate financial records in its account for its Award, the accompanying Underlying Agreement, and any Amendments thereto, including, but not limited to, records of:

(i)    *Assets Received that Implement the Award*. The amount of all assets it receives to implement its Award, the accompanying Underlying Agreement, and any Amendments thereto including, but not limited to all federal assistance or the value of any property the Federal Government provides that implement its Award, the accompanying Underlying Agreement, and any Amendments thereto, and all other funds and the value of any property or services it has received from sources other than the Federal Government provided for, accruing to,

or otherwise received on account of its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(ii) *Costs Incurred that Implement the Award*. Information about the costs incurred to implement its Award, the accompanying Underlying Agreement, and any Amendments thereto, including all costs incurred for the eligible property or services, detailed descriptions of the type of property or services acquired, including, but not limited to, properly executed payrolls, time records, invoices, contracts, vouchers, and other appropriate records, and detailed justifications for those costs.

(iii) *Program Income*. All program income derived from the use of Project property, except income FTA determines to be exempt from federal program income record requirements.

(2) *Other Records Needed for Reports Related to the Award*. Sufficient records as needed to prepare adequate reports related to the Award that it must submit to the Federal Government.

(3) *Formats*. Formats for records must be satisfactory to FTA and include, but are not limited to, electronic records, including any emails related to the Award, records on paper, and records created in other formats.

(4) *Availability of Records Related to the Award*. Accessibility for review and separation from other records not related to the Award to the extent feasible must be maintained.

(b) *Reports*. The Recipient agrees to provide to FTA, and others if FTA so directs, all reports related in whole or in part required by applicable federal laws, regulations, requirements, the Underlying Agreement, or at FTA's express direction in the number and format as FTA specifies.

(c) *Data on Assaults on Transit Workers and Bus Impact Fatalities*. The Recipient agrees to report when required to the National Transit Database in accordance with FTA regulation 49 CFR Part 630, "National Transit Database," and applicable FTA instructions—

(1) Any data on assaults on transit workers of the Recipient; and

(2) Any data on fatalities that result from an impact with a bus.

(d) *National Transit Database*. For each fiscal year the Recipient receives or provides to any public transportation operator federal assistance appropriated or made available

42

for 49 U.S.C. § 5307 (including the Passenger Ferry Grant Program) or any provision of 49 U.S.C. § 5311 (including the Tribal Transit Program):

(1)     *Reporting Requirements*. The Recipient agrees to, and assures that it will require any person that receives benefits directly from its Award (including the public transportation operators participating in its Award), the accompanying Underlying Agreement, and any Amendments thereto:

   (i)     To facilitate compliance with 49 U.S.C. § 5335(a), which authorizes the National Transit Database (NTD);

   (ii)    To conform to the NTD reporting system and the Uniform System of Accounts and Records;

   (iii)   To comply with FTA regulations, "Uniform System of Accounts and Records and Reporting System," 49 CFR Part 630;

   (iv)    To report when required to the National Transit Database in accordance with FTA regulation 49 CFR Part 630, "National Transit Database," and applicable FTA instructions—

      (A)     Any information relating to a transit asset inventory or condition assessment conducted by the Recipient; and

      (B)     Such other information as FTA may require; and

   (v)     To comply with any other applicable reporting regulations, and requirements, and

   (vi)    To follow FTA guidance.

(2)     *Voluntary Compliance*. FTA encourages any Recipient that is not required to provide information for the NTD, to provide that information voluntarily.

(e)   *U.S. OMB Special Reporting Requirements*.

(1)     *Authority*. U.S. OMB has issued regulatory guidance in 2 C.F.R. § 25.220 instructing federal agencies to include special "award terms" as authorized under federal laws, including:

   (i)     The Federal Funding Accountability and Transparency Act of 2006 (FFATA), Public Law No. 109-282, September 26, 2006;

(ii)    Section 6202 of the Department of Defense Appropriations Act for Fiscal Year 2008, Public Law No. 110-252, June 30, 2008, which amended the FFATA; and

(iii)    Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Public Law No. 110-417, October 14, 2008, which further amended the FFATA.

(2)    *Universal Identifier and System for Award Management (SAM)*. The Recipient agrees to comply with the award terms in U.S. OMB regulatory guidance, "Universal Identifier and System for Award Management (SAM)," 2 CFR Part 25, appendix A, which FTA has included in this Master Agreement at the direction of U.S. OMB:

(i)    *Requirements for the System for Award Management (SAM)*. Unless exempted from SAM as provided in 2 C.F.R. § 25.110, the Recipient agrees to:

(A)    Maintain the currency of its information in SAM until the later of the date it submits its final financial report required under this Master Agreement, or the date it receives its final federal payment for the Underlying Agreement; and

(B)    Review and update its information in SAM at least annually after the initial registration, and more frequently if required by changes in its information, another provision of an applicable federal or federally assisted agreement, or an applicable federal law or regulation, or U.S. OMB regulatory guidance.

(ii)    *Requirement for a Unique Entity Identifier [Currently, the Data Universal Numbering System (DUNS) Number for SAM]*. If the Award includes federal assistance intended to support subawards, the Recipient agrees to notify each potential Subrecipient and other entity participating in the Award that:

(A)    The potential Subrecipient or entity must provide its unique entity identifier for SAM [currently, its DUNS number] to the Recipient;

(B)    The Recipient may not make any subaward to any potential Subrecipient or entity unless that Subrecipient or entity has provided its unique entity identifier for SAM [currently, its DUNS number] to the Recipient; and

(C)     No Subrecipient or entity, as described below in section 8(d)(4) of this Master Agreement, may receive a subaward provided through the Underlying Agreement, unless that entity has provided its unique entity identifier for SAM [currently, its DUNS number] to the Recipient.

(3)     *Reporting Subawards and Executive Compensation*. The Recipient agrees to comply with the award terms in U.S. OMB regulatory guidance, "Reporting Subaward and Executive Compensation Information," 2 CFR Part 170, appendix A, which FTA has included in this Master Agreement at the direction of U.S. OMB.

(4)     *Reporting of First-Tier Subawards*. The Recipient agrees that when it takes an action that obligates $25,000 or more in federal assistance for a subaward, it must report each such action as provided below, but it need not report an obligation of $25,000 or more in federal assistance, if the Recipient is exempt from U.S. OMB's Special Reporting Requirements as provided below.

(i)     *Where and when to report*. The Recipient agrees to report each obligating action described below to http://www.fsrs.gov, and the Recipient agrees to report subaward information no later than the end of the month after the month in which the obligation was made, *(for example, if the obligation was made on October 1, 2015, the obligation must be reported by no later than November 1, 2015)*.

(ii)    *What to report*. The Recipient agrees to report the requisite information about each obligating action required by the submission instructions posted at http://www.usaspending.gov.

(iii)   *Reporting Total Compensation of the Recipient's Executives*. The Recipient agrees to report the total compensation for each of its five highest compensated executives for the preceding completed fiscal year if:

(A)     The total federal assistance authorized to date for the Underlying Agreement is $25,000 or more; and

(B)     In its preceding fiscal year, the Recipient:

a.      Received 80 percent or more of its annual gross revenues from federal assistance subject to the Transparency Act, as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts);

    b.   Received $25,000,000 or more in annual gross revenues from federal assistance subject to the Transparency Act, as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts); and

    c.   The public does not have access to information about the compensation of the Recipient's executives through periodic reports filed under Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d), or Section 6104 of the Internal Revenue Code of 1986, 26 U.S.C. § 6104 (to determine if the public has access to the compensation information, see the U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

(C)    The Recipient agrees to report executive total compensation described above as part of Recipient's registration profile at http://www.sam.gov, and by the end of the month after the month in which the Underlying Agreement is executed and annually thereafter.

(D)    Reporting of Total Compensation of the Subrecipient's Executives. Unless exempt as provided below, the Recipient agrees to report the names and total compensation of each of its first-tier Subrecipient's five highest compensated executives for the Subrecipient's preceding completed fiscal year if:

    a.   It received 80 percent or more of its annual gross revenues from federal assistance subject to the Transparency Act, as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts); and

    b.   It received $25,000,000 or more in annual gross revenues from federal assistance subject to the Transparency Act as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts);

c.  The public does not have access to information about the compensation of the Subrecipient's executives through periodic reports filed under Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d), or Section 6104 of the Internal Revenue Code of 1986, 26 U.S.C. § 6104 (to determine if the public has access to the compensation information, see the U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

(E)  The Recipient agrees to report the Subrecipient's executives' total compensation described above to FTA and elsewhere as may be determined by the Federal Government, and by the end of the month following the month during which the Recipient makes the subaward (for example, if a subaward is obligated on any date during the month of October of a given year, i.e., between October 1 and 31, the Recipient must report any required compensation information about the Subrecipient by November 30 of that year).

(F)  Any Recipient that had gross income under $300,000 from all sources in the previous tax year is exempt from those federal requirements to report subawards, and the total compensation of the five highest compensated executives of any Subrecipient.

(5)  *Recipient Integrity and Performance Matters*. U.S. OMB regulatory guidance, "Recipient Integrity and Performance Matters," 2 CFR Part 200, appendix XII, contains mandatory provisions that may affect the Recipient's reporting requirements.

(f)  *Closeout*. The Recipient agrees that closeout of its Award does not alter the record-keeping and reporting requirements of this section of this Master Agreement.

**Section 9.    Record Retention and Access to Sites of Performance.**

(a)  *Types of Records*. The Recipient agrees to retain, and will require its Third Party Participants to retain, complete and readily accessible records related in whole or in part to the Underlying Agreement, including, but not limited to, data, documents, reports, statistics, subagreements, leases, third party contracts, arrangements, other third party agreements of any type, and supporting materials related to those records.

(b)     *Retention Period*. The Recipient agrees to comply with the record retention requirements in the applicable U.S. DOT Common Rule. Records pertaining to its Award, the accompanying Underlying Agreement, and any Amendments thereto must be retained from the day the Underlying Agreement was signed by the authorized FTA official through the course of the Award, the accompanying Underlying Agreement, and any Amendments thereto until three years after the Recipient has submitted its last or final expenditure report, and other pending matters are closed.

(c)     *Access to Recipient and Third Party Participant Records*. The Recipient agrees, and assures that each Subrecipient, if any, will agree to:

  (1)     Provide, and require its Third Party Participants at each tier to provide, sufficient access to inspect and audit records and information, including such records and information the Recipient or its Third Party Participants may regard as confidential or proprietary, related to its Award, the accompanying Underlying Agreement, and any Amendments thereto to the U.S. Secretary of Transportation or the Secretary's duly authorized representatives, to the Comptroller General of the United States, and the Comptroller General's duly authorized representatives, and to the Recipient and each of its Subrecipients;

  (2)     Permit those individuals listed above to inspect all work and materials related to its Award, and to audit any information related to its Award under the control of the Recipient or Third Party Participant within books, records, accounts, or other locations; and

  (3)     Otherwise comply with 49 U.S.C. § 5325(g), and federal access to records requirements as set forth in the applicable U.S. DOT Common Rules.

(d)     *Access to the Sites of Performance*. The Recipient agrees to permit, and to require its Third Party Participants to permit, FTA to have access to the sites of performance of its Award, the accompanying Underlying Agreement, and any Amendments thereto, and to make site visits as needed in compliance with the U.S. DOT Common Rules.

(e)     *Closeout*. Closeout of the Award does not alter the record retention or access requirements of this section of this Master Agreement.

**Section 10.     Completion, Audit, Settlement, and Closeout.**

(a)     *Completion*. Within one hundred twenty (120) calendar days after completion or termination of the Award, the Recipient agrees to submit; and within ninety (90) calendar days after completion or termination of the Award (or an earlier date as

agreed upon by the pass-through entity and subrecipient), the subrecipient agrees to submit to the pass-through entity:

(1)     Its final Federal Financial Report, either electronically or on Federal Financial Report Standard Form 425 (SF-425);

(2)     A certification of expenses incurred that implement its Award, the accompanying Underlying Agreement, and any Amendments thereto; and

(3)     The necessary audit reports of its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(b)     *Audit of the Recipient*. Except as the Federal Government determines otherwise in writing, the Recipient agrees that:

(1)     *Audits Required*. It must obtain the following audits:

(i)     *Annual "Single Audit."* A financial and compliance audit consistent with the requirements of the Single Audit Act Amendments of 1996, 31 U.S.C. § 7501, et seq., and applicable U.S. DOT "Single Audit" requirements of 2 CFR Part 1201, which incorporate by reference 2 CFR Part 200, for each Award, the accompanying Underlying Agreement, and any Amendments to any Underlying Agreement; and

(ii)    *Other Audits*. Other audits the Federal Government may require.

(2)     *Auditing Standards*. It must comply with the "Audit Requirements" of 2 CFR Part 200, subpart F, and conform to U.S. Government Accountability Office (U.S. GAO) "Government Auditing Standards" in the conduct of audits of its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(3)     *Costs of Audits*. The audit costs for the administration and management of the Award, the accompanying Underlying Agreement, and any Amendments to any Underlying Agreement are allowable to the extent authorized by the cost principles of 49 CFR Part 1201, which incorporate by reference 2 CFR Part 200.

(c)     *Amounts Owed to the Federal Government*. The Recipient agrees to return to the Federal Government any excess federal payments it receives for disallowed costs, and the Federal Government's proportionate part of any amounts it recovers from third parties or other sources, including refunds due and amounts recovered from third parties or other sources, interest assessed, penalties, and administrative charges.

(d)    *Closeout*. The Recipient agrees that closeout of the Award occurs when FTA notifies the Recipient that the Award is closed, and approves the final federal payment, or acknowledges receipt of the proper refund. Closeout of the Award does not alter the Recipient's audit responsibilities and does not invalidate any continuing requirements of applicable federal law, regulations, or requirements, this Master Agreement or the Underlying Agreement.

**Section 11.    Right of the Federal Government to Terminate.**

(a)    *Justification*. After providing written notice to the Recipient, the Recipient agrees that the Federal Government may suspend, suspend then terminate, or terminate all or any part of the federal assistance for the Award if:

   (1)    The Recipient has failed to make reasonable progress implementing the Award;

   (2)    The Federal Government determines that continuing to provide federal assistance to support the Award does not adequately serve the purposes of the law authorizing the Award; or

   (3)    The Recipient has violated the terms of the Underlying Agreement, especially if that violation would endanger substantial performance of the Underlying Agreement.

(b)    *Financial Implications*. In general, termination of federal assistance for the Award will not invalidate obligations properly incurred before the termination date to the extent that those obligations cannot be canceled. The Federal Government may recover the federal assistance it has provided for the Award, including the federal assistance for obligations properly incurred before the termination date, if it determines that the Recipient has misused its federal assistance by failing to make adequate progress, failing to make appropriate use of the Project property, or failing to comply with the Underlying Agreement, and require the Recipient to refund the entire amount or a lesser amount, as the Federal Government may determine including obligations properly incurred before the termination date.

(c)    *Expiration of the Period of Performance*. Except for a Full Funding Grant Agreement, expiration of any period of performance established for the Award does not, by itself, constitute an expiration or termination of the Award; FTA may extend the period of performance to assure that each Formula Project or related activities and each Project or related activities funded with "no year" funds can receive FTA assistance to the extent FTA deems appropriate.

(d)    *Uniform Administrative Requirements.* These termination rights are in addition to and in no way limit the Federal Government's rights to terminate described in 2 CFR § 200.340.

**Section 12.    Civil Rights.**

(a)    *Civil Rights Requirements.* The Recipient agrees that it must comply with applicable federal civil rights laws, regulations, and requirements, and follow applicable federal guidance, except as the Federal Government determines otherwise in writing. Therefore, unless a Recipient or a federal program, including the Indian Tribe Recipient or the Tribal Transit Program, is specifically exempted from a civil rights statute, FTA requires compliance with each civil rights statute, including compliance with equity in service requirements.

(b)    *Nondiscrimination in Federal Public Transportation Programs.* The Recipient agrees to, and assures that it and each Third Party Participant will:

    (1)    Prohibit discrimination based on race, color, religion, national origin, sex (including sexual orientation), disability, or age.

    (2)    Prohibit the:

        (i)    Exclusion from participation in employment or a business opportunity for reasons identified in 49 U.S.C. § 5332;

        (ii)    Denial of program benefits in employment or a business opportunity identified in 49 U.S.C. § 5332; or

        (iii)    Discrimination identified in 49 U.S.C. § 5332, including discrimination in employment or a business opportunity identified in 49 U.S.C. § 5332.

    (3)    Follow:

        (i)    The most recent edition of FTA Circular 4702.1, "Title VI Requirements and Guidelines for Federal Transit Administration Recipients," to the extent consistent with applicable federal laws, regulations, requirements, and guidance; but

        (ii)    FTA does not require an Indian Tribe to comply with FTA program-specific guidelines for Title VI when administering its Underlying Agreement supported with federal assistance under the Tribal Transit Program.

(c)  *Nondiscrimination – Title VI of the Civil Rights Act*. The Recipient agrees to, and assures that each Third Party Participant will:

(1)  Prohibit discrimination based on race, color, or national origin,

(2)  Comply with:

(i)  Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq.;

(ii)  U.S. DOT regulations, "Nondiscrimination in Federally-Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964," 49 CFR Part 21, including any amendments thereto; and

(iii)  Federal transit law, specifically 49 U.S.C. § 5332; and

(3)  Follow:

(i)  The most recent edition of FTA Circular 4702.1, "Title VI Requirements and Guidelines for Federal Transit Administration Recipients," to the extent consistent with applicable federal laws, regulations, requirements, and guidance;

(ii)  U.S. DOJ, "Guidelines for the enforcement of Title VI, Civil Rights Act of 1964," 28 C.F.R. § 50.3; and

(iii)  All other applicable federal guidance that may be issued.

(d)  *Equal Employment Opportunity*.

(1)  *Federal Requirements and Guidance*. The Recipient agrees to, and assures that each Third Party Participant will, prohibit discrimination based on race, color, religion, sex, sexual orientation, or national origin, and:

(i)  Comply with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.;

(ii)  Comply with Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq.;

(iii)  Comply with federal transit law, specifically 49 U.S.C. § 5332, as provided in section 12 of this Master Agreement;

(iv)    FTA Circular 4704.1 "Equal Employment Opportunity (EEO) Requirements and Guidelines for Federal Transit Administration Recipients;" and

(v)    Follow other federal guidance pertaining to EEO laws, regulations, and requirements.

(2)    *Indian Tribes*. The Recipient agrees to, and assures that each Third Party Participant will recognize that Title VII of the Civil Rights Act of 1964, as amended, exempts Indian Tribes under the definition of "Employer".

(e)    *Disadvantaged Business Enterprise*. To the extent authorized by applicable federal laws, regulations, or requirements, the Recipient agrees to facilitate, and assures that each Third Party Participant will facilitate, participation by small business concerns owned and controlled by socially and economically disadvantaged individuals, also referred to as "Disadvantaged Business Enterprises" (DBEs), in the Underlying Agreement as follows:

(1)    *Statutory and Regulatory Requirements*. The Recipient agrees to comply with:

(i)    Section 11101(e) of IIJA;

(ii)    U.S. DOT regulations, "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs," 49 CFR Part 26, including any amendments thereto; and

(iii)    Federal transit law, specifically 49 U.S.C. § 5332, as provided in section 12 of this Master Agreement.

(2)    *Special Requirements for a Transit Vehicle Manufacturer (TVM)*. The Recipient agrees that:

(i)    *TVM Certification*. Each TVM, as a condition of being authorized to bid or propose on FTA-assisted transit vehicle procurements, must certify that it has complied with the requirements of 49 CFR Part 26, including any amendments thereto; and

(ii)    *Reporting TVM Awards*. Within 30 days of any third party contract award for a transit vehicle purchase, the Recipient must submit to FTA the name of the TVM contractor and the total dollar value of the third party contract using the Transit Vehicle Award Reporting Form on FTA's website. The Recipient must also submit additional

notifications if options are exercised in subsequent years to ensure that the TVM is still in good standing.

(3)    *Assurance*. As required by 49 C.F.R. § 26.13(a):

    (i)    *Recipient Assurance*. The Recipient agrees and assures that:

        (A)    It must not discriminate based on race, color, national origin, or sex in the award and performance of any FTA or U.S. DOT-assisted contract, or in the administration of its DBE program or the requirements of 49 CFR Part 26;

        (B)    It must take all necessary and reasonable steps under 49 CFR Part 26 to ensure nondiscrimination in the award and administration of U.S. DOT-assisted contracts;

        (C)    Its DBE program, as required under 49 CFR Part 26 and as approved by U.S. DOT, is incorporated by reference and made part of the Underlying Agreement; and

        (D)    Implementation of its DBE program approved by U.S. DOT is a legal obligation and failure to carry out its terms shall be treated as a violation of this Master Agreement.

    (ii)    *Subrecipient/Third Party Contractor/Third Party Subcontractor Assurance*. The Recipient agrees and assures that it will include the following assurance in each subagreement and third party contract it signs with a Subrecipient or Third Party Contractor and agrees to obtain the agreement of each of its Subrecipients, Third Party Contractors, and Third Party Subcontractors to include the following assurance in every subagreement and third party contract it signs:

        (A)    The Subrecipient, each Third Party Contractor, and each Third Party Subcontractor must not discriminate based on race, color, national origin, or sex in the award and performance of any FTA or U.S. DOT-assisted subagreement, third party contract, and third party subcontract, as applicable, and the administration of its DBE program or the requirements of 49 CFR Part 26;

        (B)    The Subrecipient, each Third Party Contractor, and each Third Party Subcontractor must take all necessary and reasonable steps under 49 CFR Part 26 to ensure nondiscrimination in the award and administration of U.S. DOT-assisted

subagreements, third party contracts, and third party subcontracts, as applicable;

(C)    Failure by the Subrecipient and any of its Third Party Contractors or Third Party Subcontractors to carry out the requirements of this subparagraph 12.e(4)(ii) is a material breach of this subagreement, third party contract, or third party subcontract, as applicable; and

(D)    The following remedies, or such other remedy as the Recipient deems appropriate, include, but are not limited to, withholding monthly progress payments, assessing sanctions, liquidated damages, and/or disqualifying the Subrecipient, Third Party Contractor, or Third Party Subcontractor from future bidding as non-responsible.

(4)    *Remedies*. Upon notification to the Recipient of its failure to carry out its approved program, FTA or U.S. DOT may impose sanctions as provided for under 49 CFR Part 26, and, in appropriate cases, refer the matter for enforcement under either or both 18 U.S.C. § 1001, and/or the Program Fraud Civil Remedies Act of 1986, 31 U.S.C. § 3801, et seq.

(f)    *Nondiscrimination on the Basis of Sex*. The Recipient agrees to comply with federal prohibitions against discrimination based on sex, including:

(1)    Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, et seq.;

(2)    U.S. DOT regulations, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 49 CFR Part 25; and

(3)    Federal transit law, specifically 49 U.S.C. § 5332.

(g)    *Nondiscrimination on the Basis of Age*. The Recipient agrees to comply with federal prohibitions against discrimination based on age, including:

(1)    The Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634, which prohibits discrimination based on age;

(2)    U.S. Equal Employment Opportunity Commission (U.S. EEOC) regulations, "Age Discrimination in Employment Act," 29 CFR Part 1625;

(3)    The Age Discrimination Act of 1975, as amended, 42 U.S.C. § 6101, et seq., which prohibits discrimination against individuals based on age in the

administration of Programs, Projects, and related activities receiving federal assistance;

(4) U.S. Health and Human Services regulations, "Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance," 45 CFR Part 90; and

(5) Federal transit law, specifically 49 U.S.C. § 5332.

(h) *Nondiscrimination on the Basis of Disability.* The Recipient agrees to comply with the following federal prohibitions against discrimination based on disability:

(1) Federal laws, including:

(i) Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which prohibits discrimination based on disability in the administration of federally assisted Programs, Projects, or activities;

(ii) The Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101, et seq., which requires that accessible facilities and services be made available to individuals with disabilities:

(A) For FTA Recipients generally, Titles I, II, and III of the ADA apply; but

(B) For Indian Tribes, Titles II and III of the ADA apply, but Title I of the ADA does not apply because it exempts Indian Tribes from the definition of "employer;"

(iii) The Architectural Barriers Act of 1968, as amended, 42 U.S.C. § 4151, et seq., which requires that buildings and public accommodations be accessible to individuals with disabilities;

(iv) Federal transit law, specifically 49 U.S.C. § 5332, which now includes disability as a prohibited basis for discrimination; and

(v) Other applicable federal laws, regulations, and requirements pertaining to access for seniors or individuals with disabilities.

(2) Federal regulations and guidance, including:

(i) U.S. DOT regulations, "Transportation Services for Individuals with Disabilities (ADA)," 49 CFR Part 37;

(ii)    U.S. DOT regulations, "Nondiscrimination on the Basis of Disability in Programs and Activities Receiving or Benefiting from Federal Financial Assistance," 49 CFR Part 27;

(iii)    Joint U.S. Architectural and Transportation Barriers Compliance Board (U.S. ATBCB) and U.S. DOT regulations, "Americans With Disabilities (ADA) Accessibility Specifications for Transportation Vehicles," 49 CFR Part 38;

(iv)    U.S. DOT regulations, "Transportation for Individuals with Disabilities: Passenger Vessels," 49 CFR Part 39;

(v)    U.S. DOJ regulations, "Nondiscrimination on the Basis of Disability in State and Local Government Services," 28 CFR Part 35;

(vi)    U.S. DOJ regulations, "Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities," 28 CFR Part 36;

(vii)    U.S. EEOC, "Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 CFR Part 1630;

(viii)    U.S. Federal Communications Commission regulations, "Telecommunications Relay Services and Related Customer Premises Equipment for Persons with Disabilities," 47 CFR Part 64, subpart F;

(ix)    U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194;

(x)    FTA regulations, "Transportation for Elderly and Handicapped Persons," 49 CFR Part 609;

(xi)    FTA Circular 4710.1, "Americans with Disabilities Act: Guidance;" and

(xii)    Other applicable federal civil rights and nondiscrimination regulations and guidance.

(i)    *Drug or Alcohol Abuse – Confidentiality and Other Civil Rights Protections*. The Recipient agrees to comply with the confidentiality and civil rights protections of:

(1)    The Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. § 1101, et seq.;

(2)    The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

(3)    The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)    *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of Justice guidance.

(k)    *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)    *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)    *Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)    *Federal Anti-Discrimination*.

(1)    Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(2)    Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

**Section 13.    Planning.**

(a)    *Standard Planning Provisions*. The Recipient agrees to the following:

    (1)    *Planning Requirements and Guidance*. To assure that its Underlying Agreement is consistent with the Planning requirements that apply, the Recipient agrees to:

        (i)    Comply with the Metropolitan planning requirements of 49 U.S.C. § 5303, and joint FHWA and FTA regulations, "Planning and Assistance Standards" (for Metropolitan Transportation Planning and Programming), 23 CFR Part 450 and 49 CFR Part 613, to the extent those regulations are consistent with the metropolitan planning requirements of 49 U.S.C. § 5303;

        (ii)    Comply with the statewide and nonmetropolitan planning requirements of 49 U.S.C. § 5304, and joint FHWA and FTA regulations, "Planning and Assistance Standards" (for statewide transportation planning and programming), 23 CFR Part 450 and 49 CFR Part 613, to the extent those regulations are consistent with the state planning requirements of 49 U.S.C. § 5304; and

        (iii)    Follow any guidance FTA issues to implement requirements of 49 U.S.C. §§ 5303 and 5304.

    (2)    *Participation of State or Local Governmental and Private Nonprofit Providers of Nonemergency Transportation*. The Recipient agrees to comply with 49 U.S.C. § 5323(k) by assuring that it will, as feasible:

        (i)    Provide the opportunity to participate and coordinate with the Recipient in the design and the delivery of federally assisted transportation services, and be included in planning for the Recipient's federally assisted transportation services; and

        (ii)    Make that opportunity available to federally-assisted state or local governmental agencies and nonprofit organizations that receive federal assistance for nonemergency transportation, but do not receive federal assistance for nonemergency transportation from U.S. DOT.

(b)    *Tribal Transit Program Planning Provisions*. The Indian Tribe agrees that:

    (1)    *Planning Requirements*. The federal assistance it receives for its Tribal Transit Program will be consistent with its documents, including any formal plan provided to FTA in support of the development and basis of its Award

of federal assistance under the Tribal Transit Program, and are or will be coordinated with transportation service funded by other federal sources to the maximum extent feasible.

(2)    *Participation of State or Local Governmental and Private Nonprofit Providers of Nonemergency Transportation*. The Recipient agrees to comply with 49 U.S.C. § 5323(k) by assuring that it will, as feasible:

    (i)    Provide the opportunity to participate and coordinate with the Recipient in the design and the delivery of federally assisted transportation services, and be included in planning for the Recipient's federally assisted transportation services; and

    (ii)    Make that opportunity available to federally-assisted state or local governmental agencies and nonprofit organizations that receive federal assistance for nonemergency transportation, but do not receive federal assistance for nonemergency transportation from U.S. DOT.

**Section 14.    Private Enterprise.**

(a)    *Protections*. The Recipient agrees to protect the interests of private enterprise affected by federal public transportation programs by:

(1)    Encouraging private enterprise to participate in the planning of public transportation and programs that provide public transportation, to the extent permitted under 49 U.S.C. § 5306; and

(2)    Providing just compensation for the Project property it acquires, including the franchises of private providers of public transportation, as required under 49 U.S.C. § 5323(a)(1)(C).

(b)    *Infrastructure Investment*. The Recipient agrees to follow the infrastructure investment recommendations of:

(1)    Executive Order No. 12803, "Infrastructure Privatization," April 30, 1992, 31 U.S.C. § 501 note (57 Fed. Reg. 19,036); and

(2)    Executive Order No. 12893, "Principles for Federal Infrastructure Investments," January 26, 1994, 31 U.S.C. § 501 note (59 Fed. Reg. 4233).

(c)    *Joint Development*. If joint development is involved, the Recipient agrees to follow the latest edition of FTA Circular 7050.1, "Federal Transit Administration Guidance on Joint Development."

**Section 15.    Preference for United States Products and Services.**

Except as the Federal Government determines otherwise in writing, the Recipient agrees to comply with FTA's U.S. domestic preference requirements and follow federal guidance, including:

(a)    *Buy America*. The domestic preference procurement requirements of 49 U.S.C. § 5323(j), and FTA regulations, "Buy America Requirements," 49 CFR Part 661, to the extent consistent with 49 U.S.C. § 5323(j);

(b)    *Build America, Buy America Act*. Construction materials used in the Project are subject to the domestic preference requirement of the Build America, Buy America Act, Pub. L. 117-58, div. G, tit. IX, §§ 70911 – 70927 (2021), as implemented by the U.S. Office of Management and Budget's "Buy America Preferences for Infrastructure Projects," 2 CFR Part 184. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b). In accordance with 2 CFR § 184.2(a), the Recipient shall  apply the standards of 49 CFR Part 661 to iron, steel, and manufactured products.

(c)    *Cargo Preference–Use of United States-Flag Vessels*. At least 50 percent of any equipment, materials or commodities procured, contracted for or otherwise obtained with funds granted, guaranteed, loaned, or advanced by the U.S. Government under this agreement, and which may be transported by ocean vessel, shall be transported on privately owned United States-flag commercial vessels, if available. 46 U.S.C. § 55305, and U.S. Maritime Administration regulations, "Cargo Preference – U.S.-Flag Vessels," 46 CFR Part 381. Within 20 days following the date of loading for shipments originating within the United States or within 30 working days following the date of loading for shipments originating outside the United States, a legible copy of a rated, 'on-board' commercial ocean bill-of-lading in English for each shipment of cargo described in 46 CFR § 381.7(a)(1) shall be furnished to both the recipient (through the prime contractor in the case of subcontractor bills-of-lading) and to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, DC 20590.

(d)    *Fly America*. The air transportation requirements of Section 5 of the International Air Transportation Fair Competitive Practices Act of 1974, as amended, 49 U.S.C. § 40118, and U.S. General Services Administration (U.S. GSA) regulations, "Use of United States Flag Air Carriers," 41 C.F.R. §§ 301-10.131 – 301-10.143.

(e)    *Uniform Administrative Requirements*. Compliance with FTA's "Buy America Requirements," 49 CFR Part 661, and "Buy America Preferences for Infrastructure Projects," 2 CFR Part 184, as described in this Master Agreement shall be deemed to satisfy 2 CFR § 200.322, "Domestic Preferences for Procurements."

(f)    *Limitation on Certain Rolling Stock Procurements*. The Recipient will comply with the limitation on certain rolling stock procurements at 49 U.S.C. § 5323(u).

**Section 16.    Procurement.**

(a)    *Federal Laws, Regulations, Requirements, and Guidance*. The Recipient agrees:

    (1)    To comply with the requirements of 49 U.S.C. chapter 53 and other applicable federal laws, regulations, and requirements in effect now or later that affect its third party procurements;

    (2)    To comply with the applicable U.S. DOT Common Rules; and

    (3)    To follow the most recent edition and any revisions of FTA Circular 4220.1, "Third Party Contracting Guidance," to the extent consistent with applicable federal laws, regulations, requirements, and guidance.

(b)    *Full and Open Competition*. The Recipient agrees to conduct all its third party procurements using full and open competition as provided in 49 U.S.C. § 5325(a), and as determined by FTA.

(c)    *Exclusionary or Discriminatory Specifications*. The Recipient agrees that it will not use any federal assistance under 49 U.S.C. chapter 53 for any procurement based on exclusionary or discriminatory specifications, as provided in 49 U.S.C. § 5325(h), unless authorized by other applicable federal laws, regulations, or requirements.

(d)    *Required Clauses in Third Party Contracts*. In addition to other applicable provisions of federal law, regulations, requirements, and guidance, all third party contracts made by the Recipient under the Federal award must contain provisions covering the following, as applicable:

    (1)    *Simplified Acquisition Threshold*. Contracts for more than the simplified acquisition threshold, which is the inflation adjusted amount determined by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) as authorized by 41 U.S.C. § 1908, or otherwise set by law, must address administrative, contractual, or legal remedies in instances where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate. (Note that the simplified acquisition threshold determines the procurement procedures that must be employed pursuant to 2 C.F.R. §§ 200.317–200.327. The simplified acquisition threshold does not exempt a procurement from other eligibility or processes requirements that may apply. For example, Buy America's eligibility and process requirements apply to any procurement in excess of $150,000. 49 U.S.C. § 5323(j)(13).)

(2)     *Termination*. All contracts in excess of $10,000 must address termination for cause and for convenience by the non-federal entity including the manner by which it will be effected and the basis for settlement.

(3)     *Davis-Bacon Act, as amended (40 U.S.C. §§ 3141 – 3148)*. When required by federal program legislation, all prime construction contracts in excess of $2,000 awarded by non-federal entities must include a provision for compliance with the Davis-Bacon Act (40 U.S.C. §§ 3141 – 3144, and 3146 – 3148) as supplemented by Department of Labor regulations (29 CFR Part 5, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction"). In accordance with the statute, contractors must be required to pay wages to laborers and mechanics at a rate not less than the prevailing wages specified in a wage determination made by the Secretary of Labor. In addition, contractors must be required to pay wages not less than once a week. The non-federal entity must place a copy of the current prevailing wage determination issued by the Department of Labor in each solicitation. The decision to award a contract or subcontract must be conditioned upon the acceptance of the wage determination. The non-federal entity must report all suspected or reported violations to the federal awarding agency. The contracts must also include a provision for compliance with the Copeland "Anti-Kickback" Act (40 U.S.C. § 3145), as supplemented by Department of Labor regulations (29 CFR Part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"). The Act provides that each contractor or subrecipient must be prohibited from inducing, by any means, any person employed in the construction, completion, or repair of a public work, to give up any part of the compensation to which he or she is otherwise entitled. The non-federal entity must report all suspected or reported violations to the federal awarding agency.

(4)     *Contract Work Hours and Safety Standards Act (40 U.S.C. §§ 3701 – 3708)*. Where applicable, all contracts awarded by the non-federal entity in excess of $100,000 that involve the employment of mechanics or laborers must include a provision for compliance with 40 U.S.C. §§ 3702 and 3704, as supplemented by Department of Labor regulations (29 CFR Part 5). Under 40 U.S.C. § 3702 of the Act, each contractor must be required to compute the wages of every mechanic and laborer based on a standard work week of 40 hours. Work in excess of the standard work week is permissible provided that the worker is compensated at a rate of not less than one and a half times the basic rate of pay for all hours worked in excess of 40 hours in the work week. The requirements of 40 U.S.C. § 3704 are applicable to construction work and provide that no laborer or mechanic must be required to work in

surroundings or under working conditions which are unsanitary, hazardous or dangerous. These requirements do not apply to the purchases of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

(5)    *Rights to Inventions Made Under a Contract or Agreement*. If the federal award meets the definition of "funding agreement" under 37 C.F.R. § 401.2(a) and the recipient or subrecipient wishes to enter into a contract with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the recipient or subrecipient must comply with the requirements of 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any implementing regulations issued by the awarding agency.

(6)    *Clean Air Act (42 U.S.C. §§ 7401 – 7671q.) and the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 – 1388), as amended*. Contracts and subgrants of amounts in excess of $150,000 must contain a provision that requires the non-federal award to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. §§ 7401 – 7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. §§ 1251 – 1388). Violations must be reported to the Federal awarding agency and the Regional Office of the Environmental Protection Agency (EPA).

(7)    *Debarment and Suspension (Executive Orders 12549 and 12689)*. A covered transaction (see 2 C.F.R. §§ 180.220 and 1200.220) must not be entered into with any party listed on the governmentwide exclusions in the System for Award Management (SAM), in accordance with the OMB guidelines at 2 C.F.R. 180 that implement Executive Orders 12549 (31 U.S.C. § 6101 note, 51 Fed. Reg. 6370,) and 12689 (31 U.S.C. § 6101 note, 54 Fed. Reg. 34131), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549. The Recipient agrees to include, and require each Third Party Participant to include, a similar provision in each lower tier covered transaction, ensuring that each lower tier Third Party Participant:

(1) Complies with federal debarment and suspension requirements; and

(2) Reviews the SAM at https://www.sam.gov, if necessary to comply with U.S. DOT regulations, 2 CFR Part 1200.

(8) *Restrictions on Lobbying (31 U.S.C. § 1352)*. Contractors that apply or bid for an award exceeding $100,000 must file the certification required by 49 CFR Part 20. Each tier certifies to the tier above that it will not and has not used federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any federal contract, grant or any other award covered by 31 U.S.C. § 1352. Each tier must also disclose any lobbying with non-federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non-federal award.

(9) *Solid Wastes*. A Recipient that is a state agency or agency of a political subdivision of a state and its contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

(e) *Geographic Restrictions*. The Recipient agrees that it will not use any state or local geographic preference, except as permitted by federal law (for example, Section 25019 of the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58), regulation, requirement, or guidance.

(f) *In-State Bus Dealer Restrictions*. The Recipient agrees that any state law requiring buses to be purchased through in-state dealers will not apply to purchases of vehicles supported with federal assistance appropriated or made available for 49 U.S.C. chapter 53, as provided in 49 U.S.C. § 5325(i).

(g) *Organizational Conflict of Interest*. The Recipient agrees that it will not enter into a procurement that involves a real or apparent organizational conflict of interest.

(h) *Project Labor Agreements*. As a condition of a third party contract award, the Recipient may require the Third Party Contractor or Subcontractor to have an

affiliation with a labor organization, such as a Project Labor Agreement, consistent with Executive Order No. 13502, "Use of Project Labor Agreements for Federal Construction Projects," February 6, 2009 (74 Fed. Reg. 6985).

(i) *Force Account.* The Recipient agrees that FTA may determine the extent to which Federal assistance may be used to participate in force account costs.

(j) *FTA Technical Review.* The Recipient agrees that FTA may review and approve the Recipient's technical specifications and requirements to the extent FTA believes necessary to ensure proper administration of the Underlying Agreement.

(k) *Relationship of the Award to Third Party Contract Approval.* The Recipient agrees that the terms of the Underlying Agreement do not, by themselves, constitute approval of any non- competitive third party contract associated with the Award, unless FTA indicates otherwise in writing.

(l) *National Intelligent Transportation Systems Architecture and Standards.* The Recipient agrees to conform to the National Intelligent Transportation Systems (ITS) Architecture requirements of 23 U.S.C. § 517(d), unless it obtains an exemption from those requirements, and to follow FTA Notice, "FTA National ITS Architecture Policy on Transit Projects," 66 Fed. Reg. 1455, January 8, 2001, and all other applicable federal guidance.

(m) *Rolling Stock.* The Recipient agrees that any procurement for rolling stock will comply with 49 U.S.C. § 5325 (Contract Requirements), 49 U.S.C. § 5323(j) (Buy America Requirements), 49 U.S.C. § 5323(m) (Pre-Award and Post Delivery Requirements), and 49 U.S.C. § 5318(e) (Bus Testing Requirements), 49 U.S.C. § 5323(u) (limitation on certain rolling stock procurements), and their implementing regulations.

(n) *Bonding.* The Recipient agrees to comply with the following bonding requirements and restrictions as provided in federal regulations and guidance:

   (1) *Construction.* As provided in federal regulations and modified by FTA guidance, for each Project or related activities implementing the Underlying Agreement that involve construction, it will provide bid guarantee bonds, contract performance bonds, and payment bonds.

   (2) *Activities Not Involving Construction.* For each Project or related activities implementing the Underlying Agreement not involving construction, the Recipient will not impose excessive bonding and will follow FTA guidance.

(o) *Architectural Engineering and Related Services.* When procuring architectural engineering or related services supported with federal assistance appropriated or

made available for 49 U.S.C. chapter 53 or provided in any other law requiring the Award to be administered under 49 U.S.C. chapter 53, the Recipient agrees to comply and assures that each of its Subrecipients will comply with 49 U.S.C. § 5325(b).

(p)   *Design-Build Projects*. As provided in 49 U.S.C. § 5325(d), the Recipient may use a design- build procurement to carry out its Design-Build Project, provided that it complies with applicable federal laws, regulations, and requirements, and follows federal guidance.

(q)   *Award to Other than the Lowest Bidder*. As permitted under 49 U.S.C. § 5325(c), the Recipient may award a third party contract to other than the lowest bidder, if that award furthers an objective (for example, improved long-term operating efficiency and lower long- term costs) consistent with the purposes of 49 U.S.C. chapter 53 and any implementing federal regulations, requirements, or guidance that FTA may issue.

(r)   *Award to Responsible Third Party Contractors*. The Recipient agrees to award third party contracts only to contractors able to carry out the procurement successfully, as provided in 49 U.S.C. § 5325(j), and before awarding a third party contract, it will consider the proposed contractor's integrity, compliance with public policy, past performance, and financial and technical resources.

(s)   *Access to Third Party Contract Records*. The Recipient agrees to require, and assures that each of its Subrecipients will require, its Third Party Contractors at each tier to provide:

(1)   The U.S. Secretary of Transportation and the Comptroller General of the United States, the state, or their duly authorized representatives, access to all third party contract records (at any tier) as required under 49 U.S.C. § 5325(g); and

(2)   Sufficient access to all third party contract records (at any tier) as needed for compliance with applicable federal laws, regulations, and requirements or to assure proper management of Underlying Agreement as determined by FTA.

(t)   *Electronic and Information Technology*. The Recipient agrees that reports or information it provides to or on behalf of the Federal Government will use electronic or information technology that complies with the accessibility requirements of Section 508 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794d, and U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194.

(u)     *Veterans Preference*. As provided in 49 U.S.C. § 5325(k), to the extent practicable, the Recipient agrees and assures that each of its Subrecipients:

    (1)     Will give a hiring preference to veterans, as defined in 5 U.S.C. § 2108, who have the skills and abilities required to perform construction work required under a third party contract in connection with a Capital Project supported with federal assistance appropriated or made available for 49 U.S.C. chapter 53; and

    (2)     Will not require an employer to give a preference to any veteran over any equally qualified applicant who is a member of any racial or ethnic minority, female, an individual with a disability, or a former employee.

(v)     *Acquisition by Lease*. The Recipient agrees that if it intends to acquire Project property through a lease it will comply, as applicable, with 49 U.S.C. chapter 53 and section 3019 of the FAST Act.

(w)     *Bid Protests*. The Recipient agrees to provide FTA, as part of the annual or quarterly Milestone Progress Report, with a list of all bid protests and appeals for solicitations or contracts in excess of $500,000. The Recipient also should be mindful of the requirement in Section 39, Disputes, that the Recipient must promptly notify the FTA Chief Counsel, or FTA Regional Counsel for the Region in which the Recipient is located, of significant current or prospective legal matters that may affect the Federal Government.

## Section 17.    Patent Rights.

(a)     *General*. The Recipient agrees that:

    (1)     Depending on the nature of the Underlying Agreement, the Federal Government may acquire patent rights when the Recipient or Third Party Participant produces a patented or patentable invention, improvement, or discovery;

    (2)     The Federal Government's rights arise when the patent or patentable information is conceived or reduced to practice with federal assistance provided through the Underlying Agreement; or

    (3)     When a patent is issued or patented information becomes available as described in the preceding section 17(a)(2) of this Master Agreement, the Recipient will notify FTA immediately and provide a detailed report satisfactory to FTA.

(b)     *Federal Rights*. The Recipient agrees that:

(1)    Its rights and responsibilities and each Third Party Participant's rights and responsibilities in that federally assisted invention, improvement, or discovery will be determined as provided in applicable federal laws, regulations, requirements, and guidance, including any waiver thereof; and

(2)    Unless the Federal Government determines otherwise in writing, irrespective of its status or the status of any Third Party Participant as a large business, small business, state government, state instrumentality, local government, Indian tribe, nonprofit organization, institution of higher education, or individual, the Recipient will transmit the Federal Government's patent rights to FTA, as specified in 35 U.S.C. § 200, et seq., and U.S. Department of Commerce regulations, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," 37 CFR Part 401.

(c)    *License Fees and Royalties*. Consistent with the applicable U.S. DOT Common Rules, the Recipient agrees that license fees and royalties for patents, patent applications, and inventions produced with federal assistance provided through the Underlying Agreement are program income, and must be used in compliance with applicable federal requirements.

## Section 18.    Rights in Data and Copyrights.

(a)    *Definition of "Subject Data."* As used in this section, "subject data" means recorded information, whether or not copyrighted, that is delivered or specified to be delivered as required by the Underlying Agreement. Examples of subject data include, but are not limited to computer software, standards, specifications, engineering drawings and associated lists, process sheets, manuals, technical reports, catalog item identifications, and related information, but do not include financial reports, cost analyses, or other similar information used for performance or administration of the Underlying Agreement.

(b)    *General Federal Restrictions*. The following restrictions apply to all subject data first produced in the performance of the Underlying Agreement:

(1)    *Prohibitions*. The Recipient may not publish or reproduce any subject data, in whole, in part, or in any manner or form, or permit others to do so.

(2)    *Exceptions*. The prohibitions do not apply to publications or reproductions for the Recipient's own internal use, an institution of higher learning, the portion of subject data that the Federal Government has previously released or approved for release to the public, or the portion of data that has the Federal Government's prior written consent for release.

(c)     *Federal Rights in Data and Copyrights*. The Recipient agrees that:

    (1)     *General*. It must provide a license to its subject data to the Federal Government that is royalty-free, non-exclusive, and irrevocable. The Federal Government's license must permit the Federal Government to reproduce, publish, or otherwise use the subject data or permit other entities or individuals to use the subject data provided those actions are taken for Federal Government purposes; and

    (2)     *U.S. DOT Public Access Plan – Copyright License*. The Recipient grants to U.S. DOT a worldwide, non-exclusive, non-transferable, paid-up, royalty-free copyright license, including all rights under copyright, to any and all Publications and Digital Data Sets as such terms are defined in the U.S. DOT Public Access plan, resulting from scientific research funded either fully or partially by this funding agreement. The Recipient herein acknowledges that the above copyright license grant is first in time to any and all other grants of a copyright license to such Publications and/or Digital Data Sets, and that U.S. DOT shall have priority over any other claim of exclusive copyright to the same.

(d)     *Special Federal Rights in Data for Research, Development, Demonstration, Deployment, Technical Assistance, and Special Studies Programs*. In general, FTA's purpose in providing federal assistance for a research, development, demonstration, deployment, technical assistance, or special studies program is to increase transportation knowledge, rather than limit the benefits of the Award to the Recipient and its Third Party Participants. Therefore, the Recipient agrees that:

    (1)     *Publicly Available Report*. When an Award providing federal assistance for any of the programs described above is completed, it must provide a report of the Underlying Agreement that FTA may publish or make available for publication on the Internet.

    (2)     *Other Reports*. It must provide other reports related to the Award that FTA may request.

    (3)     *Availability of Subject Data*. FTA may make available its copyright license to the subject data, and a copy of the subject data to any FTA Recipient or any Third Party Participant at any tier, except as the Federal Government determines otherwise in writing.

    (4)     *Identification of Information*. It must identify clearly any specific confidential, privileged, or proprietary information submitted to FTA.

(5)    *Incomplete*. If the Award is not completed for any reason whatsoever, all data developed with federal assistance for the Award becomes subject data and must be delivered as the Federal Government may direct.

(6)    *Exception*. This section does not apply to an adaptation of any automatic data processing equipment or program that is both for the Recipient's use, and acquired with FTA capital program assistance.

(e)    *License Fees and Royalties*. Consistent with the applicable U.S. DOT Common Rules, the Recipient agrees that license fees and royalties for patents, patent applications, and inventions produced with federal assistance provided through the Underlying Agreement are program income, and must be used in compliance with federal applicable requirements.

(f)    *Hold Harmless*. Upon request by the Federal Government, the Recipient agrees that if it intentionally violates any proprietary rights, copyrights, or right of privacy, and if its violation under the preceding section occurs from any of the publication, translation, reproduction, delivery, use or disposition of subject data, then it will indemnify, save, and hold harmless the Federal Government against any liability, including costs and expenses of the Federal Government's officers, employees, and agents acting within the scope of their official duties. The Recipient will not be required to indemnify the Federal Government for any liability described in the preceding sentence, if the violation is caused by the wrongful acts of federal officers, employees or agents, or if indemnification is prohibited or limited by applicable state law.

(g)    *Restrictions on Access to Patent Rights*. Nothing in this section of this Master Agreement pertaining to rights in data either implies a license to the Federal Government under any patent, or may be construed to affect the scope of any license or other right otherwise granted to the Federal Government under any patent.

(h)    *Data Developed Without Federal Assistance or Support*. The Recipient agrees that in certain circumstances it may need to provide to FTA data developed without any federal assistance or support. Nevertheless, this section generally does not apply to data developed without federal assistance, even though that data may have been used in connection with the Award. The Recipient agrees that the Federal Government will not be able to protect data developed without federal assistance from unauthorized disclosure unless that data is clearly marked "Proprietary," or "Confidential."

(i)    *Requirements to Release Data*. The Recipient understands and agrees that the Federal Government may be required to release data and information that the Recipient submits to the Federal Government as required under:

71

(1)     The Freedom of Information Act (FOIA), 5 U.S.C. § 552;

(2)     The U.S. DOT Common Rules;

(3)     The U.S. DOT Public Access Plan, which provides that the Recipient agrees to satisfy the reporting and compliance requirements as set forth in the U.S. DOT Public Access plan, including, but not limited to, the submission and approval of a Data Management Plan, the use of Open Researcher and Contributor ID (ORCID) numbers, the creation and maintenance of a Research Project record in the Transportation Research Board's (TRB) Research in Progress (RiP) database, and the timely and complete submission of all required publications and associated digital data sets as such terms are defined in the DOT Public Access plan. Additional information about how to comply with the requirements can be found at http://ntl.bts.gov/publicaccess/howtocomply.html; or

(4)     Other federal laws, regulations, requirements, and guidance concerning access to records pertaining to the Award, the accompanying Underlying Agreement, and any Amendments thereto.

**Section 19.    Use of Real Property, Equipment, and Supplies.**

(a)     *Federal Interest*. The Recipient agrees that the Federal Government retains a federal interest in all real property, equipment, and supplies acquired or improved for use in connection with a Project (Project property) until, and to the extent that, the Federal Government removes its federal interest.

(b)     *FTA Requirements and Guidance for Use of Project Property*. The Recipient agrees that:

(1)     *Satisfactory Continuing Control*. It will maintain continuing control of the use of its Project property as satisfactory to FTA, which is defined as the legal assurance that Project property will remain available to be used for its originally authorized purpose throughout its useful life or until disposition.

(2)     *Appropriate Use*. It will use its Project property for appropriate purposes (including joint development purposes as well as uses that provide program income to support public transportation) for the duration of the useful life of its Project property, which may extend beyond the duration of the Award, and consistent with other requirements FTA may impose.

(3)     *Delay or Failure to Use Project Property*. The Federal Government may require it to return the entire amount of federal assistance spent on its Project

72

property if, during the useful life of its Project property, it has unreasonably delayed using its Project property, or failed to use its Project property.

(4)     *Notification*. It will notify FTA immediately when it uses any of its Project property in a manner substantially different from the representations in its Application or other documents submitted in support of the Award, or the requirements of the accompanying Underlying Agreement, or it withdraws any of its Project property from appropriate use.

(5)     *FTA Guidance*. It will consult FTA guidance through its circulars or other written documents for ways in which FTA property requirements should be implemented. FTA guidance will apply unless FTA determines otherwise in writing.

(c)     *General Federal Requirements*. The Recipient agrees to comply with the applicable U.S. DOT property management provisions as provided in the U.S. DOT Common Rules and this Master Agreement. The Recipient also agrees to follow FTA's reimbursement provisions pertaining to premature dispositions of certain equipment, as provided in this Master Agreement and FTA guidance.

(d)     *Maintenance*. As provided in federal laws, regulations, requirements, and guidance, the Recipient agrees to maintain its Project property in good operating order, and comply with FTA regulations, "Transit Asset Management" and "National Transit Database," 49 CFR Parts 625 and 630.

(e)     *Property Records*. The Recipient agrees to keep satisfactory records of its use of its Project property, and, upon request, it will provide FTA the necessary information required to assure compliance with this Master Agreement.

(f)     *Incidental Use*.

(1)     The Recipient agrees that any incidental use of Project property will not exceed what is permitted under applicable federal requirements and federal guidance.

(2)     As provided in 49 U.S.C. § 5323(p), it may permit nontransit public entities and private entities to have incidental use of its federally assisted alternative fueling facilities and equipment, only if:

(i)     The incidental use does not interfere with public transportation operations or violate the provisions of the Underlying Agreement and any Amendments thereto;

      (ii)     It fully recaptures all the costs related to the incidental use from any nontransit public entity or private entity that uses the alternative fueling facilities or equipment;

      (iii)    It uses revenues it receives from the incidental use in excess of costs for planning, capital, and operating expenses that are incurred in providing public transportation; and

      (iv)    Private entities pay all applicable excise taxes on fuel.

(g)    *Reasonable Access for Private Intercity or Charter Transportation Operators*. The Recipient agrees to comply with 49 U.S.C. § 5323(r), and may not deny reasonable access for a private intercity or charter transportation operator to federally funded public transportation facilities, including intermodal facilities, park and ride lots, and bus-only highway lanes. In determining reasonable access, capacity requirements of the Recipient and the extent to which access would be detrimental to existing public transportation services must be considered.

(h)    *Encumbrance of Project Property*. Absent the express consent of the Federal Government in writing, the Recipient agrees to preserve the federal interest in its Project property, and to maintain satisfactory continuing control of its Project property as follows:

    (1)    *Written Transactions*. The Recipient agrees that it will not execute any documents that would either adversely affect the federal interest in or impair its continuing control of the use of its Project property including, but not limited to, lease, transfer of title, lien, pledge, mortgage, encumbrance, third party contract, subagreement, grant anticipation note, alienation, innovative finance arrangements, such as a cross-border or leveraged lease, or other types of innovative financing arrangements, or any restriction, constraint, or commitment that may apply to the Project property. Upon request, the Recipient will provide a copy of any document described above to FTA.

    (2)    *Oral Transactions*. The Recipient agrees it will not obligate itself in any way through an oral statement to any third party with respect to its Project property that would either adversely affect the federal interest in or impair its continuing control of the use of its Project property.

    (3)    *Other Actions*. The Recipient agrees that it will not take any other action that would either adversely affect the federal interest in or impair its continuing control of the use of its Project property.

(i)    *Useful Life of Project Property*. The Recipient agrees that:

(1)     *Determining the Useful Life*. FTA may establish the useful life of Project property;

(2)     *Required Use*. It will use its Project property continuously and appropriately throughout the useful life of that property;

(3)     *Expired Useful Life*. When the useful life of its Project property has expired, it will comply with FTA's disposition requirements; and

(4)     *Premature Withdrawal*. The Federal Government retains a federal interest in the fair market value of Project property or remaining useful life in Project property calculated based on straight line depreciation (including Project equipment acquired by a state). Therefore, if the Recipient withdraws that property from public transportation use prematurely, it will notify FTA immediately when any of its Project property is prematurely withdrawn from appropriate use, whether by planned withdrawal, misuse, or casualty loss.

    (i)     *Amount of Federal Interest*. The federal interest in the Recipient's or any of its Subrecipients' Project property will be determined based on the ratio of the federal assistance provided for that property to the actual cost of that property.

    (ii)     *Financial Commitments to the Federal Government*. Except as otherwise approved in writing by the Federal Government, the Recipient agrees that if its Project property is prematurely withdrawn from appropriate use:

        (A)     It will return an amount equal to the remaining federal interest in the withdrawn property to the Federal Government; or

        (B)     With FTA approval, it will invest an amount equal to the remaining federal interest in the withdrawn property in other transit property eligible for federal assistance provided through the Underlying Agreement.

(j)     *Calculating the Value of Prematurely Withdrawn Project Property*. The Recipient agrees that the fair market value of Project property prematurely withdrawn from use in support of the Award (including the fair market value of project equipment acquired or improved by a state) will be calculated as follows:

(1)     *Equipment and Supplies*. The fair market value of project equipment or supplies will be calculated by straight-line depreciation, based on the useful life of that equipment or supplies as established or approved by FTA. The fair market value of the Project equipment and supplies withdrawn from

proper use will be based on the value of that property immediately before it was withdrawn from appropriate use irrespective of whether the Project property was withdrawn from use due to fire, casualty, or natural disaster, and irrespective of the extent of insurance coverage.

(2)   *Real Property*. The Recipient agrees that the fair market value of Project real property shall be determined by:

(i)    Competent appraisal based on an appropriate date as approved by FTA, consistent with U.S. DOT regulations, "Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally-Assisted Programs," 49 CFR Part 24;

(ii)   Straight line depreciation of improvements to the Project real property coupled with the value of the land determined by FTA based on appraisal; or

(iii)  Other applicable federal laws, regulations, and requirements.

(3)   *Exceptional Circumstances*. The Recipient agrees that the Federal Government may require another method of valuation to be used to determine the fair market value of Project real property withdrawn from service. In unusual circumstances, the Recipient may request permission to use another reasonable valuation method including, but not limited to accelerated depreciation, comparable sales, or established market values.

(k)   *Insurance Proceeds*. The Recipient agrees to use any insurance proceeds it receives for Project property that has been damaged or destroyed (including insurance proceeds for Project equipment acquired or improved by a state) as follows:

(1)   *Replacement*. It may apply those insurance proceeds to the cost of replacing that damaged or destroyed property;

(2)   *Another Purpose*. It may use those insurance proceeds for another authorized purpose, provided that it has obtained FTA's consent in writing; or

(3)   *Return to the Federal Government*. It may return to the Federal Government an amount equal to the amount of the remaining federal interest in that property that has been damaged or destroyed.

(l)   *Misused or Damaged Project Property*. If any damage to Project property results from abuse or misuse occurring with the Recipient's knowledge and consent, the Recipient agrees to restore the Project property that has been damaged to its original condition, or refund the value of the federal interest in its Project property (including

the remaining federal interest in Project equipment acquired by a state), as the Federal Government may require.

(m)   *Disposition of Project Property*. The Recipient agrees that disposition of its Project property may be made as provided in FTA's enabling legislation, 49 U.S.C. § 5334(h), U.S. DOT Common Rules, and the most recent edition of FTA Circular 5010.1, to the extent consistent with applicable federal laws, regulations, requirements, and guidance. The Recipient understands and agrees that under certain circumstances, the Recipient must obtain disposition instructions from FTA before disposing of Project property, including real property, equipment including rolling stock, and supplies. Disposition performed under any authority is subject to 49 U.S.C. § 5334(h)(4)(B) ("Reimbursement").

(n)   *Responsibilities After Closeout*. The Recipient agrees that closeout of the Award will not change the Recipient's property management responsibilities for its Project property as provided in federal laws, regulations, requirements, and guidance effective now or at a later date, and this section of this Master Agreement.

## Section 20.   Transit Asset Management.

(a)   *Transit Asset Management Plan*. The Recipient agrees to develop a Transit Asset Management Plan that complies with federal transit laws, specifically 49 U.S.C. § 5326, FTA regulations, "Transit Asset Management," 49 CFR Part 625, and "National Transit Database," 49 CFR Part 630, and other applicable federal laws, regulations, and requirements.

(b)   *When Compliance is Required*. The Recipient agrees to, and assures that each Third Party Participant will, comply with FTA regulations, "Transit Asset Management; National Transit Database," 49 CFR Parts 625 and 630, and follow applicable federal guidance.

## Section 21.   Insurance.

(a)   *Flood Insurance*. The Recipient agrees and assures that its Third Party Participants will agree to comply with flood insurance laws and guidance as follows:

(1)   It will have flood insurance as required by the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4012a(a), for any building located in a special flood hazard area (100-year flood zone), before accessing federal assistance to acquire, construct, reconstruct, repair, or improve that building.

(2)   Each such building and its contents will be covered by flood insurance in an amount at least equal to the federal investment (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular

type of property under the National Flood Insurance Act of 1968, 42 U.S.C. § 4001, et seq., whichever is less.

(3)     It will follow FTA guidance, except to the extent FTA determines otherwise in writing.

(b)     *Other Insurance Requirements*. It will comply with the insurance requirements normally imposed by its state and local laws, regulations, and ordinances.

## Section 22.     Relocation and Real Property.

(a)     *Relocation Protections*. Irrespective of whether federal assistance is used to pay relocation costs required under federal laws, regulations, or requirements, the Recipient agrees to:

(1)     Provide fair and equitable treatment to displaced individuals and businesses that must be relocated as a result of any Project for which the FTA has provided federal assistance; and

(2)     Comply with federal transit laws, specifically 49 U.S.C. § 5323(b), which requires compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 U.S.C. § 4601, et seq., and U.S. DOT regulations, "Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs," 49 CFR Part 24.

(b)     *Nondiscrimination in Housing*. The Recipient agrees that when it must provide housing for individuals as a result of relocation, it will comply with Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act), 42 U.S.C. § 3601, et seq., and facilitate and follow Executive Order No. 12892, "Leadership and Coordination of Fair Housing in Federal Programs: Affirmatively Furthering Fair Housing," January 17, 1994, 42 U.S.C. § 3608 note, (59 Fed. Reg. 2939), except as the Federal Government determines otherwise in writing.

(c)     *Prohibition Against the Use of Lead-Based Paint*. The Recipient agrees that if it constructs or rehabilitates residential structures on behalf of individuals displaced by its any Project, it will not use lead-based paint, and it will comply with Section 401(b) of the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4831(b), and U.S. Housing and Urban Development regulations, "Lead-based Paint Poisoning Prevention in Certain Residential Structures," 24 CFR Part 35.

(d)     *Real Property Acquisition Protections*. Irrespective of whether federal assistance is used to pay real property acquisition costs required to implement the Award, the Recipient agrees to provide fair and equitable treatment to owners of real property or

interests in real property that must be acquired as a result of any Project, and comply with federal transit laws, specifically 49 U.S.C. § 5323(b), which requires compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 U.S.C. § 4601, et seq., and U.S. DOT regulations, "Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally-Assisted Programs," 49 CFR Part 24.

(e)    *Covenant Against Discrimination*. The Recipient agrees to include a covenant in the title of the real property acquired for use in any Project that assures nondiscrimination during the useful life of that real property.

(f)    *Recording the Title to Real Property*. The Recipient agrees to record the federal interest in the title to real property used in connection with any Project if FTA so requires.

(g)    *FTA Approval of Changes in Real Property Ownership*. Unless it receives permission or instructions from FTA, the Recipient agrees that it will not dispose of, modify the use of, or change the title to real property used in any Project, or any other interests in the site and facilities used in any Project.

**Section 23.    Construction.**

(a)    *Construction Plans and Specifications*. The Recipient agrees to comply with all applicable statutes, regulations, and requirements, and follow FTA guidance in the development and implementation of construction plans and specifications, including drafting, review, and approval, for the Award.

(b)    *Seismic Safety*. The Recipient agrees to comply with the Earthquake Hazards Reduction Act of 1977, as amended, 42 U.S.C. § 7701, et seq., and U.S. DOT regulations, "Seismic Safety," 49 CFR Part 41, specifically, 49 C.F.R. § 41.117.

(c)    *Supervision of Construction*. The Recipient agrees to maintain competent and adequate engineering supervision at the construction site of any Project to ensure that the completed work conforms to the approved plans and specifications.

(d)    *Construction Reports*. For any Project or related activities involving construction, the Recipient agrees to provide progress reports and other relevant information or data, as required by FTA or the state in which construction takes place.

(e)    *Major Capital Investment Projects*. If the Recipient's Project involves a Major Federal Project, it agrees to comply with all applicable federal regulations, including FTA regulations, "Major Capital Investment Projects,"49 CFR Part 611, and "Project Management Oversight," 49 CFR Part 633, to the extent that they are

consistent with applicable federal legislation, regulations, and requirements, and follow all applicable federal guidance.

**Section 24.    Employee Protections.**

(a)    *Awards Involving Construction.* The Recipient agrees to comply and assures that each Third Party Participant will comply with all federal laws, regulations, and requirements providing protections for construction employees involved in each Project or related activities with federal assistance provided through the Underlying Agreement, including the:

  (1)    Prevailing Wage Requirements of:

    (i)    Federal transit laws, specifically 49 U.S.C. § 5333(a), (FTA's "Davis-Bacon Related Act");

    (ii)    The Davis-Bacon Act, 40 U.S.C. §§ 3141 – 3144, 3146, and 3147; and

    (iii)    U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 CFR Part 5.

  (2)    Wage and Hour Requirements of:

    (i)    Section 102 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. § 3702, and other relevant parts of that Act, 40 U.S.C. § 3701, et seq.; and

    (ii)    U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 CFR Part 5.

  (3)    "Anti-Kickback" Prohibitions of:

    (i)    Section 1 of the Copeland "Anti-Kickback" Act, as amended, 18 U.S.C. § 874;

    (ii)    Section 2 of the Copeland "Anti-Kickback" Act, as amended, 40 U.S.C. § 3145; and

(iii)　U.S. DOL regulations, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States," 29 CFR Part 3.

(4)　Construction Site Safety of:

(i)　Section 107 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. § 3704, and other relevant parts of that Act, 40 U.S.C. § 3701, et seq.; and

(ii)　U.S. DOL regulations, "Recording and Reporting Occupational Injuries and Illnesses," 29 CFR Part 1904; "Occupational Safety and Health Standards," 29 CFR Part 1910; and "Safety and Health Regulations for Construction," 29 CFR Part 1926.

(b)　*Awards Not Involving Construction*. The Recipient agrees to comply and assures that each Third Party Participant will comply with all federal laws, regulations, and requirements providing wage and hour protections for nonconstruction employees, including Section 102 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. § 3702, and other relevant parts of that Act, 40 U.S.C. § 3701, et seq., and U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 CFR Part 5.

(c)　*Awards Involving Commerce*. The Recipient agrees to comply and assures that each Third Party Participant will comply with the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq. to the extent that the FLSA applies to employees performing work with federal assistance provided through the Underlying Agreement involving commerce, and as the Federal Government otherwise determines applicable.

(d)　*Public Transportation Employee Protective Arrangements*. As a condition of award of federal assistance appropriated or made available for FTA programs involving public transportation operations, the Recipient agrees to comply and assures that each Third Party Participant will comply with the following employee protective arrangements of 49 U.S.C. § 5333(b):

(1)　*U.S. DOL Certification*. When its Award, the accompanying Underlying Agreement, or any Amendments thereto involve public transportation operations and are supported with federal assistance appropriated or made available for 49 U.S.C. §§ 5307 – 5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, 5338(b), or 5339, or former 49 U.S.C. §§ 5308, 5309, 5312, or other provisions of law as required by the Federal Government, U.S. DOL must provide a certification of employee protective arrangements

before FTA may provide federal assistance for that Award. The Recipient agrees that the certification issued by U.S. DOL is a condition of the Underlying Agreement and that the Recipient must comply with its terms and conditions.

(2) *Special Warranty*. When its Underlying Agreement involves public transportation operations and is supported with federal assistance appropriated or made available for 49 U.S.C. § 5311, U.S. DOL will provide a Special Warranty for its Award, including its Award of federal assistance under the Tribal Transit Program. The Recipient agrees that its U.S. DOL Special Warranty is a condition of the Underlying Agreement and the Recipient must comply with its terms and conditions.

(3) *Special Arrangements for Underlying Agreements for Federal Assistance Authorized under 49 U.S.C. § 5310*. The Recipient agrees, and assures that any Third Party Participant providing public transportation operations will agree, that although pursuant to 49 U.S.C. § 5310, and former 49 U.S.C. §§ 5310 or 5317, FTA has determined that it was not "necessary or appropriate" to apply the conditions of 49 U.S.C. § 5333(b) to any Subrecipient participating in the program to provide public transportation for seniors (elderly individuals) and individuals with disabilities, FTA reserves the right to make case-by-case determinations of the applicability of 49 U.S.C. § 5333(b) for all transfers of funding authorized under title 23, United States Code (flex funds), and make other exceptions as it deems appropriate.

## Section 25.    Early Systems Work Agreement.

(a) *Statutory Requirements*. If FTA enters into an Early System Work Agreement (ESWA) with the Recipient to advance the implementation of the Recipient's Capital Project, the Recipient agrees that the provisions of 49 U.S.C. § 5309(k)(3) will apply to that ESWA, the Recipient, and FTA.

(b) *ESWA Provisions*. Except to the extent that the Federal Government determines otherwise in writing, the Recipient understands and agrees that the following provisions apply to its ESWA, unless the ESWA contains specific requirements to the contrary:

(1) *Recipient Representations*. In view of the standards and commitments imposed on the Recipient by 49 U.S.C. § 5309(k)(3), the Recipient has provided sufficient representations and information to FTA so that FTA has reason to believe the following:

<div style="margin-left:2em">

(i) FTA and the Recipient will enter into a Full Funding Grant Agreement for the Project; and

(ii) The terms of the ESWA will promote the ultimate completion of the Project more rapidly and at less cost.

</div>

(2) *FTA Commitments*. By entering into an ESWA with the Recipient, FTA has agreed to provide for reimbursement of the preliminary costs of carrying out the Project, including:

<div style="margin-left:2em">

(i) Land acquisition;

(ii) Timely procurement of system elements for which the specifications are decided; and

(iii) Other activities that FTA decides are appropriate to make efficient, long-term Project management easier.

</div>

(3) *Time Period of the ESWA*. FTA reserves the right to determine the period of time in which the ESWA will remain in effect, even if that period extends beyond the time of the authorization of federal funding that will support the Project costs covered by the ESWA.

(4) *Interest and Other Financing Costs*. Interest and other financing costs of carrying out the ESWA efficiently and within a reasonable time are eligible ESWA costs, provided that:

<div style="margin-left:2em">

(i) The interest and financing costs claimed do not exceed the cost of the most favorable financing terms reasonably available for the Project at the time of borrowing;

(ii) The Recipient has certified that it will show reasonable diligence in seeking the most favorable financing terms; and

(iii) The Recipient is able to show reasonable diligence in seeking the most favorable financing terms to support this ESWA.

</div>

(5) *Contingent Commitment*. In providing funding for the ESWA:

<div style="margin-left:2em">

(i) In its discretion, FTA may include a commitment, contingent on amounts made available under a later-enacted law, to obligate an additional amount from future available budget authority to support the costs of the Recipient's ESWA; and

</div>

      (ii)     If FTA does make a commitment to provide funding contingent on future amounts to be specified in law, that commitment is not an obligation of the Federal Government.

(6)     *Failure to Carry Out the Project*. If, for reasons within its control, the Recipient does not carry out the Project for which its ESWA was made available by FTA, the Recipient must:

      (i)     Repay all Federal Grant funds awarded under the ESWA from all Federal funding sources for all Project activities, facilities, and equipment; and

      (ii)     Pay reasonable interest and penalty charges:

          (A)     As established by FTA before or after FTA provided funding for the ESWA; or

          (B)     Allowable under law.

### Section 26.    Environmental Protections.

(a)     *General*. The Recipient agrees to, and assures that its Third Party Participants will, comply with all applicable environmental and resource use laws, regulations, and requirements, and follow applicable guidance, now in effect or that may become effective in the future, including state and local laws, ordinances, regulations, and requirements and follow applicable guidance.

(b)     *National Environmental Policy Act*. An Award of federal assistance requires the full compliance with applicable environmental laws, regulations, and requirements. Accordingly, the Recipient agrees to, and assures that its Third Party Participants will:

(1)     Comply and facilitate compliance with federal laws, regulations, and requirements, including, but not limited to:

      (i)     Federal transit laws, such as 49 U.S.C. § 5323(c)(2), and 23 U.S.C. § 139;

      (ii)     The National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C. §§ 4321, et seq., as limited by 42 U.S.C. § 5159, and CEQ's implementing regulations 40 CFR Part 1500 – 1508;

      (iii)     Joint FHWA and FTA regulations, "Environmental Impact and Related Procedures," 23 CFR Part 771 and 49 CFR Part 622;

      (iv)    Executive Order No. 11514, as amended, "Protection and Enhancement of Environmental Quality," March 5, 1970, 42 U.S.C. § 4321 note (35 Fed. Reg. 4247); and

      (v)    Other federal environmental protection laws, regulations, and requirements applicable to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(2)    Follow the federal guidance identified herein to the extent that the guidance is consistent with applicable authorizing legislation:

      (i)    Joint FHWA and FTA final guidance, "Interim Guidance on MAP-21 Section 1319, Accelerated Decisionmaking in Environmental Reviews," January 14, 2013;

      (ii)    Joint FHWA and FTA final guidance, "SAFETEA-LU Environmental Review Process (Public Law 109-59)," 71 Fed. Reg. 66576, November 15, 2006; and

      (iii)    Other federal environmental guidance applicable to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(c)    *Other Environmental Federal Laws*. The Recipient agrees to comply or facilitate compliance, and assures that its Third Party Participants will comply or facilitate compliance, with all applicable federal laws, regulations, and requirements, and will follow applicable guidance, including, but not limited to, the Clean Air Act, Clean Water Act, Wild and Scenic Rivers Act of 1968, Coastal Zone Management Act of 1972, the Endangered Species Act of 1973, Magnuson Stevens Fishery Conservation and Management Act, Resource Conservation and Recovery Act, Comprehensive Environmental Response, Compensation, and Liability Act, Executive Order No. 11990 relating to "Protection of Wetlands," and Executive Order No. 11988, as amended, "Floodplain Management."

(d)    *Corridor Preservation*. The Recipient agrees that:

(1)    It will not develop any right-of-way acquired under 49 U.S.C. § 5323(q) in anticipation of implementing its Award until all required environmental reviews for each Project or related activities have been completed; and

(2)    It will follow FTA Final Guidance on the Application of 49 U.S.C § 5323(q) to Corridor Preservation for a Transit Project, October 27, 2014.

(e)     *Use of Certain Public Lands*. The Recipient agrees to comply, and assures that its Third Party Participants will comply, with U.S. DOT laws, specifically 49 U.S.C. § 303 (often referred to as "section 4(f)"), and joint FHWA and FTA regulations, "Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites," 23 CFR Part 774, and referenced in 49 CFR Part 622.

(f)     *Historic Preservation*. The Recipient agrees to, and assures that its Third Party Participants will:

(1)     Comply with U.S. DOT laws, including 49 U.S.C. § 303 (often referred to as "section 4(f)"), which requires certain findings be made before an Award may be undertaken if it involves the use of any land from a historic site that is on or eligible for inclusion on the National Register of Historic Places.

(2)     Encourage compliance with the federal historic and archaeological preservation requirements of section 106 of the National Historic Preservation Act, as amended, 54 U.S.C. § 306108.

(3)     Comply with the Archeological and Historic Preservation Act of 1974, as amended, 54 U.S.C. § 312501, et seq.

(4)     Comply with U.S. Advisory Council on Historic Preservation regulations, "Protection of Historic Properties," 36 CFR Part 800.

(5)     Comply with federal requirements and follow federal guidance to avoid or mitigate adverse effects on historic properties.

(g)     *Indian Sacred Sites*. The Recipient agrees to, and assures that its Third Party Participants will, facilitate compliance with federal efforts to promote the preservation of places and objects of religious importance to American Indians, Eskimos, Aleuts, and Native Hawaiians, and facilitate compliance with the American Indian Religious Freedom Act, 42 U.S.C. § 1996, and Executive Order No. 13007, "Indian Sacred Sites," May 24, 1996, 42 U.S.C. § 3161 note (61 Fed. Reg. 26771).

(h)     *Mitigation of Adverse Environmental Effects*.

(1)     The Recipient agrees to comply with all environmental mitigation measures that may be identified as conditions that the Federal Government might impose in its finding of no significant impact or record of decision or commitments in the environmental documents that apply to the Award, such as environmental assessments, environmental impact statements, categorical exclusions, memoranda of agreement, documents required under 49 U.S.C. § 303, and other environmental documents.

(2)     The Recipient agrees that:

(i)     Any mitigation measures agreed on will be incorporated by reference and made part of the Underlying Agreement and any Amendments thereto;

(ii)    Any deferred mitigation measures will be incorporated by reference and made part of the Underlying Agreement and any Amendments thereto as soon as agreement with the Federal Government is reached; and

(iii)   Any mitigation measures agreed on will not be modified or withdrawn without the written approval of the Federal Government.

(i)     *Energy Conservation*. The Recipient agrees to, and assures that its Subrecipients will, comply with the mandatory energy standards and policies of its state energy conservation plans under the Energy Policy and Conservation Act, as amended, 42 U.S.C. § 6321, et seq., and perform an energy assessment for any building constructed, reconstructed, or modified with federal assistance required under FTA regulations, "Requirements for Energy Assessments," 49 CFR Part 622, subpart C.

## Section 27.    State Management and Monitoring Systems.

The Recipient agrees to comply with joint FHWA and FTA regulations, "Management and Monitoring Systems," 23 CFR Part 500, and FTA regulations, "Transportation Infrastructure Management," 49 CFR Part 614.

## Section 28.    Charter Service.

(a)     *Prohibitions*. The Recipient agrees that neither it nor any Third Party Participant involved in the Award will engage in charter service, except as permitted under federal transit laws, specifically 49 U.S.C. § 5323(d), (g), and (r), FTA regulations, "Charter Service," 49 CFR Part 604, any other federal Charter Service regulations, federal requirements, or federal guidance.

(b)     *Exceptions*. Apart from exceptions to the Charter Service restrictions in FTA's Charter Service regulations, FTA has established the following additional exceptions to those restrictions:

(1)     FTA's Charter Service restrictions do not apply to equipment or facilities supported with federal assistance appropriated or made available for 49 U.S.C. § 5307 to support a Job Access and Reverse Commute (JARC)-type Project or related activities that would have been eligible for assistance under repealed 49 U.S.C. § 5316 in effect in Fiscal Year 2012 or a previous

fiscal year, provided that the Recipient uses that federal assistance for FTA program purposes only; and

(2)    FTA's Charter Service restrictions do not apply to equipment or facilities supported with the federal assistance appropriated or made available for 49 U.S.C. § 5310 to support a New Freedom-type Project or related activities that would have been eligible for federal assistance under repealed 49 U.S.C. § 5317 in effect in Fiscal Year 2012 or a previous fiscal year, provided the Recipient uses that federal assistance for FTA program purposes only.

(c)    *Violations*. If it or any Third Party Participant engages in a pattern of violations of FTA's Charter Service regulations, FTA may require corrective measures and remedies, including withholding an amount of federal assistance as provided in FTA's Charter Service regulations, 49 CFR Part 604, appendix D, or barring it or the Third Party Participant from receiving federal assistance provided in 49 U.S.C. chapter 53, 23 U.S.C. § 133, or 23 U.S.C. § 142.

## Section 29.    School Bus Operations.

(a)    *Prohibitions*. The Recipient agrees that neither it nor any Third Party Participant that is participating in its Award will engage in school bus operations exclusively for the transportation of students or school personnel in competition with private school bus operators, except as permitted by federal transit laws, 49 U.S.C. § 5323(f) or (g), FTA regulations, "School Bus Operations," 49 CFR Part 605, and any other applicable federal "School Bus Operations" laws, regulations, requirements, or applicable federal guidance.

(b)    *Violations*. If a Recipient or any Third Party Participant has operated school bus service in violation of FTA's School Bus laws, regulations, or requirements, FTA may require the Recipient or Third Party Participant to take such remedial measures as FTA considers appropriate, or bar the Recipient or Third Party Participant from receiving federal transit assistance.

## Section 30.    Geographic Information and Related Spatial Data.

The Recipient agrees that each Project or related activity that implements the Award will conform to the Federal Geographic Data Committee's National Spatial Data Infrastructure if the Project or related activity directly or indirectly involves spatial data, or geographic information systems, and it will follow U.S. OMB Circular A-16, "Coordination of Geographic Information and Related Spatial Data Activities," August 19, 2002, and U.S. OMB Circular A-16 Supplemental Guidance, "Geospatial Line of Business," November 10, 2010.

**Section 31.    Federal "$1 Coin" Requirements.**

The Recipient agrees to comply with section 104 of the Presidential $1 Coin Act of 2005, 31 U.S.C. § 5112(p), its equipment and facilities will be fully capable of accepting and dispensing $1 coins when coins or currency are required to use that equipment or those facilities, and it will display signs and notices of the $1 coin capability of its equipment and facilities on its premises, including vending machines, where coins or currency are used.

**Section 32.    Public Transportation Safety.**

The Recipient agrees to comply with applicable federal laws, regulations, and requirements and follow applicable guidance that implement the Public Transportation Safety Program provisions of 49 U.S.C. § 5329.

**Section 33.    Motor Carrier Safety.**

(a)    *Financial Responsibility*. The Recipient agrees to comply and assures that its Third Party Participants will comply with the economic and insurance registration requirements of the:

    (1)    U.S. Federal Motor Carrier Safety Administration (U.S. FMCSA) regulations, "Minimum Levels of Financial Responsibility for Motor Carriers," 49 CFR Part 387, if it is engaged in operations requiring compliance with 49 CFR Part 387, it is engaged in interstate commerce, and it is not within a defined commercial zone; and

    (2)    The provisions of 49 U.S.C. § 31138(e)(4), which supersede inconsistent provisions of 49 CFR Part 387, and reduce the amount of insurance the Recipient must obtain to the highest amount required by any state in which the public transportation provider operates, if it operates within a public transportation service area located in more than one state, and receives federal assistance under 49 U.S.C. §§ 5307, 5310, and 5311.

(b)    *U.S. FMCSA Requirements*. The Recipient agrees to comply and assures that its Third Party Participants will comply with:

    (1)    The safety requirements of U.S. FMCSA regulations, "Federal Motor Carrier Safety Regulations," 49 CFR Parts 390 – 397, to the extent applicable; and

    (2)    The driver's license requirements of U.S. FMCSA regulations, "Commercial Driver's License Standards, Requirements, and Penalties," 49 CFR Part 383, and "State Compliance with Commercial Driver's License," 49 CFR Part 384, to the extent applicable, with the substance abuse requirements and guidance of U.S. FMCSA's regulations, "Controlled Substances and Alcohol

Use and Testing," 49 CFR Part 382, and implementing federal guidance, to the extent applicable.

**Section 34.    Safe Operation of Motor Vehicles.**

(a)    *Seat Belt Use*. The Recipient agrees to implement Executive Order No. 13043, "Increasing Seat Belt Use in the United States," April 16, 1997, 23 U.S.C. § 402 note, (62 Fed. Reg. 19217), by:

    (1)    Adopting and promoting on-the-job seat belt use policies and programs for its employees and other personnel that operate company-owned vehicles, company-rented vehicles, or personally operated vehicles; and

    (2)    Including a "Seat Belt Use" provision in each third party agreement related to the Award.

(b)    *Distracted Driving, Including Text Messaging While Driving*. The Recipient agrees to comply with:

    (1)    Executive Order No. 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009, 23 U.S.C. § 402 note, (74 Fed. Reg. 51225);

    (2)    U.S. DOT Order 3902.10, "Text Messaging While Driving," December 30, 2009; and

    (3)    The following U.S. DOT Special Provision pertaining to Distracted Driving:

        (i)    *Safety*. The Recipient agrees to adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers, including policies to ban text messaging while using an electronic device supplied by an employer, and driving a vehicle the driver owns or rents, a vehicle Recipient owns, leases, or rents, or a privately-owned vehicle when on official business in connection with the Award, or when performing any work for or on behalf of the Award;

        (ii)    *Recipient Size*. The Recipient agrees to conduct workplace safety initiatives in a manner commensurate with its size, such as establishing new rules and programs to prohibit text messaging while driving, re-evaluating the existing programs to prohibit text messaging while driving, and providing education, awareness, and other outreach to employees about the safety risks associated with texting while driving; and

(iii)   *Extension of Provision*. The Recipient agrees to include the preceding Special Provision of section 34(b)(3)(i) – (ii) of this Master Agreement in its third party agreements, and encourage its Third Party Participants to comply with this Special Provision, and include this Special Provision in each third party subagreement at each tier supported with federal assistance.

**Section 35.    Substance Abuse.**

(a)   *Drug-Free Workplace*. The Recipient agrees to:

    (1)   Comply with the Drug-Free Workplace Act of 1988, as amended, 41 U.S.C. § 8103, et seq.;

    (2)   Comply with U.S. DOT regulations, "Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)," 49 CFR Part 32; and

    (3)   Follow and facilitate compliance with U.S. OMB regulatory guidance, "Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)," 2 CFR Part 182, particularly where the U.S. OMB regulatory guidance supersedes comparable provisions of 49 CFR Part 32.

(b)   *Alcohol Misuse and Prohibited Drug Use*.

    (1)   *Requirements*. The Recipient agrees to comply and assures that its Third Party Participants will comply with:

        (i)   Federal transit laws, specifically 49 U.S.C. § 5331;

        (ii)   FTA regulations, "Prevention of Alcohol Misuse and Prohibited Drug Use in Transit Operations," 49 CFR Part 655; and

        (iii)   Applicable provisions of U.S. DOT regulations, "Procedures for Transportation Workplace Drug and Alcohol Testing Programs," 49 CFR Part 40.

    (2)   *Remedies for Non-Compliance*. The Recipient agrees that if FTA determines that the Recipient or a Third Party Participant receiving federal assistance under 49 U.S.C. chapter 53 is not in compliance with 49 CFR Part 655, the Federal Transit Administrator may bar that Recipient or Third Party Participant from receiving all or a portion of the federal transit assistance for public transportation it would otherwise receive.

**Section 36.**    **Protection of Sensitive Security and Other Sensitive Information.**

The Recipient agrees to comply with the following requirements for the protection of sensitive security information:

(a)    The Homeland Security Act, as amended, specifically 49 U.S.C. § 40119(b), and U.S. DOT regulations, "Protection of Sensitive Security Information," 49 CFR Part 15;

(b)    The Aviation and Transportation Security Act, as amended, 49 U.S.C. § 114(r), and U.S. Department of Homeland Security, Transportation Security Administration regulations, "Protection of Sensitive Security Information," 49 CFR Part 1520;

(c)    U.S. DOT Common Rules, which require the Recipient to implement, and to require its Subrecipients, if any, to implement reasonable measures to safeguard protected personally identifiable information as well as any information that the FTA or pass-through entity designates as sensitive; and

(d)    National Archives and Records Administration regulations, "Controlled Unclassified Information," 32 CFR Part 2002.

**Section 37.**    **Special Notification Requirements for States.**

(a)    *Types of Information*. To the extent required under federal law, the State, as the Recipient, agrees to provide the following information about federal assistance awarded for its State Program, Project, or related activities:

(1)    The Identification of FTA as the federal agency providing the federal assistance for a State Program or Project;

(2)    The Catalog of Federal Domestic Assistance Number of the program from which the federal assistance for a State Program or Project is authorized; and

(3)    The amount of federal assistance FTA has provided for a State Program or Project.

(b)    *Documents*. The State agrees to provide the information required under this provision in the following documents: (1) applications for federal assistance, (2) requests for proposals or solicitations, (3) forms, (4) notifications, (5) press releases, and (6) other publications.

**Section 38.    Freedom of Information.**

(a)    *Applicability*. The Recipient agrees that the Freedom of Information Act (FOIA), 5 U.S.C. § 552, as amended, applies to most information submitted to FTA and U.S. DOT, whether electronically or in typewritten hard copy.

(b)    *Records*. The Recipient agrees that all records it submits to FTA will become federal agency records and may be subject to release in response to a FOIA request unless FTA in its sole discretion determines that a valid exemption under FOIA or another statute applies. Unless FTA explicitly states otherwise in writing, FTA does not make any assurance that it will keep private any records submitted to FTA.

(c)    *Confidentiality*. President Obama's "Memorandum for the Heads of Executive Departments and Agencies on the Freedom of Information Act," dated January 21, 2009, directs federal agencies to adopt a presumption that information should generally be disclosed when requested, and therefore the Recipient agrees that:

    (1)    Unless a federal law or regulation requires that a document or other information be withheld, FTA does not consent to withhold information, irrespective of its format, merely because it is accompanied by a "routine" confidentiality statement that may appear on:

        (i)    Information about the Award, the accompanying Underlying Agreement, and any Amendments thereto;

        (ii)    Information accompanying or supplementing the Award, the accompanying Underlying Agreement, and any Amendments thereto; or

        (iii)    Any other information FTA may obtain.

    (2)    As provided in federal laws, regulations, requirements, and guidance, FTA will review the information and documents that are the subject of each FOIA request to determine the extent to which FTA must or should exercise its discretion to withhold that information or those documents.

    (3)    Any genuinely confidential, privileged, or sensitive security information will be marked clearly and specifically as confidential or privileged, and justified as confidential or privileged under FOIA standards. The Recipient will mark all sensitive security information (SSI), as defined by 49 C.F.R. § 15.5, as set forth in 49 C.F.R. § 1520.13. The Recipient will not mark non-SSI material as SSI. Also refer to Section 36 of this Agreement, regarding the protection of SSI and other sensitive information.

**Section 39.    Disputes, Breaches, Defaults, and Litigation.**

(a)    *FTA Interest*. FTA has a vested interest in the settlement of any violation of federal law, regulation, or requirement, or any disagreement involving the Award, the accompanying Underlying Agreement, and any Amendments thereto including, but not limited to, a default, breach, major dispute, or litigation, and FTA reserves the right to concur in any settlement or compromise.

(b)    *Notification to FTA; Flow Down Requirement*. If a current or prospective legal matter that may affect the Federal Government emerges, the Recipient must promptly notify the FTA Chief Counsel and FTA Regional Counsel for the Region in which the Recipient is located. The Recipient must include a similar notification requirement in its Third Party Agreements and must require each Third Party Participant to include an equivalent provision in its subagreements at every tier, for any agreement that is a "covered transaction" according to 2 C.F.R. §§ 180.220 and 1200.220.

   (1)    The types of legal matters that require notification include, but are not limited to, a major dispute, breach, default, litigation, or naming the Federal Government as a party to litigation or a legal disagreement in any forum for any reason.

   (2)    Matters that may affect the Federal Government include, but are not limited to, the Federal Government's interests in the Award, the accompanying Underlying Agreement, and any Amendments thereto, or the Federal Government's administration or enforcement of federal laws, regulations, and requirements.

   (3)    *Additional Notice to U.S. DOT Inspector General*. The Recipient must promptly notify the U.S. DOT Inspector General in addition to the FTA Chief Counsel or Regional Counsel for the Region in which the Recipient is located, if the Recipient has knowledge of potential fraud, waste, or abuse occurring on a Project receiving assistance from FTA. The notification provision applies if a person has or may have submitted a false claim under the False Claims Act, 31 U.S.C. § 3729, et seq., or has or may have committed a criminal or civil violation of law pertaining to such matters as fraud, conflict of interest, bid rigging, misappropriation or embezzlement, bribery, gratuity, or similar misconduct involving federal assistance. This responsibility occurs whether the Project is subject to this Agreement or another agreement between the Recipient and FTA, or an agreement involving a principal, officer, employee, agent, or Third Party Participant of the Recipient. It also applies to subcontractors at any tier. Knowledge, as used in this paragraph, includes, but is not limited to, knowledge of a

criminal or civil investigation by a Federal, state, or local law enforcement or other investigative agency, a criminal indictment or civil complaint, or probable cause that could support a criminal indictment, or any other credible information in the possession of the Recipient. In this paragraph, "promptly" means to refer information without delay and without change. This notification provision applies to all divisions of the Recipient, including divisions tasked with law enforcement or investigatory functions.

(c)    *Federal Interest in Recovery*. The Federal Government retains the right to a proportionate share of any proceeds recovered from any third party, based on the percentage of the federal share for the Underlying Agreement. Notwithstanding the preceding sentence, the Recipient may return all liquidated damages it receives to its Award Budget for its Underlying Agreement rather than return the federal share of those liquidated damages to the Federal Government, provided that the Recipient receives FTA's prior written concurrence.

(d)    *Enforcement*. The Recipient must pursue its legal rights and remedies available under any third party agreement or any federal, state, or local law or regulation.

## Section 40.    Amendments to the Underlying Agreement.

(a)    *When Required*. An Amendment to the Underlying Agreement is required under the following circumstances:

    (1)    A change in the scope of work or an addition of federal assistance to an existing Award (regardless of whether the source of assistance is the same or different);

    (2)    A change to the scope of work that necessitates a change in the distribution of federal assistance across scope codes or activities; or

    (3)    The Award includes multiple sources of financial assistance and the action requires the addition of a new Scope to a Project.

(b)    *Process*. An amendment to the Underlying Agreement must be submitted and approved in TrAMS, and must meet the same application requirements as would apply to a request for a new Award.

## Section 41.    FTA's Transit Award Management System (TrAMS).

The Recipient agrees to submit its application for an Award, reports, documents, or other information required by federal law, regulations, or requirements, through FTA's Transit Award Management System (TrAMS). To submit its application, reports, documents, or information required to FTA, any signature submitted for use in TrAMS must comply with the requirements

of the Electronic Signatures in Global and National Commerce Act (E-Sign Act), 15 U.S.C. §§ 7001, et seq.

**Section 42.    Information Obtained through Internet Links.**

Although this Master Agreement may include electronic links to federal laws, regulations, requirements, and guidance, FTA does not guarantee the accuracy of the information that may accessed through such links. Accordingly, the Recipient understands and agrees that any information obtained through any electronic link within this Master Agreement does not represent an official version of a federal law, regulation, or requirement, and might be inaccurate. Therefore, any information that is obtained through such links is neither incorporated by reference nor made part of this Master Agreement. The Federal Register and the Code of Federal Regulations are the official sources for regulatory information pertaining to the Federal Government.

**Section 43.    Severability.**

The Recipient agrees that if any provision of the Underlying Agreement or any Amendment thereto is determined to be invalid, then the remaining provisions thereof that conform to federal laws, regulations, requirements, and guidance will continue in effect.

## SPECIAL PROVISIONS FOR SPECIFIC PROGRAMS

**Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs.**

(a)    *Applicability*. The Recipient understands and agrees that this section of the Master Agreement applies to the following programs to which FTA provides federal assistance, including the following programs:

(1)    Programs authorized under 49 U.S.C. § 5312, irrespective of the fiscal year for which the appropriations that supported the Underlying Agreement were authorized;

(2)    Programs authorized under former 49 U.S.C. § 5313, irrespective of the fiscal year for which the appropriations that supported the Underlying Agreement were authorized;

(3)    Programs authorized under 49 U.S.C. § 5314, irrespective of the fiscal year for which the appropriations that supported the Underlying Agreement were authorized;

(4)    Programs authorized by the repealed section 3045 of SAFETEA-LU;

(5)    Programs authorized by the repealed section 3046 of SAFETEA-LU; and

(6)    Other similar Programs for which FTA awards federal assistance under 49 U.S.C. §§ 5312 or 5314, as amended, or other similar research-type or technical assistance authorizing legislation.

(b)    *Provisions for Underlying Agreements for Public Transportation Innovation or Technical Assistance and Workforce Development Awards*. The Recipient agrees that the following provisions will apply to the Underlying Agreement for a Public Transportation Innovation or Technical Assistance and Workforce Development Project or related activities:

(1)    *Report*. The Recipient agrees that in addition to any other Report FTA may require, the Recipient will prepare and submit to FTA a Report of each Project and related activities that describes the subject (or subjects) investigated, the methods used, the results, and the conclusions reached, is satisfactory, sufficiently organized, well-written, and comprehensive.

(2)    *Disclaimer*. The Report must contain the following disclaimer: "This document is disseminated under the sponsorship of the United States Department of Transportation, Federal Transit Administration, in the interest

of information exchange. The United States government assumes no liability for the contents or use thereof. The United States government does not endorse products or manufacturers. Trade or manufacturers' names appear herein solely because they are considered essential to the contents of the report."

(3)  *Format*. The Report must comply with the accessibility requirements of Section 508 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794d, and U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194, and the specific publication elements and report style guide at http://www.fta.dot.gov/research/program_requirements. The Report must identify clearly and precisely any specific information or data that is confidential, privileged, or proprietary and is contained within any report or document.

(4)  *Publication*. Except for confidential, privileged, or proprietary information in the Report, FTA may publish the Report, and make it available for publication on the Internet or in any other venue.

(5)  *Identification of Federal Assistance*. The Recipient agrees that:

(i)  It will display information on any product developed with federal assistance for 49 U.S.C. § 5312 for which the U.S. Department of Transportation, Federal Transit Administration provided federal assistance to support the development of the product that is tangible and is produced from, or is a result of, a Project, is a deliverable, and visible to the public, or is or will be made available to other research organizations, or public transportation providers, and consists of equipment, a prototype, hardware, construction, reports, data, software, internet pages, or any similar item.

(ii)  The information required will be given using an appropriate sign, designation, or notice.

(c)  *Special Disposition Provision*. In addition to other disposition provisions, FTA may vest title in tangible personal property used in the conduct of basic or applied scientific research in a nonprofit institution of higher education or in a nonprofit organization whose primary purpose is conducting scientific research, provided the requirements of 31 U.S.C. § 6306 are met.

(d)  *Protection of Human Subjects*. The Recipient agrees to comply with the protections for human subjects involved in a Project or related activities supported with federal assistance through the Underlying Agreement, as required by the National Research

Act, as amended, 42 U.S.C. § 289, et seq., and U.S. DOT regulations, "Protection of Human Subjects," 49 CFR Part 11.

(e)    *Protection of Animals*. The Recipient agrees to comply with the protections for animals involved in a Project or related activities, as required by the Animal Welfare Act, as amended, 7 U.S.C. § 2131, et seq., and U.S. Department of Agriculture regulations, "Animal Welfare," 9 CFR Parts 1, 2, 3, and 4.

(f)    *Export Control*. The Recipient understands and agrees that before exporting any information that is subject to federal export requirements, it must first obtain the necessary federal license(s), and comply with the federal export control regulations of the U.S. Department of Commerce, Bureau of Industry and Security, "Export Administration Regulations," specifically, 15 CFR Parts 730, et seq., U.S. Department of State, U.S. Department of the Treasury, and U.S. Department of Defense.

**Section 45.    Special Provisions for the State Safety Oversight Grant Program.**

In administering any State Safety Oversight Grant Program Award under 49 U.S.C. § 5329(e)(6), the Recipient agrees to comply with 49 U.S.C. § 5329(e)(6).

**Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program.**

(a)    *Federal Laws, Regulations, Requirements, and Guidance*. The State, as the Recipient, agrees to administer its Underlying Agreement to support its SIB consistent with federal laws, regulations, requirements, and guidance, including, but not limited to:

(1)    Title 23, U.S.C. (Highways), specifically 23 U.S.C. § 610, to the extent required under the FAST Act, and other applicable federal legislation;

(2)    Federal transit laws, specifically 49 U.S.C. § 5323(o), which requires compliance with 49 U.S.C. §§ 5307, 5309, and 5337 for Underlying Agreements to which MAP-21 and the FAST Act apply;

(3)    Section 350 of the National Highway System Designation Act of 1995, as amended, (NHS Act), 23 U.S.C. § 101 note, to the extent this section has not been superseded by 23 U.S.C. § 610;

(4)    Any federal law enacted or federal regulation or requirements promulgated at a later date applicable to the Underlying Agreement;

(5)    All other applicable federal guidance that may be issued;

99

(6)     The terms and conditions of any U.S. DOL certification(s) of employee protective arrangements;

(7)     The SIB Cooperative Agreement establishing the SIB in the state, signed by the Executive Director of the Build America Bureau, the Federal Transit Administrator, authorized state official(s) or their authorized designees, and if applicable, the administrator (or designee) for any other federal modal agency that the State wishes to include in its SIB; and

(8)     The FTA Grant Agreement providing federal assistance for the Underlying Agreement in support of its SIB, except that any provision of this Master Agreement that would otherwise apply to a SIB Project does not apply to the Underlying Agreement if it conflicts with any other federal law or regulation applicable to a SIB, federal SIB Guidelines, the SIB Cooperative Agreement, or the Underlying Agreement, but the conflicting provision of this Master Agreement will prevail, however, if FTA expressly determines so in writing.

(b)     *Limitations on Accessing Federal Assistance in the Transit Account*. The Recipient understands that the total amount of federal assistance awarded under the Grant Agreement to be supported with SIB deposits may not be available for immediate withdrawal. The State and the Recipient agree to restrict the amount of federal assistance it withdraws from its SIB to an amount not exceeding the limits specified in its Grant Agreement in support of the SIB or the Award Budget for that Grant Agreement.

**Section 47.     Special Provisions for the TIFIA and RRIF Programs.**

(a)     *Federal Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to administer any Underlying Agreement for TIFIA or RRIF credit assistance as required by and in accordance with the terms of the Underlying Agreement.

(b)     *Default*. The Recipient agrees that FTA may declare the Recipient in violation of this Master Agreement if there has been an Event of Default according to an Underlying Agreement for TIFIA or RRIF assistance, and that Event of Default is not cured within 90 days.

(c)     *Order of Precedence*. Any provision of this Master Agreement that is applicable to the Recipient's Underlying Agreement for TIFIA or RRIF assistance but that conflicts with the laws, regulations, and requirements applicable to the Recipient's Underlying Agreement for TIFIA or RRIF assistance, will not apply to the Recipient's TIFIA or RRIF Loan, Loan Guarantee, Line of Credit, or Master Credit Agreement, unless FTA determines otherwise in writing.

**Section 48.    Special Provisions for the Joint FTA–FRA Program.**

(a)    *General Legal Requirements*. When both FTA and the U.S. Federal Railroad Administration (FRA) make federal assistance available for the same Underlying Agreement, the Recipient understands and agrees to administer the Underlying Agreement to achieve maximum compliance with FTA's statutory and regulatory requirements, FRA's statutory and regulatory requirements, and other federal statutory requirements.

(b)    Disadvantaged Business Enterprises.

(1)    The Recipient acknowledges and understands that the statutory and regulatory provisions relating to disadvantaged business enterprises (DBE) differ significantly between FTA and FRA, including Section 1101(b) of the FAST Act (23 U.S.C. § 101 note) and U.S. DOT regulations, "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs," 49 CFR Part 26, both of which apply to FTA, but not to FRA.

(2)    FRA is not authorized to use FTA's DBE regulations, and consequently the Recipient agrees to comply with the statutory and regulatory DBE provisions that apply to federal assistance provided by FTA when using that federal assistance for purchases.

(3)    The Recipient agrees to use the "contracting with small and minority firms, women's business enterprise" provisions of the applicable U.S. DOT Common Rules.

(c)    *Buy America*. The Recipient agrees that statutory and regulatory Buy America provisions that apply to federal assistance authorized for FTA differ from those that apply to federal assistance authorized for FRA. Therefore, the Recipient agrees that:

(1)    It must comply with FTA's statutory and regulatory Buy America provisions to the extent that the purchases are for a Project or related activities that implement the Underlying Agreement;

(2)    It must comply with FRA's statutory and regulatory Buy America provisions, section 301(a) of the Passenger Rail Investment and Improvement Act of 2008 (PRIIA), Pub L. 110-432, October 16, 2008, and 49 U.S.C. § 24405(a), to the extent that the purchases are required to comply with FRA Buy America requirements; and

(3)     If it uses federal assistance authorized for FTA and for FRA to finance a purchase, the Recipient agrees to comply with both FTA's and FRA's requirements.

(d)     *Force Account – Procurement*. The Recipient agrees that FTA deems section 16(j) of this Master Agreement to be satisfied for work that is performed by the railroad's force account employees if a Project or related activities are being conducted on the property of a railroad, and under the railroad's collective bargaining agreements with its employees, certain work to be performed for the Recipient must be performed by force account employees.

(e)     *Procurement of Rolling Stock*. The Recipient agrees that if FRA requires the Recipient to acquire any rolling stock for the Underlying Agreement from the Next Generation Corridor Equipment Pool Committee that has been established under section 305 of PRIIA, FTA deems section 15 of this Master Agreement to be satisfied.

(f)     *Use of Real Property, Equipment, and Supplies*. The Recipient agrees that application of section 19 of this Master Agreement is reserved.

(g)     *Davis-Bacon*. The Recipient agrees that, as provided in 49 U.S.C. § 24312, wages paid to railroad employees at rates provided in a collective bargaining agreement negotiated under the Railway Labor Act, 45 U.S.C. § 151, et seq., are deemed to comply with the requirements of the Davis-Bacon Act, 40 U.S.C. § 3141, et seq., and satisfy section 24 of this Master Agreement.

(h)     *Employee Protective Arrangements*. The Recipient agrees to pass down to a railroad employee subject to the Railway Labor Act, 45 U.S.C. § 151, et seq., protective arrangements as provided in a special Attachment to FTA's Grant Agreement or Cooperative Agreement with the Recipient, and not pass down employee protective arrangements as provided in section 24 of this Master Agreement.

(i)     *Motor Carrier Safety*. The Recipient agrees that railroad signal employees and their employers must comply with the hours of service requirements of 49 U.S.C. § 21104, see 49 U.S.C. § 21104(e), and FRA's hours of service regulation, specifically 49 CFR Part 228, and that section 33 of this Master Agreement does not apply to railroad signal employees concerning hours of service.

(j)     *Railroad Safety*. The Recipient agrees that a railroad subject to FRA's safety jurisdiction must comply with the federal railroad safety laws.

## APPENDIX A
## TRIBAL TRANSIT PROGRAM—APPLICABLE PROVISIONS

FTA recognizes that several provisions of this Master Agreement generally applicable to other programs do not apply to the Tribal Transit Programs or the Indian Tribes that are the Direct Recipients of federal assistance under those Programs. The following sections of this Master Agreement are not applicable to the Tribal Transit Programs:

Section 14(a)(1) and 14(b) – Private Enterprise

Section 22(e) – Relocation and Real Property

Section 27 – State Management and Monitoring Systems

Section 30 – Geographic Information and Related Spatial Data

Section 37 – Special Notification Requirement for States

However, this list is not intended to be comprehensive and FTA may determine that other provisions are not applicable depending upon the Underlying Agreement for the Tribal Transit or a Tribe having entered into a compact and funding agreement with the U.S. Department of Transportation pursuant to the Tribal Transportation Self-Governance Program (23 U.S.C. 207; 49 CFR Part 29).