ANDREW JANZ (SBN 287672)*
City Attorney
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084
*Application for admission pro hac vice forthcoming

Attorney for Plaintiff
CITY OF FRESNO

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

Attorneys for Plaintiffs
CITY OF FRESNO; CITY OF EUREKA; CITY
OF SOUTH LAKE TAHOE; COUNTY OF
SACRAMENTO; COUNTY OF MONROE;
MONROE COUNTY AIRPORT AUTHORITY

LYNDSEY OLSON (MN Lic. #0332288)*
Saint Paul City Attorney
Lyndsey.olson@ci.stpaul.mn.us
KELSEY MCELVEEN (MN Lic. #0396744)*
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone: (651) 266-8710
Facsimile (651) 298-5619
*Application for admission pro hac vice forthcoming

Attorneys for Plaintiff
CITY OF SAINT PAUL

MELISSA C. ALLISON (MA Bar No. 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL
(MA Bar No. 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500
*Application for admission pro hac vice forthcoming

Attorneys for Plaintiffs
COUNTY OF MONROE
MONROE COUNTY AIRPORT AUTHORITY

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO et al.<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT TURNER et al.<br><br>Defendants. | Case No.: 3:25-cv-07070-RS<br><br>**DECLARATION OF LINDSAY BACHER IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**<br><br>Complaint Filed: August 20, 2025 |

I, Lindsay Bacher, declare:

1.      I am a resident of the State of Minnesota. I am over the age of 18 years, am competent to testify as to the matters in this declaration, and make this declaration based on my own personal knowledge and on my review of business records.

2.      I have been employed as the Grants Director for the City of Saint Paul ("Saint Paul," or the "City") since 2024.

3.      I am responsible for overseeing the central Grants Division within the Office of Financial Services, managing citywide grant processes, and managing citywide planning to align needs with grant funding opportunities and generating grant revenue. I ensure compliance with state, federal, and philanthropic regulatory requirements and adhere to City code, policies, procedures, practices, and standards.

4.      I have been the lead for the City's federal grants strategy in response to the federal funding freeze and other changes in federal financial assistance, including analysis of citywide grants data.

## CITY OF SAINT PAUL

5.      Saint Paul is the capital of Minnesota, the Ramsey County seat, the second most populous city in the state, and is home to more than 300,000 people. As the northernmost port on the Mississippi River, and with more shoreline along the river than any other city, Saint Paul is a transportation hub and is central to the economy of the upper Midwest. Saint Paul is also a thriving economic center that supports Fortune 500 companies, three professional sports stadiums, large regional enterprises, and countless small businesses and professional firms. Saint Paul is consistently recognized for its excellent park system and is a historical and cultural destination. The City's infrastructure is essential to the economy and wellbeing of the entire state and region.

6.      The City of Saint Paul is committed to fostering inclusivity and equality. Saint Paul strives to uplift and serve its residents and City of Saint Paul employees with dignity and respect, and center humanity and autonomy in all that it does. Saint Paul engages its communities in the process of governing to ensure residents stand to benefit from the policies built together.

BACHER DEC. ISO TRO & OSC – CASE NO. 3:25-cv-07070-RS

Docusign Envelope ID: FF0DB53E-4EB1-4329-8CC2-EAE887C75F88

7.      Chapter 44 of Saint Paul's Administrative Code, entitled "Employee Authority in Immigration Matters," a copy of which is attached hereto as **Exhibit 1**, provides that although the City will work cooperatively with the Department of Homeland Security, just as it does with other state and federal law enforcement agencies, it does not operate its programs for the purpose of enforcing federal immigration laws.

8.      For example, Section 44.03(a)(1) states: "Public Safety officials may not undertake any law enforcement action for the sole purpose of detecting the presence of undocumented persons, or to verify immigration status, including but not limited to, questioning any person or persons about their immigration status." *See* **Exhibit 1**.

## <u>OVERVIEW OF FEDERAL GRANTS RECEIVED BY SAINT PAUL</u>

9.      Currently, Saint Paul relies on several sources of federal grants to fund capital improvements, development, maintenance, and operations for ongoing City programs and departments.

10.     The City receives entitlement grants through the U.S. Department of Housing and Urban Development (HUD), including, *e.g.*, the following: Community Development Block Grants (CDBG) program grants, HOME Investment Partnership (HOME) program grants, and Emergency Solutions Grants (ESG) program grants. These grants are awarded by HUD pursuant to a statutory formula to recipients determined by Congress. Saint Paul also receives earmark funding through HUD, which is congressionally directed.

11.     Saint Paul currently has $45.1 million in HUD funding under contract. This includes:

- $27.1 million in CDBG Program grants

- $7.2 million in HOME Investment Partnerships Program grants

- $5.7 million in HOME – American Rescue Plan Program grants

- $1.1 million in ESG Program grants

- $2.6 million in Congressionally Directed Spending[1]

---

[1] This Congressionally Directed Spending is earmark funding that came through the Federal appropriations process rather than an entitlement grant.

12.     The City also receives entitlement and discretionary grants through the U.S. Department of Transportation (DOT). The City has been awarded grants through the Safe Streets and Roads for All (SS4A) grant program and the Innovative Finance and Asset Concession (IFAC) grant program. Saint Paul has also applied for a Bridge Investment Program (BIP) grant for 2025, which is also administered by DOT. That application is currently under review.

13.     Saint Paul currently has $62.8 million in grants that have been awarded by DOT but that are not yet under contract. This includes:

- $15.7 million in SS4A Program grants
- $805 thousand in IFAC Program grants

14.     Saint Paul has an application pending for $44.3 million in BIP grants.

15.     In total, Saint Paul has $197.3 million in federal funds currently under contract. The majority of these funds, roughly $144.6 million, is tied to one-time projects, largely capital investments. The remainder, approximately $52.6 million, consists of operational funding supporting ongoing programs and departments.

16.     In addition to the foregoing amounts, Saint Paul has been awarded $64.6 million in federal funds for which it is in the post-award phase of establishing work plans and executing contracts. Saint Paul has applied for additional amounts of federal grants totaling approximately $64.2 million. These applications are pending as of the date of this Declaration.

## NEW HUD GRANT CONDITIONS

17.     In June 2025, HUD provided the City a revised HUD 424-B Assurances and Certifications form. Applicants and recipients of HUD grants, such as CDGB, HOME, and ESG, are required to sign this form to receive funds. The revised form contains a new grant condition requiring the City to certify that it "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws." See **Exhibit 2** attached hereto.

18.     On July 1, 2025, the City received an email from HUD that purported to be "questioning the accuracy of the city of St. Paul's certification that the Community Development Block Grant (CDBG)-PRO Housing funds described in its Fiscal Year 2023 Action Plan (the Plan) will be

-4-

administered in conformity with applicable laws, including Executive Orders." Further, the email stated "[f]ailure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan." See **Exhibit 3** attached hereto.

19.     Specifically, HUD identified language in the City's Plan that it claimed, "appears to violate Order 14151 *Ending Radical and Wasteful Government DEI Programs and Preferencing*, and Executive Order 14173 *Ending Taxpayer Subsidization of Open Borders*." HUD asked the City to strip its Plan of words and phrases such as "equity," "immigrants," "refugees," "minority-owned," "empowering women," and "inclusive," and provide "assurance statements" that the Plan would comply with federal laws and Executive Orders. See **Exhibit 3**.

20.     HUD gave the City one day to revise and re-submit its Plan. The City re-submitted its Plan and received verbal confirmation that it has been accepted. The City, however, has not yet received a grant agreement. The City expects to receive from HUD, and to be required to sign, a grant agreement that includes DEI and immigration enforcement conditions as part of its funding disbursement.

## NEW DOT GRANT CONDITIONS

21.     The City has become aware of DOT's "General Terms and Conditions Under the Fiscal Year 2024 Safe Streets and Roads for All ("SS4A") Grant Program: FHWA Projects" dated March 17, 2025 ("SS4A T&C"). The revised SS4A T&C includes the following new grant conditions:

- Recipient will cooperate with Federal Officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal Office and components of the Department of Homeland Security in the enforcement of Federal immigration law.
- Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.
- Pursuant to Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination law.

See **Exhibit 4** attached hereto.

-5-

22.     Additionally, Exhibit A to the revised SS4A T&C requires the City to assure and certify that "it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project." The listed Federal laws and Executive Orders include, e.g., 8 U.S.C. § 1324 and § 1327; EO 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*; EO 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*; and EO 14173. See **Exhibit 5** attached hereto.

23.     The City expects to receive from DOT, and to be required to sign, a SS4A grant agreement with the revised SS4A T&C as part of its funding disbursement.

24.     The City has become aware of new terms and conditions relating to its BIP grant application entitled "2025 FHWA General Terms and Conditions" ("FHWA T&C") dated April 22, 2025. The FHWA T&C contains new conditions identical to those noted above in relation to the revised SS4A T&C, and requires certifications and assurances identical to those noted above in relation to Exhibit A of the revised SS4A T&C. See **Exhibit 6** attached hereto.

25.     If the City is awarded a BIP grant, the City expects to receive from DOT, and to be required to sign, a grant agreement with the revised FHWA T&C as part of its funding disbursement.

26.     On April 24, 2025, the City received a letter signed by the Secretary of Transportation, Sean Duffy ("the Duffy letter"), purporting to "provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements." The Duffy letter goes on to state that grant recipients may not allocate money received under DOT awards to "DEI" programs, and that grant recipients have "legal obligations" requiring "cooperating generally" with federal authorities – specifically Immigration and Customs Enforcement ("ICE"). See **Exhibit 7** attached hereto.

27.     The Duffy letter further purports to provide notice that "[n]oncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to loss of Federal funding from DOT." See **Exhibit 7**.

Docusign Envelope ID: FF0DB53E-4EB1-4329-86C2-EAF887C75F88

28.     On May 7, 2025, the City received an IFAC Cooperative Agreement from DOT containing new terms and conditions identical to those noted above in relation to the revised SS4A T&C and requiring certifications and assurances identical to those noted above in relation to Exhibit A of the revised SS4A T&C.

29.     The City responded by letter on June 27, 2025, stating that it had struck out the language relating to immigration enforcement and DEI, noting specifically that the immigration enforcement conditions violated court orders, and had executed the agreement. See **Exhibit 8** attached hereto.

30.     On July 22, DOT responded by email stating that it could not accept or countersign the agreement with the City's strikethroughs. The email further acknowledged that the immigration enforcement provisions included in the IFAC Cooperative Agreement would not comply with preliminary injunctions issued against DOT. See **Exhibit 9** attached hereto. DOT therefore sent a revised agreement containing the following term:

> Pursuant to the court's preliminary injunction orders in State of California v. US Dep't of Transportation, 1:25-cv-00208-JJM-PAS (D.R.I.) (Jun. 19, 2025) and City and County of San Francisco v. Trump, 3:25-cv-01350-WHO (N.D. Cal.) (Apr. 24, 2025; Clarifying Order Jun. 23, 2025), DOT will not impose or enforce the challenged immigration enforcement condition* or any materially similar terms and conditions, to any grant funds awarded, directly or indirectly, to Plaintiff States or local government entities within those States (collectively referred to as "Plaintiff State Entities"), or otherwise rescind, withhold, terminate, or take other adverse action, absent specific statutory authority, based on the challenged immigration enforcement condition while DOT is subject to an injunction. DOT will not require Plaintiff State Entities to make any certification or other representation related to compliance the challenged immigration enforcement condition nor will DOT construe acceptance of funding from DOT as certification as to the challenged immigration enforcement condition.
>> * The challenged immigration enforcement condition: "[T]he Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law"

See **Exhibit 10** attached hereto.

31.     The City has not responded to DOT's email or signed the Cooperation Agreement with the new term as of the date of this Declaration. The deadline for the City to sign the agreement is September 3, 2025.

**IMPACTS OF WITHHOLDING HUD AWARDS**

32.     Last year, Saint Paul utilized HUD funds to, for example:

- Rehabilitate 20 single-family homes and four multi-family housing developments
- Create 36 affordable rental units
- Improve four parks and one fire station
- Serve 271,940 people by providing public services such as employment training, crime awareness, health services, and youth services
- Provide 15 individuals and families new units in an affordable rental construction project
- Support four emergency shelters – two for youth, one for adults, and one for adults and families fleeing domestic violence
- Support two Rapid ReHousing providers that provide medium-term rental assistance and legal services, including credit repair for single adult women and women with families, and rental assistance for youth
- Support two Homeless Prevention services for individuals and families, including culturally-specific services for American Indian individuals and families

33.     Additionally, CDBG funds are invested in the year-round Right Track internship program serving youth from low-income neighborhoods, totaling 28,400 intern hours during the school year. 87% of interns reported that their internship wages are a crucial source of income for themselves and their families.

34.     The City utilized CDBG funds to work with three community development organizations to assist low- to moderate-income (LMI) homeowners with housing rehabilitation, and with Ramsey County for a lead-based paint program to address windows for homeowners.

35.     The City also subgranted CDBG funding to two community development organizations to assist businesses with economic development activities in low- to moderate-income areas and/or serve LMI residents.

-8-

36.    HUD grants also fund the Block Nurse program to serve older adults and their caregivers, providing in-home health visits, rides to appointments, grocery shopping or errands, and caregiver support and respite, all to help older residents remain at home as long as possible.

37.    Loss of HUD funding, especially the entitlement formula funds through CDBG, HOME, and ESG, would severely limit the City's capacity to invest in affordable housing, economic development, neighborhood district councils, and youth employment.

## IMPACTS OF WITHHOLDING SS4A AWARD

38.    Saint Paul plans to use DOT-awarded SS4A grants to fund systemic safety projects widely across Saint Paul's High Injury Network ("HIN"), including treatments to address the top safety concerns identified in the Transportation Safety Action Plan.  Treatments will improve safety at signalized intersections, protect vulnerable road users, and implement traffic calming to reduce speeds. Approximately 74% of the total project funding will provide benefits to disadvantaged census tracts.

39.    This project will implement proven transportation safety countermeasures across Saint Paul's HIN and conduct supplemental planning activities on several high injury network streets. Countermeasures will include features such as curb extensions, medians, pavement markings, street lighting, signing, and reflective signal backplates.  The project includes improvements on approximately 34 miles of the City's HIN and at over 70 of the City's most dangerous intersections, reflecting a widespread and systemic safety improvement impact.

40.    The selected roadways have a widespread fatal and serious injury crash problems, with 12 fatalities and 94 serious injury crashes along the roadways between 2017 and 2021.  The improvements are highly effective, low-cost, and quickly implementable.  Without the SS4A grant funding, the City will not be able to improve street safety and prevent further fatalities and serious injury crashes.

## IMPACTS OF WITHHOLDING IFAC AWARD

41.    The City of St. Paul was awarded $805,139 in Technical Assistance Cooperative Agreement grant funding to conduct an Asset Scan to inventory public real estate assets and identify subsequent program development for one or more relevant assets. In particular, the City is looking to inventory city-owned/controlled properties that are within a half-mile of fixed transit assets or would otherwise be eligible for the TIFIA loan program. The City intends to use the results of the Asset Scan to

-9-

1  establish an asset management initiative that taps unused or underutilized city-owned real estate and

2  responsibly stewards these existing taxpayer assets to create greater value for our community.

3       42.    The goal is to identify City real estate assets that can provide opportunities for

4  City/private partnership and increase the efficiency of our transit by locating more residential units and

5  jobs nearby transit hubs, contributing to the economic development of Saint Paul's neighborhoods and

6  the overall Twin Cities metro area. Without federal funds, this project will not move forward. The City

7  will not conduct an Asset Scan and the City will miss out on the opportunity to promote economic

8  development for the City's residents.

9                          **IMPACTS OF WITHHOLDING BIP AWARD**

10      43.    The City of Saint Paul's Bridge Investment Program proposal requests $43.3 million from

11  DOT for the replacement of the structurally deficient, 88-year-old, Eastbound Kellogg RiverCentre

12  Bridge (NBI BR# 90378). The bridge measures close to a quarter mile long, plays a pivotal role as a

13  gateway to the region's hub of economic activity, and provides direct access to major regional

14  attractions—Xcel Energy Center, RiverCentre Convention Center, Science Museum of Minnesota,

15  Ordway Center for the Performing Arts, residential properties, and a multitude of local businesses.

16  Kellogg Boulevard sees 2,097,000 total person miles traveled and 14,011 average daily traffic.

17      44.    The Eastbound Kellogg RiverCentre Bridge is at the center of a combined $1.3 million in

18  proposed development projects. These projects include the renovations and revitalization of the $500

19  million Xcel Energy Center complex, $788 million RiversEdge mixed-use development project, and

20  $114.3 million River Balcony 1.5-mile river promenade and mixed-use community development.

21  Without the bridge replacement, the success of these projects remains in jeopardy.

22      45.    The benefit-cost analysis conducted for the BIP proposal was done in accordance with the

23  methodology recommended by the USDOT in the "Benefit-Cost Analysis Guidance for Discretionary

24  Grant Programs," last revised December 2023. The period of analysis spans 32 years, which includes

25  three years of construction beginning in 2026, and 30 years of recurring maintenance costs and benefits

26  between 2028 and 2057. The benefit-cost ratio was estimated at 2.11 with a net positive present value of

27  approximately $58,279,427 in 2024 US Dollars.

28

46.     The Eastbound Kellogg Bridge is the City's highest priority for upcoming infrastructure improvement projects. The City has been shovel ready on this project since 2023, and the last missing piece is BIP dollars. The City has a $7 million federal appropriations for the Eastbound Kellogg Bridge through the Consolidated Appropriations Act, 2023, which if not obligated, will expire on September 30, 2026. Additionally, the cost of replacing the bridge has increased 34% since the initial BIP proposal in 2022, putting increased pressure on federal, state, and local infrastructure funding. If not replaced, the bridge will need to have a weight restriction in the future to mitigate the risk of catastrophic damage. A weight restriction will cause decreased accessibility and decreased economic activity to the major tourist and business attractions due to the bridge's central location to downtown Saint Paul.

## CONCLUSION

47.     The above is a non-exhaustive list of potential harms from the loss of federal funds. Because Saint Paul relies on federal funds for its ongoing operations across many subject matter areas, and for many different purposes, it is not possible to identify each and every area in which the city would suffer significantly were it to lose out on federal funds.

48.     If the City were to lose federal funding from HUD and DOT, the impact would be substantial, put the full burden of infrastructure investments on local and state resources, and cause delays to projects that would ripple for decades.

49.     The effect of a complete loss of federal funds would be devastating for Saint Paul, its employees, and its residents.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Ramsey County, MN on August 21, 2025.



Lindsay Bacher
Grants Director
City of Saint Paul

Docusign Envelope ID: FE0DB53E-4EB1-4389-8CC3-EAE087C75E88



EXHIBIT 1

Docusign Envelope ID: FE0DB53E-4EB1-4389-8CC3-EAE087C75E88

# Chapter 44. Employee Authority in Immigration Matters

## Sec. 44.01. Purpose and policy statement.

This chapter clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security ("homeland security") and other federal agencies with respect to the enforcement of civil immigration laws. The city works cooperatively with homeland security, as it does with all state and federal agencies, but the city does not operate its programs for the purpose of enforcing federal immigration laws. Homeland security has the legal authority to enforce immigration laws in the United States, in Minnesota and in the city. It is the policy of the city to respect the role of homeland security by avoiding pro-active enforcement of civil immigration laws. This chapter is not intended to limit the proper enforcement of generally applicable laws. It is the policy of the city that all residents are equally entitled to protection and that all residents should be able to access city services to which they are entitled, without regard to their immigration status under federal law.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.02. General city services.

(a)    To the extent permitted by law, in determining eligibility for, and providing general city services, city employees shall be governed by the following requirements:

(1)    City employees are to carry out their regular duties for the purpose of administering general city services and program. Employees may complete I-9 forms, may question a person regarding the I-9 form and documents supporting the I-9 form, and may allow homeland security to audit the I-9 forms as allowed by law. With the exception of inquiries allowed by law or as necessary for law enforcement purposes, no St. Paul city officer or employee should inquire into the immigration status of any person or request any documents or information verifying the immigration status of any individual. Employees shall comply with any properly issued subpoena for the production of documents or witnesses, even if related to immigration issues or issues of homeland security.

(2)    City employees shall follow general city, state and federal guidelines to assess eligibility for services. City employees shall only solicit immigration information or inquire about immigration status when specifically required to do so by law or program guidelines as a condition of eligibility for the service sought. City employees may require evidence of a person's identity and may ask to see a person's personal identifying documents only when specifically authorized and required to do so by the employee's work duties. Information about immigration status in the possession of or known to city employees and representatives, however received, shall not be maintained or recorded except as otherwise specifically required by law. The confidentiality of such information shall be maintained to the fullest extent permitted by the laws of the United States and the state, including the obligation to maintain the confidentiality of personal information under the Minnesota Government Data Practices Act. City employees shall not discriminate against any current or potential service users on the basis of any of the protected categories listed in the city's human rights ordinance, Legislative Code Chapter 183.02(5), or on the basis of immigration status.

(3)    Other than complying with lawful subpoenas, city employees and representatives shall not use city resources or personnel solely for the purpose of detecting or apprehending persons whose only

Created: 2025-07-30 15:06:42 [EST]

violation of law is or may be being undocumented, being out of status, or illegally residing in the United States (collectively "undocumented").

(4)   Where presentation of a state driver's license is customarily accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document), or of a photo identity document issued by any Minnesota county, shall not subject the person to an inquiry into the person's immigration status. This paragraph does not apply to I-9 forms.

(b)   General city services defined. General city services shall mean all city services excepting those services specifically listed as public safety services in section 44.03

(c)   Supervisors of general city services employees shall include information regarding the city's policy and expectations as set forth in this chapter in the orientation of new employees and as part of their employees' on-going in-service training.

(d)   City attorney's office. Civil division employees may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.03. Public safety services.

(a)   To the extent permitted by law, in providing public safety services, employees of the police and fire departments, and the city attorney's office - criminal division, (collectively, public safety officials), shall be governed by the following requirements:

(1)   Public safety officials may not undertake any law enforcement action for the sole purpose of detecting the presence of undocumented persons, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status.

(2)   City attorney's office - criminal division employees shall be permitted to:

a.   Inform persons of the possible immigration consequences of a guilty plea.

b.   Question and conduct cross-examination of a witness or defendant regarding immigration status.

c.   Inquire about immigration status for purposes of bail or conditional release.

d.   Investigate and inquire about immigration status when relevant to the potential or actual prosecution of the case or when immigration status is an element of the crime.

e.   Take immigration status and collateral effects of possible deportation into consideration during discussions held for the purpose of case resolution.

(3)   Public safety officials may not question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c).

(4)   Nothing in this chapter shall prohibit public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws.

(5)   Nothing in this chapter prohibits public safety personnel from adequately identifying criminal suspects or assessing the risk of flight of criminal suspects.

(6)   Where presentation of a state driver's license is customarily accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's

license, passport, or matricula consular (consulate-issued document), or of a photo identity document issued by any Minnesota county, shall not subject the person to an inquiry into the person's immigration status.

(b)  All such use of city public safety personnel under 44.03(a)(3) and (a)(4) shall be documented, including any applicable homeland security mission statement and operational guidelines, the reason for the dispatch of personnel, the name of the homeland security agent in charge, and the name of the officer authorizing the use of city personnel.

(c)  Supervisors of public safety officials shall include information regarding the city's policy and expectations as set forth in this chapter, in the orientation of new employees and as part of their employees' on-going in-service training.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.04. Complaints and discipline.

(a)  An employee of the city who violates this chapter may be subject to disciplinary action, such as oral reprimands, written reprimands, suspension without pay, and discharge, under the appropriate union contract, civil service commission rules, or department work rules.

(b)  Complaints of a violation by an employee of the city police department shall be received and investigated by the police internal integrity assurance unit and forwarded to the police civilian review commission. Complaints of a violation of this chapter by an employee of any other city department shall be received and investigated by the director of the office of human resources. The results of any such investigation shall be provided to the complainant in writing within ninety (90) days of receipt of the complaint. Complainants and witnesses shall not be asked to provide their immigration status at any point during the complaint process, and no investigation of the immigration status of the complainant and witnesses shall be made by any city personnel in the investigation of such a complaint or thereafter.

(c)  It shall not be a violation of this chapter to require the completion of I-9 forms .

(d)  The city office of human resources, in consultation with the police civilian internal affairs review commission and affected communities, shall prepare and file in April of each year with the city council and the mayor an annual report and recommendations regarding the implementation of this chapter.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.05. Subpoena.

Nothing in this chapter prohibits city employees from responding to a properly issued subpoena.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.06. Certifications for victims of crimes.

(a)  *Definitions.* For the purposes of this section, the following definitions shall apply:

(1)  *Certification request.* A request made by a victim of crime, or the victim's attorney or other appropriate representative, to a city certifying agency for a U Nonimmigrant Status Certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons for persons eligible under 8 U.S.C. §1101(a)(15)(T) or (U) as provided in the Victims of Trafficking and Violence Prevention Act of 2000.

(2) *City certifying agency.* Any city department having legal authority to sign a U Visa Nonimmigrant Status Certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons, including the Saint Paul police department and the city attorney's office.

(3) *Investigation or prosecution.* The phrase "investigation or prosecution" has the meaning set out in 8 CFR §214.14(a)(5) that includes the detection or investigation of a qualifying crime or criminal activity, as well as the prosecution, conviction, or sentencing of the perpetrator of the qualifying crime or criminal activity.

(b) *Certification process.*

(1) Standard review. City certifying agencies must process certification requests as quickly as reasonably possible. All certification requests must be processed within thirty (30) days of receipt by the applicable city certifying agency of the request or as soon as reasonably possible thereafter if the processing is delayed by the need to seek off-site records or other good cause.

(2) Expedited review. City certifying agencies must provide for an expedited review process for victims or qualifying family members of victims who are in removal proceedings, with requests processed within seven (7) days request or as soon as reasonably possible thereafter if the processing is delayed by the need to seek off-site records or other good cause.

(3) City certifying agencies shall make information about the certification process, including standard and expedited review, readily available to the public in multiple languages and include this information on the city's website.

(4) The head of each city certifying agency must designate a certifying official authorized to review, process, and certify requests as legally appropriate on a case-by-case basis taking into consideration all relevant facts.

(c) *Certification of helpfulness.* A city certifying agency must evaluate whether a victim requesting U Nonimmigrant Status Certification possesses information concerning a qualifying criminal activity, and has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the criminal activity as provided in 8 U.S.C. §1101(a)(15)(U). Victim helpfulness is minimally established by making a criminal complaint or filing a full and accurate police report.

(d) *Data privacy.* City certifying agencies must not disclose private or confidential information about victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order.

(Ord. No. 18-21, § 1, 6-13-18)

Editor's note(s)—Ord. No. 18-21, § l, adopted June 13, 2018, in effect, repealed § 44.06 and enacted a new § 44.06 as set out herein. Former § 44.06 pertained to no intent to create private cause of action and derived from C.F. No. 04-316, adopted May 5, 2004.

## Sec. 44.07. No intent to create private cause of action.

Nothing in this chapter is intended to create a private cause of action for violations of this chapter.

(Ord. No. 18-21, § 2, 6-13-18)

Editor's note(s)—Ord. No. 18-21, § 3, adopted June 13, 2018, renumbered § 44.07 as § 44.08.

**Sec. 44.08. Severability.**

If a section of this chapter is found to be invalid for any reason, the remaining sections of the chapter shall continue in full force and effect.

(C.F. No. 04-316, § 1, 5-5-04; Ord. No. 18-21, § 3, 6-13-18)

Editor's note(s)—See editor's note, § 44.07.

Docusign Envelope ID: FE0DB53E-4EB1-4389-8CC3-EAE087C75E88



EXHIBIT 2

**Applicant and Recipient
Assurances and Certifications**

**U.S. Department of Housing
and Urban Development**

OMB Number: 2501-0044
Expiration Date: 2/28/2027

## Instructions for the HUD 424-B Assurances and Certifications

As part of your application for HUD funding, you, as the official authorized to sign on behalf of your organization or as an individual, must provide the following assurances and certifications. The Responsible Civil Rights Official has specified this form for use for purposes of general compliance with 24 CFR §§ 1.5, 3.115, 8.50, and 146.25, as applicable. The Responsible Civil Rights Official may require specific civil rights assurances to be furnished consistent with those authorities and will specify the form on which such assurances must be made. A failure to furnish or comply with the civil rights assurances contained in this form may result in the procedures to effect compliance at 24 CFR §§ 1.8, 3.115, 8.57, or 146.39.

By submitting this form, you are stating that all assertions made in this form are true, accurate, and correct.

As the duly representative of the applicant, I certify that the applicant: [Insert below the Name and title of the Authorized Representative, name of Organization and the date of signature]:

  *Authorized Representative Name:

  *Title:

  *Applicant/Recipient Organization:

1.    Has the legal authority to apply for Federal assistance, has the institutional, managerial and financial capability (including funds to pay the non-Federal share of program costs) to plan, manage and complete the program as described in the application and the governing body has duly authorized the submission of the application, including these assurances and certifications, and authorized me as the official representative of the application to act in connection with the application and to provide any additional information as may be required.

2.    Will administer the grant in compliance with Title VI of the Civil Rights Act of 1964 (42 U.S.C 2000(d)) and implementing regulations (24 CFR part 1), which provide that no person in the United States shall, on the grounds of race, color or national origin, be excluded from participation in, be denied the benefits of, or otherwise be subject to discrimination under any program or activity that receives Federal financial assistance OR if the applicant is a Federally recognized Indian tribe or its tribally designated housing entity, is subject to the Indian Civil Rights Act (25 U.S.C. 1301-1303).

3.    Will administer the grant in compliance with Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), as amended, and implementing regulations at 24 CFR part 8, the American Disabilities Act (42 U.S.C. §§ 12101 et.seq.), and implementing regulations at 28 CFR part 35 or 36, as applicable, and the Age Discrimination Act of 1975 (42 U.S.C. 6101-07) as amended, and implementing regulations at 24 CFR part 146 which together provide that no person in the United States shall, on the grounds of disability or age, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance; except if the grant program authorizes or limits participation to designated populations, then the applicant will comply with the nondiscrimination requirements within the designated population.

4.    Will comply with the Fair Housing Act (42 U.S.C. 3601-19), as amended, and the implementing regulations at 24 CFR part 100, which prohibit discrimination in housing on the basis of race, color, religion, sex, disability, familial status, or national origin and will affirmatively further fair housing; except an applicant which is an Indian tribe or its instrumentality which is excluded by statute from coverage does not make this certification; and further except if the grant program authorizes or limits participation to designated populations, then the applicant

will comply with the nondiscrimination requirements within the designated population.

5.    Will comply with all applicable Federal nondiscrimination requirements, including those listed at 24 CFR §§ 5.105(a) and 5.106 as applicable.

6.    Will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws.

7.    Will comply with the acquisition and relocation requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended (42 U.S.C. 4601) and implementing regulations at 49 CFR part 24 and, as applicable, Section 104(d) of the Housing and Community Development Act of 1974 (42 U.S.C. 5304(d)) and implementing regulations at 24 CFR part 42, subpart A.

8.    Will comply with the environmental requirements of the National Environmental Policy Act (42 U.S.C. 4321 et.seq.) and related Federal authorities prior to the commitment or expenditure of funds for property.

9.    That no Federal appropriated funds have been paid, or will be paid, by or on behalf of the applicant, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, and officer or employee of Congress, or an employee of a Member of Congress, in connection with the awarding of this Federal grant or its extension, renewal, amendment or modification. If funds other than Federal appropriated funds have or will be paid for influencing or attempting to influence the persons listed above, I shall complete and submit Standard Form-LLL, Disclosure Form to Report Lobbying. I certify that I shall require all subawards at all tiers (including sub-grants and contracts) to similarly certify and disclose accordingly. Federally recognized Indian Tribes and tribally designated housing entities (TDHEs) established by Federally-recognized Indian tribes as a result of the exercise of the tribe's sovereign power are excluded from coverage by the Byrd Amendment, but State-recognized Indian tribes and TDHEs established under State law are not excluded from the statute's coverage.

**I/We, the undersigned, certify under penalty of perjury that the information provided above is true, accurate, and correct. WARNING: Anyone who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil and administrative penalties. (18 U.S.C. §§287, 1001, 1010, 1012, 1014; 31 U.S.C. §3729, 3802; 24 CFR §28.10(b)(1)(iii)).**

 * Signature:


 * Date: (mm/dd/yyyy):

**Public Reporting Burden Statement:** The public reporting burden for this collection of information is estimated to average 0.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. Comments regarding the accuracy of this burden estimate and any suggestions for reducing this burden can be sent to: U.S. Department of Housing and Urban Development, Office of the Chief Data Officer, R, 451 7th St SW, Room 4176, Washington, DC 20410-5000. **Do not send completed HUD 424-B forms to this address.** This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection displays a valid OMB control number. The Department of Housing and Urban Development is authorized to collect this information under the authority cited in the Notice of Funding Opportunity for this grant program. The information collected provides assurances and certifications for legal requirements related to the administration of this grant program. HUD will use this information to ensure compliance of its grantees. This information is required to obtain the benefit sought in the grant program. This information will not be held confidential and may be made available to the public in accordance with the Freedom of Information Act (5 U.S.C. §552).

Docusign Envelope ID: FE0DB53E-AEB1-4389-8CC3-EAE087C75F88



EXHIBIT 3

**From:** CPD DAS for Field Operations <CPDDASforfieldoperations@hud.gov>
**Sent:** Tuesday, July 1, 2025 5:52 PM
**To:** Beth Ulrich <beth.ulrich@ci.stpaul.mn.us>
**Cc:** MinneapolisCPD <MinneapolisCPD@hud.gov>; Lamantia, Matthew C <Matthew.C.Lamantia@hud.gov>
**Subject:** NOTIFICATION: City of St. Paul, MN FY25 Consolidated Plan/Action Plan

Dear Grantee,

This message serves as notification that the Department is questioning the accuracy of the city of St. Paul's certification that the Community Development Block Grant (CDBG)-PRO Housing funds described in its Fiscal Year 2023 Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders.  HUD is providing this opportunity for your jurisdiction to comment (i.e., provide specific evidence demonstrating compliance with the certification) by responding to this notification.  The grantee's demonstration of compliance with the certification should include taking the actions described below by **close of business on Wednesday, July 2, 2025**.  Failure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan.

During HUD's review of the Fiscal Year 2025 Consolidated Plan/Action Plan submitted by your jurisdiction, the Department identified language in the Plan that appears to violate Order *14151 Ending Radical and Wasteful Government DEI Programs and Preferencing,* Executive Order 14173 *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, and Executive Order 14218 *Ending Taxpayer Subsidization of Open Borders,*  Specifically, the jurisdiction's Plan states the following:

- "The most recent Community Health Improvement Plan emphasized racial **equity**, healthy food, active living, access to health care, mental health, violence prevention, homelessness and housing instability, climate change and opioid crisis and response as community priorities." (Page 12, emphasis added)
- "The City has a strong focus on racial **equity** and addressing disparities and has designed funding programs intended to close these gaps to ensure we are **Affirmatively Furthering Fair Housing**." (Pages 41, 44, additional flags on p. 118, emphasis added)
- "The City's 2040 Comprehensive Plan supports the **equitable** geographic allocation of public funding and investment (especially for land use, housing, transportation, community wealth creation, public utilities and parks) to ensure that residents in these areas have the resources they need to thrive and prosper." (Page 94, emphasis added)
- "There remains a sustained focus across Mayoral administrations to address racial **inequities**." (Page 187, emphasis added)

- 
- 

- "Over 72% of SPIP clients, who are victims of domestic violence and their children, are Indigenous, people of color, or **refugees/immigrants** and the majority have dependent children." (Page 37, emphasis added)
- "Community development and social service organizations expressed that Saint Paul's new Americans and **immigrant** population can experience housing problems due to language barriers, vulnerable residency status, and lack of access to, or knowledge of, resources. Saint Paul's new Americans and newly arrived **refugees** need stable affordable housing that is adequate for their family size, which may include accommodating multi-generational living. Since **refugees and immigrants** are simultaneously learning a new language, new culture, and marketable job skills, these residents need to be able to access housing information, programs, and services in their primary language." (Page 61-62, emphasis added)
- "Recent **immigrants** from countries from around the world over the last decade has followed this historic residential pattern for people of color and has contributed to the concentration of racial and ethnic communities." (Page 98, emphasis added)
- "The City also sees a high rate of new **immigrants** in the unsheltered population." (Page 175, emphasis added)

- "YWCA St. Paul collaborates with Ramsey County Coordinated Entry, Public Housing Agency, Ramsey County Workforce Solutions, Saint Paul Public Schools and other partners to provide safe affordable housing; comprehensive support services; employment and educational training; and health & wellness initiatives to advance the mission of eliminating racism and **empowering women**." (Page 129, emphasis added)
- "Labor Standards and Section 3 – The City monitors contract compliance for labor standards and Section 3 through B2GNow, which has a certification portal for CERT (a small business certification program recognized by Hennepin County, Ramsey County, the City of Minneapolis and the City of Saint Paul and certifies **Minority-Owned Business Enterprise (MBE), Women-Owned Business Enterprise (WBE),** and Small Business Enterprise (SBE))" (Page 147, emphasis added)
- "The Department of Human Rights and Equal Economic Opportunity (HREEO) deals with discrimination issues and provides access to economic opportunities through **inclusive** contracting practices and workforce development policies." (Page 146, emphasis added)

This language includes provisions that are prohibited in the implementation of federal programs pursuant to the referenced executive orders.  To address this issue, your jurisdiction should provide assurance to the Department by taking the following actions:

1. Remove or replace all "diversity and equity" and "equity" references throughout the document and replace with "activities and actions that do not violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" ;
2. Replacing all "immigrant" and "refugee" references with "legal/documented immigrant/refugee"  and
3. Provide the following assurance statements within the Plan:

    "The city of St. Paul agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code."

    "The city of St. Paul will not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964."

    "The city of St. Paul agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code."

"The city of St. Paul shall administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and certification requirement that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S. C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218 or other Executive Orders or immigration laws."

The grantee should re-submit the action plan to HUD by the deadline noted above. Please work to revise and resubmit your Plan in HUD's Integrated Disbursement and Information System (IDIS). If HUD disapproves the Plan, the grantee must resubmit its Plan within 45 days after first notification of Plan disapproval (see 24 CFR 91.500(d)).

If you should have any questions, please reach out to the Office of Community Planning and Development Office of Field Operations at cpddasforfieldoperations@hud.gov .

Docusign Envelope ID: FE0DB53E-4EB1-4339-8CC3-EAE087C75F88



# EXHIBIT 4

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE
FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT
PROGRAM:
FHWA PROJECTS**

**Date: June 13, 2024
Revised:  October 1, 2024
Revised:  March 17, 2025**

# Table of Contents

Article 7 Purpose ........................................................................................................................ 6
   7.1    Purpose ............................................................................................................................ 6
Article 8 USDOT Role ............................................................................................................... 6
   8.1    Division of USDOT Responsibilities ........................................................................... 6
   8.2    USDOT Program Contact ............................................................................................. 7
Article 9 Recipient Role ............................................................................................................. 7
   9.1    Statements on the Project .............................................................................................. 7
   9.2    Statements on Authority and Capacity ......................................................................... 7
   9.3    USDOT Reliance ........................................................................................................... 8
   9.4    Project Delivery ............................................................................................................. 8
   9.5    Rights and Powers Affecting the Project ...................................................................... 8
   9.6    Notification of Changes to Key Personnel .................................................................... 9
Article 10 Award Amount, Obligation, and Time Periods ........................................................ 9
   10.1   Federal Award Amount ................................................................................................. 9
   10.2   Federal Obligations ....................................................................................................... 9
   10.3   Budget Period .............................................................................................................. 10
   10.4   Period of Performance ................................................................................................. 10
Article 11 Statement of Work, Schedule, and Budget Changes ............................................. 11
   11.1   Notification Requirement ............................................................................................. 11
   11.2   Statement of Work Changes ....................................................................................... 11
   11.3   Schedule Changes ....................................................................................................... 11
   11.4   Budget Changes .......................................................................................................... 11
   11.5   USDOT Acceptance of Changes ................................................................................ 12
Article 12 General Reporting Terms ....................................................................................... 12
   12.1   Report Submission ...................................................................................................... 12
   12.2   Alternative Reporting Methods ................................................................................... 13
   12.3   Paperwork Reduction Act Notice ............................................................................... 13
Article 13 Progress and Financial Reporting ......................................................................... 13
   13.1   Quarterly Performance Progress Reports ................................................................... 13
   13.2   Quarterly Financial Status ........................................................................................... 13
   13.3   Final Performance Progress Reports and Financial Status ......................................... 13
Article 14 Performance Reporting ........................................................................................... 14
   14.1   Baseline Performance Measurement ........................................................................... 14
   14.2   SS4A Final Report: .................................................................................................... 14
   14.3   Performance Measurement Information ...................................................................... 15
   14.4   Performance Reporting Survival ................................................................................. 15
   14.5   Program Evaluation .................................................................................................... 15
Article 15 Noncompliance and Remedies ............................................................................... 15
   15.1   Noncompliance Determinations .................................................................................. 15
   15.2   Remedies ...................................................................................................................... 16
   15.3   Other Oversight Entities ............................................................................................. 17
Article 16 Agreement Termination .......................................................................................... 17
   16.1   USDOT Termination .................................................................................................. 17
   16.2   Closeout Termination ................................................................................................. 18
   16.3   Post-Termination Adjustments ................................................................................... 18
   16.4   Non-Terminating Events ............................................................................................ 18
   16.5   Other Remedies .......................................................................................................... 18

Article 17 Monitoring, Financial Management, Controls, and Records ...................................... 18
  17.1  Recipient Monitoring and Record Retention. ................................................................. 18
  17.2  Financial Records and Audits. ....................................................................................... 19
  17.3  Internal Controls. ........................................................................................................... 19
  17.4  USDOT Record Access. ................................................................................................. 19
Article 18 Contracting and Subawards ....................................................................................... 19
  18.1  Build America, Buy America. ........................................................................................ 19
  18.2  Small and Disadvantaged Business Requirements. ....................................................... 22
  18.3  Engineering and Design Services. ................................................................................. 22
  18.4  Foreign Market Restrictions. ......................................................................................... 23
  18.5  Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ... 23
  18.6  Recipient Responsibilities for Subawards. .................................................................... 23
  18.7  Subaward and Contract Authorization. .......................................................................... 23
Article 19 Costs, Payments, and Unexpended Funds ................................................................. 23
  19.1  Limitation of Federal Award Amount. ........................................................................... 23
  19.2  Projects Costs. ................................................................................................................ 23
  19.3  Timing of Project Costs. ................................................................................................ 23
  19.4  Recipient Recovery of Federal Funds. ........................................................................... 24
  19.5  Unexpended Federal Funds. ........................................................................................... 24
  19.6  Timing of Payments to the Recipient. ........................................................................... 24
  19.7  Payment Method. ............................................................................................................ 24
  19.8  Information Supporting Expenditures. ........................................................................... 24
  19.9  Reimbursement Frequency. ............................................................................................ 24
  19.10 Match. ............................................................................................................................. 24
Article 20 Liquidation, Adjustments, and Funds Availability .................................................. 25
  20.1  Liquidation of Recipient Obligations. ........................................................................... 25
Article 21 Agreement Modifications .......................................................................................... 25
  21.1  Bilateral Amendments. .................................................................................................. 25
  21.2  Unilateral Contact Modifications. ................................................................................. 25
  21.3  USDOT Unilateral Modifications. ................................................................................. 25
  21.4  Other Modifications. ...................................................................................................... 25
Article 22 [RESERVED] ............................................................................................................ 25
  22.1  [RESERVED]. ................................................................................................................ 25
Article 23 [RESERVED] ............................................................................................................ 26
  23.1  [RESERVED]. ................................................................................................................ 26
Article 24  Labor and Workforce ............................................................................................... 26
  24.1  Labor and Workforce. .................................................................................................... 26
Article 25 Critical Infrastructure Security and Resilience ......................................................... 26
  25.1  Critical Infrastructure Security and Resilience. ............................................................ 26
Article 26  Civil Rights and Title VI .......................................................................................... 26
  26.1  Civil Rights and Tile VI. ................................................................................................ 26
Article 27 Federal Financial Assistance, Administrative, and National Policy Requirements .... 27
  27.1  Uniform Administrative Requirements for Federal Awards. ......................................... 27
  27.2  Federal Law and Public Policy Requirements. .............................................................. 27
  27.3  Federal Freedom of Information Act. ............................................................................. 28
  27.4  History of Performance. ................................................................................................. 28
  27.5  Whistleblower Protection. .............................................................................................. 28
  27.6  External Award Terms and Obligations. ........................................................................ 28
  27.7  Incorporated Certifications. ........................................................................................... 29

Article 28 Assignment ........................................................................................................ 29
  28.1  Assignment Prohibited. ............................................................................................ 29
Article 29 Waiver .............................................................................................................. 29
  29.1  Waivers. ................................................................................................................... 29
Article 30  Additional Terms and Conditions ................................................................... 30
  30.1  Effect of Planning and Demonstration or Implementation Award. ......................... 30
  30.2  Disclaimer of Federal Liability. .............................................................................. 30
  30.3  Environmental Review. ........................................................................................... 30
  30.4  Railroad Coordination. ............................................................................................ 31
  30.5  Relocation and Real Property Acquisition. ............................................................ 32
  30.6  Equipment Disposition. ........................................................................................... 32
Article 31 Mandatory Award Information ......................................................................... 32
  31.1  Information Contained in a Federal Award. ........................................................... 32
Article 32 Construction and Definitions ............................................................................ 33
  32.1  Attachments. ............................................................................................................ 33
  32.2  Exhibits. ................................................................................................................... 33
  32.3  Construction. ............................................................................................................ 33
  32.4  Integration. ............................................................................................................... 33
  32.5  Definitions. ............................................................................................................... 33
Article 33 Agreement Execution and Effective Date ........................................................ 34
  33.1  Counterparts. ............................................................................................................ 34
  33.2  Effective Date. ......................................................................................................... 34

## Index of Definitions

Administering Operating Administration ...................................................................................... 7
Environmental Review Entity…………………………………………………………………...29
Federal Share ................................................................................................................................. 12
FHWA ............................................................................................................................................. 7
NOFO .............................................................................................................................................. 6
OMB ............................................................................................................................................... 13
Program Statute ............................................................................................................................ 32
Project…………………………………………………………………………………………....22
Project Closeout ........................................................................................................................... 18
SS4A Grant ................................................................................................................................... 32
USDOT ............................................................................................................................................ 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act (Pub. L. 117–58, November 15, 2021; also referred to as the "IIJA") established the Safe Streets and Roads for All (the "SS4A") Discretionary Grant Program (IIJA Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2024 for the SS4A Discretionary Grant Program.

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2024 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through F are project-specific attachments.

## ARTICLE 7
## PURPOSE

7.1    **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

## ARTICLE 8
## USDOT ROLE

8.1    **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b) The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2    USDOT Program Contact.**

Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2822

# ARTICLE 9
# RECIPIENT ROLE

**9.1    Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)    Attachment B documents all material changes in the information contained in that application.

**9.2    Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)    it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the

recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 27.7 on behalf of the Recipient.

**9.3**    **USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)    the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)    the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)    the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4**    **Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c) The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d) The Recipient shall provide access to records as provided at 2 C.F.R. 200.337.

**9.5**    **Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**9.6**     **Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.3 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.2.

## ARTICLE 10
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**10.1**    **Federal Award Amount** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in section 2.2 as the SS4A Grant Amount.

**10.2**    **Federal Obligations.**

This agreement obligates funds for the period of performance listed on Page 1, Block 6 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in Section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," (for phased agreements) then an amount up to the Grant Amount listed in Section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.2(c)–10.2(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant funds among separate phases of the Project for the purpose of the Federal obligation of funds. The scope of each phase of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if the condition is met not later than the date listed in Section 2.4 of the project-specific agreement.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

(1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

(2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

(1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

(2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

(3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

## 10.3    Budget Period

The budget period for this award begins on the effective date of this agreement and ends on the budget period end date that is listed in section 2.4, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

## 10.4    Period of Performance.

(a) The period of performance for this award begins on the effective date of award listed in page 1, Block 2 and ends on the period of performance end date that is listed in Page 1, Block 6.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

## ARTICLE 11
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**11.1    Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.3 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

**11.2    Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

**11.3    Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant date(s):

(1)    a substantial completion date for the Project or a component of the Project that is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

(2)    a schedule change would require the period of performance to continue after the period of performance end date listed on Page 1, Block 6 (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements).

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

**11.4    Budget Changes.**

(a)    The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b)    The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

      (2)      the "Total Eligible Project Cost" amount decreases.

(c) For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

      (1)      in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

      (2)      if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SS4A Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3(a).

(f) The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5**    **USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

# ARTICLE 12
# GENERAL REPORTING TERMS

**12.1    Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.3.  Reports will be added to a central repository maintained by FHWA.

**12.2    Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

**12.3    Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

# ARTICLE 13
# PROGRESS AND FINANCIAL REPORTING

**13.1    Quarterly Performance Progress Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Performance Progress Report in the format and with the content described in Exhibit C. If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Performance Progress Report in the second calendar year quarter that begins after the date of this agreement.

**13.2    Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit a Federal Financial Report using SF-425.

**13.3    Final Performance Progress Reports and Financial Status.** No later than 120 days after the end of the period of performance, the Recipient shall submit:

(1)    a Final Performance Progress Report in the format and with the content described in Exhibit C for each Quarterly Performance Progress Report, including a final Federal Financial Report (SF-425); and

(2)    any other information required under the Administering Operating Administration's award closeout procedures.

## ARTICLE 14
## PERFORMANCE REPORTING

**14.1    Baseline Performance Measurement.** Recipients of Implementation Grants or Planning and Demonstration Grants with demonstration activities shall:

(1)    collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

(2)    on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

**14.2    SS4A Final Report.**

The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report in the format specified by FHWA and with the content described in Attachment A that describes, consistent with sections 24112(g)-(h) of IIJA:

(1)    the costs of each eligible project and strategy carried out using the grant;

(2)    the roadway safety outcomes and any additional benefits (e.g., increased walking, biking, or transit use without a commensurate increase in serious and fatal crashes, etc.) that each such project and strategy has generated, as—

• identified in the grant application; and

• measured by data to the maximum extent practicable;

(3) [RESERVED]

(4)    the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

**14.3    Performance Measurement Information.**

For each performance measure identified to be submitted annually in the Performance Measure Table in Attachment A, not later than January 31 of each year, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

**14.4    Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

**14.5    Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant recipients, before/after photographs of the sites, qualitative activities such as videos describing the project and its impact on the community, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

# ARTICLE 15

# NONCOMPLIANCE AND REMEDIES

**15.1    Noncompliance Determinations.**

(a)  If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b)  If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

    (1)     accept the remedy;

    (2)     acknowledge the noncompliance, but propose an alternative remedy; or

    (3)     dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

    (1)     after considering the Recipient's response under section 15.1(b); or

    (2)     if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the basis for that determination.

## 15.2    Remedies.

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

    (1)     additional conditions on the award;

    (2)     any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

    (3)     any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the

Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the
Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**15.3    Other Oversight Entities.**

Nothing in this article 15 limits any party's authority to report activity under this
agreement to the United States Department of Transportation Inspector General or other
appropriate oversight entities.

**ARTICLE 16
AGREEMENT TERMINATION**

**16.1    USDOT Termination.**

(a) The USDOT may terminate this agreement and all its obligations under this agreement if
any of the following occurs:

    (1)    the Recipient fails to obtain or provide any non-SS4A Grant contribution (all
eligible project costs other than the SS4A Grant Amount, as described in section
3.3(a) of the grant agreement) or alternatives approved by the USDOT as
provided in this agreement and consistent with article 3;

    (2)    a construction start date for the project or strategy is listed in section 3.2 and the
Recipient fails to meet that milestone by six months after the date listed in section
3.2;

    (3)    a substantial completion date for the project or strategy is listed in section 3.2 and
the Recipient fails to meet that milestone by six months after the date listed in
section 3.2;

    (4)    the Recipient fails to comply with the terms and conditions of this agreement,
including a material failure to comply with the schedule in section 3.2 even if it is
beyond the reasonable control of the Recipient; or,

    (5)    the USDOT determines that termination of this agreement is in the public interest.

    (6)    the Recipient fails to expend the funds within 5 years after the date on which the
government executes the grant agreement, which is the date funds are provided
for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only
the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a
remedy under section 15.2.

17 of 33

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2   Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3   Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4   Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5   Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

## ARTICLE 17
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**17.1   Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

   (1)     that those activities comply with this agreement; and

   (2)     that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**17.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the project, and the amount or nature of that portion of the cost of the project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2024 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2024" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2024" in column c ("Additional Award Identification").

**17.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

## ARTICLE 18
## CONTRACTING AND SUBAWARDS

**18.1    Build America, Buy America.** This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184, and Office of Management and Budget (OMB) Memorandum M-24-02, "Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards for each construction material are provided at 2 CFR 184.6.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a domestic content procurement preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.*

An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) manufactured products; (iii) construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated. An article, material, or supply incorporated into an infrastructure project must meet the requirements for only the single category in which it is classified.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1) applying the domestic content procurement preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"**Construction materials**" means articles, materials, or supplies that consist of only one of the items listed in paragraph (21) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material.

(1) The listed items are:
- non-ferrous metals;
- plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
- glass (including optic glass);
- fiber optic cable (including drop cable)
- lumber;
- engineered wood; and
- drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"**Domestic content procurement preference**" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"**Iron or steel products**" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"**Manufactured products**" means

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

"**Predominantly of iron or steel or a combination of both**" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

"**Project**" means the development of a safety action plan (including supplemental and topical plans) or the temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.

"**Section 70917(c) materials**" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

**18.2**    **Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

**18.3**    **Engineering and Design Services.** The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract

for architectural and engineering services is negotiated under 2 C.F.R. 200.320 or an equivalent qualifications-based requirement prescribed for or by the Recipient.

**18.4    Foreign Market Restrictions.** The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**18.6    Recipient Responsibilities for Subawards.**

If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R.  parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

**18.7    Subaward and Contract Authorization.**

If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f) (6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.

## ARTICLE 19
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**19.1    Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11, Federal Funds Obligated.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**19.2    Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**19.3    Timing of Project Costs.**

(a)  The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b) The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement unless there has been an approval of pre-award costs under 2 C.F.R. 200.458.

**19.4   Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**19.5   Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

**19.6   Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

**19.7   Payment Method.** The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8   Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF-270 (Request for Advance or Reimbursement) or SF-271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9   Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI iSupplier," then the Recipient shall not request reimbursement more frequently than monthly.

**19.10 Match.** The recipient should show on each request for reimbursement that at least 20 percent of the incurred costs will count towards match. If the recipient intends to vary the match percentage over the life of the project, it must communicate its plan to USDOT. The recipient is responsible for tracking match according to the plan.  At the completion of the grant award, the cost share requirement must be met, and Federal funds must not exceed the project's Federal share.

## ARTICLE 20
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**20.1    Liquidation of Recipient Obligations.**

(a)  The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b)  Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 21
## AGREEMENT MODIFICATIONS

**21.1    Bilateral Amendments.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**  The USDOT may update the contacts who are listed in section 4.3 by written notice to all the Recipient contacts who are listed in sections 4.1 and 4.2.

**21.3    USDOT Unilateral Modifications.**

(a)  The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b)  To unilaterally modify this agreement under this section 20.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications. T**he parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

## ARTICLE 22

## [RESERVED]

## ARTICLE 23

## [RESERVED]

## ARTICLE 24
## LABOR AND WORKFORCE

**24.1 Labor and Workforce.** Attachment E documents the consideration of job quality and labor rights, standards, and protections related to the Project.

## ARTICLE 25
## CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**25.1 Critical Infrastructure Security and Resilience.**

Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021), the Recipient shall consider physical and cyber security and resilience in planning, design, and oversight of the Project. Attachment F documents the consideration of critical security infrastructure for projects that include the purchase of information technology and/or operational technology.

## ARTICLE 26
## CIVIL RIGHTS AND TITLE VI

**26.1    Civil Rights and Title VI**

(a) The purpose of sections 26.1(b)–26.1(c) is to ensure that the Recipient has a plan to comply with civil rights obligations and nondiscrimination laws, including Title VI and 49 C.F.R. part 21, including any amendments thereto.

(b) If the Recipient is an Existing Recipient, the Recipient shall submit to the USDOT either:

(1) not later than one month after the date of this agreement, documentation showing that the Recipient has complied with all reporting requirements under the Administering Operating Administration's implementation of Title VI; or

(2) not later than six months after the date of this agreement, both a Title VI Plan and a Community Participation Plan, as those plans are described in chapter II, sections 3–4 of DOT Order 1000.12C.

(c) If the Recipient is "New," then the Administering Operating Administration completed a Title VI Assessment of the Recipient, as described in chapter II, section 2 of DOT Order 1000.12C., before entering this agreement.

(d) In this section 26.1:

(1) "**Title VI**" means Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified at 42 U.S.C. 2000d to 2000d-4a).

(2) "**Existing**" means a prior recipient of DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

(3) "**New**" means a recipient who has not received DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.


# ARTICLE 27
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**27.1** **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**27.2** **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity,* the Recipient agrees that its compliance in all respects with all

applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity,* by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination law.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

## 27.3 Federal Freedom of Information Act.

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**27.4  History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

## 27.5 Whistleblower Protection.

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

## 27.6 External Award Terms and Obligations.

(a) In addition to this document and the contents described in article 32, this agreement includes the following additional terms as integral parts:

(1) Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

(2) Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

(3) 2 C.F.R part 175: Award term for Trafficking in Persons; and

      (4)     Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

      (1)     49 C.F.R. part 20: New Restrictions on Lobbying;

      (2)     49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

      (3)     49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

      (4)     Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**27.7  Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

      (1)     Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).


## ARTICLE 28
## ASSIGNMENT


**28.1 Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.


## ARTICLE 29
## WAIVER


**29.1  Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

# ARTICLE 30
# ADDITIONAL TERMS AND CONDITIONS

**30.1   Effect of Planning and Demonstration or Implementation Award.** Based on information that the Recipient provided to the USDOT, including the Grant Application, as indicated in section 2.5, this agreement designates this award as a Planning and Demonstration award or an Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation as listed in the FY 2024 Notice of Funding Opportunity for Safe Streets and Roads for All.

**30.2   Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**30.3 Environmental Review**

(a) In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b) Except as authorized under section 30.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

(1) the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

(2) if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

(1) the Environmental Review Entity's actions under section 30.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

(2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

(1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

(2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**30.4 Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**30.5 Relocation and Real Property Acquisition.**

(a) The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c) The Recipient shall make available to displaced persons, , comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**30.6 Equipment Disposition.**

(a) In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b) In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.313–200.316 and 2 C.F.R. 1201.313.

(c) The Recipient shall ensure compliance with this section 30.6 for all tiers of subawards under this award.

## ARTICLE 31
## MANDATORY AWARD INFORMATION

**31.1    Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)    the "Federal Award Date" is the date of this agreement, as defined under section 33.2;

(2)    the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)    this award is not for research and development.

## ARTICLE 32
## CONSTRUCTION AND DEFINITIONS

**32.1    Attachments.** This agreement includes the following attachments as integral parts:

| | |
|---|---|
| Attachment A | Performance Measurement Information |
| Attachment B | Changes from Application |
| Attachment C | Reserved |
| Attachment D | Reserved |
| Attachment E | Labor and Workforce |
| Attachment F | Critical Infrastructure Security and Resilience |
| Attachment G | Reserved |

**32.2    Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2024 SS4A Grant Program", dated March 17, 2025, and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Performance Progress Reports: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**32.3   Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1–30, then the provision in articles 1–30 prevails. If a provision in the attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

**32.4   Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

**32.5   Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the BIL section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement.

"**SS4A Grant**" means an award of funds that were made available under the SS4A NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 33
## AGREEMENT EXECUTION AND EFFECTIVE DATE

**33.1   Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**33.2   Effective Date.** The agreement will become effective when all parties have signed it. The effective date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

Docusign Envelope ID: FE0DB53E-4EB1-4329-8CC3-EAE087C75F88



EXHIBIT 5

## U.S. DEPARTMENT OF TRANSPORTATION

## EXHIBITS TO FHWA GRANT AGREEMENTS UNDER THE
## FISCAL YEAR 2024 SAFE STREETS AND ROADS FOR ALL (SS4A) GRANT
## PROGRAM

**June 13, 2024**
**Revised:  March 17, 2025**

# EXHIBIT A
## APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this agreement for a FY 2024 Safe Streets and Roads for All Grant, the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this agreement include, but are not limited to, the following:

**General Federal Legislation**
a. Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
b. Hatch Act – 5 U.S.C. 1501, et seq.
c. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
d. National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
e. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
f. Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
g. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
h. Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
i. Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
j. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
k. Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
l. Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
m. American Indian Religious Freedom Act, P.L. 95-341, as amended
n. Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
o. The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
p. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
q. Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
r. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
s. Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
t. Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
u. National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
v. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
w. Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
x. Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
y. Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
z. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
aa. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794
bb. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.
cc. Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C. 1101 -1104, 541, et seq.
dd. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and

Financial Transactions − 31 U.S.C. 1352
ee. Freedom of Information Act − 5 U.S.C. 552, as amended
ff. Magnuson-Stevens Fishery Conservation and Management Act − 16 U.S.C. 1855
gg. Farmland Protection Policy Act of 1981 − 7 U.S.C. 4201, et seq.
hh. Noise Control Act of 1972 − 42 U.S.C. 4901, et seq.
ii. Fish and Wildlife Coordination Act of 1956 − 16 U.S.C. 661, et seq.
jj. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 − 33 U.S.C. 401 and 525
kk. Section 4(f) of the Department of Transportation Act of 1966 − 49 U.S.C. 303
ll. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended − 42 U.S.C. 9601, et seq.
mm. Safe Drinking Water Act − 42 U.S.C. 300f to 300j-26
nn. Wilderness Act − 16 U.S.C. 1131-1136
oo. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 − 42 U.S.C. 6901, et seq.
pp. Migratory Bird Treaty Act − 16 U.S.C. 703, et seq.
qq. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109−282, as amended by section 6202 of Public Law 110−252)
rr. Cargo Preference Act of 1954 − 46 U.S.C. 55305
ss. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
tt. Bringing in and harboring certain aliens − 8 U.S.C. 1324
uu. Aiding or assisting certain aliens to enter − 8 U.S.C. 1327

## Executive Orders
a. Executive Order 11990 − Protection of Wetlands
b. Executive Order 11988 − Floodplain Management
c. Executive Order 12372 − Intergovernmental Review of Federal Programs
d. Executive Order 12549 − Debarment and Suspension
e. Executive Order 14005 − Ensuring the Future is Made in All of America by All of America's Workers
f. Executive Order 14025 − Worker Organizing and Empowerment
g. Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship
h. Executive Order 14154, Unleashing American Energy
i. Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing
j. Executive Order 14168 Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
k. Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity

## Presidential Policy Directives and Memorandums
a. Presidential Policy Directive 21 − Critical Infrastructure Security and Resilience
b. National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Systems

## General Federal Regulations
a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for

Federal Awards – 2 C.F.R. Parts 200, 1201
b. Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200
c. Investigative and Enforcement Procedures – 14 C.F.R. Part 13
d. Procedures for predetermination of wage rates – 29 C.F.R. Part 1
e. Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3
f. Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5
g. Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60, et seq.
h. New Restrictions on Lobbying – 49 C.F.R. Part 20
i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21, including any amendments thereto
j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24
k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25
l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27
m. DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35
n. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28
o. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30
p. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32
q. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38
r. Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 C.F.R. Part 26, including any amendments thereto (as applicable under section 18.3 of this agreement)

**Office of Management and Budget Circulars**
a. Any applicable OMB Circular based upon the specific FY 2024 Safe Streets and Roads for All Grant Recipient.

**Highway Federal Legislation**
a. Agreements relating to the use of an access to rights-of-way—Interstate System, 23 U.S.C. 111
b. Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

A-3

    c. Tolls, 23 U.S.C. 301 (to the extent the recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.

    d. Efficient Environmental Reviews - 23 U.S.C. 139

    e. Policy on lands, wildlife and waterfowl refuges, and historic sites - 49 U.S.C. 303

**Federal Highway Regulations**

    a. Planning – 23 C.F.R. Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)

    b. National Highway System Design Standards – 23 C.F.R. Part 625

    c. Location and Hydraulic Design of Encroachments on Flood Plains – 23 C.F.R. Part 650 Subpart A

    d. Manual on Uniform Traffic Control Devices – 23 C.F.R. Part 655

    e. Environmental Impact and Related Procedures – 23 C.F.R. Part 771

    f. Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites (Section 4(f)) – 23 C.F.R. Part 774

    g. Permitting Requirements under the National Pollutant Discharge Elimination System – 40 C.F.R. Part 122

Specific assurances required to be included in the FY 2024 Safe Streets and Roads for All Grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this agreement.

**EXHIBIT B**
**ADDITIONAL STANDARD TERMS**

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY ASSISTED**
**PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL**
**FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities
Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37, and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this agreement under
the FY 2024 Safe Streets and Roads for All (SS4A) grant program, the Recipient **HEREBY
AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S.
Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it
is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*, 78 stat. 252),
  (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21, including any amendments thereto (entitled *Non-discrimination In
  Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of
  Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title
  VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and
"Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

## **Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FY 2024 SS4A grant program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FY 2024 SS4A Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

> *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5.  That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6.  That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7.  That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

    a.  for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
    b.  for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8.  That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
    b.  the period during which the Recipient retains ownership or possession of the property.

9.  The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FY 2024 SS4A grant program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FY 2024 SS4A grant program.

# APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

    a.  withholding payments to the contractor under the contract until the contractor complies; and/or
    b.  cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as

the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

# APPENDIX B

## CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), the Consolidated Appropriations Act, 2024, Pub. L. No. 118-122 (Mar. 9, 2024) , the Regulations for the Administration of FY 2024 SS4A grant program**,** and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

### (HABENDUM CLAUSE)

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

# APPENDIX C

## CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.   The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

   1.   In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.   With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.   With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns. *

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

# APPENDIX D

## CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

## TERM B.2
## CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS

### 2 C.F.R. Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FY 2024 SS4A grant program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FY 2024 SS4A Grant, as set out below.

## 1. Instructions for Certification – First Tier Participants:

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or

contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is

erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## TERM B.3
## REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (Dec. 29, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

    (1) Certify whether the entity has a Tax Delinquency; and

    (2) Certify whether the entity has a Felony Conviction.

4 **Prohibition.** If

    (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2) an entity provides an affirmative response to either certification in section 3; or

    (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT.**

    (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

    (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

    (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1) require the SAM check in section 2;

    (2) require the certifications in section 3;

    (3) include the prohibition in section 4; and

    (4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

**TERM B.4**
**RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
  (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
    (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
    (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
  (2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

      (i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

      (ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**EXHIBIT C**
**QUARTERLY PERFORMANCE PROGRESS REPORTS:**
**FORMAT AND CONTENT**

**1.    Purpose**. The purpose of the Quarterly Performance Progress Reports under this agreement for the FY 2024 SS4A grant program is to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

**2.    Format and Content.** The Recipient shall produce a quarterly cost, schedule, and status report that contains the sections enumerated in the following list. The first Quarterly Performance Progress Report should include a detailed description of the items funded.

    **(a) Project Information.**  This section provides the name of the project, the State, the federal agency to which the report is submitted, submission date, award number, name of the recipient, report year and quarter and NOFO funding year.

    **(b) Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any significant activities and issues, action items and outstanding issues.

      i.    **Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any applicable IIJA or NOFO requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

      ii.   **Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

    **(c) Milestones.**  This section documents progress of the milestones outlined in Section 3.2.  The Recipient should include the baseline date (when the project is projected to begin) of each milestone, amendments to those dates (if applicable) and the actual/expected date of completion.  There are Milestone charts for action plans, supplemental planning activities, demonstration activity projects and implementation (both construction and non-construction) projects.

## EXHIBIT D
## FORM FOR SUBSEQUENT OBLIGATION OF FUNDS

The USDOT and **[recipient name]** entered a grant agreement for the **[project name]** that was executed by the USDOT on **[date of USDOT signature on original agreement]** (the "**Agreement**").

This instrument obligates **[$XXX]** for **[insert portion of project listed in the Agreement]**.

**[Recipient name]** states that:

    (1)     the Agreement accurately describe the Project's activities;

    (2)     for each completion date listed in the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in the Agreement;

    (3)     comparing the Project's current budget with the amounts listed in the Agreement, the "Non-Federal Funds" amount has not decreased and the total eligible project costs amount has not decreased; and

    (4)     under the terms of article 21 of the General Terms and Conditions, the Recipient is not presently required to request a modification to the Agreement.

**[Recipient name]** acknowledges that USDOT is acting in reliance on the Recipient's statements above.

By:

| | |
|---|---|
| Date | Signature of Recipient's Authorized Representative |
| | **[insert name]** |
| | Name |
| | **[insert title]** |
| | Title |

The USDOT has determined that all applicable Federal requirements for obligating these funds are satisfied.

By:
_____     _____
Date                                                      Signature of USDOT's Authorized Representative

                                                          **[insert name]**
                                   _____
                                                          Name

                                                          **[insert title]**
                                   _____
                                                          Title

Docusign Envelope ID: FE0DB53E-AFB1-4389-8CC3-EAE087C75F88



EXHIBIT 6

**FEDERAL HIGHWAY ADMINISTRATION**

**COMPETITIVE GRANT PROGRAM GENERAL TERMS AND CONDITIONS**

**Date: April 22, 2025**

# TABLE OF CONTENTS

GENERAL TERMS AND CONDITIONS ............................................................... 6
Article 1 PURPOSE ............................................................................................. 6
   1.1   Purpose ........................................................................................................ 6
Article 2 FHWA ROLE ........................................................................................ 6
   2.1   Federal Highway Administration (FHWA) Responsibilities. ...................... 6
Article 3 RECIPIENT ROLE ............................................................................... 6
   3.1   Statements on the Project ............................................................................ 6
   3.2   Statements on Authority and Capacity ....................................................... 6
   3.3   USDOT FHWA Reliance ............................................................................ 7
   3.4   Project Delivery. ......................................................................................... 7
   3.5   Rights and Powers Affecting the Project. ................................................... 7
   3.6   Subaward to Designated Subrecipient ........................................................ 8
   3.7   Designated Subrecipient Statements and Responsibilities ......................... 8
Article 4 AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ................. 8
   4.1   Federal Award Amount ............................................................................... 8
   4.2   Federal Obligations. .................................................................................... 8
   4.3   Budget Period. ............................................................................................. 9
   4.4   Period of Performance. .............................................................................. 10
Article 5 STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ... 10
   5.1   Notification Requirement .......................................................................... 10
   5.2   Scope and Statement of Work Changes .................................................... 10
   5.3   Schedule Changes ...................................................................................... 10
   5.4   Budget Changes. ........................................................................................ 11
   5.5   FHWA Acceptance of Changes. ................................................................ 12
Article 6 GENERAL REPORTING TERMS ...................................................... 12
   6.1   Report Submission ..................................................................................... 12
   6.2   Alternative Reporting Methods ................................................................. 12
Article 7 PROGRESS AND FINANCIAL REPORTING ................................... 12
   7.1   Project Progress and Financial Reports and Recertifications. ................... 12
   7.2   Final Progress Reports and Financial Information .................................... 13
Article 8 PERFORMANCE REPORTING ......................................................... 13
   8.1   Baseline Performance Measurement. ........................................................ 13
   8.2   Post-construction Performance Measurement. ......................................... 14
   8.3   Project Outcomes Report. .......................................................................... 14
   8.4   General Performance Measures ................................................................. 14
   8.5   Performance Reporting Survival. ............................................................... 15
Article 9 NONCOMPLIANCE AND REMEDIES .............................................. 15
   9.1   Noncompliance Determinations. ............................................................... 15
   9.2   Remedies. ................................................................................................... 15
   9.3   Other Oversight Entities ........................................................................... 16
Article 10 AGREEMENT TERMINATION ........................................................ 16
   10.1   FHWA Termination. ................................................................................ 16
   10.2   Closeout Termination. ............................................................................. 17
   10.3   Post-Termination Adjustments ................................................................ 17
   10.4   Non-Terminating Events. ........................................................................ 17

10.5   Other Remedies ................................................................................. 18
Article 11 MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS
...................................................................................................................... 18
11.1   Recipient Monitoring and Record Retention. ....................................... 18
11.2   Financial Records and Audits. ............................................................. 18
11.3   Internal Controls ................................................................................. 19
11.4   USDOT Record Access ....................................................................... 19
11.5   Title 23 Oversight Responsibilities .................................................... 19
Article 12 CONTRACTING AND SUBAWARDS ......................................... 19
12.1   Minimum Wage Rates ......................................................................... 19
12.2   Buy America. ...................................................................................... 19
12.3   Small and Disadvantaged Business Requirements ............................... 19
12.4   Engineering and Design Services ........................................................ 20
12.5   Prohibition on Certain Telecommunications and Video Surveillance Services or
       Equipment. ......................................................................................... 20
12.6   Pass-through Entity Responsibilities ................................................... 20
12.7   Subaward and Contract Authorization. ............................................... 20
Article 13 COSTS, PAYMENTS, AND UNEXPENDED FUNDS ................... 20
13.1   Limitation of Federal Award Amount. ................................................ 20
13.2   Projects Costs. .................................................................................... 21
13.3   Timing of Project Costs. ..................................................................... 21
13.4   Recipient Recovery of Federal Funds ................................................. 21
13.5   Unexpended Federal Funds .................................................................. 21
13.6   Timing of Payments to the Recipient. ................................................. 21
13.7   Payment Method. ................................................................................ 21
13.8   Information Supporting Expenditures. ................................................. 22
13.9   Reimbursement Frequency .................................................................. 22
Article 14 LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY ... 22
14.1   Liquidation of Recipient Obligations. ................................................. 22
Article 15 AGREEMENT MODIFICATIONS ............................................... 23
15.1   Bilateral Modifications ....................................................................... 23
15.2   Unilateral Contact Modifications. ....................................................... 23
15.3   FHWA Unilateral Modifications. ........................................................ 23
15.4   Other Modifications. ........................................................................... 23
Article 16 Civil Rights and Title VI ............................................................. 23
16.1   Title VI. .............................................................................................. 23
16.2   Legacy Infrastructure and Facilities. ................................................... 24
Article 17 CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ..... 24
17.1   Critical Infrastructure Security and Resilience. ................................... 24
Article 18 FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL
POLICY REQUIREMENTS. ........................................................................ 25
18.1   Uniform Administrative Requirements for Federal Awards ................. 25
18.2   Federal Law and Public Policy Requirements. .................................... 25
18.3   Implementation of Executive Order 14025 ......................................... 25
18.4   Implementation of Executive Order 14173 ......................................... 25
18.5   Federal Freedom of Information Act. ................................................... 26

18.6    History of Performance ................................................................. 26
18.7    Whistleblower Protection ............................................................... 26
18.8    External Award Terms and Obligations ........................................ 26
18.9    Incorporated Certifications ........................................................... 27
Article 19 ASSIGNMENT ........................................................................... 27
19.1    Assignment Prohibited. ................................................................. 27
Article 20 WAIVER .................................................................................... 27
20.1    Waivers. ......................................................................................... 27
Article 21 ADDITIONAL TERMS AND CONDITIONS ........................... 27
21.1    Effect of Urban or Rural Designation ........................................... 27
21.2    Disclaimer of Federal Liability ..................................................... 28
21.3    Relocation and Real Property Acquisition. ................................... 28
21.4    Equipment Disposition. ................................................................. 28
21.5    Environmental Review. .................................................................. 28
21.6    Railroad Coordination ................................................................... 30
Article 22 MANDATORY AWARD INFORMATION ............................... 30
22.1    Information Contained in a Federal Award ................................... 30
22.2    Federal Award Identification Number. .......................................... 30
22.3    Recipient's Unique Entity Identifier. ............................................ 30
Article 23 CONSTRUCTION AND DEFINITIONS ................................. 31
23.1    Schedules ....................................................................................... 31
23.2    Exhibits .......................................................................................... 31
23.3    Construction. .................................................................................. 31
23.4    Integration. ..................................................................................... 31
23.5    Definitions ..................................................................................... 32
Article 24 AGREEMENT EXECUTION AND EFFECTIVE DATE ........... 32
24.1    Counterparts. .................................................................................. 32
24.2    Effective Date ................................................................................ 32

## Index of Definitions

Environmental Review Entity ................................................................. 29
Federal Share ......................................................................................... 12
FHWA ....................................................................................................... 6
General Terms and Conditions ............................................................. 32
Grant ...................................................................................................... 32
Grant Amount ........................................................................................ 32
Grant Program ...................................................................................... 32
Program Statute ..................................................................................... 32
Project .................................................................................................... 32
Project Closeout .................................................................................... 17
Project Cost Savings ............................................................................. 11
Technical Application ............................................................................ 32
Title VI ................................................................................................... 24

## GENERAL TERMS AND CONDITIONS

These General Terms and Conditions are incorporated by reference in this grant agreement under the Grant Program. The term "Recipient" is defined in this grant agreement. This grant agreement includes schedules A through H. The grant agreement may include special terms and conditions in grant agreement articles or schedules.

## ARTICLE 1
## PURPOSE

1.1     **Purpose.** The purpose of this award is to fund the eligible project defined in this grant agreement that has been selected to receive an award for the Grant Program. The parties will accomplish that purpose by achieving the following objectives:

(1)     timely completing the Project; and

(2)     ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule E.

## ARTICLE 2
## FHWA ROLE

2.1     **Federal Highway Administration (FHWA) Responsibilities.**

(a)     The FHWA is the operating administration under the United States Department of Transportation ("USDOT") responsible for the administration of the Grant Program, the approval and execution of this grant agreement, and any modifications to this grant agreement under section 15.1.

## ARTICLE 3
## RECIPIENT ROLE

3.1     **Statements on the Project.** The Recipient states that:

(1)     all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)     schedule E documents all material changes in the information contained in that application.

3.2     **Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this grant agreement;

(2)    it has the legal authority to complete the Project;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this grant agreement;

(4)    not less than the difference between the total eligible project costs listed in section 3 of schedule D and the Grant Amount listed in section 1 of schedule D is committed to fund the Project;

(5)    it has sufficient funds available to ensure that infrastructure completed or improved under this grant agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this grant agreement on behalf of the Recipient has authority to enter this grant agreement and make the statements in this article 3 and in section 18.9 on behalf of the Recipient.

**3.3    USDOT FHWA Reliance.** The Recipient acknowledges that:

(1)    the USDOT FHWA relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)    the USDOT FHWA relied on statements of fact in both the Technical Application and this grant agreement to determine that the Recipient and the Project are eligible under the terms of the Notice of Funding Opportunity ("NOFO") in section 7 of schedule D.

(3)    the USDOT FHWA's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**3.4    Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this grant agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to the Project.

**3.5    Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this grant agreement without written approval of the FHWA.

(b) The Recipient shall act promptly, in a manner acceptable to the FHWA, to

acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this grant agreement.

**3.6    Subaward to Designated Subrecipient.** If section 7 of schedule A identifies a Designated Subrecipient:

(1)    the Recipient hereby awards a subaward to the Designated Subrecipient for the purpose described in section 1.1;

(2)    the Recipient and the Designated Subrecipient may enter into a separate agreement, to which the FHWA is not a party, assigning responsibilities, including administrative and oversight responsibilities, among the Recipient and the Designated Subrecipient; and

(3)    for the purpose of 2 C.F.R. parts 200 and 1201, the Recipient is a pass-through entity.

**3.7    Designated Subrecipient Statements and Responsibilities.** If section 7 of schedule A identifies a Designated Subrecipient:

(1)    the Designated Subrecipient affirms all statements and acknowledgments that are attributed to the Recipient under sections 3.1 and 3.2; and

(2)    the Designated Subrecipient assumes the Recipient's reporting obligations under article 7.

## ARTICLE 4
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**4.1    Federal Award Amount.** The FHWA hereby awards a Grant to the Recipient in the amount listed in section 1 of schedule D as the Grant Amount.

**4.2    Federal Obligations.**

(a)    If the Federal Obligation Type identified in section 2 of schedule D is "Single," then this grant agreement obligates for the budget period the amount listed in section 1 of schedule D as the Grant Amount and sections 4.2(c)–4.2(h) do not apply to this grant agreement.

(b)    If the Federal Obligation Type identified in section 2 of schedule D is "Multiple," then an amount up to the Grant Amount listed in section 1 of schedule D will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 4.2(c)–4.2(h).

(c)    The Fund Obligation Table in section 2 of schedule D allocates the Grant among

separate portions of the Project for the purpose of the Federal obligation of funds. The scope of each portion of the Project that is identified in that table is described in the Technical Application, as modified by schedule E.

(d)  This grant agreement obligates for the budget period only for the amounts allocated in the Fund Obligation Table in section 2 of schedule D to the portion of the project described under "First Fund Obligation" in section 1 of schedule C.

(e)  This grant agreement does not obligate amounts allocated in the Fund Obligation Table in section 2 of schedule D to any portion of the project except the portion described under "First Fund Obligation" in section 1 of schedule C. The parties may obligate the amounts allocated to those portions of the Project only as described in section 4.2(f) or by modifying this grant agreement under article 15.

(f)  If the USDOT Payment System identified in section 5 of schedule A is "FMIS," then for each portion of the Project except the portion described under "First Fund Obligation" in section 1 of schedule C, the amount allocated in section 2 of schedule D to that portion of the Project is obligated if, not later than the statutory lapse date identified in this grant agreement as applicable to the Grant Program, the parties execute an instrument, in the form provided in Exhibit D, documenting that:

(1)  the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied; and

(2)  the Recipient states that it is not required to request a modification of this grant agreement under article 5.

(g)  The Recipient shall not request reimbursement of costs for a portion of the Project described in section 1 of Schedule C except for the portion described under "First Fund Obligation", unless the amount allocated in section 2 of schedule D to that portion is obligated under section 4.2(f).

(h)  The Recipient acknowledges that:

(1)  the FHWA is not liable for payments for a portion of the Project described in section 1 of Schedule C except for the portion described under "First Fund Obligation", unless the amount allocated in section 2 of schedule D to that portion of the Project is obligated under section 4.2(f);

(2)  any portion of the Grant that is not obligated under this section 4.2 by the statutory lapse date identified in section 6 of schedule F for those funds lapses on the day after that date and becomes unavailable for the Project; and

(3)  the FHWA may consider the failure to obligate funds by the statutory lapse date identified in section 6 of schedule F for those funds to be a basis for terminating this grant agreement under section 10.1.

**4.3    Budget Period.**

(a) If the Federal Obligation Type identified in section 1 of schedule C is "Single," then the budget period for this award begins on the effective date of this grant agreement and ends on the budget period end date that is listed in section 1 of schedule C or as determined in FMIS.

(b) If the Federal Obligation Type identified in section 1 of schedule C is "Multiple," then the first budget period for this award begins on the effective date of this grant agreement and the last budget period end date shall be no later than the end of the period of performance dated identified in section 4.4.

(c) In this grant agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

**4.4    Period of Performance.**

(a) The period of performance for this award begins on the effective date of this grant agreement and ends on the period of performance end date that is listed in section 1 of schedule C.

(b) In this grant agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

## ARTICLE 5
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1    Notification Requirement.** The Recipient shall notify all FHWA representatives who are identified in section 4 of schedule A in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 5.1 is separate from any requirements under this article 5 that the Recipient request modification of this grant agreement.

**5.2    Scope and Statement of Work Changes.** If the Project's activities differ from the activities described in the Technical Application, then the Recipient shall request a modification of this grant agreement in schedule E.

**5.3    Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request a modification of this grant agreement to update schedule C:

(1)    a completion date for the Project or a portion of the Project is listed in section 2 of schedule C and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 2 of schedule C;

(2)    a schedule change would require the budget period to continue after the budget period end date listed in section 1 of schedule C; and

(3)    a schedule change would require the period of performance to continue after the Period of Performance End Date listed in section 1 of schedule C.

For other schedule changes, the Recipient shall follow the applicable procedures of the FHWA and document the changes in writing.

## 5.4    Budget Changes.

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this grant agreement to complete the Project; and

(2)    the FHWA will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient shall request a modification of this grant agreement to update schedule D if, in comparing the Project's budget to the amounts listed in section 3 of schedule D:

(1)    the total "Non-Federal Funds" amount decreases; or

(2)    the total eligible Project costs amount decreases.

(c)  For budget changes that are not identified in section 5.4(b), the Recipient shall follow the applicable procedures of the FHWA and document the changes in writing.

(d)  If there are Project Cost Savings, then the Recipient may propose to the FHWA, in writing consistent with the FHWA's requirements, to include in this grant agreement specific additional activities that are within the scope of this award, as defined in section 1.1 and schedule B, and that the Recipient could complete with the Project Cost Savings.

In this grant agreement, "**Project Cost Savings**" means the difference between the actual eligible project costs and the total eligible project costs that are listed in section 3 of schedule D, but only if the actual eligible project costs are less than the total eligible project costs that are listed in section 3 of schedule D. There are no Project Cost Savings if the actual eligible project costs are equal to or greater than the total eligible project costs that are listed in section 3 of schedule D.

(e)  If there are Project Cost Savings and either the Recipient does not make a proposal under section 5.4(d) or the FHWA does not accept the Recipient's proposal under section 5.4(d), then:

(1)    in a request under section 5.4(b), the Recipient shall reduce the Federal Share by the Project Cost Savings; and

(2)    if that modification reduces this award and the FHWA had reimbursed

costs exceeding the revised award, the Recipient shall refund to the FHWA the difference between the reimbursed costs and the revised award.

In this agreement, "**Federal Share**" means the sum of the total "Grant Funds" and "Other Federal Funds" amounts that are listed in section 3 of schedule D.

(f) The Recipient acknowledges that amounts that are required to be refunded under section 5.4(e)(2) constitute a debt to the Federal Government that the FHWA may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**5.5    FHWA Acceptance of Changes.** The FHWA may accept or reject modifications requested under this article 5, and in doing so may elect to consider only the interests of the Grant Program and the FHWA. The Recipient acknowledges that requesting a modification under this article 5 does not amend, modify, or supplement this grant agreement unless the FHWA accepts that modification request and the parties modify this grant agreement under section 15.1.

## ARTICLE 6
## GENERAL REPORTING TERMS

**6.1    Report Submission.** The Recipient shall send all reports required by this grant agreement to all FHWA contacts who are listed in section 4 of schedule A.

**6.2    Alternative Reporting Methods.** The FHWA may establish processes for the Recipient to submit reports required by this grant agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

## ARTICLE 7
## PROGRESS AND FINANCIAL REPORTING

**7.1    Project Progress and Financial Reports and Recertifications.**

(a) The Recipient will submit to FHWA project progress and financial reports and recertifications based on the frequency defined in the NOFO and section 8 of schedule A. If "Quarterly" or "Semiannual" are selected in section 8 of schedule A, then the reporting period and report submission due dates are defined in the table below.

| Quarterly Reporting Periods | | Semiannual Reporting Periods | |
|---|---|---|---|
| **Reporting Period** | **Due Date** | **Reporting Period** | **Due Date** |
| Quarter 1 | January 1 – March 31 | April 20 | Half Year 1 | January 1 – June 30 | July 20 |

| Quarter 2 | April 1 – June 30 | July 20 | Half Year 2 | July 1 – December 31 | January 20 of the next calendar year |
|---|---|---|---|---|---|
| Quarter 3 | July 1 – September 30 | October 20 | | | |
| Quarter 4 | October 1 – December 31 | January 20 of the next calendar year | | | |

If "Annual" is selected in section 8 of schedule A, then the reporting period is from January 1 to December 31 and the Recipient must submit reports to FHWA by January 20 of the next calendar year.

(b) If the date of this grant agreement is in the final month of a calendar year reporting period, then the Recipient shall submit the first Project Progress Report and Recertification in the second reporting period for the subsequent that begins after the date of this grant agreement.

(c) The Recipient shall submit to the FHWA a Project Progress Report and Recertification in the format and with the content described in exhibit C.

**7.2    Final Progress Reports and Financial Information.** No later than 120 days after the end of the period of performance, the Recipient shall submit:

(1)    a Final Project Progress Report and Recertification in the format and with the content described in exhibit C for each Project Progress Report and Recertification, including a final Federal Financial Report (SF-425); and

(2)    any other information required under FHWA award closeout procedures.

**ARTICLE 8**
**PERFORMANCE REPORTING**

**8.1    Baseline Performance Measurement.**

(a) The Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in schedule G, accurate as of the Baseline Measurement Date that is identified in schedule G; and

(b) On or before the Baseline Report Date that is stated in schedule G, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 8.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is

identified in the Performance Measure Table in schedule G.

**8.2    Post-construction Performance Measurement.**

(a) For each performance measure that is identified in the Performance Measure Table in schedule G with quarterly measurement frequency, for each of 12 consecutive calendar quarters, beginning with the first calendar quarter that begins after the Project substantial completion date, at least once during the quarter, the Recipient shall collect data for that performance measure;

(b) For each performance measure that is identified in the Performance Measure Table in schedule G with annual measurement frequency, the Recipient shall collect data for that performance measure on at least three separate occasions: (i) once during the four consecutive calendar quarters that begin after the Project substantial completion date; (ii) once during the fourth calendar quarter after the first collection; and (iii) once during the eighth calendar quarter after the first collection; and

(c) Not later than January 31 of each year that follows a calendar year during which data was collected under this section 8.2, the Recipient shall submit to the USDOT a Post-Project Performance Measurement Report containing the data collected under this section 8.2 in the previous calendar year and stating the dates when the data was collected.

(d) If an external factor significantly affects the value of a performance measure collected under this section 8.2, then the Recipient shall identify that external factor in the Post-Project Performance Measurement Report and discuss its influence on the performance measure.

**8.3    Project Outcomes Report.** The Recipient shall submit to the FHWA, not later than January 31 of the year that follows the final calendar year during which data was collected under section 8.2, a Project Outcomes Report that contains:

(1)     a narrative discussion detailing project successes and the influence of external factors on project expectations;

(2)     all baseline and post-Project performance measurement data that the Recipient reported in the Baseline Performance Measurement Report and the Post-Project Performance Measurement Reports; and

(3)     an *ex post* examination of project effectiveness relative to the baseline data that the Recipient reported in the Baseline Performance Measurement Report.

**8.4    General Performance Measures.** For each performance measure that is enumerated in schedule G, the Recipient shall ensure that all data collections under this article 8 are completed in a manner consistent with the description, location, and other attributes associated with that performance measure in schedule G.

8.5 **Performance Reporting Survival.** The data collection and reporting requirements in this article 8 survive the termination of this agreement.

# ARTICLE 9
## NONCOMPLIANCE AND REMEDIES

9.1 **Noncompliance Determinations.**

(a) If the FHWA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this grant agreement, the FHWA may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the FHWA must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the FHWA notifies the Recipient of a proposed determination of noncompliance under section 9.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1) accept the remedy;

(2) acknowledge the noncompliance, but propose an alternative remedy; or

(3) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The FHWA may make a final determination of noncompliance only:

(1) after considering the Recipient's response under section 9.1(b); or

(2) if the Recipient fails to respond under section 9.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the FHWA must provide a notice to the Recipient that states the bases for that determination.

9.2 **Remedies.**

(a) If the FHWA makes a final determination of noncompliance under section 9.1, the FHWA may impose a remedy, including:

(1) additional conditions on the award;

(2)     any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to the FHWA; suspension or termination of the award; or suspension and debarment under 2 C.F.R. part 180; or

(3)     any other remedy legally available.

(b) To impose a remedy, the FHWA must provide a written notice to the Recipient that describes the remedy, but the FHWA may make the remedy effective before the Recipient receives that notice.

(c) If the FHWA determines that it is in the public interest, the FHWA may impose a remedy, including all remedies described in section 9.2(a), before making a final determination of noncompliance under section 9.1. If it does so, then the notice provided under section 9.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 9.2 or making a public interest determination under section 9.2(c), the FHWA may elect to consider the interests of only the FHWA.

(e) The Recipient acknowledges that amounts that the FHWA requires the Recipient to refund to the FHWA due to a remedy under this section 9.2 constitute a debt to the Federal Government that the FHWA may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**9.3     Other Oversight Entities.** Nothing in this article 9 limits any party's authority to report activity under this grant agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 10
## AGREEMENT TERMINATION

**10.1     FHWA Termination.**

(a) The FHWA may terminate this grant agreement and all of its obligations under this agreement if any of the following occurs:

(1)     the Recipient fails to obtain or provide any non- Grant contribution or alternatives approved by the FHWA as provided in this grant agreement and consistent with schedule D;

(2)     a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient fails to meet that milestone by six months after the date listed in section 2 of schedule C;

(3)     the Recipient fails to meet a milestone listed in section 3 of schedule C by the deadline date listed in that section for that milestone;

(4)     the Recipient fails to comply with the terms and conditions of this grant agreement, including a material failure to comply with the project schedule in schedule C even if it is beyond the reasonable control of the Recipient;

(5)     circumstances cause changes to the Project that the FHWA determines are inconsistent with the FHWA's basis for selecting the Project to receive a Grant; or

(6)     the FHWA determines that termination of this grant agreement is in the public interest.

(b) In terminating this grant agreement under this section, the FHWA may elect to consider only the interests of the FHWA.

(c) This section 10.1 does not limit the FHWA's ability to terminate this grant agreement as a remedy under section 9.2.

(d) The Recipient may request that the FHWA terminate this grant agreement under this section 10.1.

**10.2     Closeout Termination.**

(a) This grant agreement terminates on Project Closeout.

(b) In this grant agreement, "**Project Closeout**" means the date that the FHWA notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**10.3     Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of this grant agreement does not extinguish the FHWA's authority to disallow costs, including costs that the FHWA reimbursed before termination, and recover funds from the Recipient.

**10.4     Non-Terminating Events.**

(a) The end of the budget period described under section 4.3 does not terminate this grant agreement or the Recipient's obligations under this grant agreement.

(b) The end of the period of performance described under section 4.4 does not terminate this grant agreement or the Recipient's obligations under this grant agreement.

(c) The cancellation of funds under section 7 of schedule F does not terminate this grant agreement or the Recipient's obligations under this grant agreement.

**10.5    Other Remedies.** The termination authority under this article 10 supplements and does not limit the FHWA's remedial authority under article 9 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

# ARTICLE 11
## MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**11.1    Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this grant agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**11.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 11.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. 200 subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year of the Grant Program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. 200 subpart F, including the Federal Fiscal Year ("FY") in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including the Federal Fiscal Year ("FY") in column c ("Additional Award

Identification").

**11.3  Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**11.4  USDOT Record Access.** The FHWA may access Recipient records related to this award under 2 C.F.R. 200.337.

**11.5  Title 23 Oversight Responsibilities.** This award is subject to the oversight requirements of title 23, United States Code.

# ARTICLE 12
# CONTRACTING AND SUBAWARDS

**12.1  Minimum Wage Rates.** The Recipient shall include, in all contracts in excess of $2,000 for construction work to be performed on a Federal-aid highway (or work that is treated as if performed on a Federal-aid highway) under the Project that involves labor, provisions establishing minimum rates of wages, to be predetermined by the United States Secretary of Labor, in accordance with 23 U.S.C. 113, as applicable, that contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

**12.2  Buy America.**

(a) Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as implemented by the FHWA. The Recipient acknowledges that this grant agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C. 313(b).

(b) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021), as implemented by OMB, USDOT, and FHWA. The Recipient acknowledges that this grant agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c) Under 2 C.F.R. 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The Recipient shall include the requirements of 2 C.F.R. 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

**12.3  Small and Disadvantaged Business Requirements.**

(a) If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 C.F.R. part 26, including any amendments thereto.

(b) If any funds under this award are not administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 2 C.F.R. 200.321, including any amendments thereto.

**12.4    Engineering and Design Services.** As applicable, the Recipient shall award each contract or sub- contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the Project in the same manner that a contract for architectural and engineering services that is negotiated under the Brooks Act, 40 U.S.C. 1101-1104 as implemented in 23 U.S.C. 112(b)(2), or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**12.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 C.F.R. 200.216 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under the Grant award.

**12.6    Pass-through Entity Responsibilities.** If the Recipient makes a subaward under the Grant award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

**12.7    Subaward and Contract Authorization.**

(a) If the FHWA Office for Subaward and Contract Authorization identified in section 6 of schedule A is "FHWA Division," then the Recipient shall comply with subaward and contract authorization requirements under 23 C.F.R chapter I.

(b) If the FHWA Office for Subaward and Contract Authorization identified in section 6 of schedule A is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308, 2 C.F.R. 200.333, and 23 C.F.R. 172, as applicable. Approvals under 2 C.F.R. 200.308(f)(6) do not apply to the procurement of goods and services.

## ARTICLE 13
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**13.1    Limitation of Federal Award Amount.** Under the Grant Program award, the FHWA shall not provide funding greater than the amount obligated under section 4.2, and FMIS as applicable. The Recipient acknowledges that the FHWA is not liable for

payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**13.2    Projects Costs.** The Grant Program award is subject to the cost principles at 2 C.F.R. 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**13.3    Timing of Project Costs.**

(a) The Recipient shall not charge to the Grant Program award costs that are incurred after the budget period.

(b) Except as permitted under section 13.3(d), the Recipient shall not charge to the Grant award costs that were incurred before the date of this grant agreement.

(c) The execution of this grant agreement will terminate and supersede any previous FHWA approval for the Recipient to incur costs under the Grant Program award for the Project. Section 4 of schedule D is the exclusive FHWA approval of costs incurred before the date of this grant agreement.

(d) If section 4 of schedule D identifies an advance construction authorization under 23 U.S.C. 115 or identifies a pre-award approval under 2 C.F.R. 200.458, then the Recipient may charge to the Grant Program award, for payment from the Grant Program grant or other Federal amounts, costs that were incurred before the date of this grant agreement, were consistent with that authorization, and would have been allowable if incurred during the budget period.

**13.4    Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the FHWA determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the Grant award unless approved in advance in writing by the FHWA.

**13.5    Unexpended Federal Funds.** Any Federal funds that are awarded at section 4.1 but not expended on allocable, allowable costs remain the property of the United States.

**13.6    Timing of Payments to the Recipient.**

(a) Reimbursement is the payment method for the Grant Program.

(b) The Recipient shall not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**13.7    Payment Method.**

(a) If the USDOT Payment System identified in section 5 of schedule A is "FMIS," then

the Recipient shall follow FMIS procedures to request and receive reimbursement payments under this award.

(b) If the USDOT Payment System identified in section 5 of schedule A is "DELPHI eInvoicing," then the Recipient shall use the DELPHI eInvoicing System to request reimbursement under this award unless the FHWA agreement officer provides written approval for the Recipient to use a different request and payment method.

(c) The FHWA may deny a payment request that is not submitted using the method identified in this section 13.7.

**13.8    Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 5 of schedule A is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the FHWA determines does not include or is not supported by sufficient detail, the FHWA may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.9    Reimbursement Frequency.** If the USDOT Payment System identified in section 5 of schedule A is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.


**ARTICLE 14**
**LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY**


**14.1    Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this grant agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory funds cancellation date identified in section 7 of schedule F.

(b) Liquidation of obligations and adjustment of costs under the project-specific agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 15
## AGREEMENT MODIFICATIONS

**15.1    Bilateral Modifications.** The parties may amend, modify, or supplement this grant agreement by mutual agreement in writing signed by the FHWA and the Recipient. Either party may request to amend, modify, or supplement this grant agreement by written notice to the other party.

**15.2    Unilateral Contact Modifications.**

(a) The Recipient may update the contacts who are listed in section 3 of schedule A by written notice to all of the FHWA contacts who are listed in section 4 of schedule A.

(b) The FHWA may update the contacts who are listed in section 4 of schedule A by written notice to all of the Recipient contacts who are listed in section 3 of schedule A.

**15.3    FHWA Unilateral Modifications.**

(a) The FHWA may unilaterally modify this grant agreement to comply with Federal law, including the Program Statute.

(b) To unilaterally modify this grant agreement under this section 15.3, the FHWA must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**15.4    Other Modifications.** The parties shall not amend, modify, or supplement this grant agreement except as permitted under sections 15.1, 15.2, or 15.3. If an amendment, modification, or supplement is not permitted under section 15.1, not permitted under section 15.2, and not permitted under section 15.3, it is void.

## ARTICLE 16
## CIVIL RIGHTS AND TITLE VI

**16.1    Title VI.**

(a)  The purpose of sections 16.1(b)-16.1(c) is to ensure that the Recipient has a plan to comply with Title VI and 49 C.F.R. part 21, including any amendments thereto.

(b) If the Recipient is a State DOT recipient of apportioned (formula) Federal-aid highway funding or a non-State DOT who has received other Federal funds and has a current Title VI Plan on file with the FHWA, then the Recipient shall submit to the FHWA before signing this grant agreement documentation showing that the Recipient has a current Title VI Plan on file with FHWA.

(c) If the Recipient is a non-State DOT and does not have a current Title VI Plan on file with the FHWA then as described in chapter II, section 2 of DOT Order 1000.12C, including any amendments or updates thereto, FHWA must complete a Title VI Assessment of the Recipient before entering this grant agreement. Until DOT guidance on conducting such an assessment is finalized, FHWA may rely on the date of Title VI assurances provided with the signing of the grant agreement.

(d) In this section 12.1, **"Title VI"** means Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified at 42 U.S.C. 2000d to 2000d-4a).

## 16.2    Legacy Infrastructure and Facilities.

In furtherance of the Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336 (codified at 42 U.S.C. 12101-12213), and Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 (codified at 29 U.S.C. 794), not later than one year after the date of this agreement, the Recipient shall develop a plan to address any legacy infrastructure or facilities that are not compliant with ADA standards and are involved in, or closely associated with, the Project. Consistent with 49 C.F.R. part 27, even in the absence of prior discriminatory practice or usage, a Recipient administering a program or activity receiving Federal financial assistance is expected to take action to ensure that no person is excluded from participation in or denied the benefits of the program or activity on the basis of disability.

# ARTICLE 17
# CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

## 17.1    Critical Infrastructure Security and Resilience.

(a) Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Critical Infrastructure Security and Resilience (NSM-22), the Recipient shall consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b) If the Security Risk Designation in section 3 of schedule F is "Elevated," then, not later that than two years after the date of this agreement, the Recipient shall submit to the FHWA a report that:

    (1)    identifies a cybersecurity Point of Contact for the transportation infrastructure being improved in the Project;

    (2)    summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

    (3)    summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)    documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)    describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 18
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**18.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**18.2    Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) The failure of this grant agreement to expressly identify Federal law applicable to the Recipient or activities under this grant agreement does not make that law inapplicable.

**18.3    Implementation of Executive Order 14025.** Consistent with Executive Order 14025, "Worker Organizing and Empowerment" (Apr. 26, 2021), Schedule H, Labor and Work, documents the consideration of job quality and labor rights, standards, and protections related to the Project.

**18.4    Implementation of Executive Order 14173**

(a) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(b) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal

anti-discrimination laws.

**18.5    Federal Freedom of Information Act.**

(a) The FHWA is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the FHWA by the Recipient related to this grant agreement may become FHWA records subject to public release under 5 U.S.C. 552.

**18.6    History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this grant agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**18.7    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of the Grant Program award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**18.8    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 25 this grant agreement includes the following additional terms as integral parts:

   (1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

   (2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

   (3)    2 C.F.R. part 175: Award Term for Trafficking in Persons; and

   (4)    Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

   (1)    49 C.F.R. part 20: New Restrictions on Lobbying;

   (2)    49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto;

(3)     49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance;

(4)     23 C.F.R. Chapter 1: Federal Highway Administration, Department of Transportation as, applicable to the Recipient.

(5)     Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**18.9    Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)     Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).


# ARTICLE 19
# ASSIGNMENT


**19.1    Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this grant agreement, any right to satisfy a condition under this grant agreement, any remedy under this grant agreement, or any obligation imposed under this grant agreement.


# ARTICLE 20
# WAIVER


**20.1    Waivers.**

(a) A waiver of a term of this grant agreement granted by the FHWA will not be effective unless it is in writing and signed by an authorized representative of the FHWA.

(b) A waiver of a term of this grant agreement granted by the FHWA on one occasion will not operate as a waiver on other occasions.

(c) If the FHWA fails to require strict performance of a term of this grant agreement, fails to exercise a remedy for a breach of this grant agreement, or fails to reject a payment during a breach of this grant agreement, that failure does not constitute a waiver of that term or breach.


# ARTICLE 21
# ADDITIONAL TERMS AND CONDITIONS


**21.1    Effect of Urban or Rural Designation.** As applicable to the Grant Program, based on information that the Recipient provided to the FHWA, including the Technical

Application, if section 1 of schedule F designates the Grant award as an urban award or a rural award, as defined in the NOFO, then the Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

**21.2    Disclaimer of Federal Liability.** The FHWA shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this grant agreement.

**21.3    Relocation and Real Property Acquisition.**

(a) The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c) The Recipient shall make available to displaced persons comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**21.4    Equipment Disposition.**

(a) In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient, a Designated Subrecipient, or a subrecipient acquires equipment under the Grant Program award, then when that equipment is no longer needed for the Project:

　　(1)    if the entity that acquired the equipment is a State, the State shall dispose of that equipment in accordance with State laws and procedures; and

　　(2)    if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 C.F.R. 200.313; and

　　(3)    if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity shall request disposition instructions from the FHWA.

(b) In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.310-200.316 and 2 C.F.R. 1201.313.

(c) The Recipient shall ensure compliance with this section 21.4 for all tiers of subawards under the Grant Program award.

**21.5    Environmental Review.**

(a) In this section, "**Environmental Review Entity**" means:

    (1)    if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

    (2)    for all other cases, the FHWA.

(b) Except as authorized under section 21.5(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

    (1)    the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 et seq. and any other applicable environmental laws and regulations; and

    (2)    if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d) The Recipient acknowledges that:

    (1)    the Environmental Review Entity's actions under section 21.5(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

    (2)    applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in schedule B and other information described in this grant agreement may inform environmental decision-making processes, but the parties do not intend this grant agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with schedule B or other information in this grant agreement, then:

    (1)    the parties may amend the grant agreement under section 15.1 for consistency with the selected build alternative; or

(2)    if the FHWA determines that the condition at section 10.1(a)(5) is satisfied, the FHWA may terminate this grant agreement under section 10.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**21.6**    **Railroad Coordination.** If section 3 of schedule C includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

## ARTICLE 22
## MANDATORY AWARD INFORMATION

**22.1**    **Information Contained in a Federal Award.** For 2 C.F.R. 200.211

(1)    the "Federal Award Date" is the date of this grant agreement, as defined under section 24.2;

(2)    the "Assistance Listings Number" is provided in section 7 of schedule D; and

(3)    this award is not for research and development.

**22.2**    **Federal Award Identification Number.**

(a) The Federal Award Identification Number ("FAIN") will be generated when the FHWA authorizes the project in FMIS. If the Recipient is a State DOT, they acknowledge that they have access to FMIS and can retrieve the FAIN from FMIS. If the Recipient is a non-State DOT, they acknowledge that the FAIN is on the FMIS project authorization.

**22.3**    **Recipient's Unique Entity Identifier.**

(a) If the USDOT Payment System identified in section 5 of schedule A is "FMIS," then the Recipient's Unique Entity Identifier, as defined at 2 C.F.R. 25.400, is available in FMIS or GrantSolutions, as applicable. The Recipient acknowledges that it has access to FMIS or GrantSolutions and can retrieve the unique entity identifier from FMIS or GrantSolutions, as applicable.

(b) If the USDOT Payment System identified in section 5 of schedule A is "DELPHI eInvoicing," then the Recipient's Unique Entity Identifier, as defined at 2 C.F.R. 25.400, is listed on page 1, line 4 of the Non-State DOT Recipient Signature Page.

**ARTICLE 23**
**CONSTRUCTION AND DEFINITIONS**

**23.1    Schedules.** This grant agreement includes the following schedules as integral parts:

| | |
|---|---|
| Schedule A | Administrative Information |
| Schedule B | Project Activities |
| Schedule C | Award Dates and Project Schedule |
| Schedule D | Award and Project Financial Information |
| Schedule E | Project Changes |
| Schedule F | Grant Program Designations |
| Schedule G | Grant Performance Measurement Information |
| Schedule H | Labor and Work |

**23.2    Exhibits.** The following exhibits, which are located in the document titled "Federal Highway Administration Exhibits to Competitive Grant Agreements", and available at https://www.fhwa.dot.gov/pgc/, are part of this grant agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Project Progress Reports and Recertifications: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**23.3    Construction.**

(a) In these General Terms and Conditions:

(1)    unless expressly specified, a reference to a section or article refers to that section or article in these General Terms and Conditions;

(2)    a reference to a section or other subdivision of a schedule listed in section 23.1 will expressly identify the relevant schedule; and

(3)    there are no references to articles or sections in this grant agreement portions of this grant agreement that are not contained in schedules listed in section 23.1.

(b) If a provision in these General Terms and Conditions or the exhibits conflicts with a provision in this grant agreement, then this grant agreement prevails. If a provision in the exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

**23.4    Integration.** This grant agreement constitutes the entire agreement of the parties relating to the Grant Program and awards under that program and supersedes any previous agreements, oral or written, relating to the Grant Program and awards under that program.

23.5    **Definitions.** In this grant agreement,, the following definitions apply:

"**General Terms and Conditions**" means this document, including articles 1–24.

"**Grant**" means an award of Federal Highway Administration grant program funds that were made available under the Notice of Funding Opportunity ("NOFO") identified in section 7 of schedule D.

"**Grant Amount**" means the amount of the grant funds awarded to the Recipient in section 1 of schedule D.

"**Grant Program**" means the grant program on the title page of Schedules A to H to the Grant Agreement.

"**Program Statute**" means the collective statutory text in schedule F.

"**Project**" means the project proposed in the Technical Application, as modified by the negotiated provisions of this grant agreement, including schedules A to H.

"**Technical Application**" means the application identified in section 1 of schedule A, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 24
## AGREEMENT EXECUTION AND EFFECTIVE DATE

24.1    **Counterparts.** This grant agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

24.2    **Effective Date.** This grant agreement will become effective when all parties have signed it. The date of this grant agreement will be the date this grant agreement is signed by the last party to sign it. This instrument constitutes a Grant when the FHWA's authorized representative signs it.

Docusign Envelope ID: FF0DB63E-4FB1-4329-8962-FAE087G75F88



EXHIBIT 6.1

**FEDERAL HIGHWAY ADMINISTRATION**

**EXHIBITS TO COMPETITIVE GRANT AGREEMENTS**


**Date:  April 30, 2025**

## EXHIBIT A
## APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this grant agreement under the grant program on the title page of Schedules A to H to the Grant Agreement the Recipient assures and certifies, with respect to this Grant, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this grant agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this grant agreement include, but are not limited to, the following:

**General Federal Legislation**
   a. Davis-Bacon Act – 40 U.S.C. 3141, et seq., as applicable under 23 U.S.C. 113
   b. Federal Fair Labor Standards Act – 29 U.S.C. 201, et seq.
   c. Hatch Act – 5 U.S.C. 1501, et seq.
   d. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. 4601, et seq.
   e. National Historic Preservation Act of 1966 - Section 106 – 54 U.S.C. 306108
   f. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. 312501, et seq.
   g. Native American Graves Protection and Repatriation Act – 25 U.S.C. 3001, et seq.
   h. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. 7401, et seq.
   i. Section 404 of the Clean Water Act, as amended – 33 U.S.C. 1344
   j. Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. 1536
   k. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. 1451, et seq.
   l. Flood Disaster Protection Act of 1973 - Section 102(a) – 42 U.S.C. 4012a
   m. Age Discrimination Act of 1975 – 42 U.S.C. 6101, et seq.
   n. American Indian Religious Freedom Act, P.L. 95-341, as amended
   o. Drug Abuse Office and Treatment Act of 1972, as amended – 21 U.S.C. 1101, et seq.
   p. The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, P.L. 91-616, as amended – 42 U.S.C. 4541, et seq.
   q. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. 290dd through 290dd-2
   r. Architectural Barriers Act of 1968 – 42 U.S.C. 4151, et seq.
   s. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 – 42 U.S.C. 8373
   t. Contract Work Hours and Safety Standards Act – 40 U.S.C. 3701, et seq.
   u. Copeland Anti-kickback Act, as amended – 18 U.S.C. 874 and 40 U.S.C. 3145
   v. National Environmental Policy Act of 1969 – 42 U.S.C. 4321, et seq.
   w. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. 1271, et seq.
   x. Federal Water Pollution Control Act, as amended – 33 U.S.C. 1251-1376
   y. Single Audit Act of 1984 – 31 U.S.C. 7501, et seq.
   z. Americans with Disabilities Act of 1990 – 42 U.S.C. 12101, et seq.
   aa. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. 1681 through 1683 and 1685 through 1687
   bb. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. 794

cc. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. 2000d, et seq.
dd. Title IX of the Federal Property and Administrative Services Act of 1949 – 40 U.S.C. 1101 -1104, 541, et seq.
ee. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. 1352
ff. Freedom of Information Act – 5 U.S.C. 552, as amended
gg. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. 1855
hh. Farmland Protection Policy Act of 1981 – 7 U.S.C. 4201, et seq.
ii. Noise Control Act of 1972 – 42 U.S.C. 4901, et seq.
jj. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. 661, et seq.
kk. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. 401 and 525
ll. Section 4(f) of the Department of Transportation Act of 1966 – 49 U.S.C. 303 and 23 U.S.C. 138
mm. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. 9601, et seq.
nn. Safe Drinking Water Act – 42 U.S.C. 300f to 300j-26
oo. Wilderness Act – 16 U.S.C. 1131-1136
pp. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. 6901, et seq.
qq. Migratory Bird Treaty Act – 16 U.S.C. 703, et seq.
rr. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)
ss. Cargo Preference Act of 1954 – 46 U.S.C. 55305
tt. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
uu. Bringing in and harboring certain aliens – 8 U.S.C. 1324
vv. Aiding or assisting certain aliens to enter – 8 U.S.C. 1327

**Executive Orders**
a. Executive Order 11990 – Protection of Wetlands
b. Executive Order 11988 – Floodplain Management
c. Executive Order 12372 – Intergovernmental Review of Federal Programs
d. Executive Order 12549 – Debarment and Suspension
e. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f. Executive Order 14025 – Worker Organizing and Empowerment
g. Executive Order 14149 – Restoring Freedom of Speech and Ending Federal Censorship
h. Executive Order 14151 – Ending Radical and Wasteful Government DEI Programs and Preferencing
i. Executive Order 14154 – Unleashing American Energy
j. Executive Order 14168 – Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
k. Executive Order 14173 – Ending Illegal Discrimination and Restoring Merit-based Opportunity

**Presidential Policy Directives and Memorandums**
    a. Presidential Policy Directive 21 – Critical Infrastructure Security and Resilience
    b. National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Systems

**General Federal Regulations**
    a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201
    b. Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200
    c. Investigative and Enforcement Procedures – 14 C.F.R. Part 13
    d. Procedures for predetermination of wage rates – 29 C.F.R. Part 1
    e. Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3
    f. Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5
    g. Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60, et seq.
    h. New Restrictions on Lobbying – 49 C.F.R. Part 20
    i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21, including any amendments thereto
    j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24
    k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25
    l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27
    m. DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35
    n. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28
    o. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30
    p. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32
    q. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38
    r. Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs – 49 C.F.R. Part 26, including any amendments thereto (as applicable under section 18.3 of this grant agreement)

**Office of Management and Budget Circulars**
   a.  Any applicable OMB Circular.

**Highway Federal Legislation**
   a.  Highways – Title 23, U.S.C. including but not limited to:
   b.  Brooks Act (for FHWA projects, this incorporates Title IX of the Federal Property and Administrative Services Act of 1949 (formerly 40 U.S.C. 541, et seq.)) – 40 U.S.C. 1101-1104; 23 U.S.C. 112(b)(2)
   c.  Letting of Contracts, 23 U.S.C. 112
   d.  Highway Design and Construction Standards, 23 U.S.C. 109
   e.  Prevailing Rate of Wage, 23 U.S.C. 113
   f.  Planning, 23 U.S.C. 134 and 135 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
   g.  Tolls, 23 U.S.C. 301 (to the extent the Recipient wishes to toll an existing free facility that has received Title 23 funds in the past); except as authorized by 23 U.S.C. 129 and 166.
   h.  Size, Weight, and Length Limitations – 23 U.S.C. 127, 49 U.S.C. 31101 et seq.
   i.  Buy America – 23 U.S.C. 313
        (see http://www.fhwa.dot.gov/construction/contracts/buyam_qa.cfm)
   j.  Nondiscrimination – 23 U.S.C. 140
   k.  Efficient Environmental Reviews - 23 U.S.C. 139

**Federal Highway Regulations**
   a.  Highways – Title 23, C.F.R. including but not limited to the specific parts identified herein.
   b.  Planning – 23 C.F.R. Part 450 (except for projects that are not regionally significant that do not receive funding under Title 23 or Chapter 53 of Title 49)
   c.  National Highway System Design Standards – 23 C.F.R. Part 625
   d.  Preconstruction Procedures – 23 C.F.R. Part 630 Subparts A and B
   e.  Construction and Maintenance – 23 C.F.R. Part 635
   f.  Manual on Uniform Traffic Control Devices – 23 C.F.R. Part 655
   g.  Environmental Impact and Related Procedures – 23 C.F.R. Part 771
   h.  Procedures for Abatement of Highway Traffic and Construction Noise – 23 C.F.R. Part 772
   i.  Intelligent Transportation System Architecture and Standards – 23 C.F.R. Part 940
   j.  Procedures Implementing Section 4(f) of the Department of Transportation Act – 23 C.F.R. Part 774
   k.  Permitting Requirements under the National Pollutant Discharge Elimination System – 40 C.F.R. Part 122
   l.  Required Contract Provisions – 23 C.F.R. Part 633 (Form 1273)
   m.  External Programs – 23 C.F.R. Part 230

Specific assurances required to be included in the grant agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this grant agreement.

# EXHIBIT B
## ADDITIONAL STANDARD TERMS

**TERM B.1**
**TITLE VI ASSURANCE**
**(Implementing Title VI of the Civil Rights Act of 1964, as amended)**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 C.F.R. Parts 21 (including any amendments thereto), 25, 27, 37 and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Technical Application and by entering into this grant agreement under the grant program on the title page of Schedules A to H to the Grant Agreement, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Federal Highway Administration (FHWA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*, 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

*"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the FHWA.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

## Specific Assurances

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted award under the grant program on the title page of Schedules A to H to the Grant Agreement:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with an award under the grant program on the title page of Schedules A to H to the Grant Agreement and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   *"The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."*

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

    a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
    b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
    b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the FHWA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the FHWA. You must keep records, reports, and submit the material for review upon request to FHWA, or its designee in a timely,

complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the grant program on the title page of Schedules A to H to the Grant Agreement . This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the award under the grant program on the title page of Schedules A to H to the Grant Agreement.

# APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Federal Highway Administration (FHWA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the FHWA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the FHWA may determine to be appropriate, including, but not limited to:

    a.  withholding payments to the contractor under the contract until the contractor complies; and/or
    b.  cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as

the Recipient or the FHWA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

## APPENDIX B

## CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the terms and conditions of the award under the grant program on the title page of Schedules A to H to the Grant Agreement, and the policies and procedures prescribed by the Federal Highway Administration (FHWA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

### (HABENDUM CLAUSE)

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

## APPENDIX C

### CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

  1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

## APPENDIX D

## CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

B-11

## APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

### Pertinent Non-Discrimination Authorities:

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq*.), (prohibits discrimination on the basis of sex);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

**TERM B.2**
**CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS**

**2 C.F.R. Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FHWA approval or that is estimated to cost $25,000 or more – as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the grant program on the title page of Schedules A to H to the Grant Agreement, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the award under the grant program on the title page of Schedules A to H to the Grant Agreement, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to

the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FHWA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered

transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## TERM B.3
## REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (Dec. 29, 2022), similar provisions in prior appropriation acts, and anticipated for future appropriations acts, and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

    (1) Certify whether the entity has a Tax Delinquency; and

    (2) Certify whether the entity has a Felony Conviction.

4. **Prohibition.** If

    (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2) an entity provides an affirmative response to either certification in section 3; or

    (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

   then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5. **Mandatory Notice to the USDOT FHWA.**

    (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT FHWA in writing of that entry.

    (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT FHWA in writing of that affirmative response.

    (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT FHWA in writing of that inaccuracy.

6. **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1) require the SAM check in section 2;

    (2) require the certifications in section 3;

    (3) include the prohibition in section 4; and

B-19

(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT FHWA under section 5.

## TERM B.4
## RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

(1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

(i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—

(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

# EXHIBIT C
# PROJECT PROGRESS REPORTS AND RECERTIFICATIONS:
# FORMAT AND CONTENT

**1.    Purpose**. The purpose of the Project Progress Reports and Recertifications under the grant program on the title page of Schedules A to H to the Grant Agreement are to ensure that the project scope, schedule, and budget will be maintained to the maximum extent possible.

**2.    Format and Content.** The Recipient shall produce a cost, schedule, and project status report that contains the sections enumerated in the following list. At the discretion of the FHWA, modifications or additions can be made to produce a progress reporting format that will most effectively serve both the Recipient and the FHWA. Some projects will have a more extensive project progress status reporting than others. For smaller projects, the FHWA may determine that the content of the project progress reports will be streamlined and project status meetings will be held on a less-frequent basis. The first project progress report should include a detailed description and, where appropriate, drawings of the items funded.

   **(a) Project Overall Status.** This section provides an overall status of the project's scope, schedule and budget. The Recipient shall note and explain any deviations from the scope of work, the schedule, or the budget that are described in this grant agreement.

   **(b) Project Significant Activities and Issues.** This section provides highlights of key activities, accomplishments, and issues occurring on the project during the previous quarter. Activities and deliverables to be reported on should include meetings, audits and other reviews, design packages submitted, advertisements, awards, construction submittals, construction completion milestones, submittals related to any grant award requirements, media or Congressional inquiries, value engineering/constructability reviews, and other items of significance.

   **(c) Action Items/Outstanding Issues.** This section should draw attention to, and track the progress of, highly significant or sensitive issues requiring action and direction in order to resolve. The Recipient should include administrative items and outstanding issues that could have a significant or adverse effect on the project's scope, schedule, or budget. Status, responsible person(s), and due dates should be included for each action item/outstanding issue. Action items requiring action or direction should be included in the quarterly status meeting agenda. The action items/outstanding issues may be dropped from this section upon full implementation of the remedial action, and upon no further monitoring anticipated.

   **(d) Project Scope Overview.** The purpose of this section is to provide a further update regarding the project scope. If the original scope contained in the grant agreement is still accurate, this section can simply state that the scope is unchanged.

   **(e) Project Schedule.** An updated master program schedule reflecting the current status of the program activities should be included in this section. A Gantt (bar) type chart is probably the most appropriate for quarterly reporting purposes, with the ultimate format to be agreed upon between the Recipient and the USDOT. It is imperative that

the master program schedule be integrated, i.e., the individual contract milestones tied to each other, such that any delays occurring in one activity will be reflected throughout the entire program schedule, with a realistic completion date being reported. Narratives, tables, and/or graphs should accompany the updated master program schedule, basically detailing the current schedule status, delays and potential exposures, and recovery efforts. The following information should also be included:

- Current overall project completion percentage vs. latest plan percentage.

- Completion percentages vs. latest plan percentages for major activities such as right-of-way, major or critical design contracts, major or critical construction contracts, and significant force accounts or task orders. A schedule status description should also be included for each of these major or critical elements.

- Any delays or potential exposures to milestone and final completion dates. The delays and exposures should be quantified, and overall schedule impacts assessed. The reasons for the delays and exposures should be explained, and initiatives being analyzed or implemented in order to recover the schedule should be detailed.

**(f) Project Cost.** An updated cost spreadsheet reflecting the current forecasted cost vs. the latest approved budget vs. the baseline budget should be included in this section. One way to track project cost is to show: (1) Baseline Budget, (2) Latest Approved Budget, (3) Current Forecasted Cost Estimate, (4) Expenditures or Commitments to Date, and (5) Variance between Current Forecasted Cost and Latest Approved Budget. Line items should include all significant cost centers, such as prior costs, right-of-way, preliminary engineering, environmental mitigation, general engineering consultant, section design contracts, construction administration, utilities, construction packages, force accounts/task orders, wrap-up insurance, construction contingencies, management contingencies, and other contingencies. The line items can be broken-up in enough detail such that specific areas of cost change can be sufficiently tracked and future improvements made to the overall cost estimating methodology. A Program Total line should be included at the bottom of the spreadsheet. Narratives, tables, and/or graphs should accompany the updated cost spreadsheet, basically detailing the current cost status, reasons for cost deviations, impacts of cost overruns, and efforts to mitigate cost overruns. The following information should be provided:

- Reasons for each line item deviation from the approved budget, impacts resulting from the deviations, and initiatives being analyzed or implemented in order to recover any cost overruns.

- Transfer of costs to and from contingency line items, and reasons supporting the transfers.

- Speculative cost changes that potentially may develop in the future, a quantified dollar range for each potential cost change, and the current status of the speculative change. Also, a comparison analysis to the available contingency amounts should be included, showing that reasonable and sufficient amounts of contingency remain to keep the project within the latest approved budget.

- Detailed cost breakdown of the general engineering consultant (GEC) services (if applicable), including such line items as contract amounts, task orders issued (amounts), balance remaining for tasks, and accrued (billable) costs.

- Federal obligations and/or disbursements for the project, compared to planned obligations and disbursements.

**(g) Federal Financial Report (SF-425).** The Federal Financial Report (SF-425) is a financial reporting form used throughout the Federal Government Grant system. Recipients shall complete this form and attach it to each quarterly Project Progress and Monitoring Report. The form is available at https://www.grants.gov/forms/post-award-reporting-forms.html.

**(h) Certifications.**

    i.    A certification that the Recipient is in compliance with 2 C.F.R. 200.303 (Internal Controls) and 2 C.F.R. Part 200, Subpart F (Audit Requirements).

    ii.    The certification required under 2 C.F.R. 200.415(a).

## EXHIBIT D
## FORM FOR SUBSEQUENT OBLIGATION OF FUNDS

The FHWA and **Recipient name**          entered a grant agreement for the **Project name**          that was executed by the FHWA on **Signature date**  (the "**Agreement**").

As described in section 4.2(f) of the General Terms and Conditions, this instrument authorizes the obligation of **Amount**       for **Portion of the project in fund obligation table**       .

**Recipient name**       states that:

(1)     schedule B of the Agreement accurately describe the Project's activities;

(2)     for each completion date listed in section 2 of schedule C of the Agreement, the Recipient's estimate for that milestone is not more than six months after the date listed in section 2 of schedule C of the Agreement;

(3)     comparing the Project's current budget with the amounts listed in section 3 of schedule D of the Agreement, the "Non-Federal Funds" amount has not decreased and the total eligible project costs amount has not decreased; and

(4)     under the terms of article 5 of the General Terms and Conditions, the Recipient is not presently required to request a modification to the Agreement.

acknowledges that FHWA is acting in reliance on the Recipient's statements above.

_____By:
Date

_____
Signature of Recipient's Authorized Representative

_____
Name

_____
Title

The FHWA has determined that:

(1)    all applicable Federal requirements for obligating these funds are satisfied.

_____By:    _____
Date                                    Signature of FHWA Division Administrator

                                        _____
                                        Name

                                        _____
                                        Title



# EXHIBIT 7



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq*.) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq*.), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq*.).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

Docusign Envelope ID: FE0DB63E-4FB1-4329-8962-FAE087G75F88    Case 3:25-cv-07070-RS    Document 9-22    Filed 08/21/25    Page 158 of 305

Page 4

DOT remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families. This mission depends upon your strict adherence to the legal framework governing our partnership, and I trust you will take all necessary steps to comply with Federal law and satisfy your legal obligations.

Sincerely,

Sean P. Duffy

Docusign Envelope ID: FE0DB63E-4FB1-4329-8962-FAE087G75F88



EXHIBIT 8



OFFICE OF THE CITY ATTORNEY
LYNDSEY M. OLSON, CITY ATTORNEY

Civil Division, 15 Kellogg Blvd. West, 400 City Hall
Saint Paul, MN 55102
Tel: 651-266-8710 | Fax: 651-298-5619

To: United States Department of Transportation

Care of: Lisa Leone, Lead Grants Management Specialist, Build America Bureau

From: Sarah Sullivan, Assistant City Attorney

Subject: Grant Program Cooperative Agreement Conditions in Violation of Federal Injunctions and Constitutional Law

Applicable to: Department of Transportation Innovative Finance and Asset Concession Grant Program

Date: June 27, 2025

Dear Lisa,

The City of Saint Paul (City) is a recipient of an Innovative Finance and Asset Concession Grant and has reviewed the Department of Transportation's required Cooperative Agreement for disbursement of funds. The City is submitting this addendum to be read jointly with the Cooperative Agreement attached hereto. The grant agreement process necessitates the inclusion of this addendum as the Department of Transportation, in email to the City on June 17, 2025, has rejected the City's request to remove language from the Cooperative Agreement that is in direct violation of court orders. We request that you share this addendum with Department

Department of Transportation insistence on the inclusion of the language, as shown through strikethrough in the attached signed agreement, is in violation of the Preliminary Injunction dated April 24, 2025, as clarified by the Court in its subsequent Orders dated May 9, 2025 and June 23, 2025, in the matter of San Francisco v. Trump, File No. 25-CV-1350 (N.D.Cal May 9, 2025), for which the City is a party to, as well as a Preliminary Injunction dated June 19, 2025, in the matter of State of California v. U.S. DOT, File No. 25-CV-208-JJM-PAS. The San Francisco v. Trump Injunction specifically bars the United States from conditioning the provision of funds to cities on matters not related to immigration, on the affected city agreeing to fully cooperate with the Trump Administration on executive orders and other mandates issued related to immigration. The June 23, 2025 subsequent order clarifies that the Preliminary Injunction applies to Department of Transportation grant conditions. Here, the grant in question has no connection whatsoever to immigration. The California v. U.S. DOT injunction enjoins the United States from imposing the immigration enforcement condition as a condition to receive Department of Transportation funds, on the states who sued as well as their government subdivisions, including the City

of Saint Paul. Requiring the City to agree to the conditions in order to receive these Department of Transportation funds is a plain violation of the Preliminary Injunctions and Clarifying Orders.

Additionally, courts consistently have found that the Executive Orders and threatened actions related to funding related to DEI are likely unconstitutional and illegal under the Separation of Powers doctrine, the Fifth Amendment's Due Process Clause, and the Tenth Amendment. The conditions on Federal Funding related to the Executive Orders are unconstitutionally vague under the Spending Clause and the Administrative Procedures Act ("APA").

The City is explicitly providing you notice through this addendum that it is not agreeing to the following crossed-out language in the attached Cooperative Agreement:

**Subpart C. MISCELLANEOUS PROVISIONS**

**Federal Law and Public Policy Requirements**

(1) ...and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

**APPENDIX E**

- Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship, which prohibits taxpayer resources from abridging freedom of speech.
- Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, which requires, to the maximum extent permissible by law, the termination of all diversity, equity, inclusion, and accessibility (DEIA) performance requirements for recipients.
- Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, which prohibits the use of Federal funds to promote gender ideology.
- Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, which requires
  - pursuant to Section (3)(b)(iv)(A), the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and pursuant to Section (3)(b)(iv)(B), by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

The City has fully executed the Cooperative Agreement with the language that it is not agreeing to crossed out in order to move forward in coherence with the applicable Court Orders. The City reserves all legal rights to challenge the Agency's position with respect to the Agreement terms, including but not limited to seeking sanctions and penalties for contempt of court, as well as seeking relief through additional legal actions. The City requests that the Agency accept the City of Saint Paul's signed

Docusign Envelope ID: EE0DB63E-4FB1-4329-8662-EAE087C75F88

Cooperative Agreement, including the removal of the illegal language, and proceed with the dispersal of funds in conformity with the Preliminary Injunctions and Clarifying Orders, attached hereto.

Sincerely,

Sarah K. Sullivan
Assistant City Attorney
Saint Paul City Attorney's Office
15 W. Kellogg Blvd, 400 City Hall
Saint Paul, MN 55102

# Innovative Finance and Asset Concession Grant Program Cooperative Agreement

# Contents

COOPERATIVE AGREEMENT TERMS AND CONDITIONS ...................................... 4

APPLICABLE AUTHORITIES ............................................................... 4

ADDITIONAL AUTHORITIES ............................................................... 4

SUBPART A. GENERAL PROVISIONS ...................................................... 4

    Definitions .................................................................... 5

    Order of Precedence ........................................................... 5

    Flow Down Requirement ......................................................... 5

    Period of Performance ......................................................... 5

    Contracting ................................................................... 5

    Budget ........................................................................ 5

    Budget Period ................................................................. 5

    Cost Sharing or Matching Funds ................................................ 5

Direct Assistance ................................................................ 6

    Role of the Recipient ......................................................... 6

    Role of DOT's Grant Program Director (GPD) .................................... 8

    Role of DOT's Grant Program Manager (GPM) ..................................... 8

    Role of DOT's Grant Technical Advisor (GTA) ................................... 8

    Role of DOT's Grant Management Specialist (GMS) ............................... 8

    Degree of DOT Involvement ..................................................... 8

    Monitoring and Reporting Requirements ......................................... 9

    Site Visits and Desk Review ................................................... 9

    Unauthorized Promotion or Endorsement of Goods or Services .................... 10

    Work Products ................................................................. 10

    News Releases ................................................................. 11

    Property Standards ............................................................ 11

    Intangible Property ........................................................... 11

    Computer Software ............................................................. 11

    Record Retention and Access to Records Monitoring ............................ 11

    Restrictions on Public Access to Records and Privacy Act ...................... 11

    Performance Goals and Measurements ............................................ 11

    Basic Considerations .......................................................... 12

    Labor Rates ................................................................... 12

    Indirect Costs ................................................................ 13

Pre-Award Costs ................................................................ 13
Program Income ............................................................... 13
Profit or Fee ..................................................................... 13
Federal Payment ............................................................... 13
Financial Management and Internal Controls .................... 14
Audit ................................................................................ 14
Transportation and Travel ................................................ 14
SUBPART C. MISCELLANEOUS PROVISIONS ............ 15
Federal Law and Public Policy Requirements ................... 15
Prior Written Approvals ................................................... 15
Key Personnel .................................................................. 15
Procurement ..................................................................... 15
Subawards ........................................................................ 16
In-Person Conferences, Trainings, and Other Events ........ 16
System of Award Management and Unique Entity Identifier Requirements ............ 16
Remedies for Noncompliance ........................................... 16
Objections, Hearings and Appeals .................................... 16
Suspension of Agreement ................................................. 16
Termination of Agreement ................................................ 17
Termination/Expiration of Agreement Procedures ............ 17
Non-Discrimination .......................................................... 17
Closeout ........................................................................... 18
After-the-Award Requirements ......................................... 18
ATTACHMENT 1. U.S DEPARTMENT OF TRANSPORTATION CONTACT INFORMATION ..... 21
ATTACHMENT 2. RECORD RETENTION ...................... 22
ATTACHMENT 3. BILLING REQUIREMENTS ............... 24
ATTACHMENT 4. U.S. DEPARTMENT OF TRANSPORTATION AND FEDERAL ASSURANCES ...... 27
Attachment 4.1 .................................................................. 27
Attachment 4.2 .................................................................. 32
Attachment 4.3 .................................................................. 35
Attachment 4.4 .................................................................. 37
Attachment 4.5 .................................................................. 39
Attachment 4.6 .................................................................. 42
ATTACHMENT 5. NON-DISCRIMINATION ASSURANCES ...... 43
APPENDIX A ................................................................... 46
APPENDIX B ................................................................... 48

2

APPENDIX C ................................................................................................................. 50

APPENDIX D ................................................................................................................. 51

APPENDIX E ................................................................................................................. 52

## COOPERATIVE AGREEMENT TERMS AND CONDITIONS

This Cooperative Agreement (Agreement) funds and sets out the terms and conditions (Provisions) governing a collaborative effort between the Department of Transportation (DOT) and **City of Saint Paul** (Recipient) for project**, Saint Paul Asset Scan for Transit-Oriented Development Opportunities**.

This is a cost reimbursement Cooperative Agreement. The responsibility for conducting activities under this Agreement lies primarily with the organization named in this Agreement (Recipient). DOT, through its designated representatives, shall consult and coordinate in the conduct of the activities performed during the period of this Agreement. By signing the signature page, the Recipient accepts the terms and conditions, as stated.

## APPLICABLE AUTHORITIES

Unless otherwise noted, this Agreement incorporates the provisions from DOT's Notice of Funding Opportunity (NOFO) for the **Innovative Finance and Asset Concession Grant Program (IFACGP or the Program)** for the Fiscal Years 2022, 2023 and 2024, the Recipient's federal assistance application submitted in response to the NOFO, and the documents submitted to DOT to execute this Agreement.

This Agreement requires the Recipient to comply with the applicable requirements of part 200 of Title II of the Code of Federal Regulations (2 CFR part 200) and the DOT's implementation of those requirements at 2 CFR part 1201. Program Evaluation is encouraged for grant recipients and subrecipients, however is not required.

## ADDITIONAL AUTHORITIES

The authority for funding this Agreement incorporates Public Law No. 117-58, the Consolidated Appropriations Act, 2022, Section 71001 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58)

## SUBPART A. GENERAL PROVISIONS

**The purpose and scope of this Agreement is to facilitate and evaluate public-private partnerships in which the private sector partner could assume a greater role in project planning, development, financing, construction, maintenance, and operation, including by assisting eligible entities in entering into Asset Concessions consistent with the Budget Details of the award and the eligible activities and requirements outlined in the NOFO through technical assistance or expert services, as amended by this Agreement.** All activities, services, and products completed under this Agreement must align with this general scope and purpose. The Recipient is expected to implement the project via a proposal and quarterly reporting, which require collaboration with and approval by DOT's Grant Management Specialist (GMS) and DOT's Grant Technical Advisor (GTA). Approved work products are incorporated by reference in this Agreement. The award must not be used in the implementation of any other matters not set forth in this Agreement, except as may be reasonably related or incidental to the implementation of the purpose and scope of this Agreement.

4

## Definitions

This Agreement applies and incorporates the same meaning of terms, defined directly, or incorporated by reference, in the NOFO and at 2 CFR 200.1, unless otherwise specified within the applicable and additional authorities (above) or within these Provisions.

## Order of Precedence

In the event of an inconsistency in the provision or execution of this Agreement, the following order of precedence applies: (a) applicable Federal laws and regulations, (b) these Provisions, and (c) work products approved by DOT.

## Flow Down Requirement

The Recipient is legally and financially responsible for all aspects of the activities funded under this Agreement, including funds provided to contractors (including consultants) and subrecipients as referenced in 2 CFR 200.332. Further, as required by 2 CFR 200.327, in all applicable contracts, the Recipient must include and require compliance with the provisions at Appendix II of 2 CFR part 200.

## Period of Performance

The Period of Performance (POP) for this Agreement is included on the award document signature page. Performance period extensions shall be made consistent with 2 CFR 200.308 and 2 CFR 200.309.

## Contracting

Prior approval of all contracting services will be required in coordination with DOT's Grant Program Manager (GPM), along with final GPM approval. Procurements for and contracts with grantee-contracted advisors procured for this award must comply with the requirements set forth in the 2 CFR 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards; also refer to contractor determinations in 2 CFR 200.331.

## Budget

DOT's financial obligations to the Recipient will not exceed the amount of federal funding awarded to date, as reflected on the signature page of this agreement. DOT is not liable for any costs the Recipient incurs in anticipation of receiving additional funds from DOT or any costs the Recipient incurs in a manner inconsistent with the terms of this Agreement.

## Budget Period

The budget period for the award is 36 months in length beginning on the start date of the performance period. The Recipient is authorized to expend funds awarded based on DOT-approved work products. Requested budget period extensions for both the award and the work product must be made consistent with 2 CFR 200.308.

## Cost Sharing or Matching Funds

The maximum value of cooperative agreements is $2 million. Cooperative agreements of up to $1 million are offered at 100 percent federal share (no required non-federal match). Amounts in excess of $1 million are offered at 50 percent federal share (50 percent required non-federal match). For example, a cooperative agreement of $2 million in federal aid would be matched by $1 million of non-federal funds, supporting a $3 million effort.

**Direct Assistance**

If the Proposed Activities include direct assistance for an Asset Concession, the following conditions apply:

(1) the Asset Concession shall not prohibit, discourage, or make it more difficult for a Recipient to construct new infrastructure, to provide or expand transportation services, or to manage associated infrastructure in publicly beneficial ways, along a transportation corridor or in the proximity of a transportation facility that was a part of the Asset Concession;

(2) the Recipient shall have adopted binding rules to publish all major business terms of the proposed Asset Concession not later than the date that is 30 days before entering into the Asset Concession, to enable public review, including a certification of public interest based on the results of an assessment under subparagraph (4);

(3) the Asset Concession shall not result in displacement, job loss, or wage reduction for the existing workforce of the Recipient or other public entities;

(4) the Recipient or the concessionaire shall carry out a value-for-money analysis, or similar assessment, to compare the aggregate costs and benefits to the Recipient of the Asset Concession against alternative options to determine whether the Asset Concession generates additional public benefits and serves the public interest;

(5) the full amount of any Asset Concession payment received by the Recipient under the Asset Concession, less any amount paid for transaction costs relating to the Asset Concession, shall be used to pay infrastructure costs of the Recipient; and

(6) the terms of the Asset Concession shall not result in any increase in costs under the asset concession being shifted to taxpayers the annual household income of whom is less than $400,000 per year, including through taxes, user fees, tolls, or any other measure, for use of an approved infrastructure asset.

(7) Not later than three years after the date on which a Recipient enters into an Asset Concession as a result of a grant under this section—

i. the Recipient shall hire an independent auditor to evaluate the performance of the concessionaire based on the requirements described in subparagraphs (1) through (6); and

ii. the independent auditor shall submit to the Recipient, and make publicly available, a report describing the results of the audit under subparagraph (i).

**Role of the Recipient**

The Recipient must:
(1) Comply with the terms and conditions of this Agreement;
(2) Collaborate with DOT staff in implementation and monitoring of the project, including identifying specific metrics and deliverables within the first 90 days of Period of Performance;
(3) Comply with IFACGP deliverable table below:

| Deliverable | Approximate Due Date | Section 508 Compliant? |
|---|---|---|
| **Kick-off Meeting**<br><br>Conduct a kick-off meeting with USDOT at a mutually-agreed-upon location. | Within 4 weeks of Period of Performance Start Date | No |
| **Reporting & Meeting**<br><br>Submit semi-annual Program performance reports using the Performance Progress (SF-PPR) and quarterly Federal Financial (SF-425) reports to document activities performed, anticipated activities, progress toward meeting performance goals and metrics, and any changes to schedule or anticipated issues.<br><br>Quarterly meetings or as needed to discuss the report and project status will be coordinated and scheduled by the Grant Technical Advisor.<br><br>For grants with asset scanning activities, provide asset information including, but not limited to, asset description, current use, potential zoning uses, objectives for the asset, any known environmental, technical, or financial issues, and market analysis to be shared by DOT with private entities for potential project analysis, business plan development, and contact information to share proposals with potential project sponsors. | Semi-Annual Program Performance Report in accordance with Fiscal Year schedule<br><br>Quarterly Federal Financial Reports in accordance with Fiscal Year schedule<br><br>Asset Information at completion of asset scan activities | Yes |
| **Project Management Plan**<br><br>The Recipient shall submit to USDOT's GTA for approval a Project Management Plan, which shall include, at a minimum:<br>a) A **Statement of Work**, with a description of **Tasks and Sub-Tasks** by which the project work activities will be organized, executed, and monitored;<br>b) A **Project Schedule** (Gantt Chart or equivalent) displaying begin and end times for each Task and Sub-Task, plus achievement of Project Milestones;<br>c) A **Project Budget,** displaying planned expenditures for each Task, with a further breakdown by Cost Element for each Task, and by the federal share vs. non-federal share, if applicable.<br>d) A description of major **Project Milestones**, including key Reports, start of operations of important systems or subsystems, and other important deliverables or events;<br>e) A **Risk Management Plan,** which includes identification and assessment and of all known risks, assignment of risk roles and responsibilities, processes for monitoring and controlling risks, and a risk registry; | Within 45 days of Period of Performance Start Date | No |
| **Annual Report**<br><br>Submit a report to the Build America Bureau that describes the findings and effectiveness of the program. The specific format and contents of this report shall be discussed during the kickoff meeting and approved by the Agreement Officer Representative (AOR). | On the anniversary date of Period of Performance start and annually thereafter | Yes |

## Role of DOT's Grant Program Director (GPD)

The GPD is the DOT official authorized to execute and/or administer this award. The GPD is identified as the DOT official on the award document. The GPD is responsible for approving awards and amendments that obligate or de-obligate funds, suspending and terminating awards, and performing other responsibilities that are set forth in this Agreement.

## Role of DOT's Grant Program Manager (GPM)

The GPM is responsible for oversight of the Grant Management Team (GTA & GMS) activities to include but not limited to, all financial and administrative aspects of the award and all business management aspects of the award.

## Role of DOT's Grant Technical Advisor (GTA)

The GTA will have overall responsibility for monitoring the conduct and progress of the project, including conducting site visits, and reviewing financial and performance reports with the Grant Management Specialist (GMS) and other appropriate DOT staff. The GTA will provide substantial input, in collaboration with both the Recipient and DOT subject matter experts, in the planning and implementation of work products approved by the Grant Team. The GTA will provide written recommendations to the Grant Team regarding work product approval and performance period extensions. Also, the GTA will participate in the acceptance and publication of work products and materials, to make them available to the public.

## Role of DOT's Grant Management Specialist (GMS)

The GMS is responsible for all financial and administrative aspects of the award. The GMS will also assist the GTA in monitoring the conduct and progress of the project, including conducting site visits, and reviewing financial and performance reports. Further, the GMS will ensure that the award is operated in compliance with this Agreement. Questions concerning the applicability of regulations and policies to this Agreement, and all requests for required prior approvals, such as requests for permission to expend funds for certain items, should be directed to the GMS. Required approvals, including work product approvals, must be provided in writing to the Grant Team to include: GPD, GPM, GTA, & GMS. The GMS will be responsible for communicating the required approvals.

## Degree of DOT Involvement

The DOT anticipates substantial Federal involvement with the Recipient during performance period of this project. The anticipated Federal involvement will include:

- Review of deliverables as defined by the proposal from the Recipient
- Reviewing draft project documents and plans for approval and comment
- Reviewing semi-annual performance reports and final reports from the Recipient
- Convening quarterly meetings with the recipient to review project activities, schedule, and progress toward the scope of work
- Identifying relevant federal technical assistance programs aligned with the IFACGP efforts to share with grantee as additional funding, finance, and technical assistance opportunities.
- Assigning federal agency staff to serve as liaisons with grantee.
- Reviewing and approving changes in key personnel or scope changes
- Oversight of ongoing compliance with applicable federal regulations
- Budget oversight, including reviewing and reimbursing monthly invoices for incurred costs and receiving notification when budgets are 50% and 90% expended.

## Monitoring and Reporting Requirements

(1) **Requirements**. This Agreement incorporates the reporting requirements of 2 CFR 200.512 (Report submission), 2 CFR 200.328 (Financial reporting), 2 CFR 200.329 (Monitoring and reporting program performance), and 2 CFR 200.330 (Reporting on real property). Accordingly, the reporting frequencies are identified below.  DOT may adjust these frequencies to respond to award management deficiencies or to implement requirements of the applicable authorities.  Failure to comply with these reporting requirements is considered a material noncompliance.

| Reporting Requirements for Recipients | Frequency |
|---|---|
| Project Management Reporting | |
| • Performance Report | SA |
| • Financial Report (SF-425) | Q |
| Closeout Reporting | |
| • Final Performance Report | F |
| • Final Property Report (SF-428 & SF-428B) | F |
| Other Reporting (where applicable) | |
| • Intellectual Property Report | A |
| • Invention Report | Y |
| • Equipment/Property Report (SF-428) | Y |
| • Annual Financial Statement Audit (not the same as a Single Audit) | RA |
| A – Within a week after the event<br>F – Final; within 120 calendar days after the performance period or termination of this Agreement, whichever is first.<br>Q – Quarterly; within the 30 days following the end of the Federal fiscal year quarters<br>SA – Semi-Annually; within the 30 days following the end of two Federal fiscal year quarters<br>Y – Yearly; within 90 calendar days after the end of the annual report period<br>RA - Within 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period. | |

(2) **Performance reporting**. The Recipient will include the requirements of the "Performance Goals and Measurements" provision, of this Agreement, in its work products and track for inclusion in its performance report for each work product.

(3) **Submission to DOT**.  The Recipient must submit reports to both the GTA and GMS, in a manner directed by DOT and provided guidance in Attachment 1.

(4) **Restrictions**. Reports submitted in non-DOT systems must not contain any Protected Personal Identifiable Information (PII), limited rights data (proprietary data), classified information, information subject to export control classification, or other information not subject to release.

## Site Visits and Desk Review

DOT may perform site visits and desk reviews, as per 2 CFR 200.329(f), to monitor project progress and to ensure full accountability for Federal funds and compliance with this Agreement.

**Unauthorized Promotion or Endorsement of Goods or Services**

While receiving technical assistance, the Recipient or any of its personnel will not sell or promote its own or any other products or services. Neither the Recipient nor its personnel may imply that DOT endorses any product or service produced by non-DOT funding, nor use the name of DOT or any division of DOT to sell any product or service. For funding jointly administered by DOT and another Federal agency, the Recipient provides the same assurances to both agencies.

**Work Products**

(1) **Sharing Work Products**. The Recipient agrees to make available to the public the work products produced under this Agreement. Work products include studies, plans, market analyses, estimates, schedules, agreements, asset information, public outreach materials, performance reports, audits and any other documents produced while effectuating the purpose of this Agreement. Work products will be made publicly available in a manner and location determined by DOT.

(2) **Draft and Final Products**. The GTA and GMS may review and will accept or deny draft and final products. The Recipient must submit to the GTA and the GMS draft and final products developed under this Agreement. DOT will determine the manner in which products are submitted. Deliverables, quotations therefrom, paraphrasing, and disclosures of draft or interim findings must not be published by the Recipient or other participants in the work without DOT approval. In addition, except for open-source code, DOT reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work products, in whole or in part (including creating derivative works), for federal government purposes and to authorize others to do so, DOT's license applies to: (1) the copyright in any work developed under this award, sub-award, or contract awarded under this cooperative agreement; and (2) any rights of copyright to which the Recipient or its personnel, including contractors, purchases ownership with award funds from this Agreement. In addition, DOT may make any work that was developed under this Agreement publicly available by any means without restriction, including on a DOT website, or social media account, as a hard copy, or in electronic form. DOT also reserves the right, at its discretion, not to publish deliverables and other materials (e.g., reports, publications, manuals, and training curricula) developed under this cooperative agreement as DOT resources.

(3) **Acknowledgment of Support**. Products, including tools, publications, training materials, and online resources (material), developed under this Agreement, may include the DOT's logo, provided the GMS has approved the products and provides written permission to use the DOT logo. In addition, the Recipient must include the following acknowledgment and disclaimer on all products unless another version is authorized:

"This material is based upon work supported, in whole or in part, by Federal award number [insert award number] awarded to [name of Recipient] by the U.S. Department of Transportation."

The substance and findings of the work are dedicated to the public. Neither the United States Government nor any of its employees make any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately-owned rights. Reference herein to any individuals, agencies, companies, products, process, services, service by trade name, trademark, manufacturer, or otherwise does not constitute or imply an endorsement, recommendation, or favoring by the author(s), contributor(s), the U.S.

10

Government, or any agency thereof. Opinions contained herein are those of the author(s) and do not necessarily reflect the official position of, or a position that is endorsed by, DOT or any Federal agency.

## News Releases

All press releases or public issuances regarding the underlying Project made during the performance period for this Agreement must be reviewed and approved by DOT before release.

## Property Standards

The property standards at 2 CFR 200.310 through 200.316, as modified by 2 CFR 1201.313, apply to this Agreement and set forth the requirements for insurance coverage, real property, equipment, supplies, intangible property, and other property.

## Intangible Property

(1) This Agreement incorporates the requirements of 2 CFR 200.315.

(2) DOT will not retain exclusive rights to technical data, software, and analytic code previously developed by the Recipient or its personnel and used in the performance of work supported by this award. Computer software and "open-source" code available to the public prior to the work of this award may remain in the public domain.

## Computer Software

(1) Software, especially computer software used for online products, must be commercially available off-the-shelf.

(2) Requests for exceptions to computer software standards must be submitted in writing to DOT.

## Record Retention and Access to Records Monitoring

This Agreement incorporates the requirements at:

- 200.334 Retention requirements for records.
- 200.335 Requests for transfer of records.
- 200.336 Methods for collection, transmission, and storage of information.
- 200.337 Access to records.

## Restrictions on Public Access to Records and Privacy Act

This Agreement incorporates the requirements of 2 CFR 200.338. In the event of improper use or disclosure of protected personally identifiable information, the Recipient agrees to immediately report the incident to the GMS.

## Performance Goals and Measurements

To implement 2 CFR 200.301, 2 CFR 200.329, and the applicable authorities, in collaboration with the responsible DOT parties to this Agreement, the Recipient must develop a specific performance plan based on DOT-provided performance measures. The Recipient's performance plan must track progress and report on the effectiveness of each deliverable. The Recipient must propose, track and report project accomplishments against the following performance measures:

| Goal | Metric |
|------|--------|
| Goal 1: Provide benefits to the community through transportation projects. | • Increase collaboration with the private sector during project planning |
| Goal 2: Increase grant recipient's capacity, knowledge, and skills to execute transportation projects. | • Hire staff and/or procure consultants to serve as advisors within six months of the project's performance period start date |
| Goal 3: Engage, educate, and listen to the community throughout the project planning process. | • Conduct at minimum one stakeholder outreach initiative<br>• Create a best practices document based on learnings from the project |
| Goal 4: Advance the transformational project(s) closer to delivery. | • Complete all planned asset analyses for all existing assets<br>• Provide an implementation plan or next steps for each asset at the conclusion of the project |

## SUBPART B. FINANCIAL PROVISIONS

### Basic Considerations

This Agreement, including the work products, incorporates the basic cost principles of 2 CFR part 200:
- 200.402 Composition of costs.
- 200.403 Factors affecting allowability of costs.
- 200.404 Reasonable costs.
- 200.405 Allocable costs.
- 200.406 Applicable credits.
- 200.407 Prior written approval (prior approval).
- 200.408 Limitation on allowance of costs.
- 200.409 Special considerations.
- 200.410 Collection of unallowable costs.
- 200.411 Adjustment of previously negotiated indirect (F&A) cost rates containing unallowable costs.

Failure to provide adequate supporting documentation may result in a determination by DOT that those costs are unallowable.

### Labor Rates

This Agreement incorporates the labor rate submitted in the recipient's cost estimate. These rates are used for the purposes of determining reasonableness of direct labor costs, in accordance with 2 CFR part 200, including 2 CFR 200.404. All direct labor costs charged to this award require DOT approval, unless otherwise authorized by the GMS.

## Indirect Costs

(1) This Agreement incorporates the requirements of 2 CFR 200.414 and the NOFO.

(2) If indirect costs are included in the budget, the Recipient must include documentation to support the indirect cost rate it is using. The Recipient is only entitled to reimbursement of indirect costs. The Recipient may use a current Federally-approved and negotiated indirect cost rate agreement with DOT concurrence. If the Recipient does not have a negotiated indirect cost rate agreement, it must submit its first indirect cost rate proposal to its cognizant federal agency for review and approval. The Recipient may elect to use, if eligible, up to 15 percent de minimis rate per 2 CFR 200.414(f).

(3) If the Recipient is seeking reimbursement of indirect costs, the Recipient is responsible for maintaining an approved rate for the life of the award. The Recipient is required to reconcile the difference between its provisional indirect cost rate and final rate for the same year. The Recipient is not entitled to more than the unspent award amount, for underpayments.

## Pre-Award Costs

The Recipient will incur pre-award costs at its own risk, after the date of the DOT selection announcement and prior to the start date of the award performance period.

The incurrence of pre-award costs in anticipation of an award imposes no obligation on DOT either to make the award or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

## Program Income

Pursuant to 2 CFR 200.307(a), any program income earned during the award period, as a result of award activities, must be added to the funds committed to the award and used to further eligible activities supported by this Agreement. Program income earned after the award must be returned to the Federal government. Before using program income, any affected work product shall be revised and approved by DOT to include the use of program income.

## Profit or Fee

No increment (fee or profit) above cost may be paid to the Recipient or subrecipient under this award, except as otherwise expressly provided by law. The term "subrecipient" does not include the Recipient's procurement of goods and services, such as maintenance contracts for equipment or facilities, contracts for communication services, etc.

## Federal Payment

(1) **Payment Method**. Payment by reimbursement is the only payment method under this Agreement. This Agreement incorporates the payment requirements of 2 CFR 200.305. The Debt Collection Improvement Act of 1996 requires payment be made by electronic funds transfer. Electronic transfer shall be made from DOT's Delphi system to the Recipient's bank account on file with DOT. DOT will reimburse labor and direct costs incurred by the Recipient, including subcontractors. See attachment 3 for billing requirements.

(2) **Labor and Direct Costs**. DOT will reimburse labor and direct costs incurred by the Recipient, including subcontractors. Recipient should maintain a system for recording all project costs. Invoices may be transmitted to DOT monthly.

(3) **Reimbursement Limitation**. DOT financial obligations to the Recipient are limited by the amount of federal funding awarded to date as reflected on the award document. If the Recipient incurs costs in anticipation of receiving additional funds from DOT, it does so at its own risk.

(4) **Timing of Submittals**. Invoices should be transmitted to DOT monthly with a completed SF270, all corresponding invoices, and timesheets.

(5) **Payment approval**. Consistent with 2 CFR 200.305(b)(3), DOT will determine approval of payment requests submitted through Delphi as soon as practical, but not later than 30 days after the Recipient's request is received, unless the billing is improper, or an extenuating circumstance requires additional DOT time to approve a payment request.

(6) **Unauthorized Drawdown of Federal Funds**. The Recipient must immediately refund DOT any amounts drawn down in excess of the authorized amounts. The Recipient and subrecipients shall promptly, but at least quarterly, remit to DOT interest earned on advances drawn in excess of disbursement needs and shall comply with the procedure for remitting interest earned to the Federal government per 2 CFR 200.305, as applicable. The GPD, in collaboration with the Technical Assistance Division, will determine the appropriate refund method.

## Financial Management and Internal Controls

This Agreement incorporates the financial management systems requirements in 2 CFR 200.302, and internal controls set forth in 2 CFR 200.303.

### Audit

(1) **Single or Program-Specific Audits**. This Agreement incorporates the audit requirements of 2 CFR 200.501, 2 CFR 200.514 and 2 CFR 200.507.

DOT may require the Recipient to complete a Program-Specific Audit in accordance with 2 CFR 200.507. Audits must be guided by Appendix XI of 2 CFR part 200.

(2) **Financial Statement Audit Required**. DOT may require the Recipient to have an annual financial statement audit conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

(3) Audits must be submitted in a manner either described at 2 CFR 200 Subpart F or reference in this Agreement, within 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period. This requirement applies to all Recipients, including commercial and not-for-profit organizations.

(4) Failure to comply with these audit requirements is considered material noncompliance.

(5) DOT will reimburse the Recipient for eligible costs associated with audits allowed by this Agreement as indicated within the Recipient's award budget.

## Transportation and Travel

This Agreement incorporates the requirements of 2 CFR 200.475. All travel activities require prior approval from the GMS, as per 2 CFR 200.407.

## SUBPART C. MISCELLANEOUS PROVISIONS

### Federal Law and Public Policy Requirements

(1) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(2) The Recipient hereby agrees that, as a condition of receiving any Federal financial assistance under this agreement, it will certify that it will comply with the assurances listed in Attachment 4 of this agreement. The Recipient must sign each of the assurances located in Attachment 4. The assurances attached cover the following:

- Certification regarding debarment, suspension, and other responsibility matters
- Requirements regarding delinquent tax liability or a felony conviction under any federal law
- Recipient policy to ban text messaging while driving - DOT Order 3902.10
- Certification regarding drug-free work-place requirements
- Compliance with the Trafficking Victims Protection Act (TVPA) of 2000 and implementing regulations in 2 CFR 175
- Lobbying and 49 CFR 20

### Prior Written Approvals

The Agreement incorporates and applies the prior approval requirements of 2 CFR 200.407 to the entire project, including changes to the award and the associated work product. The Recipient must comply with 2 CFR 200.407 before incurring certain costs under the award, including costs incurred pursuant to a work plan.

### Key Personnel

**Definition**. "Personnel" means employees of the Recipient, or any contractor(s), or team members, and consultants engaged by any of those entities.

The key personnel specified in the Recipient's application are considered essential to the work being performed under this Agreement. Any change to the key personnel assigned to a work product or included in the Recipient's application is considered a revision of program plans and requires compliance with 2 CFR 200.407 and advance written notice to and approval by the GPM. The notice must include a revised application along with a justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the award or work product.

### Procurement

The Recipient's process for acquiring goods and services under this award must comply with 2 CFR 200.317 through 200.327, as modified by 2 CFR 1201.317. Agreements executed by the Recipient must comply with this Agreement, as applicable, and include the contract provisions set forth in Appendix II to 2 CFR part 200, as applicable to the contract. The recipient will need to submit specific procurement

documents for review prior to the entering into agreements with contractors and consultants. The documents include but are not limited to solicitations, specifications, contract agreements and any other document requested by DOT.

## Subawards

The use of sub-awards is subject to the specific written, prior approval of DOT. Any subaward made by a Recipient must comply with the requirements in 2 CFR 200.331- 200.333. When making subawards, the Recipient must comply with the reporting requirements of 2 CFR 170. This requirement provides guidelines for reporting of information on subawards and executive total compensation, as required by the Federal Funding Accountability and Transparency Act of 2006.

## In-Person Conferences, Trainings, and Other Events

This Agreement incorporates the requirements of 2 CFR 200.432, including the regulations referenced in the same section, and the related DOT standards.

## System of Award Management and Unique Entity Identifier Requirements

This Agreement incorporates the requirements of 2 CFR part 25, including Appendix A to part 25, which includes the requirement for the Recipient to maintain an active registration in the System of Award Management (www.sam.gov). An active SAM registration with the unique entity identifier (UEI) is required until the Recipient submits its final financial report or receives the final payment under this Agreement, whichever is later. The Recipient may not make a subaward to any entity that has not provided its unique entity identifier number.

## Remedies for Noncompliance

This Agreement incorporates the remedies for noncompliance included at:

- 200.339 Remedies for noncompliance.
- 200.340 Termination.
- 200.341 Notification of termination requirement.
- 200.342 Opportunities to object, hearings and appeals.
- 200.343 Effects of suspension and termination.

## Objections, Hearings and Appeals

The Recipient may object to any remedy for noncompliance as outlined in 2 CFR 200.342, the Recipient may submit written objections or appeals to DOT via email, within 60 days of an initial DOT decision. A decision from the GPD or the appropriate DOT senior executive official shall be the final decision of DOT.

## Suspension of Agreement

DOT may suspend this Cooperative Agreement by giving written notice of this suspension to the **City of Saint Paul**, instructing the Recipient not to incur additional obligations, or disburse funds, pending the Recipient's action to correct violations of the terms and conditions of this Cooperative Agreement.

Failure by **City of Saint Paul** to take the corrective actions specified in the Notice of Suspension within thirty (30) days of receipt of said notice may result in termination of this Cooperative Agreement.

## Termination of Agreement

Consistent with 2 CFR 200.340, DOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

> (1)(a) The Recipient fails to obtain or provide any Recipient matching funds as required by the agreement;
>
> (b) A completion date for the Project or a component of the Project is listed in the agreement and the Recipient fails to meet that milestone by six months after the date listed in the agreement;
>
> (c) The Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the Project Schedule even if it is beyond the reasonable control of the Recipient;
>
> (d) Circumstances cause changes to the Project that DOT determines are inconsistent with DOT's basis for selecting the Project to receive an award; or
>
> (e) DOT determines that termination of this agreement is in the public interest.
>
> (2) In terminating this agreement under this section, DOT may elect to consider only the interests of DOT.
>
> (3) The Recipient may request that DOT terminate the agreement under this section.

## Termination/Expiration of Agreement Procedures

DOT may provide additional time and/or resources to closeout upon expiration or termination of this Cooperative Agreement. The Recipient must provide DOT a written report detailing all open business within five (5) days of expiration or termination of this Cooperative Agreement.

## Non-Discrimination

The Recipient hereby agrees that, as a condition of receiving any Federal financial assistance under this agreement, it will comply with Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. 2000d) and implementing regulations (49 CFR part 21, including any amendments thereto), related nondiscrimination statutes (i.e., 23 U.S.C. 324, Section 504 of the Rehabilitation Act of 1973 as amended, and the Age Discrimination Act of 1975), and applicable regulatory requirements to the end that no person in the United States shall, on the grounds of race, color, national origin, sex, handicap, or age be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity for which the Recipient receives Federal financial assistance.

The specific requirements of the Department of Transportation Civil Rights assurances (required by 49 CFR 21.7 and 27.9) are incorporated in the agreement and are in located in Attachment 5. The assurances in Attachment 4 must be executed and signed by the Recipient with a separate signature in addition to the Recipient's signature for this agreement.

## Closeout

This Agreement incorporates the requirements of 2 CFR 200.344. DOT will initiate the administrative closeout of the cooperative agreement after receiving evidence that all technical work and administrative requirements have been completed. The Recipient shall furnish all required documents in support of the closeout of the cooperative agreement within the timeframes requested by the Government. The anticipated timeframe to complete administrative closeout of the cooperative agreement will not exceed six (6) months.

## After-the-Award Requirements

This Agreement incorporates the requirements of 2 CFR 200.345 and 2 CFR 200.346 for post-closeout adjustments and the collection of amounts due.


Sarah Sullivan (Jun 30, 2025 12:47 CDT)

**ENTIRE AGREEMENT**
This document embodies the entire Agreement between **City of Saint Paul** and the DOT. This Cooperative Agreement may be amended, altered, or any of its provisions waived only in writing and signed by both parties. **The agreement will become effective when all parties have signed. The effective date of this agreement will be the date this agreement is signed by the last party.**

**PARTIES EXECUTING THIS COOPERATIVE AGREEMENT**

**Federal Award and Obligation Amount: $805,139.00**
**Non-Federal Match Amount:   $    0.00**
**Period of Performance: July 28, 2025- July 27, 2028**

This Cooperative Agreement is entered on this day _____ of _____ by the United States Department of Transportation, Build America Bureau, District of Columbia.

By: _____
    Morteza Farajian, Executive Director
    Build America Bureau
    U.S. Department of Transportation

This Cooperative Agreement is entered by **City of Saint Paul.**

By:   *Jaime Rae Tincher*
    Jaime Rae Tincher (Jun 30, 2025 13:21 CDT)
    (Signature)

    Jaime Tincher
    (Print Name)

Date:   Jun 30, 2025
    (month/day/year)

Title:   Deputy Mayor

By:   *Laura Logsdon*
    (Signature)

    Laura Logsdon
    (Print Name)

Date:   Jun 30, 2025
    (month/day/year)

Title:   Interim Finance Director

    Approved as to Form:

By:   *Sarah Sullivan*
    Sarah Sullivan (Jun 30, 2025 12:47 CDT)
    (Signature)

    Sarah Sullivan
    (Print Name)

Date:   Jun 30, 2025
    (month/day/year)

Title:   Assistant City Attorney

19

**ATTACHMENT 1. U.S DEPARTMENT OF TRANSPORTATION CONTACT INFORMATION**

All responses to provisions of this Agreement, which require communication with DOT, should be sent using the contact information below.

E-mail: InnovativeFinanceTA@dot.gov

For regular and overnight delivery:

Innovative Finance and Asset Concession Grant Program
Build America Bureau
Department of Transportation
1200 New Jersey Ave SE
Washington, DC 20590

## ATTACHMENT 2. RECORD RETENTION

Financial Records Financial Status Reports
Final Financial Status Report
Requests for Reimbursements
Copies of Audits (federal and private)
Copies of Audit Responses
Copies of all tax reports filled with the IRS, state, and local governments

Deposits and Receipts
Monthly Bank Statements and Reconciliations
Written Procedures for Spending Funds
All Contracts:
    Contracts with Other Groups
    Consultant Contracts
    Insurance Policies
    Service/Maintenance Contracts
    Sole Source Contract Justifications
    Construction Contracts
    Bid Documents
    Performance Bonds
    Indirect Cost Documentation
Chart of Accounts
Ledgers
Cash Disbursement Journals
Payroll Register for Each Employee
Supporting Documentation for All Expenditures:
    Purchase Orders
    Vouchers
    Receipts
    Petty Cash Vouchers
    Deposit Receipt for Petty Cash Reconciliation
    Travel Reimbursement (with receipts where applicable)
    Time and Attendance Records
    Price Quotations
Equipment Inventory Listing

Nonprofit Parent or Sponsoring Organization Records
Articles of Incorporation
    Corporate Charter with a Nonprofit Status
    Constitution and By-laws
    Federal Charitable Organization Designation (501(c)(3))
    FICA Waiver of Exemption
    List of Board Members
    Monthly/Quarter/Annual Reports (whichever is applicable)
    Minutes of Board Meetings
    All Pertinent Correspondence Related to Work Under Award
    Copy of Written Personnel Policies

<u>Project Records</u>
Approved Work Products
Approved Budget Narratives
Grant Award Notice
Special Conditions
Program Modification Requests
Budget Modification Requests
Award Adjustment Notices
Copies of Required Quarterly Reports (Narrative and Financial)
Copy of Close-out Documents (Narrative and Financial)
Pertinent Correspondence Related to This Award (incoming and outgoing)
Lists of Work Force/Advisory/Community Organization Meetings Related to the Performance of Work
    under the Award
Evaluations Conducted as Required by the Award
Letters of Appreciation
Personnel Folders:
        Resumes
Letters of Employment
        Documentation of Pay Raises
Nondisclosure Agreement(s)

## ATTACHMENT 3. BILLING REQUIREMENTS

Not more than ninety (90) days following service delivery related to each DOT-approved work products, the Recipient of this Agreement is required to submit payment requests for allowable costs incurred. Payment requested must be submitted to DOT at a frequency that is not less than once every Federal fiscal year quarter. Payment requests that are not submitted timely must include a justification for the delayed submission. Payment requests for actual costs incurred must comply with the allowable cost standards of this Agreement.

All payment requests from the Recipient must be submitted to DOT and approved by DOT using the Delphi eInvoicing system.

(1) <u>Documentation submitted with payment requests</u>. The following documentation must accompany any requests for payment of eligible technical assistance services provided:

(a)  The voucher number, cooperative agreement award number, funding source, and work product plan number or name. A single voucher must include costs for work product under the same award; a voucher must not include work product associated with different awards.

(b)  Total amount of the payment request for the voucher, the bill period, and amount by work product.

(c)  The following certification statement: "I certify that the data contained in this document, as well as any information provided in the accompanying voucher, are true, correct, actual, and that all outlays were made in accordance with the cooperative agreement conditions and applicable Regulations. I also certify that all contractors and/or consultants have certified to the same certification statements, and the certifications on file for future inspection and audit."

(d)  Program-specific documentation of actual costs, including reports from the Recipient's financial management system, which must be supported by the documents in the Recipient's program files. Unless exempted by 2 CFR, the Recipient must generate reports from its financial management system supporting and documenting salaries, wages, travel, and all other payments for each employee, contractor personnel, and consultant that conducted work under the subject voucher. The report(s) supporting payment requests must include:
 i. The cooperative agreement award number, funding source, and work product number or name.
 ii. Dates of the activities/actual costs by work product.
 iii. The name and position/title of each employee, contractor personnel, and consultant by work product; dates with applicable hours worked; the compensation rate attributable to the employee, contractor personnel and consultant; and travel costs by each employee, contractor personnel, and consultant. **Do not** include individuals, such as senior management or other staff, whose costs are included in the indirect cost rate calculation.
 iv. Actual activity, not estimates of activity, of each employee, contractor personnel and consultant.
 v. The federally-approved indirect cost rate used, and the total indirect costs.
 vi. If applicable, the approved G&A rate used, and the total G&A rate costs.
 vii. A cumulative amount of funds expended by work product and by the award.
 viii. A cover page with the voucher number, cooperative agreement award number, funding source, current and historic cumulative totals by work product number and by award.

(2) <u>File documentation</u>. In addition to the applicable record retention items included in Attachment 2 or elsewhere in this Agreement, the Recipient must maintain, at a minimum, the following documentation in its files and the documentation must be available for DOT review during an on-site monitoring visit, for submission when the Grants Team or GPD request particular documentation for remote monitoring purposes, and for submission when the GTA, GMS or GPD request particular documentation to assess payment requests from the Recipient:

(a)  Documentation to support salary costs, such as timesheets signed by the responsible supervisory official having knowledge of the activities performed by the employee and by the employee, or an electronic equivalent.  In signing, the supervisor and employee would be verifying that the technical assistance activities were performed and that the report is true and accurate.

(b)  For direct costs, invoices/receipts to support the charge for the costs and a certification for these costs.  Documentation or an electronic equivalent signed by the employee who incurred the costs indicating the expense was incurred pursuant to the subject technical assistance activities.

(c)  Copies of invoices submitted by the contractor/consultant along with the contract.  The invoices should include the dates of services, the hours worked attributable to the services, the rate of compensation, the nature of the services provided, an itemized list of other costs, if any, the office for which the services were performed, and the total billed amount.

(d)  For contractor costs, a certification signed by the contractor who incurred the costs indicating the expense was incurred pursuant to the subject technical assistance activities.

(e)  Employees' and contractors' work products and related documents, such as trip reports, minutes/notes of meetings, and collateral reports.

- Delphi eInvoicing System for DOT Financial Assistance Awardees: Subject to the requirements in 2 CFR 200, payments will be made after receipt of required modal reporting forms. Each payment request must be made electronically via the Delphi eInvoicing System.

The following are the procedures for accessing and utilizing the Delphi eInvoicing System:

I.   <u>Recipient Requirements</u>

a.  Recipients (organization participating in Cooperative Agreement) must have internet access to register and submit payment requests through the Delphi invoicing system.

b.  Recipients must submit payment requests electronically and DOT Operating Administrations must process payment requests electronically.

c.  Recipients must submit at a minimum the required forms (SF270) and supporting documentation (receipts, itineraries, travel documentation, and event agendas) and obtain approval by the GMS prior to uploading invoices into the Delphi system for payment.

d.  All invoices must be uploaded into the Delphi system electronically by the 10th of each month if the Recipient would like to be reimbursed within the same month.

    e.    All eligible expenses must be submitted to DOT within 60-days of being incurred to receive reimbursement, unless otherwise authorized by DOT. Failure to submit eligible expenses for reimbursement within 60-days may result in the disapproval of the expense reimbursement request.

    f.    All invoices that have been submitted, approved, and paid will not be adjusted or recalculated by DOT staff to reimburse for miscalculated rates provided by **City of Saint Paul**.

    g.    It is the responsibility of the Recipient to provide, calculate and invoice correctly for all internal staff salaries. Changes or adjustments will not be made once final invoices have been submitted by the recipient and paid by DOT.

    h.    The Recipient shall follow the invoice/payment process for the close out of the cooperative agreement with DOT.

    i.    The Recipient shall not submit request for payment for any costs accrued outside the agreement timeframe of Period of Performance.

II.    <u>System User Requirements</u>

    a.    DOT will provide the Recipient's name and email address to the DOT Financial Management Office. The DOT will then invite the Recipient to sign up for the system.

    b.    DOT will send the Recipient a form to verify the Recipient's identity. The Recipient must complete the form and present it to a Notary Public for verification.

    c.    The Recipient will return the notarized form to:

    DOT Enterprise Services Center
    FAA Accounts Payable, AMZ-100
    PO Box 25710
    Oklahoma City, OK 73125

III.    The DOT will validate the form and email a user ID and password to the Recipient. Recipients should contact the Operating Administration's grants office with any changes to their system information.

Note: Additional information, including access forms and training materials, can be found on the DOT eInvoicing website (http: www.dot.gov/cfo/delphi-einvoicing-system.html)

## ATTACHMENT 4.  U.S. DEPARTMENT OF TRANSPORTATION AND FEDERAL ASSURANCES

### Attachment 4.1
CERTIFICATION REGARDING DEBARMENT
SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS

### 2 CFR Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring DOT approval or that is estimated to cost $25,000 or more – as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program, as set out below.

## 1. Instructions for Certification – First Tier Participants:

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction

under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior DOT approval or estimated to cost $25,000 or more - 2 CFR Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the

proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

By signing this ASSURANCE, the Recipient agrees to comply with 2 CFR Parts 180 and 1200 and the requirements listed above.

Bruce Engelbrekt
(Name of Recipient)

By _____
(Signature of Authorized Official)

DATED  June 30, 2025

**Attachment 4.2**
**REQUIREMENTS REGARDING**
**DELINQUENT TAX LIABILITY OR A FELONY CONVICTION**
**UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "SAM") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

31

    (1) Certify whether the entity has a Tax Delinquency; and

    (2) Certify whether the entity has a Felony Conviction.

4  **Prohibition.** If

    (1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2) an entity provides an affirmative response to either certification in section 3; or

    (3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5.  **Mandatory Notice to the USDOT.**

    (a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

    (b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

    (c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6.  **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1) require the SAM check in section 2;
    (2) require the certifications in section 3;
    (3) include the prohibition in section 4; and
    (4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

By signing this ASSURANCE, the Recipient also agrees to comply with USDOT Order 4200.6 and the requirements listed above.

Bruce Engelbrekt
(Name of Recipient)

By _____
(Signature of Authorized Official)

DATED June 30, 2025

33

## Attachment 4.3

### RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING

(a)    Definitions. The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of Attachment 4.3, "Motor Vehicles" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of Attachment 4.3, "Driving" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of Attachment 4.3, "Text messaging" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of Attachment 4.3, the "Government" includes the United States Government and State, local, and tribal governments at all levels.

(b)    Workplace Safety. In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

      (1)    adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

           (i)    Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

           (ii)    Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

      (2)    Conduct workplace safety initiatives in a manner commensurate with the size of the

34

business, such as—

(i)     Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii)    Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c)     Subawards and Contracts. To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving.

Bruce Engelbrekt
(Name of Recipient)

By_____
(Signature of Authorized Official)

DATED June 30, 2025

35

**Attachment 4.4**

CERTIFICATION REGARDING DRUG-FREE WORK-PLACE REQUIREMENTS

The Recipient named in this agreement certifies that it will establish and continue to provide a drug-free workplace by:

a.   Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Recipient's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

b.   Establishing an ongoing drug-free awareness program to inform employees about--

    1.   The dangers of drug abuse in the workplace;
    2.   The Recipient 's policy of maintaining a drug-free workplace;
    3.   Any available drug counseling, rehabilitation, and employee assistance programs; and,
    4.   The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

c.   Making it a requirement that each employee to be engaged in the performance of the grant or cooperative agreement be given a copy of the statement required by paragraph (a).

d.   Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant or cooperative agreement, the employee will--

    1.   Abide by the terms of the statement; and,
    2.   Notify the employer in writing of his or her conviction for a violation of a criminal drug statue occurring in the workplace no later than five (5) calendar days after such conviction;

e.   Notifying the Federal agency in writing, within ten (10) calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction, Employers of convicted employees must provide notice, including position title, to every project officer or other designee on whose project activity the convicted employee was working.  Notice shall include the identification number(s) of each affected grant or cooperative agreement.

f.   Taking one of the following actions, within thirty (30) calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted--

    1. Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or

    2. Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

g.   Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

1. The Recipient 's headquarters is located at the following address.  The addresses of all workplaces maintained by the Recipient are provided on an accompanying list.

_____       June 30, 2025
  (Signature of Authorized Official)          (Date)

**Attachment 4.5**
TRAFFICKING IN PERSONS

**2 CFR PART 175**

a. *Provisions applicable to a recipient that is a private entity.*

     1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not—

         i. Engage in severe forms of trafficking in persons during the period of time that the award is in effect;

         ii. Procure a commercial sex act during the period of time that the award is in effect; or

         iii. Use forced labor in the performance of the award or subawards under the award.

     2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity —

         i. Is determined to have violated a prohibition in paragraph a.1 of this award term; or

         ii. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a.1 of this award term through conduct that is either—

            A. Associated with performance under this award; or

            B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 1200.

b. *Provision applicable to a recipient other than a private entity.* We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity—

     1. Is determined to have violated an applicable prohibition in paragraph a.1 of this award term; or

     2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a.1 of this award term through conduct that is either—

         i. Associated with performance under this award; or

         ii. Imputed to the subrecipient using the standards and due process for imputing the

conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 1200.

c. *Provisions applicable to any recipient.*

1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a.1 of this award term.

2. Our right to terminate unilaterally that is described in paragraph a.2 or b of this section:

i. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

ii. Is in addition to all other remedies for noncompliance that are available to us under this award.

3. You must include the requirements of paragraph a.1 of this award term in any subaward you make to a private entity.

d. *Definitions.* For purposes of this award term:

1. "Employee" means either:

i. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

ii. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

3. "Private entity":

i. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

ii. Includes:

A. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).

B. A for-profit organization.

39

4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

5. "Recipient" and "subrecipient" include for-profit entities for the purpose of Attachment 4.5 only.

By signing this ASSURANCE, the Recipient certifies that it has read and understands the provisions listed above.

_____          June 30, 2025
(Signature of Authorized Official)                (Date)

## Attachment 4.6
### LOBBYING

*If the Recipient will apply for a grant or cooperative agreement exceeding $100,000, or a loan, line of credit, loan guarantee, or loan insurance exceeding $150,000, it must make the following certification and, if applicable, make a disclosure regarding the Recipient's lobbying activities. This certification is required by 49 CFR 20.110 and app. A to that part.*

*This certification does not apply to a Recipient that is an Indian Tribe, Indian organization, or an Indian tribal organization exempt from the requirements of 49 CFR Part 20.*

**Certification for Contracts, Grants, Loans, and Cooperative Agreements.**

The undersigned certifies, to the best of his or her knowledge and belief, that:

No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.
If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.
The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**Statement for Loan Guarantees and Loan Insurance.**

The undersigned states, to the best of his or her knowledge and belief, that:

If any funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this commitment providing for the United States to insure or guarantee a loan, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

Submission of this statement is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required statement shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Signature of Authorized Official _____     DATED June 30, 2025

## ATTACHMENT 5.  NON-DISCRIMINATION ASSURANCES

### Standard Title VI/Non-Discrimination Assurances

### DOT Order No. 1050.2A

By signing and submitting an application and by entering into this agreement under the FY 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Build America Bureau, it is subject to and will comply with the following:

### Statutory/Regulatory Authorities

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 CFR Part 21 (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*), including any amendments thereto;
- 28 CFR 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

### General Assurances

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the Build America Bureau.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

### Specific Assurances

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FYs 2022, 2023, and 2024

Innovative Finance and Asset Concession Grant Program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in 49 CFR 21.23(b) and (e) will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

      a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or

      b.  the period during which the Recipient retains ownership or possession of the property.

9.  The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10.  The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the DOT's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the DOT. You must keep records, reports, and submit the material for review upon request to DOT, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program.

Bruce Engelbrekt
_____
(Name of Recipient)

By _____
(Signature of Authorized Official)

DATED  June 30, 2025
_____

44

# APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, the Build America Bureau), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the OST, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the OST may determine to be appropriate, including, but not limited to:

    a. withholding payments to the contractor under the contract until the contractor complies; and/or
    b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or the OST may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with

litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

## APPENDIX B

CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), Section 71001 of Division G of the BIL (Asset Concessions), the Regulations for the Administration of FY 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program**,** and the policies and procedures prescribed by the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

### (HABENDUM CLAUSE)

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

Docusign Envelope ID: FF0DB63E-4FB1-4329-8662-FAE087G75F88

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

# APPENDIX C

CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The  (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

   1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

# APPENDIX D

CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

# APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

## Pertinent Non-Discrimination Authorities:

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq*.), (prohibits discrimination on the basis of sex);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Access to Services for Persons with Limited English Proficiency (LEP). The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq., its implementing regulation at 28 CFR 42.405(d), and applicable guidance issued by the Department of Justice;Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).
- ~~Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship, which prohibits taxpayer resources from abridging freedom of speech.~~
- ~~Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, which requires, to the maximum extent permissible by law, the termination of all diversity, equity, inclusion, and accessibility (DEIA) performance requirements for recipients.~~

- Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, which prohibits the use of Federal funds to promote gender ideology.
- Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, which requires
    - pursuant to Section (3)(b)(iv)(A), the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

pursuant to Section (3)(b)(iv)(B), by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

1
2
3
4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    CITY AND COUNTY OF SAN                    Case No.  25-cv-01350-WHO
     FRANCISCO, et al.,
8                                              **ORDER GRANTING PRELIMINARY
              Plaintiffs,                       INJUNCTION**[1]
9
              v.                               Re: Dkt. No. 61
10
     DONALD J. TRUMP, et al.,
11
              Defendants.
12

13          In 2017, President Donald Trump issued Executive Order 13,768 ("EO 13,768"), titled

14   "Enhancing Public Safety in the Interior of the United States," which was directed at so-called

15   "sanctuary jurisdictions."  The City and County of San Francisco and County of Santa Clara sued,

16   arguing that Section 9 of EO 13,768 was unconstitutional.  I found that they had pre-enforcement

17   standing, that they were likely to succeed on the merits because Section 9(a) of EO 13,768 was

18   unconstitutional, and that they faced irreparable harm absent an injunction.  I enjoined Section 9(a)

19   of EO 13,768.  The Ninth Circuit affirmed.  *Cnty. of Santa Clara v. Trump, et al.*, 250 F. Supp. 3d

20   497 (N.D. Cal. Apr. 25, 2017) (Preliminary Injunction Order), *aff'd*, 897 F.3d 1225 (9th Cir.

21   2018).

22          Here we are again.  Shortly after taking office in 2025, President Trump issued Executive

23   Orders 14,159 ("Protecting the American People Against Invasion") ("EO 14,159") and 14,218

24   ("Ending Taxpayer Subsidization of Open Borders") ("EO 14,218") (together, the "2025

25   Executive Orders"), the language and purpose of which mirror EO 13,768.  Like EO 13,768, EO

26

27   ─────────────────────
     [1] This is a summary order because of the exigencies it addresses.  I will enter an order that
28   discusses the issues and my reasoning in more detail at a later date.

14,159 directs the United States Attorney General and the United States Department of Homeland
Security ("DHS") Secretary to withhold federal funds from "sanctuary jurisdictions," cities and
counties that limit the use of local resources to enforce federal immigration law.  EO 14,218
directs every federal agency to ensure that "federal payments" to localities do not "by design or
effect" "abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

       Neither Executive Order provides a definition for "sanctuary jurisdiction."  But a memo
from Attorney General Pamela Bondi on February 5, 2025, (the "Bondi Directive"), along with
various memoranda and public comments about the orders and their force, provide a clear picture
of what jurisdictions qualify, and of the 2025 Executive Orders' intended purpose: to end or
severely curtail federal funding for cities, counties and states that the Trump administration deems
to be sanctuary jurisdictions.

       The plaintiffs in this case—San Francisco, Santa Clara, and fourteen other cities and
counties from around the country that maintain policies placing them within the definition of
"sanctuary jurisdictions" (hereafter the "Cities and Counties")[2]— have moved for a preliminary
injunction to block the 2025 Executive Orders and Bondi Directive to the extent that they mandate
the withholding of the Cities and Counties' federal funding because they are sanctuary
jurisdictions.  The Cities and Counties seek to preliminarily enjoin the defendants[3] and their
officers, agents, servants, employees, and attorneys, and any other persons who are in active
concert or participation with them, from taking any action to withhold, freeze, or condition federal

---

[2] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara
("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"),
City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville
("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of
Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey
("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul
("St. Paul"), and City of Santa Fe ("Santa Fe").

[3] Defendants are Donald J. Trump, President of the United States; the United States; the United
States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the
United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States;
the United States Department of Homeland Security; and Kristi Noem in her official capacity as
Secretary of the Department of Homeland Security.

2

1    funds based on (1) Section 17 of Executive Order 14,159; [4] (2) Section 2(a)(ii) of Executive Order

2    14,218; and (3) the Bondi Directive to jurisdictions on the basis that they have policies limiting (i)

3    the honoring of civil immigration detainer requests; (ii) cooperation with administrative warrants

4    for purposes of immigration enforcement; (iii) sharing of information with federal immigration

5    authorities other than immigration or citizenship status; (iv) the use of local law enforcement to

6    arrest or detain individuals solely for civil immigration violations; or (v) the use of local resources

7    to assist with civil immigration enforcement activities.

8         Issuance of a preliminary injunction is warranted if the movant establishes (1) a likelihood

9    of success on the merits; (2) a likelihood of irreparable harm in the absence of relief; (3) that the

10   balance of equities tips in the movant's favor; and (4) that granting relief is in the public interest.

11   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in the Ninth Circuit evaluate

12   these factors on a "sliding scale" such that "serious questions going to the merits and a balance of

13   hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

14   so long as the plaintiff also shows that there is a likelihood of irreparable injury and the injunction

15   is in the public interest." *Arc. of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (cleaned up).

16   As government entities are parties to this case, the final two factors merge.  *Roman v. Wolf*, 977

17   F.3d 935, 940–41 (9th Cir. 2020).

18        The Government challenges the Cities and Counties' motion on justiciability.  It argues

19   that the Cities and Counties lack standing and that their claims are not ripe because the 2025

20   Executive Orders and the Bondi Directive merely provide guidance for executive agencies

21   reviewing federal funding to sanctuary jurisdictions, and because the Cities and Counties have not

22   yet suffered a loss of funds.  This is essentially the same argument it made in 2017.  Indeed, this

23   case is on all fours with *Cnty. of Santa Clara v. Trump, et al.*, 250 F. Supp. 3d 497 (N.D. Cal. Apr.

24   25, 2017) (Preliminary Injunction Order), *aff'd*, 897 F.3d 1225 (9th Cir. 2018), where I and the

25   Ninth Circuit rejected the same justiciability arguments, finding that the plaintiffs had a well-

26

27   [4] The plaintiffs seek to enjoin the first sentence in Section 17 regarding the withholding of funding
     from sanctuary jurisdictions but not the second sentence of Section 17, which addresses civil and
28   criminal enforcement.

United States District Court
Northern District of California

1   founded fear of enforcement of Section 9(a) of EO 13,768.  The Government asserts that the use in

2   Section 17 of EO 14,159 of the phrase "evaluate and undertake any lawful actions" in directing the

3   Attorney General and DHS Secretary to "ensure that so-called 'sanctuary' jurisdictions . . . do not

4   receive access to Federal funds" makes it different than EO 13,768, which directed the same

5   executive agencies to, "to the extent consistent with law . . . ensure that [sanctuary jurisdictions]

6   … are not eligible for Federal grants."  But this is a distinction without a difference.  Section 17 of

7   EO 14,159, like Section 9(a) of EO 13,768, "unambiguously command[s] action," *see City &*

8   *Cnty. of S.F.*, 897 F.3d at 1239, and neither Executive Order's savings clause insulates it from

9   judicial review, *see id.*

10      The Cities and Counties have pre-enforcement standing just as San Francisco and Santa

11  Clara did in 2017.  They each have policies that place them within the scope of the funding freeze

12  that the 2025 Executive Orders and Bondi Directive (and other executive agency directives like it)

13  seek to implement.  Their well-founded fear of enforcement is even stronger than it was in 2017:

14  it stems from the plain language of EO 14,159 and EO 14,218, the Bondi Directive, numerous

15  directives from executive agencies ordering the withholding of funds to localities like the

16  plaintiffs, and legal action that the Government has already initiated against sanctuary jurisdictions

17  in Illinois and New York, in addition to recent statements from high ranking government officials

18  and the litigation over these issues in the first Trump administration.

19      Precedent in the Ninth Circuit and the orders of this court show why the Cities and

20  Counties have established that they are likely to prevail on the merits of at least their separation of

21  powers, Spending Clause, and Fifth and Tenth Amendment claims.  The challenged sections in the

22  2025 Executive Orders and the Bondi Directive that order executive agencies to withhold, freeze,

23  or condition federal funding apportioned to localities by Congress, violate the Constitution's

24  separation of powers principles and the Spending Clause, as explained by the Ninth Circuit in the

25  earlier iteration of this case in 2018; they also violate the Fifth Amendment to the extent they are

26  unconstitutionally vague and violate due process.  *See City & Cnty. of S.F. v. Trump*, 897 F.3d

27  1225, 1234– 35 (9th Cir. 2018); *Cnty. of Santa Clara v. Trump, et al*., 250 F. Supp. 3d 497, 530–

28  32, 534–36 (N.D. Cal. Apr. 25, 2017).  The 2025 Executive Orders' directives to withhold or

4

freeze federal funding to sanctuary jurisdictions also violate the Tenth Amendment because they impose coercive condition intended to commandeer local officials into enforcing federal immigration practices and law. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 533. And as the order that will follow this one makes plain, the Cities and Counties have also shown a likelihood of success on the merits of their Administrative Procedure Act ("APA") claim: the Bondi Directive's order to freeze all DOJ funds is likely arbitrary and capricious, contrary to the Constitution and an ultra vires final agency action under the APA. 5 U.S.C. § 706(2).

The Cities and Counties have also demonstrated a likelihood of irreparable harm. The threat to withhold funding causes them irreparable injury in the form of budgetary uncertainty, deprivation of constitutional rights, and undermining trust between the Cities and Counties and the communities they serve. *See City & Cnty. of S.F.*, 897 F.3d at 1244 (budgetary harms); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (constitutional harms); *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (community harms), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019). Lastly, the balance of the equities favors the Cities and Counties, and the requested relief is in the public interest. *City & Cnty. of S.F.*, 897 F.3d at 1244. Having established all of the *Winter* factors, the Cities and Counties are entitled to a preliminary injunction.

## PRELIMINARY INJUNCTION

Now, therefore, it is ORDERED that:

1.      Defendants[5] and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them ARE HEREBY RESTRAINED AND ENJOINED from directly or indirectly taking any action to withhold, freeze, or condition federal

---

[5] Defendant President Donald J. Trump is not enjoined by this Order with respect to the "performance of his official duties." *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (citation and quotation marks omitted). However, the injunction does run against any federal agency or official, including the other named defendants and any other agency or individual acting in concert with or as an agent of the President or other defendants to implement the enjoined provisions of Executive Orders 14,159 and 14,128 and the Bondi Directive. *See Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("Injunctive relief, however, may run against executive officials"), *rev'd on other grounds, Trump v. Hawaii*, 583 U.S. 941 (2017); *see also* Fed. R. Civ. Proc. 65(d)(2) (preliminary injunction may reach "other persons who are in active concert or participation with" the enjoined parties).

United States District Court
Northern District of California

Docusign Envelope ID: EE0DB635-4FB1-4329-8962-5AE087C75F88

Docusign Envelope ID: FE0DB63E-4FB1-4329-8C62-FAE087C75F88

1   funds from the Cities and Counties based on (1) the first sentence of Section 17 of Executive

2   Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and Section I of

3   the February 5, 2025 Memorandum from the Attorney General entitled "Sanctuary Jurisdictions

4   Directives" on the basis that the Cities and Counties have policies that limit (i) the honoring of

5   civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of

6   immigration enforcement; (iii) sharing of information with federal immigration authorities other

7   than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain

8   individuals solely for civil immigration violations; or (v) the use of local resources to assist with

9   civil immigration enforcement activities.

10  2.      Defendants are instructed to provide written notice of this Order to all federal departments

11  and agencies by April 28, 2025.  The written notice shall instruct those agencies that they may not

12  take steps to withhold from, freeze, or condition funds to the Cities and Counties based on the first

13  sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or

14  the Preamble and Section I of the February 5, 2025, Memorandum from the Attorney General

15  entitled "Sanctuary Jurisdictions Directives."

16  3.      This Order shall apply to the maximum extent provided for by Federal Rule of Civil

17  Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.

18          **IT IS SO ORDERED.**

19  Dated: April 24, 2025

20

21

22                                                  William H. Orrick
                                                    United States District Judge
23

24

25

26

27

28

United States District Court
Northern District of California

1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6   CITY AND COUNTY OF SAN              Case No.  25-cv-01350-WHO
    FRANCISCO, et al.,
7
              Plaintiffs,               **ORDER CLARIFYING PRELIMINARY
8                                       INJUNCTION**
       v.
9                                       Re: Dkt. No. 128
    DONALD J. TRUMP, et al.,
10
              Defendants.
11

12          How will the litigation over sanctuary cities and federal funding unfold during the next

13   four years?  That is the unasked question that President Trump's Executive Order 14,287, 90 Fed.

14   Reg. 18765 ("Protecting American Communities from Criminal Aliens") (hereafter, "EO

15   14,287"), which is aimed at so-called "sanctuary" jurisdictions, and the Cities and Counties[1]

16   Motion to Enforce, or in the Alternative, to Modify Preliminary Injunction (hereafter, the "Motion

17   to Enforce"), bring to mind.  To answer it, and rule on the Motion to Enforce, I return to first

18   principles.

19          First, the litigation may not proceed with the coercive threat to end all federal funding

20   hanging over the Cities and Counties' heads like the sword of Damocles.  That threat was explicit

21   in the first sentence of Section 17 of Executive Order 14,159, in Section 2(a)(ii) of Executive

22   Order 14,218, and in the Preamble and Section I of the February 5, 2025, memo from the Attorney

23   General defendant Pamela Bondi (the "Bondi Directive"), and that is why they are enjoined.  *See*

24

25   ---

     [1] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara
26   ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"),
     City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville
27   ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of
     Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey
28   ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul
     ("St. Paul"), and City of Santa Fe ("Santa Fe").

United States District Court
Northern District of California

Dkt. No. 111 (Preliminary Injunction).

Second, the Government must proceed within the bounds of the Constitution. That is the reason that I asked Government counsel at the hearing on April 23, 2025, to confirm: (1) that Congress has the spending power and the Executive Branch and its agencies cannot place new conditions on already appropriated funds; (2) that the President does not have unilateral authority to refuse to spend funds appropriated by Congress; (3) that conditions on federal funds must be unambiguous and timely; (4) that conditions on federal funds must bear relation to the funds at issue; and (5) that the total financial incentive for compliance with federal immigration law cannot be coercive. The Government agreed that those principles apply. *See* April 23, 2025, Preliminary Injunction Hearing Tr. [Dkt. No. 117] at 3:14-5:20.

Third, while complying with the first two principles, the Government is entitled to identify particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives, and to litigate its position. The Preliminary Injunction does not reach the litigation filed by the Government against Illinois, New York or Colorado, for example, nor does it prohibit efforts to enforce a condition regarding the Byrne JAG Act or other specific programs with a plausible nexus to "sanctuary" policies.

With that, I turn to the Motion to Enforce.

## BACKGROUND

On April 24, 2025, I issued the Preliminary Injunction in this case, enjoining the defendants[2] and their officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with them, from taking any action to withhold, freeze, or condition federal funds from the Cities and Counties based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi

---

[2] Defendants are Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security.

1    Directive"). Dkt. No. 111 (Preliminary Injunction). On May 3, 2025, I issued a longer order

2    expanding upon my reasoning for issuing the Preliminary Injunction. Dkt. No. 126 (Further

3    Order).

4            On April 28, 2025, four days after I issued the Preliminary Injunction, President Trump

5    issued a *new* Executive Order, EO 14,287, which also concerns sanctuary jurisdictions and their

6    receipt of federal funds. Because EO 14,287 issued after the Preliminary Injunction, I did not

7    consider it in my decision making or in the more detailed analysis provided in the Further Order.

8    A week after President Trump issued EO 14,287, the Cities and Counties filed the Motion to

9    Enforce, arguing that EO 14,287 repackages its predecessors' unconstitutional funding threats.[3]

10           It is well-settled that district courts have the power to supervise compliance with an

11    injunction and to "modify a preliminary injunction in consideration of new facts." *A&M Records,*

12    *Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002); *State v. Trump*, 871 F.3d 646, 654 (9th

13    Cir. 2017); *accord* Fed. R. Civ. P. 62(c)-(d). "A party seeking modification . . . of an injunction

14    bears the burden of establishing that a significant change in facts or laws warrants revision . . . of

15    the injunction." *Sharp v. Weston*, 233 F.3d 1166. 1170 (9th Cir. 2000); *Trump*, 871 F.3d at 654.

16                                        **DISCUSSION**

17           At this early moment in the case, it is incumbent upon me to clarify the core purpose of the

18    Preliminary Injunction: to ensure that litigation over how federal funding is allocated to the Cities

19    and Counties is not driven by coercion and remains within the parameters of the United States

20    Constitution. Executive Orders 14,159 and 14,218, which were the subject of the Preliminary

21    Injunction, threatened to withhold *all* federal funding from sanctuary jurisdictions if they did not

22    adapt their policies and practices to conform with the federal government's preferences. That

23

24    _____

      [3] After the Cities and Counties filed the Motion to Enforce (and accompanying Motion to Shorten
25    Time for Expedited Briefing and Hearing on the Motion to Enforce), I told the parties that if they
      could stipulate to the plaintiffs' requested relief at least until the matter could be fully briefed on a
26    normal briefing schedule, I would hold a hearing on June 11, 2025. Otherwise, I set an expedited
      briefing schedule and a hearing for May 8, 2025, at 3 p.m. Pacific time. At a Case Management
27    Conference on May 6, 2025, the parties informed me that no such stipulation would be entered.
      The Government timely submitted its expedited response to the Cities and Counties' Motion to
28    Enforce. *See* Dkt. No. 132 (Response). I held a hearing on May 8, 2025, at 3 p.m. Pacific time, at
      which counsel for both the Cities and Counties' and the Government was heard.

*(left margin, rotated)* United States District Court / Northern District of California

coercive threat (and any actions agencies take to realize that threat) is unconstitutional, so I enjoined its effect. To be clear: While the *letter* of the Preliminary Injunction refers to specific sections of EO 14,159, EO 14,218, and the Bondi Directive, its *spirit* enjoins the kind of coercion that was evident, at the time of the Preliminary Injunction's issuance, in the language of those sections. The Government cannot avoid liability down the line by "hewing to the narrow letter of the injunction" while "simultaneously ignoring its spirit[.]" *Inst. Of Cetacean Research v. Sea Shepard Conserv. Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014). The Preliminary Injunction in this case reaches any subsequent Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a "sanctuary" jurisdiction.

At the same time, the Preliminary Injunction was not designed to freeze litigation over the propriety of "sanctuary" policies or immigration-related conditions on particular government grants and contracts. The Ninth Circuit, for example, has held that the Department of Justice may include immigration-related factors when considering certain grants. Response [Dkt. No. 132] at 9; *City of Los Angeles. v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019) (discussing conditions on DOJ grants issued through DOJ's competitive federal grant program under the Public Safety Partnership and Community Policing Act).

With this in mind, I turn to the differences between EO 14,287 and the Orders already specifically enjoined. While addressing the same topic and seemingly targeting the same ultimate goal (ending or severely curtailing the issuance of federal funds to States and localities that limit the use of local resources for aiding in federal civil immigration enforcement), there are material differences between the challenged sections of EO 14,287 and the sections of EO 14,159 and EO 14,218 that I enjoined.

Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218 both direct the Attorney General and DHS Secretary to withhold *all* federal funds from localities deemed to be "sanctuary" jurisdictions. Section 17 of EO 14,159 directs the Attorney General and DHS Secretary to "evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . *do not receive access to Federal funds*." EO 14,159, Section 17 (emphasis added). And Section

4

2(a)(ii) of EO 14,218 similarly directs the head of "each executive department or agency" to

"ensure . . . that Federal payments to States and localities do not . . . facilitate the subsidization or

promotion of illegal immigration, or abet so-called 'sanctuary' policies[.]" EO 14,218, Section

2(a)(ii).  These provisions' respective broad scopes drove my conclusion under binding Ninth

Circuit authority to issue the Preliminary Injunction.  *See* Further Order at pp. 35-36 (Section

I(A)(2)(b)).  In so finding, I rejected the Government's arguments that those orders merely

provided guidance for executive agencies conducting evaluations of localities' federal funding as a

disingenuous read of their plain language, and I rejected its arguments that the Orders' savings

clauses insulated them from judicial review; to give such weight to those clauses would require

looking past the Orders' clear and specific language directing unlawful action, which I cannot do.

*See* Further Order at pp. 47-49 (Section II(A)).

Executive Order 14,287 is different from EO 14,159 and EO 14,218 in some ways.

Section 2 of EO 14,287 calls for the Attorney General, in coordination with the DHS Secretary, to

publish a list of States and local jurisdictions they have identified as "sanctuary" jurisdictions[4],

and to notify[5] those jurisdictions of their status on the list.  In contrast with Section 17 of EO

14,159 and Section 2(a)(ii) of EO 14,218, nothing in Section 2 of EO 14,287 directs executive

agency heads to withhold from, freeze, or condition all federal funding to sanctuary jurisdictions

on their compliance with federal immigration law; it directs them to *identify* those jurisdictions

that qualify as sanctuary jurisdictions and *notify* them of their inclusion on that list.  This will at

least resolve the ambiguity of what jurisdictions the Government considers to be "sanctuary"

jurisdictions and put those States and localities that qualify on notice.  *See* Further Order at p. 50,

n.7.[6]  There is nothing improper about Section 2.

---

[4] Section 2(a) directs the Attorney General, in coordination with the DHS Secretary, to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)." EO 14,287, Section 2(a).

[5] Section 2(b) directs the same agency heads to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.*, Section 2(b).

[6] At the hearing on May 8, 2025, counsel for the Cities and Counties clarified that the plaintiffs' Motion to Enforce only seeks to enjoin Section 2 of EO 14,287 to the extent that it informs the

1    Section 3 of EO 14,287 is closer to the enjoined sections of EO 14,159 and EO 14,218. It

2    lays out "Consequences for Sanctuary Jurisdiction Status." Section 3(a) provides that "with

3    respect to sanctuary jurisdictions that are designated under section 2(a)" of EO 14,287, "the head

4    of each executive department or agency . . . in coordination with the Director of the Office of

5    Management and Budget and as permitted by law, shall identify appropriate Federal funds to

6    sanctuary jurisdictions, including grants and contracts, for suspension or termination as

7    appropriate." *Id.*, Section 3(a). And Section 3(b) says that, after notice under Section 2(b), the

8    Attorney General and DHS Secretary "shall pursue all necessary legal remedies and enforcement

9    measures to end these violations and bring such jurisdictions into compliance with the laws of the

10   United States." *Id.*, Section 3(b). While the Government asserts that Section 3 does not direct

11   actual termination or suspension of funds, a "Fact Sheet" published by the White House alongside

12   EO 14,287 explains that President Trump signed EO 14,287 "to enforce federal law with respect

13   to sanctuary jurisdictions," states that sanctuary jurisdictions that do not comply with federal law

14   "may lose federal funding," and quotes President Trump's Truth Social post declaring his intent to

15   "end" sanctuary jurisdictions. *See* Tilak Decl. Ex. 2 (White House Fact Sheet entitled "Cracking

16   Down on Sanctuary Jurisdictions," published April 28, 2025).

17   That said, some aspects of Section 3 may resolve some of the problems I described

18   pertaining to the overbreadth of EO 14,159 and EO 14,218. Identification of the funds the

19   Government believes are at issue would, if done in a constitutionally targeted way, provide clarity.

20   The requirement to identify funds for potential rescission, by itself, is not inappropriate, following

21   an evaluation of the type of funding involved to determine if there is a nexus between the funding

22   stream, the jurisdiction's policies, and the desired immigration-related conditions, as the

23   Government is constitutionally obligated to do before it acts. *See* Further Order at pp. 50-51

24   (Section II(B)).

25   What *would* be inappropriate is if the criterion for identification of funds for "suspension

26   or termination" was *the fact that* the so-called "sanctuary" jurisdictions received them. If the

27

28   _____

action called for in Section 3(a) of the same Order.

United States District Court
Northern District of California

1    Government were to take the unconstitutional approach of flagging *all* federal funds (or funds

2    unrelated to sanctuary policies) to those States and localities the Attorney General and DHS

3    Secretary determined to be "sanctuary" jurisdictions as being "appropriate" for suspension or

4    termination, it would violate Constitution in the same way that the enjoined sections of EO 14,159

5    and EO 14,218 do. *That* approach would violate the Preliminary Injunction.

6            The Government argues that EO 14,287 only calls for the publication of a list, the

7    notification of jurisdictions on that list of their presence on it, and identification of funds for

8    possible suspension or termination, but that it "does not direct for actual termination or

9    suspension." Response at 7. Executive Order 14,287 does not direct executive agencies to freeze

10   *all* federal funds to jurisdictions like the Cities and Counties. But the context surrounding this

11   Executive Order and its predecessors raises the threat that the Government will employ these

12   executive actions to unconstitutionally coerce the Cities and Counties (and other jurisdictions like

13   them) into changing their policies and practices to conform with the second Trump

14   Administration's preferences.

15           President Trump's actions, communications, and representations about sanctuary

16   jurisdictions have made it perfectly clear that his ultimate goal is their elimination; directives from

17   executive agencies in his administration have put finer points on his (often informal) expressions.

18   *See* Further Order at pp. 5-7 (discussing actions and communications surrounding EO 14,159 and

19   EO 14,218 that gave rise to the Cities and Counties' reasonable fear of enforcement). Since I

20   issued the Preliminary Injunction, the Executive Branch has compounded the concern that it will

21   wield the latest Executive Order to cut off (or coercively *threaten* to cut off) *all* federal funds from

22   so-called "sanctuary" jurisdictions; the White House "Fact Sheet" published alongside EO 14,287,

23   proclaiming that through EO 14,287, President Trump is "following through on his promise to rid

24   the United States of sanctuary cities," and quoting a Truth Social post from the President wherein

25   he stated that he was "[w]orking on papers to withhold all Federal Funding for any City or State

26   that allows these Death Traps [referring to sanctuary cities] to exist!!!" does not inspire confidence

27   in the Government's representation that it will limit its implementation of EO 14,287 to

28   "identification" of funds for "suspension or termination."

7

1    The Preliminary Injunction is not intended to hamstring the Government's lawful

2    evaluation of federal funds to States and localities that have sanctuary policies. It seems relatively

3    easy to identify categories of funds that have little or nothing to do with sanctuary policies (such

4    as healthcare, transportation, emergency relief and so forth), that would have an unlawfully

5    coercive effect on the Cities and Counties if those categories of funds were identified for

6    suspension or termination; to do so would violate the Preliminary Injunction. As the

7    Government's counsel acknowledged, the Preliminary Injunction reaches the Government's

8    proscribed conduct whether it is based on EO 14,287 or on some as yet unpublished Executive

9    Order.

10    In light of all these considerations, I clarify that neither Executive Order 14,287 nor any

11    other Government action that postdates the Preliminary Injunction can be used as an end run

12    around the Preliminary Injunction Order. *See Inst. Of Cetacean Research*, supra. The language

13    "based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive

14    Order 14,218, or the Preamble and Section I of the February 5, 2025, memo from the Attorney

15    General defendant Pamela Bondi (the "Bondi Directive")" shall be read to apply to *any* Executive

16    Order or agency directive that purports to attempt to cut off federal funding from States or

17    localities that meet the Government's definition of "sanctuary" jurisdiction in the wholesale,

18    overly broad and unconstitutional manner threatened by Section 17 of EO 14,159 and Section

19    2(a)(ii) of EO 14,218.

20    So that there is no failure of communication, the defendants are instructed to provide

21    written notice of this Order Clarifying Preliminary Injunction to all federal departments and

22    agencies by May 16, 2025.

23    **IT IS SO ORDERED.**

24    Dated: May 9, 2025

25

26    William H. Orrick
      United States District Judge

27

28

United States District Court
Northern District of California

1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   CITY AND COUNTY OF SAN                    Case No.  25-cv-01350-WHO
    FRANCISCO, et al.,
8                                             ORDER REGARDING DISPUTES
              Plaintiffs,                     OVER PROPRIETY OF STANDARD
9                                             CONDITIONS ON FEDERAL GRANTS
         v.
10                                            Re: Dkt. No. 143
    DONALD J. TRUMP, et al.,
11
              Defendants.
12
         On April 24, 2025, I issued an Order Granting Preliminary Injunction to enjoin the

13   defendants[1] from taking any action to withhold, freeze, or condition federal funds to the

14   Cities and Counties[2] (the plaintiffs in this case) based on (1) the first sentence of Section 17 of

15   Executive Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and

16   Section I of the February 5, 2025, Memorandum from the Attorney General entitled "Sanctuary

17   Jurisdictions Directives." Dkt. No. 111 (Order Granting Preliminary Injunction). I described in

18   detail in my Further Order Regarding Preliminary Injunction on May 3, 2025, the many ways in

19

20

21   ---
     [1] Defendants are Donald J. Trump, President of the United States; the United States; the United
22   States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the
     United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States;
23   the United States Department of Homeland Security; and Kristi Noem in her official capacity as
     Secretary of the Department of Homeland Security. The Preliminary Injunction enjoins the
24   defendants and their officers, agents, servants, employees, and attorneys, as well as any other
     persons in active concert or participation with them.
25
     [2] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara
26   ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"),
     City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville
27   ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of
     Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey
28   ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul
     ("St. Paul"), and City of Santa Fe ("Santa Fe").

United States District Court
Northern District of California

1    which those Executive Orders and threatened actions were likely unconstitutional and illegal under

2    the Separation of Powers doctrine, the Fifth Amendment's Due Process Clause, the Tenth

3    Amendment, and the Administrative Procedure Act ("APA").  Dkt. No. 126 (Further Order).  In

4    the Order Clarifying Preliminary Injunction on May 9, 2025, I emphasized that other Executive

5    Orders and actions by government agencies could not evade the strictures of the Preliminary

6    Injunction simply because they used different language or occurred after the Preliminary

7    Injunction went into effect.  Dkt. No. 136 (Order Clarifying Preliminary Injunction).  It "reaches

8    any subsequent Executive Order or Government action that poses the same coercive threat."  *Id.*

9    4.[3]

10    In their joint letter brief dated June 13, 2025, the parties clashed over whether grant

11    conditions imposed by the Department of Homeland Security ("DHS"), the Department of

12    Transportation ("DOT"), and the Department of Housing and Urban Development ("HUD") fall

13    within the scope of the Preliminary Injunction insofar as they implement the enjoined sections of

14    Executive Order 14,159 ("EO 14,159") and Executive Order 14,218 ("EO 14,218") to impose

15    immigration-related conditions upon grants to sanctuary jurisdictions.  Dkt. No. 143 (Joint Letter

16    Brief).  I would have thought the answer was obvious.  The identified provisions in the DHS and

17    DOT Standard Terms may not be applied in the blunderbuss way that Secretaries Noem and Duffy

18    have directed.[4]  Conditions placed on congressional spending must have some nexus with the

19    purpose of the implicated funds.  *See* Further Order at 50-51; *see also Cnty. of Santa Clara v.*

20    *Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. Apr. 25, 2017), *aff'd, City & Cnty. of S.F. v. Trump*,

21    897 F.3d 1225, 1234–35 (9th Cir. 2018).  They impose ill-defined immigration conditions upon

United States District Court
Northern District of California

---

[3] Defendants filed a Notice of Appeal of the Preliminary Injunction, the Further Order, and the Order Clarifying Preliminary Injunction on June 19, 2025.  Dkt. No. 146 (Notice of Appeal).

[4] I previously explained that the Preliminary Injunction was "not designed to freeze litigation over the propriety of 'sanctuary' policies or immigration-related conditions on particular government grants and contracts."  Dkt. No. 136 (Order Clarifying Preliminary Injunction) 4.  There may be individual law enforcement grant programs, for example, that have a sufficient relationship to the sanctuary jurisdiction policies that immigration-related conditions may be legal.  That is a different matter altogether than efforts like the Executive Orders and challenged standard terms and conditions to coerce the Cities and Counties to change their so-called sanctuary policies.

grants that have no evident nexus with the plaintiffs' so-called "sanctuary" policies.

The Preliminary Injunction enjoins the DHS and DOT standard terms and conditions from applying to grants issued to the plaintiff Cities and Counties that are implemented by DHS and DOT. The HUD Continuum of Care grant terms and conditions appear to be inconsistent with the Preliminary Injunction as well.

The plaintiffs also ask that I order the defendants to produce copies of the court-ordered notice that they have provided to federal agencies. Given the defendants' apparent unwillingness to comply or confusion about their obligations under the Preliminary Injunction, the defendants shall provide the Cities and Counties copies of the notices as requested no later than July 2, 2025.

## I.     DHS STANDARD TERMS

On April 18, 2025, DHS issued standard terms and conditions (the "DHS Standard Terms") that apply to "all new federal awards" in Fiscal Year 2025 and include numerous immigration conditions that reflect the enjoined language of EO 14,218. *See* Dkt. No. 143, Attachment B. Section IX of the DHS Standard Terms (entitled "Communication and Cooperation with [DHS] and Immigration Officials") requires grant recipients to certify five different immigration conditions, the language of each of which evidences their connection to the enjoined Orders. *Compare* Dkt. No. 143, Attachment B (DHS Standard Terms, Section IX), *with* EO 14,159, Section 17 (directing the Attorney General and DHS Secretary to condition Federal funds to so-called "sanctuary" jurisdictions on compliance with federal immigration law), *and* EO 14,218 Section 2 (directing agency and executive department heads to "ensure . . . that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation.").[5]

Although the DHS Standard Terms apply to "all new federal awards," the defendants contend that the conditions will only apply based on individualized assessments of different federal grants. I do not credit that representation for at least two reasons.

---

[5] In the Further Order, I referenced the DHS Standard Terms and HUD Continuum of Care grants, among other things, as evidence that the federal government had already taken steps to try to implement EO 14,159 and EO 14,218. *See* Further Order 5-7.

United States District Court
Northern District of California

1    First, the promise—articulated in both the defendants' letter brief and in a June 11, 2025,

2    DHS website update[6]—echoes the savings clauses I already rejected as insufficient to insulate the

3    2025 Executive Orders from judicial scrutiny.  *See* Further Order 41, 47-48.  Here, as there, the

4    "clear and specific language" of the DHS Standard Terms communicates DHS's intent to apply

5    those terms to "all new federal awards." Even if I were to interpret the June 11, 2025, DHS

6    website update as a formal savings clause (which I am not inclined to do, given the relative

7    informality of a sentence on a website compared to adopted agency terms and conditions), when

8    read in context, the clause cannot be given effect because to do so would "override clear and

9    specific language" found in the DHS Standard Terms.  *See* Further Order 48 (quoting *City & Cnty.*

10   *of S.F. v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018)).

11   Second, DHS's conduct belies its representation.  DHS has already acted as though the

12   immigration conditions in its Standard Terms may be applied to grants with no nexus to

13   immigration or so-called "sanctuary" policies.  A March 20, 2025, memo from a senior FEMA

14   administrator to DHS Secretary Noem is a good example.  In the memo, FEMA sought approval

15   of its review process and parameters of its grant programs "to align with Administration and

16   Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions."

17   Dkt. No. 143, Attachment D (March 20, 2025, FEMA memo).  The memo, which DHS Secretary

18   Noem approved, acknowledges that immigration conditions may be applied to the Emergency

19   Management Performance Grant ("EMPG"), State Homeland Security Grant Program ("HSGP"),

20   and Urban Area Security Initiative ("UASI") grants.  *Id.*

21   Declarations from various city officials submitted alongside the Cities and Counties'

22   Preliminary Injunction Motion indicate that these grants are used for emergency preparedness,

23   which has no nexus to immigration enforcement.  *See* Declaration of Brendan McClusky [Dkt. No.

24   61-5] ¶¶ 8-11 (describing how King County relies on EMPG, HSGP, and UASI grants to prepare

25   the region against terrorist attacks); Declaration of Patricia Cole-Tindall [Dkt. No. 61-6] ¶¶ 14-19

26

27   _____

28   [6] The DHS website states that "[n]ot all of DHS's Standard Terms and Conditions apply to every
     DHS grant program[]." DHS Website, https://www.dhs.gov/publication/dhs-standard-terms-and-
     conditions, last updated June 11, 2025, last accessed June 18, 2025.

United States District Court
Northern District of California

1   (describing how the King County Sheriff's Office employs UASI Grants, which are awarded to

2   "assist high-threat, high-density Urban Areas efforts to build, sustain, and deliver the capabilities

3   necessary to prevent, prepare for, protect against, and respond to acts of terrorism," to train

4   aviation aircrews, conduct joint agency drills and use small unmanned aerial systems (SUAS)

5   which are important anti-terrorism tools); Declaration of Maria Oberg [Dkt. No. 71] ¶ 4(k)

6   (describing how the City of San Jose uses the UASI grant to help local agencies "prepare for and

7   respond to terrorism").

8          The DHS Standard Terms are exactly what the Preliminary Injunction is designed to

9   prohibit.  This is not to say that the terms cannot be imposed on individual grants with a

10  meaningful nexus to sanctuary jurisdiction policies.  The defendants point to the Targeted

11  Violence and Terrorism Prevention Grant Program ("TVTP") as an example of the type of grant

12  the Preliminary Injunction should not reach.  Dkt. No. 143 at 6.  DHS authorizes and appropriates

13  funds for TVTP annually; TVTP grant awards are discretionary and competitive, and they lack

14  statutory award criteria.  Litigation may be necessary to determine whether the challenged

15  immigration conditions are appropriate to that grant program, and nothing in the Preliminary

16  Injunction Order precludes defendants from trying to impose them on an individual basis.  And

17  that is precisely the point: on a case-by-case basis, the Trump administration may attempt to apply

18  immigration conditions as long as there exists a substantive relationship between the conditions

19  and the grant upon which they are to be imposed.  But defendants cannot pretend, as they do now,

20  that they are assessing the relationship between immigration conditions on federal funding and the

21  programs those funds enable in a manner that is consistent with the Constitution and the APA,

22  when the defendants apply those conditions to FEMA or, as will be seen below, the DOT

23  infrastructure projects.  Applying immigration conditions to all new federal awards without regard

24  to whether those awards enjoy a real nexus to so-called "sanctuary" policies violates the

25  Preliminary Injunction.

26  **II.     DOT STANDARD TERMS**

27         On April 24, 2025, Secretary of Transportation Secretary Sean Duffy issued a letter (the

28  "Duffy Letter") that announced DOT's policy of providing federal funding only to recipients that

5

"cooperate with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." Dkt. No. 143, Attachment E. The Duffy Letter utilizes language found in EO 14,159. *Compare id.*, *with* EO 14,159, Section 17 (directing the Attorney General and DHS Secretary to ensure that so-called "sanctuary" jurisdictions, which "seek to interfere with the lawful exercise of Federal law enforcement operations," "do not receive access to Federal funds."). The DOT has since included that language in standard terms and template grant agreements employed across various operating administrations, including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), Federal Aviation Administration ("FAA"), and Federal Railroad Administration ("FRA"). *See* Dkt. No. 143, Attachments F-I (collectively, the "DOT Standard Terms.").

The DOT Standard Terms have made their way into specific grant programs and agreements that the Cities and Counties have received, including grants with no conceivable nexus to sanctuary policies. *See id.*, Attachments J-L. The conditions apply to transportation infrastructure grants; they apply to grants related to railroad crossing studies, bridge improvements, and airport repairs. *See e.g.*, Dkt. No. 143, Attachment K ("Better Utilizing Infrastructure to Leverage Development Grant Agreement," which has a stated purpose to "fund an eligible project that will have a significant local or regional impact and improve transportation infrastructure[]"), *id.*, Attachment L ("Strengthening Mobility and Revolutionizing Transportation," or "SMART" grant, which has a stated purpose of providing grants to improve transportation efficiency and safety); *see also e.g., id.*, Attachments F-I.

The defendants raise the same argument in defense of the DOT Standard Terms as they do with respect to the DHS Standard Terms: They insist that the immigration conditions will only apply where there is statutory authority. But that is obviously untrue. DOT has included these conditions across a vast array of programs and grants, *see e.g.* Dkt. No. 143, Attachments F-L: it

1    is apparent that they are being applied without meaningful regard to statutory authority.[7]  These

2    conditions exist to strongarm the Cities and Counties to abandon their policies or face critical

3    infrastructure degradation.

4        I am not the only judge to think so.  In the United States District Court for the Western

5    District of Washington, the Hon. Barbara Rothstein recently held that the immigration conditions

6    in the DOT Standard Terms are likely unconstitutional and arbitrary and capricious under the

7    APA.  *See Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, at *17

8    (W.D. Wash. June 3, 2025) ("*King County*").  That injunction applies to six plaintiffs in this action

9    who are also parties to that action: Martin Luther King Jr. County, City and County of San

10   Francisco, County of Santa Clara, City of Minneapolis, City of Portland, and the City of San Jose.

11   Ten other plaintiffs here are not protected by the *King County* injunction.  They are by this one.

12       The defendants speculate that there may be programs for which immigration conditions

13   like those found in the DOT Standard Terms are appropriate.  They did not provide an example.  If

14   there is one, the challenged immigration conditions may be applied.  But just because the

15   conditions may apply on a case-by-case basis to *some* grants does not justify their present

16   overbroad application to seemingly *any* grant.

17   **III.    HUD CONTINUUM OF CARE GRANTS**

18       The HUD grant agreements that the plaintiffs highlight also use language from the

19   enjoined executive orders; the HUD Continuum of Care ("CoC") grant agreements include

20   language like EO 14,218, stating that "[n]o state or unit of general local government that receives

21   funding under this grant may use that funding in a manner that by design or effect facilitates the

22   subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens

23   from deportation." Dkt. No. 143, Attachment M, p. 2.  The immigration conditions found in the

24   HUD CoC grant agreements differ from their DOT and DHS counterparts in that they apply to the

25   use of already awarded funds, they do not condition the receipt of funds.

26

27   [7] As for the defendants' argument that those terms are now beyond the scope of the Preliminary
     Injunction because they have been incorporated into particular grant programs, *see* Dkt. No. 143 at
28   7, to accept that argument would be to hamstring the Preliminary Injunction.

1      Congress enacted the McKinney-Vento Homeless Assistance Act to "meet the critically

2   urgent needs of the homeless of the Nation" by providing "funds for programs to assist the

3   homeless, with special emphasis on elderly persons, handicapped persons, families with children,

4   Native Americans, and veterans." 42 U.S.C. §11301(b)(2)-(3).  Congress, through the Act,

5   provides federal funding to several programs, including the Continuum of Care program, which is

6   designed to "assist individuals (including unaccompanied youth) and families experiencing

7   homelessness" by providing services "to help such individuals move into transitional and

8   permanent housing, with the goal of long-term stability."[8]  HUD is responsible for administering

9   the CoC program.

10      The 2024 HUD CoC grant agreements at issue state that "[n]o state or unit of general local

11   government that receives funding under this grant may use that funding in a manner that by design

12   or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek

13   to shield illegal aliens from deportation." Dkt. No. 143, Attachment M.  As the thoughtful opinion

14   of Judge Rothstein in *King County* illustrates, the defendants have no more shown a nexus

15   between immigration enforcement and the kind of services that the HUD CoC grants provide—

16   safety-net services for cities' most vulnerable populations, including the homeless, veterans, and

17   unaccompanied youth—than they have shown a nexus here between immigration enforcement and

18   the DHS and DOT programs.  *See King County*, 2025 WL 1582368, at *17.

19      The programs that HUD CoC grants fund do not promote illegal immigration or attempt to

20   shield individuals in the country illegally from deportation. Judge Rothstein's opinion is

21   persuasive and likely on all fours with the situation here.  Unlike the DHS and DOT conditions,

22   the HUD CoC grants are for an individual program where the funding has already been received

23   by the Cities and Counties.  The defendants have not yet attempted to show the required nexus.

24   They may file a brief and supporting declarations on the merits of their assertion that the

25   conditions are substantively related to the HUD CoC grants and should not be enjoined by July 11,

---

[8] *Continuum of Care (CoC) Program Eligibility Requirements*, HUD Exchange,
https://www.hudexchange.info/programs/coc/coc-program-eligibility-requirements/, last accessed
June 19, 2025.

United States District Court
Northern District of California

1    2025.  The Cities and Counties may reply by July 25, 2025, and I will rule thereafter.

2    **IV.    NOTICE DISCLOSURE**

3    The Cities and Counties also ask that I order the defendants to disclose a copy of the court-

4    ordered notice they issued to all federal departments and agencies regarding the April 24, 2025,

5    Preliminary Injunction Order and the May 9, 2025, Further Order.  Dkt. No. 143 at 1-3.

6    Defendants have thus far rejected the plaintiffs' request, stating that since I did not order them to

7    provide copies of the notice to the plaintiffs, their confirmation that the notices did go out is

8    sufficient.

9    Because the federal government continues to act inconsistently with my prior orders, the

10    Cities and Counties' request to know what notice was sent to agencies of the federal government

11    is reasonable.  The defendants are now ORDERED to provide the plaintiffs with copies of the

12    notices disseminated to all federal departments and agencies by July 2, 2025.

13    **CONCLUSION**

14    The Preliminary Injunction protects the Cities and Counties from the coercive impact of

15    the DHS and DOT Standard Terms.  The DHS Standard Terms are applied to "all new federal

16    awards," and the DOT Standard Terms have already been applied to a vast array of agency

17    operations, most of which appear to have no relation to immigration enforcement or sanctuary

18    policies.  The defendants' promise to apply the terms only after individualized, grant-by-grant

19    assessment is empty rhetoric belied by the words of the Standard Terms and the defendants' own

20    conduct.  I will allow further briefing to understand if there is a substantive relationship between

21    the HUD CoC grant agreements and the Cities and Counties' so-called sanctuary policies.

22    It appears that the defendants continue to seek an end run around the Preliminary

23    Injunction.  There is a way, which I have suggested, for defendants to lawfully seek to achieve

24    their policy objectives without attempting to coerce the Cities and Counties.  I suggest that they

25    use it.

26    **IT IS SO ORDERED.**

27    Dated: June 23, 2025

28                                                    William H. Orrick
                                                     United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF MARYLAND; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF MAINE; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, Plaintiffs, v. UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, *in his official capacity as Secretary of Transportation,* Defendants. | C.A. No. 25-cv-208-JJM-PAS |

## PRELIMINARY INJUNCTION

Before the Court is twenty States' Motion for a Preliminary Injunction in a case filed against Defendants United States Department of Transportation ("U.S. DOT") and Secretary Sean Duffy ("collectively Defendants") after Defendants adopted an Immigration Enforcement Condition ("IEC") on federal transportation grants that requires State recipients of those funds to cooperate with federal officials in the

enforcement of federal immigration law.[1]  ECF No. 41 (as amended by ECF No. 49). Essentially, U.S. DOT is now requiring future grant applicants to agree to adhere to the IEC when they sign the grant application.   Because some applicants face a June 20, 2025, deadline to apply for certain grants whose applications include the IEC, the Court issues this timely short Order.[2]

Defendants initially raise two jurisdictional arguments.  First, Defendants contend that some of the States' claims may be subject to statutory provisions that confer exclusive jurisdiction on federal appellate courts to hear challenges to, for example, orders issued by the Federal Aviation Administration.  The statutes cited specify that federal appellate courts have exclusive jurisdiction only for a narrow set of challenges to an "order" issued "*under*" the specific statutes listed.   These jurisdictional statutes do not apply here because the U.S. DOT is not exercising its authority "*under*" the specific statutes listed in these jurisdictional provisions. Rather, it is the Duffy Directive issued by the U.S. DOT that the States challenge, and thus jurisdiction is proper in the district court.  *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 722 (D.C. Cir. 2016).

---

[1] Secretary Duffy issued the "Duffy Directive" in April 2025, requiring transportation grant recipients to "cooperate with Federal officials in the enforcement of Federal Law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law." ECF No. 1-2 at 2.  The U.S. DOT has added the IEC to general terms and conditions governing all federal funding administered by several subagencies within U.S. DOT as well as to the terms and conditions for specific federal grants.  It has demanded that state officials execute grant agreements with the IEC language.

[2] The Court relies on the facts alleged in the States' Complaint but, considering the brief time frame, does not restate them here.

Second, Defendants cite the Tucker Act in arguing that this case should be heard in the Court of Claims. This Court, and many others, has ruled on this issue and found that the States' challenges to the grant conditions are not claims sounding in contract. The States bring claims under the Administrative Procedures Act ("APA") and the United States Constitution, seeking equitable relief to enjoin Defendants' actions in conditioning transportation funding on cooperation with the implementing of immigration enforcement, not specific performance of any grant agreements. This relief "'is not a claim for money damages,'" precluded under the APA—even though "'it is a claim that would require the payment of money by the federal government.'" *Bowen v. Massachusetts*, 487 U.S. 879, 894 (1988) (quoting *Maryland Dep't. of Human Res. v. Dep't of Health and Human Servs.*, 763 F.2d 1441, 1446 (1985)). Accordingly, because the States' challenges are based on statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are *not* contractual, so they are not subject to the exclusive jurisdiction of the Court of Claims under the Tucker Act. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106-08 (D.C. Cir. 2022).

The Court will now move on to the merits of the States' preliminary injunction motion. "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108,

120 (1st Cir. 2003)).  In evaluating whether plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)).  The Court now turns to the four factors.

<u>Likelihood of Success on the Merits</u>

We begin with what courts have called a key factor—a consideration of the movant's likelihood of success on the merits.  "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success–rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Loc. 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).  The States' claims are as follows:

In **<u>Count I</u>**, the States allege that the Executive's actions here are ultra vires because the U.S. DOT lacks any statutory authority to impose the IEC as a requirement for federal funding that was specifically appropriated for transportation because Congress has not granted the U.S. DOT any power to conscript the State government into federal immigration enforcement efforts.  In **<u>Count II</u>**, the States allege a violation of the Spending Clause of the U.S. Constitution, (U.S. Const. art. I,

4

§ 8, cl. 1),[3] because the IEC imposes conditions on federal funds that overstep Congress's spending authority, it is impermissibly vague, ambiguous, and retroactively imposed, is a condition wholly unrelated to the purposes of the transportation funding and is coercive. In **Count III**, the States allege that the Defendants' actions violate the APA because they exceed their statutory authority by issuing the Duffy Directive and including the IEC as a requirement of federal transportation funding. In **Count IV**, the States allege that the Defendants' actions violate the APA because the policy of imposing the IEC as a requirement for U.S. DOT funding is arbitrary and capricious in multiple respects. In **Count V**, the States allege that the Duffy Directive and IEC violate constitutional provisions and principles, including the Spending Clause, in violation of the APA.

The Court has determined based on the record before it at this time, that the States are likely to succeed on the merits of some or all their claims. Defendants' conduct violates the APA because they acted outside of their statutory authority when they issued the Duffy Directive and imposed the IEC categorically across all U.S. DOT grants when Congress appropriated those funds for transportation purposes, not immigration enforcement purposes. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Congress did not authorize or grant authority to the Secretary of

---

[3] "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States; . . ."

Transportation to impose immigration enforcement conditions on federal dollars specifically appropriated for transportation purposes.

The IEC, backed by the Duffy Directive, is arbitrary and capricious in its scope and lacks specificity in how the States are to cooperate on immigration enforcement in exchange for Congressionally appropriated transportation dollars–grant money that the States rely on to keep their residents safely and efficiently on the road, in the sky, and on the rails.

These conditions violate the Spending Clause as well; the IEC is not at all reasonably related to the transportation funding program grants whose statutorily articulated purposes are for the maintenance and safety of roads, highways, bridges, and development of other transportation projects. The Government does not cite to any plausible connection between cooperating with ICE enforcement and the congressionally approved purposes of the Department of Transportation. Under the Defendants' position, the Executive would be allowed to place any conditions it chose on congressionally appropriated funds, even when it would be entirely unrelated to the Department's purpose. Such is not how the three equal branches of government are allowed to operate under our Constitution.

The Court finds that the record now before it confirms that the States' claims are likely to succeed because the Defendants' actions here violate the Constitution and statutes of the United States. Having found that the States met this key element, the Court now moves on to the remaining three injunction factors.

## Irreparable Harm

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). There are "relevant guideposts" to guide that discretion—"the plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (citations omitted). The Court finds that the States have demonstrated they will face irreparable and continuing harm if forced to agree to Defendants' unlawful and unconstitutional immigration conditions imposed in order to receive federal transportation grant funds. *See* ECF No. 49 at 47-52. The States face losing billions of dollars in federal funding, are being put in a position of relinquishing their sovereign right to decide how to use their own police officers, are at risk of losing the trust built between local law enforcement and immigrant communities, and will have to scale back, reconsider, or cancel ongoing transportation projects.[4] *Id.*

---

[4] To try to avoid an injunction, Defendants argue that there is no irreparable harm if the Court were to interpret the Duffy Directive as simply requiring the States to follow federal law, which they should be able to easily do. The problem with that solution is that it would require this Court to interpret the Duffy Directive in a way that both ignores its plain meaning and its obviously broad intention to coerce the States into cooperating with federal immigration enforcement.

## Balance of the Equities and Public Interest

The final two preliminary injunction factors—balance of the equities and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). When weighing these factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief ... pay[ing] particular regard for the public consequences" that would result from granting the emergency relief sought. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks and citations omitted). Here, the two factors weigh strongly in favor of equitable relief.

If Defendants are prevented from conditioning transportation grants on an agreement to cooperate with ICE, they would merely have to consider the applicant's application and make the awards as usual. On the other hand, if the Court denies the preliminary injunction, the States will be forced to commit their state and local law enforcement (and potentially other state and local actors) to the mission of federal immigration enforcement or sacrifice securing billions of dollars in federal funding that Congress intended to be used for transportation purposes. The fact that the States have shown a likelihood of success on the merits strongly suggests that an injunction would serve the public interest. Moreover, the public interest further favors an injunction because absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in transportation services jeopardizing ongoing projects, ones in development for which resources have been

expended, and the health and safety of transportation services that are integral to daily life.

In light of the conclusions that Defendants' adoption of the IEC is unconstitutional and/or unlawful because it: (a) violates the APA; (b) is ultra vires; and (c) to the extent that it relies on congressional authority, exceeds Congress's powers under the Spending Clause, the Court GRANTS the Plaintiffs'' Motion for a Preliminary Injunction[5] (ECF No. 41 as amended by ECF No. 49) as to the States and their governmental subdivisions and ORDERS as follows:

1. Defendants are prohibited from implementing or enforcing the Immigration Enforcement Condition as set forth in the Duffy Directive.

2. Defendants are prohibited from withholding or terminating federal funding based on the Immigration Enforcement Condition as set forth in the Duffy Directive absent specific statutory authorization.

3. Defendants are prohibited from taking adverse action against any state entity or local jurisdiction, including barring it from receiving or making it ineligible for federal funding, based on the Immigration Enforcement Condition, absent specific statutory authorization.

4. The Court forbids and enjoins any attempt to implement the Immigration Enforcement Condition, and any actions by the Defendants to implement or enforce the Immigration Enforcement Condition.

---

[5] This Order binds Defendants' officers, agents, employees, attorneys, and other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).  Fed. R. Civ. P. 65(d)(2).

Docusign Envelope ID: FE0DB635-4FB1-4329-8662-FAE087G75F88

The Court retains jurisdiction to monitor Defendants' compliance with this Preliminary Injunction Order.  The Court will not require that the States post a bond in accordance with Federal Rule of Civil Procedure 65(c).  Additionally, because the Court found that the States are likely to succeed on the merits of their claims and that large-scale irreparable harm would occur without the preliminary injunction, the Court DENIES Defendants' request to stay this Order.  *See* ECF No. 51 at 42-43.


IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____
John J. McConnell, Jr.
Chief Judge
United States District Court


June 19, 2025

# U.S. DOT IFAC Cooperative Agreement City of Saint Paul 6.30.25

**Final Audit Report**                                                    2025-06-30

| | |
|---|---|
| Created: | 2025-06-30 |
| By: | Bruce Engelbrekt (bruce.engelbrekt@ci.stpaul.mn.us) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZ_fIRBVvS93r547L0DFd8TPGzTAaEiOG |

## "U.S. DOT IFAC Cooperative Agreement City of Saint Paul 6.30. 25" History

Document created by Bruce Engelbrekt (bruce.engelbrekt@ci.stpaul.mn.us)
2025-06-30 - 5:41:16 PM GMT

Document emailed to Sarah Sullivan (Sarah.Sullivan@ci.stpaul.mn.us) for signature
2025-06-30 - 5:41:26 PM GMT

Document emailed to Laura Logsdon (Laura.Logsdon@ci.stpaul.mn.us) for signature
2025-06-30 - 5:41:26 PM GMT

Document emailed to Jaime Tincher (jaime.tincher@ci.stpaul.mn.us) for signature
2025-06-30 - 5:41:26 PM GMT

Email viewed by Sarah Sullivan (Sarah.Sullivan@ci.stpaul.mn.us)
2025-06-30 - 5:46:51 PM GMT

Document e-signed by Sarah Sullivan (Sarah.Sullivan@ci.stpaul.mn.us)
Signature Date: 2025-06-30 - 5:47:22 PM GMT - Time Source: server

Email viewed by Laura Logsdon (Laura.Logsdon@ci.stpaul.mn.us)
2025-06-30 - 5:53:43 PM GMT

Document e-signed by Laura Logsdon (Laura.Logsdon@ci.stpaul.mn.us)
Signature Date: 2025-06-30 - 5:54:00 PM GMT - Time Source: server

Email viewed by Jaime Tincher (jaime.tincher@ci.stpaul.mn.us)
2025-06-30 - 6:20:49 PM GMT

Signer Jaime Tincher (jaime.tincher@ci.stpaul.mn.us) entered name at signing as Jaime Rae Tincher
2025-06-30 - 6:21:12 PM GMT

**Adobe Acrobat Sign**

Document e-signed by Jaime Rae Tincher (jaime.tincher@ci.stpaul.mn.us)
Signature Date: 2025-06-30 - 6:21:14 PM GMT - Time Source: server

Agreement completed.
2025-06-30 - 6:21:14 PM GMT

**Adobe Acrobat Sign**



EXHIBIT 9

| | |
|---|---|
| **From:** | Hawks, Robert (OST) |
| **To:** | Sarah Sullivan |
| **Cc:** | Leone, Lisa (OST); Hara, Jennifer (OST); Carlson, Terence (OST) |
| **Subject:** | IFAC Agreement |
| **Date:** | Tuesday, July 22, 2025 8:24:10 AM |
| **Attachments:** | MN_Saint Paul_FinalAgreement_rev072125.pdf |
| | MN_Saint Paul_FinalAgreement_rev072125ChangeHighlight.pdf |

You don't often get email from robert.hawks@dot.gov. Learn why this is important

**Think Before You Click:** This email originated **outside** our organization.

Ms. Sullivan:

Thank you for your letter dated June 27, 2025, enclosing the Innovative Finance and Asset Concession grant agreement signed by the City of Saint Paul.

Unfortunately, we are not able to accept or countersign the grant agreement with the City's strikethroughs. On June 19, 2025, while the grant agreement was under review with the City, the United States District Court for the District of Rhode Island entered a preliminary injunction against DOT from implementing or enforcing immigration enforcement conditions. The City is covered by that preliminary injunction as a local government entity within the State of Minnesota, a party to the litigation. We acknowledge the prior grant agreement would not comply with that preliminary injunction, and we have attached a revised version that includes a new special term, which complies and is consistent with language used for other affected recipients. The second .pdf highlights those revisions as well as the revised period of performance.

We hope this revised grant agreement addresses the City's concerns, and that the City can execute this attached grant agreement without delay. We appreciate your patience as we work through these issues.


Respectfully,

Rob

Rob Hawks
Attorney Advisor

Office of Federal Financial Assistance, Acquisitions, and Fiscal Law (C-80)
U.S. Department of Transportation
1200 New Jersey Ave SE
Washington, DC 20590

P: (202) 451-0573
E: robert.hawks@dot.gov

Docusign Envelope ID: FE0DB63E-4FB1-4329-8662-FAE087C75F88



EXHIBIT 10

**Innovative Finance and Asset Concession Grant Program Cooperative Agreement**

# Contents

COOPERATIVE AGREEMENT TERMS AND CONDITIONS ................................................ 4

APPLICABLE AUTHORITIES ................................................................................................ 4

ADDITIONAL AUTHORITIES ............................................................................................... 4

SUBPART A. GENERAL PROVISIONS ................................................................................ 4

    Definitions .............................................................................................................................. 5

    Order of Precedence .............................................................................................................. 5

    Flow Down Requirement ...................................................................................................... 5

    Period of Performance........................................................................................................... 5

    Contracting ............................................................................................................................ 5

    Budget ................................................................................................................................... 5

    Budget Period ........................................................................................................................ 5

    Cost Sharing or Matching Funds ......................................................................................... 5

Direct Assistance ...................................................................................................................... 6

    Role of the Recipient............................................................................................................. 6

    Role of DOT's Grant Program Director (GPD)................................................................... 8

    Role of DOT's Grant Program Manager (GPM) ................................................................ 8

    Role of DOT's Grant Technical Advisor (GTA) ................................................................ 8

    Role of DOT's Grant Management Specialist (GMS) ........................................................ 8

    Degree of DOT Involvement ................................................................................................ 8

    Monitoring and Reporting Requirements.............................................................................. 9

    Site Visits and Desk Review ................................................................................................ 9

    Unauthorized Promotion or Endorsement of Goods or Services ....................................... 10

    Work Products..................................................................................................................... 10

    News Releases ..................................................................................................................... 11

    Property Standards............................................................................................................... 11

    Intangible Property.............................................................................................................. 11

    Computer Software.............................................................................................................. 11

    Record Retention and Access to Records Monitoring ....................................................... 11

    Restrictions on Public Access to Records and Privacy Act ............................................... 11

    Performance Goals and Measurements............................................................................... 11

    Basic Considerations .......................................................................................................... 12

    Labor Rates ......................................................................................................................... 12

    Indirect Costs ...................................................................................................................... 13

Pre-Award Costs ................................................................................................... 13

Program Income .................................................................................................... 13

Profit or Fee .......................................................................................................... 13

Federal Payment .................................................................................................... 13

Financial Management and Internal Controls ....................................................... 14

Audit ...................................................................................................................... 14

Transportation and Travel ..................................................................................... 14

SUBPART C. MISCELLANEOUS PROVISIONS ...................................................... 15

Federal Law and Public Policy Requirements ...................................................... 15

Prior Written Approvals ........................................................................................ 15

Key Personnel ....................................................................................................... 16

Procurement ........................................................................................................... 16

Subawards .............................................................................................................. 16

In-Person Conferences, Trainings, and Other Events ........................................... 16

System of Award Management and Unique Entity Identifier Requirements ......... 16

Remedies for Noncompliance ................................................................................ 16

Objections, Hearings and Appeals ........................................................................ 17

Suspension of Agreement ...................................................................................... 17

Termination of Agreement ..................................................................................... 17

Termination/Expiration of Agreement Procedures ............................................... 17

Non-Discrimination ............................................................................................... 18

Closeout ................................................................................................................. 18

After-the-Award Requirements ............................................................................. 18

ATTACHMENT 1. U.S DEPARTMENT OF TRANSPORTATION CONTACT INFORMATION ..... 21

ATTACHMENT 2. RECORD RETENTION ................................................................. 22

ATTACHMENT 3. BILLING REQUIREMENTS ......................................................... 24

ATTACHMENT 4.  U.S. DEPARTMENT OF TRANSPORTATION AND FEDERAL ASSURANCES
.................................................................................................................................. 27

Attachment 4.1 ...................................................................................................... 27

Attachment 4.2 ...................................................................................................... 32

Attachment 4.3 ...................................................................................................... 35

Attachment 4.4 ...................................................................................................... 37

Attachment 4.5 ...................................................................................................... 39

Attachment 4.6 ...................................................................................................... 42

ATTACHMENT 5.  NON-DISCRIMINATION ASSURANCES ................................... 43

APPENDIX A ......................................................................................................... 46

APPENDIX B ......................................................................................................... 48

APPENDIX C .............................................................................................................. 50

APPENDIX D .............................................................................................................. 51

APPENDIX E .............................................................................................................. 52

**COOPERATIVE AGREEMENT TERMS AND CONDITIONS**

This Cooperative Agreement (Agreement) funds and sets out the terms and conditions (Provisions) governing a collaborative effort between the Department of Transportation (DOT) and **City of Saint Paul** (Recipient) for project**, Saint Paul Asset Scan for Transit-Oriented Development Opportunities**.

This is a cost reimbursement Cooperative Agreement. The responsibility for conducting activities under this Agreement lies primarily with the organization named in this Agreement (Recipient). DOT, through its designated representatives, shall consult and coordinate in the conduct of the activities performed during the period of this Agreement.  By signing the signature page, the Recipient accepts the terms and conditions, as stated.

## APPLICABLE AUTHORITIES

Unless otherwise noted, this Agreement incorporates the provisions from DOT's Notice of Funding Opportunity (NOFO**)** for the **Innovative Finance and Asset Concession Grant Program (IFACGP or the Program)** for the Fiscal Years 2022, 2023 and 2024, the Recipient's federal assistance application submitted in response to the NOFO, and the documents submitted to DOT to execute this Agreement.

This Agreement requires the Recipient to comply with the applicable requirements of part 200 of Title II of the Code of Federal Regulations (2 CFR part 200) and the DOT's implementation of those requirements at 2 CFR part 1201. Program Evaluation is encouraged for grant recipients and subrecipients, however is not required.

## ADDITIONAL AUTHORITIES

The authority for funding this Agreement incorporates Public Law No. 117-58, the Consolidated Appropriations Act, 2022, Section 71001 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58)

## SUBPART A. GENERAL PROVISIONS

**The purpose and scope of this Agreement is to facilitate and evaluate public-private partnerships in which the private sector partner could assume a greater role in project planning, development, financing, construction, maintenance, and operation, including by assisting eligible entities in entering into Asset Concessions consistent with the Budget Details of the award and the eligible activities and requirements outlined in the NOFO through technical assistance or expert services, as amended by this Agreement.** All activities, services, and products completed under this Agreement must align with this general scope and purpose. The Recipient is expected to implement the project via a proposal and quarterly reporting, which require collaboration with and approval by DOT's Grant Management Specialist (GMS) and DOT's Grant Technical Advisor (GTA). Approved work products are incorporated by reference in this Agreement. The award must not be used in the implementation of any other matters not set forth in this Agreement, except as may be reasonably related or incidental to the implementation of the purpose and scope of this Agreement.

4

## Definitions

This Agreement applies and incorporates the same meaning of terms, defined directly, or incorporated by reference, in the NOFO and at 2 CFR 200.1, unless otherwise specified within the applicable and additional authorities (above) or within these Provisions.

## Order of Precedence

In the event of an inconsistency in the provision or execution of this Agreement, the following order of precedence applies: (a) applicable Federal laws and regulations, (b) these Provisions, and (c) work products approved by DOT.

## Flow Down Requirement

The Recipient is legally and financially responsible for all aspects of the activities funded under this Agreement, including funds provided to contractors (including consultants) and subrecipients as referenced in 2 CFR 200.332.  Further, as required by 2 CFR 200.327, in all applicable contracts, the Recipient must include and require compliance with the provisions at Appendix II of 2 CFR part 200.

## Period of Performance

The Period of Performance (POP) for this Agreement is included on the award document signature page. Performance period extensions shall be made consistent with 2 CFR 200.308 and 2 CFR 200.309.

## Contracting

Prior approval of all contracting services will be required in coordination with DOT's Grant Program Manager (GPM), along with final GPM approval.  Procurements for and contracts with grantee-contracted advisors procured for this award must comply with the requirements set forth in the 2 CFR 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards**;** also refer to contractor determinations in 2 CFR 200.331.

## Budget

DOT's financial obligations to the Recipient will not exceed the amount of federal funding awarded to date, as reflected on the signature page of this agreement.  DOT is not liable for any costs the Recipient incurs in anticipation of receiving additional funds from DOT or any costs the Recipient incurs in a manner inconsistent with the terms of this Agreement.

## Budget Period

The budget period for the award is 36 months in length beginning on the start date of the performance period.  The Recipient is authorized to expend funds awarded based on DOT-approved work products. Requested budget period extensions for both the award and the work product must be made consistent with 2 CFR 200.308.

## Cost Sharing or Matching Funds

The maximum value of cooperative agreements is $2 million. Cooperative agreements of up to $1 million are offered at 100 percent federal share (no required non-federal). Amounts in excess of $1 million are offered at 50 percent federal share (50 percent required non-federal match). For example, a cooperative agreement of $2 million in federal aid would be matched by $1 million of non-federal funds, supporting a $3 million effort.

## Direct Assistance

If the Proposed Activities include direct assistance for an Asset Concession, the following conditions apply:

(1) the Asset Concession shall not prohibit, discourage, or make it more difficult for a Recipient to construct new infrastructure, to provide or expand transportation services, or to manage associated infrastructure in publicly beneficial ways, along a transportation corridor or in the proximity of a transportation facility that was a part of the Asset Concession;

(2) the Recipient shall have adopted binding rules to publish all major business terms of the proposed Asset Concession not later than the date that is 30 days before entering into the Asset Concession, to enable public review, including a certification of public interest based on the results of an assessment under subparagraph (4);

(3) the Asset Concession shall not result in displacement, job loss, or wage reduction for the existing workforce of the Recipient or other public entities;

(4) the Recipient or the concessionaire shall carry out a value-for-money analysis, or similar assessment, to compare the aggregate costs and benefits to the Recipient of the Asset Concession against alternative options to determine whether the Asset Concession generates additional public benefits and serves the public interest;

(5) the full amount of any Asset Concession payment received by the Recipient under the Asset Concession, less any amount paid for transaction costs relating to the Asset Concession, shall be used to pay infrastructure costs of the Recipient; and

(6) the terms of the Asset Concession shall not result in any increase in costs under the asset concession being shifted to taxpayers the annual household income of whom is less than $400,000 per year, including through taxes, user fees, tolls, or any other measure, for use of an approved infrastructure asset.

(7) Not later than three years after the date on which a Recipient enters into an Asset Concession as a result of a grant under this section—

    i. the Recipient shall hire an independent auditor to evaluate the performance of the concessionaire based on the requirements described in subparagraphs (1) through (6); and

    ii. the independent auditor shall submit to the Recipient, and make publicly available, a report describing the results of the audit under subparagraph (i).

## Role of the Recipient

The Recipient must:
(1) Comply with the terms and conditions of this Agreement;
(2) Collaborate with DOT staff in implementation and monitoring of the project, including identifying specific metrics and deliverables within the first 90 days of Period of Performance;
(3) Comply with IFACGP deliverable table below:

| Deliverable | Approximate Due Date | Section 508 Compliant? |
|---|---|---|
| **Kick-off Meeting**<br><br>Conduct a kick-off meeting with USDOT at a mutually-agreed-upon location. | Within 4 weeks of Period of Performance Start Date | No |
| **Reporting & Meeting**<br><br>Submit semi-annual Program performance reports using the Performance Progress (SF-PPR) and quarterly Federal Financial (SF-425) reports to document activities performed, anticipated activities, progress toward meeting performance goals and metrics, and any changes to schedule or anticipated issues.<br><br>Quarterly meetings or as needed to discuss the report and project status will be coordinated and scheduled by the Grant Technical Advisor.<br><br>For grants with asset scanning activities, provide asset information including, but not limited to, asset description, current use, potential zoning uses, objectives for the asset, any known environmental, technical, or financial issues, and market analysis to be shared by DOT with private entities for potential project analysis, business plan development, and contact information to share proposals with potential project sponsors. | Semi-Annual Program Performance Report in accordance with Fiscal Year schedule<br><br>Quarterly Federal Financial Reports in accordance with Fiscal Year schedule<br><br>Asset Information at completion of asset scan activities | Yes |
| **Project Management Plan**<br><br>The Recipient shall submit to USDOT's GTA for approval a Project Management Plan, which shall include, at a minimum:<br>  a) A **Statement of Work**, with a description of **Tasks and Sub-Tasks** by which the project work activities will be organized, executed, and monitored;<br>  b) A **Project Schedule** (Gantt Chart or equivalent) displaying begin and end times for each Task and Sub-Task, plus achievement of Project Milestones;<br>  c) **A Project Budget,** displaying planned expenditures for each Task, with a further breakdown by Cost Element for each Task, and by the federal share vs. non-federal share, if applicable.<br>  d) A description of major **Project Milestones**, including key Reports, start of operations of important systems or subsystems, and other important deliverables or events;<br>  e) A **Risk Management Plan,** which includes identification and assessment and of all known risks, assignment of risk roles and responsibilities, processes for monitoring and controlling risks, and a risk registry; | Within 45 days of Period of Performance Start Date | No |
| **Annual Report**<br><br>Submit a report to the Build America Bureau that describes the findings and effectiveness of the program. The specific format and contents of this report shall be discussed during the kickoff meeting and approved by the Agreement Officer Representative (AOR). | On the anniversary date of Period of Performance start and annually thereafter | Yes |

## Role of DOT's Grant Program Director (GPD)

The GPD is the DOT official authorized to execute and/or administer this award. The GPD is identified as the DOT official on the award document. The GPD is responsible for approving awards and amendments that obligate or de-obligate funds, suspending and terminating awards, and performing other responsibilities that are set forth in this Agreement.

## Role of DOT's Grant Program Manager (GPM)

The GPM is responsible for oversight of the Grant Management Team (GTA & GMS) activities to include but not limited to, all financial and administrative aspects of the award and all business management aspects of the award.

## Role of DOT's Grant Technical Advisor (GTA)

The GTA will have overall responsibility for monitoring the conduct and progress of the project, including conducting site visits, and reviewing financial and performance reports with the Grant Management Specialist (GMS) and other appropriate DOT staff. The GTA will provide substantial input, in collaboration with both the Recipient and DOT subject matter experts, in the planning and implementation of work products approved by the Grant Team. The GTA will provide written recommendations to the Grant Team regarding work product approval and performance period extensions. Also, the GTA will participate in the acceptance and publication of work products and materials, to make them available to the public.

## Role of DOT's Grant Management Specialist (GMS)

The GMS is responsible for all financial and administrative aspects of the award. The GMS will also assist the GTA in monitoring the conduct and progress of the project, including conducting site visits, and reviewing financial and performance reports. Further, the GMS will ensure that the award is operated in compliance with this Agreement. Questions concerning the applicability of regulations and policies to this Agreement, and all requests for required prior approvals, such as requests for permission to expend funds for certain items, should be directed to the GMS. Required approvals, including work product approvals, must be provided in writing to the Grant Team to include: GPD, GPM, GTA, & GMS. The GMS will be responsible for communicating the required approvals.

## Degree of DOT Involvement

The DOT anticipates substantial Federal involvement with the Recipient during performance period of this project. The anticipated Federal involvement will include:
- Review of deliverables as defined by the proposal from the Recipient
- Reviewing draft project documents and plans for approval and comment
- Reviewing semi-annual performance reports and final reports from the Recipient
- Convening quarterly meetings with the recipient to review project activities, schedule, and progress toward the scope of work
- Identifying relevant federal technical assistance programs aligned with the IFACGP efforts to share with grantee as additional funding, finance, and technical assistance opportunities.
- Assigning federal agency staff to serve as liaisons with grantee.
- Reviewing and approving changes in key personnel or scope changes
- Oversight of ongoing compliance with applicable federal regulations
- Budget oversight, including reviewing and reimbursing monthly invoices for incurred costs and receiving notification when budgets are 50% and 90% expended.

## Monitoring and Reporting Requirements

(1) **Requirements**. This Agreement incorporates the reporting requirements of 2 CFR 200.512 (Report submission), 2 CFR 200.328 (Financial reporting), 2 CFR 200.329 (Monitoring and reporting program performance), and 2 CFR 200.330 (Reporting on real property). Accordingly, the reporting frequencies are identified below.  DOT may adjust these frequencies to respond to award management deficiencies or to implement requirements of the applicable authorities.  Failure to comply with these reporting requirements is considered a material noncompliance.

| Reporting Requirements for Recipients | Frequency |
|---|---|
| Project Management Reporting | |
| • Performance Report | SA |
| • Financial Report (SF-425) | Q |
| Closeout Reporting | |
| • Final Performance Report | F |
| • Final Property Report (SF-428 & SF-428B) | F |
| Other Reporting (where applicable) | |
| • Intellectual Property Report | A |
| • Invention Report | Y |
| • Equipment/Property Report (SF-428) | Y |
| • Annual Financial Statement Audit (not the same as a Single Audit) | RA |
| A – Within a week after the event<br>F – Final; within 120 calendar days after the performance period or termination of this Agreement, whichever is first.<br>Q – Quarterly; within the 30 days following the end of the Federal fiscal year quarters<br>SA – Semi-Annually; within the 30 days following the end of two Federal fiscal year quarters<br>Y – Yearly; within 90 calendar days after the end of the annual report period<br>RA - Within 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period. | |

(2) **Performance reporting**. The Recipient will include the requirements of the "Performance Goals and Measurements" provision, of this Agreement, in its work products and track for inclusion in its performance report for each work product.

(3) **Submission to DOT**.  The Recipient must submit reports to both the GTA and GMS, in a manner directed by DOT and provided guidance in Attachment 1.

(4) **Restrictions**. Reports submitted in non-DOT systems must not contain any Protected Personal Identifiable Information (PII), limited rights data (proprietary data), classified information, information subject to export control classification, or other information not subject to release.

## Site Visits and Desk Review

DOT may perform site visits and desk reviews, as per 2 CFR 200.329(f), to monitor project progress and to ensure full accountability for Federal funds and compliance with this Agreement.

**Unauthorized Promotion or Endorsement of Goods or Services**

While receiving technical assistance, the Recipient or any of its personnel will not sell or promote its own or any other products or services. Neither the Recipient nor its personnel may imply that DOT endorses any product or service produced by non-DOT funding, nor use the name of DOT or any division of DOT to sell any product or service. For funding jointly administered by DOT and another Federal agency, the Recipient provides the same assurances to both agencies.

**Work Products**

(1) **Sharing Work Products**. The Recipient agrees to make available to the public the work products produced under this Agreement. Work products include studies, plans, market analyses, estimates, schedules, agreements, asset information, public outreach materials, performance reports, audits and any other documents produced while effectuating the purpose of this Agreement. Work products will be made publicly available in a manner and location determined by DOT.

(2) **Draft and Final Products**. The GTA and GMS may review and will accept or deny draft and final products. The Recipient must submit to the GTA and the GMS draft and final products developed under this Agreement. DOT will determine the manner in which products are submitted. Deliverables, quotations therefrom, paraphrasing, and disclosures of draft or interim findings must not be published by the Recipient or other participants in the work without DOT approval. In addition, except for open-source code, DOT reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work products, in whole or in part (including creating derivative works), for federal government purposes and to authorize others to do so, DOT's license applies to: (1) the copyright in any work developed under this award, sub-award, or contract awarded under this cooperative agreement; and (2) any rights of copyright to which the Recipient or its personnel, including contractors, purchases ownership with award funds from this Agreement. In addition, DOT may make any work that was developed under this Agreement publicly available by any means without restriction, including on a DOT website, or social media account, as a hard copy, or in electronic form. DOT also reserves the right, at its discretion, not to publish deliverables and other materials (e.g., reports, publications, manuals, and training curricula) developed under this cooperative agreement as DOT resources.

(3) **Acknowledgment of Support**. Products, including tools, publications, training materials, and online resources (material), developed under this Agreement, may include the DOT's logo, provided the GMS has approved the products and provides written permission to use the DOT logo. In addition, the Recipient must include the following acknowledgment and disclaimer on all products unless another version is authorized:

"This material is based upon work supported, in whole or in part, by Federal award number [insert award number] awarded to [name of Recipient] by the U.S. Department of Transportation."

The substance and findings of the work are dedicated to the public. Neither the United States Government nor any of its employees make any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately-owned rights. Reference herein to any individuals, agencies, companies, products, process, services, service by trade name, trademark, manufacturer, or otherwise does not constitute or imply an endorsement, recommendation, or favoring by the author(s), contributor(s), the U.S.

Government, or any agency thereof. Opinions contained herein are those of the author(s) and do not necessarily reflect the official position of, or a position that is endorsed by, DOT or any Federal agency.

## News Releases

All press releases or public issuances regarding the underlying Project made during the performance period for this Agreement must be reviewed and approved by DOT before release.

## Property Standards

The property standards at 2 CFR 200.310 through 200.316, as modified by 2 CFR 1201.313, apply to this Agreement and set forth the requirements for insurance coverage, real property, equipment, supplies, intangible property, and other property.

## Intangible Property

(1) This Agreement incorporates the requirements of 2 CFR 200.315.

(2) DOT will not retain exclusive rights to technical data, software, and analytic code previously developed by the Recipient or its personnel and used in the performance of work supported by this award. Computer software and "open-source" code available to the public prior to the work of this award may remain in the public domain.

## Computer Software

(1) Software, especially computer software used for online products, must be commercially available off-the-shelf.

(2) Requests for exceptions to computer software standards must be submitted in writing to DOT.

## Record Retention and Access to Records Monitoring

This Agreement incorporates the requirements at:

- 200.334 Retention requirements for records.
- 200.335 Requests for transfer of records.
- 200.336 Methods for collection, transmission, and storage of information.
- 200.337 Access to records.

## Restrictions on Public Access to Records and Privacy Act

This Agreement incorporates the requirements of 2 CFR 200.338. In the event of improper use or disclosure of protected personally identifiable information, the Recipient agrees to immediately report the incident to the GMS.

## Performance Goals and Measurements

To implement 2 CFR 200.301, 2 CFR 200.329, and the applicable authorities, in collaboration with the responsible DOT parties to this Agreement, the Recipient must develop a specific performance plan based on DOT-provided performance measures. The Recipient's performance plan must track progress and report on the effectiveness of each deliverable. The Recipient must propose, track and report project accomplishments against the following performance measures:

| Goal | Metric |
|------|--------|
| Goal 1: Provide benefits to the community through transportation projects. | • Increase collaboration with the private sector during project planning |
| Goal 2: Increase grant recipient's capacity, knowledge, and skills to execute transportation projects. | • Hire staff and/or procure consultants to serve as advisors within six months of the project's performance period start date |
| Goal 3: Engage, educate, and listen to the community throughout the project planning process. | • Conduct at minimum one stakeholder outreach initiative<br>• Create a best practices document based on learnings from the project |
| Goal 4: Advance the transformational project(s) closer to delivery. | • Complete all planned asset analyses for all existing assets<br>• Provide an implementation plan or next steps for each asset at the conclusion of the project |

## SUBPART B. FINANCIAL PROVISIONS

### Basic Considerations

This Agreement, including the work products, incorporates the basic cost principles of 2 CFR part 200:

- 200.402 Composition of costs.
- 200.403 Factors affecting allowability of costs.
- 200.404 Reasonable costs.
- 200.405 Allocable costs.
- 200.406 Applicable credits.
- 200.407 Prior written approval (prior approval).
- 200.408 Limitation on allowance of costs.
- 200.409 Special considerations.
- 200.410 Collection of unallowable costs.
- 200.411 Adjustment of previously negotiated indirect (F&A) cost rates containing unallowable costs.

Failure to provide adequate supporting documentation may result in a determination by DOT that those costs are unallowable.

### Labor Rates

This Agreement incorporates the labor rate submitted in the recipient's cost estimate. These rates are used for the purposes of determining reasonableness of direct labor costs, in accordance with 2 CFR part 200, including 2 CFR 200.404. All direct labor costs charged to this award require DOT approval, unless otherwise authorized by the GMS.

## Indirect Costs

(1) This Agreement incorporates the requirements of 2 CFR 200.414 and the NOFO.

(2) If indirect costs are included in the budget, the Recipient must include documentation to support the indirect cost rate it is using. The Recipient is only entitled to reimbursement of indirect costs. The Recipient may use a current Federally-approved and negotiated indirect cost rate agreement with DOT concurrence. If the Recipient does not have a negotiated indirect cost rate agreement, it must submit its first indirect cost rate proposal to its cognizant federal agency for review and approval. The Recipient may elect to use, if eligible, up to 15 percent de minimis rate per 2 CFR 200.414(f).

(3) If the Recipient is seeking reimbursement of indirect costs, the Recipient is responsible for maintaining an approved rate for the life of the award. The Recipient is required to reconcile the difference between its provisional indirect cost rate and final rate for the same year. The Recipient is not entitled to more than the unspent award amount, for underpayments.

## Pre-Award Costs

The Recipient will incur pre-award costs at its own risk, after the date of the DOT selection announcement and prior to the start date of the award performance period.

The incurrence of pre-award costs in anticipation of an award imposes no obligation on DOT either to make the award or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

## Program Income

Pursuant to 2 CFR 200.307(a), any program income earned during the award period, as a result of award activities, must be added to the funds committed to the award and used to further eligible activities supported by this Agreement. Program income earned after the award must be returned to the Federal government. Before using program income, any affected work product shall be revised and approved by DOT to include the use of program income.

## Profit or Fee

No increment (fee or profit) above cost may be paid to the Recipient or subrecipient under this award, except as otherwise expressly provided by law. The term "subrecipient" does not include the Recipient's procurement of goods and services, such as maintenance contracts for equipment or facilities, contracts for communication services, etc.

## Federal Payment

(1) **Payment Method**. Payment by reimbursement is the only payment method under this Agreement. This Agreement incorporates the payment requirements of 2 CFR 200.305. The Debt Collection Improvement Act of 1996 requires payment be made by electronic funds transfer. Electronic transfer shall be made from DOT's Delphi system to the Recipient's bank account on file with DOT. DOT will reimburse labor and direct costs incurred by the Recipient, including subcontractors. See attachment 3 for billing requirements.

(2) **Labor and Direct Costs**. DOT will reimburse labor and direct costs incurred by the Recipient, including subcontractors. Recipient should maintain a system for recording all project costs. Invoices may be transmitted to DOT monthly.

(3) **Reimbursement Limitation**. DOT financial obligations to the Recipient are limited by the amount of federal funding awarded to date as reflected on the award document.  If the Recipient incurs costs in anticipation of receiving additional funds from DOT, it does so at its own risk.

(4) **Timing of Submittals**.  Invoices should be transmitted to DOT monthly with a completed SF270, all corresponding invoices, and timesheets.

(5) **Payment approval**. Consistent with 2 CFR 200.305(b)(3), DOT will determine approval of payment requests submitted through Delphi as soon as practical, but not later than 30 days after the Recipient's request is received, unless the billing is improper, or an extenuating circumstance requires additional DOT time to approve a payment request.

(6) **Unauthorized Drawdown of Federal Funds**.  The Recipient must immediately refund DOT any amounts drawn down in excess of the authorized amounts. The Recipient and subrecipients shall promptly, but at least quarterly, remit to DOT interest earned on advances drawn in excess of disbursement needs and shall comply with the procedure for remitting interest earned to the Federal government per 2 CFR 200.305, as applicable.  The GPD, in collaboration with the Technical Assistance Division, will determine the appropriate refund method.

## Financial Management and Internal Controls

This Agreement incorporates the financial management systems requirements in 2 CFR 200.302, and internal controls set forth in 2 CFR 200.303.

### Audit

(1) **Single or Program-Specific Audits**. This Agreement incorporates the audit requirements of 2 CFR 200.501, 2 CFR 200.514 and 2 CFR 200.507.

DOT may require the Recipient to complete a Program-Specific Audit in accordance with 2 CFR 200.507. Audits must be guided by Appendix XI of 2 CFR part 200.

(2) **Financial Statement Audit Required**. DOT may require the Recipient to have an annual financial statement audit conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

(3) Audits must be submitted in a manner either described at 2 CFR 200 Subpart F or reference in this Agreement, within 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period.  This requirement applies to all Recipients, including commercial and not-for-profit organizations.

(4) Failure to comply with these audit requirements is considered material noncompliance.

(5) DOT will reimburse the Recipient for eligible costs associated with audits allowed by this Agreement as indicated within the Recipient's award budget.

## Transportation and Travel

This Agreement incorporates the requirements of 2 CFR 200.475.  All travel activities require prior approval from the GMS, as per 2 CFR 200.407.

## SUBPART C. MISCELLANEOUS PROVISIONS

**Federal Law and Public Policy Requirements**

(1) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(2) The Recipient hereby agrees that, as a condition of receiving any Federal financial assistance under this agreement, it will certify that it will comply with the assurances listed in Attachment 4 of this agreement. The Recipient must sign each of the assurances located in Attachment 4. The assurances attached cover the following:

- Certification regarding debarment, suspension, and other responsibility matters
- Requirements regarding delinquent tax liability or a felony conviction under any federal law
- Recipient policy to ban text messaging while driving - DOT Order 3902.10
- Certification regarding drug-free work-place requirements
- Compliance with the Trafficking Victims Protection Act (TVPA) of 2000 and implementing regulations in 2 CFR 175
- Lobbying and 49 CFR 20

(3) Pursuant to the court's preliminary injunction orders in State of California v. US Dep't of Transportation, 1:25-cv-00208-JJM-PAS (D.R.I.) (Jun. 19, 2025) and City and County of San Francisco v. Trump, 3:25-cv-01350-WHO (N.D. Cal.) (Apr. 24, 2025; Clarifying Order Jun. 23, 2025), DOT will not impose or enforce the challenged immigration enforcement condition* or any materially similar terms and conditions, to any grant funds awarded, directly or indirectly, to Plaintiff States or local government entities within those States (collectively referred to as "Plaintiff State Entities"), or otherwise rescind, withhold, terminate, or take other adverse action, absent specific statutory authority, based on the challenged immigration enforcement condition while DOT is subject to an injunction. DOT will not require Plaintiff State Entities to make any certification or other representation related to compliance the challenged immigration enforcement condition nor will DOT construe acceptance of funding from DOT as certification as to the challenged immigration enforcement condition.
\* The challenged immigration enforcement condition:
    "[T]he Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law"

**Prior Written Approvals**

The Agreement incorporates and applies the prior approval requirements of 2 CFR 200.407 to the entire project, including changes to the award and the associated work product.  The Recipient must comply with 2 CFR 200.407 before incurring certain costs under the award, including costs incurred pursuant to a work plan.

## Key Personnel

**Definition**. "Personnel" means employees of the Recipient, or any contractor(s), or team members, and consultants engaged by any of those entities.

The key personnel specified in the Recipient's application are considered essential to the work being performed under this Agreement. Any change to the key personnel assigned to a work product or included in the Recipient's application is considered a revision of program plans and requires compliance with 2 CFR 200.407 and advance written notice to and approval by the GPM. The notice must include a revised application along with a justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the award or work product.

## Procurement

The Recipient's process for acquiring goods and services under this award must comply with 2 CFR 200.317 through 200.327, as modified by 2 CFR 1201.317. Agreements executed by the Recipient must comply with this Agreement, as applicable, and include the contract provisions set forth in Appendix II to 2 CFR part 200, as applicable to the contract. The recipient will need to submit specific procurement documents for review prior to the entering into agreements with contractors and consultants. The documents include but are not limited to solicitations, specifications, contract agreements and any other document requested by DOT.

## Subawards

The use of sub-awards is subject to the specific written, prior approval of DOT. Any subaward made by a Recipient must comply with the requirements in 2 CFR 200.331- 200.333. When making subawards, the Recipient must comply with the reporting requirements of 2 CFR 170. This requirement provides guidelines for reporting of information on subawards and executive total compensation, as required by the Federal Funding Accountability and Transparency Act of 2006.

## In-Person Conferences, Trainings, and Other Events

This Agreement incorporates the requirements of 2 CFR 200.432, including the regulations referenced in the same section, and the related DOT standards.

## System of Award Management and Unique Entity Identifier Requirements

This Agreement incorporates the requirements of 2 CFR part 25, including Appendix A to part 25, which includes the requirement for the Recipient to maintain an active registration in the System of Award Management (www.sam.gov). An active SAM registration with the unique entity identifier (**UEI**) is required until the Recipient submits its final financial report or receives the final payment under this Agreement, whichever is later. The Recipient may not make a subaward to any entity that has not provided its unique entity identifier number.

## Remedies for Noncompliance

This Agreement incorporates the remedies for noncompliance included at:

- 200.339 Remedies for noncompliance.
- 200.340 Termination.
- 200.341 Notification of termination requirement.
- 200.342 Opportunities to object, hearings and appeals.

- 200.343 Effects of suspension and termination.

## Objections, Hearings and Appeals

The Recipient may object to any remedy for noncompliance as outlined in 2 CFR 200.342, the Recipient may submit written objections or  appeals to DOT via email, within 60 days of an initial DOT decision. A decision from the GPD or the appropriate DOT senior executive official shall be the final decision of DOT.

## Suspension of Agreement

DOT may suspend this Cooperative Agreement by giving written notice of this suspension to the **City of Saint Paul**, instructing the Recipient not to incur additional obligations, or disburse funds, pending the Recipient's action to correct violations of the terms and conditions of this Cooperative Agreement.

Failure by **City of Saint Paul** to take the corrective actions specified in the Notice of Suspension within thirty (30) days of receipt of said notice may result in termination of this Cooperative Agreement.

## Termination of Agreement

Consistent with 2 CFR 200.340, DOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

> (1)(a) The Recipient fails to obtain or provide any Recipient matching funds as required by the agreement;

>> (b) A completion date for the Project or a component of the Project is listed in the agreement and the Recipient fails to meet that milestone by six months after the date listed in the agreement;

>> (c) The Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the Project Schedule even if it is beyond the reasonable control of the Recipient;

>> (d) Circumstances cause changes to the Project that DOT determines are inconsistent with DOT's basis for selecting the Project to receive an award; or

>> (e) DOT determines that termination of this agreement is in the public interest.

> (2) In terminating this agreement under this section, DOT may elect to consider only the interests of DOT.

> (3) The Recipient may request that DOT terminate the agreement under this section.

## Termination/Expiration of Agreement Procedures

DOT may provide additional time and/or resources to closeout upon expiration or termination of this Cooperative Agreement. The Recipient must provide DOT a written report detailing all open business within five (5) days of expiration or termination of this Cooperative Agreement.

## Non-Discrimination

The Recipient hereby agrees that, as a condition of receiving any Federal financial assistance under this agreement, it will comply with Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. 2000d) and implementing regulations (49 CFR part 21, including any amendments thereto), related nondiscrimination statutes (i.e., 23 U.S.C. 324, Section 504 of the Rehabilitation Act of 1973 as amended, and the Age Discrimination Act of 1975), and applicable regulatory requirements to the end that no person in the United States shall, on the grounds of race, color, national origin, sex, handicap, or age be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity for which the Recipient receives Federal financial assistance.

The specific requirements of the Department of Transportation Civil Rights assurances (required by 49 CFR 21.7 and 27.9) are incorporated in the agreement and are in located in Attachment 5. The assurances in Attachment 4 must be executed and signed by the Recipient with a separate signature in addition to the Recipient's signature for this agreement.

## Closeout

This Agreement incorporates the requirements of 2 CFR 200.344. DOT will initiate the administrative closeout of the cooperative agreement after receiving evidence that all technical work and administrative requirements have been completed. The Recipient shall furnish all required documents in support of the closeout of the cooperative agreement within the timeframes requested by the Government. The anticipated timeframe to complete administrative closeout of the cooperative agreement will not exceed six (6) months.

## After-the-Award Requirements

This Agreement incorporates the requirements of 2 CFR 200.345 and 2 CFR 200.346 for post-closeout adjustments and the collection of amounts due.

## ENTIRE AGREEMENT

This document embodies the entire Agreement between **City of Saint Paul** and the DOT. This Cooperative Agreement may be amended, altered, or any of its provisions waived only in writing and signed by both parties. **The agreement will become effective when all parties have signed. The effective date of this agreement will be the date this agreement is signed by the last party.**

## PARTIES EXECUTING THIS COOPERATIVE AGREEMENT

**Federal Award and Obligation Amount: $805,139.00**
**Non-Federal Match Amount:    $    0.00**
**Period of Performance: August 11, 2025 – August 10, 2028**

This Cooperative Agreement is entered on this day _____ of _____ by the United States Department of Transportation, Build America Bureau, District of Columbia.

By:    _____
       Morteza Farajian, Executive Director
       Build America Bureau
       U.S. Department of Transportation

This Cooperative Agreement is entered by **City of Saint Paul.**

By:    _____    Date:    _____
       (Signature)           (month/day/year)

       _____
       (Print Name)

Title:    _____

By:    _____    Date:    _____
       (Signature)           (month/day/year)

       _____
       (Print Name)

Title:    _____

By:    _____    Date:    _____
       (Signature)           (month/day/year)

       _____
       (Print Name)

Title:    _____

By: _____     Date: _____
    (Signature)                                 (month/day/year)

    _____
    (Print Name)

Title: _____

**ATTACHMENT 1. U.S DEPARTMENT OF TRANSPORTATION CONTACT INFORMATION**

All responses to provisions of this Agreement, which require communication with DOT, should be sent using the contact information below.

E-mail: InnovativeFinanceTA@dot.gov

For regular and overnight delivery:

Innovative Finance and Asset Concession Grant Program
Build America Bureau
Department of Transportation
1200 New Jersey Ave SE
Washington, DC 20590

## ATTACHMENT 2. RECORD RETENTION

Financial Records Financial Status Reports
Final Financial Status Report
Requests for Reimbursements
Copies of Audits (federal and private)
Copies of Audit Responses
Copies of all tax reports filled with the IRS, state, and local governments

<u>Deposits and Receipts</u>
Monthly Bank Statements and Reconciliations
Written Procedures for Spending Funds
All Contracts:
    Contracts with Other Groups
    Consultant Contracts
    Insurance Policies
    Service/Maintenance Contracts
    Sole Source Contract Justifications
    Construction Contracts
    Bid Documents
    Performance Bonds
    Indirect Cost Documentation
Chart of Accounts
Ledgers
Cash Disbursement Journals
Payroll Register for Each Employee
Supporting Documentation for All Expenditures:
    Purchase Orders
    Vouchers
    Receipts
    Petty Cash Vouchers
    Deposit Receipt for Petty Cash Reconciliation
    Travel Reimbursement (with receipts where applicable)
    Time and Attendance Records
    Price Quotations
Equipment Inventory Listing

<u>Nonprofit Parent or Sponsoring Organization Records</u>
Articles of Incorporation
    Corporate Charter with a Nonprofit Status
    Constitution and By-laws
    Federal Charitable Organization Designation (501(c)(3))
    FICA Waiver of Exemption
    List of Board Members
    Monthly/Quarter/Annual Reports (whichever is applicable)
    Minutes of Board Meetings
    All Pertinent Correspondence Related to Work Under Award
    Copy of Written Personnel Policies

<u>Project Records</u>
Approved Work Products
Approved Budget Narratives
Grant Award Notice
Special Conditions
Program Modification Requests
Budget Modification Requests
Award Adjustment Notices
Copies of Required Quarterly Reports (Narrative and Financial)
Copy of Close-out Documents (Narrative and Financial)
Pertinent Correspondence Related to This Award (incoming and outgoing)
Lists of Work Force/Advisory/Community Organization Meetings Related to the Performance of Work
    under the Award
Evaluations Conducted as Required by the Award
Letters of Appreciation
Personnel Folders:
        Resumes
Letters of Employment
        Documentation of Pay Raises
Nondisclosure Agreement(s)

## ATTACHMENT 3. BILLING REQUIREMENTS

Not more than ninety (90) days following service delivery related to each DOT-approved work products, the Recipient of this Agreement is required to submit payment requests for allowable costs incurred. Payment requested must be submitted to DOT at a frequency that is not less than once every Federal fiscal year quarter. Payment requests that are not submitted timely must include a justification for the delayed submission. Payment requests for actual costs incurred must comply with the allowable cost standards of this Agreement.

All payment requests from the Recipient must be submitted to DOT and approved by DOT using the Delphi eInvoicing system.

(1) <u>Documentation submitted with payment requests</u>.  The following documentation must accompany any requests for payment of eligible technical assistance services provided:

(a)  The voucher number, cooperative agreement award number, funding source, and work product plan number or name.  A single voucher must include costs for work product under the same award; a voucher must not include work product associated with different awards.

(b)  Total amount of the payment request for the voucher, the bill period, and amount by work product.

(c)  The following certification statement: "I certify that the data contained in this document, as well as any information provided in the accompanying voucher, are true, correct, actual, and that all outlays were made in accordance with the cooperative agreement conditions and applicable Regulations.  I also certify that all contractors and/or consultants have certified to the same certification statements, and the certifications on file for future inspection and audit."

(d)  Program-specific documentation of actual costs, including reports from the Recipient's financial management system, which must be supported by the documents in the Recipient's program files.  Unless exempted by 2 CFR, the Recipient must generate reports from its financial management system supporting and documenting salaries, wages, travel, and all other payments for each employee, contractor personnel, and consultant that conducted work under the subject voucher.  The report(s) supporting payment requests must include:
  i.   The cooperative agreement award number, funding source, and work product number or name.
  ii.  Dates of the activities/actual costs by work product.
  iii. The name and position/title of each employee, contractor personnel, and consultant by work product; dates with applicable hours worked; the compensation rate attributable to the employee, contractor personnel and consultant; and travel costs by each employee, contractor personnel, and consultant.  **Do not** include individuals, such as senior management or other staff, whose costs are included in the indirect cost rate calculation.
  iv.  Actual activity, not estimates of activity, of each employee, contractor personnel and consultant.
  v.   The federally-approved indirect cost rate used, and the total indirect costs.
  vi.  If applicable, the approved G&A rate used, and the total G&A rate costs.
  vii. A cumulative amount of funds expended by work product and by the award.
  viii. A cover page with the voucher number, cooperative agreement award number, funding source, current and historic cumulative totals by work product number and by award.

24

(2) <u>File documentation</u>. In addition to the applicable record retention items included in Attachment 2 or elsewhere in this Agreement, the Recipient must maintain, at a minimum, the following documentation in its files and the documentation must be available for DOT review during an on-site monitoring visit, for submission when the Grants Team or GPD request particular documentation for remote monitoring purposes, and for submission when the GTA, GMS or GPD request particular documentation to assess payment requests from the Recipient:

(a)  Documentation to support salary costs, such as timesheets signed by the responsible supervisory official having knowledge of the activities performed by the employee and by the employee, or an electronic equivalent.  In signing, the supervisor and employee would be verifying that the technical assistance activities were performed and that the report is true and accurate.

(b)  For direct costs, invoices/receipts to support the charge for the costs and a certification for these costs.  Documentation or an electronic equivalent signed by the employee who incurred the costs indicating the expense was incurred pursuant to the subject technical assistance activities.

(c)  Copies of invoices submitted by the contractor/consultant along with the contract.  The invoices should include the dates of services, the hours worked attributable to the services, the rate of compensation, the nature of the services provided, an itemized list of other costs, if any, the office for which the services were performed, and the total billed amount.

(d)  For contractor costs, a certification signed by the contractor who incurred the costs indicating the expense was incurred pursuant to the subject technical assistance activities.

(e)  Employees' and contractors' work products and related documents, such as trip reports, minutes/notes of meetings, and collateral reports.

- Delphi eInvoicing System for DOT Financial Assistance Awardees: Subject to the requirements in 2 CFR 200, payments will be made after receipt of required modal reporting forms. Each payment request must be made electronically via the Delphi eInvoicing System.

The following are the procedures for accessing and utilizing the Delphi eInvoicing System:

I.    <u>Recipient Requirements</u>

  a.  Recipients (organization participating in Cooperative Agreement) must have internet access to register and submit payment requests through the Delphi invoicing system.

  b.  Recipients must submit payment requests electronically and DOT Operating Administrations must process payment requests electronically.

  c.  Recipients must submit at a minimum the required forms (SF270) and supporting documentation (receipts, itineraries, travel documentation, and event agendas) and obtain approval by the GMS prior to uploading invoices into the Delphi system for payment.

  d.  All invoices must be uploaded into the Delphi system electronically by the 10th of each month if the Recipient would like to be reimbursed within the same month.

    e.   All eligible expenses must be submitted to DOT within 60-days of being incurred to receive reimbursement, unless otherwise authorized by DOT.  Failure to submit eligible expenses for reimbursement within 60-days may result in the disapproval of the expense reimbursement request.

    f.   All invoices that have been submitted, approved, and paid will not be adjusted or recalculated by DOT staff to reimburse for miscalculated rates provided by **City of Saint Paul**.

    g.   It is the responsibility of the Recipient to provide, calculate and invoice correctly for all internal staff salaries. Changes or adjustments will not be made once final invoices have been submitted by the recipient and paid by DOT.

    h.   The Recipient shall follow the invoice/payment process for the close out of the cooperative agreement with DOT.

    i.   The Recipient shall not submit request for payment for any costs accrued outside the agreement timeframe of Period of Performance.

II.   <u>System User Requirements</u>

    a.   DOT will provide the Recipient's name and email address to the DOT Financial Management Office. The DOT will then invite the Recipient to sign up for the system.

    b.   DOT will send the Recipient a form to verify the Recipient's identity. The Recipient must complete the form and present it to a Notary Public for verification.

    c.   The Recipient will return the notarized form to:

        DOT Enterprise Services Center
        FAA Accounts Payable, AMZ-100
        PO Box 25710
        Oklahoma City, OK 73125

III.   The DOT will validate the form and email a user ID and password to the Recipient. Recipients should contact the Operating Administration's grants office with any changes to their system information.

Note: Additional information, including access forms and training materials, can be found on the DOT eInvoicing website (http: www.dot.gov/cfo/delphi-einvoicing-system.html)

## ATTACHMENT 4.  U.S. DEPARTMENT OF TRANSPORTATION AND FEDERAL ASSURANCES

### Attachment 4.1
CERTIFICATION REGARDING DEBARMENT
SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS

### 2 CFR Parts 180 and 1200

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring DOT approval or that is estimated to cost $25,000 or more – as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Technical Application and by entering into this agreement under the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants in the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program, as set out below.

## 1. Instructions for Certification – First Tier Participants:

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction

under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

## 2. Instructions for Certification - Lower Tier Participants:

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior DOT approval or estimated to cost $25,000 or more - 2 CFR Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the

proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

By signing this ASSURANCE, the Recipient agrees to comply with 2 CFR Parts 180 and 1200 and the requirements listed above.


_____

(Name of Recipient)



By_____

(Signature of Authorized Official)

DATED _____

**Attachment 4.2**
**REQUIREMENTS REGARDING**
**DELINQUENT TAX LIABILITY OR A FELONY CONVICTION**
**UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "SAM") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

(1) Certify whether the entity has a Tax Delinquency; and

(2) Certify whether the entity has a Felony Conviction.

4    **Prohibition.** If

(1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

(2) an entity provides an affirmative response to either certification in section 3; or

(3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5.    **Mandatory Notice to the USDOT.**

(a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

(b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

(c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6.    **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

(1) require the SAM check in section 2;
(2) require the certifications in section 3;
(3) include the prohibition in section 4; and
(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

By signing this ASSURANCE, the Recipient also agrees to comply with USDOT Order 4200.6 and the requirements listed above.

_____
(Name of Recipient)


By _____
(Signature of Authorized Official)


DATED _____

## Attachment 4.3

RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING

(a)     Definitions. The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of Attachment 4.3, "Motor Vehicles" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of Attachment 4.3, "Driving" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of Attachment 4.3, "Text messaging" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of Attachment 4.3, the "Government" includes the United States Government and State, local, and tribal governments at all levels.

(b)     Workplace Safety. In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:

    (1)     adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—

        (i)     Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or

        (ii)     Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

    (2)     Conduct workplace safety initiatives in a manner commensurate with the size of the

business, such as—

(i)     Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and

(ii)    Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

(c)     Subawards and Contracts. To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving.

_____

(Name of Recipient)

By_____

(Signature of Authorized Official)

DATED _____

36

## Attachment 4.4
### CERTIFICATION REGARDING DRUG-FREE WORK-PLACE REQUIREMENTS

The Recipient named in this agreement certifies that it will establish and continue to provide a drug-free workplace by:

a. Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Recipient's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

b. Establishing an ongoing drug-free awareness program to inform employees about--

1. The dangers of drug abuse in the workplace;
2. The Recipient 's policy of maintaining a drug-free workplace;
3. Any available drug counseling, rehabilitation, and employee assistance programs; and,
4. The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

c. Making it a requirement that each employee to be engaged in the performance of the grant or cooperative agreement be given a copy of the statement required by paragraph (a).

d. Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant or cooperative agreement, the employee will--

1. Abide by the terms of the statement; and,
2. Notify the employer in writing of his or her conviction for a violation of a criminal drug statue occurring in the workplace no later than five (5) calendar days after such conviction;

e. Notifying the Federal agency in writing, within ten (10) calendar days after receiving notice under subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction, Employers of convicted employees must provide notice, including position title, to every project officer or other designee on whose project activity the convicted employee was working. Notice shall include the identification number(s) of each affected grant or cooperative agreement.

f. Taking one of the following actions, within thirty (30) calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted--

1. Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or

2. Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

g. Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

1.  The Recipient 's headquarters is located at the following address.  The addresses of all workplaces
    maintained by the Recipient are provided on an accompanying list.


_____        _____
      (Signature of Authorized Official)                    (Date)

**Attachment 4.5**
TRAFFICKING IN PERSONS

**2 CFR PART 175**

a. *Provisions applicable to a recipient that is a private entity.*

    1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not—

        i. Engage in severe forms of trafficking in persons during the period of time that the award is in effect;

        ii. Procure a commercial sex act during the period of time that the award is in effect; or

        iii. Use forced labor in the performance of the award or subawards under the award.

    2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity —

        i. Is determined to have violated a prohibition in paragraph a.1 of this award term; or

        ii. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a.1 of this award term through conduct that is either—

            A. Associated with performance under this award; or

            B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 1200.

b. *Provision applicable to a recipient other than a private entity.* We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity—

    1. Is determined to have violated an applicable prohibition in paragraph a.1 of this award term; or

    2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a.1 of this award term through conduct that is either—

        i. Associated with performance under this award; or

        ii. Imputed to the subrecipient using the standards and due process for imputing the

conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 1200.

c. *Provisions applicable to any recipient.*

1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a.1 of this award term.

2. Our right to terminate unilaterally that is described in paragraph a.2 or b of this section:

i. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

ii. Is in addition to all other remedies for noncompliance that are available to us under this award.

3. You must include the requirements of paragraph a.1 of this award term in any subaward you make to a private entity.

d. *Definitions.* For purposes of this award term:

1. "Employee" means either:

i. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

ii. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

3. "Private entity":

i. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

ii. Includes:

A. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).

B. A for-profit organization.

4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

5. "Recipient" and "subrecipient" include for-profit entities for the purpose of Attachment 4.5 only.

By signing this ASSURANCE, the Recipient certifies that it has read and understands the provisions listed above.

_____

(Signature of Authorized Official)          (Date)

**Attachment 4.6**
LOBBYING

*If the Recipient will apply for a grant or cooperative agreement exceeding $100,000, or a loan, line of credit, loan guarantee, or loan insurance exceeding $150,000, it must make the following certification and, if applicable, make a disclosure regarding the Recipient's lobbying activities. This certification is required by 49 CFR 20.110 and app. A to that part.*

*This certification does not apply to a Recipient that is an Indian Tribe, Indian organization, or an Indian tribal organization exempt from the requirements of 49 CFR Part 20.*

**Certification for Contracts, Grants, Loans, and Cooperative Agreements.**

The undersigned certifies, to the best of his or her knowledge and belief, that:

No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.
If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.
The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**Statement for Loan Guarantees and Loan Insurance.**

The undersigned states, to the best of his or her knowledge and belief, that:

If any funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this commitment providing for the United States to insure or guarantee a loan, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

Submission of this statement is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required statement shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Signature of Authorized Official _____     DATED _____

## ATTACHMENT 5.  NON-DISCRIMINATION ASSURANCES

### Standard Title VI/Non-Discrimination Assurances

### DOT Order No. 1050.2A

By signing and submitting an application and by entering into this agreement under the FY 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program, the Recipient **HEREBY AGREES THAT**, as a condition to receiving any Federal financial assistance from the U.S. Department of Transportation (DOT), through the Build America Bureau, it is subject to and will comply with the following:

### Statutory/Regulatory Authorities

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 CFR Part 21 (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*), including any amendments thereto;
- 28 CFR 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

### General Assurances

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including the Build America Bureau.*

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

### Specific Assurances

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted FYs 2022, 2023, and 2024

Innovative Finance and Asset Concession Grant Program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in 49 CFR 21.23(b) and (e) will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or

    b.  the period during which the Recipient retains ownership or possession of the property.

9.  The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10.  The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing the DOT's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by the DOT. You must keep records, reports, and submit the material for review upon request to DOT, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the U.S. Department of Transportation under the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the FYs 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program.

          _____
                   (Name of Recipient)

By _____
          (Signature of Authorized Official)

          DATED _____

# APPENDIX A

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, the Build America Bureau), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or the FHWA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or the OST, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or the OST may determine to be appropriate, including, but not limited to:

   a. withholding payments to the contractor under the contract until the contractor complies; and/or
   b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or the OST may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with

litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

## APPENDIX B

CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), Section 71001 of Division G of the BIL (Asset Concessions), the Regulations for the Administration of FY 2022, 2023, and 2024 Innovative Finance and Asset Concession Grant Program**,** and the policies and procedures prescribed by the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

## (HABENDUM CLAUSE)

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

Docusign Envelope ID: FE0DB63E-4FB1-4329-8662-5AE087G75F88

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

49

# APPENDIX C

CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.   The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

    1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

# APPENDIX D

CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A. The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B. With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C. With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

# APPENDIX E

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

## Pertinent Non-Discrimination Authorities:

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq*.), (prohibits discrimination on the basis of sex);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Access to Services for Persons with Limited English Proficiency (LEP). The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq., its implementing regulation at 28 CFR 42.405(d), and applicable guidance issued by the Department of Justice;Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).
- Executive Order 14149, Restoring Freedom of Speech and Ending Federal Censorship, which prohibits taxpayer resources from abridging freedom of speech.
- Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, which requires, to the maximum extent permissible by law, the termination of all diversity, equity, inclusion, and accessibility (DEIA) performance requirements for recipients.

- Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, which prohibits the use of Federal funds to promote gender ideology.
- Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, which requires
  - pursuant to Section (3)(b)(iv)(A), the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

pursuant to Section (3)(b)(iv)(B), by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.