3-06-0363-025-2024

The Sponsor's acceptance of this Offer and ratification and adoption of the Project Application incorporated herein shall be evidenced by execution of this instrument by the Sponsor, as hereinafter provided, and this Offer and Acceptance shall comprise a Grant Agreement, constituting the contractual obligations and rights of the United States and the Sponsor with respect to the accomplishment of the Project and compliance with the Grant Assurances, terms, and conditions as provided herein. Such Grant Agreement shall become effective upon the Sponsor's acceptance of this Offer.

**Please read the following information:** By signing this document, you are agreeing that you have reviewed the following consumer disclosure information and consent to transact business using electronic communications, to receive notices and disclosures electronically, and to utilize electronic signatures in lieu of using paper documents. You are not required to receive notices and disclosures or sign documents electronically. If you prefer not to do so, you may request to receive paper copies and withdraw your consent at any time.

I declare under penalty of perjury that the foregoing is true and correct.[1]

UNITED STATES OF AMERICA
FEDERAL AVIATION ADMINISTRATION

*Amy Choi*

Amy Choi (Sep 5, 2024 15:42 PDT)
_____
(Signature)

Amy Choi
_____
(Typed Name)

Manager, SFO ADO
_____
(Title of FAA Official)

---

[1] Knowingly and willfully providing false information to the Federal government is a violation of 18 U.S.C. § 1001 (False Statements) and could subject you to fines, imprisonment, or both.

14

3-06-0363-025-2024

**Part II - Acceptance**

The Sponsor does hereby ratify and adopt all assurances, statements, representations, warranties, covenants, and agreements contained in the Project Application and incorporated materials referred to in the foregoing Offer, and does hereby accept this Offer and by such acceptance agrees to comply with all of the Grant Assurances, terms, and conditions in this Offer and in the Project Application.

**Please read the following information:** By signing this document, you are agreeing that you have reviewed the following consumer disclosure information and consent to transact business using electronic communications, to receive notices and disclosures electronically, and to utilize electronic signatures in lieu of using paper documents. You are not required to receive notices and disclosures or sign documents electronically. If you prefer not to do so, you may request to receive paper copies and withdraw your consent at any time.

I declare under penalty of perjury that the foregoing is true and correct.[2]

Dated  September 6, 2024

_____

County of Sacramento
_____
*(Name of Sponsor)*

*Cynthia a Nhl*
_____
*(Signature of Sponsor's Authorized Official)*

By:  Cynthia Nichol
_____
*(Typed Name of Sponsor's Authorized Official)*

Title:  Director of Airports
_____
*(Title of Sponsor's Authorized Official)*

---

[2] Knowingly and willfully providing false information to the Federal government is a violation of 18 U.S.C. § 1001 (False Statements) and could subject you to fines, imprisonment, or both.

15

3-06-0363-025-2024

## CERTIFICATE OF SPONSOR'S ATTORNEY

I, Katrina Nelson _____, acting as Attorney for the Sponsor do hereby certify:

That in my opinion the Sponsor is empowered to enter into the foregoing Grant Agreement under the laws of the State of ___California___ . Further, I have examined the foregoing Grant Agreement and the actions taken by said Sponsor and Sponsor's official representative, who has been duly authorized to execute this Grant Agreement, which is in all respects due and proper and in accordance with the laws of the said State; and Title 49, United States Code (U.S.C.), Chapters 471 and 475; 49 U.S.C. §§ 40101 et seq., and 48103; FAA Reauthorization Act of 2018 (P.L. 115-254); the Department of Transportation Appropriations Act, 2021 (P.L. 116-260, Division L); the Consolidated Appropriations Act, 2022 ( P.L. 117-103); Consolidated Appropriations Act, 2023 ( P.L. 117-328); Consolidated Appropriations Act, 2024 (P.L. 118-42); FAA Reauthorization Act of 2024 (P.L. 118-63); and the representations contained in the Project Application. In addition, for grants involving projects to be carried out on property not owned by the Sponsor, there are no legal impediments that will prevent full performance by the Sponsor. Further, it is my opinion that the said Grant Agreement constitutes a legal and binding obligation of the Sponsor in accordance with the terms thereof.

**Please read the following information:** By signing this document, you are agreeing that you have reviewed the following consumer disclosure information and consent to transact business using electronic communications, to receive notices and disclosures electronically, and to utilize electronic signatures in lieu of using paper documents. You are not required to receive notices and disclosures or sign documents electronically. If you prefer not to do so, you may request to receive paper copies and withdraw your consent at any time.

I declare under penalty of perjury that the foregoing is true and correct.[3]

Dated at   September 6, 2024 _____

                                                    By: _Katrina G. Nelson_____
                                                         *(Signature of Sponsor's Attorney)*

---

[3] Knowingly and willfully providing false information to the Federal government is a violation of 18 U.S.C. § 1001 (False Statements) and could subject you to fines, imprisonment, or both.

3-06-0363-025-2024

# ASSURANCES

## AIRPORT SPONSORS

**A. General.**

1. These assurances shall be complied with in the performance of grant agreements for airport development, airport planning, and noise compatibility program grants for airport sponsors.

2. These assurances are required to be submitted as part of the project application by sponsors requesting funds under the provisions of Title 49, U.S.C., subtitle VII, as amended. As used herein, the term "public agency sponsor" means a public agency with control of a public-use airport; the term "private sponsor" means a private owner of a public-use airport; and the term "sponsor" includes both public agency sponsors and private sponsors.

3. Upon acceptance of this grant offer by the sponsor, these assurances are incorporated in and become part of this Grant Agreement.

**B. Duration and Applicability.**

1. **Airport development or Noise Compatibility Program Projects Undertaken by a Public Agency Sponsor.**

   The terms, conditions and assurances of this Grant Agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise compatibility program project, or throughout the useful life of the project items installed within a facility under a noise compatibility program project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project. However, there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport. There shall be no limit on the duration of the terms, conditions, and assurances with respect to real property acquired with federal funds. Furthermore, the duration of the Civil Rights assurance shall be specified in the assurances.

2. **Airport Development or Noise Compatibility Projects Undertaken by a Private Sponsor.**

   The preceding paragraph (1) also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of the facilities developed or equipment acquired under an airport development or noise compatibility program project shall be no less than ten (10) years from the date of acceptance of Federal aid for the project.

3. **Airport Planning Undertaken by a Sponsor.**

   Unless otherwise specified in this Grant Agreement, only Assurances 1, 2, 3, 5, 6, 13, 18, 23, 25, 30, 32, 33, 34, and 37 in Section C apply to planning projects. The terms, conditions, and assurances of this Grant Agreement shall remain in full force and effect during the life of the project; there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport.

3-06-0363-025-2024

### C. Sponsor Certification.

The sponsor hereby assures and certifies, with respect to this grant that:

#### 1. General Federal Requirements

It will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant including but not limited to the following:

FEDERAL LEGISLATION

  a. 49 U.S.C. subtitle VII, as amended.

  b. Davis-Bacon Act, as amended — 40 U.S.C. §§ 3141-3144, 3146, and 3147, et seq.[1]

  c. Federal Fair Labor Standards Act – 29 U.S.C. § 201, et seq.

  d. Hatch Act – 5 U.S.C. § 1501, et seq.[2]

  e. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, et seq.[1, 2]

  f. National Historic Preservation Act of 1966 – Section 106 – 54 U.S.C. § 306108.[1]

  g. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. § 312501, et seq.[1]

  h. Native Americans Grave Repatriation Act – 25 U.S.C. § 3001, et seq.

  i. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. § 7401, et seq

  j. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. § 1451, et seq.

  k. Flood Disaster Protection Act of 1973 – Section 102(a) - 42 U.S.C. § 4012a.[1]

  l. 49 U.S.C. § 303, (formerly known as Section 4(f)).

  m. Rehabilitation Act of 1973 – 29 U.S.C. § 794.

  n. Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252) (prohibits discrimination on the basis of race, color, national origin).

  o. Americans with Disabilities Act of 1990, as amended, (42 U.S.C. § 12101 et seq.) (prohibits discrimination on the basis of disability).

  p. Age Discrimination Act of 1975 – 42 U.S.C. § 6101, et seq.

  q. American Indian Religious Freedom Act, P.L. 95-341, as amended.

  r. Architectural Barriers Act of 1968, as amended – 42 U.S.C. § 4151, et seq.[1]

  s. Powerplant and Industrial Fuel Use Act of 1978 – Section 403 – 42 U.S.C. § 8373.[1]

  t. Contract Work Hours and Safety Standards Act – 40 U.S.C. § 3701, et seq.[1]

  u. Copeland Anti-kickback Act – 18 U.S.C. § 874.[1]

  v. National Environmental Policy Act of 1969 – 42 U.S.C. § 4321, et seq.[1]

  w. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. § 1271, et seq.

  x. Single Audit Act of 1984 – 31 U.S.C. § 7501, et seq.[2]

y.  Drug-Free Workplace Act of 1988 – 41 U.S.C. §§ 8101 through 8105.

z.  The Federal Funding Accountability and Transparency Act of 2006, as amended (P.L. 109-282, as amended by section 6202 of P.L. 110-252).

aa. Civil Rights Restoration Act of 1987, P.L. 100-259.

bb. Build America, Buy America Act, P.L. 117-58, Title IX.

### EXECUTIVE ORDERS

a.  Executive Order 11246 – Equal Employment Opportunity[1]

b.  Executive Order 11990 – Protection of Wetlands

c.  Executive Order 11998 – Flood Plain Management

d.  Executive Order 12372 – Intergovernmental Review of Federal Programs

e.  Executive Order 12699 – Seismic Safety of Federal and Federally Assisted New Building Construction[1]

f.  Executive Order 12898 – Environmental Justice

g.  Executive Order 13166 – Improving Access to Services for Persons with Limited English Proficiency

h.  Executive Order 13985 – Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government

i.  Executive Order 13988 - Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation

j.  Executive Order 14005 – Ensuring the Future is Made in all of America by All of America's Workers

k.  Executive Order 14008 – Tackling the Climate Crisis at Home and Abroad

### FEDERAL REGULATIONS

a.  2 CFR Part 180 – OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement).

b.  2 CFR Part 200 – Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. [4,5]

c.  2 CFR Part 1200 – Nonprocurement Suspension and Debarment.

d.  14 CFR Part 13 – Investigative and Enforcement Procedures.

e.  14 CFR Part 16 – Rules of Practice for Federally-Assisted Airport Enforcement Proceedings.

f.  14 CFR Part 150 – Airport Noise Compatibility Planning.

g.  28 CFR Part 35 – Nondiscrimination on the Basis of Disability in State and Local Government Services.

h.  28 CFR § 50.3 – U.S. Department of Justice Guidelines for the Enforcement of Title VI of the Civil Rights Act of 1964.

i.  29 CFR Part 1 – Procedures for Predetermination of Wage Rates.[1]

3-06-0363-025-2024

    j.   29 CFR Part 3 – Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States.[1]

    k.   29 CFR Part 5 – Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (Also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act).[1]

    l.   41 CFR Part 60 – Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and Federally-assisted contracting requirements).[1]

    m.   49 CFR Part 20 – New Restrictions on Lobbying.

    n.   49 CFR Part 21 – Nondiscrimination in Federally-Assisted Programs of the Department of Transportation - Effectuation of Title VI of the Civil Rights Act of 1964.

    o.   49 CFR Part 23 – Participation by Disadvantage Business Enterprise in Airport Concessions.

    p.   49 CFR Part 24 – Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally-Assisted Programs.[1, 2]

    q.   49 CFR Part 26 – Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs.

    r.   49 CFR Part 27 – Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance.[1]

    s.   49 CFR Part 28 – Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation.

    t.   49 CFR Part 30 – Denial of Public Works Contracts to Suppliers of Goods and Services of Countries That Deny Procurement Market Access to U.S. Contractors.

    u.   49 CFR Part 32 – Governmentwide Requirements for Drug-Free Workplace (Financial Assistance).

    v.   49 CFR Part 37 – Transportation Services for Individuals with Disabilities (ADA).

    w.   49 CFR Part 38 – Americans with Disabilities Act (ADA) Accessibility Specifications for Transportation Vehicles.

    x.   49 CFR Part 41 – Seismic Safety.

*FOOTNOTES TO ASSURANCE (C)(1)*

[1]  These laws do not apply to airport planning sponsors.

[2]  These laws do not apply to private sponsors.

[3]  2 CFR Part 200 contains requirements for State and Local Governments receiving Federal assistance. Any requirement levied upon State and Local Governments by this regulation *shall* apply where applicable to private sponsors receiving Federal assistance under Title 49, United States Code.

[4]  Cost principles established in 2 CFR part 200 subpart E must be used as guidelines for determining the eligibility of specific types of expenses.

[5]  Audit requirements established in 2 CFR part 200 subpart F are the guidelines for audits.

3-06-0363-025-2024

## SPECIFIC ASSURANCES

Specific assurances required to be included in grant agreements by any of the above laws, regulations or circulars are incorporated by reference in this Grant Agreement.

2. **Responsibility and Authority of the Sponsor.**

    a. Public Agency Sponsor:

    It has legal authority to apply for this Grant, and to finance and carry out the proposed project; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

    b. Private Sponsor:

    It has legal authority to apply for this Grant and to finance and carry out the proposed project and comply with all terms, conditions, and assurances of this Grant Agreement. It shall designate an official representative and shall in writing direct and authorize that person to file this application, including all understandings and assurances contained therein; to act in connection with this application; and to provide such additional information as may be required.

3. **Sponsor Fund Availability.**

    It has sufficient funds available for that portion of the project costs which are not to be paid by the United States. It has sufficient funds available to assure operation and maintenance of items funded under this Grant Agreement which it will own or control.

4. **Good Title.**

    a. It, a public agency or the Federal government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired.

    b. For noise compatibility program projects to be carried out on the property of the sponsor, it holds good title satisfactory to the Secretary to that portion of the property upon which Federal funds will be expended or will give assurance to the Secretary that good title will be obtained.

5. **Preserving Rights and Powers.**

    a. It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in this Grant Agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. This shall be done in a manner acceptable to the Secretary.

    b. Subject to the FAA Act of 2018, Public Law 115-254, Section 163, it will not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application or, for a noise compatibility program project, that portion of the property upon which Federal funds have been expended, for the duration of the terms, conditions, and assurances in this Grant Agreement without approval by the

3-06-0363-025-2024

Secretary. If the transferee is found by the Secretary to be eligible under Title 49, United States Code, to assume the obligations of this Grant Agreement and to have the power, authority, and financial resources to carry out all such obligations, the sponsor shall insert in the contract or document transferring or disposing of the sponsor's interest, and make binding upon the transferee all of the terms, conditions, and assurances contained in this Grant Agreement.

c.  For all noise compatibility program projects which are to be carried out by another unit of local government or are on property owned by a unit of local government other than the sponsor, it will enter into an agreement with that government. Except as otherwise specified by the Secretary, that agreement shall obligate that government to the same terms, conditions, and assurances that would be applicable to it if it applied directly to the FAA for a grant to undertake the noise compatibility program project. That agreement and changes thereto must be satisfactory to the Secretary. It will take steps to enforce this agreement against the local government if there is substantial non-compliance with the terms of the agreement.

d.  For noise compatibility program projects to be carried out on privately owned property, it will enter into an agreement with the owner of that property which includes provisions specified by the Secretary. It will take steps to enforce this agreement against the property owner whenever there is substantial non-compliance with the terms of the agreement.

e.  If the sponsor is a private sponsor, it will take steps satisfactory to the Secretary to ensure that the airport will continue to function as a public-use airport in accordance with these assurances for the duration of these assurances.

f.  If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor will reserve sufficient rights and authority to ensure that the airport will be operated and maintained in accordance with Title 49, United States Code, the regulations and the terms, conditions and assurances in this Grant Agreement and shall ensure that such arrangement also requires compliance therewith.

g.  Sponsors of commercial service airports will not permit or enter into any arrangement that results in permission for the owner or tenant of a property used as a residence, or zoned for residential use, to taxi an aircraft between that property and any location on airport. Sponsors of general aviation airports entering into any arrangement that results in permission for the owner of residential real property adjacent to or near the airport must comply with the requirements of Sec. 136 of Public Law 112-95 and the sponsor assurances.

6.  **Consistency with Local Plans.**

The project is reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport.

7.  **Consideration of Local Interest.**

It has given fair consideration to the interest of communities in or near where the project may be located.

8.  **Consultation with Users.**

In making a decision to undertake any airport development project under Title 49, United States Code, it has undertaken reasonable consultations with affected parties using the airport at which project is proposed.

9. **Public Hearings.**

In projects involving the location of an airport, an airport runway, or a major runway extension, it has afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport or runway location and its consistency with goals and objectives of such planning as has been carried out by the community and it shall, when requested by the Secretary, submit a copy of the transcript of such hearings to the Secretary. Further, for such projects, it has on its management board either voting representation from the communities where the project is located or has advised the communities that they have the right to petition the Secretary concerning a proposed project.

10. **Metropolitan Planning Organization.**

In projects involving the location of an airport, an airport runway, or a major runway extension at a medium or large hub airport, the sponsor has made available to and has provided upon request to the metropolitan planning organization in the area in which the airport is located, if any, a copy of the proposed amendment to the airport layout plan to depict the project and a copy of any airport master plan in which the project is described or depicted.

11. **Pavement Preventive Maintenance-Management.**

With respect to a project approved after January 1, 1995, for the replacement or reconstruction of pavement at the airport, it assures or certifies that it has implemented an effective airport pavement maintenance-management program and it assures that it will use such program for the useful life of any pavement constructed, reconstructed or repaired with Federal financial assistance at the airport. It will provide such reports on pavement condition and pavement management programs as the Secretary determines may be useful.

12. **Terminal Development Prerequisites.**

For projects which include terminal development at a public use airport, as defined in Title 49, it has, on the date of submittal of the project grant application, all the safety equipment required for certification of such airport under 49 U.S.C. § 44706, and all the security equipment required by rule or regulation, and has provided for access to the passenger enplaning and deplaning area of such airport to passengers enplaning and deplaning from aircraft other than air carrier aircraft.

13. **Accounting System, Audit, and Record Keeping Requirements.**

   a. It shall keep all project accounts and records which fully disclose the amount and disposition by the recipient of the proceeds of this Grant, the total cost of the project in connection with which this Grant is given or used, and the amount or nature of that portion of the cost of the project supplied by other sources, and such other financial records pertinent to the project. The accounts and records shall be kept in accordance with an accounting system that will facilitate an effective audit in accordance with the Single Audit Act of 1984.

   b. It shall make available to the Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, for the purpose of audit and examination, any books, documents, papers, and records of the recipient that are pertinent to this Grant. The Secretary may require that an appropriate audit be conducted by a recipient. In any case in which an independent audit is made of the accounts of a sponsor relating to the disposition of the proceeds of a grant or relating to the project in connection with which this Grant was given or used, it shall file a certified copy of such audit with the Comptroller General of the United

3-06-0363-025-2024

States not later than six (6) months following the close of the fiscal year for which the audit was made.

### 14. Minimum Wage Rates.

It shall include, in all contracts in excess of $2,000 for work on any projects funded under this Grant Agreement which involve labor, provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor under 40 U.S.C. §§ 3141-3144, 3146, and 3147, Public Building, Property, and Works), which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

### 15. Veteran's Preference.

It shall include in all contracts for work on any project funded under this Grant Agreement which involve labor, such provisions as are necessary to insure that, in the employment of labor (except in executive, administrative, and supervisory positions), preference shall be given to Vietnam era veterans, Persian Gulf veterans, Afghanistan-Iraq war veterans, disabled veterans, and small business concerns owned and controlled by disabled veterans as defined in 49 U.S.C. § 47112. However, this preference shall apply only where the individuals are available and qualified to perform the work to which the employment relates.

### 16. Conformity to Plans and Specifications.

It will execute the project subject to plans, specifications, and schedules approved by the Secretary. Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this Grant Agreement, and, upon approval of the Secretary, shall be incorporated into this Grant Agreement. Any modification to the approved plans, specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into this Grant Agreement.

### 17. Construction Inspection and Approval.

It will provide and maintain competent technical supervision at the construction site throughout the project to assure that the work conforms to the plans, specifications, and schedules approved by the Secretary for the project. It shall subject the construction work on any project contained in an approved project application to inspection and approval by the Secretary and such work shall be in accordance with regulations and procedures prescribed by the Secretary. Such regulations and procedures shall require such cost and progress reporting by the sponsor or sponsors of such project as the Secretary shall deem necessary.

### 18. Planning Projects.

In carrying out planning projects:

a. It will execute the project in accordance with the approved program narrative contained in the project application or with the modifications similarly approved.

b. It will furnish the Secretary with such periodic reports as required pertaining to the planning project and planning work activities.

c. It will include in all published material prepared in connection with the planning project a notice that the material was prepared under a grant provided by the United States.

3-06-0363-025-2024

d.  It will make such material available for examination by the public, and agrees that no material prepared with funds under this project shall be subject to copyright in the United States or any other country.

e.  It will give the Secretary unrestricted authority to publish, disclose, distribute, and otherwise use any of the material prepared in connection with this grant.

f.  It will grant the Secretary the right to disapprove the sponsor's employment of specific consultants and their subcontractors to do all or any part of this project as well as the right to disapprove the proposed scope and cost of professional services.

g.  It will grant the Secretary the right to disapprove the use of the sponsor's employees to do all or any part of the project.

h.  It understands and agrees that the Secretary's approval of this project grant or the Secretary's approval of any planning material developed as part of this grant does not constitute or imply any assurance or commitment on the part of the Secretary to approve any pending or future application for a Federal airport grant.

19. **Operation and Maintenance.**

a.  The airport and all facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal, state, and local agencies for maintenance and operation. It will not cause or permit any activity or action thereon which would interfere with its use for airport purposes. It will suitably operate and maintain the airport and all facilities thereon or connected therewith, with due regard to climatic and flood conditions. Any proposal to temporarily close the airport for non-aeronautical purposes must first be approved by the Secretary. In furtherance of this assurance, the sponsor will have in effect arrangements for:

    1.  Operating the airport's aeronautical facilities whenever required;

    2.  Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions; and

    3.  Promptly notifying pilots of any condition affecting aeronautical use of the airport. Nothing contained herein shall be construed to require that the airport be operated for aeronautical use during temporary periods when snow, flood, or other climatic conditions interfere with such operation and maintenance. Further, nothing herein shall be construed as requiring the maintenance, repair, restoration, or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstance beyond the control of the sponsor.

b.  It will suitably operate and maintain noise compatibility program items that it owns or controls upon which Federal funds have been expended.

20. **Hazard Removal and Mitigation.**

It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

**21. Compatible Land Use.**

It will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

**22. Economic Nondiscrimination.**

a. It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

b. In any agreement, contract, lease, or other arrangement under which a right or privilege at the airport is granted to any person, firm, or corporation to conduct or to engage in any aeronautical activity for furnishing services to the public at the airport, the sponsor will insert and enforce provisions requiring the contractor to:

1. Furnish said services on a reasonable, and not unjustly discriminatory, basis to all users thereof, and

2. Charge reasonable, and not unjustly discriminatory, prices for each unit or service, provided that the contractor may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

c. Each fixed-based operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

d. Each air carrier using such airport shall have the right to service itself or to use any fixed-based operator that is authorized or permitted by the airport to serve any air carrier at such airport.

e. Each air carrier using such airport (whether as a tenant, non-tenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and utilize similar facilities, subject to reasonable classifications such as tenants or non-tenants and signatory carriers and non-signatory carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

f. It will not exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees (including, but not limited to maintenance, repair, and fueling) that it may choose to perform.

g. In the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions.

3-06-0363-025-2024

h. The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.

i. The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

23. **Exclusive Rights.**

It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:

a. It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and

b. If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport. It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code.

24. **Fee and Rental Structure.**

It will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport, taking into account such factors as the volume of traffic and economy of collection. No part of the Federal share of an airport development, airport planning or noise compatibility project for which a Grant is made under Title 49, United States Code, the Airport and Airway Improvement Act of 1982, the Federal Airport Act or the Airport and Airway Development Act of 1970 shall be included in the rate basis in establishing fees, rates, and charges for users of that airport.

25. **Airport Revenues.**

a. All revenues generated by the airport and any local taxes on aviation fuel established after December 30, 1987, will be expended by it for the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport. The following exceptions apply to this paragraph:

1. If covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in governing statutes controlling the owner or operator's financing, provide for the use of the

revenues from any of the airport owner or operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply.

2. If the Secretary approves the sale of a privately owned airport to a public sponsor and provides funding for any portion of the public sponsor's acquisition of land, this limitation on the use of all revenues generated by the sale shall not apply to certain proceeds from the sale. This is conditioned on repayment to the Secretary by the private owner of an amount equal to the remaining unamortized portion (amortized over a 20-year period) of any airport improvement grant made to the private owner for any purpose other than land acquisition on or after October 1, 1996, plus an amount equal to the federal share of the current fair market value of any land acquired with an airport improvement grant made to that airport on or after October 1, 1996.

3. Certain revenue derived from or generated by mineral extraction, production, lease, or other means at a general aviation airport (as defined at 49 U.S.C. § 47102), if the FAA determines the airport sponsor meets the requirements set forth in Section 813 of Public Law 112-95.

b. As part of the annual audit required under the Single Audit Act of 1984, the sponsor will direct that the audit will review, and the resulting audit report will provide an opinion concerning, the use of airport revenue and taxes in paragraph (a), and indicating whether funds paid or transferred to the owner or operator are paid or transferred in a manner consistent with Title 49, United States Code and any other applicable provision of law, including any regulation promulgated by the Secretary or Administrator.

c. Any civil penalties or other sanctions will be imposed for violation of this assurance in accordance with the provisions of 49 U.S.C. § 47107.

**26. Reports and Inspections.**

It will:

a. submit to the Secretary such annual or special financial and operations reports as the Secretary may reasonably request and make such reports available to the public; make available to the public at reasonable times and places a report of the airport budget in a format prescribed by the Secretary;

b. for airport development projects, make the airport and all airport records and documents affecting the airport, including deeds, leases, operation and use agreements, regulations and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request;

c. for noise compatibility program projects, make records and documents relating to the project and continued compliance with the terms, conditions, and assurances of this Grant Agreement including deeds, leases, agreements, regulations, and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request; and

d. in a format and time prescribed by the Secretary, provide to the Secretary and make available to the public following each of its fiscal years, an annual report listing in detail:

1. all amounts paid by the airport to any other unit of government and the purposes for which each such payment was made; and

2. all services and property provided by the airport to other units of government and the amount of compensation received for provision of each such service and property.

**27. Use by Government Aircraft.**

It will make available all of the facilities of the airport developed with Federal financial assistance and all those usable for landing and takeoff of aircraft to the United States for use by Government aircraft in common with other aircraft at all times without charge, except, if the use by Government aircraft is substantial, charge may be made for a reasonable share, proportional to such use, for the cost of operating and maintaining the facilities used. Unless otherwise determined by the Secretary, or otherwise agreed to by the sponsor and the using agency, substantial use of an airport by Government aircraft will be considered to exist when operations of such aircraft are in excess of those which, in the opinion of the Secretary, would unduly interfere with use of the landing areas by other authorized aircraft, or during any calendar month that:

a. Five (5) or more Government aircraft are regularly based at the airport or on land adjacent thereto; or

b. The total number of movements (counting each landing as a movement) of Government aircraft is 300 or more, or the gross accumulative weight of Government aircraft using the airport (the total movement of Government aircraft multiplied by gross weights of such aircraft) is in excess of five million pounds.

**28. Land for Federal Facilities.**

It will furnish without cost to the Federal Government for use in connection with any air traffic control or air navigation activities, or weather-reporting and communication activities related to air traffic control, any areas of land or water, or estate therein as the Secretary considers necessary or desirable for construction, operation, and maintenance at Federal expense of space or facilities for such purposes. Such areas or any portion thereof will be made available as provided herein within four months after receipt of a written request from the Secretary.

**29. Airport Layout Plan.**

a. Subject to the FAA Reauthorization Act of 2018, Public Law 115-254, Section 163, it will keep up to date at all times an airport layout plan of the airport showing:

1. boundaries of the airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the sponsor for airport purposes and proposed additions thereto;

2. the location and nature of all existing and proposed airport facilities and structures (such as runways, taxiways, aprons, terminal buildings, hangars and roads), including all proposed extensions and reductions of existing airport facilities;

3. the location of all existing and proposed non-aviation areas and of all existing improvements thereon; and

4. all proposed and existing access points used to taxi aircraft across the airport's property boundary.

Such airport layout plans and each amendment, revision, or modification thereof, shall be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities

which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport.

b. Subject to the FAA Reauthorization Act of 2018, Public Law 115-254, Section 163, if a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary:

1. eliminate such adverse effect in a manner approved by the Secretary; or

2. bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities except in the case of a relocation or replacement of an existing airport facility due to a change in the Secretary's design standards beyond the control of the airport sponsor.

**30. Civil Rights.**

It will promptly take any measures necessary to ensure that no person in the United States shall, on the grounds of race, color, and national origin (including limited English proficiency) in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4); creed and sex (including sexual orientation and gender identity) per 49 U.S.C. § 47123 and related requirements; age per the Age Discrimination Act of 1975 and related requirements; or disability per the Americans with Disabilities Act of 1990 and related requirements, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination in any program and activity conducted with, or benefiting from, funds received from this Grant.

a. Using the definitions of activity, facility, and program as found and defined in 49 CFR §§ 21.23(b) and 21.23(e), the sponsor will facilitate all programs, operate all facilities, or conduct all programs in compliance with all non-discrimination requirements imposed by or pursuant to these assurances.

b. Applicability

1. Programs and Activities. If the sponsor has received a grant (or other federal assistance) for any of the sponsor's program or activities, these requirements extend to all of the sponsor's programs and activities.

2. Facilities. Where it receives a grant or other federal financial assistance to construct, expand, renovate, remodel, alter, or acquire a facility, or part of a facility, the assurance extends to the entire facility and facilities operated in connection therewith.

3. Real Property. Where the sponsor receives a grant or other Federal financial assistance in the form of, or for the acquisition of real property or an interest in real property, the assurance will extend to rights to space on, over, or under such property.

c. Duration.

The sponsor agrees that it is obligated to this assurance for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or

structures or improvements thereon, in which case the assurance obligates the sponsor, or any transferee for the longer of the following periods:

1. So long as the airport is used as an airport, or for another purpose involving the provision of similar services or benefits; or

2. So long as the sponsor retains ownership or possession of the property.

d. Required Solicitation Language. It will include the following notification in all solicitations for bids, Requests For Proposals for work, or material under this Grant Agreement and in all proposals for agreements, including airport concessions, regardless of funding source:

"The (County of Sacramento), in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders or offerors that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, [select businesses, or disadvantaged business enterprises or airport concession disadvantaged business enterprises] will be afforded full and fair opportunity to submit bids in response to this invitation and no businesses will be discriminated against on the grounds of race, color, national origin (including limited English proficiency), creed, sex (including sexual orientation and gender identity), age, or disability in consideration for an award."

e. Required Contract Provisions.

1. It will insert the non-discrimination contract clauses requiring compliance with the acts and regulations relative to non-discrimination in Federally-assisted programs of the Department of Transportation (DOT), and incorporating the acts and regulations into the contracts by reference in every contract or agreement subject to the non-discrimination in Federally-assisted programs of the DOT acts and regulations.

2. It will include a list of the pertinent non-discrimination authorities in every contract that is subject to the non-discrimination acts and regulations.

3. It will insert non-discrimination contract clauses as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a sponsor.

4. It will insert non-discrimination contract clauses prohibiting discrimination on the basis of race, color, national origin (including limited English proficiency), creed, sex (including sexual orientation and gender identity), age, or disability as a covenant running with the land, in any future deeds, leases, license, permits, or similar instruments entered into by the sponsor with other parties:

   a. For the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and

   b. For the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

f. It will provide for such methods of administration for the program as are found by the Secretary to give reasonable guarantee that it, other recipients, sub-recipients, sub-grantees, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the acts, the regulations, and this assurance.

g.  It agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the acts, the regulations, and this assurance.

**31. Disposal of Land.**

a.  For land purchased under a grant for airport noise compatibility purposes, including land serving as a noise buffer, it will dispose of the land, when the land is no longer needed for such purposes, at fair market value, at the earliest practicable time. That portion of the proceeds of such disposition which is proportionate to the United States' share of acquisition of such land will be, at the discretion of the Secretary, (1) reinvested in another project at the airport, or (2) transferred to another eligible airport as prescribed by the Secretary. The Secretary shall give preference to the following, in descending order:

   1.  Reinvestment in an approved noise compatibility project;

   2.  Reinvestment in an approved project that is eligible for grant funding under 49 U.S.C. § 47117(e);

   3.  Reinvestment in an approved airport development project that is eligible for grant funding under 49 U.S.C. §§ 47114, 47115, or 47117;

   4.  Transfer to an eligible sponsor of another public airport to be reinvested in an approved noise compatibility project at that airport; or

   5.  Payment to the Secretary for deposit in the Airport and Airway Trust Fund.

   If land acquired under a grant for noise compatibility purposes is leased at fair market value and consistent with noise buffering purposes, the lease will not be considered a disposal of the land. Revenues derived from such a lease may be used for an approved airport development project that would otherwise be eligible for grant funding or any permitted use of airport revenue.

b.  For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land. That portion of the proceeds of such disposition which is proportionate to the United States' share of the cost of acquisition of such land will, upon application to the Secretary, be reinvested or transferred to another eligible airport as prescribed by the Secretary. The Secretary shall give preference to the following, in descending order:

   1.  Reinvestment in an approved noise compatibility project;

   2.  Reinvestment in an approved project that is eligible for grant funding under 49 U.S.C. § 47117(e);

   3.  Reinvestment in an approved airport development project that is eligible for grant funding under 49 U.S.C. §§ 47114, 47115, or 47117;

   4.  Transfer to an eligible sponsor of another public airport to be reinvested in an approved noise compatibility project at that airport.

c.  Land shall be considered to be needed for airport purposes under this assurance if (1) it may be needed for aeronautical purposes (including runway protection zones) or serve as noise buffer land, and (2) the revenue from interim uses of such land contributes to the financial self-

sufficiency of the airport. Further, land purchased with a grant received by an airport operator or owner before December 31, 1987, will be considered to be needed for airport purposes if the Secretary or Federal agency making such grant before December 31, 1987, was notified by the operator or owner of the uses of such land, did not object to such use, and the land continues to be used for that purpose, such use having commenced no later than December 15, 1989.

d. Disposition of such land under (a), (b), or (c) will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport.

**32. Engineering and Design Services.**

If any phase of such project has received Federal funds under Chapter 471 subchapter 1 of Title 49 U.S.C., it will award each contract, or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping or related services in the same manner as a contract for architectural and engineering services is negotiated under Chapter 11 of Title 40 U S.C., or an equivalent qualifications-based requirement prescribed for or by the sponsor of the airport.

**33. Foreign Market Restrictions.**

It will not allow funds provided under this Grant to be used to fund any project which uses any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**34. Policies, Standards, and Specifications.**

It will carry out any project funded under an Airport Improvement Program Grant in accordance with policies, standards, and specifications approved by the Secretary including, but not limited to, current FAA Advisory Circulars (https://www.faa.gov/airports/aip/media/aip-pfc-checklist.pdf) for AIP projects as of August 15, 2024.

**35. Relocation and Real Property Acquisition.**

a. It will be guided in acquiring real property, to the greatest extent practicable under State law, by the land acquisition policies in Subpart B of 49 CFR Part 24 and will pay or reimburse property owners for necessary expenses as specified in Subpart B.

b. It will provide a relocation assistance program offering the services described in Subpart C of 49 CFR Part 24 and fair and reasonable relocation payments and assistance to displaced persons as required in Subpart D and E of 49 CFR Part 24.

c. It will make available within a reasonable period of time prior to displacement, comparable replacement dwellings to displaced persons in accordance with Subpart E of 49 CFR Part 24.

**36. Access By Intercity Buses.**

The airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport; however, it has no obligation to fund special facilities for intercity buses or for other modes of transportation.

3-06-0363-025-2024

37. **Disadvantaged Business Enterprises.**

The sponsor shall not discriminate on the basis of race, color, national origin, or sex, in the award and performance of any DOT-assisted contract covered by 49 CFR Part 26, or in the award and performance of any concession activity contract covered by 49 CFR Part 23. In addition, the sponsor shall not discriminate on the basis of race, color, national origin or sex in the administration of its Disadvantaged Business Enterprise (DBE) and Airport Concessions Disadvantaged Business Enterprise (ACDBE) programs or the requirements of 49 CFR Parts 23 and 26. The sponsor shall take all necessary and reasonable steps under 49 CFR Parts 23 and 26 to ensure nondiscrimination in the award and administration of DOT-assisted contracts, and/or concession contracts. The sponsor's DBE and ACDBE programs, as required by 49 CFR Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement. Implementation of these programs is a legal obligation and failure to carry out its terms shall be treated as a violation of this agreement. Upon notification to the sponsor of its failure to carry out its approved program, the Department may impose sanctions as provided for under Parts 26 and 23 and may, in appropriate cases, refer the matter for enforcement under 18 U.S.C. § 1001 and/or the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. §§ 3801-3809, 3812).

38. **Hangar Construction.**

If the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

39. **Competitive Access.**

a.  If the airport owner or operator of a medium or large hub airport (as defined in 49 U.S.C. § 47102) has been unable to accommodate one or more requests by an air carrier for access to gates or other facilities at that airport in order to allow the air carrier to provide service to the airport or to expand service at the airport, the airport owner or operator shall transmit a report to the Secretary that:

   1.  Describes the requests;

   2.  Provides an explanation as to why the requests could not be accommodated; and

   3.  Provides a time frame within which, if any, the airport will be able to accommodate the requests.

b.  Such report shall be due on either February 1 or August 1 of each year if the airport has been unable to accommodate the request(s) in the six month period prior to the applicable due date.

# EXHIBIT B



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq.*) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq.*), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq.*).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

Case 3:25-cv-07070-RS    Document 9-25    Filed 08/21/25    Page 26 of 29

DOT remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families. This mission depends upon your strict adherence to the legal framework governing our partnership, and I trust you will take all necessary steps to comply with Federal law and satisfy your legal obligations.

Sincerely,

Sean P. Duffy

# EXHIBIT C

the 9.45-mile Westside-Seghers Branch, between milepost 764.80 near Hillsboro and milepost 754.57 near Seghers; [2] and (3) the 14.32-mile Newberg Branch, between milepost 763.99 near Cook and milepost 749.67 near Newberg.

According to the verified notice, in 1995, PNWR entered into an agreement with UP's predecessor on the Lines, the Southern Pacific Transportation Company (SP), [3] to lease and operate the Lines. *See Portland & W. R.R.—Lease & Operation Exemption—S. Pac. Transp. Co.,* FD 32758 (ICC served Sept. 13, 1995). PNWR states that the original lease was for a period of 10 years and automatically extended into 2025. PNWR further states that PNWR and UP have amended the original lease numerous times [4] and that the parties have agreed to further extend the term and to make other commercial revisions. According to PNWR, it will continue to be the operator on the Lines after the transaction.

According to the verified notice, the lease agreement with UP contains an interchange commitment pertaining to interchange with carriers other than UP. PNWR has provided additional information regarding the interchange commitment as required by 49 CFR 1150.43(h). [5]

PNWR certifies that its projected revenues as a result of the transaction will not exceed those that would qualify it as a Class III rail carrier and that its current annual revenues exceed $5 million. Pursuant to 49 CFR 1150.42(e), if a carrier's projected annual revenues will exceed $5 million, it must, at least 60 days before the exemption is to

---

because PNWR holds authority to operate this segment via a perpetual freight easement. *See Portland & W. R.R.—Acquis. & Operation Exemption—Union Pac. R.R.,* FD 34792 (STB served Nov. 24, 2006). In light of PNWR's supplement, April 11, 2025, is considered the filing date of the verified notice.

[2] According to PNWR, while the distance noted here is correct, the mileposts have not been redesignated to reflect a previous abandonment.

[3] PNWR states that UP succeeded to the rights of SP as a result of the merger authorized in *Union Pacific Corp.—Control & Merger—Southern Pacific Rail Corp.,* 1 S.T.B. 233 (1996).

[4] PNWR does not indicate whether it believes authority from the Board was necessary for the previous amendments. The class exemption invoked by PNWR does not provide for retroactive effectiveness. *See Cent. N.Y. R.R.—Lease & Operation Exemption Including Interchange Commitment—Norfolk S. Ry.,* FD 36825, slip op. at 2 n.3 (STB served Mar. 28, 2025).

[5] Concurrent with the initial filing of its verified notice of exemption, PNWR filed, under seal, portions of the amended lease. *See* 49 CFR 150.43(h)(1) (providing that certain information related to interchange commitments, such as copies of agreements, will be kept confidential without an accompanying motion for a protective order). In its April 11 supplement, PNWR provided, under seal, the full amended agreement.

become effective, post a notice of its intent to undertake the proposed transaction at the workplace of the employees on the affected lines, serve a copy of the notice on the national offices of the labor unions with employees on the affected lines, and certify to the Board that it has done so. PNWR, however, has petitioned for waiver of the 60-day advance labor notice requirements. PNWR's waiver request will be addressed in a separate decision. The Board will establish the effective date of the exemption in its separate decision on the waiver request.

If the verified notice contains false or misleading information, the exemption is void ab initio. Petitions to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to revoke will not automatically stay the effectiveness of the exemption. Petitions to stay must be filed no later than May 2, 2025.

All pleadings, referring to Docket No. FD 36826, must be filed with the Surface Transportation Board either via e-filing on the Board's website or in writing addressed to 395 E Street SW, Washington, DC 20423–0001. In addition, a copy of each pleading must be served on PNWR's representative, Justin J. Marks, Clark Hill PLC, 1001 Pennsylvania Avenue NW, Suite 1300 South, Washington, DC 20004.

According to PNWR, this action is categorically excluded from environmental review under 49 CFR 1105.6(c) and from historic preservation reporting requirements under 49 CFR 1105.8(b).

Board decisions and notices are available at *www.stb.gov.*

Decided: April 22, 2025.

By the Board, Scott M. Zimmerman, Acting Director, Office of Proceedings.

**Aretha Laws-Byrum,**
*Clearance Clerk.*

[FR Doc. 2025–07192 Filed 4–24–25; 8:45 am]

**BILLING CODE 4915–01–P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

**[Docket No. FAA–2025–0605]**

## Airport Improvement Program (AIP) Grant Assurances

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation.

**ACTION:** Notice of modification of Airport Improvement Program grant assurances; opportunity to comment.

**SUMMARY:** The FAA proposes updates to the AIP grant assurances to reflect

recent legislative provisions in the FAA Reauthorization Act of 2024 as well as recently issued executive orders.

**DATES:** The FAA is implementing these modified grant assurances upon publication of this notice to expedite processing Fiscal Year 2025 grants. The FAA will accept public comments concerning these modified grant assurances for 14 days. Comments must be submitted on or before May 9, 2025. If necessary, in response to comments received, the FAA will consider appropriate revisions to these grant assurance modifications through publication of a subsequent notice in the **Federal Register**.

**ADDRESSES:** You may send comments [identified by Docket Number FAA–2025–0605] using any of the following methods:

• *Government-Wide Rulemaking Website:* Go to *http://www.regulations.gov* and follow the instructions for sending your comments electronically.

• *Mail:* Docket Operations, U.S. Department of Transportation, West Building, Ground Floor, Room W12–140, Routing Symbol M–30, 1200 New Jersey Avenue SE, Washington, DC 20590.

• *Fax:* 1–202–493–2251.

• *Hand Delivery:* To Docket Operations, Room W12–140 on the ground floor of the West Building, 1200 New Jersey Avenue SE, Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** David F. Cushing, Manager, Airports Financial Assistance Division, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone: (202) 267–8827; fax: (202) 267–5302.

**SUPPLEMENTARY INFORMATION:** A sponsor (applicant) seeking financial assistance in the form of an AIP grant for airport planning, airport development, noise compatibility planning, or noise mitigation under 49 U.S.C., as amended, or an airport development grant under the Infrastructure Investment and Jobs Act (IIJA) (Pub. L. 117–58), must agree to comply with certain assurances. These grant assurances are incorporated in and become part of a sponsor's grant agreement for Federal financial assistance. As need dictates, the FAA modifies these assurances to reflect new Federal requirements. Notice of such modifications is published in the **Federal Register**, and an opportunity for public comment is provided. The assurances that apply to a sponsor depend on the type of sponsor.

There are four types of grant assurances:

• Airport Sponsor (applicable for airport development);
• Non-Airport Sponsors Undertaking Noise Compatibility Program Projects;
• Planning Agency Sponsors; and
• Aviation State Block Grant Program.

The current assurances were published on May 2, 2022, at 87 FR 25691. Prior to the FAA Reauthorization Act of 2024 (Pub. L. 118–63), the assurances were published on:

• February 3, 1988, at 53 FR 3104 and amended on September 6, 1988, at 53 FR 34361;
• August 29, 1989, at 54 FR 35748;
• June 10, 1994, at 59 FR 30076;
• January 4, 1995, at 60 FR 521;
• June 2, 1997, at 62 FR 29761;
• August 18, 1999, at 64 FR 45008;
• August 24, 2004, at 69 FR 52057 and amended on March 29, 2005, at 70 FR 15980;
• March 18, 2011, at 76 FR 15028;
• April 13, 2012, at 72 FR 22376;
• April 3, 2014, at 79 FR 18755;
• February 28, 2020, at 85 FR 12048; and
• May 2, 2022, at 84 FR 25691.

A complete list of the current grant assurances may be viewed at: *https://www.faa.gov/airports/aip/grant_assurances.*

## Discussion of Grant Assurance Modifications

The FAA is making five changes to the grant assurances. These changes will be in effect for grants issued in fiscal year 2025 and beyond. The changes to the grant assurances are as follows:

*Removal of Executive Orders*

Executive Order 11246—Equal Employment Opportunity
Executive Order 12898—Environmental Justice
Executive Order 13985—Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government
Executive Order 13988—Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation
Executive Order 14008—Tackling the Climate Crisis at Home and Abroad

*Additions to Federal Legislation and List of Executive Orders*

Infrastructure Investment and Jobs Act, Public Law 117–58, Title VIII
Executive Order 14149—Restoring Freedom of Speech and Ending Federal Censorship
Executive Order 14151—Ending Radical and Wasteful Government DEI Programs and Preferencing

Executive Order 14154—Unleashing American Energy
Executive Order 14168—Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
Executive Order 14173—Ending Illegal Discrimination and Restoring Merit-Based Opportunity

*Updates to Grant Assurances 1, General Federal Requirements*

The FAA updated the introductory paragraph of Grant Assurance 1 to include the following language:
"Performance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Sponsor and any applicable subrecipients. The applicable provisions to this agreement include, but are not limited to, the following:"

*Updates to Grant Assurances 5, Preserving Rights and Powers, and 29, Airport Layout Plan*

The FAA updated Grant Assurances 5 and 29 to conform with Section 743 of the FAA Reauthorization Act of 2024 (Pub. L. 118–63).

*Updates to Grant Assurance 30, Civil Rights*

The FAA updated Grant Assurance 30 to conform with Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing.

*Addition of Assurance 40, Access to Leaded Aviation Fuel*

The FAA has added Grant Assurance 40 that requires an airport owner or operator that made any 100-octane low lead aviation gasoline (100LL) available at such airport, at any time during calendar year 2022, to not restrict or prohibit the sale of or self-fueling with 100-octane low lead aviation gasoline. This requirement remains until the earlier of December 31, 2030, or the date on which the airport or any retail fuel seller at the airport makes available an unleaded aviation gasoline that has been authorized for use by the Administrator of the Federal Aviation Administration as a replacement for 100-octane low lead aviation gasoline for use in nearly all piston-engine aircraft and engine models; and meets either an industry consensus standard or other standard that facilitates the safe use, production, and distribution of such unleaded aviation gasoline, as determined appropriate by the Administrator. Violations are subject to civil penalties in accordance with 49 U.S.C. 46301(a)(8).

## Authority for Grant Assurance Modifications

This notice is published under the authority described in Subtitle VII, Part B, Chapter 471, Sections 47107 and 47122 of Title 49 United States Code (U.S.C.). In addition, the statutory authorities delegated to the Federal Aviation Administration are enumerated in Title 49 Code of Federal Regulations (CFR) 1.83 ("Delegations to the Federal Aviation Administration").

Issued in Washington, DC, on April 22, 2025.

**David F. Cushing,**
*Manager, Airports Financial Assistance Division.*

[FR Doc. 2025–07224 Filed 4–24–25; 8:45 am]
**BILLING CODE 4910–13–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Railroad Administration

**Safety Advisory 2025–01; Proper Configuration of Grand Master 4000 and 4000A Switch Machines To Prevent Unintended Switch Movement**

**AGENCY:** Federal Railroad Administration (FRA), Department of Transportation (DOT).
**ACTION:** Notice of safety advisory.

**SUMMARY:** FRA is issuing Safety Advisory 2025–01 to heighten awareness within the rail industry of the potential for unintended movement of Grand Master 4000 and 4000A switch machines. Improper configuration of these machines could allow power to be present at the switch machine controller when locking is in effect, creating the potential for unintended switch movement underneath or in front of a train.

**FOR FURTHER INFORMATION CONTACT:** Scott Johnson, Part 236 Subject Matter Expert, Signal, Train Control and Crossings Division, Office of Railroad Safety, FRA, 1200 New Jersey Ave. SE, Washington, DC 20590, 406–210–3608, *scott.j.johnson@dot.gov.*

*Disclaimer:* This Safety Advisory is considered guidance pursuant to DOT Order 2100.6A (June 7, 2021). Except when referencing laws, regulations, policies, or orders, the information in this Safety Advisory does not have the force and effect of law and is not binding in any way. This document does not review or replace any previously issued guidance.

**SUPPLEMENTARY INFORMATION:**

## Background

The Grand Master 4000 and 4000A is an electric switch machine designed to