ANDREW JANZ (SBN 287672)*
City Attorney
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084
* *Application for admission pro hac vice
forthcoming*

*Attorney for Plaintiff*
CITY OF FRESNO

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF EUREKA; CITY
OF SOUTH LAKE TAHOE; COUNTY OF
SACRAMENTO; COUNTY OF MONROE;
MONROE COUNTY AIRPORT AUTHORITY

LYNDSEY OLSON (MN Lic. #0332288)*
Saint Paul City Attorney
Lyndsey.olsen@ci.stpaul.mn.us
KELSEY MCELVEEN (MN Lic. #0396744)*
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone: (651) 266-8710
Facsimile (651) 298-5619
* *Application for admission pro hac vice
forthcoming*

*Attorneys for Plaintiff*
CITY OF SAINT PAUL

MELISSA C. ALLISON (MA Bar No. 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL
(MA Bar No. 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500
* *Application for admission pro hac vice
forthcoming*

*Attorneys for Plaintiffs*
COUNTY OF MONROE
MONROE COUNTY AIRPORT AUTHORITY

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO et al.<br><br>        Plaintiffs,<br><br>v.<br><br>SCOTT TURNER et al.<br><br>        Defendants. | Case No.: 3:25-cv-07070-RS<br><br>**DECLARATION OF JENNIFER CLARK IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**<br><br>Complaint Filed: August 20, 2025 |

I, Jennifer Clark, declare:

1.     I am over the age of 18 years, am competent to testify as to the matters in this declaration, and make this declaration based on my own personal knowledge.

2.     I am the Director of Planning and Development for the City of Fresno (the "City").  As the Director of Planning and Development, I am responsible for ensuring the department is equipped with resources and proper funding to effectuate its purpose of assisting, regulating, and preserving residential and commercial development within the City.

3.     My department strives to maintain the aesthetic beauty of Fresno, as well as the sustainable management of our land and water resources and public infrastructure, while enhancing the quality of life of residents and ensuring the protection of public health, safety, and welfare within the City.

## FEDERAL GRANTS IN THE CITY OF FRESNO

4.     The EPA's Brownfields and Land Revitalization Program provides funds to states, Tribal Nations, communities, and other stakeholders to work together to prevent, assess, safely clean up, and sustainably reuse contaminated or potentially contaminated properties, commonly referred to as "brownfields."  *See* U.S. Environmental Protection Agency, EPA Brownfields Revolving Loan Fund Grants Program Overview, https://www.epa.gov/system/files/documents/2022-08/Program%20Overview_RLF.pdf.  Revolving Loan Fund (RLF) Grants provide funding to a grant recipient for capitalizing an RLF program.  RLF programs provide loans and subgrants to eligible entities to carry out cleanup activities at brownfield sites contaminated with hazardous substances.

5.     Since 2015, the City's Planning and Development Department has successfully leveraged multiple EPA Brownfields grants to assess and remediate contaminated properties in the City's most underserved neighborhoods.

6.     On November 7, 2024, the City submitted a Fiscal Year 2025 Community-Wide Assessment (CWA) grant application.

7.     On March 26, 2025, the City submitted a Fiscal Year 2025 Revolving Loan Fund (RLF) supplemental funding request to the EPA's Program Officer on March 26, 2025.

8.      In May 2025, the City was notified that both the CWA and the RLF were selected for award.

9.      On August 5, 2025, the EPA awarded the City a $1,750,000 Brownfields RFL grant[1] for the budget period of 1/1/2023 to 12/31/2030.  The award states, "Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carryout this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date." This is an award amendment, and the amendment mailing date is August 8, 2025. Accordingly, the City must decide whether to accept this award or file a notice of disagreement by August 26, 2025. (Attached is a true and correct copy of EPA Notice of Award as Exhibit A.)

10.     The EPA has also selected the City for a Brownfields Assessment grant of $500,000.  The City has not yet received the finalized award letter or the grant agreement but anticipates receiving the final grant agreement to be issued imminently. (Attached is a true and correct copy of EPA Award Letter as Exhibit B.)

11.     The RLF grant and the Assessment grant are subject to the EPA's General Terms and Conditions, which were amended in April of 2025 to include a new condition requiring recipients to agree "that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the Federal Claims Act]; and (B) the recipient certifies that it does not operate any programs promoting Diversity, Equity and Inclusion that violate any applicable Federal anti-discrimination laws." (Attached is a true and correct copy of the U.S. Environmental Protection Agency, EPA General Terms and Conditions effective October 1, 2024, as Exhibit C.)

12.     Although EPA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, recent executive orders and guidance have interpreted anti-discrimination laws to be broader than previously understood.  Furthermore, the condition requiring recipients to certify that compliance "in all respects with all applicable Federal anti-discrimination laws" is always "material"

---

[1] The City had previously been awarded a $1,000,000 Brownfields RFL grant. The August 5, 20205 award was a modification added and additional $750,000 to the grant amount.

1    for purposes of the FCA requires recipients to concede a vague and overbroad legal conclusion, thereby

2    exposing the City to legal liability.

3         13.    If the City is not able to accept the above grants, it will lose over $1.2 million in federal

4    funding that has already been awarded and appropriated for brownfield cleanup and redevelopment.

5    Without these funds, the City will be unable to proceed with critical remediation projects that address

6    hazardous substance contamination, impede redevelopment of blighted properties, and protect public

7    health and the environment.  The loss of funding would not only delay or halt ongoing cleanup and

8    revitalization efforts but would also deprive the community of associated economic development,

9    housing, and job creation opportunities that depend on the successful implementation of these projects.

10

11        I declare under penalty of perjury of the laws of California and the United States of America that

12   the foregoing is true and correct.  Executed at Sacramento, California on August 21, 2025.

13

14

15   Jennifer Clark
     Director of Development
16   City of Fresno

Docusign Envelope ID: 670C5EF8-5B28-4FB2-A2A9-D688536AA9D5



EXHIBIT A

4B - 98T50501 - 2    Page 1

| | | GRANT NUMBER (FAIN): 98T50501 | |
|---|---|---|---|
| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Assistance Amendment | MODIFICATION NUMBER:  2 PROGRAM CODE:  4B | DATE OF AWARD 08/05/2025 |
| | | TYPE OF ACTION Augmentation: Increase | MAILING DATE 08/08/2025 |
| | | PAYMENT METHOD: ASAP | ACH# 90512 |

| RECIPIENT TYPE: Municipal | Send Payment Request to: Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| Fresno, City of 2600 FRESNO STREET FRESNO, CA 93721-3620 EIN:  94-6000338 | Fresno, City of 2600 FRESNO STREET FRESNO, CA 93721-3620 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| David Densley 2600 FRESNO ST. FRESNO, CA 93721 **Email:** david.densley@fresno.gov **Phone:** 559-621-8473 | Jorine Campopiano 75 Hawthorne Street, LND-2-1 San Francisco, CA 94105 **Email:**  Campopiano.Jorine.K@epa.gov **Phone:** 415-972-3399 | Janelle Freeman Grants Branch, MSD-6 75 Hawthorne Street San Francisco, CA 94105 **Email:**  Freeman.Janelle@epa.gov **Phone:** 415-972-3399 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Brownfields Revolving Loan Fund (RLF) Cooperative Agreement - BIL Cleanup Program

Brownfields are real property, the expansion, development or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant. This agreement will provide funding under the Infrastructure Investment and Jobs Act for the City of Fresno, California to re-capitalize a revolving loan fund as authorized by CERCLA 104(k)(5)(A)(ii) in the City of Fresno, California.

This amendment provides additional federal funding in the amount of $750,000 and extends the project/budget end dates to 12/31/2030. Subawards are included in this assistance agreement. See general terms and conditions.

| BUDGET PERIOD 01/01/2023 - 12/31/2030 | PROJECT PERIOD 01/01/2023 - 12/31/2030 | TOTAL BUDGET PERIOD COST $ 1,750,000.00 | TOTAL PROJECT PERIOD COST $ 1,750,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 06/06/2025 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 750,000.00. EPA agrees to cost-share <u>100.00%</u> of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 1,750,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 9, U.S. EPA, Region 9 Grants Branch, MSD-6 75 Hawthorne Street San Francisco, CA 94105 | U.S. EPA, Region 9, Land, Chemicals and Redevelopment, LND-1 R9 - Region 9 75 Hawthorne Street San Francisco, CA 94105 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Ellen Blake - Acting Grants Management Officer | DATE 08/05/2025 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 1,000,000 | $ 750,000 | $ 1,750,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 1,000,000 | $ 750,000 | $ 1,750,000 |

| Assistance Program | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.818 - Brownfields Multipurpose, Assessment, Revolving Loan Fund, and Cleanup Cooperative Agreements | CERCLA: Secs. 104(k)(3) & 104(k)(5)(E) & 104(k)(10)(B)(iii) & Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2509QE0066 | 25 | E4SD | 0900AG7 | 000D79X89 | 4114 | - | - | $ 750,000 |
| | | | | | | | | | $ 750,000 |

4B - 98T50501 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 180,000 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 8,250 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 101,750 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,447,000 |
| 9. Total Direct Charges | $ 1,737,000 |
| 10. Indirect Costs: 0.00 % Base : See General Terms and Conditions | $ 13,000 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 1,750,000 |
| 12. Total Approved Assistance Amount | $ 1,750,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 750,000 |
| 15. Total EPA Amount Awarded To Date | $ 1,750,000 |

# Administrative Conditions

All previous Administrative Terms and Conditions remain the same except condition C is removed and condition D is added.

**C. MBE WBE Reporting** - Deleted. Refer to RAIN-2025-G02 (https://www.epa.gov/grants/rain-2025-g02)

**D.  Subaward(s)**

The recipient's approved budget includes subaward(s). As applicable, the recipient will comply with the General Term and Condition on reporting of first tier subawards to the System for Award Management (SAM.gov) per "Reporting Subawards and Executive Compensation" requirement.

## General Terms and Conditions

The General Terms and Conditions of this agreement are updated in accordance with the link below. However, these updated conditions apply solely to the funds added with this amendment and any previously awarded funds not yet disbursed by the recipient as of the award date of this amendment. The General Terms and Conditions cited in the original award or prior funded amendments remain in effect for funds disbursed by the recipient prior to the award date of this amendment.

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later

These terms and conditions are binding for disbursements and are in addition to or modify the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

# Programmatic Conditions

Previous Programmatic Terms and Conditions are superceded by the following conditions. These conditions apply henceforth.

FY25 Brownfields Revolving Loan Fund (RLF) Cooperative Agreement Infrastructure Investment and Jobs Act Funds Terms and Conditions

Please note that these Terms and Conditions (T&Cs) apply to Brownfields RLF capitalization cooperative agreements awarded under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) § 104(k) and the Infrastructure Investment and Jobs Act (IIJA), as well as, agreements that transitioned to § 104(k), or agreements which have been amended after 12/24/14.

## I. GENERAL FEDERAL REQUIREMENTS

Note: For the purposes of complying with certain provisions of the Uniform Grants Guidance (UGG), 2 CFR Part 200, loans made by RLF recipients are Subawards as that term is defined at 2 CFR § 200.1. The term subaward also encompasses "grants" made by the RLF recipient under CERCLA § 104(k)(3)(B)(ii). The UGG requirements for subawards in the form of loans and subawards in the form of grants are different. For clarity, these T&Cs refer to "loans" to describe subawards that generate program income from repayments of principal, interest charges, and loan processing fees paid by "borrowers." The T&Cs refer to "subgrants" to describe subawards the RLF recipient provides to an eligible entity or nonprofit organization ("subgrantees") under terms that do not require repayment.

a.] Federal Policy and Guidance

1. Cooperative Agreement Recipients: By awarding this cooperative agreement, the Environmental Protection Agency (EPA) has approved the application for the Cooperative Agreement Recipient (CAR). These T&Cs are effective for activities occurring after the date of amendment of this cooperative agreement.

EPA has conditionally approved the workplan. The recipient may incur costs on eligible activities associated with the conditionally-approved workplan until a final revised workplan has been approved by the EPA Grants Management Officer or Award Official as appropriate:

a. the recipient must not request payments and EPA will not make payments for unapproved work; and

b. any costs incurred for unapproved work by the recipient are at its own risk.

2. In implementing this agreement, the CAR shall comply with and require that work done by borrowers and subgrantees with cooperative agreement funds complies with CERCLA § 104(k). The CAR shall also ensure that cleanup activities supported with cooperative agreement funding comply with all applicable Federal and state laws and regulations. The CAR must ensure cleanups are protective of human health and the environment.

3. The CAR must consider whether it is required to have borrowers or subgrantees conduct cleanups through a State or Tribal response program. If the CAR chooses not to require borrowers and subgrantees to participate in a State or Tribal response program, then the CAR is required to consult with the EPA Project Officer on each loan or subgrant to ensure the proposed cleanup is protective of human

health and the environment.

If the State or Tribe does not have a promulgated response program that is applicable to the planned brownfield activity, then the CAR is required to consult with the EPA Project Officer to ensure the protectiveness of human health and the environment.

4. A term and condition or other legally binding provision shall be included in all loan and subgrant agreements entered into with the funds awarded under this agreement, or when funds awarded under this agreement are used in combination with non-Federal sources of funds, to ensure that the CAR complies with all applicable Federal and state laws and requirements. In addition to CERCLA § 104(k), applicable Federal laws and requirements include 2 CFR Part 200.

5. The CAR must comply with Federal cross-cutting requirements. These requirements include, but are not limited to, DBE requirements found at 40 CFR Part 33 (as applicable); OSHA Worker Health & Safety Standard 29 CFR § 1910.120; Uniform Relocation Act (40 USC § 61); National Historic Preservation Act (16 USC § 470); Endangered Species Act (P.L. 93-205); Permits required by Section 404 of the Clean Water Act; Contract Work Hours and Safety Standards Act, as amended (40 USC §§ 327-333); the Anti-Kickback Act (40 USC § 3145); and Section 504 of the Rehabilitation Act of 1973, 29 USC §§ 793 and 794; 40 CFR Part 7, Subpart C. For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

6. The CAR must comply with Davis-Bacon Related Act prevailing wage requirements and associated U.S. Department of Labor (DOL) regulations for all construction, alteration, and repair contracts and subcontracts awarded with funds provided under this agreement by operation of CERCLA § 104(g). For more detailed information on complying with the Davis-Bacon Related Act, please see the Contract Provisions for Davis-Bacon and Related Acts and the Brownfields Davis-Bacon terms and conditions.

7. For funding added after May 14, 2022, refer to the General Term & Conditions for Buy America Sourcing requirements under the Build America, Buy America (BABA) provisions of the Infrastructure Investment and Jobs Act (IIJA; also known as Bipartisan Infrastructure Law or BIL) (P.L. 117-58, §§70911-70917). An adjustment period waiver may apply to funding awarded between May 14, 2022 and February 28, 2023.

8. The recipient agrees to have financial management and programmatic management systems in place to:

a. Track and report on expenditures of IIJA funds.

b. Track and report outputs and outcomes achieved with IIJA funds.

9. RLF supplemental funding is generally awarded on an annual basis to high-performing CARs who meet specific criteria. The CAR can find additional information on the timing and procedures for supplemental funding requests on the EPA Brownfields Program website (https://www.epa.gov/brownfields/brownfields-revolving-loan-fund-rlf-grants).


II. SITE/BORROWER/SUBGRANTEE ELIGIBILITY REQUIREMENTS

All brownfield sites that will be addressed using RLF funds must be located within the geographic boundary described in the scope of work for this cooperative agreement (i.e., the EPA-approved workplan).

a.] Brownfield Site Eligibility

1. Prior to performing site work, the CAR must provide information to the EPA Project Officer about each site that will be addressed under this cooperative agreement. The CAR may use cooperative agreement funds to prepare information that is provided to the EPA Project Officer. The information that must be provided includes whether the site meets the definition of a brownfield site as defined in § 101(39) of CERCLA and whether the CAR is a potentially responsible party under CERCLA § 107, is exempt from CERCLA liability, or has a defense to CERCLA liability.

2. If the site is excluded from the general definition of a brownfield site but is eligible for a property-specific funding determination, then the CAR may request a property-specific funding determination from the EPA Project Officer. In its request, the CAR must provide information sufficient for EPA to make a property-specific funding determination on how financial assistance will protect human health and the environment, and either promote economic development or enable the creation of, preservation of, or addition to parks, greenways, undeveloped property, other recreational property, or other property used for nonprofit purposes. The CAR must not incur costs for cleaning up sites requiring a property-specific funding determination by EPA until the EPA Project Officer has advised the CAR that EPA has determined that the property is eligible.

3. Brownfield Sites Contaminated with Petroleum

a. For any petroleum-contaminated brownfield site that is not included in the CAR's EPA-approved workplan, the CAR shall provide sufficient documentation to EPA prior to incurring costs under this cooperative agreement which documents that:

i. the State determines there is "no viable responsible party" for the site;

ii. the State determines that the person assessing, investigating, or cleaning up the site is a person who is not potentially liable for cleaning up the site; and

iii. the site is not subject to any order issued under Section 9003(h) of the Solid Waste Disposal Act.

This documentation must be prepared by the CAR or the State, following contact and discussion with the appropriate state petroleum program official. Please contact the EPA Project Officer for additional information.

b. Documentation must include:

i. the identity of the State program official contacted;

ii. the State official's telephone number;

iii. the date of the contact; and

iv. a summary of the discussion relating to the State's determination that there is no viable responsible

party and that the person assessing, investigating, or cleaning up the site is not potentially liable for cleaning up the site.

Other documentation provided by a State to the recipient relevant to any of the determinations by the State must also be provided to the EPA Project Officer.

c. If the State chooses not to make the determinations described in Section II.A.3. above, the CAR must contact the EPA Project Officer and provide the information necessary for EPA to make the requisite determinations.

d. EPA will make all determinations on the eligibility of petroleum-contaminated brownfield sites located on tribal lands (i.e., reservation lands or lands otherwise in Indian country, as defined at 18 U.S.C. § 1151). Before incurring costs for these sites, the CAR must contact the EPA Project Officer and provide the information necessary for EPA to make the determinations.

b.] Borrower and Subgrantee Eligibility

1. The CAR may provide loans to an eligible entity, a site owner, a site developer, or another person without regard to whether the borrower is a for-profit organization. Borrowers do not have to own the property throughout the term of the loan unless ownership is required for the purpose of securing collateral or the CAR otherwise determines that borrower site ownership is necessary.

2. The CAR may only provide cleanup subgrants to an eligible entity or nonprofit organization to clean up sites owned by the eligible entity or nonprofit organization at the time of the award of the subgrant. Eligible subgrantees include eligible entities as defined under CERCLA § 104(k)(1), which includes nonprofit organizations exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, and other nonprofit organizations as defined at 2 CFR § 200.1. Nonprofit institutions of higher education as defined at 2 CFR § 200.1 are also eligible for cleanup subgrants. Nonprofit organizations described in Section 501(c)(4) of the Internal Revenue Code that do not engage in lobbying activities with the Federal government as defined in Section 3 of the Lobbying Disclosure Act of 1995 are eligible for loans and subgrants. Nonprofit organizations with 501(c)(4) tax exemption status that lobby the Federal government are not eligible for loans and subgrants.

3. The subgrantee must retain ownership of the site throughout the period of performance of the subgrant. The subgrantee must consult with the CAR, who in turn must consult with the EPA Project Officer prior to transferring title or otherwise conveying the real property comprising the site during the period of performance of the subgrant. Once the subgrant ends, the statutory ownership requirement is extinguished. For the purposes of this agreement, the term "owns" means fee simple title unless the EPA Project Officer approves a different ownership arrangement.

4. The CAR shall not provide a subgrant to itself or another component of its own unit of government or organization.

5. The CAR may discount loans, also referred to as the practice of forgiving a portion of loan principal. For an individual loan, the amount of principal discounted may be any percentage of the total loan amount up to 50%, provided that the total amount of the principal forgiven for that loan shall not exceed $500,000 of the CAR's total award amount (EPA funds + cost share, if applicable – see Section IV.A.1. and IV.B.3.). Eligible entities and nonprofit organizations described in Section II.B.1. are eligible for discounted loans. Private, for-profit entities are not eligible for discounted loans. In addition to these

terms, a discounted loan shall not be used in combination with a subgrant at the same site. The discounted amount in a discounted loan shall apply towards non-loan costs in the 50/50 split rule described in Section IV.B.4. (i.e., the discounted amount cannot apply towards the 50% of EPA funds + cost share, if applicable – see Section IV.A.1., that must be spent on loans and associated eligible programmatic expenses. The CAR may request a waiver of the discounted amount, discounted percentage, or the minimum 50/50 split by consulting with the EPA Project Officer for information about the waiver process. In general, a loan may not be discounted after it has already been executed. Any post-execution discounting has to be approved by the EPA Project Officer.

6. The CAR shall not loan or subgrant funds that will be used to pay for cleanup activities at a site for which a borrower or subgrantee is potentially liable under CERCLA § 107. In addition, the borrower or subgrantee may not be affiliated with a potentially liable person as described in CERCLA §§ 101(40) and 107(q)(1)(A)(ii). The CAR may rely on its own investigation which can include an opinion from the borrower's or subgrantee's counsel. However, the CAR must advise the borrower or subgrantee that the investigation and/or opinion of its subgrantee counsel is not binding on the Federal Government.

7. For approved eligible petroleum-contaminated brownfield sites, the borrower or subgrantee cleaning up the site must not be potentially liable for cleaning up the site. For brownfield grant purposes, an entity generally will not be considered potentially liable for petroleum contamination if it has not dispensed or disposed of petroleum or petroleumproduct at the site, has not exacerbated the contamination at the site, and has taken reasonable steps with regard to the contamination at the site.

8. The CAR shall maintain sufficient documentation supporting and demonstrating the eligibility of the sites, borrowers, and subgrantees.

9. A borrower or subgrantee must submit information regarding its overall environmental compliance history including any penalties resulting from environmental non-compliance at the site subject to the loan or subgrant. The CAR, in consultation with EPA, must consider this history in its analysis of the borrower or subgrantee as a cleanup and business risk.

10. An entity that is currently suspended, debarred, or otherwise declared ineligible cannot be a borrower or subgrantee. Refer to EPA's General Term and Condition "Suspension and Debarment" for additional information on this requirement.

c.] Obligations for CARs, Borrowers, or Subgrantees

1. CARs, borrowers, or subgrantees who are eligible, or seek to become eligible, to receive a loan or subgrant must provide information indicating that cooperative agreement funds will not be used to pay for a response cost at a site for which the CAR, borrower, or subgrantee is potentially liable under CERCLA § 107. The CAR, borrower, or subgrantee must demonstrate that it meets the requirements for one of the Landowner Liability Protections as either a Bona Fide Prospective Purchaser (BFPP), Contiguous Property Owner (CPO), or Innocent Landowner (ILO). These requirements include certain threshold criteria and continuing obligations that must be met in order for the CAR, borrower, or subgrantee to maintain its eligible status. If the CAR, borrower, or subgrantee fails to meet these obligations, EPA may disallow the costs incurred under this cooperative agreement for cleaning up the site under CERCLA § 104(k)(8)(C). The Landowner Liability Protection requirements include:

a. Performing "all appropriate inquiries" into the previous ownership and uses of the property before acquiring the property.

b. Not being potentially liable or affiliated with any other person who is potentially liable for response costs at the site through: any direct or indirect familial relationship, any contractual, corporate, or financial relationship, or through the result of a reorganized business entity that was potentially liable.

While not necessary to obtain ILO protection, the CAR, borrower, or subgrantee must still establish by a preponderance of the evidence that the act or omission that caused the release or threat of release of hazardous substances and any resulting damages were caused by a third party with whom the person does not have an employment, agency, or contractual relationship.

c. Demonstrating that no disposal of hazardous substances occurred at the facility after acquisition by the landowner (does not specifically apply for the CPO protection).

d. Taking "reasonable steps" with respect to hazardous substance releases by stopping any continuing releases, preventing any threatened future releases, and preventing or limiting human, environmental, or natural resource exposure to any previously released hazardous substance.

e. Complying with any land use restrictions established or relied on in connection with the response action at the site and not impeding the effectiveness or integrity of institutional controls employed in connection with the response action.

f. Providing full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource restoration at the site from which there has been a release or threatened release.

g. Complying with information requests and administrative subpoenas (does not specifically apply for the ILO protection).

h. Providing all legally required notices with respect to the discovery or release of any hazardous substances at the site (does not specifically apply for the ILO protection).

Notwithstanding the CAR's, borrower's, and subgrantee's continuing obligations under this agreement, the CAR, borrower, and subgrantee are subject to the applicable liability provisions of CERCLA governing its status as a BFPP, CPO, or ILO. CERCLA requires additional obligations to maintain the liability limitations for BFPP, CPO, and ILO; the relevant provisions for these obligations include §§ 101 (35), 101(40), 107(b), 107(q) and 107(r).

CARs, borrowers, and subgrantees that are exempt from CERCLA liability or do not have to meet the requirements for asserting an affirmative defense to CERCLA liability must also comply with continuing obligation items c.-h.


III. GENERAL COOPERATIVE AGREEMENT ADMINISTRATIVE REQUIREMENTS

a.] Sufficient Progress

1. This condition supplements the requirements of the Termination and Sufficient Progress Conditions in the General Terms and Conditions.

The EPA Project Officer will assess whether the recipient is making sufficient progress in implementing the cooperative agreement 2 years from the date of award and on an annual basis thereafter. If EPA determines that the CAR has not made sufficient progress in implementing the cooperative agreement, the CAR, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Grants Management Officer or Award Official. Alternatively, EPA may terminate this agreement under 2 CFR § 200.340 either for material non-compliance with its terms or with the consent of the CAR, depending on the circumstances. Sufficient progress at 2 years and annually thereafter is indicated by the CAR having made a loan(s) and/or grant(s), but may also be demonstrated by a combination of all the following: hiring of all key personnel, the establishment and advertisement of the RLF, the development of one or more potential loans/subgrants, or other documented activities that demonstrate to EPA's satisfaction that the CAR will successfully perform the cooperative agreement.

2. Partial termination can occur if a CAR fails to complete the initial round of lending in the time schedule provided in the cooperative agreement. In this situation, as provided at 2 CFR § 200.340(a), the agreement may be partially terminated and the following actions may occur:

a. Unused cooperative agreement funds will be deobligated by EPA;

b. The cooperative agreement award may be amended to reflect the reduced amount of the cooperative agreement;

c. EPA may determine whether sufficient funds remain to permit effective RLF operation; or

d. EPA may terminate the agreement and recover the Federal share of its assets if it determines that the purpose of the cooperative agreement cannot be met.

b.] Substantial Involvement

1. The EPA Project Officer will be substantially involved in overseeing and monitoring this cooperative agreement. Substantial involvement, includes, but is not limited to:

a. Close monitoring of the CAR's performance to verify compliance with the EPA-approved workplan and achievement of environmental results.

b. Participation in periodic telephone conference calls to share ideas, project successes and challenges, etc., with EPA.

c. Reviewing and commenting on quarterly and annual reports prepared under the cooperative agreement (the final decision on the content of reports rests with the recipient or subrecipients receiving pass-through awards).

d. Verifying sites meet applicable site eligibility criteria (including property-specific funding determinations described in Section II.A.2.), including when the CAR awards a subaward. The CAR must obtain technical assistance from the EPA Project Officer, or his/her designee, on which sites qualify as a brownfield site and determine whether the statutory prohibitions found in CERCLA § 104(k)(5)(B)(i)-(iv) apply. (Note, the prohibition does not allow a subrecipient to use EPA cooperative agreement funds to clean up a site for which the subrecipient is potentially liable under CERCLA § 107.)

e. Reviewing and approving Quality Assurance Project Plans and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved Quality Assurance Management Plan.

f. Monitoring the use of program income after the cooperative agreement project period ends.

Substantial involvement may also include, depending on the direction of the EPA Project Officer:

g. Collaboration during the performance of the scope of work including participation in project activities, to the extent permissible under EPA policies. Examples of collaboration include:

i. Consultation between EPA staff and the CAR on effective methods of carrying out the scope of work provided the CAR makes the final decision on how to perform authorized activities.

ii. Advice from EPA staff on how to access publicly available information on EPA or other Federal agency websites.

iii. With the consent of the CAR, EPA staff may provide technical advice to the CAR's contractors or subrecipients provided the CAR approves any expenditures of funds necessary to follow advice from EPA staff. (The CAR remains accountable for performing contract and subaward management as specified in 2 CFR § 200.318 and 2 CFR § 200.332 as well as the terms of the EPA cooperative agreement.)

iv. EPA staff participation in meetings, webinars, and similar events upon the request of the CAR or in connection with a co-sponsorship agreement.

h. Reviewing and approving that the Analysis of Brownfield Cleanup Alternatives (ABCA), or equivalent state Brownfields program document, meets the Brownfields Program's requirements for an ABCA.

i. Reviewing proposed procurements in accordance with 2 CFR § 200.325, as well as the substantive terms of proposed contracts or subawards (i.e., both subgrants and loans) as appropriate and discussing compliance with 50/50 split rule. If applicable, the EPA Project Officer may review the substantive terms of intra-governmental loans. The EPA Project Officer may review requests for proposals, invitations for bids, scopes of work, and/or plans and specifications for contracts over $250,000 prior to advertising for bids.

j. Reviewing the qualifications of key personnel. (EPA does not have the authority to select employees or contractors, including consultants, employed by the CAR or subrecipients receiving pass-through awards.)

k. Reviewing information in performance reports to ensure all costs incurred by the CAR, borrower, subgrantee, and/or its contractor(s) if needed to ensure appropriate expenditure of grant funds.

EPA may waive any of the provisions in Section III.B.1., except for property-specific funding determinations. The EPA Project Officer will provide waivers to provisions a. – f. in Section III.B.1. in writing.

2. Effects of EPA's substantial involvement include:

a. EPA's review of any project phase, document, or cost incurred under this cooperative agreement will not have any effect upon CERCLA § 128 Eligible Response Site determinations or rights, authorities, and actions under CERCLA or any Federal statute.

b. The CAR remains responsible for ensuring that all cleanups are protective of human health and the environment and comply with all applicable Federal and state laws. If changes to the expected cleanup become necessary based on public comment or other reasons, the CAR must consult with the EPA Project Officer and the State.

c. The CAR and its subrecipients remain responsible for ensuring costs are allowable under 2 CFR Part 200, Subpart E.

c.] Cooperative Agreement Recipient Roles and Responsibilities

1. All additional sites selected for eligible activities throughout the period of performance (i.e., sites that were not identified in the workplan) must be located within the geographic boundary(ies) identified by the CAR in the workplan.

If the CAR has another open RLF cooperative agreement that was awarded in FY23 or later, criteria for selecting additional sites should consider the prioritization criteria identified in the FY23 or later application, FY23 or later RLF Supplemental Funding request, the workplan, or developed during implementation of the workplan. Note, subgrant criteria developed during the implementation of the workplan should lead to the CAR addressing sites in areas with similar characteristics to the areas discussed in the FY23 or later application or FY23 or later Supplemental Funding request.

2. CARs, other than state or Tribal entities, that procure a contractor(s) (including consultants) where the contract will be more than the micro-purchase threshold in 2 CFR § 200.320(a)(1) ($10,000 for most CARs) must select the contractor(s) in compliance with the competitive procurement standards in 2 CFR Part 200 (including the requirements for full and open competition). Additionally, all CARs (including State and Tribal entities), regardless of the contract amount, must comply with EPA's regulations at 40 CFR Part 33 as applicable. For additional information on these requirements, see https://www.epa.gov/grants/rain-2025-g02 and the "Utilization of Disadvantaged Business Enterprises" General Term and Condition of this agreement. These requirements also apply to procurement processes that were completed before the award of this cooperative agreement, to include if the CAR intends to submit payment requests for pre-award costs. See the Brownfields Grants: Guidance on Competitively Procuring a Contractor for additional information.

CARs may procure multiple contractors to ensure the appropriate expertise is in place to perform work under the agreement (e.g., expertise to provide oversight on site cleanup activities vs. community engagement) and to allow the ability for work be performed concurrently at multiple sites within the defined and approved geographic boundary.

3. The CAR is responsible for establishing an RLF team that will implement the program and assign a Program Manager for coordinating the team's activities as outlined below.

4. The CAR must acquire the services of a Qualified Environmental Professional(s) as defined in 40 CFR § 312.10, if it does not have such a professional on staff, to provide technical assistance, advice, and expertise to the CAR while the borrower or subgrantee and their cleanup contractor direct the cleanup at a given site.

5. The CAR shall act as or appoint a qualified "fund manager" to carry out responsibilities that relate to financial management of the loan and/or subgrant program. However, the CAR remains accountable to EPA for the proper expenditure of cooperative agreement funds. Any funding arrangements between the CAR and the fund manager must be consistent with 2 CFR Parts 200 and 1500 and EPA's Subaward Policy. Additional information is available in EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

6. The CAR shall appoint appropriate legal counsel if counsel is not already available. Counsel must review all loan/subgrant agreements prior to execution unless the EPA Project Officer waives this requirement.

7. The CAR is responsible for ensuring that borrowers and subgrantees comply with the terms of their agreements with the CAR, and that agreements between the CAR and borrowers and subgrantees are consistent with the terms and conditions of this agreement.

8. When the CAR makes loans and subgrants under this agreement, they become a pass-through entity for the purposes of the subrecipient oversight and management requirements of 2 CFR §§ 200.331 through 200.332. Requirements for oversight and management of subgrantees are supplemented in EPA's National Term and Condition for Subawards "Establishing and Managing Subawards" which is included in the General Terms and Conditions of this Cooperative Agreement.

9. The following requirements apply when a pass-through entity (CAR) makes loans. These requirements apply to loans and borrowers in lieu of those specified in EPA's "Establishing and Managing Subawards" National Term and Condition for Subawards.

a. Pass-through entities must establish and follow a system that ensures all loan agreements are in writing and contain all of the elements required by 2 CFR § 200.332(b) with the exception of the indirect cost provision of 2 CFR § 200.332(b)(4), the applicability of the Procurement Standards in 2 CFR Part 200, and the "Consultant Fee Cap" described in 2 CFR 1500.10. EPA has developed an optional template for subaward agreements that is available in Appendix D of EPA's Subaward Policy which may also be used for loan agreements.

b. Borrowers must comply with the internal control requirements specified at 2 CFR § 200.303 and are subject to the 2 CFR Part 200, Subpart F, Audit Requirements. The pass-through entity (CAR) must include a condition in all loans that requires borrowers to comply with this requirement. No other provisions of the Uniform Grants Guidance, including the Procurement Standards, apply directly to borrowers.

c. Prior to making loans or subgrants, the pass-through entity (CAR) must ensure that each borrower or subgrantee has a "unique entity identifier."This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR § 200.332(b)(1), but based on 2 CFR § 25.300, borrowers and subgrantees do not have to register in SAM. The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's (CAR's) agreement with EPA entitled "System for Award Management and Universal Identifier Requirements."

d. The pass-through entity (CAR) must ensure that the terms of all loan agreements and subgrants require that borrowers and subgrantees comply with 2 CFR Part 170, Reporting Subaward and Executive Compensation under Federal Funding Accountability and Transparency Act (FFATA) set forth in the

General Condition of the pass-through entity's (CAR's) agreement with EPA entitled "Reporting Subawards and Executive Compensation."

e. In addition to other prudent lending practices described, in Section VI. below, pass-through entities (CARs) must comply with EPA's General T&Cs (Establishing and Managing Subawards).

10. As the pass-through entity, the CAR must report to EPA on its borrower and subgrantee monitoring activities under 2 CFR § 200.332(e), including the following information as part of the CAR's quarterly performance reporting:

a. Summaries of results of reviews of financial and programmatic reports;

b. Summaries of findings from site visits and/or desk reviews to ensure effective borrower or subgrantee performance;

c. Environmental results the borrower or subgrantee achieved;

d. Summaries of audit findings and related pass-through entity management decisions, if any; and

e. Actions the pass-through entity has taken to correct any deficiencies such as those specified at 2 CFR § 200.332(d), (f), and (i); 2 CFR § 200.208, Specific conditions; and the 2 CFR § 200.339, Remedies for Noncompliance.

11. Cybersecurity – The recipient agrees that when collecting and managing environmental data under this cooperative agreement, it will protect the data by following all applicable Stare or Tribal law cybersecurity requirements.

a. EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement are secure. For purposes of this section, a connection is defined as a dedicated persistent interface between an Agency Information Technology (IT) system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

b. The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in Cybersecurity Section a. above if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR § 200.332(e), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in

the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

12. All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at www.fgdc.gov.

d.] Quarterly Performance Reports

1. In accordance with the regulations at 2 CFR Parts 200 and 1500 (specifically, 2 CFR § 200.329, Monitoring and Reporting Program Performance), the CAR agrees to submit quarterly performance reports to the EPA Project Officer within 30 days after each reporting period. Initially, quarterly performance reports will be submitted via email or via the optional Quarterly Reporting function tool within the Assessment, Cleanup and Redevelopment Exchange System (ACRES). The EPA Project Officer will notify the CAR when use of the Quarterly Reporting tool within ACRES is required. Once the EPA Project Officer notifies the CAR of required use, the CAR agrees to use this tool to input quarterly performance reports directly into ACRES within 30 days after each reporting period. The reporting periods are October 1 – December 31 (1st quarter); January 1 – March 31 (2nd quarter); April 1 – June 30 (3rd quarter); and July 1 – September 30 (4th quarter). If a due date falls on a weekend or holiday, the report will be due on the next business day.

These reports shall cover work status, work progress, difficulties encountered, preliminary data results, and a statement of activity anticipated during the subsequent reporting period, including a description of equipment, techniques, and materials to be used or evaluated. A discussion of expenditures and financial status for each workplan task, along with a comparison of the percentage of the project completed to the project schedule and an explanation of significant discrepancies from the EPA-approved workplan and budget shall be included in the report. The report shall also include any changes of key personnel concerned with the project that were approved by the EPA Grants Management Officer or Award Official. (Note, as provided at 2 CFR § 200.308, Revision of budget and program, the CAR must seek prior approval from the EPA Grants Management Officer or Award Official for a change in a key personnel (including employees and contractors) that are identified by name or position in the workplan. Prior approval means the written approval obtained in advance of a recipient taking an action by an authorized official of a Federal agency or pass-through entity of certain costs or programmatic decisions.)

2. The CAR must submit performance reports on a quarterly basis in ACRES using the Revolving Loan Fund Quarterly Report function. Quarterly performance reports must include:

a. A summary that clearly differentiates between activities completed with EPA funds provided under the Brownfield RLF cooperative agreement, including the required cost share, if applicable – see Section IV. A.1., and related activities completed with other sources of leveraged funding.

b. A summary and status of approved activities performed during the reporting quarter; a summary of the performance outputs/outcomes achieved during the reporting quarter; and a description of problems encountered during the reporting quarter that may affect the project schedule.

c. A comparison of actual accomplishments to the anticipated outputs/outcomes specified in the EPA-approved workplan and reasons why anticipated outputs/outcomes were not met.

d. An update on the project schedule and milestones, including an explanation of any discrepancies from the EPA-approved workplan.

e. A list of the loans and/or subgrants during the reporting quarter.

f. The amount of the cooperative agreement's total award amount (EPA funds + cost share, if applicable – see Section IV.A.1.) that has been committed thus far on loan costs and non-loan costs, respectively, and whether the cooperative agreement is expected to meet the 50/50 split by the end of the cooperative agreement project period for the cooperative agreement's current total award amount.

g. A budget summary table with the following information: current approved project budget; EPA funds drawn down during the reporting quarter; costs drawn down to date (cumulative expenditures); cost share contributions, if applicable – see Section IV.A.1.; program income generated and used (e.g., program income received and disbursed during the reporting quarter and during the entire cooperative agreement, and the amount of program income remaining); and total remaining funds. The budget summary table must include costs that are charged to the "other" budget object class category (e.g., subawards, etc.).

The CAR shall include an explanation of any discrepancies in the budget from the EPA-approved workplan, cost overruns or high unit costs, and other pertinent information. Program income accounting records must differentiate program income generated from interest and fees, versus program income generated from principal repayments. If significant developments occur that negatively impact the Federal Award, the CAR shall include information on their plan for corrective action and any assistance needed to resolve the situation. The CAR shall include a statement on funding transfers among direct budget categories or programs, functions and activities that occurred during the quarter and cumulatively during the period of performance.

Note: ACRES reporting requirements may change over time, based on expansion of EPA's information collection authority, and the CAR is responsible for complying with the latest ACRES reporting requirements at the time of each quarterly performance report. The EPA Project Officer will notify the CAR when ACRES reporting requirements specific to Brownfields RLF change.

h. For local governments that are using RLF funding for health monitoring, the quarterly report must also include the specific budget, the quarterly expenditure, and cumulative expenditures to demonstrate that 10% of Federal funding is not exceeded.

Note: Each property wherecleanup activities were performed and/or completed must have its corresponding information updated in ACRES (or via the Property Profile Form with prior approval from the EPA Project Officer) prior to submitting the quarterly performance report (see Section III.E. below).

3. For the loans executed by the CAR under this agreement, the CAR must also report on the following items as part of the CAR's quarterly performance reporting:

a. Summaries of results of reviews of borrower financial and programmatic reports.

b. Environmental results achieved by the borrower.

4. The CAR must maintain records that will enable it to report to EPA on the amount of funds (direct EPA funding, cost share, if applicable – see Section IV.A.1., and program income) disbursed by the CAR to clean up specific properties under this cooperative agreement.

5. In accordance with 2 CFR § 200.329(e), the CAR agrees to inform the EPA Project Officer as soon as

problems, delays, or adverse conditions become known which will materially impair the ability to meet the outputs/outcomes specified in the EPA-approved workplan.

e.] ACRES Data Submission

1. Property Profile Form: The CAR must report on interim progress (e.g., loan signed, clean up started) and any final accomplishments (e.g., clean up completed, contaminants removed, institutional controls required, engineering controls required, leveraged dollars and/or jobs) by completing and submitting relevant portions of the electronic Property Profile Form using the Assessment, Cleanup and Redevelopment Exchange System (ACRES). The CAR must enter the data in ACRES as soon as the interim action or final accomplishment has occurred, or within 30 days after the end of each reporting quarter. The CAR must enter any new data into ACRES prior to submitting the quarterly performance report to the EPA Project Officer. The CAR must utilize the electronic version of the Property Profile Form in ACRES unless approval is obtained from the EPA Project Officer to use the hardcopy version of the Property Profile Form or its use is included in the approved workplan.

2. Brownfields RLF Form: Additionally, the CAR must also report program income details quarterly on the Brownfields RLF Form, which is located on the CAR's RLF cooperative agreement homepage in ACRES.

f.] Final Cooperative Agreement Performance Report with Environmental Results

1. In accordance with the regulations at 2 CFR Parts 200 and 1500 (specifically, § 200.329 Monitoring and Reporting Program Performance and 2 CFR § 200.344(a), Closeout), the CAR agrees to submit to the EPA Project Officer within 120 days after the expiration or termination of the approved project period a final performance report on the cooperative agreement via email, unless the EPA Project Officer agrees to accept a paper copy of the report. The final performance report shall document and summarize the elements listed in Section III.D.2., as appropriate, for activities that occurred over the entire project period. In addition, when applicable, the CAR must include required documentation associated with an EPA-approved waiver for not meeting the minimum 50/50 split by the end of the cooperative agreement's project period.

IV. FINANCIAL ADMINISTRATION REQUIREMENTS

a.] Cost Share Requirement

1. As provided in IIJA, no cost share is required for this agreement. However, the CAR may have an open non-IIJA funded RLF cooperative agreement where cost share is required as part of its overall RLF program. Therefore, any references to cost share in these Terms and Conditions are related to the overall RLF program (i.e., cost share associated with a non-IIJA funded RLF cooperative agreement).

b.] Eligible Uses of the Funds for the Cooperative Agreement Recipient, Borrower, and/or Subgrantee

1. To the extent allowable under the EPA-approved workplan, the CAR may use cooperative agreement funds to capitalize a revolving loan fund to be used for loans or subgrants for cleanup and for eligible programmatic expenses. Eligible programmatic expenses may include activities described in Section V. of these Terms and Conditions. In addition, eligible programmatic expenses may include:

a. Determining whether RLF cleanup activities at a particular site are authorized by CERCLA § 104(k).

b. Ensuring that an RLF cleanup complies with applicable requirements under Federal and state laws, as required by CERCLA § 104(k).

c. Ensuring the adequacy of each RLF cleanup as it is implemented, including overseeing the borrowers and/or subgrantees activities to ensure compliance with applicable Federal and state environmental requirements.

d. Preparing and updating an Analysis of Brownfield Cleanup Alternatives (ABCA) which will include information about the site and contamination issues, cleanup standards, applicable laws, alternatives considered, and the proposed cleanup.

e. Developing a Quality Assurance Project Plan (QAPP) as required by 2 CFR § 1500.12. The specific requirement for a QAPP is outlined in Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance available at https://www.epa.gov/grants/implementation-quality-assurance-requirements-organizations-receiving-epa-financial.

f. Performing limited site characterization to confirm the effectiveness of the proposed cleanup design or the effectiveness of a cleanup once an action has been completed.

g. Ensuring that public participation requirements are met. This includes preparing a Community Involvement Plan which will include reasonable notice, opportunity for public involvement and comment on the proposed cleanup, and response to comments.

h. Establishing an Administrative Record for each site.

i. Ensuring that the site is secure if a borrower or subgrantee is unable or unwilling to complete a brownfield site cleanup.

j. Using a portion of a loan or subgrant to purchase environmental insurance for the site. [The loan or subgrant shall not be used to purchase insurance intended to provide coverage for any of the ineligible uses under Section IV., Ineligible Uses of the Funds for the Cooperative Agreement Recipient, Borrower, and/or Subgrantees.]

k. Any other eligible programmatic costs, including costs incurred by the recipient in making and managing a loan or subgrant; obtaining RLF fund manager services; quarterly reporting to EPA including preparation of Property Profiles; awarding, managing and monitoring loans and subgrants as required by the terms of this agreement implementing 2 CFR § 200.332 and the "Establishing and Managing Subawards" General Term and Condition; and carrying out outreach pertaining to the loan and subgrant program to potential borrowers and subgrantees.

l. Borrower and subgrantee progress reporting to the CAR.

2. The CAR must maintain records that will enable it to report to EPA on the amount of costs incurred by the CAR, borrowers, or subgrantees at brownfield sites.

3. Each site being remediated via an RLF subgrant is limited to a total of $500,000 of the CAR's total award amount (i.e., funds EPA awards directly to the CAR for all open RLF grants and any associated

cost share, if applicable – see Section IV.A.1.). The term "CAR's total award amount" is used to represent the EPA funds + cost share (if applicable – see Section IV.A.1.) from all of the CAR's open RLF grants (i.e., the term considers the RLF program as a single, unified program rather than separate open RLF cooperative agreements; it does not include any funding from cooperative agreements that the CAR has already closed out). The total award amount also never includes program income earned while the cooperative agreement is open or retained and post-closeout program income. For the purposes of determining compliance with the subgrant cap, the value of any technical assistance the CAR provides to the subgrantee (e.g., an ABCA paid for with EPA funds or cost share, if applicable – see Section IV.A.1.) would not be included in the subgrant and does not count towards the $500,000 per site cap. However, any expenses charged to the subgrant by the subgrantee (e.g., including the cost of an ABCA) would count towards the $500,000 subgrant cap. Private, for-profit entities are not eligible for subgrants.

4. At least 50% of each open cooperative agreement's total award amount (i.e., EPA funds + cost share, if applicable – see Section IV.A.1.) must be used by the CAR to provide loans for the cleanup of eligible brownfield sites and associated eligible programmatic costs by the end of the cooperative agreement project period. The remaining EPA funding and cost share, if applicable – see Section IV.A.1, may be used for all other eligible programmatic costs that are not associated with loans, such as subgrants, forgiven principal in discounted loans, and eligible programmatic costs to manage/market the RLF. This is referred to as the 50/50 split rule, which addresses the minimum ratio of loan costs to non-loan costs required for the cooperative agreement's total award amount by the end of the cooperative agreement project period. CARs are not required to meet the 50/50 split rule "proportionally" when drawing down funds, but the EPA Project Officer will monitor to confirm the CAR is on track to meet the minimum 50/50 split by the end of the cooperative agreement.

The CAR may request a waiver of the $500,000 subgrant limit or the minimum 50/50 split by seeking a waiver through the EPA Project Officer who can provide information on the waiver process. However, a waiver is not required for either requirement when only program income is used, since subgrants that are funded with 100% program income are not limited in amount and do not contribute to this 50% limitation. A waiver is also not required for the discounted amount of a loan if the loan is funded with 100% program income. Furthermore, if program income and/or post-closeout program income are combined with EPA funds and/or cost share (if applicable – see Section IV.A.1.) the program income and post-closeout program income must not be included in the total subgrant or loan amount for the purposes of determining compliance with the subgrant cap, discounted loan limits, or 50/50 split rule.

If the CAR has more than one open RLF cooperative agreement and would like to close out the older cooperative agreement more quickly, the CAR has the option of:

a. Submitting a waiver request to the EPA Project Officer requesting to apply the 50/50 split rule to the CAR's RLF program as a whole for all open RLF cooperative agreements, rather than to each open RLF cooperative agreement individually, on one condition: if one of those open RLF grants closes out (i.e., project period ends) and that closing cooperative agreement does not meet the 50/50 split requirement on its own due to excessive non-loan costs, the CAR must continue to include that cooperative agreement in the 50/50 split calculation for the other open cooperative agreement going forward. This allows the 50/50 split rule to be honored for the entire open RLF program.

b. Requesting that the EPA Project Officer and Grants Management Officer allow shifting of programmatic costs (loan and non-loan costs) between the two open cooperative agreements, in accordance with 2 CFR § 200.405(c), to better achieve the CAR's RLF program priorities. Once the oldest cooperative agreement closes out, the workplan and budget for the remaining open cooperative

agreement would need to be amended to include programmatic costs.

5. To determine whether a cleanup subgrant is appropriate, the CAR must consider the following as required by CERCLA § 104(k)(3)(C):

a. The extent to which the subgrant will facilitate the creation of, preservation of, or addition to a park, greenway, undeveloped property, recreational property, or other property used for nonprofit purposes;

b. The extent to which the subgrant will meet the needs of a community that has the inability to draw on other sources of funding for environmental remediation and subsequent redevelopment of the area in which a brownfield site is located because of the small population or low income of the community;

c. The extent to which the subgrant will facilitate the use or reuse of existing infrastructure; and

d. The benefit of promoting the long-term availability of funds from a revolving loan fund for brownfield remediation.

The CAR must maintain sufficient records to support and document these determinations.

6. Under CERCLA § 104(k)(5)(E), CARs and subgrantees may use up to 5% of the direct EPA funding plus the CAR's cost share, if applicable – see Section IV.A.1., for this cooperative agreement for administrative costs, including indirect costs under 2 CFR § 200.414. The limit on administrative costs for the CAR under this agreement is $37,500.Thetotal amount of indirect costs and any direct costs for cooperative agreement administrationby the CAR paid for by EPA under thecooperative agreement, or used to meet the recipient's cost share, if applicable – see Section IV.A.1., shall not exceed this amount. Note that additional administrative costs may be allowed when using program income received under this cooperative agreement during the period of performance (see Section IV.D.2.). Subgrantees and borrowers may use up to 5% of the amount of Federal funds (direct EPA funding, cost share – if applicable – see Section IV.A.1, and program income) in their subawards for administrative costs. As required by 2 CFR § 200.403(d), the CAR and subgrantees must classify administrative costs as directorindirect consistently and shall not classify the same types of costs in both categories. [Note: Borrowers may charge direct administrative costs to their loan, but borrowers cannot charge indirect costs.]

The term "administrative costs" does not include:

a. Investigation and identification of the extent of contamination of a brownfield site;

b. Design and performance of a response action; or

c. Monitoring of a natural resource.

Eligible cooperative agreement and subgrant administrative costs subject to the 5% limitation include direct costs for:

a. Costs incurred to comply with the following provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards at 2 CFR Parts 200 and 1500 other than those identified as programmatic.

i. Record-keeping associated with equipment purchases required under 2 CFR § 200.313;

ii. Preparing revisions and changes in the budgets, scopes of work, program plans, and other activities required under 2 CFR § 200.308;

iii. Maintaining and operating financial management systems required under 2 CFR § 200.302;

iv. Preparing payment requests and handling payments under 2 CFR § 200.305;

v. Financial reporting under 2 CFR § 200.328;

vi. Non-Federal audits required under 2 CFR Part 200, Subpart F; and

vii. Closeout under 2 CFR § 200.344 with the exception of preparing the recipient's final performance report. Costs for preparing this report are programmatic and are not subject to the 5% limitation on direct administrative costs.

b. Pre-award costs for preparation of the proposal and application for this cooperative agreement (including the final workplan) or applications for subgrants are not allowable as direct costs but may be included in the CAR's or subrecipient's indirect cost pool to the extent authorized by 2 CFR § 200.460.

c. Borrowers may use up to 5% of the amount of the Federal funds in the loan for loan administration costs. Eligible administrative costs for borrowers include direct costs for:

i. Salaries, benefits, and other compensation for persons who are not directly engaged in the cleanup of the site (e.g., marketing and human resource personnel), but only to the extent to which these persons activities support the cleanup and subsequent re-use of the site;

ii. Facility costs such as depreciation, utilities, and rent on the borrower's administrative offices; and

iii. Supplies and equipment not used directly for cleanup at the site.

d. Eligible direct costs for loan administration include expenses for:

i. Preparing revisions and changes in the budget, workplans, and other documents required under the loan agreement;

ii. Maintaining and operating financial management and personnel systems;

iii. Preparing payment requests and handling payments; and

iv. Audits including non-Federal audits required under 2 CFR Part 200, Subpart F.

e. Borrowers shall not use loan funds for indirect costs even if the borrower has an indirect cost rate approved by a cognizant Federal agency.

7. Local Governments Only. If authorized in the EPA-approved workplan and budget narrative, up to 10%

of the funds awarded by this agreement may be used by the CAR itself as a programmatic cost for Brownfield Program development and implementation of monitoring health conditions and institutional controls. The health monitoring activities must be associated with brownfield sites at which at least a Phase II environmental site assessment is conducted, and the assessment indicates that the sites are contaminated with hazardous substances. The CAR must maintain records on funds that will be used to carry out this task to ensure compliance with this requirement.

8. If the CAR makes a subgrant to a local government that includes an amount (not to exceed 10% of the subgrant) for Brownfields Program development and implementation, the terms and conditions of that agreement must include a provision that ensures that the local government subgrantee maintains records adequate to ensure compliance with the limits on the amount of subgrant funds that may be expended for this purpose.

c.] Ineligible Uses of the Funds for the Cooperative Agreement Recipient, Borrower, and/or Subgrantee

1. Cooperative agreement funds shall not be used by the CAR, borrower and/or subgrantee for any of the following activities:

a. Pre-cleanup Phase I and Phase II environmental site assessment activities with the exception of site monitoring activities that are reasonable and necessary during the cleanup process, including determination of the effectiveness of a cleanup;

b. Monitoring and data collection necessary to apply for, or comply with, environmental permits under other Federal and state laws, unless such a permit is required as a component of the cleanup action;

c. Construction, demolition, and post-cleanup site development activities that are not cleanup actions (e. g., marketing of property (activities or products created specifically to attract buyers or investors), construction of a new facility, or addressing public or private drinking water supplies that have deteriorated through ordinary use);

d. Job training activities unrelated to performing a specific cleanup at a site (i.e., on the job training) covered by a loan or subgrant;

e. To pay for a penalty or fine;

f. To pay a Federal cost share requirement (e.g., a cost share required by another Federal grant) unless there is specific statutory authority;

g. To pay for a response cost at a brownfield site for which the CAR or recipient of the subgrant or loan is potentially liable under CERCLA § 107;

h. To pay a cost of compliance with any Federal law, excluding the cost of compliance with laws applicable to the cleanup; and

i. Unallowable costs (e.g., lobbying and purchases of alcoholic beverages) under 2 CFR Part 200, Subpart E.

2. Cooperative agreement funds shall not be used for any of the following properties:

a. Facilities listed, or proposed for listing, on the National Priorities List (NPL);

b. Facilities subject to unilateral administrative orders, court orders, and administrative orders on consent or judicial consent decree issued to or entered by parties under CERCLA;

c. Facilities that are subject to the jurisdiction, custody, or control of the United States government except for land held in trust by the United States government for an Indian Tribe; or

d. A site excluded from the definition of a brownfield site for which EPA has not made a property-specific funding determination.

d.] Use of Program Income – During the Performance Period

1. Program income for the RLF shall be defined as the gross income received by the recipient, directly generated by the cooperative agreement award or earned during the period of the award. Program income shall include principal repayments, interest earned on outstanding loan principal, interest earned on accounts holding RLF program income not needed for immediate lending, all loan fees and loan-related charges received from borrowers and other income generated from RLF operations including proceeds from the sale, collection, or liquidations of assets acquired through defaults of loans.

2. In accordance with 2 CFR § 200.307 and 2 CFR § 1500.8, during the performance period of the cooperative agreement, the CAR is authorized to add program income to the funds awarded by EPA and use the program income under the same terms and conditions of this agreement unless otherwise specified (e.g., Section IV.B.4. regarding the minimum 50/50 split). Accordingly, program income may be used for administrative costs, including any applicable indirect costs, provided that the total amount of funds used for administrative costs does not exceed 5% of the sum of direct EPA funding plus the cost share, if applicable – see Section IV.A.1., and program income the CAR generates.CARs that intend to use program income for cost share for any other Brownfield Grants under 2 CFR § 200.307(b)(3) must obtain prior approval from the EPA Grant Management Officer or Award Official unless the cost share method for using program income was approved at time of award. Note that repayments of principal for loans made all or in part with cooperative agreement funds shall not be used for cost share for any other Brownfield Grants. These repayments of principal must be returned to the CAR's Brownfields Revolving Loan Fund.

3. In accordance with 2 CFR § 1500.8(c), to continue the mission of the Brownfields Revolving Loan Fund, recipients may use cooperative agreement funding prior to using program income funds generated by the revolving loan fund.

4. The CAR that elects to use program income to cover all or part of an RLF's programmatic costs shall maintain adequate accounting records and source documentation to substantiate the amount and percent of program income expended for eligible RLF programmatic costs, and comply with OMB cost principles at 2 CFR Part 200, Subpart E when charging costs against program income. For any cost determined by EPA to have been an ineligible or unallowable use of program income, the recipient shall reimburse the RLF or refund the amount to EPA as directed by the EPA Action Official in its disallowance determination. EPA will notify the recipient of the time period allowed for reimbursement or refund.

5. Loans or subgrants made with a combination of program income, post-closeout program income, cost share, if applicable – see Section IV.A.1., and/or direct funding from EPA are subject to the same terms and conditions as those applicable to this agreement. Loans and subgrants made with direct funding

from EPA and/or cost share, if applicable – see Section IV.A.1., in combination with non-Federal sources of funds are also subject to the same terms and conditions of this agreement.

6. The CAR must obtain the EPA Project Officer approval of the substantive terms of loans and subgrants made entirely with program income unless this requirement is waived by the EPA Project Officer.

7. In accordance with CERCLA § 104(d)(3)(D), when a CAR transitions to a §104(k) cooperative agreement, any program income (e.g., fees, interest or principal repayments) generated prior to transition will be added to the §104(k) agreement and must be used in a manner consistent with Section § 104(k)(3) and with the Terms and Conditions, contained herein.

e.] Interest-Bearing Accounts

1. The CAR (as well as any subgrantees) must deposit advances of cooperative agreement funds (as described in Section VII.A., Methods of Disbursement) and program income (as defined earlier) in an interest-bearing account unique to this cooperative agreement [i.e., separate from funds for another open RLF cooperative agreement, and separate from post-closeout program income governed under a Closeout Agreement (COA) since separate reporting of funds is required under a COA]. Consistent with 2 CFR 200.305(b)(9) as well as the unique accounting requirements for states under 2 CFR 200.302(a) and 200.305(a), the CAR does not have to establish entirely separate bank accounts for EPA funds. The CAR does, however, have to be able to account for EPA funds (including cost share, if applicable – see Section IV.A.1., and program income) received, obligated, and expended, and Federal funds must be deposited and maintained in insured accounts whenever possible as required by the regulation. Subaccounts are allowed, as long as the interest earned and all funds for each of the CAR's open and post-closeout RLF grants can be accounted for accurately by the CAR.

2. With the exception of state CARs, which are subject to applicable Treasury regulations, CARs (as well as any subgrantees) must place advances of EPA funds (and other Federal funds as well) in interest bearing accounts as provided in 2 CFR § 200.305(b)(11). Advances of EPA funds must be maintained in an account that is separate from the post-closeout program income in the RLF. While interest earned by CARs on advances of EPA funds should be minimal given the regulatory and T&C requirements for prompt disbursement of drawn down funds, any interest the CAR does earn on advanced Federal funds is subject to 2 CFR § 200.305(b)(12). This regulation generally requires that interest on advanced Federal funds in excess of $500 must be transmitted annually to the U.S. Department of Health and Human Services.

3. Interest earned on program income is considered additional program income.

f.] Closeout Agreement and Use of Post Cooperative Agreement (i.e., Post-Closeout) Program Income

1. As provided at 2 CFR § 200.307(f) and 2 CFR § 1500.8(c), after the end of the period of performance of the cooperative agreement, the CAR may keep and use program income at the end of the cooperative agreement (retained program income) and use program income earned after the cooperative agreement period of performance (post-closeout program income) in accordance with terms of a COA. At the end of the cooperative agreement period of performance, the CAR shall comply with the attached COA. The COA goes into effect for this assistance agreement number the day after the cooperative agreement period of performance ends unless otherwise designated by the EPA Grants Management Officer or Award Official. The period of performance is identified as the project period in the Notice of Award.

2. This COA is based on the FY22 RLF COA template. EPA plans to modify RLF COA templates every five years. EPA reserves the right to renegotiate the terms of this RLF COA every five years, in conjunction with the template change (e.g., next change will be in FY27). If the CAR agrees to continue to operate the RLF under a COA past FY27, the CAR shall work with the EPA Project Officer to update to the latest COA template. Otherwise, the Project Officer and CAR will negotiate a mutually acceptable disposition of unused program income, and an Authorized EPA Official (e.g., Grants Management Officer or Award Official) will modify the COA accordingly.

## V. RLF REQUIREMENTS

a.] Authorized RLF Cleanup Activities

1. The CAR, or borrower/subgrantee with CAR concurrence, shall prepare an ABCA, or equivalent state Brownfields program document, which will include information about the site and contamination issues (i. e., exposure pathways, identification of contaminant sources, etc.); cleanup standards; applicable laws; alternatives considered; and the proposed cleanup. The evaluation of alternatives must include effectiveness, ability to implement, and the cost of the response proposed. The evaluation of alternatives must also consider the resilience of the remedial options to address potential adverse impacts caused by extreme weather events (e.g., sea level rise, drought, increased frequency and intensity of flooding, etc.). The alternatives may additionally consider the degree to which they reduce greenhouse gas discharges, reduce energy use or employ alternative energy sources, reduce volume of wastewater generated/disposed of, reduce volume of materials taken to landfills, and recycle and re-use materials generated during the cleanup process to the maximum extent practicable. The evaluation will include an analysis of reasonable alternatives including no action. The cleanup method chosen must be based on this analysis and documented in a decision document upon completion of the public comment period. The CAR, or borrower/subgrantee with CAR concurrence, must consult with the relevant state program (or EPA if there is not a state program that covers the site) to determine if the selected cleanup requires formal modification based on public comments or new information.

2. Prior to conducting or engaging in any on-site activity with the potential to impact historic properties (such as invasive sampling or cleanup), the CAR shall consult with the EPA Project Officer regarding potential applicability of the National Historic Preservation Act (NHPA) (16 USC § 470) and, if applicable, shall assist EPA in complying with any requirements of the NHPA and implementing regulations.

b.] Quality Assurance (QA) Requirements

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

When environmental data are collected as part of the brownfield cleanup (e.g., cleanup verification sampling, post-cleanup confirmation sampling), the CAR shall comply with 2 CFR § 1500.12 requirements to develop and implement quality assurance practices sufficient to produce data adequate to meet project objectives and to minimize data loss. State law may impose additional QA requirements.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this

term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

1. Quality Assurance Project Plan (QAPP) (Select an Option for clause a.)

a. Prior to beginning environmental information operations, the recipient must:

i. Develop a QAPP (The QAPP is the document that provides comprehensive details about the quality assurance, quality control, and technical activities that must be implemented to ensure that project objectives are met. Environmental programs include direct measurements or data generation, environmental modeling, compilation of data from literature or electronic media, and data supporting the design, construction, and operation of environmental technology.),

ii. Prepare QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

b. The recipient must submit the QAPP 90 days after grant award.

c. The recipient shall notify the EPA Project Officer and the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the EPA Project Officer and the QAM at least annually and may also be submitted when changes occur.

For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: Guidance for Quality Assurance Project Plans.

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for

Organizations Receiving EPA Financial Assistance.

3. Competency of Organizations Generating Environmental Measurement Data: In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the CAR agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the CAR agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The CAR shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/measurements-modeling/documents-about-measurement-competency-under-assistance-agreements or a copy may also be requested by contacting the EPA Project Officer for this award.

c.] Public Involvement and Community Outreach

1. All RLF loan and subgrant cleanup activities require a site-specific Community Involvement Plan that includes providing reasonable notice, and the opportunity for public involvement and comment on the proposed cleanup options under consideration for the site. All information, including responses to public comments and administrative records, may be made available to the public to the extent consistent with 2 CFR § 200.338 and applicable state, tribal, or local law.

d.] Public Awareness

1. The CAR agrees to clearly reference EPA investments in the project during all phases of community outreach outlined in the EPA-approved workplan which may include the development of post-project summary or success materials that highlight achievements to which this project contributed.

a. If any documents, fact sheets, and/or web materials are developed as part of this cooperative agreement, then they shall comply with the Acknowledgement Requirements for Non-ORD Assistance Agreements in the General Terms and Conditions of this agreement.

b. If a sign is developed as part of a project funded by this cooperative agreement, then the sign shall include either a statement (e.g., this project has been funded, wholly or in part, by EPA) and/or EPA's logo acknowledging that EPA is a source of funding for the project. The EPA logo may be used on project signage when the sign can be placed in a visible location with a direct linkage to site activities. Use of the EPA logo must follow the sign specifications available at https://www.epa.gov/grants/epa-logo-seal-specifications-signage-produced-epa-assistance-agreement-recipients.

To obtain the appropriate EPAlogo or seal graphic file, the CAR should send a request directly to the EPA Office of Public Affairs (OPA) and include the EPA Project Officer in the communication. Instructions for contacting OPA are available at https://www.epa.gov/aboutepa/using-epa-seal-and-logo.

c. EPA Logo: If the EPA logo is displayed along with logos from other participating entities on websites, outreach materials, or reports, it mustnotbe prominently displayed to imply that any of the recipient's or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo must be accompanied with a statement indicating that the City of Fresnoreceived Federal financial assistance from EPA for the project. The recipient will ensure compliance with the sign specifications provided by the OPA available at https://www.epa.gov/stylebook/using-epa-seal-and-logo. As provided in the sign specifications from

OPA, the EPA logo is the preferred identifier for assistance agreement projects and use of the EPA seal requires prior approval from the EPA.

d. Procuring Signs: Consistent with section 6002 of RCRA, 42 U.S.C. 6962, and 2 CFR 200.323, recipients are encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable.

2. The CAR agrees to notify the EPA Project Officer listed in this award document of public or media events publicizing the accomplishment of significant events related to construction and/or site reuse projects as a result of this agreement, and provide the opportunity for attendance and participation by Federal representatives with at least ten (10) working days' notice.

3. To increase public awareness of projects serving communities where English is not the predominant language, CARs are encouraged to include in their outreach strategies communication in non-English languages. This includes translating the language on signs (excluding the EPA logo or seal) into the appropriate non-English language(s). Translation costs for this purpose are allowable, provided the costs are reasonable.

4. All public awareness activities conducted with EPA funding are subject to the provisions in the General Terms and Conditions on compliance with section 504 of the Americans with Disabilities Act.

e.] Administrative Record

1. The CAR shall establish an Administrative Record that contains the documents that form the basis for the selection of a cleanup plan. Documents in the Administrative Record shall include the ABCA; site investigation reports; the cleanup plan (or the contractor solicitation if it includes the cleanup plan); cleanup standards used; responses to public comments; and verification that shows that cleanups are complete. The CAR shall keep the Administrative Record available at a location convenient to the public and make it available for inspection. The Administrative Record must be retained for three (3) years after the termination of the cooperative agreement subject to any requirements for maintaining records of site cleanups ongoing at the time of termination contained in the CAR's COA.

f.] Implementation of RLF Cleanup Activities

1. The CAR shall ensure the adequacy of each RLF cleanup in protecting human health and the environment as it is implemented. Each loan and subgrant agreement shall contain terms and conditions, subject to any required approvals by the state or tribal regulatory oversight authority, that allow the CAR to change cleanup activities as necessary based on comments from the public or any new information acquired.

2. If the borrower or subgrantee is unable or unwilling to complete the RLF cleanup, the CAR shall ensure that the site is secure. The CAR shall notify the appropriate state or Tribal agency and EPA to ensure an orderly transition should additional activities become necessary.

g.] Completion of RLF Cleanup Activities

1. The CAR shall ensure that the successful completion of an RLF cleanup is properly documented. This must be done through a final report or letter from a Qualified Environmental Professional, or other

documentation provided by a State or Tribe that shows cleanups are complete (including No Further Action letters, institutional controls, etc.). This documentation must be included as part of the Administrative Record.

## VI. REVOLVING LOAN FUND REQUIREMENTS

a.] Prudent Lending and Subgranting Practices

1. The CAR is expected to establish economically sound structures and day-to-day management and processing procedures to maintain the RLF and meet longterm brownfield cleanup lending/subgranting objectives. These include establishing: underwriting principles that can include the establishment of interest rates, repayment terms, fee structure, and collateral requirements sufficient to recover, as a minimum, the principal amount of the loan less any repayment discounts; and, lending/subgranting practices that can include loan/subgrant processing, documentation, approval, servicing, administrative procedures, collection, and recovery actions. Intra-governmental loans may be made consistent with EPA's guidance with the approval of the EPA Project Officer. Governmental recipients may not make intra-governmental subgrants. Nonprofit recipients may not make intra-entity loans and subgrants without EPA Project Officer approval of a waiver.

2. The CAR shall not incur costs under this cooperative agreement for loans subgrants or other eligible costs until an RLF cooperative agreement workplan has been submitted to and approved by the EPA Project Officer or program manager.  Though the workplan must identify tasks and milestones for establishing and operating the RLF, more detailed information may be submitted in supplemental documents, e.g., an "implementation plan.") The CAR shall ensure that the objectives of the workplan are met through its or the fund manager's selection and structuring of individual loans/subgrants and lending/subgranting practices. These activities shall include, but not be limited to the following:

a. Considering awarding subgrants on a competitive basis. If the CAR decides not to award any such subgrants competitively, it must document the basis for that decision and inform the EPA Project Officer in the first quarterly performance report. The CAR must inform the EPA Project Officer if the CAR subsequently decides to award subgrants competitively in the quarterly performance report immediately following the decision.

b. Establishing appropriate project selection criteria consistent with Federal and state requirements, the intent of the RLF program, and the cooperative agreement entered into with EPA.

c. Establishing threshold eligibility requirements whereby only eligible borrowers or subgrantees receive RLF financing.

d. Developing a formal protocol for potential borrowers or subgrantees to demonstrate eligibility, based on the procedures described in the initial RLF application proposal and cooperative agreement application. Such a protocol shall include descriptions of projects that will be funded, how loan monies will be used, and qualifications of the borrower or subgrantee to make legitimate use of the funds. Additionally, CARs shall ask borrowers or subgrantees for an explanation of how a project, if selected, would be consistent with RLF program objectives, statutory requirements and limitations, and protect human health and the environment.

e. Requiring that borrowers or subgrantees submit information describing the borrower's or subgrantee's environmental compliance history. The CAR shall consider this history in an analysis of the borrower or subgrant recipient as a cleanup and business risk.

f. Establishing procedures for handling the day-to-day management and processing of loans and repayments.

g. Establishing standardized procedures for the disbursement of funds to the borrower or subgrantee.

b.] Inclusion of Additional Terms and Conditions in RLF Loan and Subgrant Documents

1. All loans and subgrants must include the information required by 2 CFR § 200.332(b). EPA has developed an optional template to use in creating this agreement that is available on EPA's Subaward Policy internet page. EPA does not require CARs to use the template.

2. The CAR shall ensure that the borrower or subgrantee meets the cleanup and other program requirements of the RLF cooperative agreement by including the following special terms and conditions in RLF loan agreements and subgrants:

a. Borrowers or subgrantees shall use funds only for eligible activities and in compliance with the requirements of CERCLA § 104(k) and applicable Federal and state laws and regulations. (See Section I.A.2. and Section II.)

b. Borrowers or subgrantees shall ensure that the cleanup protects human health and the environment.

c. Borrowers or subgrantees shall document how funds are used.

d. Borrowers or subgrantees shall maintain records for a minimum of three (3) years following completion of the cleanup financed all or in part with RLF funds unless one of the conditions described at 2 CFR § 200.334 is present. Borrowers or subgrantees shall obtain written approval from the CAR prior to disposing of records, so that the CAR can maintain the records, if necessary, for complying with the CAR's obligations under 2 CFR § 200.334. CARs shall also require that the borrower or subgrantee provide access to records relating to loans and subgrants supported with RLF funds to authorized representatives of the Federal government. As stated in the attached COA, records related to the COA must be retained by the CAR for the duration of the COA and retained for a period of three (3) years following termination or discontinuation of the COA.

e. Borrowers or subgrantees shall certify that they are not currently, nor have they been, subject to any penalties resulting from environmental noncompliance at the site subject to the loan or subgrant.

f. Borrowers or subgrantees shall certify that they are not potentially liable under CERCLA § 107 for the site or that, if they are, they qualify for a limitation or defense to liability under CERCLA. If asserting a limitation or defense to liability, the borrower or subgrantee must state the basis for that assertion. When using cooperative agreement funds for petroleum-contaminated brownfield sites, borrowers or subgrantees shall certify that they are not a viable responsible party or potentially liable for the petroleum contamination at the site. The CAR may consult with EPA for assistance with this matter.

g. Borrowers or subgrantees shall conduct cleanup activities as required by the CAR.

h. Subgrantees, other than borrowers, shall comply with all applicable EPA assistance regulations (including those at 2 CFR Parts 200 and 1500). All procurements conducted with subgrant funds, but not loans, must comply with Procurement Standards in 2 CFR §§ 200.317 through 200.327, 2 CFR Part 1500, and 40 CFR Part 33, as applicable.

i. Borrowers must comply with the internal control requirements specified at 2 CFR § 200.303 and are subject to the 2 CFR Part 200, Subpart F, Audit Requirements. The CAR must oversee and manage loans as required by 2 CFR §§ 200.330 through 200.332. No other provisions of the Uniform Grants Guidance apply directly to borrowers.

j. A term and condition or other legally binding provision shall be included in all loans and subgrants entered into with the funds under this agreement, or when funds awarded under this agreement are used in combination with non-Federal sources of funds, to ensure that borrowers and subgrantees comply with all applicable Federal and state laws and requirements. In addition to CERCLA § 104(k), Federal applicable laws and requirements include 2 CFR Parts 200 and 1500.

k. EPA provides general information on statutes, regulations and Executive Orders that apply to EPA grants on the Grants internet site at www.epa.gov/grants. Many Federal requirements are agreement or program specific and EPA encourages CARs to review the terms of their cooperative agreement carefully and consult with their EPA Project Officer for advice if necessary.

c.] Default

1. In the event of a loan default, the CAR shall make reasonable efforts to enforce the terms of the loan agreement including proceeding against the assets pledged as collateral to cover losses to the loan. If the cleanup is not complete at the time of default, the CAR is responsible for:

a. documenting the nexus between the amount paid to the borrower (bank or other financial institution) and the cleanup that took place prior to the default; and

b. securing the site (e.g., ensuring public safety) and informing the EPA Project Officer and the State.

d.] Conflict of Interest

1. The CAR shall establish and enforce conflict of interest provisions that prevent the award of subawards that create real or apparent personal conflicts of interest, or the CAR's appearance of lack of impartiality. Such situations include, but are not limited to, situations in which an employee, official, consultant, contractor, or other individual associated with the CAR (affected party) approves or administers a grant or subaward to a subaward recipient in which the affected party has a financial or other interest. Such a conflict of interest or appearance of lack of impartiality may arise when:

a. The affected party,

b. Any member of his immediate family,

c. His or her partner, or

d. An organization which employs, or is about to employ, any of the above, has a financial or other interest in the subrecipient.

Affected employees will neither solicit nor accept gratuities, favors, or anything of monetary value from subrecipients. Recipients may set minimum rules where the financial interest is not substantial or the gift is an unsolicited item of nominal intrinsic value. To the extent permitted by State or local law or regulations, such standards of conduct will provide for penalties, sanctions, or other disciplinary actions for violations of such standards by affected parties.


## VII. DISBURSEMENT, PAYMENT, AND CLOSEOUT

For the purposes of these Terms and Conditions, the following definitions apply: "payment" isEPA's transfer of funds to the CAR; the CAR incurs an "obligation" when it enters into an agreement with a borrower or a subgrantee; "disbursement" is the transfer of funds from the CAR to the borrower or subgrantee. The CAR may also disburse funds to a contractor or to pay an allowable cost (e.g. personnel compensation) as provided in 2 CFR § 200.305(b)(1). "Closeout" refers to the process EPA follows to both ensure that all administrative actions and work required under the cooperative agreement have been completed and to establish a COA to govern the use of retained and post-closeout program income.

a.] Methods of Disbursement

1. The CAR may choose to disburse funds to the borrower or subgrantee by means of 'actual expense' or 'schedule.' If the schedule method is used, the recipient must ensure that the schedule is designed to reasonably approximate the borrower's or subgrantee's incurred costs.

a. An 'actual expense' disbursement approach requires the borrower or subgrantee to submit documentation of the borrower's or subgrantee's expenditures (e.g., invoices) to the CAR prior to requesting payment from EPA.

b. A 'schedule' disbursement is one in which all, or an agreed upon portion, of the obligated funds are disbursed to the borrower or subgrantee on the basis of an agreed upon schedule (e.g., progress payments) provided the schedule minimizes the time elapsing between disbursement by the CAR and the borrower or subgrantee's payment of costs incurred in carrying out the loan/subgrant. In unusual circumstances, disbursement may occur upon execution of the loan or subgrant. The CAR shall submit documentation of disbursement schedules to EPA.

c. If the disbursement schedule of the loan/subgrant agreement calls for disbursement of the entire amount of the loan/subgrant upon execution, the CAR shall demonstrate to the EPA Project Officer that this method of disbursement is necessary for purposes of cleaning up the site covered by the loan/subgrant. Further, the CAR shall include an appropriate provision in the loan/subgrant agreement which ensures that the borrower/subgrantee uses funds promptly for costs incurred in connection with the cleanup and that interest accumulated on schedule disbursements is applied to the cleanup.

b.] Schedule for Closeout

1. Assuming any applicable cost share requirement has been satisfied (see Section IV.A.1.), there are two fundamental criteria for closeout:

a. Final payment of funds from EPA to the CAR following the end date for the project and budget period

of the cooperative agreement as part of the closeout process or prior to the end date when the CAR has disbursed all of the EPA funding of the funds awarded; and

b. Completion of all workplan and cleanup activities funded completely, or in part, by direct EPA funding from the amount of the award.

2. The first criterion of cooperative agreement closeout is met when the CAR receives all payments from EPA. The second closeout criterion is met when all workplan and cleanup activities funded by the cooperative agreement are complete.

3. The CAR must follow the attached COA for any retained and future program income generated after closeout (i.e., post-closeout program income). Eligible uses include continuing to operate an RLF for brownfield site cleanup and/or other brownfield site activities as identified in the attached COA.

c.] Compliance with Closeout Schedule

1. If the CAR fails to comply with the closeout schedule, any funds attributable to the cooperative agreement, including retained program income not obligated under loan agreement to a borrower or subgrantee, may be subject to Federal recovery.

d.] Final Requirements

1. The CAR must submit the following documentation:

a. The Final Cooperative Agreement Performance Report as described in Section III.F. of these Terms and Conditions.

b. Administrative and Financial Reports as described in the General Terms and Conditions of this agreement.

2. The CAR must ensure that all appropriate data have been entered into ACRES or all hardcopy Property Profile Forms are submitted to the EPA Project Officer.

e.] Recovery of RLF Assets

1. In case of termination, the CAR shall return to EPA its fair share of the value of the RLF assets consisting of cash, receivables, personal and real property, and notes or other financial instruments developed through use of the funds. EPA's fair share is the amount computed by applying the percentage of EPA participation in the total capitalization of the RLF to the current fair market value of the assets thereof. EPA also has remedies under CERCLA § 104(k) and Remedies for Noncompliance at 2 CFR §§ 200.339 through 200.343 when EPA determines that the value of such assets has been reduced by improper/illegal use of cooperative agreement funding. In such instances, the CAR may be required to compensate EPA over and above the EPA's share of the current fair market value of the assets. Nothing in this agreement limits EPA's authorities under CERCLA to recover response costs from a potentially responsible party.

f.] Loan Guarantees

1. If the CAR chooses to use the RLF funds to support a loan guarantee approach, the following terms

and conditions apply:

a. The CAR shall:

i. Document the relationship between the expenditure of CERCLA § 104(k) funds and cleanup activities;

ii. Maintain an escrow account expressly for the purpose of guaranteeing loans, by following the payment requirement described under the Escrow Requirements term and condition below; and

iii. Ensure that cleanup activities guaranteed by RLF funds are carried out in accordance with CERCLA § 104(k), CERCLA § 104(g) relating to compliance with the Davis-Bacon Act, and applicable Federal and state laws and will protect human health and the environment.

b. Payment of funds to a CAR shall not be made until a guaranteed loan has been issued by a participating financial institution. Loans guaranteed with RLF funds shall be made available as needed for specified cleanup activities on an "actual expense" or "schedule" basis to the borrower. (See Section VII.A., Methods of Disbursement). The CAR's escrow arrangement shall be structured to ensure that the CERCLA § 104(k) funds are properly "disbursed" by the recipient for the purposes of the cooperative agreement as required by 2 CFR § 200.305. If the funds are not properly disbursed, the CERCLA § 104 (k) funds that the recipient places in an escrow account will be subject to the interest recovery provisions of 2 CFR § 200.305.

c. To ensure that funds transferred to the CAR are disbursements of assisted funds, the escrow account shall be structured to ensure that:

i. The recipient does not retain the funds;

ii. The recipient does not have access to the escrow funds on demand;

iii. The funds remain in escrow unless there is a default of a guaranteed loan;

iv. The organization holding the escrow (i.e., the escrow agency), shall be a bank or similar financial institution that is independent of the recipient; and

v. There must be an agreement with the financial institution participating in the guaranteed loan program which documents that the financial institution has made a guaranteed loan to clean up a brownfield site in exchange for access to funds held in escrow in the event of a default by the borrower or subgrantee.

d. Federal Obligation to the Loan Guarantee Program - Any obligations that the CAR incurs for loan guarantees in excess of the amount awarded under the cooperative agreement are the CAR's responsibility. This limitation on the extent of the Federal Government's financial commitment to the CAR's loan guarantee program shall be communicated to all participating banks and borrower or subgrantee.

e. Repayment of Guaranteed Loans - Upon repayment of a guaranteed loan and release of the escrow amount by the participating financial institution, the CAR shall return the cooperative agreement funds placed in escrow to EPA based on disposition instructions provided by the EPA Project Officer. Alternatively, the CAR may, with EPA approval:

i. Guarantee additional loans under the terms and conditions of the agreement; or

ii. Amend the terms and conditions of the agreement to provide for another disposition of funds that will redirect the funds for other brownfield sites' related activities authorized by the terms of the cooperative agreement or, if applicable, a COA.


VIII. Davis-Bacon Term and Condition for Brownfields

1. Program Applicability

a. Program Name: Brownfields Program

b. Statute: Brownfields Direct Cleanup and Revolving Loan Fund Grants authorized by 42 U.S.C. 9604(k) are subject to Davis-Bacon and Related Acts (DBRA) as provided in 42 U.S.C. 9604(g)

c. Activities subject to Davis-Bacon:

i. Brownfield Sites Contaminated with Hazardous Substances: All construction, alteration, and repair activity involving the remediation of hazardous substances is subject to DBRA. This includes:

- Excavation of contaminated soil;

- Construction of caps, barriers, and structures which permanently house treatment equipment;

- Installation of water supply wells/piping/connections;

- Abatement of contamination in buildings; and

- Demolition (if followed by new construction).

ii. Brownfield Sites Contaminated with Petroleum: DBRA prevailing wage requirements apply when the project includes:

- Excavation of contaminated soil and/or tank removal if followed by paving and concrete replacement, or if it is an extensive soil excavation project;

- Construction of caps, barriers, and structures which permanently house treatment equipment; and

- Installation of water supply wells/piping/connections and related excavation and replacement of contaminated soil.

d. Prevailing Wage Classification (e.g., Heavy Construction, Residential, Commercial) (optional):

- Heavy Construction: EPA has determined the "Heavy Construction" classification should be used when soliciting competitive contracts or issuing ordering instruments to existing contractors for:

- Excavation and removal of contaminated soil;

- Construction of caps or barriers;

- Replacement of paving and concrete; and

- Installation of water supply wells/piping/connections.

- Building Construction: EPA has determined the "Building Construction" classification should be used when soliciting competitive contracts or issuing ordering instruments for the construction of:

- Demolition (if followed by new construction);

- Construction of structures which permanently house treatment equipment; and

- Abatement of contamination in buildings (other than residential structures less than 4 stories in height).

- Residential Construction: EPA has determined the "Residential Construction" classification should be used when soliciting competitive contracts or issuing ordering instruments for the abatement of contamination in residential structures less than 4 stories in height.

## 2. Davis-Bacon and Related Acts

DBRA is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more

- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

3. Recipient Responsibilities When Entering Into and Managing Contracts:

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

"By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

4. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. Include DBRA Requirements in All Subawards (including Loans):

Include the following text on all subawards under this grant:

"By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients, and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

Davis-Bacon Term and Condition for Brownfields

1. Program Applicability

a. Program Name: Brownfields Program

b. Statute: Brownfields Direct Cleanup and Revolving Loan Fund Grants authorized by 42 U.S.C. 9604(k) are subject to Davis-Bacon and Related Acts (DBRA) as provided in 42 U.S.C. 9604(g)

c. Activities subject to Davis-Bacon:

i. Brownfield Sites Contaminated with Hazardous Substances: All construction, alteration, and repair activity involving the remediation of hazardous substances is subject to DBRA. This includes:

Excavation of contaminated soil;

Construction of caps, barriers, and structures which permanently house  treatment equipment;

Installation of water supply wells/piping/connections;

Abatement of contamination in buildings; and

Demolition (if followed by new construction).

ii. Brownfield Sites Contaminated with Petroleum: DBRA prevailing wage requirements apply when the project includes:

Excavation of contaminated soil and/or tank removal if followed by paving and concrete replacement, or if it is an extensive soil excavation project;

Construction of caps, barriers, and structures which permanently house treatment equipment; and

Installation of water supply wells/piping/connections and related excavation and replacement of contaminated soil.

d. Prevailing Wage Classification (e.g., Heavy Construction, Residential, Commercial) (optional):

• Heavy Construction: EPA has determined the "Heavy Construction" classification should be used when soliciting competitive contracts or issuing ordering instruments to existing contractors for:

- Excavation and removal of contaminated soil;

- Construction of caps or barriers;

- Replacement of paving and concrete; and

- Installation of water supply wells/piping/connections.

• Building Construction: EPA has determined the "Building Construction" classification should be used when soliciting competitive contracts or issuing ordering instruments for the construction of:

- Demolition (if followed by new construction);

- Construction of structures which permanently house treatment equipment; and

- Abatement of contamination in buildings (other than residential structures less than 4 stories in height).

• Residential Construction: EPA has determined the "Residential Construction" classification should be used when soliciting competitive contracts or issuing ordering instruments for the abatement of contamination in residential structures less than 4 stories in height.

## 2. Davis-Bacon and Related Acts

DBRA is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

• Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more

• Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

• Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## 3. Recipient Responsibilities When Entering Into and Managing Contracts:

a. Solicitation and Contract Requirements:

i. Include the Correct Wage Determinations in Bid Solicitations and Contracts: Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

ii. Include DBRA Requirements in All Contracts: Include the following text on all contracts under this grant:

"By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

b. After Award of Contract:

i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

4. Recipient Responsibilities When Establishing and Managing Additional Subawards:

a. Include DBRA Requirements in All Subawards (including Loans):

Include the following text on all subawards under this grant:

"By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

b. Provide Oversight to Ensure Compliance with DBRA Provisions: Recipients are responsible for oversight of subrecipients, and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

5. The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

**END OF DOCUMENT**



# EXHIBIT B



# Brownfields 2025 Assessment Fact Sheet
## *Fresno, CA*

## Grant Recipient Information

**Name:** City of Fresno
**Phone:** 559-621-8473
**Website:** http://www.fresno.gov

## EPA Information

**Region:** EPA Region 9 Brownfields Team
**Phone:** 415-972-3152
**Website:** https://www.epa.gov/brownfields/r9

### Publication Information

| | |
|---|---|
| **Office:** | United States Environmental Protection Agency Land and Emergency Management (5105T) Washington, D.C. 20460 |
| **Publication Number:** | EPA-560-F-25-083 |
| **Publication Date:** | May 2025 |

## Overview of the EPA Brownfields Program

EPA's Brownfields Program empowers states, Tribal Nations, communities, and other stakeholders to work together to prevent, assess, safely clean up, and sustainably reuse brownfield sites. A brownfield site is real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant. The Small Business Liability Relief and Brownfields Revitalization Act of 2002, as amended by the Brownfields Utilization, Investment and Local Development Act of 2018, was passed to help states and communities around the country clean up and revitalize brownfield sites. Under this law, EPA provides financial assistance to eligible applicants through five competitive grant programs: Multipurpose Grants, Assessment Grants, Revolving Loan Fund Grants, Cleanup Grants, and Job Training Grants. Additionally, funding support is provided to state and tribal response programs through a separate mechanism.

## Assessment Grant

*$500,000*

EPA has selected the City of Fresno for a Brownfields Assessment Grant. Community-wide grant funds will be used to conduct 12 Phase I and five Phase II environmental site assessments. Grant funds also will be used to develop seven cleanup plans, two reuse plans, and one area-wide plan, and support community engagement activities. The target area for this grant includes the Downtown Fresno, Chinatown Fresno, Southwest Fresno, and Elm Avenue Corridor neighborhoods. Priority sites include a 6.8-acre vacant site adjacent to a church, a 53,000-square-foot department store building that has been vacant since 1988, and a 17-acre portion of the Chinatown Commercial Core composed of vacant lots and abandoned buildings.

For further information, including specific grant contacts, additional grant information, brownfields news and events, and publications and links, visit the EPA Brownfields Web site (http://www.epa.gov /brownfields).

*The information presented in this fact sheet comes from the grant application; EPA cannot attest to the accuracy of the information. The cooperative agreement is negotiated after the selection announcement. Therefore, the funding amount and activities described in this fact sheet are subject to change.*