ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084
*Attorney for Plaintiff*
CITY OF FRESNO

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230
*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH
LAKE TAHOE; COUNTY OF SACRAMENTO; COUNTY OF
MONROE; MONROE COUNTY AIRPORT AUTHORITY;
COUNTY OF SAN DIEGO, COUNTY OF MARIN, CITY OF
ALAMEDA, CITY OF REDWOOD CITY

YIBIN SHEN (SBN 233545)
Alameda City Attorney
yshen@alamedaca.gov
CARA SILVER (SBN 136992)
Special Counsel
csilver@alamedaca.gov
DANIEL J. TURNER (SBN 336499)
Deputy City Attorney
dturner@alamedaca.gov
2263 Santa Clara Avenue, Rm 280
Alameda, CA 94501
Telephone: (510) 747-4750
*Attorneys for Plaintiff*
CITY OF ALAMEDA

MELISSA C. ALLISON (MA Bar No. 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL (MA Bar No. 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500
*Attorneys for Plaintiffs*
COUNTY OF MONROE
MONROE COUNTY AIRPORT AUTHORITY
* *Appearing pro hac vice*

BRIAN E. WASHINGTON (SBN 146807)
Marin County Counsel
KATE K. STANFORD (SBN 302825)
Deputy County Counsel
kate.stanford@marincounty.gov
EDWARD F. SEARS (SBN 297775)
Deputy County Counsel
ned.sears@marincounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF MARIN
3501 Civic Center Drive, Room 275
San Rafael, CA 94903
Telephone: (415) 473-6117
Facsimile: (415) 473-3796
*Attorneys for Plaintiff*
COUNTY OF MARIN

LYNDSEY OLSON (MN Lic. #0332288)*
Saint Paul City Attorney
Lyndsey.olson@ci.stpaul.mn.us
KELSEY MCELVEEN (MN Lic. #0396744)*
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone: (651) 266-8710
Facsimile: (651) 298-5619
*Attorneys for Plaintiff*
CITY OF SAINT PAUL
* *Appearing pro hac vice*

RENNE PUBLIC LAW GROUP
Attorneys at Law

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH LAKE TAHOE; CITY OF SAINT PAUL; COUNTY OF SACRAMENTO; COUNTY OF MONROE; MONROE COUNTY AIRPORT AUTHORITY; COUNTY OF SAN DIEGO, COUNTY OF MARIN; CITY OF ALAMEDA; CITY OF REDWOOD CITY, | Case No.: 3:25-cv-07070-RS |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; the U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SEAN DUFFY in his official capacity as Secretary of the U.S. Department of Transportation; the U.S. DEPARTMENT OF TRANSPORTATION; MARCUS J. MOLINARO in his official capacity as the Administrator of the Federal Transit Administration ; the FEDERAL TRANSIT ADMINISTRATION; GLORIA M. SHEPHERD in her official capacity as the Executive Director of the Federal Highway Administration; the FEDERAL HIGHWAY ADMINISTRATION; BRYAN BEDFORD in his official capacity as the Administration of the Federal Aviation Administration; the FEDERAL AVIATION ADMINISTRATION; ROBERT F. KENNEDY, JR. in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; LEE ZELDIN in his official capacity as Administrator of the Environmental Protection Agency; and the U.S. ENVIRONMENTAL PROTECTION AGENCY, | |
| Defendants. | |

RENNE PUBLIC LAW GROUP
Attorneys at Law

I.    INTRODUCTION

Plaintiffs bring this action reluctantly, only after the current Administration's actions have left them no other means of protecting the federal funding essential to their communities. For years, Plaintiffs have relied on congressionally authorized grant programs to deliver core public services that safeguard public safety and health, connect residents to opportunity, and sustain local economies. They have endeavored to work cooperatively with federal agencies to administer these programs, but the lawful and predictable administration of these grants has now been upended.

The Constitution vests Congress—not the Executive—with the authority to make laws and appropriate federal funds. *See* U.S. Const. art. I, § 8; *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890). While the Executive Branch is charged with faithfully executing the laws enacted by Congress, that duty does not include the power to unilaterally rewrite or expand the statutory terms under which federal funds are awarded. *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

Here, the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Department of Health and Human Services ("HHS"), the U.S. Environmental Protection Agency ("EPA"), and the U.S. Department of Transportation ("DOT")—including its operating administrations[1] such as the Federal Transit Administration ("FTA"), the Federal Highway Administration ("FHWA"), and the Federal Aviation Administration ("FAA") (collectively, the "Defendants")—have imposed vague and unauthorized conditions on federal grants to coerce compliance with executive policy preferences. These actions exceed Defendants' constitutional and statutory authority, erode the separation of powers, and disregard core constitutional and statutory protections, including the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the Administrative Procedure Act's ("APA") procedural safeguards.

Defendants' overbroad interpretation and enforcement of these conditions are not hypothetical. On or around August 18, 2025, the City of Fresno received an email from HUD notifying it that HUD "is

---

[1] The FAA, FTA, FHWA, and similar modal agencies within the DOT are officially known as "Operating Administrations." *See* 49 C.F.R. § 9.3 (defining 'operating administrations' to include FAA, FTA, FHWA, and others within the Department of Transportation); 49 C.F.R. pt. 1, subpt. D (delegating authority to Operating Administrations).

-3-

RENNE PUBLIC LAW GROUP
Attorneys at Law

questioning the accuracy of the City of Fresno's certification that the Community Development Block Grant (CDBG) funds described in its Fiscal Year 2025 Consolidated Plan/Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders."  HUD has directed Fresno to remove all references to the words "equity," "environmental justice," and all transgender references, and provide assurances that "[t]he City of Fresno shall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  HUD directed Fresno to take these actions no later than 12:00 pm EDT Thursday, August 21, 2025, and provided that "failure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan."  Defendants' unlawful attempts to repurpose congressionally established grant programs to serve unilateral policy goals have placed at risk hundreds of millions of dollars in funding already awarded or soon to be awarded to Plaintiffs.  If allowed to stand, these unauthorized and unlawful conditions will severely compromise Plaintiffs' ability to maintain safe and reliable transportation infrastructure, ensure aviation safety, public health, and sustain essential transit services.  These consequences would ripple across the economy, leaving Plaintiffs more vulnerable to accidents, service failures, and disinvestment.  Plaintiffs, therefore, have been forced to file this suit not out of preference, but out of necessity, seeking declaratory and injunctive relief to prevent the enforcement of these unlawful conditions and to preserve their ability to carry out the federally funded programs their residents depend on.

## II.    JURISDICTION

1.      The Court has jurisdiction under 28 U.S.C. § 1331.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 et seq.

2.      Venue properly lies within the Northern District of California because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiffs County of Marin, City of Eureka, City of Alameda and City of Redwood City reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district.  28 U.S.C. § 1391(e)(1).

RENNE PUBLIC LAW GROUP
Attorneys at Law

3.      Divisional Assignment: Pursuant to Civil Local Rule 3-2(d), except as provided in Civil L.R. 3-2(c), all civil actions that arise in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo or Sonoma shall be assigned to the San Francisco Division or the Oakland Division..  This action arises in various counties, including the counties of Alameda, Marin, and San Mateo.

## III.     PARTIES

4.      Plaintiff City of Fresno is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.  Fresno's city-operated airports have been allocated approximately $50 million in FAA grants for capital improvement projects and anticipate approximately $100 million in additional grant funding to complete planned airport infrastructure improvements, including the construction of a new air traffic control tower.  If Fresno does not accept the FAA's newly imposed conditions and submit its reimbursement request by the end of September, more than $13 million in already allocated and expended grant funds will lapse, leaving Fresno unable to recover those funds.

5.      Fresno has also been awarded or allocated approximately $11.7 million annually in HUD grants administered through various programs under HUD's Office of Community Planning and Development ("CPD"), over $100 million in DOT grants, described further below, to fund a broad range of transportation and infrastructure projects, and $2.2 million in Brownfields grants from the EPA. In addition, as a Designated Subrecipient of Caltrans, Fresno was approved for a $600,000 grant from DOT through Caltrans for the construction of a pedestrian bridge over Highway 99. Fresno was also awarded a 5339a grant for $1,264,735 this June for Fresno's ongoing Facility Improvement project for the Fresno Area Express ("FAX") yard, which houses Fresno's public transit buses.

6.      Plaintiff County of Sacramento is a political subdivision of the State of California and a home rule charter County.  County of Sacramento owns and operates the County's Airport System, consisting of four airports: Sacramento International ("SMF"), Mather ("MHR"), Sacramento Executive ("SAC"), and Franklin Field ("F72")—through its Department of Airports, except for SAC, which is leased from the City of Sacramento.  The Airport System operates as a self-supporting enterprise fund, relying solely on airport revenues and federal funding, with no local tax dollars.

RENNE PUBLIC LAW GROUP
Attorneys at Law

7.      County of Sacramento depends heavily on FAA grants, including Airport Improvement Program ("AIP") entitlement and discretionary grants, and Airport Infrastructure Grants ("AIG") and Airport Terminal Program ("ATP") grants.  From 2021 through 2023, the County received a total of $22,498,822 in AIP grants.  In 2024, the FAA awarded the Airport System $14,573,636 in AIP grants.  To date, the FAA also has awarded $45,166,763 in Infrastructure Investment and Jobs Act ("IIJA") grants to the Airport System.  In addition to these grants, the FAA has set aside approximately $70 million to relocate and construct a new air traffic control tower at SMF.  The County expects to receive approximately $9.5 million in grant funding for additional rehabilitation work on Runway 4R/22L at MHR.  To continue meeting the needs of the Airport System's rapidly growing catchment area, the Department also will apply for, and anticipates receiving, an additional $167.5 million in combined AIP and IIJA grants to finance various capital projects.

8.      In 2024, County of Sacramento secured a Transportation Infrastructure Finance and Innovation Act ("TIFIA") loan from DOT's Build America Bureau, which provides low-cost loans to eligible large-scale infrastructure projects.  The $36.1 million TIFIA loan is also financing the Pedestrian Walkway Project, which is scheduled to open in the summer of 2026.

9.      County of Sacramento's Department of Health Services encompasses Behavioral Health Services, Public Health, Primary Care Services, and Correctional Health Services.  The County also owns and operates a federally qualified health center ("FQHC"), known as the County of Sacramento Health Center.  The County's Health budget relies on many millions of dollars in federal funding, including sizeable grants from the U.S. Department of Health and Human Services ("HHS") and its divisions.  Currently, the County holds direct and sub-recipient federal grant allocations from HHS, including HRSA, CDC, SAMHSA, and other DHHS Administrative agencies, totaling nearly $148 million.

10.     County of Sacramento receives HUD funding for the support of critical and essential homeless services and housing programs and projects as a passthrough subrecipient entity from Sacramento Housing and Redevelopment Agency ("SHRA") and Sacramento Steps Forward ("SSF"), the lead agency for Sacramento's Continuum of Care ("CoC").  Currently, about $277,500 of Emergency Solutions Grant ("ESG") and $363,000 Community Development Block Grant Programs ("CDBG")

RENNE PUBLIC LAW GROUP
Attorneys at Law

Public Service funds are used to operate the Mather Community Campus Singles Shelter, which provides shelter, supportive services, and re-housing for up to 150 adults.

11.    County of Sacramento relies on federal funding from the DOT, FHWA, and FTA to provide critical transportation planning and improvements.  For FY2025, the County was allocated $463,882 in Section 5311 grant funds and has received the updated FTA Certifications and Assurances that must be executed within the next few weeks to maintain eligibility for continued FTA formula grants.  In FYs 2023–2024 and 2024–2025, the County received approximately $47,991,689 in FHWA funds to support bridge replacement, street rehabilitation, bicycle and pedestrian improvements, and other critical projects, and for FY 2025–2026 it has budgeted an additional $33 million in FHWA funding for similar work.  The County has also been awarded two discretionary FHWA grants: $800,000 from the Bridge Investment Program and $1,859,680 from the Advanced Transportation Technology and Innovation Program for its County of Sacramento Complete Pedestrian Trips project.  In total, these federal transportation funds amount to approximately $84 million.

12.    Plaintiff City of South Lake Tahoe is a municipal corporation organized under the existing laws of the State of California.  The City of South Lake Tahoe owns and operates the Lake Tahoe Airport ("TVL") as a division of its Public Works Department and serves as the airport sponsor for purposes of federal grant funding.  TVL is a general aviation airport and is the only airport within the Lake Tahoe Basin, thereby serving an important role in the area's economy and a critical role in public safety for aircraft access and emergency response staging during large-scale emergencies such as wildfires.

13.    The City of South Lake Tahoe depends on FAA grants to support critical capital projects and maintenance to comply with federally imposed safety requirements, including AIP entitlement and discretionary grants, and AIG grants.  Annually, the City of South Lake Tahoe receives approximately $150,000 in AIP entitlement funds and was allocated $556,000 in AIG grants for Fiscal Years 2022–2025.  The City currently holds FAA grant allocations totaling approximately $1,050,000 for critical capital projects, including its Pavement Maintenance and Management Program and Airport Master Plan. The City of South Lake Tahoe anticipates needing approximately $20 million in FAA funding over the next three years for Taxiway Alpha Reconstruction, a project necessary to maintain compliance with federal safety standards and ensure safe aircraft operations.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

14.     Plaintiff City of Eureka is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.  Eureka is a recipient of substantial federal funding administered by both HUD and the DOT.  The City will be seeking $5,000,000 in Safe Streets and Roads for All ("SS4A") grants for future implementation projects and $1,030,111 in Emergency Solutions Grant ("ESG") funding. Eureka also frequently utilizes other HUD programs, including Community Development Block Grants ("CDBG") and Continuum of Care grants, and intends to pursue additional grant opportunities in upcoming funding cycles.

15.     Plaintiff City of Saint Paul is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota.  It is a charter city.  Saint Paul is a recipient of substantial federal funding administered by both HUD and the DOT.  Through HUD, Saint Paul receives entitlement grants allocated by statutory formula, including CDBG, HOME, ESG, as well as congressionally directed earmark funding.  At present, Saint Paul has $45.1 million in HUD funds under contract, consisting of $27.1 million in CDBG funds, $7.2 million through the HOME program, $5.7 million in HOME–American Rescue Plan funds, $1.1 million in ESG funds, and $2.6 million in Congressionally Directed Spending.

16.     Saint Paul also receives entitlement and discretionary funding through DOT, including SS4A funds and awards under the Innovative Finance and Asset Concession ("IFAC") program. Currently, the City has $36.3 million in DOT funds under contract, including.  The City has additionally been awarded $62.8 million in DOT grants not yet under contract—including $15.7 million through SS4A, and $805,000 in IFAC funds—and has a pending $44.3 million application under the Bridge Investment Program ("BIP").  In total, Saint Paul currently has $197.3 million in federal funding under contract, with approximately $144.6 million dedicated to one-time capital projects and $52.6 million allocated to operational funding.  Beyond these amounts, the City has been awarded $64.6 million in federal funds that remain in the post-award contracting phase and has pending applications for an additional $64.2 million.

17.     Plaintiff County of Monroe is a municipal corporation duly incorporated and existing under the laws of the State of New York.

18.     Plaintiff Monroe County Airport Authority ("Monroe Airport Authority") is a public

-8-

benefit corporation that was created to finance, construct, develop, operate and maintain aviation and other related facilities and services with the County of Monroe.

19.     Monroe Airport Authority leases the Frederick Douglass Greater Rochester International Airport ("ROC") from the County of Monroe and operates under the terms of a lease and operating agreement dated September 15, 1989, as amended.

20.     In FY 2025, the County of Monroe and Monroe Airport Authority expect to receive over $13 million in DOT grants administered by the FAA to improve safety, security, and infrastructure at ROC.  For example, the County of Monroe and Monroe Airport Authority are relying on over $9 million in IIJA grants to carry out a critically important Terminal rehabilitation project for the airport, which includes replacing the existing fire alarm system for the Terminal, rehabilitating the Terminal viaduct and bridge, and replacing vestibule doors and elevators throughout the Terminal.  They also expect to receive several millions of dollars in AIP grants to acquire Aircraft Rescue & Firefighting ("ARFF") safety vehicles and equipment, to rehabilitate the Airport's ARFF building, to develop an FAA-required pavement management program, to ensure that airfield taxiways meet current FAA design standards, and to remove runway obstructions.

21.     Plaintiff Monroe County relies on federal funding from HUD to fund the County's Annual Action Plan.  Monroe County utilizes CDBG, HOME, and ESG grants to fund development of affordable and accessible housing and homeownership opportunities for all low-to-moderate income residents. Annually, the County receives an allocation of approximately $3.1 million in HUD funds.  For the City Program Year 2025, Monroe anticipates expending over $1.8 million of its CDBG allocation on public infrastructure projects, public services, micro-enterprise assistance, fair housing, Section 108 loan payments, and administration and compliance.  For the same Program Year, Monroe County anticipates expending over $1.1 million in its HOME program allocation for affordable housing, CHDO housing development, Tenant-Based Rental Assistance, and administration and compliance.  In addition, Monroe anticipates expending approximately $164,000 in its ESG allocation for rapid rehousing projects, emergency shelter/street outreach, homelessness prevention, and administration and compliance.

22.     Monroe County also depends on federal funding from DOT through the SS4A grant to conduct supplemental planning and demonstration activities to identify and mitigate hazardous

RENNE PUBLIC LAW GROUP
Attorneys at Law

conditions at intersections and address safety concerns in high-risk corridors. The County expects to receive $955,476 in SS4A Grants throughout its two-year planning program, in 2025 and 2026.

23.    Plaintiff County of Marin is a political subdivision of the State of California and a governmental entity that serves the Marin County geographic region.

24.    The Marin County Department of Public Works manages the Marin County Airport at Gnoss Field which provides a facility for local aviation, flight training, air charter operations, airplane and helicopter medical flights, and air-to-ground ambulance transfers for the Marin County area.

25.    The County of Marin currently has an open $900,000 FAA AIP grant that was awarded in August 2022, with a four-year budget period to fund preliminary designs, environmental mitigation, and permit applications associated with its runway extension project. The County of Marin relies on FAA funding to complete the runway extension project and to maintain FAA's safety, security, and infrastructure requirements.

26.    In addition, the County of Marin relies significantly on DOT and FHWA funding to provide infrastructure projects, including emergency road repairs, bridge replacements, and safety improvements. For fiscal year 2023-2024, Marin's Department of Public Works received approximately $4 million in FHWA funding for highway maintenance, roadwork, and traffic safety measures. For fiscal year 2024-2025, Marin's Department of Public Works has received approximately $6 million in federal funding to date. The County of Marin anticipates it will receive approximately $43 million in additional FHWA funding over the next five years to complete existing projects or for similar projects.

27.    The County of Marin's Department of Health and Human Services relies on approximately $57 million in HHS federal funding, including over $10 million in discretionary grants annually. For example, the County of Marin receives over $2.8 million annually from the CDC to strengthen the County's overall ability to respond to public health emergencies, support the County's access to infectious disease laboratories, and support the County's public health. Marin County's Continuum of Care also receives over $5 million annually in HUD CoC grants to fund programs and efforts addressing homelessness. The majority of these funds are granted directly from HUD to the County's partner agencies. For fiscal years 2024 and 2025, Marin was awarded approximately $5.7 million in CoC grants, with the County receiving approximately $400,000 directly.

RENNE PUBLIC LAW GROUP
Attorneys at Law

28.     Plaintiff County of Marin also depends on federal funding from CDBG and HOME HUD programs to fund housing and community development programs that assist low- and moderate-income households by providing decent, affordable housing, creating suitable living environments, and expanding economic opportunities.  Annually, the County receives an allocation of approximately $2.2 million in federal funding for housing and community development projects.  For Program Year 2025, Marin anticipates expending over $1.5 million in its CDBG allocation for affordable housing development and rehabilitation, public services, fair housing, and administration and compliance.  For the same Program Year, Marin anticipates expending approximately $700,000 in HOME program allocation for affordable housing development and rehabilitation.

29.     Plaintiff City of Alameda is a municipal corporation and incorporated city in California. The City of Alameda provides a full range of municipal services to its residents, including police, fire, and emergency response services, a library system, a public park system, its own public electric utility company, land use and transportation planning and public works.

30.     The City of Alameda relies on federal funding from DOT, FHWA, and FTA to provide critical transportation planning and improvements.  For FY 2024, the City of Alameda was allocated approximately $16 million in SS4A grants for the City's Lincoln Avenue/Marshall Way/Pacific Avenue Corridor Improvement Project.  In addition, the City of Alameda was awarded $1,236,715 in DOT/FHWA funds for transportation emissions reduction projects. For FY 2026, the City of Alameda will apply for $10 million DOT grant to address failures on seaplane ramps and bulkhead.

31.     Plaintiff City of Alameda also relies on funding from HUD.  The City of Alameda receives over $2 million in CDBG funds annually to support affordable housing projects and related public improvements, social services, and to provide administrative oversight of those social services and capital projects.  In addition, the City of Alameda receives approximately $547,060 annually in HOME grants to fund inclusionary housing projects.  The City of Alameda has also applied for a $2,497,000 EPA grant to fund local partnerships to build a system for advancing sustainable development at Alameda Point, the former Naval Air Station Alameda, with meaningful community engagement.

32.     Plaintiff City of Redwood City is a municipal corporation and incorporated city under the laws of the State of California.  Redwood City provides municipal services to a community of about

RENNE PUBLIC LAW GROUP
Attorneys at Law

82,423.  Forty-one percent of all households in Redwood City are considered lower income with 15% considered extremely low income, 11% considered very low income, and 15% considered low income.

33.     Redwood City relies on HUD funding including CDBG and HOME grants. Redwood City has been awarded approximately $6.2 million in HUD funding, including over $2 million in CDBG grants and over $3 million in HOME grants.  In addition, Redwood City has $4.2 million in CDBG program income and has committed those funds to make major improvements to Hoover Park.  The park is larger than ten acres in a primarily low-to-moderate income area.

34.     Redwood City receives funding from DOT and FHWA as a subrecipient.  Redwood City has received an award of $855,500 in funding from DOT and FHWA for the Bridge Parkway over Marine World Lagoon project.  Redwood City has also received an $8 million grant from the State of California Department of Transportation, which includes DOT and FHWA funding for the U.S. Highway 101/ SR 84 Interchange Reimagined project.  In addition, Redwood City has been awarded $3.8 million in One Bay Area Grant 3 funding from the State of California Department of Transportation, which includes FHWA funding, for the Bay Road Complete Streets Rehabilitation Project, $3.4 million in One Bay Area Grant 3 funding from the State of California Department of Transportation, which includes FHWA funding, for the Roosevelt Traffic Calming-Permanent Project, $1,321,000 in One Bay Area Grant 3 funding from the State of California Department of Transportation, which includes FHWA funding, for HIP Program Allocation, and $350,000 in Transit-Oriented Communities Planning and Implementation Grant funding from the State of California Department of Transportation, which includes FHWA funding, for the Parking Management project.

35.     In addition, EPA has appropriated $1,200,000 for a grant for Redwood City's Citywide Stormwater Infrastructure Improvement Project.  The City is currently preparing pre-award materials to secure these grant funds.

36.     Plaintiff County of San Diego is a political subdivision of the State of California and a governmental entity that serves the San Diego County geographic region.  It is the second-most populous county in California.

37.     The County of San Diego manages seven airports within the County including Borrego Valley Airport, Fallbrook Community Airpark, Gillespie Field, Jacumba Airport, McClellan-Palomar

-12-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Airport, Ocotillo Airport, and Ramona Airport. These airports support over 500,000 annual aircraft operations, have over 1,280 based aircraft, and at Palomar Airport, include one of only two airports in San Diego County providing scheduled airline service to passengers.

38.    The County of San Diego's airport system relies on regular funding from FAA to complete necessary maintenance and improvements. For FY 2025, the County of San Diego anticipates approximately $3,367,407 in revenue from FAA grants. FAA funding has been necessary to operate the airport system for at least the last 10 years. The County of San Diego has specifically submitted and received an AIP grant offer for its runway rehabilitation project for Fallbrook Airport. The airport's single runway has deteriorated and is in dire need of resurfacing.

39.    Plaintiff County of San Diego also receives funding from HUD. The County has been allocated approximately $14 million in CDBG, ESG, HOME, and HOPWA funds for fiscal year 2025-2026. The funds are received and administered on behalf of 12 smaller cities within the County of San Diego, including Coronado, Del Mar, Lemon Grove, Poway, Imperial Beach, and Solana Beach. For the fiscal year 2025-2026, the County has been allocated approximately $4,283,065 in CDBG funding and $371,576 in ESG funding. The allocations are used for activities such as street improvements, ADA barrier removal, improvements at senior centers and medical clinics, grants and loans for home and mobile home rehabilitation, affordable housing activities, providing emergency shelters, and other vital services. For the same fiscal year, the County received an allocation of $2,870,446 in HOME funds to support the development of affordable multifamily rental housing, first time home buyer programs, and rental assistance to special-needs populations. The County has also received an allocation of approximately $6,369,845 in HOPWA funds to support people living with HIV/AIDS and their families with housing, meal delivery, housing stabilization, emergency and transitional housing, and supportive services. The County received an allocation of approximately $631,547 in ESG funds.

40.    Defendant Scott Turner is the Secretary of HUD, the highest-ranking official in HUD, and is responsible for the decisions of HUD. He is sued in his official capacity.

41.    Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

42.     Defendant Sean Duffy is the Secretary of DOT, the highest-ranking official in DOT, and is responsible for the decisions of DOT.  He is sued in his official capacity.

43.     Defendant DOT is an executive department of the United States federal government.  49 U.S.C. § 102(a).  It houses a number of operating administrations ("OAs"), including the FTA, FHWA, FAA, and FRA.  DOT is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

44.     Defendant Marcus J. Molinaro is the Administrator of the FTA, the highest-ranking official in the FTA, and is responsible for the decisions of the FTA.  He is sued in his official capacity.

45.     Defendant FTA is an operating administration within DOT.  49 U.S.C. § 107(a).  FTA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

46.     Defendant Gloria M. Shepherd is the Executive Director of the FHWA, the highest-ranking official in the FHWA, and is responsible for the decisions of the FHWA.  She is sued in her official capacity.

47.     Defendant FHWA is an operating administration within DOT.  49 U.S.C. § 104(a).  FHWA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

48.     Defendant Bryan Bedford is the Administrator of the FAA, the highest-ranking official in the FAA, and is responsible for the decisions of the FAA.  He is sued in his official capacity.

49.     Defendant FAA is an operating administration within DOT.  49 U.S.C. § 106(a).  FAA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

50.     Defendant Robert F. Kennedy, Jr. is the Secretary of the U.S. Department of Health and Human Services ("HHS"), the highest-ranking official in HHS, and responsible for the decisions of HHS.  He is sued in his official capacity.

51.     Defendant HHS is an executive department of the United States federal government. 42 U.S.C. § 3501.  HHS is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

52.     Defendant Lee Zeldin is the Administrator of the Environmental Protection Agency ("EPA"), the highest-ranking official in the EPA, and is responsible for the decisions of the EPA.  He is sued in his official capacity.

53.     Defendant EPA is an executive agency of the United States federal government.  42 U.S. Code § 13102(2).  EPA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

-14-

## IV.    FACTUAL ALLEGATIONS

### A.    HUD Grant Programs

54.    Congress established HUD in 1965 to promote the "sound development of the Nation's communities and metropolitan areas" by, among other things, administering programs that "provide assistance for housing" and "development."  Department of Housing and Urban Development Act, 1965 § 2, Pub. L. No. 89-174, 79 Stat. 667.  The HUD Secretary is responsible for all actions taken by the Department and its component offices.  *See* 42 U.S.C. §§ 3533, 3535; 24 C.F.R. Part 5.  HUD administers both competitive and formula grant programs.  Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019).  Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up).  HUD administers grants directly and through its program offices, including the Office of Community Planning & Development (CPD), and regional field offices.  *See* 24 C.F.R. subchapter C (CPD-administered programs); *id*. § 982.101 (allocating budget authority for Section 8 Housing Choice Voucher program to field offices).

### 1.    Continuum of Care Grant Program

55.    Congress established the Continuum of Care ("CoC") program through the enactment of the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act"). 42 U.S.C. §§ 11301, 11381.  The program's "purpose" is to "promote community-wide commitment to the goal of ending homelessness" by "provid[ing] funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families."  *Id*. §11381.  In addition, the CoC program is designed to promote access to and effective utilization of mainstream programs by homeless individuals and families; and to optimize self-sufficiency among those experiencing homelessness.  *Id.*

56.    The Homeless Assistance Act directs the Secretary of HUD (the "HUD Secretary") to award CoC grants on a competitive basis using statutorily prescribed selection criteria.  42 U.S.C. §11382(a).  These grants fund critical homelessness services administered by grant recipients either directly or through service providers contracted by the grant recipient.  The CoC program funds a variety

RENNE PUBLIC LAW GROUP
Attorneys at Law

of programs that support homeless individuals and families, including through the construction of supportive housing, rehousing support, rental assistance, and supportive services, including childcare, job training, healthcare, mental health services, trauma counseling, and life skills training. *Id.* §11360 (29), 11383.

57.    Grants are awarded to local coalitions, or "Continuums," that may include representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and other stakeholders. 24 C.F.R § 578.3. Each Continuum designates an applicant to apply for CoC funding on behalf of the Continuum. *Id.*

### a. Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding CoC Grant Conditions

58.    HUD's administration of the CoC program, including the award of CoC grants, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the CoC program, the selection criteria HUD must apply in awarding CoC grants, and program requirements HUD can require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. §§ 11383, 11386, 11386a.

59.    Section 422 of the Homeless Assistance Act, 42 U.S.C. §§ 11382, contains Congress's overarching authorization for HUD to award CoC grants. Subsection (A) of that section states:

> The Secretary shall award grants, on a competitive basis, and using the
> selection criteria described in section 11386a of this title, to carry out
> eligible activities under this part for projects that meet the program
> requirements under section 11386 of this title, either by directly awarding
> funds to project sponsors or by awarding funds to unified funding agencies.

60.    Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use. These required criteria include things like the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need within the geographic area for homeless services. *Id.* (b)(1)-(2).

RENNE PUBLIC LAW GROUP
Attorneys at Law

61.     Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth "[r]equired agreements" to which grant recipients must adhere.  Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional shelter," "place families with children as close as possible to their school of origin," and obtain various certifications from direct service providers. 42 U.S.C. § 11386(b).

62.     The Homeless Assistance Act does not authorize HUD to condition CoC funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, exclusion of transgender people, or cutting off access to information about lawful abortions.

63.     Congress has authorized the Secretary to promulgate regulations establishing, *inter alia*, other selection criteria and "other terms and conditions" on grant funding "to carry out [the CoC program] in an effective and efficient manner." *Id*. §§ 11386(b)(8), 11386a(b)(1)(G), 11387.

64.     Pursuant to this authority, HUD has promulgated the Continuum of Care Program rule at 24 C.F.R. part 578 (the "CoC Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the CoC grant agreements they execute with HUD.  *Id*. § 578.23(c). While CoC Rule permits HUD to require CoC recipients to comply with additional "terms and conditions," such terms and conditions must be "establish[ed] by" a Notice of Funding Opportunity (NOFO).[2]  *Id*. § 578.23(c)(12).

65.     The CoC Rule does not impose any conditions on CoC funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

---

[2] The terms NOFO, "Notice of Funding Availability," and "Funding Opportunity Announcement" refer to a formal announcement of the availability of federal funding. As part of an effort to standardize terminology, most federal agencies now use the term NOFO. For clarity, this Complaint uses the term NOFO.

RENNE PUBLIC LAW GROUP
Attorneys at Law

**b. Congress Appropriates CoC Grant Funding and Authorizes HUD to Issue a NOFO for Fiscal Years 2024 and 2025**

66. Funding for CoC grants comes from congressional discretionary appropriations.

67. Most recently, Congress appropriated funds for the CoC program in the Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25 (the "2024 Appropriations Act").

68. The 2024 Appropriations Act contains additional directives to HUD regarding CoC funding. For instance, it requires the Secretary to "prioritize funding. . . to continuums of care that have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects," and requires the Secretary to "provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services." *Id*., 138 Stat. 362-363.

69. The 2024 Appropriations Act also authorized HUD to issue a two-year NOFO for Fiscal Years 2024 and 2025 program funding. *Id*., 138 Stat. 386.

70. By statute, the HUD Secretary must announce recipients within five months after the submission of applications for funding in response to the NOFO. 42 U.S.C. § 11382(c)(2).

71. The HUD Secretary's announcement is a "conditional award," in that the recipient must meet "all requirements for the obligation of those funds, including site control, matching funds, and environmental review requirements." *Id*. § 11382(d)(1)(A).

72. Once the recipient meets those requirements, HUD must obligate the funds within 45 days. *Id*. § 11382(d)(2) (providing that "the Secretary shall obligate the funds").

73. None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CoC grant fund conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

**c. HUD Conditionally Awards CoC Grants**

74. In July 2024, HUD posted a biennial NOFO announcing a competition for CoC funding for Fiscal Years 2024 and 2025 (the "FYs 2024 & 2025 NOFO"). *See* U.S. Dep't of Housing & Urban Dev., Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and

RENNE PUBLIC LAW GROUP
Attorneys at Law

Renewal or Replacement of Youth Homeless Demonstration Program (Jul. 24, 2024), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

75.    The FYs 2024 & 2025 NOFO directed Continuums to consider policy priorities in their applications, including "Racial Equity" and "Improving Assistance to LGBTQ+ Individuals." *Id.* at 9. The FYs 2024 & 2025 NOFO specified that "HUD is emphasizing system and program changes to address racial equity within CoCs and projects. Responses to preventing and ending homelessness should address racial inequities . . . ." *Id.* The FYs 2024 & 2025 NOFO further specified that "CoC should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation." *Id.*

76.    The NOFO did not include any grant conditions prohibiting DEI efforts, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Nor did any of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose such conditions on CoC grants.

77.    CoC grants fund permanent supportive housing programs, which provide long-term, affordable housing combined with supportive services for individuals and families experiencing, or at risk of homelessness. Such supportive services include case management which provides links to healthcare, job training, and other resources that facilitate their ability to obtain and keep their housing. These programs allow participating individuals and families to live independently and stably in their communities.

### 2.    Community Development Block Grant Program

78.    Congress established the Community Development Block Grant ("CDBG") program through Title I of the Housing and Community Development Act of 1974 (the "HCD Act"), Pub. L. 93-383, 88 Stat. 633, and subsequent amendments. The program's stated "primary objective" is to promote "development of viable urban communities" through "decent housing," a "suitable living environment," and "expan[sion of] economic opportunities, principally for persons of low and moderate income." 42

RENNE PUBLIC LAW GROUP
Attorneys at Law

-19-

U.S.C. § 5301(c).  Specific objectives include "conserv[ing] and expan[ding] the Nation's housing stock" especially for low- and moderate-income households, promoting mixed-income communities, and enhancing the "diversity and vitality of neighborhoods" by eliminating slums or blight and revitalizing "deteriorating or deteriorated neighborhoods," among other goals.  *Id*. § 5301(c)(1), (c)(3), (c)(6).

79.    The CDBG program is codified at title 42, chapter 69 of the U.S. Code.  The program provides flexible funding through annual block grants awarded on a formula basis to state and local governments for purposes related to economic and community development.  In enacting the program, Congress consolidated "a number of complex and overlapping" grant programs such that funding would be provided "on an annual basis, with maximum certainty and minimum delay," and communities could "rely [on funding] in their planning."  *Id*. § 5301(d).  The HCD Act permits communities to tailor program activities to meet local needs so long as they advance national objectives identified by Congress, including benefiting low- and moderate-income persons, preventing or eliminating slums or blight, or, in certain cases, responding to serious and immediate threats to community health or welfare where other funds are unavailable.  *Id*. §§ 5301(c), 5304(b)(4).

80.    The HCD Act authorizes the HUD Secretary to award CDBG funds using statutorily prescribed selection criteria.  42 U.S.C. §§ 5303–04.  The HUD Secretary must distribute funds annually using a formula that considers population and measures of distress including poverty, age of housing, housing overcrowding, and growth lag.  *Id*. §§ 5303–04, 5306.  These grants fund vital urban community development projects and public services administered by grant recipients either directly or through service providers contracted by the grant recipient.  *See id*. § 5305 (listing activities eligible for assistance).

### d.    Congress Imposes Legislative Directives, and HUD Promulgates Rules Regarding CDBG Grant Conditions

81.    HUD's administration of the CDBG program, including the award of block grants, is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the CDBG program, the selection criteria HUD must apply in awarding CDBG grants, and program requirements HUD can require recipients agree to as conditions for receiving funds.  *See* 42 U.S.C. §§ 5301, 5304–05.

-20-

RENNE PUBLIC LAW GROUP
Attorneys at Law

82.     Section 103 of the HCD Act, 42 U.S.C. § 5303, contains Congress's overarching authorization to award CDBG funding.  That provision states in relevant part: "The Secretary is authorized to make grants to States, units of general local government, and Indian tribes to carry out activities in accordance with the provisions of this chapter."

83.     In addition to the statutory objectives and allocation formula discussed above, Congress has imposed other requirements on CDBG funds.  For instance, 42 U.S.C. § 5305 limits the use of CDBG funds to enumerated eligible activities.  The HCD Act also mandates that recipients use at least 70% of CDBG funds on activities that principally benefit low- and moderate-income persons, *id*. § 5301(c), and prescribes eligibility criteria for such activities, *id*. § 5305(c).  Grant recipients must also submit annual plans to the HUD Secretary describing their priority nonhousing community development needs eligible for CDBG funding pursuant to procedures set out in the HCD Act.  *Id*. § 5304(m).  Finally, Congress has enumerated various certifications that CDBG recipients must make as a condition of receiving funds, including that the recipient will develop and follow a citizen participation plan, comply with statutory transparency requirements, ensure funds are consistent with the HCD Act's objectives, and administer programs in conformity with nondiscrimination laws.  *Id*. § 5304(a)(3), (b).

84.     The HCD Act does not authorize HUD to condition CDBG funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

85.     The HCD Act indicates congressional intent to benefit historically disadvantaged groups.  For example, the Act requires the Secretary to set aside some of the funds appropriated for the CDBG program for "special purpose grants," which may include, among other things, grants to "historically Black colleges."  42 U.S.C. § 5307(b)(2).  The Act further provides that, of the amount set aside for special purpose grants, the Secretary "shall" make grants to institutions of higher education "for the purpose of providing assistance to economically disadvantaged and minority students who participate in community development work study programs and are enrolled in" qualifying degree programs.  *Id*. § 5307(c).  The Act also authorizes urban development action grants to cities and urban counties experiencing severe economic distress, but only if the HUD Secretary determines the city or county has "demonstrated results in," among other things, "providing equal opportunity in housing and employment

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    for low- and moderate-income persons and members of minority groups." *Id*. § 5318(a)–(b).

2        86.    Congress has authorized the HUD Secretary to promulgate "rules and regulations"

3    necessary to carrying out the Secretary's "functions, powers, and duties." 42 U.S.C. § 3535(d).

4        87.    Pursuant to this authority, HUD has promulgated the CDBG program rule at 24 C.F.R.

5    part 570 (the "CDBG Rule"), which, among other things, imposes additional restrictions on the use of

6    CDBG funds. *See* 24 C.F.R. § 570.207. The CDBG Rule also obligates grant recipients to submit

7    annual consolidated plans in accordance with 24 C.F.R. part 91. 24 C.F.R. § 570.302. These annual

8    consolidated plans must include additional certifications enumerated in HUD regulations, including that

9    the recipient complies with lead-based paint procedures and has policies barring the use of excessive

10   force against non-violent civil rights demonstrators. 24 C.F.R. § 91.225.

11       88.    The CDBG Rule does not impose any conditions on CDBG funding related to prohibiting

12   all forms of DEI policies and initiatives, participating in immigration enforcement, verification of

13   immigration status, opposing transgender acceptance, or cutting off access to information about lawful

14   abortions.

15                        **e.    Congress Appropriates CDBG Grant Funding**

16       89.    Funding for CDBG grants comes from congressional discretionary appropriations.

17       90.    Most recently, Congress appropriated funds for the CDBG program in the 2024

18   Appropriations Act. The 2024 Appropriations Act contains additional directives to HUD regarding

19   CDBG funding. For instance, it requires that no more than 20% of any grant under the CDBG program

20   may be expended for certain planning and administrative purposes and imposes limitations on funds

21   provided to for-profit entities. 138 Stat. 358–59.

22       91.    None of the 2024 Appropriations Act's directives to HUD or any other legislation

23   authorize HUD to impose CDBG grant conditions related to prohibiting all forms of DEI, facilitating

24   enforcement of federal immigration laws, verification of immigration status, or prohibiting the

25   "promot[ion]" of "gender ideology" or "elective abortion."

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

3.    **Emergency Solutions Grant Program**

a.    **Congress Authorizes the Establishment of the Emergency Solutions Grant Program Through the HEARTH Act**

92.    In 2009, Congress established the Emergency Solutions Grant ("ESG") program through the Homeless Emergency Assistance and Rapid Transition to Housing ("HEARTH") Act, Pub. L. 111-22, 123 Stat. 1663. *See* 42 U.S.C. §§ 11371–11378. In enacting the HEARTH Act, Congress sought to remedy the "lack of affordable housing and limited scale of housing assistance programs" that it found to be "the primary causes of homelessness" and "establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." HEARTH Act, § 1002, 123 Stat. 1664. 317.

93.    The HEARTH Act amended the Homeless Assistance Act to expand what had been known as the Emergency Shelter Grant program, which provided formula funding to state and local governments for the short-term needs of homeless individuals. Reflecting a broadened focus on factors that lead to homelessness, the HEARTH Act expanded the activities eligible for funding under the new ESG program to include short- or medium-term rental assistance and housing relocation and stabilization services, in addition to emergency shelters, homelessness prevention, and supportive services, which had been covered under the original program. *See* 42 U.S.C. § 11374(a).

94.    The Homeless Assistance Act, as amended by the HEARTH Act, directs the Secretary of HUD to award ESG grants to cities, urban counties, and states on a non-competitive basis using HUD's formula for allocating CDBG funds, discussed above. 42 U.S.C. §§ 11372, 11373(a). These grants fund programs that address the most critical and immediate needs of those experiencing or at risk of homelessness, including programs for preventing homelessness, immediately rehousing individuals who become homeless, and providing emergency shelter to those experiencing homelessness. *Id.* § 11374(a).

b.    **Congress Imposes Legislative Directive, and HUD Promulgates Rules, Regarding ESG Grant Conditions**

95.    HUD's administration of the ESG program, including the award of ESG funds, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the ESG program, the responsibilities of ESG recipients, and specific certifications ESG

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    recipients must agree to as a condition of receiving funds.  42 U.S.C. §§ 11374(a), 11375.

2       96.    Congress's overarching direction to HUD to award ESG grants is codified at 42 U.S.C.

3    § 11372, which provides:

4           The Secretary shall make grants to States and local governments (and to
            private nonprofit organizations providing assistance to persons
5           experiencing homelessness or at risk of homelessness, in the case of grants
            made with reallocated amounts) for the purpose of carrying out activities
6           described in section 11374 of this title.

7       97.    Section 11374 of Title 42 limits the activities for which ESG funds may be used to

8    specific services: maintaining, operating, or renovating emergency shelters; providing supportive

9    services related to emergency shelter or street outreach; paying short- or medium-term rental assistance;

10   and providing housing relocation or stabilization services for homeless or at-risk individuals and

11   families.

12      98.    Section 11375 of Title 42 sets forth certifications that recipients must make to the

13   Secretary of HUD regarding their use of ESG funds.  Recipients must certify that, among other things,

14   they will operate facilities that receive funding as homeless shelters for a specified number of years, any

15   ESG-funded renovation will be sufficient to ensure the shelter is safe and sanitary, they will assist

16   homeless individuals in obtaining permanent housing and services such as medical and mental health

17   treatment and counseling, and they will involve homeless individuals and families through employment,

18   volunteer services, or otherwise, in constructing and operating shelters to the maximum extent

19   practicable. 42 U.S.C. § 11375(c).

20      99.    The HEARTH Act does not authorize HUD to condition ESG funding on prohibiting all

21   forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or

22   prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

23      100.    Section 11376 of Title 42 authorizes the Secretary of HUD "by notice" to "establish such

24   requirements as may be necessary to carry out the provisions of" the ESG program.  "Such requirements

25   shall be subject to section 553 of title 5," which requires rulemaking to occur pursuant to notice and

26   comment procedures.  42 U.S.C. § 11376.

27      101.    Pursuant to this authority, HUD has promulgated the ESG Rule at 24 C.F.R. part 576,

28   which sets forth additional requirements and conditions on ESG funding.  *See* 24 C.F.R. §§ 576.400–

-24-

RENNE PUBLIC LAW GROUP
Attorneys at Law

576.409.  For instance, the ESG Rule requires ESG recipients to meet minimum safety, sanitation, and privacy standards for emergency shelters; integrate ESG services with other programs targeted to homeless individuals in the area; coordinate with local Continuums; conduct initial evaluations of program participants consistent with HUD requirements; and abide by recordkeeping and reporting requirements.  *Id*. §§ 576.400, 576.401, 576.403(b), 576.500.

102.    The ESG Rule also obligates ESG recipients to submit and obtain HUD approval of a consolidated plan in accordance with the requirements in 24 C.F.R. part 91.  *Id*. § 576.200. HUD's consolidated planning regulations set forth additional certifications that must be included in a consolidated plan, including that the jurisdiction will affirmatively further fair housing, is in compliance with anti-lobbying requirements, and possesses the legal authority to carry out programs for which it is seeking funding, among other certifications.  *Id*. § 91.225(a).

103.    Neither the ESG Rule nor HUD's consolidated planning regulations impose any conditions on ESG funding related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Congress has not delegated authority that would permit an agency to adopt such conditions.

104.    Funding for the ESG program comes from congressional discretionary appropriations.

105.    Most recently, Congress appropriated funds for the ESG program in the 2024 Appropriations Act, 138 Stat. at 362.

106.    Nothing in the 2024 Appropriations Act or any other legislation authorizes HUD to impose ESG grant fund conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 4.    HOME Investment Partnerships Program

107.    Congress established the HOME program through the HOME Investment Partnerships Act (HOME Act), under Title II of the Cranston-Gonzalez National Affordable Housing Act ("NAHA"), Pub. L. No. 101–625, 104 Stat. 4079, and subsequent amendments.  The HOME program is a formula grant program that aims to help state and local governments implement local housing strategies to

increase affordable housing opportunities for low-income families.  The HOME program requires the HUD Secretary "to make funds available to participating jurisdictions for investment to increase the number of families served with decent, safe, sanitary, and affordable housing and expand the long-term supply of affordable housing." 42 U.S.C. §§ 12741, 12747(b).

108.    Participating jurisdictions may use HOME grants for a variety of housing activities. These include providing "incentives to develop and support affordable rental housing and homeownership affordability through the acquisition, new construction, reconstruction, or moderate or substantial rehabilitation of affordable housing."  42 U.S.C. § 12742(a)(1).

109.    Participating jurisdictions must allocate matching funds to affordable housing projects equivalent to at least 25 percent of the HOME funds the jurisdictions use.  42 U.S.C. § 12750.

### a.    Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding HOME Grant Conditions

110.    HUD's administration of the HOME program is authorized and governed by statutory directives.  The HOME Act specifies the eligibility requirements to become a participating jurisdiction, the permissible and prohibited uses of HOME funds, the maximum incomes of families who may receive HOME funds, and what housing qualifies as affordable for purposes of the program.  42 U.S.C. §§ 12742, 12744, 12475, 12476.

111.    The HOME Act does not grant HUD discretion in designating which jurisdictions may participate and under what circumstances those jurisdictions shall receive HOME funds.  It instead directs the HUD Secretary to establish by regulation the statutorily specified procedures with which states and local governments must comply to be designated as participating jurisdictions and receive allocations of HOME funds.  42 U.S.C. § 12746.  The HOME Act provides that such regulations "shall only provide for the" requirements for allocation, eligibility, notification, submission, reallocation, revocation, and reduction of funds listed in the statute.  *Id*. § 12746(1)–(10) (emphasis added).  Once a jurisdiction meets the statutory formula and complies with the listed requirements, HUD "*shall* designate" it "a participating jurisdiction" and the jurisdiction "*shall* remain a participating jurisdiction for subsequent fiscal years" unless certain revocation conditions are met.  *Id*. § 12746(7)–(8) (emphasis added).

RENNE PUBLIC LAW GROUP
Attorneys at Law

112.    The HOME Act further directs the HUD Secretary to "establish by regulation an allocation formula that reflects each jurisdiction's share of total need among eligible jurisdiction[s] for an increased supply of affordable housing for very low-income and low-income families of different size." 42 U.S.C. § 12747(b)(1)(A).  This formula must be based on the "objective measures" specified in the HOME Act.  *Id*.

113.    The Home Act further directs the HUD Secretary to establish a HOME Investment Trust Fund for each participating jurisdiction, along with a line of credit that includes the participating jurisdiction's allocated HOME funds.  42 U.S.C. § 12748(a)–(b).

114.    As directed by Congress, HUD promulgated the HOME program rule at 24 C.F.R. part 92 (the "HOME Rule").  The HOME Rule implements the allocation formula prescribed by Congress, along with the eligibility and related requirements listed in the HOME Act.  *See, e.g.*, 24 C.F.R. §§ 92.50, 92.102–07, 92.150, 92.200–22.  The HOME Rule also lists other federal requirements with which participating jurisdictions must comply, including the nondiscrimination requirements that apply to all HUD Programs, listed at 24 C.F.R. § 5.105(a), as well as the nondiscrimination requirements in the HOME Act, 42 U.S.C. § 12832, addressed below.  24 C.F.R. § 92.350.

115.    Neither Congress nor HUD's regulations authorize HUD to condition HOME funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

116.    NAHA and the HOME Act indicate congressional intent to benefit historically disadvantaged groups.  One of Congress's objectives in enacting NAHA was to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis."  42 U.S.C. § 12702(3).  The HOME Act requires participating jurisdictions "to establish and oversee a minority outreach program . . . to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women . . . in all contracts[] entered into by the participating jurisdiction . . . to provide affordable housing authorized under this Act." *Id*. § 12831(a).  The HOME Act also forbids participating jurisdictions from denying benefits to or otherwise discriminating against any person "on the grounds of race, color, national origin, religion, or sex."  *Id*. § 12832.

-27-

RENNE PUBLIC LAW GROUP
Attorneys at Law

117.    In January 2025, HUD issued a final rule amending the HOME Rule "to update, simplify, or streamline requirements, better align the program with other Federal housing programs, and implement recent amendments to the HOME statute."  HOME Investment Partnerships Program: Program Updates and Streamlining, 90 Fed. Reg. 746, 746 (Jan. 6, 2025).  The revised HOME Rule does not add any grant conditions related to DEI, immigration enforcement, verification of immigration status, "gender ideology," or abortion.  The revised HOME Rule was originally set to become effective February 5, 2025, but HUD delayed parts of the Rule until October 2025.  HOME Investment Partnerships Program: Program Updates and Streamlining—Delay of Effective Date, Withdrawal, and Correction, 90 Fed. Reg. 16085 (Apr. 17, 2025).

### b.    Congress Appropriates HOME Grant Finding

118.    Funding for the HOME program comes from congressional discretionary appropriations.

119.    Most recently, Congress appropriated $1,250,000,000 for the HOME program in the 2024 Appropriations Act. 38 Stat. 360.  The 2024 Appropriations Act contains additional directives to HUD regarding HOME funding.  For instance, it extends the statutory deadline for participating jurisdictions to draw funds from their HOME Investment Trust Fund.  *Id*.

120.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose HOME grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 5.    The Housing Opportunities for Persons with AIDS Program

121.    Congress established the Housing Opportunities for Persons with AIDS ("HOPWA") program through the AIDS Housing Opportunity Act, Subtitle D of Title VIII of NAHA, Pub. L. No. 101–625, 104 Stat. 4079, and subsequent amendments.  The objective of the HOPWA program is "to provide States and localities with the resources and incentives to devise long-term comprehensive strategies for meeting the housing needs of persons with acquired immunodeficiency syndrome and families of such persons." 42 U.S.C. § 12901.  To meet this aim, the program authorizes formula grants and competitively awarded grants to provide housing assistance and related supportive services to meet the housing needs of low-income persons living with HIV or AIDS and their families.

RENNE PUBLIC LAW GROUP
Attorneys at Law

122.    The HOPWA program permits grant recipients to use HOPWA funds for a number of housing programs for persons living with HIV or AIDS, including providing information and services, short-term housing, rental assistance, development of single room occupancy dwellings, and development and operation of community residences.  42 U.S.C. §§ 12906–910.

123.    Ninety percent of HOPWA funds must be allocated pursuant to a statutory formula based on total population, the number of persons living with HIV or AIDS, fair market rents, and poverty data. 42 U.S.C. § 12903(c)(1)(A).  The HUD Secretary must award the remaining 10 percent of grant funds on a competitive basis to states and local governments not eligible for a formula grant, or to states, local governments, or nonprofits seeking funding for "special projects of national significance."  *Id*. § 12903(c)(5)(A), (C).

### a.    Congress Imposes Legislative Directives, and HUD Promulgates Rules Regarding HOPWA Grant Conditions

124.    To be eligible for HOPWA funds, states and local governments must submit an application for the HUD Secretary's approval.  42 U.S.C. § 12903(d).  Congress instructed the HUD Secretary to establish by regulation procedures for the submission of applications using specified requirements.  *Id*. § 12903(d)(1)–(6).  Congress also permitted the HUD Secretary to require "other information or certifications" but only to the extent "necessary to achieve the purposes of this section," i.e., to award formula and competitive grants pursuant to the statutorily listed criteria.  *Id*. § 12903(d)(6).

125.    Pursuant to this authority, HUD promulgated the HOPWA program rule at 24 C.F.R. part 574 (the "HOPWA Rule").  The HOPWA Rule implements the allocation formula prescribed in the statute, as well as the permissible uses of HOPWA funds.  24 C.F.R. §§ 574.110, 130, 300.  The Rule also creates an application process for competitive grants, requiring applications "comply with the provisions of the Department's Notice of Funding Availability ("NOFA") for the fiscal year."  *Id*. § 574.240.  The HOPWA Rule also sets out conditions grantees and project sponsors must agree to, including compliance with HUD regulations and "such other terms and conditions . . . as HUD may establish for purposes of carrying out the program *in an effective and efficient manner*."  *Id*. § 574.500 (emphasis added).  The HOPWA Rule further lists other federal requirements with which participating jurisdictions must comply, including the nondiscrimination requirements that apply to all HUD programs

listed at 24 C.F.R. § 5.105(a).  24 C.F.R. § 574.603.

126.    Neither NAHA nor the HOPWA Rule permit HUD to condition HOPWA funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

127.    As discussed above, NAHA, which established the HOPWA program, indicates congressional intent to benefit historically disadvantaged groups, including the aim to "improve housing opportunities for . . . members of disadvantaged minorities."  42 U.S.C. § 12702(3).

**b.    Congress Appropriates HOPWA Grant Funding**

128.    Funding for HOPWA grants comes from congressional discretionary appropriations.  *See* 42 U.S.C. § 12912.

129.    Most recently, Congress appropriated $505,000,000 for the HOPWA program in the 2024 Appropriations Act.  38 Stat. 358.  The 2024 Appropriations Act contains additional directives to HUD regarding HOPWA funding.  For instance, it instructs HUD to "renew or replace all expiring contracts for permanent supportive housing . . . before awarding funds for new contracts."  *Id*.

130.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose HOPWA grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

**6.    Other HUD Grants**

131.    HUD and its program offices administer a range of other competitive and formula grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

132.    Congress annually appropriates funding for HUD grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HUD with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or

RENNE PUBLIC LAW GROUP
Attorneys at Law

conditions on HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1865–1902; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 725–766; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat 5138–5181; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 344–386.

133.   Plaintiffs City of Fresno, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood City, County of Monroe, County of Marin, County of San Diego, and County of Sacramento, (collectively the "HUD Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive HUD grants, including CoC grants, CDBG grants, ESG grants, HOME grants, HOPWA grants, and/or other HUD grant funding.  These Plaintiffs rely on millions of dollars in appropriated federal funds from HUD grant programs.

134.   The HUD Plaintiffs rely on HUD block grant programs, including the block programs described above (CDBG, ESG, HOME, and HOPWA), to provide decent, affordable housing and a suitable living environment, and to increase economic opportunities for low- and moderate-income persons throughout their jurisdictions.  The programs that these grants support are extensive and essential.  These funds are used for programs like the creation and preservation of affordable rental housing, homeownership rehabilitation and weatherization, food banks, childcare and afterschool programs, community development capital improvements, home weatherization, and job training programs.  They help those plaintiffs provide basic needs services, including food distribution, basic chore assistance for homebound seniors and disabled persons, support for children who have experienced violence or neglect, and domestic violence prevention for the benefit of low-income individuals and households.  They also help those plaintiffs provide housing services, including rental assistance, housing case management, downpayment assistance for first-time homebuyers, and capital development for affordable housing to benefit low-income individuals and households and to create affordable housing, provide rental assistance, and address homelessness in the region.  They help prevent and address homelessness, including by supporting emergency shelter services.

### B.    DOT Grant Programs

135.    Congress established DOT in 1966 "to assure the coordinated, effective administration of the transportation programs of the Federal Government."  Department of 4 Transportation Act, 1966, Pub. L. 89-670, 80 Stat. 931.  DOT administers both competitive and entitlement (sometimes referred to as formula) grant programs.  Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency.  *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019).  In administering grant programs, DOT manages certain grant programs centrally through the Office of the Secretary of Transportation (OST).  However, DOT often acts through its operating administrations, including the FTA, FHWA, FAA, and FRA.  By law, the DOT Secretary is responsible for all acts taken by its operating administrations.  The administrators of the FTA, FHWA, FAA, and FRA report directly to the DOT Secretary.  49 U.S.C. § 103(b), (d), (g)(1) (FRA); *id.* §§ 104(b)(1), (c)(1) (FHWA); *id.* §§ 106(b)(1)(E), (f)(3)(A) (FAA); *id.* §§ 107(b), (c) (FTA); *see also* 49 C.F.R. Part 1 (organization and authority of DOT).

136.    Congress has established by statute a wide variety of grant programs administered by DOT centrally through the Office of the Secretary of Transportation ("OST").  This includes, but is not limited to, the Innovative Finance and Asset Concession ("IFAC") Grant Program.

137.    Section 71001 of the Infrastructure Investment and Jobs Act created an asset concession program.  The Act directs the DOT Secretary to establish a program to facilitate access to expert services and to provide grants to states, tribes, and local governments to enhance the technical capacity of eligible entities and facilitate and evaluate public-private partnerships for transportation infrastructure projects, including through asset concessions.  23 U.S.C. § 611(b).  The Act requires appropriation of $100 million over five years to fund IFAC grants.  IFAC grants are awarded on a competitive basis.

138.    Congress must annually authorize $20,000,000 to be made available for IFAC grants until expended.  23 U.S.C. § 611(g)(2).  In the annual appropriation legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on IFAC grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.".  *See,*

RENNE PUBLIC LAW GROUP
Attorneys at Law

*e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1826; Consolidated Appropriations Act, 2022, Pub. L. 117- 103, 136 Stat. 687; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5097; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 301.

139.    Plaintiff the City of Saint Paul has been awarded an IFAC grant and is currently in the is in the post-award phase of negotiating with DOT the terms and conditions of the Cooperative Agreement for the disbursement of funds. Saint Paul is relying on $805,000 in awarded federal funds from DOT to identify assets that can provide opportunities for public-private partnership and increase the efficiency of the City's public transit system.

### 1.    FTA Grant Programs

140.    Congress has established by statute a wide variety of grant programs administered by DOT, acting through the FTA, that provide federal funds to state and local governments for public transit services.  These include, but are not limited to, programs codified in title 49, chapter 53 of the U.S. Code, as amended by the Fixing America's Surface Transportation (FAST) Act of 2015, Pub. L. 114-94, 129 Stat. 1312, and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

141.    For instance, section 5307 authorizes the Secretary of DOT (the "DOT Secretary") to make urbanized area formula grants ("UA Formula Grants"), which go toward funding the operating costs of public transit facilities and equipment in urban areas, as well as certain capital, planning, and other transit-related projects.  *See* 49 U.S.C. § 5307(a)(1).  Section 5307 imposes specific requirements on UA Formula Grant recipients related to the recipient's operation and control of public transit systems. *See id.* § 5307(c).  None of these requirements pertain to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

142.    Section 5309 establishes certain fixed guideway capital investment grants ("Fixed Guideway Grants").  *See* 49 U.S.C. § 5309(b).  This program funds certain state and local government projects that develop and improve "fixed guideway" systems—meaning public transit systems that operate on a fixed right-of-way, such as rail, passenger ferry, or bus rapid transit systems.  *Id.* §§ 5302(8), 5309(b).  Section 5309 imposes specific requirements on Fixed Guideway Grant recipients related to, for example, the recipient's capacity to carry out the project, maintain its equipment and facilities, and achieve budget, cost, and ridership outcomes.  *See id.* § 5309(c).  None of these

RENNE PUBLIC LAW GROUP
Attorneys at Law

requirements pertain to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

143.    Section 5337 authorizes grants to fund state and local government capital projects that maintain public transit systems in a state of good repair, as well as competitive grants for replacement of rail rolling stock ("Repair Grants"). *See* 49 U.S.C. § 5337(b), (f). Section 5337 specifically limits what projects may be eligible for Repair Grants, *id*. § 5337(b), and imposes specific requirements on multi-year agreements for competitive rail vehicle replacement grants, *id*. § 5337(f)(7). It does not, however, impose any conditions on Repair Grants related to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

144.    Section 5339 authorizes grants to fund the purchase and maintenance of buses and bus facilities ("Bus Grants"). *See* 49 U.S.C. § 5339(a)(2), (b), (c). The Bus Grant program incorporates the specific funding requirements set forth in section 5307 for UA Formula Grants and imposes other requirements on Bus Grant recipients. *See id*. § 5339(a)(3), (7), (b)(6), (c)(3). Section 5339 does not, however, impose any conditions on Bus Grants related to a prohibition on all kinds of DEI or local participation in the enforcement of federal immigration laws.

145.    Congress annually appropriates funding for FTA grant programs, including the programs identified above. In the annual appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FTA grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 334, 342.

146.    Plaintiffs the City of Fresno, City of Alameda, and County of Sacramento (collectively, the "FTA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive FTA grants. These Plaintiffs rely on over millions of dollars in appropriated federal funds from FTA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of

-34-

RENNE PUBLIC LAW GROUP
Attorneys at Law

their communities.

### 2. FHWA Grant Programs

147.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FHWA, that provide federal funds to state and local governments for road and street infrastructure projects.  These include, but are not limited to, programs codified in title 23 of the U.S. Code and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

148.    For instance, Section 24112(b) of the Infrastructure Investment and Jobs Act, established Safe Streets and Roads for All, or SS4A, a competitive grant program that provides funding for improving roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans.  135 Stat. 815–817.  The Act requires the DOT Secretary to consider, among other things, the extent to which applicants and their proposed projects will ensure "equitable investment in the safety needs of underserved communities in preventing transportation-related fatalities and injuries" and "achieve[] such other conditions as the Secretary considers to be necessary."  *See id*. § 24112(c)(3).  None of these considerations pertain to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

149.    In February 2024, DOT posted a Notice of Funding Opportunity ("NOFO")—which it updated in April 2024—announcing a competition for SS4A grant funding for Fiscal Year 2024 (the "FY 2024 SS4A NOFO").  *See* U.S. Dep't of Transp., Notice of Funding Opportunity for FY 2024 Safe Streets and Roads for All Funding (Apr.  16, 2024), https://www.transportation.gov/sites/dot.gov/files/2024-04/SS4A-NOFO-FY24-Amendment1.pdf.

150.    The FY 2024 SS4A NOFO directed applicants to consider policy priorities in their applications, including "Equity and Barriers to Opportunity" and "Climate Change and Environmental Justice."  *Id*. at 39; *see also id*. at 27, 29 (listing "Equity" as a selection criterion for grants).  The FY 2024 SS4A NOFO specified that "[e]ach applicant selected for SS4A grant funding must demonstrate effort to improve equity and reduce barriers to opportunity as described in Section A" and stated "the Department seeks to award funds under the SS4A grant program that will create proportional impacts to all populations in a project area, remove transportation related disparities to all populations in a project area, and increase equitable access to project benefits."  *Id*. at 12, 39.

RENNE PUBLIC LAW GROUP
Attorneys at Law

151.    The FY 2024 SS4A NOFO strongly emphasized equity considerations throughout. The NOFO defined "equity" as "[t]he consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, Indigenous and Native Americans, Asian Americans and Pacific Islanders, and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality." *Id*. at 4. The NOFO did not include any grant conditions related to prohibiting all kinds of DEI or facilitating the enforcement of federal immigration laws.

152.    In addition to SS4A, FHWA administers the Federal Highway-Aid Program, which provides federal formula funding for the construction, maintenance and operation of the country's 3.9-million-mile highway network, including the Interstate Highway System, primary highways, and secondary local roads.

153.    The Infrastructure Investment and Jobs Act authorized $356.5 billion for fiscal years 2022 through 2026 to be used for the Federal Highway-Aid Program. Currently, there are nine core formula funding programs within the Federal Highway-Aid Program: the National Highway Performance Program, 23 U.S.C. § 119; the Surface Transportation Block Grant Program ("STBG"), 23 U.S.C. § 133; the Highway Safety Improvement Program ("HSIP"), 23 U.S.C. § 148 and 23 C.F.R. Part 924; the Railway-Highway Crossings Program, 23 U.S.C. § 130 and 23 C.F.R. Part 924; the Congestion Mitigation and Air Quality Improvement Program ("CMAQ"), 23 U.S.C. § 149; the Metropolitan Planning Program, 23 U.S.C. § 104(d); the National Highway Freight Program, 23 U.S.C. § 167; the Carbon Reduction Program, 23 U.S.C. § 175; and the PROTECT Formula Program, 23 U.S.C. § 176. None of these statutes authorizes DOT or FHWA to impose a prohibition on DEI or a requirement to facilitate the enforcement of federal immigration laws as a precondition to receiving federal grants.

154.    Section 11118 of the Infrastructure Investment and Jobs Act created the Bridge Investment Program (BIP) to assist states, tribes, and local governments with rehabilitating or replacing bridges to improve safety and efficiency for people and freight moving across bridges. 23 U.S.C. § 124(b)(2). The Act directs the DOT Secretary to consider factors such as cost considerations, safety

-36-

RENNE PUBLIC LAW GROUP
Attorneys at Law

benefits, and mobility improvements.  *Id*. §§ 124(f)(3)(B); (g)(4)(B).  No part of the BIP's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

155.     Section 21203 of the Infrastructure Investment and Jobs Act created the National Culvert Removal, Replacement, and Restoration Grant Program, also known as the Culvert Aquatic Organism Passage Program ("Culvert AOP Program") to assist states, tribes, and local governments with projects that would meaningfully improve or restore passage for anadromous fish (species that are born in freshwater such as streams and rivers, spend most of their lives in the 19 marine environment, and migrate back to freshwater to spawn).  49 U.S.C. § 6703.  The Act directs the DOT Secretary to prioritize projects that would improve fish passage for certain categories of anadromous fish stocks or that would open more than 200 meters of upstream habitat before the end of the natural habitat.  *Id*. § 6703(e).  The FHWA administers some Culvert AOP Program grants on behalf of DOT.  No part of the Culvert AOP Program's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

156.     The FHWA also administers the FY 2023-24 Advanced Transportation Technology and Innovation (ATTAIN) grant program, as directed by Congress in 23 U.S.C. § 503(c)(4).  Section 503(c)(4) directs the DOT Secretary to provide grants "to deploy, install, and operate advanced transportation technologies to improve safety, mobility, efficiency, system performance, intermodal connectivity, and infrastructure return on investment."  The DOT Secretary was directed to develop selection criteria that included an enumerated list of considerations, including how the deployment of technology would "improve the mobility of people and goods," "protect the environment and deliver environmental benefits that alleviate congestion and streamline traffic flow," and "reduce the number and severity of traffic crashes and increase driver, passenger, and pedestrian safety."  *Id*.  Nothing in the statutory provisions authorizing the ATTAIN grant program describes immigration enforcement or ending DEI as considerations for the grant.

157.     In fulfillment of the statutory authorization of FHWA grant programs, including the ones identified above, Congress annually appropriates funding for FHWA grants.  In appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing or authorizing directives

RENNE PUBLIC LAW GROUP
Attorneys at Law

-37-

for or conditions on FHWA grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." *See, e.g.*, Consolidated Appropriations Act, 19 2021, Pub. L. 116-260, 134 Stat. 1835–1842; Consolidated Appropriations Act, 2022, Pub. L. 117- 103, 136 Stat. 697–705; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109– 5117; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 315–324.

158.    Plaintiffs City of Fresno, City of Eureka, City of Saint Paul, City of Alameda, County of Marin, County of San Diego, and County of Sacramento (collectively, the "FHWA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive FHWA grants.  These Plaintiffs rely on millions of dollars in appropriated federal funds from FHWA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### 3.    FAA Grant Program

159.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FAA, that provide federal funds to public agencies for planning and development of airports.  These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

160.    For instance, the Airport Improvement Program ("AIP") is codified under title 49, chapter 471 of the U.S. Code.  Under the AIP, the DOT Secretary is authorized to make formula and discretionary grants to recipients (referred to as "sponsors") for the planning and development of certain public-use airports.  49 U.S.C. 47101 et seq.  The DOT Secretary may approve AIP grant applications only if the sponsor and project meet certain statutory requirements.  For example, requiring consistency with plans for development of the surrounding area, financial capacity, and ability to complete the project "without unreasonable delay," and only if the sponsor makes certain written assurances based on the type of grant at issue, such as "the airport will be available for public use on reasonable conditions and without unjust discrimination" and "the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions".  49 U.S.C. §§ 47106, 47107.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

161.    Congress has been precise in the requirements that attach to grant recipients and has set those forth in statute, which has been implemented by DOT through contractual "Grant Assurances" that are terms of every grant agreement.  None of the statutory requirements pertain to a prohibition on DEI or a requirement of local participation in the enforcement of federal immigration laws.

162.    AIP funding levels are established periodically by reauthorization acts, such as the FAA Reauthorization Act of 2018, Pub. L. 115-254, 132 Stat. 3186, and the FAA Reauthorization Act of 2024, Pub. L. 118-63, 138 Stat. 1025.  The reauthorization acts define the AIP authorization levels, amend the various AIP statutes, and set out directives to the DOT Secretary with respect to airport improvement funding, but they do not impose or authorize directives for or conditions on AIP grants related to a prohibition on DEI or requirement of local participation in federal immigration enforcement.

163.    Similarly, the Airport Infrastructure Grants ("AIG") program is authorized under the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 1416–1418.  Under the AIG program, the DOT Secretary is authorized to make formula and discretionary grants for runways, taxiways, airport safety and sustainability projects, as well as terminal, airport transit connections, and roadway projects.  Grants made under the AIG program are treated as having been made pursuant to the DOT Secretary's authority for project grants issued under the AIP statute.  135 Stat. 1417–1418.  The Infrastructure Investment and Jobs Act sets forth the AIG funding levels but does not impose any conditions on AIG grants related to prohibitions on DEI or the requirement of local participation in the enforcement of federal immigration laws.

164.    In fulfillment of the statutory authorization of FAA grant programs, including the ones identified above, Congress annually appropriates funding for FAA grants.  In the annual appropriations legislation, Congress sets forth additional priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing directives for or conditions on FAA grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1830–1835, 1939–1941; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 691–697; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5101–5108; Consolidated Appropriations Act,

2024, Pub. L. 118- 42, 138 Stat. 307–314.

165.     Plaintiffs City of Fresno, City of South Lake Tahoe, County of Marin, County of San Diego, County of Sacramento, County of Monroe, and Monroe Airport Authority (collectively, the "FAA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive FAA grants. These Plaintiffs rely on millions of dollars in appropriated federal funds from FAA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### 4.    Other DOT Grants

166.     DOT and its operating administrations administer a range of other competitive and formula grant programs that some Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other DOT grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

167.     Congress annually appropriates funding for DOT grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of DOT with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." *See*, e.g., Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1835–1842, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 697– 705, 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109– 5117, 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 315–324, 334, 342.

168.     Plaintiffs City of Fresno, City of South Lake Tahoe, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood City, County of San Diego, County of Marin, County of Sacramento, County of Monroe, and Monroe Airport Authority (collectively, the "DOT Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive DOT grants.  These Plaintiffs rely on millions of dollars in appropriated federal funds from DOT direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

-40-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

###### C.     HHS Grant Programs

169.     Congress established the precursor to HHS—the cabinet-level Department of Health, Education, and Welfare—in 1953.  After a separate Department of Education was created in 1979, HHS took its current name.  Today, HHS is the largest grant-making agency in the United States.  It administers both competitive grant programs and formula and block grant programs that provide funds to local governments to enhance the health and well-being of their communities.  In administering grant programs, HHS often acts through its operating divisions and agencies, such as the Centers for Disease Control and Prevention ("CDC"), the Centers for Medicare & Medicaid Services (CMS), the Health Resources and Services Administration ("HRSA"), the Substance Abuse and Mental Health Services Administration ("SAMHSA"), and the National Institutes of Health ("NIH"), among others.  *See* U.S. Dep't Health & Hum. Servs., HHS Agencies & Offices, https://www.hhs.gov/about/agencies/hhsagencies-and-offices/index.html (last visited June 27, 2025). The Secretary of HHS is responsible for overseeing the actions of its operating divisions and agencies. *See, e.g.*, 42 U.S.C. § 290aa (similar for SAMHSA and its head; authority of HHS Secretary); 42 U.S.C. § 242c (appointment and authority of CDC Director; functions of HHS Secretary); 42 U.S.C. § 282 (appointment and authority of NIH Director; functions of HHS Secretary); 42 U.S.C. §§ 202–203 (organization of Public Health Service, which includes NIH, within HHS); 42 U.S.C. § 1317 (appointment of CMS Administrator); U.S. Dep't Health & Hum. Servs., Centers for Medicare & Medicaid Services, 66 Fed. Reg. 35437 (Jul. 5, 2001) (establishing CMS and delegating authority from HHS Secretary to CMS Administrator).  Some examples of the grants administered by HHS and its operating divisions and agencies are discussed below.

###### 1.     Health Resources and Services Administration Programs

170.     The Health Resources and Services Administration ("HRSA") within HHS awards grant funding to more than 3,000 recipients, including state and local governments, to support health services projects, such as training health care workers and providing specific health services.  Elayne J. Heisler, Cong. Rsch. Serv., R46001, HRSA FY2020 President's Budget Request and Agency Funding History: In Brief (Nov. 12, 2019).

171.    HRSA awards a variety of competitive and formula grants in several program areas, including Primary Care/Health Centers, Health Workforce Training, HIV/AIDS, Organ Donation, Maternal and Child Health, Rural Health, and other areas.  Grants, U.S. Dep't Health & Hum. Servs., Health Res. & Servs. Admin., https://data.hrsa.gov/topics/grants (last updated May 20, 2025).

172.    Among HRSA's largest grant programs are the Health Center Program (HCP) and the Ryan White HIV/AIDS (RWHA) program.

### a.    The Health Center Program

173.     Congress authorized the federal HCP program through Section 330 of the Public Health Service Act ("PHSA"), as amended.  42 U.S.C. § 254b.  The HCP program funds grants to support qualified outpatient facilities that provide primary care to low-income individuals and other underserved communities, as specified in the statute.

174.    In particular, the HCP program supports four types of health centers: (1) community health centers ("CHCs"), (2) health centers for the homeless ("HCHs"), (3) health centers for residents of public housing, and (4) migrant health centers.  *See* 42 U.S.C. §254b(a), (g), (h), (i).  The majority of these are CHCs, which must provide "primary health services" to medically underserved populations and serve all residents of the CHC's services area.  *Id*. § 2549(a).  HCHs provide services to individuals experiencing or at risk of homelessness and are required to provide all services CHCs provide as well as substance abuse treatment.  *Id*. § 2549(h).  Health centers for residents of public housing are located in, and offer primary care services to those who reside in or near, public housing facilities.  *Id*. § 2549(i).  Finally, migrant health centers provide care to migratory and seasonal agricultural workers and their families.  *Id*. § 2549(g).

175.    Funding for the HCP program comes from a combination of discretionary funding, appropriated by Congress each year, and mandatory funding from the Community Health Center Fund.  By statue, HCH programs receive 8.7% of HCP funds.

176.    In addition to the HCP grants themselves, health centers that receive funding under Section 330 of the PHSA become eligible for other congressionally authorized benefits.  For instance, such health centers are eligible for designation as Federally Qualified Health Centers ("FQHCs"), which entitles them to higher, cost-based Medicare and Medicaid reimbursement rates.  42 U.S.C.

-42-

RENNE PUBLIC LAW GROUP
Attorneys at Law

§§ 1395i(a)(1)(z), 1395m(o), 1395x(aa)(3).  FQHCs may also receive drug discounts under Section 340B of the PHSA.  *Id.* § 256b.

177.    Section 330 of the PHSA sets out numerous requirements that health centers must meet to ensure that HCP-funded facilities serve as part of a safety net for underserved communities.  In addition to the requirements set forth above, Congress requires that HCP-funded health centers provide services to all patients regardless of ability to pay.  42 U.S.C. § 254b(k)(3).  Recipients must therefore have fee schedules consistent with locally prevailing wages while covering operating costs, and must offer discounts based on the patient's ability to pay.  *Id.* § 254b(k)(3)(G).  They must also be located in areas or serve populations that the HHS Secretary has designated as "medically underserved."  *Id.* §§ 254b(a)(1), (b)(3), (c)(1), (e)(1)(A).  The statute sets forth additional detailed funding conditions concerning Medicaid coordination and reimbursement, governance, provision of services, reporting, and quality assurance.  *Id.* §§ 254b(b)(1), (k)(3)(C), (F), (H), (I), (q).

178.    Section 330 of the PHSA does not authorize conditions on HCP grants related to prohibiting DEI in all forms, excluding transgender individuals, denying services to immigrants, or incorporating executive orders unrelated to providing health care to underserved populations.

179.    The HHS Secretary has promulgated regulations further governing the HCP program at 42 C.F.R. parts 51c and 56 (the "HCP Rule").  Among other things, the HCP Rule sets forth additional limitations on the use of HCP funds, 42 C.F.R. § 51c.107, and enumerates project requirements and criteria the HHS Secretary will consider in awarding grants based on the purpose of the funds, *id.* §§ 51c.203, 51c.204, 51c.303, 51c.305, 51c.403, 51c.404., 51c.504.  For instance, in reviewing proposals to plan or develop new health centers, the HHS Secretary must consider the relative need of the population to be served by the proposed project, the health center's potential for developing new and effective methods for providing services, and the distribution of resources across the country.  *Id.* § 51c.204.  The HCP Rule also sets forth specific requirements for migrant health centers, including a requirement that they provide specific services to migrant and seasonal agricultural workers' needs, such as supportive services, environmental health services, accident prevention, and prevention and treatment of health conditions related to pesticide exposure.  42 C.F.R. § 56.102(g).

RENNE PUBLIC LAW GROUP
Attorneys at Law

180.     The HCP Rule does not impose any conditions on HCP grants related to prohibiting DEI in all forms, excluding transgender individuals, or incorporating executive orders unrelated to providing health care to underserved populations.

### b.    Ryan White HIV/AIDS Program

181.     In 1990, Congress established the Ryan White HIV/AIDS ("RWHA") program as part of the Ryan White Comprehensive AIDS Resources Emergency Act, Pub. L. 101-381, 104 Stat. 576, and has revised and extended it several times, including in the Ryan White HIV/AIDS Treatment Modernization Act of 2006, Pub. L. 109-415, 120 Stat. 2767, and the Ryan White HIV/AIDS Treatment Extension Act of 2009, Pub. L. 111-87, 123 Stat. 2885.  The program is codified at Title 42, Subchapter XXIV of the U.S. Code and contains four major parts.  Among these are Part A, which provides grants to urban areas and mid-sized cities, 42 U.S.C. §§ 300ff-11 to 300ff-20; Part B, which provides grants to states and territories, *id*. §§ 300ff-21 to 300ff-38; and Part C, which funds HIV outpatient primary care to low-income and medically underserved people living with HIV/AIDS, *id*. §§ 300ff–51 to 300ff–67.

### i.    RWHA Part A Program

182.     Part A of the RWHA program provides grants for medical and support services to eligible metropolitan areas with high levels of reported AIDS cases in the previous five years.  42 U.S.C. § 300ff-11(a).  HRSA distributes two-thirds of appropriated Part A grants non-competitively to eligible metropolitan areas based on a statutory formula, *id*. § 300ff-13(a)(2)–(3), and the remaining one-third via competitive supplemental grants awarded based on the applicant's demonstrated need, *id*. § 300ff-13(b). With respect to the two-thirds comprised of formula grants, the Secretary has no discretion to withhold funding and is required to allocate grants based on a formula that considers how many individuals are living with HIV/AIDS in the jurisdiction.  *See id*. § 300ff-13(a)(2), (3).

183.     Congress has imposed detailed conditions on RWHA Part A grants. For instance, Part A grant recipients must spend 75% of awarded funds on "core medical services," which are defined to include outpatient/ambulatory medical care services, AIDS pharmaceutical assistance, home health care, and mental health and substance abuse outpatient services, among others.  42 U.S.C. § 300ff-14(c).  The remaining Part A funds must go toward "support services," such as outreach, medical transportation, and referrals, as well as statutorily permitted administrative expenses.  *Id*. § 300ff-14(c)(1), (d).  Congress has

RENNE PUBLIC LAW GROUP
Attorneys at Law

also mandated that grant recipients establish HIV Health Services Planning Councils to set priorities for care delivery and has prescribed several related requirements. *Id.* § 300ff-12(b).

184.    Congress has also enacted statutory factors that HRSA must consider in awarding competitive supplemental grants to applicants based on demonstrated need. These include the rates of HIV/AIDS, impacts of co-morbid factors, and prevalence of homelessness in the applicant's area. 42 U.S.C. § 300ff-13(b)(2)(B).

185.    Neither the statutes governing the RWHA Part A program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to providing health services for low-income individuals with HIV/AIDS.

### ii.    RWHA Part B Program

186.    The RWHA Part B program provides grants to each of the 50 states, the District of Columbia, Guam, and the Virgin Islands for services such as drug treatments, home and community-based health care, support services, or health insurance coverage for low income individuals living with HIV/AIDS, among other services. 42 U.S.C. §§ 30ff-22–26. Some of these states and territories pass through RWHA Part B funds to subrecipients, including local governments. One portion of RWHA Part B is the AIDS Drug Assistance Program ("ADAP"), which receives separate appropriations from Congress. *Id.* § 300ff-26. The remaining funding goes toward Part B base grants and supplemental grants. Base grants are awarded pursuant to a formula based on the number of individuals living with HIV/AIDS cases in the state or territory relative to various comparators. *Id.* § 300ff-28. Supplemental grants under RWHA Part B are awarded to states and territories with a demonstrated need based on increasing rates of HIV/AIDS cases, unmet needs for services, and other factors. *Id.* § 300ff-29a.

187.    Congress has imposed detailed conditions on RWHA Part B grants. For instance, as in the Part A program, recipients of Part B funds must spend 75% of awarded funds on "core medical services" and 25% on "support services," which are each limited to specifically defined activities. 42 U.S.C. § 300ff-22. The Part B program also authorizes states and territories to award grants to subrecipients and imposes additional requirements on such sub-awards based on the type of services the subrecipient will provide. *See id.* §§ 300ff-23–24. For example, Congress has authorized states and

-45-

RENNE PUBLIC LAW GROUP
Attorneys at Law

territories to award grants for home- and community-based health services, but requires states and territories to prioritize providers who serve low-income individuals with HIV/AIDS and participate in an HIV care consortium. *Id*. § 300ff-24(b).

188. The statute authorizes the Secretary of HHS to require other "agreements, assurances, and information" from states and territories, but only to the extent "necessary to carry out" the Secretary's authority to "make grants to . . . enable . . . States to improve the quality, availability and organization of health care and support services for individuals and families with HIV/AIDS." 42 U.S.C. §§ 300ff-27(a), 300ff-21.

189. Congress has also authorized states and territories to award grants using RWHA Part B funds to certain associations, called HIV care consortia, comprised of public or private service providers and community-based organizations in areas most affected by HIV/AIDS. 42 U.S.C. § 300ff-23. In doing so, Congress set forth specific agreements and assurances related to the purposes of the Part B program that HIV care consortia must make as a condition to receiving funds. For instance, HIV care consortia must "agree to use such assistance for the planning, development and delivery . . . of comprehensive outpatient health and support services for individuals with HIV/AIDS." *Id*. § 300ff-23(a)(2).

190. The assurances and application requirements Congress specified for HIV care consortia under RWHA Part B indicate a statutory purpose to address the needs of minority and underserved communities. For instance, each HIV care consortium must provide an assurance that "the populations and subpopulations of individuals and families with HIV/AIDS have been identified by the consortium, particularly those experiencing disparities in access and services and those who reside in historically underserved communities." *Id*. § 300ff-23(b)(1)(A). The consortium must also provide an assurance that it has established a service plan that "addresses the special care and service needs of" such historically underserved communities. *Id*. § 300ff-23(b)(1)(B). Finally, Congress specified grant application requirements that HIV care consortia must meet to be eligible for funding, including that the application "demonstrates that adequate planning occurred to address disparities in access and services and historically underserved communities." *Id*. § 300ff-23(c)(1)(F).

191. Neither the statutes governing the RWHA Part B program nor any other legislation

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of

2  transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to

3  providing health services for low-income individuals with HIV/AIDS.

4          **iii.**        **RWHA Part C Program**

5        192.     RWHA Part C grants emphasize services designed to intervene early to improve health

6  outcomes for low-income individuals with HIV/AIDS.  HRSA awards RWHA Part C grants

7  competitively to eligible facilities, including municipal health facilities, that serve medically underserved

8  populations.  42 U.S.C. § 300ff-52(a).  Congress has mandated that HRSA prioritize applicants

9  experiencing increased burdens on HIV/AIDS services when awarding RWHA Part C grants.  *Id*.

10  § 300ff-53.

11        193.     Like Part A and Part B grants, Part C grants are subject to specific statutory requirements.

12  For instance, Part C grant recipients must also provide a mix of statutorily prescribed "core services" and

13  "supportive serves."  42 U.S.C. § 300ff-51(b)(1).  At least half of allocated funding must go toward such

14  services that focus on early intervention, including HIV/AIDS testing and referrals.  *Id*. § 300ff-51(b)(2).

15  The statute also requires applicants to agree to certain funding conditions, including that the applicant

16  will only use funds for statutorily authorized purposes, will establish fiscal control and accounting

17  procedures, and will establish a clinical quality management program, among others.  *Id*. § 300ff-64(g).

18  Finally, Congress has mandated conditions on the use of funds for HIV/AIDS counseling, including that

19  counseling programs may not directly promote intravenous drug use or sexual activity and must educate

20  patients on the availability of hepatitis a and b vaccines.  *Id*. § 300ff-67.

21        194.     Neither the statutes governing the RWHA Part C program nor any other legislation

22  authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of

23  transgender individuals, or adherence to executive orders unrelated to providing early intervention

24  services for low-income individuals with HIV/AIDS.

25        **2.**     **Substance Abuse and Mental Health Services Administration Programs**

26        195.    The Substance Abuse and Mental Health Services Administration (SAMHSA) within

27  HHS, "funds organizations providing substance use and mental health services, research, technical

28  assistance, and training to advance the behavioral health and to improve the lives of individuals living

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

with mental and substance use disorders, and their families."  Grants, SAMHSA, https://www.samhsa.gov/grants (last visited July 1, 2025).  SAMHSA administers both competitive, discretionary grant programs and "noncompetitive, formula grant" programs "mandated by the U.S. Congress."  *Id*.  Examples of these noncompetitive block grants include the Community Mental Health Services Block Grant and the Substance Use Prevention, Treatment, and Recovery Services Block Grant.

196.    SAMHSA's authority to issue grants under its various programs is conferred by statute. *See, e.g.*, 42 U.S.C. §§ 290dd-3 (Grants for reducing overdose deaths), 290dd-4 (Program to support coordination and continuation of care for drug overdose patients), 290ee (Opioid overdose reversal medication access, education, and co-prescribing grant programs), 290ee-1 (First responder training), 290ee-2 (Building communities of recovery), 290ee-3 (State demonstration grants for comprehensive opioid abuse response), 290ee-3a  (Grant program for State and Tribal response to opioid use disorders), 290ee-5a (Sobriety treatment and recovery teams), 290ee-9 (Services for families and patients in crisis). These statutes list the required criteria for a grant application and allowable uses for grant funds.  None of the statutes establishing these programs authorize conditions on these grants related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

197.    One of the requirements provided in SAMHSA's Notices of Award (NOA) is a "Disparity Impact Statement (DIS)," which includes "[a] quality improvement plan for how [recipients will use program data] to monitor and manage program outcomes by race, ethnicity, and LGBT status, when possible."  SAMHSA also required the quality improvement plan to "include strategies for how processes and/or programmatic adjustments will support efforts to reduce disparities for the identified sub-populations."  The NOAs do not include any grant conditions related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to overdose response.

### 3.    Center for Disease Control and Prevention Grant Programs

198.    The Centers for Disease Control and Prevention (CDC) within HHS describes itself as "the nation's leading science-based, data-driven, service organization that protects the public's health." Home, CDC, https://www.cdc.gov/ (last accessed June 30, 2025).  CDC provides much of the funding to support public health systems and activities by state and local governments.  Josh Michaud, et al., CDC's

-48-

Funding for State and Local Public Health: How Much and Where Does it Go?, KFF, https://www.kff.org/other/issue-brief/cdcs-funding-for-state-and-local-publichealth-how-much-and-where-does-it-go/ (Apr. 7, 2025).  In FY 2023, CDC obligated almost $15 billion to state and local jurisdictions.  *Id*.  The CDC's funding supports a range of programs including HIV/AIDS, Viral Hepatitis, STI, and TB Prevention; Chronic Disease Prevention and Health Promotion; Public Health Preparedness and Response; and Injury Prevention and Control.  Grant Funding Profiles – Funding Category View, CDC, https://fundingprofiles.cdc.gov/Category/Category (last visited June 30, 2025).

199.    For example, one of the grants awarded by CDC is the High-Impact HIV Prevention and Surveillance Programs for Health Departments grant, which is a part of CDC's funding for HIV/AIDS, Viral Hepatitis, STI, and TB Prevention. As explained by the most recent 2024 NOFO for this program, the grant funds recipients "to implement a comprehensive, person-centered HIV prevention and surveillance program to prevent new HIV infections and improve the health of people with HIV."

200.    The NOFO for this program includes as a required element, "Addressing Social and Structural Factors."  The NOFO recognizes that "[t]he impact of racism, homophobia, transphobia, and stigma significantly exacerbates the health disparities experienced among communities disproportionately affected by HIV.  Health equity is a desirable goal that entails special efforts to improve the health of those who have experienced social or economic disadvantage."  With respect to the "Population(s) of Focus," the NOFO explains that "Applicants must provide HIV services to populations within the jurisdiction that are disproportionately impacted by HIV as identified by their epidemiological data, gaps in services, or need," and "Examples to consider based on national and local data, include transgender women, cisgender Black or African American women, gay and bisexual men, American Indian or Alaska Native gay and bisexual men, people who inject drugs (PWID), youth, pregnant and postpartum persons and their infants, and other populations with disproportionately higher rates of HIV diagnosis including individuals involved in the justice system and people experiencing housing insecurity."

201.    The NOFO did not include any grant conditions related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to HIV/AIDS surveillance and prevention.

-49-

RENNE PUBLIC LAW GROUP
Attorneys at Law

202.    Statutory authority for the Fiscal Year 2024 High-Impact HIV Prevention and Surveillance Programs for Health Departments grant comes from 42 U.S.C. § 247c(b)–(c) and the Consolidated Appropriations Act of 2016, Pub. L. 114-113, 129 Stat. 2242. 42 U.S.C. § 247c authorizes HHS to make grants like the High-Impact HIV Prevention and Surveillance Programs for Health Departments grant.  It also identifies authorized conditions on the grants, including recordkeeping requirements, 42 U.S.C. § 247c(e)(3), and patient confidentiality mandates, *id*. § 247c(e)(5).  Neither 42 U.S.C. § 247c nor the Consolidated Appropriations Act of 2016 authorizes or impose conditions on this grant related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to HIV/AIDS surveillance and prevention.

### 4.    Other HHS Grants

203.    HHS and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HHS grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

204.    Congress annually appropriates funding for HHS grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HHS with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HHS grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1523–28, 1567–98; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 397–402, 441–74; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4808–13, 4854–87; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 272–77, 397–419.

205.    Plaintiffs County of Marin and County of Sacramento (collectively, the "HHS Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive HHS grants.  Both the County of Marin and County of Sacramento rely on millions of dollars in appropriated federal funds from HHS direct or pass-through grant programs for health and human services-related projects

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    undertaken for the benefit of their communities.

2        **D.    EPA Grant Programs**

3        206.    Congress established the Environmental Protection Agency ("EPA") in 1970 through

4    Reorganization Plan No. 3 of 1970, 35 Fed. Reg. 15623 (Oct. 6, 1970), which consolidated many

5    environmental responsibilities of the federal government under one agency.  Every year, EPA awards

6    more than $4 billion in funding for grants and other assistance agreements to state and local

7    governments, tribes, universities, nonprofit recipients, and other entities to protect human health and the

8    environment.  *See* U.S. Envtl. Prot. Agency, EPA Grants Overview for Applicants and Recipients,

9    https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients.  The EPA Administrator is

10   responsible for overseeing all agency programs and offices, supervising the administration of grants and

11   other funding, and ensuring the agency's actions comply with statutory and executive requirements.  *See,*

12   *e.g.*, 42 U.S. Code §§ 6912; 9628; 13103(a).

13           **1.    Brownfields and Land Revitalization Program**

14       207.    The EPA's Brownfields and Land Revitalization Program provides funds to states, Tribal

15   Nations, communities, and other stakeholders to work together to prevent, assess, safely clean up, and

16   sustainably reuse contaminated or potentially contaminated properties, commonly referred to as

17   "brownfields."  *See* U.S. Envtl. Prot. Agency, EPA Brownfields Revolving Loan Fund Grants Program

18   Overview, https://www.epa.gov/system/files/documents/2022-08/Program%20Overview_RLF.pdf.

19   Revolving Loan Fund (RLF) Grants provide funding to a grant recipient for capitalizing an RLF

20   program.  RLF programs provide loans and subgrants to eligible entities to carry out cleanup activities at

21   brownfield sites contaminated with hazardous substances.

22           **2.    Congress Authorized the Establishment of Brownfields and Land**
23                  **Revitalization Grants**

24       208.    Congress authorized the Brownfields and Land Revitalization Program through the Small

25   Business Liability Relief and Brownfields Revitalization Act of 2002, Pub. L. No. 107-118, 115 Stat.

26   2356 (2002).  This statute amended section 104 of the Comprehensive Environmental Response,

27   Compensation, and Liability Act ("CERCLA") and established EPA's Brownfields Program in its current

28   form.  Congress authorized the EPA to award assessment grants, cleanup grants, revolving loan fund

RENNE PUBLIC LAW GROUP
Attorneys at Law

("RLF") grants, and job training grants.  *See* 42 U.S.C. § 9604(k)(2)–(6).  The RLF program, set forth in 42 U.S.C. § 9604(k)(3), enables eligible entities to establish loan funds that can be used to finance cleanup activities at brownfield sites.

### 3.    Congress Imposes Legislative Directives, and EPA Promulgates Rules Regarding the Brownfields and Land Revitalization Program

209.    EPA's administration of the Brownfields and Land Revitalization Program, including the award of RLF grants, is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the Brownfields and Land Revitalization Program, the responsibilities of grant recipients, and specific certifications that grant recipients must agree to as a condition of receiving funds.  For example, assessment grants may only be used for inventorying, characterizing, assessing, and conducting planning activities related to brownfield sites.  42 U.S.C. § 9604(k)(2).  RLF grants must be used either to capitalize revolving loan funds or, in certain cases, directly for remediation at sites owned by the grantee or an eligible nonprofit.  *Id*. § 9604(k)(3). Congress also imposed clear prohibitions on the use of funds.  No grant or loan may be used to pay penalties or fines, to satisfy a federal cost-share requirement, to pay cleanup costs at a site where the recipient is a potentially responsible party under CERCLA § 107, or to cover compliance costs under other federal environmental laws (except those associated with cleanup).  *Id*. § 9604(k)(5)(B).

210.    Additionally, every grant or loan agreement must require the recipient to comply with all applicable federal and state laws and provide a 20 percent non-federal matching share in cash or in-kind contributions, unless EPA determines that such a match would cause undue hardship.  42 U.S.C. § 9604(k)(10)(B).  Congress further directed EPA to weigh community involvement and equity considerations in awarding grants.  The ranking criteria established by statute requires consideration of the extent to which projects provide for meaningful local community participation in cleanup and reuse decisions, and "the extent to which a grant would address or facilitate the identification and reduction of threats to the health or welfare of children, pregnant women, minority or low-income communities, or other sensitive populations."  *Id*. § 9604(k)(6)(C)(x).

211.    The Small Business Liability Relief and Brownfields Revitalization Act of 2002 does not authorize EPA to condition funding on prohibiting all forms of DEI, facilitating enforcement of federal

RENNE PUBLIC LAW GROUP
Attorneys at Law

immigration laws, certifying certain facts are material for the purposes of the False Claims Act, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Funding for the Brownfields and Land Revitalization Program comes from congressional appropriations. Most recently, Congress appropriated funds for the Brownfields and Land Revitalization Program in the Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 252–263. Nothing in the 2024 Appropriations Act or any other legislation authorizes EPA to impose grant fund conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, certifying certain facts are material for the purposes of the False Claims Act, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 4. Other EPA Grants

212. EPA and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other EPA grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

213. Congress annually appropriates funding for EPA grant programs. In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of EPA with respect to funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on EPA grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1507–1516; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 380–389; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4790–4800; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 252–263.

214. Plaintiffs the City of Fresno, City of Redwood City, and City of Alameda (collectively, the "EPA Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive EPA grants. Fresno and Alameda rely on millions of dollars in appropriated federal funds from EPA's direct or pass-through grant programs for environmental projects undertaken for the benefit of their

RENNE PUBLIC LAW GROUP
Attorneys at Law

communities.

**E.    Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on Federal Grants.**

**1.    President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants**

215.    Since taking office, President Trump has issued numerous executive orders directing the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend.  Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Plaintiffs cannot comply with Defendants' vague, ambiguous, and unauthorized conditions without exposing themselves to substantial legal liability or forgo critical federal funding.

216.    The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would violate federal antidiscrimination laws.  Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order").  The certification is not limited to programs funded with federal grants.  *Id*. § 3(b)(iv).

217.    The DEI Order also directs each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id*. § 3(b)(iv)(A).  The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding."

RENNE PUBLIC LAW GROUP
Attorneys at Law

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016).  Each violation of the FCA is punishable by a civil penalty of up to $27,894, plus mandatory treble damages sustained by the federal government because of that violation.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a).  Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

218.    The DEI Order does not define the term "DEI."  As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

219.    The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."  Executive Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

220.    The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status.  *See* 8 U.S.C. § 1611(a).  In particular, the Immigration Order directs all agency heads to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including … PRWORA."  *Id.* § 2(i).

221.    On April 28, 2025, President Trump issued additional executive orders related to immigration and law enforcement.  The "Protecting American Communities from Criminal Aliens" executive order states that "some State and local officials … continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   verification is conducted for individuals receiving Federal public benefits … from private entities in a

2   sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental

3   entity on its behalf." https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-

4   communities-from-criminal-aliens/. The "Strengthening and Unleashing America's Law Enforcement to

5   Pursue Criminals and Protect Innocent Citizens" executive order directs the Attorney General to, among

6   other things, "prioritize prosecution of any applicable violations of Federal criminal law with respect to

7   State and local jurisdictions" whose officials "willfully and unlawfully direct the obstruction of criminal

8   law, including by directly and unlawfully prohibiting law enforcement officers from carrying out duties

9   necessary for public safety and law enforcement" or "unlawfully engage in discrimination or civil-rights

10  violations under the guise of "diversity, equity, and inclusion" initiatives that restrict law enforcement

11  activity or endanger citizens." https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-

12  and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

13      222.    The "Defending Women from Gender Ideology Extremism and Restoring Biological

14  Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as

15  permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and

16  grantee preferences" to "ensure grant funds do not promote gender ideology." Exec. Order No. 14168

17  § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order"). The Gender Ideology

18  Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting

19  concept of self-assessed gender identity, permitting the false claim that males can identify as and thus

20  become women and vice versa, and requiring all institutions of society to regard this false claim as true."

21  Id. § 2(f). It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of

22  genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it

23  diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a

24  person to be born in the wrong sexed body." Id.

25      223.    The "Enforcing the Hyde Amendment" executive order declares it the policy of the United

26  States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." Exec.

27  Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order"). The Acting Director of the

28  U.S. Office of Management and Budget (OMB) issued a memorandum to the heads of the executive

-56-

agencies providing guidance on how agencies should implement the Abortion Order.  Memorandum from Acting Director of OMB Matthew J. Vaeth to Heads of Executive Departments and Agencies (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf (the "OMB Memo").  The OMB Memo told agency heads that the Trump Administration's policy is "not to use taxpayer funds to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion."  *Id*. (emphasis added).  The OMB Memo further instructed agency heads to "reevaluate" policies and other actions to conform with the Abortion Funding Order, audit federally funded activities suspected to contravene the Abortion Funding Order, and submit a monthly report to OMB on each agency's progress in implementing the OMB Memo.  *Id*.

224.    On August 7, 2025 President Trump issued another executive order titled, Improving Oversight of Federal Grantmaking that requires that discretionary grant awards "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or "any other initiatives that compromise public safety or promote anti-American values." Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (the "Grantmaking Oversight Order").

## 2.    HUD Attaches New Conditions to HUD Grants

225.    Since President Trump's issuance of the executive orders described above and Defendant Turner's confirmation as HUD Secretary, HUD has implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "HUD Grant Conditions") across the expansive portfolio of HUD grants established by Congress; demanding grant recipients' agreement to those new conditions and issuing agency-wide letters and statements about how HUD will enforce those conditions.

### a.    HUD issues new policy terms for all financial assistance incorporating the unlawful conditions

226.    In or around April 2025, HUD amended its General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs (the "HUD Policy Terms"), which set forth "various laws and policies that may apply to recipients of" HUD grant

RENNE PUBLIC LAW GROUP
Attorneys at Law

awards. This document is posted on HUD's website at

https://www.hud.gov/sites/default/files/CFO/documents/Administrative-Requirements-Addendum-FY2025.pdf. Among such potentially applicable policies, the document lists several of President

Trump's executive orders as well as language implementing those orders.

227. For example, in a section labelled "Compliance with Immigration Requirements," the HUD Policy Terms list the Immigration Order and summarize the potentially applicable policy:

> No state or unit of general local government that receives HUD funding under may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

228. Next, in a section labelled "Other Presidential Executive Actions Affecting Federal Financial Assistance Programs," HUD Policy Terms state that "Recipients of Federal Awards must comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to . . . :" followed by a "non-exhaustive list" of nine executive orders—including the Immigration Order, the Abortion Order, the DEI Order, and the Gender Ideology Order—as "applicable" conditions. The HUD Policy Terms then summarize the potentially applicable policies reflected in those executive orders.

    a. First, the HUD Policy Terms state that the Immigration Order "prohibits taxpayer resources and benefits from going to unqualified aliens."

    b. Second, the HUD Policy Terms summarize the Abortion Order as "prohibit[ing] the use of Federal taxpayer dollars to fund or promote elective abortion."

    c. Third, the HUD Policy Terms state that the DEI Order "requires Federal agencies to terminate all discriminatory and illegal preferences."

    d. Fourth, the HUD Policy Terms summary the Gender Ideology Order as "set[ting] forth U.S. policy recognizing two sexes, male and female."

229. These requirements outlined in the HUD Policy Terms are unlawful because the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

RENNE PUBLIC LAW GROUP
Attorneys at Law

**b.**    **HUD attaches a new, unlawful anti-DEI certification to its standard assurances and certifications**

230.    In or around May 2025, HUD updated its standard Applicant and Recipient Assurances and Certifications (the "HUD Certifications") on Form HUD-424-B, which must be submitted as part of any application for HUD funding or post-award submission.  These changes implemented President Trump's executive orders, including the DEI Order, by imposing a new anti-DEI certification that is not authorized by any of the statutes that establish HUD grant programs, any appropriations law appropriating funds for HUD grant programs, or HUD's own regulations.  In particular, the HUD Certifications require HUD grant applicants to certify that the applicant:

> Will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws.

231.    This certification is unlawful, as explained further below, because the anti-DEI certification violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

**c.    HUD attaches new, unlawful conditions to CoC grants**

232.    In or around June 2025, following President Trump's issuance of the executive orders described above, HUD presented recipients with CoC grant agreements for CoC funds awarded.  These grant agreements contained additional grant conditions not included in the FYs 2024 & 2025 NOFO, and are not authorized by the Homeless Assistance Act, the Appropriations Act, or the Rule HUD itself promulgated to implement the CoC program.  HUD has required Plaintiffs with CoC grant awards to agree to these conditions to receive funds they are entitled to.

233.    The CoC grant agreements contain substantially the same unlawful, new terms and conditions, including the following (collectively, the "CoC Grant Conditions"):

234.    First, the CoC grant agreements state that "[t]his Agreement, the Recipient's use of funds provided under this Agreement . . . , and the Recipient's operation of projects assisted with Grant Funds" are "governed by" not only certain specified statutes, rules and grant-related documents, but also by "all current Executive Orders." The CoC grant agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . other

RENNE PUBLIC LAW GROUP
Attorneys at Law

Executive Orders" (together, the "CoC EO Condition").

235.    Second, a grant recipient must certify that:

it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964.

The recipient must further agree that this condition is "material" for purposes of the FCA by agreeing that:

its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA].

(together, the "CoC Discrimination Condition")

236.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the Administration's communications to federal grant recipients make clear that the agencies seek compliance with the Trump Administration's novel, incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI programs. Without Congress passing his anti-DEI agenda, President Trump instead purports to legislate by executive order and impose his decrees on state and local governments seeking grant funding.

237.    Third, the CoC Grant Agreements provide:

No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation . . . .

The CoC Grant Agreements further require compliance with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . [the Immigration Order] . . or immigration laws" (together, the "CoC Enforcement Condition").[3]

238.    Fourth, the CoC Grant Agreements impose requirements purportedly related to PRWORA and other immigration eligibility and verification requirements:

The recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of [PRWORA] and any

---

[3] More recent grant agreements contain updated language that recites the Immigration Order. In these, the last part of this condition reads ". . . or abets *so-called "sanctuary"* policies that seek to shield illegal aliens from deportation.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

> applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [*sic*] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
> …
>
> Subject to the exceptions provided by PRWORA, the recipient must use [the Systematic Alien Verification for Entitlements (SAVE) system], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(the "CoC Verification Condition").

239.    Fifth, the CoC Grant Agreements require the recipient to agree that it "shall not grant funds to promote 'gender ideology,' as defined in" the Gender Ideology Order (the "CoC Gender Ideology Condition").

240.    Finally, the CoC Grant Agreements require the recipient to agree that it "shall not use any Grant Funds to fund or promote elective abortions, as required by" the Abortion Order. (the "CoC Abortion Condition").

241.    These conditions are unconstitutional and unlawful for several reasons.  As an initial matter, neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any legislation authorizes HUD to attach these conditions to federal funds appropriated for CoC grants.

### d.    HUD announces it will attach new, unlawful conditions to Office of Community Planning and Development grants

242.    In or around June 2025, HUD's CPD, which administers the CDBG, ESG, HOME, and HOPWA programs, among others, issued guidance announcing that it will attach new conditions to Fiscal Year 2025 agreements governing all CPD-administered grants.

243.    In particular, on June 5, 2025, CPD General Deputy Assistant Secretary Claudette Fernandez issued a letter to the executive directors of two organizations representing states and local jurisdictions that administer CPD grant programs (the "Fernandez Letter").  The Fernandez Letter states that CPD "[g]rantees are . . . encouraged to review the White House Executive Orders as they develop their consolidated plan and annual action plans," which are required under the CDBG, HOME, HOPWA, and ESG programs.  Letter from Claudette Fernandez, Acting Director, CPD General Deputy Assistant

-61-

Secretary, to Council of State Community Development Agencies and National Community Development Association (June 5, 2025), https://ncdaonline.org/wpcontent/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf.

244.    The Fernandez Letter goes on to state that "FY2025 grant agreement[s]" that are issued after a recipient submits their consolidated and action plans will "emphasize conformity with applicable Administration priorities and executive orders."  It clarifies that, "[u]nder the FY 2025 grant agreement, conformity means" that the recipient will be required to abide by a list of specific conditions.  These include the following (collectively, the "CPD Grant Conditions"):

245.    First, grant recipients will be required to agree not to "not use grant funds to promote 'gender ideology,' as defined in [the Gender Ideology Order]" (the "CPD Gender Ideology Condition").

246.    Second, each recipient must "certif[y] that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964."  Each recipient must also "agree[] that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA]" (together, the "CPD Discrimination Condition").

247.    Third, grant recipients must agree that:

> [i]f applicable, no state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

(the "CPD Enforcement Condition").

248.    Fourth, each recipient must agree to conditions purportedly related to PRWORA and other immigration eligibility and verification requirements, specifically:

> The Grantee must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
> . . . .

Renne Public Law Group
Attorneys at Law

-62-

Unless excepted by PRWORA, the Grantee must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(together, the "CPD Verification Condition").

249.    Fifth, "[u]nless excepted by PRWORA," grant recipients "must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."

250.    Finally, grant recipients must agree that they will "not use any grant funds to fund or promote elective abortions, as required by [the Abortion Order]" (the "CPD Abortion Condition").

251.    In addition to imposing these conditions through grant agreements, HUD is threatening to disapprove consolidated plans—including plans that have already been submitted—unless jurisdictions resubmit revised plans that (1) include assurances that the jurisdictions will comply with the CPD Grant Conditions and (2) strip the plans of certain words that HUD claims, in and of themselves, violate the related EOs, such as "equity" and "environmental justice." HUD is requiring these revisions and commitments with as little as 24 hours' notice.

252.    The CPD Grant Conditions are unlawful for the same reasons the other conditions are unlawful, as explained above.  In particular, and as explained further below, the CPD Grant Conditions violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 3.    DOT and its Operating Administrations Attach New Conditions to DOT Grants

253.    Since Secretary Duffy's confirmation, DOT and its operating administrations have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOT Grant Conditions") across the expansive portfolio of DOT grants established by Congress; demanding grant recipients' agreement to those new conditions, sometimes on very short timelines; and issuing agency-wide letters and statements about how DOT will enforce those conditions.

254.    The DOT's broad conception of these new conditions is confirmed in a letter from DOT

RENNE PUBLIC LAW GROUP
Attorneys at Law

Secretary Sean Duffy to all recipients of DOT funding stating that "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, presumptively violates Federal Law." Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (April 24, 2025) ("April Duffy Letter"), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

255. The April Duffy Letter announced DOT's "policy" of imposing immigration enforcement and anti-DEI conditions on all DOT-funded grants as a requirement of receiving funding, and makes clear that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals." It further asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." The April Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

256. Pursuant to the new policy set forth in the April Duffy Letter, DOT and its operating administrations have attached substantially similar conditions relating to discrimination, immigration enforcement, and executive orders to all grant agreements.

a.    **DOT and the FTA attach new, unlawful conditions to FTA Grants**

257. For instance, on March 26, 2025, the FTA issued an updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the FTA grant programs discussed above.

258. The March 26 Master Agreement imposed a new condition on all FTA grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FTA Discrimination Condition"). While FTA grants have long required compliance with

RENNE PUBLIC LAW GROUP
Attorneys at Law

nondiscrimination laws and have been subject to the FCA, the March 26 Master Agreement provided:

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA].
>
> (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

259.    That the FTA plans to enforce these new conditions more broadly than current nondiscrimination law is reinforced by the March 26 Master Agreement's requirement that the recipient "comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow *federal guidance prohibiting discrimination*."

260.    The FTA Discrimination Condition is in apparent tension with other requirements in the March 26 Master Agreement.  For example, the March 26 Master Agreement requires compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran- owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible."

261.    The FTA Discrimination Condition is also in apparent tension with DOT's own regulations.  For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity … the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage."  49 C.F.R. 21.5(b)(7).

262.    Further, the March 26 Master Agreement defined "Federal Requirement" to include "[a]n applicable federal law, regulation, or *executive order*" (the "FTA EO Condition").  The March 26 Master Agreement refers to President Trump's DEI Order as an executive order "pursuant to" which the recipient must comply and certify, with no explanation of how the DEI Order relates to funding of mass transit.

263.    The April Duffy Letter to all recipients of DOT grants (including the FTA grants) further addresses the broad scope of the Administration's anti-DEI agenda and how it expands and conflicts with established interpretations of federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"—"presumptively" violates federal nondiscrimination laws.  The April Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

264.    On April 25, 2025, the FTA issued another updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the FTA grant programs discussed above.

265.    The April 25 Master Agreement ("FTA Master Agreement") contains the same FTA Discrimination Condition and the same FTA EO Condition set forth above.  But the FTA Master Agreement contains an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FTA Enforcement Condition").

266.    In particular, the FTA Enforcement Condition amends an existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

267.    The April Duffy Letter to all recipients of DOT grants (including the FTA grants) states that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law" and that "[d]eclining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability."

268.    In May 2025, FTA retroactively applied the April 2025 FTA Master Agreement to grants that were executed pursuant to earlier versions of the agreement.  By substituting those earlier

RENNE PUBLIC LAW GROUP
Attorneys at Law

agreements with the FTA Master Agreement, the FTA purported to unilaterally add new substantive conditions to previously awarded grants without notifying the grant recipients.

269.    Neither the statutory provisions creating the FTA grants, the relevant appropriations acts, nor any other legislation authorizes the FTA to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

270.    In sum and as further explained below, the FTA Discrimination Condition, the FTA EO Condition, and the FTA Enforcement Condition (collectively, the "FTA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti- commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### b.    DOT and the FHWA attach new, unlawful conditions to FHWA Grants

271.    On March 17, 2025, DOT issued revised General Terms and Conditions applicable to Fiscal Year 2024 SS4A grants ("FY 2024 SS4A General Terms and Conditions").

272.    The FY 2024 SS4A General Terms and Conditions imposed a new condition on all Fiscal Year 2024 SS4A grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("SS4A Discrimination Condition"). While SS4A grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the FY 2024 SS4A General Terms and Conditions provided:

> (b)    Pursuant to Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (c)    Pursuant to Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting

diversity, equity, and inclusion (DEI) initiatives that violate any applicable
Federal anti-discrimination law.

273.    The SS4A Discrimination Condition is in apparent tension with other requirements in the FY 2024 SS4A General Terms and Conditions.  For example, the FY 2024 SS4A General Terms and Conditions require compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, inter alia, "included on solicitation lists" and "solicited" when "deemed eligible."

274.    The SS4A Discrimination Condition is also in apparent tension with DOT's own regulations.  For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage."  49 C.F.R. 21.5(b)(7).

275.    The FY 2024 SS4A General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "SS4A Enforcement Condition").

276.    In particular, the SS4A Enforcement Condition amends a pre-existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

277.    Exhibit A to the FY 2024 SS4A General Terms and Conditions also requires the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "SS4A EO Condition").  While this requirement existed in a similar form in prior agreements, Exhibit A to the FY 2024 SS4A General Terms and Conditions lists President Trump's

RENNE PUBLIC LAW GROUP
Attorneys at Law

DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions" purportedly "applicable" to SS4A grant agreements, with no explanation of how those Orders or statutes relate to roadway grants or even apply to local governments.

278.    Also on March 17, 2025, DOT issued revised General Terms and Conditions applicable to Fiscal Year 2023 SS4A grants and to Fiscal Year 2022 SS4A grants.  Those revised General Terms and Conditions, and the revised Exhibit A to each, contain provisions identical to the SS4A Discrimination Condition, the SS4A Immigration Condition, and the SS4A EO Condition discussed above.

279.    On April 22, 2025, the FHWA issued Competitive Grant Program General Terms and Conditions purportedly applicable to all FHWA competitive grants ("2025 FHWA General Terms and Conditions").

280.    The 2025 FHWA General Terms and Conditions imposed a new condition on all FHWA competitive grants (including the BIP, Culvert AOP Program, and ATTAIN program discussed above) implementing President Trump's directive, as set out in the DEI Order and further explained in the April Duffy letter, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("FHWA Discrimination Condition").  While FHWA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FHWA General Terms and Conditions provide:

> (b) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (c) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

281.    The 2025 FHWA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FHWA Enforcement Condition").

282.     In particular, the FHWA Enforcement Condition incorporates immigration enforcement into a provision addressing compliance with federal law and policy as follows 8 (immigration enforcement language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

283.     The Exhibits to the 2025 FHWA General Terms and Conditions—dated April 30, 2025 and applicable to FHWA competitive grants—further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the "FHWA EO Condition").  The Exhibits list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327), as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those Orders or statutes relate to highway grants or even apply to local governments.

284.     Additionally, the April Duffy Letter (described in paragraphs 85 and 86 above) was directed to all recipients of DOT grants, including those receiving FHWA grants.

285.     Neither the statutory provisions creating the FHWA grants, the relevant appropriations acts, nor any other legislation authorizes the FHWA or DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts.  Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws.  But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

286.     In sum and as further explained below, the SS4A Discrimination Condition, the SS4A Enforcement Condition, the SS4A EO Condition, the FHWA Discrimination Condition, the FHWA

Enforcement Condition, and the FHWA EO Condition (collectively, the "FHWA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti- commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c.    DOT and the FAA attach new, unlawful conditions to FAA Grants

287.    Implementing the April Duffy Letter and the Trump Administration Executive Orders, on April 25, 2025, the FAA issued a proposal labeled "Notice of modification of Airport Improvement Program grant assurances; opportunity to comment," providing notice and soliciting public comments on modifications to the Grant Assurances ("2025 FAA Grant Assurances").  In its notice, the FAA stated that the 2025 FAA Grant Assurances would become effective immediately, notwithstanding the opportunity to comment.

288.    The 2025 FAA Grant Assurances require the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant." While this requirement existed in a similar form in prior versions of the Grant Assurances, the 2025 FAA Grant Assurances list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders, including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, even though these Orders on their face do not apply to non-federal entities and do not relate to funding of airport development or infrastructure.  Congress has not directed or authorized that the DEI Order, Gender Ideology Order, or Immigration Order be imposed as Grant Assurances.

289.    Implementing the April Duffy Letter and the Trump administration Executive Orders, on May 6, 2025, FAA posted on its website a revised grant agreement template for 2025 for AIG grants with added terms and conditions that did not appear in prior iterations of FAA grant agreements ("FY 2025 FAA AIG Grant Template").  The FY 2025 FAA AIG Grant Template has not been circulated for comment, as is statutorily required for changes to Grant Assurances.

290.    The FY 2025 FAA AIG Grant Template imposes a new condition on all AIG grants that implements President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede that this requirement is material for purposes of

-71-

RENNE PUBLIC LAW GROUP
Attorneys at Law

the FCA (the "FAA Discrimination Condition"). While FAA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the FY 2025 FAA AIG Grant Template provides:

> Pursuant to Section (3)(b)(iv), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the sponsor:
>
> a. Agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]; and
>
> b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

291. The FAA Discrimination Condition is in apparent tension with statutorily required Grant Assurances imposed on sponsors with respect to FAA grant funds. For example, one of the statutorily required Grant Assurances sponsors must make for airport development grants is that the airport sponsor will take necessary action to ensure, to the maximum extent possible, that at least 10 percent of all businesses at the airport selling consumer products or providing consumer services to the public are small business concerns owned and controlled by "a socially and economically disadvantaged individual" or other small business concerns in historically underutilized business zones. 49 U.S.C. § 47107(e)(1). "Socially and economically disadvantaged individual" is defined to include "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities," as well as women. 49 U.S.C. § 47113(a)(2); 15 U.S.C. § 637(d).

292. The FAA Discrimination Condition is also in apparent tension with DOT's own regulations. For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity … the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7). And the FAA Discrimination Condition is in tension with other provisions of the FY 2025 FAA AIG Grant Template. For example, the FY 2025 FAA AIG Grant Template states that the "sponsor's [Disadvantaged Business Enterprise] and [Airport Concession Disadvantaged Business Enterprise] programs as required by

RENNE PUBLIC LAW GROUP
Attorneys at Law

49 C.F.R. Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement." But 49 C.F.R. 23.25(e), for instance, requires the use of "race-conscious measures" in implementing the Airport Concession Disadvantaged Business Enterprise program when race-neutral measures, standing alone, are not projected to be sufficient to meet an overall goal, and sets forth examples of race-conscious measures airports can implement.

293.    The FY 2025 FAA AIG Grant Template contains an additional condition requiring sponsors to cooperate with the enforcement of any federal law, including federal immigration enforcement efforts (the "FAA Enforcement Condition").

294.    In particular, the FAA Enforcement Condition incorporates immigration enforcement into a provision addressing free speech and religious liberty as follows (immigration enforcement language emphasized):

> The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.*

295.    The FY 2025 FAA AIG Grant Template further states with respect to immigration: "Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration.  The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter."  The FY 2025 FAA AIG Grant Template does not explain how those criminal immigration statutes relate to airport grants or even apply to local governments.

296.    The FY 2025 FAA AIG Grant Template also requires the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant" (the "FAA EO Condition").  While this requirement existed in a similar form in prior agreements, the FY 2025 FAA AIG Grant Template lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders,

-73-

including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders relate to funding of airport development or infrastructure or apply to local governments.

297.    The FY 2025 FAA AIG Grant Template also states that the "FAA may terminate this agreement and all of its obligations under this agreement" in certain circumstances, including if "FAA determines that termination of this agreement is in the public interest"; and further states that "[i]n terminating this agreement under this section, the FAA may elect to consider only the interests of the FAA" (the "FAA Termination Condition").  The FY 2025 FAA AIG Grant Template does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure.

298.    AIP and AIG grant agreements require sponsors to certify a number of sponsor assurances (i.e., the Grant Assurances described above) that require sponsors to maintain and operate their facilities safely, efficiently, and in accordance with specified conditions, including compliance with numerous statutes, agency rules, and executive orders.

299.    Additionally, The April Duffy Letter was directed to all recipients of DOT grants, including those receiving FAA grants.

300.    Neither the statutory provisions authorizing the FAA grants, the relevant appropriations acts, nor any other legislation authorizes the FAA or DOT to condition the granting of these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts.  Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws.  But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

301.    In sum and as further explained below, the FAA Discrimination Condition, the FAA Enforcement Condition, the FAA EO Condition, the FAA Termination Condition (collectively, the "FAA Grant Conditions"), including in the 2025 Grant Assurances, FAA AIG Grant Template, and any other agreement, template, assurances, or other terms and conditions, violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti- commandeering principle, and the Fifth Amendment's

RENNE PUBLIC LAW GROUP
Attorneys at Law

1   void-for-vagueness doctrine.

        **4.    HHS and its Operating Divisions and Agencies Attach New Conditions to**
        **HHS Grants**

4   302.    HHS and its operating divisions and agencies have implemented President Trump's

Executive Orders by making changes to HHS policy and attaching new and unlawful conditions

(collectively, the "HHS Grant Conditions") across the expansive portfolio of HHS grants established by

Congress and demanding grant recipients' agreement to those new conditions.

8   303.    For example, on April 16, 2025, HHS issued an updated HHS Grants Policy Statement

(2025 HHS GPS) applicable to discretionary grants that is "incorporated by reference in the official

Notice of Award (NoA) as a standard term and condition."  It applies to "awards and award

modifications that add funding made on or after April 16, 2025," includes "supplements to award,

competing and non-competing continuations," and applies to "all HHS recipients and the requirements

flow down to subrecipients."  The 2025 HHS GPS "is incorporated by reference as a standard term and

condition of awards."  The 2025 HHS GPS states that it does not apply to nondiscretionary awards, but

that "HHS agencies have the discretion to apply certain parts of the GPS to non-discretionary awards and

other policies to" non-discretionary awards.[4]

17  304.    The 2025 HHS GPS imposed a new condition on HHS grants implementing President

Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement

not to promote DEI and to concede this requirement is material for purposes of the FCA ("HHS

Discrimination Condition").  While HHS grants have long required compliance with nondiscrimination

laws and have been subject to the FCA, the 2025 HHS GPS states that in addition to filing Form HHS

690 (Assurance of Compliance with federal nondiscrimination laws, which was previously required

under older versions of the GPS), "recipients must comply with all applicable Federal anti-discrimination

laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4)."  Further,

the 2025 HHS GPS states that "By accepting the grant award, recipients are certifying that . . . [t]hey do

not, and will not during the term of this financial assistance award, operate any programs that advance or

---

[4] The 2025 HHS GPS does not apply to NIH grant awards.

RENNE PUBLIC LAW GROUP
Attorneys at Law

promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . .” For this purpose, the following definitions apply:

> (a) DEI means “diversity, equity, and inclusion.”

> (b) DEIA means “diversity, equity, inclusion, and accessibility.”

> (c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

> . . . .

> (e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

305.    In July 2025, HHS released a revised 2025 GPS in which all mention of DEI was removed. Instead, the updated 2025 GPS simply stated, “By applying for or accepting federal funds . . . recipients certify compliance with all federal antidiscrimination laws and that complying with those laws is a material condition.” This revised version became effective as of July 24, 2025.

306.    However, recently, HHS released an updated 2025 GPS, effective on October 1, 2025, doubling down on the imposition of new conditions. The 2025 GPS states that “[a]ll recipients subject to Title IX requirements must also adhere to the following term.” The terms referenced are as follows:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipient certifies as follows:

> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including requirements set forth in Presidential Executive Order 14168 titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and recipient will remain compliant for the duration of the Agreement.

> - The above requirements are conditions of payment that go the essence of the Agreement are therefore material terms of the Agreement.

> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.

> - Recipient acknowledges that this certification reflects a change in the government’s position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims

-76-

Renne Public Law Group
Attorneys at Law

does not reflect the materiality of the foregoing requirements to this Agreement.

- Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

307.    Furthermore, the newest 2025 GPS warns that Recipients who knowingly make false statements "relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

308.    In addition to these agency-wide conditions, several HHS operating divisions and agencies have issued their own requirements.  For example, CDC recently issued updated general terms and conditions for both research and non-research awards.  Those updated general terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply.

309.    SAMHSA recently issued updated general terms and conditions for discretionary grants.  Those updated general terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply.  Moreover, in April 2025, SAMHSA updated its Notice of Funding Opportunity (NOFO) Application Guide to state that "[a]ll activities proposed in your application and budget narrative must be in alignment with the current Executive Orders" (the "SAMHSA EO Condition") and that "[f]unds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens" (the "SAMHSA Immigration Condition").

310.    On July 25, 2025, HRSA issued updated general terms and conditions applicable to "all active awards."  The revised HRSA terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply.  They also contain the following provision (the "HRSA Gender Ideology Condition"):

By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:

- Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and

-77-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.

- The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.

- Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.

- Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.

- Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

311.    It is not clear if HRSA's assertion that compliance with Title IX (or any other nondiscrimination law) purportedly now requires agreement to the Gender Ideology Order is shared by other HHS operating divisions and agencies, or is implicitly imported into other operating divisions and agencies' conditions requiring compliance with nondiscrimination laws that do not expressly contain this added gloss.

312.    Meanwhile, on May 6, 2025, HHS sent a "Dear Colleague" letter to medical schools receiving federal funds, providing "[HHS's] current interpretation of federal law."  Regarding DEI, the letter stated "some American educational institutions . . . have adopted race-conscious policies under a broader umbrella of concepts known as 'systemic and structural racism' and 'diversity, equity, and inclusion' (DEI) to incorporate race-based criteria into training and discipline," and "[a]dditionally, certain DEI programs may confer advantages or impose burdens based on generalizations associated with racial identity, rather than evaluating individuals on their own merits.  Such programs can create a hostile environment, denying a student the ability to participate fully in school life because of the student's race." The letter also warned that institutions "found to be out of compliance with federal civil rights law may, consistent with applicable law, be subject to investigation and measures to secure compliance with may, if unsuccessful, affect continued eligibility for federal funding" and stated HHS would "prioritize

-78-

RENNE PUBLIC LAW GROUP
Attorneys at Law

investigations" of institutions that, among other things, require DEI or diversity statements in connection with hiring.  Letter from Anthony F. Archeval, Acting Director, HHS Office for Civil Rights, to medical schools that receive federal financial assistance (May 6, 2025), https://www.hhs.gov/sites/default/files/guidance-med-schools-dear-colleague-letter.pdf.

313.    In a May 14, 2025 statement to the Senate Committee on Health, Education, Labor, and Pensions regarding President Trump's FY 2026 budget, HHS Secretary Kennedy stated, among other things, that HHS is "committed to restoring a tradition of gold-standard, evidence based science—not one driven by politicized DEI, gender ideology, nor sexual identity."  Secretary Kennedy also stated that "NIH will no longer issue grants to promote radical gender ideology to the detriment of America's youth, or fund dangerous gain-of-function research, though related research will continue consistent with Administration policy and oversight.  Our Administration is committed to eliminating radical gender ideologies that poison the minds of Americans."  Statement by Robert F. Kennedy, Jr. on the President's Fiscal Year 2026 Budget before Committee on Health, Education, Labor, and Pensions (May 14, 2025), https://www.help.senate.gov/imo/media/doc/b1b74b8b-0612-8b5d-1904-a50babc1deea/HELP%20Secretary%20Kennedy%20Testimony.pdf.

314.    Neither the statutory provisions creating the HHS grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes HHS, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not "promote" DEI or gender ideology or its admission that its compliance with these prohibitions is material for purposes of the FCA.  Nor are Plaintiffs aware of any statute authorizing HHS, itself or through its operating divisions and agencies, to impose such conditions on any other HHS grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.  Federal grant recipients must comply with nondiscrimination and other federal laws.  But executive orders and statements from agency heads cannot change what these laws require under existing court decisions.

315.    In sum and as further explained below, the HHS Grant Conditions violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

5.      **EPA Attaches New Conditions to EPA Grants**

316.    EPA and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "EPA Grant Conditions") across the expansive portfolio of EPA grants established by Congress and demanding grant recipients' agreement to those new conditions.

317.    For example, on April 3, 2025, EPA issued an updated General Terms and Conditions, which included a new condition that states:

> By accepting this EPA financial assistance agreement, (A) the recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the Federal Claims Act]; and (B) the recipient certifies that it does not operate any programs promoting Diversity, Equity and Inclusion that violate any applicable Federal anti-discrimination laws.

U.S. Envtl. Prot. Agency, EPA General Terms and Conditions effective October 1, 2024 or later, https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf.

318.    The revised EPA General Terms and Conditions impose this new condition on EPA grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA ("EPA Discrimination Condition").  While EPA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, executive orders and letters from agency heads cannot change what the laws require under existing court decisions.  The EPA Discrimination Condition requiring recipients to certify that compliance "in all respects with all applicable Federal anti-discrimination laws" is always "material" for purposes of the FCA, is unauthorized by Congress and unconstitutionally vague.  Furthermore, "materiality," under the FCA, "is a functional rather than formulistic, inquiry" that requires courts to evaluate three factors, only one of which is whether the government's payment was conditioned on compliance.  *See United States ex rel. Bashir v. Boeing Co.*, 765 F. Supp. 3d 1111, 1128–29 (W.D. Wash. 2025).  To determine materiality, a court also considered the government's past enforcement of the requirement and the magnitude of the violation.  *Id*.  Accordingly, the EPA Discrimination Condition imposes an impermissibly vague legal standard that is

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    broader than the statute allows.

2        319.    In sum and as further explained below, the EPA Grant Conditions violate the Separation

3    of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth

4    Amendment's void-for-vagueness doctrine, and the APA.

5        **6.    The New Grant Conditions Implementing and Incorporating the Executive**

6            **Orders Are Unlawful**

7            **a.    Incorporation of the Executive Orders is Unlawful**

8        320.    The conditions discussed above purport to incorporate executive orders as governing the

9    use of federal funds.  These orders in many ways purport to adopt new laws by presidential fiat, amend

10   existing laws, and overturn court precedent interpreting laws.  In so doing, the new grant conditions seek

11   to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to

12   say what the law means.

13       321.    Furthermore, the executive orders are the President's directives to federal agencies.  These

14   orders are unintelligible and vague as applied to grant recipients, and as implemented in the unlawful

15   conditions at issue.

16       322.    Without Congress passing his anti-DEI agenda, President Trump purports to have granted

17   himself unchecked Article II powers to legislate by executive order and impose his decrees on state and

18   local governments seeking grant funding.

19           **b.    The Discrimination Condition is Unlawful**

20       323.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws

21   as a condition of federal funding in the past, the Trump Administration's communications to federal

22   grant recipients make clear that the agencies seek compliance with the Trump Administration's novel,

23   incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI

24   programs.  The Trump Administration's conception of an "illegal" DEI program is contrary to actual

25   nondiscrimination statutes and is inconsistent with what any court has endorsed when interpreting them.

26       324.    For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ

27   employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and

28   DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on

RENNE PUBLIC LAW GROUP
Attorneys at Law

race or sex"—potentially reaching affinity groups or teaching about racial history.  Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl?inline.

325.     Defendant Turner has stated that "HUD is carrying out Present Trump's executive orders, mission, and agenda," by "[a]lign[ing] all programs, trainings, and *grant agreements* with the President's Executive Orders, removing diversity, equity, inclusion (DEI)." Press Release No. 25-059, *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, https://www.hud.gov/news/hud-no-25-059 (emphasis added).

326.     Neither the text of Title VI nor any other statute or other condition enacted by Congress prohibits recipients of federal funding from considering issues of diversity, equity, or inclusion.  The Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.  Indeed, existing case law rejects the Trump Administration's expansive views on nondiscrimination law with respect to DEI.  The President has no authority to declare, let alone change, federal nondiscrimination law by executive fiat.  Yet, the DEI Order seeks to impose his views on DEI as if they were the law by using federal grant conditions and the threat of FCA enforcement to direct and coerce federal grant recipients into acquiescing in his Administration's unorthodox legal interpretation of nondiscrimination law.

327.     Accepting these conditions would permit Defendants to threaten Plaintiffs with burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align their activities with President Trump's political agenda.  This threat is intensified by the grant conditions that purport to have recipients concede the DEI certification's "materiality"—an otherwise "demanding" element of an FCA claim.  Further, even short of bringing a suit, the FCA authorizes the Attorney General to serve civil investigative demands on anyone reasonably believed to have information related to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of.  *See* 31 U.S.C. § 3733.

328.     The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting

-82-

RENNE PUBLIC LAW GROUP
Attorneys at Law

them.  Requiring recipients to certify that compliance "in all respects with all applicable Federal anti-discrimination laws" is always "material" for purposes of FCA imposes an impermissibly vague standard that is broader than the statute allows.

### c.    The Immigration Enforcement Condition is Unlawful

329.    Congress has not delegated to Defendants the authority to condition grant funding on a recipient's agreement not to "promot[e] . . . illegal immigration" or "abet[] policies that seek to shield illegal aliens from deportation."  It is also unclear what type of conduct this might encompass, leaving federal grant recipients without fair notice of what activities would violate the prohibition and giving federal agencies free rein to arbitrarily enforce it.

330.    Indeed, on April 24, 2025, Judge William H. Orrick of the United States District Court for the Northern District of California preliminarily enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties on the basis of Section 2(a)(ii) of the Immigration Order, which directs that no "Federal payments" be made to states and localities if the "effect," even unintended, is to fund activities that the Administration deems to "facilitate" illegal immigration or "abet so-called 'sanctuary' policies." *City & Cnty. of San Francisco v. Trump*, 25-CV-01350- WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025). The court ruled that the direction "to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate[s] the Constitution's separation of powers principles and the Spending Clause"; "violate[s] the Fifth Amendment to the extent [it is] unconstitutionally vague and violate[s] due process"; and "violate[s] the Tenth Amendment because [it] impose[s] [a] coercive condition intended to commandeer local officials into enforcing federal immigration practices and law." *Id*. at *2.

### d.    The Verification Condition is Unlawful

331.    Further, PRWORA does not authorize the Verification Condition for at least two reasons. First, PRWORA explicitly does not require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations.  8 U.S.C. § 1642(b). Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner." *Id*. § 1642(b)(ii), (iii).  The Attorney General has issued interim guidance and a proposed

-83-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

verification rule, but has not implemented a final rule. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation. 62 Fed. Reg. at 61348–49. Absent implementing regulations, Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system. *See* 42 U.S.C. § 1320b-7. Requiring recipients to do so exceeds the authority created in PRWORA.

332. Second, SAVE is a database operated by the U.S. Department of Homeland Security, acting through U.S. Citizenship and Immigration Services, that is sometimes used to assist federal immigration enforcement actions. The Verification Condition would require Plaintiffs to gain access to this system, train their own employees how to use the system, and require them to enter immigration information. Such an effort to commandeer local resources for matters related to federal immigration enforcement is counter to federal law, as well as applicable local and state laws precluding local participation in federal immigration enforcement.

### e.    The Gender Ideology Condition is Unlawful

333. The Gender Ideology Condition improperly seeks to force federal grant recipients to no longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes "gender ideology." This violates HUD's own regulations, which require that grant recipients and subrecipients ensure "[e]qual access to CPD programs, shelters, other buildings and facilities, benefits, services, and accommodations is provided to an individual in accordance with the individual's gender identity, and in a manner that affords equal access to the individual's family," including facilities with "shared sleeping quarters or shared bathing facilities." 24 C.F.R. § 5.106(b)–(c). HUD regulations also prohibit subjecting an individual "to intrusive questioning or asked to provide anatomical information or documentary, physical, or medical evidence of the individual's gender identity." *Id*. § 5.106(b)(3).

334. While Defendant Turner announced HUD will no longer enforce these regulations, the regulations remain in effect and applicable to the CPD programs.

335.     The Gender Ideology Condition is also vague.  The definition of "gender ideology" is not only demeaning, but also idiosyncratic and unscientific.  Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who merely collect information on gender identity, which has long been authorized and encouraged by HUD in its binding regulations, as such information can be used to improve the quality and efficacy of homeless services.

336.     The Trump Administration has already terminated federal funding as a result of agency action carrying out the Gender Ideology Order and related executive orders.  For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the U.S. Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program.  The CDC ended the grant in order to comply with the Gender Ideology Order.  *See* Kristen Hwang, LA clinics lose funding for transgender health care as Trump executive orders take hold, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/.

337.     On February 28, 2025, Judge Lauren King of the United States District Court for the Western District of Washington enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition it incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers.  *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261-77 (W.D. Wash. 2025).

338.     Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress," subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative 11 powers."  *Id*. at *1261.  The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people."  *Id*. at 1277 (citation omitted).

### f.     The Abortion Condition is Unlawful

339.     The Abortion Condition (including the Abortion Order incorporated by reference) does not implement, but rather exceeds, the Hyde Amendment's narrow prohibition on using federal funds to

-85-

RENNE PUBLIC LAW GROUP
Attorneys at Law

pay for, or require others to perform or facilitate, abortions.  While it purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits the use of federal funds for abortions (subject to narrow exceptions)—in reality, it goes well beyond the Hyde Amendment.  The Hyde Amendment to the 2024 Appropriations Act specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest." Pub. L. 118-42, §§ 202, 203, 138 Stat. 25 (March 9, 2024).  But the Hyde Amendment to the 2024 Appropriations Act does not require grant recipients to refrain from "promot[ing] abortion"—a vague prohibition that is susceptible to arbitrary enforcement.  And in doing so, the Abortion Condition usurps Congress's spending, appropriations, and legislative power.  In sum and as further explained below, Defendants' imposition of the Abortion Condition violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void- for-vagueness doctrine, and the APA.

340.    In sum and as further explained below, Defendant's imposition of the EO Grant Conditions violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void- for-vagueness doctrine, and the APA.

**F.    Multiple Courts Have Issued Injunctions Preventing the Imposition of the Unlawful Grant Conditions**

341.    Since President Trump issued the executive orders directing federal agencies to impose new conditions on grant funding and terminate funding for noncompliance, numerous plaintiffs—including states, cities, and nonprofit organizations—have filed lawsuits seeking to enjoin the implementation of these directives.  In response, courts across the country have granted preliminary injunctions to halt enforcement of these unlawful conditions while litigation proceeds.  *See e.g. Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025); *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025), opinion clarified, No. 25-CV-01350-WHO, 2025 WL 1358492 (N.D. Cal. May 9, 2025); *S. Educ. Found. v. United States Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3,

RENNE PUBLIC LAW GROUP
Attorneys at Law

2025); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025).

342.    On July 2, 2025, presumably in response to the numerous injunctions granted against DOT and HUD, DOT Secretary Sean Duffy sent another letter to all recipients of DOT funding, attempting to walk back his earlier statements in the April Duffy Letter (described in paragraphs 85 and 86 above).  The July Duffy Letter states:

> "I write to clarify that the Department will no longer enforce [Biden's executive policies], or any other requirements incorporated into its Federal financial assistance agreements that are inconsistent with the policy objectives of this Administration and current DOT leadership…This letter does not impose new conditions or requirements, but instead serves merely to provide notice that DOT will not enforce or require adherence to any of the [Biden executive policies]"

Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (July 2, 2025) ("July Duffy Letter"), https://www.transportation.gov/sites/dot.gov/files/2025-07/SecDOT%20letter%20to%20 recipients%20of%20FFA%2007022025.pdf.

343.    The July Duffy Letter directly contradicts his earlier April Letter, the Executive Orders, and the June 5th Letter from Claudette Fernandez.  Furthermore, the July letter completely ignores the provisions of Trump's Executive Orders, which Defendants have implemented, that directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI," and directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

344.    The conditions placed on HUD and DOT funding require more than compliance with pre-existing law.  The DEI Order, the Immigration Order, and subsequent agency letters broadly reinterpret the law to prohibit all DEI and require affirmative cooperation with federal immigration enforcement, indicating these new conditions are not reflective of existing law and instead are intended to further the Trump administration's policy goals—not Congress's.

345.    Although the July Duffy Letter purports to "clarify" the Department's position, it does not retract or disavow the Administration's prior threats to vigorously enforce its sweeping and unlawful

RENNE PUBLIC LAW GROUP
Attorneys at Law

interpretation of federal law.  Nowhere does the July Duffy Letter state that DOT will cease enforcing this Administration's novel, overbroad, and contradictory interpretation of federal law, nor does it acknowledge the numerous official statements by federal officials warning that noncompliance with these policies will result in the loss of funding.

### G. Plaintiffs, as Recipients of Pass-Through Grants, have a Reasonable Concern that the Challenged Conditions Apply to them

346.    Local government entities that receive federal grant funds may receive the funds directly from a federal agency (as a direct recipient) or indirectly from a pass-through entity (as a sub-recipient). Where a pass-through entity (for example, a state) provides federal funds to a sub- recipient (for example, a city or county within the state), the pass-through entity is responsible for ensuring the sub-recipient complies with applicable federal requirements.  *See* 2 C.F.R. §§ 200.332(b)(2) (pass-through entity must provide to the sub-recipient information regarding "[a]ll requirements of the subaward, including requirements imposed by Federal statutes, regulations, and the terms and conditions of the Federal award"), 200.332(e) (pass-through entity must "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward"); 2 C.F.R. Part 2400 (incorporating 2 C.F.R. Part 200 requirements with respect to federal awards made by HUD to non-federal entities); 2 C.F.R. Part 1201 (same for DOT).

347.    Consistent with 2 CFR § 200.332, the grant agreements and terms and conditions at issue in this case incorporate applicable federal requirements against any sub-recipients.

348.    For example, the FY 2024 SS4A General Terms and Conditions require that the recipient "monitor activities under this award, including activities under subawards and contracts, to ensure … that those activities comply with this agreement," and state that "[i]f the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e)."  Exhibit A to the 2024 SS4A General Terms and Conditions—which incorporates the DEI and Gender Ideology Orders and two criminal immigration statutes as "applicable provisions" as discussed above—states that "[p]erformance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients."  The 2025 FHWA General Terms and Conditions, the Exhibits

RENNE PUBLIC LAW GROUP
Attorneys at Law

thereto, as well as the 2025 FAA Grant Assurances and FY 2025 FAA AIG Grant Template, contain similar language.

349.    The FTA Master Agreement requires that grant recipients take measures to assure that "Third Party Participants" (defined to include sub-recipients) "comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing."

350.    Plaintiffs receive federal grant funds via pass-through grants (i.e., as sub-recipients) and has a reasonable concern, based on the April Duffy Letter, applicable regulations, and the grant agreement language discussed above, that the challenged grant conditions apply to their use of the pass-through funds.

### H.    Plaintiffs face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services

351.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are unauthorized by Congress, violate the Constitution, and accompanied by poison pill provisions that increase the risk of FCA claims, or forgoing the grant funds—funds paid (at least partly) through local federal taxes—that are essential for vital local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

352.    Defendants' overbroad interpretation and enforcement of the EO Conditions is not hypothetical.  On or around August 18, 2025, the City of Fresno received an email from HUD notifying it "that the Department is questioning the accuracy of the City of Fresno's certification that the Community Development Block Grant ("CDBG") funds described in its Fiscal Year 2025 Consolidated Plan/Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders."  In the email, HUD explained that it had "identified language in Fresno's 2025 Consolidated Plan/Action Plan "that is not consistent with Executive Order 14148 Additional Rescissions of Harmful Executive Orders and Actions, Executive Order 14151 Ending Radical and Wasteful Government DEI Programs and Preferencing, Executive Order 14173 Ending Illegal Discrimination and Restoring Merit-Based Opportunity, and Executive Order 14168 Defending Women From Gender Ideology Extremism and

RENNE PUBLIC LAW GROUP
Attorneys at Law

Restoring Biological Truth to the Federal Government."  Specifically, HUD took issue with the

following statements from Fresno's 2025 Consolidated Plan/Action Plan:

> "The DRIVE Plan has goals to improve housing affordability and stability,
> reduce **racial** and economic isolation and support **environmental justice**
> and sustainability, most of which are addressed in the strategic plan."

> "Emergency shelter for **all genders and their dependent children** who
> are fleeing domestic violence." (emphasis added by HUD).

353.    HUD stated that "[t]his language includes provisions that appear to be inconsistent with

the implementation of federal programs pursuant to the referenced executive orders, and directed Fresno

to "[r]emove or replace all 'equity' references throughout the document," "[r]emove or replace all

"environmental justice" references throughout the document," "[r]emoving all "transgender" references

throughout the document," and provide assurances that "[t]he City of Fresno shall not use grant funds to

promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, Defending Women from Gender

Ideology Extremism and Restoring Biological Truth to the Federal Government."

354.    HUD directed Fresno to take these actions no later than 12:00 pm EDT Thursday, **August

21, 2025**, and provided that "failure to address HUD's concerns regarding the certification may result in

HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of

the Plan."

355.    Plaintiffs, the City of Redwood City, City of Saint Paul, and the County of Marin have

received similar notices from HUD.

356.    Additionally, Defendants' unlawful conduct has already occurred, causing delay and

uncertainty in Plaintiffs' budgeting and long-term planning processes.  Furthermore, the deadlines for

Plaintiffs to submit assurances and agreements containing the unlawful conditions to Defendants are

imminent.

357.    For example, on or around August 14, 2025, the City of Fresno received an additional

Grant Offer and Agreement letter from the FAA regarding an ATP grant.  The Grant Offer included the

2025 FAA Grant Assurances, which, as discussed above, incorporate the unlawful EO Conditions, as

"provisions" purportedly "applicable" to grant agreements.  The Grant Offer stated, "You may not make

any modification to the text, terms or conditions of the grant offer," and provided that the offer will

1    expire and the FAA will not be obligated to pay any part of the costs of the designated ATP project

2    unless the offer has been fully executed and finalized on or before **August 29, 2025**.

3        358.    Additionally, Fresno has already spent $13 million of FAA funding allocated for Fresno's

4    use on FAT's terminal expansion project.  Those funds are set to expire on **September 30, 2025**.  If

5    Fresno and the other FAA Plaintiffs do not submit for reimbursement by the end of September, which

6    requires assuring compliance with the 2025 FAA Grant Assurances, they will lose out on millions of

7    previously allocated federal funds.

8        359.    Fresno was also recently awarded a Brownfields and Land Revitalization RFL grant of

9    $750,000 on August 5, 2025, with the mailing date of August 8, 2025.  For an RFL grant, the recipient

10   demonstrates its commitment to carry out the award by either drawing down funds within 21 days after

11   the EPA award or amendment mailing date.  Additionally, the City of Fresno has received notice from

12   the EPA that it intends to award the City an additional grant that will also be subject to the unlawful EO

13   Conditions.

14       360.    Nor is the heightened FCA risk merely speculative.  A May 19, 2025, letter from Deputy

15   Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that

16   DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil

17   Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against

18   any recipient of federal funds that knowingly violates civil rights laws."  The letter asserts the FCA "is

19   implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws

20   while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including

21   through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity,

22   or national origin."  It further states that the Civil Fraud Section and Civil Rights Division will "engage

23   with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements

24   for federal funding recipients" (including HUD) and "will also establish partnerships with state attorneys

25   general and local law enforcement to share information and coordinate enforcement actions."  Finally,

26   the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone

27   with knowledge of discrimination by federal-funding recipients to report that information to the

28   appropriate federal authorities so that [DOJ] may consider the information and take any appropriate

RENNE PUBLIC LAW GROUP
Attorneys at Law

action." Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline.

361.    Withholding HUD grants from the HUD Plaintiffs could result in a loss of millions of dollars in funding for housing and other services that Plaintiffs have adopted to meet the basic needs of their residents.  It would result in Plaintiffs being unable to serve their residents resulting in the loss of access to housing, healthcare, counseling, and other assistance.  This funding represents a significant percentage of those Plaintiffs' total budgets for housing and community support programs, including community development and infrastructure improvements, affordable housing creation and rehabilitation, and homelessness services such as outreach, shelter, prevention, and rapid re-housing.  The loss of this funding would have devastating effects on Plaintiffs and their residents.

362.    Withholding DOT grants from Plaintiffs would result in the loss of hundreds of millions of dollars in funding for critical services and projects for their residents.

363.    Withholding FTA grants from the FTA Plaintiffs would result in the loss of funding for public transit services, including capital projects, maintenance, and improvements, which would cause long-lasting harm to Plaintiffs' finances and lead to delays in or the elimination of critical transit projects.  The loss of this funding, which represents a significant percentage of those Plaintiffs' total budgets for public transit services, would threaten transit improvements and safety initiatives and have severe negative impacts on these services.

364.    Withholding FHWA grants from the FHWA Plaintiffs would result in the loss of funding for street and roadway improvements, including enhancing pedestrian safety, reconfiguring major roadways to decrease crashes and improve transit, and building bike lanes, that will result in long-lasting harm to Plaintiffs' finances, delays to or elimination of critical infrastructure and safety projects, and diversion of funds from other crucial local projects.  The loss of this funding, which represents a significant percentage of those Plaintiffs total budgets for street and roadway projects, would threaten roadway improvement and safety initiatives and have severe negative impacts on these projects.

365.    Withholding FAA grants from the FAA Plaintiffs would result in the loss of funding for ongoing and future airport projects—including development and improvement of runways, taxiways, terminals, and control tower as well as airport transit, safety, and sustainability projects—that will result

Renne Public Law Group
Attorneys at Law

-92-

in long-lasting harm to those Plaintiffs' finances, delays to or elimination of critical airport infrastructure and safety projects, and diversion of funds from other crucial projects. The loss of this funding, which represents a significant percentage of those Plaintiffs' total budgets for airport development and infrastructure projects, would threaten airport improvement and safety initiatives and have severe negative impacts on these critical projects.

366.    Withholding HHS grants from the HHS Plaintiff would threaten or eliminate critical individual and public health services for millions of residents. Loss of funding could decimate public health budgets and cause residents, including those most vulnerable, to lose access to meals, medical care, housing, and lifesaving social safety net services. Loss of funding could also devastate local public health and child welfare agencies, which may be forced to conduct significant layoffs and operational reductions.

367.    Withholding EPA grants from the EPA Plaintiffs would result in the loss of funding for environmental protection and infrastructure projects, including brownfields mitigation and sustainability development, which would cause long-lasting harm to Plaintiffs' finances and lead to delays in or elimination of critical environmental and public health projects. The loss of this funding would have severe negative impacts on public health and environmental safety.

368.    The prospective loss of these federal funds would be so catastrophic to Plaintiffs' finances that the essential services it provides—including housing support, public transportation, street and roadway safety improvements, and airport operations—would be effectively halted. Plaintiffs cannot replace these funds with local revenue without drastically cutting other critical services or abandoning their obligations to vulnerable populations. Yet agreeing to the vague, unauthorized, and contradictory grant conditions—even if Plaintiffs were to make a good faith effort to revise their policies to comply— would expose them to significant liability. Certifying compliance with these conditions carries an intolerable risk of enforcement under the False Claims Act, and constitutional and statutory challenges from stakeholders who could assert that Plaintiffs have adopted discriminatory or otherwise unlawful policies in violation of their rights. Plaintiffs thus face an impossible dilemma: either accept legal jeopardy by complying with the conditions, or forfeit funding that is essential to the health, safety, and well-being of their residents.

RENNE PUBLIC LAW GROUP
Attorneys at Law

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
*(All Grant Conditions)*

369.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

370.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Id*. (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

371.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7.  Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

372.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id*., No. 51, at 350).

373.    "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'"  *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

374.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution.  *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24; *Seila Law LLC*, 591 U.S. at 227; *see also Clinton v. City of New York*, 524 U.S. 417, 450 (1998) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers" (Kennedy, J., concurring)).  Consistent with these principles,

RENNE PUBLIC LAW GROUP
Attorneys at Law

the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

375. Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments. 2 U.S.C. §§ 681 et seq. The President has not done so.

376. Congress has not conditioned the provision of Defendants' grants on compliance with a prohibition on all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Nor has Congress delegated to Defendants the authority to attach the EO Grant Conditions unilaterally.

377. By imposing the EO Grant Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

378. Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

379. Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

380. For these reasons, Defendants' conditioning of grants on compliance with the EO Grant Conditions violates the separation of powers doctrine.

## Count 2: Spending Clause
### *(All Grant Conditions)*

381. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

RENNE PUBLIC LAW GROUP
Attorneys at Law

382.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States …"  U.S. Const. art. I, § 8, cl. 1.

383.    As described above, Defendants violate the separation of powers because the EO Grant Conditions are neither expressly nor impliedly authorized by Congress.  For the same reasons, Defendants violate the Spending Clause.

384.    The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).  The grant conditions must be set forth "unambiguously."  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

385.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.  *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

386.    Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional."  *Id*. at 210.

387.    Even if Congress had delegated authority to the Executive and HUD, DOT, HHS, or EPA to condition grant funding on terms prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.", the EO Grant Conditions would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

b.    imposing conditions that are so severe as to be coercive;

c.    imposing conditions that are not germane to the stated purpose of grant program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

d.    with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id*. at 210.

-96-

RENNE PUBLIC LAW GROUP
Attorneys at Law

### Count 3: Tenth Amendment
*(All Grant Conditions)*

388.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

389.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X.

390.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012).  States must have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id*. at 578.

391.    Even if Congress had delegated authority to the Executive or Defendants to condition grant funds on any policy that "promotes" the Administration's conception of an "illegal" DEI program or on participation in the Administration's enforcement of federal immigration laws, the EO Grant Conditions would violate the Tenth Amendment by imposing conditions so severe as to coerce recipients of such funds to adopt the Administration's reinterpretation of the law.  *See id*. at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

### Count 4: Fifth Amendment Due Process – Vagueness
*(All Grant Conditions)*

392.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

393.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

394.    The EO Grant Conditions are unconstitutionally vague.

395.    Initially, each of the EO Conditions is vague in purporting to incorporate all executive orders.  Executive orders are the President's directives to federal agencies and do not apply to federal grant recipients.  The purported incorporation of all executive orders into the recipient or sponsor's use of

RENNE PUBLIC LAW GROUP
Attorneys at Law

grant funds renders the other new grant conditions vague.

396.    Each of the Discrimination Conditions fails to clearly define what conduct is prohibited and fails to specify clear standards for enforcement.  This uncertainty is amplified by agency letters and statements, including the April Duffy Letter and Turner statements, that conflict with federal statutes and case law.

397.    The HUD Enforcement Condition (which incorporates by reference the Immigration Order) fails to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what would violate the prohibition.

398.    Similarly, each of the DOT Enforcement Conditions fails to define the terms "cooperate," "cooperating," "impeding," and "enforcement" with respect to "Federal immigration law," leaving federal grant recipients without fair notice of what would violate the prohibition.

399.    Similarly, the FAA Termination Condition does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure, leaving federal grant recipients without fair notice of what would trigger termination of their grants.

400.    The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague as to require people of ordinary intelligence to guess as to what is prohibited.  By the same token, the Gender Ideology Condition affords unfettered discretion to Defendants to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

401.    The meaning of the phrase "promote elective abortion" is also vague, leaving federal grant recipients without fair notice of what activities would violate the prohibition and affording Defendants unfettered discretion.

402.    The vague terms and conditions described above are likely to chill individuals from engaging in First Amendment-protected speech on matters of public concern

403.    Thus, the EO Grant Conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

RENNE PUBLIC LAW GROUP
Attorneys at Law

## Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2) –

### Arbitrary and Capricious

*(All Grant Conditions)*

404.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

405.    Defendant HUD, HHS, EPA, and DOT, as well as the DOT operating administrations (the FTA, the FHWA, and the FAA), are all "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). Additionally, the HUD Grant Agreements, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, HHS's revised Grants Policy Statement, and the EPA's updated General Terms and Conditions are all agency actions subject to review under the APA.

406.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

407.    The HUD Grant Agreements are final agency actions because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal HUD funds.  *See State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).

408.    Similarly, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, HHS's revised Grants Policy Statement, and the EPA's updated General Terms and Conditions are final agency actions because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Administration policy priorities as a

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  condition to receiving federal funds.

2      409.    These actions determine rights and obligations and produce legal consequences because

3  they exercise purported authority to create new conditions on already awarded funds that would obligate

4  recipients to comply with the Executive's policy priorities.

5      410.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings,

6  and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

7  accordance with law." 5 U.S.C. § 706(2)(A).

8      411.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and

9  reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio*

10  *Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency

11  has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts

12  found and the choice made.'" *Id*. (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm*

13  *Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[A]n agency cannot simply ignore 'an important

14  aspect of the problem'" addressed by its action.  *Id*. at 293.

15      412.    HUD has provided no reasoned explanation for its decision to impose conditions related to

16  prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verifying immigration

17  status, and prohibiting the "promot[ion]" of "gender ideology" and "elective abortion" on HUD funds

18  that have no connection to those issues.

19      413.    HUD has provided no reasoned basis for withholding funds Congress appropriated for

20  disbursement, except to the extent the HUD Grant Agreements make clear HUD is enacting the

21  President's policy desires, as expressed in Executive Orders 14168, 14173, 14182, and 14218, in place of

22  Congress's intent.

23      414.    HUD also ignores essential aspects of the "problem" it purports to address via the CPD

24  programs, including the Plaintiff's reasonable and inevitable reliance on now at-risk funds, the

25  expectation of reimbursement from already appropriated funds, and the potential impacts on low-income

26  and homeless individuals and families who may be dissuaded from accepting services if they must verify

27  their immigration status or are unable to use their identified gender in doing so.

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

415.     Similarly, neither DOT nor its OAs have provided any reasoned basis for anti-DEI-related conditions to the FTA, FHWA, and FAA grants, seeking to impose the Administration's view on all policies and programs, even when they are unrelated to programs receiving such grants.  Moreover, DOT and its EOs failed to explain how Plaintiffs could simultaneously comply with each of the DOT Discrimination Conditions, while also complying with statutory, regulatory, and other requirements that are in apparent tension with those Conditions.

416.     Nor has HHS or the EPA provided a reasoned basis for imposing conditions related to "cooperation" with federal immigration enforcement on federal funds that have no connection to that issue.

417.     Defendants have also ignored Plaintiffs' reasonable reliance on awarded, but not yet obligated, funds and the expectation of reimbursement from already appropriated funds.

418.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the EO Grant Conditions violates the APA because it is arbitrary and capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2) –

## Contrary to the Constitution
### *(All Grant Conditions)*

419.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

420.     Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

421.     As described above, Defendants' imposition of the EO Grant Conditions violates bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, the Tenth Amendment and the Fifth Amendment.

422.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the EO Grant Conditions violates the APA because it is contrary to

RENNE PUBLIC LAW GROUP
Attorneys at Law

constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2) –

### In Excess of Statutory Authority
*(All Grant Conditions)*

423.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

424.    Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

425.    Defendants may exercise only authority granted to them by statute or the Constitution.

426.    No law or provision of the Constitution authorizes Defendants to impose extra- statutory conditions not authorized by Congress on congressionally-appropriated funds.

427.    Neither the Housing and Community Development Act, the Cranston-Gonzalez National Affordable Housing Act, the Stewart B. McKinney Homeless Assistance Act, the AIDS Housing Opportunity Act nor any other legislation authorizes HUD to impose conditions on HUD grant funding related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.".

428.    Similarly none of the statutes authorizing the HHS, EPA, FTA, FHWA, and FAA grants, nor the relevant appropriations acts, authorize Defendants to impose conditions on federal funding prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.".

429.    Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed grant conditions, Defendants attempts to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.

RENNE PUBLIC LAW GROUP
Attorneys at Law

430.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the EO Grant Conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 8: Administrative Procedure Act, 5 U.S.C. § 706(2) –
### Agency Action Contrary to Regulation
*(HUD Grant Conditions)*

431.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

432.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A).

433.     The NOFOs under which Plaintiffs were awarded HUD funding for FY 2024 contain no terms or conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

434.     By imposing new terms and conditions on the HUD Grant Agreements not included in the NOFO or authorized elsewhere, HUD failed to comply with its own regulations governing the formation of CPD grant agreements and failed to observe the procedure required by law.

435.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions violates the APA because it is contrary to HUD's own regulations and thus not in accordance with law and without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin HUD from imposing the HUD Grant Conditions without complying with the APA.

RENNE PUBLIC LAW GROUP
Attorneys at Law

**Count 9: Administrative Procedure Act, 5 U.S.C. § 706(2) –**

**Agency Action Without Procedure Required By Law**
*(HUD, FTA, and FFA Grant Conditions)*

436.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

437.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

438.    An agency "must abide by its own regulations."  *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

439.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants."  24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); 24 C.F.R. § 10.2 (definition of "rule"); 24 C.F.R. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994).

440.    The FTA is subject to statutory notice-and-comment requirements for certain statements pertaining to grants issued under title 49, chapter 53 of the U.S. Code (including the FTA Grants). Specifically, "[t]he Administrator of the [FTA] shall follow applicable rulemaking procedures under section 553 of title 5 before the [FTA] issues a statement that imposes a binding obligation on recipients of Federal assistance under this chapter."  49 U.S.C. § 5334(k)(1).  For this purpose, "binding obligation" means "a substantive policy statement, rule, or guidance document issued by the [FTA] that grants rights, imposes obligations, produces significant effects on private interests, or effects a significant change in existing policy."  *Id.* § 5334(k)(2).

441.    The FTA, and the FAA have also adopted regulations requiring those agencies to proceed by notice-and-comment rulemaking when they promulgate substantive rules.  *See* 49 C.F.R. §§ 601.22(a), 601.24–601.28 (FTA); 14 C.F.R. Part 11 (FAA).

RENNE PUBLIC LAW GROUP
Attorneys at Law

442.     Through the HUD Grant Conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new conditions on HUD Grant Agreements that require grant recipients to comply with various Administration directives as a condition to receiving federal funds.  These new conditions thus comprise a substantive rule, not an interpretive rule or general statement of policy.  *See, e.g.*, *Yesler Terrace Cmty. Council*, 37 F.3d at 449 ("Substantive rules … create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (explaining that a rule is substantive, i.e., "legislative," inter alia, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule").

443.     In imposing the HUD Grant Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe the procedure required by law.

444.     Through the FTA and FAA Grant Conditions the FTA and the FAA have not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but attached new terms and conditions to FTA and FAA Grants that require grant recipients to comply with various Administration directives as a condition to receiving federal transit, and airport funds, which are substantive policy statements, rules, or guidance documents that impose obligations or effect significant changes in existing policy, not interpretive rules or general statements of policy.

445.     In imposing the FTA Grant Conditions, the FTA failed to comply with the notice- and-comment requirements set forth in 49 U.S.C. § 5334(k)(1) and its own regulations, and thus failed to observe procedure required by law.

446.     In imposing the FAA Grant Conditions, the FAA failed to comply with the notice- and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

447.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions, the FTA Grant Conditions, and the FAA Grant Conditions

RENNE PUBLIC LAW GROUP
Attorneys at Law

violates the APA because it is without observance of procedure required by law; provide preliminary

relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from imposing those

Conditions without complying with the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

      A.      A declaration that the HUD Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

      B.      A preliminary and permanent injunction enjoining HUD and its program offices from imposing or enforcing the HUD Grant Conditions or any materially similar terms or conditions to any HUD application or action plans submitted by, or HUD funds received by or awarded to Plaintiffs, directly or indirectly;

      C.      A declaration that the DOT Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

      D.      A preliminary and permanent injunction enjoining DOT Defendants from imposing or enforcing the DOT Grant Conditions or any materially similar terms or conditions to any DOT funds received by or awarded to Plaintiffs, directly or indirectly;

      E.      A declaration that the HHS Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

      F.      A preliminary and permanent injunction enjoining HHS from imposing or enforcing the HHS Grant Conditions or any materially similar terms or conditions to any HHS funds received by or awarded to Plaintiffs, directly or indirectly;

      G.      A declaration that the EPA Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

      H.      A preliminary and permanent injunction enjoining EPA from imposing or enforcing the EPA Grant Conditions or any materially similar terms or conditions to any EPA funds received by or awarded to Plaintiffs, directly or indirectly;

      I.      Award Plaintiffs their reasonable costs and attorneys' fees; and

      J.      Grant any other further relief that the Court deems fit and proper.

RENNE PUBLIC LAW GROUP
Attorneys at Law

Dated:  September 8, 2025                    RENNE PUBLIC LAW GROUP


By:  _____*/s/ Jonathan V. Holtzman*_____
       JONATHAN V. HOLTZMAN

Attorneys for Plaintiffs
City of Fresno; City of Eureka; City of South
Lake Tahoe; County of Sacramento; County of
Monroe; Monroe County Airport Authority;
County of San Diego; County of Marin; City of
Alameda; City of Redwood City

Dated:  September 8, 2025                    FRESNO CITY ATTORNEY'S OFFICE


By:  _____*/s/ Andrew Janz*_____
       ANDREW JANZ

Attorney for Plaintiff
CITY OF FRESNO

Dated:  September 8, 2025                    SAINT PAUL CITY ATTORNEY'S OFFICE


By:  _____*/s/ Kelsey McElveen*_____
       LYNDSEY OLSON *
       KELSEY MCELVEEN *
* *Appearing pro hac vice*

Attorneys for Plaintiff
City of Saint Paul

Dated:  September 8, 2025                    ANDERSON & KREIGER LLP


By:  _____*/s/ Melissa C. Allison*_____
       MELISSA C. ALLISON *
       CHRISTINA S. MARSHALL *
* *Appearing pro hac vice*

Attorneys for Plaintiffs
County of Monroe and Monroe County Airport
Authority

-107-

**ECF ATTESTATION**

I, JONATHAN V. HOLTZMAN, am the ECF user whose identification and password are being used to file this FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Dated:  September 8, 2025                                        RENNE PUBLIC LAW GROUP


By: _____*/s/ Jonathan V. Holtzman*_____
     JONATHAN V. HOLTZMAN

RENNE PUBLIC LAW GROUP
Attorneys at Law