1   ANDREW JANZ (SBN 287672)              JONATHAN V. HOLTZMAN (SBN 99795)
2   Fresno City Attorney                  jholtzman@publiclawgroup.com
    andrew.janz@fresno.gov                JAMES R. ROSS (SBN 149199)
3   CITY OF FRESNO                        jross@publiclawgroup.com
    2600 Fresno Street                    RYAN P. McGINLEY-STEMPEL (SBN 296182)
4   Fresno, CA 93721                      rmcginleystempel@publiclawgroup.com
    Telephone: (559) 621-7500             JAKE D. FREITAS (SBN 341837)
5   Facsimile:  (559) 457-1084            jfreitas@publiclawgroup.com
    *Attorney for Plaintiff*              MARIBEL LOPEZ (SBN 340907)
6   CITY OF FRESNO                        mlopez@publiclawgroup.com
                                          RENNE PUBLIC LAW GROUP
7                                         350 Sansome Street, Suite 300
                                          San Francisco, California 94104
8                                         Telephone: (415) 848-7200
                                          Facsimile:  (415) 848-7230
9                                         *Attorneys for Plaintiffs*
                                          CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH
10                                        LAKE TAHOE; COUNTY OF SACRAMENTO; COUNTY OF
                                          MONROE; MONROE COUNTY AIRPORT AUTHORITY;
11                                        COUNTY OF SAN DIEGO, COUNTY OF MARIN, CITY OF
                                          ALAMEDA, CITY OF REDWOOD CITY

12  YIBIN SHEN (SBN 233545)               MELISSA C. ALLISON (MA Bar No. 657470)*
    Alameda City Attorney                 mallison@andersonkreiger.com
13  yshen@alamedaca.gov                   CHRISTINA S. MARSHALL (MA Bar No. 688348)*
    CARA SILVER (SBN 136992)              cmarshall@andersonkreiger.com
14  Special Counsel                       ANDERSON & KREIGER LLP
    csilver@alamedaca.gov                 50 Milk Street, Floor 21
15  DANIEL J. TURNER (SBN 336499)         Boston, MA 02109
    Deputy City Attorney                  Telephone: (617) 621-6500
16  dturner@alamedaca.gov                 *Attorneys for Plaintiffs*
    2263 Santa Clara Avenue, Rm 280       COUNTY OF MONROE
17  Alameda, CA 94501                     MONROE COUNTY AIRPORT AUTHORITY
    Telephone: (510) 747-4750             * *Appearing pro hac vice*
18  *Attorneys for Plaintiff*
    CITY OF ALAMEDA
19
20  BRIAN E. WASHINGTON (SBN 146807)      LYNDSEY OLSON (MN Lic. #0332288)*
    Marin County Counsel                  Saint Paul City Attorney
21  KATE K. STANFORD (SBN 302825)         Lyndsey.olsen@ci.stpaul.mn.us
    Deputy County Counsel                 KELSEY MCELVEEN (MN Lic. #0396744)*
22  kate.stanford@marincounty.gov         Assistant City Attorney
    EDWARD F. SEARS (SBN 297775)          Kelsey.McElveen@ci.stpaul.mn.us
23  Deputy County Counsel                 SAINT PAUL CITY ATTORNEY'S OFFICE
    ned.sears@marincounty.gov             400 City Hall and Courthouse
24  OFFICE OF THE COUNTY COUNSEL          15 Kellogg Boulevard West
    COUNTY OF MARIN                       Saint Paul, Minnesota 55102
25  3501 Civic Center Drive, Room 275     Telephone: (651) 266-8710
    San Rafael, CA 94903                  Facsimile:  (651) 298-5619
26  Telephone:  (415) 473-6117            *Attorneys for Plaintiff*
    Facsimile:  (415) 473-3796            CITY OF SAINT PAUL
27  *Attorneys for Plaintiff*             * *Appearing pro hac vice*
    COUNTY OF MARIN
28

RENNE PUBLIC LAW GROUP
Attorneys at Law

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CITY OF FRESNO; CITY OF EUREKA; CITY
OF SOUTH LAKE TAHOE; CITY OF SAINT
PAUL; COUNTY OF SACRAMENTO; COUNTY
OF MONROE; MONROE COUNTY AIRPORT
AUTHORITY; COUNTY OF SAN DIEGO,
COUNTY OF MARIN; CITY OF ALAMEDA;
CITY OF REDWOOD CITY,

      Plaintiffs,

v.

SCOTT TURNER in his official capacity as
Secretary of the U.S. Department of Housing and
Urban Development; the U.S. DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT;
SEAN DUFFY in his official capacity as Secretary
of the U.S. Department of Transportation; the U.S.
DEPARTMENT OF TRANSPORTATION;
MARCUS J. MOLINARO in his official capacity
as the Administrator of the Federal Transit
Administration ; the FEDERAL TRANSIT
ADMINISTRATION; GLORIA M. SHEPHERD in
her official capacity as the Executive Director of
the Federal Highway Administration; the
FEDERAL HIGHWAY ADMINISTRATION;
BRYAN BEDFORD in his official capacity as the
Administration of the Federal Aviation
Administration; the FEDERAL AVIATION
ADMINISTRATION; ROBERT F. KENNEDY,
JR. in his official capacity as Secretary of the U.S.
Department of Health and Human Services; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; LEE ZELDIN in his official capacity
as Administrator of the Environmental Protection
Agency; and the U.S. ENVIRONMENTAL
PROTECTION AGENCY,

      Defendants.

Case No.: 3:25-cv-07070-RS

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

Complaint Filed: August 20, 2025
FAC Filed: September 8, 2025

Hon. Richard Seeborg

Hearing Date:   September 23, 2025
Hearing Time:   1:30 p.m.
Location:      Zoom Videoconference

RENNE PUBLIC LAW GROUP
Attorneys at Law

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................1

    A.    Defendants Unilaterally Impose New Conditions on Federal Grant Funds ..................1

        1.    HUD Conditions ...........................................................................2

        2.    DOT Conditions ............................................................................5

            a.    FTA .....................................................................6

            b.    FWHA ..................................................................6

            c.    FAA .....................................................................7

        3.    HHS Conditions ............................................................................9

        4.    EPA Conditions ..........................................................................11

    B.    Plaintiffs Confront Harm and Uncertainty Under Defendants' Unlawful Federal Grant Conditions ..........................................................................11

III.  LEGAL STANDARD .........................................................................................13

IV.   ARGUMENT .......................................................................................................14

    A.    Plaintiffs Have Standing to Challenge the Unlawful Grant Conditions ....................14

    B.    This Court Has the Power to Review the Lawfulness of Defendants' Grant Conditions ...................................................................................................14

        1.    This Court Can Enjoin the DOT and the FAA from Imposing the Unlawful Grant Conditions ...........................................................................14

        2.    The Tucker Act Does Not Preclude This Court's Review...............................15

    C.    Plaintiffs Are Likely to Succeed on the Merits ............................................18

        1.    The Federal Grant Conditions Violate the U.S. Constitution ..........................18

            a.    Plaintiffs' non-APA claims for equitable relief are independently actionable. ...................................................18

            b.    The Federal Grant Conditions are unconstitutionally vague. .............21

                i.    The EO Conditions ...................................................21

                ii.    DEI and Discrimination Conditions..........................................23

                iii.    Gender Ideology Conditions....................................................24

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:25-cv-07070-RS

RENNE PUBLIC LAW GROUP
Attorneys at Law

## TABLE OF CONTENTS
(continued)

                                                                            **Page**

       iv.    Elective Abortion Conditions ....................................................24

       v.     Immigration Enforcement Conditions ......................................25

    c.    The Federal Grant Conditions violate the Separation of Powers. ...................................................................................25

    d.    The Federal Grant Conditions are not germane. ...............................26

    e.    The Immigration Enforcement Condition violates the Tenth Amendment. ......................................................................28

  2.    The Federal Grant Conditions Violate the APA ...............................29

    a.    Defendants' unlawful grant conditions are not committed to agency discretion by law. .......................................................29

    b.    The federal agency actions at issue are "final agency action" reviewable under the APA. ...................................................30

    c.    The Federal Grant Conditions are in excess of statutory jurisdiction. ...................................................................31

       i.     Congress has not authorized the HUD Grant Conditions. .......31

       ii.    Congress has not authorized the DOT Grant Conditions. ........33

       iii.   Congress has not authorized the HHS Grant Conditions. ........35

       iv.   Congress has not authorized the EPA Grant Conditions. ........36

    d.    The Federal Grant Conditions are arbitrary and capricious. ...............36

D.    Plaintiffs Will Suffer Irreparable Harm If the Conditions Are Not Enjoined ............38

E.    The Balance of Equities Weighs in Plaintiffs' Favor, and a Preliminary Injunction Is in the Public Interest ........................................................40

V.    CONCLUSION..........................................................................40

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ..................................................................................................36

*Amica Ctr. for Immigrant Rights v. U.S. Dep't of Justice,*
  2025 WL 1852762 (D.D.C. July 6, 2025)..............................................................................29

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ...............................................................................................40

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006).................................................................................................................21

*Armstrong v. Exceptional Child Center, Inc.,*
  575 U.S. 320 (2015)...........................................................................................................18, 19

*Bostock v. Clayton Cnty., Georgia,*
  590 U.S. 644 (2020).................................................................................................................36

*California v. Bernhardt,*
  472 F. Supp. 3d 573 (N.D. Cal. 2020) ...................................................................................37

*California v. Env't Prot. Agency,*
  72 F.4th 308 (D.C. Cir. 2023).................................................................................................37

*California v. U.S. Dep't of Educ.,*
  No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025)....................................17

*California v. U.S. Dep't of Transp.,*
  --- F. Supp. 3d ----, 2025 WL 1711531 (D.R.I. June 19, 2025).............................................15

*City & Cnty. of San Francisco v. Trump,*
  --- F. Supp. 3d ----, 2025 WL 1282637 (N.D. Cal. May 3, 2025) .........................................16

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ....................................................................................14, 25, 26

*City of Los Angeles v. Barr,*
  941 F.3d 931 (9th Cir. 2019)...................................................................................................25

*City of Los Angeles v. F.A.A.,*
  2239 F.3d 1033 (9th Cir. 2001) ..............................................................................................15

*Cnty of Santa Clara v. Trump,*
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................22, 27, 28, 39

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*,
  802 F.3d 413 (2d Cir. 2015)................................................................................32

*Collins v. Yellen*,
  594 U.S. 220 (2021)..........................................................................................18

*Community Legal Services in East Palo Alto v. United States Department of Health and
  Human Services*,
  137 F.4th 932 (9th Cir. 2025) ............................................................................17

*Corr. Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001)............................................................................................18

*Dalton v. Specter*,
  511 U.S. 462 (1994)..........................................................................................20

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)..............................................................................18, 29, 38

*Department of Education v. California*,
  145 S. Ct. 966 (2025).......................................................................................17

*Diemert v. City of Seattle*,
  No. 2:22-cv-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025) .....................38

*E.V. v. Robinson*,
  906 F.3d 1082 (9th Cir. 2018) ..............................................................19, 20, 21

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..........................................................................................37

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ..............................................................................13

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010)..........................................................................................18

*Geo Group, Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ..............................................................................13

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)..........................................................................................21

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ..............................................................................36

RENNE PUBLIC LAW GROUP
Attorneys at Law

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hernandez v. Sessions,*
872 F.3d 976 (9th Cir. 2017) .......................................................................................40

*Jajati v. U.S. Customs & Border Prot.,*
102 F.4th 1011 (9th Cir. 2024) ...................................................................................29

*Larson v. Domestic & Foreign Commerce Corp.,*
337 U.S. 682 (1949).............................................................................................19, 21

*Latif v. Holder,*
686 F.3d 1122 (9th Cir. 2012) ...................................................................................15

*Lincoln v. Vigil,*
508 U.S. 182 (1993).....................................................................................................29

*Loan Syndications & Trading Ass'n v. S.E.C.,*
818 F.3d 716 (D.C. Cir. 2016)...................................................................................15

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.,*
73 F.4th 657 (9th Cir. 2023) ......................................................................................37

*Louisiana Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986).............................................................................................19, 25

*Magassa v. Mayorkas,*
52 F.4th 1156 (9th Cir. 2022) ....................................................................................15

*Maine Cmty. Health Options v. United States,*
590 U.S. 296 (2020).....................................................................................................16

*Martin Luther King, Jr. Cnty. v. Turner,*
--- F. Supp. 3d ----, 2025 WL 1582368 (W.D. Wash. June 3, 2025).............16, 30, 37

*Martin Luther King, Jr. Cnty. v. Turner,*
No. 2:25-CV-814, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025)...................26, 39

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982)...................................................................................16

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) .....................................................................................40

*Moranski v. Gen. Motors Corp.,*
433 F.3d 537 (7th Cir. 2005) .....................................................................................38

RENNE PUBLIC LAW GROUP
Attorneys at Law

-iv-

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................37, 38

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ........................................19, 20, 21

*Murthy v. Missouri*,
    603 U.S. 43 (2024)................................................................14

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    767 F. Supp. 3d 243 (D. Md.)................................................23

*Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*,
    779 F. Supp. 3d 53 (D.D.C. 2025)........................................23

*Nat'l Educ. Ass'n v. United States Dep't of Educ.*,
    779 F. Supp. 3d 149 (D.N.H. 2025)......................................23

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012).............................................................28

*National Ass'n of Mfrs. v. Dep't of Defense*,
    583 U.S. 109 (2018).............................................................15

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) .............................................19

*Nguyen v. Kissinger*,
    528 F.2d 1194 (9th Cir. 1975) .............................................30

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
    606 U.S. ---, 2025 WL 2415669 (U.S. Aug. 21, 2025)..........15, 17

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025).............................................................20

*Ohio v. Env't Prot. Agency*,
    603 U.S. 279 (2024).............................................................37

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981).................................................................21, 22

*Pollack v. Hogan*,
    703 F.3d 117 (D.C. Cir. 2012)..............................................20

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*President and Fellows of Harvard College v. U.S. Dep't of Health & Human Servs.*,
--- F. Supp. 3d ----, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ..........................................16

*Printz v. United States*,
521 U.S. 898 (1997)....................................................................................................................28

*Religious Sisters of Mercy v. Azar*,
513 F. Supp. 3d 1113 (D.N.D. 2021)..........................................................................................28

*Rhode Island Coalition Against Domestic Violence v. Bondi*,
--- F. Supp. 3d ----, 2025 WL 2271867 (D.R.I. Aug. 8, 2025) ..........................................30, 39

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) .....................................................................................................36

*San Francisco AIDS Foundation v. Trump*,
--- F. Supp. 3d ----, 2025 WL 1621636 (N.D. Cal. June 9, 2025) ................................22, 23, 26

*San Francisco Unified Sch. Dist. v. AmeriCorps*,
--- F.Supp.3d ----, 2025 WL 1713360 (N.D. Cal. June 18, 2025) ..............................22, 23, 30

*San Francisco Unified Sch. Dist. v. AmeriCorps*,
--- F. Supp. 3d ----, 2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ........................16, 29, 30

*South Dakota v. Dole*,
483 U.S. 203 (1987).....................................................................................................................27

*Strickland v. United States*,
32 F.4th 311 (4th Cir. 2022) .......................................................................................................20

*The Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) ......................................................................................................19

*United Aeronautical Corp. v. U.S. Air Force*,
80 F.4th 1017 (9th Cir. 2023) .....................................................................................................16

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ......................................................................................................28

*United States v. McIntosh*,
833 F.3d 1163 (9th Cir. 2016) ....................................................................................................18

*United States v. Mitchell*,
463 U.S. 206 (1983).....................................................................................................................19

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Webster v. Doe,*
    486 U.S. 592 (1988) ........................................................................................................29, 30

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ...................................................................................................40

*Wong v. Warden, FCI Raybrook,*
    171 F.3d 148 (2d Cir. 1999) ......................................................................................................30

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ..................................................................................................................18

**Statutes**

5 U.S.C. § 701(a)(2) ........................................................................................................................29, 30

5 U.S.C. § 702 ................................................................................................................................16, 19

5 U.S.C. § 706(2) .................................................................................................................................15

5 U.S.C. § 706(2)(B) ............................................................................................................................31

5 U.S.C. § 706(2)(C) ............................................................................................................................31

8 U.S.C. § 1324 ...................................................................................................................................7, 8

8 U.S.C. § 1327 ...................................................................................................................................7, 8

8 U.S.C. § 1642(b) .................................................................................................................................33

20 U.S.C. §§ 1681 et seq. .......................................................................................................................9

23 U.S.C. § 119 .....................................................................................................................................34

23 U.S.C. § 124 .....................................................................................................................................34

23 U.S.C. § 133 .....................................................................................................................................34

23 U.S.C. § 148 .....................................................................................................................................34

23 U.S.C. § 149 .....................................................................................................................................34

23 U.S.C. § 167 .....................................................................................................................................34

23 U.S.C. § 175 .....................................................................................................................................34

RENNE PUBLIC LAW GROUP
Attorneys at Law

# TABLE OF AUTHORITIES
(continued)

Page(s)

23 U.S.C. § 176.................................................................................................34

23 U.S.C. § 177(e)(2).........................................................................................35

23 U.S.C. § 503(c)(4).........................................................................................34

23 U.S.C. § 611..................................................................................................33

23 U.S.C § 24112..........................................................................................30, 34

28 U.S.C. § 1331................................................................................................16

28 U.S.C. § 1491(a)...........................................................................................16

42 U.S.C. § 300a-6............................................................................................26

42 U.S.C. § 247c................................................................................................35

42 U.S.C. §§ 247c(b)–(c)...................................................................................35

42 U.S.C. §§ 247c(e)(3), (5)..............................................................................35

42 U.S.C. § 1320b-7...........................................................................................33

42 U.S.C. §§ 5303 et seq..............................................................................30, 31

42 U.S.C. § 5304(a)(3), (b)................................................................................31

42 U.S.C. § 5307(b)(2).......................................................................................32

42 U.S.C. §§ 9604(k)(2)–(6)..............................................................................36

42 U.S.C. § 11301..............................................................................................32

42 U.S.C. § 11372..............................................................................................30

42 U.S.C. § 11374-11375....................................................................................30

42 U.S.C. § 11381..............................................................................................32

42 U.S.C. § 11386..............................................................................................32

42 U.S.C. § 12711..............................................................................................32

49 U.S.C. ch. 53.................................................................................................34

49 U.S.C. § 6703................................................................................................34

RENNE PUBLIC LAW GROUP
Attorneys at Law

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

49 U.S.C. § 46110.................................................................................................................14, 15

49 U.S.C. § 46110(a)...................................................................................................................15

49 U.S.C. §§ 47101 et seq...........................................................................................................34

49 U.S.C. § 47102(26) ..................................................................................................................7

49 U.S.C. § 47106................................................................................................................30, 34

49 U.S.C. § 47107.......................................................................................................................34

49 U.S.C. § 47113.......................................................................................................................35

**Other Authorities**

24 C.F.R. § 5.106(b)–(c).............................................................................................................38

49 C.F.R. Part 26........................................................................................................................35

49 C.F.R. § 26.5 .........................................................................................................................35

62 Fed. Reg. 61344 (Nov. 17, 1997)..........................................................................................33

62 Fed. Reg. 61348–49 (Nov. 17, 1997).....................................................................................33

63 Fed. Reg. 41662 (Aug. 4, 1998).............................................................................................33

U.S. Constitution....................................................................................................................*passim*

RENNE PUBLIC LAW GROUP
Attorneys at Law

1

2

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3

4

5

6

7

8

9

10

11

12

13

14

15

        Please take note that on September 23, 2025 at 1:30pm via Zoom videoconference and in San Francisco Courthouse, Courtroom 3 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs City of Fresno; City of Eureka; City of South Lake Tahoe; City of Saint Paul; County of Sacramento; County of Monroe; Monroe County Airport Authority; County of San Diego; County of Marin; City of Alameda; and City of Redwood City ("Plaintiffs") will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2 for a Preliminary Injunction enjoining Defendants U.S. Department of Housing and Urban Development ("HUD"), the Department of Health and Human Services ("HHS"), the Environmental Protection Agency ("EPA") and the U.S. Department of Transportation ("DOT"), including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), and Federal Aviation Administration ("FAA") (collectively, "Defendants") from imposing or enforcing unlawful and unauthorized grant conditions (collectively "Federal Grant Conditions") or any materially similar terms or conditions to any federal funds received by or awarded to Plaintiffs, directly or indirectly.

16

17

18

19

20

21

        This Motion presents the following four issues to be decided: (1) whether Plaintiffs have shown a likelihood of success on the merits of their claims that the Federal Grant Conditions violate the United States Constitution; (2) whether Plaintiffs have shown a likelihood of success on the merits of their claims that the Federal Grant Conditions violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C); (3) whether Plaintiffs face a likelihood of irreparable harm in the absence of a preliminary injunction; and (4) whether the balance of equities and public interest favor preliminary injunctive relief.

22

23

24

        Plaintiffs' Motion is based on the supporting Memorandum of Points and Authorities ("MPA") and Request for Judicial Notice filed concurrently herewith, declarations and exhibits in support of the MPA, and all pleadings, arguments, and matters before the Court.

25

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

Dated:  September 8, 2025                    RENNE PUBLIC LAW GROUP


                                             By:  _____/s/ Jonathan V. Holtzman_____
                                                  JONATHAN V. HOLTZMAN

                                             Attorneys for Plaintiffs
                                             City of Fresno; City of Eureka; City of South
                                             Lake Tahoe; County of Sacramento; County of
                                             Monroe; Monroe County Airport Authority;
                                             County of San Diego; County of Marin; City of
                                             Alameda; City of Redwood City

Dated:  September 8, 2025                    FRESNO CITY ATTORNEY'S OFFICE


                                             By:  _____/s/ Andrew Janz_____
                                                  ANDREW JANZ

                                             Attorney for Plaintiff
                                             CITY OF FRESNO


Dated:  September 8, 2025                    SAINT PAUL CITY ATTORNEY'S OFFICE


                                             By:  _____/s/ Kelsey McElveen_____
                                                  LYNDSEY OLSON *
                                                  KELSEY MCELVEEN *
                                             * Appearing pro hac vice

                                             Attorneys for Plaintiff
                                             City of Saint Paul

Dated:  September 8, 2025                    ANDERSON & KREIGER LLP


                                             By:  _____/s/ Melissa C. Allison_____
                                                  MELISSA C. ALLISON *
                                                  CHRISTINA S. MARSHALL *
                                             * Appearing pro hac vice

                                             Attorneys for Plaintiffs
                                             County of Monroe and Monroe County Airport
                                             Authority

1

RENNE PUBLIC LAW GROUP
Attorneys at Law

## I.     INTRODUCTION

Plaintiffs now move for a preliminary injunction to preserve the status quo and prevent the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Department of Transportation ("DOT")—including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), and Federal Aviation Administration ("FAA")—the U.S. Department of Health and Human Services ("HHS"), and the U.S. Environmental Protection Agency ("EPA") (collectively, "Defendants") from enforcing unlawful and unauthorized conditions imposed on critical federal grant programs.  In granting Plaintiffs' motion for a temporary restraining order, this Court recognized both the imminent and irreparable harm Plaintiffs face in being compelled to accept these unlawful and unauthorized conditions or forgo critical federal funding, and Plaintiffs' strong likelihood of success on the merits of their constitutional and statutory claims.  *See* Dkt. 27 (Minute Order Granting Motion for TRO); *see also* Dkt. 28 (Order Granting Motion for TRO).  Those findings remain equally true today and apply equally to the new plaintiffs (the County of San Diego, County of Marin, City of Alameda, and City of Redwood City) who have joined the First Amended Complaint.

The grant conditions at issue—imposed without statutory authority, in disregard of the U.S. Constitution, and in violation of the Administrative Procedure Act—threaten hundreds of millions of dollars in essential funding that Plaintiffs depend on to provide core public services and maintain vital transportation and infrastructure systems.  Plaintiffs cannot comply with these vague and unauthorized conditions without exposing themselves to substantial legal liability, nor can they forgo critical federal funds without severe and immediate consequences for their communities.

Because the TRO is set to expire on September 23, 2025, a preliminary injunction is necessary to ensure that Defendants are enjoined from imposing or enforcing the unlawful conditions, or any materially similar conditions, throughout the duration of this litigation.  Only such relief will preserve the status quo, prevent irreparable harm to Plaintiffs and their residents, and protect against further unlawful executive overreach while this case proceeds to final judgment.

## II.    STATEMENT OF FACTS

### A.    Defendants Unilaterally Impose New Conditions on Federal Grant Funds

Following President Trump's inauguration, he issued a series of executive orders ("EOs")

-1-

directing executive agencies to impose new conditions on federal grants.  These EOs include EO

No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025) (Ending Radical and Wasteful Government DEI Programs

and Preferencing); EO No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (Defending Women from Gender

Ideology Extremism); EO No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) (Ending Illegal Discrimination

and Restoring Merit-Based Opportunity); EO No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) (Enforcing

the Hyde Amendment); EO No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) (Ending Taxpayer

Subsidization of Open Borders); EO No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) (Protecting

American Communities From Criminal Aliens); and EO No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025)

(Improving Oversight of Federal Grantmaking).  Pursuant to these EOs and other policy directives,

Defendants have incorporated new conditions into grant programs' terms and conditions and agreements.

### 1.    HUD Conditions

In or around April 2025, HUD revised its General Administrative, National, and Departmental

Policy Requirements and Terms for HUD's Financial Assistance Programs ("General HUD Terms") to

require recipients of HUD grant funding to comply with all existing and future EOs, including those

enumerated above.  *See* Request for Judicial Notice ("RJN"), Ex. A.  The General HUD Terms require

that "[r]ecipients of Federal Awards must comply with applicable existing and future Executive Orders,

as advised by the Department, including but not limited to" a "non-exhaustive list" of nine executive

orders, including the EOs related to DEI, gender ideology, immigration, and elective abortions.  *Id*. at 10

(the "HUD EO Condition").  The General HUD Terms also provide, "[n]o state or unit of general local

government that receives HUD funding under [sic] may use that funding in a manner that by design or

effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield

illegal aliens from deportation."  *Id*. at 2 (the "HUD Immigration Enforcement Condition").

HUD's revised General Terms were followed by public statements affirming the agency's

commitment to the President's agenda.  On or about May 15, 2025, Defendant Turner stated that "HUD

is carrying out President Trump's EOs, mission, and agenda," by "[a]lign[ing] all programs, trainings,

and grant agreements with the President's EOs, removing diversity, equity, inclusion (DEI)."  RJN, Ex.

B, Press Release No. 25-059, at 4.

In or around June 2025, HUD distributed a revised HUD-424B Assurances and Certifications

form.  The HUD-424B form is a required certification document for applicants and recipients of

Continuum of Care ("CoC") grants and grants administered through HUD's Office of Community

Planning and Development ("CPD"), including the Community Development Block Grant ("CDBG"),

HOME Investment Partnerships Program ("HOME"), and Emergency Solutions Grants ("ESG")

Program.  The revised HUD-424B form includes conditions that were not included in the FY 2024 or FY

2025 Notices of Funding Opportunity ("NOFO") and are not authorized by the statutory provisions

governing the grant programs.  Specifically, the revised form requires recipients to assure that they

"[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies,

programs, or activities that violate any applicable Federal anti-discrimination laws."  *See* RJN, Ex. C at 1

(the "HUD DEI Condition").  Recipients of HUD grants were already required to comply with all federal

anti-discrimination laws.  The legal effect of the HUD DEI Condition prohibiting recipients from

"promot[ing]" DEI policies "or" any applicable anti-discrimination law appears to impose an additional

condition beyond existing applicable law.

On June 5, 2025, CPD General Deputy Assistant Secretary Claudette Fernandez issued a letter,

"[o]n behalf of Secretary Scott Turner," to the executive directors of two organizations representing

states and local jurisdictions that administer CPD grant programs.  *See* RJN, Ex. Q ("Fernandez Letter").

The Fernandez Letter "encouraged" grantees "to review the White House Executive Orders as they

develop their consolidated plan and annual action plans" to ensure "conformity with applicable

Administration priorities and executive orders."  *Id*. at 2.  The Fernandez Letter provided that "[u]nder

the FY 2025 grant agreement, conformity means that a grantee…shall not use grant funds to promote

'gender ideology,' as defined in [the Gender Ideology EO]" (the "HUD Gender Ideology Condition"),

must "agree[] that its compliance in all respects with all applicable Federal anti-discrimination laws is

material to the U.S. Government's payment decisions for purposes of [the FCA]."  *Id*.  And that grant

recipients must agree that they will "not use any grant funds to fund or promote elective abortions, as

required by E.O. 14182."  *Id*. (the "HUD Elective Abortion Condition").

In March 2025, HUD began circulating new CoC grant agreements that included additional grant

conditions not included in the FYs 2024 & 2025 NOFOs.  *See e.g.* Warhuus Decl., Ex. A.  The CoC

Grant Agreements state that "[t]his Agreement, the Recipient's use of funds provided under this

RENNE PUBLIC LAW GROUP
Attorneys at Law

Agreement … , and the Recipient's operation of projects assisted with Grant Funds" are "governed by … all current Executive Orders." *Id*. at 1 (the "CoC EO Condition").  The CoC Agreements also provide that the recipient "shall not use grant funds to promote "gender ideology" as defined in E.O. 14168…" *Id*. at 3 (the "CoC Gender Ideology Condition").  The CoC Agreements also provide that recipients "shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182…" *Id*. (the "CoC Elective Abortion Condition").  Additionally, the CoC Agreements require the recipient to "certif[y] that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" and "agrees that its compliance in all respects with applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA].  Warhuus Decl., Ex. A at 3 (the "CoC Discrimination Condition").

The CoC Agreements further contain a CoC Immigration Enforcement Condition identical to the HUD Immigration Enforcement Condition, as well as an additional condition requiring the recipient to "administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [sic] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws."  Warhuus Decl., Ex. A at 3.  The CoC Agreements further require that" [s]ubject to the exceptions provided by PRWORA, the recipient must use [Systematic Alien Verification for Entitlements (SAVE)], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."  *Id*. (the "CoC PRWORA Verification Condition").

Defendants have unilaterally imposed the HUD EO Condition, the HUD DEI Condition, the HUD Immigration Enforcement Condition, the HUD Gender Ideology Condition, the HUD Elective Abortion Condition, the CoC Discrimination Condition, the CoC Elective Abortion Condition, the CoC Gender Ideology Condition, the CoC EO Condition, the CoC Immigration Enforcement Condition, and the CoC PRWORA Verification Condition, collectively referred to as the HUD Conditions, on HUD grants relied

-4-

RENNE PUBLIC LAW GROUP
Attorneys at Law

upon by Plaintiffs, without prior authorization from Congress.

## 2. DOT Conditions

DOT has similarly revised its grant agreements and assurances. The FTA, FHWA, and FAA have all incorporated language into grant conditions requiring compliance with the EOs. On April 24, 2025, Secretary Duffy sent a letter to transportation agencies nationwide announcing DOT's new policy governing the terms of all DOT-funded grants. *See* RJN, Ex. P ("April Duffy Letter"). The letter stated that it was DOT's "policy" to impose immigration enforcement and anti-DEI conditions as requirements for receiving funding and explained that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals." *Id*. The Duffy letter further declared that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id*. To underscore the seriousness of these new conditions, the letter warned that DOT would "vigorous[ly] enforce[]" compliance, including through "comprehensive audits, claw-back of grant funds, and termination of grant awards," as well as potential "enforcement actions and loss of any future federal funding from DOT." *Id*.

DOT has incorporated these conditions into its grant agreements. For example, on May 7, 2025, Plaintiff City of Saint Paul received an Innovative Finance and Asset Concession ("IFAC") grant program Cooperative Agreement from DOT. *See* Bacher Decl. ¶¶ 28-31, Ex. 8. The IFAC Agreement requires recipients to "cooperate with Federal officials in the enforcement of federal law, including cooperating with and not impeding U.S. Immigration and Customs enforcement (ICE) and other federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id*., Ex. 8 (the "DOT Immigration Enforcement Condition"). The IFAC agreement also requires that the recipient include certain clauses in all subcontracting contracts or agreements, including a requirement that the subcontractor "comply" with several EOs, including those regarding gender ideology and DEI. *Id*., Ex. 8, Appendix E (the "DOT EO Condition"). The agreement specifically provides:

RENNE PUBLIC LAW GROUP
Attorneys at Law

pursuant to Section (3)(b)(iv)(A) [of the DEI EO], the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]; and pursuant to Section (3)(b)(iv)(B) [of the DEI EO], by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

*Id.* (the "DOT DEI Condition").

The DOT's operating administrations have also included the unlawful conditions in their agreements and terms and conditions.

### a.    FTA

On March 26, 2025, the FTA issued an updated Master Agreement applicable to all funding awards authorized under specified federal statutes.  RJN, Ex. D.  The March 26 Master Agreement provides:

(1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA].

(2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

*Id.* at 58 (the "FTA DEI Condition").  It also requires recipients to "comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow *federal guidance prohibiting discrimination*."  *Id.*  Federal guidance, such as the April Duffy Letter, as well as Defendants' actual enforcement of the DEI Conditions (*infra*, Section II(B)), shows that these new conditions are broader than existing nondiscrimination law.  These conditions have also been incorporated into FTA's FY 2025 Certifications and Assurances, which require grant recipients to "comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing the program under which it is applying for assistance."  *See* Darrow Decl., Ex. A at 4 (the "FTA EO Condition").

### b.    FWHA

The FHWA has incorporated similar conditions into its terms and grant agreements.  On April 22, 2025, the FHWA issued updated Competitive Grant Program General Terms and Conditions applicable to all FHWA competitive grants.  RJN Ex. E.  The 2025 FHWA General Terms imposed new conditions

-6-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

on all FHWA competitive grants, including the BIP, Culvert AOP Program, and ATTAIN programs utilized by Plaintiffs.  The FHWA General Terms include an FHWA DEI Condition identical to the DOT DEI Condition discussed above.  *Id*. at 25.  The FHWA General Terms also contain an FHWA Immigration Enforcement Condition identical to the DOT Immigration Enforcement Condition.  *Id*.

The Exhibits to the 2025 FHWA General Terms, dated April 30, 2025, further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" RJN Ex. E at 34.  The Exhibits, imposing a condition similar to the DOT EO Condition discussed above, list President Trump's EOs regarding DEI and gender ideology (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327), as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those EOs or statutes relate to highway grants or even apply to local governments.  *Id*. (the "FHWA EO Condition").  FHWA has included identical or similar conditions in additional program terms and conditions, such as the FY 2024 Safe Streets for All ("SS4A") General Terms and Conditions.  *See* RJN Ex. R.  FHWA also retroactively revised the SS4A General Terms and Conditions for 2022 and 2023 to include the same unlawful conditions.  *See* RJN, Ex. S (FY 2023), Ex. T (FY 2022).

### c.    FAA

Implementing the April Duffy Letter and the President's EOs, on April 25, 2025, the FAA issued a proposal labeled "Notice of modification of Airport Improvement Program grant assurances; opportunity to comment," providing notice and soliciting public comment, for a 14-day period,  on modifications to the Grant Assurances.  *See* RJN, Ex. G.  In its notice, the FAA stated that the 2025 FAA Grant Assurances would take effect immediately, notwithstanding the expedited comment period.  The 2025 FAA Grant Assurances are included with all FAA grants and require sponsors[1] to assure and certify that they will "comply with all applicable Federal laws, regulations, executive orders, policies,

---

[1] The FAA refers to grant recipients under its Airport Improvement Program and related funding statutes as "sponsors."  *See, e.g.*, 49 U.S.C. § 47102(26) (defining "sponsor" to mean, in relevant part, a public agency or private owner that submits an application for financial assistance under the Act).

guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant," specifically incorporating the EOs related to DEI and gender ideology as "provisions" purportedly "applicable" to grant agreements.  *Id*. at 2–3 (the "FAA EO Condition").

On May 6, 2025, FAA posted on its website a revised grant agreement template for 2025 Airport Infrastructure Grants ("AIG") with added terms and conditions that did not appear in prior iterations of FAA grant agreements.  *See* RJN, Ex. F.  The FY 2025 FAA AIG Grant Template imposes a new condition on all AIG grants implementing the directives of the April Duffy Letter.  The FY 2025 FAA AIG Grant Template contains conditions substantively identical to the DOT DEI Condition (*id*. at 10–11) and the DOT Immigration Enforcement Condition (*id*. at 11), although the language varies slightly.  For example. the FAA agreements provide:

> Pursuant to Section (3)b)(iv), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the sponsor:
>
> a. Agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of 31 U.S.C. 3729(b)(4); and
>
> b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

*Id*. at 10–11 (the "FAA DEI Condition").  The agreements also include a condition identical to the DOT Immigration Enforcement Condition, as well as a requirement that sponsors agree to "follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter" ("the "FAA Immigration Condition").  *Id*. at 11.  These conditions have been implemented across both AIG and Airport Improvement Program ("AIP") grant agreements.  *See, e.g.*, Moore Decl., Exs. A (FY2025 AIP), C (FY2025 AIG).

Defendants have unilaterally imposed the DOT EO Condition, the DOT DEI Condition, the DOT Immigration Enforcement Condition, the FTA DEI Condition, the FTA EO Condition, the FHWA DEI Condition, the FHWA Immigration Enforcement Condition, the FHWA EO Condition, the FAA EO Condition, FAA Immigration Condition, and the FAA DEI Condition, collectively referred to as the DOT Conditions, on grants relied upon by Plaintiffs, without prior authorization from Congress.

-8-

### 3.     HHS Conditions

Similarly, HHS and its operating divisions and agencies have attached unlawful grant conditions across the expansive portfolio of HHS grants established by Congress, including grants from the Health Resources and Services Administration ("HRSA"), Substance Abuse and Mental Health Services Administration ("SAMHSA"), and Centers for Disease Control and Prevention ("CDC").

On April 16, 2025, HHS issued an updated HHS Grants Policy Statement ("April 2025 HHS GPS") that "is incorporated by reference in the official Notice of Award (NoA) as a standard term and condition" and applicable to discretionary grants.  RJN, Ex. H at 3.  The April 2025 HHS GPS applies to "awards and award modifications that add funding made on or after April 16, 2025." *Id*.  The April 2025 HHS GPS states that "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . ." *Id*. at 19.  The April HHS GPS defines DEI to mean "diversity, equity, and inclusion," DEIA to mean "diversity, equity, inclusion, and accessibility," and provides that "[d]iscriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025." *Id*. at 19 (the "April HHS GPS DEI Condition").

In July 2025, HHS released a revised 2025 GPS, effective as of July 24, 2025, removing all mention of DEI.  *See* RJN, Ex. U.  Instead, the updated July GPS simply stated, "By applying for or accepting federal funds . . . recipients certify compliance with all federal antidiscrimination laws and that complying with those laws is a material condition." *Id*. at 19 (the "July 2025 HHS GPS Discrimination Condition").  However, recently, HHS again revised its GPS, to become effective on October 1, 2025, which now provides:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipient certifies as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including requirements set forth in Presidential Executive Order 14168 titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and recipient will remain compliant for the duration of the Agreement.
> - The above requirements are conditions of payment that go [sic] the essence of the Agreement are therefore material terms of the Agreement.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RJN Ex. V, October 2025 HHS GPS at 22 (the "October HHS GPS Gender Ideology Condition"). The time at which a specific grant award was issued determines which HHS GPS applies.

In addition to these department-wide conditions, agencies have issued their own requirements. In July 2025, CDC issued updated its General Terms and Conditions for both research and non-research awards. The general terms and conditions for research and non-research grants require grant recipients to "comply with…grants policy contained in applicable HHS Grants Policy Statements…[and] applicable Executive Orders" without designating which EOs are applicable. *See* RJN Ex. W (Research Grants) at 1; *id*. Ex. X (Non-Research Grants) at 1 (the "CDC EO Condition"). Both CDC General Terms and Conditions also include identical provisions that provide:

> By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply.

RJN Ex. W at 1; *id.*, Ex. X at 1. (the "CDC Discrimination Condition").

In April 2025, SAMHSA updated its Notice of Funding Opportunity (NOFO) Application Guide to state that "[a]ll activities proposed in your application and budget narrative must be in alignment with the current Executive Orders" (the "SAMHSA EO Condition") and that "[f]unds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens." RJN Ex. J at 31 (the "SAMHSA Immigration Condition").

On July 25, 2025, HRSA issued updated general terms and conditions applicable to "all active awards." *See* RJN Ex. Y. The revised HRSA terms and conditions incorporate the HHS GPS and include an HRSA Discrimination Condition identical to the CDC Discrimination Condition described above. The General Terms and individual HRSA Grant Agreements also contain a condition identical to the October HHS GPS Gender Ideology Condition. *Id*. at 4; *see* Lutz Decl., Exs. A-B, D, F– I (the "HRSA Gender Ideology Condition").

Defendants have unilaterally imposed the April HHS GPS DEI Condition, the July 2025 HHS GPS Discrimination Condition, the October HHS GPS Gender Ideology Condition, the CDC EO Condition, the CDC Discrimination Condition, the CDC Discrimination Condition, the SAMHSA EO Condition, the SAMHSA Immigration Condition, the HRSA Discrimination Condition, and the HRSA

RENNE PUBLIC LAW GROUP
Attorneys at Law

Gender Ideology Condition, collectively referred to as the HSS Conditions, on grants relied upon by Plaintiffs, without prior authorization from Congress.

**4.     EPA Conditions**

The EPA has incorporated similar unlawful DEI Conditions into its General Terms and Conditions applicable to all EPA grants.  On April 3, 2025, EPA updated its General Terms and Conditions.  *See* RJN, Ex. K.  This update included a term that provides:

> By accepting this EPA financial assistance agreement, (A) the recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and (B) the recipient certifies that it does not operate any programs promoting Diversity, Equity and Inclusion that violate any applicable Federal anti-discrimination laws.

*Id*. at 44.  On August 25, the EPA again updated its General Terms and revised the last clause of the above-described term to, "the recipient certifies that it does not operate *any programs violating any applicable Federal antidiscrimination law or promoting any such violation*."  *See* RJN, Ex. Z, August 2025 Update at 44 (emphasis added) (EPA DEI Condition).  Defendants have unilaterally imposed the EPA DEI Conditions ("EPA Condition") on all EPA grants, including the grants relied upon by Plaintiffs, without prior authorization from Congress.

**B.     Plaintiffs Confront Harm and Uncertainty Under Defendants' Unlawful Federal Grant Conditions**

Defendants' grant conditions place Plaintiffs in an untenable position: either accept the vague and unlawful requirements or forfeit crucial funds that, in many cases, have already been awarded and incorporated into Plaintiffs' budgets and planned infrastructure projects.  The loss of these funds would cause immediate, irreparable, and far-reaching harm.  Moreover, even if Plaintiffs agreed to the conditions, the lack of clarity in the application of the conditions would leave them exposed to arbitrary enforcement, unpredictable penalties, and legal liability.  The First Amended Complaint and the supporting declarations concurrently filed with this motion describe, in greater detail than is possible in this memorandum, the numerous awarded, pending, and anticipated grant funds on which Plaintiffs rely.  The discussion below highlights only a few examples and identifies which Plaintiffs receive grant funds from which Defendants.

Plaintiffs City of Fresno, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood

-11-

City, County of Sacramento, County of Marin, County of San Diego, and County of Monroe (collectively, the "HUD Plaintiffs"), receive, directly or indirectly, grant funds administered by HUD. For example, Fresno receives an annual allocation of approximately $11.7 million in federal funding for housing and development projects from HUD.  Skei Decl. ¶ 7.  On August 18, 2025, HUD notified Fresno that its FY 2025 Consolidated Plan/Action Plan would not be approved unless the City removed references to "equity," "environmental justice," and "transgender," and certified compliance with EO 14168. *Id*. ¶¶ 13–14.  When Fresno requested additional time to respond, HUD formally disapproved the Plan on August 22, 2025, citing unsatisfactory certifications.  As a result, Fresno has been forced to pause use of CDBG funds pending resolution of this dispute.  *Id*. ¶ 15.  Plaintiffs the City of Redwood City, City of Saint Paul, and the County of Marin have received similar notices from HUD.  Diaz Decl. ¶ 15; Bacher Decl. ¶ 19–20; Thomas Decl. ¶ 11.  These grant funds, along with the others detailed in Plaintiffs' supporting declarations, are subject to the unlawful HUD Grant Conditions discussed above.

Plaintiffs City of Fresno, City of Alameda, City of Eureka, City of South Lake Tahoe, City of Saint Paul, County of Marin, County of Sacramento, County of San Diego, County of Monroe, and Monroe Airport Authority (collectively, the "DOT Plaintiffs"), receive grant funds, directly or indirectly, administered by DOT and its operating administrations.  For example, Frederick Douglass Greater Rochester International Airport, leased to the Monroe County Airport Authority by the County of Monroe, has applied for over $12 million in federal grants for the 2025 fiscal year.  Moore Decl. ¶ 7. Between July 28, 2025, and July 30, 2025 the airport received seven grant agreements from the FAA.  *Id*. ¶ 9.  The City of Fresno, City of South Lake Tahoe, County of Marin, County of Sacramento, and County of San Diego also have pending FAA grant agreements.[2]  Partida Delgado Decl. ¶ 4; Dickinson Decl. ¶ 7; Blunk Decl. ¶ 13; Chen Decl. ¶ 10; Abbot Decl. ¶ 5.  These grant funds, along with the others detailed in Plaintiffs' supporting declarations, are subject to the unlawful DOT Grant Conditions discussed above.

Plaintiffs County of Marin, County of Sacramento, and County of San Diego (collectively, the

---

[2] According to the FAA, all pending grant agreements must be executed by September 18, 2025.  *See* Dkt. 24-2.  Pursuant to this Court's TRO, Defendants are enjoined from "failing or refusing to process and otherwise implement grants signed with changes or other objections to conditions enjoined by this Order."  Plaintiffs are presently working with Defendants to implement the TRO and finalize execution of these agreements.  However, as of this filing, those agreements have not been executed, and it is unclear whether they will remain operative absent further injunctive relief.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

"HHS Plaintiffs"), receive, directly or indirectly, grant funds administered by HHS. For example, the County of Sacramento receives tens of millions of dollars annually in HHS support, including funding from HRSA, Ryan White Part A and B, multiple CDC programs, and SAMHSA grants. Lutz Decl. ¶ 8. The County of Marin likewise depends on HHS grants, including Aging Cluster grants, Ryan White funds, CDC and DHCS public health funding, SAMHSA Adult Drug grants, and significant Title IV-E and Adoption Assistance funds administered through the Administration for Children and Families. Warhuus Decl. ¶ 6. These grant funds, along with the others detailed in Plaintiffs' supporting declarations, are subject to the unlawful HHS Grant Conditions discussed above.

Plaintiffs City of Fresno, City of Redwood City, and the City of Alameda (collectively, the "EPA Plaintiffs"), receive, directly or indirectly, grant funds administered by EPA. For example, Fresno has been awarded approximately $2.25 million in grants from the EPA, including a Brownfields Revolving Loan Fund (RFL) grant totaling $1,750,000 and a Brownfields Assessment grant in the amount of $500,000. Clark Decl. ¶ 9. The City of Alameda has a pending application before the EPA for a $2.5 million Environmental and Climate Justice Community Change Grant. Ott Decl. ¶ 5. These grant funds, along with the others detailed in Plaintiffs' supporting declarations, are subject to the unlawful EPA Grant Conditions discussed above.

Without injunctive relief, Plaintiffs will be forced to either forgo hundreds of millions of dollars in federal funds or attempt to comply with unlawful conditions that are impermissibly vague and directly conflict with the grant programs' authorizing statutes. Accordingly, Plaintiffs bring this motion seeking injunctive relief to prevent irreparable harm to themselves and their residents.

## III.    LEGAL STANDARD

"To obtain a preliminary injunction, a plaintiff must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where "the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023).

-13-

## IV.    ARGUMENT

### A.    Plaintiffs Have Standing to Challenge the Unlawful Grant Conditions

"A proper case or controversy exists only when at least one plaintiff establishes that she has standing to sue." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotations and alterations omitted). "A 'loss of funds promised under federal law[ ] satisfies Article III's standing requirement.'" *City & Cnty. of San Francisco v. Trump* ("*San Francisco I*"), 897 F.3d 1225, 1235 (9th Cir. 2018) (citing *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)). "It [is] enough that, if the plaintiffs' interpretation [of the law is] correct, the plaintiffs [] face serious repercussions in the absence of significant and costly compliance measures." *Id.* at 1236 (cleaned up) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988)).

Here, Plaintiffs receive federal funding through grants administered by Defendants.  Defendants have imposed unlawful conditions described above that force Plaintiffs to choose between agreeing to vague and unlawful conditions at the risk of incurring financial penalties, or giving up funds they were already awarded and, in many cases, accounted for in budget and project planning.  Loss of those funds would result in immediate, irreparable, and reverberating harm to Plaintiffs.  These facts establish Plaintiffs' standing to challenge the unlawful grant conditions.  *See San Francisco I*, 897 F.3d at 1236 ("the Counties have demonstrated that, if their interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences").  And, as this Court recognized before granting the temporary restraining order, Plaintiffs face a genuine threat that the Defendants will enforce the unlawful grant conditions in the absence of further injunctive relief once the restraining order expires.  *See* Dkt. 28 at 6–7 (citing *San Francisco I*, 879 F.3d at 1236).

### B.    This Court Has the Power to Review the Lawfulness of Defendants' Grant Conditions

#### 1.    This Court Can Enjoin the DOT and the FAA from Imposing the Unlawful Grant Conditions

Defendants have asserted that this Court lacks jurisdiction under 49 U.S.C. § 46110 "[t]o the extent Plaintiffs challenge DOT and FAA orders here."  Dkt. 24 at 16.  Not so.  Section 46110 specifies that the courts of appeal have exclusive jurisdiction for challenges to an "order issued" by the Secretary of Transportation or the FAA Administrator "with respect to aviation duties and powers designated to be

-14-

RENNE PUBLIC LAW GROUP
Attorneys at Law

carried out by the Administrator of the Federal Aviation Administration … in whole or in part *under this part, part B, or subsection (l) or (r) of section 114*." 49 U.S.C. § 46110(a) (emphasis added).

Indeed, the only decision that Plaintiffs are aware of involving the unlawful grant conditions rejected Defendants' argument that 49 U.S.C. § 46110 forecloses jurisdiction over the claims involving the FAA. *See California v. U.S. Dep't of Transp.*, --- F. Supp. 3d ----, 2025 WL 1711531, at *1 (D.R.I. June 19, 2025). As that court explained, this "jurisdictional statute[] [does] not apply here because the U.S. DOT is not exercising its authority '*under*' the specific statutes listed in these jurisdictional provisions. Rather, it is the Duffy Directive issued by the U.S. DOT that the States challenge, and thus jurisdiction is proper in the district court." *Id.* at *1; *see National Ass'n of Mfrs. v. Dep't of Defense*, 583 U.S. 109, 124 (2018) ("the prepositional phrase—'under section 1311'—is most naturally read to mean that the effluent limitation or other limitation must be approved or promulgated 'pursuant to' or 'by reason of authority of' § 1311").

Further, under a well-established "exception[]" to section 46110, "[c]laims remain in district court if they [] involve agencies not covered by § 46110." *Magassa v. Mayorkas*, 52 F.4th 1156, 1165 (9th Cir. 2022); *see, e.g.*, *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012) ("Plaintiffs' procedural challenge requires judicial review of orders issued both by TSA, which is named in § 46110, and by TSC, which is not."). For claims challenging the DOT's overarching policies, "jurisdiction rests with the district court," in contrast to the cases Defendants cite (*see* Dkt. 24 at 16:8-12), which "tended to involve relatively simple rules issued by a single [sub-]agency." *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 722 (D.C. Cir. 2016); *see also City of Los Angeles v. F.A.A.*, 2239 F.3d 1033, 1036-37 (9th Cir. 2001). Because Plaintiffs' claims involve various agencies not covered by section 46110 and challenge EOs and agency guidance not issued under the relevant statutes, this Court has jurisdiction.

### 2.    The Tucker Act Does Not Preclude This Court's Review.

As this Court has previously recognized, Plaintiffs' claims do not enforce contractual rights and do not seek an order mandating payment by the government. Instead, they seek an order holding the action unlawful and setting it aside. *See* 5 U.S.C. § 706(2); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. ---, 2025 WL 2415669, at *2 (U.S. Aug. 21, 2025) (Barrett, J., concurring in the partial grant of the application for stay) ("[T]he District Court was likely correct to conclude that it had

RENNE PUBLIC LAW GROUP
Attorneys at Law

jurisdiction to entertain an APA challenge to the [internal agency] guidance, and it would be confusing for our disposition of this application to suggest that the CFC [Court of Federal Claims] is the right forum for that claim").  Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, are subject to the APA's waiver of sovereign immunity, 5 U.S.C. § 702, and thus are squarely within this Court's jurisdiction.  Nothing in the Tucker Act deprives this Court of jurisdiction to grant the declaratory and injunctive relief Plaintiffs seek.

The Tucker Act confers jurisdiction on the CFC and waives federal sovereign immunity for damages claims "founded . . . upon any express or implied contract with the United States" or upon certain constitutional or statutory provisions that mandate the payment of money.  28 U.S.C. § 1491(a).  Defendants do not contend that Plaintiffs' constitutional or statutory claims establish the type of "money-mandating" obligation to which the Tucker Act applies.  *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020) (citation omitted).  Instead, they assert Plaintiffs' claims are essentially contract claims seeking money damages.  Dkt. 24 at 16-18.  But this suit is not "'at its essence' a contract action."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  Claims involving "rights and remedies" that "are statutorily or constitutionally based" are not subject to the Tucker Act.  *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (cleaned up).

As courts have held in similar cases, constitutional and APA claims seeking declaratory and injunctive relief from unlawful grant conditions are properly subject to the jurisdiction of the district courts.  *See, e.g., San Francisco Unified Sch. Dist. v. AmeriCorps*, --- F. Supp. 3d ----, 2025 WL 1180729, at *6–11 (N.D. Cal. Apr. 23, 2025) (Tucker Act did not deprive court of jurisdiction to enter a TRO enjoining defendants from imposing and enforcing new conditions on plaintiff's AmeriCorps grants); *Martin Luther King, Jr. Cnty. v. Turner*, --- F. Supp. 3d ----, 2025 WL 1582368, at *12 (W.D. Wash. June 3, 2025) (similar conclusion regarding HUD and DOT grant conditions); *City & Cnty. of San Francisco v. Trump*, --- F. Supp. 3d ----, 2025 WL 1282637, at *37 n.12 (N.D. Cal. May 3, 2025); *President and Fellows of Harvard College v. U.S. Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, 2025 WL 2528380, at *14 (D. Mass. Sept. 3, 2025) (exercising jurisdiction as to plaintiffs' First Amendment and Title VI challenges to freeze orders and termination letters, as well as plaintiffs' APA challenges to the freeze orders, but not the termination letters).

RENNE PUBLIC LAW GROUP
Attorneys at Law

Defendants primarily rely on the Supreme Court's recent decisions in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), and *NIH*, 606 U.S. ---, 2025 WL 2415669 (per curiam). But those cases are distinguishable and in fact support Plaintiffs' position.  In *California*, the Supreme Court stayed an order enjoining the defendants "from *terminating* any individual . . . grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with . . . the grant terms and conditions," *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025) (emphasis added).  Thus, the Supreme Court construed the injunction as effectively an order "'to enforce a contractual obligation to pay money.'"  *Community Legal Services in East Palo Alto v. United States Department of Health and Human Services*, 137 F.4th 932, 939 (9th Cir. 2025) (quoting *California*, 145 S. Ct. at 968).

In *NIH*, the Supreme Court granted the Government's application to stay "as to the District Court's judgments vacating the Government's termination of various research-related grants" since the APA's "'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *NIH*, 606 U.S. ---, 2025 WL 2415669, at *1.  But it "otherwise denied" a stay of the judgments insofar as they vacated internal agency guidance.  *Id.*

Here, by contrast, Plaintiffs seek to enjoin Defendants from newly attaching unlawful conditions to grant agreements, not from enforcing the terms of existing grant agreements.  Dkt. 28 at 5 & n.1.  Indeed, Justice Barrett's concurrence is instructive as to this distinction, particularly when viewed along with Chief Justice Roberts' concurrence (which was joined by Justices Sotomayor, Kagan, and Jackson).  *See NIH*, 2025 WL 2415669, at *3 (Barrett, J., concurring) ("my preliminary judgment is that the plaintiffs' challenges to the grant terminations belong in the CFC, and their APA challenges to the guidance belong in district court"); *id.* at *3 (Roberts, C.J., concurring in part) (explaining that "the District Court's vacatur of the challenged directives distinguishes this case from *Department of Ed. v. California*," "has prospective and generally applicable implications beyond the reinstatement of specific grants," and "falls well within the scope of the District Court's jurisdiction under the Administrative Procedure Act"); *cf. id.* at *5 n.2 (Gorsuch, J., concurring and dissenting in part) (noting that the plaintiffs "also asserted injuries from the guidance based on the government's alleged failure to process

-17-

RENNE PUBLIC LAW GROUP
Attorneys at Law

*new* grant applications" but that those allegations could not form a basis for the judgments vacating

internal agency guidance because "the district court declined to pass on those allegations").

### C.     Plaintiffs Are Likely to Succeed on the Merits

#### 1.     The Federal Grant Conditions Violate the U.S. Constitution

Plaintiffs are likely to succeed in demonstrating that the HUD Conditions, DOT Conditions, HHS

Conditions, and EPA Conditions (collectively the Federal Grant Conditions) violate the Constitution.

##### a.     Plaintiffs' non-APA claims for equitable relief are independently actionable.[3]

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of

courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to

England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015); *see also Corr. Servs.*

*Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("injunctive relief has long been recognized as the proper

means for preventing entities from acting unconstitutionally").

Unsurprisingly, therefore, courts have regularly entertained constitutional claims seeking

prospective equitable relief against federal officials. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*,

343 U.S. 579, 589 (1952) (entertaining action against Secretary of Commerce based on President's order

directing Secretary to take possession of and operate most of the Nation's steel mills and concluding that

the "seizure order cannot stand"); *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561

U.S. 477, 491 n.2 (2010) (entertaining action against Public Company Accounting Oversight Board and

its members; noting that "equitable relief 'has long been recognized as the proper means for preventing

entities from acting unconstitutionally" and "[i]f the Government's point is that an Appointments Clause

or separation-of-powers claim should be treated differently than every other constitutional claim, it offers

no reason and cites no authority why that might be so"); *Collins v. Yellen*, 594 U.S. 220, 263 n.1 (2021)

(Thomas, J., concurring) ("I assume the shareholders have brought such a cause of action here and have a

legal right to obtain equitable relief if they can show they suffered an injury traceable to a Government

action that violates the Constitution."); *cf. United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir.

---

[3] This Court directed the parties to "address in their preliminary injunction briefing whether the private right of action arises for the non-APA claims."  Dkt. 28 at 9 n.3.

RENNE PUBLIC LAW GROUP
Attorneys at Law

2016) ("When Congress has enacted a legislative restriction like § 542 that expressly prohibits DOJ from spending funds on certain actions, federal criminal defendants may seek to enjoin the expenditure of those funds").

To be sure, Congress may limit a court's equitable power to enjoin acts violating federal law.  *See Armstrong*, 575 U.S. at 327-28.  But courts "begin with the strong presumption that Congress intends judicial review of administrative action" and require "a showing of 'clear and convincing evidence' of a contrary legislative intent" to "restrict access to judicial review."  *Bowen*, 476 U.S. at 670-71; *see also Armstrong*, 575 U.S. at 328-29 (finding intent to foreclose equitable relief for violations of the Medicaid Act).  And here, as the Ninth Circuit has explained, the 1976 amendment to 5 U.S.C. "§ 702 enacted a broad unqualified waiver for all non-monetary claims for relief against federal agencies," including non-APA claims.  *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017) ("the text of the second sentence of § 702 contains no limitation to 'final agency action,' to APA cases, or to APA and constitutional cases"); *see also The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989); *accord United States v. Mitchell*, 463 U.S. 206, 227 & n.32 (1983) (noting that in 1976 Congress "enacted a general consent" to suits for "declaratory, injunctive or mandamus relief against the Secretary").  As explained above, because this case involves unlawful conditions for future grants and not grant terminations, it is not a situation where another "statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

What's more, even "[i]n the absence of a statutory waiver, the Supreme Court has permitted judicial review of presidential [or executive branch] actions in two circumstances."  *Murphy Co. v. Biden*, 65 F.4th 1122, 1128 (9th Cir. 2023); *see also E.V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018) ("[A] suit against a federal official for specific relief is not considered to be against the government, and thus not barred by sovereign immunity, where the plaintiff alleges:  (1) action by officers beyond their statutory powers or (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." (cleaned up)).

"First, the Court has recognized constitutional challenges to presidential" and subordinate executive actions are "reviewable."  *Murphy*, 65 F.4th at 1128 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 790-91 (1992)); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691

-19-

RENNE PUBLIC LAW GROUP
Attorneys at Law

(1949) (recognizing exception when plaintiff contends that federal officials "were acting unconstitutionally or pursuant to an unconstitutional grant of power"); *E.V.*, 906 F.3d at 1090 ("E.V.'s two constitutional claims are not 'against the government' for purposes of sovereign immunity" (citing *Larson*, 337 U.S. at 689-90)); *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (constitutional right-to-travel claim against federal officials not barred because it is "well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority" (cleaned up)); *Strickland v. United States*, 32 F.4th 311, 365 (4th Cir. 2022) (reaching similar conclusion with respect to Fifth Amendment claims).

Of course, not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). But "[w]hile 'an action taken by the President in excess of his statutory authority [does not] necessarily violate[] the Constitution,' specific allegations regarding separation of powers may suffice." *Murphy Co.*, 65 F.4th at 1130 (quoting and altering *Dalton*, 511 U.S. at 473). Thus, in *Murphy*, which involved a claim that President Obama had violated the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act when he issued a proclamation under the Antiquities Act expanding the Cascade-Siskiyou National Monument—the Ninth Circuit concluded that "the core of Murphy's claim—that the President violated separation of powers by directing the Secretary to act in contravention of a duly enacted law—could be considered constitutional and therefore reviewable." *Id.*

"Second, the Court has held that actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—*i.e.*, *ultra vires* actions—are reviewable." *Murphy*, 65 F.4th at 1129 (citing *Larson*, 337 U.S. at 689-90). Put another way, "sovereign immunity does not shield an executive officer from suit for actions in 'conflict with the terms of his valid statutory authority.'" *Id.* (quoting *Larson*, 337 U.S. at 695). This *ultra vires* exception "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Here, Plaintiffs' non-APA claims are independently viable under the foregoing principles. Section 702 effects a broad waiver of sovereign immunity for actions seeking equitable relief against unconstitutional or *ultra vires* actions. Even if

RENNE PUBLIC LAW GROUP
Attorneys at Law

section 702's statutory waiver of immunity did not apply, Plaintiffs could maintain their non-APA claims under the exceptions articulated in *Murphy*, *Larson*, and *E.V.*

### b.    The Federal Grant Conditions are unconstitutionally vague.

Plaintiffs are likely to succeed in demonstrating that the Federal Grant Conditions violate the Fifth Amendment's vagueness doctrine by imposing opaque prohibitions that leave Plaintiffs without fair notice of their legal obligations and confer unbridled enforcement discretion on Defendants.  A government-imposed requirement is unconstitutionally vague under the Fifth Amendment if it either (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or (2) fails to "provide explicit standards for those who apply" the requirement, thereby encouraging "arbitrary and discriminatory application."  *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).  The Federal Grant Conditions fail on both counts.

Additionally, under the Spending Clause, "if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*."  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added).  When determining the ambiguity of conditions on federal grants, the Court evaluates "whether [a recipient]…would clearly understand…the obligations of the [conditions]." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Here, the vague and ambiguous Federal Grant Conditions leave Plaintiffs guessing whether previously permissible activities—such as hosting community workshops, providing space for local affinity groups' programs and events, or even just using words like "diversity" or "equity"—violate the Federal Grant Conditions.  This uncertainty not only forces Plaintiffs to self-censor but also implicates their constitutional right not to be deprived of liberty and property without due process of law, particularly in light of the exposure to potentially severe penalties under the False Claims Act.

### i.    *The EO Conditions*

Defendants have imposed various EO Conditions that ambiguously incorporate the President's EOs and require recipients to "comply" with them.  Some of the EO Conditions provide a "non-exhaustive list" of specific EOs, such as the HUD EO Condition and the DOT EO Condition, while others simply refer to "all current Executive Orders" generally, such as the CoC EO Condition. However, none of the EOs at issue directly impose requirements on grant recipients; rather, they direct

-21-

RENNE PUBLIC LAW GROUP
Attorneys at Law

the heads of executive agencies to impose conditions on federal funding. Accordingly, it is nonsensical to require Plaintiffs to "comply" with the EOs, and unclear what requirements they impose on Plaintiffs.

This uncertainty renders the EO Conditions unconstitutionally vague and ambiguous under both the Due Process Clause and the Spending Clause. First, due process requires that laws and conditions on federal funding be set forth with sufficient clarity to give ordinary recipients fair notice of what is required or prohibited. *See Cnty of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) (citing *Grayned*, 408 U.S. at 108–09); *San Francisco AIDS Foundation v. Trump*, --- F. Supp. 3d ----, 2025 WL 1621636, at *20 (N.D. Cal. June 9, 2025). A condition that simply directs compliance with "all current Executive Orders" provides no meaningful guidance as to what conduct is expected, tolerated, or prohibited. Executive orders vary in scope and subject matter, are subject to change at any time, and are addressed exclusively to executive branch actors. A local government recipient is left to guess whether, and how, a particular EO applies to its conduct and risks loss of critical federal funding and FCA liability if it guesses incorrectly.

Second, the EO Conditions invite arbitrary and discriminatory enforcement. By incorporating executive orders in sweeping, undefined terms, the Conditions vest federal officials with unfettered discretion to determine whether a recipient is "in compliance" without reference to any objective standards. This discretion enables the administration to wield grant funding as a tool of coercion, selectively enforcing vague obligations against disfavored recipients while overlooking the same conduct by others. The ambiguity of the EO Conditions thus makes them ripe for use as a mechanism of retaliation against entities that express viewpoints or pursue policies disfavored by the current administration. The absence of clear guidelines transforms the grant process into a tool of political leverage, where recipients must conform to shifting executive priorities or risk losing essential funding.

Third, the Spending Clause requires that conditions attached to federal funds be stated "unambiguously" so that state and local governments may exercise their choice knowingly and voluntarily. *See Pennhurst*, 451 U.S. at 17; *SFUSD*, --- F. Supp. 3d ----, 2025 WL 1713360, at *18. The EO Conditions fail this standard. Plaintiffs cannot knowingly agree to comply with "all current Executive Orders" because that phrase does not inform them of what specific obligations they are undertaking, much less what obligations might be imposed in the future. The "non-exhaustive list"

-22-

Renne Public Law Group
Attorneys at Law

approach fares no better, since it signals that additional, unspecified EOs may be enforced against recipients at the government's discretion.  A condition that operates as a moving target—changing with each new Executive Order—cannot satisfy the Spending Clause's prohibition of ambiguous conditions.

### ii.        *DEI and Discrimination Conditions*

The DEI Conditions suffer from many of the same infirmities as the EO Conditions.  Although the various DEI Conditions differ slightly, they all essentially require recipients to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws."  *See* RJN, Ex. C at 1. On its face, this provision appears redundant because recipients are already required to comply with all applicable federal anti-discrimination laws.  The additional prohibition on using funds to "promote DEI" initiatives, however, introduces a new and undefined condition.  None of the Defendants in the various policies or agreements define the terms "diversity," "equity," or "inclusion," nor do they explain what it means for a program to "promote" DEI.  It is unclear whether routine housing equity programs, cultural competency and implicit bias training, or public health programs aimed at reducing racial disparities in health outcomes may be seen as "promoting DEI" and result in the loss of funding or FCA liability. Such vagueness not only undermines the ability of grantees to comply with the terms and conditions of their grant agreements but also creates a substantial risk of arbitrary or discriminatory enforcement.

Several courts have recently held that analogous anti-DEI and anti-equity conditions related to President Trump's EOs are likely impermissibly vague.  *See San Francisco Unified Sch. Dist. v. AmeriCorps*, --- F.Supp.3d ----, 2025 WL 1713360, at *22 (N.D. Cal. June 18, 2025); *San Francisco A.I.D.S. Found. v. Trump*, --- F.Supp.3d ----, 2025 WL 1621636 at *21 (N.D. Cal. June 9, 2025); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 279–80 (D. Md.), opinion clarified, 769 F. Supp. 3d 465 (D. Md. 2025); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149, 188–89 (D.N.H. 2025); *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 66–67 (D.D.C. 2025).

Defendants' recent revisions to some of the DEI Conditions do not cure these constitutional defects.  For example, the revised EPA Discrimination Condition requires recipients to certify that they do "not operate any programs violating any applicable Federal antidiscrimination law or promoting any

-23-

RENNE PUBLIC LAW GROUP
Attorneys at Law

such violation." RJN, Ex. Z at 44. This language remains impermissibly vague. It fails to specify what constitutes "applicable Federal antidiscrimination law," leaving recipients uncertain whether that phrase refers solely to duly enacted statutes such as Title VI and Title VII, or whether Defendants broadly interpret the language to incorporate Executive Orders and agency directives. The condition also introduces the undefined concept of "promoting" a violation of the law. It is unclear what it means for a program that itself complies with antidiscrimination law to nonetheless be deemed to "promote" a violation. Such phrasing leaves recipients to speculate whether ordinary activities—such as public statements or campaigns affirming DEI principles, employee resource groups or affinity networks, or inclusive curriculum or educational programming—might be construed as violations. By replacing explicit references to "DEI" with equally indeterminate prohibitions, the revised Discrimination Conditions perpetuate the same vagueness problems, depriving grantees of clear notice and enabling arbitrary enforcement.

### iii.    *Gender Ideology Conditions*

The Gender Ideology Conditions imposed across HUD, CoC, HHS, and HRSA grants are unconstitutionally vague and ambiguous because they fail to provide clear, enforceable standards, thereby inviting arbitrary enforcement. Although EO 14168 contains a definition of "gender ideology," that definition is itself sweeping, subjective, and infused with ideological judgments. Terms such as "ever-shifting," "false claim," and "vast spectrum" provide no objective criteria for determining when a recipient's conduct "promotes" gender ideology. A grantee cannot reasonably discern whether inclusive nondiscrimination policies, recognition of transgender individuals, provision of gender-affirming care, or even simply using the term "genders" constitutes a violation. This lack of clarity leaves recipients guessing at the scope of their obligations under threat of severe funding consequences and FCA liability. Such open-ended and ideologically charged conditions cannot satisfy constitutional requirements.

### iv.    *Elective Abortion Conditions*

The HUD and CoC Elective Abortion Conditions are also unconstitutionally vague under the Due Process Clause and ambiguous under the Spending Clause. While the Conditions reference EO 14182, neither the EO nor the grant terms define what constitutes an "elective" abortion or what it means to "promote" one. It is unclear whether "promotion" encompasses counseling, referrals, provision of

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

information, or advocacy by subgrantees, or whether "elective" excludes procedures performed for health, fetal anomaly, or other non-life-threatening medical reasons.  Such indeterminate and malleable terms do not put grantees on notice and invite selective enforcement.

### v.    *Immigration Enforcement Conditions*

Similarly, the HUD and DOT Immigration Enforcement Conditions are unconstitutionally vague and ambiguous.  The HUD Condition prohibits the use of funds in a manner that "facilitates the subsidization or promotion of illegal immigration" or "abets policies that seek to shield illegal aliens from deportation," but offers no definition of what constitutes "facilitates," "subsidization," or "promotion."  *See* RJN, Ex. A at 2.  Likewise, the DOT Condition requires recipients to "cooperate with Federal officials" and refrain from "impeding" immigration enforcement, yet does not define "cooperate" or "impeding."  *See* Bacher Decl., Ex. 8; RJN Ex. E at 25, .

These open-ended terms leave recipients without fair notice of what conduct is prohibited.  It is unclear, for example, whether providing housing assistance to mixed-status families, adopting confidentiality policies to encourage crime reporting, or limiting local law enforcement's role in federal immigration enforcement constitutes a violation.  The ambiguity of these terms forces recipients to guess at their obligations while allowing federal officials to decide after the fact what conduct is prohibited.

### c.    The Federal Grant Conditions violate the Separation of Powers.

The Constitution "exclusively grants the power of the purse to Congress, not the President."  *San Francisco I*, 897 F.3d at 1231.  Accordingly, there is no inherent executive authority to place conditions on the receipt of federal funds—any such authority must be given to the executive by the legislature.  *See City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019) (agency grant conditions imposed without statutory authority were "ultra vires").  Absent an express delegation of congressional authority, the President's power to impose conditions on grants "is at its lowest ebb."  *San Francisco I*, 897 F.3d at 1233 (cleaned up).  Similarly, "unless and until Congress confers power on" them, agencies have "literally . . . no power to act . . . ."  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Here, no statute gives Defendants the power to impose conditions on federal grants remotely approaching those at issue.  The various DEI and Discrimination Conditions attempt to prohibit the use of funds for undefined categories of "DEI mandates" or "equity ideology" even though Congress has

never enacted legislation barring grantees from supporting such initiatives.  *See San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *25.

The HUD and CoC Gender Ideology Conditions, as well as the HHS GPS Gender Ideology Conditions, similarly attempt to bind recipients to the policy dictates of Executive Order 14168, yet Congress has never authorized the Executive to use Title IX or Title VI as vehicles for prohibiting "gender ideology."  In fact, the Gender Ideology Conditions facially discriminate based on transgender status, violating the Separation of Powers by contravening antidiscrimination laws.  *See San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *27.

The HUD, CoC, and DOT Immigration Enforcement Conditions purport to require cooperation with federal immigration enforcement and prohibit policies that "facilitate" or "promote" "illegal immigration," even though Congress has repeatedly declined to enact legislation cutting off federal funds for so-called "sanctuary jurisdictions."  *See San Francisco I*, 897 F.3d at 1231 (holding that Executive Branch may not withhold federal grants from sanctuary cities without congressional authorization).

The HUD and CoC Elective Abortion Conditions purport to "enforce" the Hyde Amendment, but they go far beyond what that statute actually requires.  The Hyde Amendment, enacted as an annual appropriations rider, prohibits the use of federal funds to pay for abortions except in cases of rape, incest, or where the life of the mother is at risk.  *See* Pub. L. No. 118-47, § 810, 138 Stat. 591 (2024).  In contrast, the Elective Abortion Conditions prohibit grantees from using federal funds to "fund or promote elective abortions" in all contexts, extending the restriction beyond the prohibitions of the Hyde Amendment, imposing obligations on recipients not contemplated by Congress.  *See also Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 2322763 at *13 n.9 (W.D. Wash. Aug. 12, 2025)

These Conditions effectively rewrite the terms of numerous longstanding grant programs without any statutory basis.  By converting funds appropriated by Congress into leverage for the Executive to pursue policy goals that Congress has either declined to enact into law or chosen to address differently, Defendants usurp Congress's "power of the purse" and violate bedrock separation of powers principles.

### d.    The Federal Grant Conditions are not germane.

The Federal Grant Conditions are especially problematic because they exceed even Congress' power to condition federal funds.  The Spending Clause only permits Congress to impose "reasonable

RENNE PUBLIC LAW GROUP
Attorneys at Law

conditions relevant to federal interest in the project and to the over-all objectives thereof." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (cleaned up). Accordingly, any Federal Grant Conditions must have some "nexus" with the purpose of the grant funds at issue. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 532. The same nexus requirement applies to Executive Branch–imposed conditions. *Id*. There is no nexus whatsoever between the challenged Federal Grant Conditions and the federal interest in the grant funds at issue here.

The DEI-related condition prohibits recipients from using funds to "promote" diversity, equity, and inclusion mandates, policies, or programs. However, HUD's CPD and CoC programs are designed to fund affordable housing, prevent homelessness, provide community infrastructure, and deliver services to vulnerable populations—activities that frequently require outreach to historically underserved communities. The DEI condition is untethered to these statutory purposes and invites enforcement based on ideological disagreement rather than project compliance. Likewise, FTA's fixed guideway capital investment, urbanized area formula, state-of-good-repair, and bus facility grants, which support infrastructure projects, vehicle purchases, and system maintenance, have no connection to limitations on DEI. The same is true for FHWA's roadway safety, bridge repair, aquatic ecosystem restoration, transportation technology programs, FAA's airport improvement and infrastructure grants, and DOT IFAC grants. The DEI restriction bears no relationship to engineering, safety, environmental, transit development, or aviation objectives. Similarly, the HHS grants, which are intended to support public health programs and services, and the EPA grants, which are intended to fund environmental protection and remediation efforts, have no nexus to the DEI conditions.

The Immigration Enforcement Conditions are equally unrelated to HUD and DOT grant programs. The HUD programs have no statutory mandate to enforce immigration laws, and immigration policy has no bearing on community development, affordable housing, or homelessness. The absence of any nexus is even more apparent with DOT, FTA, FHWA, and FAA grants, whose purposes are to construct, maintain, and improve transit, highway, and aviation systems. As *Cnty. of Santa Clara v. Trump* held, immigration enforcement has no connection to programs focused on transportation, health, or housing. *See* 250 F. Supp. 3d at 532.

The HUD and HHS Gender Ideology Conditions are also unrelated to the grants at issue. HUD's

-27-

RENNE PUBLIC LAW GROUP
Attorneys at Law

housing programs are tasked with meeting fair housing obligations, preventing homelessness, and addressing community needs; this ideological restriction has nothing to do with the provision of shelter or compliance with the Fair Housing Act.  Transportation and aviation programs are concerned with building and maintaining infrastructure, not regulating gender identity.  Similarly, the prohibition on using grant funds to fund or promote "elective abortions," as set out in E.O. 14182, is entirely unrelated to the purposes of the federal grant programs at issue.  Across all programs, the Federal Grant Conditions are unconnected to the purposes of the federal programs and instead impose broad social policy restrictions divorced from the statutory objectives Congress enacted.  Their enforcement would exceed even Congress's conditional spending authority, let alone the Executive's.

> **e.**    **The Immigration Enforcement Condition violates the Tenth Amendment.**

The Immigration Enforcement Condition also violates the Tenth Amendment because it imposes a coercive condition intended to commandeer local officials into enforcing federal immigration practices and law.  The Tenth Amendment prohibits the federal government from "commandeering" state and local officials to help enforce federal law.  *See Printz v. United States*, 521 U.S. 898 (1997).  The Ninth Circuit has held that forcing state and local governments to assist with federal immigration enforcement would violate the Tenth Amendment.  *United States v. California*, 921 F.3d 865, 888–91 (9th Cir. 2019).  And the federal government cannot do indirectly through coercive grant conditions what it could not do directly.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012).  Yet that is exactly what Defendants are doing—holding a gun to recipients' heads to force them to use local resources to cooperate with federal officials in enforcing immigration law.  *See id*. at 581.  Accordingly, just as the Immigration Enforcement Condition is impermissibly coercive under the Spending Clause, it also violates the Tenth Amendment's anti-commandeering principles.  *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1151 (D.N.D. 2021) ("The Spending Clause's coercion backstop is closely linked to the Tenth Amendment concept that the federal government may not commandeer the states to enact or administer a federal regulatory program" (cleaned up)).

RENNE PUBLIC LAW GROUP
Attorneys at Law

1

2

### 2.    The Federal Grant Conditions Violate the APA

#### a.    Defendants' unlawful grant conditions are not committed to agency discretion by law.

3

4

5

6

7

Defendants erroneously argue 5 U.S.C. § 701(a)(2) precludes judicial review.  Dkt. 24 at 24-25.

Under that section, a court may not conduct APA review if the "agency action is committed to agency

discretion by law."  This "quite narrow[]" exception to the "basic presumption of judicial review" under

the APA does not apply here.  *Dep't of Commerce v. New York*, 588 U.S. 752, 771, 772 (2019) (cleaned

up); *see also SFUSD*, 2025 WL 1180729, at *3 (rejecting similar argument).

8

9

10

11

12

13

14

First, an agency action "is committed to agency discretion by law" only "where a statute is drawn

in such broad terms that in a given case there is no law to apply, and the court would have no meaningful

standard against which to judge the agency's exercise of discretion."  *Webster v. Doe*, 486 U.S. 592, 592

(1988).  Only in those "rare instances" in which there is "truly no law to apply" is it appropriate to follow

section 701(a)(2).  *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024).  Even

when Congress intended to create a wide zone of agency discretion, the agency still must meet

"permissible statutory objectives."  *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

15

16

17

18

19

20

21

22

23

Defendants rely heavily on *Lincoln*, 508 U.S. 182, and *Amica Ctr. for Immigrant Rights v. U.S.

Dep't of Justice*, 2025 WL 1852762 (D.D.C. July 6, 2025).  Dkt. 24 at 25.  But *Lincoln* involved a

"'lump sum appropriation,'" which "'reflects a congressional recognition that an agency must be allowed

flexibility to shift funds within a particular appropriation account so that the agency can make necessary

adjustments for unforeseen developments and changing requirements.'"  *SFUSD*, 2025 WL 1180729, at

*4 (quoting *Lincoln*).  Indeed, in *Amica Ctr. for Immigrant Rights*, two of the three cancelled programs

"were discretionarily funded through EOIR's lump sum appropriations."  2025 WL 1852762 at *14.  As

for the third program, "'no statute or regulation even mention[ed]'" it, and it was also not specifically

referenced in the relevant earmark or appropriations act.  2025 WL 1852762 at *14 (quoting *Lincoln*).

24

25

26

27

28

Here, in stark contrast, there is no indication that Congress, in authorizing the grant programs at

issue, intended to commit Defendants' imposition of grant conditions to agency discretion, thereby

exempting such actions entirely from judicial review.  The grant programs are authorized and governed

by statutes setting forth the purpose, selection criteria, recipient requirements, and grant conditions,

among other things.  *See, e.g.*, 23 U.S.C § 24112 (SS4A); 42 U.S.C. §§ 5303–5305 (CDBG); *id.*

-29-

§§ 11372, 11374–11375 (ESG); *id*. §§ 12742, 12744, 12475, 12476 (HOME); *id*. §§ 12903(d)(1)–(6) (HOPWA); *id*. § 254b(HCP); *id*. § 9604(k) (Brownfields); 49 U.S. Code § 47106 (AIP).

Defendants' new conditions exceed their statutory authority under those provisions.  Because the statutes provide a basis for this Court to exercise judicial review, Defendants' actions are not "committed to agency discretion by law" and thus section 701(a)(2) does not preclude Plaintiffs' APA claim.  *See King County*, 2025 WL 1582368 at *12-13 ("each of these enabling statutes provides substantial guidance as to how the agencies' discretion should be exercised in implementing these programs, and for the Court to evaluate whether that discretion is being exercised in a reasonable manner"); *SFUSD*, 2025 WL 1180729, at *3–5 (concluding similarly in APA challenge to AmeriCorps grant conditions); *see also Bowen*, 487 U.S. at 898 (noting legislative history indicates Congress understood APA would "authorize judicial review of the 'administration of Federal grant-in-aid programs'").[4]

**b.    The federal agency actions at issue are "final agency action" reviewable under the APA.**

Courts have regularly found that "the new funding conditions at issue here are 'final agency actions' for purposes of APA review."  *King County*, 2025 WL 1582368, at *14 n.18; *Rhode Island Coalition Against Domestic Violence v. Bondi*, --- F. Supp. 3d ----, 2025 WL 2271867, at *6 (D.R.I. Aug. 8, 2025) ("Accordingly, the Court sides with courts that have found that agency placement of new conditions on grant funding amounts to final agency action"); *San Francisco Unified School Dist.*, 2025 WL 1713360, at *13-15 (concluding that AmeriCorps Directive stating that "All aspects of AmeriCorps grants/awards must comply with President Trump's executive orders …" was final agency action under the APA).  Indeed, as this Court previously explained:  "The E.O. Grant Conditions are reviewable here as final agency action:  they take definitive legal positions that the Executive Orders and Executive Grant

---

[4] Even if Defendants' actions were "discretionary," section 701(a)(2) does not preclude judicial review of Plaintiffs' constitutional claims.  Absent clear congressional intent, section 701(a)(2) does not bar review of colorable constitutional claims arising from agency actions.  *See Webster*, 486 U.S. at 603 ("heightened showing" is required "in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (cleaned up)); *see also Nguyen v. Kissinger*, 528 F.2d 1194, 1199 (9th Cir. 1975) ("nothing in the [APA] purports to sanction the violation of constitutional rights committed under the guise of the exercise of discretion"); *Wong v. Warden, FCI Raybrook*, 171 F.3d 148, 149 (2d Cir. 1999) ("It is well-established that judicial review exists over allegations of constitutional violations even when the agency decisions underlying the allegations are discretionary"); *SFUSD*, 2025 WL 1180729, at *6 (section 701(a)(2) did not bar review of constitutional challenge to AmeriCorps directive imposing new grant conditions).

RENNE PUBLIC LAW GROUP
Attorneys at Law

Conditions are enforceable against Plaintiffs; this position poses an immediate and significant practical burden on Plaintiffs; and the disputed legal authority underlying the positions are fully fit for judicial review." Dkt. 28 at 5 (cleaned up).

> **c.** **The Federal Grant Conditions are in excess of statutory jurisdiction.**

Under the APA, a court may set aside an agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (C).  As discussed above, the Federal Grant Conditions are unconstitutional in several respects. *See supra*, IV(C)(1).  Accordingly, this Court may enjoin the imposition of the conditions under § 706(2)(B).  Furthermore, Defendants violate § 706(2)(C) because their promulgation of the Federal Grant Conditions does not derive from any statutory authority.  In fact, in several respects, the Federal Grant Conditions are contrary to statutory requirements.

> **i.** **_Congress has not authorized the HUD Grant Conditions._**

Congress has established various grant programs administered by HUD through CPD.  Several of these programs are codified in title 42 of the U.S. Code and were created (or later reauthorized) by the Housing and Community Development Act of 1974, Pub. L. 93 383, 88 Stat. 633; the Cranston Gonzalez National Affordable Housing Act of 1990, Pub. L. 101 625, 104 Stat. 4079; the Stewart B. McKinney Homeless Assistance Act of 1987, Pub. L. 100 77, 101 Stat. 482, as amended by the HEARTH Act of 2009, Pub. L. 111 22, 123 Stat. 1663; and the AIDS Housing Opportunity Act of 1990, Pub. L. 101 625.  42 U.S.C. §§ 5303–5304 (CDBG program), 11372 (ESG program), 12741 (HOME program), 12903 (HOPWA program).

Congress has enumerated various certifications and requirements that CPD grant recipients must adhere to as a condition of receiving funds.  Such certifications include that the recipient will develop and follow a citizen participation plan, comply with statutory transparency requirements, ensure funds are consistent with statutory objectives, and administer programs in conformity with nondiscrimination laws.  42 U.S.C. § 5304(a)(3), (b); *see also id*. §§ 11375(c), 11375(c).  None of these statutes authorize HUD to condition CPD grant funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

RENNE PUBLIC LAW GROUP
Attorneys at Law

Far from barring diversity-related "inclusion," Congress requires consideration of diversity when allocating HUD funds.  For instance, the HUD Secretary is required to set aside CDBG funds for "[s]pecial purpose grants," including grants to "historically Black colleges." 42 U.S.C. § 5307(b)(2); *see also id*. § 5307(c) (requiring CDBG funds be allocated to provide "assistance to economically disadvantaged and minority students").  And in authorizing the HOME and HOPWA programs, Congress acted to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis." *Id*. § 12702(3).  Congress also requires HOME recipients "to establish and oversee a minority outreach program...to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women...in all contracts[ ] entered into by the participating jurisdiction." *Id*. § 12831(a).

Moreover, Defendants' ability to impose the challenged conditions on the CPD grants is further constrained by 42 U.S.C. § 12711, which prohibits HUD from "denying funds made available under [HUD] programs...based on the adoption, continuation, or discontinuation" of any lawful local policies.  Stated differently, "HUD may not … condition funding on changes to local policies." *Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015).

HUD also administers the CoC grant program enacted by Congress pursuant to the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act").  42 U.S.C. §§ 11301, 11381.  The Homeless Assistance Act directs the HUD Secretary to award CoC grants on a competitive basis using statutorily prescribed selection criteria. *Id*. §11382(a).  Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use.  These required criteria include factors such as the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need for homeless services within the geographic area. *Id*. (b)(1)-(2).  Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth "[r]equired agreements" to which grant recipients must adhere.  Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional shelter," "place families with children as close as possible to their school of

-32-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

origin," and obtain various certifications from direct service providers.  *Id*. § 11386(b).  The Homeless Assistance Act does not establish any statutory requirements that: prohibit DEI initiatives, promoting "gender ideology" or "elective abortions"; mandate local participation in the enforcement of federal immigration laws; or authorize the President or the HUD Secretary to impose such conditions.

Additionally, PRWORA does not authorize the CoC PRWORA Verification Condition.  PRWORA explicitly does not require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations.  8 U.S.C. § 1642(b).  Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner."  *Id*. § 1642(b)(ii), (iii).  The Attorney General has issued interim guidance and a proposed verification rule, but has not implemented a final rule.  *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule).  This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation.  62 Fed. Reg. 61348–49 (Nov. 17, 1997).  Absent implementing regulations, Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system.  *See* 42 U.S.C. § 1320b-7.  Requiring recipients to do so exceeds the authority created in PRWORA.

### ii.    *Congress has not authorized the DOT Grant Conditions.*

The purposes of each DOT grant program, including the conditions required for participation, are described in the programs' authorizing statutes.  For example, for the IFAC grant program, codified in 23 U.S.C. § 611, the statutory requirements relate to conducting, evaluating, publishing, and implementing asset concessions and infrastructure development.  The statute does not restrict eligible entities' DEI-related activities or require them to support federal immigration enforcement.

For FTA programs codified in 49 U.S.C. ch. 53—including urbanized area formula grants (§ 5307), fixed guideway capital investment grants (§ 5309), state-of-good-repair grants (§ 5337), and bus and bus facility grants (§ 5339)—the statutory requirements relate to eligible transit purposes,

-33-

operational capacity, long-term asset maintenance, and project performance.  There are no statutory restrictions on DEI-related activities or mandates to facilitate immigration enforcement.  Congress annually appropriates funds for these programs and has never attached or authorized such conditions.

FHWA grant programs likewise are created and governed by specific statutory authorizations, including the SS4A program (§ 24112 of the Infrastructure Investment and Jobs Act ("IIJA")), the Federal-Aid Highway Program (23 U.S.C. §§ 119, 133, 148, 149, 167, 175, 176), as well as specialized programs like the BIP program (23 U.S.C. § 124), the Culvert AOP Program (49 U.S.C. § 6703), and the ATTAIN program (23 U.S.C. § 503(c)(4)).  The statutory criteria for these programs address transportation safety, mobility, environmental performance, and infrastructure condition—not immigration enforcement or the prohibition of DEI.

FAA airport grant programs, including the AIP program and the AIG program under IIJA (49 U.S.C. §§ 47101 et seq.), also include statutorily defined conditions and assurances related to safety, capacity, environmental compliance, and nondiscriminatory public use.  *See* 49 U.S.C. § 47107.  The statutorily based conditions and assurances include requiring consistency with plans for development of the surrounding area, financial capacity, ability to complete the project "without unreasonable delay," and requiring sponsor to make certain written assurances based on the type of grant at issue, such as "the airport will be available for public use on reasonable conditions and without unjust discrimination" and "the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions".  49 U.S.C. §§ 47106, 47107.  No DEI, gender ideology, or immigration enforcement related conditions are included in the assurances authorized by statute.  Reauthorization acts, such as the FAA Reauthorization Acts of 2018 and 2024, likewise do not prohibit DEI or mandate immigration-enforcement cooperation.

Furthermore, many FTA, FHWA, and FAA grant programs that provide federal financial assistance for airport, transit, or highway infrastructure projects require minority and disadvantaged business participation through the Disadvantaged Business Enterprise ("DBE") Program.  *See, e.g.,* 23 U.S.C. § 177(e)(2); 49 U.S.C. § 47113.  The DBE Program is a Congressionally mandated program established by statutes and implemented through 49 C.F.R. Part 26.  The DBE Program requires recipients of federal aviation, highway, and transit funds to set participation goals for small businesses

RENNE PUBLIC LAW GROUP
Attorneys at Law

owned and controlled by socially and economically disadvantaged individuals, including minority- and women-owned firms. *See* 49 C.F.R. § 26.5 (establishing race and gender as criteria to be considered socially and economically disadvantaged). The program's purpose is to remedy the effects of discrimination in transportation contracting and ensure disadvantaged businesses have a fair opportunity to compete. The President's DEI and Gender Ideology EOs and related DOT Conditions seek to discourage or prohibit race- and gender-conscious contracting measures, directly undermining the statutory goals of the DBE Program.

Across DOT and all relevant operating administrations—FTA, FHWA, and FAA—Congress has been precise in defining both the purposes for which federal transportation funds may be used and the conditions recipients must meet. Those statutory conditions are comprehensive, specific, and limited to program-related requirements. Where, as here, Congress has spoken and has not authorized the conditions now asserted through executive order, the Executive Branch lacks authority to impose them.

### iii.    *Congress has not authorized the HHS Grant Conditions.*

The HHS grant programs are established by Congress through statute. *See* 42 U.S.C. §§ 247c(b)–(c) (High-Impact HIV Prevention and Surveillance Program), 254b (HCP program), 290dd et seq. (SAMHSA programs); 300ff et seq. (RWHA program). These statutes provide specific eligibility and criteria requirements. For example, 42 U.S.C. § 247c establishes requirements for the High-Impact HIV Prevention and Surveillance Programs grant, including recordkeeping requirements and patient confidentiality mandates. 42 U.S.C. §§ 247c(e)(3), (5). There are no statutory requirements conditioning the availability of these grants that prohibit DEI initiatives or promoting "gender ideology."

The HHS Gender Ideology Conditions (the October HHS GPS Gender Ideology Condition and the HRSA Gender Ideology Condition) invoke Title IX of the Education Amendments Act of 1972 as a supposed statutory basis for the incorporation of EO 14168. This contention is unsupportable because the Gender Ideology Conditions actually contravene Title IX. EO 14168 mandates that "[f]ederal funds shall not be used to promote gender ideology" and requires grant recipients to "recognize two sexes, male and female" and that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." But nothing in Title IX mandates such understandings. To the contrary, courts have concluded that failure to recognize an individual's transgender status constitutes discrimination

-35-

RENNE PUBLIC LAW GROUP
Attorneys at Law

under Title IX.  *See e.g.*, *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616– 17 (4th Cir. 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *see also Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020) (recognizing transgender as a protected category under Title VII).  Contrary to enforcing Title IX, HHS's Gender Ideology Conditions seek to graft contradictory requirements into the statute.

Defendants' HHS Conditions have no basis in statute, and their imposition on the grant programs at issue exceeds their statutory authority.

### iv.    *Congress has not authorized the EPA Grant Conditions.*

Congress authorized the Brownfields and Land Revitalization Program through the Small Business Liability Relief and Brownfields Revitalization Act of 2002, Pub. L. No. 107-118, 115 Stat. 2356 (2002).  The Act authorizes the EPA to award Brownfields assessment grants, cleanup grants, revolving loan fund ("RLF") grants, and job training grants.  *See* 42 U.S.C. §§ 9604(k)(2)–(6).  The RLF program (§ 9604(k)(3)) allows eligible entities to establish loan funds for cleanup activities at brownfield sites.  Congress has specified eligible activities and prohibited uses.  Funds may not pay penalties or fines, satisfy federal cost-share requirements, cover cleanup at sites where the recipient is a potentially responsible party under CERCLA § 107, or cover compliance costs under other federal environmental laws except those associated with cleanup.  *Id.* § 9604(k)(5)(B).  Grant and loan agreements must require compliance with all applicable federal and state laws and a 20% non-federal match unless EPA waives it for hardship.  *Id.* § 9604(k)(10)(B).

The Brownfields Revitalization Act does not prohibit consideration of diversity or equity.  To the contrary, statutory ranking criteria require consideration of community involvement and equity, including meaningful participation in cleanup and reuse decisions and the extent to which projects address threats to sensitive populations, such as children, pregnant women, and minority or low-income communities.  *Id.* § 9604(k)(6)(C)(x).

### d.    **The Federal Grant Conditions are arbitrary and capricious.**

The Federal Grant Conditions are arbitrary and capricious because they fail the basic requirement that agency action be "reasonable and reasonably explained."  *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (cleaned up).  To satisfy this requirement, an agency must offer "a satisfactory explanation

RENNE PUBLIC LAW GROUP
Attorneys at Law

for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor simply ignore "an important aspect of the problem . . . ."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. ("State Farm")*, 463 U.S. 29, 43 (1983).  While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Here, Defendants have not satisfied any of these requirements.

First, "an agency must defend its actions based on the reasons it gave when it acted, not with post hoc rationalizations."  *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) (cleaned up).  Here, Defendants neither followed required notice-and-comment procedures nor contemporaneously articulated reasons for imposing the new Federal Grant Conditions.  Even taking at face value the after-the-fact explanations scattered through various administration communications, they do not supply a reasoned, non-arbitrary basis for the Federal Grant Conditions.  *See King County*, 2025 WL 1582368 at *17 (concluding "that Defendants have failed to demonstrate that the new funding conditions were the result of 'reasoned decisionmaking,' let alone have been 'reasonably explained.'")

Regarding the conditions related to immigration, HUD Secretary Turner stated that the President ordered the changes, describing the Secretary's "responsibility to effectively implement" EO 14173 and promising senior leadership review to "ensure that HUD programs are compliant" with that order.  *See* U.S. Dep't of Hous. & Urban Dev., Letter to Grantees and Stakeholders (Apr. 4, 2025), https://www.hud.gov/sites/dfiles/PA/documents/2025-04-04-HUD-Grantee-and-Stakeholder-Letter.pdf.  However, "an executive order is not 'law,'" *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023), and such an order does not exempt an agency from the APA's requirements of "reasoning, deliberation, and process," nor permit "flip-flop[s]" "on the whims of each new administration."  *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020).  Invoking a presidential directive does not relieve an agency of its duty to grapple with "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including defining critical terms, assessing statutory authority, addressing programmatic impacts, and considering reliance interests.  The Turner Letter does none of this.

Similarly, HUD's Gender Ideology condition is unexplained in light of the Department's own

-37-

binding regulations, which mandate "[e]qual access" to covered programs according to participants' self-identified gender.  24 C.F.R. § 5.106(b)–(c).  Neither the Turner Letter nor HUD's April 2025 press release addresses this conflict or offers a policy justification for discarding the prior interpretation.

The Secretary Duffy's communications do not fare any better.  His April 24 letter asserts that policies "designed to achieve so-called [DEI] goals[] presumptively violate[] Federal law" and that DOT "must ensure that discrimination based on [protected status] does not exist" in funded programs.  RJN, Ex. P, April Duffy Letter.  However, that statement is not a reasoned explanation for what the Federal Grant Conditions actually impose—that recipients certify they do not operate any DEI program that DOT deems impermissible (federally funded or not).  The Duffy Letter also does not acknowledge, much less explain, its departure from several court decisions holding that affinity groups and other DEI programs premised on racial, gender, or other classifications and open to all comply with equal protection and federal nondiscrimination law.  *See, e.g., Diemert v. City of Seattle*, No. 2:22-cv-1640, 2025 WL 446753, at *17–18 (W.D. Wash. Feb. 10, 2025) (affinity groups "open to any City employee" did not violate equal protection); *cf. Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540–41 (7th Cir. 2005) (recognition of affinity groups based on common social identity did not violate Title VII).

None of these communications provides the kind of contemporaneous, evidence-based reasoning the APA demands.  They do not show that the agencies "considered the relevant factors" or "articulated a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43; *see also Dep't of Com.*, 588 U.S. at 785 (the requirement of reasoned decision making ensures agencies provide genuine justifications subject to judicial and public scrutiny; accepting contrived reasons would render judicial review an "empty ritual").  Instead, they reflect bare assertions of presidential direction or political preference, untethered to statutory authority or the agencies' missions, and are therefore arbitrary and capricious.  Plaintiffs are likely to succeed in establishing that attaching the Federal Grant Conditions exceeded the agencies' statutory jurisdiction, violated the Constitution, and was arbitrary and capricious in violation of the APA.  *See Rhode Island Coal. Against Domestic Violence v. Bondi*, --- F.Supp.3d ----, 2025 WL 2271867, at *8 (D.R.I. Aug. 8, 2025).

**D.    Plaintiffs Will Suffer Irreparable Harm If the Conditions Are Not Enjoined**

Plaintiffs allege several forms of irreparable harm that are either presently occurring or are likely

-38-

RENNE PUBLIC LAW GROUP
Attorneys at Law

to occur in the absence of injunctive relief.  Defendants have put Plaintiffs in the position of having to

choose between accepting unlawful conditions or risking the loss of hundreds of millions of dollars in

federal grant funding, including funding that they have already budgeted and are committed to spending.

Even if Plaintiffs accepted the vague and unlawful conditions, they would still be at risk of arbitrary

enforcement and legal liability.  It is this looming risk itself that is the injury, and one that Plaintiffs are

already suffering.  Courts evaluating similar circumstances have recognized that this injury of acute

budgetary uncertainty is irreparable.  *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 537.  Moreover,

Plaintiffs have submitted substantive and detailed evidence through declarations illustrating the ways in

which a loss of the federal grant funds would be devastating and irreparable if these risks in fact

materialize.  *See, e.g.*, Skei Decl. ¶ 17–18; Bacher Decl.  ¶ 32–37, 39–40; Warhuus Decl. ¶ 20, 31, 32;

Dickinson Decl. ¶ 14–15; Stevenson Diaz Decl. ¶ 28, 30, 32–34; Chen Decl. ¶ 29–30; Liss Decl. ¶ 20–

22, 26; Moore Decl. ¶ 5, 9.  The loss of those funds would result in immediate, irreparable, and

reverberating harms to Plaintiffs—including upending their budgets, pausing crucial infrastructure

projects, and terminating essential public services.  Warhuus Decl. ¶ 20, 31, 32; Stevenson Diaz Decl. ¶

28, 30, 32–34.  Transportation projects in particular require years of planning and, often, years to

complete.  Without injunctive relief, Plaintiffs will need to divert resources from other projects to

compensate or plan around the uncertainty of whether they can accept federal funds, straining their

resources and putting other projects in jeopardy.  *See, e.g.*, Barfield Decl. ¶ 9; Darrow ¶ 16–17; Warhuus

Decl. ¶ 20, 31, 32; Dickinson Decl. ¶ 14–15; Stevenson Diaz Decl. ¶ 28, 30, 32–34; Chen Decl. ¶ 29–30;

Liss Decl. ¶ 20–22, 26; Moore Decl. ¶ 5, 9.  Without these funds, planned projects may become too

expensive to undertake, requiring them to be modified or canceled.  *See, e.g.*, Barfield Decl. ¶ 9; Darrow

¶ 16–17; Warhuus Decl. ¶ 20, 31, 32; Dickinson Decl. ¶ 14–15; Stevenson Diaz Decl. ¶ 28, 30, 32–34;

Chen Decl. ¶ 29–30; Liss Decl. ¶ 20–22, 26; Moore Decl. ¶ 5, 9.  As a result of potential loss and

uncertainty surrounding these grants, Plaintiffs will face dire consequences for their transportation

infrastructure and resident safety.  The harms Plaintiffs allege are "quintessentially" irreparable.  *See*

*Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 2322763, at *16.

　　　　Additionally, as shown above, the Federal Grant Conditions likely violate due process, Separation

of Powers, the Spending Clause, and the Tenth Amendment.  Accordingly, Plaintiffs have also made a

RENNE PUBLIC LAW GROUP
Attorneys at Law

sufficient showing of irreparable harm that would result from enforcement of those provisions, as it is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

### E.     The Balance of Equities Weighs in Plaintiffs' Favor, and a Preliminary Injunction Is in the Public Interest

The equities and public interest, which merge when the government is a party, tip sharply in Plaintiffs' favor. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). Plaintiffs face immediate and irreparable harm from the enforcement of grant conditions that threaten vital funding for public programs and services. By contrast, the federal government's interest in imposing these new conditions before the legality of its actions has been adjudicated is minimal. Preserving Plaintiffs' constitutional rights, and preventing the government from enforcing potentially unlawful conditions, clearly serves the public interest. *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up).

Whatever interest the Executive may have in introducing new grant conditions at this stage of the grant cycle, and in enforcing them during the pendency of this litigation, that interest pales in comparison to the constitutional and programmatic harms Plaintiffs will suffer. As the Ninth Circuit has recognized, "by establishing a likelihood that [the government's] policy violates the U.S. Constitution," Plaintiffs have also "established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Accordingly, the balance of equities and the public interest decisively support interim relief here.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining Defendants from imposing or enforcing the Federal Grant Conditions or any materially similar terms or conditions to any federal funds received by or awarded to Plaintiffs, directly or indirectly, in accordance with Plaintiffs' Proposed Preliminary Injunction Order accompanying this filing. Immediate relief is necessary to preserve the status quo, prevent irreparable harm to Plaintiffs and their residents, and uphold the constitutional and statutory limits on executive authority.

1

2   Dated:  September 8, 2025                    RENNE PUBLIC LAW GROUP

3
                                                By: _____*/s/ Jonathan V. Holtzman*_____
4                                                    JONATHAN V. HOLTZMAN

5                                               Attorneys for Plaintiffs
                                                City of Fresno; City of Eureka; City of South
6                                               Lake Tahoe; County of Sacramento; County of
                                                Monroe; Monroe County Airport Authority;
7                                               County of San Diego; County of Marin; City of
                                                Alameda; City of Redwood City
8

9   Dated:  September 8, 2025                    FRESNO CITY ATTORNEY'S OFFICE

10
                                                By: _____*/s/ Andrew Janz*_____
11                                                   ANDREW JANZ

12                                              Attorney for Plaintiff
                                                CITY OF FRESNO
13

14  Dated:  September 8, 2025                    SAINT PAUL CITY ATTORNEY'S OFFICE

15
                                                By: _____*/s/ Kelsey McElveen*_____
16                                                   LYNDSEY OLSON *
                                                     KELSEY MCELVEEN *
17                                              * *Application for admission pro hac vice*
                                                *forthcoming*
18
                                                Attorneys for Plaintiff
19                                              City of Saint Paul

20  Dated:  September 8, 2025                    ANDERSON & KREIGER LLP

21
                                                By: _____*/s/ Melissa C. Allison*_____
22                                                   MELISSA C. ALLISON *
                                                     CHRISTINA S. MARSHALL *
23                                              * *Appearing pro hac vice*

24                                              Attorneys for Plaintiffs
                                                County of Monroe and Monroe County Airport
25                                              Authority

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

**ECF ATTESTATION**

I, JONATHAN V. HOLTZMAN, am the ECF user whose identification and password are being used to file this PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION.  Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

 Dated:  September 8, 2025                    RENNE PUBLIC LAW GROUP


                                             By:  _____*/s/ Jonathan V. Holtzman*_____
                                                  JONATHAN V. HOLTZMAN

RENNE PUBLIC LAW GROUP
Attorneys at Law

-42-