BRETT A. SHUMATE
Assistant Attorney General
CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
JOSEPH E. BORSON
Assistant Branch Director
R. CHARLIE MERRITT (VA Bar No. 89400)
Senior Counsel
     U.S. Department of Justice
     Civil Division, Federal Programs Branch
     Washington, D.C. 20005
     Tel.: (202) 616-8098
     robert.c.merritt@usdoj.gov

PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
JEVECHIUS D. BERNARDONI (CABN 281892)
Assistant United States Attorney
     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7224
     Facsimile: (415) 436-6748
     jevechius.bernardoni@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF FRESNO, *et al.*, | Case No. 3:25-cv-07070-RS |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| SCOTT TURNER, *et al.*, | Date:   September 23, 2025 |
| Defendants. | Time:  1:30 p.m. |
| | Place:  Videoconference |
| | The Honorable Richard Seeborg |

1

2

3

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ISSUES TO BE DECIDED ............................................................................................. 2

BACKGROUND ............................................................................................................. 2

I.      Factual Background ............................................................................................. 2

        A.      HUD .............................................................................................. 4

        B.      DOT .............................................................................................. 4

        C.      HHS ............................................................................................... 5

        D.      EPA ............................................................................................... 6

II.     Procedural Background ........................................................................................ 7

LEGAL STANDARD ..................................................................................................... 8

ARGUMENT .................................................................................................................. 8

I.      Plaintiffs Fail To Establish This Court's Jurisdiction. ........................................ 8

        A.      Plaintiffs' Challenges to DOT Grant Conditions Are Within the Exclusive
                Jurisdiction of the Circuit Courts. ................................................................. 8

        B.      To the Extent Plaintiffs Seek the Payment of Federal Grants, They Have Failed to
                Establish this Court's Jurisdiction. ......................................................... 9

II.     Plaintiffs' Claims Are Not Likely to Succeed. ................................................. 13

        A.      Plaintiffs' Constitutional Claims Are Not Likely to Succeed. ................... 14

                i.      Plaintiffs' Vagueness Claim Fails ............................................ 14

                ii.     Plaintiffs' Separation of Powers Claim Fails ........................... 17

                iii.    Plaintiffs' Spending Clause Claim Fails .................................... 17

                iv.     Plaintiffs' Tenth Amendment Claim Fails .................................. 19

        B.      Plaintiffs APA Claims Are Not Likely To Succeed ............................... 20

                i.      Plaintiffs' Impermissible Programmatic Attack Does Not Challenge
                        Discrete Final Agency Action .................................................. 20

ii.   Plaintiffs Challenge a Realm of Decisionmaking That Is Committed to Agency Discretion by Law. ....................................................................... 21

iii.   Plaintiffs' APA Claims Fail on Their Merits. .......................................... 23

III.   Plaintiffs Fail To Establish Irreparable Harm. ..................................................... 27

IV.   The Balance of the Equities Weighs in the Federal Government's Favor ...................... 28

V.   Any Injunctive Relief Should Be Narrowly Tailored ...................................... 29

VI.   Any Injunctive Relief Should Be Stayed Pending Appeal, Be Accompanied By A Bond, And No Declaration Should Be Required ........................................................ 30

CONCLUSION ............................................................................................... 31

1

## TABLE OF AUTHORITIES

2

3    **Cases**

4    *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
        570 U.S. 205 (2013) ..................................................................................................... 28
5
     *Am. Cargo Transp., Inc. v. United States*,
6        625 F.3d 1176 (9th Cir. 2010) ..................................................................................... 31

7    *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
        750 F.2d 1470 (9th Cir. 1985) ..................................................................................... 27
8
     *Americopters, LLC v. FAA*,
9        441 F.3d 726 (9th Cir. 2006) ......................................................................................... 9

10   *Amica Ctr. for Immigrant Rights v. U.S. Dep't of Justice, No. 25-cv-298*,
11       2025 WL 1852762 (D.D.C. July 6, 2025) ................................................................... 22

12   *Bd. of Regents of State Colls. v. Roth*,
        408 U.S. 564 (1972) ..................................................................................................... 15
13
     *Bennett v. Spear*,
14       520 U.S. 154 (1997) ..................................................................................................... 21

15   *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
        295 F.3d 28 (D.C. Cir. 2002) ................................................................................. 16, 17
16
     *Boaz Hous. Auth. v. United States*,
17       994 F.3d 1359 (Fed. Cir. 2021) ................................................................................... 10

18   *Caribbean Marine Servs. Co. v. Baldridge*,
        844 F.2d 668 (9th Cir. 1988) ....................................................................................... 27
19
     *City of Los Angeles v. Barr*,
20       929 F.3d 1163 (9th Cir. 2019) ..................................................................................... 18

21   *Climate United Fund v. Citibank, N.A.*,
        --- F.4th ----, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) .............................. 10, 11, 12
22
     *Cobell v. Kempthorne*,
23       455 F.3d 301 (D.C. Cir. 2006) ..................................................................................... 21

24   *Cruz v. Bondi*,
        146 F.4th 730 (9th Cir. 2025) ...................................................................................... 16
25
     *Dalton v. Specter*,
26       511 U.S. 462 (1994) ..................................................................................................... 17

27   *Dep't of Educ. v. California*
        145 S. Ct. 966 ........................................................................................... 10, 11, 28, 31
28

*Dep't of Homeland Sec. v. New York*
     140 S. Ct. 599 (2020) ................................................................................................ 29

*Eloyan v. United States,*
     No. 2:19-cv-9565, 2020 WL 7382316 (C.D. Cal. Oct. 21, 2020) ................................... 15

*Env't Def. Ctr v. U.S. EPA.*,
     344 F.3d 832 (9th Cir. 2003) ................................................................................ 19, 20

*Faculty Senate of Fla. Int'l Univ. v. Winn,*
     477 F. Supp. 2d 1198 (S.D. Fla. 2007) ................................................................ 27, 28

*FCC v. Fox Television Stations, Inc.*,
     556 U.S. 502 (2009) ................................................................................................ 26

*FCC v. Fox Television Stations, Inc.*,
     567 U.S. 239 (2012) ................................................................................................ 14

*FCC v. Prometheus Radio Project,*
     592 U.S. 414 (2021) ................................................................................................ 26

*Fed'n of Indep. Bus. v. Sebelius,*
     567 U.S. 519 (2012) ................................................................................................ 20

*FERC v. Mississippi,*
     456 U.S. 742 (1982) ................................................................................................ 19

*Florida v. Dep't of Health & Hum. Servs.,*
     19 F.4th 1271 (11th Cir. 2021) ................................................................................ 29

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
     561 U.S. 477 (2010) ................................................................................................ 23

*Garcia v. Google, Inc.*,
     786 F.3d 733 (9th Cir. 2015) ..................................................................................... 8

*Goldberg v. Kelly,*
     397 U.S. 254 (1970) ................................................................................................ 15

*Grayned v. City of Rockford,*
     408 U.S. 104 (1972) ................................................................................................ 14

*Guardian Ass'n v. Civ. Serv. Comm'n,*
     463 U.S. 582 (1983) ............................................................................................ 16, 19

*Heckler v. Chaney,*
     470 U.S. 821 (1985) ................................................................................................ 22

*Heckler v. Turner,*
     468 U.S. 1305 (1984) .............................................................................................. 28

*Hill v. Colorado,*
     530 U.S. 703 (2000) ................................................................................................ 14

*Holley v. United States,*
    124 F.3d 1462 (Fed. Cir. 1997) ............................................................ 13

*Independence Mining Co. v. Babbitt,*
    105 F.3d 502 (9th Cir. 1997) .............................................................. 26

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) ............................................................. 10

*Jones v. United States,*
    625 F.3d 827 (5th Cir. 2010) ............................................................... 9

*Kidwell v. Dep't of Army,*
    56 F.3d 279 (D.C. Cir. 1995) ............................................................. 13

*Latif v. Holder,*
    686 F.3d 1122 (9th Cir. 2012) ............................................................. 9

*Lewis v. Casey,*
    518 U.S. 343 (1996) .......................................................................... 29

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) .......................................................................... 22

*Louisiana v. Biden,*
    64 F.4th 674 (5th Cir. 2023) .............................................................. 21

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) .......................................................................... 21

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009) ............................................................... 8

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................ 29

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) .......................................................................... 15

*Milk Train, Inc. v. Veneman,*
    310 F.3d 747 (D.C. Cir. 2002) ........................................................... 22

*Medina v. Planned Parenthood S. Atl.,*
    145 S. Ct. 2219 (2025) ...................................................................... 10

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) (en banc) .............................................. 11

*Munaf v. Geren,*
    553 U.S. 674 (2008) ............................................................................ 8

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) .................................................................... 14, 17

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
   2025 WL 2415669 (U.S. Aug. 21, 2025) ........................................... 11, 13, 28, 29

*Nat'l Urban League v. Trump*,
   783 F. Supp. 3d 61 (D.D.C. 2025) ............................................................ 16

*New York v. United States*,
   505 U.S. 144 (1992) ............................................................................. 19

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................... 8, 28

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................................... 20, 29

*Pennhurst, Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022) .................................................................. 18

*Pennhurst State School and Hospital v. Halderman*,
   451 U.S. 1 (1981) .................................................................................. 18

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ............................................................................. 15

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ............................................................... 13

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ......................................................... 22

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) .................................................................. 27

*Sampson v. Murray*,
   415 U.S. 61 (1974) ............................................................................... 27

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ............................................................................. 14

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) ............................................................. 13

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ............................................................... 26

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) ............................................................. 13

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ............................................................... 26

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ................................................................ 8

*Stanley v. Univ. of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ............................................................................ 27

*State ex rel. Becerra v. Sessions*,
   284 F. Supp. 3d 1015 (N.D. Cal. 2018) ........................................................ 18

*State v. Dep't of Justice*,
   951 F.3d 84 (2d Cir. 2020) .......................................................................... 19

*Steel Co v. Citizens for a Better Env't.*,
   523 U.S. 83 (1998) ........................................................................................ 8

*Town of Castle Rock v. Gonzalez*,
   545 U.S. 748 (2005) .................................................................................... 15

*Trump v. Am. Fed'n of Gov't Emps.*,
   2025 WL 1873449 (U.S. July 8, 2025) ...................................................... 25

*Tulsa Airports Improvements Tr. v. United States*,
   120 Fed. Cl. 254 (2015) ................................................................................ 9

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) .................................................................................... 19

*United States v. Salerno*,
   481 U.S. 739 (1987) .................................................................................... 13

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) .................................................................................... 29

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................... 8, 27

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
   ---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................... 13

**Statutes**

5 U.S.C. § 551 ..................................................................................................... 20

5 U.S.C. § 553 ..................................................................................................... 26

5 U.S.C. § 701 ..................................................................................................... 22

5 U.S.C. § 702 .............................................................................................. 10, 22

5 U.S.C. § 704 ..................................................................................................... 20

5 U.S.C. § 706 .............................................................................................. 22, 29

20 U.S.C. § 1682 ................................................................................................. 24

28 U.S.C. § 1491 ................................................................................................. 10

42 U.S.C. § 254b ................................................................................................. 24

42 U.S.C. § 300x-6 ............................................................................................. 24

42 U.S.C. § 5304 ............................................................................................................. 24

42 U.S.C. § 9604 ............................................................................................................. 25

42 U.S.C. § 11386 ........................................................................................................... 24

42 U.S.C. § 300ff-15 ....................................................................................................... 24

49 U.S.C. § 5334 ............................................................................................................. 24

49 U.S.C. § 46110 ............................................................................................................. 9

49 U.S.C. § 47107 ........................................................................................................... 24

49 U.S.C. § 47108 ........................................................................................................... 24

**Rules**

Fed. R. Civ. P. 65 ........................................................................................................... 30

**Regulations**

2 C.F.R. Part 200 ..................................................................................................... *passim*

2 C.F.R. §200.340 ........................................................................................................... 15

2 C.F.R. § 200.211 .......................................................................................................... 23

2 C.F.R. § 200.300 .......................................................................................................... 23

2 C.F.R. § 200.303 .......................................................................................................... 18

42 C.F.R. § 52.9 .............................................................................................................. 24

90 Fed. Reg. 8339 (Jan. 20, 2025) .................................................................................... 2

90 Fed. Reg. 8615 (Jan. 20, 2025) .................................................................................... 2

90 Fed. Reg. 8633 (Jan. 21, 2025) .................................................................................... 2

90 Fed. Reg. 8751 (Jan. 31, 2025) .................................................................................... 2

90 Fed. Reg. 10581 (Feb. 19, 2025) .................................................................................. 2

90 Fed. Reg. 18761 (Apr. 28, 2025) .................................................................................. 2

1

## INTRODUCTION

2        Plaintiffs, a group of municipal governments from across the country, bring this case in an

3   attempt to dictate the terms on which four federal agencies award grants.  Having already procured

4   an order that temporarily does just that, they now seek to expand both the roster of Plaintiffs (four

5   new ones have now joined only after this Court granted emergency relief) and the duration of their

6   entitlement to continue receiving federal funds free from the terms and conditions of the agencies

7   that have statutory authority to administer the grant programs.  Their requested order would do

8   much more than preserve the status quo during the pendency of the litigation:  it would require the

9   Defendant agencies to issue and accept federal grant awards, and disburse potentially

10  unrecoverable federal funds to recipients, without terms that the agencies have determined

11  properly implement and effectuate the grant programs.  Such sweeping relief, applicable to (if

12  Plaintiffs have their way) every grant program that each agency administers, is inappropriate, on

13  a preliminary basis or otherwise, and the Court should deny the motion.

14        To begin, the Court lacks jurisdiction over many aspects of this fundamentally contractual

15  dispute.  To the extent that Plaintiffs are seeking to enforce an obligation of the United States to

16  pay money pursuant to federal grants, the Tucker Act places those claims within the exclusive

17  jurisdiction of the Court of Federal Claims.  Even if the Court had jurisdiction, Plaintiffs are

18  unlikely to succeed on the merits of their claims.  As to their constitutional claims, Plaintiffs are

19  plainly on notice of the challenged conditions, which are fully consistent with the agencies'

20  authority to impose conditions on funds and raise no issues under the Separation of Powers,

21  Spending Clause, Tenth Amendment, or vagueness doctrine.  Plaintiffs' Administrative Procedure

22  Act (APA) claims also fail because they assert an impermissible programmatic attack that does

23  not identify discrete final agency action; because they challenge actions that are generally

24  committed to agency discretion by law; and because the challenged conditions fit comfortably

25  within the agencies' statutory authority.  Even setting all that aside, Plaintiffs assert economic, and

26  thus reparable, injuries that are insufficient to justify the awarding of emergency temporary relief,

27  and the balance of the equities favors the United States.  The Court should deny Plaintiffs' motion

28

for a preliminary injunction.

## ISSUES TO BE DECIDED

1. Have Plaintiffs carried their burden of establishing their entitlement to the extraordinary remedy of a preliminary injunction, *i.e.*, that they are likely to succeed on the merits of their claims; that they are likely to suffer irreparable harm in the absence of emergency injunctive relief; that the balance of equities tips in their favor; and that the proposed injunction is in the public interest?

2. Is this case, which seeks payment pursuant to contracts between Plaintiffs and the United States, outside the jurisdiction of this Court and within the exclusive jurisdiction of the Court of Federal Claims?

## BACKGROUND

### I.    Factual Background

On January 20, 2025, President Trump assumed the office of President of the United States. On that day, and in the weeks after, he issued a variety of Executive Orders setting the policy priorities for his administration.  Many of these focus on the expenditure of federal funds and generally instruct federal agencies to terminate, review, or revise federal grants based on long-standing Congressional mandates and administration priorities.  Plaintiffs object to an ever-expanding list of these orders, which in their most recent filing has ballooned to seven:  Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (*Ending Radical and Wasteful Government DEI Programs and Preferencin*g); Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*); Executive Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*); Executive Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) (*Enforcing the Hyde Amendment*); Executive Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) (*Ending Taxpayer Subsidization of Open Borders*); Executive Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) (*Protecting American Communities From Criminal Aliens*); and Executive Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (*Improving*

*Oversight of Federal Grantmaking*).  Each order makes clear that it must be "implemented consistent with applicable law." *See* EO 14151 § 4(b); EO 14168 § 8(b); 14173 § 8(b); EO 14182 § 4(b); EO 14218 § 3(b); EO 14287 § 6(b); EO 14332 § 7(b).

In response, agencies with grantmaking authority reviewed existing grants/grant programs and conditions and considered next steps.  The federal government, through various agencies (including the Defendants in this lawsuit), provides funding to state and local governments and other eligible stakeholders using federal financial assistance (through grants and cooperative agreements) that are subject to specified terms and conditions which govern the recipients' use of and continued receipt of the federal funds.  As a default matter, Office of Management and Budget (OMB) regulations generally provide guidance for federal agencies relating to federal financial assistance.  *See generally* 2 C.F.R. Part 200.  Agencies also promulgate their own standard terms and conditions to govern the specific grants that they issue.

As discussed throughout this brief, Plaintiffs do not focus their complaint on discrete agency grants or funding announcements, instead attempting to enjoin on a blanket basis a broad swath of "new conditions" on federal grants awarded by four agencies:  the Department of Housing and Urban Development (HUD); the Department of Transportation (DOT); the Department of Health and Human Services (HHS); and the Environmental Protection Agency (EPA).  Indeed, they have now filed an amended complaint (after the Court issued a temporary restraining order (TRO)) that identifies additional plaintiffs but does nothing to focus this case on discrete agency action or limit the potential number of conditions and grants at issue.  To the extent Plaintiffs— the City of Fresno, CA (Fresno), the County of Sacramento, CA (Sacramento County), the City of South Lake Tahoe, CA (South Lake Tahoe), the City of Eureka, CA (Eureka), the City of Saint Paul, MN (Saint Paul), the County of Monroe, NY (Monroe County, the Monroe County Airport Authority, the County of Marin, CA (Marin County), the County of San Diego, CA (San Diego County), the City of Redwood City, CA (Redwood City), and the City of Alameda, CA (Alameda)—have identified particular conditions attached to actual grants and/or programs in their pleadings, Defendants attempt to provide relevant background below.

### A.     HUD

Plaintiffs allege that ten of the municipal plaintiffs (all but South Lake Tahoe) "receive, directly or indirectly, grants funds administered by HUD."  PI Mot. at 11-12.  Through its Office of Community Planning and Development (CPD), HUD administers the Continuum of Care (CoC), the Community Development Block Grant (CDBG), and the Emergency Solutions Grant (ESG), as well as the Housing Opportunities for Persons With AIDS (HOPWA) and HOME Investment Partnerships ("HOME") programs.  *See* Decl. of Claudette Fernandez ¶ 1 (Fernandez Decl.).  CPD administers each of these grant programs through agreements with eligible grantees, which generally require compliance with applicable statutes, regulations, and executive orders, including the executive orders to which Plaintiffs object.  *Id.* ¶¶ 14-15, 18.  To the extent any grant conditions conflict with applicable grant statutes, the grantee is not required to follow the conditions, *id.* ¶ 15, and to the extent any questions arise, grantees may contact their local CPD field office, *id.* ¶ 21.

### B.     DOT

In their motion, Plaintiffs identify one grant administered at the agency level—the Innovative Finance and Asset Concession (IFAC) Grant Program.  DOT awarded an IFAC grant to Saint Paul to fund "an asset scan to identify opportunities for transit-oriented development on publicly owned property within the city."  Decl. of Morteza Farajian ¶ 4.  DOT and Saint Paul are currently working to execute an agreement that is consistent with the terms of this Court's TRO. *Id.*

Plaintiffs also highlight grants administered by the Federal Highway Administration (FHWA), the Federal Transit Administration (FTA), and the Federal Aviation Administration (FAA).  Ten of the plaintiffs (all but Redwood City) allegedly receive "grant funds, directly or indirectly, administered by DOT and its operating administrations."  PI Mot. at 12.  FAA administers two primary airport development financial assistance programs: the Airport Improvement Program (AIP) and programs authorized under the Infrastructure Investment and Jobs Act (IIJA), including the Airport Infrastructure Grant (AIG) program.  *See* Decl. of David F.

Cushing ¶¶ 3-12.  FAA is currently in the process of finalizing grant agreements with several Plaintiffs, including Fresno, South Lake Tahoe, Sacramento County, Monroe County, San Diego County, and Marin County.  *Id*. ¶¶ 13-25.

FHWA and FTA also administer various DOT grant programs.  *See* Decl. of Arlan Finfrock (Finfrock Decl.); Decl. of Raymond Tellis (Tellis Decl.).  FTA grant awards incorporate by reference the applicable version of FTA's "Master Agreement" as well as its "Certifications and Assurances" document.  Tellis Decl. ¶ 4.  For several years, this Master Agreement has required grant recipients to comply with applicable federal requirements (including any applicable federal law, regulation, or executive order) and certify their compliance with federal antidiscrimination laws.  *Id*. ¶¶ 7-11.  The Master Agreement has also longed required recipients to certify that "their grant applications, certifications, and assurances are subject to the Program Fraud Civil Remedies Act and potential criminal liability for false statement."  *Id*. ¶ 7.  Fresno and Marin County are the only Plaintiffs with a grant application pending with FTA.  *Id*. ¶¶ 13-14.  FTA, in conjunction with the Department of Labor, is in the process of reviewing both applications and has not yet finalized that review or sent grant applications to either Plaintiff to sign.  *Id*.

Many Plaintiffs also receive FHWA grants, but such grants cannot form the basis for preliminary relief because none of their relevant awards are expiring this fiscal year or are at risk of losing funding.  Finfrock Decl. ¶ 32.

C.     HHS

Two Plaintiffs—Marin County and Sacramento County—are identified as "HHS Plaintiffs" that receive HHS grant funds.  *See* Am. Compl. ¶ 205.[1]  In their motion, Plaintiffs generally avoid discussion of any HHS-specific grants that these two Plaintiffs hold, but direct their challenge at "grants from the Health Resources and Services Administration ('HRSA'),

---

[1] Plaintiffs reference a third "HHS Plaintiff," San Diego County, in their preliminary injunction motion, but do not include in any of their filings any allegation that San Diego County actually receives HHS funds.  The "HHS Plaintiffs" at issue here are thus appropriately defined by Plaintiffs' amended complaint.

Substance Abuse and Mental Health Services Administration ('SAMHSA'), and Centers for Disease Control and Prevention ('CDC')."  PI Mot. at 9.  HRSA and CDC make thousands of grants to diverse recipients to support public health projects, save lives, and improve public health. *See* Decl. of Cynthia Baugh ¶ 4 (Baugh Decl.); Decl. of Jamie Legier ¶ 4 (Legier Decl.).  SAMHSA grants support programs and initiatives that improve substance use and mental health services.  *See* Decl. of Odessa Crocker ¶ 4 (Crocker Decl.).  HHS regulations generally require HRSA, CDC, SAMHSA and other awarding components to manage and administer their awards to ensure that programs are implemented in "full accordance with U.S. statutory and public policy requirements," including by incorporating into their terms and conditions applicable statutes, regulations, and executive orders.  Baugh Decl. ¶ 7; Legier Decl. ¶ 7; Crocker Decl. ¶ 7.  Each component has explained that in the case of conflicting or inconsistent requirements, the relevant "order of precedence" for recipients to follow is: "the U.S Constitution, statutes, regulations, then program guidance and award specific requirements."  Baugh Decl. ¶ 8; Legier Decl. ¶ 8; Crocker Decl. ¶ 8. Executive orders are listed at the same level of precedence as program guidance.  *Id*.

### D.    EPA

Plaintiffs' allegations against EPA are very limited: only three Plaintiffs (Fresno, Redwood City, and Alameda) are identified as "EPA Plaintiffs," and Plaintiffs describe only one current grant (Fresno's Brownfields Revolving Loan Fund (RLF) grant).  *See* PI Mot. at 13.  That grant contains a condition (the only "EPA Condition" explicitly challenged by Plaintiffs, *see id*. at 11) that requires Fresno to certify that it "does not operate any programs violating any applicable Federal antidiscrimination law or promoting any such violation."  Decl. of Dan Coogan ¶ 3 (Coogan Decl.).[2]  EPA also has two additional pending grant awards to Fresno, pursuant to its Brownfields Assessment Grant program and its Drinking Water System Infrastructure Resilience and Sustainability Program.

---

[2] As described in the Coogan Declaration, this term is not currently being imposed upon Fresno—which need not certify compliance, or otherwise agree to, the challenged condition—in compliance with the Court's TRO.  Coogan Decl. ¶ 3(c).

Neither Redwood City nor Alameda—nor any other Plaintiff in this case—has either an active or pending grant award with the EPA that is subject to the terms and conditions challenged in this lawsuit. *See id.* ¶¶ 4-5.

## II. Procedural Background

The Plaintiff municipalities filed their complaint on August 20, seeking broad relief against an open-ended set of grant conditions assertedly imposed by HUD, HHS, EPA, and DOT. *See, e.g.*, Compl. ¶¶ 183, 201, 250, 261 (defining challenged agency "grant conditions" as those that "implemented President Trump's Executive Orders by attaching new and unlawful conditions"). The next day, they moved for a temporary restraining order preventing the defendant agencies broadly from "enforcing unlawful and unauthorized conditions imposed on critical federal grant programs." ECF No. 6-1 at 1. The Court granted the motion on August 27, 2025, and issued a TRO, covering all grants between all Plaintiffs and all Defendants, that prohibits Defendants from "imposing or enforcing the E.O. Grant Conditions . . . or any materially similar terms or conditions with respect to any grants awarded to Plaintiffs." *See* Order Granting Motion for TRO at 13, ECF No. 28 (TRO Order). The TRO remains in effect until September 23, 2025, pending further order of the Court. *See id.*

On September 8, 2025, Plaintiffs filed an amended complaint that added four new municipal plaintiffs: San Diego County, Marin County, Alameda, and Redwood City. ECF No. 35 (Am. Compl.). That same day, they filed a motion seeking a preliminary injunction that would prohibit all Defendants, as to all of the now 11 named Plaintiffs, from "imposing or enforcing the grant conditions embracing the series of Executive Orders and agency policies issued between January and August 2025." Proposed Order Granting Mot. for Prelim. Inj. at 2, ECF No. 36-25 (Pls.' Proposed PI).

### LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

1    U.S. 7, 22 (2008).  To obtain a preliminary injunction, the moving party must demonstrate (1) that

2    it is likely to succeed on the merits of its claims; (2) that it is likely to suffer irreparable harm in

3    the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the

4    proposed injunction is in the public interest.  *Id.* at 20.  Finally, when "the Government is the

5    opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.

6    *Nken v. Holder*, 556 U.S. 418, 435 (2009).

7         Preliminary relief is meant to preserve the status quo pending final judgment.  *Sierra On-*

8    *Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).  When preliminary relief

9    would change the status quo and "orders a responsible party to take action," it is "particularly

10   disfavored."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th

11   Cir. 2009) (citations omitted).  In such cases, the moving party "must establish that the law and

12   facts *clearly favor* [his] position, not simply that [he] is likely to succeed."  *Garcia v. Google, Inc.*,

13   786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original).

14                                      **ARGUMENT**

15   **I.    Plaintiffs Fail To Establish This Court's Jurisdiction.**

16        The burden of proving subject matter jurisdiction rests with the plaintiff, and the

17   requirement that a plaintiff establish subject matter jurisdiction "as a threshold matter spring[s]

18   from the nature and limits of the judicial power of the United States and is inflexible and without

19   exception."  *Steel Co v. Citizens for a Better Env't.*, 523 U.S. 83, 93-102 (1998) (citation omitted).

20        **A.    Plaintiffs' Challenges to DOT Grant Conditions Are Within the Exclusive**
            **Jurisdiction of the Circuit Courts.**
21

22        Plaintiffs seek to challenge the incorporation by DOT and its operating administrations,

23   including the FAA, of certain conditions into its grant agreements with Plaintiffs. *See* PI Mot. at

24   5-8.  But Congress has vested exclusive jurisdiction over FAA orders in federal circuit courts.  *See*

25   49 U.S. § 46110(c); *see also Tulsa Airports Improvements Tr. v. United States*, 120 Fed. Cl. 254

26   (2015) (finding that Section 46110 displaced Tucker Act jurisdiction with respect to claims

27   challenging FAA's denial of reimbursement for certain costs under a grant agreement).  District

28

1    courts also lack jurisdiction over claims that are "inescapably intertwined with a review of the

2    procedures and merits surrounding the [agency's] order." *Latif v. Holder*, 686 F.3d 1122, 1128

3    (9th Cir. 2012) (citation omitted).    To the extent Plaintiffs challenge FAA grant agreements

4    covered by this explicit jurisdictional carve out, there is no subject matter jurisdiction in this Court.

5    *See, e.g.*, *Americopters, LLC v. FAA,* 441 F.3d 726, 732 (9th Cir. 2006) ("We have direct and

6    exclusive jurisdiction over the review of FAA final orders under 49 U.S.C. § 46110."); *Jones v.*

7    *United States,* 625 F.3d 827, 829 (5th Cir. 2010) ("Section 46110(a) of the Federal Aviation Act

8    vests the exclusive jurisdiction over challenges to FAA orders in certain United States Courts of

9    Appeals[.]").

10        **B.    To the Extent Plaintiffs Seek the Payment of Federal Grants, They Have
              Failed to Establish this Court's Jurisdiction.**

11

12        Plaintiffs bring this suit to preserve "hundreds of millions of dollars in essential funding

13    that Plaintiffs depend on to provide core public services and maintain vital transportation and

14    infrastructure systems." Pls.' Mot. for Prelim. Inj. at 1, ECF No. 36 (PI Mot.).  The source of those

15    funds is undisputed—grant agreements with the federal government.  Plaintiffs also request

16    injunctive relief that would require Defendants to "implement grants signed with changes or other

17    objections to conditions" challenged in this lawsuit, and prevent Defendants from "pausing,

18    freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or conditioning

19    funds based on such terms or conditions." Pls.' Proposed PI ¶ 2.  In other words, Plaintiffs seek

20    to require the United States to make grant payments to Plaintiffs on Plaintiffs' preferred terms.

21    Such relief is beyond the jurisdiction of this Court to provide; rather, to the extent Plaintiffs assert

22    claims arising from their contracts with the federal government and seek payment of those

23    contracts, those claims can only be heard in the Court of Federal Claims.[3]

24        ────────────────

25        [3] Defendants are not arguing that challenges to purely future contracts that do not seek the
      actual payment of grant awards on Plaintiffs' preferred terms (including, for example, challenges

26    to Notices of Funding Opportunities) would be exclusively committed to the Court of Federal
      Claims.  But Plaintiffs bear the burden of proving this Court's jurisdiction and any ambiguity as

27    to the scope of their facial challenge cuts against jurisdiction.  Moreover, to the extent any claims

28

1       The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any

2   claim against the United States founded either upon the Constitution, or any Act of Congress or

3   any regulation of an executive department, or upon any express or implied contract with the United

4   States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C.

5   § 1491(a)(1).  Thus, where a party seeks funding that it believes the federal government is

6   obligated to pay under a contract, its suit can proceed only in the Court of Federal Claims.

7   Critically, the Tucker Act precludes relief under the APA or otherwise because the APA's waiver

8   of sovereign immunity is limited to claims "seeking relief other than money damages," 5 U.S.C.

9   § 702, and the APA does not apply "'if any other statute that grants consent to suit expressly or

10  impliedly forbids the relief which is sought,'" *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966,

11  968 (2025) (quoting 5 U.S.C. § 702).  The Tucker Act does so for actions founded upon contracts

12  with the United States, and its prohibition on district court jurisdiction extends to claims founded

13  on grants, like those at issue here, that are implemented through "contracts to set the terms of and

14  receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368

15  (Fed. Cir. 2021); *see also Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2231 (2025)

16  (explaining that courts have historically described federal grants as contracts); *Climate United*

17  *Fund v. Citibank, N.A.*, --- F.4th ----, 2025 WL 2502881, at *9 (D.C. Cir. Sept. 2, 2025) ("grant

18  agreements are 'contracts' within the meaning of the Tucker Act because they include the

19  traditional contract elements of offer, acceptance, and consideration").  This jurisdictional barrier

20  ensures that contract claims against the United States are channeled into a court that has "unique

21  expertise." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

22      On multiple recent occasions, the Supreme Court has emphasized the preclusive scope of

23  the Tucker Act in litigation brought by the recipients of federal grants.  In April, the Supreme Court

24  stayed a district court order to make payments based on grants because the federal government

25  was "likely to succeed in showing the District Court lacked jurisdiction" to bar termination of

26  _____

27  based purely on future contracts are asserted, such claims would necessarily be based on contingent
    future economic injuries and be insufficient to justify the award of preliminary injunctive relief.

28

various education-related grants. *California*, 145 S. Ct. at 968. The Supreme Court held the injunction was effectively an order "to enforce a contractual obligation to pay money," and thus not covered by the APA's limited waiver sovereign immunity; instead, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.* (citation omitted). Then, just last month, the Supreme Court stayed another judgment vacating the federal government's termination of grants, reiterating its view that the APA's limited waiver of sovereign immunity does not provide district courts with jurisdiction "to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (*NIH*).

This Court should follow the Supreme Court's stay rulings[4] to the extent that Plaintiffs are seeking to enforce an obligation to pay money pursuant to the grants they currently hold or that form the basis for their asserted injuries in this case. *See* PI Mot. at 14 ("Plaintiffs receive federal funding through grants administered by Defendants."). In granting the TRO, the Court found that "this is not a contract dispute in which Plaintiffs seeks money damages." TRO Order at 4. But, Defendants respectfully submit, Plaintiffs' artful pleading cannot overcome the Tucker Act's clear jurisdictional bar: the "jurisdictional inquiry cannot turn on a plaintiff's preferred characterization of its claim, lest we 'upset the carefully modulated waiver of sovereign immunity and grant of

---

[4] On August 21, 2025, the Ninth Circuit issued a decision denying the federal government's application for a stay in *Thakur v. Trump*, --- F.4th ----, 2025 WL 2414835 (9th Cir. Aug. 21, 2025). Although that decision rejected the government's Tucker Act argument, its reasoning is overridden by the Supreme Court's *NIH* decision, issued hours later. "[W]here intervening Supreme Court authority is clearly irreconcilable" with an opinion of the Circuit "district courts should consider themselves bound by the intervening higher authority" and must "reject the prior opinion." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). Further, "circuit precedent, authoritative at the time it issued, can be effectively overruled by subsequent Supreme Court decisions that are closely on point, even though those decisions do not expressly overrule the prior circuit precedent." *Id.* at 899 (citation omitted). As Justice Gorsuch emphasized, "regardless of a decision's procedural posture, its 'reasoning—its *ratio decidendi*'—carries precedential weight in 'future cases.'" *NIH*, 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part); *see also id.* (confirming that the "reasoning" from *California*—that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States"—"binds lower courts a matter of vertical *stare decisis*").

1   remedies for breach of contract embodied in the Tucker Act.'"  *Climate United Fund*, 2025 WL

2   2502881, at *4 (citation omitted).  Although they purport to seek an injunction against grant

3   conditions, the relief Plaintiffs request—uninterrupted grant funding pursuant to their federal grant

4   agreements—is fundamentally contractual.  Indeed, Plaintiffs bring this case to preserve "critical

5   federal funding," PI Mot. at 1, based on a dispute with the government about what the terms of

6   their grant agreements should be, and explicitly request that the Court prevent Defendants from

7   "rescinding, withholding, cancelling, or otherwise not processing grant agreements," or from

8   "pausing, freezing, impeding, blocking, cancelling, terminating, delaying, withholding, or

9   conditioning" funds made pursuant to such agreements on the basis of the challenged conditions.

10  *See* Pls.' Proposed PI ¶ 2.  Critically, Plaintiffs request that the Court block Defendants from

11  "refusing to process and otherwise implement grants signed with changes or other objections to

12  conditions enjoined by" their proposed injunction, *id.*, and the effect of such an order is to require

13  Defendants to finalize grant agreements with Plaintiffs (on terms dictated by Plaintiffs) and pay

14  out funds pursuant to the contractual obligations set forth in those agreements.[5]

15      As in *California* and *NIH*, any entitlement that Plaintiffs may have to the funding they seek

16  to preserve arises solely on the basis of their federal grant awards; they have no statutory or

17  constitutional right to such funding.  Because their theories of standing, relief, and irreparable harm

18  hinge entirely on contractual routing of funding to them as provided for in their grant agreements,

19  the fact that they cloak their claims as seeking equitable relief under the Constitution and the APA

20  is irrelevant.  *See, e.g.*, *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (courts must

21  look to claims' "substance, not merely [their] form"); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591,

22  619 (D.C. Cir. 2017) (district court lacks jurisdiction over any case that "is in 'its essence

23  contractual'"); *Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a

24

25      [5] The Court included similar language in its TRO, *see* TRO Order at 13, and Defendants'

26  experience complying with the TRO has verified the contractual nature of the relief Plaintiff

27  seek—Plaintiffs are returning redlined versions of Defendants' grant agreements and seeking
    payment pursuant to those modified terms.

28

1   constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a

2   properly brought claim under the Tucker Act . . . .").

3        Plaintiffs try to avoid this result by invoking Justice Barrett's concurrence in *NIH*,

4   reflecting the "preliminary judgment" of the Justice that the "APA challenges to the guidance

5   belong in district court." *NIH*, 2025 WL 2415669, at *3 (Barrett, J., concurring). Plaintiffs,

6   however, do not challenge any "internal guidance documents describing [agency] priorities." *Id*.

7   And they request to continue receiving award payments on their favored terms, not "vacatur of

8   internal agency guidance." *Id*, at *2 (Barrett, J., concurring). To that extent, they present a contract

9   dispute that belongs in the Court of Federal Claims.

10       At bottom, Plaintiffs seek an injunction to maintain funding pursuant to contracts with the

11  United States and "want[] the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S.*

12  *Dep't of State*, ---F. Supp. 3d---, 2025 WL 763738, at *5-6 (D.D.C. Mar. 11, 2025). To the extent

13  they seek to enforce such contract obligations, their claims are "founded upon a contract," and they

14  "must be heard in Claims Court." *Id.* at *7 (quoting *Sharp v. Weinberger*, 798 F.2d 1521, 1524

15  (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to

16  issue an injunction compelling the United States to fulfill its contractual obligations.")).

17  **II.    Plaintiffs' Claims Are Not Likely To Succeed.**

18       At the outset, Defendants emphasize that because Plaintiffs bring sweeping, facial claims

19  to general grant conditions, they face the heavy burden of proving that the conditions would be

20  unconstitutional in all applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987)

21  (explaining that a facial challenge must establish that "no set of circumstances exists under which

22  the [enactment] would be valid"). Plaintiffs certainly fail to carry that heightened burden, and in

23  any event have failed to establish that any of their claims are likely to succeed on the merits.

24       **A.    Plaintiffs' Constitutional Claims Are Not Likely to Succeed.**

25            i.   Plaintiffs' Vagueness Claim Fails.

26       Plaintiffs invoke the "Fifth Amendment's vagueness doctrine," contending that every

27  single "Federal Grant Condition" they have put at issue in this case "leave[s] Plaintiffs to guess"

28

about the permissibility of various activities.  PI Mot. at 21.  The vagueness doctrine—and the Due Process Clause generally—does not apply in this context for multiple threshold reasons, and even if the Court reaches the merits, there is no violation.

The Due Process Clause's vagueness doctrine—which traditionally "guarantees that ordinary people have 'fair notice' of the conduct *a statute* proscribes," *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality op.) (emphasis added)—has no application here in a case about take-them-or-leave-them federal funding conditions.  When courts have applied the doctrine outside of the statutory context, they have done so with respect to direct regulation of primary conduct.  *See, e.g.*, *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)).  That is because the Due Process Clause prohibits uneven enforcement of coercive sanctions, not the discretion to affirmatively fund the work of grant recipients.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998) ("when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe").  No vagueness concerns arise in this context.

Similarly, the facial nature of Plaintiffs' claims make them particularly ill-suited for the vagueness doctrine.  As the Supreme Court has emphasized, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a [regulation] when it is surely valid in the vast majority of its intended applications." *Hill v. Colorado*, 530 U.S. 703, 733 (2000).  Because "[o]bjections to vagueness under the Due Process clause rest on the lack of notice," they may "be overcome in any specific case where reasonable persons would know that their conduct is at risk," *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988), and the Court should decline to award sweeping preliminary relief in this posture.  Rather, any challenge must be made on a condition-by-condition basis in the context of a specific contract or proposed contract—not categorically at this upstream stage.

1    Plaintiffs also fail to establish a protectable property interest, as is required to bring a Due

2    Process Claim. "The procedural component of the Due Process Clause does not protect everything

3    that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly

4    must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He

5    must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545

6    U.S. 748, 756 (2005) (citation omitted).    Applying these principles, the Supreme Court has

7    identified a narrow set of government benefits, so-called "new property," that are protected under

8    the Due Process Clause.    *See Perry v. Sindermann*, 408 U.S. 593 (1972) (tenured teaching

9    position); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of*

10   *State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases).  The Due Process protections afforded

11   to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine'

12   government contracts."    *See generally Eloyan v. United States*, No. 2:19-cv-9565, 2020 WL

13   7382316, at *5-6 (C.D. Cal. Oct. 21, 2020).  Such an extension would be particularly inappropriate

14   in the grant context where agencies, by regulation, may generally terminate a grant at any time if

15   they determine the grant "no longer effectuates the program goals or agency priorities."  2 C.F.R.

16   §200.340(a)(4).

17    Even setting all that aside, Plaintiffs cannot establish a due process vagueness claim.  The

18   conditions to which Plaintiffs object, even as Plaintiffs define them, simply require compliance

19   with existing federal law.  *See, e.g.*, PI Mot. at 2 (alleged "HUD EO Condition" providing that

20   "[r]ecipients of Federal Awards must comply with applicable existing and future Executive

21   Orders"); *id*. at 5 (alleged "DOT Immigration Enforcement Condition" requiring recipients to

22   "cooperate with Federal officials in the enforcement of federal law"); *id*. at 23 (alleged "DEI and

23   Discrimination Conditions" restricting the use of federal funds to promote certain "policies,

24   programs, or activities *that violate any applicable Federal anti-discrimination laws*" (emphasis

25   added)).  Such conditions, incorporating sources of law with which Plaintiffs are already generally

26   required to comply, cannot be facially vague.  *See, e.g.*, *Nat'l Urban League v. Trump*, 783 F. Supp.

27   3d 61, 94-96 (D.D.C. 2025) (rejecting vagueness challenges to DEI—and gender ideology—

28

1   executive orders that "tells agencies to cancel equity related agreements in accordance with the
2   law, not whenever they see fit").  Indeed, Plaintiffs do not challenge as vague any of the underlying
3   laws, regulations, or executive orders with which the grant conditions require compliance, and the
4   conditions themselves "do[] not place upon a recipient any unanticipated burdens because any
5   recipient must anticipate having to comply with the law."  *Guardian Ass'n v. Civ. Serv. Comm'n*,
6   463 U.S. 582, 630 (1983) (Marshall, J., dissenting).

7       While Plaintiffs suggest that these conditions "enable[] the administration to wield grant
8   funding as a tool of coercion" and a "mechanism of retaliation against entities that express
9   viewpoints or pursue policies disfavored by the current administration," PI Mot. at 22, such
10  hyperbolic speculation cannot justify facial invalidation.  *See Bldg. & Constr. Trades Dep't, AFL-*
11  *CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) ("The mere possibility that some agency might
12  make a legally suspect decision to award a contract *or to deny funding for a project* does not justify
13  an injunction against enforcement of a policy that, so far as the present record reveals, is above
14  suspicion in the ordinary course of administration." (emphasis added)); *Nat'l Urban League*, 783
15  F. Supp. 3d at 95 (a vagueness challenge will not succeed just because "an agency might 'exercise[]
16  [its] discretion unlawfully' under this provision"; the question is "instead whether anything in the
17  provision prevent[s] the agency from doing so," and that standard is met for directives that require
18  accordance with the law).  Plaintiffs cannot ask the Court to assume in advance that Defendants
19  will adopt unlawful interpretations of existing laws, and in fact, the Court is required to assume
20  the opposite. *See, e.g.*, *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025) (discussing presumption
21  of regularity).

22      Ultimately, the Supreme Court has already made clear that Plaintiffs' concerns about, for
23  example, the permissibility of their use of federal funds for "inclusive curriculum or educational
24  programming," PI Mot.at 24, do not render the government's funding decisions void for vagueness.
25  Even when the government uses "opaque" language in its funding conditions that would raise
26  "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme,"
27  *Finley*, 524 U.S. at 588, so long as the government "is acting as patron rather than as sovereign,

28

the consequences of imprecision are not constitutionally severe," *id.* at 589.  The challenged statute in *Finley* "merely add[ed] some imprecise considerations to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infringe[d] on First or Fifth Amendment rights."  *Id.* at 590.  The same result obtains here.

### ii.    Plaintiffs' Separation of Powers Claim Fails.

Plaintiffs also contend that the various grant conditions they challenge "violate bedrock separation of powers principles."  PI Mot. at 26.  Constitutional dressing aside, their argument is just that "no statute gives Defendants the power to impose conditions on federal grants" at issue here.  *Id*. at 25.  As such, Plaintiffs simply assert statutory claims that are impermissible under *Dalton v. Specter*, 511 U.S. 462 (1994).  There, the Supreme Court rejected the notion that "every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution."  *Id.* at 472.  "[C]laims simply alleging that the President [or an executive officer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review[.]"  *Id.* at 473.  As explained below, *see infra* Sec. II.B.iii,  Defendants' imposition of routine requirements that recipients of federal funds comply with various provisions of federal law does not exceed the agencies' statutory authority.  The Court should dismiss out of hand Plaintiffs' attempt to constitutionalize their garden-variety statutory claim.  *See, e.g.*, *Allbaugh*, 295 F.3d at 33 (rejecting separation of powers challenge to executive order because President is merely exercising his "supervisory authority over the Executive Branch" when he "directs his subordinates" to take certain action "but only '[t]o the extent permitted by law'" (alteration in original) (citation omitted)).

### iii.    Plaintiffs' Spending Clause Claim Fails.

Plaintiffs next assert that the challenged grant conditions lack a sufficient "'nexus' with the purpose of the grant funds at issue."[6]  *See* PI Mot. at 26-27.  But the requirement that funding

---

[6] In the section of their brief devoted to vagueness, Plaintiffs briefly suggest that alleged uncertainty renders the so-called "EO Conditions" unconstitutionally vague and ambiguous "under both the Due Process Clause and the Spending Clause," citing *Pennhurst State School and Hospital*

conditions "bear *some relationship* to the purpose of the federal spending" is a "low-threshold." *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018). Indeed, the "standard is not demanding," and the Supreme "Court has never struck down a condition on federal grants based on the relatedness prong." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019).

This is not the case for the Court to break such new ground. As noted above, the challenged grant conditions generally require compliance with existing federal law, and that type of condition that has long been a staple in countless grants across agency programs that further all manner of purposes and objectives. *See, e.g.*, 2 C.F.R. § 200.303(b) (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards requiring all recipients of federal grants to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award"). And although Plaintiffs' overbroad framing of the case makes it difficult to focus on specific grant programs or conditions (and also dooms their facial challenges to agency conditions writ large), many of the conditions they put at issue reference compliance with longstanding federal laws—such as Title IX, Title VI, and other antidiscrimination provisions; the immigration laws; the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA); and the Hyde Amendment—that have never before been deemed unrelated to grantees' receipt and expenditure of federal funds.

To the contrary, conditions that require grant recipients to follow existing federal law relate to the overarching federal interest, present in the administration of any grant, in preventing the expenditure of federal funds on activities that violate the law. *Cf.*, *e.g.*, *State v. Dep't of Justice*,

---

*v. Halderman*, 451 U.S. 1, 17 (1981) for the proposition that "conditions attached to federal funds be stated 'unambiguously.'" PI Mot. at 22. Plaintiffs cannot dispute, however, that the conditions to which they object are stated clearly and unambiguously in their grant (indeed, that is their entire basis for bringing suit), so the "federalism-based clear-statement rule" of *Pennhurst, Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022), is satisfied. And for the reasons discussed above in response to Plaintiffs' vagueness arguments, *supra* Sec. II.A.i, the enumerated requirement that grantees comply with requirements set forth in executive orders are not impermissibly vague or ambiguous.

1    951 F.3d 84, 107 (2d Cir. 2020) ("[T]here is something disquieting in the idea of States and

2    localities seeking federal funds to enforce their own laws while themselves hampering the

3    enforcement of federal laws, or worse, violating those laws."); *Guardians Ass'n*, 463 U.S. at 629-

4    30 & n.22 (Marshall, J., dissenting) ("Every application for Federal financial assistance must, as a

5    condition to its approval . . . contain assurances that the program will comply with Title VI and . . .

6    the executive regulations under Title VI.").   If Plaintiffs are correct that more particularized

7    findings of germaneness are required before an agency can condition federal funding on

8    compliance with federal law, then the heretofore never enforced relatedness prong of the Spending

9    Clause would provide a sweeping veto for all such grant terms, an absurd result that the Court

10   should summarily reject.

11                        iv.    Plaintiffs' Tenth Amendment Claim Fails.

12          Plaintiffs' Tenth Amendment argument similarly fails.  The Tenth Amendment embodies

13   the principle that the "pre-existing sovereign States" (and their subdivisions) retain their

14   sovereignty under the Constitution and that the federal government may not encroach upon that

15   sovereignty.  *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995); *New York v. United

16   States*, 505 U.S. 144, 156 (1992).  Plaintiffs claim that Defendants' use of immigration enforcement

17   conditions (and only those conditions) violate the Tenth Amendment by "holding a gun to

18   recipients' heads to force them to use local resources to cooperate with federal officials in enforcing

19   immigration law."  PI Mot. at 19.  But because Plaintiffs may decline to apply for the specific

20   grants to which any offensive conditions are attached, there is no commandeering of their

21   sovereignty.  *See FERC v. Mississippi*, 456 U.S. 742, 766 (1982) ("[I]t cannot be constitutionally

22   determinative that the federal regulation is likely to move the States to act in a given way[.]");

23   *Env't Def. Ctr v. U.S. EPA.*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the alternative to

24   implementing a federal regulatory program does not offend the Constitution's guarantees of

25   federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is

26   insufficient to establish a Tenth Amendment violation." (citation omitted)).

27          Nor is this a situation where the agencies have unduly "coerc[ed]" Plaintiffs with their use

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
No. 3:25-cv-07070-RS                    19

of grant conditions. *See* PI Mot. at 28 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (*NFIB*)). *NFIB* stressed that this coercion arose from the unexpected imposition on the states to accept a dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding Medicaid coverage. *NFIB*, 567 U.S. at 579-81; *id.* at 624-25 (Ginsburg, J., concurring in judgment, dissenting in reasoning). That situation is not applicable here, especially where, as noted, Plaintiffs are generally aware of the new terms and conditions before accepting the awards.

**B.    Plaintiffs' APA Claims Are Not Likely To Succeed.**

Plaintiffs' claims under the APA fare no better, failing both at the threshold and on the merits. For multiple reasons, Plaintiffs' claims are not likely to succeed.

i.    Plaintiffs' Impermissible Programmatic Attack Does Not Challenge Discrete Final Agency Action.

To start, Plaintiffs' suit continues to suffer from the fundamental defect that it seeks to challenge all at once an unlimited set of funding conditions, involving eleven (and counting) Plaintiffs, four Defendants, and a whole host of federal grants and conditions. Because Plaintiffs fail to identify with sufficient particularity the agency action (much less final agency action) they seek to challenge, their APA claims cannot get off the ground.

"[F]inal agency action" is a requirement for APA review. 5 U.S.C. § 704. Agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." *Id.* § 551(13). It must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Meanwhile, the Supreme Court has laid out a two-part test for finality, including that (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

Plaintiffs here seek to enjoin the imposition of a vast swath of grant conditions, loosely defined as any that "embrac[e] the series of Executive Orders and agency policies issued between January and August 2025, directing executive agencies to impose new conditions on federal grants." Pls.' Proposed PI ¶ 1.  The APA forbids this kind of broad programmatic attack against agency grant conditions writ large:  a plaintiff may not "in a single swipe at the duly elected executive" seek judicial superintendence over the entire grantmaking structure of the Executive Branch.  *See Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023).  Indeed, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"— even in the face of allegations of "rampant" violations of law.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  "Because 'an on-going program or policy is not, in itself, a "final agency action" under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior."  *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).  "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program."  *Id*.

In other words, this is not a challenge to a specific Notice of Funding Opportunity or other agency action that may itself constitute final agency action; this is a challenge to, among other things, all notices and awards whatever their specific contexts, statutory criteria, or precise implementing language.  For these threshold reasons, the Court should reject Plaintiffs' grab bag of APA challenges as being beyond the bounds Congress has established for such review.

        ii.    <u>Plaintiffs Challenge a Realm of Decisionmaking That Is Committed to Agency Discretion by Law.</u>

An agency's determination of how best to condition appropriated funds to fulfill its legal mandates is discretionary agency action.  And as a general matter, federal funding decisions are quintessential agency actions "committed to agency discretion by law," for which the APA does not provide an avenue for review.  5 U.S.C. § 701(a)(2).  While the APA establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected by either final agency action or an agency's failure to act, 5 U.S.C. §§ 702, 706(1)-(2), the waiver of

1    sovereign immunity is limited.  It does not apply in circumstances where "agency action is

2    committed to agency discretion by law," *id.* § 701(a)(2).  Review under the APA therefore is

3    unavailable "if the statute is drawn so that a court would have no meaningful standard against

4    which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

5        The Supreme Court has long recognized that an agency's determination of how to allocate

6    and condition appropriated funds among competing priorities and recipients is classic discretionary

7    agency action.  *See Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993).  In *Lincoln*, the Court explained

8    that there is no waiver of sovereign immunity where agency action requires "a complicated

9    balancing of a number of factors which are peculiarly within [the agency's] expertise," including

10   whether "resources are best spent on one program or another; whether it is likely to succeed in

11   fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies;

12   and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citations

13   omitted).  An "agency is far better equipped than the courts to deal with the many variables

14   involved in the proper ordering of its priorities." *Id.*  The APA "gives the courts no leave to

15   intrude" via arbitrary-and-capricious review.  *Id.*

16       Moreover, courts have made clear that *Lincoln*'s logic extends to funding programs that

17   leave to the agency "the decision about how the moneys" for a particular program "could best be

18   distributed consistent with" the statute.  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir.

19   2002).  Such decisions—like decisions regarding how best to allocate lump-sum appropriations—

20   "clearly require[] a complicated balancing of a number of factors which are peculiarly within [the

21   agency's] expertise." *Id.* at 752 (quotation omitted); *see also Pol'y & Rsch., LLC v. U.S. Dep't of

22   Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018); *Amica Ctr. for Immigrant Rights*

23   *v. U.S. Dep't of Justice*, No. 25-cv-298, 2025 WL 1852762, at *14 (D.D.C. July 6, 2025).

24       As noted above, the overbroad nature of Plaintiffs' suit makes it difficult to determine with

25   precision which agency grants and statutory programs they seek to challenge.  But while Plaintiffs

26   assert that aspects of the challenged conditions are "contrary" to Plaintiffs' interpretation of certain

27   federal statutes, PI Mot. at 31, they do not (and cannot) argue that any statute affirmatively

28

1    prohibits those conditions.  To the extent of the agencies' discretionary statutory authority to

2    impose conditions on federal grant awards, *see infra* Sec. II.B.iii, the challenged terms and

3    conditions are within the agencies' discretion under *Lincoln*.

4              iii.    Plaintiffs' APA Claims Fail on Their Merits.

5         Even if APA review is available, Plaintiffs' arguments fail.

6         1.    Plaintiffs' primary argument is that the grant conditions are in excess of statutory

7    jurisdiction.  *See* PI Mot. at 31-36.  Not so.  The Executive has a constitutional duty to enforce

8    Congressional mandates and does so through its officers and agents.  *See Free Enter. Fund v. Pub.*

9    *Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010).  As Executive Branch agencies, HUD, DOT,

10   HHS, and EPA have the authority to impose terms on the grants they implement, including those

11   that restrict the use of federal funds based on pre-existing legal obligations.  Indeed, as a general

12   matter, government-wide grant regulations issued by OMB require that federal agencies

13   incorporate "statutory, executive order, other Presidential directive, or regulatory requirements"

14   into the terms and conditions of federal awards.  2 C.F.R. § 200.211(c)(1)(ii); *see also id*.

15   § 200.300(a) ("The Federal agency or pass-through entity must manage and administer the Federal

16   award in a manner so as to ensure that Federal funding is expended and associated programs are

17   implemented in full accordance with the U.S. Constitution, applicable Federal statutes and

18   regulations—including provisions protecting free speech, religious liberty, public welfare, and the

19   environment, and those prohibiting discrimination—and the requirements of this part.").

20        Moreover, Congress has not only authorized the agencies administering grant programs to

21   impose conditions on their receipt, but afforded discretion to the agencies named as Defendants

22   here to establish the terms of conditions of their federal awards.  For example, Congress has

23   expressly authorized HUD to set the terms and conditions of the grants it administers, including

24   requiring that grantees comply with federal laws.  *See, e.g.*, 42 U.S.C. § 5304(b)(6) ("Any [CDBG]

25   grant . . . shall be made only if the grantee certifies to the satisfaction of the Secretary that . . . the

26   grantee will comply with the other provisions of this chapter and with other applicable laws."); 42

27   U.S.C. § 11386(b)(8) (HUD Secretary may not provide assistance for CoC program grant unless

28

1    an applicant agrees "to comply with such other terms and conditions as the Secretary may establish

2    to carry out this part in an effective and efficient manner").  DOT may similarly "prescribe terms

3    for a project that receives Federal financial assistance," 49 U.S.C. § 5334(a)(1), including

4    covenants or terms that it "considers necessary."  *Id*. § 5334(a)(9); *see also, e.g.*, 49 U.S.C.

5    § 47108(a) (in approving FAA project grant, DOT Secretary "may impose terms on the offer that

6    the Secretary considers necessary to carry out this subchapter and regulations prescribed under this

7    subchapter"); *id*. § 47107(g) (authorizing DOT Secretary to "prescribe requirement for [grant

8    recipients] that the Secretary considers necessary").

9         Plaintiffs' scant allegations regarding HHS are similarly inconsistent with the authority the

10   agency has been afforded to establish the terms and conditions of its awards.  By statute, for

11   example, applications for HHS grants "shall contain such information as the Secretary shall

12   prescribe."  *See, e.g.*, 42 U.S.C. § 254b(k)(1) (HRSA Health Center Program grants); 42 U.S.C.

13   §§ 300ff-15(a) & (b) (HRSA Ryan White grants); 42 U.S.C. § 300x-6(a)(7) (Community Mental

14   Health Services Block Grants) ("[T]he application [must be] otherwise in such form, is made in

15   such manner, and contains such agreements, assurances, and information as the Secretary

16   determines to be necessary to carry out this subpart.").  And the Secretary is expressly authorized

17   to require grantees to certify compliance with Title IX, *see* 20 U.S.C. § 1682, and impose other

18   conditions.  *See* 42 C.F.R. § 52.9 ("The Secretary may with respect to any [Public Health Service

19   research] grant award or class of awards impose additional conditions prior to or at the time of any

20   award when in the Secretary's judgment such conditions are necessary to assure or protect

21   advancement of the approved project, the interests of the public health, or the conservation of grant

22   funds.").  Plaintiffs' allegations against EPA are similarly sparse, but the agency plainly has

23   authority to impose the challenged conditions on Fresno's Brownfields grant.  *See* PI Mot. at 36.

24   In particular, Congress authorizes any such grant agreement to include "such other terms and

25   conditions as the [EPA] Administrator determines to be necessary to carry out this subsection," 42

26   U.S.C. § 9604(k)(10)(B)(iv), and explicitly requires that any grant be made subject to the

27

28

1   recipient's agreement to "comply with all applicable Federal and State laws," *id.*
2   § 9604(k)(10)(B)(i).

3       In nonetheless arguing that the various challenged conditions exceed Defendants' statutory
4   authority, Plaintiffs rely on characterizations of those conditions that are inconsistent with their
5   plain terms.   For example, Plaintiffs suggest that no statutory authority authorizes "HUD to
6   condition CPD grant funding on prohibiting all forms of DEI," PI Mot. at 31, but according to their
7   own description of the "HUD DEI Condition" they seek to enjoin, that condition only limits the
8   use of funds with respect to DEI "mandates, policies, programs, or activities that violate any
9   applicable Federal anti-discrimination laws," *id.* at 3.  *See Nat'l Ass'n of Diversity Officers in*
10  *Higher Educ. v. Trump*, No. 25-1189, ECF No. 29, at 7 (4th Cir. Mar. 14, 2025 (Harris, J.,
11  concurring) (noting that the executive orders that form the basis for the agency DEI conditions "do
12  not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and
13  they should not be so understood.").   In granting the TRO, the Court found that "in many cases
14  the conditions squarely contradict the congressional acts that establish the grant programs in the
15  first instance." TRO Order at 8.  Defendants respectfully submit that grant conditions that require
16  federal funds to be expended in accordance with federal law and executive orders—including, in
17  the case of the so-called DEI conditions, federal anti-discrimination laws—cannot themselves
18  contradict the same body of federal law.  *See, e.g.*, *Trump v. Am. Fed'n of Gov't Emps.*, 2025 WL
19  1873449, at *1 (U.S. July 8, 2025) (Sotomayor, J., concurring) ("[T]he relevant Executive Order
20  directs agencies to plan . . . 'consistent with applicable law,' . . . and we thus have no occasion to
21  consider whether they can and will be carried out consistent with the constraints of law.").  None
22  of the grant conditions at issue in this case, and certainly not facially (the level of generality that
23  Plaintiffs bring their challenge), purport to override, or require that either agencies or grantees take
24  any actions inconsistent with, the "express congressional directives to invest in marginalized
25  communities" identified by the Court.[7]  TRO Order at 8; *see Sherley v. Sebelius*, 689 F.3d 776, 784

26
27      [7] *See, e.g.*, Fernandez Decl. ¶ 15 ("[W]hen applicable grant statutes conflict with grant
28

1   (D.C. Cir. 2012) (agencies "under the direction of the executive branch . . . must implement the

2   President's policy directives to the extent permitted by law").

3          2.     Plaintiffs also contend that the challenged conditions are arbitrary and capricious

4   "because they fail the basic requirement that agency action be 'reasonable and reasonably

5   explained.'" PI Mot. at 36.  But contrary to Plaintiffs' suggestion, *id.* at 37, grants are explicitly

6   excluded from APA rule-making requirements, *see* 5 U.S.C. § 553(a)(2), and so the conditions they

7   impose are not subject to the level of explanation Plaintiffs would prefer.  Nor did the agencies

8   supply any impermissible "post hoc rationalization," *id.*, in publicly explaining their adoption of

9   some of the general terms and conditions that Plaintiffs now challenge.  *See, e.g., Independence*

10  *Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) ("The rule barring consideration of post

11  hoc agency rationalizations operates where an agency has provided a particular justification for a

12  determination at the time the determination is made, but provides a different justification for that

13  same determination when it is later reviewed by another body.").

14          In any event, judicial review under the arbitrary and capricious standard is "deferential,"

15  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and a court must "uphold [even] a

16  decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox*

17  *Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).  Here, given the agencies'

18  significant discretion to impose appropriate terms and conditions on the receipt of federal funds,

19  and general grantmaking requirements that the recipients of such funds follow federal law, the

20  adoption of grant conditions that require recipients to certify their compliance with executive

21  orders, federal anti-discrimination laws, and other restrictions on the use of federal funds, such as

22  the Hyde Amendment, can hardly be considered arbitrary or capricious.

23

24

25  ───────────────

    conditions for specific programs, HUD will not require that grantees . . . follow those conditions.");
26  Legier Decl. ¶ 8 (noting that HHS policy generally provides that, in the event of any conflict, the
    order of precedence for HHS grant awards terms is "U.S. Constitution, statutes, regulations, then
27  program guidance [including Executive Orders] and award specific requirements").

28

1      **III.    Plaintiffs Fail To Establish Irreparable Harm.**

2          The "most important" *Winter* factor Plaintiffs have the burden of demonstrating is

3      irreparable harm. *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

4      That standard requires plaintiffs seeking the extraordinary remedy of a preliminary injunction to

5      "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at

6      22.  The "possibility" of such harm is insufficient, *id.*, as is "[s]peculative injury"; Plaintiffs must

7      show both immediacy and likelihood that they will be irreparably harmed absent emergency relief.

8      *See Baldridge*, 844 F.2d at 674.

9          Plaintiffs have failed to make that showing here because, fundamentally, the harms they

10     assert are economic. *See, e.g.*, PI Mot. at 39 (describing the harms that would result from "a loss

11     of the federal grant funds").  They seek the payment—on the terms that they prefer—of federal

12     funds pursuant to their contracts with the federal government and, as discussed elsewhere,

13     Plaintiffs have an adequate avenue to pursue such relief in the Court of Federal Claims.  The

14     associated injuries Plaintiffs assert are thus definitionally not irreparable, *see, e.g.*, *Stanley v. Univ.*

15     *of S. Cal.*, 13 F.3d 1313, 1320-21 (9th Cir. 1994); *Rent-A-Center, Inc. v. Canyon Television and*

16     *Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), particularly because the local

17     government plaintiffs allege no "[t]hreat of being driven out of business."  *Am. Passage Media*

18     *Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).  The most they can muster is

19     that, in the absence of injunctive relief, they will "need to divert resources from other projects,"

20     which would "strain[] their resources and put[] other projects in jeopardy."  PI Mot. at 39.  But as

21     the Supreme Court has made clear, "[m]ere injuries, however substantial, in terms of money, time

22     and energy necessarily expended . . . are not enough."  *See Sampson v. Murray*, 415 U.S. 61, 90

23     (1974) (citation omitted); *see also Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198,

24     1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the

25     desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other

26     words, the harm is financial.").

27

28

1    Plaintiffs also assert that they face harm from being put to the choice "between accepting

2    unlawful conditions or risking the loss of hundreds of millions of dollars in federal grant funding."

3    PI Mot. at 38-39.  But it is always the case that "if a party objects to a condition on the receipt of

4    federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. For Open Soc'y*

5    *Int'l, Inc.*, 570 U.S. 205, 214 (2013).  If a party makes the voluntary choice to forego those funds,

6    any resulting economic harm cannot constitute an irreparable injury attributable to the federal

7    government, particularly where, as here, Plaintiffs can seek to recover any funds they believe to

8    be unlawfully withheld.  Nor do Plaintiffs demonstrate that the mere acceptance of terms they

9    consider to be "unlawful"—but that generally require them to comply with otherwise applicable

10   federal law, such as antidiscrimination and immigration laws and the Hyde Amendment—imposes

11   any concrete, imminent harm necessitating extraordinary preliminary relief.

## IV.    The Balance of the Equities Weighs in the Federal Government's Favor.

13   Lastly, Plaintiffs cannot establish that the balance of equities and public interest favor

14   granting the extraordinary remedy of a preliminary injunction.  These final two factors merge in

15   cases where relief is sought from the government.  *Nken*, 556 U.S. at 435.

16   The Supreme Court in *California* squarely explained that the balance of the equities favors

17   the federal government in this context.  The public interest is harmed when the United States is

18   forced to pay out funds that it may not be able to recover.  *California*, 145 S. Ct. at 969.  And the

19   grantees have the choice of whether "to keep the programs operating," and if they choose not to,

20   "then any ensuing irreparable harm would be of their own making." *Id.*; *see also Heckler v. Turner*,

21   468 U.S. 1305, 1307-08 (1984) (Rehnquist, J., in chambers) (prospect of the government being

22   forced to make $1.3 million in improper payments per month supported a stay of injunction).  In

23   *NIH*, the Supreme Court reaffirmed this conclusion, emphasizing that the federal government is

24   irreparably harmed if its funds "cannot be recouped," such as when federal grant recipients "do

25   not state that they will repay grant money if the Government ultimately prevails." *NIH*, 2025 WL

26   2415669, at *1; *see also id.* at 6 (Kavanaugh, J., concurring in part).

27   This is all in addition to the fact that any injunction interfering with the President's

28

1   priorities is itself a substantial harm in the balance of the equities analysis.  For, "[a]ny time [the

2   Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable

3   injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation

4   omitted).  To the extent the Court finds the balance of various factors close, this equities analysis

5   should tip against an injunction.

6   **V.    Any Injunctive Relief Should Be Narrowly Tailored.**

7           Relief under the APA is limited; courts may either "compel agency action unlawfully

8   withheld or unreasonably delayed" or "hold unlawful and set aside agency action." 5 U.S.C. § 706;

9   *see also Norton*, 542 U.S. at 66-67 (explaining how the APA's limits on relief are intended to

10  "protect agencies from undue judicial interference with their lawful discretion, and to avoid

11  judicial entanglement in abstract policy disagreements").

12          Emergency injunctive relief should not provide "a remedy beyond what [is] necessary to

13  provide relief" to injured parties.  *Lewis v. Casey*, 518 U.S. 343, 360 (1996).  Accordingly, to the

14  extent the Court is inclined to grant the Plaintiffs' request for a preliminary injunction, and

15  particularly in light of Plaintiffs' scattershot approach to this litigation, any such relief should be

16  narrowly tailored to apply only to specific grants and conditions identified in Plaintiffs'

17  preliminary injunction papers.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The

18  purpose of a preliminary injunction is merely to preserve the relative positions of the parties until

19  a trial on the merits can be held."); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600

20  (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable

21  practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting

22  that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

23          In particular, that relief should flow only (1) to any Plaintiff that is able to demonstrate all

24  the requirements for emergency injunctive relief; (2) only against any Defendant against whom all

25  such requirements for emergency injunctive relief are met; and (3) only against any particular

26  terms and conditions, imposed in specifically-identified grant programs, with respect to which any

27  Plaintiff demonstrates all requirements for emergency injunctive relief.  This is critically important

28

in this case, where—although Plaintiffs lump together and attempt to elide differences between many disparate and unrelated parties, grant programs, and grant terms—even Plaintiffs acknowledge that all of their arguments do not apply equally to all Plaintiffs and all Defendants. For example, Plaintiffs identify only two municipalities as "HHS Plaintiffs" that receive grants funds administered by HHS.  *See* Am. Compl. ¶ 205 (identifying Marin County and Sacramento County).  Even if the Court were to find for Plaintiffs on every other issue, it should not enjoin HHS from taking any action against any other Plaintiff (and any injunctive relief against HHS tailored to those two parties should be limited to the specific grants and grant terms Plaintiffs have identified).  Similarly, Plaintiffs only assert that three "EPA Plaintiffs" receive EPA funding—thus, any injunctive relief against EPA should be limited to, at most, those three Plaintiffs and the specific grants and conditions they identify and demonstrate the requirements for emergency relief.

Finally, any injunction should at most enjoin only those portions of Defendants' identified grant conditions which can be read to require actions beyond complying with federal law (something Plaintiffs are independently required to do).

## VI.     Any Injunctive Relief Should Be Stayed Pending Appeal, Be Accompanied By A Bond, And No Declaration Should Be Required.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to consider whether to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A bond is appropriate here given that any preliminary relief would potentially

1    mandate that the Executive spend money that may be lost forever once distributed. *California*,

2    145 S. Ct. at 969.

3    Finally, Plaintiffs again request that, by the "second day after issuance of" any injunction,

4    "Enjoined Parties" be ordered to "serve and file a declaration(s) documenting the actions that they

5    have taken to comply with" the injunction, including "serving a copy of [the injunction] on every

6    defendant agency head, and detailing what additional steps, if any, they have taken to comply."

7    Pls.' Proposed PI ¶ 4.  The Court ordered such a filing in response to its TRO Order, but Defendants

8    respectfully reiterate that again requiring such an extraordinary filing is unnecessary on the facts

9    of this case and diverts valuable resources away from agency compliance efforts.  Instead, the

10   presumption of regularity should apply, and the Court should presume that Defendants will comply

11   with any injunctive order. *See Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th

12   Cir. 2010).

13                                  **CONCLUSION**

14   For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary

15   injunction.

16   DATED:  September 16, 2025                    Respectfully submitted,

17                                                 BRETT A. SHUMATE
18                                                 Assistant Attorney General

19                                                 CRAIG H. MISSAKIAN
20                                                 United States Attorney

21                                                 JOSEPH E. BORSON
                                                   Assistant Branch Director

22                                                 JEVECHIUS D. BERNARDONI
23                                                 Assistant United States Attorney

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT
Senior Counsel (VA Bar No. 89400)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washinton, D.C. 20005
(202) 616-8098
robert.c.merritt@usdoj.gov

*Attorneys for Defendants*