UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY OF FRESNO, et al.,

Plaintiffs,

v.

SCOTT TURNER, et al.,

Defendants.

Case No. 25-cv-07070-RS

**ORDER GRANTING PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Following a temporary restraining order (TRO) entered on August 26, 2025, Plaintiffs, local organizations and government entities that receive millions of dollars of federal grant money to serve the public, bring this Motion for a Preliminary Injunction to enjoin Defendants, agencies and their operating administrators, from imposing unauthorized and vague conditions on their grant funding. Defendants have announced grant conditions embracing the Administration's recent Executive Orders requiring grantees to certify they will prohibit the promotion of DEI, gender ideology, and elective abortion and will cooperate with federal immigration enforcement efforts. Plaintiffs contend that these grant conditions violate the Administrative Procedure Act (APA), the Fifth Amendment, Separation of Powers, the Spending Clause, and the Tenth Amendment.

The preliminary injunction requested by Plaintiffs is granted as described below. First, jurisdiction properly rests in district court over Plaintiffs' claims consisting of statutory and constitutional challenges to agency guidance and policy. Second, Plaintiffs meet the requirements for injunctive relief at this stage for their claims against the U.S. Department of Housing and

Urban Development (HUD), the U.S. Department of Transportation (DOT), including the Federal Transit Administration (FTA), Federal Highway Administration (FHWA), and Federal Aviation Administration (FAA), and the U.S. Department of Health and Human Services (HHS) by demonstrating (1) serious questions going to the merits of their APA claims challenging the agency action as arbitrary and capricious, in excess of statutory authority, and contrary to the Constitution, (2) likelihood of irreparable injury, (3) balance of hardships that "tips sharply towards [Plaintiffs]" and injunctive relief that is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## II. BACKGROUND

### a. Grant Condition Executive Orders

Between January and August 2025 President Trump issued a series of Executive Orders directing executive agencies to impose new conditions on federal grants (collectively, the "Grant Condition Executive Orders"). Executive Order No. 14151 *Ending Radical and Wasteful Government DEI Programs and Preferencing* calls for agencies to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions…; all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees." 90 Fed. Reg. 8339 (Jan. 29, 2025) ("DEI Executive Order"). Executive Order No. 14173 *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* "order[s] all executive departments and agencies… to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements.  I[t] further order[s] all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Merit-Based Executive Order"). (Collectively, the DEI Executive Order and Merit-Based Executive Order are referred to as the "DEI Executive Orders.")

Executive Order No. 14168 *Defending Women from Gender Ideology Extremism* calls on "[a]gencies [to] remove all statements, policies, regulations, forms, communications, or other

United States District Court
Northern District of California

internal and external messages that promote or otherwise inculcate gender ideology, and [to] cease issuing such statements, policies, regulations, forms, communications or other messages.  Agency forms that require an individual's sex shall list male or female, and shall not request gender identity.  Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." EO No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology Executive Order"). It further requires that "[f]ederal funds[] not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.* § 3(g). Executive Order No. 14182 *Enforcing the Hyde Amendment* states that "[i]t is the policy of the United States, consistent with the Hyde Amendment, to end the forced use of Federal taxpayer dollars to fund or promote elective abortion." 90 Fed. Reg. 8751 (Jan. 31, 2025) ("Elective Abortion Executive Order").

Executive Order No. 14218 *Ending Taxpayer Subsidization of Open Borders* requires each agency to ensure illegal immigrants do not "obtain any cash or non-cash public benefit" from federally funded programs and to align such programs "with Federal law including the PRWORA [i.e., the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104-193)]." 90 Fed. Reg. 10581 (Feb. 19, 2025). Executive Order No. 14287 *Protecting American Communities From Criminal Aliens* tasks agencies with "restor[ing] the enforcement of United States [immigration] law" and suspending or terminating federal funds used by "sanctuary" jurisdictions in particular. 90 Fed. Reg. 18761 (Apr. 28, 2025).

Executive Order No. 14332 *Improving Oversight of Federal Grantmaking* instructs that federal funding awards "must, where applicable, demonstrably advance the President's policy priorities" and must not "fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation;" "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic;" "illegal immigration;" or "any other initiatives that compromise public safety or promote anti-American values." Section 4, 90 Fed. Reg. 38929 (Aug. 12, 2025).

1    Additionally, "[e]ach agency head shall, to the maximum extent permitted by law and consistent

2    with relevant Executive Orders or other Presidential directives, take steps to revise the terms and

3    conditions of existing discretionary grants to permit immediate termination for convenience, or

4    clarify that such termination is permitted, including if the award no longer advances agency

5    priorities or the national interest." *Id.*

6         **b.  Agency Grant Conditions**

7         In light of these Executive Orders, HUD, DOT, including the FTA, FHWA, and FAA,

8    HHS, and the U.S. Environmental Protection Agency (EPA) have announced new grant conditions

9    embracing the Grant Condition Executive Orders. These conditions have been announced through

10   announcements of universal grant requirements, grant application guides, grant policy statements,

11   grant and grant assurances templates, master agreements, notice of funding opportunities, and

12   individual grant agreements.

13        Specifically, HUD has announced conditions that obligate grantees to certify that they

14   comply with all Executive Orders ("HUD EO Conditions"); [1] do not promote DEI activities that

15   violate anti-discrimination laws and are liable for non-compliance under the False Claims Act

16   ("HUD DEI Conditions"); do not "promote" "gender ideology" ("HUD Gender Ideology

17   Conditions"); do not "promote" "elective abortion" ("HUD Elective Abortion Condition");

18   cooperate with federal immigration enforcement ("HUD Immigration Enforcement Conditions")

19   including using verification systems per PRWORA ("HUD PRWORA Condition") (collectively

20   the "HUD Grant Conditions"). DOT has announced conditions that obligate grantees to certify the

21   same excluding the conditions regarding elective abortion and immigrant verification systems.

22   DOT's operating administrators also have announced similar or identical grant conditions

23   applying additionally to their grantees: conditions obligating grantees to certify they comply with

24

25   [1] Since HUD, DOT, and the HHS require compliance with the EOs, the specific DEI, gender
     ideology, elective abortion, and immigration enforcement requirements announced in those EOs
26   are included in the definition of the agency's more specific conditions. For example, the HUD DEI
     Conditions include the DEI requirements set forth in the DEI and *Imposing Oversight of Federal*
27   *Grantmaking* EOs.

28

applicable EOs and federal laws, regulations, and policies; do not promote DEI that violates anti-discrimination law; and cooperate with federal immigration enforcement. These are referred to as the "DOT EO Conditions," "DOT DEI Conditions," "DOT Gender Ideology," "DOT Immigration Enforcement Conditions," and collectively the "DOT Grant Conditions."

HHS also has announced conditions that make substantially the same obligations of grantees (the "HHS EO Conditions," "HHS DEI Conditions," "HHS Gender Ideology Conditions," "HHS Immigration Enforcement Conditions," and collectively, the "HHS Grant Conditions"). The HHS DEI Conditions were announced in April 2025 revisions to the HHS Grant Policy Statement, and they are also reflected in HHS requirements to comply with applicable EOs.[2] *See e.g.,* Dkt. 36-24, Request for Judicial Notice[3] (RJN), Exs. J, W, X. Since its April 2025 revisions to the HHS Grant Policy Statement, HHS has revised the relevant section of the Grant Policy Statement and removed reference to DEI, leaving only a prohibition against promoting violations of applicable Federal anti-discrimination law ("HHS Anti-Discrimination Conditions"). *Id.* Exs. U, V.

Lastly, on April 3, 2025 the EPA announced revisions to its General Terms and Conditions effective October 1, 2024 that obligate grantees to certify they do not promote DEI or violate federal-anti-discrimination law and are liable for non-compliance ("EPA DEI Conditions"). However, on August 25, 2025, the EPA revised the relevant section of its General Terms and Conditions removing reference to DEI, requiring that "recipient[s] certify that [they] do not operate any programs violating applicable Federal antidiscrimination law or promoting any such violation" ("EPA Anti-Discrimination Conditions"). *Id.*, Ex. Z.

Taken together, excluding the EPA Anti-Discrimination Condition which was announced following issuance of the TRO, these conditions are referred to as the "Grant Conditions." The conditions and their announcements are described in more detail in the discussion below as

---

[2] *See supra* note 1.

[3] Pursuant to Federal Rule of Evidence 201(b), Plaintiffs' Request for Judicial Notice is granted.

relevant.

### c. **Plaintiffs' Federal Funding**

Plaintiffs are cities, counties, and a county airport authority who receive millions of dollars in HUD, DOT, HHS, and/or EPA federal grant funding which they use to administer critical public programs and services such as housing assistance, transportation infrastructure and safety, public health, and environmental protection. This funding represents a significant portion of Plaintiffs' funds. For example, federal grant funding made up between 9% and 15% of the City of Alameda's expenditures between Fiscal Years 2022 and 2024. Dkt. 36-2, Ott Decl., ¶ 5. The Defendant agencies have made clear that Plaintiffs are subject to the Grant Conditions through general guidance as well as specific actions directed at Plaintiffs including warnings about liability and grant terminations. Plaintiffs, per their declarations, are left uncertain about if they can accept, drawdown, or seek this crucial federal funding, implicating both grants already awarded but also grants applied for and dispensed on a continuous basis.

Plaintiffs City of Fresno, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood City, County of Sacramento, County of Marin, County of San Diego, and County of Monroe, receive, directly or indirectly, millions of dollars of HUD grant funds administered through Community Development Block Grants (CDBG), the HOME Investment Partnerships Program (HOME), and Emergency Solutions Grants (ESA). These funds are threatened by the HUD Grant Conditions ratified through HUD action and guidance directed towards Plaintiffs. Dkt. 36-15, Skei Decl., ¶ 7; Dkt. 36-7, Diaz Decl. ¶ 15; Dkt. 36-22, Bacher Decl., ¶ 19–20; Dkt. 36-5, Thomas Decl., ¶ 11. For example, on August 18, 2025, HUD notified Fresno that its FY 2025 Consolidated Plan/Action Plan would not be approved unless the City removed references to "equity," "environmental justice," and "transgender," and certified compliance with EO 14168. Dkt. 36-15, Skei Decl., ¶¶ 7, 13–14. HUD formally disapproved the Plan on August 22, 2025, citing unsatisfactory certifications and rejecting Fresno's request for additional time to respond.

Plaintiffs City of Fresno, City of Alameda, City of Eureka, City of South Lake Tahoe, City of Saint Paul, County of Marin, County of Sacramento, County of San Diego, County of Monroe,

United States District Court
Northern District of California

and Monroe Airport Authority receive grant funds, directly or indirectly, administered by DOT and its operating administrations, the FTA, FAA, and FHWA. For example, the County of Marin received $6 million in FHWA funding last year for highway maintenance, roadwork, and traffic safety and anticipates receiving $43 million over the next five years. Dkt. 36-4, Blunk Decl., ¶ 5. However, Plaintiffs' DOT funding is threatened by the DOT Grant Conditions as with the HUD funding. For example, Redwood City has been awarded over $16 million in grants from the State of California Department of Transportation which receives FHWA funding via various federal projects. Dkt. 36-7, Diaz Decl., ¶ 23-24. However, it is not clear whether Redwood City can count on those funds since it is required to certify compliance with possibly unlawful conditions such as the DOT DEI Conditions which in fact conflict with other DOT policies that require considerations of equity. *Id* ¶ 24. As another example, the FHWA has already awarded $1.24 million in Carbon Reduction Program grants to the City of Alameda, but Alameda has not been able to sign the award agreement due to uncertainty about the new grant conditions and certification requirements. Dkt. 36-2, Ott Decl., ¶ 6.

The County of Marin, County of Sacramento, and County of San Diego receive, directly or indirectly, grant funds administered by HHS. For example, the County of Marin's Department of Health and Human Services has a budget of over $250 million and relies on approximately $57 million in federal funding, including $1.5 million in HHS Aging Cluster grants, $500,000 in Ryan White A and Part B grants, $2.8 million in Center for Disease Control (CDC) grants, $1.8 million in Substance Abuse and Mental Health Services Administration (SAMHSA) Adult Drug Grants, $2.4 million in Title IV-E Administration for Children and Families grants, and $1.4 million in HHS Adoption Assistance funding. Dkt. 36-6, Warhuus Decl., ¶¶ 6-7. As with HUD and DOT funding, Plaintiffs cannot rely on their HHS funding because the funds are subject to the unlawful HHS Grant Conditions.

Plaintiffs City of Fresno, City of Redwood City, and the City of Alameda receive, directly or indirectly, grant funds administered by EPA. For example, Fresno has been awarded approximately $2.25 million in grants from the EPA, including a Brownfields Revolving Loan

1   Fund grant totaling $1,750,000 and a Brownfields Assessment grant in the amount of $500,000.

2   Dkt. 36-12, Clark Decl., ¶ 9. Redwood City has also been pre-awarded $1.2 million in EPA grants

3   for stormwater infrastructure improvement. Dkt. 36-7, Diaz Decl., ¶ 31. The City of Alameda has

4   a pending application for a $2.5 million Environmental and Climate Justice Community Change

5   Grant. Dkt. 36-2, Ott Decl., ¶ 5. Plaintiffs are concerned that they cannot rely on their EPA

6   funding in light of the EPA DEI Conditions and EPA Discrimination Conditions.

### III. LEGAL STANDARD

8     Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

9   showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7,

10  22 (2008). To obtain preliminary injunctive relief, a plaintiff "must establish that he is likely to

11  succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

12  relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

13  *Id.* at 20, 129 S.Ct. 365. A court may "balance the elements" of this test, "so long as a certain

14  threshold showing is made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir.

15  2011) (per curiam). Thus, for example, "serious questions going to the merits and a balance of

16  hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

17  so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

18  injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

19  Cir. 2011) (quotation marks omitted).

### IV. DISCUSSION

21  **A. Threshold Issues**

22   **i. 49 U.S.C. Section 46110**

23    At the outset, jurisdiction to hear Plaintiffs claims in federal district court must be

24  established. Defendants challenge jurisdiction over the claims regarding FAA conditions in

25  particular. Per 49 U.S.C. § 46110(a) federal courts of appeal have exclusive jurisdiction over "an

26  order issued" by the Secretary of Transportation or FAA Administrator "with respect to aviation

27  duties and powers designated to be carried out by the Administrator of the Federal Aviation

28

United States District Court
Northern District of California

1    Administration … in whole or in part under this part, part B, or subsection (l) or (r) of section

2    114." *Id.*

3    In *Tulsa Airports Improvements Trust v. U.S.* the Ninth Circuit explained that

4    Section 46110(a) covers "a broad spectrum of actions by the Secretary of Transportation, the

5    Under Secretary of Transportation for Security, and the Administrator of the FAA" that "ha[ve]

6    indicia of finality" but went on to point out that "many if not most of [the cases in which courts of

7    appeals have undertaken review of the action] would fall into the category of 'informal

8    adjudication,'" which does not describe the at-issue agency actions. 120 Fed. Cl. 254, 261 (2015).

9    *See also City of Los Angeles v. U.S. F.A.A.*, 239 F.3d 1033, 1036 (9th Cir. 2001) ("[E]very court

10    of appeals case that could be found exercising jurisdiction under § 46110(a) involved airline

11    commerce and safety or a specific provision under Part A."). Further, in *City of Los Angeles v.*

12    *U.S. F.A.A* the Ninth Circuit held that since, "[i]n essence, the City seems to be making a 'broad

13    constitutional challenge' to… the FAA's actions (to the extent that the FAA is making policy)…

14    such a claim is not one subject to judicial review in the court of appeals but rather is reviewable by

15    the district court." *Id.* at 1036–37. Since Plaintiffs' claims against DOT are more akin to broad

16    constitutional challenges to DOT policy than informal adjudications, jurisdiction here is

17    warranted.

18    Moreover, Section 46110(a) is also not a bar to jurisdiction because Plaintiffs' claims

19    "involve agencies" and agency action "not covered by § 46110." *Magassa v. Mayorkas*, 52 F.4th

20    1156, 1165 (9th Cir. 2022). *See, e.g., Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012). The

21    FAA's conditions are "merely a conduit" for the DOT Grant Conditions which DOT has

22    expressed independently from FAA action via an April 2025 letter from the Secretary of

23    Transportation ("Duffy Letter") and non-FAA grants and grant guidance all of which "§ 46110

24    does not cover." *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012). Dkt. 36-24, RJN, Ex. P.

25    **ii. Tucker Act**

26    Under the Tucker Act, a dispute where money damages are sought pursuant to a contract or

27    contract-like agreement with the federal government can be heard only in the Federal Court of

28

Claims. 28 U.S.C. § 14191(a). The Tucker Act "'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief *only if* that action is a 'disguised' breach-of-contract claim *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis added) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). An "action is a 'disguised' breach-of-contract claim" in light of "(1) the source of the rights upon which the plaintiff bases its claims and (2) the type of relief sought (or appropriate)," jurisdiction rests in the Court of Claims. *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id.*

Plaintiffs' claims here are not disguised contract claims. Nor do Plaintiffs seek the interpretation of specific grant terms and conditions. Instead, Plaintiffs challenge the Defendant agencies' *policies* and *guidance* to condition funding on the Grant Conditions on *statutory*, namely APA, and *constitutional* grounds, and they seek injunctive relief barring Defendants' imposition of the conditions and setting aside related internal agency directives. Accordingly, jurisdiction properly rests in federal district court. *See id. See also Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring in part) ("The Government is not entitled to a stay of the judgments insofar as they vacate the guidance documents… That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded…upon' contract that only the CFC can hear."); *Dep't of Educ. v. California*, 604 U. S. ——, 145 S.Ct. 966, 221 L.Ed.2d 515, 968 (2025) ("True, a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds.") (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).

### B.    Likelihood of Success on the Merits

Plaintiffs bring constitutional claims challenging the Grant Conditions, alleging violations

of the Fifth Amendment, Separation of Powers, the Spending Clause, and the Tenth Amendment. Separately, Plaintiffs advance APA claims challenging the Grant Conditions as arbitrary and capricious, in excess of statutory authority, and contrary to the Constitution. To obtain preliminary injunctive relief, Plaintiffs must establish likelihood of success on the merits as to at least one of these claims for each Grant Condition.

Since the EPA DEI Conditions are no longer in effect following August 25, 2025 revisions to the EPA General Terms and Conditions, *see* Dkt. 36-24, RJN, Ex. Z, and there is no evidence that the EPA is still enforcing its DEI Conditions or interprets its Anti-Discrimination Condition to prohibit promotion of DEI, Plaintiffs' claims as to the EPA fail. As to the HUD, DOT, and HHS Grant Conditions, however, the court finds a likelihood of success on the merits for Plaintiffs' arbitrary and capricious, in excess of statutory authority, and contrary to the Constitution claims.[4]

### i. Reviewability under the APA

To review Plaintiffs' APA challenges to the Grant Conditions, there must be "final agency action" that is not "committed to agency discretion by law." 5 U.S.C. §§ 701(a)(2), 704. Discretion is committed to an agency by law only where a "statute is drawn in such broad terms… that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 600 (1988) (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). *See Jajati v. United States Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (holding that the Section 701(a)(2) exception applies when "there is truly no law to apply"). The Supreme Court requires courts to "read the exception in § 701(a)(2) quite narrowly" such that it should apply only in "rare circumstances." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191, (1993)). Even when Congress creates a wide zone within which decisions are committed to an agency's discretion, the agency still must meet "permissible statutory objectives." *Lincoln*, 508 U.S. at 183. *See also Jajati*, 102

---

[4] There may also be freestanding constitutional claims, but we need not address those claims in that the APA claims sufficiently warrant the requested relief.

United States District Court
Northern District of California

F.4th at 1018 (holding that "the goal of the program," "clear and consistent eligibility guidelines", and "agency duties," provided meaningful standards for review).

Here, "meaningful standard[s]" exist to review Defendants' Grant Conditions. *Webster v. Doe*, 486 U.S. at 592. Later in their briefing the Government points to statutory language as authorizing Defendants' discretion to impose the Grant Conditions. The authorizing language grants Defendants at most discretion to impose grant terms that are necessary to effectuate each programs' statutory aims. Dkt. 40 at 31; 42 U.S.C. § 11386(b)(8) (requiring HUD Continuum-of-Care (CoC) grantees to comply with "other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner"); 49 U.S.C. § 5334(a)(9) (allowing grant covenants and terms that "the Secretary of Transportation considers necessary to carry out this chapter"); 49 U.S.C. § 47108(a) (permitting FAA grant offer terms that "the Secretary considers necessary to carry out this subchapter and regulations prescribed under this subchapter"); *id.* § 47107(g) (permitting the Secretary of Transportation to "prescribe requirements for [grant recipients] that the Secretary considers necessary" "to ensure compliance with this section"); 42 U.S.C. § 300x-6(a)(7) (permitting Community Mental Health Services Block Grant assurances which "the Secretary determines to be necessary to carry out this subpart."). This language creates standards "sufficient to permit judicial review." *See Keating v. F. A. A.*, 610 F.2d 611, 612 (9th Cir. 1979) (holding that allowing the FAA administrator to make exemptions "in the public interest" provides a standard "sufficient to permit judicial review."). In addition to these necessary-to-achieve-statutory-aims standards, the authorizing statutes also include non-exhaustive criteria for grantmaking which help establish a meaningful standard for judicial review of the Grant Conditions. *See e.g., Jajati*, 102 F.4th at 1020.

The Government, nonetheless, asserts that grant funding is "quintessential agency action[] committed to agency discretion by law." Dkt. 40 at 30. The Government points to *Lincoln v. Vigil* in which the Supreme Court explained that agency action—such as the decision to terminate a program or funding to that program—that requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are

best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; [and] whether a particular program best fits the agency's overall policies" is generally committed to agency discretion by law. 508 U.S. at 193 (citing *Heckler*, 470 U.S. at 831). That, however, does not describe the agency action here. Plaintiffs do not challenge singular agency grant decisions made while weighing various factors "peculiarly in [Defendant agencies'] expertise," and in order to vindicate each "agency's overall policies" or "fulfill[] its statutory mandate." *See id.* (cleaned up). Rather, Plaintiffs challenge Defendant agencies' unilateral imposition of the Grant Conditions, which are not germane to Defendants' expertise and were imposed not in the spirit of Defendants' statutory mandates but rather to vindicate the Executive's agenda. *See e.g.,* Dkt. 36-24, RJN, Ex. B (HUD Press Release No. 25-059 announcing grant conditions as part of "HUD []carrying out President Trumps's executive orders, mission, and agenda…"). That the Grant Conditions are not imposed to further statutory aims is clear not only from Defendants' public statements but also because conditions prohibiting DEI, gender ideology, and elective abortion and requiring cooperation with immigration enforcement are not part of or in furtherance of Defendant agencies' statutory mandates as discussed below. This break from the facts in *Lincoln* makes that decision inapposite because, as that case makes clear, "the decision to allocate funds is committed to agency discretion by law" only "to [the] extent" "the agency allocates funds…to meet *permissible statutory objectives*." *Lincoln v. Vigil*, 508 U.S. at 193 (cleaned up) (emphasis added). Accordingly, the Grant Conditions are not agency action committed to agency discretion by law.

To be reviewable the challenged agency action also must be final agency action. 5 U.S.C. § 701(a)(2). This "finality[] must be interpreted in a pragmatic and flexible manner." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up). The Grant Conditions here are reviewable final agency action because they "take[ the] 'definitive' legal position" that the Executive Orders and Grant Conditions are authorized and enforceable against Plaintiffs, which poses an "immediate and significant practical burden" on Plaintiffs, rendering "the disputed [legal] authority underlying the [positions] fully fit for judicial review[.]" *See CSI*

*Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412, 414 (D.C. Cir. 2011) (quoting *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 436 (D.C.Cir.1986)). *See also Oregon Nat. Desert*, 465 F.3d at 987 (citing *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990)) (cleaned up) ("[A]n agency action may be final if it has a direct and immediate effect on the day-to-day business of the subject party," "has the status of law or comparable legal force, and[] immediate compliance with its terms is expected."); *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (Plaintiffs' challenge to "the Forest Service's actions taken pursuant to its interpretation of [an agency mining regulation]… constitute[d] more than a programmatic attack or a vague reference to Forest Service action or inaction" and was subject to the court's jurisdiction as a final agency action.). Other courts have taken the same position that similar grant conditions are final agency action. *See e.g., Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, *14 n.18 (W.D. Wash. June 3, 2025); *Rhode Island Coal. Against Domestic Violence v. Bondi*, No. CV 25-279 WES, 2025 WL 2271867, at *1 (D.R.I. Aug. 8, 2025).

### ii.  Arbitrary and Capricious

Under the APA, agency action must be set aside and held unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it is not "'reasonable and reasonably explained.'" *Ohio v. Environmental Protection Agency*, 603 U.S. 279, 292, 144 S.Ct. 2040, 219 L.Ed.2d 772 (2024) (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, (2021)). This includes when:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court may not "infer an agency's reasoning from mere silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (citation omitted).

The standard is more exacting when an agency changes positions or "'is not writing on a

blank slate.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020) (citation omitted). "[L]ongstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 1915 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212, (2016) (internal citation omitted)). Accordingly, when changing its position, an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* It is "arbitrary and capricious to ignore such matters." *Id.* However, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute[.]" *F.C.C. v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Consistent with this standard, the Ninth Circuit in *Thakur v. Trump*[5] recently found that the plaintiffs there, university researchers whose grants were terminated based on new DEI grant conditions, were likely to succeed on their arbitrary and capricious claims because the record provided no evidence of a reasoned explanation or consideration of important factors, including reliance interests, waste and the loss to the public, or alternatives to the change. 148 F.4th 1096 (9th Cir. 2025).

Prior to the Grant Conditions here, grant recipients were not subject—at least as a matter of agency policy[6]—to conditions prohibiting the promotion of DEI, gender ideology, and elective abortion or requiring cooperation with federal immigration enforcement. In fact, in some cases Defendant agency policies and regulations include grantee requirements that seemingly violate the Grant Conditions. *See e.g.,* 24 C.F.R. § 5.106(b)–(c) (requiring "[e]qual access" to covered HUD programs according to participants' self-identified gender). The fact that some conditions and EOs include language such as "… DEI programs *that violate federal anti-discrimination* law," "…to

---

[5] Pending appeal on other grounds, specifically district court jurisdiction over the terminated grants in light of the Supreme Court's decision in *Nat'l Institutes of Health*, No. 25A103 (U.S. Aug. 21, 2025).

[6] Contrary to the Government's arguments, Plaintiffs' challenges are not merely to grant terminations but to agency-wide polices regarding who is eligible for a grant and their liability as grant recipients.

ORDER ON PRELIMINARY INJUNCTION
CASE NO. 25-cv-07070-RS

United States District Court
Northern District of California

the maximum extent permitted by law," or "consistent with" federal law does not transform them into pre-existing conditions to comply with federal law that were merely unspoken. *See City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238-1240 (9th Cir. 2018) (upholding the lower court's holding that the phrase "consistent with law" did not save certain Executive Orders). This is because the conditions' references to federal law act as announcements of policies rather than as limits to the scope of the new conditions. In other words, these references to federal law make clear that their interpretation is undergoing significant change. Accordingly, the Grant Conditions reflect changes in agency position which require not only an explanation of reasoning but also consideration of reliance interests among other important factors. *See Regents of the Univ. of California*, 140 S. Ct. at 1915.

Notably, "the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." *Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (collecting cases). *See also Martin Luther King, Jr. Cnty.*, No. 2:25-CV-814, 2025 WL 1582368, at *17; *Louisiana v. Biden*, 622 F. Supp. 3d 267, 295 (W.D. La. 2022); *R.I. Coal. Against Domestic Violence v. Bondi*, No. 25-279, 2025 WL 2271867, at *8 (D.R.I. Aug. 8, 2025). If it did, "presidential administrations [could] issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first. Agencies would be permitted to implement regulations without the public involvement, transparency, and deliberation required under the APA." *State v. Su*, 121 F.4th 1, 16 (9th Cir. 2024). Clearly this is not what the APA permits. *See id.*

Here, however, HUD and HHS have provided "no substantive reasons justifying [their] radical change of course other than[] rote recitation of the need to implement the Executive Orders." *San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC, 2025 WL 1713360, at *26 (N.D. Cal. June 18, 2025). The same is true for DOT with the exception of the Duffy Letter as discussed below. The Defendant agencies have announced their conditions without explanation through universal grant requirements, grant application guides, grant policy statements, templates, master agreements, notice of funding opportunities, and individual grant

1  agreements. *See e.g.,* Dkt. 36-24, RJN, Exs. C, D, E, F, G, H, I, J, K, R, S, T, W, Y, Z; Dkt. 36-22,

2  Bacher Decl., Ex. 8. HUD also has issued Press Release No. 25-059 which announces, "HUD is

3  carrying out President Trumps's executive orders, mission, and agenda…," *id.*, Ex. B, and a June

4  2025 letter from the General Deputy Assistant Secretary regarding CDBG – Disaster Recovery

5  grantees which reannounces that grantees are required to comply with the EOs, *id.*, Ex. Q.

6          These announcements are not enough because "rote incorporation of executive orders …

7  does not constitute 'reasoned decisionmaking'" as required by the APA. *Martin Luther King, Jr.*

8  *Cnty.*, No. 2:25-CV-814, 2025 WL 1582368, at *17. Further, they do make the requisite showing

9  under the APA that Defendants considered the significant reliance interests of Plaintiffs and

10  grantees like them who apply for, spend, and/or seek reimbursement via millions of dollars of

11  federal funding on an ongoing and additive, or even nearly-automatic, basis.[7] The announcements

12  also do not show that the Defendant agencies considered the hundreds of millions of taxpayer

13  dollars already spent or allocated to  projects which may be jeopardized by the new grant

14  conditions and resulting budgeting uncertainty, delays, and cancellations or alternatives to the new

15  conditions such as proscribing grantee conduct with more particularity.

16          The Duffy Letter sent by Secretary of Transportation Sean Duffy in April 2025 to

17  transportation agencies nationwide is perhaps the one exception raised by Plaintiffs and

18  Defendants to the Defendant agencies' failure to explain the Grant Conditions beyond reference to

19  the Executive Orders. *See* Dkt. 36-24, RJN, Ex. P. The letter references the Executive's agenda

20  but also explains that the DOT Conditions effectuate the Administration's interpretation of federal

21

22  _____

23  [7] For example, the City of Fresno has approximately $75 million in DOT grant funding allocated
   to it for public works projects—$37 million of which has yet to be reimbursed. Dkt. 36-13, Mozier

24  Decl. ¶¶ 4, 8. Many of Fresno's federal transportation programs operate on multi-year cycles, with
   funding becoming available two to four years after project selection, creating reliance interests on

25  grant funding conditions. *Id.* ¶ 10. This is emblematic of the federal funding scheme and process
   for not just DOT funding but also HUD and HHS funding: the grant process is often continual,

26  multi-year, and cumulative or automatic. For example, the City of Alameda has open HUD grant
   applications for approximately $2.05 million in CDBG grants and over half a million in HOME

27  grants that are awarded annually and generally automatically on a per capita basis. Dkt. 36-2, Ott
   Decl., ¶ 6.

28

United States District Court
Northern District of California

anti-discrimination law and the Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023). *Id.* Even if this can be said to provide a sufficiently reasoned explanation for the DOT DEI Conditions, however, the Duffy Letter still provides no record evidence that DOT considered reliance interests, possible waste or loss to the public, alternatives, or other important factors. *See* Dkt. 36-24, RJN, Ex. P. Accordingly, Plaintiffs are likely to succeed on their claims that the HUD, DOT and HHS Grant Conditions are arbitrary and capricious in violation of the APA.

### iii. In Excess of Statutory Authority Claims

Under the APA a court may set aside an agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Plaintiffs here are likely to succeed on the merits of their claims that the Grant Conditions are in excess of each Defendant's statutory authority. They demonstrate, as set forth below, that the relevant authorizing statutes do not authorize the Defendants to condition funding on requirements to prohibit the promotion of DEI, gender ideology, or elective abortion or to cooperate with federal immigration enforcement and that in some cases the statutes even contradict the conditions.

Meanwhile, Defendants fail to rebut effectively Plaintiffs' showings. Rather than reference statutory language authorizing these types of conditions expressly—likely because Defendants cannot—Defendants rely on agency regulations and broad authorizations of grantmaking discretion which they argue encompasses the conditions here. However, "an agency *regulation* cannot create *statutory* authority; only Congress can do that." *Martin Luther King, Jr. Cnty.*, No. 2:25-CV-814, 2025 WL 1582368, at *15. As to Defendants' broad reading of these statutes, it flouts basic principles of statutory interpretation. Congress "rarely accomplishe[s]" "[e]xtraordinary grants of regulatory authority" through "modest words, vague terms, or subtle devices." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). This is especially true here where the Grant Conditions, as already discussed, are far afield from the agency expertise to which Congress originally deferred, and "expertise has always been one of the factors which may give an Executive Branch interpretation particular power to persuade.'" *Cf. Loper Bright*

United States District Court
Northern District of California

*Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024) (citation omitted) (collecting cases) (regarding deference to agency statutory interpretation as reflected in a formal agency rule rather than executive branch statutory interpretation as reflected in agency conditions and legal briefing as here). "'[W]hen the agency has no comparative expertise… Congress presumably would not grant it that authority.'" *Id.* at 401 (2024) (citing *Kisor v. Wilkie*, 586 U.S. 1050, 578 (2018) (opinion of the Court)).

Additionally, as already discussed, savings clauses such as "…which violate [relevant federal] law" or "to the maximum extent permitted by law" do not magically ensure that the conditions incorporating that language only operate in so far as they are within Congress's grant of authority. *See City and Cnty. of San Francisco,* 897 F.3d at 1238-1240 (upholding the lower court's holding that the phrase "consistent with law" did not save certain executive orders).

### a.  HUD Grant Conditions

Certain Plaintiffs receive CoC and other grants administered by CPD as part of the CDBG, Emergency Solutions Grant (ESG), HOME, and Housing Opportunities for Persons with AIDS (HOPWA) grant programs. The congressional acts authorizing these programs do not give HUD authority to condition its grants on the Grant Conditions. *See* 42 U.S.C. §§ 5303–5304 (authorizing the CDBG program); *id.* § 11372 (authorizing the ESG program); *id.* § 12741 (authorizing the HOME program); *id.* § 12903 (authorizing the HOPWA program); *id.* §§ 5304(a)(3), 11375(c) (enumerating certifications required for certain CPD funding); *id.* §§ 11301, 11381 (enumerating congressional findings and purpose for CoC program); *id.* §§ 11382(a), 11386a (setting out competitive process and selection criteria for CoC awards); *id.* § 11386(b) (setting out agreements CoC recipients must make). In fact, the HUD DEI Grant Conditions run afoul of express congressional directives for CDBG, HOME, and HOPWA funds. For example, 42 U.S.C. § 5307(b)(2) requires CDBG funds be set aside for "[s]pecial purpose grants," including grants to historically Black colleges. 42 U.S.C. § 5307(b)(2). Section 5307(c) requires CDBG funds be allocated to provide "assistance to economically disadvantaged and minority students." *Id.* § 5307(c). Section 12702(3) sets out that HOME and HOPWA programs aim to improve

United States District Court
Northern District of California

United States District Court
Northern District of California

1  housing opportunities for "disadvantaged minorities, on a nondiscriminatory basis," and Section

2  12831(a) requires HOME and HOPWA recipients "to establish and oversee a minority outreach

3  program...to ensure the inclusion, to the maximum extent possible, of minorities and women, and

4  entities owned by minorities and women...in all contracts… entered into by the participating

5  jurisdiction." *Id.* §§ 12702(3), 12703(3).

6         The HUD PRWORA Verification Condition is also not authorized by Congress because

7  PRWORA only requires state immigration status verification systems *twenty-four months after* the

8  Attorney General promulgates certain final regulations, and so far only interim guidance and

9  proposed rules have been issued. 8 U.S.C. § 1642(b). *See* Interim Guidance on Verification of

10  Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility

11  and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997);

12  Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule).

13         The Government argues that statutes authorizing HUD to condition grants on compliance

14  with federal laws encompass the conditions at issue. This argument fails for two reasons. First, as

15  already discussed, the Grant Conditions go beyond prohibiting violations of federal law as it is

16  currently understood and pose a real risk of curtailing programs that would not be found violative.

17  Second, the statutory authority cited for applying the conditions to HUD grants is limited to

18  certification of compliance "with the other provisions of *this chapter* and with other *applicable*

19  laws," 42 U.S.C. § 5304(b)(6) (emphasis added), and conditions "the Secretary may establish to

20  carry out *this part* in an effective and efficient manner," 42 U.S.C. § 11386(b)(8). Dkt. 40 at 32.

21  However, in light of the contradictory statutory mandates discussed above and the fact that HUD's

22  expertise is in housing not DEI programming, gender ideology, elective abortion, or immigration

23  enforcement, such broad interpretations of 42 U.S.C. § 5304(b)(6)) and § 11386(b)(8) are

24  unconvincing.

25         **b. DOT Grant Conditions**

26         Some of the Plaintiffs receive various DOT grants including IFAC grants, FTA grants,

27  FHWA grants including Safe Streets for All (SS4A), Bridge Investment Program (BIP), Culvert

28

Aquatic Organism Passage (AOP), and Advanced Transportation Technology and Innovation (ATTAIN) grants, and FAA grants including Airport Improvement (AIP) grants and Airport Infrastructure Grants (AIG). Those plaintiffs demonstrate, as they did with HUD, that the congressional acts authorizing these programs do not give DOT authority to condition its grants on the DOT Grant Conditions. *See e.g.,* 23 U.S.C. § 611 (codifying the IFAC grant program and including grant requirements relating to conducting, evaluating, publishing, and implementing asset concessions and infrastructure development); 49 U.S.C. ch. 53 (codifying various FTA grants related to urban transportation (§ 5307), fixed guideways (§ 5309), urban rail and bus upgrades (§ 5337), and buses and bus facilities (§ 5339) with statutory eligibility requirements regarding transit purposes, operational capacity, long-term asset maintenance, and project performance). Further, federal funding programs for many airport, transit, or highway infrastructure projects in fact *require* minority and disadvantaged business participation through the Disadvantaged Business Enterprise Program in direct conflict with the DOT DEI Conditions. *See, e.g.,* 23 U.S.C. § 177(e)(2); 49 U.S.C. § 47113. 49 C.F.R. § 26.5 (establishing race and gender as criteria to be considered socially and economically disadvantaged).

Again, the Government argues that DOT is authorized to condition funding per the DOT Grant Conditions based on broad interpretations of statutory language such as DOT may "prescribe terms for a project that receives Federal financial assistance," 49 U.S.C. §5334(a)(1), DOT's terms can include those it "considers necessary," *id.* § 5334(a)(9), FAA project grant offers may include terms "the Secretary considers necessary to carry out this subchapter and regulations prescribed under this subchapter," 49 U.S.C. § 47108(a), and DOT may "prescribe requirements for [grant recipients] that the Secretary considers necessary," *id.* § 47107(g). Dkt. 40 at 33. Yet, it remains unclear how precluding DEI programming and gender ideology and cooperating with immigration enforcement are necessary to deliver effective transportation services. Accordingly, broad interpretations suggesting that DOT's authority to condition federal funding is unlimited or at least reaches so far as the Grant Conditions do not hold water in light of the rule that agency interpretation of a statute is less persuasive when it does not invoke the agency's expertise. *Loper*

1    *Bright*, 603 U.S. at 402.

2         **c.  HHS Grant Conditions**

3         As with HUD and DOT, Congress has not authorized HHS to condition its grants on

4    compliance with all EOs, precluding the promotion of DEI or gender ideology, or cooperation

5    with federal immigration enforcement. For example, the High-Impact HIV Prevention and

6    Surveillance Program statutory requirements relate not to precluding DEI and gender ideology or

7    requiring cooperation with federal immigration but instead to recordkeeping and patient

8    confidentiality and other activities related to health and human services. 42 U.S.C. § 247c(b)–(c).

9    Statutory requirements for the Healthcare Providers grant program relate to promptness and

10   continuity of primary health services, collaboration with other providers, quality improvement,

11   financial responsibility, reimbursement, fee schedules, facility capacity, and accessibility of

12   services—including with express reference to populations with "substantial proportion of

13   individuals of limited English-speaking ability" and "medically underserved populations." *Id.* §

14   254b(k)(3). Ryan White program grants have as an express statutory purpose "address[ing] the

15   disproportionate impact of HIV/AIDS on, and the disparities in access, treatment, care, and

16   outcomes for, racial and ethnic minorities," *id.* § 300ff-121(a).

17        To establish congressional authority for its HHS Grant Conditions, the Government again

18   falls back on agency regulations, which are not a source of *congressional* authorization, and broad

19   congressional authorizations of grantmaking discretion. Dkt. 40 at 33 (citing 42 C.F.R. § 52.9

20   ("The Secretary may… impose additional conditions… when in the Secretary's judgment such

21   conditions are necessary to assure or protect advancement of the approved project, the interests of

22   the public health, or the conservation of grant funds."); 42 U.S.C. § 300x-6(a)(7) (Community

23   Mental Health Services Block Grants may include assurances "the Secretary determines to be

24   necessary to carry out this subpart.")). The Government also cites as statutory authority for the

25   HHS Grant Conditions Sections 254b(k)(1) and 300ff-15(a) & (b) which provide that the HRSA

26   Health Center Program and Ryan White grants "shall contain such *information* as the Secretary

27   shall prescribe." 42 U.S.C. § 254b(k)(1), 300ff-15(a) & (b) (emphasis added). However, open-

28

United States District Court
Northern District of California

ORDER ON PRELIMINARY INJUNCTION
CASE NO. 25-cv-07070-RS

22

1  ended discretion to include information is not the same as discretion to create new grant

2  conditions.

3      The Government also argues that the HHS Grant Conditions are appropriate because the

4  HHS Secretary is expressly authorized to require grantees to certify compliance with Title IX of

5  the Education Amendments Act of 1972. Dkt. 40 at 33 (citing 20 U.S.C. § 1682). Ironically, under

6  current law failure to recognize an individual's transgender status is, in fact, a violation of Title

7  IX. *See e.g., Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025); *Grimm v. Gloucester Cnty.*

8  *Sch. Bd.*, 972 F.3d 586, 616– 17 (4th Cir. 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,

9  75 F.4th 760, 769 (7th Cir. 2023).

10     For the reasons set forth above, Plaintiffs are likely to succeed on their APA claims that the

11  HUD, DOT, and HHS Grant Conditions are in excess of statutory authority.

12  **iv. APA Contrary to the Constitution**

13     Under the APA, a court may set aside an agency action that is "contrary to constitutional

14  right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Plaintiffs are likely to succeed on

15  their claims that the Grant Conditions violate Separation of Powers as in excess of statutory

16  authority as sort forth above and the Fifth Amendment.

17      **a. Due Process**

18     "[C]larity in regulation is essential to the protections provided by the Due Process Clause

19  of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253

20  (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). "[I]f its prohibitions are not

21  clearly defined," "[i]t is a basic principle of due process that an enactment is void for

22  vagueness." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). *See also Williams*, 553 U.S.

23  at 304. "[A] regulation is not vague because it may at times be difficult to prove an incriminating

24  fact but rather because it is unclear as to what fact must be proved." *F.C.C. v. Fox*, 567 U.S. at 253

25  (citing *Williams*, 553 U.S. at 306). The two primary concerns with vague regulations are that "(1)

26  they do not give a 'person of ordinary intelligence a reasonable opportunity to know what is

27  prohibited, so that he may act accordingly'; and (2) they encourage arbitrary and discriminatory

28

United States District Court
Northern District of California

United States District Court
Northern District of California

enforcement by not providing explicit standards for policemen, judges, and juries." *United States v. Jae Gab Kim*, 449 F.3d 933, 941–42 (9th Cir. 2006) (quoting *Grayned*, 408 U.S. at 108). As to the latter, "the doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358, n. 7 (1983)).

"[T]he degree of vagueness that the Constitution [allows] depends in part on the nature of the enactment." *Dimaya*, 584 U.S. at 156 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)). There is "greater tolerance" for vagueness in "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 156. The same is also true "when the Government is acting as a patron rather than as sovereign" and "awarding scholarships and grants on the basis of subjective criteria." *Nat'l. Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). However, when a vague condition abuts First Amendment freedoms, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests.*, 455 U.S. at 499. *See also Grayned*, 408 U.S. at 109. This— "whether [a law] threatens to inhibit the exercise of constitutionally protected rights" such as First Amendment rights—is "perhaps the most important factor affecting the clarity that the Constitution demands." *Vill. of Hoffman Est.*, 455 U.S. at 499.

Whether facial or as-applied, Plaintiffs are likely to succeed on the merits of their due process challenges to the HUD, DOT, and HHS Grant Conditions. Defendants insist that "Plaintiffs bring sweeping, facial claims against the general grant conditions." Dkt. 40 at 22. However, Plaintiffs argue that as-applied to them enforcements of the Grant Conditions are overbroad and arbitrary. For example, HUD has said that the City of Fresno's FY2025 CDBG grants will not be approved because they are not "consistent" with the Grant Condition Executive Orders, citing parts of the plan that aim "to improve housing affordability and stability, reduce racial and economic isolation and support **environmental justice** and sustainability" and provide "[e]mergency shelter for **all genders and their dependent children** who are fleeing domestic

violence." Dkt. 36-15, Skei Decl (emphasis added by HUD). SAMHSA has alerted the County of Marin that it identified "costs and activities related to diversity, equity, and inclusion (DEI)" in one of its grant continuation applications and requested Marin certify compliance with certain DEI terms prohibiting spending funds on DEI activities without further defining DEI activities. Dkt. 43-5, Paran Decl., ¶ 5.

Further, to the extent Plaintiffs' claims are "sweeping" as Defendants suggest, Dkt. 40 at 22, it is because the Grant Conditions are sweeping. The Grant Conditions require not just that a particular grant award be used in compliance with the conditions but that each Plaintiff certify compliance across its grant awards and programs and perhaps even general operations. *See e.g.,* Dkt. 36-22, Bacher Decl., Ex. 8 (City of Saint Paul IFAC Agreement requiring recipients to certify they "do[] not operate *any programs* promoting diversity, equity, and inclusion (DEI)) (emphasis added); Dkt. 36-24, RJN, Ex. A (April 2025 General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs requiring that "[n]o state or unit of general local government that receives HUD funding under [sic] may use that funding in a manner that…facilitates the subsidization or promotion of illegal immigration…"); Dkt. 36-24, RJN, Ex. U (HHS Grant Policy Statement revisions effective October 1, 2025 stating that "[b]y accepting federal funds from HHS, recipients certify compliance with all federal anti-discrimination laws and these requirements and that complying with those laws is a material condition of receive federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply."). Accordingly, the Grant Conditions as applied to each Plaintiff implicate the broad range of Plaintiffs' programs.

Finally, even as facial claims, if Plaintiffs' claims implicate First Amendment interests, the standard is not, as Defendants suggest, proving that the conditions would be unconstitutional in all applications. Rather, the standard is whether the conditions "'reach[] a substantial amount of constitutionally protected conduct.'" *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 n.7 (9th Cir. 2001) (citing *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997). *See also Village of Hoffman Estates*, 455 U.S. at 494-95.

ORDER ON PRELIMINARY INJUNCTION
CASE No. 25-cv-07070-RS

The Grant Conditions here apply to funds that "the government has no obligation to offer" in the first instance, *Agency for Intern. Dev. v. All. for Open Socy. Intern., Inc.*, 570 U.S. 205, 212 (2013), and awards based on at least some "subjective criteria," *Finley*, 524 U.S. at 571. However, they also create the risk—based in some cases on Plaintiffs' mere use of already awarded funds—of severe penalties under the FCA and perhaps even criminal prosecution. Further, "even if the government has no obligation to offer [a] benefit in the first instance," "the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights." *Agency for Intern. Dev.*, 570 U.S. at 212. *See also Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) ("The *Speiser-Perry-Regan-Finley* line of cases reflects the Supreme Court's continued cautionary admonition that the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose."). The Grant Conditions here "threaten[] to inhibit the exercise of constitutionally protected [First Amendment] rights," *Vill. of Hoffman Ests.*, 455 U.S. at 499, because, in Plaintiffs' own words, they "leave Plaintiffs guessing whether previously permissible activities—such as hosting community workshops, providing space for local affinity groups' programs and events, or even just using [certain words]—violate the Federal Grant Conditions," Dkt. 36 at 35. Because vagueness here could chill Plaintiffs' expressive activity, lesser tolerance for vagueness is warranted even though the conditions attach to discretionary grant awards.

As for Defendants' reliance on *National Endowment for the Arts v. Finley*, it is misplaced. The grant awards here, for housing, transportation, and health services, are markedly different from the highly subjective "patron[age]" in *Finley*. *See Finley*, 524 U.S. at 571. There, the National Endowment for the Arts selected artists for grants based on inherently subjective criteria such as artistic excellence and merit. *See id.* It did not violate due process to "merely add[] some imprecise consideration," namely, "general standards of decency," to that already highly subjective selection process. *Id.* at 590. Here, on the other hand, selection of Plaintiffs for housing, transportation, and health services grants is not nearly so subjective as selecting artists for artistic merit. As discussed above, Congress has laid out specific aims for the grant programs as well as

specific criteria. The Grant Conditions are not "merely add[itive]" to those selection schemes—they digress from them. The vague conditions here are also different in type from those in *Finley* because they seem to demand that each Plaintiff certify their compliance generally across all federal grants, and so failure to satisfy a condition does not mean, as it did in *Finley*, loss of one grant but rather potential loss of all federal grants administered by the Defendant agency. Accordingly, the tolerance for vagueness in *Finley* is not warranted here.

### 1. Lack of Relation to Agency Expertise

As noted above, that the Grant Conditions are not related to the expertise of the Defendant agencies or Congress' intent in authorizing the grant programs also impacts Plaintiffs' due process claims. It makes the vagueness in the Grant Conditions harder to resolve.

To illustrate, it is not clear what the DOT Gender Ideology Conditions mean when applied to a grantee revitalizing shipping ports in Alameda and enforced by DOT or its operating administrators whose expertise is far afield from gender ideology. *See* Dkt. 36-2, Decl. Ott., ¶ 6 (Port Infrastructure Development Program - Pier and Seaplane Lagoon Repairs). While tempting, the answer cannot be that such a condition is meaningless because Defendants have made clear they will cut funding based on a failure to comply or certify compliance with these conditions. *See e.g.,* Dkt. 36-22, Bacher Decl., Ex. 8, Appendix E (DOT IFAC agreement requiring the City of Saint Paul to include a clause in all subcontracting contracts or agreements requiring that the subcontractor "comply" with the Gender Ideology EO); Dkt. 36-24, Ex. P, Duffy Letter (explaining DOT will "vigorous[ly] enforce[]" compliance, including through "comprehensive audits, claw-back of grant funds, and termination of grant awards," as well as potential "enforcement actions and loss of any future federal funding from DOT.").

### 2. EO Conditions

HUD, DOT, and HHS all have grant conditions requiring compliance with Executive Orders (collectively, "EO Grant Conditions"). *See* Dkt. 36-24, RJN, Ex. A (HUD General Administrative, National, and Departmental Policy requirements and Terms requiring that "[r]ecipients of Federal Awards must comply with applicable existing and future Executive

Orders…including but not limited to" a 'non-exhaustive list' of nine executive orders, including the DEI, Gender Ideology, Elective Abortion, and Immigration Enforcement EOs); Dkt. 36-22, Bacher Decl., Ex. 8, Appendix E (IFAC agreement requiring compliance with "the following non-discrimination statutes and authorities" including but not limited to the DEI and Gender Ideology EOs); Dkt. 36-6, Warhuus Decl., Ex. A (CoC grant agreement stating that recipient's use of funds is "governed by… all current Executive Orders."); Dkt. 36-24, RJN, Exs. W, Z (general terms and conditions for CDC research and non-research grants requiring recipients to "comply with…grants policy contained in… applicable Executive Orders" without designating which EOs are applicable); Dkt. 36-24, RJN, Ex. J at 31 (April 2025 SAMHSA NOFO Application Guide requiring "[a]ll activities proposed in your application and budget narrative must be in alignment with the current Executive Orders").

Plaintiffs are likely to succeed on the merits of their due process challenges to the EO Conditions. Those conditions are impermissibly vague because they incorporate the equally vague language of the EOs themselves and because in some cases they do not specify *which* EOs are "applicable to grantees" and in all cases they do not explain *how* the EOs are applicable to grantees. The EOs require agencies to terminate all "equity" or "equity-related" "actions, initiatives or programs," Executive Order No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025), and "all discriminatory and illegal preferences," Executive Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025); "to combat illegal private-sector DEI preferences," *id.*; to "remove all statements, policies…communications, or other… messages that promote or otherwise inculcate gender ideology," Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025); to "restore the enforcement of United States [immigration] law," Executive Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025), including ensuring "illegal" immigrants do not "obtain any cash or non-cash public benefit," Executive Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025); to prohibit "racial preferences" including using "intentional proxies for race," Executive Order No. 14332, 90 Fed. Reg. 38929 (Aug. 12, 2025); and to prohibit "any…initiatives that compromise public safety or promote anti-American values," *id.*

Much of this language is impermissibly vague on its own. *See e.g., San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC, 2025 WL 1713360, at *18 (N.D. Cal. June 18, 2025) ("Beginning with the executive orders themselves, the relevant provisions of the underlying [DEI] executive orders incorporated into the Directive are highly ambiguous."). Taken together the meaning of compliance with the Executive Orders is even harder to ascertain. For example, do the EO Grant Conditions require or prohibit a Plaintiff to consider certain protected classes as a proxy for immigration status in order to help ensure that immigrants do not "obtain any cash or non-cash public benefit"? *See* Executive Order No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025).

Even if violation of the EO Grant Conditions could be defined, it is not clear what compliance with the EOs requires of *Plaintiffs*. This is especially true since Executive Orders bind only executive agencies, officers, and employees—not private parties or local governments—and many of the EOs are directed at agency heads. For example, is genuine ignorance a viable excuse for non-compliance? If not, what is Plaintiffs' responsibility? How extensively and frequently must Plaintiffs audit their programs and subrecipients to be in compliance? Upon discovering a condition violation, what is sufficient to resolve the violation and how quickly must Plaintiffs act?

Since the EO Grant Conditions leave it "unclear as to what fact[s] must be proved" to comply while Defendants make clear their intent to "vigorously enforce" them, Plaintiffs are likely to succeed on the merits of their claims that the EO Grant Conditions are impermissibly vague under the Fifth Amendment. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. at 253; Dkt. 36-24, Ex. P (Duffy Letter). They do not give grantees "a reasonable opportunity to know what is prohibited, so that [they] may act accordingly" and "encourage arbitrary and discriminatory enforcement by not providing explicit standards for" Defendant agencies and courts reviewing their decisions to use. *United States v. Jae Gab Kim*, 449 F.3d at 941–42 (9th Cir. 2006) (citing *Grayned*, 408 U.S. at 108).

### 3. DEI Conditions

HUD, DOT, and HHS each generally require grant recipients to assure that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies,

United States District Court
Northern District of California

programs, or activities that violate any applicable Federal anti-discrimination laws"[8] and that such

compliance is material under the FCA. *See e.g.,* Dkt. 36-24, RJN, Ex. C (June 2025 revised HUD-

424B Assurances and Certifications form); Dkt. 36-24, RJN, Ex. A (April 2025 Revised HUD

General Administrative, National, and Departmental Policy requirements and Terms requiring

recipients comply with the DEI Executive Order); Dkt. 36-19, Darrow Decl., Ex. A (FTA FY

2025 Certifications and Assurances using substantially similar language and referencing the DEI

Executive Order); Dkt. 36-24 (April 2025 revisions to the HHS Grant Policy Statement, which

since have been removed, stating that "[b]y accepting the grant award, recipients are certifying

that… [t]hey do not, and will not… operate any programs that advance or promote DEI, DEIA, or

discriminatory equity ideology in violation of Federal anti-discrimination laws" as defined in

Section 2(b) of the DEI Executive Order").[9]

HUD and HHS fail to define "diversity," "equity," or "inclusion," or explain what it means

for a program to "promote DEI." At most, they make reference to the meanings "as set forth in

[the DEI Executive Order]." *See e.g.,* Dkt. 36-24, RJN, Ex. U (HHS April 2025 Grant Policy

Statement). Yet, "the relevant provisions of the [DEI] executive orders…are highly ambiguous."

*San Francisco Unified Sch. Dist. v. AmeriCorps*, No. 25-CV-02425-EMC, 2025 WL 1713360, at

\*18. Without further explanation, Plaintiffs do not have notice as to whether trying to reach

disadvantaged communities or women and children, hosting groups of a particular background for

an event, or training with regard to cultural competency, bias or racial disparities in housing,

transportation, or health "promot[es] DEI" that could trigger funding clawbacks or FCA liability.

*See id.* at \*21 ("Our sister courts concur that analogous anti-DEI and anti-equity or equity-related

---

[8] As discussed above, the qualifying language "that violate anti-discrimination law" does not meaningfully clarify the condition's scope but rather inserts confusion by suggesting that programs that "promote DEI" violate anti-discrimination law.

[9] The CDC, HRSA, and July 2025 revisions to the HSS Grant Policy Statement, which have since been removed, issue discrimination conditions that do not make reference to DEI but only require compliance with federal anti-discrimination law. Dkt. 36-24, Exs. X, Y, U. However, since HHS requires compliance with applicable EOs, HHS conditions prohibiting the promotion of DEI persist. *See e.g.,* Dkt. 36-24, RJN, Exs. J, W, X.

United States District Court
Northern District of California

conditions related to President Trump's executive orders are likely too ill-defined to be enforced.")
(collecting cases including *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F.
Supp. 3d 243 (D. Md. 2025), opinion clarified, 769 F.Supp.3d 465 (D. Md. 2025); *Natl. Assn. for
Advancement of Colored People v. U.S. Dept. of Educ.*, 779 F. Supp. 3d 53, 66–67 (D.D.C.
2025); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, —— F.Supp.3d ——,
2025 WL 1621636 (N.D. Cal. June 9, 2025)). Plaintiffs are likely to succeed on the merits of their
due process claims as to the HUD and HHS DEI Conditions.

In the case of the DOT DEI Conditions, additional guidance was given. The Duffy Letter
explains that DOT recipients are prohibited from allocating funds "based on race, color, national
origin, sex or religion," and "establish[ing], induc[ing], or endors[ing] prohibited discrimination
indirectly." Dkt. 36-24, RJN, Ex. P. Discrimination, as defined in the letter, must "not exist in
programs or activities [DOT] funds or financially assists." *Id.* This discrimination includes "any
policy, program, or activity" "[w]hether or not described in neutral terms" "that is premised on a
prohibited classification, including discriminatory policies or practices designed to achieve so-
called 'diversity, equity, and inclusion,' or 'DEI,' goals.'" *Id.* Additionally, "[r]ecipients of DOT
financial assistance must ensure that the personnel practices (including hiring, promotions, and
terminations) within their organizations are merit-based and do not discriminate on prohibited
categories." *Id.* While the Duffy Letter provides more guidance to Plaintiffs, it is still
impermissibly vague. In light of the recent shifting federal anti-discrimination law and the letter's
vague prohibition against grantees "establish[ing], induc[ing], or endors[ing] prohibited
discrimination indirectly," Plaintiffs do not have sufficient notice of what is required of them to
comply with the DOT DEI Conditions.

In sum, Plaintiffs are likely to succeed on their due process claims with regard to the HUD,
DOT, and HHS DEI Conditions.

### 4. Gender Ideology Conditions

HUD, DOT, and HHS require Plaintiffs to certify that they do not "promote" "gender
ideology." *See e.g.,* Dkt. 36-24, RJN, Ex. Q (Letter on behalf of HUD Secretary Scott Turner

explaining that grant agreement "conformity means that a grantee…shall not use grant funds to promote 'gender ideology,' as defined in [the Gender Ideology EO]"); Dkt. 36-6, Warhuus Decl., Ex. A. (CoC grant recipients must "not use grant funds to promote 'gender ideology' as defined in [the Gender Ideology EO]."); Dkt. 36-24, RJN, Ex. E (FHWA competitive grant recipients must certify that they comply with the Gender Ideology E.O.); Dkt. 36-24, RJN, Ex. V (HHS Grant Policy Statement revisions effective October 1, 2025 require certification of compliance with the Gender Ideology EO.). Even if the meaning of gender ideology is sufficiently clear as at least one court has suggested, what constitutes impermissible "promot[ion]" by Plaintiffs is not. *See San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, at *22–23 (rejecting due process challenges to gender ideology conditions because "the Gender [Ideology Executive] Order provides a definition of the key phrase 'gender ideology' and plaintiffs there clearly ascertained in their EPC challenge that it "stands in opposition to the principle that persons can identify as other than strictly male or female, or that persons may have a gender identity different from their biological sex as classified at birth"). The Gender Ideology Executive Order states that

> Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages.  Agency forms that require an individual's sex shall list male or female, and shall not request gender identity.  Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

Section 3(e). In addition,

> Federal funds shall not be used to promote gender ideology.  Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Section 3(g). As discussed above, since the Executive Orders make directives to agency heads, the Gender Ideology Conditions are impermissibly vague as to what is required of Plaintiffs. For example, it is not clear whether reference in the Gender Ideology Grant Conditions to the Gender Ideology EO means that the directive to agency heads that they stop using forms that allow a person to list something other than male or female now applies to Plaintiffs. As another example, it is not clear whether HHS programming designed for individuals using hormone therapies for

United States District Court
Northern District of California

United States District Court
Northern District of California

gender dysphoria would constitute promotion of gender ideology. *See U.S. v. Skrmetti*, 145 S. Ct. 1816, 1829 (2025) (Prohibitions on administering puberty blockers or hormones to treat gender dysphoria, identity disorder, or incongruence classify based on medical use of hormone and not sex.). In short, the HUD, DOT, and HHS Gender Ideology Conditions do not provide Plaintiffs with sufficient guidance, and Plaintiffs are likely to succeed on the merits of their vagueness challenges as to these conditions.

### 5. Elective Abortion Condition

HUD requires that grant recipients shall "not use any Grant Funds to fund or promote elective abortions, as required by [the Elective Abortion EO]." *See* Dkt. 36-6, Warhuus Decl., Ex. A. However, it is not clear what constitutes elective abortion even with reference to the Hyde Amendment because the Elective Abortion EO suggests the Hyde Amendment prohibits elective abortion in all cases when in fact its prohibition expressly excludes cases of rape, incest, and where the life of the mother is at risk. *See* Executive Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025); Pub. L. No. 118-47, § 810, 138 Stat. 591 (2024). Nor is it clear what "promotion" means. For example, the language does not give Plaintiffs notice as to whether housing an individual before or after an elective abortion would violate the condition and allows HUD arbitrarily to enforce the condition against Plaintiffs as it sees fit. Accordingly, Plaintiffs are likely to succeed on the merits of this claim.

### 6. Immigration Enforcement Conditions

HUD, DOT, and HHS require grant recipients to cooperate with federal immigration enforcement while using language such as recipients must "cooperat[e] with and not imped[e] U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law," Dkt. 36-24, RJN, Ex. P; recipients must not "facilitate[] the subsidization or promotion of illegal immigration or abet[] policies that seek to shield illegal aliens from deportation," *id.*, Ex. A; and "[f]unds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens," *id.*, Ex. J at 31. *See also* Dkt. 36-22, Bacher Decl., Ex. 8; Dkt. 36-24, RJN, Exs.

E, R, S, T. By the same logic already discussed the Immigration Enforcement Conditions are impermissibly vague because they do not give Plaintiffs notice as to what "cooperation with" or "not impeding" immigration enforcement or not "subsidizing," "supporting," or "promoting" immigrants require of Plaintiffs. Plaintiffs are likely to succeed on the merits of these claims.

**ii.    Plaintiffs Will Suffer Irreparable Harm If the Conditions Are Not Enjoined**

A plaintiff seeking a preliminary injunction must establish that it is likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent– A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991)).

Plaintiffs here must choose between attempting compliance with unlawful conditions or forgoing millions of dollars of key federal grant funding. This choice causes irreparable harm because the Grant Conditions likely violate Separation of Powers as in excess of statutory authority and Due Process as impermissibly vague, and "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017). Even if Plaintiffs chose to try to comply with the Grant Conditions, their grants might be withdrawn or blocked or reimbursement denied. This uncertainty as to whether the Defendant agencies will consider conditions satisfied creates irreparable injury not just in the form of constitutional injury. "The []uncertainty [also] interferes with [Plaintiffs'] ability to budget, plan for the future, and properly serve their residents" and requires "placing funds in reserve and making cuts to services" which constitutes irreparable harm. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017). This disruption cannot be remedied down the line with money alone as Defendants contend because by then projects on which millions of taxpayer dollars have already been spent, and which require years to complete and coordination across many parties, will have been compromised. Plaintiffs have adequately demonstrated a likelihood of irreparable injury with regard to their claims regarding the HUD, DOT, and HHS Grant Conditions in the form of constitutional injury and budgetary uncertainty.

United States District Court
Northern District of California

1          iii.      **Balance of Equities and Public Interest**

2          A party seeking a preliminary injunction must "establish ... that the balance of equities tips

3  in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the

4  federal government is a party as here, these factors merge. *See Nken v. Holder*, 556 U.S. 418, 435.

5  Here, the public interest is served by giving Plaintiffs the budgetary clarity needed to deliver key

6  public services to their constituents.  Further, "it is always in the public interest to prevent the

7  violation of a party's constitutional rights." *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir.

8  2012) (cleaned up).

9          The Government relies on *Department of Educ. v. California* to argue these merged factors

10  tip in their favor. *See* Dkt. 40 at 37 (citing *Dep't of Educ.*, 604 U.S. 650 (2025)). However,

11  *Department of Education v. California* is fundamentally different from the present case for two

12  reasons. First, plaintiffs there sought injunctive relief based on APA arbitrary and capricious and

13  APA contrary to law claims whereas here there are also serious constitutional concerns. *See*

14  *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 78 (D. Mass. 2025), *appeal dismissed sub*

15  *nom. California v. US Dep't of Educ.*, No. 25-1244, 2025 WL 2604596 (1st Cir. Apr. 23, 2025).

16  Second, the public interest at stake is a matter not just of "financial wherewithal to keep

17  []programs running" but also clarity in governance. *Dep't of Educ*, 604 U.S. at 652. What is the

18  federal government requiring and what choices do Plaintiffs, almost all of whom are local

19  governments, need to make? As for Defendants' concerns about recoupment of government funds,

20  these concerns cut both ways since Plaintiffs may be forced to divert and spend unplanned sources

21  of public money to keep afloat projects that the Grant Conditions jeopardize. In fact, since

22  Plaintiffs have shown a likelihood of success on the merits, this concern cuts in their favor. The

23  balance of harms weighs in Plaintiffs' favor, and preliminary injunction is in the public interest.

24                          **V. SCOPE OF REMEDY AND ORDER**

25          Emergency injunctive relief should not provide "a remedy beyond what [i]s necessary to

26  provide relief" to the injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Accordingly, the

27  injunction here covers the Grant Conditions only to the extent they make requirements of

28                                                        ORDER ON PRELIMINARY INJUNCTION
                                                         CASE NO.  25-cv-07070-RS

United States District Court
Northern District of California

1    Plaintiffs beyond what is required by current federal law. It *is* necessary, however, for the

2    injunction to enjoin each Defendant from enforcing the Grant Conditions against any Plaintiff who

3    is a grantee of the Defendant. To require instead, as the Government requests, that each Plaintiff

4    specifically identify every grant which may be implicated is backwards because Plaintiffs are

5    injured specifically by the uncertainty and broadness of the Grant Conditions' meaning and reach.

6         For the foregoing reasons and for good cause shown, the Court hereby ORDERS that as to

7    the Plaintiffs only:

8         (1) HUD, DOT and their operating administrators, and HHS and their officers, agents,

9              servants, employees, and attorneys, and any other persons who are in active concert

10             or participation with them (collectively "Enjoined Parties"), are enjoined from, as

11             to the Plaintiffs, (1) imposing or enforcing the Grant Conditions, as defined above,

12             or any materially similar terms or conditions with respect to any grants awarded to

13             Plaintiffs; (2) requiring the Plaintiffs to make any "certification" or other

14             representation related to compliance with such terms or conditions; or (3) refusing

15             to issue, process, or sign grant agreements based on Plaintiffs' participation in this

16             lawsuit.

17        (2) The Enjoined Parties shall immediately take every step necessary to effectuate this

18             order, including clearing any administrative, operational, or technical hurdles.

19        (3) By the second day after entry of this Order, Enjoined Parties shall serve and file a

20             declaration(s) verifying that (1) Plaintiffs are not subject to the Grant Conditions

21             and (2) they have complied with this Order, including serving a copy of this order

22             on every defendant agency head, and detailing what additional steps, if any, they

23             have taken to comply.

24        (4) The preliminary injunction shall remain in effect pending further orders from this

25             Court.

26        (5) By September 29, 2025, Plaintiffs shall post a nominal bond of $100 with the Clerk

27             of the Court.

28

ORDER ON PRELIMINARY INJUNCTION
CASE NO. 25-cv-07070-RS

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

## VI. REQUEST FOR SECURITY AND A STAY

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted). Since Defendants have indicated previously that they are willing to wait to enforce the conditions, Defendants have not made a particular showing as to their risk of non-repayment, and Plaintiffs are likely to succeed on the merits of their claims as to HUD, DOT, and HHS, preliminary injunction is not likely to pose any harm to Defendants. Further, a bond would deprive Plaintiffs and the public they serve of the very funds the preliminary injunction seeks to protect. Accordingly, Plaintiffs shall be required to pay only a nominal bond of $100.

As for Defendants' request for a stay, a stay is not appropriate because Plaintiffs are likely to succeed on the merits of their claims, *see Manrique v. Kolc*, 65 F.4th 1037, 1040 (9th Cir. 2023) (citing *Nken*, 556 U.S. at 434), and Defendants have not carried their burden of showing that they are likely to face "irreparable injury… during the period before the appeal is decided," *see Doe #1 v. Trump*, 957 F.3d 1050, 1058–59 (9th Cir. 2020). Accordingly, Defendants' request for a stay is denied.

# VII. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is GRANTED as set forth above.

**IT IS SO ORDERED**.

Dated: September 23, 2025

_____
RICHARD SEEBORG
Chief United States District Judge