ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile:  (559) 457-1084
*Attorney for Plaintiff*
CITY OF FRESNO

LYNDSEY OLSON (MN BN 0332288)*
Saint Paul City Attorney
Lyndsey.olson@ci.stpaul.mn.us
KELSEY MCELVEEN (MN BN 0396744)*
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone: (651) 266-8710
Facsimile:  (651) 298-5619
*Attorneys for Plaintiff*
CITY OF SAINT PAUL
* *Appearing pro hac vice*

MELISSA C. ALLISON (MA BN 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL
(MA BN 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500
*Attorneys for Plaintiffs*
COUNTY OF MONROE
MONROE COUNTY AIRPORT
AUTHORITY
* *Appearing pro hac vice*

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile:  (415) 848-7230
*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF EUREKA; CITY OF
SOUTH LAKE TAHOE; COUNTY OF
SACRAMENTO; COUNTY OF MONROE;
MONROE COUNTY AIRPORT AUTHORITY;
COUNTY OF SAN DIEGO, COUNTY OF MARIN;
CITY OF ALAMEDA; CITY OF REDWOOD
CITY; CITY OF ATLANTA; CITY OF
BEAVERTON; CITY OF CORVALLIS; CITY OF
HILLSBORO; CITY OF MOUNTAIN VIEW; CITY
OF SALEM; CITY OF SAN MATEO; CITY OF
SANTA CLARA; CITY OF SANTA CRUZ; CITY
OF STOCKTON; CITY OF SUNNYVALE; CITY
OF VACAVILLE; COUNTY OF LOS ANGELES;
COUNTY OF SANTA BARBARA

BRIAN E. WASHINGTON (SBN 146807)
Marin County Counsel
KATE K. STANFORD (SBN 302825)
Deputy County Counsel
kate.stanford@marincounty.gov
EDWARD F. SEARS (SBN 297775)
Deputy County Counsel
ned.sears@marincounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF MARIN
3501 Civic Center Drive, Room 275
San Rafael, CA 94903
Telephone: (415) 473-6117
Facsimile:  (415) 473-3796
*Attorneys for Plaintiff*
COUNTY OF MARIN

RENNE PUBLIC LAW GROUP
Attorneys at Law

ALLEGRA J. LAWRENCE
(GA BN 439797)**
lawrence@khlawfirm.com
MICHELLE McCLAFFERTY
(ASB-0880-N10I)**
McClafferty@khlawfirm.com
KREVOLIN & HORST, LLC
1201 West Peachtree St., Suite 3500
Atlanta, GA 30309
Telephone: (404) 400-3350
*Attorneys for Plaintiff*
CITY OF ATLANTA
**Application for pro hac vice forthcoming*

YIBIN SHEN (SBN 233545)
Alameda City Attorney
yshen@alamedaca.gov
CARA SILVER (SBN 136992)
Special Counsel
csilver@alamedaca.gov
DANIEL J. TURNER (SBN 336499)
Deputy City Attorney
dturner@alamedaca.gov
2263 Santa Clara Avenue, Rm 280
Alameda, CA 94501
Telephone: (510) 747-4750
*Attorneys for Plaintiff*
CITY OF ALAMEDA

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH LAKE TAHOE; CITY OF SAINT PAUL; COUNTY OF SACRAMENTO; COUNTY OF MONROE; MONROE COUNTY AIRPORT AUTHORITY; COUNTY OF SAN DIEGO, COUNTY OF MARIN; CITY OF ALAMEDA; CITY OF REDWOOD CITY; CITY OF ATLANTA; CITY OF BEAVERTON; CITY OF CORVALLIS; CITY OF HILLSBORO; CITY OF MOUNTAIN VIEW; CITY OF SALEM; CITY OF SAN MATEO; CITY OF SANTA CLARA; CITY OF SANTA CRUZ; CITY OF STOCKTON; CITY OF SUNNYVALE; CITY OF VACAVILLE; COUNTY OF LOS ANGELES; COUNTY OF SANTA BARBARA,

Plaintiffs,

v.

SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development; the U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SEAN DUFFY in his official capacity as Secretary of the U.S. Department of Transportation; the U.S. DEPARTMENT OF TRANSPORTATION; MARCUS J. MOLINARO in his official capacity as the Administrator of the Federal Transit Administration ; the FEDERAL TRANSIT ADMINISTRATION; GLORIA M. SHEPHERD in her official capacity as the Executive Director of the Federal Highway Administration; the FEDERAL HIGHWAY ADMINISTRATION; BRYAN BEDFORD in his official capacity as the

Case No.: 3:25-cv-07070-RS

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

RENNE PUBLIC LAW GROUP
Attorneys at Law

Administrator of the Federal Aviation
Administration; the FEDERAL AVIATION
ADMINISTRATION; DAVID FINK in his official
capacity as the Administrator of the Federal
Railroad Administration; the FEDERAL
RAILROAD ADMINISTRATION; JONATHAN
MORRISON in his official capacity as the
Administrator of the National Highway Traffic
Safety Administration; the NATIONAL
HIGHWAY TRAFFIC SAFETY
ADMINISTRATION; ROBERT F. KENNEDY,
JR. in his official capacity as Secretary of the U.S.
Department of Health and Human Services; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; LEE ZELDIN in his official capacity
as Administrator of the Environmental Protection
Agency; and the U.S. ENVIRONMENTAL
PROTECTION AGENCY; KRISTI NOEM in her
official capacity as Secretary of Homeland
Security; the U.S. DEPARTMENT OF
HOMELAND SECURITY; KAREN EVANS in
her official capacity as Acting Administrator of
Federal Emergency Management Agency;
the FEDERAL EMERGENCY MANAGEMENT
AGENCY; DOUG BURGUM in his official
capacity as Secretary of the Interior; the U.S.
DEPARTMENT OF THE INTERIOR; PAMELA
BONDI in her official capacity as Attorney
General; the U.S. DEPARTMENT OF JUSTICE,

    Defendants.

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

## I.    INTRODUCTION

Plaintiffs bring this action reluctantly, only after the current Administration's actions have left them no other means of protecting the federal funding essential to their communities.  For years, Plaintiffs have relied on congressionally authorized grant programs to deliver core public services that safeguard public safety and health, connect residents to opportunity, and sustain local economies.  They have endeavored to work cooperatively with federal agencies to administer these programs, but the lawful and predictable administration of these grants has now been upended.

The Constitution vests Congress—not the Executive—with the authority to make laws and appropriate federal funds.  *See* U.S. Const. art. I, § 8; *Cunningham v. Neagle*, 135 U.S. 1, 83–84 (1890).  While the Executive Branch is charged with faithfully executing the laws enacted by Congress, that duty does not include the power to unilaterally rewrite or expand the statutory terms under which federal funds are awarded.  *City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020).

Here, the U.S. Department of Housing and Urban Development (HUD), the U.S. Department of Health and Human Services (HHS), the U.S. Environmental Protection Agency (EPA), the U.S. Department of Homeland Security (DHS), the Department of the Interior (DOI), the Department of Justice (DOJ), and the U.S. Department of Transportation (DOT)—including its operating administrations[1] such as the Federal Transit Administration (FTA), the Federal Highway Administration (FHWA), and the Federal Aviation Administration (FAA), the Federal Railroad Administration (FRA), and the National Highway Traffic Safety Administration (NHTSA) (collectively, the "Defendants")—have imposed vague and unauthorized conditions on federal grants to coerce compliance with executive policy preferences.  These actions exceed Defendants' constitutional and statutory authority, erode the separation of powers, and disregard core constitutional and statutory protections, including the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the Administrative Procedure Act's (APA) procedural safeguards.

---

[1] The FAA, FTA, FHWA, FRA, NHTSA and similar modal agencies within the DOT are officially known as "Operating Administrations."  *See* 49 C.F.R. § 9.3 (defining 'operating administrations' to include FAA, FTA, FHWA, and others within the Department of Transportation); 49 C.F.R. pt. 1, subpt. D (delegating authority to Operating Administrations).

RENNE PUBLIC LAW GROUP
Attorneys at Law

Defendants' overbroad interpretation and enforcement of these conditions are not hypothetical. On or around August 18, 2025, the City of Fresno received an email from HUD notifying it that HUD "is questioning the accuracy of the City of Fresno's certification that the Community Development Block Grant (CDBG) funds described in its Fiscal Year 2025 Consolidated Plan/Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders." HUD has directed Fresno to remove all references to the words "equity," "environmental justice," and all transgender references, and provide assurances that "[t]he City of Fresno shall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." HUD directed Fresno to take these actions no later than 12:00 pm EDT Thursday, August 21, 2025, and provided that "failure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan." Defendants' unlawful attempts to repurpose congressionally established grant programs to serve unilateral policy goals have placed at risk hundreds of millions of dollars in funding already awarded or soon to be awarded to Plaintiffs. If allowed to stand, these unauthorized and unlawful conditions will severely compromise Plaintiffs' ability to maintain safe and reliable transportation infrastructure, ensure aviation safety, public health, and sustain essential transit services. These consequences would ripple across the economy, leaving Plaintiffs more vulnerable to accidents, service failures, and disinvestment. Plaintiffs, therefore, have been forced to file this suit not out of preference, but out of necessity, seeking declaratory and injunctive relief to prevent the enforcement of these unlawful conditions and to preserve their ability to carry out the federally funded programs their residents depend on.

## II.    JURISDICTION

1.    The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 et seq.

2.    Venue properly lies within the Northern District of California because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiffs County of Marin, City of Eureka, City of Alameda, the City of Redwood City, the City of Santa Clara, the City of Santa Cruz, the City of Sunnyvale, and the City of San Mateo reside in this judicial district, and a

1  substantial part of the events or omissions giving rise to this action occurred in this district.  28 U.S.C.

2  § 1391(e)(1).

3      3.      Divisional Assignment:  Pursuant to Civil Local Rule 3-2(d), except as provided in Civil

4  L.R. 3-2(c), all civil actions that arise in the counties of Alameda, Contra Costa, Marin, Napa, San

5  Francisco, San Mateo or Sonoma shall be assigned to the San Francisco Division or the Oakland

6  Division.  This action arises in various counties, including the counties of Alameda, Marin, San Mateo,

7  Santa Clara, and Santa Cruz.

8  **III.    PARTIES**

9      4.      Plaintiff City of Fresno is a municipal corporation and charter city organized and existing

10  under and by virtue of the laws of the State of California.  Fresno's city-operated airports have been

11  allocated approximately $50 million in FAA grants for capital improvement projects and anticipate

12  approximately $100 million in additional grant funding to complete planned airport infrastructure

13  improvements, including the construction of a new air traffic control tower.  For FY 2026, Fresno

14  received a Supplemental and Discretionary Runway Reconstruction grant for approximately $60-70

15  million. Fresno also expects to receive approximately $20 million in Airport Terminal Program funding

16  for FY26, and approximately $50 million in funding for FY 2027.  If Fresno does not accept the FAA's

17  newly imposed conditions and submit its reimbursement request by the end of September, more than $13

18  million in already allocated and expended grant funds will lapse, leaving Fresno unable to recover those

19  funds.

20      5.      Fresno has also been awarded or allocated, on average, approximately $11.7 million over

21  the last three years in HUD grants administered through various programs under HUD's Office of

22  Community Planning and Development (CPD), and over $100 million in DOT grants, described further

23  below, to fund a broad range of transportation and infrastructure projects.  In addition, as a Designated

24  Subrecipient of Caltrans, Fresno was approved for a $600,000 grant from DOT for the construction of a

25  pedestrian bridge over Highway 99.  Fresno was also awarded a 5339a grant for $1,264,735 this June for

26  Fresno's ongoing Facility Improvement project for the Fresno Area Express (FAX yard), which houses

27  Fresno's public transit buses.

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

-6-

6.      Fresno has also been awarded several EPA grants, including $2.2 million in Brownfields grants.  Fresno has also received a $3,791,044 Drinking Water System Infrastructure Resilience and Sustainability grant, which will be used to replace failing polyethylene water services throughout the City of Fresno.

7.      Fresno also utilizes DOJ grants to support community safety efforts.  In FY 2024, Fresno was awarded a $297,935, Justice Assistance Grant (JAG).  The City is using those JAG funds to provide critical funding to support a range of program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections.  Fresno declined to apply for certain DOJ grants in FY 2025, including the Office of Community Oriented Policing (COPS) Community Policing Development Microgrant and the Law Enforcement Mental Health and Wellness Act Program grant because the application required the submittal of DEI and immigration-related certifications.

8.      Fresno also utilizes DOI grant programs.  Fresno currently has two active WaterSMART grants administered by the Bureau of Reclamation: a $734,452 BOR WaterSMART Drought Resiliency Program grant being used to install an on-site wellhead treatment system to remove naturally occurring contaminants from existing municipal potable water supply and a $379,390 WaterSMART Water and Energy Efficiency grant being used to purchase, install, and program 1,500 smart irrigation timers for its residential customers.

9.      Fresno also relies on federal funds administered by DHS through FEMA to support its Fire Department.  The Fresno Fire Department relies on a $702,727.27 Assistance to Firefighter (AFG) grant to protect the health and safety of the public and its firefighting personnel against fire and fire-related hazards and a $7,347,000 Staffing for Adequate Fire and Emergency Response (SAFER) grant to help increase the number of firefighters to meet industry minimum standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards, and to fulfill traditional missions of fire departments.

10.     Plaintiff County of Sacramento is a political subdivision of the State of California and a home rule charter County.  County of Sacramento owns and operates the County's Airport System, consisting of four airports: Sacramento International (SMF), Mather (MHR), Sacramento Executive

RENNE PUBLIC LAW GROUP
Attorneys at Law

(SAC), and Franklin Field (F72)—through its Department of Airports, except for SAC, which is leased from the City of Sacramento.  The Airport System operates as a self-supporting enterprise fund, relying solely on airport revenues and federal funding, with no local tax dollars.

11.    County of Sacramento depends heavily on FAA grants, including Airport Improvement Program (AIP) entitlement and discretionary grants, and Airport Infrastructure Grants (AIG) and Airport Terminal Program (ATP) grants.  From 2021 through 2023, the County received a total of $22,498,822 in AIP grants.  In 2024, the FAA awarded the Airport System $14,573,636 in AIP grants.  To date, the FAA also has awarded $45,166,763 in Infrastructure Investment and Jobs Act (IIJA) grants to the Airport System.  In addition to these grants, the FAA has set aside approximately $70 million to relocate and construct a new air traffic control tower at SMF.  The County expects to receive approximately $9.5 million in grant funding for additional rehabilitation work on Runway 4R/22L at MHR.  To continue meeting the needs of the Airport System's rapidly growing catchment area, the Department also will apply for, and anticipates receiving, an additional $167.5 million in combined AIP and IIJA grants to finance various capital projects.

12.    In 2024, County of Sacramento secured a Transportation Infrastructure Finance and Innovation Act (TIFIA) loan from DOT's Build America Bureau, which provides low-cost loans to eligible large-scale infrastructure projects.  The $36.1 million TIFIA loan is also financing the Pedestrian Walkway Project, which is scheduled to open in the summer of 2026.

13.    County of Sacramento's Department of Health Services encompasses Behavioral Health Services, Public Health, Primary Care Services, and Correctional Health Services.  The County also owns and operates a federally qualified health center (FQHC), known as the County of Sacramento Health Center.  The County's Health budget relies on many millions of dollars in federal funding, including sizeable grants from the U.S. Department of Health and Human Services (HHS) and its divisions.  Currently, the County holds direct and sub-recipient federal grant allocations from HHS, including HRSA, CDC, SAMHSA, and other DHHS Administrative agencies, totaling nearly $148 million.

14.    County of Sacramento receives HUD funding for the support of critical and essential homeless services and housing programs and projects as a passthrough subrecipient entity from

-8-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Sacramento Housing and Redevelopment Agency (SHRA) and Sacramento Steps Forward (SSF), the lead agency for Sacramento's Continuum of Care (CoC).  Currently, about $277,500 of Emergency Solutions Grant (ESG) and $363,000 Community Development Block Grant Programs (CDBG) Public Service funds are used to operate the Mather Community Campus Singles Shelter, which provides shelter, supportive services, and re-housing for up to 150 adults.

15.    County of Sacramento relies on federal funding from the DOT, FHWA, and FTA to provide critical transportation planning and improvements.  For FY2025, the County was allocated $463,882 in Section 5311 grant funds and has received the updated FTA Certifications and Assurances that must be executed within the next few weeks to maintain eligibility for continued FTA formula grants.  In FYs 2023–2024 and 2024–2025, the County received approximately $47,991,689 in FHWA funds to support bridge replacement, street rehabilitation, bicycle and pedestrian improvements, and other critical projects, and for FY 2025–2026 it has budgeted an additional $33 million in FHWA funding for similar work.  The County has also been awarded two discretionary FHWA grants: $800,000 from the Bridge Investment Program and $1,859,680 from the Advanced Transportation Technology and Innovation Program for its County of Sacramento Complete Pedestrian Trips project.  In total, these federal transportation funds amount to approximately $84 million.

16.    Plaintiff City of South Lake Tahoe is a municipal corporation organized under the existing laws of the State of California.  The City of South Lake Tahoe owns and operates the Lake Tahoe Airport (TVL) as a division of its Public Works Department and serves as the airport sponsor for purposes of federal grant funding.  TVL is a general aviation airport and is the only airport within the Lake Tahoe Basin, thereby serving an important role in the area's economy and a critical role in public safety for aircraft access and emergency response staging during large-scale emergencies such as wildfires.

17.    The City of South Lake Tahoe depends on FAA grants to support critical capital projects and maintenance to comply with federally imposed safety requirements, including AIP entitlement and discretionary grants, and AIG grants.  Annually, the City of South Lake Tahoe receives approximately $150,000 in AIP entitlement funds and was allocated $556,000 in AIG grants for Fiscal Years 2022–2025.  The City currently holds FAA grant allocations totaling approximately $1,050,000 for critical capital projects, including its Pavement Maintenance and Management Program and Airport Master Plan.

RENNE PUBLIC LAW GROUP
Attorneys at Law

The City of South Lake Tahoe anticipates needing approximately $20 million in FAA funding over the next three years for Taxiway Alpha Reconstruction, a project necessary to maintain compliance with federal safety standards and ensure safe aircraft operations.

18.     Plaintiff City of Eureka is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California.  Eureka is a recipient of substantial federal funding administered by both HUD and the DOT.  The City will be seeking $5,000,000 in Safe Streets and Roads for All (SS4A) grants for future implementation projects and $1,030,111 in Emergency Solutions Grant (ESG) funding. Eureka also frequently utilizes other HUD programs, including Community Development Block Grants (CDBG) and Continuum of Care grants, and intends to pursue additional grant opportunities in upcoming funding cycles.

19.     Plaintiff City of Saint Paul is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota.  It is a charter city.  Saint Paul is a recipient of substantial federal funding administered by both HUD and the DOT.  Through HUD, Saint Paul receives entitlement grants allocated by statutory formula, including CDBG, HOME, ESG, as well as congressionally directed earmark funding.  At present, Saint Paul has $45.1 million in HUD funds under contract, consisting of $27.1 million in CDBG funds, $7.2 million through the HOME program, $5.7 million in HOME–American Rescue Plan funds, $1.1 million in ESG funds, and $2.6 million in Congressionally Directed Spending.

20.     Saint Paul also receives entitlement and discretionary funding through DOT, including SS4A funds and awards under the Innovative Finance and Asset Concession (IFAC) program.  Currently, the City has $36.3 million in DOT funds under contract.  The City has additionally been awarded $62.8 million in DOT grants not yet under contract—including $15.7 million through SS4A, and $805,000 in IFAC funds—and has a pending $44.3 million application under the Bridge Investment Program (BIP). In total, Saint Paul currently has $197.3 million in federal funding under contract, with approximately $144.6 million dedicated to one-time capital projects and $52.6 million allocated to operational funding. Beyond these amounts, the City has been awarded $64.6 million in federal funds that remain in the post-award contracting phase and has pending applications for an additional $64.2 million.

RENNE PUBLIC LAW GROUP
Attorneys at Law

21.     Plaintiff County of Monroe is a municipal corporation duly incorporated and existing under the laws of the State of New York.

22.     Plaintiff Monroe County Airport Authority (the "Monroe Airport Authority") is a public benefit corporation that was created to finance, construct, develop, operate, and maintain aviation and other related facilities and services with the County of Monroe.

23.     Monroe Airport Authority leases the Frederick Douglass Greater Rochester International Airport (ROC) from the County of Monroe and operates under the terms of a lease and operating agreement dated September 15, 1989, as amended.

24.     In FY 2025, the County of Monroe and Monroe Airport Authority expect to receive over $13 million in DOT grants administered by the FAA to improve safety, security, and infrastructure at ROC.  For example, the County of Monroe and Monroe Airport Authority are relying on over $9 million in IIJA grants to carry out a critically important Terminal rehabilitation project for the airport, which includes replacing the existing fire alarm system for the Terminal, rehabilitating the Terminal viaduct and bridge, and replacing vestibule doors and elevators throughout the Terminal.  They also expect to receive several millions of dollars in AIP grants to acquire Aircraft Rescue & Firefighting (ARFF) safety vehicles and equipment, to rehabilitate the Airport's ARFF building, to develop an FAA-required pavement management program, to ensure that airfield taxiways meet current FAA design standards, and to remove runway obstructions.

25.     Plaintiff Monroe County relies on federal funding from HUD to fund the County's Annual Action Plan.  Monroe County utilizes CDBG, HOME, and ESG grants to fund development of affordable and accessible housing and homeownership opportunities for all low-to-moderate income residents. Annually, the County receives an allocation of approximately $3.1 million in HUD funds.  For the City Program Year 2025, Monroe anticipates expending over $1.8 million of its CDBG allocation on public infrastructure projects, public services, micro-enterprise assistance, fair housing, Section 108 loan payments, and administration and compliance.  For the same Program Year, Monroe County anticipates expending over $1.1 million in its HOME program allocation for affordable housing, CHDO housing development, Tenant-Based Rental Assistance, and administration and compliance.  In addition, Monroe anticipates expending approximately $164,000 in its ESG allocation for rapid rehousing projects,

-11-

emergency shelter/street outreach, homelessness prevention, and administration and compliance.

26.    Monroe County also depends on federal funding from DOT through the SS4A grant to conduct supplemental planning and demonstration activities to identify and mitigate hazardous conditions at intersections and address safety concerns in high-risk corridors.  The County expects to receive $955,476 in SS4A Grants throughout its two-year planning program, in 2025 and 2026.

27.    Plaintiff County of Marin is a political subdivision of the State of California and a governmental entity that serves the Marin County geographic region.

28.    The Marin County Department of Public Works manages the Marin County Airport at Gnoss Field which provides a facility for local aviation, flight training, air charter operations, airplane and helicopter medical flights, and air-to-ground ambulance transfers for the Marin County area.

29.    The County of Marin currently has an open $900,000 FAA AIP grant that was awarded in August 2022, with a four-year budget period to fund preliminary designs, environmental mitigation, and permit applications associated with its runway extension project.  The County of Marin relies on FAA funding to complete the runway extension project and to maintain FAA's safety, security, and infrastructure requirements.

30.    In addition, the County of Marin relies significantly on DOT and FHWA funding to provide infrastructure projects, including emergency road repairs, bridge replacements, and safety improvements.  For fiscal year 2023-2024, Marin's Department of Public Works received approximately $4 million in FHWA funding for highway maintenance, roadwork, and traffic safety measures.  For fiscal year 2024-2025, Marin's Department of Public Works has received approximately $6 million in federal funding to date.  The County of Marin anticipates it will receive approximately $43 million in additional FHWA funding over the next five years to complete existing projects or for similar projects.

31.    The County of Marin's Department of Health and Human Services relies on approximately $57 million in HHS federal funding, including over $10 million in discretionary grants annually.  For example, the County of Marin receives over $2.8 million annually from the CDC to strengthen the County's overall ability to respond to public health emergencies, support the County's access to infectious disease laboratories, and support the County's public health.  Marin County's Continuum of Care also receives over $5 million annually in HUD CoC grants to fund programs and

RENNE PUBLIC LAW GROUP
Attorneys at Law

efforts addressing homelessness. The majority of these funds are granted directly from HUD to the County's partner agencies. For fiscal years 2024 and 2025, Marin was awarded approximately $5.7 million in CoC grants, with the County receiving approximately $400,000 directly.

32.    Plaintiff County of Marin also depends on federal funding from CDBG and HOME HUD programs to fund housing and community development programs that assist low- and moderate-income households by providing decent, affordable housing, creating suitable living environments, and expanding economic opportunities. Annually, the County receives an allocation of approximately $2.2 million in federal funding for housing and community development projects. For Program Year 2025, Marin anticipates expending over $1.5 million in its CDBG allocation for affordable housing development and rehabilitation, public services, fair housing, and administration and compliance. For the same Program Year, Marin anticipates expending approximately $700,000 in HOME program allocation for affordable housing development and rehabilitation.

33.    Plaintiff City of Alameda is a municipal corporation and incorporated city in California. The City of Alameda provides a full range of municipal services to its residents, including police, fire, and emergency response services, a library system, a public park system, its own public electric utility company, land use and transportation planning and public works.

34.    The City of Alameda relies on federal funding from DOT, FHWA, and FTA to provide critical transportation planning and improvements. For FY 2024, the City of Alameda was allocated approximately $16 million in SS4A grants for the City's Lincoln Avenue/Marshall Way/Pacific Avenue Corridor Improvement Project. In addition, the City of Alameda was awarded $1,236,715 in DOT/FHWA funds for transportation emissions reduction projects. For FY 2026, the City of Alameda will apply for $10 million DOT grant to address failures on seaplane ramps and bulkhead.

35.    Plaintiff City of Alameda also relies on funding from HUD. The City of Alameda receives over $2 million in CDBG funds annually to support affordable housing projects and related public improvements, social services, and to provide administrative oversight of those social services and capital projects. In addition, the City of Alameda receives approximately $547,060 annually in HOME grants to fund inclusionary housing projects. The City of Alameda has also applied for a $2,497,000 EPA grant to fund local partnerships to build a system for advancing sustainable development at

-13-

1    Alameda Point, the former Naval Air Station Alameda, with meaningful community engagement.

2    36.    Plaintiff City of Redwood City is a municipal corporation and incorporated city under the

3    laws of the State of California.  Redwood City provides municipal services to a community of about

4    82,423.  Forty-one percent of all households in Redwood City are considered lower income with 15%

5    considered extremely low-income, 11% considered very low-income, and 15% considered low-income.

6    37.    Redwood City relies on HUD funding including CDBG and HOME grants.  Redwood

7    City has been awarded approximately $6.2 million in HUD funding, including over $2 million in CDBG

8    grants and over $3 million in HOME grants.  In addition, Redwood City has $4.2 million in CDBG

9    program income and has committed those funds to make major improvements to Hoover Park.  The park

10    is larger than ten acres in a primarily low-to-moderate income area.

11    38.    Redwood City receives funding from DOT and FHWA as a subrecipient.  Redwood City

12    has received an award of $855,500 in funding from DOT and FHWA for the Bridge Parkway over

13    Marine World Lagoon project.  Redwood City has also received an $8 million grant from the State of

14    California Department of Transportation, which includes DOT and FHWA funding for the U.S. Highway

15    101/ SR 84 Interchange Reimagined project.  In addition, Redwood City has been awarded $3.8 million

16    in One Bay Area Grant 3 funding from the State of California Department of Transportation, which

17    includes FHWA funding, for the Bay Road Complete Streets Rehabilitation Project, $3.4 million in One

18    Bay Area Grant 3 funding from the State of California Department of Transportation, which includes

19    FHWA funding, for the Roosevelt Traffic Calming-Permanent Project, $1,321,000 in One Bay Area

20    Grant 3 funding from the State of California Department of Transportation, which includes FHWA

21    funding, for HIP Program Allocation, and $350,000 in Transit-Oriented Communities Planning and

22    Implementation Grant funding from the State of California Department of Transportation, which includes

23    FHWA funding, for the Lane Use project.

24    39.    Redwood City also receives funding from the EPA.  EPA has appropriated $1,200,000 for

25    a grant for Redwood City's Citywide Stormwater Infrastructure Improvement Project.  The City is

26    currently preparing pre-award materials to secure these grant funds.

27    40.    Redwood City also relies on federal funds administered by DHS through FEMA to

28    implement essential flood-risk reduction, climate-resilience projects, and hazard mitigation throughout

RENNE PUBLIC LAW GROUP
Attorneys at Law

-14-

the city.  Redwood City has received a $306,584 Pre-Disaster Mitigation grant to support the design and engineering of seismic improvements for the Easter Bowl and Glenloch water tanks, as well as several Hazard Mitigation Grant Program (HMGP) awards to support critical flood-mitigation infrastructure, including a majority of the $501,682.50 grant for the Price Storm Drainage Pump Station Improvement Project to upgrade stormwater pumping capacity and reduce street and property flooding, $809,925 for the Bradford Storm Drainage Pump Station Improvement Project to make similar improvements, and $2,000,000 for the Redwood Shores Sea Level Rise Protection project, which will protect homes, schools, businesses, and critical infrastructure by addressing flood risk identified by FEMA and projected future sea level rise. The project will also integrate opportunities for nature-based solutions where conditions allow along a raised and strengthened Redwood Shores levee, while enhancing recreational amenities for the community.  Redwood City has also received approximately $856,904 through FEMA's Flood Mitigation Assistance Grant Program for its Redwood Creek Watershed and Wetland Capacity Project.

41.     Redwood City has also received FEMA funding to support its firefighters through a $1,320,578 Assistance to Firefighter (AFG) grant and a $3,630,607 Staffing for Adequate Fire and Emergency Response (SAFER) grant.

42.     Redwood City participates in the DOJ's Asset Forfeiture Program, which distributes federal forfeiture proceeds in appropriate cases with cooperating state, local, and tribal law enforcement agencies through equitable sharing.

43.     Plaintiff County of San Diego is a political subdivision of the State of California and a governmental entity that serves the San Diego County geographic region.  It is the second-most populous county in California.

44.     The County of San Diego manages seven airports within the County including Borrego Valley Airport, Fallbrook Community Airpark, Gillespie Field, Jacumba Airport, McClellan-Palomar Airport, Ocotillo Airport, and Ramona Airport.  These airports support over 500,000 annual aircraft operations, have over 1,280 based aircraft, and at Palomar Airport, include one of only two airports in San Diego County providing scheduled airline service to passengers.

RENNE PUBLIC LAW GROUP
Attorneys at Law

45.     The County of San Diego's airport system relies on regular funding from FAA to complete necessary maintenance and improvements. For FY 2025, the County of San Diego anticipates approximately $3,367,407 in revenue from FAA grants. FAA funding has been necessary to operate the airport system for at least the last 10 years. The County of San Diego has specifically submitted and received an AIP grant offer for its runway rehabilitation project for Fallbrook Airport. The airport's single runway has deteriorated and is in dire need of resurfacing.

46.     Plaintiff County of San Diego also receives funding from HUD. The County has been allocated approximately $14 million in CDBG, ESG, HOME, and HOPWA funds for fiscal year 2025-2026. The funds are received and administered on behalf of 12 smaller cities within the County of San Diego, including Coronado, Del Mar, Lemon Grove, Poway, Imperial Beach, and Solana Beach. For the fiscal year 2025-2026, the County has been allocated approximately $4,283,065 in CDBG funding and $371,576 in ESG funding. The allocations are used for activities such as street improvements, ADA barrier removal, improvements at senior centers and medical clinics, grants and loans for home and mobile home rehabilitation, affordable housing activities, providing emergency shelters, and other vital services. For the same fiscal year, the County received an allocation of $2,870,446 in HOME funds to support the development of affordable multifamily rental housing, first time home buyer programs, and rental assistance to special-needs populations. The County has also received an allocation of approximately $6,369,845 in HOPWA funds to support people living with HIV/AIDS and their families with housing, meal delivery, housing stabilization, emergency and transitional housing, and supportive services. The County received an allocation of approximately $631,547 in ESG funds.

47.     San Diego County also receives grants administered by HHS, including Ending the HIV Epidemic: A Plan for America — Ryan White HIV/AIDS Program ($2,754,627), the Ryan White HIV/AIDS Program Part A ($12,325,778), and the Ryan White HIV/AIDS Program Part B ($2,322,859). The County uses these federal funds to deliver a range of services, either directly or through contracted community-based organizations, to people living with and at risk for HIV. These services support local efforts to diagnose, treat, and prevent HIV infection and include client support and navigation services to ensure access to treatment and viral suppression, primary medical and dental care, case management, emergency and temporary housing, mental health services, substance use treatment services, and other

-16-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    related services.

2    48.    Plaintiff City of Atlanta ("Atlanta") is a municipal corporation existing under and by

3    virtue of the laws of the State of Georgia.  Atlanta administers an extensive portfolio of public services,

4    including the operation of Hartsfield-Jackson Atlanta International Airport, housing services,

5    rental assistance, neighborhood development and revitalization, and non-aviation related transportation

6    support and service, among many others.  Atlanta relies on many millions of dollars in federal funding,

7    including an anticipated $24.9 million annually in HUD grants, $68 million in DOT grants, $48.9 million

8    in upcoming FAA grants, and $2.4 million in EPA grants.

9    49.    Atlanta relies on HUD funding for support of critical housing services, including to

10   support its mission of developing affordable, equitable, and resilient communities throughout the city.

11   Atlanta receives funding from HUD's CDBG, HOME, ESG, HOPWA, and Lead Hazard Control grant

12   programs.  For FY2023, FY2024, and FY2025 combined, Atlanta received an allocation of over $6.5

13   million in HOME funding to support the development of affordable multifamily rental housing, first time

14   home buyer programs, and rental assistance to special-needs populations.  Also, for FY2023, FY2024,

15   and FY2025 combined, Atlanta received an allocation of approximately $45 million in HOPWA funds to

16   support low-income people living with HIV/AIDS and their families with housing, meal delivery,

17   housing stabilization, emergency and transitional housing, and supportive services.  Additionally, Atlanta

18   received funding through the Lead Hazard Reduction Grant Program, including $1,753,802.27 for

19   FY2024 and $1,857,651 for FY2025, respectively.  Atlanta uses these grants to build safer homes,

20   conduct lead inspections and risk assessments in older homes, and provide community education about

21   the risks of lead exposure and preventive measures.

22   50.    Atlanta also receives significant annual Community Development Block Grant (CDBG)

23   and Emergency Solutions Grant (ESG) funding from HUD to support housing, shelter, and community

24   development programs.  Atlanta received $6,811,222 in CDBG funds for FY2024, $6,971,235 for

25   FY2023, and $6,602,130 for FY2025, which the City uses to support neighborhood revitalization, public

26   facility improvements, essential public services, and programs that benefit low- and moderate-income

27   residents.  Atlanta additionally received $615,584 in ESG funds in FY2023, $612,698 in FY2024, and

28   $598,623 in FY2025 to support homelessness prevention, emergency shelter operations, rapid rehousing,

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    and related services aimed at stabilizing individuals and families experiencing or at risk of

2    homelessness.

3        51.    Through its Department of Transportation ("ATLDOT"), Atlanta is responsible for all

4    aspects of the public right of way within the jurisdiction of Atlanta, including but not limited to traffic

5    management and bridge, street, and sidewalk construction within the right of way.  ATLDOT is

6    responsible for 95,000 street signs, 1,100 traffic signals, 1,400 miles of sidewalks, 155 bridges, and 4,500

7    miles of lanes throughout the city.  As part of the funding of the ATLDOT construction and management

8    of the public right of way, Atlanta pursues and receives millions of dollars in federal grant funding,

9    including entitlement and discretionary funding from the DOT, awarded through agencies including the

10   FTA, the FWHA, and the FRA.  Of particular importance to Atlanta are STBG (Surface Transportation

11   Block Grants) grants, flex fund transfers for pedestrian mobility and accessibility improvements adjacent

12   to rapid transit stations, bicycle mobility improvement grants, and a $25 million BUILD/RAISE[2] grant

13   from DOT (of which Atlanta is a subrecipient through the State of Georgia),  that relate to the Atlanta

14   Beltline project, which is a core element of the redevelopment and revitalization of urban

15   neighborhoods.

16       52.    In FY2024, Atlanta received a $16 million BUILD/RAISE grant to fund the Westside

17   Park Multimodal Access Project, which will fund various infrastructure improvements.   Atlanta has also

18   received several Section 5307 grants since FY2016, funding a number multi-year transportation

19   infrastructure projects.  The projects include: a $6,517,049 grant for the Lee Street Trail Project to

20   construct a multi-use trail that will create safe transit access for pedestrians and cyclists and a $5,880,000

21   grant for Pedestrian Accessibility Improvements.  There is also extension funding for projects that are

22   already underway, including approximately $16 million for pedestrian and bike improvements.  Atlanta

23   has also been awarded a $1.2 million railroad crossing elimination grant from the FRA to fund highway-

24   rail or pathway-rail grade crossing improvement projects that focus on improving the safety and mobility

25   of people and goods.

RENNE PUBLIC LAW GROUP
Attorneys at Law

26

27   [2] This grant program was renamed the Better Utilizing Investments to Leverage Development (BUILD)
     program in 2018.  In 2021, the program's name was changed to Rebuilding American Infrastructure with
     Sustainability and Equity (RAISE) grants.  In 2025, the name was reverted back to the BUILD grant

28   program, though the program's purpose and statutory authorization remain substantively the same.

-18-

53.     Atlanta's Hartsfield-Jackson International Airport also depends heavily on FAA grants, including Airport Improvement Program (AIP) grants, Airport Infrastructure Grants (AIG), and Airport Terminal Program (ATP) grants.  In November 2025, Hartsfield-Jackson International Airport pre-applied for federal grants from the FAA totaling $48,933,406.  These funds will be used for the reconstruction of Runway 9L/27R and replace aging runway and taxiway pavement that has reached the end of its service life.  The federal funds will be matched with $75.5 million from other sources.

54.     Atlanta relies on EPA funding to support its goal to achieve 100% clean energy by 2035 and reduce greenhouse gas emissions by 59% by 2030.  Atlanta receives funding from EPA's Clean Heavy-Duty Vehicle Grant.  The $2,376,203 in funding will replace seven medium and heavy-duty diesel vehicles with zero-emission electric vehicles (ZEVs), install ZEV charging port sites throughout the city, and launch a workforce development and community engagement effort centered on equity and clean transportation.

55.     Plaintiff the City of Beaverton is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Beaverton City Charter.

56.     Beaverton relies on HUD funding for a variety of public services.  For FY2025, Beaverton received an allocation of $679,728 in CDBG funding.  These funds allow Beaverton to offer grants to community programs such as outreach and shelter for homeless households with focus on homeless youth, critical home repair and disability home adaptations, microenterprise assistance and low-income homebuyer assistance.  Beaverton has also received a $3 million allocation through HUD Community Project Funding to support the operation of the Beaverton Shelter, which provides safe, warm accommodations for adults experiencing homelessness.

57.     Beaverton also relies on DOT funding.  Beaverton has been awarded several grants through NHTSA and FHWA as a subrecipient of the Oregon Department of Transportation (ODOT).  These grants include a $ 2 million BUILD/RAISE Planning Grant for the Beaverton Loop Complete Street Project, which will create a strong connection between Beaverton's Old Town and the Beaverton Central district, with wider sidewalks, protected bike lanes, better lighting, new street trees and landscaping, and safer crossings for pedestrians and cyclists.  Beaverton has also received a $20,000 Safety Belt Grant that will fund the Beaverton Police Department's education services for safety belt and

-19-

RENNE PUBLIC LAW GROUP
Attorneys at Law

child passenger safety, as well as for education and traffic enforcement activities. Beaverton has also received a $20,000 Impact Distracted Driving Grant as part of the Statewide Distracted Driving Overtime Enforcement Campaign (DD) mini-grant program to Oregon law enforcement agencies to include education and prevention for texting while driving and youth cell phone use while driving. In addition, Beaverton received a $25,000 Impact DUII Grant that will fund overtime for Driving Under the Influence of Intoxicants enforcement. Beaverton has also been awarded a $33,000 Impact Speed Grant as part of a Speed Overtime Enforcement mini-grant program to Oregon law enforcement agencies to reduce the number of vehicles exceeding the maximum permitted speed limits while driving.

58. Beaverton has also been awarded a $500,000 Brownfield assessment grant by the EPA to assess the scope and scale of brownfields within Beaverton.

59. Beaverton relies on DOJ funding for its Municipal Court and police department. The Beaverton Municipal Court received a DOJ Bureau of Justice Assistance (BJA) grant of $724,000 for its Beaverton Sobriety Opportunity for Beginning Recovery (B-SOBR) treatment court that assists repeat DUII offenders in recovering from alcohol and drug additions. B-SOBR participants agree to strict supervision while remaining out of jail, including court check-ins, communication with a case manager, sobriety and urine tests, wearing an alcohol monitoring bracelet, and random check-ins from Beaverton police officers. The Beaverton municipal court also has a $500,000 BJA Byrne Discretionary Community Project Funding/Byrne Discretionary Grants Program grant for its Behavioral Health Court, which employes a probation diversion model in which participants check in twice per month with the judge all while enrolling in treatment services and following their treatment plan.

60. The Beaverton Police Department also has a number of BJA and other DOJ grants. The department has received BJA Byrne Memorial Justice Assistance Grants in excess of $50,000 for use in, without limitation, purchasing communication devices and officer training. The Beaverton Police Department has also received Patrick Leahy Bulletproof Vest Partnership Program grants that pay 50 percent of the cost of the bulletproof vests needed by the department. Beaverton has participated in this program for many years and currently has applied for grant of approximately $20,000.

61. The City of Corvallis is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Corvallis City Charter.

-20-

RENNE PUBLIC LAW GROUP
Attorneys at Law

62.    Corvallis relies on HUD funding to help address the needs of low-income residents.  For FY2025, Corvallis received a $343,303.22 HOME Investments Partnership Program grant, which will support tenant based rental assistance, Community Housing Development Organization (CHDO) funding, and administration costs.  Corvallis has also been awarded $581,812.00 in CDBG funding, which will fund the Homeowner Rehabilitation Program, a program that assists low-income homeowners with housing rehabilitation loans that address housing quality standards and ensures continued housing for these homeowners.  The award will also support the installation of an ADA public restroom in a low-income neighborhood, ADA Parking Spaces Reconstruction, Social Service Operations, and administration costs for these programs.

63.    The City of Corvallis also relies on federal funding from DOT, FAA, FHWA, and FTA to provide critical transportation planning and improvements.  For FY 2025, Corvallis was allocated approximately $340,550 in Airport Infrastructure grants, which will fund several improvement projects for the Corvallis Municipal Airport, including projects for pavement maintenance and new hangar taxi lanes.  The City of Corvallis also received an Airport Rescue Grant to support Airport operational expenses.  In addition, the City of Corvallis has been awarded millions in FTA Section 5307 grants since FY2019, including over $3.4 million in funding for FY2025 alone.  Additionally, the FTA has awarded the City of Corvallis $2,658,068 for FY2025 to fund the purchase of hybrid electric buses, and the City has received hundreds of thousands of dollars from FHWA as a subrecipient of the State of Oregon for traffic signal safety enhancement as part of the All-Roads Transportation Safety grant program.

64.    Corvallis received funding as a subrecipient of the State of Oregon from the DOI's Land and Water Conservation Fund Grant Program for FY 2024.  This grant will support Capital improvements at Dr. Martin Luther King, Jr. Park in Corvallis, a project which includes the construction of a children's play area, restroom facility, outdoor fitness area, and basketball court.  Corvallis also received over ten-thousand dollars from DOJ for bulletproof vests in FY2025 as a subrecipient of the State of Oregon as part of the Patrick Leahy Bulletproof Vest Partnership, and has received millions of dollars from DHS as a subrecipient of the State of Oregon to support ambulance operations as part of the Ground Emergency Medical Transportation grant program.

RENNE PUBLIC LAW GROUP
Attorneys at Law

65.     The City of Hillsboro is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Hillsboro City Charter.

66.     Hillsboro annually receives HUD CDBG funding to support the provision of housing services.  For FY2025, Hillsboro received an award of $681,847.  This award allows the City to assist community members by increasing housing stability, improving of public facilities, and providing opportunities for affordable homeownership.

67.     Hillsboro also received approximately $410,000 in funding from the DOI's Land and Water Conservation Fund Grant Program through the State of Oregon Parks and Recreation Department. This grant will support capital improvements for the development of futsal courts at Dairy Creek Park in Hillsboro.

68.     Hillsboro has also received or manages approximately $940,000 in federal funds from DHS and FEMA, through the Oregon Emergency Management Department, from the Homeland Security Grant Program – State Homeland Security Program for vulnerable facility security enhancements and FEMA's Hazard Mitigation Grant Program.

69.     Hillsboro also relies on DOT funding.  Hillsboro has been awarded several grants through NHTSA as a subrecipient of Oregon Impact.  These grants include approximately $20,000 in total funding from the Impact Distracted Driving Grant, the Impact DUII Grant and the Impact Speed Grant to support distracted driving high visibility enforcement, driving under the influence of intoxicants high visibility enforcement, and speeding high visibility enforcement.  Hillsboro has also received approximately $195,000 in FHWA grant funding as a subrecipient from Oregon Metro under the Safe Routes to School grant program, which is funded through FHWA's Surface Transportation Block Grant.

70.     Hillsboro has received a $2,240,000 Drinking Water System Infrastructure Resilience and Sustainability grant from the EPA, which is being used to make improvements to the Hillsboro water system.

71.     Hillsboro has also received $500,000 in a Brownfield Assessment grant from the EPA to assess the scope and scale of brownfields within downtown Hillsboro.

72.     Hillsboro also relies on DOJ funding.  Hillsboro has been awarded several grants either directly from DOJ or indirectly as a subrecipient through the State of Oregon.  These grants include

-22-

RENNE PUBLIC LAW GROUP
Attorneys at Law

approximately $400,000 from the Stop Violence Against Women grant program, approximately $92,000 via various awards under the Edward Byrne Memorial Justice Assistance Grant (JAG), and approximately $224,000 from the Community Oriented Policing Services Grant Program.

73.    Plaintiff City of Mountain View is a charter city organized and existing under and by virtue of the laws of the State of California.

74.    Mountain View receives annual funding from HUD programs, including CDBG and HOME grants.  For FY 25-26, Mountain View has been allocated $617,916 in CDBG funds, and in previous years has been allocated $604,684 for FY 24-25, $610,539 for FY 23-24, $624,777 for FY 22-23, and $609,773 for FY 21-22 with varying remaining balances.  The HOME program allocated $230,385.94 for FY 25-26, $237,782.16 for FY 24-25, $285,869 for FY 23-24, $297,598 for FY 22-23, $271,350 for FY 21-22, $273,103 for FY 20-21, and $263,732 for FY 19-20, with significant remaining balances for each year.  Additionally, the HOME Investment Partnerships Program American Rescue Plan provided $983,655 and the Economic Development Initiative Community Project Funding provided $1,616,279 in federal funds.  Mountain View relies on these funds to support the development and rehabilitation of affordable housing projects, various nonprofit public services, supportive services, a program to assist low- and moderate-income homeowners with repairs, a program to assist microenterprise businesses that provide childcare services, and program administration costs.

75.    Mountain View will also receive $200,000 in federal funding from DOT as a subrecipient of the Metropolitan Transportation Commission via the Mobility Hub Pilot Grant Program.  This program is funded through FHWA grant funding and will be used for a project at the Mountain View Transit Center to implement multi-modal enhancements, including bicycle storage and parking, charging for electric bikes and scooters, circulation improvements, information kiosks, and way-finding signage.

76.    The City of Salem is a charter city and municipal corporation organized and existing under the constitution and laws of the State of Oregon and the Salem City Charter.

77.    Salem relies on federal funding from DOT, FHWA, and FAA to provide critical transportation planning and improvements.  Salem has been allocated multiple Airport Infrastructure Grants from the FAA totaling $1,977,215 to support critical airport infrastructure improvements at the Salem-Willamette Valley Airport.  Salem has also received a $2,704,800 BUILD/RAISE grant from

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    FHWA to fund development of the Front Street Redevelopment Transportation Corridor Plan in

2    downtown Salem.

3    78.    The City of San Mateo is a charter city organized and existing under and by virtue of the

4    laws of the State of California.

5    79.    San Mateo has been awarded a CDBG grant of $766,315 from HUD, which will provide

6    funds for critical public services, such as legal services for victims of domestic abuse, shelter services for

7    families, youth mentoring, legal aid for eviction cases, sexual abuse services for youth, free groceries,

8    rental assistance, and low-income home repair programs to the community.

9    80.    The City of Santa Clara is a charter city organized and existing under and by virtue of the

10   laws of the State of California.

11   81.    Santa Clara relies on millions in HUD funding including CDBG and HOME grants.  For

12   FY2025/2026, Santa Clara has been awarded $1,019,13 in CDBG grants and $356,007 in HOME grants.

13   Santa Clara has committed these funds to provide an extensive portfolio of housing services to low-

14   income individuals in the community.

15   82.    Santa Clara also has an extensive portfolio of entitlement and discretionary funding

16   received directly and indirectly from DOT, including over $5 million in Community Project Funding

17   from the FHWA to upsize storm drain pipeline, replace existing storm drain manholes, and the design

18   and construction of bicycle facilities and infrastructure, $450,000 Safe Streets for All (SS4A) funds,

19   $4,386,152 for grade crossing improvements, and multiple awards under the Selective Traffic

20   Enforcement Program.  As a Designated Subrecipient of Caltrans, Santa Clara has received $573,750 in

21   federal funds to complete a project to improve railroad crossings, $262,360 for bridge preventative

22   maintenance, $418,880 for bridge maintenance, and $1,053,435 for the Transit and Intercity Rail Capital

23   Program (TIRCP).  Additional projects that rely on federal funding include a One Bay Area Grant for

24   Bicycle and Pedestrian Improvements, which will fund significant pedestrian and bicycle improvements

25   that will ensure safer infrastructure for cyclists and pedestrians, among others.

26   83.    Santa Clara received $332,902 in EPA funding through the San Francisco Bay Water

27   Quality Improvement Fund, a competitive grant program that funds projects to protect and restore the

28   San Francisco Bay.  This award funds a project to rehabilitate parking facilities at Bowers Park, a popular

RENNE PUBLIC LAW GROUP
Attorneys at Law

-24-

community park in the City.

84.    Santa Clara has received federal funds, directly and indirectly DHS and FEMA, including: $60,000 in Bay Area UASI Funds for Fire CTOs Training, which reimburse personnel costs for approved trainings; $11,269,422 through a Staffing for Adequate Fire and Emergency Response (SAFER) grant funding firefighter staffing for front line operations; and approximately $250,000 in State Homeland Security Grant Program funds related to urban search and rescue training and deployment grant reimbursing personnel costs for trainings and deployments.

85.    Santa Clara participates in the DOJ's Asset Forfeiture Program, which distributes federal forfeiture proceeds in appropriate cases with cooperating state, local, and tribal law enforcement agencies through equitable sharing.

86.    Plaintiff the City of Santa Cruz is a charter city organized and existing under and by virtue of the laws of the State of California.

87.    Santa Cruz relies on millions in HUD funding, including CDBG and HOME program formula funding.  Santa Cruz uses CDBG funds to provide housing, establish a suitable living environment, and expand economic opportunities for its low- and moderate-income residents. Specifically, Santa Cruz uses its CDBG funds for services such as support for social service providers and community facility improvements.  From Fiscal Years 2021-2025, Santa Cruz was awarded approximately $1,951,110 in CDBG funds.  Santa Cruz uses HOME funds to produce and preserve affordable housing for low-income households through building affordable housing, rental assistance, housing rehabilitation, and homeownership assistance.  From Fiscal Year 2023-2026, Santa Cruz was awarded approximately $6,471,573 in HOME funds.

88.    In addition, Santa Cruz utilizes millions of dollars in DOT grant funding as both a direct recipient and subrecipient through Caltrans.  The Santa Cruz Police Department relies on $73,000 in pass-through funding from the California Office of Traffic Safety for the Traffic Enforcement Program. Santa Cruz's Department of Public Works relies on $3,816,000 in DOT pass-through funding from the California Office of Traffic Safety for City Arterial & Collector Street Maintenance and Reconditioning; $4,852,609 in FRA funding for Rail Trail Segments; $45,096,435 in FHWA funding to address and mitigate future road damage due to storms and coastal erosion; and $1,504,700 in Highway Safety

Improvement Program funding for unsignalized crossing improvements and advanced dilemma zone detection and retroflection.

89.     Santa Cruz relies on DHS and FEMA funding to support efforts to mitigate potential disasters.  The City relies on $190,000 in FEMA Hazard Mitigation funding to update the City's local hazard mitigation plan and to mitigate future disaster losses in the community.  The Department of Parks and Recreation relies on $360,994 in FEMA Disaster Relief Grant funding to conduct storm damage repair.  The Department of Public Works relies on $12,520,035 in FEMA funding for Public Works projects, including drainage system assessment, road work, and erosion repair.  The City's Water Department relies on $9,415,048 in FEMA Hazard Mitigation funding.  The City's Economic Development office intends to apply for approximately $200,000 in HSGP-UASI funding as soon as the next round of applications begins.

90.     Santa Cruz receives $19,020 in Bulletproof Vest Partnership Grant funding from DOJ.

91.     Santa Cruz relies on millions of dollars of Congressional Direct Spending through the EPA for water projects, including $1,000,000 for a water tank replacement and rehabilitation project and $959,752 for a water pipeline project.  Santa Cruz also intends to apply for millions of dollars in State Water Board pass-through grants from the EPA, related to supplying clean and safe drinking water, in or around March 2026.

92.     The City of Stockton is a charter city organized and existing under and by virtue of the laws of the State of California.

93.     Stockton annually receives funding through various HUD grant programs.  For FY2025, the City has been allocated $3,229,216 in CDBG funds, $248,821 in ESG funds, and $1,382,561 in HOME funds.  These grant funds support a variety of services to promote housing affordability, increase homeownership for low to moderate income populations, and other critical housing-related services.

94.     Stockton will also receive approximately $500,000 in funding through the DOJ-COPS Office Safer Outcomes: Enhancing Deescalation and Crisis Response Training for Law Enforcement Safer Outcomes program.  This award funds specialized training for law enforcement agencies to promote safe outcomes during police encounters with persons in crisis, including training for law enforcement officers, support personnel, campus public safety officers, and mental health professionals.

-26-

RENNE PUBLIC LAW GROUP
Attorneys at Law

95.     Stockton also utilizes DOI grant programs.  For FY 2024, the city applied for and received a grant through the Bureau of Reclamation's WaterSMART Water and Energy Efficiency Grant program for $4,273,925.  This funding will support a project to replace and retrofit the City's outdated metering system, improving water meters with advanced metering infrastructure for residential, commercial, and irrigation customers.  The project will promote efficiency and preserve water resources to achieve a more reliable water supply for economically challenged communities in Stockton.

96.     The City of Sunnyvale is a charter city organized and existing under and by virtue of the laws of the State of California.

97.     Sunnyvale depends on HUD funding to provide housing and supportive services through the community, including $1,038,891 in CDBG funding and $383,900 in HOME funding.  This funding supports low-income home rehabilitation programs, counseling, food programs, fair housing programs, and tenant's rights programs that serve vulnerable populations including children, foster youth, persons experiencing homelessness, and seniors.  Sunnyvale also relies on approximately $1,000,000 in Congressionally directed spending administered by HUD for the "Fire Station No. 2 – New Construction" project.

98.     The City of Sunnyvale relies on approximately $836,000 in Surface Transportation Program (STP) funding from DOT for the "Traffic Signal Upgrades at Sunnyvale/California" project and approximately $1,000,000 in STP funding for the "Poplar Sidewalk" project.

99.     The City relies on approximately $880,000 in Congressionally directed spending administered by DOT for the "Pedestrian and Safe Routes to School (SRTS) Improvements in SNAIL and Braly Corners Neighborhoods" project; approximately $3,000,000 in for the "Stevens Creek Trail Extension" project; and approximately $2,500,000 for the "Bernardo Avenue Bicycle and Pedestrian Undercrossing" project.

100.     Sunnyvale also relies on approximately $2,480,000 in Caltrans Highway Bridge Program funding for the "Preventative Maintenance for Various Bridges" project, sourced from federal DOT funds.

101.     In addition, the City relies on approximately $500,000 in One Bay Area Grant program funding for the "Bernardo Avenue Bicycle and Pedestrian Undercrossing" project, funded by the

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    Congestion Mitigation and Air Quality (CMAQ) program through DOT.

2        102.    Sunnyvale also relies on millions of dollars of EPA funding, including revolving fund

3    loans, to support its Cleanwater Program's rehabilitation and construction projects at the City's Water

4    Pollution Control Plant.  These projects are ongoing and expected to continue into the 2040's.  For the

5    2025-2026 fiscal year, Sunnyvale anticipates receiving over $30 million in loans from the EPA for its

6    Cleanwater Program.

7        103.    The City of Vacaville is a general law city organized and existing under and by virtue of

8    the laws of the State of California.

9        104.    Vacaville has been awarded funding through DOT, including an FHWA Safe Streets and

10   Roads for All (SS4A) grant of over $11 million.  Additionally, Vacaville has received over $4 million in

11   funding through the FTA, which supports operating assistance for Vacaville's public transit system, as

12   well as projects to improve and build electric charging infrastructure for buses and other transit

13   expansion projects.

14       105.    Vacaville also relies on federal funds administered by HUD, including $2,638,400 in

15   CDBG Section 108 Loan Guarantee Loan Program funds, $500,000 in HOME Investment Partnership

16   Program funds, and $312,654 from Family Self Sufficiency (FSS) Program.  These funds enable the City

17   to finance critical community development projects, expand affordable housing opportunities, and

18   provide stability and self-sufficiency services to low-income households.

19       106.    The County of Los Angeles is a charter County organized and existing under and by virtue

20   of the laws of the State of California.

21       107.    Los Angeles County depends on HUD grant funding to support housing services.  The

22   County receives more than $28 million in funding through the HUD, including Emergency Solutions

23   Grant ($1,725,321 for FY 2025-26), Community Development Block Grant ($19,508,115 for FY 2025-

24   26), and HOME Investment Partnerships Program Grant ($7,427,175.63 for FY 2025-26).  The ESG

25   funding supports homelessness prevention, shelter, street outreach, and rapid rehousing programs.

26   CDBG funding supports community, housing, and economic development programs that primarily

27   benefit low- and moderate-income households/residents.  The HOME Investment Partnerships Program

28   Grant funds a wide range of activities including building, buying, and/or rehabilitating affordable

-28-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  housing for rent or homeownership or providing direct rental assistance to low-income people.

2  108.    Los Angeles County relies on approximately $54,288,324 in DOT funding, which support

3  a wide range of projects aimed at improving transportation infrastructure and fostering transportation

4  safety and accessibility.  This funding includes Safe Streets and Roads for All (SS4A) funds for the

5  Florence-Firestone for All Project ($16,364,807), the Urban and Rural Los Angeles County: Together for

6  Road Safety Project ($576,000), and the Safer Steps for Los Angeles County Pedestrians ($29,805,830).

7  Los Angeles County also receives DOT funding for the Reconnecting Communities Grant Program for

8  the East Los Angeles Green Bridge Project for Belvedere Park ($800,000), Promoting Resilient

9  Operations for Transformative, Efficient, and Cost-Savings Transportation (PROTECT) grant funds for

10  the Resilient Castaic-Santa Clarita Valley Project ($3,178,400), and Bridge Investment Program funds

11  for the Enhancing Safety and Mobility: Slauson Avenue Bridge Widening Project ($320,000).

12  109.    Los Angeles County also receives Airport Improvement Program (AIP) and Airport

13  Infrastructure Grant (AIG) funds for the San Gabriel Valley Airport ($1,497,535), the Compton/Woodley

14  Airport ($1,156,319), and the General William J. Fox Airfield Airport ($589,433).

15  110.    In addition, Los Angeles County has been approved to receive approximately $9 million

16  in federal grant funds from HHS for programs administered by the Health Resources and Services

17  Administration (HRSA), including the Healthy Start Initiative ($1.1 million annually for five years) and

18  the Maternal Mental Health and Substance Use Disorders Program ($750,000 annually for five years).

19  The County uses these federal grant funds for perinatal case management with group health education

20  and community education, as well as for operating a perinatal psychiatric and substance use consultation

21  line with accompanying provider training.  Los Angeles County has also been approved to receive

22  $8,766,368 in federal grant funds from HHS for the National Bioterrorism Hospital Preparedness

23  Program administered by the Administration for Strategic Preparedness and Response (ASPR).  Los

24  Angeles County receives additional federal funds from HHS to deliver a range of services to people

25  living with and at risk for HIV, either directly or through contracted community-based organizations,

26  including Ending the HIV Epidemic: A Plan for America — Ryan White HIV/AIDS Program funds

27  ($7,541,999), Ryan White HIV/AIDS Program Part A funds ($46,295,740), and Ryan White Program

28  Part B funds ($7,139,007).  Los Angeles County and its Child Support Services Department (CSSD) also

-29-

1   receives HHS funds indirectly through the California Department of Child Support Services (DCSS),

2   which is the state agency designated to administer the federal Title IV-D State Plan.  DCSS received a

3   five-year $2,102,942 grant from HHS for the South Los Angeles Impact Outreach Impact Outreach

4   project (SOLA Project), which CSSD is implementing as a sub-grantee.

5       111.    Los Angeles County also relies on DOJ grant programs.  The County's Department of

6   Medical Examiner (DME) currently receives the Strengthening the Medical Examiner-Coroner Systems

7   grant, which allows DME to secure paid fellows for the Forensic Pathologist Medical program with the

8   hopes of attracting and retaining these fellows full-time.  The DME has applied for this grant and

9   anticipates being awarded either $150,000 for one fellow or $300,000 for two fellows.  The DME also

10  receives The Paul Coverdell Forensic Science Improvement Grant Program as a subrecipient of the

11  California Governor's Office of Emergency Service.  These funds provide financial support for staff,

12  including deputy medical examiners, investigators, and criminalists, to attend classes, conferences, and

13  seminars for continuing education.  The County's District Attorney's Office (DA) has applied for a

14  United States Department of Justice, Office for Victims of Crime (DOJ OVC), FY 2025 Services for

15  Victims of Crime grant in the amount of $500,000 to implement the Services to Victims of Gang

16  Violence Program that is intended to strengthen and expand services to help victims rebuild their lives

17  after gang violence.  The DA declined to apply for a DOJ BJA FY25 National Sexual Assault Kit

18  Initiative (SAKI) for $2.5 million to work through the County's backlog of unsubmitted and partially

19  tested sexual assault kits and to enhance victim services and support for past and current victims of

20  sexual assault because the application required the submittal of DEI and immigration-related

21  certifications, and also included immigration-related priorities and DEI and immigration-related

22  unallowable uses similar to the DOJ OVC grant.

23      112.    Los Angeles County is also a recipient of significant DOI grant funding.  Los Angeles

24  County Department of Parks and Recreation, through the State of California Natural Resources Agency,

25  has applied for, and been conditionally awarded, a DOI, National Parks Service Land and Water

26  Conservation Fund (LWCF) grant in the amount of approximately $15 million for the development of a

27  section of the 40-acre Western Deck of the former Puente Hills Landfill Park, including a 5-acre bike

28  skills course, a children's nature play area, a picnic area, an amphitheater, dog run, open grassland and

-30-

RENNE PUBLIC LAW GROUP
Attorneys at Law

ceremonial space.

113.    Additionally, Los Angeles County Public Works has applied for $3,725,000 in federal grant funds from the EPA, including $350,000 to fund the Sustainable Water Infrastructure for Antelope Valley Well Location Study, $1,050,000 to fund the Hasley Canyon Stormwater Infrastructure Improvements project, and $2,325,000 through the EPA's Drinking Water Infrastructure Resiliency and Sustainability Program for the Rock Creek Water Main Improvement project.  These grants fund critical infrastructure improvements and build water supply resilience for communities served by Los Angeles County.

114.    The County of Santa Barbara is a general law County organized and existing under and by virtue of the laws of the State of California.

115.    Santa Barbara County relies on over $68 million in federal funding from DOT through FAA, FHWA, FTA, and NHTSA, as both a direct recipient and a designated subrecipient of CalTrans. Santa Barbara County's Santa Ynez Valley Airport has been allocated approximately $1 million in FAA grants for capital improvement projects, which includes an AIP grant for a project to rehabilitate the airport's runways.  The millions of dollars in federal funds that the County receives as a sub-recipient of the State of California fund key infrastructure projects, such as the Fernald Point Bridge Replacement Project, the Floradale Bridge Replacement Project, the Bonita School Ridge Road Replacement, the Foothill Road at Cuyama River Project, the Refugio Road at Refugio Creek Project, and the East Mountain Drive Project, all of which address the replacement of key bridges and future replacement mitigation post-construction.  These pass-through grant funds will also go to reconstruction and improvements to Hollister Road, installation of new guardrail systems throughout Santa Barbara County, and additional winter storm preparation measures.

116.    Santa Barbara County has also been awarded or allocated approximately $2.7 million annually in HUD grants administered through various programs under HUD's CPD.  Santa Barbara County received a $1,177,513 CDBG grant which will go toward funding public services and programs administered by the County and associated agencies and non-profits, including: Freedom Warming Centers of Santa Barbara, supporting accommodations for homeless and chronically homeless individuals; CALM (Child Abuse Listening Mediation)'s Childhood Trauma Treatment Program;

-31-

CommUnifys construction of Head Start facilities; and the County's Bridgehouse Shelter utility improvements. Santa Barbara County is also a recipient of $1,073,695 in HOME funding, which will be used to fund the Hollister Lofts and Perkins Place Affordable Housing Developments, as well as Tenant-Based Rental Assistance programs in the Cities of Santa Maria and Lompoc.

117.    Santa Barbara County also utilizes DOJ grants to support community safety efforts, both directly and as a subrecipient of the California Governor's Office of Emergency Services (Cal OES). For FY2026, Santa Barbara County received over $1 million in funding as a subrecipient of DOJ OVC grant funding. These grants enable Santa Barbara County to provide services ranging from advocacy for victims of human trafficking and outreach and support for victims of crime. Santa Barbara County is also a direct recipient of a $385,000 BJA Smart Prosecution Innovative Prosecution Solutions grant, which will fund the Santa Barbara District Attorney's efforts to implement a Digital Evidence Management System to enhance the investigation and prosecution of violent crime in the community.

118.    Santa Barbara County is also a recipient of over $5 million in DHS and FEMA funding, including a $200,919 Emergency Management Performance Grant (EMPG) to support staffing to enhance emergency management capabilities. Other FEMA grants include $448,412 from the Homeland Security Grant Program (HSGP) to support training and equipment that will strengthen the County's capacity to prevent, prepare for, protect against, and respond to acts of terrorism or other catastrophic events. Santa Barbara County also receives over $3.8 million in grants from the Hazard Mitigation Grant Program (HMGP), including a $1,384,040 grant to be used for the San Marcos Grade Stabilization Project, designed to implement slope stabilization along Old San Marcos Road. Other HMGP-funded projects include the Cold Springs Debris Basin Capacity Improvement Project, the Buena Vista Creek Debris Basin Project, and the San Ysidro Debris Basin Capacity Improvement Project, each of which will build and improve infrastructure to better withstand severe weather events.

119.    Santa Barbara County relies on many millions of dollars in federal funding from the HHS and its divisions. Santa Barbara County has received direct and subrecipient federal grant allocations from HHS, including HRSA, CDC, and other HHS Administrative agencies, totaling nearly $56 million in funding. Santa Barbara County's HHS funding includes over $10 million in 2025-2026 to fund Child Support Services. It also encompasses over $26 million in State of California pass-through grant funding

-32-

RENNE PUBLIC LAW GROUP
Attorneys at Law

to support a range of COVID-19 testing, epidemiological surveillance systems, containment, and mitigation, as well as to generally improve public health infrastructure, workforce, and data systems. Moreover, over $1 million of the pass-through grants go to Santa Barbara County maternal, child, and adolescent health services. The County relies on millions of dollars of HSS funds through HRSA's Health Center Program including a recent July of 2025 award of $1,575,862. The County relies on additional funds administered by HRSA including Behavioral Health Service Expansion grants and Quality Improvement grants. The County also received $1,022,981 in pass-through funding from the Maternal Child and Adolescent Health Block Grant Program through CDPH and HRSA, which supports maternal, child, and adolescent health services. Santa Barbara County also received a $1,151,130 Ryan White Part B grant and a $333,214 yearly Ryan White Part C grant to fund medical case management, health care referrals, primary health care, support services, outreach services, and food vouchers for patients with HIV. In addition, Santa Barbara County has received over $800,000 in funding through the ASPR Hospital Preparedness Program to implement a disaster healthcare coalition, with the goal of increasing hospitals' and the health care system's ability to prepare for and respond to bioterrorism and medical and public health emergencies.

120. Santa Barbara County has also received funding from DOI via the Bureau of Reclamation's WaterSmart program. This grant provides $436,667 in federal funding to maintain the Water-Wise Landscape Rebate Program. The Program is a collaboration between seven of the County's water purveyors and the Santa Barbara County Water Agency and helps fund lawn-replacement rebates, irrigation upgrades, and planting water-wise plants. Each purveyor has its own rebate program, and the Water Agency provides administrative support.

121. Defendant Scott Turner is the Secretary of HUD, the highest-ranking official in HUD, and is responsible for the decisions of HUD. He is sued in his official capacity.

122. Defendant HUD is an executive department of the United States federal government. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

123. Defendant Sean Duffy is the Secretary of DOT, the highest-ranking official in DOT, and is responsible for the decisions of DOT. He is sued in his official capacity.

RENNE PUBLIC LAW GROUP
Attorneys at Law

124.    Defendant DOT is an executive department of the United States federal government.  49 U.S.C. § 102(a).  It houses a number of operating administrations (OAs), including the FTA, FHWA, FAA, and FRA.  DOT is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

125.    Defendant Marcus J. Molinaro is the Administrator of the FTA, the highest-ranking official in the FTA, and is responsible for the decisions of the FTA.  He is sued in his official capacity.

126.    Defendant FTA is an operating administration within DOT.  49 U.S.C. § 107(a).  FTA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

127.    Defendant Gloria M. Shepherd is the Executive Director of the FHWA, the highest-ranking official in the FHWA, and is responsible for the decisions of the FHWA.  She is sued in her official capacity.

128.    Defendant FHWA is an operating administration within DOT.  49 U.S.C. § 104(a).  FHWA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

129.    Defendant Bryan Bedford is the Administrator of the FAA, the highest-ranking official in the FAA, and is responsible for the decisions of the FAA.  He is sued in his official capacity.

130.    Defendant FAA is an operating administration within DOT.  49 U.S.C. § 106(a).  FAA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

131.    Defendant David Fink is the Administrator of the FRA, the highest-ranking official in the FRA, and is responsible for the decisions of the FRA.  He is sued in his official capacity.

132.    Defendant Federal Railroad Administration is an operating administration within DOT.  49 U.S.C. § 103(a).  FRA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

133.    Defendant Jonathan Morrison is the Administrator of NHTSA, the highest-ranking official in the NHTSA, and is responsible for the decisions of the NHTSA.  He is sued in his official capacity.

134.    Defendant NHTSA is an operating administration within DOT.  49 U.S.C. § 105(a).  NHTSA is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

135.    Defendant Robert F. Kennedy, Jr. is the Secretary of HHS, the highest-ranking official in HHS, and responsible for the decisions of HHS.  He is sued in his official capacity.

136.    Defendant HHS is an executive department of the United States federal government.  42 U.S.C. § 3501.  HHS is an "agency" within the meaning of the APA.  5 U.S.C. § 551(1).

-34-

RENNE PUBLIC LAW GROUP
Attorneys at Law

137. Defendant Lee Zeldin is the Administrator of the EPA, the highest-ranking official in the EPA, and is responsible for the decisions of the EPA. He is sued in his official capacity.

138. Defendant EPA is an executive agency of the United States federal government. 42 U.S. Code § 13102(2). EPA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

139. Defendant Kristi Noem is the Secretary of DHS, the highest-ranking official in DHS, and is responsible for the decisions of DHS. She is sued in her official capacity.

140. Defendant DHS is an executive department of the United States federal government. 6 U.S.C. § 111(a). DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

141. Defendant Karen Evans is the Acting Administrator of FEMA, the highest-ranking official in FEMA, and is responsible for the decisions of FEMA. She is sued in her official capacity.

142. FEMA is a federal agency within DHS. 6 U.S.C. § 313. FEMA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

143. Defendant Doug Burgum is the Secretary of DOI, the highest-ranking official in DOI, and is responsible for the decisions of DOI. He is sued in his official capacity.

144. Defendant DOI is an executive department of the United States federal government. 43 U.S.C. § 1451. DOI is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

145. Defendant Pamela Bondi is the Attorney General of the United States and the head of the DOJ, the highest-ranking official in DOJ, and is responsible for the decisions of DOJ. She is sued in her official capacity.

146. Defendant DOJ is an executive department of the United States federal government. 28 U.S.C. § 501. DOJ is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## IV. FACTUAL ALLEGATIONS

### A. HUD Grant Programs

147. Congress established HUD in 1965 to promote the "sound development of the Nation's communities and metropolitan areas" by, among other things, administering programs that "provide assistance for housing" and "development." Department of Housing and Urban Development Act, 1965 § 2, Pub. L. No. 89-174, 79 Stat. 667. The HUD Secretary is responsible for all actions taken by the Department and its component offices. *See* 42 U.S.C. §§ 3533, 3535; 24 C.F.R. Part 5. HUD

-35-

RENNE PUBLIC LAW GROUP
Attorneys at Law

administers both competitive and formula grant programs.  Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency.  *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019).  Entitlement grant programs (sometimes referred to as formula grant programs) "are awarded pursuant to a statutory formula" wherein "Congress determines who the recipients are and how much money each shall receive."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (cleaned up).  HUD administers grants directly and through its program offices, including the Office of Community Planning & Development (CPD), and regional field offices.  *See* 24 C.F.R. subchapter C (CPD-administered programs); *id*. § 982.101 (allocating budget authority for Section 8 Housing Choice Voucher program to field offices).

### 1.    Continuum of Care Grant Program

148.    Congress established the Continuum of Care (CoC) program through the enactment of the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act").  42 U.S.C. §§ 11301, 11381.  The program's "purpose" is to "promote community-wide commitment to the goal of ending homelessness" by "provid[ing] funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families."  *Id*. § 11381.  In addition, the CoC program is designed to promote access to and effective utilization of mainstream programs by homeless individuals and families; and to optimize self-sufficiency among those experiencing homelessness.  *Id.*

149.    The Homeless Assistance Act directs the Secretary of HUD (the "HUD Secretary") to award CoC grants on a competitive basis using statutorily prescribed selection criteria.  42 U.S.C. § 11382(a).  These grants fund critical homelessness services administered by grant recipients either directly or through service providers contracted by the grant recipient.  The CoC program funds a variety of programs that support homeless individuals and families, including through the construction of supportive housing, rehousing support, rental assistance, and supportive services, including childcare, job training, healthcare, mental health services, trauma counseling, and life skills training.  *Id*. §§ 11360 (29), 11383.

150.    Grants are awarded to local coalitions, or "Continuums," that may include representatives from local governments, nonprofits, faith-based organizations, advocacy groups, public housing agencies, universities, and other stakeholders.  24 C.F.R § 578.3.  Each Continuum designates an

RENNE PUBLIC LAW GROUP
Attorneys at Law

applicant to apply for CoC funding on behalf of the Continuum.  *Id*.

### a. Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding CoC Grant Conditions

151.    HUD's administration of the CoC program, including the award of CoC grants, is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the CoC program, the selection criteria HUD must apply in awarding CoC grants, and program requirements HUD can require recipients agree to as conditions for receiving funds.  *See* 42 U.S.C. §§ 11383, 11386, 11386a.

152.    Section 422 of the Homeless Assistance Act, 42 U.S.C. §§ 11382, contains Congress's overarching authorization for HUD to award CoC grants.  Subsection (A) of that section states:

> The Secretary shall award grants, on a competitive basis, and using the selection criteria described in section 11386a of this title, to carry out eligible activities under this part for projects that meet the program requirements under section 11386 of this title, either by directly awarding funds to project sponsors or by awarding funds to unified funding agencies.

153.    Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use.  These required criteria include things like the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need within the geographic area for homeless services.  *Id*. (b)(1)-(2).

154.    Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth "[r]equired agreements" to which grant recipients must adhere.  Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional shelter," "place families with children as close as possible to their school of origin," and obtain various certifications from direct service providers.  42 U.S.C. § 11386(b).

155.    The Homeless Assistance Act does not authorize HUD to condition CoC funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration

-37-

RENNE PUBLIC LAW GROUP
Attorneys at Law

enforcement, exclusion of transgender people, or cutting off access to information about lawful abortions.

156.    Congress has authorized the Secretary to promulgate regulations establishing, *inter alia*, other selection criteria and "other terms and conditions" on grant funding "to carry out [the CoC program] in an effective and efficient manner." *Id*. §§ 11386(b)(8), 11386a(b)(1)(G), 11387.

157.    Pursuant to this authority, HUD has promulgated the Continuum of Care Program rule at 24 C.F.R. part 578 (the "CoC Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree in the CoC grant agreements they execute with HUD. *Id*. § 578.23(c). While the CoC Rule permits HUD to require CoC recipients to comply with additional "terms and conditions," such terms and conditions must be "establish[ed] by" a Notice of Funding Opportunity (NOFO).[3] *Id*. § 578.23(c)(12).

158.    The CoC Rule does not impose any conditions on CoC funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

### b.  Congress Appropriates CoC Grant Funding and Authorizes HUD to Issue a NOFO for Fiscal Years 2024 and 2025

159.    Funding for CoC grants comes from congressional discretionary appropriations.

160.    Congress appropriated funds for the CoC program in the Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25 (the "2024 Appropriations Act").

161.    The 2024 Appropriations Act contains additional directives to HUD regarding CoC funding. For instance, it requires the Secretary to "prioritize funding. . . to continuums of care that have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects," and requires the Secretary to "provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-

---

[3] The terms NOFO, "Notice of Funding Availability," and "Funding Opportunity Announcement" refer to a formal announcement of the availability of federal funding. As part of an effort to standardize terminology, most federal agencies now use the term NOFO. For clarity, this Complaint uses the term NOFO.

-38-

housing services." *Id.*, 138 Stat. 362-363.

162.     The 2024 Appropriations Act also authorized HUD to issue a two-year NOFO for Fiscal Years 2024 and 2025 program funding. *Id.*, 138 Stat. 386.

163.     By statute, the HUD Secretary must announce recipients within five months after the submission of applications for funding in response to the NOFO. 42 U.S.C. § 11382(c)(2).

164.     The HUD Secretary's announcement is a "conditional award," in that the recipient must meet "all requirements for the obligation of those funds, including site control, matching funds, and environmental review requirements." *Id.* § 11382(d)(1)(A).

165.     Once the recipient meets those requirements, HUD must obligate the funds within 45 days. *Id.* § 11382(d)(2) (providing that "the Secretary shall obligate the funds").

166.     None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CoC grant fund conditions related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### c.  HUD Conditionally Awards CoC Grants

167.     In July 2024, HUD posted a biennial NOFO announcing a competition for CoC funding for Fiscal Years 2024 and 2025 (the "FYs 2024 & 2025 NOFO"). *See* U.S. Dep't of Housing & Urban Dev., Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program (Jul. 24, 2024), https://www. hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf (last visited December 17, 2025).

168.     The FYs 2024 & 2025 NOFO directed Continuums to consider policy priorities in their applications, including "Racial Equity" and "Improving Assistance to LGBTQ+ Individuals." *Id.* at 9. The FYs 2024 & 2025 NOFO specified that "HUD is emphasizing system and program changes to address racial equity within CoCs and projects. Responses to preventing and ending homelessness should address racial inequities . . . ." *Id.* The FYs 2024 & 2025 NOFO further specified that "CoC should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their

-39-

RENNE PUBLIC LAW GROUP
Attorneys at Law

local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation." *Id*.

169.    The NOFO did not include any grant conditions prohibiting DEI efforts, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Nor did any of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose such conditions on CoC grants.

170.    CoC grants fund permanent supportive housing programs, which provide long-term, affordable housing combined with supportive services for individuals and families experiencing, or at risk of homelessness.  Such supportive services include case management which provides links to healthcare, job training, and other resources that facilitate their ability to obtain and keep their housing. These programs allow participating individuals and families to live independently and stably in their communities.

### 2.    Community Development Block Grant Program

171.    Congress established the Community Development Block Grant (CDBG) program through Title I of the Housing and Community Development Act of 1974 (the "HCD Act"), Pub. L. 93-383, 88 Stat. 633, and subsequent amendments.  The program's stated "primary objective" is to promote "development of viable urban communities" through "decent housing," a "suitable living environment," and "expan[sion of] economic opportunities, principally for persons of low and moderate income."  42 U.S.C. § 5301(c).  Specific objectives include "conserv[ing] and expan[ding] the Nation's housing stock" especially for low- and moderate-income households, promoting mixed-income communities, and enhancing the "diversity and vitality of neighborhoods" by eliminating slums or blight and revitalizing "deteriorating or deteriorated neighborhoods," among other goals.  *Id*. § 5301(c)(1), (c)(3), (c)(6).

172.    The CDBG program is codified at title 42, chapter 69 of the U.S. Code.  The program provides flexible funding through annual block grants awarded on a formula basis to state and local governments for purposes related to economic and community development.  In enacting the program, Congress consolidated "a number of complex and overlapping" grant programs such that funding would be provided "on an annual basis, with maximum certainty and minimum delay," and communities could "rely [on funding] in their planning."  *Id*. § 5301(d).  The HCD Act permits communities to tailor

-40-

program activities to meet local needs so long as they advance national objectives identified by Congress, including benefiting low- and moderate-income persons, preventing or eliminating slums or blight, or, in certain cases, responding to serious and immediate threats to community health or welfare where other funds are unavailable. *Id*. §§ 5301(c), 5304(b)(4).

173.    The HCD Act authorizes the HUD Secretary to award CDBG funds using statutorily prescribed selection criteria. 42 U.S.C. §§ 5303–04. The HUD Secretary must distribute funds annually using a formula that considers population and measures of distress including poverty, age of housing, housing overcrowding, and growth lag. *Id*. §§ 5303–04, 5306. These grants fund vital urban community development projects and public services administered by grant recipients either directly or through service providers contracted by the grant recipient. *See id*. § 5305 (listing activities eligible for assistance).

### d.    Congress Imposes Legislative Directives, and HUD Promulgates Rules Regarding CDBG Grant Conditions

174.    HUD's administration of the CDBG program, including the award of block grants, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the CDBG program, the selection criteria HUD must apply in awarding CDBG grants, and program requirements HUD can require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. §§ 5301, 5304–05.

175.    Section 103 of the HCD Act, 42 U.S.C. § 5303, contains Congress's overarching authorization to award CDBG funding. That provision states in relevant part: "The Secretary is authorized to make grants to States, units of general local government, and Indian tribes to carry out activities in accordance with the provisions of this chapter."

176.    In addition to the statutory objectives and allocation formula discussed above, Congress has imposed other requirements on CDBG funds. For instance, 42 U.S.C. § 5305 limits the use of CDBG funds to enumerated eligible activities. The HCD Act also mandates that recipients use at least 70% of CDBG funds on activities that principally benefit low- and moderate-income persons, *id*. § 5301(c), and prescribes eligibility criteria for such activities, *id*. § 5305(c). Grant recipients must also submit annual plans to the HUD Secretary describing their priority nonhousing community development

-41-

needs eligible for CDBG funding pursuant to procedures set out in the HCD Act. *Id*. § 5304(m). Finally, Congress has enumerated various certifications that CDBG recipients must make as a condition of receiving funds, including that the recipient will develop and follow a citizen participation plan, comply with statutory transparency requirements, ensure funds are consistent with the HCD Act's objectives, and administer programs in conformity with nondiscrimination laws. *Id*. § 5304(a)(3), (b).

177.    The HCD Act does not authorize HUD to condition CDBG funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

178.    The HCD Act indicates congressional intent to benefit historically disadvantaged groups. For example, the Act requires the Secretary to set aside some of the funds appropriated for the CDBG program for "special purpose grants," which may include, among other things, grants to "historically Black colleges." 42 U.S.C. § 5307(b)(2). The Act further provides that, of the amount set aside for special purpose grants, the Secretary "shall" make grants to institutions of higher education "for the purpose of providing assistance to economically disadvantaged and minority students who participate in community development work study programs and are enrolled in" qualifying degree programs. *Id*. § 5307(c). The Act also authorizes urban development action grants to cities and urban counties experiencing severe economic distress, but only if the HUD Secretary determines the city or county has "demonstrated results in," among other things, "providing equal opportunity in housing and employment for low- and moderate-income persons and members of minority groups." *Id*. § 5318(a)–(b).

179.    Congress has authorized the HUD Secretary to promulgate "rules and regulations" necessary to carrying out the Secretary's "functions, powers, and duties." 42 U.S.C. § 3535(d).

180.    Pursuant to this authority, HUD has promulgated the CDBG program rule at 24 C.F.R. part 570 (the "CDBG Rule"), which, among other things, imposes additional restrictions on the use of CDBG funds. *See* 24 C.F.R. § 570.207. The CDBG Rule also obligates grant recipients to submit annual consolidated plans in accordance with 24 C.F.R. part 91. 24 C.F.R. § 570.302. These annual consolidated plans must include additional certifications enumerated in HUD regulations, including that the recipient complies with lead-based paint procedures and has policies barring the use of excessive force against non-violent civil rights demonstrators. 24 C.F.R. § 91.225.

RENNE PUBLIC LAW GROUP
Attorneys at Law

181.    The CDBG Rule does not impose any conditions on CDBG funding related to prohibiting all forms of DEI policies and initiatives, participating in immigration enforcement, verification of immigration status, opposing transgender acceptance, or cutting off access to information about lawful abortions.

### e.    Congress Appropriates CDBG Grant Funding

182.    Funding for CDBG grants comes from congressional discretionary appropriations.

183.    Congress appropriated funds for the CDBG program in the 2024 Appropriations Act.  The 2024 Appropriations Act contains additional directives to HUD regarding CDBG funding.  For instance, it requires that no more than 20% of any grant under the CDBG program may be expended for certain planning and administrative purposes and imposes limitations on funds provided to for-profit entities. 138 Stat. 358–59.

184.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose CDBG grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 3.    Emergency Solutions Grant Program

### a.    Congress Authorizes the Establishment of the Emergency Solutions Grant Program Through the HEARTH Act

185.    In 2009, Congress established the Emergency Solutions Grant (ESG) program through the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, Pub. L. 111-22, 123 Stat. 1663.  *See* 42 U.S.C. §§ 11371–11378.  In enacting the HEARTH Act, Congress sought to remedy the "lack of affordable housing and limited scale of housing assistance programs" that it found to be "the primary causes of homelessness" and "establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days."  HEARTH Act, § 1002, 123 Stat. 1664.

186.    The HEARTH Act amended the Homeless Assistance Act to expand what had been known as the Emergency Shelter Grant program, which provided formula funding to state and local governments for the short-term needs of homeless individuals.  Reflecting a broadened focus on factors

RENNE PUBLIC LAW GROUP
Attorneys at Law

-43-

that lead to homelessness, the HEARTH Act expanded the activities eligible for funding under the new ESG program to include short- or medium-term rental assistance and housing relocation and stabilization services, in addition to emergency shelters, homelessness prevention, and supportive services, which had been covered under the original program. *See* 42 U.S.C. § 11374(a).

187.    The Homeless Assistance Act, as amended by the HEARTH Act, directs the Secretary of HUD to award ESG grants to cities, urban counties, and states on a non-competitive basis using HUD's formula for allocating CDBG funds, discussed above. 42 U.S.C. §§ 11372, 11373(a). These grants fund programs that address the most critical and immediate needs of those experiencing or at risk of homelessness, including programs for preventing homelessness, immediately rehousing individuals who become homeless, and providing emergency shelter to those experiencing homelessness. *Id*. § 11374(a).

**b.    Congress Imposes Legislative Directive, and HUD Promulgates Rules, Regarding ESG Grant Conditions**

188.    HUD's administration of the ESG program, including the award of ESG funds, is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the ESG program, the responsibilities of ESG recipients, and specific certifications ESG recipients must agree to as a condition of receiving funds. 42 U.S.C. §§ 11374(a), 11375.

189.    Congress's overarching direction to HUD to award ESG grants is codified at 42 U.S.C. § 11372, which provides:

> The Secretary shall make grants to States and local governments (and to private nonprofit organizations providing assistance to persons experiencing homelessness or at risk of homelessness, in the case of grants made with reallocated amounts) for the purpose of carrying out activities described in section 11374 of this title.

190.    Section 11374 of Title 42 limits the activities for which ESG funds may be used to specific services: maintaining, operating, or renovating emergency shelters; providing supportive services related to emergency shelter or street outreach; paying short- or medium-term rental assistance; and providing housing relocation or stabilization services for homeless or at-risk individuals and families.

191.    Section 11375 of Title 42 sets forth certifications that recipients must make to the Secretary of HUD regarding their use of ESG funds. Recipients must certify that, among other things,

-44-

they will operate facilities that receive funding as homeless shelters for a specified number of years, any ESG-funded renovation will be sufficient to ensure the shelter is safe and sanitary, they will assist homeless individuals in obtaining permanent housing and services such as medical and mental health treatment and counseling, and they will involve homeless individuals and families through employment, volunteer services, or otherwise, in constructing and operating shelters to the maximum extent practicable.  42 U.S.C. § 11375(c).

192.    The HEARTH Act does not authorize HUD to condition ESG funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

193.    Section 11376 of Title 42 authorizes the Secretary of HUD "by notice" to "establish such requirements as may be necessary to carry out the provisions of" the ESG program.  "Such requirements shall be subject to section 553 of title 5," which requires rulemaking to occur pursuant to notice and comment procedures.  42 U.S.C. § 11376.

194.    Pursuant to this authority, HUD has promulgated the ESG Rule at 24 C.F.R. part 576, which sets forth additional requirements and conditions on ESG funding.  *See* 24 C.F.R. §§ 576.400–576.409.  For instance, the ESG Rule requires ESG recipients to meet minimum safety, sanitation, and privacy standards for emergency shelters; integrate ESG services with other programs targeted to homeless individuals in the area; coordinate with local Continuums; conduct initial evaluations of program participants consistent with HUD requirements; and abide by recordkeeping and reporting requirements.  *Id*. §§ 576.400, 576.401, 576.403(b), 576.500.

195.    The ESG Rule also obligates ESG recipients to submit and obtain HUD approval of a consolidated plan in accordance with the requirements in 24 C.F.R. part 91.  *Id*. § 576.200.  HUD's consolidated planning regulations set forth additional certifications that must be included in a consolidated plan, including that the jurisdiction will affirmatively further fair housing, is in compliance with anti-lobbying requirements, and possesses the legal authority to carry out programs for which it is seeking funding, among other certifications.  *Id*. § 91.225(a).

196.    Neither the ESG Rule nor HUD's consolidated planning regulations impose any conditions on ESG funding related to prohibiting all forms of DEI, facilitating enforcement of federal

RENNE PUBLIC LAW GROUP
Attorneys at Law

immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Congress has not delegated authority that would permit an agency to adopt such conditions.

197. Funding for the ESG program comes from congressional discretionary appropriations.

198. Congress appropriated funds for the ESG program in the 2024 Appropriations Act, 138 Stat. at 362.

199. Nothing in the 2024 Appropriations Act or any other legislation authorizes HUD to impose ESG grant fund conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 4. HOME Investment Partnerships Program

200. Congress established the HOME program through the HOME Investment Partnerships Act (HOME Act), under Title II of the Cranston-Gonzalez National Affordable Housing Act (NAHA), Pub. L. No. 101–625, 104 Stat. 4079, and subsequent amendments. The HOME program is a formula grant program that aims to help state and local governments implement local housing strategies to increase affordable housing opportunities for low-income families. The HOME program requires the HUD Secretary "to make funds available to participating jurisdictions for investment to increase the number of families served with decent, safe, sanitary, and affordable housing and expand the long-term supply of affordable housing." 42 U.S.C. §§ 12741, 12747(b).

201. Participating jurisdictions may use HOME grants for a variety of housing activities. These include providing "incentives to develop and support affordable rental housing and homeownership affordability through the acquisition, new construction, reconstruction, or moderate or substantial rehabilitation of affordable housing." 42 U.S.C. § 12742(a)(1).

202. Participating jurisdictions must allocate matching funds to affordable housing projects equivalent to at least 25 percent of the HOME funds the jurisdictions use. 42 U.S.C. § 12750.

-46-

a.    **Congress Imposes Legislative Directives, and HUD Promulgates Rules, Regarding HOME Grant Conditions**

203.    HUD's administration of the HOME program is authorized and governed by statutory directives.  The HOME Act specifies the eligibility requirements to become a participating jurisdiction, the permissible and prohibited uses of HOME funds, the maximum incomes of families who may receive HOME funds, and what housing qualifies as affordable for purposes of the program.  42 U.S.C. §§ 12742, 12744, 12475, 12476.

204.    The HOME Act does not grant HUD discretion in designating which jurisdictions may participate and under what circumstances those jurisdictions shall receive HOME funds.  It instead directs the HUD Secretary to establish by regulation the statutorily specified procedures with which states and local governments must comply to be designated as participating jurisdictions and receive allocations of HOME funds.  42 U.S.C. § 12746.  The HOME Act provides that such regulations "shall only provide for the" requirements for allocation, eligibility, notification, submission, reallocation, revocation, and reduction of funds listed in the statute.  *Id*. § 12746(1)–(10) (emphasis added).  Once a jurisdiction meets the statutory formula and complies with the listed requirements, HUD "*shall* designate" it "a participating jurisdiction" and the jurisdiction "*shall* remain a participating jurisdiction for subsequent fiscal years" unless certain revocation conditions are met.  *Id*. § 12746(7)–(8) (emphasis added).

205.    The HOME Act further directs the HUD Secretary to "establish by regulation an allocation formula that reflects each jurisdiction's share of total need among eligible jurisdiction[s] for an increased supply of affordable housing for very low-income and low-income families of different size."  42 U.S.C. § 12747(b)(1)(A).  This formula must be based on the "objective measures" specified in the HOME Act.  *Id*.

206.    The Home Act further directs the HUD Secretary to establish a HOME Investment Trust Fund for each participating jurisdiction, along with a line of credit that includes the participating jurisdiction's allocated HOME funds.  42 U.S.C. § 12748(a)–(b).

207.    As directed by Congress, HUD promulgated the HOME program rule at 24 C.F.R. part 92 (the "HOME Rule").  The HOME Rule implements the allocation formula prescribed by Congress, along

-47-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

with the eligibility and related requirements listed in the HOME Act.  *See, e.g.*, 24 C.F.R. §§ 92.50, 92.102–07, 92.150, 92.200–22.  The HOME Rule also lists other federal requirements with which participating jurisdictions must comply, including the nondiscrimination requirements that apply to all HUD Programs, listed at 24 C.F.R. § 5.105(a), as well as the nondiscrimination requirements in the HOME Act, 42 U.S.C. § 12832, addressed below.  24 C.F.R. § 92.350.

208.     Neither Congress nor HUD's regulations authorize HUD to condition HOME funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

209.     NAHA and the HOME Act indicate congressional intent to benefit historically disadvantaged groups.  One of Congress's objectives in enacting NAHA was to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis."  42 U.S.C. § 12702(3).  The HOME Act requires participating jurisdictions "to establish and oversee a minority outreach program . . . to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women . . . in all contracts[] entered into by the participating jurisdiction . . . to provide affordable housing authorized under this Act." *Id*. § 12831(a).  The HOME Act also forbids participating jurisdictions from denying benefits to or otherwise discriminating against any person "on the grounds of race, color, national origin, religion, or sex." *Id*. § 12832.

210.     In January 2025, HUD issued a final rule amending the HOME Rule "to update, simplify, or streamline requirements, better align the program with other Federal housing programs, and implement recent amendments to the HOME statute."  HOME Investment Partnerships Program: Program Updates and Streamlining, 90 Fed. Reg. 746, 746 (Jan. 6, 2025).  The revised HOME Rule does not add any grant conditions related to DEI, immigration enforcement, verification of immigration status, "gender ideology," or abortion.  The revised HOME Rule was originally set to become effective February 5, 2025, but HUD delayed parts of the Rule until October 2025.  *See* HOME Investment Partnerships Program: Program Updates and Streamlining—Delay of Effective Date, Withdrawal, and Correction, 90 Fed. Reg. 16085 (Apr. 17, 2025).

-48-

**b.    Congress Appropriates HOME Grant Finding**

211.    Funding for the HOME program comes from congressional discretionary appropriations.

212.    Congress appropriated $1,250,000,000 for the HOME program in the 2024 Appropriations Act.  38 Stat. 360.  The 2024 Appropriations Act contains additional directives to HUD regarding HOME funding.  For instance, it extends the statutory deadline for participating jurisdictions to draw funds from their HOME Investment Trust Fund.  *Id.*

213.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose HOME grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

214.    Additionally, Section 3205 of the American Rescue Plan Act (ARPA) of 2021 allocated $5 billion to the HOME program in response to the COVID-19 pandemic for homelessness assistance and supportive services.  Pub. L. 117-2, 135 Stat. 61.  These funds were appropriated to the HOME program and distributed to states, localities, consortia, and insular areas via the HOME formula.

215.    The ARPA did not authorize HUD to impose grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

**5.    The Housing Opportunities for Persons with AIDS Program**

216.    Congress established the Housing Opportunities for Persons with AIDS (HOPWA) program through the AIDS Housing Opportunity Act, Subtitle D of Title VIII of NAHA, Pub. L. No. 101–625, 104 Stat. 4079, and subsequent amendments.  The objective of the HOPWA program is "to provide States and localities with the resources and incentives to devise long-term comprehensive strategies for meeting the housing needs of persons with acquired immunodeficiency syndrome and families of such persons."  42 U.S.C. § 12901.  To meet this aim, the program authorizes formula grants and competitively awarded grants to provide housing assistance and related supportive services to meet the housing needs of low-income persons living with HIV or AIDS and their families.

217.    The HOPWA program permits grant recipients to use HOPWA funds for a number of housing programs for persons living with HIV or AIDS, including providing information and services,

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  short-term housing, rental assistance, development of single room occupancy dwellings, and

2  development and operation of community residences.  42 U.S.C. §§ 12906–910.

3          218.    Ninety percent of HOPWA funds must be allocated pursuant to a statutory formula based

4  on total population, the number of persons living with HIV or AIDS, fair market rents, and poverty data.

5  42 U.S.C. § 12903(c)(1)(A).  The HUD Secretary must award the remaining 10 percent of grant funds on

6  a competitive basis to states and local governments not eligible for a formula grant, or to states, local

7  governments, or nonprofits seeking funding for "special projects of national significance."  *Id.*

8  § 12903(c)(5)(A), (C).

9          a.      **Congress Imposes Legislative Directives, and HUD Promulgates Rules**

10                 **Regarding HOPWA Grant Conditions**

11         219.    To be eligible for HOPWA funds, states and local governments must submit an

12  application for the HUD Secretary's approval.  42 U.S.C. § 12903(d).  Congress instructed the HUD

13  Secretary to establish by regulation procedures for the submission of applications using specified

14  requirements.  *Id.* § 12903(d)(1)–(6).  Congress also permitted the HUD Secretary to require "other

15  information or certifications" but only to the extent "necessary to achieve the purposes of this section,"

16  i.e., to award formula and competitive grants pursuant to the statutorily listed criteria.  *Id.* § 12903(d)(6).

17         220.    Pursuant to this authority, HUD promulgated the HOPWA program rule at 24 C.F.R. part

18  574 (the "HOPWA Rule").  The HOPWA Rule implements the allocation formula prescribed in the

19  statute, as well as the permissible uses of HOPWA funds.  24 C.F.R. §§ 574.110, 130, 300.  The Rule

20  also creates an application process for competitive grants, requiring applications "comply with the

21  provisions of the Department's Notice of Funding Availability (NOFA) for the fiscal year."  *Id.*

22  § 574.240.  The HOPWA Rule also sets out conditions grantees and project sponsors must agree to,

23  including compliance with HUD regulations and "such other terms and conditions . . . as HUD may

24  establish for purposes of carrying out the program *in an effective and efficient manner*."  *Id.* § 574.500

25  (emphasis added).  The HOPWA Rule further lists other federal requirements with which participating

26  jurisdictions must comply, including the nondiscrimination requirements that apply to all HUD programs

27  listed at 24 C.F.R. § 5.105(a).  24 C.F.R. § 574.603.

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

221.    Neither NAHA nor the HOPWA Rule permit HUD to condition HOPWA funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

222.    As discussed above, NAHA, which established the HOPWA program, indicates congressional intent to benefit historically disadvantaged groups, including the aim to "improve housing opportunities for . . . members of disadvantaged minorities."  42 U.S.C. § 12702(3).

### b.    Congress Appropriates HOPWA Grant Funding

223.    Funding for HOPWA grants comes from congressional discretionary appropriations.  *See* 42 U.S.C. § 12912.

224.    Congress appropriated $505,000,000 for the HOPWA program in the 2024 Appropriations Act.  38 Stat. 358.  The 2024 Appropriations Act contains additional directives to HUD regarding HOPWA funding.  For instance, it instructs HUD to "renew or replace all expiring contracts for permanent supportive housing . . . before awarding funds for new contracts."  *Id.*

225.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose HOPWA grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 6.    Family Self-Sufficiency Program Grant

226.    Congress established the Family Self-Sufficiency Program (FSSP) under Section 23 of the Housing Act.  42 U.S.C. § 1437u.  The purpose of the FSSP is to "promote the development of local strategies to coordinate use of assistance" under sections 1437f ("Low-income housing assistance") and 1437g ("Public housing Capital and Operating Funds") "with public and private resources" and to ultimately "enable eligible families to achieve economic independence and self-sufficiency."  *Id.* § 1437u; *see also id.* §§ 1437f, 1437g.

227.    FSSP grants enable PHAs to assist low-income families to achieve financial self-sufficiency through services such as case management, training, and referrals to supportive social services.

RENNE PUBLIC LAW GROUP
Attorneys at Law

a.  **Congress Imposes Legislative Directives, and HUD Promulgates Rules Regarding FSSP Grant Conditions**

228.    HUD's administration of the FSSP is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the FSSP, the formula HUD must apply in allocating grants, and program requirements HUD may require recipients agree to as conditions for receiving funds.  *See* 42 U.S.C. § 1437u.

229.    Section 23 of the Housing Act, 42 U.S.C. § 1437u, contains Congress's overarching authorization for HUD to allocate FSSP grants.  Subsection (i)(1) of that section states:

> Subject to appropriations, the Secretary shall establish a formula by which annual funds shall be awarded or as otherwise determined by the Secretary for the costs incurred by an eligible entity in administering the [FSSP] under this section.

230.    Section 23 of the Housing Act, 42 U.S.C. § 1437u(i)(2), provides for the HUD Secretary to establish a formula to determine FSSP funding amounts and sets forth eligibility criteria the HUD Secretary shall consider to determine awards.  These considerations include the number of participants in an FSSP program and other criteria.  *Id.* at § 1437u(i)(2).

231.    The Housing Act does not authorize HUD to condition FSSP funding on opposition to all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

232.    Pursuant to the authority to establish formulas and funding criteria under the Housing Act, HUD has promulgated the Program rule at 24 C.F.R. part 984 (the "Family Self-Sufficiency Rule"), which, among other things, sets forth additional conditions to which grant recipients must agree to in the grant agreements they execute with HUD.  *Id.* Part 984.

233.    The Family Self-Sufficiency Rule does not impose any conditions on Public Housing funding related to prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Congress has not delegated authority that would permit an agency to adopt such conditions.

RENNE PUBLIC LAW GROUP
Attorneys at Law

### b. Congress Appropriates FSSP Grant Funding

234.    Funding for FSSP grants comes from congressional appropriations. Congress appropriated funds for the FSSP program in the 2024 Consolidated Appropriations Act. *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 355.

235.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose FSSP grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 7.    Lead Hazard Reduction Grant Program

236.    The Residential Lead-Based Paint Hazard Reduction Act of 1992 authorized the creation of the Lead Hazard Reduction (LHR) grant programs, which awards grants on a competitive basis. 42 U.S.C. § 4852. The purpose of the program is to maximize the number of children under the age of six protected from lead poisoning by assisting certain States, Tribes, and local governments in undertaking comprehensive programs to identify and control lead-based paint hazards.

### a.    Congress Imposes Legislative Directives Regarding LHR Grant Conditions

237.    HUD's administration of the LHR program is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the LHR program, the selection criteria HUD shall apply in selecting recipients, and program requirements HUD may require recipients agree to as conditions for receiving funds. *See* 42 U.S.C. § 4852.

238.    The statute authorizes HUD to award grants only to States and units of local government with an approved comprehensive housing affordability strategy. 42 U.S.C. § 4852(b). Grant funds may be used solely for non-federally assisted, non-federally owned housing that meets specified income-targeting and occupancy requirements, including minimum set-asides for very low- and low-income households and prioritization of families with children under the age of six. 42 U.S.C. § 4852(a)(1)–(2). The statute requires applicants submit an application "in such form and in such manner as the [HUD] Secretary shall prescribe". However, the statute identifies specific information that must be included in the applications, including the relevant portions of the applicants housing strategy, a description of the

-53-

RENNE PUBLIC LAW GROUP
Attorneys at Law

amount of assistance requested, the activities to be undertaken, the forms of financial assistance to be provided, and assurances demonstrating the applicant's capacity to carry out the program. *Id.* § 4852(c)(1)–(5). In awarding grants, the Secretary must apply statutory selection criteria that focus on reducing lead poisoning risks to young children, the severity of lead hazards in the jurisdiction, the applicant's ability to leverage non-federal funds, and the applicant's administrative and technical capacity. *Id.* § 4852(d)(1)–(4). The statute permits the HUD Secretary to consider "such other factors as the Secretary determines appropriate" but only "to ensure that grants made available under this section are used effectively and to promote the purposes of this chapter." *Id.* § 4852(d)(5). Recipients are further required to provide a non-federal match of at least ten percent of the grant amount, may not use grant funds to supplant existing State or local funding, must limit administrative expenses to no more than ten percent of the grant, and must maintain financial records and submit annual reports documenting the use and outcomes of the funds. 42 U.S.C. § 4852(h)–(l).

239.    Congress has not authorized HUD to condition funding on opposition to all forms of Diversity, Equity, and Inclusion (DEI) policies and initiatives through the guise of federal nondiscrimination law, nor on participating in aggressive and lawless immigration enforcement, exclusion of transgender people, or cutting off access to information about lawful abortions.

**b.  Congress Appropriates LHR Grant Funding**

240.    Funding for LHR grants comes from congressional appropriations. Congress appropriated funds for the LHR program in the 2024 Consolidated Appropriations Act. *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 370-372.

241.    None of the 2024 Appropriations Act's directives to HUD or any other legislation authorize HUD to impose LHR grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

**8.    Other HUD Grants**

242.    HUD and its program offices administer a range of other competitive and formula grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Congress also appropriates Congressionally Directed Spending and Community Project Funding

-54-

RENNE PUBLIC LAW GROUP
Attorneys at Law

through specific line items or set-asides in HUD's annual appropriations acts.  Those funds are administered through existing HUD programs and are generally subject to the requirements of the underlying program, unless Congress expressly waives or modifies those requirements in the appropriations law.

243.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HUD funds related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

244.    Congress annually appropriates funding for HUD grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HUD with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1865–1902; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 725–766; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat 5138–5181; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 344–386.

245.    Plaintiffs City of Fresno, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood City, County of Monroe, County of Marin, County of San Diego, County of Sacramento, City of Hillsboro, City of Atlanta, City of Beaverton, City of Mountain View, City of San Mateo, City of Santa Clara, City of Stockton, City of Sunnyvale, City of Vacaville, City of Corvallis, City of Santa Cruz, County of Santa Barbara, and County of Los Angeles (collectively the "HUD Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive HUD grants, including CoC grants, CDBG grants, ESG grants, HOME grants, HOPWA grants, FSSP grants, LHR grants, and/or other HUD grant funding.  These Plaintiffs rely on millions of dollars in appropriated federal funds from HUD grant programs.

246.    The HUD Plaintiffs rely on HUD block grant programs, including the block programs described above (CDBG, ESG, HOME, and HOPWA), to provide decent, affordable housing and a

-55-

RENNE PUBLIC LAW GROUP
Attorneys at Law

suitable living environment, and to increase economic opportunities for low- and moderate-income persons throughout their jurisdictions. The programs that these grants support are extensive and essential. These funds are used for programs like the creation and preservation of affordable rental housing, homeownership rehabilitation and weatherization, food banks, childcare and afterschool programs, community development capital improvements, home weatherization, and job training programs. They help those plaintiffs provide basic needs services, including food distribution, basic chore assistance for homebound seniors and disabled persons, support for children who have experienced violence or neglect, and domestic violence prevention for the benefit of low-income individuals and households. They also help those plaintiffs provide housing services, including rental assistance, housing case management, downpayment assistance for first-time homebuyers, and capital development for affordable housing to benefit low-income individuals and households and to create affordable housing, provide rental assistance, and address homelessness in the region. They help prevent and address homelessness, including by supporting emergency shelter services.

### B. DOT Grant Programs

247. Congress established DOT in 1966 "to assure the coordinated, effective administration of the transportation programs of the Federal Government." Department of Transportation Act, 1966, Pub. L. 89-670, 80 Stat. 931. DOT administers both competitive and entitlement (sometimes referred to as formula) grant programs. Competitive grant programs "allocate[] a limited pool of funds to state and local applicants whose applications are approved by" a federal agency. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019). In administering grant programs, DOT manages certain grant programs centrally through the Office of the Secretary of Transportation (OST). However, DOT often acts through its operating administrations, including the FTA, FHWA, FAA, FRA, and NHTSA. By law, the DOT Secretary is responsible for all acts taken by its operating administrations. The administrators of the FTA, FHWA, FAA, FRA, and NHTSA report directly to the DOT Secretary. 49 U.S.C. § 103(b), (d), (g)(1) (FRA); *id.* §§ 104(b)(1), (c)(1) (FHWA); *id.* §§ 106(b)(1)(E), (f)(3)(A) (FAA); *id.* §§ 107(b), (c) (FTA); *see also* 49 C.F.R. Part 1 (organization and authority of DOT).

248. Congress has established by statute a wide variety of grant programs administered by DOT centrally through the Office of the Secretary of Transportation (OST). This includes, but is not

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  limited to, the Reconnecting Communities Pilot (RCP) Program and the Innovative Finance and Asset

2  Concession (IFAC) Grant Program.

3       249.    Section 11509 of the Infrastructure Investment and Jobs Act established the Reconnecting

4  Communities Pilot (RCP) Program to advance community-centered transportation connection projects.

5  Pub. L. 117-58, 135 Stat. 448 (codified as a note to 23 U.S.C. § 101).  The Act directs the DOT Secretary

6  to establish a program to establish a pilot program through which an eligible entity may apply for funding

7  in order to restore community connectivity.  The Act requires appropriation of $30 million over five

8  years to fund RCP Planning grants, which are awarded on a competitive basis.  Pub. L. 117-58, Title 1,

9  § 11101(d)(3)(A), 135 Stat. 448.  The Act also requires appropriation of the following funding amounts

10 for Capital Construction Grants:  $65,000,000 for fiscal year 2022; $68,000,000 for fiscal year 2023;

11 $70,000,000 for fiscal year 2024; $72,000,000 for fiscal year 2025; and $75,000,000 for fiscal year 2026.

12 Pub. L. 117-58, Title 1, § 11101(d)(3)(B), 135 Stat. 448.

13      250.    Congress must annually authorize the amounts, consistent with the Act, to be made

14 available for RCP grants until expended.  Pub. L. 117-58, Title 1, § 11101(d)(3)(C).  In the annual

15 appropriation legislation, Congress sets forth priorities and directives to the DOT Secretary with respect

16 to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives

17 for or conditions on RCP grants related to a prohibition on all forms of DEI, facilitating enforcement of

18 immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender

19 ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134

20 Stat. 1835; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 698; Consolidated

21 Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109; Consolidated Appropriations Act, 2024, Pub.

22 L. 118-42, 138 Stat. 315.

23      251.    Section 71001 of the Infrastructure Investment and Jobs Act created an asset concession

24 program.  The Act directs the DOT Secretary to establish a program to facilitate access to expert services

25 and to provide grants to states, tribes, and local governments to enhance the technical capacity of eligible

26 entities and facilitate and evaluate public-private partnerships for transportation infrastructure projects,

27 including through asset concessions.  23 U.S.C. § 611(b).  The Act requires appropriation of $100 million

28 over five years to fund IFAC grants.  IFAC grants are awarded on a competitive basis.

Renne Public Law Group
Attorneys at Law

-57-

252.    Congress must annually authorize $20,000,000 to be made available for IFAC grants until expended. 23 U.S.C. § 611(g)(2).  In the annual appropriation legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on IFAC grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1826; Consolidated Appropriations Act, 2022, Pub. L. 117- 103, 136 Stat. 687; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5097; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 301.

253.    Plaintiff the City of Saint Paul has been awarded an IFAC grant and is currently in the post-award phase of negotiating with DOT the terms and conditions of the Cooperative Agreement for the disbursement of funds.  Saint Paul is relying on $805,000 in awarded federal funds from DOT to identify assets that can provide opportunities for public-private partnership and increase the efficiency of the City's public transit system.

### 1.    FTA Grant Programs

254.    Congress has established by statute a wide variety of grant programs administered by DOT, acting through the FTA, that provide federal funds to state and local governments for public transit services.  These include, but are not limited to, programs codified in title 49, chapter 53 of the U.S. Code, as amended by the Fixing America's Surface Transportation (FAST) Act of 2015, Pub. L. 114-94, 129 Stat. 1312, and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

255.    For instance, section 5307 authorizes the Secretary of DOT (the "DOT Secretary") to make urbanized area formula grants ("UA Formula Grants"), which go toward funding the operating costs of public transit facilities and equipment in urban areas, as well as certain capital, planning, and other transit-related projects. *See* 49 U.S.C. § 5307(a)(1).  Section 5307 imposes specific requirements on UA Formula Grant recipients related to the recipient's operation and control of public transit systems. *See id.* § 5307(c).  None of these requirements pertain to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

RENNE PUBLIC LAW GROUP
Attorneys at Law

256.     Section 5309 establishes certain fixed guideway capital investment grants ("Fixed Guideway Grants").  *See* 49 U.S.C. § 5309(b).  This program funds certain state and local government projects that develop and improve "fixed guideway" systems—meaning public transit systems that operate on a fixed right-of-way, such as rail, passenger ferry, or bus rapid transit systems.  *Id.* §§ 5302(8), 5309(b).  Section 5309 imposes specific requirements on Fixed Guideway Grant recipients related to, for example, the recipient's capacity to carry out the project, maintain its equipment and facilities, and achieve budget, cost, and ridership outcomes.  *See id.* § 5309(c).  None of these requirements pertain to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

257.     Section 5337 authorizes grants to fund state and local government capital projects that maintain public transit systems in a state of good repair, as well as competitive grants for replacement of rail rolling stock ("Repair Grants").  *See* 49 U.S.C. § 5337(b), (f).  Section 5337 specifically limits what projects may be eligible for Repair Grants, *id.* § 5337(b), and imposes specific requirements on multi-year agreements for competitive rail vehicle replacement grants, *id.* § 5337(f)(7).  It does not, however, impose any conditions on Repair Grants related to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

258.     Section 5339 authorizes grants to fund the purchase and maintenance of buses and bus facilities ("Bus Grants").  *See* 49 U.S.C. § 5339(a)(2), (b), (c).  The Bus Grant program incorporates the specific funding requirements set forth in section 5307 for UA Formula Grants and imposes other requirements on Bus Grant recipients.  *See id.* § 5339(a)(3), (7), (b)(6), (c)(3).  Section 5339 does not, however, impose any conditions on Bus Grants related to a prohibition on all kinds of DEI or local participation in the enforcement of federal immigration laws.

259.     Congress annually appropriates funding for FTA grant programs, including the programs identified above.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FTA grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act,

RENNE PUBLIC LAW GROUP
Attorneys at Law

2021, Pub. L. 116-260, 134 Stat. 1182, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 334, 342.

260.    Plaintiffs the City of Fresno, City of Alameda, County of Sacramento, City of Atlanta, the City of Corvallis, City of Santa Cruz, City of Vacaville, and the County of Santa Barbara (collectively, the "FTA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive FTA grants.  These Plaintiffs rely on over millions of dollars in appropriated federal funds from FTA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

## 2.    FHWA Grant Programs

261.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FHWA, that provide federal funds to state and local governments for road and street infrastructure projects.  These include, but are not limited to, programs codified in title 23 of the U.S. Code and the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

262.    For instance, Section 24112(b) of the Infrastructure Investment and Jobs Act, established Safe Streets and Roads for All, or SS4A, a competitive grant program that provides funding for improving roadway safety through the development, refinement, and subsequent implementation of comprehensive safety action plans.  135 Stat. 815–817.  The Act requires the DOT Secretary to consider, among other things, the extent to which applicants and their proposed projects will ensure "equitable investment in the safety needs of underserved communities in preventing transportation-related fatalities and injuries" and "achieve[] such other conditions as the Secretary considers to be necessary."  *See id*. § 24112(c)(3).  None of these considerations pertain to a prohibition on all kinds of DEI or facilitating the enforcement of federal immigration laws.

263.    In February 2024, DOT posted a Notice of Funding Opportunity (NOFO)—which it updated in April 2024—announcing a competition for SS4A grant funding for Fiscal Year 2024 (the "FY 2024 SS4A NOFO").  *See* U.S. Dep't of Transp., Notice of Funding Opportunity for FY 2024 Safe Streets and Roads for All Funding (Apr. 16, 2024), https://www.transportation.gov/sites/dot.gov/files/2024-04/SS4A-NOFO-FY24-Amendment1.pdf (last visited December 17, 2025).

-60-

RENNE PUBLIC LAW GROUP
Attorneys at Law

264.     The FY 2024 SS4A NOFO directed applicants to consider policy priorities in their applications, including "Equity and Barriers to Opportunity" and "Climate Change and Environmental Justice." *Id*. at 39; *see also id*. at 27, 29 (listing "Equity" as a selection criterion for grants). The FY 2024 SS4A NOFO specified that "[e]ach applicant selected for SS4A grant funding must demonstrate effort to improve equity and reduce barriers to opportunity as described in Section A" and stated "the Department seeks to award funds under the SS4A grant program that will create proportional impacts to all populations in a project area, remove transportation related disparities to all populations in a project area, and increase equitable access to project benefits." *Id*. at 12, 39.

265.     The FY 2024 SS4A NOFO strongly emphasized equity considerations throughout. The NOFO defined "equity" as "[t]he consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, Indigenous and Native Americans, Asian Americans and Pacific Islanders, and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality." *Id*. at 4. The NOFO did not include any grant conditions related to prohibiting all kinds of DEI or facilitating the enforcement of federal immigration laws.

266.     In addition to SS4A, FHWA administers the Federal Highway-Aid Program, which provides federal formula funding for the construction, maintenance, and operation of the country's 3.9-million-mile highway network, including the Interstate Highway System, primary highways, and secondary local roads.

267.     The Infrastructure Investment and Jobs Act authorized $356.5 billion for fiscal years 2022 through 2026 to be used for the Federal Highway-Aid Program. Currently, there are nine core formula funding programs within the Federal Highway-Aid Program:  the National Highway Performance Program, 23 U.S.C. § 119; the Surface Transportation Block Grant Program (STBG), 23 U.S.C. § 133; the Highway Safety Improvement Program (HSIP), 23 U.S.C. § 148 and 23 C.F.R. Part 924; the Railway-Highway Crossings Program, 23 U.S.C. § 130 and 23 C.F.R. Part 924; the Congestion Mitigation and Air Quality Improvement Program (CMAQ), 23 U.S.C. § 149; the Metropolitan Planning

-61-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Program, 23 U.S.C. § 104(d); the National Highway Freight Program, 23 U.S.C. § 167; the Carbon

Reduction Program, 23 U.S.C. § 175; and the PROTECT Formula Program, 23 U.S.C. § 176. None of

these statutes authorizes DOT or FHWA to impose a prohibition on DEI or a requirement to facilitate the

enforcement of federal immigration laws as a precondition to receiving federal grants.

268.    Section 11118 of the Infrastructure Investment and Jobs Act created the Bridge

Investment Program (BIP) to assist states, tribes, and local governments with rehabilitating or replacing

bridges to improve safety and efficiency for people and freight moving across bridges. 23 U.S.C.

§ 124(b)(2). The Act directs the DOT Secretary to consider factors such as cost considerations, safety

benefits, and mobility improvements. *Id*. §§ 124(f)(3)(B); (g)(4)(B). No part of the BIP's authorizing

language describes immigration enforcement or ending DEI as considerations for the grant.

269.    Section 21203 of the Infrastructure Investment and Jobs Act created the National Culvert

Removal, Replacement, and Restoration Grant Program, also known as the Culvert Aquatic Organism

Passage Program (Culvert AOP) Program to assist states, tribes, and local governments with projects that

would meaningfully improve or restore passage for anadromous fish (species that are born in freshwater

such as streams and rivers, spend most of their lives in the 19 marine environment, and migrate back to

freshwater to spawn). 49 U.S.C. § 6703. The Act directs the DOT Secretary to prioritize projects that

would improve fish passage for certain categories of anadromous fish stocks or that would open more

than 200 meters of upstream habitat before the end of the natural habitat. *Id*. § 6703(e). The FHWA

administers some Culvert AOP Program grants on behalf of DOT. No part of the Culvert AOP

Program's authorizing language describes immigration enforcement or ending DEI as considerations for

the grant.

270.    Section 21202 of the Infrastructure Investment and Jobs Act created the Local and

Regional Project Assistance Program, which authorized the Secretary of Transportation to award grants

for "capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b)(1). Section 21202

establishes the program's primary selection criteria, which directs the DOT secretary to evaluate the

extent to which a project ''(A) improves safety; (B) improves environmental sustainability; (C) improves

the quality of life of rural areas or urbanized areas; (D) increases economic competitiveness and

opportunity, including increasing tourism opportunities; (E) contributes to a state of good repair; and

-62-

RENNE PUBLIC LAW GROUP
Attorneys at Law

(F) improves mobility and community connectivity." 49 U.S.C. § 6702(d)(3).  To implement the Local and Regional Project Assistance Program, DOT created the Rebuilding American Infrastructure with Sustainability and Equity (RAISE) Grant Program).  The RAISE program is now known as the Better Utilizing Investments to Leverage Development (BUILD) Grant Program.  No part of the Program's authorizing language describes immigration enforcement or ending DEI as considerations for the grant.

271.     The FHWA also administers the FY 2023-24 Advanced Transportation Technology and Innovation (ATTAIN) grant program, as directed by Congress in 23 U.S.C. § 503(c)(4).  Section 503(c)(4) directs the DOT Secretary to provide grants "to deploy, install, and operate advanced transportation technologies to improve safety, mobility, efficiency, system performance, intermodal connectivity, and infrastructure return on investment."  The DOT Secretary was directed to develop selection criteria that included an enumerated list of considerations, including how the deployment of technology would "improve the mobility of people and goods," "protect the environment and deliver environmental benefits that alleviate congestion and streamline traffic flow," and "reduce the number and severity of traffic crashes and increase driver, passenger, and pedestrian safety."  *Id*.  Nothing in the statutory provisions authorizing the ATTAIN grant program describes immigration enforcement or ending DEI as considerations for the grant.

272.     In practice, local governments frequently do not receive FHWA-administered funds directly from DOT but instead receive such funds as sub-grantees through their respective state departments of transportation.  Under the Federal Highway-Aid Program and many IIJA-authorized programs, FHWA apportions or awards funds to states, which then pass through a substantial portion of these funds to cities and counties for locally sponsored projects, subject to the same statutory and regulatory requirements that attach to the underlying federal program.

273.     In fulfillment of the statutory authorization of FHWA grant programs, including the ones identified above, Congress annually appropriates funding for FHWA grants.  In appropriations legislation, Congress sets forth priorities and directives to the DOT Secretary with respect to transportation funding, but Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FHWA grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender

-63-

ideology" or "elective abortion." *See, e.g.*, Consolidated Appropriations Act, 19 2021, Pub. L. 116-260, 134 Stat. 1835–1842; Consolidated Appropriations Act, 2022, Pub. L. 117- 103, 136 Stat. 697–705; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109– 5117; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 315–324.

274.    Plaintiffs City of Fresno, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood City, County of Marin, County of San Diego, County of Sacramento, City of Atlanta, the City of Beaverton, City of Corvallis, City of Hillsboro, City of Mountain View, City of Santa Clara, City of Santa Cruz, City of Salem, City of Vacaville, County of Santa Barbara, and County of Los Angeles (collectively, the "FHWA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive FHWA grants. These Plaintiffs rely on millions of dollars in appropriated federal funds from FHWA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### 3.    FAA Grant Program

275.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FAA, that provide federal funds to public agencies for planning and development of airports. These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

276.    For instance, the Airport Improvement Program (AIP) is codified under title 49, chapter 471 of the U.S. Code. Under the AIP, the DOT Secretary is authorized to make formula and discretionary grants to recipients (referred to as "sponsors") for the planning and development of certain public-use airports. 49 U.S.C. 47101 et seq. The DOT Secretary may approve AIP grant applications only if the sponsor and project meet certain statutory requirements. For example, requiring consistency with plans for development of the surrounding area, financial capacity, and ability to complete the project "without unreasonable delay," and only if the sponsor makes certain written assurances based on the type of grant at issue, such as "the airport will be available for public use on reasonable conditions and without unjust discrimination" and "the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions." 49 U.S.C. §§ 47106, 47107.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-64-

RENNE PUBLIC LAW GROUP
Attorneys at Law

277.     Congress has been precise in the requirements that attach to grant recipients and has set those forth in statute, which has been implemented by DOT through contractual "Grant Assurances" that are terms of every grant agreement.  None of the statutory requirements pertain to a prohibition on DEI or a requirement of local participation in the enforcement of federal immigration laws.

278.     AIP funding levels are established periodically by reauthorization acts, such as the FAA Reauthorization Act of 2018, Pub. L. 115-254, 132 Stat. 3186, and the FAA Reauthorization Act of 2024, Pub. L. 118-63, 138 Stat. 1025.  The reauthorization acts define the AIP authorization levels, amend the various AIP statutes, and set out directives to the DOT Secretary with respect to airport improvement funding, but they do not impose or authorize directives for or conditions on AIP grants related to a prohibition on DEI or requirement of local participation in federal immigration enforcement.

279.     Similarly, the Airport Infrastructure Grants (AIG) program is authorized under the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 1416–1418.  Under the AIG program, the DOT Secretary is authorized to make formula and discretionary grants for runways, taxiways, airport safety and sustainability projects, as well as terminal, airport transit connections, and roadway projects.  Grants made under the AIG program are treated as having been made pursuant to the DOT Secretary's authority for project grants issued under the AIP statute.  135 Stat. 1417–1418.  The Infrastructure Investment and Jobs Act sets forth the AIG funding levels but does not impose any conditions on AIG grants related to prohibitions on DEI or the requirement of local participation in the enforcement of federal immigration laws.

280.     The Airport Rescue Grant (ARG) program is authorized under the American Rescue Plan Act of 2021 (ARPA), Pub. L. 117-2, 135 Stat. 96–98.  Section 7102 of ARPA provides approximately $8 billion in economic relief to airports to prevent, prepare for, and respond to the COVID-19 pandemic. The ARPA establishes funding criteria but does not impose any conditions on ARG funds related to prohibitions on DEI or the requirement of local participation in the enforcement of federal immigration laws.

281.     In fulfillment of the statutory authorization of FAA grant programs, including the ones identified above, Congress annually appropriates funding for FAA grants.  In the annual appropriations legislation, Congress sets forth additional priorities and directives to the DOT Secretary with respect to

-65-

Renne Public Law Group
Attorneys at Law

transportation funding, but Plaintiffs are not aware of Congress ever imposing directives for or conditions on FAA grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1830–1835, 1939–1941; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 691–697; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5101–5108; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 307–314.

282.    Plaintiffs City of Fresno, City of South Lake Tahoe, County of Marin, County of San Diego, County of Sacramento, County of Monroe, the Monroe Airport Authority, City of Atlanta, City of Corvallis, City of Salem, County of Santa Barbara, and County of Los Angeles (collectively, the "FAA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive FAA grants. These Plaintiffs rely on millions of dollars in appropriated federal funds from FAA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### 4.    FRA Grants

283.    Congress has established by statute a variety of grant programs administered by DOT, acting through the FRA, that provide federal funds to public agencies for rail infrastructure projects. These include, but are not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

284.    For example, the Railroad Crossing Elimination (RCE) Grant Program, authorized in Section 22305 of the Infrastructure Investment and Jobs Act, directs the DOT Secretary, in cooperation with the FRA Administrator, to establish a competitive grant program that provides funds to improve the safety and mobility of people and goods at railway crossings.  49 U.S.C. § 22909.  Section 22305 limits eligibility for the RCE program to certain entities such as states and local governments.  *Id.* § 22909(c). It also directs that the Secretary "shall" evaluate certain criteria for selecting projects funded by the grants, including, among other things, whether the proposed projects would "improve safety at highway-rail or pathway-rail crossings"; "grade separate, eliminate, or close highway-rail or path-way rail crossings"; "improve the mobility of people or goods"; "reduce emissions, protect the environment, and provide community benefits, including noise reduction"; "improve access to emergency services";

"provide economic benefits"; and "improve access to communities separated by rail crossings." *Id.* § 22909(d), (f). None of these considerations pertains to prohibiting DEI or facilitating enforcement of federal immigration laws.

285. Funding for the RCE program was made available for FY 2024 and 2025 through advance appropriations provided in the Infrastructure Investment and Jobs Act and by remaining unawarded FY 2022 RCE Program balances. 135 Stat. 1436. The appropriations provisions do not impose or authorize directives for or conditions on FRA grants related to prohibiting DEI or to local participation in federal immigration enforcement.

286. Plaintiffs the City of Santa Cruz and City of Atlanta (the "FRA Plaintiff") have previously received, currently receive, or are otherwise eligible to receive FRA grants. These Plaintiffs rely on over a million dollars in appropriated federal funds from FRA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### 5. NHTSA Grants

287. Congress has established by statute a variety of grant programs administered by DOT, acting through the National Highway Traffic Safety Administration (NHTSA), that provide federal funds to state and local governments for highway safety and traffic enforcement projects. These include, but are not limited to, programs codified in title 23 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429.

288. In practice, local governments frequently do not receive NHTSA-administered funds directly from DOT but instead receive such funds as sub-grantees through their respective state departments of transportation. Under the authorized programs discussed above, NHTSA apportions or awards funds to states, which then pass through a substantial portion of these funds to cities and counties for locally sponsored projects, subject to the same statutory and regulatory requirements that attach to the underlying federal program.

289. For example, the Highway Safety Grant Program, authorized under 23 U.S.C. § 402, directs the DOT Secretary, in cooperation with the NHTSA Administrator, to provide federal funds to states to support initiatives that reduce traffic fatalities and injuries. Eligible activities include, among others, driver education, impaired driving prevention, seat belt enforcement, and child passenger safety

RENNE PUBLIC LAW GROUP
Attorneys at Law

-67-

programs. *Id*. § 402(a)-(b). States receiving funds must submit annual highway safety plans for approval by NHTSA, which review them based on criteria including potential for reducing crashes, injuries, and fatalities. *Id*. § 402(a)(2). None of these statutory requirements pertains to prohibiting diversity, equity, and inclusion initiatives or facilitating enforcement of federal immigration laws.

290.    Similarly, the National Priority Safety Program, authorized under 23 U.S.C. § 405, directs the DOT Secretary, acting through NHTSA, to provide federal funds to states to address specified traffic safety priorities identified by Congress. Eligible activities vary by program area but include, among others, initiatives related to occupant protection, impaired driving prevention, distracted driving, motorcycle safety, nonmotorized road user safety, speeding, and traffic safety data systems. *Id*. § 405(a), (b). To receive funds, a state must satisfy the statutory eligibility criteria applicable to each priority area and submit the required certifications and assurances demonstrating compliance with those criteria, which NHTSA evaluates before awarding funds. *Id*. § 405(c)–(e). None of these statutory requirements concerns restricting diversity, equity, and inclusion initiatives or facilitating the enforcement of federal immigration laws.

291.    Section 402 and Section 405 grants are primarily formula-based. Funding is appropriated annually by Congress through DOT's Federal Highway Administration and NHTSA accounts. The statutory and appropriations provisions do not impose or authorize conditions on NHTSA grants related to prohibiting DEI or to local participation in federal immigration enforcement.

292.    Plaintiffs City of Beaverton, City of Hillsboro, City of Santa Clara, City of Santa Cruz, County of Santa Barbara (the "NHTSA Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive NHTSA grants. These Plaintiff rely on over a million dollars in appropriated federal funds from NHTSA direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### 6.    Other DOT Grants

293.    DOT and its operating administrations administer a range of other competitive and formula grant programs that some Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Congress also appropriates Congressionally Directed Spending and Community Project Funding through specific line items or set-asides in DOT's annual appropriations acts. Those

-68-

RENNE PUBLIC LAW GROUP
Attorneys at Law

funds are administered through existing DOT programs and are generally subject to the requirements of the underlying program, unless Congress expressly waives or modifies those requirements in the appropriations law.

294.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other DOT grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

295.    Congress annually appropriates funding for DOT grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of DOT with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HUD grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See*, e.g., Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, 1835–1842, 1854; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 697–705, 716, 724; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 5109– 5117, 5129, 5138; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 315–324, 334, 342.

296.    Plaintiffs City of Fresno, City of South Lake Tahoe, City of Eureka, City of Saint Paul, City of Alameda, City of Redwood City, County of San Diego, County of Marin, County of Sacramento, County of Monroe, Monroe Airport Authority, City of Atlanta, City of Beaverton, City of Mountain View, City of Santa Clara, City of Sunnyvale, City of Santa Cruz, City of Vacaville, City of Corvallis, City of Hillsboro, City of Salem, County of Santa Barbara, and County of Los Angeles (collectively, the "DOT Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive DOT grants.  These Plaintiffs rely on millions of dollars in appropriated federal funds from DOT direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### C.    HHS Grant Programs

297.    Congress established the precursor to HHS—the cabinet-level Department of Health, Education, and Welfare—in 1953.  After a separate Department of Education was created in 1979, HHS

-69-

RENNE PUBLIC LAW GROUP
Attorneys at Law

took its current name.  Today, HHS is the largest grant-making agency in the United States.  It

administers both competitive grant programs and formula and block grant programs that provide funds to

local governments to enhance the health and well-being of their communities.  In administering grant

programs, HHS often acts through its operating divisions and agencies, such as the Centers for Disease

Control and Prevention (CDC), the Centers for Medicare & Medicaid Services (CMS), the Health

Resources and Services Administration (HRSA), the Substance Abuse and Mental Health Services

Administration (SAMHSA), and the National Institutes of Health (NIH), among others.  *See* U.S. Dep't

Health & Hum. Servs., HHS Agencies & Offices, https://www.hhs.gov/about/agencies/hhs-agencies-and-

offices/index.html (last visited December 17, 2025).  The Secretary of HHS is responsible for overseeing

the actions of its operating divisions and agencies.  *See, e.g.*, 42 U.S.C. § 290aa (similar for SAMHSA

and its head; authority of HHS Secretary); 42 U.S.C. § 242c (appointment and authority of CDC

Director; functions of HHS Secretary); 42 U.S.C. § 282 (appointment and authority of NIH Director;

functions of HHS Secretary); 42 U.S.C. §§ 202–203 (organization of Public Health Service, which

includes NIH, within HHS); 42 U.S.C. § 1317 (appointment of CMS Administrator); U.S. Dep't Health

& Hum. Servs., Centers for Medicare & Medicaid Services, 66 Fed. Reg. 35437 (Jul. 5, 2001)

(establishing CMS and delegating authority from HHS Secretary to CMS Administrator).  Some

examples of the grants administered by HHS and its operating divisions and agencies are discussed

below.

### 1.    Health Resources and Services Administration Programs

298.    The Health Resources and Services Administration (HRSA) within HHS awards grant

funding to more than 3,000 recipients, including state and local governments, to support health services

projects, such as training health care workers and providing specific health services.  *See* Elayne J.

Heisler, Cong. Rsch. Serv., R46001, HRSA FY2020 President's Budget Request and Agency Funding

History: In Brief (Nov. 12, 2019).

299.    HRSA awards a variety of competitive and formula grants in several program areas,

including Primary Care/Health Centers, Health Workforce Training, HIV/AIDS, Organ Donation,

Maternal and Child Health, Rural Health, and other areas.  *See* Grants, U.S. Dep't Health & Hum. Servs.,

Health Res. & Servs. Admin., https://data.hrsa.gov/topics/grants (last visited December 17, 2025).

RENNE PUBLIC LAW GROUP
Attorneys at Law

300.    Among HRSA's largest grant programs are the Health Center Program (HCP) and the Ryan White HIV/AIDS (RWHA) program.

### a.    The Health Center Program

301.    Congress authorized the federal HCP program through Section 330 of the Public Health Service Act (PHSA), as amended.  42 U.S.C. § 254b.  The HCP program funds grants to support qualified outpatient facilities that provide primary care to low-income individuals and other underserved communities, as specified in the statute.

302.    In particular, the HCP program supports four types of health centers:  (1) community health centers (CHCs), (2) health centers for the homeless (HCHs), (3) health centers for residents of public housing, and (4) migrant health centers.  *See* 42 U.S.C. §254b(a), (g), (h), (i).  The majority of these are CHCs, which must provide "primary health services" to medically underserved populations and serve all residents of the CHC's services area.  *Id*. § 2549(a).  HCHs provide services to individuals experiencing or at risk of homelessness and are required to provide all services CHCs provide as well as substance abuse treatment.  *Id*. § 2549(h).  Health centers for residents of public housing are located in, and offer primary care services to those who reside in or near, public housing facilities.  *Id*. § 2549(i).  Finally, migrant health centers provide care to migratory and seasonal agricultural workers and their families.  *Id*. § 2549(g).

303.    Funding for the HCP program comes from a combination of discretionary funding, appropriated by Congress each year, and mandatory funding from the Community Health Center Fund.  By statue, HCH programs receive 8.7% of HCP funds.

304.    In addition to the HCP grants themselves, health centers that receive funding under Section 330 of the PHSA become eligible for other congressionally authorized benefits.  For instance, such health centers are eligible for designation as Federally Qualified Health Centers (FQHCs), which entitles them to higher, cost-based Medicare and Medicaid reimbursement rates.  42 U.S.C. §§ 1395i(a)(1)(z), 1395m(o), 1395x(aa)(3).  FQHCs may also receive drug discounts under Section 340B of the PHSA.  *Id*. § 256b.

305.    Section 330 of the PHSA sets out numerous requirements that health centers must meet to ensure that HCP-funded facilities serve as part of a safety net for underserved communities.  In addition

-71-

RENNE PUBLIC LAW GROUP
Attorneys at Law

to the requirements set forth above, Congress requires that HCP-funded health centers provide services to all patients regardless of ability to pay.  42 U.S.C. § 254b(k)(3).  Recipients must therefore have fee schedules consistent with locally prevailing wages while covering operating costs, and must offer discounts based on the patient's ability to pay.  *Id*. § 254b(k)(3)(G).  They must also be located in areas or serve populations that the HHS Secretary has designated as "medically underserved."  *Id*. §§ 254b(a)(1), (b)(3), (c)(1), (e)(1)(A).  The statute sets forth additional detailed funding conditions concerning Medicaid coordination and reimbursement, governance, provision of services, reporting, and quality assurance.  *Id*. §§ 254b(b)(1), (k)(3)(C), (F), (H), (I), (q).

306.    Section 330 of the PHSA does not authorize conditions on HCP grants related to prohibiting DEI in all forms, excluding transgender individuals, denying services to immigrants, or incorporating executive orders unrelated to providing health care to underserved populations.

307.    The HHS Secretary has promulgated regulations further governing the HCP program at 42 C.F.R. parts 51c and 56 (the "HCP Rule").  Among other things, the HCP Rule sets forth additional limitations on the use of HCP funds, 42 C.F.R. § 51c.107, and enumerates project requirements and criteria the HHS Secretary will consider in awarding grants based on the purpose of the funds, *id*. §§ 51c.203, 51c.204, 51c.303, 51c.305, 51c.403, 51c.404, 51c.504.  For instance, in reviewing proposals to plan or develop new health centers, the HHS Secretary must consider the relative need of the population to be served by the proposed project, the health center's potential for developing new and effective methods for providing services, and the distribution of resources across the country.  *Id*. § 51c.204.  The HCP Rule also sets forth specific requirements for migrant health centers, including a requirement that they provide specific services to migrant and seasonal agricultural workers' needs, such as supportive services, environmental health services, accident prevention, and prevention and treatment of health conditions related to pesticide exposure.  42 C.F.R. § 56.102(g).

308.    The HCP Rule does not impose any conditions on HCP grants related to prohibiting DEI in all forms, excluding transgender individuals, or incorporating executive orders unrelated to providing health care to underserved populations.

RENNE PUBLIC LAW GROUP
Attorneys at Law

### b.     Ryan White HIV/AIDS Program

309.     In 1990, Congress established the Ryan White HIV/AIDS (RWHA) program as part of the Ryan White Comprehensive AIDS Resources Emergency Act, Pub. L. 101-381, 104 Stat. 576, and has revised and extended it several times, including in the Ryan White HIV/AIDS Treatment Modernization Act of 2006, Pub. L. 109-415, 120 Stat. 2767, and the Ryan White HIV/AIDS Treatment Extension Act of 2009, Pub. L. 111-87, 123 Stat. 2885.  The program is codified at Title 42, Subchapter XXIV of the U.S. Code and contains four major parts.  Among these are Part A, which provides grants to urban areas and mid-sized cities, 42 U.S.C. §§ 300ff-11 to 300ff-20; Part B, which provides grants to states and territories, *id*. §§ 300ff-21 to 300ff-38; and Part C, which funds HIV outpatient primary care to low-income and medically underserved people living with HIV/AIDS, *id*. §§ 300ff–51 to 300ff–67.

### i.     RWHA Part A Program

310.     Part A of the RWHA program provides grants for medical and support services to eligible metropolitan areas with high levels of reported AIDS cases in the previous five years.  42 U.S.C. § 300ff-11(a).  HRSA distributes two-thirds of appropriated Part A grants non-competitively to eligible metropolitan areas based on a statutory formula, *id*. § 300ff-13(a)(2)–(3), and the remaining one-third via competitive supplemental grants awarded based on the applicant's demonstrated need, *id*. § 300ff-13(b).  With respect to the two-thirds comprised of formula grants, the Secretary has no discretion to withhold funding and is required to allocate grants based on a formula that considers how many individuals are living with HIV/AIDS in the jurisdiction.  *See id*. § 300ff-13(a)(2), (3).

311.     Congress has imposed detailed conditions on RWHA Part A grants.  For instance, Part A grant recipients must spend 75% of awarded funds on "core medical services," which are defined to include outpatient/ambulatory medical care services, AIDS pharmaceutical assistance, home health care, and mental health and substance abuse outpatient services, among others.  42 U.S.C. § 300ff-14(c).  The remaining Part A funds must go toward "support services," such as outreach, medical transportation, and referrals, as well as statutorily permitted administrative expenses.  *Id*. § 300ff-14(c)(1), (d).  Congress has also mandated that grant recipients establish HIV Health Services Planning Councils to set priorities for care delivery and has prescribed several related requirements.  *Id*. § 300ff-12(b).

RENNE PUBLIC LAW GROUP
Attorneys at Law

312.    Congress has also enacted statutory factors that HRSA must consider in awarding competitive supplemental grants to applicants based on demonstrated need.  These include the rates of HIV/AIDS, impacts of co-morbid factors, and prevalence of homelessness in the applicant's area.  42 U.S.C. § 300ff-13(b)(2)(B).

313.    Neither the statutes governing the RWHA Part A program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to providing health services for low-income individuals with HIV/AIDS.

### ii.    RWHA Part B Program

314.    The RWHA Part B program provides grants to each of the 50 states, the District of Columbia, Guam, and the Virgin Islands for services such as drug treatments, home and community-based health care, support services, or health insurance coverage for low-income individuals living with HIV/AIDS, among other services.  42 U.S.C. §§ 30ff-22–26.  Some of these states and territories pass through RWHA Part B funds to subrecipients, including local governments.  One portion of RWHA Part B is the AIDS Drug Assistance Program (ADAP), which receives separate appropriations from Congress.  *Id*. § 300ff-26.  The remaining funding goes toward Part B base grants and supplemental grants.  Base grants are awarded pursuant to a formula based on the number of individuals living with HIV/AIDS cases in the state or territory relative to various comparators.  *Id*. § 300ff-28.  Supplemental grants under RWHA Part B are awarded to states and territories with a demonstrated need based on increasing rates of HIV/AIDS cases, unmet needs for services, and other factors.  *Id*. § 300ff-29a.

315.    Congress has imposed detailed conditions on RWHA Part B grants.  For instance, as in the Part A program, recipients of Part B funds must spend 75% of awarded funds on "core medical services" and 25% on "support services," which are each limited to specifically defined activities.  42 U.S.C. § 300ff-22.  The Part B program also authorizes states and territories to award grants to subrecipients and imposes additional requirements on such sub-awards based on the type of services the subrecipient will provide.  *See id.* §§ 300ff-23–24.  For example, Congress has authorized states and territories to award grants for home- and community-based health services, but requires states and territories to prioritize providers who serve low-income individuals with HIV/AIDS and participate in an

-74-

RENNE PUBLIC LAW GROUP
Attorneys at Law

HIV care consortium.  *Id*. § 300ff-24(b).

316.    The statute authorizes the Secretary of HHS to require other "agreements, assurances, and information" from states and territories, but only to the extent "necessary to carry out" the Secretary's authority to "make grants to . . . enable . . . States to improve the quality, availability and organization of health care and support services for individuals and families with HIV/AIDS."  42 U.S.C. §§ 300ff-27(a), 300ff-21.

317.    Congress has also authorized states and territories to award grants using RWHA Part B funds to certain associations, called HIV care consortia, comprised of public or private service providers and community-based organizations in areas most affected by HIV/AIDS.  42 U.S.C. § 300ff-23.  In doing so, Congress set forth specific agreements and assurances related to the purposes of the Part B program that HIV care consortia must make as a condition to receiving funds.  For instance, HIV care consortia must "agree to use such assistance for the planning, development and delivery . . . of comprehensive outpatient health and support services for individuals with HIV/AIDS."  *Id*. § 300ff-23(a)(2).

318.    The assurances and application requirements Congress specified for HIV care consortia under RWHA Part B indicate a statutory purpose to address the needs of minority and underserved communities.  For instance, each HIV care consortium must provide an assurance that "the populations and subpopulations of individuals and families with HIV/AIDS have been identified by the consortium, particularly those experiencing disparities in access and services and those who reside in historically underserved communities." *Id*. § 300ff-23(b)(1)(A).  The consortium must also provide an assurance that it has established a service plan that "addresses the special care and service needs of" such historically underserved communities.  *Id*. § 300ff-23(b)(1)(B).  Finally, Congress specified grant application requirements that HIV care consortia must meet to be eligible for funding, including that the application "demonstrates that adequate planning occurred to address disparities in access and services and historically underserved communities." *Id*. § 300ff-23(c)(1)(F).

319.    Neither the statutes governing the RWHA Part B program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to

-75-

providing health services for low-income individuals with HIV/AIDS.

### iii.     RWHA Part C Program

320.     RWHA Part C grants emphasize services designed to intervene early to improve health outcomes for low-income individuals with HIV/AIDS.  HRSA awards RWHA Part C grants competitively to eligible facilities, including municipal health facilities, that serve medically underserved populations.  42 U.S.C. § 300ff-52(a).  Congress has mandated that HRSA prioritize applicants experiencing increased burdens on HIV/AIDS services when awarding RWHA Part C grants.  *Id*. § 300ff-53.

321.     Like Part A and Part B grants, Part C grants are subject to specific statutory requirements. For instance, Part C grant recipients must also provide a mix of statutorily prescribed "core services" and "supportive serves."  42 U.S.C. § 300ff-51(b)(1).  At least half of allocated funding must go toward such services that focus on early intervention, including HIV/AIDS testing and referrals.  *Id*. § 300ff-51(b)(2). The statute also requires applicants to agree to certain funding conditions, including that the applicant will only use funds for statutorily authorized purposes, will establish fiscal control and accounting procedures, and will establish a clinical quality management program, among others.  *Id*. § 300ff-64(g). Finally, Congress has mandated conditions on the use of funds for HIV/AIDS counseling, including that counseling programs may not directly promote intravenous drug use or sexual activity and must educate patients on the availability of hepatitis a and b vaccines.  *Id*. § 300ff-67.

322.     Neither the statutes governing the RWHA Part C program nor any other legislation authorizes HRSA to impose grant conditions related to prohibiting all forms of DEI, exclusion of transgender individuals, or adherence to executive orders unrelated to providing early intervention services for low-income individuals with HIV/AIDS.

### c.  Maternal Mental Health and Substance Use Disorders Program

323.     Congress authorized the Maternal Mental Health and Substance Use Disorders Program (MMH-SUD) through the enactment of the Into the Light for Maternal Mental Health and Substance Use Disorder Act of 2022, within the Consolidated Appropriations Act of 2023.  Pub. L.117-328, 136 Stat. 5640-5643.  The Act amends the Public Health Service Act (PHSA) to create the MMH-SUD program. Administered by HRSA's Maternal and Child Health Bureau, the program funds grants to support the

-76-

RENNE PUBLIC LAW GROUP
Attorneys at Law

expansion of health care providers' capacity to screen, assess, treat, and refer pregnant and postpartum people for maternal mental health and substance use disorders.  *See* 42 U.S.C. § 247b–13a.

324.    Section 317L-1(a) of the PHSA authorizes the HHS Secretary to make grants "to establish, improve, or maintain programs for screening, assessment, and treatment services, including culturally and linguistically appropriate services, as appropriate, for women who are postpartum, pregnant, or have given birth within the preceding 12 months, for maternal mental health and substance use disorders." *Id*. § 247b–13a(a).

325.    Section 317L-1(b) of the PHSA sets forth the application criteria for MMH-SUD grant applicants.  The statute specifies that an entity seeking a grant through the program must submit an application to include explanations of "(1) how a program, or programs, will increase the percentage of women screened and treated, as appropriate, for maternal mental health and substance use disorders in 1 or more communities; and (2) how a program, or programs, if expanded, would increase access to screening and treatment services for maternal mental health and substance use disorders." *Id*. § 247b–13a(b).

326.    Section 317L-1(c) of the PHSA commands the HHS Secretary to prioritize eligible entities providing screening and treatment for maternal behavioral health issues through partnerships with community-based organizations in areas with disproportionate need or in health professional shortage areas.  *Id*. § 247b–13a(c).

327.    Section 317-L(d) specifies the eligible uses of funds, including screening, brief intervention, and treatment; psychiatric consultation; coordination with maternal and child health programs, including child psychiatric access programs; public outreach and awareness; creation of a multistate consortia; and training primary care providers on trauma-informed care, culturally appropriate services, and other best practices.  *Id*. § 247b–13a(d)(1)–(2).

328.    Section 317L-1(h) of the PHSA Section authorizes $24 million to be appropriated for the MMH-SUD program for each of fiscal years 2023 through 2027.

329.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on MMH-SUD funds related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the

-77-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    grant.

2                                 **d.  Healthy Start Program**

3         330.    Congress authorized the Healthy Start Program (HSP) through Section 330H of the Public

4    Health Service Act ("PHSA"), as amended.  42 U.S.C. § 254c-8.  PHSA authorizes the HHS Secretary,

5    acting through the Administrator of the HRSA, Maternal and Child Health Bureau, to establish a grant

6    program with the aim of reducing infant mortality by providing community-based services for pregnant

7    women, infants, and families in high-risk areas, focusing on tailored support and addressing social

8    determinants of health.  *See id.*, § 254c-8(a).

9         331.    HRSA's administration of the HSP is authorized and governed by statutory directives.

10   Congress has specified what activities are eligible for funding under the HSP, the criteria HRSA must

11   consider in allocating grants, and program requirements HRSA may require recipients agree to as

12   conditions for receiving funds.  *See id.*, § 254c-8(a).

13        332.    Section 330H of the PHSA sets out numerous requirements that projects for HSP grant

14   funding must meet.  For example, grant recipients are required to establish "community based consortia

15   of individuals and organizations" that are appropriate for participation in HSP projects.  *Id.* § 254c-8(b).

16   The statute also sets forth criteria the HHS Secretary may take into account when selecting grant

17   recipients, which include the following considerations:  factors that contribute to infant mortality,

18   including poor birth outcomes and social determinants of health; communities with high rates of infant

19   mortality or poor perinatal outcomes or high rates of infant mortality or poor perinatal outcomes in

20   specific subpopulations within the community; and the extent to which applicants for such grants

21   facilitate collaboration with the local community in the development of the project, among other such

22   considerations.  *See id.*, § 254c-8(b)(2).

23        333.    Funding for the HSP program comes from congressional appropriations.  The most recent

24   authorization comes from Section 330H(e) of the PHSA, as amended by Section 3225 of the Coronavirus

25   Aid, Relief, and Economic Security (CARES) Act.  Pub. L. 116-136, 134 Stat. 381.  Congress authorized

26   an appropriation of $125,500,000 for each of the fiscal years 2021 through 2025.  *See id.* § 254c-8(e).

27        334.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or

28   conditions on HSP funds related to a prohibition on all kinds of DEI, exclusion of transgender people,

RENNE PUBLIC LAW GROUP
Attorneys at Law

-78-

1    denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

2        **2.    Substance Abuse and Mental Health Services Administration Programs**

3        335.    The Substance Abuse and Mental Health Services Administration (SAMHSA) within

4    HHS, "funds organizations providing substance use and mental health services, research, technical

5    assistance, and training to advance the behavioral health and to improve the lives of individuals living

6    with mental and substance use disorders, and their families."  Grants, SAMHSA, https://www.samhsa.

7    gov/grants (last visited December 17, 2025).  SAMHSA administers both competitive, discretionary

8    grant programs and "noncompetitive, formula grant" programs "mandated by the U.S. Congress."  *Id*.

9    Examples of these noncompetitive block grants include the Community Mental Health Services Block

10   Grant and the Substance Use Prevention, Treatment, and Recovery Services Block Grant.

11       336.    SAMHSA's authority to issue grants under its various programs is conferred by statute.

12   *See, e.g.*, 42 U.S.C. §§ 290dd-3 (Grants for reducing overdose deaths), 290dd-4 (Program to support

13   coordination and continuation of care for drug overdose patients), 290ee (Opioid overdose reversal

14   medication access, education, and co-prescribing grant programs), 290ee-1 (First responder training),

15   290ee-2 (Building communities of recovery), 290ee-3 (State demonstration grants for comprehensive

16   opioid abuse response), 290ee-3a (Grant program for State and Tribal response to opioid use disorders),

17   290ee-5a (Sobriety treatment and recovery teams), 290ee-9 (Services for families and patients in crisis).

18   These statutes list the required criteria for a grant application and allowable uses for grant funds.  None

19   of the statutes establishing these programs authorize conditions on these grants related to prohibiting all

20   forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to

21   executive orders unrelated to the purpose of the grant.

22       337.    One of the requirements provided in SAMHSA's Notices of Award (NOA) is a "Disparity

23   Impact Statement (DIS)," which includes "[a] quality improvement plan for how [recipients will use

24   program data] to monitor and manage program outcomes by race, ethnicity, and LGBT status, when

25   possible."  SAMHSA also requires the quality improvement plan to "include strategies for how processes

26   and/or programmatic adjustments will support efforts to reduce disparities for the identified sub-

27   populations."  The NOAs do not include any grant conditions related to prohibiting all kinds of DEI,

28   exclusion of transgender people, or adherence to executive orders unrelated to overdose response.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-79-

### 3.     Center for Disease Control and Prevention Grant Programs

338.     The Centers for Disease Control and Prevention (CDC) within HHS describes itself as "the nation's leading science-based, data-driven, service organization that protects the public's health." Home, CDC, https://www.cdc.gov/ (last visited December 17, 2025).  CDC provides much of the funding to support public health systems and activities by state and local governments.  *See* Josh Michaud, et al., CDC's Funding for State and Local Public Health: How Much and Where Does it Go?, KFF, https://www.kff.org/other-health/cdcs-funding-for-state-and-local-public-health-how-much-and-where-does-it-go/#:~:text=Among%20the%20key%20findings%3A,and%20public%20health%20infrastructure%20rebuilding (last visited December 17, 2025).  In FY 2023, CDC obligated almost $15 billion to state and local jurisdictions.  *Id.*  The CDC's funding supports a range of programs including HIV/AIDS, Viral Hepatitis, STI, and TB Prevention; Chronic Disease Prevention and Health Promotion; Public Health Preparedness and Response; and Injury Prevention and Control.  *See* Grant Funding Profiles – Funding Category View, CDC, https://fundingprofiles.cdc.gov/Category/Category (last visited December 17, 2025).

339.     For example, one of the grants awarded by CDC is the High-Impact HIV Prevention and Surveillance Programs for Health Departments grant, which is a part of CDC's funding for HIV/AIDS, Viral Hepatitis, STI, and TB Prevention.  As explained by the 2024 NOFO for this program, the grant funds recipients "to implement a comprehensive, person-centered HIV prevention and surveillance program to prevent new HIV infections and improve the health of people with HIV."

340.     The NOFO for this program includes as a required element, "Addressing Social and Structural Factors."  The NOFO recognizes that "[t]he impact of racism, homophobia, transphobia, and stigma significantly exacerbates the health disparities experienced among communities disproportionately affected by HIV.  Health equity is a desirable goal that entails special efforts to improve the health of those who have experienced social or economic disadvantage."  With respect to the "Population(s) of Focus," the NOFO explains that "Applicants must provide HIV services to populations within the jurisdiction that are disproportionately impacted by HIV as identified by their epidemiological data, gaps in services, or need," and "Examples to consider based on national and local data, include transgender women, cisgender Black or African American women, gay and bisexual men, American

-80-

Indian or Alaska Native gay and bisexual men, people who inject drugs (PWID), youth, pregnant and postpartum persons and their infants, and other populations with disproportionately higher rates of HIV diagnosis including individuals involved in the justice system and people experiencing housing insecurity."

341.     The NOFO did not include any grant conditions related to prohibiting all kinds of DEI, exclusion of transgender people, or adherence to executive orders unrelated to HIV/AIDS surveillance and prevention.

342.     Statutory authority for the Fiscal Year 2024 High-Impact HIV Prevention and Surveillance Programs for Health Departments grant comes from 42 U.S.C. § 247c(b)–(c) and the Consolidated Appropriations Act of 2016, Pub. L. 114-113, 129 Stat. 2242.  42 U.S.C. § 247c authorizes HHS to make grants like the High-Impact HIV Prevention and Surveillance Programs for Health Departments grant.  It also identifies authorized conditions for the grants, including recordkeeping requirements, 42 U.S.C. § 247c(e)(3), and patient confidentiality mandates, *id.* § 247c(e)(5).  Neither 42 U.S.C. § 247c nor the Consolidated Appropriations Act of 2016 authorizes or imposes conditions on this grant related to prohibiting all forms of DEI, exclusion of transgender individuals, denying services to immigrants, or adherence to executive orders unrelated to HIV/AIDS surveillance and prevention.

### 4.     Hospital Preparedness Program (HPP)

343.     Congress authorized the Hospital Preparedness Program (HPP) through the enactment the Pandemic and All-Hazards Preparedness Act (PAHPA), Pub. L. No. 109-417, 120 Stat. 2861 (2000).  The program is administered by the Office of the Assistant Secretary for Preparedness and Response (ASPR).  The HPP is intended to prepare the health care delivery system to meet community needs, provide equitable access to care, and save lives during disasters and emergencies.

344.     HHS's administration of the HPP is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the HPP program, the criteria HHS must consider in allocating grant funding, and program requirements HHS may require applicants to agree to as conditions for receiving funds.  *See* 42 U.S.C. § 247d–3b(b).

345.     The PHSA authorizes the Assistant Secretary for Preparedness and Response to award competitive grants or cooperative agreements to eligible entities to improve surge capacity and enhance

RENNE PUBLIC LAW GROUP
Attorneys at Law

community and hospital preparedness.  U.S.C. § 247d–3b(a).

346.    The statute requires ASPR to distribute HPP funding based on specified eligibility criteria, and sets forth eligible activities funds may be used for.  *See* 42 U.S.C. § 247d–3b(c).

347.    The PHSA does not authorize conditions on HSI grants related to prohibiting DEI in all forms, excluding transgender individuals, denying services to immigrants, or incorporating executive orders unrelated to hospital emergency preparedness.

348.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HPP grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

### 5.    Other HHS Grants

349.    HHS and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other HHS grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

350.    Congress annually appropriates funding for HHS grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Secretary of HHS with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HHS grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1523–28, 1567–98; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 397–402, 441–74; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4808–13, 4854–87; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 272–77, 397–419.

351.    Plaintiffs County of Marin, County of Sacramento, County of San Diego, County of Los Angeles, and County of Santa Barbara (collectively, the "HHS Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive HHS grants.  The HHS Plaintiffs rely on millions of

-82-

RENNE PUBLIC LAW GROUP
Attorneys at Law

dollars in appropriated federal funds from HHS direct or pass-through grant programs for health and human services-related projects undertaken for the benefit of their communities.

### D.     EPA Grant Programs

352.     Congress established the Environmental Protection Agency (EPA) in 1970 through Reorganization Plan No. 3 of 1970, 35 Fed. Reg. 15623 (Oct. 6, 1970), which consolidated many environmental responsibilities of the federal government under one agency.  Every year, EPA awards more than $4 billion in funding for grants and other assistance agreements to state and local governments, tribes, universities, nonprofit recipients, and other entities to protect human health and the environment.  *See* U.S. Envtl. Prot. Agency, EPA Grants Overview for Applicants and Recipients, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients (last visited December 17, 2025).  The EPA Administrator is responsible for overseeing all agency programs and offices, supervising the administration of grants and other funding, and ensuring the agency's actions comply with statutory and executive requirements.  *See, e.g.*, 42 U.S. Code §§ 6912; 9628; 13103(a).

### 1.     Brownfields and Land Revitalization Program

353.     The EPA's Brownfields and Land Revitalization Program provides funds to states, Tribal Nations, communities, and other stakeholders to work together to prevent, assess, safely clean up, and sustainably reuse contaminated or potentially contaminated properties, commonly referred to as "brownfields."  *See* U.S. Envtl. Prot. Agency, EPA Brownfields Revolving Loan Fund Grants Program Overview, https://www.epa.gov/system/files/documents/2022-08/Program%20Overview_RLF.pdf (last visited December 17, 2025).  Revolving Loan Fund (RLF) Grants provide funding to a grant recipient for capitalizing an RLF program.  RLF programs provide loans and subgrants to eligible entities to carry out cleanup activities at brownfield sites contaminated with hazardous substances.

354.     Congress authorized the Brownfields and Land Revitalization Program through the Small Business Liability Relief and Brownfields Revitalization Act of 2002, Pub. L. No. 107-118, 115 Stat. 2356 (2002).  This statute amended section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and established EPA's Brownfields Program in its current form.  Congress authorized the EPA to award assessment grants, cleanup grants, revolving loan fund (RLF) grants, and job training grants.  *See* 42 U.S.C. § 9604(k)(2)–(6).  The RLF program, set forth in 42

-83-

U.S.C. § 9604(k)(3), enables eligible entities to establish loan funds that can be used to finance cleanup activities at brownfield sites.

355.    EPA's administration of the Brownfields and Land Revitalization Program, including the award of RLF grants, is authorized and governed by statutory directives.  Congress has specified what activities are eligible for funding under the Brownfields and Land Revitalization Program, the responsibilities of grant recipients, and specific certifications that grant recipients must agree to as a condition of receiving funds.  For example, assessment grants may only be used for inventorying, characterizing, assessing, and conducting planning activities related to brownfield sites.  42 U.S.C. § 9604(k)(2).  RLF grants must be used either to capitalize revolving loan funds or, in certain cases, directly for remediation at sites owned by the grantee or an eligible nonprofit.  *Id*. § 9604(k)(3). Congress also imposed clear prohibitions on the use of funds.  No grant or loan may be used to pay penalties or fines, to satisfy a federal cost-share requirement, to pay cleanup costs at a site where the recipient is a potentially responsible party under CERCLA § 107, or to cover compliance costs under other federal environmental laws (except those associated with cleanup).  *Id*. § 9604(k)(5)(B).

356.    Additionally, every grant or loan agreement must require the recipient to comply with all applicable federal and state laws and provide a 20 percent non-federal matching share in cash or in-kind contributions, unless EPA determines that such a match would cause undue hardship.  42 U.S.C. § 9604(k)(10)(B).  Congress further directed EPA to weigh community involvement and equity considerations in awarding grants.  The ranking criteria, established by statute, requires consideration of the extent to which projects provide for meaningful local community participation in cleanup and reuse decisions, and "the extent to which a grant would address or facilitate the identification and reduction of threats to the health or welfare of children, pregnant women, minority or low-income communities, or other sensitive populations."  *Id*. § 9604(k)(6)(C)(x).

357.    The Small Business Liability Relief and Brownfields Revitalization Act of 2002 does not authorize EPA to condition funding on prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, certifying certain facts are material for the purposes of the False Claims Act, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Funding for the Brownfields and Land Revitalization Program comes from congressional appropriations.  Congress appropriated

-84-

1    funds for the Brownfields and Land Revitalization Program in the Consolidated Appropriations Act,

2    2024, Pub. L. 118-42, 138 Stat. 252–263.  Nothing in the 2024 Appropriations Act or any other

3    legislation authorizes EPA to impose grant fund conditions related to prohibiting all forms of DEI,

4    facilitating enforcement of federal immigration laws, certifying certain facts are material for the purposes

5    of the False Claims Act, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

6            **2.     Drinking Water System Infrastructure Resilience and Sustainability Program**

7         358.    The Safe Drinking Water Act (SDWA), codified at 42 U.S.C. §§ 300f et seq., as amended

8    through the 2018 America's Water Infrastructure Act (Pub. L. No. 115–270), authorizes the

9    Environmental Protection Agency (EPA) to establish the Drinking Water System Infrastructure

10    Resilience and Sustainability Program.  Under 42 U.S.C. § 300j-19a(l), EPA may award grants to eligible

11    public water systems to assist underserved, small, and disadvantaged communities for the purpose of

12    increasing drinking water facility resilience to natural hazards.  The statute directs EPA to prioritize

13    funding for small, underserved, and disadvantaged communities and for projects that improve a drinking

14    water system's ability to prepare for, withstand, and recover from natural hazards and extreme weather

15    events, including droughts, floods, wildfires, and earthquakes.  *Id*. §§ 300j-19a(l)(2), (5).  Eligible

16    activities include planning, design, and construction of infrastructure improvements, as well as system

17    consolidation, regionalization, and other measures that reduce vulnerability to climate-related and natural

18    hazard risks.  *Id*. § 300j-19a(l)(3)(A)–(F).

19         359.    Congress expressly prescribed the application and selection criteria for grants awarded

20    under the Drinking Water System Infrastructure Resilience and Sustainability Program.  *See* 42 U.S.C.

21    § 300j-19a(l)(4).  The statute requires that any eligible entity seeking funding submit an application

22    containing specific, enumerated elements, including a detailed proposal describing the program or project

23    to be planned, designed, constructed, implemented, operated, or maintained; identification of the natural

24    hazard risk the project is intended to address; and documentation prepared by a federal, state, regional, or

25    local governmental agency substantiating the existence of that natural hazard risk in the project area.  *Id*.

26    § 300j-19a(l)(4)(A)–(C).  Applicants must further describe any recent natural hazard events that have

27    affected the applicable water system and explain how the proposed program or project would improve

28    system performance under anticipated natural hazard conditions.  *Id*. § 300j-19a(l)(4)(D)–(E).  Finally,

RENNE PUBLIC LAW GROUP
Attorneys at Law

-85-

the application must explain how the proposed program or project is expected to enhance the resilience of the drinking water system to the identified hazards. *Id*. § 300j-19a(l)(4)(F). These criteria are statutory requirements enacted by Congress that govern both eligibility and EPA's evaluation of grant applications.

360. Nothing in the authorizing statutes or any other legislation related to the Drinking Water System Infrastructure Resilience and Sustainability Program authorizes EPA to impose grant fund conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, certifying certain facts are material for the purposes of the False Claims Act, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

### 3. Other EPA Grants

361. EPA and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Additionally, Congress appropriates resources for specifically named community water infrastructure projects identified as Congressionally Directed Spending and Community Project Funding items in Appropriations Acts. Funding is provided in the State and Tribal Assistance Grants (STAG) account for these drinking water, wastewater, stormwater infrastructure, and water quality protection Community Grants projects. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these other EPA grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

362. Congress annually appropriates funding for EPA grant programs. In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of EPA with respect to funding. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on EPA grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1507–1516; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 380–389; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4790–4800; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138

RENNE PUBLIC LAW GROUP
Attorneys at Law

Stat. 252–263.

363.     Plaintiffs the City of Fresno, City of Redwood City, City of Alameda, City of Atlanta, City of Beaverton, City of Hillsboro, City of Santa Clara, City of Santa Cruz, City of Sunnyvale, and County of Los Angeles (collectively, the "EPA Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive EPA grants.  Fresno and Alameda rely on millions of dollars in appropriated federal funds from EPA's direct or pass-through grant programs for environmental projects undertaken for the benefit of their communities.

### E.     DHS Grant Programs

364.     Congress established DHS in 2002 in the aftermath of the September 11, 2001 attacks with the goal of protecting the United States against terrorism.  *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2142.  DHS administers both competitive and entitlement grant programs.  The Secretary of Homeland Security is responsible for the overall direction, supervision, and coordination of the Department of Homeland Security, including oversight of its component agencies, the administration of grants and other financial assistance programs, and ensuring compliance with statutory and executive mandates.  *See* 6 U.S.C. § 112(a)(1).

365.     DHS often acts through its operating administrations, including FEMA.  Congress established FEMA in 1979 to consolidate all federal support for emergency preparedness, mitigation, and response activities under one agency's purview.  In 2006, Congress passed legislation entitled Preserving the Federal Emergency Management Agency," which requires FEMA to "be maintained as a distinct entity" within DHS.  *See* 6 U.S.C. §§ 313(a); 316(a).  By law, the DHS Secretary is responsible for all acts taken by its operating administrations.  The administrator of FEMA reports directly to the DHS Secretary.

### 1.     Homeland Security Grant Program

366.     FEMA's Homeland Security Grant Program (HSGP) comprises several discrete subprograms, including the State Homeland Security Program (HSGP-SHSP) and the Urban Area Security Initiative (HSGP-UASI) grant program.

### a.     State Homeland Security Program

367.     Congress authorized the creation of the Homeland Security Grant Program – State Homeland Security Program to provide federal funding to States to build the necessary capacity to

RENNE PUBLIC LAW GROUP
Attorneys at Law

prevent, prepare for, protect against, and respond to acts of terrorism.  SHSP funds have been available to States since the first version of the program was created by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) in 2001.  *See* 6 U.S.C. §§ 603, 605-09.

368.    The State Homeland Security Program (HSGP-SHSP) grants exist to provide federal funding to States—and, through them, to local governments—to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

369.    HSGP-SHSP funds have been available to States—and, through them, to local governments—since the first version of the program was created by the USA PATRIOT Act in 2001. Congress codified the program at 6 U.S.C. §§ 603, 605-09.

370.    Congress has directed FEMA to allocate HSGP-SHSP funds pursuant to a risk assessment, which determines the relative threat, vulnerability, and consequences to each State from acts of terrorism, considering factors such as population density and history of threats.  *Id*. § 608(a)(1). Recipients may then use HSGP-SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries.  *Id*. § 609(a).

371.    Because HSGP-SHSP grants are formula grants based on a statutory risk formula, not competitive grants, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.  Congress has directed that the FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for HSGP-SHSP grants.  *Id*. § 605(e)(1)(A)(v).

### b.  Urban Areas Security Initiative

372.    Urban Areas Security Initiative (HSGP-UASI) grants serve a similar purpose to HSGP-SHSP grants.  They are used to ensure States—and, through them, local government entities serving high-risk urban areas—build and maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism.  HSGP-UASI funds have been available to States—and, through them, local government entities serving high-risk urban areas—since an initial version of the program was created by appropriations statute in 2003.  *See* Pub. L. No. 108-90, 117 Stats. 1137, 1146.  The program is codified at 6 U.S.C. §§ 603-04, 606-09.

RENNE PUBLIC LAW GROUP
Attorneys at Law

373.    Each year, FEMA must conduct a risk assessment based on a list of factors specified by statute to determine the relative threat, vulnerability, and consequences "eligible metropolitan areas"—meaning the top one hundred most populous metropolitan statistical areas in the United States—would face from an act of terrorism. *Id.* §§ 601(5), 604(b)(2)(A)(i), 608(a)(1). Based on that risk assessment, FEMA must designate a list of high-risk urban areas that may submit applications for HSGP-UASI grants. *Id.* § 604(b)(3). FEMA must also rely on the same set of factors—including but not limited to population density and whether the given metropolitan area was targeted by a past act of terrorism—to allocate funding to the States and high-risk urban areas that apply for grants. *Id.* § 608(a).

374.    HSGP-UASI grants are based on a risk assessment formula that Congress has directed FEMA to refine, establish, and use to allocate HSGP-UASI funding. Each State is entitled to a specific allocation based on FEMA's risk assessment and tied to the FEMA-designated high-risk urban area or areas in that State.

375.    Recipients of HSGP-UASI grant funding must use the funds for purposes permitted by statute, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id.* § 609(a). States that receive HSGP-UASI funds must provide the eligible urban area or areas in that State with at least 80% of the grant funds. *Id.* § 604(d)(2)(A).

376.    States collectively receive hundreds of millions of dollars per year in HSGP-UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities they pass these funds to use HSGP-UASI funds for myriad counterterrorism and emergency response purposes, including support for urban fusion centers (hubs for sharing threat-related information across government and private sector partners), SWAT teams, canine units, and bomb squads.

377.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HSGP grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### 2.    Hazard Mitigation Grant Program

378.    Section 324 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (Stafford Act) authorizes FEMA to provide funding under the Hazard Mitigation Grant Program (HMGP) for management costs incurred in the administration of HMGP. The Stafford Act

-89-

provides that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." 42 U.S.C. § 5170c(a).

379.     The Hazard Mitigation Grant Program provides federal funding to state, local, tribal, and territorial governments to develop hazard mitigation plans and rebuild their communities after a Presidential major disaster declaration in ways that reduce or mitigate future disaster losses.

380.     Eligible risk reduction projects include, but are not limited to, retrofitting facilities to make them more resistant to floods, earthquakes, wind, wildfires, and other natural disasters; installing permanent barriers to prevent floodwater from entering homes or businesses; building safe rooms for communities in hurricane- or tornado-prone areas; stabilizing slopes to prevent structural losses; and developing or improving warning systems. *See* 42 U.S.C. § 5170c(f)–(g)

381.     HMGP funding and funding applications do not necessarily operate on a predicable, fiscal-year basis. HMGP funding often follows the occurrence of disasters, emergencies, and other events and Presidential declarations. The amount of HMGP funds available to a State in connection with a declared disaster is a function of the level of disaster assistance provided. The State also administers a process to identify and select local project plans for FEMA approval and funding. In this process, local jurisdictions submit their applications to the State, which selects projects to then submit to FEMA for approval within 15 months of the date of disaster declaration. *See generally* 44 C.F.R. §§ 206.430-440. Some approved mitigation projects can span several years since many contain structural renovation components.

382.     Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on HMGP funds related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### 3.     Flood Mitigation Assistance

383.     The Flood Mitigation Assistance (FMA) Program is a federal grant program administered by FEMA to reduce or eliminate the risk of repetitive flood damage to structures insured under the National Flood Insurance Program (NFIP) and to enhance community flood resilience within NFIP-participating communities.

-90-

RENNE PUBLIC LAW GROUP
Attorneys at Law

384.    Congress authorized the FMA program in Section 1366 of the National Flood Insurance Act of 1968, which directs FEMA to provide assistance for mitigation activities that reduce future flood losses to NFIP-insured properties. *See* 42 U.S.C. § 4104c.  Congress has further expanded and supported the FMA program through Division J, Title V of the Infrastructure Investment and Jobs Act, which provides additional funding and directives for flood mitigation and resilience activities.  Pub. L. No. 117-58, 135 Stat. 1387–1388 (2021).

385.    Congress established specific statutory requirements governing the award of FMA grants. Eligible applicants must be NFIP-participating States, local governments, Tribes, or territories, and funded projects must reduce or eliminate flood risk to structures insured under the National Flood Insurance Program.  42 U.S.C. § 4104c(a)–(b).  Congress directed FEMA to prioritize mitigation projects benefiting repetitive loss and severe repetitive loss properties and to evaluate applications based on cost-effectiveness, technical feasibility, and consistency with FEMA-approved hazard mitigation plans.  *Id.* § 4104c(c)–(d).  The statute establishes a default federal cost share of up to 75 percent, while authorizing enhanced federal cost shares, including up to 100 percent, for qualifying projects addressing severe repetitive loss properties or benefiting disadvantaged communities.  *Id.* § 4104c(d).

386.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on FMA grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### 4.    United States Fire Administration Grant Programs

387.    The U.S. Fire Administration (USFA) is a component of FEMA established by Congress under the Federal Fire Prevention and Control Act of 1974 to provide national leadership in fire prevention, training, research, and data collection.  *See* 15 U.S.C. § 2204.  The USFA's purpose is to advance fire prevention and control efforts, improve firefighter and public safety, promote public education and awareness, conduct fire-related research, and support professional development through training and technical assistance.  Consistent with these statutory responsibilities, Congress has authorized USFA, acting through FEMA, to administer national fire grant programs, including the Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program and the Assistance to Firefighters Grant (AFG) Program and, in accordance with the eligibility criteria, priorities, and

-91-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    conditions established by statute.

### a. Staffing for Adequate Fire and Emergency Response

3    388.    Congress established the Staffing for Adequate Fire and Emergency Response (SAFER)

Program to provide funding directly to local fire departments (among other entities) to help them increase

or maintain the number of trained, front-line firefighters available to serve their communities.

6    389.    The goal of SAFER grants is to enhance local fire departments' abilities to comply with

staffing, response, and operational standards established by the National Fire Protection Association,

including assisting fire departments with "attain[ing] 24-hour staffing to provide adequate protection

from fire and fire-related hazards." 15 U.S.C. § 2229a(a)(1)(A). SAFER grants are "awarded on a

competitive basis through a neutral peer review process." *Id.* § 2229a(a)(1)(G).

11    390.    The NOFO for the SAFER Program, which is from FY 2024 but which governs awards

that FEMA will make through September 30, 2025 based on applications received by July 3, 2025, states

that "[g]rant funds are obligated upon [FEMA's issuance of] the offer of grant award in the FEMA GO

system," and that recipients of SAFER funds must "comply with DHS Standard Terms and Conditions in

effect at the time the award is issued." *See* FEMA, Notice of Funding Opportunity (NOFO): FY 24

Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program, https://www.fema.gov

/sites/default/files/documents/fema_gpd_safer-nofo_fy24.pdf (last visited December 17, 2025).

### b. Assistance Firefighter Grant

19    391.    Congress's primary goal in creating the Assistance to Firefighters Grant (AFG) was to

ensure that firefighters and other first responders can obtain critical equipment, training, and other

resources necessary to protect the public and emergency personnel from fire and fire-related hazards. 15

U.S.C. § 2229(c). Eligible fire departments can apply for AFG funding, which is awarded on a

competitive basis, in consultation with the chief executives of the States in which the recipients are

located, with the amount of grant funding capped based on statutory standards related to population size.

*Id.* § 2229(c)(1), (2), (e).

26    392.    FEMA awards AFG grants on a rolling basis. The NOFO for the AFG program, which is

from FY 2024 but which governs awards that FEMA will make through September 30, 2025, states that

recipients of AFG funds must "comply with the DHS Standard Terms and Conditions in effect as of the

RENNE PUBLIC LAW GROUP
Attorneys at Law

date of the federal award." *See* FEMA, Notice of Funding Opportunity (NOFO): FY 24 Assistance to Firefighters Grant Program, https://files.simpler.grants.gov/opportunities/ab253b7e-83d1-40b5-9d92-f550ee51ba74/attachments/d04af45f-2c82-492c-a791-cf3fce90ab1d/FY_2024_AFG_NOFO.pdf (last visited December 17, 2025).

393.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on grant funds administered by the USFA related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

### 5.    Other DHS Grant Programs

394.    DHS and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any DHS grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

395.    Congress annually appropriates funding for DHS grant programs.  In the annual appropriations legislation, Congress sets forth priorities and directives to the Administrator of DHS with respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DHS grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1448-1477; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 312-348; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4725–4760; Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 593-628.

396.    Plaintiffs City of Fresno, City of Redwood City, City of Corvallis, City of Hillsboro, City of Santa Clara, City of Santa Cruz, and the County of Santa Barbara (collectively, the "DHS Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive DHS grants.  DHS Plaintiffs rely on millions of dollars in appropriated federal funds from DHS's direct or pass-through grant programs for projects undertaken for the benefit of their communities.

-93-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

### F.     DOI Grant Programs

397.     Congress established the Department of the Interior in 1849 to administer the rapidly expanding land holdings acquired by the Federal Government in the first half of the nineteenth century. Act of Mar. 3, 1849, ch. 108, § 11, 9 Stat. at 396.  Today, the DOI manages 420 million acres of federal lands, nearly 55 million acres of tribal lands, more than 700 million acres of subsurface minerals, and about 2.5 billion acres of the outer continental shelf.  The DOI Secretary is responsible for all actions taken by the Department and its component offices, which include the Bureau of Indian Affairs (BIA), Bureau of Indian Education (BIE), Bureau of Land Management (BLM), Bureau of Ocean Energy Management (BOEM), Bureau of Reclamation, Bureau of Safety and Environmental Enforcement (BSEE), National Park Service (NPS), Office of Surface Mining Reclamation and Enforcement (OSMRE), U.S. Fish and Wildlife Service (FWS), and U.S. Geological Survey (USGS).

398.     The Secretary of the Interior is charged with the supervision and management of the Department of the Interior and its bureaus, including the administration of federal programs and grants, management of public lands and resources, and ensuring that departmental actions are carried out in accordance with governing statutes and executive directives.  *See* 43 U.S.C. §§ 1457; 1458.

### 1.     Land and Water Conservation Fund Grant Program (LWCF)

399.     Congress established the Land and Water Conservation Fund Grant Program in 1965, through the enactment of the Land and Water Conservation Fund Act of 1965.  Pub. L. 88-578, 54 U.S.C. § 200301 et seq., as amended.  The purpose of the Act is to assist the states and agencies to meet the "present and future outdoor recreation demands and needs of the American people."  Pub. L. 88-578. LWCFA appropriates federal funds to states for outdoor recreation planning, acquisition, and facilities development.

400.     DOI's administration of the LWCF is authorized and governed by statutory directives. Congress has specified what activities are eligible for funding under the LWCF, the formula DOI must apply in allocating grants, and program requirements DOI may require recipients agree to as conditions for receiving funds.  *See* 54 U.S.C. § 200305.

401.     The Land and Water Conservation Act, 54 U.S.C. § 200305, contains Congress's overarching authorization for DOI to allocate LCWF grants.  The statute authorizes the DOI Secretary to

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  make payments to the states for outdoor recreation.  Subsection (b) of 54 U.S.C. § 200305 provides for

2  the DOI Secretary to establish a formula to determine funding amounts and sets forth eligibility criteria

3  the DOI Secretary shall consider to determine awards.

4      402.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or

5  conditions on LWCF grant funds related to a prohibition on all kinds of DEI, exclusion of transgender

6  people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the

7  grant.

8                          **2.    WaterSMART Grant Program**

9      403.    DOI established the WaterSMART (Sustain and Manage American Resources for

10  Tomorrow) program in 2010 under DOI Secretarial Order 3297, with the goal to "pursue a sustainable

11  water supply for the Nation by establishing a framework to provide federal leadership and assistance on

12  the efficient use of water, integrating water and energy policies to support the sustainable use of all

13  natural resources, and coordinating the water conservation activities of the various Interior bureaus and

14  office."  *See* Secretarial Order No. 3297, Department of the Interior WaterSMART Program - Sustain

15  and Manage America's Resources for Tomorrow, U.S. Dep't of the Interior (Feb. 22, 2010), https://

16  www.doi.gov/document-library/secretary-order/3297-department-interior-watersmart-program-sustain-

17  and-manage (last visited December 17, 2025).  The program was codified under the Omnibus Public

18  Land Management Act of 2009, Pub. L. 111-11, as amended 42 U.S.C. § 10364.

19      404.    The WaterSmart program authorizes the DOI Secretary to provide cost-shared funding in

20  four grant categories on a competitive basis:  water and energy efficiency, small-scale water efficiency,

21  water strategy grants, and environmental water resources projects.  *See* 42 U.S.C. § 10364(a)(1).  To be

22  eligible for funding, applicants must meet certain criteria; they must be located in Alaska, Arizona,

23  California, Colorado, Hawaii, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota,

24  Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wyoming, American Samoa, Guam, the

25  Northern Mariana Islands, and the Virgin Islands, and must submit a proposal of the improvement the

26  grant is intended to fund.  *See* 42 U.S.C. § 10364(a)(2).  Applicants must also agree to cost sharing

27  requirements of fifty percent or more of the total project cost, among other considerations.  *See* 42 U.S.C.

28  § 10364(a)(3)(e).

-95-

405.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on WaterSMART grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

406.    Congress annually appropriates funding for the WaterSMART grant program.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOI Secretary with respect to WaterSMART funding.  *See*, e.g., Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1363; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 221; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4631; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 194, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 24.

407.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on WaterSMART grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

### 3.    Other DOI Grants

408.    DOI and its operating divisions and agencies administer a range of other grant programs that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on any DOI grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

409.    Congress annually appropriates funding for DOI grant programs, including the programs identified above.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOI Secretary with respect to transportation funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on DOI grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1544; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136

RENNE PUBLIC LAW GROUP
Attorneys at Law

Stat. 417; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4828 Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 291.

410.     Plaintiffs the City of Fresno, City of Corvallis, City of Hillsboro, City of Stockton, County of Los Angeles, and County of Santa Barbara (collectively, the "DOI Plaintiffs") have previously received, currently receive, or are otherwise eligible to receive DOI grants.  These Plaintiffs rely on millions of dollars in appropriated federal funds from DOI direct or pass-through grant programs for transportation-related projects undertaken for the benefit of their communities.

### G.    DOJ Grant Programs

411.     Congress established the Department of Justice in 1870.  28 U.S.C. §§ 501 et seq.  The DOJ administers both competitive grant programs and formula and block grant programs that provide funds to local governments to support public safety and justice activities in their communities.  DOJ administers grants directly and through its program offices, including but not limited to the Community Oriented Policing Services (COPS) Office and the Office of Justice Programs (OJP), which includes the Bureau of Justice Assistance (BJA).

412.     The Attorney General is responsible for supervising and directing the administration and operation of the Department of Justice, including oversight of all departmental components, the administration of grants and other federal funding, and ensuring that the Department's actions comply with applicable statutory and executive requirements.  *See* 28 U.S.C. § 509.

### 1.    Byrne Memorial Justice Assistance Grant Program

413.     The Edward Byrne Memorial Justice Assistance Grant (JAG) program operates under a comprehensive statutory framework established by 34 U.S.C. § 10156 that mandates a precise, data-driven allocation formula for distributing federal criminal justice funding to states and localities.  The allocation methodology employs a dual-factor formula:  50% of funds are allocated based on each state's population ratio compared to the total U.S. population, and 50% based on each state's average annual Part 1 violent crimes reported to the FBI over the three most recent years compared to all states.  *Id.* § 10156(a)(1).  Local governments receive 40% of their state's allocation based on their proportional share of Part 1 violent crimes, subject to specific eligibility requirements including three years of crime data reporting to the FBI within the preceding 10 years.  *Id.* § 10156(b)(2), (d), (e)(3).  The program

RENNE PUBLIC LAW GROUP
Attorneys at Law

includes comprehensive safeguards such as minimum allocation guarantees, expenditure caps, and detailed application requirements designed to ensure evidence-based criminal justice funding while maintaining federal oversight and constitutional compliance. *See id*. § 10156(d), (e), (f).

414.    The statutory scheme authorizes grants to states and units of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice across nine specific program categories:  law enforcement programs; prosecution and court programs; prevention and education programs; corrections and community corrections programs; drug treatment and enforcement programs; planning, evaluation, and technology improvement programs; crime victim and witness programs; mental health programs and related law enforcement and corrections programs; and implementation of state crisis intervention court proceedings and related programs or initiatives.  34 U.S.C. § 10152(a)

415.    To receive JAG funding, a state or local government must submit an application within 120 days after funds are appropriated, including several mandatory certifications and assurances.  *See* 34 U.S.C.§ 10153.  These requirements include:  certification that federal funds will not supplant state or local funds but will increase available law enforcement funding; assurance of governing body review at least 30 days before application submission; assurance of public notice and comment opportunities; and assurance that applicants will maintain and report required programmatic and financial data.  *Id*.

416.    States must develop comprehensive statewide strategic plans detailing how grants will improve criminal justice administration.  These plans must be designed in consultation with local governments and representatives of all criminal justice system segments, include descriptions of funding allocation approaches, describe evidence-based data gathering processes, identify barriers to implementing evidence-based approaches, and be updated every five years with annual progress reports. 34 U.S.C. § 10153(a)(6).

417.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on JAG grant funds related to a prohibition on all kinds of DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

RENNE PUBLIC LAW GROUP
Attorneys at Law

## 2.   Community Oriented Policing Services Grant Programs

418.   Congress authorized the Community Oriented Policing Services program through the enactment of the Public Safety Partnership and Community Policing Act of 1994, Pub. L. No. 103-322, Title I, Sept. 13, 1994, 108 Stat. 1807, with the goal of "increas[ing] the number of law enforcement officers interacting directly with members of the community" and improving "training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community."  *See* 34 U.S.C. § 10381(b).

419.   To this end, the statute authorized the DOJ to make grants to states and localities to "increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety."  Pub. L. No 103-322 at § 1701, 108 Stat. at 1808.  Congress enumerated twenty-four purposes for which grants may be made, including, as relevant here, "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing."  34 U.S.C. § 10381(b)(2).  In 2018, Congress enacted the Law Enforcement Mental Health and Wellness Act of 2017, Pub. L. No. 115-113, Jan. 10, 2018, 131 Stat. 2276 (LEMHWA), with the goal of "provid[ing] support for law enforcement agency efforts to protect the mental health and well-being of law enforcement officers."  131 Stat. at 2276.  LEMHWA amended the COPS Statute to add the following purpose for which COPS Grants may be made:  "to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies."  34 U.S.C. § 10381(b)(24).

420.   The COPS Statute also sets out various requirements for applications for grant funding, including that applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency."  34 U.S.C. § 10382(c)(11).

421.   The DOJ administers COPS Grants through the COPS Office.  The COPS Office manages several types of COPS Grants each year.  Plaintiffs in this case received three grants, the COPS Hiring Program grant (Safer Outcomes Grant), Community Policing Development Microgrant Program (COPS Microgrants), and Law Enforcement Mental Health and Wellness Program Grant (Mental Health Grant).

RENNE PUBLIC LAW GROUP
Attorneys at Law

-99-

422.    Congress annually appropriates funding for the COPS program.  In the annual appropriations legislation, Congress sets forth priorities and directives to the DOJ Secretary with respect to COPS funding.  *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1262-1263; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 130-131; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4539-4541; Consolidated Appropriations Act, 2024, Pub. L. 118- 42, 138 Stat. 153-154.

423.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on COPS grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

### 3.    Paul Coverdell Forensic Science Improvement Grant

424.    Congress authorized the Paul Coverdell Forensic Science Improvement Grant program (Coverdell grant) through the enactment of the Paul Coverdell National Forensic Sciences Improvement Act of 2000, Pub. L. No. 106-561, 114 Stat. 2788 (2000).  This statute amended the Omnibus Crime Control and Safe Streets Act of 1968 to establish the Coverdell grant program in its current form.  *See* Pub. L. No. 90-351.  The aim of the program is to improve the quality, timeliness, and credibility of forensic science services for criminal justice purposes.  *See* 34 U.S.C. § 10564(a).

425.    DOJs administration of the Coverdell is authorized and governed by statutory directives. Congress authorized the Attorney General to award Coverdell grants to states and units of local government.  34 U.S.C. § 10561.

426.    Recipients may use Coverdell grants for one or more statutorily defined purposes to improve forensic science and medicolegal death investigation services.  *See* 34 U.S.C. § 10564.  Eligible uses include carrying out all or a substantial part of a program to improve the quality and timeliness of forensic science or medical examiner services, including services provided by State and local government laboratories; eliminating backlogs in the analysis of forensic science evidence across a wide range of disciplines; training, assisting, and employing forensic laboratory personnel and medicolegal death investigators as necessary to eliminate such backlogs; addressing emerging forensic science issues and technologies; educating and training forensic pathologists; and funding medicolegal death

-100-

RENNE PUBLIC LAW GROUP
Attorneys at Law

investigation systems to facilitate accreditation of medical examiner and coroner offices and certification of medicolegal death investigators. *Id*. § 10564(a)(1)–(6). Grant funds awarded for programmatic improvements under 34 U.S.C. § 10564(a)(1) may be used only for expenses related to facilities, personnel, computerization, equipment, supplies, accreditation and certification, education, and training, and may not be used for general law enforcement or nonforensic investigatory functions. *Id*. § 10564(b)(1)–(2). The statute further limits the percentage of grant funds that may be used for construction of new facilities based on the size of the grant award, *id*. § 10564(c)(1)–(2), caps administrative expenses at ten percent of the total grant amount, *id*. § 10564(d), and defines a "backlog" as forensic evidence that has been stored and not subjected to appropriate testing due to a lack of resources or personnel, *id*. § 10564(e).

427.    To apply for a Coverdell grant a State or unit of local government must submit several certifications to the Attorney General. *Id*. § 10562. The applicant must certify that it has developed a forensic science laboratory plan consistent with the program described in 34 U.S.C. § 10564(a) and must provide a specific description of how the grant funds will be used to carry out that plan. *Id*. § 10562(1). The applicant must also certify that any forensic science laboratory system, medical examiner's office, or coroner's office that will receive grant funds uses generally accepted laboratory practices and procedures established by recognized accrediting or certifying bodies. *Id*. § 10562(2). In addition, except with respect to medical examiner or coroner offices, the applicant must certify that such laboratories are accredited by an internationally recognized accrediting body, or, in the alternative, must provide a legally binding and enforceable assurance that a portion of the grant funds will be used to prepare and apply for such accreditation within two years of the grant award. *Id*.

428.    If the proposed program includes construction of a new facility, the applicant must provide a specific description of the facility and its estimated costs and must certify that the amount of grant funds used for construction will not exceed the limitations set forth in 34 U.S.C. § 10564(c). *Id*. § 10562(3). The applicant must certify that a government entity exists and that an appropriate process is in place to conduct independent external investigations into allegations of serious negligence or misconduct that substantially affect the integrity of forensic results, when such allegations involve employees or contractors of any forensic laboratory system, medical examiner's office, coroner's office,

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

law enforcement storage facility, or medical facility in the State that will receive grant funds.  *Id.*
§ 10562(4).

429.    The statute does not require applicants make certifications related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

430.    Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on Coverdell grants related to a prohibition on all forms of DEI, facilitating enforcement of immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

431.    Funding for Coverdell grants comes from congressional appropriations.  Congress most recently appropriated funds for the Coverdell program in the 2025 Full-Year Continuing Appropriations and Extensions Act, 2025.  *See* Pub. L. No. 119-4, 139 Stat. 9, 10-11.

432.    None of the 2025 Appropriations and Extensions Act's directives to DOJ or any other legislation authorize DOJ to impose grant conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology."

### 4.    Office of Victims of Crime Grants

433.    Federal grants administered by DOJ have long been instrumental in supporting programs that provide compensation and assistance to victims of crime.

434.    In December 1982, President Ronald Reagan's Task Force on Victims of Crime issued a report concluding that "[t]he neglect of crime victims is a national disgrace."  Among the report's key recommendations was to "enact legislation to provide federal funding to assist state crime victim compensation programs" and "provide federal funding, reasonably matched by local revenues, to assist in the operation of federal, state, local, and private nonprofit victim/witness assistance agencies that make comprehensive assistance available to all victims of crime."

435.    Two years later, Congress passed the Victims of Crime Act (VOCA), which created the Crime Victims Fund within the U.S. Treasury and established Office for Victims of Crime (OVC) as an office within DOJ.  Congress structured VOCA "with minimal bureaucratic 'strings attached,' for direct

-102-

compensation and service programs to assist victims of crime" in order to support inadequately funded state and local victim assistance programs.  S. Rep. No. 497, 98th Cong., 2d Sess. at 1, 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3607, 3607, 1984 WL 37447.  "Unlike some past compensation bills," VOCA is "intended to keep conditions on Federal Aid to a bare minimum."  *Id*. at 9.  The U.S. Attorney General at the time emphasized that the new grants would not "creat[e] an unnecessary bureaucracy to impose the Federal government's priorities on the States .... [T]he Federal government will provide money to the States to enable the States to effectively run their own programs."  130 Cong. Rec. S5252, 5352 (Mar. 13, 1984) (statement of Attorney General William French Smith).

436.    Over the years, Congress has amended VOCA to "allow a greater measure of flexibility to ... State and local victims' assistance programs" and provide "greater certainty" that VOCA funding "will not wax and wane with events .... [Grant recipients] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential."  S. Rep. No. 179, 104th Cong., 1st Sess. at 29 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 941, 1995 WL 731704.

437.    VOCA directs that the U.S. government shall deposit into the Crime Victims Fund various penalties and fees recovered from individuals convicted of federal offenses.

438.    VOCA further directs that the federal government shall draw on the Crime Victims Fund to issue annual grants to States for victim compensation and assistance.  34 U.S.C. §§ 20101-20111.

439.    Since VOCA's enactment, VOCA funds have been instrumental in providing critical support to millions of victims and survivors (and their families) of serious crime.  *See, e.g.*, Office for Victims of Crime, VOCA Victim Compensation Data Dashboard: Data Analyses for Fiscal Years 2021-2024, https://ovc.ojp.gov/funding/performance-measures/data-analyses/voca-victim-compensation (last visited December 17, 2025).

440.    As available amounts in the Crime Victims Fund have fluctuated over the years, Congress has taken action to make additional funds available, including by amendments to VOCA through the 2001 USA PATRIOT ACT, Pub. L. 107-56, and the VOCA Fix to Sustain the Crime Victims Fund Act of 2021, Pub. L. 117-27.  In January 2002, Congress also appropriated $68.1 million for the Crime Victims Fund to assist in providing relief to 9/11 victims.  Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act, Pub. L. 107-117.

-103-

RENNE PUBLIC LAW GROUP
Attorneys at Law

441.   Congress has directed OVC to administer two formula grant programs pursuant to VOCA that support crime victim compensation and assistance:  Victim Compensation Formula Grants and Victim Assistance Formula Grants.

442.   The Victim Compensation and Victim Assistance grants are formula grants, not competitive grants.  Recipients are entitled to a specific amount of funding based on the applicable statutory formula.

443.   For FY 2025, over $178 million from the Crime Victims Fund is to be awarded to States, and their subrecipients under the Victim Compensation Formula Grant, and over $1.2 billion is to be awarded to States, and their subrecipients under the Victim Assistance Formula Grant.

### a.   Victim Compensation Formula Grants

444.   Victim Compensation Formula Grants provide funding to all qualifying crime victim compensation programs.  34 U.S.C. § 20102.

445.   The purpose of these grants is to provide compensation to eligible crime victims for costs resulting from crime, including for medical care, lost wages, mental health counseling, funeral expenses, and crime scene clean-up.  The grants are designed to supplement state and territory efforts to provide financial compensation to crime victims.  *See id*.

446.   VOCA provides that the OVC Director "shall make an annual grant" to eligible victim compensation programs based on a fixed statutory formula.  34 U.S.C. § 20102(a).

447.   VOCA delineates a precise set of requirements that a state victim compensation program must satisfy to be eligible for a grant, requiring, for example, that States pay for certain victim expenses, treat federal and state crimes and residents and non-residents the same, and do not deny compensation based on a victim's familial relationship with an offender.  *Id*. § 20102(b)(1)–(9).  The recipients must also certify that grant funds will "not be used to supplant State funds otherwise available to provide crime victim compensation."  *See id*. § 20102(b)(3).  None of the statutory eligibility or certification requirements relate to prohibitions on DEI, promotion of gender ideology, elective abortion, or immigration enforcement.

448.   Victim Compensation Formula Grants are distributed among eligible recipients based on a statutory formula that accounts for the amount of money each state crime victim compensation program

RENNE PUBLIC LAW GROUP
Attorneys at Law

distributed to victims in the preceding fiscal year. Specifically, the OVC "Director shall make an annual grant from the Fund to an eligible crime victim compensation program of 75 percent of the amounts awarded" by the state compensation program "during the preceding fiscal year, other than amounts awarded for property damage." *Id*. § 20102(a)(1).

449. The statute recognizes only one exception to this statutory formula. If the Crime Victims Fund is "insufficient" to provide 75 percent of the amount distributed by each State in the preceding fiscal year, "the [OVC] Director shall make, from the sums available, a grant to each eligible crime victim compensation program so that all such programs receive the same percentage of the amounts awarded by such program during the preceding fiscal year, other than amounts awarded for property damage." *Id*. § 20102(a)(2).

450. The statutory formula makes no reference to prohibitions on DEI, promotion of gender ideology, elective abortion, or immigration policy. Plaintiffs are unaware of OVC ever having previously conditioned Victim Compensation funding on conditions related to prohibitions on DEI, promotion of gender ideology, elective abortion, or immigration enforcement.

### b. Victim Assistance Formula Grants

451. Victim Assistance Formula Grants provide financial support for eligible crime victim assistance programs. 34 U.S.C. § 20103(a).

452. The purpose of Victim Assistance Formula Grants is to improve the treatment of victims of crime by providing them with the assistance, support, and services necessary to aid their restoration and healing after a criminal act. These grants are intended to enable States to provide subgrants to local community-based organizations and public agencies that provide services directly to crime victims, including but not limited to victim and witness advocacy services; crisis counseling; telephone and onsite information and referrals; criminal justice support and advocacy; emergency shelter; therapy; and consistent communication about significant events in their case. *Id*. These services are to be administered without regard to a victim's immigration status. *See, e.g.*, 28 C.F.R. § 94.103(a).

453. VOCA provides that the OVC Director "shall make an annual grant" to the chief executive of each State to provide financial support to eligible victim assistance programs. 34 U.S.C. § 20103(a). Each State subgrants such funds out to community-based organizations and public agencies

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    that provide services directly to crime victims.  *Id.* § 20103(b)–(c).

2    454.    Congress has specified the criteria for determining the eligibility of a victim assistance

3    program to receive Victim Assistance grant funds.  *Id.* § 20103(b).  A program is eligible under these

4    statutory criteria if, among other things, it is run by a public agency or nonprofit organization, has a

5    demonstrated record of providing effective services to crime victims, assists victims in seeking

6    compensation benefits, and does not discriminate against victims because they disagree with how a case

7    is prosecuted.  *Id.*  Congress has also specified which certifications are required of a State's chief

8    executive, including that "funds awarded to eligible crime victim assistance programs will not be used to

9    supplant State and local funds otherwise available for crime victim assistance."  *Id.* § 20103(a)(2).  None

10    of the eligibility criteria or required certifications specified in the statute relate to prohibitions of DEI,

11    promotion of gender ideology, elective abortion, or immigration enforcement.

12    455.    Victim Assistance Formula Grants are distributed among the States based on a fixed

13    statutory formula.  Under that formula, each State is entitled to a base amount of $500,000 and an

14    additional share of the remaining available money in the Crime Victims Fund based on "each State's

15    population in relation to the population of all States."  *Id.* § 20103(a)(3).

16    456.    The statutory formula makes no reference to DEI, gender ideology, elective abortion, or

17    immigration enforcement.  And Plaintiffs are unaware of OVC ever having previously conditioned

18    Victim Assistance funding on conditions related to DEI, gender ideology, elective abortion, or

19    immigration enforcement.

20                                    **c.  OVC Competitive Grants**

21    457.    OVC also administers certain competitive grant programs authorized by VOCA,

22    including:  Services for Victims of Crime; Emergency and Transitional Pet Shelter and Housing

23    Assistance for Victims of Domestic Violence Program; Technology to Support Services for Victims of

24    Crime; Services for Victims of Technology-Facilitated Abuse; Sexual Assault Nurse Examiner Program

25    Development and Operation Guide; National Crime Victim Crisis Hotlines; and Increasing Availability

26    of Medical Forensic Examinations for Victims of Sexual Assault.

27    458.    Awards under these programs support a range of initiatives designed to expand and

28    strengthen services for crime victims, including funding specialized assistance for children, elders, and

-106-

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    victims of technology-facilitated abuse; providing housing assistance for victims; expanding victims'

2    access to specialized medical forensic professionals and examinations; and development of statewide

3    technology programs to improve the quality and reach of victim services.  Collectively, they enhance the

4    quality and accessibility of services for victims of crime nationwide.

5    459.    VOCA's competitive grants are generally governed by 34 U.S.C. § 20103(c), which

6    specifies the purpose of competitive grants.  VOCA provides that the OVC Director "shall make grants"

7    for "victim services, demonstration projects, program evaluation, compliance efforts, and training and

8    technical assistance services to eligible crime victim assistance programs" and "for the financial support

9    of services to victims of Federal crime by eligible crime victim assistance programs."  *Id.*

10   § 20103(c)(1)(A)–(B).  The OVC Director "shall … use funds made available" for these grants "pursuant

11   to rules or guidelines that generally establish a publicly-announced, competitive process."  *Id.*

12   § 20103(c)(3)(E).  The statutory purposes of VOCA competitive grant funds do not relate in any way to

13   prohibitions of DEI, gender ideology, elective abortion, or immigration enforcement.

14   460.    Congress has also specified certain criteria for creating and awarding these competitive

15   grant funds under VOCA.  The only relevant restriction that Congress has placed on the use of these

16   funds is that not more than 50 percent of available funds shall be used for support of victims of Federal

17   crime.  *See id.* § 20103(c)(2)(A)–(B).  Plaintiffs are unaware of OVC ever having previously conditioned

18   VOCA competitive grants on prohibitions on DEI, promotion of gender ideology, elective abortion, or

19   immigration enforcement.

20                    **5.    Other DOJ Grant Programs**

21   461.    DOJ and its operating divisions and agencies administer a range of other grant programs

22   that some plaintiffs have previously received, currently receive, or are otherwise eligible to receive.

23   Plaintiffs are not aware of Congress ever imposing or authorizing directives for or conditions on these

24   other DOJ grants related to a prohibition on all kinds of DEI, exclusion of transgender people, denying

25   services to immigrants, or adherence to executive orders unrelated to the purpose of the grant.

26   462.    Congress annually appropriates funding for DOJ grant programs.  In the annual

27   appropriations legislation, Congress sets forth priorities and directives to the Administrator of DOJ with

28   respect to funding.  Plaintiffs are not aware of Congress ever imposing or authorizing directives for or

Renne Public Law Group
Attorneys at Law

conditions on DOJ grants related to a prohibition on DEI, exclusion of transgender people, denying services to immigrants, or adherence to executive orders unrelated to the purpose of the grant. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1245-1266; Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 113-134; Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4521-4544; Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 133-156.

463.    Plaintiffs the City of Fresno, City of Redwood City, City of Beaverton, City of Corvallis, City of Hillsboro, City of Santa Clara, City of Santa Cruz, City of Stockton, County of Los Angeles, and County of Santa Barbara (collectively, the "DOJ Plaintiffs"), have previously received, currently receive, or are otherwise eligible to receive DOJ grants. DOJ Plaintiffs rely on millions of dollars in appropriated federal funds from DOJ's programs for the benefit of their communities.

## H.    Following President Trump's Inauguration, Defendants Unilaterally Impose New Conditions on Federal Grants.

### 1.    President Trump Issues Executive Orders Directing Federal Agencies to Impose New Conditions on Federal Grants

464.    Since taking office, President Trump has issued numerous executive orders directing the heads of executive agencies to impose conditions on federal funding that bear little or no connection to the purposes of the grant programs Congress established, lack statutory authorization, conflict with the law as interpreted by the courts, and are even at odds with the purposes of the grants they purport to amend. Instead, the conditions appear to require federal grant recipients to agree to promote the political agenda President Trump campaigned on during his run for office and has continued espousing since, including prohibiting all kinds of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion." Plaintiffs cannot comply with Defendants' vague, ambiguous, and unauthorized conditions without exposing themselves to substantial legal liability or forgo critical federal funding.

465.    The "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" executive order directs each federal agency head to include "in every contract or grant award" a term that the contractor or grant recipient "certify that it does not operate any programs promoting DEI" that would

-108-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

violate federal antidiscrimination laws. Exec. Order 14173 § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (the "DEI Order"). The certification is not limited to programs funded with federal grants. *Id*. § 3(b)(iv).

466.    The DEI Order also directs each agency head to include a term requiring the contractor or grant recipient to agree that its compliance "in all respects" with all applicable federal nondiscrimination laws is "material to the government's payment decisions" for purposes of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. *Id*. § 3(b)(iv)(A). The FCA imposes liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). For FCA liability to attach, the alleged misrepresentation must be "material to the Government's payment decision"—an element the U.S. Supreme Court has called "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). Each violation of the FCA is punishable by a civil penalty of up to $27,894, plus mandatory treble damages sustained by the federal government because of that violation. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5(a). Given the demands of proving materiality and the severity of penalties imposed by the FCA, the certification term represents another effort to coerce compliance with the President's policies by effectively forcing grant recipients to concede an essential element of an FCA claim.

467.    The DEI Order does not define the term "DEI." As explained below, subsequent executive agency memoranda and letters make clear that the Trump Administration's conception of what federal antidiscrimination law requires, including what constitutes a purportedly "illegal" DEI program, is inconsistent with the requirements of federal nondiscrimination statutes as interpreted by the courts.

468.    The "Ending Taxpayer Subsidization of Open Borders" executive order directs all agency heads to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Executive Order 14218 § 2(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (the "Immigration Order").

469.    The Immigration Order also purports to implement the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), pursuant to which certain federal benefits are limited to individuals with qualifying immigration status. *See* 8 U.S.C. § 1611(a). In particular, the Immigration

1  Order directs all agency heads to "identify all federally funded programs administered by the agency that

2  currently permit illegal aliens to obtain any cash or non-cash public benefit" and "take all appropriate

3  actions to align such programs with the purposes of this order and the requirements of applicable Federal

4  law, including … PRWORA."  *Id.* § 2(i).

5       470.    On April 28, 2025, President Trump issued additional executive orders related to

6  immigration and law enforcement.  The "Protecting American Communities from Criminal Aliens"

7  executive order states that "some State and local officials … continue to use their authority to violate,

8  obstruct, and defy the enforcement of Federal immigration laws" and directs the Attorney General in

9  coordination with the Secretary of Homeland Security to identify "sanctuary jurisdictions," take steps to

10  withhold federal funding from such places, and develop "mechanisms to ensure appropriate eligibility

11  verification is conducted for individuals receiving Federal public benefits … from private entities in a

12  sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental

13  entity on its behalf."  https://www.whitehouse.gov/presidential-actions/2025/04/protecting-american-

14  communities-from-criminal-aliens/ (last visited December 17, 2025).  The "Strengthening and

15  Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" executive

16  order directs the Attorney General to, among other things, "prioritize prosecution of any applicable

17  violations of Federal criminal law with respect to State and local jurisdictions" whose officials "willfully

18  and unlawfully direct the obstruction of criminal law, including by directly and unlawfully prohibiting

19  law enforcement officers from carrying out duties necessary for public safety and law enforcement" or

20  "unlawfully engage in discrimination or civil-rights violations under the guise of "diversity, equity, and

21  inclusion" initiatives that restrict law enforcement activity or endanger citizens."  https://www.

22  whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-

23  to-pursue-criminals-and-protect-innocent-citizens/ (last visited December 17, 2025).

24       471.    The "Defending Women from Gender Ideology Extremism and Restoring Biological

25  Truth to the Federal Government" executive order directs agency heads to "take all necessary steps, as

26  permitted by law, to end the Federal funding of gender ideology" and "assess grant conditions and

27  grantee preferences" to "ensure grant funds do not promote gender ideology."  Exec. Order No. 14168

28  § 3(e), (g), 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Order").  The Gender Ideology

RENNE PUBLIC LAW GROUP
Attorneys at Law

Order states that "'[g]ender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." *Id*. § 2(f).  It goes on to state that "[g]ender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex" and is therefore "internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id*.

472.    The "Enforcing the Hyde Amendment" executive order declares it the policy of the United States "to end the forced use of Federal taxpayer dollars to fund or promote elective abortion."  Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (the "Abortion Order").  The Acting Director of the U.S. Office of Management and Budget (OMB) issued a memorandum to the heads of the executive agencies providing guidance on how agencies should implement the Abortion Order.  Memorandum from Acting Director of OMB Matthew J. Vaeth to Heads of Executive Departments and Agencies (Jan. 24, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-12-Memorandum-on-Hyde-Amendment-EO.pdf (the "OMB Memo") (last visited December 17, 2025).  The OMB Memo told agency heads that the Trump Administration's policy is "not to use taxpayer funds to fund, facilitate, or promote abortion, including travel or transportation to obtain an abortion, consistent with the Hyde Amendment and other statutory restrictions on taxpayer funding for abortion."  *Id*. (emphasis added). The OMB Memo further instructed agency heads to "reevaluate" policies and other actions to conform with the Abortion Funding Order, audit federally funded activities suspected to contravene the Abortion Funding Order, and submit a monthly report to OMB on each agency's progress in implementing the OMB Memo.  *Id*.

473.    On August 7, 2025 President Trump issued another executive order titled, Improving Oversight of Federal Grantmaking that requires that discretionary grant awards "demonstrably advance the President's policy priorities" and "shall not be used to fund, promote, encourage, subsidize, or facilitate" "racial preferences or other forms of racial discrimination by the grant recipient," "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic," or "any other initiatives that compromise public safety or promote anti-American values."

RENNE PUBLIC LAW GROUP
Attorneys at Law

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (the "Grantmaking Oversight Order").

### 2.     HUD Attaches New Conditions to HUD Grants

474.     Since President Trump's issuance of the executive orders described above and Defendant Turner's confirmation as HUD Secretary, HUD has implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "HUD Grant Conditions") across the expansive portfolio of HUD grants established by Congress; demanding grant recipients' agreement to those new conditions and issuing agency-wide letters and statements about how HUD will enforce those conditions.

#### a.     HUD issues new policy terms for all financial assistance incorporating the unlawful conditions

475.     In or around April 2025, HUD amended its General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs (the "HUD Policy Terms"), which set forth "various laws and policies that may apply to recipients of" HUD grant awards.  This document is posted on HUD's website at https://www.hud.gov/sites/default/files/CFO/documents/Administrative-Requirements-Addendum-FY2025.pdf (last visited December 17, 2025). Among such potentially applicable policies, the document lists several of President Trump's executive orders as well as language implementing those orders.

476.     For example, in a section labelled "Compliance with Immigration Requirements," the HUD Policy Terms list the Immigration Order and summarize the potentially applicable policy:

> No state or unit of general local government that receives HUD funding under may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

477.     Next, in a section labelled "Other Presidential Executive Actions Affecting Federal Financial Assistance Programs," HUD Policy Terms state that "Recipients of Federal Awards must comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to . . . :" followed by a "non-exhaustive list" of nine executive orders—including the Immigration Order, the Abortion Order, the DEI Order, and the Gender Ideology Order—as "applicable" conditions.  The HUD Policy Terms then summarize the potentially applicable policies reflected in those executive orders.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-112-

a. First, the HUD Policy Terms state that the Immigration Order "prohibits taxpayer resources and benefits from going to unqualified aliens."

b. Second, the HUD Policy Terms summarize the Abortion Order as "prohibit[ing] the use of Federal taxpayer dollars to fund or promote elective abortion."

c. Third, the HUD Policy Terms state that the DEI Order "requires Federal agencies to terminate all discriminatory and illegal preferences."

d. Fourth, the HUD Policy Terms summarize the Gender Ideology Order as "set[ting] forth U.S. policy recognizing two sexes, male and female."

478.    These requirements outlined in the HUD Policy Terms are unlawful because the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### b.    HUD attaches a new, unlawful anti-DEI certification to its standard assurances and certifications

479.    In or around May 2025, HUD updated its standard Applicant and Recipient Assurances and Certifications (the "HUD Certifications") on Form HUD-424-B, which must be submitted as part of any application for HUD funding or post-award submission.  These changes implemented President Trump's executive orders, including the DEI Order, by imposing a new anti-DEI certification that is not authorized by any of the statutes that establish HUD grant programs, any appropriations law appropriating funds for HUD grant programs, or HUD's own regulations.  In particular, the HUD Certifications require HUD grant applicants to certify that the applicant:

> Will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws.

480.    This certification is unlawful, as explained further below, because the anti-DEI certification violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c.  HUD attaches new, unlawful conditions to CoC grants

481.    In or around June 2025, following President Trump's issuance of the executive orders described above, HUD presented recipients with CoC grant agreements for CoC funds awarded.  These

RENNE PUBLIC LAW GROUP
Attorneys at Law

grant agreements contained additional grant conditions not included in the FYs 2024 & 2025 NOFO, and are not authorized by the Homeless Assistance Act, the Appropriations Act, or the Rule HUD itself promulgated to implement the CoC program.  HUD has required Plaintiffs with CoC grant awards to agree to these conditions to receive funds they are entitled to.

482.    The CoC grant agreements contain substantially the same unlawful, new terms and conditions, including the following (collectively, the "CoC Grant Conditions"):

483.    First, the CoC grant agreements state that "[t]his Agreement, the Recipient's use of funds provided under this Agreement . . . , and the Recipient's operation of projects assisted with Grant Funds" are "governed by" not only certain specified statutes, rules and grant-related documents, but also by "all current Executive Orders."  The CoC grant agreements further require recipients to comply with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . other Executive Orders" (together, the "CoC EO Condition").

484.    Second, a grant recipient must certify that:

> it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964.

The recipient must further agree that this condition is "material" for purposes of the FCA by agreeing that:

> its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA].

(together, the "CoC Discrimination Condition")

485.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws as a condition of federal funding in the past, the Administration's communications to federal grant recipients make clear that the agencies seek compliance with the Trump Administration's novel, incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI programs.  Without Congress passing his anti-DEI agenda, President Trump instead purports to legislate by executive order and impose his decrees on state and local governments seeking grant funding.

486. Third, the CoC Grant Agreements provide:

> No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation . . . .

The CoC Grant Agreements further require compliance with "applicable requirements that . . . may [be] establish[ed] from time to time to comply with . . . [the Immigration Order] . . or immigration laws" (together, the "CoC Enforcement Condition").[4]

487. Fourth, the CoC Grant Agreements impose requirements purportedly related to PRWORA and other immigration eligibility and verification requirements:

> The recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of [PRWORA] and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [*sic*] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
> …
>
> Subject to the exceptions provided by PRWORA, the recipient must use [the Systematic Alien Verification for Entitlements (SAVE) system], or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(the "CoC Verification Condition").

488. Fifth, the CoC Grant Agreements require the recipient to agree that it "shall not grant funds to promote 'gender ideology,' as defined in" the Gender Ideology Order (the "CoC Gender Ideology Condition").

489. Finally, the CoC Grant Agreements require the recipient to agree that it "shall not use any Grant Funds to fund or promote elective abortions, as required by" the Abortion Order. (the "CoC Abortion Condition").

---

[4] More recent grant agreements contain updated language that recites the Immigration Order. In these, the last part of this condition reads ". . . or abets *so-called "sanctuary"* policies that seek to shield illegal aliens from deportation.

RENNE PUBLIC LAW GROUP
Attorneys at Law

490.     These conditions are unconstitutional and unlawful for several reasons.  As an initial matter, neither the Homeless Assistance Act, the Appropriations Act, PRWORA, nor any legislation authorizes HUD to attach these conditions to federal funds appropriated for CoC grants.

### d.     HUD announces it will attach new, unlawful conditions to Office of Community Planning and Development grants

491.     In or around June 2025, HUD's CPD, which administers the CDBG, ESG, HOME, and HOPWA programs, among others, issued guidance announcing that it will attach new conditions to Fiscal Year 2025 agreements governing all CPD-administered grants.

492.     In particular, on June 5, 2025, CPD General Deputy Assistant Secretary Claudette Fernandez issued a letter to the executive directors of two organizations representing states and local jurisdictions that administer CPD grant programs (the "Fernandez Letter").  The Fernandez Letter states that CPD "[g]rantees are . . . encouraged to review the White House Executive Orders as they develop their consolidated plan and annual action plans," which are required under the CDBG, HOME, HOPWA, and ESG programs.  Letter from Claudette Fernandez, Acting Director, CPD General Deputy Assistant Secretary, to Council of State Community Development Agencies and National Community Development Association (June 5, 2025), https://ncdaonline.org/wp-content/uploads/2025/06/6-5-2025-HUD-Response-to-COSCDA-NCDA.pdf (last visited December 17, 2025).

493.     The Fernandez Letter goes on to state that "FY2025 grant agreement[s]" that are issued after a recipient submits their consolidated and action plans will "emphasize conformity with applicable Administration priorities and executive orders."  It clarifies that, "[u]nder the FY 2025 grant agreement, conformity means" that the recipient will be required to abide by a list of specific conditions.  These include the following (collectively, the "CPD Grant Conditions"):

494.     First, grant recipients will be required to agree to "not use grant funds to promote 'gender ideology,' as defined in [the Gender Ideology Order]" (the "CPD Gender Ideology Condition").

495.     Second, each recipient must "certif[y] that it does not operate any programs that violate any applicable Federal antidiscrimination laws, including Title VI of the Civil Rights Act of 1964."  Each recipient must also "agree[] that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [the FCA]"

RENNE PUBLIC LAW GROUP
Attorneys at Law

1  (together, the "CPD Discrimination Condition").

2        496.    Third, grant recipients must agree that:

> [i]f applicable, no state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

(the "CPD Enforcement Condition").

497.    Fourth, each recipient must agree to conditions purportedly related to PRWORA and other immigration eligibility and verification requirements, specifically:

> The Grantee must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.
>
> . . . .
>
> Unless excepted by PRWORA, the Grantee must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(together, the "CPD Verification Condition").

498.    Fifth, "[u]nless excepted by PRWORA," grant recipients "must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States."

499.    Finally, grant recipients must agree that they will "not use any grant funds to fund or promote elective abortions, as required by [the Abortion Order]" (the "CPD Abortion Condition").

500.    In addition to imposing these conditions through grant agreements, HUD is threatening to disapprove consolidated plans—including plans that have already been submitted—unless jurisdictions resubmit revised plans that (1) include assurances that the jurisdictions will comply with the CPD Grant Conditions and (2) strip the plans of certain words that HUD claims, in and of themselves, violate the

RENNE PUBLIC LAW GROUP
Attorneys at Law

related EOs, such as "equity" and "environmental justice."  HUD is requiring these revisions and commitments with as little as 24 hours' notice.

501.    The CPD Grant Conditions are unlawful for the same reasons the other conditions are unlawful, as explained above.  In particular, and as explained further below, the CPD Grant Conditions violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 3.    DOT and its Operating Administrations Attach New Conditions to DOT Grants

502.    Since Secretary Duffy's confirmation, DOT and its operating administrations have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOT Grant Conditions") across the expansive portfolio of DOT grants established by Congress; demanding grant recipients' agreement to those new conditions, sometimes on very short timelines; and issuing agency-wide letters and statements about how DOT will enforce those conditions.

503.    The DOT's broad conception of these new conditions is confirmed in a letter from DOT Secretary Sean Duffy to all recipients of DOT funding stating that "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals, presumptively violates Federal Law."  Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (April 24, 2025) (the "April Duffy Letter"), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf (last visited December 17, 2025).

504.    The April Duffy Letter announced DOT's "policy" of imposing immigration enforcement and anti-DEI conditions on all DOT-funded grants as a requirement of receiving funding, and makes clear that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals."  It further asserts that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and

-118-

RENNE PUBLIC LAW GROUP
Attorneys at Law

components of the Department of Homeland Security in the enforcement of Federal immigration law."
The April Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits,
claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future
federal funding from DOT.

505.     Pursuant to the new policy set forth in the April Duffy Letter, DOT and its operating
administrations have attached substantially similar conditions relating to discrimination, immigration
enforcement, and executive orders to all grant agreements.

**a.     DOT and the FTA attach new, unlawful conditions to FTA Grants**

506.     For instance, on March 26, 2025, the FTA issued an updated Master Agreement
applicable to all funding awards authorized under specified federal statutes, including the FTA grant
programs discussed above.

507.     The March 26 Master Agreement imposed a new condition on all FTA grants
implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds
on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of
the FCA (the "FTA Discrimination Condition").  While FTA grants have long required compliance with
nondiscrimination laws and have been subject to the FCA, the March 26 Master Agreement provided:

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending
> Illegal Discrimination and Restoring Merit-Based Opportunity, the
> Recipient agrees that its compliance in all respects with all applicable
> Federal antidiscrimination laws is material to the government's payment
> decisions for purposes of [the FCA].

> (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending
> Illegal Discrimination and Restoring Merit-Based Opportunity, by entering
> into this Agreement, the Recipient certifies that it does not operate any
> programs promoting diversity, equity, and inclusion (DEI) initiatives that
> violate any applicable Federal anti-discrimination laws.

508.     That the FTA plans to enforce these new conditions more broadly than current
nondiscrimination law is reinforced by the March 26 Master Agreement's requirement that the recipient
"comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow
*federal guidance prohibiting discrimination*."

509.     The FTA Discrimination Condition is in apparent tension with other requirements in the
March 26 Master Agreement.  For example, the March 26 Master Agreement requires compliance with

-119-

RENNE PUBLIC LAW GROUP
Attorneys at Law

2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible."

510.    The FTA Discrimination Condition is also in apparent tension with DOT's own regulations.  For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity … the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage."  49 C.F.R. 21.5(b)(7).

511.    Further, the March 26 Master Agreement defined "Federal Requirement" to include "[a]n applicable federal law, regulation, or *executive order*" (the "FTA EO Condition").  The March 26 Master Agreement refers to President Trump's DEI Order as an executive order "pursuant to" which the recipient must comply and certify, with no explanation of how the DEI Order relates to funding of mass transit.

512.    The April Duffy Letter to all recipients of DOT grants (including the FTA grants) further addresses the broad scope of the Administration's anti-DEI agenda and how it expands and conflicts with established interpretations of federal nondiscrimination law, taking the position that any policy, program, or activity "designed to achieve so-called [DEI] goals"—even if "described in neutral terms"—"presumptively" violates federal nondiscrimination laws.  The April Duffy Letter also threatens "vigorous[] enforcement," ranging from comprehensive audits, claw-back of grant funds, and termination of grant awards to enforcement actions and loss of any future federal funding from DOT.

513.    On April 25, 2025, the FTA issued another updated Master Agreement applicable to all funding awards authorized under specified federal statutes, including the FTA grant programs discussed above.

514.    The April 25 Master Agreement (the "FTA Master Agreement") contains the same FTA Discrimination Condition and the same FTA EO Condition set forth above.  But the FTA Master Agreement contains an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FTA Enforcement Condition").

RENNE PUBLIC LAW GROUP
Attorneys at Law

-120-

515.     In particular, the FTA Enforcement Condition amends an existing provision addressing free speech and religious liberty as follows (new language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

516.     The April Duffy Letter to all recipients of DOT grants (including the FTA grants) states that "DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law" and that "[d]eclining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability."

517.     In May 2025, FTA retroactively applied the April 2025 FTA Master Agreement to grants that were executed pursuant to earlier versions of the agreement.  By substituting those earlier agreements with the FTA Master Agreement, the FTA purported to unilaterally add new substantive conditions to previously awarded grants without notifying the grant recipients.

518.     Neither the statutory provisions creating the FTA grants, the relevant appropriations acts, nor any other legislation authorizes the FTA to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts.  Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws.  But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

519.     In sum and as further explained below, the FTA Discrimination Condition, the FTA EO Condition, and the FTA Enforcement Condition (collectively, the "FTA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti- commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

b.     **DOT and the FHWA attach new, unlawful conditions to FHWA Grants**

520.    On March 17, 2025, DOT issued revised General Terms and Conditions applicable to Fiscal Year 2024 SS4A grants (the "FY 2024 SS4A General Terms and Conditions").

521.    The FY 2024 SS4A General Terms and Conditions imposed a new condition on all Fiscal Year 2024 SS4A grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA (the "SS4A Discrimination Condition").  While SS4A grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the FY 2024 SS4A General Terms and Conditions provided:

> (b)     Pursuant to Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].

> (c)     Pursuant to Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination law.

522.    The SS4A Discrimination Condition is in apparent tension with other requirements in the FY 2024 SS4A General Terms and Conditions.  For example, the FY 2024 SS4A General Terms and Conditions require compliance with 2 C.F.R. § 300.321, which states, "[w]hen possible, the recipient or subrecipient should ensure that small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms" are, *inter alia*, "included on solicitation lists" and "solicited" when "deemed eligible."

523.    The SS4A Discrimination Condition is also in apparent tension with DOT's own regulations.  For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity . . . the applicant or recipient must take affirmative action to remove or overcome

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    the effects of the prior discriminatory practice or usage." 49 C.F.R. 21.5(b)(7).

2        524.    The FY 2024 SS4A General Terms and Conditions contain an additional condition

3    requiring recipients to cooperate with federal immigration enforcement efforts (the "SS4A Enforcement

4    Condition").

5        525.    In particular, the SS4A Enforcement Condition amends a pre-existing provision

6    addressing free speech and religious liberty as follows (new language emphasized):

7            The Recipient shall ensure that Federal funding is expended in full
             accordance with the United States Constitution, Federal law, and statutory
8            and public policy requirements: including but not limited to, those
             protecting free speech, religious liberty, public welfare, the environment,
9            and prohibiting discrimination; *and Recipient will cooperate with Federal
             officials in the enforcement of Federal law, including cooperating with and
10           not impeding U.S. Immigration and Customs Enforcement (ICE) and other
             Federal offices and components of the Department of Homeland Security
11           in the enforcement of Federal immigration law.*

12       526.    Exhibit A to the FY 2024 SS4A General Terms and Conditions also requires the recipient

13   to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders,

14   policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal

15   funds for this Project" (the "SS4A EO Condition").  While this requirement existed in a similar form in

16   prior agreements, Exhibit A to the FY 2024 SS4A General Terms and Conditions lists President Trump's

17   DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as

18   well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327) as "provisions"

19   purportedly "applicable" to SS4A grant agreements, with no explanation of how those Orders or statutes

20   relate to roadway grants or even apply to local governments.

21       527.    Also on March 17, 2025, DOT issued revised General Terms and Conditions applicable to

22   Fiscal Year 2023 SS4A grants and to Fiscal Year 2022 SS4A grants.  Those revised General Terms and

23   Conditions, and the revised Exhibit A to each, contain provisions identical to the SS4A Discrimination

24   Condition, the SS4A Immigration Condition, and the SS4A EO Condition discussed above.

25       528.    On April 22, 2025, the FHWA issued Competitive Grant Program General Terms and

26   Conditions purportedly applicable to all FHWA competitive grants (the "2025 FHWA General Terms

27   and Conditions").

28

-123-

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - CASE NO.: 3:25-CV-07070-RS

RENNE PUBLIC LAW GROUP
Attorneys at Law

529.    The 2025 FHWA General Terms and Conditions imposed a new condition on all FHWA competitive grants (including the BIP, Culvert AOP Program, and ATTAIN program discussed above) implementing President Trump's directive, as set out in the DEI Order and further explained in the April Duffy letter, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA (the "FHWA Discrimination Condition").  While FHWA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 FHWA General Terms and Conditions provide:

> (b) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].
>
> (c) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

530.    The 2025 FHWA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FHWA Enforcement Condition").

531.    In particular, the FHWA Enforcement Condition incorporates immigration enforcement into a provision addressing compliance with federal law and policy as follows (immigration enforcement language emphasized):

> The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.*

532.    The Exhibits to the 2025 FHWA General Terms and Conditions—dated April 30, 2025 and applicable to FHWA competitive grants—further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project" (the

-124-

RENNE PUBLIC LAW GROUP
Attorneys at Law

"FHWA EO Condition"). The Exhibits list President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327), as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those Orders or statutes relate to highway grants or even apply to local governments.

533. Additionally, the April Duffy Letter (described in paragraphs 85 and 86 above) was directed to all recipients of DOT grants, including those receiving FHWA grants.

534. Neither the statutory provisions creating the FHWA grants, the relevant appropriations acts, nor any other legislation authorizes the FHWA or DOT to condition these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts. Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws. But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

535. In sum and as further explained below, the SS4A Discrimination Condition, the SS4A Enforcement Condition, the SS4A EO Condition, the FHWA Discrimination Condition, the FHWA Enforcement Condition, and the FHWA EO Condition (collectively, the "FHWA Grant Conditions") violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### c. DOT and the FAA attach new, unlawful conditions to FAA Grants

536. Implementing the April Duffy Letter and the Trump Administration Executive Orders, on April 25, 2025, the FAA issued a proposal labeled "Notice of modification of Airport Improvement Program grant assurances; opportunity to comment," providing notice and soliciting public comments on modifications to the Grant Assurances (the "2025 FAA Grant Assurances"). In its notice, the FAA stated that the 2025 FAA Grant Assurances would become effective immediately, notwithstanding the opportunity to comment.

537. The 2025 FAA Grant Assurances require the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and

RENNE PUBLIC LAW GROUP
Attorneys at Law

requirements as they relate to the application, acceptance, and use of Federal funds for this Grant."

While this requirement existed in a similar form in prior versions of the Grant Assurances, the 2025 FAA

Grant Assurances list President Trump's DEI Order and Gender Ideology Order (among other recent

Trump Administration executive orders), and incorporates all other executive orders, including the

Immigration Order, as "provisions" purportedly "applicable" to grant agreements, even though these

Orders on their face do not apply to non-federal entities and do not relate to funding of airport

development or infrastructure.  Congress has not directed or authorized that the DEI Order, Gender

Ideology Order, or Immigration Order be imposed as Grant Assurances.

538.    Implementing the April Duffy Letter and the Trump administration Executive Orders, on

May 6, 2025, FAA posted on its website a revised grant agreement template for 2025 for AIG grants with

added terms and conditions that did not appear in prior iterations of FAA grant agreements (the "FY

2025 FAA AIG Grant Template").  The FY 2025 FAA AIG Grant Template has not been circulated for

comment, as is statutorily required for changes to Grant Assurances.

539.    The FY 2025 FAA AIG Grant Template imposes a new condition on all AIG grants that

implements President Trump's directive, as set out in the DEI Order, to condition federal grant funds on

recipients' agreement not to promote DEI and to concede that this requirement is material for purposes of

the FCA (the "FAA Discrimination Condition").  While FAA grants have long required compliance with

nondiscrimination laws and have been subject to the FCA, the FY 2025 FAA AIG Grant Template

provides:

> Pursuant to Section (3)(b)(iv), Executive Order 14173, Ending Illegal
> Discrimination and Restoring Merit-Based Opportunity, the sponsor:
>
> a. Agrees that its compliance in all respects with all applicable Federal anti-
> discrimination laws is material to the government's payment decisions for
> purposes of [the FCA]; and
>
> b. certifies that it does not operate any programs promoting diversity,
> equity, and inclusion (DEI) initiatives that violate any applicable Federal
> anti-discrimination laws.

540.    The FAA Discrimination Condition is in apparent tension with statutorily required Grant

Assurances imposed on sponsors with respect to FAA grant funds.  For example, one of the statutorily

required Grant Assurances sponsors must make for airport development grants is that the airport sponsor

-126-

RENNE PUBLIC LAW GROUP
Attorneys at Law

RENNE PUBLIC LAW GROUP
Attorneys at Law

will take necessary action to ensure, to the maximum extent possible, that at least 10 percent of all businesses at the airport selling consumer products or providing consumer services to the public are small business concerns owned and controlled by "a socially and economically disadvantaged individual" or other small business concerns in historically underutilized business zones.  49 U.S.C. § 47107(e)(1). "Socially and economically disadvantaged individual" is defined to include "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities," as well as women. 49 U.S.C. § 47113(a)(2); 15 U.S.C. § 637(d).

541.    The FAA Discrimination Condition is also in apparent tension with DOT's own regulations.  For example, 49 C.F.R. 21.5, which prohibits discrimination, states, "[w]here prior discriminatory practice or usage tends, on the grounds of race, color, or national origin to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program or activity … the applicant or recipient must take affirmative action to remove or overcome the effects of the prior discriminatory practice or usage."  49 C.F.R. 21.5(b)(7).  And the FAA Discrimination Condition is in tension with other provisions of the FY 2025 FAA AIG Grant Template. For example, the FY 2025 FAA AIG Grant Template states that the "sponsor's [Disadvantaged Business Enterprise] and [Airport Concession Disadvantaged Business Enterprise] programs as required by 49 C.F.R. Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement." But 49 C.F.R. 23.25(e), for instance, requires the use of "race-conscious measures" in implementing the Airport Concession Disadvantaged Business Enterprise program when race-neutral measures, standing alone, are not projected to be sufficient to meet an overall goal, and sets forth examples of race-conscious measures airports can implement.

542.    The FY 2025 FAA AIG Grant Template contains an additional condition requiring sponsors to cooperate with the enforcement of any federal law, including federal immigration enforcement efforts (the "FAA Enforcement Condition").

543.    In particular, the FAA Enforcement Condition incorporates immigration enforcement into a provision addressing free speech and religious liberty as follows (immigration enforcement language emphasized):

RENNE PUBLIC LAW GROUP
Attorneys at Law

> The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; *and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.*

544. The FY 2025 FAA AIG Grant Template further states with respect to immigration: "Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration.  The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter."  The FY 2025 FAA AIG Grant Template does not explain how those criminal immigration statutes relate to airport grants or even apply to local governments.

545. The FY 2025 FAA AIG Grant Template also requires the sponsor to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant" (the "FAA EO Condition").  While this requirement existed in a similar form in prior agreements, the FY 2025 FAA AIG Grant Template lists President Trump's DEI Order and Gender Ideology Order (among other recent Trump Administration executive orders), and incorporates all other executive orders, including the Immigration Order, as "provisions" purportedly "applicable" to grant agreements, with no explanation of how those Orders relate to funding of airport development or infrastructure or apply to local governments.

546. The FY 2025 FAA AIG Grant Template also states that the "FAA may terminate this agreement and all of its obligations under this agreement" in certain circumstances, including if "FAA determines that termination of this agreement is in the public interest"; and further states that "[i]n terminating this agreement under this section, the FAA may elect to consider only the interests of the FAA" (the "FAA Termination Condition").  The FY 2025 FAA AIG Grant Template does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure.

-128-

547.    AIP and AIG grant agreements require sponsors to certify a number of sponsor assurances (i.e., the Grant Assurances described above) that require sponsors to maintain and operate their facilities safely, efficiently, and in accordance with specified conditions, including compliance with numerous statutes, agency rules, and executive orders.

548.    Additionally, The April Duffy Letter was directed to all recipients of DOT grants, including those receiving FAA grants.

549.    Neither the statutory provisions authorizing the FAA grants, the relevant appropriations acts, nor any other legislation authorizes the FAA or DOT to condition the granting of these funds on the recipient's certification that it does not "promote DEI," its admission that its compliance with this prohibition is material for purposes of the FCA, or its agreement to "cooperate" with federal immigration enforcement efforts.  Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws.  But executive orders and letters from agency heads cannot change what these laws require under existing court decisions.

550.    In sum and as further explained below, the FAA Discrimination Condition, the FAA Enforcement Condition, the FAA EO Condition, the FAA Termination Condition (collectively, the "FAA Grant Conditions"), including in the 2025 Grant Assurances, FAA AIG Grant Template, and any other agreement, template, assurances, or other terms and conditions, violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti- commandeering principle, and the Fifth Amendment's void-for-vagueness doctrine.

### 4.    HHS and its Operating Divisions and Agencies Attach New Conditions to HHS Grants

551.    HHS and its operating divisions and agencies have implemented President Trump's Executive Orders by making changes to HHS policy and attaching new and unlawful conditions (collectively, the "HHS Grant Conditions") across the expansive portfolio of HHS grants established by Congress and demanding grant recipients' agreement to those new conditions.

552.    For example, on April 16, 2025, HHS issued an updated HHS Grants Policy Statement (2025 HHS GPS) applicable to discretionary grants that is "incorporated by reference in the official Notice of Award (NoA) as a standard term and condition."  It applies to "awards and award

RENNE PUBLIC LAW GROUP
Attorneys at Law

modifications that add funding made on or after April 16, 2025," includes "supplements to award, competing and non-competing continuations," and applies to "all HHS recipients and the requirements flow down to subrecipients." The 2025 HHS GPS "is incorporated by reference as a standard term and condition of awards." The 2025 HHS GPS states that it does not apply to nondiscretionary awards, but that "HHS agencies have the discretion to apply certain parts of the GPS to non-discretionary awards and other policies to" non-discretionary awards.[5]

553.    The 2025 HHS GPS imposed a new condition on HHS grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA (the "HHS Discrimination Condition"). While HHS grants have long required compliance with nondiscrimination laws and have been subject to the FCA, the 2025 HHS GPS states that in addition to filing Form HHS 690 (Assurance of Compliance with federal nondiscrimination laws, which was previously required under older versions of the GPS), "recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4)." Further, the 2025 HHS GPS states that "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . ." For this purpose, the following definitions apply:

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

. . . .

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

RENNE PUBLIC LAW GROUP
Attorneys at Law

---

[5] The 2025 HHS GPS does not apply to NIH grant awards.

554.    In July 2025, HHS released a revised 2025 GPS in which all mention of DEI was removed.  Instead, the updated 2025 GPS simply stated, "By applying for or accepting federal funds . . . recipients certify compliance with all federal antidiscrimination laws and that complying with those laws is a material condition." This revised version became effective as of July 24, 2025.

555.    However, recently, HHS released an updated 2025 GPS, effective on October 1, 2025, doubling down on the imposition of new conditions.  The 2025 GPS states that "[a]ll recipients subject to Title IX requirements must also adhere to the following term."  The terms referenced are as follows:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipient certifies as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including requirements set forth in Presidential Executive Order 14168 titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and recipient will remain compliant for the duration of the Agreement.
>
> - The above requirements are conditions of payment that go the essence of the Agreement are therefore material terms of the Agreement.
>
> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.
>
> - Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.
>
> - Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

556.    Furthermore, the newest 2025 GPS warns that Recipients who knowingly make false statements "relating to Recipient's compliance with the above requirements and/or eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001."

557.    In addition to these agency-wide conditions, several HHS operating divisions and agencies have issued their own requirements.  For example, CDC recently issued updated general terms

RENNE PUBLIC LAW GROUP
Attorneys at Law

and conditions for both research and non-research awards.  Those updated general terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply.

558.    SAMHSA recently issued updated general terms and conditions for discretionary grants. Those updated general terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply.  Moreover, in April 2025, SAMHSA updated its Notice of Funding Opportunity (NOFO) Application Guide to state that "[a]ll activities proposed in your application and budget narrative must be in alignment with the current Executive Orders" (the "SAMHSA EO Condition") and that "[f]unds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens" (the "SAMHSA Immigration Condition").

559.    On July 25, 2025, HRSA issued updated general terms and conditions applicable to "all active awards."  The revised HRSA terms and conditions incorporate the 2025 HHS GPS as applicable grants policy with which recipients must comply.  They also contain the following provision (the "HRSA Gender Ideology Condition"):

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipients, whose programs, are covered by Title IX certify as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and Recipient will remain compliant for the duration of the Agreement.
>
> - The above requirements are conditions of payment that go the essence of the Agreement and are therefore material terms of the Agreement.
>
> - Payments under the Agreement are predicated on compliance with the above requirements, and therefore Recipient is not eligible for funding under the Agreement or to retain any funding under the Agreement absent compliance with the above requirements.
>
> - Recipient acknowledges that this certification reflects a change in the government's position regarding the materiality of the foregoing requirements and therefore any prior payment of similar claims does not reflect the materiality of the foregoing requirements to this Agreement.
>
> - Recipient acknowledges that a knowing false statement relating to Recipient's compliance with the above requirements and/or

RENNE PUBLIC LAW GROUP
Attorneys at Law

-132-

eligibility for the Agreement may subject Recipient to liability under the False Claims Act, 31 U.S.C. § 3729, and/or criminal liability, including under 18 U.S.C. §§ 287 and 1001.

560.    It is not clear if HRSA's assertion that compliance with Title IX (or any other nondiscrimination law) purportedly now requires agreement to the Gender Ideology Order is shared by other HHS operating divisions and agencies, or is implicitly imported into other operating divisions and agencies' conditions requiring compliance with nondiscrimination laws that do not expressly contain this added gloss.

561.    Meanwhile, on May 6, 2025, HHS sent a "Dear Colleague" letter to medical schools receiving federal funds, providing "[HHS's] current interpretation of federal law." Regarding DEI, the letter stated "some American educational institutions . . . have adopted race-conscious policies under a broader umbrella of concepts known as 'systemic and structural racism' and 'diversity, equity, and inclusion' (DEI) to incorporate race-based criteria into training and discipline," and "[a]dditionally, certain DEI programs may confer advantages or impose burdens based on generalizations associated with racial identity, rather than evaluating individuals on their own merits. Such programs can create a hostile environment, denying a student the ability to participate fully in school life because of the student's race." The letter also warned that institutions "found to be out of compliance with federal civil rights law may, consistent with applicable law, be subject to investigation and measures to secure compliance with may, if unsuccessful, affect continued eligibility for federal funding" and stated HHS would "prioritize investigations" of institutions that, among other things, require DEI or diversity statements in connection with hiring. Letter from Anthony F. Archeval, Acting Director, HHS Office for Civil Rights, to medical schools that receive federal financial assistance (May 6, 2025), https://www.hhs.gov/sites/default/files/guidance-med-schools-dear-colleague-letter.pdf (last visited December 17, 2025).

562.    In a May 14, 2025 statement to the Senate Committee on Health, Education, Labor, and Pensions regarding President Trump's FY 2026 budget, HHS Secretary Kennedy stated, among other things, that HHS is "committed to restoring a tradition of gold-standard, evidence based science—not one driven by politicized DEI, gender ideology, nor sexual identity." Secretary Kennedy also stated that "NIH will no longer issue grants to promote radical gender ideology to the detriment of America's youth, or fund dangerous gain-of-function research, though related research will continue consistent with

Administration policy and oversight. Our Administration is committed to eliminating radical gender ideologies that poison the minds of Americans." Statement by Robert F. Kennedy, Jr. on the President's Fiscal Year 2026 Budget before Committee on Health, Education, Labor, and Pensions (May 14, 2025), https://www.help.senate.gov/imo/media/doc/b1b74b8b-0612-8b5d-1904-a50babc1deea/HELP%20Secretary%20Kennedy%20Testimony.pdf (last visited December 17, 2025).

563.    Neither the statutory provisions creating the HHS grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes HHS, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not "promote" DEI or gender ideology or its admission that its compliance with these prohibitions is material for purposes of the FCA. Nor are Plaintiffs aware of any statute authorizing HHS, itself or through its operating divisions and agencies, to impose such conditions on any other HHS grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive. Federal grant recipients must comply with nondiscrimination and other federal laws. But executive orders and statements from agency heads cannot change what these laws require under existing court decisions.

564.    In sum and as further explained below, the HHS Grant Conditions violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 5.    EPA Attaches New Conditions to EPA Grants

565.    EPA and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "EPA Grant Conditions") across the expansive portfolio of EPA grants established by Congress and demanding grant recipients' agreement to those new conditions.

566.    For example, on April 3, 2025, EPA issued an updated General Terms and Conditions, which included a new condition that states:

> By accepting this EPA financial assistance agreement, (A) the recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the Federal Claims Act]; and (B) the recipient certifies that it does not operate any programs promoting Diversity, Equity and Inclusion that violate any applicable Federal anti-discrimination laws.

-134-

RENNE PUBLIC LAW GROUP
Attorneys at Law

U.S. Envtl. Prot. Agency, EPA General Terms and Conditions effective October 1, 2024 or later, https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf (last visited December 17, 2025).

567.     The revised EPA General Terms and Conditions impose this new condition on EPA grants implementing President Trump's directive, as set out in the DEI Order, to condition federal grant funds on recipients' agreement not to promote DEI and to concede this requirement is material for purposes of the FCA (the "EPA Discrimination Condition").  While EPA grants have long required compliance with nondiscrimination laws and have been subject to the FCA, executive orders and letters from agency heads cannot change what the laws require under existing court decisions.  The EPA Discrimination Condition requiring recipients to certify that compliance "in all respects with all applicable Federal anti-discrimination laws" is always "material" for purposes of the FCA, is unauthorized by Congress and unconstitutionally vague.  Furthermore, "materiality," under the FCA, "is a functional rather than formulistic, inquiry" that requires courts to evaluate three factors, only one of which is whether the government's payment was conditioned on compliance.  *See United States ex rel. Bashir v. Boeing Co.*, 765 F. Supp. 3d 1111, 1128–29 (W.D. Wash. 2025).  To determine materiality, a court also considered the government's past enforcement of the requirement and the magnitude of the violation.  *Id.* Accordingly, the EPA Discrimination Condition imposes an impermissibly vague legal standard that is broader than the statute allows.

568.     In sum and as further explained below, the EPA Grant Conditions violate the Separation of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 6.     DHS Attaches New Conditions to DHS Grants

569.     DHS and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DHS Grant Conditions") across the expansive portfolio of DHS grants established by Congress and demanding grant recipients' agreement to those new conditions.

570.     For example, on or around April 18, 2025, DHS issued new sets of "Standard Terms and Conditions" applicable to all federal awards.  *See* U.S. Dep't of Homeland Security, Notice of Funding

-135-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Opportunity for FY 2025 Standard Terms and Conditions (Apr. 18, 2025),

https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf (last visited December 17, 2025). These Terms and Conditions include new requirements compelling grant recipients to accept the following terms:

> By accepting the grant award, recipients are certifying that: (i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrim-ination laws; and (ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott. (iii) They do not, and will not during the term of this award, operate and program that benefits illegal immigrants or incentivizes illegal immigration.

571.     Term (i) discussed above will hereto be referred to as the "DHS DEI Condition" and term (iii) the "DHS Enforcement Condition."

572.     Next, the DHS General Terms state that "Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference." (the "DHS EO Condition").

573.     Neither the statutory provisions creating the DHS rants, the relevant appropriations acts, nor any other legislation authorizes the DHS to condition these funds on the recipient's certification that it does not "promote DEI" or its agreement to not operate a program that "benefits illegal immigrants or incentivizes illegal immigration."  Federal grant recipients are required to comply with nondiscrimination and other applicable federal laws.  But executive orders and letters from agency heads cannot change what these laws require under existing court decisions

574.     These requirements outlined in the DHS Terms and Conditions are unlawful because the requirements violate the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 7.     DOI Attaches New Conditions to DOI Grants

575.     DOI and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOI Grant Conditions") across the expansive portfolio of DOI grants established by Congress and demanding grant recipients' agreement to those new conditions.

RENNE PUBLIC LAW GROUP
Attorneys at Law

576.     For example, on or around July 30, 2025, the DOI's Office of Grants Management issued General Award Terms and Conditions.  *See* U.S. Dep't of the Interior, Office of Grants Management issued General Award Terms and Conditions, https://www.doi.gov/sites/default/files/documents/2025-07/doi-general-terms-and-conditions-v6.pdf (last visited December 17, 2025).  These conditions include a provision that states:  "In accepting this award the grant recipient agrees to operating in compliance in all respects with all applicable Federal anti-discrimination laws, and certify that it does not operate any programs promoting diversity, equity and inclusion programs that violate any applicable Federal antidiscrimination laws." (the "DOI DEI Condition").

577.     Neither the statutory provisions creating the DOI grant described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes DOI, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not operate or "promote" DEI or its admission that its compliance with these prohibitions is material for purposes of the FCA.  Nor are Plaintiffs aware of any statute authorizing DOI, itself or through its operating divisions and agencies, to impose such conditions on any other DOI grants that Plaintiffs have previously received, currently receive, or are otherwise eligible to receive.

578.     This certification is unlawful, as explained further below, because the anti-DEI certification violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void-for-vagueness doctrine, and the APA.

### 8.     DOJ Attaches New Conditions to DOJ Grants

579.     DOJ and its operating divisions and agencies have implemented President Trump's Executive Orders by attaching new and unlawful conditions (collectively, the "DOJ Grant Conditions") across the expansive portfolio of DOJ grants established by Congress and demanding grant recipients' agreement to those new conditions.

580.     For example, on or around May 12, 2025, the DOJ's Office of Justice Programs published "General Conditions" for OJP Awards in FY 2025.  *See* Dep't of Justice, "General Conditions" for OJP Awards in FY 2025, https://www.ojp.gov/funding/explore/legaloverview2025/mandatorytermsconditions (last visited December 17, 2025).  The General Conditions included term that provides:

RENNE PUBLIC LAW GROUP
Attorneys at Law

The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and, by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

(the "OJP DEI Condition").

581.    In addition, the DOJ released a Notice of Funding Opportunity for FY25 COPS Community Policing Development Microgrants that warns applicants that funding may not be used to "promote gender ideology" (the "COPS Gender Ideology Condition") or "for projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," (the "COPS DEI Condition").  *See* Dep't of Justice., Notice of Funding Opportunity for FY25 Community Policing Development Microgrants, https://cops.usdoj.gov/pdf/2025ProgramDocs /cpdmicrogrants/nofo.pdf (last visited December 17, 2025).

582.    Likewise, a Notice of Funding Opportunity for FY25 COPS Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects also includes the same conditions.  *See* Dep't of Justice, Notice of Funding Opportunity for FY25 Law Enforcement Mental Health and Wellness Act (LEMHWA) Implementation Projects, https://cops.usdoj.gov/pdf/2025ProgramDocs/lemhwa/ nofo.pdf (last visited December 17, 2025).

583.    In or around August 2025, the DOJ published the 2025 COPS Office Law Enforcement Mental Health and Wellness Act (LEMHWA) Program Award Owner's Manual.  The Manual also includes the same provision requiring recipients to certify non-operation of diversity, equity, and inclusion programs, in addition to a condition that recipients "must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President."  Furthermore, the 2025 LEMHWA requires that "the recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812)."  *See* Dep't of Justice, 2025 COPS Office Law Enforcement Mental Health and Wellness Act (LEMHWA) Program Award Owner's Manual, https://cops.usdoj.gov/pdf/2025AwardDocs/lemhwa/aom.pdf (last

visited December 17, 2025). Additionally, the 2025 COPS Office Safer Outcomes Program Award Owner's Manual contains the same conditions.  *See* Dep't of Justice, 2025 COPS Office Safer Outcomes Program Award Owner's Manual, https://cops.usdoj.gov/pdf/2025AwardDocs/saferoutcomes/AOM.pdf (last visited December 17, 2025).

584.    The DOJ has also issued statements confirming this administration's overbroad interpretation of "DEI" that conflicts with current law.  In a February 5, 2025, letter to DOJ Attorney General Pam Bondi stated that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and DEIA" activities, characterizing such programs as discriminatory if they "divide individuals based on race or sex."  The letter suggests this may include race- or gender-based affinity groups or even teaching about racial history.  *See* Letter from Pam Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025) https://www.justice.gov/ag/media/1388501/dl?inline (last visited December 17, 2025).

585.    A second letter from Attorney General Bondi to grant recipients, issued on July 29, 2025, purports to clarify the application of federal antidiscrimination laws to DEI programs for entities receiving federal funds.  However, contrary to established legal precedent, the letter states that entities that promote DEI training programs that include discussions of inherent bias, white privilege, or toxic masculinity violate federal law.  The letter instructs entities to "[m]onitor their parties that receive federal funds to ensure ongoing compliance, including reviewing program materials."  Letter from Pam Bondi, Attorney General, to all Federal Agencies (Jul. 29, 2025) https://www.justice.gov/ag/media/1409486/dl (last visited December 17, 2025).  If this requirement, to condition federal funding on the content of program materials, were enforced, it would be a violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995).

586.    Additionally, in May 2025, the Deputy Attorney General issued a letter indicating that the DOJ will invoke the FCA to pursue funding recipients engaged in what it characterizes as "civil rights fraud"—including DEI initiatives.  Along with starting an initiative to "utilize the [FCA] to investigate and, as appropriate, pursue claims against any recipient of federal funds," the letter states that DOJ "strongly encourages" private FCA lawsuits against funding recipients.  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S. Attorneys (May 19, 2025) https://www.justice.gov/dag/media/1400826/dl?inline (last visited December 17, 2025).

587.    U.S. Attorney General, Pamela Bondi also issued memorandum to DOJ on February 5, 2025, titled "Sanctuary Jurisdiction Directives" that directed DOJ to undertake wide-ranging efforts to punish "so-called 'sanctuary jurisdictions'" for failing to assist in federal immigration enforcement. Office of the Attorney General, U.S. Dep't of Justice, Memorandum for All Department Employees: Sanctuary Jurisdiction Directives (the "Bondi Directive") (Feb. 5, 2025), https://www.justice.gov/ag/media/1388531/dl?inline (last visited December 17, 2025).

588.    The Bondi Directive required DOJ attorneys to evaluate "all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens" for their potential termination.  The Bondi Directive instructed DOJ attorneys to investigate and prosecute "violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373," to promptly report declination decisions to DOJ leadership, and to investigate and challenge state and local laws and policies "that facilitate violations of federal immigration laws or impede lawful federal immigration operations."

589.    "In furtherance of that objective," the Directive declares:

> [T]he Department of Justice will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department.  Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.

590.    The Bondi Directive further reiterated that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."

591.    DOJ's grant-funding offices proceeded to give effect to the Administration's directives requiring States to cooperate with federal civil immigration-enforcement efforts.

592.    OVC has adopted a policy, which it has implemented across all OVC-administered grants, of refusing to allow grant recipients to use any awarded funds for victim compensation and assistance unless the grant recipients agree to broadly support and assist federal immigration enforcement by DHS.

593.    On July 21, 2025, OVC issued NOFOs for its Victim Compensation Formula Grant and Victim Assistance Formula Grant and various competitive grants specifying new immigration-related conditions on issuance of funding for FY 2025.

-140-

RENNE PUBLIC LAW GROUP
Attorneys at Law

594.    In accordance with OVC's policy, every one of the OVC NOFOs provides, in relevant part, that "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" is "out of the program scope and will not be funded" (collectively, the "OVC Immigration Enforcement Condition" ). *See e.g.*, U.S. Dep't of Justice, Office of Justice Programs, OVC FY25 Victims of Crime Act (VOCA) Victim Assistance Formula Grant NOFO, https://www.ojp.gov/funding/docs/ovc-2025-172428.pdf (last visited December 17, 2025).

595.    Although styled as a restriction on the "unallowable use of funds," this language functions as an eligibility requirement: OVC "will not … fund" "[a]ny program or activity" unless it agrees to (1) provide notice to DHS agents on demand, (2) give unfettered access to DHS agents, (3) comply with 8 U.S.C. § 1373, and (4) honor any and all DHS requests.  Further, funds will not be provided to any program if DHS concludes that the program is directly or indirectly "imped[ing] or hinder[ing] enforcement of federal immigration law" in any other way.  The NOFOs impose these requirements on any and all FY 2025 grant awards by the OVC.

596.    The NOFOs do not explain what, if any, limits exist on the "notice" and "access" that must be provided and the "requests" that must be honored.  The NOFOs also do not define "program or activity" or "promoting or facilitating." And it is unclear what an "indirect" violation of the immigration laws (or "indirectly" promoting or facilitating a violation of the immigration laws) constitutes.  On their face, however, the Conditions would require States to provide information about, and access to, victims with whom States may interact in operating their victim services programs, that DHS is targeting for potential immigration enforcement.

597.    Neither the statutory provisions creating the DOJ grants described in this Complaint, the relevant appropriations acts, nor any other legislation authorizes DOJ, itself or through its operating divisions and agencies, to condition these funds on the recipient's certification that it does not "promote" DEI or gender ideology or its admission that its compliance with these prohibitions is material for purposes of the FCA.  Nor are Plaintiffs aware of any statute authorizing DOJ, itself or through its

RENNE PUBLIC LAW GROUP
Attorneys at Law

operating divisions and agencies, to impose conditions requiring cooperation with immigration

enforcement or the prohibitions on "indirectly" promoting or facilitating a violation of the immigration

laws on any other DOJ grants that Plaintiffs have previously received, currently receive, or are otherwise

eligible to receive.  Federal grant recipients must comply with nondiscrimination and other federal laws.

But executive orders and statements from agency heads cannot change what these laws require under

existing court decisions.

598.    In sum and as further explained below, the DOJ Grant Conditions violate the Separation

of Powers, the Spending Clause, the Tenth Amendment's anti-commandeering principle, the Fifth

Amendment's void-for-vagueness doctrine, and the APA.

**9.    The New Grant Conditions Implementing and Incorporating the Executive Orders Are Unlawful**

**a.    Incorporation of the Executive Orders is Unlawful**

599.    The conditions discussed above purport to incorporate executive orders as governing the

use of federal funds.  These orders in many ways purport to adopt new laws by presidential fiat, amend

existing laws, and overturn court precedent interpreting laws.  In so doing, the new grant conditions seek

to usurp Congress's prerogative to legislate and its power of the purse, as well as the judiciary's power to

say what the law means.

600.    Furthermore, the executive orders are the President's directives to federal agencies.  These

orders are unintelligible and vague as applied to grant recipients, and as implemented in the unlawful

conditions at issue.

601.    Without Congress passing his anti-DEI agenda, President Trump purports to have granted

himself unchecked Article II powers to legislate by executive order and impose his decrees on state and

local governments seeking grant funding.

**b.    The Discrimination Condition is Unlawful**

602.    While Plaintiffs have routinely certified compliance with federal nondiscrimination laws

as a condition of federal funding in the past, the Trump Administration's communications to federal

grant recipients make clear that the agencies seek compliance with the Trump Administration's novel,

incorrect, and unsupported interpretation of federal nondiscrimination law as barring any and all DEI

-142-

RENNE PUBLIC LAW GROUP
Attorneys at Law

programs.  The Trump Administration's conception of an "illegal" DEI program is contrary to actual

nondiscrimination statutes and is inconsistent with what any court has endorsed when interpreting them.

603.    For instance, a February 5, 2025 letter from Attorney General Pam Bondi to DOJ

employees states that DOJ's Civil Rights Division will "penalize" and "eliminate" "illegal DEI and

DEIA" activities and asserts that such activities include any program that "divide[s] individuals based on

race or sex"—potentially reaching affinity groups or teaching about racial history.  Letter from Pam

Bondi, Attorney General, to all DOJ Employees (Feb. 5, 2025), https://www.justice.gov/ag/media/

1388501/dl?inline (last visited December 17, 2025).

604.    Defendant Turner has stated that "HUD is carrying out Present Trump's executive orders,

mission, and agenda," by "[a]lign[ing] all programs, trainings, and *grant agreements* with the President's

Executive Orders, removing diversity, equity, inclusion (DEI)." Press Release No. 25-059, *HUD*

*Delivers Mission-Minded Results in Trump Administration's First 100 Days*, https://www.hud.gov/news/

hud-no-25-059 (emphasis added) (last visited December 17, 2025).

605.    Neither the text of Title VI nor any other statute or other condition enacted by Congress

prohibits recipients of federal funding from considering issues of diversity, equity, or inclusion.  The

Supreme Court has never interpreted Title VI to prohibit diversity, equity, and inclusion programs.

Indeed, existing case law rejects the Trump Administration's expansive views on nondiscrimination law

with respect to DEI.  The President has no authority to declare, let alone change, federal

nondiscrimination law by executive fiat.  Yet, the DEI Order seeks to impose his views on DEI as if they

were the law by using federal grant conditions and the threat of FCA enforcement to direct and coerce

federal grant recipients into acquiescing in his Administration's unorthodox legal interpretation of

nondiscrimination law.

606.    Accepting these conditions would permit Defendants to threaten Plaintiffs with

burdensome and costly enforcement action, backed by the FCA's steep penalties, if they refuse to align

their activities with President Trump's political agenda.  This threat is intensified by the grant conditions

that purport to have recipients concede the DEI certification's "materiality"—an otherwise "demanding"

element of an FCA claim.  Further, even short of bringing a suit, the FCA authorizes the Attorney

General to serve civil investigative demands on anyone reasonably believed to have information related

-143-

RENNE PUBLIC LAW GROUP
Attorneys at Law

to a false claim—a power that could be abused to target grant recipients with DEI initiatives the Trump Administration disapproves of.  *See* 31 U.S.C. § 3733.

607.    The FCA is intended to discourage and remedy fraud perpetrated against the United States—not to serve as a tool for the Executive to impose unilateral changes to nondiscrimination law, which is instead within the province of Congress in adopting the laws and the Judiciary in interpreting them.  Requiring recipients to certify that compliance "in all respects with all applicable Federal anti-discrimination laws" is always "material" for purposes of FCA imposes an impermissibly vague standard that is broader than the statute allows.

### c.    The Immigration Enforcement Condition is Unlawful

608.    Congress has not delegated to Defendants the authority to condition grant funding on a recipient's agreement not to "promot[e] . . . illegal immigration" or "abet[] policies that seek to shield illegal aliens from deportation."  It is also unclear what type of conduct this might encompass, leaving federal grant recipients without fair notice of what activities would violate the prohibition and giving federal agencies free rein to arbitrarily enforce it.

609.    Indeed, on April 24, 2025, Judge William H. Orrick of the United States District Court for the Northern District of California preliminarily enjoined the federal government from "directly or indirectly taking any action to withhold, freeze, or condition federal funds from" sixteen cities and counties on the basis of Section 2(a)(ii) of the Immigration Order, which directs that no "Federal payments" be made to states and localities if the "effect," even unintended, is to fund activities that the Administration deems to "facilitate" illegal immigration or "abet so-called 'sanctuary' policies." *City & Cnty. of San Francisco v. Trump*, 25-CV-01350- WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025). The court ruled that the direction "to withhold, freeze, or condition federal funding apportioned to localities by Congress, violate[s] the Constitution's separation of powers principles and the Spending Clause"; "violate[s] the Fifth Amendment to the extent [it is] unconstitutionally vague and violate[s] due process"; and "violate[s] the Tenth Amendment because [it] impose[s] [a] coercive condition intended to commandeer local officials into enforcing federal immigration practices and law." *Id*. at *2.

RENNE PUBLIC LAW GROUP
Attorneys at Law

#### d.    The Verification Condition is Unlawful

610.    Further, PRWORA does not authorize the Verification Condition for at least two reasons. First, PRWORA explicitly does not require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations.  8 U.S.C. § 1642(b). Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner."  *Id*. § 1642(b)(ii), (iii).  The Attorney General has issued interim guidance and a proposed verification rule, but has not implemented a final rule.  *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule).  This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation.  62 Fed. Reg. at 61348–49.  Absent implementing regulations, Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system.  *See* 42 U.S.C. § 1320b-7.  Requiring recipients to do so exceeds the authority created in PRWORA.

611.    Second, SAVE is a database operated by the U.S. Department of Homeland Security, acting through U.S. Citizenship and Immigration Services, that is sometimes used to assist federal immigration enforcement actions.  The Verification Condition would require Plaintiffs to gain access to this system, train their own employees how to use the system, and require them to enter immigration information.  Such an effort to commandeer local resources for matters related to federal immigration enforcement is counter to federal law, as well as applicable local and state laws precluding local participation in federal immigration enforcement.

#### e.    The Gender Ideology Condition is Unlawful

612.    The Gender Ideology Condition improperly seeks to force federal grant recipients to no longer recognize transgender, gender diverse, and intersex people by restricting funding that promotes "gender ideology."  This violates HUD's own regulations, which require that grant recipients and subrecipients ensure "[e]qual access to CPD programs, shelters, other buildings and facilities, benefits,

-145-

services, and accommodations is provided to an individual in accordance with the individual's gender identity, and in a manner that affords equal access to the individual's family," including facilities with "shared sleeping quarters or shared bathing facilities." 24 C.F.R. § 5.106(b)–(c).  HUD regulations also prohibit subjecting an individual "to intrusive questioning or asked to provide anatomical information or documentary, physical, or medical evidence of the individual's gender identity." *Id*. § 5.106(b)(3).

613.    While Defendant Turner announced HUD will no longer enforce these regulations, the regulations remain in effect and applicable to the CPD programs.

614.    The Gender Ideology Condition is also vague.  The definition of "gender ideology" is not only demeaning, but also idiosyncratic and unscientific.  Further, given the expansive meaning of "promote," federal agencies have free rein to punish recipients who merely collect information on gender identity, which has long been authorized and encouraged by HUD in its binding regulations, as such information can be used to improve the quality and efficacy of homeless services.

615.    The Trump Administration has already terminated federal funding as a result of agency action carrying out the Gender Ideology Order and related executive orders.  For example, one of the largest free and reduced-cost healthcare providers in Los Angeles reported that the U.S. Centers for Disease Control and Prevention (CDC) terminated a $1.6 million grant that would have supported the clinic's transgender health and social health services program.  The CDC ended the grant in order to comply with the Gender Ideology Order.  *See* Kristen Hwang, LA clinics lose funding for transgender health care as Trump executive orders take hold, Cal Matters (Feb. 4, 2025), https://calmatters.org/health/2025/02/trump-executive-order-transgender-health/ (last visited December 17, 2025).

616.    On February 28, 2025, Judge Lauren King of the United States District Court for the Western District of Washington enjoined enforcement of the Gender Ideology Order in part (including parts the Gender Ideology Condition it incorporates by references), holding that the plaintiffs had shown a likelihood of success on their claims that the Order violates the Fifth Amendment's guarantee of equal protection and the separation of powers.  *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261-77 (W.D. Wash. 2025).

617.     Particularly relevant here, the Court ruled that the plaintiffs were likely to succeed in showing that "[b]y attaching conditions to federal funding that were . . . unauthorized by Congress,"

-146-

RENNE PUBLIC LAW GROUP
Attorneys at Law

subsections 3(e) and (g) of the Gender Ideology Order "usurp Congress's spending, appropriation, and legislative 11 powers." *Id*. at *1261. The Court explained that the Gender Ideology Order "reflects a 'bare desire to harm a politically unpopular group'" by "deny[ing] and denigrat[ing] the very existence of transgender people." *Id*. at 1277 (citation omitted).

### f.     The Abortion Condition is Unlawful

618.    The Abortion Condition (including the Abortion Order incorporated by reference) does not implement, but rather exceeds, the Hyde Amendment's narrow prohibition on using federal funds to pay for, or require others to perform or facilitate, abortions. While it purports to apply the Hyde Amendment—a provision that has been enacted in successive appropriations acts that limits the use of federal funds for abortions (subject to narrow exceptions)—in reality, it goes well beyond the Hyde Amendment. The Hyde Amendment to the 2024 Appropriations Act specifically and narrowly prohibits the use of appropriated funds to "require any person to perform, or facilitate in any way the performance of, any abortion" or to "pay for an abortion, except where the life of the mother would be endangered if the fetus were carried to term, or in the case of rape or incest." Pub. L. 118-42, §§ 202, 203, 138 Stat. 25 (March 9, 2024). But the Hyde Amendment to the 2024 Appropriations Act does not require grant recipients to refrain from "promot[ing] abortion"—a vague prohibition that is susceptible to arbitrary enforcement. And in doing so, the Abortion Condition usurps Congress's spending, appropriations, and legislative power. In sum and as further explained below, Defendants' imposition of the Abortion Condition violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void- for-vagueness doctrine, and the APA.

619.    In sum and as further explained below, Defendant's imposition of the EO Grant Conditions violates the Separation of Powers, the Spending Clause, the Fifth Amendment's void- for-vagueness doctrine, and the APA.

### I.     Multiple Courts Have Issued Injunctions Preventing the Imposition of the Unlawful Grant Conditions

620.    Since President Trump issued the executive orders directing federal agencies to impose new conditions on grant funding and terminate funding for noncompliance, numerous plaintiffs—including states, cities, and nonprofit organizations—have filed lawsuits seeking to enjoin the

-147-

RENNE PUBLIC LAW GROUP
Attorneys at Law

implementation of these directives.  In response, courts across the country have granted preliminary

injunctions to halt enforcement of these unlawful conditions while litigation proceeds.  *See e.g., Chicago*

*Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025); *City & Cnty. of*

*San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025),

opinion clarified, No. 25-CV-01350-WHO, 2025 WL 1358492 (N.D. Cal. May 9, 2025); *S. Educ. Found.*

*v. United States Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025);

*Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3,

2025); *San Francisco A.I.D.S. Found. v. Trump*, No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal.

June 9, 2025).

621.    On July 2, 2025, presumably in response to the numerous injunctions granted against

DOT and HUD, DOT Secretary Sean Duffy sent another letter to all recipients of DOT funding,

attempting to walk back his earlier statements in the April Duffy Letter (described in paragraphs 85 and

86 above).  The July Duffy Letter states:

> "I write to clarify that the Department will no longer enforce [Biden's
> executive policies], or any other requirements incorporated into its Federal
> financial assistance agreements that are inconsistent with the policy
> objectives of this Administration and current DOT leadership…This letter
> does not impose new conditions or requirements, but instead serves merely
> to provide notice that DOT will not enforce or require adherence to any of
> the [Biden executive policies]"

Letter from Sean Duffy, DOT Secretary, to All Recipients of DOT Funding (July 2, 2025) (the "July

Duffy Letter"), https://www.transportation.gov/sites/dot.gov/files/2025-07/SecDOT%20letter%20to%20

recipients%20of%20FFA%2007022025.pdf (last visited December 17, 2025).

622.    The July Duffy Letter directly contradicts his earlier April Letter, the Executive Orders,

and the June 5th Letter from Claudette Fernandez.  Furthermore, the July letter completely ignores the

provisions of Trump's Executive Orders, which Defendants have implemented, that directs each federal

agency head to include "in every contract or grant award" a term that the contractor or grant recipient

"certify that it does not operate any programs promoting DEI," and directs all agency heads to ensure

"that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or

promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens

from deportation."

-148-

623.    The conditions placed on HUD and DOT funding require more than compliance with pre-existing law.  The DEI Order, the Immigration Order, and subsequent agency letters broadly reinterpret the law to prohibit all DEI and require affirmative cooperation with federal immigration enforcement, indicating these new conditions are not reflective of existing law and instead are intended to further the Trump administration's policy goals—not Congress's.

624.    Although the July Duffy Letter purports to "clarify" the Department's position, it does not retract or disavow the Administration's prior threats to vigorously enforce its sweeping and unlawful interpretation of federal law.  Nowhere does the July Duffy Letter state that DOT will cease enforcing this Administration's novel, overbroad, and contradictory interpretation of federal law, nor does it acknowledge the numerous official statements by federal officials warning that noncompliance with these policies will result in the loss of funding.

## J.    Plaintiffs, as Recipients of Pass-Through Grants, have a Reasonable Concern that the Challenged Conditions Apply to them

625.    Local government entities that receive federal grant funds may receive the funds directly from a federal agency (as a direct recipient) or indirectly from a pass-through entity (as a sub-recipient). Where a pass-through entity (for example, a state) provides federal funds to a sub- recipient (for example, a city or county within the state), the pass-through entity is responsible for ensuring the sub-recipient complies with applicable federal requirements.  *See* 2 C.F.R. §§ 200.332(b)(2) (pass-through entity must provide to the sub-recipient information regarding "[a]ll requirements of the subaward, including requirements imposed by Federal statutes, regulations, and the terms and conditions of the Federal award"), 200.332(e) (pass-through entity must "[m]onitor the activities of a subrecipient as necessary to ensure that the subrecipient complies with Federal statutes, regulations, and the terms and conditions of the subaward"); 2 C.F.R. Part 2400 (incorporating 2 C.F.R. Part 200 requirements with respect to federal awards made by HUD to non-federal entities); 2 C.F.R. Part 1201 (same for DOT).

626.    Consistent with 2 CFR § 200.332, the grant agreements and terms and conditions at issue in this case incorporate applicable federal requirements against any sub-recipients.

627.    For example, the FY 2024 SS4A General Terms and Conditions require that the recipient "monitor activities under this award, including activities under subawards and contracts, to ensure … that

-149-

RENNE PUBLIC LAW GROUP
Attorneys at Law

those activities comply with this agreement," and state that "[i]f the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e)." Exhibit A to the 2024 SS4A General Terms and Conditions—which incorporates the DEI and Gender Ideology Orders and two criminal immigration statutes as "applicable provisions" as discussed above—states that "[p]erformance under this agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients." The 2025 FHWA General Terms and Conditions, the Exhibits thereto, as well as the 2025 FAA Grant Assurances and FY 2025 FAA AIG Grant Template, contain similar language.

628.    The FTA Master Agreement requires that grant recipients take measures to assure that "Third Party Participants" (defined to include sub-recipients) "comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing."

629.    Plaintiffs receive federal grant funds via pass-through grants (i.e., as sub-recipients) and has a reasonable concern, based on the April Duffy Letter, applicable regulations, and the grant agreement language discussed above, that the challenged grant conditions apply to their use of the pass-through funds.

### K.    Plaintiffs face an Impossible Choice of Accepting Illegal Conditions, or Forgoing Federal Grant Funding for Critical Programs and Services

630.    The grant conditions that Defendants seek to impose leave Plaintiffs with the Hobson's choice of accepting illegal conditions that are unauthorized by Congress, violate the Constitution, and accompanied by poison pill provisions that increase the risk of FCA claims, or forgoing the grant funds—funds paid (at least partly) through local federal taxes—that are essential for vital local services. The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to budget and plan for services covered by the grants.

631.    Defendants' overbroad interpretation and enforcement of the EO Conditions is not hypothetical. On or around August 18, 2025, the City of Fresno received an email from HUD notifying it "that the Department is questioning the accuracy of the City of Fresno's certification that the Community

RENNE PUBLIC LAW GROUP
Attorneys at Law

Development Block Grant (CDBG) funds described in its Fiscal Year 2025 Consolidated Plan/Action Plan (the Plan) will be administered in conformity with applicable laws, including Executive Orders." In the email, HUD explained that it had "identified language in Fresno's 2025 Consolidated Plan/Action Plan "that is not consistent with Executive Order 14148 Additional Rescissions of Harmful Executive Orders and Actions, Executive Order 14151 Ending Radical and Wasteful Government DEI Programs and Preferencing, Executive Order 14173 Ending Illegal Discrimination and Restoring Merit-Based Opportunity, and Executive Order 14168 Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Specifically, HUD took issue with the following statements from Fresno's 2025 Consolidated Plan/Action Plan:

> "The DRIVE Plan has goals to improve housing affordability and stability, reduce **racial** and economic isolation and support **environmental justice** and sustainability, most of which are addressed in the strategic plan."

> "Emergency shelter for **all genders and their dependent children** who are fleeing domestic violence." (emphasis added by HUD).

632. HUD stated that "[t]his language includes provisions that appear to be inconsistent with the implementation of federal programs pursuant to the referenced executive orders, and directed Fresno to "[r]emove or replace all 'equity' references throughout the document," "[r]emove or replace all "environmental justice" references throughout the document," "[r]emoving all "transgender" references throughout the document," and provide assurances that "[t]he City of Fresno shall not use grant funds to promote 'gender ideology,' as defined in Executive Order (E.O.) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

633. HUD directed Fresno to take these actions no later than 12:00 pm EDT Thursday, **August 21, 2025**, and provided that "failure to address HUD's concerns regarding the certification may result in HUD determining that the certification is inaccurate or unsatisfactory, which will result in disapproval of the Plan."

634. Plaintiffs, the City of Redwood City, City of Saint Paul, and the County of Marin have received similar notices from HUD.

635. Additionally, Defendants' unlawful conduct has already occurred, causing delay and uncertainty in Plaintiffs' budgeting and long-term planning processes. Furthermore, the deadlines for

1   Plaintiffs to submit assurances and agreements containing the unlawful conditions to Defendants are

2   imminent.

3        636.    For example, on or around August 14, 2025, the City of Fresno received an additional

4   Grant Offer and Agreement letter from the FAA regarding an ATP grant.  The Grant Offer included the

5   2025 FAA Grant Assurances, which, as discussed above, incorporate the unlawful EO Conditions, as

6   "provisions" purportedly "applicable" to grant agreements.  The Grant Offer stated, "You may not make

7   any modification to the text, terms or conditions of the grant offer," and provided that the offer will

8   expire and the FAA will not be obligated to pay any part of the costs of the designated ATP project

9   unless the offer has been fully executed and finalized on or before **August 29, 2025**.

10       637.    Additionally, Fresno has already spent $13 million of FAA funding allocated for Fresno's

11  use on FAT's terminal expansion project.  Those funds are set to expire on **September 30, 2025**.  If

12  Fresno and the other FAA Plaintiffs do not submit for reimbursement by the end of September, which

13  requires assuring compliance with the 2025 FAA Grant Assurances, they will lose out on millions of

14  previously allocated federal funds.

15       638.    Fresno was also recently awarded a Brownfields and Land Revitalization RFL grant of

16  $750,000 on August 5, 2025, with the mailing date of August 8, 2025.  For an RFL grant, the recipient

17  demonstrates its commitment to carry out the award by either drawing down funds within 21 days after

18  the EPA award or amendment mailing date.  Additionally, the City of Fresno has received notice from

19  the EPA that it intends to award the City an additional grant that will also be subject to the unlawful EO

20  Conditions.

21       639.    Nor is the heightened FCA risk merely speculative.  A May 19, 2025, letter from Deputy

22  Attorney General Todd Blanche to certain DOJ divisions and offices and all U.S. Attorneys states that

23  DOJ is setting up a "Civil Rights Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil

24  Rights Division—that will "utilize the [FCA] to investigate and, as appropriate, pursue claims against

25  any recipient of federal funds that knowingly violates civil rights laws."  The letter asserts the FCA "is

26  implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws

27  while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including

28  through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity,

RENNE PUBLIC LAW GROUP
Attorneys at Law

-152-

or national origin."  It further states that the Civil Fraud Section and Civil Rights Division will "engage

with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements

for federal funding recipients" (including HUD) and "will also establish partnerships with state attorneys

general and local law enforcement to share information and coordinate enforcement actions."  Finally,

the letter states that DOJ "strongly encourages" private lawsuits under the FCA and "encourages anyone

with knowledge of discrimination by federal-funding recipients to report that information to the

appropriate federal authorities so that [DOJ] may consider the information and take any appropriate

action."  Letter from Todd Blanche, Deputy Attorney General, to DOJ Offices, 19 Divisions, and U.S.

Attorneys (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline (last visited December

17, 2025).

640.    Withholding HUD grants from the HUD Plaintiffs could result in a loss of millions of

dollars in funding for housing and other services that Plaintiffs have adopted to meet the basic needs of

their residents.  It would result in Plaintiffs being unable to serve their residents resulting in the loss of

access to housing, healthcare, counseling, and other assistance.  This funding represents a significant

percentage of those Plaintiffs' total budgets for housing and community support programs, including

community development and infrastructure improvements, affordable housing creation and rehabilitation,

and homelessness services such as outreach, shelter, prevention, and rapid re-housing.  The loss of this

funding would have devastating effects on Plaintiffs and their residents.

641.    Withholding DOT grants from Plaintiffs would result in the loss of hundreds of millions

of dollars in funding for critical services and projects for their residents.

642.    Withholding FTA grants from the FTA Plaintiffs would result in the loss of funding for

public transit services, including capital projects, maintenance, and improvements, which would cause

long-lasting harm to Plaintiffs' finances and lead to delays in or the elimination of critical transit projects.

The loss of this funding, which represents a significant percentage of those Plaintiffs' total budgets for

public transit services, would threaten transit improvements and safety initiatives and have severe

negative impacts on these services.

643.    Withholding FHWA grants from the FHWA Plaintiffs would result in the loss of funding

for street and roadway improvements, including enhancing pedestrian safety, reconfiguring major

RENNE PUBLIC LAW GROUP
Attorneys at Law

roadways to decrease crashes and improve transit, and building bike lanes, that will result in long-lasting harm to Plaintiffs' finances, delays to or elimination of critical infrastructure and safety projects, and diversion of funds from other crucial local projects. The loss of this funding, which represents a significant percentage of those Plaintiffs total budgets for street and roadway projects, would threaten roadway improvement and safety initiatives and have severe negative impacts on these projects.

644. Withholding FAA grants from the FAA Plaintiffs would result in the loss of funding for ongoing and future airport projects—including development and improvement of runways, taxiways, terminals, and control tower as well as airport transit, safety, and sustainability projects—that will result in long-lasting harm to those Plaintiffs' finances, delays to or elimination of critical airport infrastructure and safety projects, and diversion of funds from other crucial projects. The loss of this funding, which represents a significant percentage of those Plaintiffs' total budgets for airport development and infrastructure projects, would threaten airport improvement and safety initiatives and have severe negative impacts on these critical projects.

645. Withholding HHS grants from the HHS Plaintiff would threaten or eliminate critical individual and public health services for millions of residents. Loss of funding could decimate public health budgets and cause residents, including those most vulnerable, to lose access to meals, medical care, housing, and lifesaving social safety net services. Loss of funding could also devastate local public health and child welfare agencies, which may be forced to conduct significant layoffs and operational reductions.

646. Withholding EPA grants from the EPA Plaintiffs would result in the loss of funding for environmental protection and infrastructure projects, including brownfields mitigation and sustainability development, which would cause long-lasting harm to Plaintiffs' finances and lead to delays in or elimination of critical environmental and public health projects. The loss of this funding would have severe negative impacts on public health and environmental safety.

647. The prospective loss of these federal funds would be so catastrophic to Plaintiffs' finances that the essential services it provides—including housing support, public transportation, street and roadway safety improvements, and airport operations—would be effectively halted. Plaintiffs cannot replace these funds with local revenue without drastically cutting other critical services or abandoning

-154-

RENNE PUBLIC LAW GROUP
Attorneys at Law

their obligations to vulnerable populations.  Yet agreeing to the vague, unauthorized, and contradictory grant conditions—even if Plaintiffs were to make a good faith effort to revise their policies to comply—would expose them to significant liability.  Certifying compliance with these conditions carries an intolerable risk of enforcement under the False Claims Act, and constitutional and statutory challenges from stakeholders who could assert that Plaintiffs have adopted discriminatory or otherwise unlawful policies in violation of their rights.  Plaintiffs thus face an impossible dilemma: either accept legal jeopardy by complying with the conditions, or forfeit funding that is essential to the health, safety, and well-being of their residents.

## V.    CAUSES OF ACTION

### Count 1: Separation of Powers
*(All Grant Conditions)*

648.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

649.    The Constitution "exclusively grants the power of the purse to Congress, not the President."  *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  This power is "directly linked to [Congress's] power to legislate," and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Id*. (second alteration in original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

650.    The Constitution vests Congress—not the Executive—with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, *see* U.S. Const. art. 1, § 9, cl. 7.  Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

651.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id*., No. 51, at 350).

RENNE PUBLIC LAW GROUP
Attorneys at Law

-155-

652.    "As Chief Justice Marshall put it, this means that 'important subjects … must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'"  *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L. Ed. 253 (1825)).

653.    The separation of powers doctrine thus represents perhaps the central tenet of our Constitution.  *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24; *Seila Law LLC*, 591 U.S. at 227; *see also Clinton v. City of New York*, 524 U.S. 417, 450 (1998) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers" (Kennedy, J., concurring)).  Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

654.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate."  *City & Cnty. of S.F.*, 897 F.3d at 1234.  Indeed, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.  The President has not done so.

655.    Congress has not conditioned the provision of Defendants' grants on compliance with a prohibition on all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."  Nor has Congress delegated to Defendants the authority to attach the EO Grant Conditions unilaterally.

656.    By imposing the EO Grant Conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

657.    Further, the "[t]he interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–13 (2024) (internal quotations omitted).

-156-

RENNE PUBLIC LAW GROUP
Attorneys at Law

658.    Here, Defendants seek to impose conditions that purport to require compliance with the law interpreted and envisioned by the Executive, contrary to Congress's authority to legislate and the Judiciary's interpretation of the law's meaning.

659.    For these reasons, Defendants' conditioning of grants on compliance with the EO Grant Conditions violates the separation of powers doctrine.

### Count 2: Spending Clause
#### *(All Grant Conditions)*

660.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

661.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States …" U.S. Const. art. I, § 8, cl. 1.

662.    As described above, Defendants violate the separation of powers because the EO Grant Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, Defendants violate the Spending Clause.

663.    The Spending Clause also requires States to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

664.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *S. Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

665.    Finally, federal funds "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id*. at 210.

666.    Even if Congress had delegated authority to the Executive and HUD, DOT, HHS, or EPA to condition grant funding on terms prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender

ideology" or "elective abortion.", the EO Grant Conditions would violate the Spending Clause by:

    a.    imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17;

    b.    imposing conditions that are so severe as to be coercive;

    c.    imposing conditions that are not germane to the stated purpose of grant program funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'"); and

    d.    with respect to the prohibition on promotion of "gender ideology," imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex, *see id*. at 210.

### Count 3: Tenth Amendment
*(All Grant Conditions)*

667.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

668.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X.

669.    Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012). States must have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id*. at 578.

670.    Even if Congress had delegated authority to the Executive or Defendants to condition grant funds on any policy that "promotes" the Administration's conception of an "illegal" DEI program or on participation in the Administration's enforcement of federal immigration laws, the EO Grant Conditions would violate the Tenth Amendment by imposing conditions so severe as to coerce recipients of such funds to adopt the Administration's reinterpretation of the law. *See id*. at 579 (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion.").

RENNE PUBLIC LAW GROUP
Attorneys at Law

## Count 4: Fifth Amendment Due Process – Vagueness
*(All Grant Conditions)*

671.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

672.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

673.    The EO Grant Conditions are unconstitutionally vague.

674.    Initially, each of the EO Conditions is vague in purporting to incorporate all executive orders.  Executive orders are the President's directives to federal agencies and do not apply to federal grant recipients.  The purported incorporation of all executive orders into the recipient or sponsor's use of grant funds renders the other new grant conditions vague.

675.    Each of the Discrimination Conditions fails to clearly define what conduct is prohibited and fails to specify clear standards for enforcement.  This uncertainty is amplified by agency letters and statements, including the April Duffy Letter and Turner statements, that conflict with federal statutes and case law.

676.    The HUD Enforcement Condition (which incorporates by reference the Immigration Order) fails to define the terms "facilitates," "subsidization," or "promotion" with respect to "illegal immigration," leaving federal grant recipients without fair notice of what would violate the prohibition.

677.    Similarly, each of the DOT Enforcement Conditions fails to define the terms "cooperate," "cooperating," "impeding," and "enforcement" with respect to "Federal immigration law," leaving federal grant recipients without fair notice of what would violate the prohibition.

678.    Similarly, the FAA Termination Condition does not define "the public interest" or "the interests of the FAA" that would support a termination decision or expressly limit those interests to the funding of airport development or infrastructure, leaving federal grant recipients without fair notice of what would trigger termination of their grants.

RENNE PUBLIC LAW GROUP
Attorneys at Law

679.    The definition of "gender ideology" adopted in the Gender Ideology Condition is so vague as to require people of ordinary intelligence to guess as to what is prohibited.  By the same token, the Gender Ideology Condition affords unfettered discretion to Defendants to determine, based on their subjective interpretation, whether a federal grant is used to "promote gender ideology."

680.    The meaning of the phrase "promote elective abortion" is also vague, leaving federal grant recipients without fair notice of what activities would violate the prohibition and affording Defendants unfettered discretion.

681.    The vague terms and conditions described above are likely to chill individuals from engaging in First Amendment-protected speech on matters of public concern

682.    Thus, the EO Grant Conditions are unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### Count 5: Administrative Procedure Act, 5 U.S.C. § 706(2) –

### Arbitrary and Capricious
*(All Grant Conditions)*

683.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

684.    Defendant HUD, HHS, EPA, and DOT, as well as the DOT operating administrations (the FTA, the FHWA, and the FAA), are all "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). Additionally, the HUD Grant Agreements, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, HHS's revised Grants Policy Statement, and the EPA's updated General Terms and Conditions are all agency actions subject to review under the APA.

685.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

686.    The HUD Grant Agreements are final agency actions because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Trump Administration policy priorities as a condition to receiving federal HUD funds.  *See State ex rel.*

-160-

RENNE PUBLIC LAW GROUP
Attorneys at Law

*Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018) (holding that agency decision to impose new conditions on federal grants satisfies both tests for final agency action because it "articulate[s] that certain funds" will "require adherence to the" new conditions and "opens up the [recipient] to potential legal consequences," including withholding of funds if the recipient declines to accept the conditions); *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same).

687.    Similarly, the FTA Master Agreement, the FY 2024 SS4A General Terms and Conditions, the 2025 FHWA General Terms and Conditions, the 2025 FAA Grant Assurances, the FY 2025 FAA AIG Grant Template, HHS's revised Grants Policy Statement, and the EPA's updated General Terms and Conditions are final agency actions because they reflect final decisions—in accord with presidential directives—to require grant recipients to comply with various Administration policy priorities as a condition to receiving federal funds.

688.    These actions determine rights and obligations and produce legal consequences because they exercise purported authority to create new conditions on already awarded funds that would obligate recipients to comply with the Executive's policy priorities.

689.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

690.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id*. (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action.  *Id*. at 293.

691.    HUD has provided no reasoned explanation for its decision to impose conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, and prohibiting the "promot[ion]" of "gender ideology" and "elective abortion" on HUD funds

RENNE PUBLIC LAW GROUP
Attorneys at Law

1    that have no connection to those issues.

2    692.    HUD has provided no reasoned basis for withholding funds Congress appropriated for

3    disbursement, except to the extent the HUD Grant Agreements make clear HUD is enacting the

4    President's policy desires, as expressed in Executive Orders 14168, 14173, 14182, and 14218, in place of

5    Congress's intent.

6    693.    HUD also ignores essential aspects of the "problem" it purports to address via the CPD

7    programs, including the Plaintiff's reasonable and inevitable reliance on now at-risk funds, the

8    expectation of reimbursement from already appropriated funds, and the potential impacts on low-income

9    and homeless individuals and families who may be dissuaded from accepting services if they must verify

10    their immigration status or are unable to use their identified gender in doing so.

11    694.    Similarly, neither DOT nor its OAs have provided any reasoned basis for anti-DEI-related

12    conditions to the FTA, FHWA, and FAA grants, seeking to impose the Administration's view on all

13    policies and programs, even when they are unrelated to programs receiving such grants.  Moreover, DOT

14    and its EOs failed to explain how Plaintiffs could simultaneously comply with each of the DOT

15    Discrimination Conditions, while also complying with statutory, regulatory, and other requirements that

16    are in apparent tension with those Conditions.

17    695.    Nor has HHS or the EPA provided a reasoned basis for imposing conditions related to

18    "cooperation" with federal immigration enforcement on federal funds that have no connection to that

19    issue.

20    696.    Defendants have also ignored Plaintiffs' reasonable reliance on awarded, but not yet

21    obligated, funds and the expectation of reimbursement from already appropriated funds.

22    697.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201

23    that Defendants imposing the EO Grant Conditions violates the APA because it is arbitrary and

24    capricious; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin

25    Defendants from imposing those Conditions without complying with the APA.

26

27

28

RENNE PUBLIC LAW GROUP
Attorneys at Law

## Count 6: Administrative Procedure Act, 5 U.S.C. § 706(2) –

## Contrary to the Constitution
*(All Grant Conditions)*

698.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

699.    Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

700.    As described above, Defendants' imposition of the EO Grant Conditions violates bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, the Tenth Amendment, and the Fifth Amendment.

701.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the EO Grant Conditions violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

## Count 7: Administrative Procedure Act, 5 U.S.C. § 706(2) –

## In Excess of Statutory Authority
*(All Grant Conditions)*

702.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

703.    Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

704.    Defendants may exercise only authority granted to them by statute or the Constitution.

705.    No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally-appropriated funds.

RENNE PUBLIC LAW GROUP
Attorneys at Law

706.     Neither the Housing and Community Development Act, the Cranston-Gonzalez National Affordable Housing Act, the Stewart B. McKinney Homeless Assistance Act, the AIDS Housing Opportunity Act nor any other legislation authorizes HUD to impose conditions on HUD grant funding related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.".

707.     Similarly none of the statutes authorizing the HHS, EPA, FTA, FHWA, and FAA grants, nor the relevant appropriations acts, authorize Defendants to impose conditions on federal funding prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verification of immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion.".

708.     Indeed, by threatening to unilaterally withhold funds on the basis of unauthorized agency-imposed grant conditions, Defendants attempt to circumvent the process established in the Impoundment Control Act of 1974, which requires the President to notify and request authority from Congress to rescind or defer the expenditure of funds before acting to withhold or pause federal payments.  2 U.S.C. §§ 681 et seq.

709.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants imposing the EO Grant Conditions violates the APA because it is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

### Count 8: Administrative Procedure Act, 5 U.S.C. § 706(2) –
### Agency Action Contrary to Regulation
*(HUD Grant Conditions)*

710.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

711.     Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A).

712.    The NOFOs under which Plaintiffs were awarded HUD funding for FY 2024 contain no terms or conditions related to prohibiting all forms of DEI, facilitating enforcement of federal immigration laws, verifying immigration status, or prohibiting the "promot[ion]" of "gender ideology" or "elective abortion."

713.    By imposing new terms and conditions on the HUD Grant Agreements not included in the NOFO or authorized elsewhere, HUD failed to comply with its own regulations governing the formation of CPD grant agreements and failed to observe the procedure required by law.

714.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions violates the APA because it is contrary to HUD's own regulations and thus not in accordance with law and without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin HUD from imposing the HUD Grant Conditions without complying with the APA.

## Count 9: Administrative Procedure Act, 5 U.S.C. § 706(2) –
### Agency Action Without Procedure Required By Law
*(HUD, FTA, and FFA Grant Conditions)*

715.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

716.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

717.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990).

718.    HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants." 24 C.F.R. § 10.1 ("It is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts . . . ."); 24 C.F.R. § 10.2 (definition of "rule"); 24 C.F.R. §§ 10.7–10.10 (notice-and-comment procedures); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447, 448 (9th Cir. 1994).

RENNE PUBLIC LAW GROUP
Attorneys at Law

719.    The FTA is subject to statutory notice-and-comment requirements for certain statements pertaining to grants issued under title 49, chapter 53 of the U.S. Code (including the FTA Grants). Specifically, "[t]he Administrator of the [FTA] shall follow applicable rulemaking procedures under section 553 of title 5 before the [FTA] issues a statement that imposes a binding obligation on recipients of Federal assistance under this chapter."  49 U.S.C. § 5334(k)(1).  For this purpose, "binding obligation" means "a substantive policy statement, rule, or guidance document issued by the [FTA] that grants rights, imposes obligations, produces significant effects on private interests, or effects a significant change in existing policy.  *Id*. § 5334(k)(2).

720.    The FTA, and the FAA have also adopted regulations requiring those agencies to proceed by notice-and-comment rulemaking when they promulgate substantive rules.  *See* 49 C.F.R. §§ 601.22(a), 601.24–601.28 (FTA); 14 C.F.R. Part 11 (FAA).

721.    Through the HUD Grant Conditions, HUD has not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but also attached new conditions on HUD Grant Agreements that require grant recipients to comply with various Administration directives as a condition to receiving federal funds.  These new conditions thus comprise a substantive rule, not an interpretive rule or general statement of policy.  *See, e.g.*, *Yesler Terrace Cmty. Council*, 37 F.3d at 449 ("Substantive rules … create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (explaining that a rule is substantive, i.e., "legislative," *inter alia*, if there is no "adequate legislative basis for enforcement action" without the rule, or if the rule "effectively amends a prior legislative rule").

722.    In imposing the HUD Grant Conditions, HUD failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe the procedure required by law.

723.    Through the FTA and FAA Grant Conditions the FTA and the FAA have not just continued preexisting requirements to comply with nondiscrimination laws and the other types of conditions approved by and consistent with the relevant statutes and regulations, but attached new terms and conditions to FTA and FAA Grants that require grant recipients to comply with various

-166-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Administration directives as a condition to receiving federal transit, and airport funds, which are substantive policy statements, rules, or guidance documents that impose obligations or effect significant changes in existing policy, not interpretive rules or general statements of policy.

724.    In imposing the FTA Grant Conditions, the FTA failed to comply with the notice-and-comment requirements set forth in 49 U.S.C. § 5334(k)(1) and its own regulations, and thus failed to observe procedure required by law.

725.    In imposing the FAA Grant Conditions, the FAA failed to comply with the notice-and-comment requirements set forth in its own regulations, and thus failed to observe procedure required by law.

726.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that imposing the HUD Grant Conditions, the FTA Grant Conditions, and the FAA Grant Conditions violates the APA because it is without observance of procedure required by law; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing those Conditions without complying with the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.    A declaration that the HUD Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

B.    A preliminary and permanent injunction enjoining HUD and its program offices from imposing or enforcing the HUD Grant Conditions or any materially similar terms or conditions to any HUD application or action plans submitted by, or HUD funds received by or awarded to Plaintiffs, directly or indirectly;

C.    A declaration that the DOT Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

D.    A preliminary and permanent injunction enjoining DOT Defendants from imposing or enforcing the DOT Grant Conditions or any materially similar terms or conditions to any DOT funds received by or awarded to Plaintiffs, directly or indirectly;

RENNE PUBLIC LAW GROUP
Attorneys at Law

E.      A declaration that the HHS Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

F.      A preliminary and permanent injunction enjoining HHS from imposing or enforcing the HHS Grant Conditions or any materially similar terms or conditions to any HHS funds received by or awarded to Plaintiffs, directly or indirectly;

G.      A declaration that the EPA Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

H.      A preliminary and permanent injunction enjoining EPA from imposing or enforcing the EPA Grant Conditions or any materially similar terms or conditions to any EPA funds received by or awarded to Plaintiffs, directly or indirectly;

I.      A declaration that the DHS Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

J.      A preliminary and permanent injunction enjoining DHS Defendants from imposing or enforcing the DHS Grant Conditions or any materially similar terms or conditions to any DHS funds received by or awarded to Plaintiffs, directly or indirectly;

K.      A declaration that the DOI Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

L.      A preliminary and permanent injunction enjoining DOI from imposing or enforcing the DOI Grant Conditions or any materially similar terms or conditions to any DOI funds received by or awarded to Plaintiffs, directly or indirectly;

M.      A declaration that the DOJ Grant Conditions are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

N.      A preliminary and permanent injunction enjoining DOJ from imposing or enforcing the DOJ Grant Conditions or any materially similar terms or conditions to any DOJ funds received by or awarded to Plaintiffs, directly or indirectly;

O.      Award Plaintiffs their reasonable costs and attorneys' fees; and

P.      Grant any other further relief that the Court deems fit and proper.

RENNE PUBLIC LAW GROUP
Attorneys at Law

Dated:  December 19, 2025

RENNE PUBLIC LAW GROUP

By: _____/s/ Jonathan V. Holtzman_____
        JONATHAN V. HOLTZMAN

Attorneys for Plaintiffs
City of Fresno; City of Eureka; City of South
Lake Tahoe; County of Sacramento; County of
Monroe; Monroe County Airport Authority;
County of San Diego, County of Marin; City of
Alameda; City of Redwood City; City of Atlanta;
City of Beaverton; City of Corvallis; City of
Hillsboro; City of Mountain View; City of Salem;
City of San Mateo; City of Santa Clara; City of
Santa Cruz; City of Stockton; City of Sunnyvale;
City of Vacaville; County of Los Angeles;
County of Santa Barbara

Dated:  December 19, 2025

FRESNO CITY ATTORNEY'S OFFICE

By: _____/s/ Andrew Janz_____
        ANDREW JANZ

Attorney for Plaintiff
City of Fresno

Dated:  December 19, 2025

SAINT PAUL CITY ATTORNEY'S OFFICE

By: _____/s/ Kelsey McElveen_____
        LYNDSEY OLSON *
        KELSEY MCELVEEN *
* Appearing pro hac vice

Attorneys for Plaintiff
City of Saint Paul

Dated:  December 19, 2025

ANDERSON & KREIGER LLP

By: _____/s/ Melissa C. Allison_____
        MELISSA C. ALLISON *
        CHRISTINA S. MARSHALL *
* Appearing pro hac vice

Attorneys for Plaintiffs
County of Monroe and Monroe County Airport
Authority

Dated:  December 19, 2025

OFFICE OF THE COUNTY COUNSEL
COUNTY OF MARIN

By: _____/s/ Brian E. Washington_____
       BRIAN E. WASHINGTON
       KATE K. STANFORD

*Attorneys for Plaintiff*
County of Marin

Dated:  December 19, 2025

KREVOLIN & HORST, LLC

By: _____/s/ Allegra J. Lawrence_____
       ALLEGRA J. LAWRENCE*
       MICHELLE McCLAFFERTY*
*Application for pro hac vice forthcoming*

Attorneys for Plaintiff
City of Atlanta

Dated:  December 19, 2025

ALAMEDA CITY ATTORNEY'S OFFICE

By: _____/s/ Yibin Shen_____
       YIBIN SHEN
       CARA SILVER
       DANIEL J. TURNER

Attorneys for Plaintiff
City of Alameda

RENNE PUBLIC LAW GROUP
Attorneys at Law

**ECF ATTESTATION**

I, JONATHAN V. HOLTZMAN, am the ECF user whose identification and password are being used to file this SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Dated: December 19, 2025                                    RENNE PUBLIC LAW GROUP


By: _____*/s/ Jonathan V. Holtzman*_____
       JONATHAN V. HOLTZMAN