ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone:  (559) 621-7500
Facsimile:  (559) 457-1084
*Attorney for Plaintiff*
CITY OF FRESNO

KELSEY MCELVEEN (MN BN 0396744)*
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone: (651) 266-8710
Facsimile:  (651) 298-5619
*Attorneys for Plaintiff*
CITY OF SAINT PAUL
* *Appearing pro hac vice*

MELISSA C. ALLISON (MA BN 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL
(MA BN 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500
*Attorneys for Plaintiffs*
COUNTY OF MONROE
MONROE COUNTY AIRPORT
AUTHORITY
* *Appearing pro hac vice*

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone:  (415) 848-7200
Facsimile:  (415) 848-7230
*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF EUREKA; CITY OF
SOUTH LAKE TAHOE; COUNTY OF
SACRAMENTO; COUNTY OF MONROE;
MONROE COUNTY AIRPORT AUTHORITY;
COUNTY OF SAN DIEGO, COUNTY OF MARIN;
CITY OF ALAMEDA; CITY OF REDWOOD
CITY; CITY OF ATLANTA; CITY OF
BEAVERTON; CITY OF CORVALLIS; CITY OF
HILLSBORO; CITY OF MOUNTAIN VIEW; CITY
OF SALEM; CITY OF SAN MATEO; CITY OF
SANTA CLARA; CITY OF SANTA CRUZ; CITY
OF STOCKTON; CITY OF SUNNYVALE; CITY
OF VACAVILLE; COUNTY OF LOS ANGELES;
COUNTY OF SANTA BARBARA

BRIAN E. WASHINGTON (SBN 146807)
Marin County Counsel
KATE K. STANFORD (SBN 302825)
Deputy County Counsel
kate.stanford@marincounty.gov
EDWARD F. SEARS (SBN 297775)
Deputy County Counsel
ned.sears@marincounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF MARIN
3501 Civic Center Drive, Room 275
San Rafael, CA 94903
Telephone:  (415) 473-6117
Facsimile:  (415) 473-3796
*Attorneys for Plaintiff*
COUNTY OF MARIN

RENNE PUBLIC LAW GROUP
Attorneys at Law

ALLEGRA J. LAWRENCE
(GA BN 439797)**
lawrence@khlawfirm.com
MICHELLE McCLAFFERTY
(ASB-0880-N10I)**
McClafferty@khlawfirm.com
KREVOLIN & HORST, LLC
1201 West Peachtree St., Suite 3500
Atlanta, GA 30309
Telephone: (404) 400-3350
*Attorneys for Plaintiff*
CITY OF ATLANTA
**Application for pro hac vice forthcoming*

YIBIN SHEN (SBN 233545)
Alameda City Attorney
yshen@alamedaca.gov
CARA SILVER (SBN 136992)
Special Counsel
csilver@alamedaca.gov
DANIEL J. TURNER (SBN 336499)
Deputy City Attorney
dturner@alamedaca.gov
2263 Santa Clara Avenue, Rm 280
Alameda, CA 94501
Telephone: (510) 747-4750
*Attorneys for Plaintiff*
CITY OF ALAMEDA

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO et al.,<br><br>   Plaintiffs,<br><br>v.<br><br>SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development et al.,<br><br>   Defendants. | Case No.: 3:25-cv-07070-RS<br><br>**DECLARATION OF SOLOMON CAVINESS, IV IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Complaint Filed: August 20, 2025<br>FAC Filed: September 8, 2025<br>SAC Filed: February 9, 2026<br><br>Hon. Richard Seeborg |

RENNE PUBLIC LAW GROUP
Attorneys at Law

1.     My name is Solomon Caviness, IV. I am over the age of eighteen and competent to testify to the matters set forth herein.

2.     I currently serve as the Commissioner of the City of Atlanta Department of Transportation ("ATLDOT").

3.     The facts and information set out in this Declaration are based on my personal and professional knowledge, conversations I have had with relevant ATLDOT staff, and a review of documents in the possession of ATLDOT. I have personal knowledge of the facts and information incorporated in this Declaration and, if called to testify, would testify to these facts.

-1-

4.    This Declaration is offered in support of Plaintiffs' Motion for a Preliminary Injunction.

5.    It is the Commissioner's responsibility to oversee all aspects of the public right of way within the jurisdiction of the City of Atlanta, including but not limited to traffic management and bridge, street, and sidewalk construction within the right of way. In my position, I lead a workforce of over 150 public servants responsible for 95,000 street signs, 1,100 traffic signals, 1,400 miles of sidewalks, 155 bridges, and 4,500 lane miles throughout the City of Atlanta.

6.    I have over twenty years' experience as a transportation professional. Immediately prior to joining the City of Atlanta, I led the Middlesex County New Jersey Department of Transportation. My responsibilities included overseeing the County's Office of Engineering, Planning, Public Works, and the Middlesex County Area Transit service.

7.    I received my undergraduate degree from North Carolina Agricultural and Technical State University and my Master of Science in Civil Engineering from the University of Tennessee. I also hold an MBA from the Stern School of Business at New York University.

8.    Throughout my career as a transportation professional, I have worked with all aspects of the federal grant process including applying for funding, monitoring compliance with funding conditions, and ensuring timely completion.

BACKGROUND OF FEDERAL GRANTS

9.    Transportation projects are complex and often take years of planning before construction begins. Projects are typically identified, developed, and funded over several years, or even decades, and involve close coordination by partners at the local, state, and federal levels.

10.    As part of the funding of the ATLDOT construction and management of the public right of way, the City pursues federal grant funding. As part of my leadership role with ATLDOT, I have knowledge of federal competitive grants, formula funds, and cooperative agreements awarded to the City of Atlanta, including grants from the United States Department of Transportation ("U.S. DOT").

11.    Some the grants that ATLDOT receives are received directly from U.S. DOT and others are grants for which ATLDOT may be a subrecipient and receive funding from the direct grantee – which is typically the State of Georgia or the Atlanta Regional Commission.

12.    The U.S. DOT awards grants through the Federal Transportation Administration (FTA),

-2-

RENNE PUBLIC LAW GROUP
Attorneys at Law

the Federal Highway Administration (FHWA), and the Federal Railroad Administration (FRA), among others.

13.    The City of Atlanta is an applicant for and recipient of millions of dollars in federal funds, including both entitlement funding and discretionary funding, for a variety of transportation-related projects throughout the City. The funding that ATLDOT receives is exclusive of any federal funds designated for the Atlanta Hartsfield-Jackson International Airport and exclusive of any funds designated for Atlanta's public transit system (Metropolitan Atlanta Transportation Authority – MARTA).

<u>SIGNIFICANCE OF FEDERAL FUNDING TO ATLDOT TRANSPORTATION PROJECTS</u>

14.    Federal funds are essential to advance significant capital improvements to bridges, roads, public spaces, and sidewalks throughout the City. Separate federal programs enable the ATLDOT to keep existing infrastructure in a good state of repair, provide greater access to alternative modes of transportation, and improve pedestrian access and vehicle safety. Funding decisions are often made after there has been back and forth between the governmental partners and practical impediments are identified and assessed.

15.    Federal grants are anticipated throughout the planning process and ATLDOT relies on approvals of grants in all aspects of transportation planning and project execution.

<u>STANDARD REQUIREMENTS FOR GRANT APPLICATIONS AND AWARDS</u>

16.    The City of Atlanta is required to renew its Federal Transit Authority Certifications and Assurances annually. The FY 2025 FTA Certifications and Assurances were published after Executive Order 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) was published.

17.    The FY 2025 FTA Certifications and Assurances include as a standard condition that the application "[w]ill comply with all applicable requirements of all . . . executive orders . . . governing the program under which it is applying for assistance." (FY 2025 FTA Certifications and Assurances, Section 1.1. Standard Assurances, subpart (r). **Exhibit A** is a true and correct copy of the FY 2025 FTA Conditions and Assurances.

18.    In addition to the requirement in the FTA Certifications and Assurances that all grant applicants will comply with all Executive Orders, on April 24, 2025, Sean Duffy, Secretary of the United

-3-

RENNE PUBLIC LAW GROUP
Attorneys at Law

States Department of Transportation, issued a letter addressed to "All Recipients of U.S. Department of Transportation Funding." **Exhibit B** is a true and correct copy of the April 24, 2025, letter from Secretary Duffy.

19. In his letter, Secretary Duffy said he was writing to "clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal laws and the terms of [the] financial agreements."

20. The letter stated it was DOT's "policy" to impose immigration enforcement and anti-DEI conditions as requirements for receiving funding and explained that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called 'diversity, equity, and inclusion,' or 'DEI' goals, presumptively violates Federal law."

21. The Duffy letter also declared that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law."

22. Significantly, the Duffy letter warned that DOT would "vigorous[ly] enforce[]" compliance, including through "comprehensive audits, claw-back of grant funds, and termination of grant awards," as well as potential "enforcement actions and loss of any future federal funding from DOT."

23. The DOT and its operating administrations including the Federal Highway Administration, the Federal Transit Administration, and the Federal Railway Administration, have incorporated the conditions outlined in the Duffy letter into their General Terms and Conditions that are applicable to all federal grants and grant recipients.

   a. The FTA updated its Master Agreement on April 25, 2025, to incorporate the anti-DEI provisions. A true and correct copy of the Master Agreement is attached as **Exhibit C**.

   b. The FHWA imposed similar conditions for all of its grants and, in the case of some Safe Streets for All grants, made the General Terms and Conditions retroactive for 2022 and 2023. A true and correct copy is attached as **Exhibit D**.

   c. The Federal Railroad Administration ("FRA") has incorporated the same

-4-

RENNE PUBLIC LAW GROUP
Attorneys at Law

conditions in its Grant Agreements. A true and correct copy of Grant Agreement 69A36525421580RCEGA is attached as **Exhibit E**.

PROJECTS IMPACTED BY THE UNAVAILABILITY OF FEDERAL FUNDS

24.     The City of Atlanta has received or will receive millions of dollars in federal grants that may now be subject to the revised Terms and Conditions, including over $68 million in competitive U.S. DOT grants; approximately $41 million from FHWA; $26 million from the FTA that includes previously awarded STBG (Surface Transportation Block Grant) funds that the City intended to flex to FTA managed grants; and $1,200,000 from the FRA.

25.     Currently, the City of Atlanta receives federal STBG funding. These are grants that localities, like Atlanta, may use "to preserve and improve the conditions and performance on any Federal-aid highway, bridge and tunnel projects on any public road, pedestrian and bicycle infrastructure, and transit capital projects, including intercity bus terminals." Funds for the program are apportioned in accordance with a formula. See https://www.fhwa.dot.gov/specialfunding/stp/.

26.     Current grants include the FHWA to FTA flex fund transfer pursuant to FTA Section 5307. The projects involved include:

a.     2879-2022-1 5307 Lee Street Trail - Pedestrian Mobility Improvements STBG Urban - City of Atlanta: Lee Street Trail FLEX to FTA: $6,517,040.00 (originally FY2017) The proposed trail will run along the east side of Lee Street and reconfigure Lee Street from five to four travel lanes with turn lanes at signalized intersections. The trail cross sections will vary based upon available right-of-way and agreements with CSX, and Norfolk Southern railroads and MARTA. The ideal trail width is 12 feet wide and where space permits, includes a landscaped buffer protecting trail users from vehicle lanes. **Exhibit F** is a true and correct copy of the Grant Application.

b.     2879-2018-1 City of Atlanta Pedestrian Accessibility Improvements - FFY 2015 & 2016 Transportation Alternatives (Section 133(h)) Urban. This project will improve pedestrian accessibility by the installation of rectangular rapid flashing beacons (RRFBs), pedestrian hybrid beacons (PHB)/HAWK signals, signal upgrades, pedestrian refuge islands, curb extensions, construction of spot upgrades, ADA improvements and sidewalks where appropriate across the

RENNE PUBLIC LAW GROUP
Attorneys at Law

-5-

City of Atlanta. Specific locations are provided in the detailed location descriptions. FEDERAL FUNDING $5,880,000. **Exhibit G** is a true and correct copy of the Grant Application.

27.     There are also approved projects for which the City has already-underway projects. These projects include:

a.     GA-2017-027-00 (Bike-Ped Mobility Improvements Program - FFY 2014 & 2015 $4,000,000) **Exhibit H** is a true and correct copy of the Award;

b.     GA -2017-007-01 (MOORES MILL RD MULTI MODAL IMPROVEMENTS AND TRANSIT LAYOVER FACILITY FUND $1,640,000) **Exhibit I** is a true and correct copy of the Award;

c.     GA-2018-004-00 (Atlanta Streetcar Downtown Crosstown Extension $1,600,000) **Exhibit J i**s a true and correct copy of the Award;

d.     GA-95-X035 (Transit and mobility improvements $7,843,177.00) **Exhibit K** is a true and correct copy of the Award; and

e.     GA-2020-023-00 (Boulevard Pedestrian Mobility Improvements – STP Urban; City of Atlanta, GA $1,000,000) **Exhibit L** is a true and correct copy of the Award.

28.     The City has also been awarded the following competitive grants available from the U.S. Department of Transportation:

a.     FHWA RAISE Grant AWARD.  Westside Park Multimodal Access Project.  Notice of Award in 2024.  $16,000,000.  RAISE stands for Rebuilding American Infrastructure with Sustainability and Equity. On June 27, 2024, the City was notified it was awarded this grant for The Westside Park Multimodal Access Project, also known as Westside Thrive, a project located on Atlanta's Westside that will implement transportation improvements that increase safety along five important commuter routes for people and freight. Specifically, the project will allow for the planning and development of intersection improvements and lighting and stormwater updates on the City's upper westside, a part of the City that is integral to the City's efforts to provide better vehicle and pedestrian access to Atlanta neighborhoods, major employment hubs, and essential services.  **Exhibit M** is a true and correct copy of the proposed Grant Agreement.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-6-

CAVINESS DEC ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:25-cv-07070-RS

b.      FHWA FY2023 RAISE Grant Federal Funds $25,000,000. Atlanta Beltline Northeast trail.  The City, along with Atlanta Beltline, Inc., is a subrecipient of this $25 million grant that was awarded June 23, 2023. The Atlanta Beltline is a citywide project to connect forty-five historically separate neighborhoods with a loop of trails, parks, and future light rail. The project has already revitalized communities and spurred job creation. The RAISE grant was intended to construct Segment 3 and Connector Trails 1-4 of the Atlanta Beltline Northeast Trail. Construction includes ADA-accessible ramps, crosswalks, signage, lights and security cameras, environmental remediation, utility relocations, stormwater infrastructure, retaining walls, new bridge structures, and landscaping.

i.      For this project, the City of Atlanta is a subrecipient of the Georgia Department of Transportation. As a subrecipient, the City of Atlanta is a party to the Grant Agreement. See **Exhibit N**, a true and correct copy of the Grant Agreement Under the FY 2023 RAISE Program.

ii.      As set out in Art. 1.1(a) of the Grant Agreement, the Agreement incorporates General Terms and Conditions, which are available at https://www.transportation.gov/BUILDgrants/grant-agreements. **Exhibit O** is a true and correct copy of the General Terms and Conditions as of November 4, 2025.

iii.      The General Terms and Conditions, at Article 21.2, provide as follows:

1.      (a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

2.      (b) Pursuant to Executive Order 14173, Ending Illegal

-7-

RENNE PUBLIC LAW GROUP
Attorneys at Law

Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

3.    (c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

iv.    The City of Atlanta is unable and unwilling to agree to the General Terms and Conditions set out in Article 21.2.

c.    FRA RCE Agreement: $1,200,000.00.  Award from the Federal Railroad Administration to study the feasibility of railroad crossing elimination across the City. A true and correct copy of the Grant Agreement for this project is attached as **Exhibit P.** Attached to the Grant Agreement is the document General Terms and Conditions that incorporates, at Article 20.2, the requirement of cooperation with ICE and the anti-DEI requirements. The City received notice of the award of the RCE grant on January 10, 2025. After the City had applied for the grant and received the notice of the award, the terms and conditions were modified to include Article 20.2.

d.    The Infrastructure Investment and Jobs Act established the Reconnecting Communities Pilot (RCP) Program to advance community-centered transportation connection projects, that prioritized projects that benefit low-capacity communities. FHWA awarded Atlanta a FY2024 RCP planning grant in the amount of $2,000,000 to complete 80% of the design, engineering, and NEPA for the Centennial Yards Complete Streets project. The project is a 2.34-acre, nonmotorized, active pedestrian-bicycle bridge and park. The RCP Grant awards now incorporate the FHWA competitive grant General Terms and Conditions. **Exhibit Q** is a true and correct copy of the RCP Terms and Conditions.

RENNE PUBLIC LAW GROUP
Attorneys at Law

-8-

CAVINESS DEC ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:25-cv-07070-RS

## THE CONSEQUENCES OF LOSING THE FEDERAL FUNDS

29.    The City of Atlanta is hardly alone as a major metropolitan area struggling to maintain a balanced budget while provide critical services to its residents. Federal funding is crucial to the City's ability to provide services and maintain a safe environment for the public traveling through, visiting, and living and working in the City.

In accordance with 28 U.S.C. Section 1746, I declare that the foregoing is true and correct.

Executed at ___, on February __, 2026.
2/26/2026

DocuSigned by:

Solomon Caviness, IV
CCCF5AE172DF47A...

Solomon Caviness, IV
Commissioner of the City of Atlanta
Department of Transportation

RENNE PUBLIC LAW GROUP
Attorneys at Law

-9-

# EXHIBIT A

Certifications and Assurances                                      Fiscal Year 2025

> *Not every provision of every certification will apply to every applicant or award. If a provision of a certification does not apply to the applicant or its award, FTA will not enforce that provision.*
>
> *Text in italic is not part of a certification and is of no legal effect. Its purpose is to provide explanation and context for the certification.*

## CATEGORY 1. CERTIFICATIONS AND ASSURANCES REQUIRED OF EVERY APPLICANT.

*All applicants must make the certifications in this category.*

### 1.1.  Standard Assurances.

*The certifications in this subcategory appear as part of the applicant's registration or annual registration renewal in the System for Award Management (SAM.gov) and on the Office of Management and Budget's standard form 424B "Assurances—Non-Construction Programs". This certification has been modified in places to include analogous certifications required by U.S. DOT statutes or regulations.*

As the duly authorized representative of the applicant, you certify that the applicant:

(a)     Has the legal authority to apply for Federal assistance and the institutional, managerial and financial capability (including funds sufficient to pay the non-Federal share of project cost) to ensure proper planning, management and completion of the project described in this application.

(b)     Will give the awarding agency, the Comptroller General of the United States and, if appropriate, the State, through any authorized representative, access to and the right to examine all records, books, papers, or documents related to the award; and will establish a proper accounting system in accordance with generally accepted accounting standards or agency directives.

(c)     Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain.

(d)     Will initiate and complete the work within the applicable time frame after receipt of approval of the awarding agency.

(e)     Will comply with the Intergovernmental Personnel Act of 1970 (42 U.S.C. §§ 4728–4763) relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration (5 CFR 900, Subpart F).

(f)     Will comply with all Federal statutes relating to nondiscrimination. These include but are not limited to:

Certifications and Assurances                                    Fiscal Year 2025

(1)   Title VI of the Civil Rights Act of 1964 (P.L. 88-352) which prohibits discrimination on the basis of race, color or national origin, as effectuated by U.S. DOT regulation 49 CFR Part 21, including any amendments thereto;

(2)   Title IX of the Education Amendments of 1972, as amended (20 U.S.C. §§ 1681–1683, and 1685–1686), which prohibits discrimination on the basis of sex, as effectuated by U.S. DOT regulation 49 CFR Part 25;

(3)   Section 5332 of the Federal Transit Law (49 U.S.C. § 5332), which prohibits any person being excluded from participating in, denied a benefit of, or discriminated against under, a project, program, or activity receiving financial assistance from FTA because of race, color, religion, national origin, sex, disability, or age.

(4)   Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794), which prohibits discrimination on the basis of handicaps, as effectuated by U.S. DOT regulation 49 CFR Part 27;

(5)   The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101–6107), which prohibits discrimination on the basis of age;

(6)   The Drug Abuse Office and Treatment Act of 1972 (P.L. 92-255), as amended, relating to nondiscrimination on the basis of drug abuse;

(7)   The comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 (P.L. 91–616), as amended, relating to nondiscrimination on the basis of alcohol abuse or alcoholism;

(8)   Sections 523 and 527 of the Public Health Service Act of 1912 (42 U.S.C. §§ 290 dd-3 and 290 ee-3), as amended, relating to confidentiality of alcohol and drug abuse patient records;

(9)   Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§ 3601 et seq.), as amended, relating to nondiscrimination in the sale, rental, or financing of housing;

(10)  Any other nondiscrimination provisions in the specific statute(s) under which application for Federal assistance is being made; and,

(11)  the requirements of any other nondiscrimination statute(s) which may apply to the application.

(g)   Will comply, or has already complied, with the requirements of Titles II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Uniform Act") (P.L. 91-646) which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal or federally-assisted programs. These requirements apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases. The requirements of the Uniform Act are effectuated by U.S. DOT regulation 49 CFR Part 24.

(h)   Will comply, as applicable, with provisions of the Hatch Act (5 U.S.C. §§ 1501–1508 and 7324–7328) which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

Certifications and Assurances                                            Fiscal Year 2025

(i)    Will comply, as applicable, with the provisions of the Davis–Bacon Act (40 U.S.C. §§ 276a to 276a-7), the Copeland Act (40 U.S.C. § 276c and 18 U.S.C. § 874), and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§ 327–333), regarding labor standards for federally assisted construction sub-agreements.

(j)    Will comply, if applicable, with flood insurance purchase requirements of Section 102(a) of the Flood Disaster Protection Act of 1973 (P.L. 93-234) which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

(k)    Will comply with environmental standards which may be prescribed pursuant to the following:

    (1)    Institution of environmental quality control measures under the National Environmental Policy Act of 1969 (P.L. 91-190) and Executive Order (EO) 11514;

    (2)    Notification of violating facilities pursuant to EO 11738;

    (3)    Protection of wetlands pursuant to EO 11990;

    (4)    Evaluation of flood hazards in floodplains in accordance with EO 11988;

    (5)    Assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972 (16 U.S.C. §§ 1451 et seq.);

    (6)    Conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176(c) of the Clean Air Act of 1955, as amended (42 U.S.C. §§ 7401 et seq.);

    (7)    Protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended (P.L. 93-523); and

    (8)    Protection of endangered species under the Endangered Species Act of 1973, as amended (P.L. 93–205).

(l)    Will comply with the Wild and Scenic Rivers Act of 1968 (16 U.S.C. §§ 1271 et seq.) related to protecting components or potential components of the national wild and scenic rivers system.

(m)    Will assist the awarding agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. § 470), EO 11593 (identification and protection of historic properties), and the Archaeological and Historic Preservation Act of 1974 (16 U.S.C. §§ 469a-1 et seq.).

(n)    Will comply with P.L. 93-348 regarding the protection of human subjects involved in research, development, and related activities supported by this award of assistance.

(o)    Will comply with the Laboratory Animal Welfare Act of 1966 (P.L. 89-544, as amended, 7 U.S.C. §§ 2131 et seq.) pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this award of assistance.

(p)     Will comply with the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. §§ 4801 et seq.) which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

(q)     Will cause to be performed the required financial and compliance audits in accordance with the Single Audit Act Amendments of 1996 and 2 CFR Part 200, Subpart F, "Audit Requirements", as adopted and implemented by U.S. DOT at 2 CFR Part 1201.

(r)     Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing the program under which it is applying for assistance.

(s)     Will comply with the requirements of Section 106(g) of the Trafficking Victims Protection Act (TVPA) of 2000, as amended (22 U.S.C. § 7104) which prohibits grant award recipients or a subrecipient from:

(1)     Engaging in severe forms of trafficking in persons during the period of time that the award is in effect;

(2)     Procuring a commercial sex act during the period of time that the award is in effect; or

(3)     Using forced labor in the performance of the award or subawards under the award.

## 1.2.    Standard Assurances: Additional Assurances for Construction Projects.

*This certification appears on the Office of Management and Budget's standard form 424D "Assurances—Construction Programs" and applies specifically to federally assisted projects for construction. This certification has been modified in places to include analogous certifications required by U.S. DOT statutes or regulations.*

As the duly authorized representative of the applicant, you certify that the applicant:

(a)     Will not dispose of, modify the use of, or change the terms of the real property title or other interest in the site and facilities without permission and instructions from the awarding agency; will record the Federal awarding agency directives; and will include a covenant in the title of real property acquired in whole or in part with Federal assistance funds to assure nondiscrimination during the useful life of the project.

(b)     Will comply with the requirements of the assistance awarding agency with regard to the drafting, review, and approval of construction plans and specifications.

(c)     Will provide and maintain competent and adequate engineering supervision at the construction site to ensure that the complete work confirms with the approved plans and specifications, and will furnish progressive reports and such other information as may be required by the assistance awarding agency or State.

Certifications and Assurances                                        Fiscal Year 2025

### 1.3.  Procurement.

*The Uniform Administrative Requirements, 2 CFR § 200.325, allow a recipient to self-certify that its procurement system complies with Federal requirements, in lieu of submitting to certain pre-procurement reviews.*

The applicant certifies that its procurement system complies with:

(a)     U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, which incorporates by reference U.S. OMB regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200, particularly 2 CFR §§ 200.317–200.327 "Procurement Standards;

(b)     Federal laws, regulations, and requirements applicable to FTA procurements; and

(c)     The latest edition of FTA Circular 4220.1 and other applicable Federal guidance.

### 1.4.  Increased Micro-Purchase Threshold.

*A recipient may establish a micro-purchase threshold that is higher than the Federal micro-purchase threshold. Pursuant to 2 CFR § 200.320(a)(1)(iv), the recipient may self-certify a micro-purchase threshold up to $50,000. Pursuant to 2 CFR § 200.320(a)(1)(v), the recipient may set a micro-purchase threshold higher than $50,000, but only with the approval of the recipient's Federal cognizant agency for indirect costs. To determine an applicant's cognizant agency for indirect costs, consult the definition of "cognizant agency for indirect costs" in 2 CFR § 200.1.*

If the recipient uses a micro-purchase threshold that is higher than the Federal micro-purchase threshold, the recipient certifies:

(a)     The recipient's micro-purchase threshold does not exceed $50,000, or the recipient has approval from its Federal cognizant agency for indirect costs to use a higher micro-purchase threshold;

(b)     The recipient has a written justification for its micro-purchase threshold; and

(c)     The recipient has supporting documentation of any of the following:
 (1)     The recipient qualifies as a low-risk auditee, in accordance with the criteria in 2 CFR § 200.520 for the most recent audit;
 (2)     The recipient has an annual internal institutional risk assessment to identify, mitigate, and manage financial risks; or
 (3)     For public institutions, a higher threshold is consistent with State law.

### 1.5.  Suspension and Debarment.

*Pursuant to Executive Order 12549, as implemented at 2 CFR Parts 180 and 1200, prior to entering into a covered transaction with an applicant, FTA must determine whether the applicant is excluded from participating in covered non-procurement transactions. For this purpose, FTA is authorized to collect a certification from each applicant regarding the applicant's exclusion status. 2 CFR § 180.300. Additionally, each applicant must disclose any information required by 2 CFR § 180.335 about the applicant and the applicant's principals prior to entering into an award agreement with FTA. This certification serves both purposes.*

The applicant certifies, to the best of its knowledge and belief, that the applicant and each of its principals:

(a)    Is not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily or involuntarily excluded from covered transactions by any Federal department or agency;

(b)    Has not, within the preceding three years, been convicted of or had a civil judgment rendered against him or her for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public or private agreement or transaction; violation of Federal or State antitrust statutes, including those proscribing price fixing between competitors, allocation of customers between competitors, and bid rigging; commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, receiving stolen property, making false claims, or obstruction of justice; or commission of any other offense indicating a lack of business integrity or business honesty;

(c)    Is not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any offense described in paragraph (b) of this certification; and

(d)    Has not, within the preceding three years, had one or more public transactions (Federal, State, or local) terminated for cause or default.

### 1.6.  Lobbying.

*If the applicant will apply for a grant or cooperative agreement exceeding $100,000, or a loan, line of credit, loan guarantee, or loan insurance exceeding $150,000, it must make the following certification and, if applicable, make a disclosure regarding the applicant's lobbying activities. This certification is required by 49 CFR § 20.110 and app. A to that part.*

*This certification does not apply to an applicant that is an Indian Tribe, Indian organization, or an Indian tribal organization exempt from the requirements of 49 CFR Part 20.*

Certifications and Assurances                                    Fiscal Year 2025

### 1.6.1.  Certification for Contracts, Grants, Loans, and Cooperative Agreements.

The undersigned certifies, to the best of his or her knowledge and belief, that:

(a)     No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(b)     If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(c)     The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

### 1.6.2.  Statement for Loan Guarantees and Loan Insurance.

The undersigned states, to the best of his or her knowledge and belief, that:

If any funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this commitment providing for the United States to insure or guarantee a loan, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

Submission of this statement is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required statement

shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

### 1.7. Real Property Use

*This certification responds to Recommendation #7 in the U.S. Department of Transportation's Office of Inspector General Report FS2024025 (May 20, 2024).*

If the applicant will use assistance provided by the Federal Transit Administration to acquire or improve real property, the applicant certifies that it will comply with the requirements of 2 CFR § 200.311, including but not limited to, requirements to use the property for the purposes authorized in its award, and to seek disposition instructions from FTA when the property no longer is needed for any authorized purpose.

### CATEGORY 2. PUBLIC TRANSPORTATION AGENCY SAFETY PLANS

*This certification is required of each applicant under the Urbanized Area Formula Grants Program (49 U.S.C. § 5307), each rail operator that is subject to FTA's state safety oversight programs, and each State that is required to draft and certify a Public Transportation Agency Safety Plan on behalf of a Small Public Transportation Provider (as that term is defined at 49 CFR § 673.5) pursuant to 49 CFR § 673.11(d).*

*This certification is required by 49 U.S.C. § 5307(c)(1)(L), 49 U.S.C. § 5329(d)(1), and 49 CFR § 673.13. This certification is a condition of receipt of Urbanized Area Formula Grants Program (49 U.S.C. § 5307) funding.*

*This certification does not apply to any applicant that only receives financial assistance from FTA under the Formula Grants for the Enhanced Mobility of Seniors Program (49 U.S.C. § 5310), the Formula Grants for Rural Areas Program (49 U.S.C. § 5311), or combination of these two programs, unless it operates a rail fixed guideway public transportation system.*

If the applicant is an operator, the applicant certifies that it has established a Public Transportation Agency Safety Plan meeting the requirements of 49 U.S.C. § 5329(d)(1) and 49 CFR Part 673; including, specifically, that the board of directors (or equivalent entity) of the applicant has approved, or, in the case of an applicant that will apply for assistance under 49 U.S.C. § 5307 that is serving an urbanized area with a population of 200,000 or more, the safety committee of the entity established under 49 U.S.C. § 5329(d)(5), followed by the board of directors (or equivalent entity) of the applicant has approved, the Public Transportation Agency Safety Plan or any updates thereto; and, for each recipient serving an urbanized area with a population of fewer than 200,000, that the Public Transportation Agency Safety Plan has been developed in cooperation with frontline employee representatives.

Certifications and Assurances                                    Fiscal Year 2025

If the applicant is a State that drafts and certifies a Public Transportation Agency Safety Plan on behalf of a public transportation operator, the applicant certifies that:

(a) It has drafted and certified a Public Transportation Agency Safety Plan meeting the requirements of 49 U.S.C. § 5329(d)(1) and 49 CFR Part 673 for each Small Public Transportation Provider (as that term is defined at 49 CFR § 673.5) in the State, unless the Small Public Transportation Provider provided notification to the State that it was opting out of the State-drafted plan and drafting its own Public Transportation Agency Safety Plan; and

(b) Each Small Public Transportation Provider within the State that opts to use a State-drafted Public Transportation Agency Safety Plan has a plan that has been approved by the provider's Accountable Executive (as that term is defined at 49 CFR § 673.5), Board of Directors or Equivalent Authority (as that term is defined at 49 CFR § 673.5), and, if the Small Public Transportation Provider serves an urbanized area with a population of 200,000 or more, the safety committee of the Small Public Transportation Provider established under 49 U.S.C. § 5329(d)(5).

### CATEGORY 3. TAX LIABILITY AND FELONY CONVICTIONS.

*If the applicant is a business association (regardless of for-profit, not for-profit, or tax-exempt status), it must make this certification. Federal appropriations acts since at least 2014 have prohibited FTA from using funds to enter into an agreement with any corporation that has unpaid Federal tax liabilities or recent felony convictions without first considering the corporation for debarment. E.g., Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. B, tit. VII, §§ 744-745. U.S. DOT Order 4200.6 defines a "corporation" as "any private corporation, partnership, trust, joint-stock company, sole proprietorship, or other business association", and applies the restriction to all tiers of subawards. As prescribed by U.S. DOT Order 4200.6, FTA requires each business association applicant to certify as to its tax and felony status.*

If the applicant is a private corporation, partnership, trust, joint-stock company, sole proprietorship, or other business association, the applicant certifies that:

(a)     It has no unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and

(b)     It has not been convicted of a felony criminal violation under any Federal law within the preceding 24 months.

9

## CATEGORY 4. PRIVATE SECTOR PROTECTIONS.

*If the applicant will apply for funds that it will use to acquire or operate public transportation facilities or equipment, the applicant must make the following certification regarding protections for the private sector.*

### 4.1.  Charter Service Agreement.

*To enforce the provisions of 49 U.S.C. § 5323(d), FTA's charter service regulation requires each applicant seeking assistance from FTA for the purpose of acquiring or operating any public transportation equipment or facilities to make the following Charter Service Agreement. 49 CFR § 604.4.*

The applicant agrees that it, and each of its subrecipients, and thirdparty contractors at any level who use FTA-funded vehicles, may provide charter service using equipment or facilities acquired with Federal assistance authorized under the Federal Transit Laws only in compliance with the regulations set out in 49 CFR Part 604, the terms and conditions of which are incorporated herein by reference.

### 4.2.  School Bus Agreement.

*To enforce the provisions of 49 U.S.C. § 5323(f), FTA's school bus regulation requires each applicant seeking assistance from FTA for the purpose of acquiring or operating any public transportation equipment or facilities to make the following agreement regarding the provision of school bus services. 49 CFR § 605.15.*

(a)     If the applicant is not authorized by the FTA Administrator under 49 CFR § 605.11 to engage in school bus operations, the applicant agrees and certifies as follows:
   (1)     The applicant and any operator of project equipment agrees that it will not engage in school bus operations in competition with private school bus operators.
   (2)     The applicant agrees that it will not engage in any practice which constitutes a means of avoiding the requirements of this agreement, part 605 of the Federal Mass Transit Regulations, or section 164(b) of the Federal-Aid Highway Act of 1973 (49 U.S.C. 1602a(b)).
(b)     If the applicant is authorized or obtains authorization from the FTA Administrator to engage in school bus operations under 49 CFR § 605.11, the applicant agrees as follows:
   (1)     The applicant agrees that neither it nor any operator of project equipment will engage in school bus operations in competition with private school bus operators except as provided herein.
   (2)     The applicant, or any operator of project equipment, agrees to promptly notify the FTA Administrator of any changes in its operations which might jeopardize the continuation of an exemption under § 605.11.

(3)    The applicant agrees that it will not engage in any practice which constitutes a means of avoiding the requirements of this agreement, part 605 of the Federal Transit Administration regulations or section 164(b) of the Federal-Aid Highway Act of 1973 (49 U.S.C. 1602a(b)).

(4)    The applicant agrees that the project facilities and equipment shall be used for the provision of mass transportation services within its urban area and that any other use of project facilities and equipment will be incidental to and shall not interfere with the use of such facilities and equipment in mass transportation service to the public.

## CATEGORY 5. TRANSIT ASSET MANAGEMENT PLAN.

*If the applicant owns, operates, or manages capital assets used to provide public transportation, the following certification is required by 49 U.S.C. § 5326(a).*

The applicant certifies that it is in compliance with 49 CFR Part 625.

## CATEGORY 6. ROLLING STOCK BUY AMERICA REVIEWS AND BUS TESTING.

### 6.1.  Rolling Stock Buy America Reviews.

*If the applicant will apply for an award to acquire rolling stock for use in revenue service, it must make this certification. This certification is required by 49 CFR § 663.7.*

The applicant certifies that it will conduct or cause to be conducted the pre-award and post-delivery audits prescribed by 49 CFR Part 663 and will maintain on file the certifications required by Subparts B, C, and D of 49 CFR Part 663.

### 6.2.  Bus Testing.

*If the applicant will apply for funds for the purchase or lease of any new bus model, or any bus model with a major change in configuration or components, the applicant must make this certification. This certification is required by 49 CFR § 665.7.*

The applicant certifies that the bus was tested at the Bus Testing Facility established in accordance with 49 U.S.C. § 5318 (currently the Larson Transportation Institute's Bus Research and Testing Center at Pennsylvania State University) and that the bus received a passing test score as required by 49 CFR Part 665. The applicant has received or will receive the appropriate full Bus Testing Report and any applicable partial testing reports before final acceptance of the first vehicle.

11

## CATEGORY 7. URBANIZED AREA FORMULA GRANTS PROGRAM.

*If the applicant will apply for an award under the Urbanized Area Formula Grants Program (49 U.S.C. § 5307), or any other program or award that is subject to the requirements of 49 U.S.C. § 5307, including the Formula Grants for the Enhanced Mobility of Seniors Program (49 U.S.C. § 5310); "flex funds" from infrastructure programs administered by the Federal Highways Administration (see 49 U.S.C. § 5334(i)); projects that will receive an award authorized by the Transportation Infrastructure Finance and Innovation Act ("TIFIA") (23 U.S.C. §§ 601–609) or State Infrastructure Bank Program (23 U.S.C. § 610) (see 49 U.S.C. § 5323(o)); formula awards or competitive awards to urbanized areas under the Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339(a) and (b)); or low or no emission awards to any area under the Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339(c)), the applicant must make the following certification. This certification is required by 49 U.S.C. § 5307(c)(1).*

The applicant certifies that it:

(a)     Has or will have the legal, financial, and technical capacity to carry out the program of projects (developed pursuant 49 U.S.C. § 5307(b)), including safety and security aspects of the program;

(b)     Has or will have satisfactory continuing control over the use of equipment and facilities;

(c)     Will maintain equipment and facilities in accordance with the applicant's transit asset management plan;

(d)     Will ensure that, during non-peak hours for transportation using or involving a facility or equipment of a project financed under this section, a fare that is not more than 50 percent of the peak hour fare will be charged for any—

    (1)     Senior;

    (2)     Individual who, because of illness, injury, age, congenital malfunction, or any other incapacity or temporary or permanent disability (including an individual who is a wheelchair user or has semi-ambulatory capability), cannot use a public transportation service or a public transportation facility effectively without special facilities, planning, or design; and

    (3)     Individual presenting a Medicare card issued to that individual under title II or XVIII of the Social Security Act (42 U.S.C. §§ 401 et seq., and 1395 et seq.);

(e)     In carrying out a procurement under 49 U.S.C. § 5307, will comply with 49 U.S.C. §§ 5323 (general provisions) and 5325 (contract requirements);

(f)     Has complied with 49 U.S.C. § 5307(b) (program of projects requirements);

(g)     Has available and will provide the required amounts as provided by 49 U.S.C. § 5307(d) (cost sharing);

(h)     Will comply with 49 U.S.C. §§ 5303 (metropolitan transportation planning) and 5304 (statewide and nonmetropolitan transportation planning);

12

Docusign Envelope ID: 50F87D3D-332A-4611-8C48-BB1DEEDA05CF

(i)    Has a locally developed process to solicit and consider public comment before raising a fare or carrying out a major reduction of transportation;

(j)    Either—

   (1)    Will expend for each fiscal year for public transportation security projects, including increased lighting in or adjacent to a public transportation system (including bus stops, subway stations, parking lots, and garages), increased camera surveillance of an area in or adjacent to that system, providing an emergency telephone line to contact law enforcement or security personnel in an area in or adjacent to that system, and any other project intended to increase the security and safety of an existing or planned public transportation system, at least 1 percent of the amount the recipient receives for each fiscal year under 49 U.S.C. § 5336; or

   (2)    Has decided that the expenditure for security projects is not necessary;

(k)    In the case of an applicant for an urbanized area with a population of not fewer than 200,000 individuals, as determined by the Bureau of the Census, will submit an annual report listing projects carried out in the preceding fiscal year under 49 U.S.C. § 5307 for associated transit improvements as defined in 49 U.S.C. § 5302; and

(l)    Will comply with 49 U.S.C. § 5329(d) (public transportation agency safety plan).

## CATEGORY 8. FORMULA GRANTS FOR RURAL AREAS.

*If the applicant will apply for funds made available to it under the Formula Grants for Rural Areas Program (49 U.S.C. § 5311), it must make this certification. Paragraph (a) of this certification helps FTA make the determinations required by 49 U.S.C. § 5311(b)(2)(C). Paragraph (b) of this certification is required by 49 U.S.C. § 5311(f)(2). Paragraph (c) of this certification, which applies to funds apportioned for the Appalachian Development Public Transportation Assistance Program, is necessary to enforce the conditions of 49 U.S.C. § 5311(c)(2)(D).*

(a)    The applicant certifies that its State program for public transportation service projects, including agreements with private providers for public transportation service—

   (1)    Provides a fair distribution of amounts in the State, including Indian reservations; and

   (2)    Provides the maximum feasible coordination of public transportation service assisted under 49 U.S.C. § 5311 with transportation service assisted by other Federal sources; and

(b)    If the applicant will in any fiscal year expend less than 15% of the total amount made available to it under 49 U.S.C. § 5311 to carry out a program to develop and support intercity bus transportation, the applicant certifies that it has consulted with affected

intercity bus service providers, and the intercity bus service needs of the State are being met adequately.

(c)     If the applicant will use for a highway project amounts that cannot be used for operating expenses authorized under 49 U.S.C. § 5311(c)(2) (Appalachian Development Public Transportation Assistance Program), the applicant certifies that—

    (1)     It has approved the use in writing only after providing appropriate notice and an opportunity for comment and appeal to affected public transportation providers; and

    (2)     It has determined that otherwise eligible local transit needs are being addressed.

## CATEGORY 9. FIXED GUIDEWAY CAPITAL INVESTMENT GRANTS AND THE EXPEDITED PROJECT DELIVERY FOR CAPITAL INVESTMENT GRANTS PILOT PROGRAM.

*If the applicant will apply for an award under any subsection of the Fixed Guideway Capital Investment Program (49 U.S.C. § 5309), including an award made pursuant to the FAST Act's Expedited Project Delivery for Capital Investment Grants Pilot Program (Pub. L. 114-94, div. A, title III, § 3005(b)), the applicant must make the following certification. This certification is required by 49 U.S.C. § 5309(c)(2) and Pub. L. 114-94, div. A, title III, § 3005(b)(3)(B).*

The applicant certifies that it:

(a)     Has or will have the legal, financial, and technical capacity to carry out its Award, including the safety and security aspects of that Award,

(b)     Has or will have satisfactory continuing control over the use of equipment and facilities acquired or improved under its Award.

(c)     Will maintain equipment and facilities acquired or improved under its Award in accordance with its transit asset management plan; and

(d)     Will comply with 49 U.S.C. §§ 5303 (metropolitan transportation planning) and 5304 (statewide and nonmetropolitan transportation planning).

## CATEGORY 10. GRANTS FOR BUSES AND BUS FACILITIES AND LOW OR NO EMISSION VEHICLE DEPLOYMENT GRANT PROGRAMS.

*If the applicant is in an urbanized area and will apply for an award under subsection (a) (formula grants), subsection (b) (buses and bus facilities competitive grants), or subsection (c) (low or no emissions grants) of the Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339), the applicant must make the certification in Category 7 for Urbanized Area Formula Grants (49 U.S.C. § 5307). This certification is required by 49 U.S.C. § 5339(a)(3), (b)(6), and (c)(3), respectively.*

Docusign Envelope ID: 50F87D3D-332A-4611-8C48-BB1DEEDA05CF

*If the applicant is in a rural area and will apply for an award under subsection (a) (formula grants), subsection (b) (bus and bus facilities competitive grants), or subsection (c) (low or no emissions grants) of the Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339), the applicant must make the certification in Category 8 for Formula Grants for Rural Areas (49 U.S.C. § 5311). This certification is required by 49 U.S.C. § 5339(a)(3), (b)(6), and (c)(3), respectively.*

*Making this certification will incorporate by reference the applicable certifications in Category 7 or Category 8.*

*If the applicant will receive a competitive award under subsection (b) (buses and bus facilities competitive grants), or subsection (c) (low or no emissions grants) of the Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339) related to zero emissions vehicles or related infrastructure, it must make the following certification. This certification is required by 49 U.S.C. § 5339(d).*

The applicant will use 5 percent of grants related to zero emissions vehicles (as defined in 49 U.S.C. § 5339(c)(1)) or related infrastructure under 49 U.S.C. § 5339(b) or (c) to fund workforce development training as described in section 49 U.S.C. § 5314(b)(2) (including registered apprenticeships and other labor-management training programs) under the recipient's plan to address the impact of the transition to zero emission vehicles on the applicant's current workforce; or the applicant certifies a smaller percentage is necessary to carry out that plan.

## CATEGORY 11. ENHANCED MOBILITY OF SENIORS AND INDIVIDUALS WITH DISABILITIES PROGRAMS.

*If the applicant will apply for an award under the Formula Grants for the Enhanced Mobility of Seniors and Individuals with Disabilities Program (49 U.S.C. § 5310), it must make the certification in Category 7 for Urbanized Area Formula Grants (49 U.S.C. § 5307). This certification is required by 49 U.S.C. § 5310(e)(1). Making this certification will incorporate by reference the certification in Category 7, except that FTA has determined that (d), (f), (i), (j), and (k) of Category 7 do not apply to awards made under 49 U.S.C. § 5310 and will not be enforced.*

*In addition to the certification in Category 7, the applicant must make the following certification that is specific to the Formula Grants for the Enhanced Mobility of Seniors and Individuals with Disabilities Program. This certification is required by 49 U.S.C. § 5310(e)(2).*

The applicant certifies that:

(a)     The projects selected by the applicant are included in a locally developed, coordinated public transit-human services transportation plan;

15

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF
Case 3:25-cv-07070-RS     Document 71-5     Filed 03/05/26     Page 27 of 619

Certifications and Assurances                                    Fiscal Year 2025

(b)     The plan described in clause (a) was developed and approved through a process that included participation by seniors, individuals with disabilities, representatives of public, private, and nonprofit transportation and human services providers, and other members of the public;

(c)     To the maximum extent feasible, the services funded under 49 U.S.C. § 5310 will be coordinated with transportation services assisted by other Federal departments and agencies, including any transportation activities carried out by a recipient of a grant from the Department of Health and Human Services; and

(d)     If the applicant will allocate funds received under 49 U.S.C. § 5310 to subrecipients, it will do so on a fair and equitable basis.

## CATEGORY 12. STATE OF GOOD REPAIR GRANTS.

*If the applicant will apply for an award under FTA's State of Good Repair Grants Program (49 U.S.C. § 5337), it must make the following certification. Because FTA generally does not review the transit asset management plans of public transportation providers, the asset management certification is necessary to enforce the provisions of 49 U.S.C. § 5337(a)(4). The certification with regard to acquiring restricted rail rolling stock is required by 49 U.S.C. § 5323(u)(4). Note that this certification is not limited to the use of Federal funds.*

The applicant certifies that the projects it will carry out using assistance authorized by the State of Good Repair Grants Program, 49 U.S.C. § 5337, are aligned with the applicant's most recent transit asset management plan and are identified in the investment and prioritization section of such plan, consistent with the requirements of 49 CFR Part 625.

If the applicant operates a rail fixed guideway service, the applicant certifies that, in the fiscal year for which an award is available to the applicant under the State of Good Repair Grants Program, 49 U.S.C. § 5337, the applicant will not award any contract or subcontract for the procurement of rail rolling stock for use in public transportation with a rail rolling stock manufacturer described in 49 U.S.C. § 5323(u)(1).

## CATEGORY 13. INFRASTRUCTURE FINANCE PROGRAMS.

*If the applicant will apply for an award for a project that will include assistance under the Transportation Infrastructure Finance and Innovation Act ("TIFIA") Program (23 U.S.C. §§ 601–609) or the State Infrastructure Banks ("SIB") Program (23 U.S.C. § 610), it must make the certifications in Category 7 for the Urbanized Area Formula Grants Program, Category 9 for the Fixed Guideway Capital Investment Grants program, and Category 12 for the State of Good Repair Grants program. These certifications are required by 49 U.S.C. § 5323(o).*

*Making this certification will incorporate the certifications in Categories 7, 9, and 12 by reference.*

Certifications and Assurances                                      Fiscal Year 2025

## CATEGORY 14. ALCOHOL AND CONTROLLED SUBSTANCES TESTING.

*If the applicant will apply for an award under FTA's Urbanized Area Formula Grants Program (49 U.S.C. § 5307), Fixed Guideway Capital Investment Program (49 U.S.C. § 5309), Formula Grants for Rural Areas Program (49 U.S.C. § 5311), or Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339) programs, the applicant must make the following certification. The applicant must make this certification on its own behalf and on behalf of its subrecipients and contractors. This certification is required by 49 CFR § 655.83.*

The applicant certifies that it, its subrecipients, and its contractors are compliant with FTA's regulation for the Prevention of Alcohol Misuse and Prohibited Drug Use in Transit Operations, 49 CFR Part 655.

## CATEGORY 15. RAIL SAFETY TRAINING AND OVERSIGHT.

*If the applicant is a State with at least one rail fixed guideway system, or is a State Safety Oversight Agency, or operates a rail fixed guideway system, it must make the following certification. The elements of this certification are required by 49 CFR §§ 672.31 and 674.39.*

The applicant certifies that the rail fixed guideway public transportation system and the State Safety Oversight Agency for the State are:

(a)     Compliant with the requirements of 49 CFR Part 672, "Public Transportation Safety Certification Training Program"; and

(b)     Compliant with the requirements of 49 CFR Part 674, "Sate Safety Oversight".

## CATEGORY 16. DEMAND RESPONSIVE SERVICE.

*If the applicant operates demand responsive service and will apply for an award to purchase a non-rail vehicle that is not accessible within the meaning of 49 CFR Part 37, it must make the following certification. This certification is required by 49 CFR § 37.77.*

The applicant certifies that the service it provides to individuals with disabilities is equivalent to that provided to other persons. A demand responsive system, when viewed in its entirety, is deemed to provide equivalent service if the service available to individuals with disabilities, including individuals who use wheelchairs, is provided in the most integrated setting appropriate to the needs of the individual and is equivalent to the service provided other individuals with respect to the following service characteristics:

(a)     Response time;

(b)     Fares;

(c)     Geographic area of service;

(d)     Hours and days of service;

Certifications and Assurances                                    Fiscal Year 2025

(e)     Restrictions or priorities based on trip purpose;

(f)     Availability of information and reservation capability; and

(g)     Any constraints on capacity or service availability.

## CATEGORY 17. INTEREST AND FINANCING COSTS.

*If the applicant will pay for interest or other financing costs of a project using assistance awarded under the Urbanized Area Formula Grants Program (49 U.S.C. § 5307), the Fixed Guideway Capital Investment Grants Program (49 U.S.C. § 5309), or any program that must comply with the requirements of 49 U.S.C. § 5307, including the Formula Grants for the Enhanced Mobility of Seniors Program (49 U.S.C. § 5310), "flex funds" from infrastructure programs administered by the Federal Highways Administration (*see *49 U.S.C. § 5334(i)), or awards to urbanized areas under the Grants for Buses and Bus Facilities Program (49 U.S.C. § 5339), the applicant must make the following certification. This certification is required by 49 U.S.C. §§ 5307(e)(3) and 5309(k)(2)(D).*

The applicant certifies that:

(a)     Its application includes the cost of interest earned and payable on bonds issued by the applicant only to the extent proceeds of the bonds were or will be expended in carrying out the project identified in its application; and

(b)     The applicant has shown or will show reasonable diligence in seeking the most favorable financing terms available to the project at the time of borrowing.

## CATEGORY 18. CYBERSECURITY CERTIFICATION FOR RAIL ROLLING STOCK AND OPERATIONS.

*If the applicant operates a rail fixed guideway public transportation system, it must make this certification. This certification is required by 49 U.S.C. § 5323(v). For information about standards or practices that may apply to a rail fixed guideway public transportation system, visit* https://www.nist.gov/cyberframework *and* https://www.cisa.gov/.

The applicant certifies that it has established a process to develop, maintain, and execute a written plan for identifying and reducing cybersecurity risks that complies with the requirements of 49 U.S.C. § 5323(v)(2).

## CATEGORY 19. PUBLIC TRANSPORTATION ON INDIAN RESERVATIONS FORMULA AND DISCRETIONARY PROGRAM (TRIBAL TRANSIT PROGRAMS).

*Before FTA may provide Federal assistance for an Award financed under either the Public Transportation on Indian Reservations Formula or Discretionary Program authorized under 49 U.S.C. § 5311(c)(1), as amended by the FAST Act, (Tribal Transit Programs), the applicant*

Certifications and Assurances                                    Fiscal Year 2025

*must select the Certifications in this Category, except as FTA determines otherwise in writing. Tribal Transit Program applicants may certify to this Category and Category 1 (Certifications and Assurances Required of Every Applicant) and need not make any other certification, to meet Tribal Transit Program certification requirements. If an applicant will apply for any program in addition to the Tribal Transit Program, additional certifications may be required.*

FTA has established terms and conditions for Tribal Transit Program grants financed with Federal assistance appropriated or made available under 49 U.S.C. § 5311(c)(1). The applicant certifies that:

(a)　　It has or will have the legal, financial, and technical capacity to carry out its Award, including the safety and security aspects of that Award.

(b)　　It has or will have satisfactory continuing control over the use of its equipment and facilities acquired or improved under its Award.

(c)　　It will maintain its equipment and facilities acquired or improved under its Award, in accordance with its transit asset management plan and consistent with FTA regulations, "Transit Asset Management," 49 CFR Part 625. Its Award will achieve maximum feasible coordination with transportation service financed by other federal sources.

(d)　　With respect to its procurement system:

　　(1)　　It will have a procurement system that complies with U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, which incorporates by reference U.S. OMB regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200, for Awards made on or after December 26, 2014,

　　(2)　　It will have a procurement system that complies with U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," 49 CFR Part 18, specifically former 49 CFR § 18.36, for Awards made before December 26, 2014, or

　　(3)　　It will inform FTA promptly if its procurement system does not comply with either of those U.S. DOT regulations.

(e)　　It will comply with the Certifications, Assurances, and Agreements in:

　　(1)　　Category 4.1 and 4.2 (Charter Service Agreement and School Bus Agreement),

　　(2)　　Category 5 (Transit Asset Management Plan),

　　(3)　　Category 6.1 and 6.2 (Rolling Stock Buy America Reviews and Bus Testing),

　　(4)　　Category 8 (Formula Grants for Rural Areas),

　　(5)　　Category 14 (Alcohol and Controlled Substances Testing), and

　　(6)　　Category 16 (Demand Responsive Service).

## CATEGORY 20. EMERGENCY RELIEF PROGRAM.

*An applicant to the Public Transportation Emergency Relief Program, 49 U.S.C. § 5324, must make the following certification. The certification is required by 49 U.S.C. § 5324(f) and must be made before the applicant can receive a grant under the Emergency Relief program.*

The applicant certifies that the applicant has insurance required under State law for all structures related to the emergency relief program grant application.

Certifications and Assurances                                        Fiscal Year 2025

# FEDERAL FISCAL YEAR 2025 CERTIFICATIONS AND ASSURANCES FOR FTA ASSISTANCE PROGRAMS

(Signature pages alternate to providing Certifications and Assurances in TrAMS.)

Name of Applicant:_____

The Applicant certifies to the applicable provisions of all categories: (*check here*) _____.

*Or,*

The Applicant certifies to the applicable provisions of the categories it has selected:

| Category | | Certification |
|----------|--|---------------|
| 01 | Certifications and Assurances Required of Every Applicant | _____ |
| 02 | Public Transportation Agency Safety Plans | _____ |
| 03 | Tax Liability and Felony Convictions | _____ |
| 04 | Private Sector Protections | _____ |
| 05 | Transit Asset Management Plan | _____ |
| 06 | Rolling Stock Buy America Reviews and Bus Testing | _____ |
| 07 | Urbanized Area Formula Grants Program | _____ |
| 08 | Formula Grants for Rural Areas | _____ |
| 09 | Fixed Guideway Capital Investment Grants and the Expedited Project Delivery for Capital Investment Grants Pilot Program | _____ |
| 10 | Grants for Buses and Bus Facilities and Low or No Emission Vehicle Deployment Grant Programs | _____ |
| 11 | Enhanced Mobility of Seniors and Individuals with Disabilities Programs | _____ |

1

Certifications and Assurances                                    Fiscal Year 2025

12      State of Good Repair Grants                           _____

13      Infrastructure Finance Programs                       _____

14      Alcohol and Controlled Substances Testing             _____

15      Rail Safety Training and Oversight                    _____

16      Demand Responsive Service                             _____

17      Interest and Financing Costs                          _____

18      Cybersecurity Certification for Rail Rolling Stock and
        Operations                                            _____

19      Tribal Transit Programs                               _____

20      Emergency Relief Program                              _____

**CERTIFICATIONS AND ASSURANCES SIGNATURE PAGE**

**AFFIRMATION OF APPLICANT**

Name of the Applicant: _____

BY SIGNING BELOW, on behalf of the Applicant, I declare that it has duly authorized me to make these Certifications and Assurances and bind its compliance. Thus, it agrees to comply with all federal laws, regulations, and requirements, follow applicable federal guidance, and comply with the Certifications and Assurances as indicated on the foregoing page applicable to each application its Authorized Representative makes to the Federal Transit Administration (FTA) in the federal fiscal year, irrespective of whether the individual that acted on his or her Applicant's behalf continues to represent it.

The Certifications and Assurances the Applicant selects apply to each Award for which it now seeks, or may seek in the future, of federal assistance to be awarded by FTA during the federal fiscal year.

The Applicant affirms the truthfulness and accuracy of the Certifications and Assurances it has selected in the statements submitted with this document and any other submission made to FTA, and acknowledges that the Program Fraud Civil Remedies Act of 1986, 31 U.S.C. § 3801 *et seq*., and implementing U.S. DOT regulations, "Program Fraud Civil Remedies," 49 CFR part 31, apply to any certification, assurance or submission made to FTA. The criminal provisions of 18 U.S.C. § 1001 apply to any certification, assurance, or submission made in connection with a federal public transportation program authorized by 49 U.S.C. chapter 53 or any other statute

In signing this document, I declare under penalties of perjury that the foregoing Certifications and Assurances, and any other statements made by me on behalf of the Applicant are true and accurate.

Signature_____    Date: _____

2

Certifications and Assurances                                    Fiscal Year 2025

Name_____  Authorized Representative of Applicant

### AFFIRMATION OF APPLICANT'S ATTORNEY

For (Name of Applicant): _____

As the undersigned Attorney for the above-named Applicant, I hereby affirm the Applicant has the authority under state, local, or tribal government law, as applicable, to make and comply with the Certifications and Assurances as indicated on the foregoing pages. I further affirm that, in my opinion, the Certifications and Assurances have been legally made and constitute legal and binding obligations on it.

I further affirm that, to the best of my knowledge, there is no legislation or litigation pending or imminent that might adversely affect the validity of these Certifications and Assurances, or of the performance of its FTA assisted Award.

Signature_____    Date: _____

Name_____  Attorney for Applicant

*Each Applicant for federal assistance to be awarded by FTA must provide an Affirmation of Applicant's Attorney pertaining to the Applicant's legal capacity. The Applicant may enter its electronic signature in lieu of the Attorney's signature within TrAMS, provided the Applicant has on file and uploaded to TrAMS this hard-copy Affirmation, signed by the attorney and dated this federal fiscal year.*

# EXHIBIT B



# THE SECRETARY OF TRANSPORTATION
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id*. at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id*. at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq.*) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq.*), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq.*).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

DOT remains committed to advancing a transportation system that serves the public interest efficiently and unleashes economic prosperity and a superior quality of life for American families. This mission depends upon your strict adherence to the legal framework governing our partnership, and I trust you will take all necessary steps to comply with Federal law and satisfy your legal obligations.

Sincerely,

Sean P. Duffy

# EXHIBIT C

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF



# EXHIBIT D

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**MASTER AGREEMENT**

**For Federal Transit Administration Agreements authorized by**
**49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by**
**the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface**
**Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act**
**(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy**
**for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other**
**federal laws that FTA administers.**

**FTA MA(33)**
**April 25, 2025**

http://www.transit.dot.gov

# TABLE OF CONTENTS

Table of Contents.............................................................................................................i

Preface ..............................................................................................................................1

Statutory Authorities .....................................................................................................1

Purpose of this Master Agreement................................................................................1

Generally Applicable Provisions .................................................................................3

Section 1.    Terms of this Master Agreement and Compliance......................................3

Section 2.    Definitions..................................................................................................4

Section 3.    Implementation. ........................................................................................12

Section 4.    Ethics, Political Activity, Disqualification, and Certain Criminal Activity...............19

Section 5.    Federal Assistance....................................................................................27

Section 6.    Non-Federal Share. ...................................................................................28

Section 7.    Payments to the Recipient.........................................................................30

Section 8.    Records and Reports Related to the Award and the Underlying Agreement.............41

Section 9.    Record Retention and Access to Sites of Performance. .............................47

Section 10.   Completion, Audit, Settlement, and Closeout............................................48

Section 11.   Right of the Federal Government to Terminate. .........................................50

Section 12.   Civil Rights. .............................................................................................51

Section 13.   Planning. ..................................................................................................59

Section 14.   Private Enterprise. ...................................................................................60

Section 15.   Preference for United States Products and Services. .................................61

Section 16.   Procurement. ............................................................................................62

Section 17.   Patent Rights. ...........................................................................................68

Section 18.   Rights in Data and Copyrights. .................................................................69

Section 19.   Use of Real Property, Equipment, and Supplies. .......................................72

Section 20.   Transit Asset Management.........................................................................77

Section 21.   Insurance. .................................................................................................77

Section 22.   Relocation and Real Property....................................................................78

Section 23.   Construction. ............................................................................................79

Section 24.   Employee Protections. ..............................................................................80

Section 25.   Early Systems Work Agreement.................................................................82

Section 26.   Environmental Protections. .......................................................................84

Section 27.   State Management and Monitoring Systems................................................87

Section 28.   Charter Service..........................................................................................87

Section 29.    School Bus Operations. ................................................................... 88

Section 30.    Geographic Information and Related Spatial Data. ........................... 88

Section 31.    Federal "$1 Coin" Requirements. .................................................... 89

Section 32.    Public Transportation Safety. ........................................................... 89

Section 33.    Motor Carrier Safety. ...................................................................... 89

Section 34.    Safe Operation of Motor Vehicles. .................................................. 90

Section 35.    Substance Abuse. ............................................................................. 91

Section 36.    Protection of Sensitive Security and Other Sensitive Information. ........... 92

Section 37.    Special Notification Requirements for States. .................................. 92

Section 38.    Freedom of Information. ................................................................... 93

Section 39.    Disputes, Breaches, Defaults, and Litigation. ................................. 94

Section 40.    Amendments to the Underlying Agreement. ..................................... 95

Section 41.    FTA's Transit Award Management System (TrAMS). ...................... 95

Section 42.    Information Obtained through Internet Links. .................................. 96

Section 43.    Severability. ..................................................................................... 96

Special Provisions for Specific Programs ...................................................................... 97

Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs. ........................................... 97

Section 45.    Special Provisions for the State Safety Oversight Grant Program. ............. 99

Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program. ......... 99

Section 47.    Special Provisions for the TIFIA and RRIF Programs. ................... 100

Section 48.    Special Provisions for the Joint FTA–FRA Program. ..................... 101

Appendix A Tribal Transit Program—Applicable Provisions .................................... 103

# UNITED STATES DEPARTMENT OF TRANSPORTATION
# FEDERAL TRANSIT ADMINISTRATION

## MASTER AGREEMENT

## PREFACE

### Statutory Authorities

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)     Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

   (1)     The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

   (2)     The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

   (3)     The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

   (4)     The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)     Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)     Title 23, United States Code (Highways).

(d)     Other federal legislation that FTA administers, as FTA so determines.

### Purpose of this Master Agreement

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

1

(a)     FTA Grant Agreement, including an FTA Grant Agreement for an award of federal assistance under the Tribal Transit Program;

(b)     FTA Cooperative Agreement; or

(c)     Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of Credit, Master Credit Agreement for a Project overseen by FTA, or State Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein, FTA and the Recipient agree as follows:

## GENERALLY APPLICABLE PROVISIONS

**Section 1.     Terms of this Master Agreement and Compliance.**

(a)     The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)     To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)     FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)     FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

  (1)     FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

  (2)     This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

  (3)     Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)     As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(f)     Each provision of this Master Agreement must be interpreted in context with all other provisions of this Master Agreement and the Underlying Agreement. If a single provision is read apart from the rest of this Master Agreement or the Underlying Agreement, that provision might not convey the extent of the Recipient's responsibility to comply with the requirements of this Master Agreement and the Underlying Agreement.

(g)     This Master Agreement does not have an Expiration Date. This Master Agreement continues to apply to the Recipient and its Underlying Agreement, until modified or superseded by a more recently enacted or issued applicable federal law, regulation, requirement, or guidance, or Amendment to this Master Agreement or the Underlying Agreement.

**Section 2.     Definitions.**

(a)     *List of Definitions*. In addition to the definitions provided in 49 U.S.C. § 5302, as amended, or in previous legislation if circumstances may require, the Recipient agrees that the following definitions apply:

   (1)     *Application* means the request for federal assistance submitted that is signed and dated by the Applicant or an official authorized to act on the behalf of the Applicant, and includes all explanatory, supporting, and supplementary documents filed with FTA by or on behalf of the Applicant, and has been reviewed by FTA staff and addresses FTA's comments and concerns. An application for federal assistance in the form of a Grant or Cooperative Agreement must be submitted in FTA's Transit Award Management System (TrAMS).

   (2)     *Approval*, unless FTA determines otherwise in writing, means a written statement of an authorized federal official transmitted electronically or in typewritten hard copy expressly permitting the Recipient to take or omit an action in connection with its Underlying Agreement, and signed by a federal official authorized to permit the Recipient to take or omit an action that may not be taken or omitted without the Federal Government's permission. Approval does not mean permission to take or omit a similar action other than the specific action for which approval was given and does not include an oral permission or interpretation, which has no legal force, authority, or effect. For purposes of this Master Agreement, the definition of "approval" also applies to "concurrence" and "waiver."

   (3)     *Associated Transit Improvement* means, with respect to a Project or an area to be served by a Project, an activity that is designed to enhance transit service or use and that is physically or functionally related to transit facilities.

4

(4)     *Award* means the Scope of Work that FTA has approved when FTA agreed to provide federal assistance. The Award also includes the requirements of all documents, terms, and conditions incorporated by reference and made part of the Underlying Agreement, which may be a Grant or Cooperative Agreement.

(5)     *Award Budget* [formerly, *Approved Project Budget*] means the budget for all the Projects encompassed by the FTA Award. In contrast, Project Budget means the budget allocated for a single Project contained within an Award that FTA or a pass-through entity approves during the federal award process or in subsequent amendments to the FTA Award. It may include the federal and non-federal share or only the federal share, as determined by FTA or the pass-through entity. For legal and other purposes, FTA reserves the right to consider information other than that displayed electronically or on paper in the "Award Budget" to determine the scope of the Award, eligible Project activities, and other terms used in connection with the Award.

(6)     *Common Rules* means any one or more of the following:

   (i)     U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, which incorporates by reference U.S. Office of Management and Budget (OMB) regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200;

   (ii)    U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," former 49 CFR Part 18; and

   (iii)   U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-profit Organizations," former 49 CFR Part 19.

(7)     *Concurrence* has the same meaning as the definition of Approval in this section of this Master Agreement.

(8)     *Cooperative Agreement* means an instrument that the Federal Government uses to award federal assistance to the Recipient to support each specific Project and related activities described in the Underlying Agreement in which, consistent with 31 U.S.C. § 6305, the Federal Government takes an active role and retains substantial control. An FTA Cooperative Agreement consists of three parts:

5

(i) The FTA Award, consisting of the amount of federal assistance FTA is providing to support each specific Project and related activities, and a description of each Project as set forth in the Application submitted to FTA in TrAMS or on paper if permitted;

(ii) The Terms and Conditions incorporated by reference and made part of the Cooperative Agreement consisting of the following documents, irrespective of whether electronic or in typewritten hard copy, including:

(A) The most recent Federal Transit Administration Master Agreement, which applies to this Cooperative Agreement;

(B) The current Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA; and

(C) Any Award notification containing special conditions or requirements if issued; and

(iii) The Execution of the Cooperative Agreement by the Recipient.

(9) *Designated Recipient* means an entity designated, in accordance with the planning process under 49 U.S.C. §§ 5303 and 5304, by the governor of a state, responsible local officials, and publicly owned operators of public transportation, to receive and apportion amounts under 49 U.S.C. § 5336 to urbanized areas of 200,000 or more in population; or a state or regional authority, if the authority is responsible under the laws of a state for a Capital Project and for financing and directly providing public transportation.

(10) *Disability* has the same meaning as in section 3(1) of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12102.

(11) *Federal Assistance* means a type of federal funding that the Recipient receives through the Underlying Agreement.

(12) *Federal Award Identification Number* has the same meaning as "Project No." in previous Grant Agreements and Cooperative Agreements with FTA.

(13) *Federal Government* means the United States of America and any of its executive departments or agencies.

(14) *Federal Guidance* includes any federal document or publication signed by an authorized federal official providing official instructions or advice about a federal program that is not defined as a "federal requirement" and applies to

6

entities other than the Federal Government. Federal Guidance also may apply to the Federal Government, and may take the form of a:

(i)      Federal directive;

(ii)     Federal circular;

(iii)    Federal order;

(iv)     Federal published policy;

(v)      Federal administrative practice;

(vi)     Federal guideline;

(vii)    Federal guidance document;

(viii)   Letter signed by an authorized federal official; or

(ix)     Similar document.

(15)    *Federal Requirement* means:

(i)      An applicable federal law, regulation, or executive order;

(ii)     An applicable provision of the Underlying Agreement, including any Special Condition, Requirement, Provision, or Condition of Award;

(iii)    This Master Agreement;

(iv)     A later Master Agreement after FTA and the Recipient have entered into the Underlying Agreement; or

(v)      Another applicable federal mandate.

(16)    *Federal Transit Administration (FTA)* is an operating administration of the Department of Transportation (U.S. DOT). Any reference to the "Urban Mass Transportation Administration" (also referred to as "UMTA") refers to the "Federal Transit Administration" or "FTA" when appearing in any records of the United States.

(17)    *Federal Transit Administrator* is the head of the Federal Transit Administration.

(18)    *Federally Recognized Indian Tribe* means an Indian tribe that is federally recognized by the Bureau of Indian Affairs of the U.S. Department of the

Interior in accordance with the provisions of the Federally Recognized Indian Tribe List Act of 1994, as amended, 25 U.S.C. § 5130.

(19) *Fiscal Year*, as used in this Master Agreement, means "federal fiscal year," which begins on October 1 of each calendar year and ends on September 30 of the next calendar year.

(20) *Governor* means the governor of a state, the mayor of the District of Columbia, or the chief executive officer of a territory of the United States and includes the designee thereof.

(21) *Grant Agreement* means a legal instrument that the Federal Government uses to award federal assistance to the Recipient to support each specific Project and related activities described in the Underlying Agreement in which, consistent with 31 U.S.C. § 6304, the Federal Government does not take an active role and does not retain substantial control. An FTA Grant Agreement consists of three parts:

(i) The FTA Award, consisting of the amount of federal assistance FTA is providing to support each specific Project and related activities, and a description of each Project as set forth in the Application submitted to FTA in TrAMS or on paper if permitted;

(ii) The Terms and Conditions incorporated by reference and made part of the Grant Agreement consisting of the following documents, irrespective of whether electronic or in typewritten hard copy, including:

(A) The most recent "Federal Transit Administration Master Agreement, which applies to this Grant Agreement;

(B) The current Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA; and

(C) Any Award notification containing special conditions or requirements if issued; and

(iii) The Execution of the Grant Agreement by the Recipient.

(22) *Indian Tribe* means the Recipient or Subrecipient that receives "Tribal Transit Program" assistance authorized by 49 U.S.C. § 5311(c)(1) to support its Underlying Agreement.

8

(23) *Internal Controls* means a process, implemented by a Recipient or Subrecipient, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) effectiveness and efficiency of operations, (b) reliability of reporting for internal and external use, and (c) compliance with applicable laws, regulations, and requirements.

(24) *Local Government Authority* includes (a) a political subdivision of a state; (b) an authority of at least one state or political subdivision of a state; (c) an Indian tribe; and (d) a public corporation, board, or commission established under the laws of a state.

(25) *Low-Income Individual*, for purposes of 49 U.S.C. § 5311(j)(1)(A)(iii), means an individual whose family income is at or below 100 percent of the poverty line, as that term is defined in section 673(2) of the Community Services Block Grant Act, 42 U.S.C. § 9902(2), including any revision required under that section, for a family of the size involved.

(26) *Master Credit Agreement* means a conditional agreement to extend one or more loans to a Recipient under the Transportation Infrastructure Finance and Innovation Act (TIFIA) of 1998, as amended, 23 U.S.C. §§ 601 – 609, or the Railroad Rehabilitation and Improvement Financing (RRIF) program, 45 U.S.C. §§ 821 – 823, and also means the type of Underlying Agreement used for the TIFIA or RRIF loans.

(27) *Non-Federal Funds* or *Non-Federal Share* includes the following sources of funding or in-kind property or services used to match the federal assistance awarded for the Grant or Cooperative Agreement:

(i) Local funds;

(ii) Local in-kind property or services;

(iii) State funds;

(iv) State in-kind property or services;

(v) Other federal funds for which the federal statute authorizing a program specifically provides that federal funds made available for that program can be applied to the cost sharing requirements of other federal programs.

(28) *Non-Tribal Service Provider*, for purposes of 49 U.S.C. § 5311(j)(2), means a non-tribal provider of public transportation that connects residents of tribal

9

lands with surrounding communities, improves access to employment or healthcare, or otherwise addresses the mobility needs of tribal members.

(29)   *Project* means the public transportation improvement activities eligible for federal assistance in an application to FTA and/or in an FTA Award.

(30)   *Public Transportation*, has the same meaning as "transit" or "mass transportation," and, consistent with the definition at 49 U.S.C. § 5302, means regular, continuing shared- ride surface transportation services that are open to the general public, or open to a segment of the general public defined by age, disability, or low income, but does not include:

    (i)    Intercity passenger rail transportation provided by Amtrak or a successor thereof as described in 49 U.S.C. chapter 243;

    (ii)   Intercity bus service;

    (iii)  Charter service;

    (iv)   School bus service;

    (v)    Sightseeing service;

    (vi)   Courtesy shuttle service for patrons of one or more specific establishments; or

    (vii)  Intra-terminal or intra-facility shuttle services.

(31)   *Recipient* or *Direct Recipient* means a non-federal entity that receives a federal award directly from a federal awarding agency to carry out an activity under a federal program. The term "Recipient" does not include a Subrecipient.

(32)   *Scope of Work* means the purpose of the Grant Agreement or Cooperative Agreement and the activities and approaches required to carry out a Project. The scope of work consists of various components, including the Award Budget, beneficiaries, locations, and other aspects identified in the approved application. FTA reserves the right to consider other information in determining the scope of the Project or the "scope of work of a Grant Agreement or Cooperative Agreement" when "scope" is used for other purposes. See the latest edition of the FTA Master Agreement.

(33)   *Split Letter* (sometimes referred to as a suballocation letter or government subapportionment letter) means a letter in which a Designated Recipient of Urbanized Area Formula Grant Program funding authorized by 49 U.S.C.

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

§ 5307, a Designated Recipient of Formula Grants for Enhanced Mobility of Seniors and Individuals with Disabilities authorized by 49 U.S.C. § 5310, a Designated Recipient of the State of Good Repair Formula Grants, 49 U.S.C. § 5337, agrees to a reassignment or reallocation of that federal assistance to one or more direct Recipients.

(34)  *Subagreement* or *Subgrant* means an agreement through which the Recipient awards federal assistance to its Subrecipient(s) to support or stimulate any of the Recipient's or Subrecipient's Projects or related activities supported under the Award, the accompanying Underlying Agreement, or Amendments thereto, but does not include a third party contract, third party subcontract, or lease.

(35)  *Subrecipient* or *Subgrantee* means any entity or person that receives federal assistance provided by an FTA Recipient instead of FTA directly, but does not include a Third Party Contractor, Third Party Subcontractor, or Lessee.

(36)  *Third Party Agreement* includes agreements or arrangements supported in whole or in part with federal assistance awarded to a Recipient by FTA, including a subagreement with a subrecipient, a third party contract, a third party subcontract, a lease, or similar arrangement or agreement as FTA may recognize.

(37)  *Third Party Contract* means a legal instrument by which a Recipient or Subrecipient purchases property or services needed to carry out the Grant Agreement or Cooperative Agreement. This does not include an instrument describing a transaction that meets the definition of a federal Award, Grant, Cooperative Agreement, Subaward, or Subagreement.

(38)  *Third Party Participant* means each participant in the Recipient's Project, except for FTA and the Recipient, whose work under the Project is supported with FTA funding, eligible non-federal share dedicated to the Project, or is dedicated as an in-kind contribution eligible for non-federal share. A Third Party Participant may be a Subrecipient, Third Party Contractor, Third Party Subcontractor, Lessee, or Similar Participant in the Recipient's Project (for example, a partner in a joint development venture).

(39)  *Third Party Subcontract* means a subcontract entered into by the Third Party Contractor with a Third Party Subcontractor, or a Third Party Subcontractor with another Third Party Subcontractor at any tier, and is supported in whole or in part with the federal assistance originally derived from FTA, or non-federal share dedicated to the Recipient's Underlying Agreement.

11

(40)   *Underlying Agreement* means a specific Grant Agreement, Cooperative Agreement, or, with respect to TIFIA or RRIF assistance, a specific Loan Agreement, Line of Credit Agreement, or Loan Guarantee Agreement that incorporates the terms of this Master Agreement, in each case including any amendments thereto, supported with federal assistance appropriated or made available under the authorized program.

(41)   *Unique Entity Identifier* has two meanings:

(i)   A Recipient's or a Subrecipient's unique entity identifier for purposes of the "System of Award Management" (SAM), which currently is the DUNS Number; but

(ii)   For FTA purposes, FTA assigns a separate Recipient/Vendor ID as a "unique entity identifier," which is a four-digit number and is displayed on the Grant Agreement and the Cooperative Agreement following the heading "Recipient ID."

(42)   *Waiver* has the same meaning as the definition of Approval in this section of this Master Agreement.

(b)   *Application of Definitions*. The Recipient also agrees that the definitions in section 2(a) above apply throughout this Master Agreement.

**Section 3.   Implementation.**

(a)   *Effective Date*. The Effective Date of Recipient's Underlying Agreement is the date when the authorized FTA official signs the Underlying Agreement.

(b)   *Description of Each Project*. The "Description of Each Project" in the "Executive Summary" of the "FTA Award" section of the Recipient's Underlying Agreement often provides only a brief description of each Project and related activities to be undertaken by the Recipient; therefore, the Recipient agrees to perform the work described in the terms of its Underlying Agreement, including all the documents and information incorporated by reference and made part of that Underlying Agreement.

(c)   *Prompt Implementation*. After receiving notice that the FTA official signed the Underlying Agreement, the Recipient agrees to undertake promptly each Project and related activities described in the Underlying Agreement.

(d)   *Completion Dates*. The Recipient agrees to complete each Project within the time periods specified in the Underlying Agreement and all activities must be completed by the Award's end date, unless FTA agrees in writing to extend the end date. Unless FTA determines otherwise in writing, interim milestone dates and other completion

dates applicable to the Award are good faith estimates and are not intended to be firm contractual requirements. However, FTA and the Recipient agree that milestone dates and other completion dates for Full Funding Grant Agreements, Small Starts Grant Agreements or other specific agreements in which FTA expressly states that the milestone dates or other completion dates for the Underlying Agreement are firm dates that may be enforced.

(e)    *The Recipient's Capacity.* To carry out its Underlying Agreement, the Recipient agrees to maintain:

    (1)    Sufficient legal, financial, technical, and managerial capacity, and adequate functional capacity to:

        (i)    Plan, manage, and complete its responsibilities outlined in the Underlying Agreement;

        (ii)    Use the Project property;

        (iii)    Carry out the safety and security aspects of the Underlying Agreement;

        (iv)    Comply with the terms and conditions of the Underlying Agreement, the Recipient's annual Certifications and Assurances to FTA, and applicable federal laws, regulations, and requirements; and

        (v)    Follow applicable federal guidance, except as the Federal Government determines otherwise in writing.

    (2)    Strong internal controls to assure that it is managing its Award in compliance with federal laws, regulations, requirements, and the terms and conditions of the Underlying Agreement including, but not limited to:

        (i)    Amendments or revisions to its Award Budget;

        (ii)    Salaries and wages of the Recipient's and Subrecipient's personnel;

        (iii)    Protection of personally identifiable information and other sensitive information; and

        (iv)    Other matters that must be in compliance with federal laws, regulations, requirements, and the terms and conditions of the Underlying Agreement.

(f)    *U.S. DOT Administrative Requirements.* The Recipient agrees to comply with the following U.S. DOT regulations (Common Rules) to the extent applicable:

13

(1) *Requirements Applicable On or After December 26, 2014*. The following requirements apply to the Award, the accompanying Underlying Agreement, and any Amendments thereto signed by an authorized FTA official on or after December 26, 2014 as follows:

    (i)    U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, which incorporates by reference U.S. OMB regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200, and which applies to an Award, the accompanying Underlying Agreement, and any Amendments to any Underlying Agreement with a state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization; and

    (ii)    Except as FTA determines otherwise in writing, U.S. DOT regulations, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 1201, and subparts A through E of U.S. OMB regulatory guidance, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 CFR Part 200, apply to a private for-profit entity; notably, the Cost Principles of Part 31 of the Federal Acquisition Regulation, which permits the payment of profits or fees for work under procurement contracts, generally will not apply to private for-profit entities.

(2) *Requirements Applicable Before December 26, 2014*. The following requirements apply to the Award, the accompanying Underlying Agreement, and any Amendments thereto signed by an authorized FTA official before December 26, 2014, as follows:

    (i)    For a state, local government, or Indian tribal government, U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," former 49 CFR Part 18;

    (ii)    For an institution of higher education or a nonprofit organization, U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education; Hospitals, and Other Non-Profit Organizations," former 49 CFR Part 19; or

    (iii)    For a private for-profit organization, U.S. DOT regulations, "Uniform Administrative Requirements for Grants and Agreements with

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

Institutions of Higher Education, Hospitals, and Other Non-profit Organizations," former 49 CFR Part 19.

(g) *Application of Federal, State, and Local Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with all applicable federal requirements and follow applicable federal guidance. All standards or limits are minimum requirements when those standards or limits are included in the Recipient's Underlying Agreement or this Master Agreement. At the time the FTA official awards federal assistance to the Recipient in support of the Underlying Agreement, the federal requirements and guidance that apply then may be modified from time to time, and will apply to the Recipient or the accompanying Underlying Agreement, except as FTA determines otherwise in writing.

(h) *The Recipient's Responsibility to Comply with Federal Requirements*. Irrespective of involvement by any other entity in the Underlying Agreement:

(1) *General*. The Recipient agrees to comply with all federal requirements that apply to itself and the Underlying Agreement.

(2) *Primary Responsibility for Compliance*.

(i) The Recipient, as the Direct Recipient of federal assistance, agrees that it is ultimately responsible for full compliance with federal requirements related to itself, its Award, the accompanying Underlying Agreement, and any Amendments thereto, even though:

(A) A Third Party Participant provides property or services to support a Project or related activities implementing the Award, the accompanying Underlying Agreement, any Amendments thereto; or

(B) Another entity or person is involved with the Award, the accompanying Underlying Agreement, or any Amendments thereto.

(ii) FTA and the Recipient agree that if FTA makes an Award to a Recipient other than the Designated Recipient as defined under 49 U.S.C. § 5302, the Designated Recipient is not a party to the Award or the Underlying Agreement and is not responsible for compliance with federal requirements related to the Underlying Agreement. However, if FTA makes an Award to a Designated Recipient, then that Designated Recipient is responsible for compliance with federal requirements related to its Underlying Agreement. FTA and the Recipient further agree to the terms of the

15

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

Designated Recipient's Split Letter, Suballocation Letter, or Government Subapportionment Letter attached in TrAMS, including the amounts allocated by the Designated Recipient to each Direct Recipient, and the commitment to comply with the associated transit improvement requirement as stated in that letter.

(iii)    Apart from other oversight and reviews FTA may conduct, the Recipient agrees that FTA is expressly authorized to conduct oversight of the Recipient's and its Subrecipients' compliance with federal requirements for safety and security, procurement (including Buy America requirements), management, and finance.

(i)    *The Recipient's Responsibility to Extend Federal Requirements to Third Party Participants*. In certain circumstances, the Recipient's compliance with specific federal requirements depends on compliance by its Third Party Participant(s) with those federal requirements, and therefore:

(1)    *General*. The Recipient agrees to ensure that its Third Party Participant(s) will comply with applicable federal requirements, and follow applicable federal guidance.

(2)    *The Recipient as a "Pass-Through" Entity*. If the Recipient is providing a subaward to a Subrecipient to carry out all or part of its Award, the Recipient agrees to obtain the agreement of each Subrecipient to comply with U.S. DOT's administrative requirements, as set forth above.

(3)    *Performance of the Recipient's Responsibilities*. If a Third Party Participant is expected to fulfill any responsibilities typically performed by the Recipient, the Recipient agrees to ensure that the Third Party Participant will carry out the Recipient's responsibilities in compliance with federal requirements, and provide enough information to each Third Party Participant so that it understands that it will be expected to follow federal guidance.

(4)    *Risk*. As provided in 2 CFR Part 1201, which incorporates by reference 2 CFR Part 200, the Recipient agrees to evaluate the risk involved before awarding a subagreement to any entity.

(5)    *Third Party Agreements*. To comply with federal requirements, the Recipient agrees to enter into a written Third Party Agreement with each Third Party Participant in its Underlying Agreement and must include all appropriate provisions stating the Third Party Participant's responsibilities to assure the Recipient's capability to comply with applicable federal requirements and

16

guidance and specifying the responsibilities that the Third Party Participant will fulfill on the Recipient's behalf.

(6) *Notice to Third Party Participants*. The Recipient agrees to include notice in each Third Party Agreement that:

(i) Federal requirements that apply to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto may change due to changes in federal law, regulation, other requirements, or guidance, or changes in the Recipient's Underlying Agreement including any information incorporated by reference and made part of that Underlying Agreement; and

(ii) Applicable changes to those federal requirements will apply to each Third Party Agreement and parties thereto at any tier.

(j) *Changed Circumstances*. The Recipient agrees that changed circumstances may occur that may impact the Recipient's ability to comply with the terms and conditions of the Underlying Agreement.

(1) *Types of Changes*. Certain circumstances can cause significant changes in performance of a Project or related activities or adversely affect the Recipient's ability to carry out its Underlying Agreement, such as:

(i) A change in federal requirements or guidance;

(ii) A change in state, territorial, local, or tribal requirements;

(iii) A change in the Recipient's circumstances, including:

(A) Its legal, financial, technical, or managerial capacity;

(B) Its continuing control of Project property; or

(C) Another similar situation; and

(iv) Any current or prospective legal matter with potentially serious consequences, including a major dispute, default, breach, or litigation, or knowledge that the Recipient's principal, official, employee, agent, or a Third Party Participant, or other person has submitted a false claim under the False Claims Act, 31 U.S.C. § 3729, et seq., or has committed a criminal or civil violation of law pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving federal assistance; suspension, debarment, or other similar administrative or enforcement action against the Recipient or any

Third Party Participant; or any matter or situation, including any other change or legal action that may adversely affect the Federal Government's interest in a Project or related activities.

(2)   *Notice*. In the circumstances described above, the Recipient agrees to provide immediate written notice to the:

    (i)   FTA Regional Counsel for the Region in which the Recipient operates public transportation or implements the Underlying Agreement;

    (ii)   FTA Headquarters Manager that administers the Underlying Agreement; or

    (iii)   FTA Chief Counsel.

(k)   *Conflict Between Federal Requirements and State, Territorial, Local, or Tribal Requirements*. FTA and the Recipient understand that a federal requirement may conflict with a state, territorial, local, or tribal requirement, and agree that the Recipient must comply with each applicable federal requirement that pre-empts the conflicting state, territorial, local, or tribal requirement.

(1)   *Compliance with State, Territorial, Local or Tribal Requirements*. Unless otherwise pre-empted by a federal requirement, FTA and the Recipient agree that:

    (i)   FTA expects the Recipient to comply with applicable state, territorial, local, and tribal requirements; and

    (ii)   FTA does not require the Recipient to take any action involving the Underlying Agreement that would violate a state, territorial, local, or tribal requirement that conflicts with a federal requirement.

(2)   *When a Conflict Arises*. When a federal requirement conflicts with a state, territorial, local, or tribal requirement:

    (i)   The Recipient must notify FTA immediately in writing if compliance with the federal requirement would violate a state, territorial, local, or tribal requirement, or require the Recipient to violate a state, territorial, local, or tribal requirement.

    (ii)   The Recipient must make appropriate arrangements with FTA to proceed with its responsibilities as set forth in the Underlying Agreement, or terminate the Underlying Agreement expeditiously, if necessary.

18

(l)     *No Federal Government Commitment or Liability to Third Parties*. Except as the Federal Government expressly consents in writing, the Recipient agrees that:

(1)     The Federal Government does not and shall not have any commitment or liability related to the Underlying Agreement, to any Third Party Participant at any tier, or to any other person or entity that is not a party (FTA or the Recipient) to the Underlying Agreement; and

(2)     Notwithstanding that the Federal Government may have concurred in or approved any Solicitation or Third Party Agreement at any tier that may affect the Underlying Agreement, the Federal Government does not and shall not have any commitment or liability to any Third Party Participant or other entity or person that is not a party (FTA or the Recipient) to the Underlying Agreement.

**Section 4.     Ethics, Political Activity, Disqualification, and Certain Criminal Activity.**

(a)     *Standards of Conduct*. At a minimum, the Recipient agrees to, and assures that its Subrecipients will, establish and maintain written Standards of Conduct covering conflicts of interest that:

(1)     Apply to the following individuals who have a present or potential financial interest, or other significant interest, such as a present or potential employment interest in the selection, award, or administration of a third party contract or subcontract:

(i)     The Recipient or its Subrecipients' officers, employees, board members, or agents engaged in the selection, award, or administration of any third party agreement;

(ii)    The immediate family members or partners of those listed above in section 4(a)(1)(i) of this Master Agreement; and

(iii)   An entity or organization that employs or is about to employ any person that has a relationship with the Recipient or its Subrecipient listed above in sections 4(a)(1)(i) and (ii) of this Master Agreement;

(2)     Prohibit those individuals listed above in section 4(a)(1) from:

(i)     Engaging in any activities involving the Recipient's or any of its Subrecipients' present or potential Third Party Participants at any tier, including selection, award, or administration of a third party agreement in which the individual has a present or potential financial or other significant interest; and

19

     (ii)     Accepting a gratuity, favor, or anything of monetary value from a present or potential Third Party Participant in the Recipient's Underlying Agreement, unless the gift is unsolicited and has an insubstantial financial or nominal intrinsic value; and

    (3)     Establish penalties, sanctions, or other disciplinary actions for violations, as permitted by state or local law or regulations, that apply to those individuals listed above in section 4(a)(1) and the Recipient's or Subrecipient's Third Party Participants.

(b)     *Bonus or Commission*. The Recipient affirms that it has not paid, and agrees that it will not pay, any bonus or commission to obtain federal assistance for any Project or related activities supported under the Underlying Agreement.

(c)     *Lobbying Restrictions*. The Recipient agrees that neither it nor any Third Party Participant will use federal assistance to influence any officer or employee of a federal agency, member of Congress or an employee of a member of Congress, or officer or employee of Congress on matters that involve the Underlying Agreement, including any extension or modification, according to the following:

    (1)     *Laws, Regulations, Requirements, and Guidance*. This includes:

        (i)     The Byrd Anti-Lobbying Amendment, 31 U.S.C. § 1352, as amended;

        (ii)     U.S. DOT regulations, "New Restrictions on Lobbying," 49 CFR Part 20, to the extent consistent with 31 U.S.C. § 1352, as amended; and

        (iii)     Other applicable federal laws, regulations, requirements, and guidance prohibiting the use of federal assistance for any activity concerning legislation or appropriations designed to influence the U.S. Congress or a state legislature; and

    (2)     *Exception*. If permitted by applicable federal law, regulations, requirements, or guidance, such lobbying activities described above may be undertaken through the Recipient's or Subrecipient's proper official channels.

(d)     *Political Activity*. The Recipient agrees to comply with:

    (1)     The Hatch Act, 5 U.S.C. chapter 15, which limits the political activities of state and local government agencies supported in whole or in part with federal assistance, including the political activities of state and local government officers and employees whose principal governmental

employment activities are supported in whole or in part with federal assistance;

(2)     U.S. Office of Personnel Management regulations, "Political Activity of State or Local Officers or Employees," 5 CFR Part 151; and

(3)     49 U.S.C. § 5323(*l*)(2) and 23 U.S.C. § 142(g), which limits the applicability of the Hatch Act, as follows:

   (i)     The Hatch Act does not apply to nonsupervisory employees of a public transportation system, or any other agency or entity performing related functions, based upon the Award of federal assistance under 49 U.S.C. chapter 53 or 23 U.S.C. § 142(a)(2); but

   (ii)    Notwithstanding the preceding section 4(e)(3)(ii) of this Master Agreement, the Hatch Act does apply to a nonsupervisory employee if imposed for a reason other than the Award of federal assistance to its employer under 49 U.S.C. chapter 53 or 23 U.S.C. § 142(a)(2).

(e)     *False or Fraudulent Statements or Claims*.

(1)     *Civil Fraud*. The Recipient acknowledges and agrees that:

   (i)     Federal laws, regulations, and requirements apply to itself and its Underlying Agreement, including the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. § 3801, et seq., and U.S. DOT regulations, "Program Fraud Civil Remedies," 49 CFR Part 31.

   (ii)    By executing the Underlying Agreement, the Recipient certifies and affirms to the Federal Government the truthfulness and accuracy of any claim, statement, submission, certification, assurance, affirmation, or representation that the Recipient provides to the Federal Government.

   (iii)   The Federal Government may impose the penalties of the Program Fraud Civil Remedies Act of 1986, as amended, and other applicable penalties if the Recipient presents, submits, or makes available any false, fictitious, or fraudulent information.

(2)     *Criminal Fraud*. The Recipient acknowledges that 49 U.S.C. § 5323(*l*)(1) authorizes the Federal Government to impose the penalties under 18 U.S.C. § 1001 if the Recipient provides a false, fictitious, or fraudulent claim, statement, submission, certification, assurance, or representation in

21

connection with a federal public transportation program under 49 U.S.C. chapter 53 or any other applicable federal law.

(f)    *Trafficking in Persons*.

   (1)    *Legal Authorities*. The Recipient agrees to comply and assures the compliance of each Subrecipient, with federal requirements and guidance, including:

      (i)    Section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended, 22 U.S.C. § 7104(g); and

      (ii)    The terms of this section 4(f), which have been derived from U.S. OMB regulatory guidance, "Award Term for Trafficking in Persons," 2 CFR Part 175, per U.S. OMB's direction.

   (2)    *Definitions*. The Recipient agrees that for purposes of this section 4(f):

      (i)    *Employee* means either an individual who is employed by the Recipient or a Subrecipient, and is participating in a Project or related activities as set forth in the Underlying Agreement, or another person who is participating in a Project or related activities as set forth in the Underlying Agreement and is not compensated by the Recipient, including, but not limited to, a volunteer, or an individual whose services are contributed by the Recipient or Third Party Participant as an in-kind contribution toward the cost sharing requirements of the Recipient's Underlying Agreement.

      (ii)    *Forced labor* means labor obtained by recruitment, harboring, transportation, provision, or other means of obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

      (iii)    *Private entity* means any entity other than a state, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR § 175.25, and includes a for-profit organization, or a nonprofit organization, including any nonprofit organization of higher education, hospital, or tribal organization other than one included in the definition of Indian Tribe at 2 CFR § 175.25(b).

      (iv)    *Severe forms of trafficking in persons* has the meaning given at section 103 of the TVPA, as amended, 22 U.S.C. § 7102.

22

(v) *Commercial sex act* has the meaning given at section 103 of the TVPA, as amended, 22 U.S.C. § 7102.

(vi) *Coercion* has the meaning given at section 103 of the TVPA, as amended, 22 U.S.C. § 7102.

(3) *Provisions Applicable to All Recipients.* The Recipient agrees to, and assures that its Subrecipients will:

(i) *Provide Information.* Inform FTA immediately of any information it receives from any source alleging a violation of the prohibitions listed in section 4(f)(4) of this Master Agreement; and

(ii) Subagreement Provision. Include the following provision in any subagreement it enters into with a private entity as defined above in section 4(f)(2)(iii) of this Master Agreement:

*XXX agrees that it and its employees that participate in the Recipient's Award, may not:*

*Engage in severe forms of trafficking in persons during the period of time that the Recipient's Award is in effect,*
*Procure a commercial sex act during the period of time that the Recipient's Award is in effect, or*
*Use forced labor in the performance of the Recipient's Award or subagreements thereunder.*

(4) *Provisions Applicable to a Private Entity Recipient.* If the Recipient is a private entity, it agrees that:

(i) *Prohibitions.* It, its employees, its Subrecipients, and its Subrecipients' employees that participate in the Underlying Agreement will not:

(A) Engage in severe forms of trafficking in persons during the period of time that the Recipient's Underlying Agreement is in effect;

(B) Procure a commercial sex act during the period of time that the Recipient's Underlying Agreement is in effect; or

(C) Use forced labor in the performance of the Recipient's Underlying Agreement or subagreements.

23

(ii) *Termination of Federal Assistance*. Section 106(g) of the TVPA, as amended, 22 U.S.C. § 7104(g), and U.S. OMB regulatory guidance, "Award Term for Trafficking in Persons," 2 CFR Part 175, provide FTA the right to unilaterally terminate the Underlying Agreement for a violation of that Act without penalty to the Federal Government, if FTA determines that the private entity Recipient or its Subrecipient:

    (A) Has violated a prohibition described above in section 4(g)(4)(i) of this Master Agreement; or

    (B) Has an employee whose conduct is determined to have violated a prohibition described above in section 4(g)(4)(i) of this Master Agreement because that employee's conduct is either:

        a. Associated with the performance of the Recipient's Underlying Agreement; or

        b. Imputed to the Recipient or Subrecipient using the standards of due process for conduct of an individual to an organization provided in:

            i. U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR Part 1200; or

            ii. U.S. OMB regulatory guidance, "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR Part 180.

(5) *Provisions Applicable to a Recipient That is Not a Private Entity*. A Recipient that is not a private entity agrees that section 106(g) of the TVPA, as amended, 22 U.S.C. § 7104(g), and U.S. OMB regulatory guidance, "Award Term for Trafficking in Persons," 2 CFR Part 175, provides FTA the right to unilaterally terminate the Underlying Agreement, without penalty to the Federal Government, for a violation of that Act if FTA determines that:

    (i) A private entity that is the Subrecipient of the Recipient is determined to have engaged in severe forms of trafficking in persons during the period of time that the Recipient's Underlying Agreement is in effect; procured a commercial sex act during the period of time that the Recipient's Underlying Agreement is in effect; or used forced labor in

24

the performance of the Recipient's Underlying Agreement or subagreements thereunder; or

(ii) An employee of a private entity that is the Subrecipient has engaged in severe forms of trafficking in persons during the period of time that the Recipient's Underlying Agreement is in effect; procured a commercial sex act during the period of time that the Recipient's Underlying Agreement is in effect; or used forced labor in the performance of the Recipient's Underlying Agreement or subagreements thereunder, and whose conduct described above is associated with the performance of the Recipient's Underlying Agreement; or is imputed to the Subrecipient using the standards for due process to impute the conduct of an individual to an organization as provided in U.S. OMB regulatory guidance, "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR Part 180, and U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR Part 1200.

(6) *Remedies Other Than Termination of Federal Assistance.* The Recipient agrees that FTA's right to terminate federal assistance as provided in the TVPA and in sections 4(f)(4)(ii) and 4(f)(5) are in addition to all other remedies for noncompliance available to the Federal Government under this Master Agreement.

(g) *Federal Tax Liability and Recent Felony Convictions.*

(1) *Transactions Prohibited.*

(i) The Recipient agrees that, prior to entering into any Third Party Agreement with any private corporation, partnership, trust, joint-stock company, sole proprietorship, or other business association, the Recipient will obtain from the prospective Third Party Participant a certification that the Third Party Participant—

(A) Does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and

(B) Was not convicted of the felony criminal violation under any Federal law within the preceding 24 months.

(ii)     If the prospective Third Party Participant cannot so certify, the Recipient agrees to refer the matter to FTA and not to enter into any Third Party Agreement with the Third Party Participant without FTA's written approval.

(2)     *Flow-Down*. The Recipient agrees to require all Third Party Participants to flow this requirement down to participants at all lower tiers, without regard to the value of any subagreement.

(h)     *Debarment and Suspension*. The Recipient agrees to the following:

(1)     It will comply with the following requirements of 2 CFR Part 180, subpart C, as adopted and supplemented by U.S. DOT regulations at 2 CFR Part 1200.

(2)     It will not enter into any "covered transaction" (as that phrase is defined at 2 CFR §§ 180.220 and 1200.220) with any Third Party Participant that is, or whose principal is, suspended, debarred, or otherwise excluded from participating in covered transactions, except as authorized by—

(i)     U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR Part 1200;

(ii)     U.S. OMB regulatory guidance, "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR Part 180; and

(iii)     Other applicable federal laws, regulations, or requirements regarding participation with debarred or suspended Recipients or Third Party Participants.

(3)     It will review the U.S. GSA "System for Award Management – Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs," if required by U.S. DOT regulations, 2 CFR Part 1200.

(4)     It will ensure that its Third Party Agreements contain provisions necessary to flow down these suspension and debarment provisions to all lower tier covered transactions.

(5)     If the Recipient suspends, debars, or takes any similar action against a Third Party Participant or individual, the Recipient will provide immediate written notice to the:

(i)     FTA Regional Counsel for the Region in which the Recipient is located or implements the Underlying Agreement;

26

(ii)     FTA Headquarters Manager that administers the Grant or Cooperative Agreement; or

(iii)    FTA Chief Counsel.

**Section 5.     Federal Assistance.**

(a)    *Total Federal Assistance Awarded and Obligated.* The Recipient agrees that FTA's responsibility to provide federal assistance for its Underlying Agreement is up to the amount shown in the Underlying Agreement, as modified by any Amendments thereto, which is equal to the smallest of: (1) the maximum amount permitted by federal law or regulation, or (2) the "Total FTA Amount Awarded and Obligated," as stated in the Underlying Agreement. FTA's responsibility to provide federal assistance is limited to the amounts listed in the most recent Award Budget identified in the Underlying Agreement and may not exceed the federal share of the actual eligible expenses incurred for participation in the Award.

(b)    *Basis of Federal Assistance.* The Recipient agrees that the "Total FTA Amount Awarded and Obligated" stated in the Underlying Agreement and modified by any Amendments thereto is calculated based on the Net Project Cost or on another basis as set forth below:

    (1)    *"Net Project Cost."* The Recipient agrees that if federal law or regulation requires an Underlying Agreement to be financed based on its "Net Project Cost," as defined in 49 U.S.C. § 5302:

        (i)    FTA will provide federal assistance for a percentage of the portion of the "Total Award Budget" that the Recipient cannot reasonably finance from its revenues, which is the "Net Project Cost;"

        (ii)    FTA will use the amount of the "Total Award Budget" stated on the Underlying Agreement to calculate the "Total FTA Amount Awarded and Obligated;" and

        (iii)    In TrAMS, the amount stated as the "Total Award Budget" on the Underlying Agreement is actually the "Net Project Cost," as defined in 49 U.S.C. § 5302.

    (2)    *Other Basis for FTA Participation.* The Recipient agrees that if federal law or FTA permits an Underlying Agreement to be financed on a basis other than its "Net Project Cost," as defined in 49 U.S.C. § 5302, or under previous authorizing legislation:

27

> (i)     FTA will provide federal assistance for all or part of the cost of the Underlying Agreement that is eligible for federal assistance;
>
> (ii)    In some instances, FTA has discretion to determine the amount of federal assistance to provide for each specific Project or related activities; and
>
> (iii)   FTA will use the amount stated in the Underlying Agreement as the "Total Award Budget" to calculate the "Total FTA Amount Awarded and Obligated."

(c)     *Award Budget*. The Recipient agrees to prepare an Award Budget that, after FTA has provided its approval, will be incorporated by reference and made part of the Underlying Agreement.

> (1)    *Restrictions*. The Recipient agrees that it will not incur costs eligible for FTA participation under the Award or withdraw federal assistance for eligible costs incurred unless those costs are consistent with the Award Budget.
>
> (2)    *Amendments to the Award Budget*. To the extent specified in applicable FTA program management guidance, the Recipient agrees that it must obtain prior FTA approval in writing before amending its Award Budget or transferring federal assistance for the Award if the transfer is not expressly authorized by federal law, regulation, or guidance. An Award of additional federal assistance will require an amended Award Budget.
>
> (3)    *Revisions to the Award Budget*. To the extent specified in applicable FTA program management guidance, the Recipient may revise the Award Budget without prior FTA written approval. The Recipient agrees that all other Award Budget revisions will require prior FTA approval in writing.
>
> (4)    *Unexpended Federal Assistance*. The Recipient agrees to inform FTA promptly if it believes it will have unexpended federal assistance after the period of performance for the Award ends.

**Section 6.     Non-Federal Share.**

(a)     *Amount*. The Recipient agrees to provide the amount of non-federal share specified in the Underlying Agreement. Except to the extent that FTA has provided its written consent permitting the Recipient to defer payment of the non-federal share required by the Underlying Agreement, the Recipient agrees to provide its proportionate amount of the non- federal share no later than the time it draws down the federal share to pay eligible costs.

(b)     *Duty to Obtain*. The Recipient agrees to complete all proceedings necessary to provide the non-federal share and to notify FTA of any changed circumstances adversely affecting its ability to pay the non-federal share, including a description of the actions it has taken or will take to ensure adequate resources to provide the non-federal share, and a re-affirmation of its commitment to provide the non-federal share.

(c)     *Permissible Sources*. The Recipient agrees that the following are permissible sources of the non-federal share for the Award:

   (1)     Undistributed cash surpluses;

   (2)     A replacement or depreciation cash fund or reserve; and

   (3)     New capital.

(d)     *Restricted Sources*. Because sources of non-federal share differ among FTA's public transportation assistance programs, FTA will specify in an FTA circular or otherwise whether the following sources may be used as the non-federal share for a specific Award under that program:

   (1)     Program income generated by a Project or related activities supported by a prior Grant or Cooperative Agreement, which is a form of undistributed cash surplus;

   (2)     Advertising revenues;

   (3)     Concession revenues;

   (4)     Revenues from a service agreement from a state or local social service agency or a private social service organization;

   (5)     Third party in-kind contributions;

   (6)     Proceeds from the issuance of revenue bonds pursuant 49 U.S.C. § 5323(e);

   (7)     Transportation development credits (formerly toll revenue credits) pursuant to 23 U.S.C. § 120(i);

   (8)     Revenue from Value Capture pursuant to 49 U.S.C. § 5323(s);

   (9)     Federal assistance made available for the Federal Lands Highway Program authorized under 23 U.S.C. § 204; or

(10)  Federal assistance derived from other federal programs whose enabling laws permit their funds to be used as the non-federal share.

(e)  *Prohibited Sources*. Except as permitted by federal laws, regulations, requirements, or guidance, or approved in writing by FTA, the Recipient agrees that it will not provide any non-federal share for the Underlying Agreement derived from:

(1)  Farebox revenues from providing public transportation services using facilities and equipment acquired with federal assistance for the Award;

(2)  Program income derived from the use of facilities or equipment acquired with federal assistance for the Award, except if expressly permitted by federal laws, regulations, requirements, or FTA guidance; or

(3)  Other federal funds not authorized for use as non-federal share by federal law, regulation, requirements, or guidance.

(f)  *Reductions or Refunds*.

(1)  *Reductions*. The Recipient agrees that if it reduces the non-federal share of eligible costs required for the Award, then at the same time it must reduce the proportionate amount of federal assistance for the Award.

(2)  *Refunds*. The Recipient agrees that if it accepts a refund of the non-federal share of eligible costs provided through the Underlying Agreement, then at the same time it must provide the Federal Government an amount of that refund proportionate to the federal contribution.

**Section 7.    Payments to the Recipient.**

(a)  *Conditions for Accessing Federal Assistance*. To seek or obtain federal assistance for the costs of implementing the Award, the Recipient agrees that:

(1)  It must execute the Underlying Agreement and any Amendments thereto;

(2)  It must receive and file a properly signed document seeking payment for the expense, such as a voucher or other appropriate record, and a properly detailed description of the relationship of the expense to the Award;

(3)  It must identify all sources of federal assistance from which the payment is derived;

(4)  It must provide FTA with all financial and progress reports required to date; and

30

(5)     If the Recipient must provide a non-federal share, unless FTA has stated otherwise in writing that the Recipient may defer the non-federal share:

    (i)     The Recipient will not request or obtain more federal assistance than justified by the eligible non-federal share it has provided;

    (ii)     The Recipient will not cause the proportion of federal assistance available for the Award at any time to exceed the percentage of federal assistance authorized and documented in the Underlying Agreement; and

    (iii)     When combined with federal payments, the Recipient will be able to demonstrate that the non-federal share will be adequate to cover all eligible costs incurred in support of the Award.

(b)     *Eligible Costs*. Except as the Federal Government determines otherwise in writing, the Recipient agrees, and will obtain the agreement of each Subrecipient, to seek and obtain federal assistance only for the eligible costs of the Award that are:

(1)     Consistent with the Description of Each Project, the Award Budget, this Master Agreement, and the Underlying Agreement and any Amendments thereto;

(2)     Necessary to carry out the Award;

(3)     Reasonable for the property or services acquired for use in the Project;

(4)     The actual net costs, which consist of the price paid minus reductions of the costs incurred, such as any refunds, rebates, or other items of value, but excluding program income;

(5)     Incurred for work performed after the Effective Date of the:

    (i)     Award;

    (ii)     Pre-award authority that FTA has provided; or

    (iii)     Letter of No Prejudice;

(6)     Satisfactorily documented;

(7)     Consistent with federally approved accounting principles and procedures, including requirements for indirect costs, consistent with the applicable U.S. DOT Common Rules; and

31

(8)    Consistent with applicable U.S. DOT Common Rules and other applicable federal law, regulations, requirements, and guidance.

(c)    *Ineligible Costs*. The Recipient agrees that, except as the Federal Government determines otherwise in writing, FTA will exclude ineligible costs incurred in connection with the Award or otherwise, such as:

   (1)    A cost the Recipient has incurred before the Effective Date of the Award as documented in the Underlying Agreement or any Amendments thereto that is not accompanied by FTA's written approval, including, but not limited to, pre-award authority or a Letter of No Prejudice, and permitted by applicable federal law, regulation, guidance, or the Underlying Agreement or any Amendments thereto;

   (2)    A cost not included in the most recent Award Budget;

   (3)    A cost for property or services received in connection with any third party agreement lacking any FTA approval or concurrence in writing that is required;

   (4)    An ordinary governmental or operating cost not applicable to the Award, as prohibited by 49 U.S.C. § 5323(h)(1);

   (5)    A profit or fee for services provided by the Recipient or any of its Subrecipients in implementing the Award; or

   (6)    A cost that is ineligible for FTA participation as provided in applicable federal law, regulation, requirement, or guidance.

(d)    *Bond Interest and Other Financing Costs – Limited Eligibility*. The Recipient agrees that bond interest and other financing costs are allowable costs to the extent permitted by applicable federal law, regulation, requirement, or guidance. FTA's share of interest and financing costs that implement the Award will be limited to an amount that does not exceed the most favorable financing terms reasonably available at the time of borrowing, except as the Federal Government determines otherwise in writing.

(e)    *Payment Procedures Based on the Type of Federal Assistance Awarded*. The Recipient agrees that:

   (1)    All payments in connection with the Award will be made through electronic methods.

   (2)    Payment procedures for a Recipient differ based upon the type of federal assistance that is awarded.

32

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

(3)    FTA determines which electronic system it will use to make payments to the Recipient as follows:

    (i)    For Grants and other types of federal assistance, FTA will use the Electronic Clearinghouse Operation Web System (ECHO-Web), Automated Clearing House (ACH) payment method, except as provided below in sections 7(e)(3)(ii) and (iii) of this Master Agreement;

    (ii)    For Cooperative Agreements, FTA will use the DELPHI eInvoicing System or DELPHI Mark View System if the Recipient is granted a waiver (see the following section 7(g) of this Master Agreement for more information about payments for cooperative agreements and section 7(g) of this Master Agreement for information about accessing and using the DELPHI eInvoicing System); and

    (iii)    For Grants requiring more detailed review of supporting documentation before receiving federal assistance and as determined by the FTA Manager for the Underlying Agreement, FTA will use the DELPHI eInvoicing System (see the following section 7(g) of this Master Agreement for more information about accessing and using the DELPHI eInvoicing System).

(f)    *Payment Procedures Using ECHO.* The Recipient agrees that if payment is made through ECHO-Web using an ECHO Control Number, it will comply with the "FTA ECHO-Web User Manual," April 2016, and it will withdraw federal assistance only to pay the eligible costs of implementing the Award.

(1)    *Major Withdrawals.* When a single withdrawal will exceed $50,000,000, the Recipient agrees to notify the appropriate FTA Regional or Program Office at least three (3) days before the withdrawal is anticipated.

(2)    *Immediate Use.* The Recipient agrees that it will not withdraw federal assistance until needed for immediate payment of those expenses and will use that federal assistance to pay for expenses that implement the Award no later than three (3) days after receipt, except as an authorized official of the Federal Government permits otherwise in writing.

(3)    *Limits.* The Recipient agrees that it will not withdraw more than the sum of federal assistance the Federal Government has awarded or the current available balance for its Award, the accompanying Underlying Agreement, and any Amendments thereto, whichever is less.

(4) *Control*. The Recipient agrees to provide for the control and accountability of all federal assistance for its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(5) *Reporting*. Unless an authorized FTA official determines otherwise in writing, the Recipient agrees to report its cash payments and balances promptly.

(6) *Penalties*. If the Recipient fails to comply with this section of this Master Agreement, it agrees that it may incur or be subjected to penalties, including, but not limited to, the following:

 (i) *Access to ECHO-Web*. The Federal Government may revoke or suspend the Recipient's ECHO Control Number and access to the ECHO-Web if the Federal Government determines that:

  (A) Fraud, waste, mismanagement, or abuse exists in the Recipient's use and application of federal assistance;

  (B) The Recipient has failed to use federal assistance it withdrew to pay costs incurred that implement the Underlying Agreement within three (3) days of withdrawing that federal assistance;

  (C) The Recipient has failed to return withdrawn but unspent federal assistance to the Federal Government within a reasonable time;

  (D) The Recipient has failed to establish procedures to minimize the time between advances of federal assistance and payments of costs incurred that implement the Underlying Agreement;

  (E) The Recipient has been awarded Federal assistance through a Cooperative Agreement with FTA and will use the eInvoicing or DELPHI Mark View System as its payment method instead of the ECHO-Web System (see section 7(g)); or

  (F) For Grants requiring a more detailed review of supporting documentation before receiving federal assistance, and as determined by the FTA Manager for the Award, the Recipient will use eInvoicing (see section 7(g)).

 (ii) *Interest*. The Recipient agrees to pay interest to the Federal Government on any federal assistance withdrawn prematurely,

34

irrespective of whether the federal assistance has been deposited in an interest-bearing account.

(A)     *A State or State Instrumentality*. If the Recipient is a state or state instrumentality, it agrees to pay interest calculated as provided in section 5(b) of the Cash Management Improvement Act of 1990, as amended, 31 U.S.C. § 6503(b), and U.S. Department of Treasury (U.S. Treasury) regulations, "Rules and Procedures for Efficient Federal-State Funds Transfers," 31 CFR Part 205.

(B)     *Other than a State or State Instrumentality*. If the Recipient is not a state or state instrumentality, it agrees to pay prejudgment common law interest determined by the Federal Government, as authorized by joint U.S. Treasury and U.S. Department of Justice (joint U.S. Treasury and U.S. DOJ) regulations, "Standards for the Administrative Collection of Claims," 31 C.F.R. § 901.9(i). The Federal Government may determine the amount of interest due, based on the amount of interest the Recipient demonstrates it earned on its premature withdrawals of federal assistance, the amount of interest based on the "Treasury tax and loan account" rate prescribed under 31 U.S.C. § 3717 for debts owed to the United States, or an amount of interest as the Federal Government otherwise determines.

(7)     *ECHO System*. If the Recipient is authorized to receive payments provided through ECHO-Web, FTA does not generally review the drawdown when made; however, FTA may review the drawdown at a later time, and subject that drawdown to an audit under a financial oversight review, a triennial review, or another audit.

(g)     *Payment Procedures for a Cooperative Agreement*. A Recipient of federal assistance through a Cooperative Agreement must use the DELPHI eInvoicing System to obtain federal payments for costs incurred that implement the Underlying Agreement, unless a waiver is granted.

(1)     *Standard Procedures*. To make and receive payments through the DELPHI eInvoicing System, the procedures below must be followed:

(i)     *Access to the DELPHI eInvoicing System*. To access the DELPHI eInvoicing System, the Recipient:

35

(A)     Must have internet access to register and submit payment requests through the DELPHI eInvoicing System;

(B)     Should contact its FTA Manager for the Underlying Agreement to obtain the required DELPHI User access form and approval;

(C)     Must complete the required form that the FAA, Enterprise Service Center's (ESC) Help Desk uses to verify the Recipient's identity, and present it to a Notary Public for verification;

(D)     Return that form, completed and notarized, to:
DOT Enterprise Services Center
FAA Accounts Payable, AMZ-100
PO Box 25710
Oklahoma City, OK 73125;
and

(E)     Should contact its FTA Manager for the Underlying Agreement with any changes to its system profile information.

(ii)    *Payment Requests*. The Recipient must submit each payment request electronically through the DELPHI eInvoicing System, unless a waiver is granted; use of the DELPHI eInvoicing System requires the FTA Manager for the Underlying Agreement to review all supporting documentation before authorizing payment.

(iii)   *Additional Information*. The U.S. DOT DELPHI eInvoicing System website at http://www.dot.gov/cfo/delphi-einvoicing-system.html displays additional information, including the access form and training materials a Recipient may need.

(iv)    *Federal Responsibilities*. When FTA so requests, the Federal Aviation Administration (FAA) will make payments to FTA Recipients electronically. On behalf of FTA, FAA/ESC must process payment requests to a Recipient of federal assistance documented in its Cooperative Agreement with FTA, and will deposit that federal assistance with the Recipient's financial institution (Note: FTA no longer issues paper checks).

(2)     *Waiver Requests*. On a case-by-case basis, U.S. DOT Financial Management officials may waive the requirement for a Recipient to register and use the DELPHI eInvoicing System.

(i)     *The Recipient's Responsibilities*. If the Recipient seeks a waiver from the requirement to use the DELPHI eInvoicing System:

    (A)     It must notify U.S. DOT and FTA by downloading the waiver request form, which can be obtained on the U.S. DOT eInvoicing website at http://www.dot.gov/cfo/delphi-einvoicing-system.html, and notifying its FTA Manager for the Underlying Agreement that it has requested a waiver from using the DELPHI eInvoicing System;

    (B)     It must send its waiver request to the Director of the Office of Financial Management, U.S. Department of Transportation, Office of the Secretary (OST), Office of Financial Management, B-30, 1200 New Jersey Avenue SE, Washington DC 20590-0001 DOTElectronicInvoicing@dot.gov; and

    (C)     If it obtains a waiver from the use of the DELPHI eInvoicing System, then payment will be made using the DELPHI Mark View System, and the Recipient should submit all invoices and any supporting documentation directly to:

        a.     FTAinvoices@faa.gov (Note: no more than 10 MB of data can be transmitted at one time. For invoices greater than 10MB, split into multiple emails and notate in the subject Email 1 of 4, 2 of 4, etc.); or

        b.     DOT/FAA (FTA Account)
            6500 South MacArthur Blvd.
            AMZ-150, HQ Room 272
            PO Box 26904
            Oklahoma City, OK 73125-69041

(ii)    *Federal Responsibilities*. FTA and U.S. DOT have the following responsibilities:

    (A)     The Director, OST, Office of Financial Management, will confirm or deny the waiver request within approximately 30 days.

    (B)     If the request is granted, then payments will be made after receipt of the required FTA reporting forms, provided the Recipient has complied with the U.S. DOT Common Rules and this Master Agreement.

(iii) *DELPHI eInvoicing System or DELPHI Mark View System.* If the Recipient receives payments provided through the DELPHI eInvoicing System or DELPHI Mark View System, the Recipient must submit a request for payment with adequate supporting documentation for FTA to determine that:

(A) It has complied and is complying with the Underlying Agreement;

(B) It has made and is making adequate progress toward completion of the Award; and

(C) It has satisfied FTA that the federal assistance requested is needed for the eligible purposes of the Award in that requisition period.

(iv) *Reimbursement.* After it has demonstrated satisfactory compliance with this section, FTA may reimburse the federal share of the Recipient's apparent allowable costs incurred or to be incurred in the requisition period if those apparent allowable costs are consistent with the Award Budget, and those apparent allowable costs do not exceed the maximum amount of federal assistance that may be paid through the federal fiscal year of that requisition.

(h) *Safeguarding Federal Assistance.* The Recipient agrees to deposit all federal assistance it receives in a financial institution and in an insured account whenever possible, and understands that FTA encourages it to use financial institutions owned at least fifty (50) percent by minority group members.

(i) *The Recipient's Duty to Pay Eligible Costs.* When accompanied by appropriate documentation, the Recipient agrees to pay the eligible costs incurred that implement the Award when due, using the available federal assistance provided for the Award and the non- federal share.

(j) *Effect of Federal Payments.* The Recipient agrees that any federal payment made for a cost incurred that is supported by its Underlying Agreement does not constitute the Federal Government's final decision about the eligibility of the cost for payment with federal assistance provided through the Underlying Agreement, or a waiver of any violation of any federal law, regulation, requirement, guidance, the Underlying Agreement or this Master Agreement.

(k) *Revocation of Federal Assistance.* The Federal Government may revoke the unexpended portion of federal assistance for the Award after the Award has been made and executed.

(l)    *Final Cost Determination*. The Recipient acknowledges that the Federal Government will not make a final determination about the eligibility of any cost until the audit of the Award and Underlying Agreement has been completed.

(m)    *Closeout*. The Recipient agrees that closeout of the Award will not alter:

   (1)    The Recipient's obligation to return any amounts it owes the Federal Government for later refunds, corrections, or other similar actions; and

   (2)    The Federal Government's right to disallow costs and recover federal assistance based on a later audit or other review.

(n)    *Notification*. If the Federal Government determines that the Recipient is not entitled to any portion of federal assistance paid, the Federal Government will notify the Recipient in writing.

(o)    *Recovery of Improper Payments*. Unless prohibited by federal law or regulation, the Federal Government may recover any federal assistance necessary to satisfy any outstanding monetary claims it may have against the Recipient.

(p)    *Program Income*. The Recipient agrees that it may use its program income derived from a Project receiving federal assistance through the Underlying Agreement as FTA permits. In determining the total amount of program income a Recipient has earned from its Project, those costs incident to earning program income that have not been charged to the Award may be deducted from the Recipient's gross income.

   (1)    *During the Period of Performance*. The Recipient may use program income earned during the period of performance of the Underlying Agreement as follows:

      (i)    The Recipient may retain the income for other capital or operating public transportation expenses. If the Recipient chooses not to use program income for current or future FTA Grants or Cooperative Agreements or for other purposes ineligible for federal participation, then the amount of program income used for purposes ineligible for federal participation will be deducted from the total allowable costs to determine the net allowable costs.

      (ii)    For each Public Transportation Innovation, Technical Assistance, Workforce Development Project or Enhanced Mobility of Seniors and Individuals with Disabilities project, or related activities, the Recipient may add program income to the Award.

(iii)    Depending on federal statutory or regulatory restrictions, the Recipient may use the program income for the non-federal share for a future public transportation Project that will receive federal assistance provided by FTA.

(2)    *After the Award Period.* Except as FTA determines otherwise in writing, the Recipient has no obligation to the Federal Government regarding the disposition of program income earned after the end of the period of performance of the Award (i.e., after the ending date of the final Federal Financial Report).

(q)    *Profits.* The Recipient and Subrecipient may earn or keep the profits it may derive as a result of an Award, but the Recipient agrees that any such profits must be used in a manner consistent with the provisions of this Master Agreement or applicable federal guidance.

(r)    *Excess Payments, Disallowed Costs, Refunds, Claims, Debts, Interest, Penalties, Administrative Charges, and Other Amounts Owed to the Federal Government.*

(1)    *The Recipient's Responsibility to Pay.* The Recipient agrees that after receiving notice of specific amounts due, it will pay the amount it owes the Federal Government for:

(i)    Excess federal payments for disallowed costs;

(ii)    Refunds due and amounts recovered from third parties or other sources;

(iii)    Federal claims or debts;

(iv)    Interest assessed;

(v)    Penalties;

(vi)    Administrative charges; or

(vii)    Other amounts it owes the Federal Government.

(2)    *Amount of Interest Due.* The amount of interest to be assessed depends on the procedures used to pursue payment:

(i)    *The Debt Collection Act.* When the Federal Government uses the procedures of the Debt Collection Act of 1982, as amended, 31 U.S.C. § 3701, et seq., to collect claims or debts owed by the Recipient for any reason authorized under that Act (including excess

40

payments and disallowed costs), the Recipient agrees that the amount of interest it will owe will be determined by the Joint U.S. Treasury and U.S. DOJ regulations, "Standards for the Administrative Collection of Claims," 31 CFR Part 900, specifically 31 C.F.R. § 901.9(a) – (g), or common law interest authorized by 31 C.F.R. § 901.9(i), as the Federal Government determines.

(ii)     *Other Collection Processes*. When the Federal Government uses methods or procedures other than those described in 31 U.S.C. § 3701, et seq., to recover money(ies) the Recipient owes the Federal Government, the Recipient agrees that common law interest will be due as authorized by Joint U.S. Treasury and U.S. DOJ regulations, "Standards for the Administrative Collection of Claims," 31 C.F.R. § 901.9(i), but interest for premature withdrawals of federal assistance by states or state instrumentalities will be calculated as required under Section 5(b) of the Cash Management Improvement Act of 1990, as amended, 31 U.S.C. § 6503(b), and U.S. Treasury regulations, "Rules and Procedures for Efficient Federal-State Funds Transfers," 31 CFR Part 205.

(s)     *De-obligation of Federal Assistance*. The Recipient agrees that the Federal Government may de-obligate federal assistance the Recipient has not spent both before and after closeout of the Award.

**Section 8.     Records and Reports Related to the Award and the Underlying Agreement.**

(a)     *Records*. The Recipient agrees to maintain satisfactory records of each Project and activities related in whole or in part to its Award, the accompanying Underlying Agreement, and any Amendments thereto to the extent FTA requires, including, but not limited to:

(1)     *Financial Records*. Accurate financial records in its account for its Award, the accompanying Underlying Agreement, and any Amendments thereto, including, but not limited to, records of:

(i)     *Assets Received that Implement the Award*. The amount of all assets it receives to implement its Award, the accompanying Underlying Agreement, and any Amendments thereto including, but not limited to all federal assistance or the value of any property the Federal Government provides that implement its Award, the accompanying Underlying Agreement, and any Amendments thereto, and all other funds and the value of any property or services it has received from sources other than the Federal Government provided for, accruing to,

41

or otherwise received on account of its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(ii)  *Costs Incurred that Implement the Award.* Information about the costs incurred to implement its Award, the accompanying Underlying Agreement, and any Amendments thereto, including all costs incurred for the eligible property or services, detailed descriptions of the type of property or services acquired, including, but not limited, to properly executed payrolls, time records, invoices, contracts, vouchers, and other appropriate records, and detailed justifications for those costs.

(iii)  *Program Income.* All program income derived from the use of Project property, except income FTA determines to be exempt from federal program income record requirements.

(2)  *Other Records Needed for Reports Related to the Award.* Sufficient records as needed to prepare adequate reports related to the Award that it must submit to the Federal Government.

(3)  *Formats.* Formats for records must be satisfactory to FTA and include, but are not limited to, electronic records, including any emails related to the Award, records on paper, and records created in other formats.

(4)  *Availability of Records Related to the Award.* Accessibility for review and separation from other records not related to the Award to the extent feasible must be maintained.

(b)  *Reports.* The Recipient agrees to provide to FTA, and others if FTA so directs, all reports related in whole or in part required by applicable federal laws, regulations, requirements, the Underlying Agreement, or at FTA's express direction in the number and format as FTA specifies.

(c)  *Data on Assaults on Transit Workers and Bus Impact Fatalities.* The Recipient agrees to report when required to the National Transit Database in accordance with FTA regulation 49 CFR Part 630, "National Transit Database," and applicable FTA instructions—

(1)  Any data on assaults on transit workers of the Recipient; and

(2)  Any data on fatalities that result from an impact with a bus.

(d)  *National Transit Database.* For each fiscal year the Recipient receives or provides to any public transportation operator federal assistance appropriated or made available

for 49 U.S.C. § 5307 (including the Passenger Ferry Grant Program) or any provision of 49 U.S.C. § 5311 (including the Tribal Transit Program):

(1)  *Reporting Requirements*. The Recipient agrees to, and assures that it will require any person that receives benefits directly from its Award (including the public transportation operators participating in its Award), the accompanying Underlying Agreement, and any Amendments thereto:

    (i)  To facilitate compliance with 49 U.S.C. § 5335(a), which authorizes the National Transit Database (NTD);

    (ii)  To conform to the NTD reporting system and the Uniform System of Accounts and Records;

    (iii)  To comply with FTA regulations, "Uniform System of Accounts and Records and Reporting System," 49 CFR Part 630;

    (iv)  To report when required to the National Transit Database in accordance with FTA regulation 49 CFR Part 630, "National Transit Database," and applicable FTA instructions—

        (A)  Any information relating to a transit asset inventory or condition assessment conducted by the Recipient; and

        (B)  Such other information as FTA may require; and

    (v)  To comply with any other applicable reporting regulations, and requirements, and

    (vi)  To follow FTA guidance.

(2)  *Voluntary Compliance*. FTA encourages any Recipient that is not required to provide information for the NTD, to provide that information voluntarily.

(e)  *U.S. OMB Special Reporting Requirements*.

(1)  *Authority*. U.S. OMB has issued regulatory guidance in 2 C.F.R. § 25.220 instructing federal agencies to include special "award terms" as authorized under federal laws, including:

    (i)  The Federal Funding Accountability and Transparency Act of 2006 (FFATA), Public Law No. 109-282, September 26, 2006;

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

(ii)    Section 6202 of the Department of Defense Appropriations Act for Fiscal Year 2008, Public Law No. 110-252, June 30, 2008, which amended the FFATA; and

(iii)    Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Public Law No. 110-417, October 14, 2008, which further amended the FFATA.

(2)    *Universal Identifier and System for Award Management (SAM).* The Recipient agrees to comply with the award terms in U.S. OMB regulatory guidance, "Universal Identifier and System for Award Management (SAM)," 2 CFR Part 25, appendix A, which FTA has included in this Master Agreement at the direction of U.S. OMB:

(i)    *Requirements for the System for Award Management (SAM).* Unless exempted from SAM as provided in 2 C.F.R. § 25.110, the Recipient agrees to:

(A)    Maintain the currency of its information in SAM until the later of the date it submits its final financial report required under this Master Agreement, or the date it receives its final federal payment for the Underlying Agreement; and

(B)    Review and update its information in SAM at least annually after the initial registration, and more frequently if required by changes in its information, another provision of an applicable federal or federally assisted agreement, or an applicable federal law or regulation, or U.S. OMB regulatory guidance.

(ii)    *Requirement for a Unique Entity Identifier [Currently, the Data Universal Numbering System (DUNS) Number for SAM].* If the Award includes federal assistance intended to support subawards, the Recipient agrees to notify each potential Subrecipient and other entity participating in the Award that:

(A)    The potential Subrecipient or entity must provide its unique entity identifier for SAM [currently, its DUNS number] to the Recipient;

(B)    The Recipient may not make any subaward to any potential Subrecipient or entity unless that Subrecipient or entity has provided its unique entity identifier for SAM [currently, its DUNS number] to the Recipient; and

(C)    No Subrecipient or entity, as described below in section 8(d)(4) of this Master Agreement, may receive a subaward provided through the Underlying Agreement, unless that entity has provided its unique entity identifier for SAM [currently, its DUNS number] to the Recipient.

(3)    *Reporting Subawards and Executive Compensation*. The Recipient agrees to comply with the award terms in U.S. OMB regulatory guidance, "Reporting Subaward and Executive Compensation Information," 2 CFR Part 170, appendix A, which FTA has included in this Master Agreement at the direction of U.S. OMB.

(4)    *Reporting of First-Tier Subawards*. The Recipient agrees that when it takes an action that obligates $25,000 or more in federal assistance for a subaward, it must report each such action as provided below, but it need not report an obligation of $25,000 or more in federal assistance, if the Recipient is exempt from U.S. OMB's Special Reporting Requirements as provided below.

(i)    *Where and when to report*. The Recipient agrees to report each obligating action described below to http://www.fsrs.gov, and the Recipient agrees to report subaward information no later than the end of the month after the month in which the obligation was made, *(for example, if the obligation was made on October 1, 2015, the obligation must be reported by no later than November 1, 2015)*.

(ii)    *What to report*. The Recipient agrees to report the requisite information about each obligating action required by the submission instructions posted at http://www.usaspending.gov.

(iii)    *Reporting Total Compensation of the Recipient's Executives*. The Recipient agrees to report the total compensation for each of its five highest compensated executives for the preceding completed fiscal year if:

(A)    The total federal assistance authorized to date for the Underlying Agreement is $25,000 or more; and

(B)    In its preceding fiscal year, the Recipient:

a.    Received 80 percent or more of its annual gross revenues from federal assistance subject to the Transparency Act, as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts);

45

    b.  Received $25,000,000 or more in annual gross revenues from federal assistance subject to the Transparency Act, as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts); and

    c.  The public does not have access to information about the compensation of the Recipient's executives through periodic reports filed under Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d), or Section 6104 of the Internal Revenue Code of 1986, 26 U.S.C. § 6104 (to determine if the public has access to the compensation information, see the U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

(C)    The Recipient agrees to report executive total compensation described above as part of Recipient's registration profile at http://www.sam.gov, and by the end of the month after the month in which the Underlying Agreement is executed and annually thereafter.

(D)    Reporting of Total Compensation of the Subrecipient's Executives. Unless exempt as provided below, the Recipient agrees to report the names and total compensation of each of its first-tier Subrecipient's five highest compensated executives for the Subrecipient's preceding completed fiscal year if:

    a.  It received 80 percent or more of its annual gross revenues from federal assistance subject to the Transparency Act, as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts); and

    b.  It received $25,000,000 or more in annual gross revenues from federal assistance subject to the Transparency Act as defined in 2 C.F.R. § 170.320 (and subawards) and/or federal procurement contracts (and subcontracts);

46

    c.   The public does not have access to information about the compensation of the Subrecipient's executives through periodic reports filed under Section 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(a), Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d), or Section 6104 of the Internal Revenue Code of 1986, 26 U.S.C. § 6104 (to determine if the public has access to the compensation information, see the U.S. Securities and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm).

(E)    The Recipient agrees to report the Subrecipient's executives' total compensation described above to FTA and elsewhere as may be determined by the Federal Government, and by the end of the month following the month during which the Recipient makes the subaward (for example, if a subaward is obligated on any date during the month of October of a given year, i.e., between October 1 and 31, the Recipient must report any required compensation information about the Subrecipient by November 30 of that year).

(F)    Any Recipient that had gross income under $300,000 from all sources in the previous tax year is exempt from those federal requirements to report subawards, and the total compensation of the five highest compensated executives of any Subrecipient.

(5)    *Recipient Integrity and Performance Matters*. U.S. OMB regulatory guidance, "Recipient Integrity and Performance Matters," 2 CFR Part 200, appendix XII, contains mandatory provisions that may affect the Recipient's reporting requirements.

(f)    *Closeout*. The Recipient agrees that closeout of its Award does not alter the record-keeping and reporting requirements of this section of this Master Agreement.

**Section 9.    Record Retention and Access to Sites of Performance.**

(a)    *Types of Records*. The Recipient agrees to retain, and will require its Third Party Participants to retain, complete and readily accessible records related in whole or in part to the Underlying Agreement, including, but not limited to, data, documents, reports, statistics, subagreements, leases, third party contracts, arrangements, other third party agreements of any type, and supporting materials related to those records.

47

(b)     *Retention Period*. The Recipient agrees to comply with the record retention requirements in the applicable U.S. DOT Common Rule. Records pertaining to its Award, the accompanying Underlying Agreement, and any Amendments thereto must be retained from the day the Underlying Agreement was signed by the authorized FTA official through the course of the Award, the accompanying Underlying Agreement, and any Amendments thereto until three years after the Recipient has submitted its last or final expenditure report, and other pending matters are closed.

(c)     *Access to Recipient and Third Party Participant Records*. The Recipient agrees, and assures that each Subrecipient, if any, will agree to:

> (1)     Provide, and require its Third Party Participants at each tier to provide, sufficient access to inspect and audit records and information, including such records and information the Recipient or its Third Party Participants may regard as confidential or proprietary, related to its Award, the accompanying Underlying Agreement, and any Amendments thereto to the U.S. Secretary of Transportation or the Secretary's duly authorized representatives, to the Comptroller General of the United States, and the Comptroller General's duly authorized representatives, and to the Recipient and each of its Subrecipients;

> (2)     Permit those individuals listed above to inspect all work and materials related to its Award, and to audit any information related to its Award under the control of the Recipient or Third Party Participant within books, records, accounts, or other locations; and

> (3)     Otherwise comply with 49 U.S.C. § 5325(g), and federal access to records requirements as set forth in the applicable U.S. DOT Common Rules.

(d)     *Access to the Sites of Performance*. The Recipient agrees to permit, and to require its Third Party Participants to permit, FTA to have access to the sites of performance of its Award, the accompanying Underlying Agreement, and any Amendments thereto, and to make site visits as needed in compliance with the U.S. DOT Common Rules.

(e)     *Closeout*. Closeout of the Award does not alter the record retention or access requirements of this section of this Master Agreement.

**Section 10.     Completion, Audit, Settlement, and Closeout.**

(a)     *Completion*. Within one hundred twenty (120) calendar days after completion or termination of the Award, the Recipient agrees to submit; and within ninety (90) calendar days after completion or termination of the Award (or an earlier date as

48

agreed upon by the pass-through entity and subrecipient), the subrecipient agrees to submit to the pass-through entity:

(1)     Its final Federal Financial Report, either electronically or on Federal Financial Report Standard Form 425 (SF-425);

(2)     A certification of expenses incurred that implement its Award, the accompanying Underlying Agreement, and any Amendments thereto; and

(3)     The necessary audit reports of its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(b)     *Audit of the Recipient*. Except as the Federal Government determines otherwise in writing, the Recipient agrees that:

(1)     *Audits Required*. It must obtain the following audits:

(i)      *Annual "Single Audit."* A financial and compliance audit consistent with the requirements of the Single Audit Act Amendments of 1996, 31 U.S.C. § 7501, et seq., and applicable U.S. DOT "Single Audit" requirements of 2 CFR Part 1201, which incorporate by reference 2 CFR Part 200, for each Award, the accompanying Underlying Agreement, and any Amendments to any Underlying Agreement; and

(ii)     *Other Audits*. Other audits the Federal Government may require.

(2)     *Auditing Standards*. It must comply with the "Audit Requirements" of 2 CFR Part 200, subpart F, and conform to U.S. Government Accountability Office (U.S. GAO) "Government Auditing Standards" in the conduct of audits of its Award, the accompanying Underlying Agreement, and any Amendments thereto.

(3)     *Costs of Audits*. The audit costs for the administration and management of the Award, the accompanying Underlying Agreement, and any Amendments to any Underlying Agreement are allowable to the extent authorized by the cost principles of 49 CFR Part 1201, which incorporate by reference 2 CFR Part 200.

(c)     *Amounts Owed to the Federal Government*. The Recipient agrees to return to the Federal Government any excess federal payments it receives for disallowed costs, and the Federal Government's proportionate part of any amounts it recovers from third parties or other sources, including refunds due and amounts recovered from third parties or other sources, interest assessed, penalties, and administrative charges.

49

(d)     *Closeout*. The Recipient agrees that closeout of the Award occurs when FTA notifies the Recipient that the Award is closed, and approves the final federal payment, or acknowledges receipt of the proper refund. Closeout of the Award does not alter the Recipient's audit responsibilities and does not invalidate any continuing requirements of applicable federal law, regulations, or requirements, this Master Agreement or the Underlying Agreement.

## Section 11.     Right of the Federal Government to Terminate.

(a)     *Justification*. After providing written notice to the Recipient, the Recipient agrees that the Federal Government may suspend, suspend then terminate, or terminate all or any part of the federal assistance for the Award if:

(1)     The Recipient has failed to make reasonable progress implementing the Award;

(2)     The Federal Government determines that continuing to provide federal assistance to support the Award does not adequately serve the purposes of the law authorizing the Award; or

(3)     The Recipient has violated the terms of the Underlying Agreement, especially if that violation would endanger substantial performance of the Underlying Agreement.

(b)     *Financial Implications*. In general, termination of federal assistance for the Award will not invalidate obligations properly incurred before the termination date to the extent that those obligations cannot be canceled. The Federal Government may recover the federal assistance it has provided for the Award, including the federal assistance for obligations properly incurred before the termination date, if it determines that the Recipient has misused its federal assistance by failing to make adequate progress, failing to make appropriate use of the Project property, or failing to comply with the Underlying Agreement, and require the Recipient to refund the entire amount or a lesser amount, as the Federal Government may determine including obligations properly incurred before the termination date.

(c)     *Expiration of the Period of Performance*. Except for a Full Funding Grant Agreement, expiration of any period of performance established for the Award does not, by itself, constitute an expiration or termination of the Award; FTA may extend the period of performance to assure that each Formula Project or related activities and each Project or related activities funded with "no year" funds can receive FTA assistance to the extent FTA deems appropriate.

(d)     *Uniform Administrative Requirements.* These termination rights are in addition to and in no way limit the Federal Government's rights to terminate described in 2 CFR § 200.340.

**Section 12.     Civil Rights.**

(a)     *Civil Rights Requirements.* The Recipient agrees that it must comply with applicable federal civil rights laws, regulations, and requirements, and follow applicable federal guidance, except as the Federal Government determines otherwise in writing. Therefore, unless a Recipient or a federal program, including the Indian Tribe Recipient or the Tribal Transit Program, is specifically exempted from a civil rights statute, FTA requires compliance with each civil rights statute, including compliance with equity in service requirements.

(b)     *Nondiscrimination in Federal Public Transportation Programs.* The Recipient agrees to, and assures that it and each Third Party Participant will:

    (1)     Prohibit discrimination based on race, color, religion, national origin, sex (including sexual orientation), disability, or age.

    (2)     Prohibit the:

        (i)      Exclusion from participation in employment or a business opportunity for reasons identified in 49 U.S.C. § 5332;

        (ii)     Denial of program benefits in employment or a business opportunity identified in 49 U.S.C. § 5332; or

        (iii)    Discrimination identified in 49 U.S.C. § 5332, including discrimination in employment or a business opportunity identified in 49 U.S.C. § 5332.

    (3)     Follow:

        (i)      The most recent edition of FTA Circular 4702.1, "Title VI Requirements and Guidelines for Federal Transit Administration Recipients," to the extent consistent with applicable federal laws, regulations, requirements, and guidance; but

        (ii)     FTA does not require an Indian Tribe to comply with FTA program-specific guidelines for Title VI when administering its Underlying Agreement supported with federal assistance under the Tribal Transit Program.

Docusign Envelope ID: 50F87D3D-332A-4641-8C48-BB1DEEDA05CF

(c)     *Nondiscrimination – Title VI of the Civil Rights Act*. The Recipient agrees to, and assures that each Third Party Participant will:

   (1)     Prohibit discrimination based on race, color, or national origin,

   (2)     Comply with:

   (i)     Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq.;

   (ii)    U.S. DOT regulations, "Nondiscrimination in Federally-Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964," 49 CFR Part 21, including any amendments thereto; and

   (iii)   Federal transit law, specifically 49 U.S.C. § 5332; and

   (3)     Follow:

   (i)     The most recent edition of FTA Circular 4702.1, "Title VI Requirements and Guidelines for Federal Transit Administration Recipients," to the extent consistent with applicable federal laws, regulations, requirements, and guidance;

   (ii)    U.S. DOJ, "Guidelines for the enforcement of Title VI, Civil Rights Act of 1964," 28 C.F.R. § 50.3; and

   (iii)   All other applicable federal guidance that may be issued.

(d)     *Equal Employment Opportunity*.

   (1)     *Federal Requirements and Guidance*. The Recipient agrees to, and assures that each Third Party Participant will, prohibit discrimination based on race, color, religion, sex, sexual orientation, or national origin, and:

   (i)     Comply with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.;

   (ii)    Comply with Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq.;

   (iii)   Comply with federal transit law, specifically 49 U.S.C. § 5332, as provided in section 12 of this Master Agreement;

        (iv)    FTA Circular 4704.1 "Equal Employment Opportunity (EEO) Requirements and Guidelines for Federal Transit Administration Recipients;" and

        (v)    Follow other federal guidance pertaining to EEO laws, regulations, and requirements.

    (2)    *Indian Tribes*. The Recipient agrees to, and assures that each Third Party Participant will recognize that Title VII of the Civil Rights Act of 1964, as amended, exempts Indian Tribes under the definition of "Employer".

(e)    *Disadvantaged Business Enterprise*. To the extent authorized by applicable federal laws, regulations, or requirements, the Recipient agrees to facilitate, and assures that each Third Party Participant will facilitate, participation by small business concerns owned and controlled by socially and economically disadvantaged individuals, also referred to as "Disadvantaged Business Enterprises" (DBEs), in the Underlying Agreement as follows:

    (1)    *Statutory and Regulatory Requirements*. The Recipient agrees to comply with:

        (i)    Section 11101(e) of IIJA;

        (ii)    U.S. DOT regulations, "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs," 49 CFR Part 26, including any amendments thereto; and

        (iii)    Federal transit law, specifically 49 U.S.C. § 5332, as provided in section 12 of this Master Agreement.

    (2)    *Special Requirements for a Transit Vehicle Manufacturer (TVM)*. The Recipient agrees that:

        (i)    *TVM Certification*. Each TVM, as a condition of being authorized to bid or propose on FTA-assisted transit vehicle procurements, must certify that it has complied with the requirements of 49 CFR Part 26, including any amendments thereto; and

        (ii)    *Reporting TVM Awards*. Within 30 days of any third party contract award for a transit vehicle purchase, the Recipient must submit to FTA the name of the TVM contractor and the total dollar value of the third party contract using the Transit Vehicle Award Reporting Form on FTA's website. The Recipient must also submit additional

notifications if options are exercised in subsequent years to ensure that the TVM is still in good standing.

(3) *Assurance*. As required by 49 C.F.R. § 26.13(a):

(i) *Recipient Assurance*. The Recipient agrees and assures that:

(A) It must not discriminate based on race, color, national origin, or sex in the award and performance of any FTA or U.S. DOT-assisted contract, or in the administration of its DBE program or the requirements of 49 CFR Part 26;

(B) It must take all necessary and reasonable steps under 49 CFR Part 26 to ensure nondiscrimination in the award and administration of U.S. DOT-assisted contracts;

(C) Its DBE program, as required under 49 CFR Part 26 and as approved by U.S. DOT, is incorporated by reference and made part of the Underlying Agreement; and

(D) Implementation of its DBE program approved by U.S. DOT is a legal obligation and failure to carry out its terms shall be treated as a violation of this Master Agreement.

(ii) *Subrecipient/Third Party Contractor/Third Party Subcontractor Assurance*. The Recipient agrees and assures that it will include the following assurance in each subagreement and third party contract it signs with a Subrecipient or Third Party Contractor and agrees to obtain the agreement of each of its Subrecipients, Third Party Contractors, and Third Party Subcontractors to include the following assurance in every subagreement and third party contract it signs:

(A) The Subrecipient, each Third Party Contractor, and each Third Party Subcontractor must not discriminate based on race, color, national origin, or sex in the award and performance of any FTA or U.S. DOT-assisted subagreement, third party contract, and third party subcontract, as applicable, and the administration of its DBE program or the requirements of 49 CFR Part 26;

(B) The Subrecipient, each Third Party Contractor, and each Third Party Subcontractor must take all necessary and reasonable steps under 49 CFR Part 26 to ensure nondiscrimination in the award and administration of U.S. DOT-assisted

54

subagreements, third party contracts, and third party subcontracts, as applicable;

(C) Failure by the Subrecipient and any of its Third Party Contractors or Third Party Subcontractors to carry out the requirements of this subparagraph 12.e(4)(ii) is a material breach of this subagreement, third party contract, or third party subcontract, as applicable; and

(D) The following remedies, or such other remedy as the Recipient deems appropriate, include, but are not limited to, withholding monthly progress payments, assessing sanctions, liquidated damages, and/or disqualifying the Subrecipient, Third Party Contractor, or Third Party Subcontractor from future bidding as non-responsible.

(4) *Remedies*. Upon notification to the Recipient of its failure to carry out its approved program, FTA or U.S. DOT may impose sanctions as provided for under 49 CFR Part 26, and, in appropriate cases, refer the matter for enforcement under either or both 18 U.S.C. § 1001, and/or the Program Fraud Civil Remedies Act of 1986, 31 U.S.C. § 3801, et seq.

(f) *Nondiscrimination on the Basis of Sex*. The Recipient agrees to comply with federal prohibitions against discrimination based on sex, including:

(1) Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, et seq.;

(2) U.S. DOT regulations, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 49 CFR Part 25; and

(3) Federal transit law, specifically 49 U.S.C. § 5332.

(g) *Nondiscrimination on the Basis of Age*. The Recipient agrees to comply with federal prohibitions against discrimination based on age, including:

(1) The Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634, which prohibits discrimination based on age;

(2) U.S. Equal Employment Opportunity Commission (U.S. EEOC) regulations, "Age Discrimination in Employment Act," 29 CFR Part 1625;

(3) The Age Discrimination Act of 1975, as amended, 42 U.S.C. § 6101, et seq., which prohibits discrimination against individuals based on age in the

administration of Programs, Projects, and related activities receiving federal assistance;

(4)      U.S. Health and Human Services regulations, "Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance," 45 CFR Part 90; and

(5)      Federal transit law, specifically 49 U.S.C. § 5332.

(h)      *Nondiscrimination on the Basis of Disability.* The Recipient agrees to comply with the following federal prohibitions against discrimination based on disability:

(1)      Federal laws, including:

(i)      Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which prohibits discrimination based on disability in the administration of federally assisted Programs, Projects, or activities;

(ii)      The Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101, et seq., which requires that accessible facilities and services be made available to individuals with disabilities:

(A)      For FTA Recipients generally, Titles I, II, and III of the ADA apply; but

(B)      For Indian Tribes, Titles II and III of the ADA apply, but Title I of the ADA does not apply because it exempts Indian Tribes from the definition of "employer;"

(iii)      The Architectural Barriers Act of 1968, as amended, 42 U.S.C. § 4151, et seq., which requires that buildings and public accommodations be accessible to individuals with disabilities;

(iv)      Federal transit law, specifically 49 U.S.C. § 5332, which now includes disability as a prohibited basis for discrimination; and

(v)      Other applicable federal laws, regulations, and requirements pertaining to access for seniors or individuals with disabilities.

(2)      Federal regulations and guidance, including:

(i)      U.S. DOT regulations, "Transportation Services for Individuals with Disabilities (ADA)," 49 CFR Part 37;

56

(ii) U.S. DOT regulations, "Nondiscrimination on the Basis of Disability in Programs and Activities Receiving or Benefiting from Federal Financial Assistance," 49 CFR Part 27;

(iii) Joint U.S. Architectural and Transportation Barriers Compliance Board (U.S. ATBCB) and U.S. DOT regulations, "Americans With Disabilities (ADA) Accessibility Specifications for Transportation Vehicles," 49 CFR Part 38;

(iv) U.S. DOT regulations, "Transportation for Individuals with Disabilities: Passenger Vessels," 49 CFR Part 39;

(v) U.S. DOJ regulations, "Nondiscrimination on the Basis of Disability in State and Local Government Services," 28 CFR Part 35;

(vi) U.S. DOJ regulations, "Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities," 28 CFR Part 36;

(vii) U.S. EEOC, "Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 CFR Part 1630;

(viii) U.S. Federal Communications Commission regulations, "Telecommunications Relay Services and Related Customer Premises Equipment for Persons with Disabilities," 47 CFR Part 64, subpart F;

(ix) U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194;

(x) FTA regulations, "Transportation for Elderly and Handicapped Persons," 49 CFR Part 609;

(xi) FTA Circular 4710.1, "Americans with Disabilities Act: Guidance;" and

(xii) Other applicable federal civil rights and nondiscrimination regulations and guidance.

(i) *Drug or Alcohol Abuse – Confidentiality and Other Civil Rights Protections*. The Recipient agrees to comply with the confidentiality and civil rights protections of:

(1) The Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. § 1101, et seq.;

57

(2)   The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

(3)   The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)   *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of Justice guidance.

(k)   *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)   *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)   *Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)   *Federal Anti-Discrimination*.

(1)   Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(2)   Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

**Section 13.    Planning.**

(a)    *Standard Planning Provisions*. The Recipient agrees to the following:

(1)    *Planning Requirements and Guidance*. To assure that its Underlying Agreement is consistent with the Planning requirements that apply, the Recipient agrees to:

(i)    Comply with the Metropolitan planning requirements of 49 U.S.C. § 5303, and joint FHWA and FTA regulations, "Planning and Assistance Standards" (for Metropolitan Transportation Planning and Programming), 23 CFR Part 450 and 49 CFR Part 613, to the extent those regulations are consistent with the metropolitan planning requirements of 49 U.S.C. § 5303;

(ii)    Comply with the statewide and nonmetropolitan planning requirements of 49 U.S.C. § 5304, and joint FHWA and FTA regulations, "Planning and Assistance Standards" (for statewide transportation planning and programming), 23 CFR Part 450 and 49 CFR Part 613, to the extent those regulations are consistent with the state planning requirements of 49 U.S.C. § 5304; and

(iii)    Follow any guidance FTA issues to implement requirements of 49 U.S.C. §§ 5303 and 5304.

(2)    *Participation of State or Local Governmental and Private Nonprofit Providers of Nonemergency Transportation*. The Recipient agrees to comply with 49 U.S.C. § 5323(k) by assuring that it will, as feasible:

(i)    Provide the opportunity to participate and coordinate with the Recipient in the design and the delivery of federally assisted transportation services, and be included in planning for the Recipient's federally assisted transportation services; and

(ii)    Make that opportunity available to federally-assisted state or local governmental agencies and nonprofit organizations that receive federal assistance for nonemergency transportation, but do not receive federal assistance for nonemergency transportation from U.S. DOT.

(b)    *Tribal Transit Program Planning Provisions*. The Indian Tribe agrees that:

(1)    *Planning Requirements*. The federal assistance it receives for its Tribal Transit Program will be consistent with its documents, including any formal plan provided to FTA in support of the development and basis of its Award

59

of federal assistance under the Tribal Transit Program, and are or will be coordinated with transportation service funded by other federal sources to the maximum extent feasible.

(2) *Participation of State or Local Governmental and Private Nonprofit Providers of Nonemergency Transportation*. The Recipient agrees to comply with 49 U.S.C. § 5323(k) by assuring that it will, as feasible:

(i) Provide the opportunity to participate and coordinate with the Recipient in the design and the delivery of federally assisted transportation services, and be included in planning for the Recipient's federally assisted transportation services; and

(ii) Make that opportunity available to federally-assisted state or local governmental agencies and nonprofit organizations that receive federal assistance for nonemergency transportation, but do not receive federal assistance for nonemergency transportation from U.S. DOT.

## Section 14.    Private Enterprise.

(a) *Protections*. The Recipient agrees to protect the interests of private enterprise affected by federal public transportation programs by:

(1) Encouraging private enterprise to participate in the planning of public transportation and programs that provide public transportation, to the extent permitted under 49 U.S.C. § 5306; and

(2) Providing just compensation for the Project property it acquires, including the franchises of private providers of public transportation, as required under 49 U.S.C. § 5323(a)(1)(C).

(b) *Infrastructure Investment*. The Recipient agrees to follow the infrastructure investment recommendations of:

(1) Executive Order No. 12803, "Infrastructure Privatization," April 30, 1992, 31 U.S.C. § 501 note (57 Fed. Reg. 19,036); and

(2) Executive Order No. 12893, "Principles for Federal Infrastructure Investments," January 26, 1994, 31 U.S.C. § 501 note (59 Fed. Reg. 4233).

(c) *Joint Development*. If joint development is involved, the Recipient agrees to follow the latest edition of FTA Circular 7050.1, "Federal Transit Administration Guidance on Joint Development."

**Section 15.    Preference for United States Products and Services.**

Except as the Federal Government determines otherwise in writing, the Recipient agrees to comply with FTA's U.S. domestic preference requirements and follow federal guidance, including:

(a)     *Buy America*. The domestic preference procurement requirements of 49 U.S.C. § 5323(j), and FTA regulations, "Buy America Requirements," 49 CFR Part 661, to the extent consistent with 49 U.S.C. § 5323(j);

(b)     *Build America, Buy America Act*. Construction materials used in the Project are subject to the domestic preference requirement of the Build America, Buy America Act, Pub. L. 117-58, div. G, tit. IX, §§ 70911 – 70927 (2021), as implemented by the U.S. Office of Management and Budget's "Buy America Preferences for Infrastructure Projects," 2 CFR Part 184. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b). In accordance with 2 CFR § 184.2(a), the Recipient shall  apply the standards of 49 CFR Part 661 to iron, steel, and manufactured products.

(c)     *Cargo Preference–Use of United States-Flag Vessels*. At least 50 percent of any equipment, materials or commodities procured, contracted for or otherwise obtained with funds granted, guaranteed, loaned, or advanced by the U.S. Government under this agreement, and which may be transported by ocean vessel, shall be transported on privately owned United States-flag commercial vessels, if available. 46 U.S.C. § 55305, and U.S. Maritime Administration regulations, "Cargo Preference – U.S.-Flag Vessels," 46 CFR Part 381. Within 20 days following the date of loading for shipments originating within the United States or within 30 working days following the date of loading for shipments originating outside the United States, a legible copy of a rated, 'on-board' commercial ocean bill-of-lading in English for each shipment of cargo described in 46 CFR § 381.7(a)(1) shall be furnished to both the recipient (through the prime contractor in the case of subcontractor bills-of-lading) and to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, DC 20590.

(d)     *Fly America*. The air transportation requirements of Section 5 of the International Air Transportation Fair Competitive Practices Act of 1974, as amended, 49 U.S.C. § 40118, and U.S. General Services Administration (U.S. GSA) regulations, "Use of United States Flag Air Carriers," 41 C.F.R. §§ 301-10.131 – 301-10.143.

(e)     *Uniform Administrative Requirements*. Compliance with FTA's "Buy America Requirements," 49 CFR Part 661, and "Buy America Preferences for Infrastructure Projects," 2 CFR Part 184, as described in this Master Agreement shall be deemed to satisfy 2 CFR § 200.322, "Domestic Preferences for Procurements."

61

(f)    *Limitation on Certain Rolling Stock Procurements*. The Recipient will comply with the limitation on certain rolling stock procurements at 49 U.S.C. § 5323(u).

## Section 16.    Procurement.

(a)    *Federal Laws, Regulations, Requirements, and Guidance*. The Recipient agrees:

    (1)    To comply with the requirements of 49 U.S.C. chapter 53 and other applicable federal laws, regulations, and requirements in effect now or later that affect its third party procurements;

    (2)    To comply with the applicable U.S. DOT Common Rules; and

    (3)    To follow the most recent edition and any revisions of FTA Circular 4220.1, "Third Party Contracting Guidance," to the extent consistent with applicable federal laws, regulations, requirements, and guidance.

(b)    *Full and Open Competition*. The Recipient agrees to conduct all its third party procurements using full and open competition as provided in 49 U.S.C. § 5325(a), and as determined by FTA.

(c)    *Exclusionary or Discriminatory Specifications*. The Recipient agrees that it will not use any federal assistance under 49 U.S.C. chapter 53 for any procurement based on exclusionary or discriminatory specifications, as provided in 49 U.S.C. § 5325(h), unless authorized by other applicable federal laws, regulations, or requirements.

(d)    *Required Clauses in Third Party Contracts*. In addition to other applicable provisions of federal law, regulations, requirements, and guidance, all third party contracts made by the Recipient under the Federal award must contain provisions covering the following, as applicable:

    (1)    *Simplified Acquisition Threshold*. Contracts for more than the simplified acquisition threshold, which is the inflation adjusted amount determined by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) as authorized by 41 U.S.C. § 1908, or otherwise set by law, must address administrative, contractual, or legal remedies in instances where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate. (Note that the simplified acquisition threshold determines the procurement procedures that must be employed pursuant to 2 C.F.R. §§ 200.317–200.327. The simplified acquisition threshold does not exempt a procurement from other eligibility or processes requirements that may apply. For example, Buy America's eligibility and process requirements apply to any procurement in excess of $150,000. 49 U.S.C. § 5323(j)(13).)

62

(2)     *Termination.* All contracts in excess of $10,000 must address termination for cause and for convenience by the non-federal entity including the manner by which it will be effected and the basis for settlement.

(3)     *Davis-Bacon Act, as amended (40 U.S.C. §§ 3141 – 3148).* When required by federal program legislation, all prime construction contracts in excess of $2,000 awarded by non-federal entities must include a provision for compliance with the Davis-Bacon Act (40 U.S.C. §§ 3141 – 3144, and 3146 – 3148) as supplemented by Department of Labor regulations (29 CFR Part 5, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction"). In accordance with the statute, contractors must be required to pay wages to laborers and mechanics at a rate not less than the prevailing wages specified in a wage determination made by the Secretary of Labor. In addition, contractors must be required to pay wages not less than once a week. The non-federal entity must place a copy of the current prevailing wage determination issued by the Department of Labor in each solicitation. The decision to award a contract or subcontract must be conditioned upon the acceptance of the wage determination. The non-federal entity must report all suspected or reported violations to the federal awarding agency. The contracts must also include a provision for compliance with the Copeland "Anti-Kickback" Act (40 U.S.C. § 3145), as supplemented by Department of Labor regulations (29 CFR Part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"). The Act provides that each contractor or subrecipient must be prohibited from inducing, by any means, any person employed in the construction, completion, or repair of a public work, to give up any part of the compensation to which he or she is otherwise entitled. The non-federal entity must report all suspected or reported violations to the federal awarding agency.

(4)     *Contract Work Hours and Safety Standards Act (40 U.S.C. §§ 3701 – 3708).* Where applicable, all contracts awarded by the non-federal entity in excess of $100,000 that involve the employment of mechanics or laborers must include a provision for compliance with 40 U.S.C. §§ 3702 and 3704, as supplemented by Department of Labor regulations (29 CFR Part 5). Under 40 U.S.C. § 3702 of the Act, each contractor must be required to compute the wages of every mechanic and laborer based on a standard work week of 40 hours. Work in excess of the standard work week is permissible provided that the worker is compensated at a rate of not less than one and a half times the basic rate of pay for all hours worked in excess of 40 hours in the work week. The requirements of 40 U.S.C. § 3704 are applicable to construction work and provide that no laborer or mechanic must be required to work in

63

surroundings or under working conditions which are unsanitary, hazardous or dangerous. These requirements do not apply to the purchases of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

(5)   *Rights to Inventions Made Under a Contract or Agreement*. If the federal award meets the definition of "funding agreement" under 37 C.F.R. § 401.2(a) and the recipient or subrecipient wishes to enter into a contract with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the recipient or subrecipient must comply with the requirements of 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any implementing regulations issued by the awarding agency.

(6)   *Clean Air Act (42 U.S.C. §§ 7401 – 7671q.) and the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 – 1388), as amended*. Contracts and subgrants of amounts in excess of $150,000 must contain a provision that requires the non-federal award to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. §§ 7401 – 7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. §§ 1251 – 1388). Violations must be reported to the Federal awarding agency and the Regional Office of the Environmental Protection Agency (EPA).

(7)   *Debarment and Suspension (Executive Orders 12549 and 12689)*. A covered transaction (see 2 C.F.R. §§ 180.220 and 1200.220) must not be entered into with any party listed on the governmentwide exclusions in the System for Award Management (SAM), in accordance with the OMB guidelines at 2 C.F.R. 180 that implement Executive Orders 12549 (31 U.S.C. § 6101 note, 51 Fed. Reg. 6370,) and 12689 (31 U.S.C. § 6101 note, 54 Fed. Reg. 34131), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549. The Recipient agrees to include, and require each Third Party Participant to include, a similar provision in each lower tier covered transaction, ensuring that each lower tier Third Party Participant:

(1) Complies with federal debarment and suspension requirements; and

(2) Reviews the SAM at https://www.sam.gov, if necessary to comply with U.S. DOT regulations, 2 CFR Part 1200.

(8) *Restrictions on Lobbying (31 U.S.C. § 1352)*. Contractors that apply or bid for an award exceeding $100,000 must file the certification required by 49 CFR Part 20. Each tier certifies to the tier above that it will not and has not used federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any federal contract, grant or any other award covered by 31 U.S.C. § 1352. Each tier must also disclose any lobbying with non-federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non-federal award.

(9) *Solid Wastes*. A Recipient that is a state agency or agency of a political subdivision of a state and its contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

(e) *Geographic Restrictions*. The Recipient agrees that it will not use any state or local geographic preference, except as permitted by federal law (for example, Section 25019 of the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58), regulation, requirement, or guidance.

(f) *In-State Bus Dealer Restrictions*. The Recipient agrees that any state law requiring buses to be purchased through in-state dealers will not apply to purchases of vehicles supported with federal assistance appropriated or made available for 49 U.S.C. chapter 53, as provided in 49 U.S.C. § 5325(i).

(g) *Organizational Conflict of Interest*. The Recipient agrees that it will not enter into a procurement that involves a real or apparent organizational conflict of interest.

(h) *Project Labor Agreements*. As a condition of a third party contract award, the Recipient may require the Third Party Contractor or Subcontractor to have an

65

affiliation with a labor organization, such as a Project Labor Agreement, consistent with Executive Order No. 13502, "Use of Project Labor Agreements for Federal Construction Projects," February 6, 2009 (74 Fed. Reg. 6985).

(i)     *Force Account*. The Recipient agrees that FTA may determine the extent to which Federal assistance may be used to participate in force account costs.

(j)     *FTA Technical Review*. The Recipient agrees that FTA may review and approve the Recipient's technical specifications and requirements to the extent FTA believes necessary to ensure proper administration of the Underlying Agreement.

(k)     *Relationship of the Award to Third Party Contract Approval*. The Recipient agrees that the terms of the Underlying Agreement do not, by themselves, constitute approval of any non- competitive third party contract associated with the Award, unless FTA indicates otherwise in writing.

(l)     *National Intelligent Transportation Systems Architecture and Standards*. The Recipient agrees to conform to the National Intelligent Transportation Systems (ITS) Architecture requirements of 23 U.S.C. § 517(d), unless it obtains an exemption from those requirements, and to follow FTA Notice, "FTA National ITS Architecture Policy on Transit Projects," 66 Fed. Reg. 1455, January 8, 2001, and all other applicable federal guidance.

(m)     *Rolling Stock*. The Recipient agrees that any procurement for rolling stock will comply with 49 U.S.C. § 5325 (Contract Requirements), 49 U.S.C. § 5323(j) (Buy America Requirements), 49 U.S.C. § 5323(m) (Pre-Award and Post Delivery Requirements), and 49 U.S.C. § 5318(e) (Bus Testing Requirements), 49 U.S.C. § 5323(u) (limitation on certain rolling stock procurements), and their implementing regulations.

(n)     *Bonding*. The Recipient agrees to comply with the following bonding requirements and restrictions as provided in federal regulations and guidance:

(1)     *Construction*. As provided in federal regulations and modified by FTA guidance, for each Project or related activities implementing the Underlying Agreement that involve construction, it will provide bid guarantee bonds, contract performance bonds, and payment bonds.

(2)     *Activities Not Involving Construction*. For each Project or related activities implementing the Underlying Agreement not involving construction, the Recipient will not impose excessive bonding and will follow FTA guidance.

(o)     *Architectural Engineering and Related Services*. When procuring architectural engineering or related services supported with federal assistance appropriated or

66

made available for 49 U.S.C. chapter 53 or provided in any other law requiring the Award to be administered under 49 U.S.C. chapter 53, the Recipient agrees to comply and assures that each of its Subrecipients will comply with 49 U.S.C. § 5325(b).

(p)   *Design-Build Projects*. As provided in 49 U.S.C. § 5325(d), the Recipient may use a design- build procurement to carry out its Design-Build Project, provided that it complies with applicable federal laws, regulations, and requirements, and follows federal guidance.

(q)   *Award to Other than the Lowest Bidder*. As permitted under 49 U.S.C. § 5325(c), the Recipient may award a third party contract to other than the lowest bidder, if that award furthers an objective (for example, improved long-term operating efficiency and lower long- term costs) consistent with the purposes of 49 U.S.C. chapter 53 and any implementing federal regulations, requirements, or guidance that FTA may issue.

(r)   *Award to Responsible Third Party Contractors*. The Recipient agrees to award third party contracts only to contractors able to carry out the procurement successfully, as provided in 49 U.S.C. § 5325(j), and before awarding a third party contract, it will consider the proposed contractor's integrity, compliance with public policy, past performance, and financial and technical resources.

(s)   *Access to Third Party Contract Records*. The Recipient agrees to require, and assures that each of its Subrecipients will require, its Third Party Contractors at each tier to provide:

(1)   The U.S. Secretary of Transportation and the Comptroller General of the United States, the state, or their duly authorized representatives, access to all third party contract records (at any tier) as required under 49 U.S.C. § 5325(g); and

(2)   Sufficient access to all third party contract records (at any tier) as needed for compliance with applicable federal laws, regulations, and requirements or to assure proper management of Underlying Agreement as determined by FTA.

(t)   *Electronic and Information Technology*. The Recipient agrees that reports or information it provides to or on behalf of the Federal Government will use electronic or information technology that complies with the accessibility requirements of Section 508 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794d, and U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194.

(u)     *Veterans Preference*. As provided in 49 U.S.C. § 5325(k), to the extent practicable, the Recipient agrees and assures that each of its Subrecipients:

  (1)     Will give a hiring preference to veterans, as defined in 5 U.S.C. § 2108, who have the skills and abilities required to perform construction work required under a third party contract in connection with a Capital Project supported with federal assistance appropriated or made available for 49 U.S.C. chapter 53; and

  (2)     Will not require an employer to give a preference to any veteran over any equally qualified applicant who is a member of any racial or ethnic minority, female, an individual with a disability, or a former employee.

(v)     *Acquisition by Lease*. The Recipient agrees that if it intends to acquire Project property through a lease it will comply, as applicable, with 49 U.S.C. chapter 53 and section 3019 of the FAST Act.

(w)     *Bid Protests*. The Recipient agrees to provide FTA, as part of the annual or quarterly Milestone Progress Report, with a list of all bid protests and appeals for solicitations or contracts in excess of $500,000. The Recipient also should be mindful of the requirement in Section 39, Disputes, that the Recipient must promptly notify the FTA Chief Counsel, or FTA Regional Counsel for the Region in which the Recipient is located, of significant current or prospective legal matters that may affect the Federal Government.

## Section 17.     Patent Rights.

(a)     *General*. The Recipient agrees that:

  (1)     Depending on the nature of the Underlying Agreement, the Federal Government may acquire patent rights when the Recipient or Third Party Participant produces a patented or patentable invention, improvement, or discovery;

  (2)     The Federal Government's rights arise when the patent or patentable information is conceived or reduced to practice with federal assistance provided through the Underlying Agreement; or

  (3)     When a patent is issued or patented information becomes available as described in the preceding section 17(a)(2) of this Master Agreement, the Recipient will notify FTA immediately and provide a detailed report satisfactory to FTA.

(b)     *Federal Rights*. The Recipient agrees that:

68

(1)      Its rights and responsibilities and each Third Party Participant's rights and responsibilities in that federally assisted invention, improvement, or discovery will be determined as provided in applicable federal laws, regulations, requirements, and guidance, including any waiver thereof; and

(2)      Unless the Federal Government determines otherwise in writing, irrespective of its status or the status of any Third Party Participant as a large business, small business, state government, state instrumentality, local government, Indian tribe, nonprofit organization, institution of higher education, or individual, the Recipient will transmit the Federal Government's patent rights to FTA, as specified in 35 U.S.C. § 200, et seq., and U.S. Department of Commerce regulations, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," 37 CFR Part 401.

(c)      *License Fees and Royalties.* Consistent with the applicable U.S. DOT Common Rules, the Recipient agrees that license fees and royalties for patents, patent applications, and inventions produced with federal assistance provided through the Underlying Agreement are program income, and must be used in compliance with applicable federal requirements.

**Section 18.    Rights in Data and Copyrights.**

(a)      *Definition of "Subject Data."* As used in this section, "subject data" means recorded information, whether or not copyrighted, that is delivered or specified to be delivered as required by the Underlying Agreement. Examples of subject data include, but are not limited to computer software, standards, specifications, engineering drawings and associated lists, process sheets, manuals, technical reports, catalog item identifications, and related information, but do not include financial reports, cost analyses, or other similar information used for performance or administration of the Underlying Agreement.

(b)      *General Federal Restrictions.* The following restrictions apply to all subject data first produced in the performance of the Underlying Agreement:

(1)      *Prohibitions.* The Recipient may not publish or reproduce any subject data, in whole, in part, or in any manner or form, or permit others to do so.

(2)      *Exceptions.* The prohibitions do not apply to publications or reproductions for the Recipient's own internal use, an institution of higher learning, the portion of subject data that the Federal Government has previously released or approved for release to the public, or the portion of data that has the Federal Government's prior written consent for release.

(c)     *Federal Rights in Data and Copyrights*. The Recipient agrees that:

   (1)     *General*. It must provide a license to its subject data to the Federal Government that is royalty-free, non-exclusive, and irrevocable. The Federal Government's license must permit the Federal Government to reproduce, publish, or otherwise use the subject data or permit other entities or individuals to use the subject data provided those actions are taken for Federal Government purposes; and

   (2)     *U.S. DOT Public Access Plan – Copyright License*. The Recipient grants to U.S. DOT a worldwide, non-exclusive, non-transferable, paid-up, royalty-free copyright license, including all rights under copyright, to any and all Publications and Digital Data Sets as such terms are defined in the U.S. DOT Public Access plan, resulting from scientific research funded either fully or partially by this funding agreement. The Recipient herein acknowledges that the above copyright license grant is first in time to any and all other grants of a copyright license to such Publications and/or Digital Data Sets, and that U.S. DOT shall have priority over any other claim of exclusive copyright to the same.

(d)     *Special Federal Rights in Data for Research, Development, Demonstration, Deployment, Technical Assistance, and Special Studies Programs*. In general, FTA's purpose in providing federal assistance for a research, development, demonstration, deployment, technical assistance, or special studies program is to increase transportation knowledge, rather than limit the benefits of the Award to the Recipient and its Third Party Participants. Therefore, the Recipient agrees that:

   (1)     *Publicly Available Report*. When an Award providing federal assistance for any of the programs described above is completed, it must provide a report of the Underlying Agreement that FTA may publish or make available for publication on the Internet.

   (2)     *Other Reports*. It must provide other reports related to the Award that FTA may request.

   (3)     *Availability of Subject Data*. FTA may make available its copyright license to the subject data, and a copy of the subject data to any FTA Recipient or any Third Party Participant at any tier, except as the Federal Government determines otherwise in writing.

   (4)     *Identification of Information*. It must identify clearly any specific confidential, privileged, or proprietary information submitted to FTA.

70

(5) *Incomplete*. If the Award is not completed for any reason whatsoever, all data developed with federal assistance for the Award becomes subject data and must be delivered as the Federal Government may direct.

(6) *Exception*. This section does not apply to an adaptation of any automatic data processing equipment or program that is both for the Recipient's use, and acquired with FTA capital program assistance.

(e) *License Fees and Royalties*. Consistent with the applicable U.S. DOT Common Rules, the Recipient agrees that license fees and royalties for patents, patent applications, and inventions produced with federal assistance provided through the Underlying Agreement are program income, and must be used in compliance with federal applicable requirements.

(f) *Hold Harmless*. Upon request by the Federal Government, the Recipient agrees that if it intentionally violates any proprietary rights, copyrights, or right of privacy, and if its violation under the preceding section occurs from any of the publication, translation, reproduction, delivery, use or disposition of subject data, then it will indemnify, save, and hold harmless the Federal Government against any liability, including costs and expenses of the Federal Government's officers, employees, and agents acting within the scope of their official duties. The Recipient will not be required to indemnify the Federal Government for any liability described in the preceding sentence, if the violation is caused by the wrongful acts of federal officers, employees or agents, or if indemnification is prohibited or limited by applicable state law.

(g) *Restrictions on Access to Patent Rights*. Nothing in this section of this Master Agreement pertaining to rights in data either implies a license to the Federal Government under any patent, or may be construed to affect the scope of any license or other right otherwise granted to the Federal Government under any patent.

(h) *Data Developed Without Federal Assistance or Support*. The Recipient agrees that in certain circumstances it may need to provide to FTA data developed without any federal assistance or support. Nevertheless, this section generally does not apply to data developed without federal assistance, even though that data may have been used in connection with the Award. The Recipient agrees that the Federal Government will not be able to protect data developed without federal assistance from unauthorized disclosure unless that data is clearly marked "Proprietary," or "Confidential."

(i) *Requirements to Release Data*. The Recipient understands and agrees that the Federal Government may be required to release data and information that the Recipient submits to the Federal Government as required under:

71

(1)     The Freedom of Information Act (FOIA), 5 U.S.C. § 552;

(2)     The U.S. DOT Common Rules;

(3)     The U.S. DOT Public Access Plan, which provides that the Recipient agrees
        to satisfy the reporting and compliance requirements as set forth in the U.S.
        DOT Public Access plan, including, but not limited to, the submission and
        approval of a Data Management Plan, the use of Open Researcher and
        Contributor ID (ORCID) numbers, the creation and maintenance of a
        Research Project record in the Transportation Research Board's (TRB)
        Research in Progress (RiP) database, and the timely and complete submission
        of all required publications and associated digital data sets as such terms are
        defined in the DOT Public Access plan. Additional information about how to
        comply with the requirements can be found at
        http://ntl.bts.gov/publicaccess/howtocomply.html; or

(4)     Other federal laws, regulations, requirements, and guidance concerning
        access to records pertaining to the Award, the accompanying Underlying
        Agreement, and any Amendments thereto.

**Section 19.     Use of Real Property, Equipment, and Supplies.**

(a)     *Federal Interest*. The Recipient agrees that the Federal Government retains a federal
        interest in all real property, equipment, and supplies acquired or improved for use in
        connection with a Project (Project property) until, and to the extent that, the Federal
        Government removes its federal interest.

(b)     *FTA Requirements and Guidance for Use of Project Property*. The Recipient agrees
        that:

(1)     *Satisfactory Continuing Control*. It will maintain continuing control of the
        use of its Project property as satisfactory to FTA, which is defined as the
        legal assurance that Project property will remain available to be used for its
        originally authorized purpose throughout its useful life or until disposition.

(2)     *Appropriate Use*. It will use its Project property for appropriate purposes
        (including joint development purposes as well as uses that provide program
        income to support public transportation) for the duration of the useful life of
        its Project property, which may extend beyond the duration of the Award,
        and consistent with other requirements FTA may impose.

(3)     *Delay or Failure to Use Project Property*. The Federal Government may
        require it to return the entire amount of federal assistance spent on its Project

72

property if, during the useful life of its Project property, it has unreasonably delayed using its Project property, or failed to use its Project property.

(4)     *Notification.* It will notify FTA immediately when it uses any of its Project property in a manner substantially different from the representations in its Application or other documents submitted in support of the Award, or the requirements of the accompanying Underlying Agreement, or it withdraws any of its Project property from appropriate use.

(5)     *FTA Guidance.* It will consult FTA guidance through its circulars or other written documents for ways in which FTA property requirements should be implemented. FTA guidance will apply unless FTA determines otherwise in writing.

(c)     *General Federal Requirements.* The Recipient agrees to comply with the applicable U.S. DOT property management provisions as provided in the U.S. DOT Common Rules and this Master Agreement. The Recipient also agrees to follow FTA's reimbursement provisions pertaining to premature dispositions of certain equipment, as provided in this Master Agreement and FTA guidance.

(d)     *Maintenance.* As provided in federal laws, regulations, requirements, and guidance, the Recipient agrees to maintain its Project property in good operating order, and comply with FTA regulations, "Transit Asset Management" and "National Transit Database," 49 CFR Parts 625 and 630.

(e)     *Property Records.* The Recipient agrees to keep satisfactory records of its use of its Project property, and, upon request, it will provide FTA the necessary information required to assure compliance with this Master Agreement.

(f)     *Incidental Use.*

(1)     The Recipient agrees that any incidental use of Project property will not exceed what is permitted under applicable federal requirements and federal guidance.

(2)     As provided in 49 U.S.C. § 5323(p), it may permit nontransit public entities and private entities to have incidental use of its federally assisted alternative fueling facilities and equipment, only if:

(i)     The incidental use does not interfere with public transportation operations or violate the provisions of the Underlying Agreement and any Amendments thereto;

(ii)     It fully recaptures all the costs related to the incidental use from any nontransit public entity or private entity that uses the alternative fueling facilities or equipment;

(iii)    It uses revenues it receives from the incidental use in excess of costs for planning, capital, and operating expenses that are incurred in providing public transportation; and

(iv)    Private entities pay all applicable excise taxes on fuel.

(g)     *Reasonable Access for Private Intercity or Charter Transportation Operators*. The Recipient agrees to comply with 49 U.S.C. § 5323(r), and may not deny reasonable access for a private intercity or charter transportation operator to federally funded public transportation facilities, including intermodal facilities, park and ride lots, and bus-only highway lanes. In determining reasonable access, capacity requirements of the Recipient and the extent to which access would be detrimental to existing public transportation services must be considered.

(h)     *Encumbrance of Project Property*. Absent the express consent of the Federal Government in writing, the Recipient agrees to preserve the federal interest in its Project property, and to maintain satisfactory continuing control of its Project property as follows:

(1)     *Written Transactions*. The Recipient agrees that it will not execute any documents that would either adversely affect the federal interest in or impair its continuing control of the use of its Project property including, but not limited to, lease, transfer of title, lien, pledge, mortgage, encumbrance, third party contract, subagreement, grant anticipation note, alienation, innovative finance arrangements, such as a cross-border or leveraged lease, or other types of innovative financing arrangements, or any restriction, constraint, or commitment that may apply to the Project property. Upon request, the Recipient will provide a copy of any document described above to FTA.

(2)     *Oral Transactions*. The Recipient agrees it will not obligate itself in any way through an oral statement to any third party with respect to its Project property that would either adversely affect the federal interest in or impair its continuing control of the use of its Project property.

(3)     *Other Actions*. The Recipient agrees that it will not take any other action that would either adversely affect the federal interest in or impair its continuing control of the use of its Project property.

(i)     *Useful Life of Project Property*. The Recipient agrees that:

74

(1)     *Determining the Useful Life*. FTA may establish the useful life of Project property;

(2)     *Required Use*. It will use its Project property continuously and appropriately throughout the useful life of that property;

(3)     *Expired Useful Life*. When the useful life of its Project property has expired, it will comply with FTA's disposition requirements; and

(4)     *Premature Withdrawal*. The Federal Government retains a federal interest in the fair market value of Project property or remaining useful life in Project property calculated based on straight line depreciation (including Project equipment acquired by a state). Therefore, if the Recipient withdraws that property from public transportation use prematurely, it will notify FTA immediately when any of its Project property is prematurely withdrawn from appropriate use, whether by planned withdrawal, misuse, or casualty loss.

   (i)     *Amount of Federal Interest*. The federal interest in the Recipient's or any of its Subrecipients' Project property will be determined based on the ratio of the federal assistance provided for that property to the actual cost of that property.

   (ii)    *Financial Commitments to the Federal Government*. Except as otherwise approved in writing by the Federal Government, the Recipient agrees that if its Project property is prematurely withdrawn from appropriate use:

      (A)     It will return an amount equal to the remaining federal interest in the withdrawn property to the Federal Government; or

      (B)     With FTA approval, it will invest an amount equal to the remaining federal interest in the withdrawn property in other transit property eligible for federal assistance provided through the Underlying Agreement.

(j)     *Calculating the Value of Prematurely Withdrawn Project Property*. The Recipient agrees that the fair market value of Project property prematurely withdrawn from use in support of the Award (including the fair market value of project equipment acquired or improved by a state) will be calculated as follows:

   (1)     *Equipment and Supplies*. The fair market value of project equipment or supplies will be calculated by straight-line depreciation, based on the useful life of that equipment or supplies as established or approved by FTA. The fair market value of the Project equipment and supplies withdrawn from

75

proper use will be based on the value of that property immediately before it was withdrawn from appropriate use irrespective of whether the Project property was withdrawn from use due to fire, casualty, or natural disaster, and irrespective of the extent of insurance coverage.

(2)     *Real Property*. The Recipient agrees that the fair market value of Project real property shall be determined by:

    (i)     Competent appraisal based on an appropriate date as approved by FTA, consistent with U.S. DOT regulations, "Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally-Assisted Programs," 49 CFR Part 24;

    (ii)    Straight line depreciation of improvements to the Project real property coupled with the value of the land determined by FTA based on appraisal; or

    (iii)   Other applicable federal laws, regulations, and requirements.

(3)     *Exceptional Circumstances*. The Recipient agrees that the Federal Government may require another method of valuation to be used to determine the fair market value of Project real property withdrawn from service. In unusual circumstances, the Recipient may request permission to use another reasonable valuation method including, but not limited to accelerated depreciation, comparable sales, or established market values.

(k)     *Insurance Proceeds*. The Recipient agrees to use any insurance proceeds it receives for Project property that has been damaged or destroyed (including insurance proceeds for Project equipment acquired or improved by a state) as follows:

(1)     *Replacement*. It may apply those insurance proceeds to the cost of replacing that damaged or destroyed property;

(2)     *Another Purpose*. It may use those insurance proceeds for another authorized purpose, provided that it has obtained FTA's consent in writing; or

(3)     *Return to the Federal Government*. It may return to the Federal Government an amount equal to the amount of the remaining federal interest in that property that has been damaged or destroyed.

(l)     *Misused or Damaged Project Property*. If any damage to Project property results from abuse or misuse occurring with the Recipient's knowledge and consent, the Recipient agrees to restore the Project property that has been damaged to its original condition, or refund the value of the federal interest in its Project property (including

76

the remaining federal interest in Project equipment acquired by a state), as the Federal Government may require.

(m) *Disposition of Project Property*. The Recipient agrees that disposition of its Project property may be made as provided in FTA's enabling legislation, 49 U.S.C. § 5334(h), U.S. DOT Common Rules, and the most recent edition of FTA Circular 5010.1, to the extent consistent with applicable federal laws, regulations, requirements, and guidance. The Recipient understands and agrees that under certain circumstances, the Recipient must obtain disposition instructions from FTA before disposing of Project property, including real property, equipment including rolling stock, and supplies. Disposition performed under any authority is subject to 49 U.S.C. § 5334(h)(4)(B) ("Reimbursement").

(n) *Responsibilities After Closeout*. The Recipient agrees that closeout of the Award will not change the Recipient's property management responsibilities for its Project property as provided in federal laws, regulations, requirements, and guidance effective now or at a later date, and this section of this Master Agreement.

## Section 20.    Transit Asset Management.

(a) *Transit Asset Management Plan*. The Recipient agrees to develop a Transit Asset Management Plan that complies with federal transit laws, specifically 49 U.S.C. § 5326, FTA regulations, "Transit Asset Management," 49 CFR Part 625, and "National Transit Database," 49 CFR Part 630, and other applicable federal laws, regulations, and requirements.

(b) *When Compliance is Required*. The Recipient agrees to, and assures that each Third Party Participant will, comply with FTA regulations, "Transit Asset Management; National Transit Database," 49 CFR Parts 625 and 630, and follow applicable federal guidance.

## Section 21.    Insurance.

(a) *Flood Insurance*. The Recipient agrees and assures that its Third Party Participants will agree to comply with flood insurance laws and guidance as follows:

   (1)   It will have flood insurance as required by the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4012a(a), for any building located in a special flood hazard area (100-year flood zone), before accessing federal assistance to acquire, construct, reconstruct, repair, or improve that building.

   (2)   Each such building and its contents will be covered by flood insurance in an amount at least equal to the federal investment (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular

77

type of property under the National Flood Insurance Act of 1968, 42 U.S.C. § 4001, et seq., whichever is less.

(3)     It will follow FTA guidance, except to the extent FTA determines otherwise in writing.

(b)     *Other Insurance Requirements*. It will comply with the insurance requirements normally imposed by its state and local laws, regulations, and ordinances.

**Section 22.     Relocation and Real Property.**

(a)     *Relocation Protections*. Irrespective of whether federal assistance is used to pay relocation costs required under federal laws, regulations, or requirements, the Recipient agrees to:

(1)     Provide fair and equitable treatment to displaced individuals and businesses that must be relocated as a result of any Project for which the FTA has provided federal assistance; and

(2)     Comply with federal transit laws, specifically 49 U.S.C. § 5323(b), which requires compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 U.S.C. § 4601, et seq., and U.S. DOT regulations, "Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs," 49 CFR Part 24.

(b)     *Nondiscrimination in Housing*. The Recipient agrees that when it must provide housing for individuals as a result of relocation, it will comply with Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act), 42 U.S.C. § 3601, et seq., and facilitate and follow Executive Order No. 12892, "Leadership and Coordination of Fair Housing in Federal Programs: Affirmatively Furthering Fair Housing," January 17, 1994, 42 U.S.C. § 3608 note, (59 Fed. Reg. 2939), except as the Federal Government determines otherwise in writing.

(c)     *Prohibition Against the Use of Lead-Based Paint*. The Recipient agrees that if it constructs or rehabilitates residential structures on behalf of individuals displaced by its any Project, it will not use lead-based paint, and it will comply with Section 401(b) of the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4831(b), and U.S. Housing and Urban Development regulations, "Lead-based Paint Poisoning Prevention in Certain Residential Structures," 24 CFR Part 35.

(d)     *Real Property Acquisition Protections*. Irrespective of whether federal assistance is used to pay real property acquisition costs required to implement the Award, the Recipient agrees to provide fair and equitable treatment to owners of real property or

interests in real property that must be acquired as a result of any Project, and comply with federal transit laws, specifically 49 U.S.C. § 5323(b), which requires compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 U.S.C. § 4601, et seq., and U.S. DOT regulations, "Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally-Assisted Programs," 49 CFR Part 24.

(e)     *Covenant Against Discrimination*. The Recipient agrees to include a covenant in the title of the real property acquired for use in any Project that assures nondiscrimination during the useful life of that real property.

(f)     *Recording the Title to Real Property*. The Recipient agrees to record the federal interest in the title to real property used in connection with any Project if FTA so requires.

(g)     *FTA Approval of Changes in Real Property Ownership*. Unless it receives permission or instructions from FTA, the Recipient agrees that it will not dispose of, modify the use of, or change the title to real property used in any Project, or any other interests in the site and facilities used in any Project.

## Section 23.    Construction.

(a)     *Construction Plans and Specifications*. The Recipient agrees to comply with all applicable statutes, regulations, and requirements, and follow FTA guidance in the development and implementation of construction plans and specifications, including drafting, review, and approval, for the Award.

(b)     *Seismic Safety*. The Recipient agrees to comply with the Earthquake Hazards Reduction Act of 1977, as amended, 42 U.S.C. § 7701, et seq., and U.S. DOT regulations, "Seismic Safety," 49 CFR Part 41, specifically, 49 C.F.R. § 41.117.

(c)     *Supervision of Construction*. The Recipient agrees to maintain competent and adequate engineering supervision at the construction site of any Project to ensure that the completed work conforms to the approved plans and specifications.

(d)     *Construction Reports*. For any Project or related activities involving construction, the Recipient agrees to provide progress reports and other relevant information or data, as required by FTA or the state in which construction takes place.

(e)     *Major Capital Investment Projects*. If the Recipient's Project involves a Major Federal Project, it agrees to comply with all applicable federal regulations, including FTA regulations, "Major Capital Investment Projects,"49 CFR Part 611, and "Project Management Oversight," 49 CFR Part 633, to the extent that they are

consistent with applicable federal legislation, regulations, and requirements, and follow all applicable federal guidance.

**Section 24.    Employee Protections.**

(a)    *Awards Involving Construction.* The Recipient agrees to comply and assures that each Third Party Participant will comply with all federal laws, regulations, and requirements providing protections for construction employees involved in each Project or related activities with federal assistance provided through the Underlying Agreement, including the:

    (1)    Prevailing Wage Requirements of:

        (i)    Federal transit laws, specifically 49 U.S.C. § 5333(a), (FTA's "Davis-Bacon Related Act");

        (ii)    The Davis-Bacon Act, 40 U.S.C. §§ 3141 – 3144, 3146, and 3147; and

        (iii)    U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 CFR Part 5.

    (2)    Wage and Hour Requirements of:

        (i)    Section 102 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. § 3702, and other relevant parts of that Act, 40 U.S.C. § 3701, et seq.; and

        (ii)    U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 CFR Part 5.

    (3)    "Anti-Kickback" Prohibitions of:

        (i)    Section 1 of the Copeland "Anti-Kickback" Act, as amended, 18 U.S.C. § 874;

        (ii)    Section 2 of the Copeland "Anti-Kickback" Act, as amended, 40 U.S.C. § 3145; and

(iii)   U.S. DOL regulations, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States," 29 CFR Part 3.

(4)   Construction Site Safety of:

(i)   Section 107 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. § 3704, and other relevant parts of that Act, 40 U.S.C. § 3701, et seq.; and

(ii)   U.S. DOL regulations, "Recording and Reporting Occupational Injuries and Illnesses," 29 CFR Part 1904; "Occupational Safety and Health Standards," 29 CFR Part 1910; and "Safety and Health Regulations for Construction," 29 CFR Part 1926.

(b)   *Awards Not Involving Construction*. The Recipient agrees to comply and assures that each Third Party Participant will comply with all federal laws, regulations, and requirements providing wage and hour protections for nonconstruction employees, including Section 102 of the Contract Work Hours and Safety Standards Act, as amended, 40 U.S.C. § 3702, and other relevant parts of that Act, 40 U.S.C. § 3701, et seq., and U.S. DOL regulations, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction (also Labor Standards Provisions Applicable to Nonconstruction Contracts Subject to the Contract Work Hours and Safety Standards Act)," 29 CFR Part 5.

(c)   *Awards Involving Commerce*. The Recipient agrees to comply and assures that each Third Party Participant will comply with the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq. to the extent that the FLSA applies to employees performing work with federal assistance provided through the Underlying Agreement involving commerce, and as the Federal Government otherwise determines applicable.

(d)   *Public Transportation Employee Protective Arrangements*. As a condition of award of federal assistance appropriated or made available for FTA programs involving public transportation operations, the Recipient agrees to comply and assures that each Third Party Participant will comply with the following employee protective arrangements of 49 U.S.C. § 5333(b):

(1)   *U.S. DOL Certification*. When its Award, the accompanying Underlying Agreement, or any Amendments thereto involve public transportation operations and are supported with federal assistance appropriated or made available for 49 U.S.C. §§ 5307 – 5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, 5338(b), or 5339, or former 49 U.S.C. §§ 5308, 5309, 5312, or other provisions of law as required by the Federal Government, U.S. DOL must provide a certification of employee protective arrangements

81

before FTA may provide federal assistance for that Award. The Recipient agrees that the certification issued by U.S. DOL is a condition of the Underlying Agreement and that the Recipient must comply with its terms and conditions.

(2)  *Special Warranty*. When its Underlying Agreement involves public transportation operations and is supported with federal assistance appropriated or made available for 49 U.S.C. § 5311, U.S. DOL will provide a Special Warranty for its Award, including its Award of federal assistance under the Tribal Transit Program. The Recipient agrees that its U.S. DOL Special Warranty is a condition of the Underlying Agreement and the Recipient must comply with its terms and conditions.

(3)  *Special Arrangements for Underlying Agreements for Federal Assistance Authorized under 49 U.S.C. § 5310*. The Recipient agrees, and assures that any Third Party Participant providing public transportation operations will agree, that although pursuant to 49 U.S.C. § 5310, and former 49 U.S.C. §§ 5310 or 5317, FTA has determined that it was not "necessary or appropriate" to apply the conditions of 49 U.S.C. § 5333(b) to any Subrecipient participating in the program to provide public transportation for seniors (elderly individuals) and individuals with disabilities, FTA reserves the right to make case-by-case determinations of the applicability of 49 U.S.C. § 5333(b) for all transfers of funding authorized under title 23, United States Code (flex funds), and make other exceptions as it deems appropriate.

**Section 25.    Early Systems Work Agreement.**

(a)  *Statutory Requirements*. If FTA enters into an Early System Work Agreement (ESWA) with the Recipient to advance the implementation of the Recipient's Capital Project, the Recipient agrees that the provisions of 49 U.S.C. § 5309(k)(3) will apply to that ESWA, the Recipient, and FTA.

(b)  *ESWA Provisions*. Except to the extent that the Federal Government determines otherwise in writing, the Recipient understands and agrees that the following provisions apply to its ESWA, unless the ESWA contains specific requirements to the contrary:

(1)  *Recipient Representations*. In view of the standards and commitments imposed on the Recipient by 49 U.S.C. § 5309(k)(3), the Recipient has provided sufficient representations and information to FTA so that FTA has reason to believe the following:

82

     (i)       FTA and the Recipient will enter into a Full Funding Grant Agreement for the Project; and

     (ii)     The terms of the ESWA will promote the ultimate completion of the Project more rapidly and at less cost.

(2)    *FTA Commitments*. By entering into an ESWA with the Recipient, FTA has agreed to provide for reimbursement of the preliminary costs of carrying out the Project, including:

     (i)       Land acquisition;

     (ii)     Timely procurement of system elements for which the specifications are decided; and

     (iii)    Other activities that FTA decides are appropriate to make efficient, long-term Project management easier.

(3)    *Time Period of the ESWA*. FTA reserves the right to determine the period of time in which the ESWA will remain in effect, even if that period extends beyond the time of the authorization of federal funding that will support the Project costs covered by the ESWA.

(4)    *Interest and Other Financing Costs*. Interest and other financing costs of carrying out the ESWA efficiently and within a reasonable time are eligible ESWA costs, provided that:

     (i)       The interest and financing costs claimed do not exceed the cost of the most favorable financing terms reasonably available for the Project at the time of borrowing;

     (ii)     The Recipient has certified that it will show reasonable diligence in seeking the most favorable financing terms; and

     (iii)    The Recipient is able to show reasonable diligence in seeking the most favorable financing terms to support this ESWA.

(5)    *Contingent Commitment*. In providing funding for the ESWA:

     (i)       In its discretion, FTA may include a commitment, contingent on amounts made available under a later-enacted law, to obligate an additional amount from future available budget authority to support the costs of the Recipient's ESWA; and

       (ii)     If FTA does make a commitment to provide funding contingent on future amounts to be specified in law, that commitment is not an obligation of the Federal Government.

(6)    *Failure to Carry Out the Project*. If, for reasons within its control, the Recipient does not carry out the Project for which its ESWA was made available by FTA, the Recipient must:

       (i)      Repay all Federal Grant funds awarded under the ESWA from all Federal funding sources for all Project activities, facilities, and equipment; and

       (ii)     Pay reasonable interest and penalty charges:

           (A)    As established by FTA before or after FTA provided funding for the ESWA; or

           (B)    Allowable under law.

## Section 26.    Environmental Protections.

(a)    *General*. The Recipient agrees to, and assures that its Third Party Participants will, comply with all applicable environmental and resource use laws, regulations, and requirements, and follow applicable guidance, now in effect or that may become effective in the future, including state and local laws, ordinances, regulations, and requirements and follow applicable guidance.

(b)    *National Environmental Policy Act*. An Award of federal assistance requires the full compliance with applicable environmental laws, regulations, and requirements. Accordingly, the Recipient agrees to, and assures that its Third Party Participants will:

    (1)    Comply and facilitate compliance with federal laws, regulations, and requirements, including, but not limited to:

       (i)      Federal transit laws, such as 49 U.S.C. § 5323(c)(2), and 23 U.S.C. § 139;

       (ii)     The National Environmental Policy Act of 1969 (NEPA), as amended, 42 U.S.C. §§ 4321, et seq., as limited by 42 U.S.C. § 5159, and CEQ's implementing regulations 40 CFR Part 1500 – 1508;

       (iii)    Joint FHWA and FTA regulations, "Environmental Impact and Related Procedures," 23 CFR Part 771 and 49 CFR Part 622;

(iv) Executive Order No. 11514, as amended, "Protection and Enhancement of Environmental Quality," March 5, 1970, 42 U.S.C. § 4321 note (35 Fed. Reg. 4247); and

(v) Other federal environmental protection laws, regulations, and requirements applicable to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(2) Follow the federal guidance identified herein to the extent that the guidance is consistent with applicable authorizing legislation:

(i) Joint FHWA and FTA final guidance, "Interim Guidance on MAP-21 Section 1319, Accelerated Decisionmaking in Environmental Reviews," January 14, 2013;

(ii) Joint FHWA and FTA final guidance, "SAFETEA-LU Environmental Review Process (Public Law 109-59)," 71 Fed. Reg. 66576, November 15, 2006; and

(iii) Other federal environmental guidance applicable to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto.

(c) *Other Environmental Federal Laws*. The Recipient agrees to comply or facilitate compliance, and assures that its Third Party Participants will comply or facilitate compliance, with all applicable federal laws, regulations, and requirements, and will follow applicable guidance, including, but not limited to, the Clean Air Act, Clean Water Act, Wild and Scenic Rivers Act of 1968, Coastal Zone Management Act of 1972, the Endangered Species Act of 1973, Magnuson Stevens Fishery Conservation and Management Act, Resource Conservation and Recovery Act, Comprehensive Environmental Response, Compensation, and Liability Act, Executive Order No. 11990 relating to "Protection of Wetlands," and Executive Order No. 11988, as amended, "Floodplain Management."

(d) *Corridor Preservation*. The Recipient agrees that:

(1) It will not develop any right-of-way acquired under 49 U.S.C. § 5323(q) in anticipation of implementing its Award until all required environmental reviews for each Project or related activities have been completed; and

(2) It will follow FTA Final Guidance on the Application of 49 U.S.C § 5323(q) to Corridor Preservation for a Transit Project, October 27, 2014.

(e)  *Use of Certain Public Lands.* The Recipient agrees to comply, and assures that its Third Party Participants will comply, with U.S. DOT laws, specifically 49 U.S.C. § 303 (often referred to as "section 4(f)"), and joint FHWA and FTA regulations, "Parks, Recreation Areas, Wildlife and Waterfowl Refuges, and Historic Sites," 23 CFR Part 774, and referenced in 49 CFR Part 622.

(f)  *Historic Preservation.* The Recipient agrees to, and assures that its Third Party Participants will:

(1)  Comply with U.S. DOT laws, including 49 U.S.C. § 303 (often referred to as "section 4(f)"), which requires certain findings be made before an Award may be undertaken if it involves the use of any land from a historic site that is on or eligible for inclusion on the National Register of Historic Places.

(2)  Encourage compliance with the federal historic and archaeological preservation requirements of section 106 of the National Historic Preservation Act, as amended, 54 U.S.C. § 306108.

(3)  Comply with the Archeological and Historic Preservation Act of 1974, as amended, 54 U.S.C. § 312501, et seq.

(4)  Comply with U.S. Advisory Council on Historic Preservation regulations, "Protection of Historic Properties," 36 CFR Part 800.

(5)  Comply with federal requirements and follow federal guidance to avoid or mitigate adverse effects on historic properties.

(g)  *Indian Sacred Sites.* The Recipient agrees to, and assures that its Third Party Participants will, facilitate compliance with federal efforts to promote the preservation of places and objects of religious importance to American Indians, Eskimos, Aleuts, and Native Hawaiians, and facilitate compliance with the American Indian Religious Freedom Act, 42 U.S.C. § 1996, and Executive Order No. 13007, "Indian Sacred Sites," May 24, 1996, 42 U.S.C. § 3161 note (61 Fed. Reg. 26771).

(h)  *Mitigation of Adverse Environmental Effects.*

(1)  The Recipient agrees to comply with all environmental mitigation measures that may be identified as conditions that the Federal Government might impose in its finding of no significant impact or record of decision or commitments in the environmental documents that apply to the Award, such as environmental assessments, environmental impact statements, categorical exclusions, memoranda of agreement, documents required under 49 U.S.C. § 303, and other environmental documents.

86

(2)    The Recipient agrees that:

    (i)    Any mitigation measures agreed on will be incorporated by reference and made part of the Underlying Agreement and any Amendments thereto;

    (ii)    Any deferred mitigation measures will be incorporated by reference and made part of the Underlying Agreement and any Amendments thereto as soon as agreement with the Federal Government is reached; and

    (iii)    Any mitigation measures agreed on will not be modified or withdrawn without the written approval of the Federal Government.

(i)    *Energy Conservation*. The Recipient agrees to, and assures that its Subrecipients will, comply with the mandatory energy standards and policies of its state energy conservation plans under the Energy Policy and Conservation Act, as amended, 42 U.S.C. § 6321, et seq., and perform an energy assessment for any building constructed, reconstructed, or modified with federal assistance required under FTA regulations, "Requirements for Energy Assessments," 49 CFR Part 622, subpart C.

## Section 27.    State Management and Monitoring Systems.

The Recipient agrees to comply with joint FHWA and FTA regulations, "Management and Monitoring Systems," 23 CFR Part 500, and FTA regulations, "Transportation Infrastructure Management," 49 CFR Part 614.

## Section 28.    Charter Service.

(a)    *Prohibitions*. The Recipient agrees that neither it nor any Third Party Participant involved in the Award will engage in charter service, except as permitted under federal transit laws, specifically 49 U.S.C. § 5323(d), (g), and (r), FTA regulations, "Charter Service," 49 CFR Part 604, any other federal Charter Service regulations, federal requirements, or federal guidance.

(b)    *Exceptions*. Apart from exceptions to the Charter Service restrictions in FTA's Charter Service regulations, FTA has established the following additional exceptions to those restrictions:

    (1)    FTA's Charter Service restrictions do not apply to equipment or facilities supported with federal assistance appropriated or made available for 49 U.S.C. § 5307 to support a Job Access and Reverse Commute (JARC)-type Project or related activities that would have been eligible for assistance under repealed 49 U.S.C. § 5316 in effect in Fiscal Year 2012 or a previous

fiscal year, provided that the Recipient uses that federal assistance for FTA program purposes only; and

(2)    FTA's Charter Service restrictions do not apply to equipment or facilities supported with the federal assistance appropriated or made available for 49 U.S.C. § 5310 to support a New Freedom-type Project or related activities that would have been eligible for federal assistance under repealed 49 U.S.C. § 5317 in effect in Fiscal Year 2012 or a previous fiscal year, provided the Recipient uses that federal assistance for FTA program purposes only.

(c)    *Violations*. If it or any Third Party Participant engages in a pattern of violations of FTA's Charter Service regulations, FTA may require corrective measures and remedies, including withholding an amount of federal assistance as provided in FTA's Charter Service regulations, 49 CFR Part 604, appendix D, or barring it or the Third Party Participant from receiving federal assistance provided in 49 U.S.C. chapter 53, 23 U.S.C. § 133, or 23 U.S.C. § 142.

## Section 29.    School Bus Operations.

(a)    *Prohibitions*. The Recipient agrees that neither it nor any Third Party Participant that is participating in its Award will engage in school bus operations exclusively for the transportation of students or school personnel in competition with private school bus operators, except as permitted by federal transit laws, 49 U.S.C. § 5323(f) or (g), FTA regulations, "School Bus Operations," 49 CFR Part 605, and any other applicable federal "School Bus Operations" laws, regulations, requirements, or applicable federal guidance.

(b)    *Violations*. If a Recipient or any Third Party Participant has operated school bus service in violation of FTA's School Bus laws, regulations, or requirements, FTA may require the Recipient or Third Party Participant to take such remedial measures as FTA considers appropriate, or bar the Recipient or Third Party Participant from receiving federal transit assistance.

## Section 30.    Geographic Information and Related Spatial Data.

The Recipient agrees that each Project or related activity that implements the Award will conform to the Federal Geographic Data Committee's National Spatial Data Infrastructure if the Project or related activity directly or indirectly involves spatial data, or geographic information systems, and it will follow U.S. OMB Circular A-16, "Coordination of Geographic Information and Related Spatial Data Activities," August 19, 2002, and U.S. OMB Circular A-16 Supplemental Guidance, "Geospatial Line of Business," November 10, 2010.

**Section 31.    Federal "$1 Coin" Requirements.**

The Recipient agrees to comply with section 104 of the Presidential $1 Coin Act of 2005, 31 U.S.C. § 5112(p), its equipment and facilities will be fully capable of accepting and dispensing $1 coins when coins or currency are required to use that equipment or those facilities, and it will display signs and notices of the $1 coin capability of its equipment and facilities on its premises, including vending machines, where coins or currency are used.

**Section 32.    Public Transportation Safety.**

The Recipient agrees to comply with applicable federal laws, regulations, and requirements and follow applicable guidance that implement the Public Transportation Safety Program provisions of 49 U.S.C. § 5329.

**Section 33.    Motor Carrier Safety.**

(a)    *Financial Responsibility*. The Recipient agrees to comply and assures that its Third Party Participants will comply with the economic and insurance registration requirements of the:

  (1)    U.S. Federal Motor Carrier Safety Administration (U.S. FMCSA) regulations, "Minimum Levels of Financial Responsibility for Motor Carriers," 49 CFR Part 387, if it is engaged in operations requiring compliance with 49 CFR Part 387, it is engaged in interstate commerce, and it is not within a defined commercial zone; and

  (2)    The provisions of 49 U.S.C. § 31138(e)(4), which supersede inconsistent provisions of 49 CFR Part 387, and reduce the amount of insurance the Recipient must obtain to the highest amount required by any state in which the public transportation provider operates, if it operates within a public transportation service area located in more than one state, and receives federal assistance under 49 U.S.C. §§ 5307, 5310, and 5311.

(b)    *U.S. FMCSA Requirements*. The Recipient agrees to comply and assures that its Third Party Participants will comply with:

  (1)    The safety requirements of U.S. FMCSA regulations, "Federal Motor Carrier Safety Regulations," 49 CFR Parts 390 – 397, to the extent applicable; and

  (2)    The driver's license requirements of U.S. FMCSA regulations, "Commercial Driver's License Standards, Requirements, and Penalties," 49 CFR Part 383, and "State Compliance with Commercial Driver's License," 49 CFR Part 384, to the extent applicable, with the substance abuse requirements and guidance of U.S. FMCSA's regulations, "Controlled Substances and Alcohol

89

Use and Testing," 49 CFR Part 382, and implementing federal guidance, to the extent applicable.

**Section 34.    Safe Operation of Motor Vehicles.**

(a)    *Seat Belt Use*. The Recipient agrees to implement Executive Order No. 13043, "Increasing Seat Belt Use in the United States," April 16, 1997, 23 U.S.C. § 402 note, (62 Fed. Reg. 19217), by:

(1)    Adopting and promoting on-the-job seat belt use policies and programs for its employees and other personnel that operate company-owned vehicles, company-rented vehicles, or personally operated vehicles; and

(2)    Including a "Seat Belt Use" provision in each third party agreement related to the Award.

(b)    *Distracted Driving, Including Text Messaging While Driving*. The Recipient agrees to comply with:

(1)    Executive Order No. 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009, 23 U.S.C. § 402 note, (74 Fed. Reg. 51225);

(2)    U.S. DOT Order 3902.10, "Text Messaging While Driving," December 30, 2009; and

(3)    The following U.S. DOT Special Provision pertaining to Distracted Driving:

(i)    *Safety*. The Recipient agrees to adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers, including policies to ban text messaging while using an electronic device supplied by an employer, and driving a vehicle the driver owns or rents, a vehicle Recipient owns, leases, or rents, or a privately-owned vehicle when on official business in connection with the Award, or when performing any work for or on behalf of the Award;

(ii)    *Recipient Size*. The Recipient agrees to conduct workplace safety initiatives in a manner commensurate with its size, such as establishing new rules and programs to prohibit text messaging while driving, re-evaluating the existing programs to prohibit text messaging while driving, and providing education, awareness, and other outreach to employees about the safety risks associated with texting while driving; and

90

(iii)   *Extension of Provision*. The Recipient agrees to include the preceding Special Provision of section 34(b)(3)(i) – (ii) of this Master Agreement in its third party agreements, and encourage its Third Party Participants to comply with this Special Provision, and include this Special Provision in each third party subagreement at each tier supported with federal assistance.

**Section 35.    Substance Abuse.**

(a)    *Drug-Free Workplace*. The Recipient agrees to:

(1)    Comply with the Drug-Free Workplace Act of 1988, as amended, 41 U.S.C. § 8103, et seq.;

(2)    Comply with U.S. DOT regulations, "Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)," 49 CFR Part 32; and

(3)    Follow and facilitate compliance with U.S. OMB regulatory guidance, "Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)," 2 CFR Part 182, particularly where the U.S. OMB regulatory guidance supersedes comparable provisions of 49 CFR Part 32.

(b)    *Alcohol Misuse and Prohibited Drug Use*.

(1)    *Requirements*. The Recipient agrees to comply and assures that its Third Party Participants will comply with:

(i)    Federal transit laws, specifically 49 U.S.C. § 5331;

(ii)   FTA regulations, "Prevention of Alcohol Misuse and Prohibited Drug Use in Transit Operations," 49 CFR Part 655; and

(iii)  Applicable provisions of U.S. DOT regulations, "Procedures for Transportation Workplace Drug and Alcohol Testing Programs," 49 CFR Part 40.

(2)    *Remedies for Non-Compliance*. The Recipient agrees that if FTA determines that the Recipient or a Third Party Participant receiving federal assistance under 49 U.S.C. chapter 53 is not in compliance with 49 CFR Part 655, the Federal Transit Administrator may bar that Recipient or Third Party Participant from receiving all or a portion of the federal transit assistance for public transportation it would otherwise receive.

**Section 36.    Protection of Sensitive Security and Other Sensitive Information.**

The Recipient agrees to comply with the following requirements for the protection of sensitive security information:

(a)    The Homeland Security Act, as amended, specifically 49 U.S.C. § 40119(b), and U.S. DOT regulations, "Protection of Sensitive Security Information," 49 CFR Part 15;

(b)    The Aviation and Transportation Security Act, as amended, 49 U.S.C. § 114(r), and U.S. Department of Homeland Security, Transportation Security Administration regulations, "Protection of Sensitive Security Information," 49 CFR Part 1520;

(c)    U.S. DOT Common Rules, which require the Recipient to implement, and to require its Subrecipients, if any, to implement reasonable measures to safeguard protected personally identifiable information as well as any information that the FTA or pass-through entity designates as sensitive; and

(d)    National Archives and Records Administration regulations, "Controlled Unclassified Information," 32 CFR Part 2002.

**Section 37.    Special Notification Requirements for States.**

(a)    *Types of Information*. To the extent required under federal law, the State, as the Recipient, agrees to provide the following information about federal assistance awarded for its State Program, Project, or related activities:

   (1)    The Identification of FTA as the federal agency providing the federal assistance for a State Program or Project;

   (2)    The Catalog of Federal Domestic Assistance Number of the program from which the federal assistance for a State Program or Project is authorized; and

   (3)    The amount of federal assistance FTA has provided for a State Program or Project.

(b)    *Documents*. The State agrees to provide the information required under this provision in the following documents: (1) applications for federal assistance, (2) requests for proposals or solicitations, (3) forms, (4) notifications, (5) press releases, and (6) other publications.

**Section 38.     Freedom of Information.**

(a)     *Applicability*. The Recipient agrees that the Freedom of Information Act (FOIA), 5 U.S.C. § 552, as amended, applies to most information submitted to FTA and U.S. DOT, whether electronically or in typewritten hard copy.

(b)     *Records*. The Recipient agrees that all records it submits to FTA will become federal agency records and may be subject to release in response to a FOIA request unless FTA in its sole discretion determines that a valid exemption under FOIA or another statute applies. Unless FTA explicitly states otherwise in writing, FTA does not make any assurance that it will keep private any records submitted to FTA.

(c)     *Confidentiality*. President Obama's "Memorandum for the Heads of Executive Departments and Agencies on the Freedom of Information Act," dated January 21, 2009, directs federal agencies to adopt a presumption that information should generally be disclosed when requested, and therefore the Recipient agrees that:

> (1)     Unless a federal law or regulation requires that a document or other information be withheld, FTA does not consent to withhold information, irrespective of its format, merely because it is accompanied by a "routine" confidentiality statement that may appear on:
>
> > (i)      Information about the Award, the accompanying Underlying Agreement, and any Amendments thereto;
> >
> > (ii)     Information accompanying or supplementing the Award, the accompanying Underlying Agreement, and any Amendments thereto; or
> >
> > (iii)    Any other information FTA may obtain.
>
> (2)     As provided in federal laws, regulations, requirements, and guidance, FTA will review the information and documents that are the subject of each FOIA request to determine the extent to which FTA must or should exercise its discretion to withhold that information or those documents.
>
> (3)     Any genuinely confidential, privileged, or sensitive security information will be marked clearly and specifically as confidential or privileged, and justified as confidential or privileged under FOIA standards. The Recipient will mark all sensitive security information (SSI), as defined by 49 C.F.R. § 15.5, as set forth in 49 C.F.R. § 1520.13. The Recipient will not mark non-SSI material as SSI. Also refer to Section 36 of this Agreement, regarding the protection of SSI and other sensitive information.

93

**Section 39.   Disputes, Breaches, Defaults, and Litigation.**

(a)   *FTA Interest*. FTA has a vested interest in the settlement of any violation of federal law, regulation, or requirement, or any disagreement involving the Award, the accompanying Underlying Agreement, and any Amendments thereto including, but not limited to, a default, breach, major dispute, or litigation, and FTA reserves the right to concur in any settlement or compromise.

(b)   *Notification to FTA; Flow Down Requirement*. If a current or prospective legal matter that may affect the Federal Government emerges, the Recipient must promptly notify the FTA Chief Counsel and FTA Regional Counsel for the Region in which the Recipient is located. The Recipient must include a similar notification requirement in its Third Party Agreements and must require each Third Party Participant to include an equivalent provision in its subagreements at every tier, for any agreement that is a "covered transaction" according to 2 C.F.R. §§ 180.220 and 1200.220.

   (1)   The types of legal matters that require notification include, but are not limited to, a major dispute, breach, default, litigation, or naming the Federal Government as a party to litigation or a legal disagreement in any forum for any reason.

   (2)   Matters that may affect the Federal Government include, but are not limited to, the Federal Government's interests in the Award, the accompanying Underlying Agreement, and any Amendments thereto, or the Federal Government's administration or enforcement of federal laws, regulations, and requirements.

   (3)   *Additional Notice to U.S. DOT Inspector General*. The Recipient must promptly notify the U.S. DOT Inspector General in addition to the FTA Chief Counsel or Regional Counsel for the Region in which the Recipient is located, if the Recipient has knowledge of potential fraud, waste, or abuse occurring on a Project receiving assistance from FTA. The notification provision applies if a person has or may have submitted a false claim under the False Claims Act, 31 U.S.C. § 3729, et seq., or has or may have committed a criminal or civil violation of law pertaining to such matters as fraud, conflict of interest, bid rigging, misappropriation or embezzlement, bribery, gratuity, or similar misconduct involving federal assistance. This responsibility occurs whether the Project is subject to this Agreement or another agreement between the Recipient and FTA, or an agreement involving a principal, officer, employee, agent, or Third Party Participant of the Recipient. It also applies to subcontractors at any tier. Knowledge, as used in this paragraph, includes, but is not limited to, knowledge of a

94

criminal or civil investigation by a Federal, state, or local law enforcement or other investigative agency, a criminal indictment or civil complaint, or probable cause that could support a criminal indictment, or any other credible information in the possession of the Recipient. In this paragraph, "promptly" means to refer information without delay and without change. This notification provision applies to all divisions of the Recipient, including divisions tasked with law enforcement or investigatory functions.

(c)     *Federal Interest in Recovery*. The Federal Government retains the right to a proportionate share of any proceeds recovered from any third party, based on the percentage of the federal share for the Underlying Agreement. Notwithstanding the preceding sentence, the Recipient may return all liquidated damages it receives to its Award Budget for its Underlying Agreement rather than return the federal share of those liquidated damages to the Federal Government, provided that the Recipient receives FTA's prior written concurrence.

(d)     *Enforcement*. The Recipient must pursue its legal rights and remedies available under any third party agreement or any federal, state, or local law or regulation.

## Section 40.     Amendments to the Underlying Agreement.

(a)     *When Required*. An Amendment to the Underlying Agreement is required under the following circumstances:

(1)     A change in the scope of work or an addition of federal assistance to an existing Award (regardless of whether the source of assistance is the same or different);

(2)     A change to the scope of work that necessitates a change in the distribution of federal assistance across scope codes or activities; or

(3)     The Award includes multiple sources of financial assistance and the action requires the addition of a new Scope to a Project.

(b)     *Process*. An amendment to the Underlying Agreement must be submitted and approved in TrAMS, and must meet the same application requirements as would apply to a request for a new Award.

## Section 41.     FTA's Transit Award Management System (TrAMS).

The Recipient agrees to submit its application for an Award, reports, documents, or other information required by federal law, regulations, or requirements, through FTA's Transit Award Management System (TrAMS). To submit its application, reports, documents, or information required to FTA, any signature submitted for use in TrAMS must comply with the requirements

of the Electronic Signatures in Global and National Commerce Act (E-Sign Act), 15 U.S.C. §§ 7001, et seq.

**Section 42.    Information Obtained through Internet Links.**

Although this Master Agreement may include electronic links to federal laws, regulations, requirements, and guidance, FTA does not guarantee the accuracy of the information that may accessed through such links. Accordingly, the Recipient understands and agrees that any information obtained through any electronic link within this Master Agreement does not represent an official version of a federal law, regulation, or requirement, and might be inaccurate. Therefore, any information that is obtained through such links is neither incorporated by reference nor made part of this Master Agreement. The Federal Register and the Code of Federal Regulations are the official sources for regulatory information pertaining to the Federal Government.

**Section 43.    Severability.**

The Recipient agrees that if any provision of the Underlying Agreement or any Amendment thereto is determined to be invalid, then the remaining provisions thereof that conform to federal laws, regulations, requirements, and guidance will continue in effect.

**SPECIAL PROVISIONS FOR SPECIFIC PROGRAMS**

**Section 44.    Special Provisions for All Public Transportation Innovation, Technical Assistance or Workforce Development Programs.**

(a)    *Applicability*. The Recipient understands and agrees that this section of the Master Agreement applies to the following programs to which FTA provides federal assistance, including the following programs:

(1)    Programs authorized under 49 U.S.C. § 5312, irrespective of the fiscal year for which the appropriations that supported the Underlying Agreement were authorized;

(2)    Programs authorized under former 49 U.S.C. § 5313, irrespective of the fiscal year for which the appropriations that supported the Underlying Agreement were authorized;

(3)    Programs authorized under 49 U.S.C. § 5314, irrespective of the fiscal year for which the appropriations that supported the Underlying Agreement were authorized;

(4)    Programs authorized by the repealed section 3045 of SAFETEA-LU;

(5)    Programs authorized by the repealed section 3046 of SAFETEA-LU; and

(6)    Other similar Programs for which FTA awards federal assistance under 49 U.S.C. §§ 5312 or 5314, as amended, or other similar research-type or technical assistance authorizing legislation.

(b)    *Provisions for Underlying Agreements for Public Transportation Innovation or Technical Assistance and Workforce Development Awards*. The Recipient agrees that the following provisions will apply to the Underlying Agreement for a Public Transportation Innovation or Technical Assistance and Workforce Development Project or related activities:

(1)    *Report*. The Recipient agrees that in addition to any other Report FTA may require, the Recipient will prepare and submit to FTA a Report of each Project and related activities that describes the subject (or subjects) investigated, the methods used, the results, and the conclusions reached, is satisfactory, sufficiently organized, well-written, and comprehensive.

(2)    *Disclaimer*. The Report must contain the following disclaimer: "This document is disseminated under the sponsorship of the United States Department of Transportation, Federal Transit Administration, in the interest

97

of information exchange. The United States government assumes no liability for the contents or use thereof. The United States government does not endorse products or manufacturers. Trade or manufacturers' names appear herein solely because they are considered essential to the contents of the report."

(3)    *Format*. The Report must comply with the accessibility requirements of Section 508 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794d, and U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194, and the specific publication elements and report style guide at http://www.fta.dot.gov/research/program_requirements. The Report must identify clearly and precisely any specific information or data that is confidential, privileged, or proprietary and is contained within any report or document.

(4)    *Publication*. Except for confidential, privileged, or proprietary information in the Report, FTA may publish the Report, and make it available for publication on the Internet or in any other venue.

(5)    *Identification of Federal Assistance*. The Recipient agrees that:

(i)    It will display information on any product developed with federal assistance for 49 U.S.C. § 5312 for which the U.S. Department of Transportation, Federal Transit Administration provided federal assistance to support the development of the product that is tangible and is produced from, or is a result of, a Project, is a deliverable, and visible to the public, or is or will be made available to other research organizations, or public transportation providers, and consists of equipment, a prototype, hardware, construction, reports, data, software, internet pages, or any similar item.

(ii)    The information required will be given using an appropriate sign, designation, or notice.

(c)    *Special Disposition Provision*. In addition to other disposition provisions, FTA may vest title in tangible personal property used in the conduct of basic or applied scientific research in a nonprofit institution of higher education or in a nonprofit organization whose primary purpose is conducting scientific research, provided the requirements of 31 U.S.C. § 6306 are met.

(d)    *Protection of Human Subjects*. The Recipient agrees to comply with the protections for human subjects involved in a Project or related activities supported with federal assistance through the Underlying Agreement, as required by the National Research

Act, as amended, 42 U.S.C. § 289, et seq., and U.S. DOT regulations, "Protection of Human Subjects," 49 CFR Part 11.

(e)  *Protection of Animals*. The Recipient agrees to comply with the protections for animals involved in a Project or related activities, as required by the Animal Welfare Act, as amended, 7 U.S.C. § 2131, et seq., and U.S. Department of Agriculture regulations, "Animal Welfare," 9 CFR Parts 1, 2, 3, and 4.

(f)  *Export Control*. The Recipient understands and agrees that before exporting any information that is subject to federal export requirements, it must first obtain the necessary federal license(s), and comply with the federal export control regulations of the U.S. Department of Commerce, Bureau of Industry and Security, "Export Administration Regulations," specifically, 15 CFR Parts 730, et seq., U.S. Department of State, U.S. Department of the Treasury, and U.S. Department of Defense.

## Section 45.    Special Provisions for the State Safety Oversight Grant Program.

In administering any State Safety Oversight Grant Program Award under 49 U.S.C. § 5329(e)(6), the Recipient agrees to comply with 49 U.S.C. § 5329(e)(6).

## Section 46.    Special Provisions for the State Infrastructure Bank (SIB) Program.

(a)  *Federal Laws, Regulations, Requirements, and Guidance*. The State, as the Recipient, agrees to administer its Underlying Agreement to support its SIB consistent with federal laws, regulations, requirements, and guidance, including, but not limited to:

(1)  Title 23, U.S.C. (Highways), specifically 23 U.S.C. § 610, to the extent required under the FAST Act, and other applicable federal legislation;

(2)  Federal transit laws, specifically 49 U.S.C. § 5323(o), which requires compliance with 49 U.S.C. §§ 5307, 5309, and 5337 for Underlying Agreements to which MAP-21 and the FAST Act apply;

(3)  Section 350 of the National Highway System Designation Act of 1995, as amended, (NHS Act), 23 U.S.C. § 101 note, to the extent this section has not been superseded by 23 U.S.C. § 610;

(4)  Any federal law enacted or federal regulation or requirements promulgated at a later date applicable to the Underlying Agreement;

(5)  All other applicable federal guidance that may be issued;

99

(6)    The terms and conditions of any U.S. DOL certification(s) of employee protective arrangements;

(7)    The SIB Cooperative Agreement establishing the SIB in the state, signed by the Executive Director of the Build America Bureau, the Federal Transit Administrator, authorized state official(s) or their authorized designees, and if applicable, the administrator (or designee) for any other federal modal agency that the State wishes to include in its SIB; and

(8)    The FTA Grant Agreement providing federal assistance for the Underlying Agreement in support of its SIB, except that any provision of this Master Agreement that would otherwise apply to a SIB Project does not apply to the Underlying Agreement if it conflicts with any other federal law or regulation applicable to a SIB, federal SIB Guidelines, the SIB Cooperative Agreement, or the Underlying Agreement, but the conflicting provision of this Master Agreement will prevail, however, if FTA expressly determines so in writing.

(b)    *Limitations on Accessing Federal Assistance in the Transit Account.* The Recipient understands that the total amount of federal assistance awarded under the Grant Agreement to be supported with SIB deposits may not be available for immediate withdrawal. The State and the Recipient agree to restrict the amount of federal assistance it withdraws from its SIB to an amount not exceeding the limits specified in its Grant Agreement in support of the SIB or the Award Budget for that Grant Agreement.

## Section 47.    Special Provisions for the TIFIA and RRIF Programs.

(a)    *Federal Laws, Regulations, Requirements, and Guidance.* The Recipient agrees to administer any Underlying Agreement for TIFIA or RRIF credit assistance as required by and in accordance with the terms of the Underlying Agreement.

(b)    *Default.* The Recipient agrees that FTA may declare the Recipient in violation of this Master Agreement if there has been an Event of Default according to an Underlying Agreement for TIFIA or RRIF assistance, and that Event of Default is not cured within 90 days.

(c)    *Order of Precedence.* Any provision of this Master Agreement that is applicable to the Recipient's Underlying Agreement for TIFIA or RRIF assistance but that conflicts with the laws, regulations, and requirements applicable to the Recipient's Underlying Agreement for TIFIA or RRIF assistance, will not apply to the Recipient's TIFIA or RRIF Loan, Loan Guarantee, Line of Credit, or Master Credit Agreement, unless FTA determines otherwise in writing.

**Section 48.    Special Provisions for the Joint FTA–FRA Program.**

(a)    *General Legal Requirements*. When both FTA and the U.S. Federal Railroad Administration (FRA) make federal assistance available for the same Underlying Agreement, the Recipient understands and agrees to administer the Underlying Agreement to achieve maximum compliance with FTA's statutory and regulatory requirements, FRA's statutory and regulatory requirements, and other federal statutory requirements.

(b)    Disadvantaged Business Enterprises.

(1)    The Recipient acknowledges and understands that the statutory and regulatory provisions relating to disadvantaged business enterprises (DBE) differ significantly between FTA and FRA, including Section 1101(b) of the FAST Act (23 U.S.C. § 101 note) and U.S. DOT regulations, "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs," 49 CFR Part 26, both of which apply to FTA, but not to FRA.

(2)    FRA is not authorized to use FTA's DBE regulations, and consequently the Recipient agrees to comply with the statutory and regulatory DBE provisions that apply to federal assistance provided by FTA when using that federal assistance for purchases.

(3)    The Recipient agrees to use the "contracting with small and minority firms, women's business enterprise" provisions of the applicable U.S. DOT Common Rules.

(c)    *Buy America*. The Recipient agrees that statutory and regulatory Buy America provisions that apply to federal assistance authorized for FTA differ from those that apply to federal assistance authorized for FRA. Therefore, the Recipient agrees that:

(1)    It must comply with FTA's statutory and regulatory Buy America provisions to the extent that the purchases are for a Project or related activities that implement the Underlying Agreement;

(2)    It must comply with FRA's statutory and regulatory Buy America provisions, section 301(a) of the Passenger Rail Investment and Improvement Act of 2008 (PRIIA), Pub L. 110-432, October 16, 2008, and 49 U.S.C. § 24405(a), to the extent that the purchases are required to comply with FRA Buy America requirements; and

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

(3)     If it uses federal assistance authorized for FTA and for FRA to finance a purchase, the Recipient agrees to comply with both FTA's and FRA's requirements.

(d)     *Force Account – Procurement*. The Recipient agrees that FTA deems section 16(j) of this Master Agreement to be satisfied for work that is performed by the railroad's force account employees if a Project or related activities are being conducted on the property of a railroad, and under the railroad's collective bargaining agreements with its employees, certain work to be performed for the Recipient must be performed by force account employees.

(e)     *Procurement of Rolling Stock*. The Recipient agrees that if FRA requires the Recipient to acquire any rolling stock for the Underlying Agreement from the Next Generation Corridor Equipment Pool Committee that has been established under section 305 of PRIIA, FTA deems section 15 of this Master Agreement to be satisfied.

(f)     *Use of Real Property, Equipment, and Supplies*. The Recipient agrees that application of section 19 of this Master Agreement is reserved.

(g)     *Davis-Bacon*. The Recipient agrees that, as provided in 49 U.S.C. § 24312, wages paid to railroad employees at rates provided in a collective bargaining agreement negotiated under the Railway Labor Act, 45 U.S.C. § 151, et seq., are deemed to comply with the requirements of the Davis-Bacon Act, 40 U.S.C. § 3141, et seq., and satisfy section 24 of this Master Agreement.

(h)     *Employee Protective Arrangements*. The Recipient agrees to pass down to a railroad employee subject to the Railway Labor Act, 45 U.S.C. § 151, et seq., protective arrangements as provided in a special Attachment to FTA's Grant Agreement or Cooperative Agreement with the Recipient, and not pass down employee protective arrangements as provided in section 24 of this Master Agreement.

(i)     *Motor Carrier Safety*. The Recipient agrees that railroad signal employees and their employers must comply with the hours of service requirements of 49 U.S.C. § 21104, see 49 U.S.C. § 21104(e), and FRA's hours of service regulation, specifically 49 CFR Part 228, and that section 33 of this Master Agreement does not apply to railroad signal employees concerning hours of service.

(j)     *Railroad Safety*. The Recipient agrees that a railroad subject to FRA's safety jurisdiction must comply with the federal railroad safety laws.

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

## APPENDIX A
## TRIBAL TRANSIT PROGRAM—APPLICABLE PROVISIONS

FTA recognizes that several provisions of this Master Agreement generally applicable to other programs do not apply to the Tribal Transit Programs or the Indian Tribes that are the Direct Recipients of federal assistance under those Programs. The following sections of this Master Agreement are not applicable to the Tribal Transit Programs:

Section 14(a)(1) and 14(b) – Private Enterprise

Section 22(e) – Relocation and Real Property

Section 27 – State Management and Monitoring Systems

Section 30 – Geographic Information and Related Spatial Data

Section 37 – Special Notification Requirement for States

However, this list is not intended to be comprehensive and FTA may determine that other provisions are not applicable depending upon the Underlying Agreement for the Tribal Transit or a Tribe having entered into a compact and funding agreement with the U.S. Department of Transportation pursuant to the Tribal Transportation Self-Governance Program (23 U.S.C. 207; 49 CFR Part 29).

# EXHIBIT D

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE
FISCAL YEAR 2022 SAFE STREETS AND ROADS FOR ALL ("SS4A") GRANT
PROGRAM (INCLUDING TITLE 23 FUNDS):
FHWA PROJECTS**

Original:  February 8, 2023
Revision 1: March 28, 2023
Revision 2:  August 1, 2023
Revision 3:  October 1, 2024
Revision 4:  March 17, 2025

## Table of Contents

Article 7 Purpose..................................................................................................................... 6
   7.1    Purpose................................................................................................................6
Article 8 USDOT Role............................................................................................................ 6
   8.1    Division of USDOT Responsibilities...................................................................6
   8.2    USDOT Program Contacts....................................................................................7
Article 9 Recipient Role.......................................................................................................... 7
   9.1    Statements on the Project......................................................................................7
   9.2    Statements on Authority and Capacity.................................................................7
   9.3    USDOT Reliance..................................................................................................8
   9.4    Project Delivery...................................................................................................8
   9.5    Rights and Powers Affecting the Project..............................................................8
   9.6    Notification of Changes to Key Personnel...........................................................9
Article 10 Award Amount, Obligation, and Time Periods .................................................... 9
   10.1   Federal Award Amount.........................................................................................9
   10.2   Federal Obligations..............................................................................................9
   10.3   Budget Period.....................................................................................................10
   10.4   Period of Performance........................................................................................10
Article 11 Statement of Work, Schedule, and Budget Changes ......................................... 11
   11.1   Notification Requirement....................................................................................11
   11.2   Statement of Work Changes...............................................................................11
   11.3   Schedule Changes...............................................................................................11
   11.4   Budget Changes..................................................................................................11
   11.5   USDOT Acceptance of Changes.........................................................................12
Article 12 General Reporting Terms..................................................................................... 13
   12.1   Report Submission..............................................................................................13
   12.2   Alternative Reporting Methods..........................................................................13
   12.3   Paperwork Reduction Act Notice.......................................................................13
Article 13 Progress and Financial Reporting ...................................................................... 13
   13.1   Quarterly Program Performance Reports...........................................................13
   13.2   Quarterly Financial Status..................................................................................13
Article 14 Performance Reporting ....................................................................................... 13
   14.1   Baseline Performance Measurement..................................................................13
   14.2   Section 24112(h) Report ...................................................................................14
   14.3   Performance Measurement Information…............................................................14
   14.4   Performance Reporting Survival…......................................................................14
   14.5   Program Evaluation…........................................................................................14
Article 15 Noncompliance and Remedies............................................................................. 15
   15.1   Noncompliance Determinations.........................................................................15
   15.2   Remedies............................................................................................................15
   15.3   Other Oversight Entities.....................................................................................16
Article 16 Agreement Termination....................................................................................... 16
   16.1   USDOT Termination...........................................................................................16
   16.2   Closeout Termination.........................................................................................17
   16.3   Post-Termination Adjustments...........................................................................17
   16.4   Non-Terminating Events.....................................................................................17
   16.5   Other Remedies..................................................................................................17

Article 17 Monitoring, Financial Management, Controls, and Records ...................................... 18
    17.1    Recipient Monitoring and Record Retention. ...............................................18
    17.2    Financial Records and Audits. ...................................................................18
    17.3    Internal Controls. ....................................................................................18
    17.4    USDOT Record Access. ............................................................................19
    17.5    Oversight Responsibilities…………………………………………………….19
Article 18 Contracting and Subawards ............................................................................. 19
    18.1    Build America, Buy America. ....................................................................19
    18.2    Small and Disadvantaged Business Requirements. .......................................22
    18.3    Engineering and Design Services. ..............................................................22
    18.4    Foreign Market Restrictions.......................................................................22
    18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment...22
    18.6    Recipient Responsibilities For Subawards....................................................22
    18.7    Subaward and Contract Authorization. ........................................................22
    18.8    Minimum Wage Rates…………………………………………………………22
Article 19 Costs, Payments, and Unexpended Funds ......................................................... 23
    19.1    Limitation of Federal Award Amount. .........................................................23
    19.2    Projects Costs...........................................................................................23
    19.3    Timing of Project Costs. ...........................................................................23
    19.4    Recipient Recovery of Federal Funds. .........................................................23
    19.5    Unexpended Federal Funds.........................................................................23
    19.6    Timing of Payments to the Recipient...........................................................23
    19.7    Payment Method.......................................................................................234
    19.8    Information Supporting Expenditures..........................................................244
    19.9    Reimbursement Frequency. .......................................................................24
Article 20 Liquidation, Adjustments, and Funds Availability............................................. 24
    20.1    Liquidation of Recipient Obligations...........................................................24
Article 21 Agreement Modifications ................................................................................ 24
    21.1    Bilateral Modifications. ............................................................................24
    21.2    Unilateral Contact Modifications.................................................................25
    21.3    USDOT Unilateral Modifications. ..............................................................25
    21.4    Other Modifications. .................................................................................25
Article 22 [RESERVED] ............................................................................................... 25
    22.1    [RESERVED]. .........................................................................................25
Article 23 [RESERVED] ............................................................................................... 25
    23.1    [RESERVED]. .........................................................................................25
Article 24 Federal Financial Assistance, Administrative, and National Policy Requirements .... 25
    24.1    Uniform Administrative Requirements for Federal Awards..............................25
    24.2    Federal Law and Public Policy Requirements. ..............................................25
    24.3    Federal Freedom of Information Act. ...........................................................26
    24.4    History of Performance..............................................................................26
    24.5    Whistleblower Protection............................................................................26
    24.6    External Award Terms and Obligations.........................................................26
    24.7    Incorporated Certifications. .......................................................................27
Article 25 Assignment .................................................................................................. 27
    25.1    Assignment Prohibited...............................................................................27
Article 26 Waiver......................................................................................................... 27
    26.1    Waivers. ..................................................................................................27
Article 27 Additional Terms and Conditions.................................................................... 28
    27.1    Effect of Action Plan or Implementation Plan...............................................28

27.2 Disclaimer of Federal Liability. ...................................................................................... 28
27.3 Environmental Review. ............................................................................................... 28
27.4 Railroad Coordination. ............................................................................................... 29
27.5 Relocation and Real Property Acquisition. .................................................................. 29
27.6 Equipment Disposition. .............................................................................................. 29
Article 28 Mandatory Award Information ............................................................................... 30
28.1 Information Contained in a Federal Award. ................................................................. 30
Article 29 Construction and Definitions ................................................................................. 30
29.1 Attachments. .............................................................................................................. 30
29.2 Exhibits. ..................................................................................................................... 30
29.3 Construction. .............................................................................................................. 30
29.4 Integration. ................................................................................................................. 30
29.5 Definitions. ................................................................................................................. 31
Article 30 Agreement Execution and Effective Date .............................................................. 31
30.1 Counterparts. .............................................................................................................. 31
30.2 Effective Date. ........................................................................................................... 31

# Index of Definitions

Administering Operating Administration ....................................................................... 7
Environmental Review Entity………………………………………………………....27
Federal Share ........................................................................................................... 12
FHWA....................................................................................................................... 7
NOFO....................................................................................................................... 6
OMB ....................................................................................................................... 13
Program Statute....................................................................................................... 30
Project…………………………………………………………………………………..21
Project Closeout...................................................................................................... 17
SS4A Grant ............................................................................................................. 30
USDOT .................................................................................................................... 6

**GENERAL TERMS AND CONDITIONS**

The Infrastructure Investment and Jobs Act (IIJA; Pub. L. 117–58, November 15, 2021) established the Safe Streets and Roads for All (SS4A) Discretionary Grant Program (BIL Section 24112) and appropriated funds to the United States Department of Transportation (the "**USDOT**") under Division J, Title VIII of IIJA to implement the program. The funds are available to provide Federal financial assistance to support local initiatives to prevent death and serious injury on roads and streets, commonly referred to as "Vision Zero" or "Toward Zero Deaths" initiatives.

The USDOT published a Notice of Funding Opportunity (the "**NOFO**") to solicit applications for Federal financial assistance in Fiscal Year 2022 for the SS4A Discretionary Grant Program (87 Fed. Reg. 31606 (May 24, 2022; subsequently amended in 87 Fed. Reg. 47818 on August 4, 2022).

These general terms and conditions are incorporated by reference in a project-specific grant agreement under the fiscal year 2022 SS4A grant program. Articles 1–6 are in the project-specific portion of the agreement. The term "Recipient" is defined in the project-specific portion of the agreement. Attachments A through D are project-specific attachments.

**ARTICLE 7**
**PURPOSE**

7.1    **Purpose.** The purpose of this award is to improve roadway safety by significantly reducing or eliminating roadway fatalities and serious injuries through safety action plan development or projects focused on all users, including pedestrians, bicyclists, public transportation users, motorists, personal conveyance and micromobility users, and commercial vehicle operators. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Grant Application, as modified by section 3.3 and Attachment B.

**ARTICLE 8**
**USDOT ROLE**

8.1    **Division of USDOT Responsibilities.**

(a) The Office of the Secretary of Transportation is ultimately responsible for the USDOT's administration of the SS4A Grant Program.

(b) The Federal Highway Administration (the "**FHWA**") will administer this grant agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**8.2     USDOT Program Contacts.**

FHWA Safe Streets and Roads for All
Federal Highway Administration
Office of Safety
1200 New Jersey Avenue SE
HSA-1, Mail Drop E71-117
Washington, DC 20590
SS4A.FHWA@dot.gov
(202) 366-2201

and

[enter FHWA Division Office lead point of contact]
[enter address]
[enter email address]
[enter telephone]

**ARTICLE 9
RECIPIENT ROLE**

**9.1     Statements on the Project.** The Recipient states that:

(1)     all material statements of fact in the Grant Application were accurate when that application was submitted; and

(2)     Attachment B documents all material changes in the information contained in that application.

**9.2     Statements on Authority and Capacity.** The Recipient states that:

(1)     it has the authority to receive Federal financial assistance under this agreement;

(2)     It has the legal authority to complete the Project, including either ownership and/or maintenance responsibilities over a roadway network; safety responsibilities that affect roadways; or has an agreement from the agency that has ownership and/or maintenance responsibilities for the roadway within the applicant's jurisdiction; if applicable.

(3)     it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

7 of 31

(4)     not less than the difference between the "Total Eligible Project Cost" and the "SS4A Grant Amount" listed in section 3.3 are committed to fund the Project;

(5)     it has sufficient funds available, or an agreement with the agency that has ownership and/or maintenance responsibilities for the roadway within the recipient's jurisdiction, to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)     the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 9 and in section 24.7 on behalf of the Recipient.

**9.3     USDOT Reliance.** The Recipient acknowledges that:

(1)     the USDOT relied on statements of fact in the Grant Application to select the Project to receive this award;

(2)     the USDOT relied on statements of fact in both the Grant Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)     the USDOT relied on statements of fact in both the Grant Application and this agreement to establish the terms of this agreement; and

(4)     the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**9.4     Project Delivery.**

(a)  The Recipient shall complete the Project under the terms of this agreement.

(b)  The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

(c)  The Recipient shall provide any certifications or assurances deemed necessary by the USDOT in ensuring the Recipient's compliance with all applicable laws, regulations, and policies.

(d)  The Recipient shall provide access to records as provided at 2 CFR 200.337.

**9.5     Rights and Powers Affecting the Project.**

(a)  The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act, in a manner acceptable to the USDOT, promptly to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

9.6    **Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in Section 4.4 in writing within 30 calendar days of any change in key personnel who are identified in Section 4.3.

## ARTICLE 10
## AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

10.1    **Federal Award Amount.** The USDOT hereby awards a SS4A Grant to the Recipient in the amount listed in Section 2.2 as the SS4A Grant Amount.

10.2    **Federal Obligations.**

This agreement obligates for the budget period listed in section 2.5 of the grant agreement.

(a) If the Federal Obligation Type identified in section 2.3 is "Single," then the project-specific agreement obligates for the budget period the amount listed in section 2.2. as the Grant Amount and sections 10.2 (c)–10.2(f) do not apply to the project specific agreement.

(b) If the Federal Obligation Type identified in section 2.3 is "Multiple," then an amount up to the Grant Amount listed in section 2.2 will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 10.3(c)–10.3(f).

(c) The Obligation Condition Table in section 2.3 allocates the Grant among separate portions of the Project for the purpose of the Federal obligation of funds. The scope of each portion of the Project that is identified in that table is described in section 2.3.

(d) The project-specific agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table does not list an obligation condition.

(e) The project-specific agreement does not obligate amounts allocated in the Obligation Condition Table in section 2.3 to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only by modifying the project specific agreement under section 21.

(f) For each portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, the amount allocated in that table to that portion of the Project will be obligated if, not later than the statutory lapse date identified in the project-specific agreement as applicable to the Grant Program.

(g) For any portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, if the obligation condition is satisfied, the parties amend this agreement documenting that:

> (1) the FHWA determines that the obligation condition listed in that table for that portion of the Project is satisfied; and

> (2) the FHWA determines that all applicable Federal requirements for obligating the amount are satisfied.

(h) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f).

(i) Reserved.

(j) The Recipient acknowledges that:

> (1) the FHWA is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2.3 lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 10.2(c)-(f);

> (2) any portion of the Grant that is not obligated under this section 10.2 by the budget period end date identified in the project-specific agreement for those funds lapses on the day after that date and becomes unavailable for the Project; and

> (3) the FHWA may consider the failure to obligate funds by the budget period end date identified in the project-specific agreement as applicable to the Grant Program for those funds to be a basis for terminating the project-specific agreement under section 16.

**10.3    Budget Period**

The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 2.5, which shall be no later than 5 years from the date of grant execution. In this agreement, "budget period" is used as defined at 2 C.F.R. 200.1.

**10.4    Period of Performance.**

(a) The period of performance for this award begins on the effective date of award listed in page 1 item 2 and ends on the period of performance end date that is listed in page 1 item 6.

(b) In this agreement, "period of performance" is used as defined at 2 C.F.R. 200.1.

# ARTICLE 11
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

11.1    **Notification Requirement.** The Recipient shall notify all USDOT representatives who are identified in section 4.4 in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 11.1 is separate from any requirements under this article 11 that the Recipient request amendment of this agreement.

11.2    **Statement of Work Changes.** If the Project's activities differ from the statement of work that is described in section 3.1 and Attachment B, then the Recipient shall request an amendment of this agreement to update section 3.1.

11.3    **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request an amendment of this agreement to update the relevant dates:

(1)    a substantial completion date for the Project or a component of the Project is listed in section 3.2 and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 3.2; or

(2)    a schedule change would require the period of performance to continue after the period of performance end date listed in page 1 item 6  (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase  budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements)..

For other schedule changes, the Recipient shall request an amendment of this agreement unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

11.4    **Budget Changes.**

(a) The Recipient acknowledges that if the cost of completing the Project increases:

(1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B if, in comparing the Project's budget to the amounts listed in section 3.3:

(1)    the "Non-Federal Funds" amount decreases; or

(2)    the "Total Eligible Project Cost" amount decreases.

(c) For budget changes that are not identified in section 11.4(b), the Recipient shall request an amendment of this agreement to update section 3.3 and Attachment B unless the USDOT has consented, in writing consistent with applicable requirements, to the change.

(d) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3, then the Recipient may propose to the USDOT, in writing consistent with applicable requirements, specific additional activities that are within the scope of this award, as defined in sections 7.1 and 3.1, and that the Recipient could complete with the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs.

(e) If the actual eligible project costs are less than the "Total Eligible Project Cost" that is listed in section 3.3 and either the Recipient does not make a proposal under section 11.4(d) or the USDOT does not accept the Recipient's proposal under section 11.4(d), then:

(1)    in a request under section 11.4(b), the Recipient shall reduce the Federal Share by the difference between the "Total Eligible Project Cost" that is listed in section 3.3 and the actual eligible project costs; and

(2)    if that amendment reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall request to add additional project work that is within the scope of this project.

In this agreement, "**Federal Share**" means the sum of the "SS4A Action Plan or Implementation Grant Amount" and the "Other Federal Funds" amounts that are listed in section 3.3.

(f) The Recipient acknowledges that amounts that are required to be refunded under section 11.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C.F.R. part 901).

**11.5    USDOT Acceptance of Changes.** The USDOT may accept or reject amendments requested under this article 11, and in doing so may elect to consider only the interests of the SS4A grant program and the USDOT. The Recipient acknowledges that requesting an amendment under this article 11 does not amend, modify, or supplement this agreement unless the USDOT accepts that amendment request and the parties modify this agreement under section 21.1.

## ARTICLE 12
## GENERAL REPORTING TERMS

12.1    **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 4.4.  Reports will be added to a central repository maintained by FHWA.

12.2    **Alternative Reporting Methods.** FHWA may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the FHWA.

12.3    **Paperwork Reduction Act Notice.**

Under 5 C.F.R. 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2125-0675.

## ARTICLE 13
## PROGRESS AND FINANCIAL REPORTING

13.1    **Quarterly Program Performance Reports.** Quarterly, on or before the 20th day of the first month of each calendar year (e.g., reports due on or before January 20th, April 20th, July 20th, and October 20th) and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Project Progress Report in the format and with the content described in Exhibit C (SF-PPR). If the date of this agreement is in the final month of a calendar year, then the Recipient shall submit the first Quarterly Project Progress Report in the second calendar year quarter that begins after the date of this agreement.

13.2    **Quarterly Financial Status.** Quarterly, on or before the 20th day of the first month of each calendar year, the Recipient shall submit a Federal Financial Report using SF-425.

## ARTICLE 14
## PERFORMANCE REPORTING

14.1    **Baseline Performance Measurement.** If the Designation in Section 2.5 is "Implementation," then:

(1)     the Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in Attachment A, accurate as of the Baseline Measurement Date that is identified in Attachment A; and

13 of 31

(2) on or before the Baseline Report Date that is stated in Attachment A, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 14.1 and a detailed description of the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is identified in the Performance Measure Table in Attachment A.

14.2 **Section 24112(h) Report:** The Recipient shall submit to the USDOT, not later than 120 days after the end of the period of performance, a report that describes, consistent with section 24112(h) of IIJA:

(1) the costs of carrying out the project;

(2) the outcomes and benefits that each eligible project generated as identified in the grant application and measured by data to the maximum extent practicable (i.e. number of fatalities and serious injuries that occurred within the limits of the project location); and

(3) the lessons learned, and any recommendations related to future projects or strategies to prevent death and serious injuries on roads and streets.

14.3 **Performance Measurement Information.**

For each performance measure that is identified in the Performance Measure Table in Attachment A, not later than January 31 of each year that follows a calendar year within the period of performance during which data was collected, the Recipient shall submit to the USDOT a Performance Measurement Report containing the data collected in the previous calendar year and stating the dates when the data was collected.

14.4 **Performance Reporting Survival.**

The data collection and reporting requirements in this article 14 survive the termination of this agreement which is three years post period of performance.

14.5 **Program Evaluation.**

As a condition of grant award, the recipient may be required to participate in an evaluation undertaken by USDOT, or another agency or partner. The evaluation may take different forms such as an implementation assessment across grant recipients, an impact and/or outcomes analysis of all or selected sites within or across grant recipients, or a benefit/cost analysis or assessment of return on investment. The Department may require applicants to collect data elements to aid the evaluation. As a part of the evaluation, as a condition of award, grant recipients must agree to: (1) make records available to the evaluation contractor; (2) provide access to program records, and any other relevant documents to calculate costs and benefits; (3) in the case of an impact analysis, facilitate the access to relevant information as requested; and (4) follow evaluation procedures as specified by the evaluation contractor or USDOT staff.

## ARTICLE 15
## NONCOMPLIANCE AND REMEDIES

**15.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 15.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)    accept the remedy;

(2)    acknowledge the noncompliance, but propose an alternative remedy; or

(3)    dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1)    after considering the Recipient's response under section 15.1(b); or

(2)    if the Recipient fails to respond under section 15.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

**15.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 15.1(d), the USDOT may impose a remedy, including:

(1)    additional conditions on the award;

(2)    any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(3)     any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 15.2(a), before making a final determination of noncompliance under section 15.1(d). If it does so, then the notice provided under section 15.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 15.2 or making a public interest determination under section 15.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 15.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Standards for Administrative Collection of Claims (31 C. F. R. part 901).

## 15.3    Other Oversight Entities.

Nothing in this article 15 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

**ARTICLE 16**
**AGREEMENT TERMINATION**

## 16.1    USDOT Termination.

(a) The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

(1)    the Recipient fails to obtain or provide any non-SS4A Grant contribution (all eligible project costs other than the SS4A Grant Amount, as described in section 3.2 table (a) of the grant agreement) or alternatives approved by the USDOT as provided in this agreement and consistent with article 3;

(2)    a construction start date for the Project or Strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(3)     a substantial completion date for the Project or Strategy is listed in section 3.2 and the Recipient fails to meet that milestone by six months after the date listed in section 3.2;

(4)     the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the schedule in section 3.2 even if it is beyond the reasonable control of the Recipient; or,

(5)     the USDOT determines that termination of this agreement is in the public interest.

(6)     the Recipient fails to expend the funds within 5 years after the date on which the government executes the grant agreement, which is the date funds are provided for the project.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 16.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 15.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 16.1.

**16.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 C.F.R. 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**16.3    Post-Termination Adjustments.** The Recipient acknowledges that under 2 C.F.R. 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that USDOT reimbursed before termination, and recover funds from the Recipient.

**16.4    Non-Terminating Events.**

(a) The end of the period of performance described under section 10.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The liquidation of funds under section 20.1 does not terminate this agreement or the Recipient's obligations under this agreement.

**16.5    Other Remedies.** The termination authority under this article 16 supplements and does not limit the USDOT's remedial authority under article 15 or 2 C.F.R. part 200, including 2 C.F.R. 200.339–200.340.

**ARTICLE 17**
**MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS**

**17.1    Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 C.F.R. 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 C.F.R. 200.334.

**17.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 17.2(a) in accordance with a financial management system that meets the requirements of 2 C.F.R. 200.302–200.307, 2 C.F.R. part 200, subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2022 SS4A grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including "FY 2022" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2022" in column c ("Additional Award Identification").

**17.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 C.F.R. 200.303.

**17.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 C.F.R. 200.337.

**17.5    Oversight Responsibilities.**  This award is subject to the oversight requirements of Title 23, United States Code.

**ARTICLE 18**
**CONTRACTING AND SUBAWARDS**

**18.1    Build America, Buy America.**  This award term implements § 70914(a) of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), 2 CFR part 184 and Office of Management and Budget (OMB) Memorandum M-24-02, "Initial Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure."

*Requirement to Use Iron, Steel, Manufactured Products, and Construction Materials Produced in the United States.*

The Recipient shall not use funds provided under this award for a project for infrastructure unless:

(1) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product; and

(3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

*Inapplicability.*

The domestic content procurement preference in this award term only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Waivers.*

When necessary, the Recipient may apply for, and the USDOT may grant, a waiver from the domestic content procurement preference in this award term.

A request to waive the application of the domestic content procurement preference must be in writing. The USDOT will provide instructions on the waiver process and on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Office of Management and Budget (OMB) Made in America Office.

When the USDOT has made a determination that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the USDOT determines that:

(1) applying the domestic content procurement preference would be inconsistent with the public interest;

(2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.transportation.gov/office-policy/transportation-policy/made-in-america.

*Definitions*

"Construction materials" means articles, materials, or supplies— that consist of only one of the items listed below in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent that one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material:

(1) The listed Items are:
   • non-ferrous metals;
   • plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
   • glass (including optic glass);
   • fiber optic cable (including drop cable)
   • optical fiber;
   • lumber;

• engineered wood; and
• drywall.

 (2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

"Domestic content procurement preference" means all iron and steel used in the project are produced in the United States; the manufactured products used in the project are produced in the United States; or the construction materials used in the project are produced in the United States.

"Iron or steel products" means articles, materials, or supplies that consist wholly or predominantly or iron or steel or a combination of both.

"Manufactured products" means:

(1) Articles, materials, or supplies that have been: (i) Processed into a specific form and shape; or (ii) combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

(2) If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph (1) of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

"Predominantly of iron or steel or a combination of both" means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forging utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Project"** means the temporary or permanent construction, alteration, maintenance, or repair of infrastructure in the United States.

"Section 70917(c) materials" cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives.

(a) Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as applicable, as implemented by the Federal Highway Administration. The Recipient acknowledges that this agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C. 313(b).

(b) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle A, 135 Stat. 429, 1294 (2021), as implemented by OMB,

USDOT, and FHWA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c)  Under 2 C.F.R. 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

**18.2    Small and Disadvantaged Business Requirements.** The Recipient shall expend all funds under this award in compliance with the requirements at 2 C.F.R. 200.321 including any amendments thereto.

**18.3    Engineering and Design Services.**  The Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under the Brooks Act, 40 U.S.C. 1101-1104 as implemented in 23 U.S.C. 112(b)(2), as applicable, or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**18.4    Foreign Market Restrictions.**  The Recipient shall not allow funds provided under this award to be used to fund the use of any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

**18.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.**  The Recipient acknowledges that Section 889 of Pub. L. No. 115-232, 2 C.F.R. 200.216 and 2 C.F.R. 200.471 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**18.6    Recipient Responsibilities For Subawards.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. 200.331–200.333.

**18.7    Subaward and Contract Authorization.**  If the USDOT Office for Subaward Authorization identified in section 5.1 is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 C.F.R. 200.308 (f)(6) and 2 C.F.R. 200.333, as applicable, for the subaward of any SS4A Grant work under the Project-Specific Agreement. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement acquisition of goods and services.

**18.8    Minimum Wage Rates.** The Recipient shall include, in all contracts in excess of $2,000 for work on the Project that involves labor, provisions establishing minimum rates of

wages, to be predetermined by the United States Secretary of Labor, in accordance with 23 U.S.C. 113, that contractors shall pay to skilled and unskilled labor, and such 19 of 33 minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

## ARTICLE 19
## COSTS, PAYMENTS, AND UNEXPENDED FUNDS

19.1    **Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated on the SS4A Grant cover page, Item 11, Federal Funds Obligated.  The Recipient acknowledges that USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

19.2    **Projects Costs.** This award is subject to the cost principles at 2 C.F.R. part 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

19.3    **Timing of Project Costs.**

(a)  The Recipient shall not charge to this award costs that are incurred after the period of performance.

(b)  The Recipient shall not charge to this award costs that were incurred before the effective date of award of this agreement, unless there has been an approval pre-award costs under 2 C.F.R. 200.458. pre-award costs under 2 C.F.R. 200.458.

19.4    **Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

19.5    **Unexpended Federal Funds.** Any Federal funds that are awarded at section 10.1 but not expended on allocable, allowable costs remain the property of the United States.

19.6    **Timing of Payments to the Recipient.** When reimbursement is used, the Recipient shall not request reimbursement of a cost before the Recipient has entered an obligation for that cost.

19.7    **Payment Method.**

(a) If the USDOT Payment System identified in section 5.2 is "DELPHI eInvoicing," then the Recipient shall use the DELPHI eInvoicing System to request reimbursement or

advance payment under this award unless the USDOT agreement officer provides written approval for the Recipient to use a different request and payment method.

(b) The USDOT may deny a payment request that is not submitted using the method identified in section 5.2.

**19.8    Information Supporting Expenditures**

(a) If the USDOT Payment System identified in section 5.2 is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 270 (Request for Advance or Reimbursement), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**19.9    Reimbursement Frequency.** If the USDOT Payment System identified in section 5.2 is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.

## ARTICLE 20
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**20.1    Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory availability to eligible entities date, which shall be 5 years after the date on which the grant is provided.

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 C.F.R. 200.344–200.346.

## ARTICLE 21
## AGREEMENT MODIFICATIONS

**21.1    Bilateral Modifications.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**21.2    Unilateral Contact Modifications.**

  (a) The USDOT may update the contacts who are listed in sections 4.4 by written notice to all of the Recipient contacts who are listed in section 4.3.

**21.3    USDOT Unilateral Modifications.**

  (a) The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

  (b) To unilaterally modify this agreement under this section 21.3(a), the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**21.4    Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 21.1, 21.2, or 21.3. If an amendment, modification, or supplement is not permitted under section 21.1, not permitted under section 21.2, and not permitted under section 21.3, it is void.

**ARTICLE 22**
**[RESERVED]**


**ARTICLE 23**
**[RESERVED]**


**ARTICLE 24**
**FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

**24.1    Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**24.2    Federal Law and Public Policy Requirements.**

  (a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

  (b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all

applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**24.3    Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**24.4    History of Performance.** Under 2 C.F.R 200.206, any Federal agency may consider the Recipient's performance under this agreement when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**24.5    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**24.6    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 29, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

(3)    2 C.F.R part 175: Award Term for Trafficking in Persons; and

(4)      Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)      49 C.F.R. part 20: New Restrictions on Lobbying;

(2)      49 C.F.R. part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)      49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)      Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**24.7 Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)      Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

## ARTICLE 25
## ASSIGNMENT

**25.1 Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

## ARTICLE 26
## WAIVER

**26.1 Waivers.**

(a) A waiver granted by USDOT under this agreement will not be effective unless it is in writing and signed by an authorized representative of USDOT.

(b) A waiver granted by USDOT under this agreement on one occasion will not operate as a waiver on other occasions.

(c) If USDOT fails to require strict performance of a provision of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that provision or breach.

**ARTICLE 27**
**ADDITIONAL TERMS AND CONDITIONS**

27.1    **Effect of Action Plan or Implementation Plan.** Based on information that the Recipient provided to the USDOT, including the Technical Application, at indicated in section 2.5, this agreement designates this award as an Action Plan award or a Implementation award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

27.2    **Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

27.3    **Environmental Review**

(a)  In this section, **"Environmental Review Entity"** means:

(1) if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2) for all other cases, the FHWA.

(b)  Except as authorized under section 27.3(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

(1) the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370-12, and any other applicable environmental laws and regulations; and

(2) if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c)  If the Recipient is using procedures for early acquisition of real property under 23 C.F.R. 710.501 or hardship and protective acquisitions of real property 23 C.F.R. 710.503, the Recipient shall comply with 23 C.F.R. 771.113(d)(1).

(d)  The Recipient acknowledges that:

(1) the Environmental Review Entity's actions under section 27.3(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

28 of 31

(2) applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 C.F.R. 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align information in this agreement, then:

(1) the parties may amend this agreement under section 21.1 for consistency with the selected build alternative; or

(2) if the USDOT determines that the condition at section 16.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 16.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**27.4    Railroad Coordination.** If the agreement includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 C.F.R. 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**27.5    Relocation and Real Property Acquisition.**

(a) The Recipient shall comply with the land acquisition policies in 49 C.F.R. part 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 C.F.R. part 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24 subparts D–E.

(c) The Recipient shall make available to displaced persons comparable replacement dwellings in accordance with 49 C.F.R. part 24.

**27.6    Equipment Disposition.**

(a) In accordance with 2 C.F.R. 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project that entity shall request disposition instructions from the FHWA.

(b) In accordance with 2 C.F.R. 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. 200.310–200.316 and 2 C.F.R. 1201.313.

(c) The Recipient shall ensure compliance with this section 27.6 for all tiers of subawards under this award.

**ARTICLE 28**
**MANDATORY AWARD INFORMATION**

**28.1    Information Contained in a Federal Award.** For 2 C.F.R. 200.211:

(1)    the "Federal Award Date" is the date of this agreement, as defined under section 30.2;

(2)    the "Assistance Listings Number" is 20.939 and the "Assistance Listings Title" is "Safe Streets and Roads for All Grant Program"; and

(3)    this award is not for research and development.

**ARTICLE 29**
**CONSTRUCTION AND DEFINITIONS**

**29.1    Attachments.** This agreement includes the following attachments as integral parts:

| | |
|---|---|
| Attachment A | Performance Measurement Information |
| Attachment B | Changes from Application |
| Attachment C | [RESERVED] |
| Attachment D | [RESERVED] |
| Attachment E | Labor and Workforce |
| Attachment F | Critical Infrastructure Security and Resilience |

**29.2    Exhibits.** The following exhibits, which are in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2022 SS4A Grant Program", dated March 17, 2025, and available at https://www.transportation.gov/grants/ss4a/grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Project Progress Reports and Recertifications: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**29.3    Construction.** If a provision in the exhibits or the attachments conflicts with a provision in articles 1-28, then the provision in articles 1-28 prevails. If a provision in the

30 of 31

attachments conflicts with a provision in the exhibits, then the provision in the attachments prevails.

29.4    **Integration.** This agreement constitutes the entire agreement of the parties relating to the SS4A grant program and awards under that program and supersedes any previous agreements, oral or written, relating to the SS4A grant program and awards under that program.

29.5    **Definitions.** In this agreement, the following definitions apply:

"**Program Statute**" means the IIJA section 24112 and statutory text under the heading "Safe Streets and Roads for All Grants" in title I of division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (November 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Grant Application, as modified by the negotiated provisions of this agreement, including article 3 and Attachments A–D.

"**SS4A Grant**" means an award of funds that were made available under the NOFO.

"**Grant Application**" means the application identified in section 2.1, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## ARTICLE 30
## AGREEMENT EXECUTION AND EFFECTIVE DATE

30.1    **Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

30.2    **Effective Date.** The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a SS4A Grant when the USDOT's authorized representative signs it.

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

# EXHIBIT E

**U.S. Department of Transportation**

**Federal Railroad Administration**

# Grant Agreement

| 1. RECIPIENT NAME AND ADDRESS | |
|---|---|
| City of Atlanta | |
| 55 Trinity Ave SW | |
| Atlanta, GA 30303-3520 | |

2. AGREEMENT NUMBER: 69A36525421580RCEGA    3. AMENDMENT NO. 0

4. PROJECT PERFORMANCE PERIOD: FROM 05/01/2025 TO 01/31/2028

5. FEDERAL FUNDING PERIOD: FROM 05/01/2025 TO 01/31/2028

1A. IRS/VENDOR NO. 586000511

6. PRE-AWARD AUTHORITY: No    6A. PRE-AWARD DATE: N/A

1B. UEI. HAAWKXL2PLE3    1C. DUNS. 065372500

7. ACTION    New

8. ASSISTANCE LISTING#: 20.327

9. PROJECT TITLE

City of Atlanta Safe Crossings Study

| TITLE | FEDERAL | NON-FEDERAL | TOTAL |
|---|---|---|---|
| 10. PREVIOUS AGREEMENTS | 0.00 | 0.00 | 0.00 |
| 11. THIS AGREEMENT | 1,200,000.00 | 300,000.00 | 1,500,000.00 |
| 12. TOTAL AGREEMENT | 1,200,000.00 | 300,000.00 | 1,500,000.00 |

12A. OTHER FEDERAL FUNDING    0.00

13. INCORPORATED ATTACHMENTS

THIS AGREEMENT INCLUDES THE FOLLOWING ATTACHMENTS, INCORPORATED HEREIN AND MADE A PART HEREOF:

General Terms and Conditions, Attachment 1; Project Specific Terms and Conditions, Attachment 2; Exhibits, Attachment 3

14. STATUTORY AUTHORITY FOR GRANT/ COOPERATIVE AGREEMENT

Sections 22104 and 22305 of the Infrastructure Investment and Jobs Act (IIJA), Public Law 117-58 (2021); 49 U.S.C. § 22909 / Advanced Appropriation in the IIJA, Division J, Title VIII, Public Law 117-58 (2021)

15. REMARKS

| GRANTEE ACCEPTANCE | AGENCY APPROVAL |
|---|---|
| 16. NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL | 18. NAME AND TITLE OF AUTHORIZED FRA OFFICIAL |
| 17. SIGNATURE OF AUTHORIZED GRANTEE OFFICIAL    17A. DATE | 19. SIGNATURE OF AUTHORIZED FRA OFFICIAL    19A. DATE |

**AGENCY USE ONLY**

20. OBJECT CLASS CODE/EXPENDITURE TYPE: 41010

21. ORG. CODE/EXPENDITURE ORG. : 9000000000

22. ACCOUNTING CLASSIFICATION CODES

| DOCUMENT NUMBER | FUND/PROJECT | BY | BPAC/TASK | AMOUNT |
|---|---|---|---|---|
| 69A36525421580RCEGA | 27X0760724 | 2025 | 10030503AA | 1,200,000.00 |

Page 1

# AWARD ATTACHMENTS

City of Atlanta                                                                  69A36525421580RCEGA

1. General Terms and Conditions, Attachment 1

2. Project Specific Terms and Conditions, Attachment 2

3. Exhibits, Attachment 3

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**U.S. Department of Transportation**
**Federal Railroad Administration**

## Attachment 1

# GENERAL TERMS AND CONDITIONS

Revision Date: April 23, 2025

![U.S. Department of Transportation Federal Railroad Administration]

# General Terms and Conditions
## Table of Contents

ATTACHMENT 1 .................................................................................................................................... 7

ARTICLE 1:  TERMS AND CONDITIONS .............................................................................................. 7

    1.1     General Terms and Conditions .......................................................................................... 7

    1.2     Project-Specific Terms and Conditions ............................................................................. 7

    1.3     Program-Specific Clauses ................................................................................................... 7

    1.4     Exhibits .............................................................................................................................. 8

ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES ................................................................................ 8

    2.1     FRA Role ............................................................................................................................. 8

    2.2     FRA Professional Staff ....................................................................................................... 8

ARTICLE 3:  RECIPIENT ROLE ........................................................................................................... 9

    3.1     Representations and Acknowledgments on the Project ................................................... 9

    3.2     Representations on Authority and Capacity ..................................................................... 9

    The Recipient represents that: .................................................................................................... 9

    3.3     FRA Reliance .................................................................................................................... 10

    3.4     Project Delivery ............................................................................................................... 10

    3.5     Rights and Powers Affecting the Project ......................................................................... 10

    3.6     Notification of Changes to Key Personnel ...................................................................... 11

ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ................................................ 11

    4.1     Federal Award Amount .................................................................................................... 11

    4.2     Federal Obligations ......................................................................................................... 11

    4.3     Maximum Funding Amount ............................................................................................. 11

    4.4     Budget Period .................................................................................................................. 11

    4.5     Period of Performance .................................................................................................... 11

ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ..................................... 11

    5.1     Notification Requirement ................................................................................................ 11

    5.2     Scope and Statement of Work Changes .......................................................................... 12

    5.3     Schedule Changes ........................................................................................................... 12

    5.4     Budget Changes .............................................................................................................. 12

    5.5     Project Cost Savings ........................................................................................................ 13

    5.6     FRA Acceptance of Changes ........................................................................................... 13

![U.S. Department of Transportation Federal Railroad Administration logo]

ARTICLE 6:  GENERAL REPORTING TERMS .................................................................................. 14

    6.1    Alternative Reporting Methods .................................................................................. 14

    6.2    Paperwork Reduction Act Notice ............................................................................... 14

ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING ................................................................ 14

    7.1    Quarterly Project Progress Reports and Recertifications .......................................... 14

    7.2    Final Progress Reports and Financial Information ...................................................... 15

    7.3    Real Property Reporting .............................................................................................. 15

ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING ................................................ 15

    8.1    Baseline Performance Measurement .......................................................................... 15

    8.2    Post-Project Performance Measurement ................................................................... 15

    8.3    Project Outcomes Report ............................................................................................ 16

    8.4    General Performance Measurement Requirements .................................................... 16

    8.5    Outcome Measurement and Reporting Survival ........................................................ 16

ARTICLE 9:  NONCOMPLIANCE AND REMEDIES ........................................................................ 16

    9.1    Noncompliance Determinations ................................................................................. 16

    9.2    Remedies ..................................................................................................................... 17

    9.3    Other Oversight Entities ............................................................................................. 18

ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION .................................................. 18

    10.1    Suspension of Award Activities .................................................................................. 18

    10.2    FRA Termination ......................................................................................................... 19

    10.3    Closeout Termination ................................................................................................. 19

    10.4    Post-Termination Adjustments .................................................................................. 19

    10.5    Non-Terminating Events ............................................................................................. 19

ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS ............. 20

    11.1    Recipient Monitoring and Record Retention .............................................................. 20

    11.2    Financial Records and Audits ...................................................................................... 20

    11.3    Internal Controls ......................................................................................................... 21

    11.4    FRA Record Access ...................................................................................................... 21

    11.5    Site Visits ..................................................................................................................... 21

ARTICLE 12:  CONTRACTING AND SUBAWARDING ................................................................... 21

    12.1    Buy America ................................................................................................................ 21

    12.2    Small and Disadvantaged Business Requirements ..................................................... 22

    12.3    Engineering and Design Services [Reserved] ............................................................. 22

![U.S. Department of Transportation Federal Railroad Administration]

12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ...22

12.5    Pass-Through Entity Responsibilities ...................................................................22

12.6    Local Hiring Preference for Construction Jobs.....................................................22

12.7    Procurement ......................................................................................................22

ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS ................................................23

13.1    Limitation of Federal Award Amount ..................................................................23

13.2    Project Costs .....................................................................................................23

13.3    Timing of Project Costs ......................................................................................23

13.4    Recipient Recovery of Federal Funds..................................................................23

13.5    Unexpended Agreement Federal Funds ..............................................................23

13.6    Interest Earned .................................................................................................24

13.7    Timing of Payments to the Recipient..................................................................24

13.8    Payment Method ..............................................................................................24

13.9    Information Supporting Expenditures .................................................................24

13.10   Reimbursement Request Timing Frequency........................................................24

13.11   Program Income................................................................................................24

ARTICLE 14:  PROPERTY AND EQUIPMENT .........................................................................25

14.1    General Requirements.......................................................................................25

14.2    Relocation and Real Property Acquisition ...........................................................25

14.3    Use for Originally Authorized Purpose................................................................25

14.4    Maintenance ....................................................................................................25

14.5    Real Property Disposition...................................................................................26

14.6    Equipment Disposition.......................................................................................26

14.7    Recordkeeping ..................................................................................................26

14.8    Encumbrance ....................................................................................................26

ARTICLE 15:  AMENDMENTS .............................................................................................27

15.1    Bilateral Amendments .......................................................................................27

15.2    FRA Unilateral Amendments..............................................................................27

15.3    Other Amendments ...........................................................................................27

ARTICLE 16:  [RESERVED] ..................................................................................................27

ARTICLE 17:  [RESERVED] ..................................................................................................27

ARTICLE 18:  LABOR AND WORK ........................................................................................27

18.1    Labor and Work.................................................................................................27

![U.S. Department of Transportation Federal Railroad Administration logo]

ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ...................................................... 28

19.1    Critical Infrastructure Security and Resilience ................................................................. 28

ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE,  AND NATIONAL POLICY REQUIREMENTS .................................................................................................................................. 28

20.1    Uniform Administrative Requirements for Federal Awards ........................................... 28

20.2    Federal Law and Public Policy Requirements ............................................................. 28

20.3    Federal Freedom of Information Act ........................................................................... 29

20.4    History of Performance ............................................................................................... 29

20.5    Whistleblower Protection ............................................................................................ 29

20.6    External Award Terms and Obligations ....................................................................... 30

20.7    Incorporated Certifications ......................................................................................... 30

ARTICLE 21:  ASSIGNMENT ............................................................................................................. 30

21.1    Assignment Prohibited ............................................................................................... 30

ARTICLE 22:  WAIVER ...................................................................................................................... 30

22.1    Waivers ..................................................................................................................... 30

ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS ....................................................................... 31

23.1    Disclaimer of Federal Liability .................................................................................... 31

23.2    Environmental Review ................................................................................................ 31

23.3    Project Maintenance Requirement .............................................................................. 32

23.4    Appropriations Act Requirements ............................................................................... 32

23.5    Standards of Conduct ................................................................................................. 32

23.6    Changed Conditions of Performance ........................................................................... 33

23.7    Litigation ................................................................................................................... 33

23.8    [Reserved] ................................................................................................................. 33

23.9    Equipment and Supplies ............................................................................................. 33

23.10   Safety and Technology Data ....................................................................................... 33

23.11   Intellectual Property .................................................................................................. 33

23.12   Liquidation of Recipient Obligations .......................................................................... 33

ARTICLE 24:  CONSTRUCTION AND DEFINITIONS .............................................................................. 34

24.1    Agreement ................................................................................................................. 34

24.2    Construction ............................................................................................................... 34

24.3    Integration ................................................................................................................. 34

24.4    Definitions .................................................................................................................. 34

**U.S. Department of Transportation**
**Federal Railroad Administration**

24.5    Calendar Dates ........................................................................................................... 35

24.6    Communication in Writing ......................................................................................... 35

24.7    Severability ................................................................................................................. 35

ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE ................................................ 35

25.1    Counterparts .............................................................................................................. 35

25.2    Effective Date ............................................................................................................. 36

ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES ............................................................................ 36

26.1    Interstate Rail Compacts Grant Program .................................................................. 36

26.2    Railroad Crossing Elimination Program Clauses ....................................................... 38

26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses ............ 40

26.4    Restoration and Enhancement Grants Clauses ......................................................... 42

26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses ......................................................................................................... 45

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 CFR part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 CFR part 1201.

## ARTICLE 1:  TERMS AND CONDITIONS

**1.1     General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2     Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3     Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.

U.S. Department of Transportation
**Federal Railroad Administration**

(e)  For Projects funded under the Federal-State Partnership for Intercity Passenger Rail program (49 U.S.C. § 24911) and Federal-State Partnership for State of Good Repair (as authorized in Sections 11103 and 11302 of the Passenger Rail Reform and Investment Act of 2015 (Title XI of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94 (2015))), the Recipient will comply with the program-specific clauses in Article 26.5.

**1.4      Exhibits**

Exhibits A–C are part of the Agreement between FRA and the Recipient. The Recipient will comply with Exhibits A–C.

## ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES

**2.1      FRA Role**

(a)  FRA is responsible for funding disbursements to the Recipient under this Agreement. FRA will also conduct oversight and monitoring activities to assess Recipient progress against established performance goals and to assess compliance with terms and conditions, including the Statement of Work and other requirements of this Agreement.

(b)  If this award is made as a Cooperative Agreement, FRA will have substantial programmatic involvement. Substantial involvement means that, after award, technical, administrative, or programmatic staff will assist, guide, coordinate, or otherwise participate with the Recipient in Project activities.

(c)  If this award is made as a Grant, FRA will not have substantial programmatic involvement.

**2.2      FRA Professional Staff**

FRA may provide professional staff to review work in progress, completed products, and to provide or facilitate access to technical assistance when it is available, feasible, and appropriate. FRA professional staff may include the following:

(a)  Financial Analyst. The Financial Analyst will serve as the Recipient's point of contact for systems (e.g., GrantSolutions and the Delphi eInvoicing System) access and troubleshooting as well as for financial monitoring.

(b)  Grant Manager. The Grant Manager will serve as the Recipient's point of contact for grant administration and will oversee compliance with the terms and conditions in this Agreement. The Grant Manager reviews financial reports, performance reports, and works with the Project Manager to facilitate effective Project delivery.

(c)  Project Manager. The Project Manager will serve as the Recipient's point of contact for the technical aspects of Project delivery. The Project Manager coordinates Project deliverable review, provides technical assistance to the Recipient, and generally assesses Project progress and performance.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 3:  RECIPIENT ROLE

**3.1**    **Representations and Acknowledgments on the Project**

(a)  The Recipient represents that:

(1)  all material statements of fact in the Application were accurate when the Application was submitted and now; and

(2)  the Recipient read and understands the terms and conditions in Attachment 1 and Attachment 2 of this Agreement, the applicable program-specific clauses in Article 26 of this Attachment 1, and the information and conditions in the Exhibits.

(b)  The Recipient acknowledges that:

(1)  the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to FRA, and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

(2)  The Recipient acknowledges that the requirements of this Agreement apply to the entire Project, including Project costs satisfied from sources other than Agreement Federal Funds.

(c)  By entering into this Agreement with FRA, the Recipient agrees to comply with the terms and conditions in Attachment 1 and Attachment 2, including applicable program-specific clauses in Article 26 of this Attachment 1, Exhibits A–C, and all applicable Federal laws and regulations, including those identified in this Agreement. The Recipient will ensure compliance with all terms of this Agreement and all of its parts for all tiers of subawards and contracts under this Agreement, as appropriate. The Recipient understands that the terms and conditions of this Agreement apply regardless of whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

**3.2**    **Representations on Authority and Capacity**

The Recipient represents that:

(a)  it has the legal authority to receive Federal financial assistance under this Agreement;

(b)  it has the legal authority to complete the Project;

(c)  all representations and warranties made in the Federal System for Awards Management (SAM.gov) and in the Application are true and correct;

U.S. Department of Transportation
**Federal Railroad Administration**

(d)  it has the capacity, including legal, technical, institutional, managerial, and financial capacity, to comply with its obligations under this Agreement and complete the Project;

(e)  the Non-Federal Funds listed in Article 6 of Attachment 2 of this Agreement are committed to fund the Project;

(f)  it has sufficient funds available to ensure that equipment and infrastructure funded under this Agreement will be operated and maintained in compliance with this Agreement and applicable Federal law;

(g)  it has sufficient funds available to ensure that operations funded under this agreement are conducted in compliance with this Agreement and applicable Federal law; and

(h)  the individual executing this agreement on behalf of the Recipient has the legal authority to enter this Agreement and make the statements and certifications in this Agreement on behalf of the Recipient.

**3.3     FRA Reliance**

The Recipient acknowledges that:

(a)  FRA relied on statements of fact in the Application and SAM.gov to select the Project to receive this award;

(b)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient and the Project are eligible to receive financial assistance under this Agreement;

(c)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient has the legal authority to implement the Project; and

(d)  FRA relied on statements of fact in both the Application and this Agreement to establish the terms of this Agreement; and

(e)  FRA's selection of the Project to receive this award may have prevented awards to other eligible applicants.

**3.4     Project Delivery**

(a)  The Recipient will implement and complete the Project to FRA's satisfaction under the terms of this Agreement.

(b)  The Recipient will ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

**3.5     Rights and Powers Affecting the Project**

(a)  The Recipient will not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this Agreement without written approval of FRA.

10

U.S. Department of Transportation
**Federal Railroad Administration**

(b)  The Recipient will act promptly, in a manner acceptable to FRA, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this Agreement.

**3.6    Notification of Changes to Key Personnel**

The Recipient will notify the FRA Grant Manager in writing within 30 days of any change in key personnel who are identified in the Application, which may require an amendment to this Agreement.

## ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**4.1    Federal Award Amount**

Under this Agreement, FRA awards a Grant to the Recipient in the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.2    Federal Obligations**

This Agreement obligates for the budget period the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.3    Maximum Funding Amount**

This Agreement funds the Project at the lesser amount of the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement, or the FRA maximum contribution percentage of the total Project cost identified in Article 6.5 of Attachment 2 of this Agreement.

**4.4    Budget Period**

The budget period for this award begins on the date of this Agreement and ends on the end date that is listed in Section 5 on the Agreement cover sheet. In this Agreement, "budget period" is used as defined at 2 CFR § 200.1.

**4.5    Period of Performance**

The Period of Performance for this award is listed in Section 4 on the Agreement cover sheet. In this Agreement, "Period of Performance" is used as defined at 2 CFR § 200.1.

## ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1    Notification Requirement**

The Recipient will notify the FRA Grant Manager and Project Manager by electronic correspondence within 30 days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project, including change in authority. In that notification, the Recipient will describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this Section 5.1 is separate from any requirements under this Article 5 that the Recipient request an amendment to this Agreement.

11

U.S. Department of Transportation
**Federal Railroad Administration**

**5.2     Scope and Statement of Work Changes**

If the Project's activities differ from the activities described in Article 4 of Attachment 2 of this Agreement, then the Recipient will notify FRA in writing of the change, which may require an amendment to this Agreement.

**5.3     Schedule Changes**

If one or more of the following conditions are satisfied, then the Recipient will request an amendment to this Agreement to update the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement:

(a)  a completion date for the Project or a component of the Project is listed in the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed;

(b)  a schedule change would require the budget period to continue after the end of the budget period defined in Section 4.4; or

(c)  a schedule change would require the Period of Performance to continue after the end of the Period of Performance defined in Section 4.5. The Recipient must submit requests to extend the Period of Performance not later than 90 days before the end of the Period of Performance.

For other schedule changes, the Recipient will notify the Grant Manager in writing.

**5.4     Budget Changes**

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)  that increase does not affect the Recipient's obligation under this Agreement to complete the Project;

(2)  any additional funds the Recipient contributes to complete the Project are subject to the requirements of this Agreement in the same manner as the Non-Federal Funds identified in Article 6.5 of Attachment 2 of this Agreement; and

(3)  FRA will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient will notify FRA in writing if the total Project cost, as described in Table 6-A of Attachment 2 of this Agreement, amount increases, which may result in an amendment to this Agreement.

(c)  The Recipient will notify FRA in writing if the Non-Federal Funds amount decreases, which may result in an amendment to this Agreement.

(d)  For all other budget changes, the Recipient will follow the applicable procedures and document the changes in writing.



U.S. Department of Transportation
**Federal Railroad Administration**

**5.5**     **Project Cost Savings**

(a)  If there are Project Cost Savings, then the Recipient may notify FRA in writing of its intent to include in the Project and complete with the Project Cost Savings the additional activities within the scope of this award that are specified in the Additional Task(s) in Article 4 of Attachment 2 of this Agreement. The Recipient will complete the Additional Task(s) after FRA provides a written approval. An amendment to this Agreement is not required to proceed with the Additional Task(s).

(b)  If there are Project Cost Savings, and there are not Additional Task(s) identified in Article 4 of Attachment 2 of this Agreement, then the Recipient may propose a new task that is within the scope of this award and request an amendment to add the new task to this Agreement and complete it with Project Cost Savings.

(c)  In this Agreement, **"Project Cost Savings"** means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs. There are no Project Cost Savings prior to completion of the Project or if the actual costs to complete the Project are equal to or greater than the total Project cost listed in Section 6.5 of Attachment 2 of this Agreement.

(d)  If there are Project Cost Savings and either the Recipient does not make a proposal or FRA does not accept the Recipient's proposal under (a) of this Section 5.5, then:

(1)  The Recipient will provide written notice to FRA and reduce the Federal Share by the Project Cost Savings, which may result in an amendment to this Agreement; and

(2)  If the reduced Federal Share reduces this award and the Recipient received reimbursed costs exceeding the appropriate amount under the reduced award, the Recipient will refund the difference between the reimbursed costs and the reduced award.

(e)  In this Agreement, "Federal Share" means the sum of the Agreement Federal Funds and Other Federal Funds amounts that are identified in the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement.

(f)  The Recipient acknowledges that amounts that are required to be refunded under this Section constitute a debt to the Federal Government that FRA may collect under 2 CFR § 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–999).

**5.6**     **FRA Acceptance of Changes**

FRA may accept or reject changes requested under this Article 5, and in doing so may elect to consider only the interests of the grant program and FRA. The Recipient acknowledges that any request under this Article 5 does not amend, modify, or supplement this Agreement unless FRA

13

![U.S. Department of Transportation Federal Railroad Administration logo]

accepts the request and the parties amend this Agreement under Section 15.1 of this Attachment 1.

## ARTICLE 6:  GENERAL REPORTING TERMS

**6.1**     **Alternative Reporting Methods**

FRA may establish processes for the Recipient to submit reports required by this Agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient will use the processes required by FRA.

**6.2**     **Paperwork Reduction Act Notice**

Under 5 CFR § 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (OMB). Notwithstanding any other term of this Agreement, the due date for any information collections required under this Agreement, including the reporting requirements in Articles 7 and 8, is the later of (1) the due date stated with the requirement and (2) the 30th day after OMB approves that information collection.

## ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING

**7.1**     **Quarterly Project Progress Reports and Recertifications**

(a)  On or before the 30th day of the first month of each quarter and until the end of the Period of Performance, the Recipient will submit to FRA through GrantSolutions a complete FRA Form 34[1] Quarterly Project Progress Report and Recertification that contains, for the previous quarter:

(1)  a certification that the Recipient is in compliance with 2 CFR § 200.303 (Internal Controls) and 2 CFR part 200, Subpart F (Audit Requirements);

(2)  the certification required under 2 CFR § 200.415(a); and

(3)  a certification that the Recipient is complying with any environmental mitigation commitments and Section 106 compliance obligations.

If the date of this Agreement is in the final month of a quarter, then the Recipient will submit the first Quarterly Project Progress Report and Recertification in the quarter that begins after the date of this Agreement.

(b)  On or before the 30th day of the first month of each quarter and until the end of the Period of Performance, the Recipient will submit to FRA through GrantSolutions a Federal Financial Report (SF-425) covering the previous quarter.

---

[1] FRA Form 34 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

**U.S. Department of Transportation**
**Federal Railroad Administration**

**7.2     Final Progress Reports and Financial Information**

No later than 120 days after the end of the Period of Performance, the Recipient will submit:

(a)  a final Quarterly Project Progress Report and Recertification in the format and with the content described in Section 7.1(a) of this Attachment 1 for each Quarterly Project Progress Report and Recertification;

(b)  a final SF-425 through GrantSolutions;

(c)  a Final Performance Report FRA Form 33 as provided by FRA[2] ; and

(d)  any other information required under FRA's award closeout procedures.

**7.3     Real Property Reporting**

The Recipient will comply with the reporting obligations in 2 CFR § 200.330, as directed by FRA.

## ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING

**8.1     Baseline Performance Measurement**

Within one year before the start of work on the Project, the Recipient will collect baseline data for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement. Within six months of the start of the Period of Performance, the Recipient will submit to FRA a Baseline Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure. The Recipient will also provide FRA access to the data collected in machine-readable format.

**8.2     Post-Project Performance Measurement**

For each performance measure that is listed in Article 7 of Attachment 2 of this Agreement, the Recipient will collect data and submit to FRA a Post-Project Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure, at the frequency and for the duration identified in Article 7 of Attachment 2 of this Agreement. The Recipient will also provide FRA access to the data collected in machine-readable format. If an external factor affects a performance measure, the Recipient will identify that external factor in the Post-Project Performance Measurement Report and discuss the external factor's influence on the performance measure. In the Post-Project Performance Report, the Recipient will compare the actual project performance against the pre-project (baseline) performance and expected post-project performance as described in Table 7-A of Attachment 2 of this Agreement.

---

[2]FRA Form 33 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

U.S. Department of Transportation
**Federal Railroad Administration**

**8.3    Project Outcomes Report**

Where indicated in Article 7 of Attachment 2 of this Agreement, the Recipient will submit to FRA, not later than January 31st of the year that follows the final year during which data were collected, a Project Outcomes Report that contains:

(a)  an analysis of the impacts of the Project, including a comparison of the baseline performance measurement data collected under Section 8.1 of this Attachment 1 with the post-project performance measurement data that the Recipient reported in the final Post-Project Performance Measurement Report required under Section 8.2 of this Attachment 1;

(b)  for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement, an analysis of the accuracy of the projected outcome; and

(c)  all data collected under Sections 8.1 and 8.2 of this Attachment 1;

(d)  additional information as directed.

**8.4    General Performance Measurement Requirements**

The Recipient will ensure that all data collection for each performance measure identified in Article 7 of Attachment 2 of this Agreement is completed in a manner consistent with the description, location, and other attributes associated with that performance measure.

**8.5    Outcome Measurement and Reporting Survival**

The data collection and reporting requirements in Article 8 of this Attachment 1 survive the termination of this Agreement. FRA may consider the Recipient's compliance with this requirement after closeout of the grant in its evaluation of future applications for Federal financial assistance.

## ARTICLE 9:  NONCOMPLIANCE AND REMEDIES

**9.1    Noncompliance Determinations**

(a)  Notice of Proposed Determination. If FRA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this Agreement, FRA will notify the Recipient of a proposed determination of noncompliance through a written notice that:

(1)  explains the noncompliance;

(2)  describes a proposed remedy that is consistent with Section 9.2 of this Attachment 1;

(3)  describes the process and form in which the Recipient may respond to the notice that is consistent with Section 9.1(b) of this Attachment 1; and

16

U.S. Department of Transportation
**Federal Railroad Administration**

> (4) if applicable, provides the Recipient an opportunity to cure the noncompliance or take corrective action.

(b) Response to Notice of Proposed Determination. The Recipient may, not later than 7 days after receiving the notice of proposed determination of noncompliance, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

> (1) accept the proposed remedy;

> (2) acknowledge the noncompliance, but propose an alternative remedy;

> (3) acknowledge the noncompliance and agree to cure or take corrective action; or

> (4) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response sufficient documentation or other information supporting the Recipient's compliance.

(c) Notice of Final Determination. After considering the Recipient's response or failure to timely respond under Section 9.1(b) of this Attachment 1, FRA will make a final determination. To make a final determination, FRA must provide a written notice to the Recipient that:

> (1) states what the final determination is (e.g., noncompliance or compliance);

> (2) states the basis for the final determination; and

> (3) describes the remedy that FRA is imposing, if applicable, or if FRA is not imposing a remedy, describes the resolution to the proposed determination of noncompliance, including whether the Recipient has cured or corrected the noncompliance.

(d) If FRA determines the noncompliance is one that cannot be addressed while work on the Project is ongoing, in the notice of proposed determination or in the notice of final determination, FRA will direct the Recipient to stop work. The Recipient will stop work and will direct any Subrecipients or contractors to stop work immediately upon receipt of a notice to stop work from FRA.

(e) FRA may consider the public interest in making a determination of noncompliance and imposing a remedy.

**9.2    Remedies**

(a) If FRA makes a final determination of noncompliance under Section 9.1(c) of this Attachment 1, FRA may impose a remedy, including:

> (1) additional conditions on the award;

> (2) requiring the Recipient to prepare and implement a corrective action plan;

17

**U.S. Department of Transportation**
**Federal Railroad Administration**

(3)  directing the Recipient to stop work;

(4)  any remedy permitted under 2 CFR §§ 200.339–200.340, including withholding of payments ; disallowance of previously reimbursed costs, requiring refunds from the Recipient to FRA; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

(5)  any other remedy legally available.

(b)  The Recipient acknowledges that any amounts FRA requires the Recipient to refund to FRA under this Section 9.2 constitute a debt to the Federal Government that FRA may collect under 2 CFR § 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–999).

(c)  Other Remedies. The termination authority under Article 10 of this Attachment 1 supplements and does not limit FRA's remedial authority under this Article 9 or 2 CFR part 200, including 2 CFR §§ 200.339-200.240.  FRA reserves the right to seek any appropriate remedy or otherwise enforce the terms and conditions of this Agreement as authorized by law.

**9.3     Other Oversight Entities**

Nothing in Article 9 of this Attachment 1 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION

**10.1     Suspension of Award Activities**

(a)  If FRA determines that the remedy for noncompliance imposed under Article 9 of this Agreement does not achieve the desired result or is unlikely to improve compliance or performance, FRA may suspend activities under this Agreement pending corrective action by the Recipient or termination.

(b)  If FRA suspends activities under this Agreement, FRA will notify the Recipient in writing of the following, which may be included in the determinations of non-compliance under Section 9.1 of this Attachment 1:

(1)  what project activities, if any, will take place during the period of suspension;

(2)  what costs FRA will reimburse if the suspension is lifted and the award resumed;

(3)  what corrective actions must occur during the suspension; and

(4)  FRA's intent to terminate the award under this Article 10 if the Recipient does not meet the conditions of the remedial action.

18

U.S. Department of Transportation
**Federal Railroad Administration**

(c)  The duration of the temporary suspension of activities under the Agreement should be commensurate with the corrective action needed, but should not exceed 120 days at the outset. If the Recipient is not making sufficient progress in correcting the noncompliance, FRA must consider both financial and programmatic requirements in determining the appropriate extension to avoid the need for termination.

**10.2    FRA Termination**

(a)  FRA may terminate this Agreement and all its obligations under this Agreement if any of the following occurs:

(1)  the Recipient fails to obtain or contribute the required Non-Federal Funds, or alternatives approved by FRA, as provided in this agreement and consistent with Article 6 of Attachment 2 of this Agreement;

(2)  the Recipient fails to meet a milestone by six months after the completion date listed in Article 5 of Attachment 2 of this Agreement and the Recipient fails to request an amendment to this Agreement pursuant to Section 5.3 of this Attachment 1;

(3)  the Recipient fails to comply with the terms and conditions of this Agreement;

(4)  there are changes to the Project that FRA determines are inconsistent with FRA's basis for selecting the Project to receive the award; or

(5)  FRA determines that termination of this Agreement is in the public interest.

(b)  The Recipient may request that FRA terminate the Agreement, which may result in FRA determining noncompliance and imposing remedies pursuant to Article 9 of this Attachment 1.

**10.3    Closeout Termination**

(a)  This Agreement terminates on Project Closeout.

(b)  In this Agreement, "Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 CFR § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

**10.4    Post-Termination Adjustments**

The Recipient acknowledges that under 2 CFR §§ 200.345–200.346, termination of this Agreement does not extinguish FRA's authority to disallow costs, including costs that FRA reimbursed before termination, and recover funds from the Recipient.

**10.5    Non-Terminating Events**

(a)  The end of the budget period described under Section 4.4 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

(b)  The end of the Period of Performance described under Section 4.5 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

## ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**11.1     Recipient Monitoring and Record Retention**

(a)  The Recipient will monitor activities under this award, including activities under subawards and contracts, to ensure:

(1)  that those activities comply with this agreement; and

(2)  that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient will monitor the activities of the Subrecipient in compliance with 2 CFR §200.332(e).

(c)  The Recipient will retain and provide access to records relevant to the award during the course of the Project and for three years after closeout or longer, as required under 2 CFR § 200.334.

(d)  The Recipient will adhere to the recording and recordkeeping requirements set forth in 2 CFR §§ 200.334–200.338.  Project Closeout does not alter these requirements.

**11.2     Financial Records and Audits**

(a)  The Recipient will keep all Project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the Project.

(b)  The Recipient will keep accounts and records described under Section 11.2(a) of this Attachment 1 in accordance with a financial management system that meets the requirements of 2 CFR §§ 200.302–200.307 and 2 CFR part 200, subpart F and will facilitate an effective audit in accordance with 31 U.S.C. §§ 7501–7506.

(c)  The Recipient will separately identify expenditures under the award in financial records required for audits under 31 U.S.C. §§ 7501–7506. Specifically, the Recipient will:

(1)  list expenditures separately on the schedule of expenditures of Federal awards required under 2 CFR part 200, subpart F, including the fiscal year in the format "FY 202X" in the program name; and

(2)  list expenditures on a separate row under Part II, Item 1 (Federal Awards Expended During Fiscal Period) of Form SF-SAC, including "FY 202X" in Column C (Additional Award Identification).

**U.S. Department of Transportation**
**Federal Railroad Administration**

(d) If the Recipient expends $1,000,000 or more in Federal awards during the Recipient's fiscal year, a single or program audit will be conducted for that year, consistent with 2 CFR §§ 200.501(a) and 200.512(c).

**11.3    Internal Controls**

The Recipient will establish and maintain internal controls as required under 2 CFR § 200.303.

**11.4    FRA Record Access**

FRA may access Recipient records related to this award under 2 CFR § 200.337.

**11.5    Site Visits**

FRA may conduct site visits to review Project activities, accomplishments, and management control systems and to provide technical assistance to the Recipient. The Recipient will provide or ensure reasonable, safe, and convenient access to FRA for any such site visit. FRA will conduct all site visits in such a manner as will not unduly delay work conducted by the Recipient, Subrecipient, or contractor.

## ARTICLE 12:  CONTRACTING AND SUBAWARDING

**12.1    Buy America**

(a)  For infrastructure projects, steel, iron, manufactured goods, and construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act (Buy American Act), Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(b)  For all other projects, the Recipient's acquisition of steel, iron, and manufactured goods with funding provided through this Agreement is subject to the requirements set forth in the Buy American Act, 41 U.S.C. §§ 8301-8305. The Recipient also represents that it has never been convicted of violating the Buy American Act nor will it make funding received under this Agreement available to any person or entity who has been convicted of violating the Buy American Act.

(c)  Under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(d)  Under 2 CFR § 200.322, the Recipient should, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders f under this award.

21

![U.S. Department of Transportation — Federal Railroad Administration logo]

**12.2    Small and Disadvantaged Business Requirements**

The Recipient will expend all funds under this award in compliance with the requirements at 2 CFR § 200.321, including any amendments thereto.

**12.3    Engineering and Design Services [Reserved]**

**12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 CFR § 200.216 prohibit the Recipient and all Subrecipients from procuring or obtaining certain telecommunications and video surveillance equipment or services under this award.

**12.5    Pass-Through Entity Responsibilities**

(a)  If the Recipient makes a subaward under this award, the Recipient will comply with the requirements for pass-through entities under 2 CFR parts 200 and 1201, including 2 CFR §§ 200.331–200.333, regardless of whether the Recipient is also a Pass-Through Entity as defined in 2 CFR § 200.1.

(b)  The Recipient will report any subaward obligation of $30,000 or more in Federal funds in USASpending.gov consistent with the Federal Funding Accountability and Transparency Act, Pub. L. 109-282.

(c)  The Recipient is accountable for performance under this award, the appropriate expenditure of funds, and other requirements under this Agreement. The Recipient is responsible for any non-compliance under the award and for compliance with any remedies imposed.

**12.6    Local Hiring Preference for Construction Jobs**

Under Section 25019 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, div. B, tit. V (2021), a Recipient or Subrecipient may implement a local or other geographical or economic hiring preference relating to the use of labor for construction of a project funded by this grant if funded under title 49 or 23 United States Code, including prehire agreements, subject to any applicable State and local laws, policies, and procedures. The use of such a local or other geographical or economic hiring preference in any bid for a contract for the construction of a project funded by this grant shall not be considered to unduly limit competition. Project labor agreements should be consistent with the definition and standards outlined in Executive Order 13502. For additional information, see https://www.transportation.gov/sites/dot.gov/files/2023-05/Creating-Local-Construction-Workforce.pdf.

**12.7    Procurement**

The Recipient may acquire property, goods, or services in connection with the Project. If the Recipient is a State or Indian Tribe, then it will follow the same policies and procedures it uses for procurements with non-Federal funds in compliance with 2 CFR § 200.317. A Subrecipient of a State will follow the policies and procedures allowed by that State when procuring property and services under this award consistent with 2 CFR § 1201.317, notwithstanding 2 CFR §

22

**U.S. Department of Transportation**
**Federal Railroad Administration**

200.317. An entity that is not a State or Indian Tribe, or Subrecipient of a State or Indian Tribe, will comply with 2 CFR §§ 200.318–200.327, and applicable supplementary USDOT or FRA directives and regulations. The Recipient will provide technical specifications and requirements to FRA for review upon request.

## ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**13.1    Limitation of Federal Award Amount**

Under this award, FRA will not provide funding in an amount greater than the Agreement Federal Funds. The Recipient acknowledges that FRA is not liable for payments exceeding that amount, and the Recipient will not request reimbursement of costs exceeding that amount.

**13.2    Project Costs**

This award is subject to the cost principles at 2 CFR part 200, subpart E, including provisions on determining allocable costs and determining allowable costs.

**13.3    Timing of Project Costs**

(a)  The Recipient will not charge to this award costs that are incurred after the budget period.

(b)  The Recipient will not charge to this award costs that were incurred before the date of this Agreement unless those costs are identified as approved pre-award costs in Section 6.6 of Attachment 2 of this Agreement and would have been allowable if incurred during the budget period. This limitation applies to pre-award costs under 2 CFR § 200.458. This agreement hereby terminates and supersedes any previous FRA approval for the Recipient to incur costs under this award for the Project. Section 6.6 of Attachment 2 of this Agreement is the exclusive FRA approval of costs incurred before the date of this Agreement.

(c)  The Recipient may request approval of pre-award costs in a written request that demonstrates the purpose and amount of the costs, compliance with 2 CFR § 200.458, and whether such costs would otherwise serve as Non-Federal Funds.

**13.4    Recipient Recovery of Federal Funds**

The Recipient will make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if FRA determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner. The Recipient will not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by FRA.

**13.5    Unexpended Agreement Federal Funds**

Any Agreement Federal Funds that are obligated but not expended on allocable, allowable costs remain the property of the United States.

U.S. Department of Transportation
**Federal Railroad Administration**

**13.6    Interest Earned**

Interest earned on advances of Agreement Federal Funds is not program income.

**13.7    Timing of Payments to the Recipient**

(a)  Reimbursement is the payment method, unless otherwise approved by FRA.

(b)  The Recipient will not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**13.8    Payment Method**

(a)  The Recipient will use the DELPHI e-Invoicing System (https://www.dot.gov/cfo/delphi-einvoicing-system.html) to request reimbursement under this award. FRA will provide access to that system upon request by the Recipient.

(b)  FRA may deny a payment request that is not submitted using the method identified in this Section.

**13.9    Information Supporting Expenditures**

(a)  When requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient will electronically submit the SF 270 (Request for Advance or Reimbursement) and will submit supporting cost detail to document clearly all costs incurred. As supporting cost detail, the Recipient will include a detailed breakout of all costs incurred and classify all costs by task and by Agreement Federal Funds and Agreement Non-Federal Funds.

(b)  Unless FRA and the Recipient agree otherwise in writing, the Recipient will ensure that the proportion of expenditure of Agreement Federal Funds to Agreement Non-Federal Funds is not more than the maximum percent of total Project cost FRA will contribute identified in Section 6.5 of Attachment 2 of this Agreement. The Recipient will ensure the proportional expenditure of funds is reflected in the detailed breakout of costs supporting the SF 270.

(c)  If the Recipient submits a request for reimbursement that FRA determines does not include or is not supported by sufficient detail, FRA may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.10   Reimbursement Request Timing Frequency**

The Recipient will request reimbursement as needed to maintain cash flow sufficient to timely complete the Project. The Recipient will not submit any single payment request exceeding $99,999,999.99. The Recipient will not submit a payment request exceeding $50,000,000.00 unless the Recipient notifies FRA six days before submitting the request.

**13.11   Program Income**

The Recipient is encouraged to earn income to defray Project costs, where appropriate, and will work with FRA to determine how income may be applied to the grant, in accordance with 2 CFR

**U.S. Department of Transportation**
**Federal Railroad Administration**

§ 200.307 and 2 CFR § 1201.80. Program income not deducted from total allowable costs may be used only for the purposes and under the terms and conditions established in this Agreement. The Recipient will maintain records of all program income.

## ARTICLE 14:  PROPERTY AND EQUIPMENT

**14.1    General Requirements**

The Recipient will comply with the property standards of 2 CFR §§ 200.310–200.316 and will ensure compliance with these standards for all tiers of subawards and contracts under this award.

**14.2    Relocation and Real Property Acquisition**

The Recipient will comply with the land acquisition policies and relocation requirements in 42 U.S.C. § 4601 et seq. and 49 CFR part 24, subparts A–F, as applicable. At a minimum, under this section, the Recipient will:

(a)  comply with the land acquisition policies in 49 CFR part 24, subpart B and will pay or reimburse property owners for necessary expenses as specified in that subpart;

(b)  provide a relocation assistance program offering the services described in 49 CFR part 24, subpart C and provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR part 24, subparts D–E; and

(c)  make available to displaced persons comparable replacement dwellings in accordance with 49 CFR part 24.

(d)  provide to FRA a real estate acquisition and management plan prior to beginning real property acquisition if the Project is designated a Major Project in Article 1 of Attachment 2 of this Agreement, or if the total Project cost in Section 6.5 of Attachment 2 of this Agreement is greater than $300 million and the Project is also receiving financial assistance from the Federal Transit Administration (FTA).

**14.3    Use for Originally Authorized Purpose**

The Recipient will ensure that property and equipment funded under this Agreement is used for the originally authorized purpose. If necessary to satisfy this obligation, the Recipient will enter into appropriate arrangements with the entity or entities using, or with the owner of right-of-way used by, the property and/or equipment funded under this Agreement.

**14.4    Maintenance**

The Recipient will ensure that any property, improvements to property, and any equipment funded under this Agreement are maintained in good working order and in accordance with FRA regulations, guidelines, and directives.

U.S. Department of Transportation
**Federal Railroad Administration**

**14.5    Real Property Disposition**

In accordance with 2 CFR § 200.311, when real property acquired or improved under this award is no longer used for its originally intended purpose, the Recipient will request disposition instructions from FRA.

**14.6    Equipment Disposition**

(a)  In accordance with 2 CFR §§ 200.313 and 1201.313, when equipment acquired under this award is no longer needed for the Project:

(1)  if the entity that acquired the equipment is a State or a Subrecipient of a State, that entity will dispose of that equipment in accordance with State laws and procedures;

(2) if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 CFR § 200.313; and

(3)  if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity will request disposition instructions from FRA. In accordance with 2 CFR § 200.313(f), FRA may permit the Recipient or Subrecipient to retain equipment.

(b)  In accordance with 2 CFR §200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR §§ 200.313–200.316 and 2 CFR § 1201.313.

**14.7    Recordkeeping**

The Recipient will keep records regarding the operation and maintenance of property, improvements to property, equipment, and supplies funded under this Agreement and will provide them to FRA upon request.

**14.8    Encumbrance**

The Recipient will not create an obligation, such as a transfer of title, lease, lien, mortgage, or encumbrance, that would dispose of or encumber the Recipient's title or other interest in property, improvements to property, equipment or supplies funded under this Agreement without prior written approval from FRA.

The Recipient will not take any action that would adversely affect FRA's interest or impair the Recipient's continuing control over the use of the property, improvements to property, equipment, or supplies funded under the Agreement without prior written approval from FRA.

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ARTICLE 15:  AMENDMENTS

**15.1    Bilateral Amendments**

The parties may amend, modify, or supplement this Agreement by mutual agreement in writing signed by FRA and the Recipient. Either party may request to amend, modify, or supplement this Agreement by written notice to the other party.

**15.2    FRA Unilateral Amendments**

(a)  FRA may unilaterally amend this Agreement for the following reasons:

(1)  to comply with Federal law;

(2)  at closeout or in anticipation of closeout; and

(3)  other non-substantive changes, such as to correct typographical errors, as deemed appropriate by FRA.

(b)  To unilaterally amend this Agreement under Section 15.3 of this Attachment 1, FRA will provide a written notice to the Recipient that includes the amendment and the date that the amendment is effective.

(c)  Except at closeout or in anticipation of closeout, FRA may not unilaterally amend the Statement of Work, this Agreement's monetary amount, the delivery schedule, the Period of Performance, or other terms or conditions of this Agreement.

**15.3    Other Amendments**

The parties will not amend, modify, or supplement this Agreement except as permitted under Sections 15.1, 15.2, or 15.3 of this Attachment 1. If an amendment, modification, or supplement is not permitted under Section 15.1, 15.2, or 15.3 of this Attachment 1, it is void.

## ARTICLE 16:  [RESERVED]

## ARTICLE 17:  [RESERVED]

## ARTICLE 18:  LABOR AND WORK

**18.1    Labor and Work**

The Recipient will document its consideration of job quality and labor standards related to the Project in Article 9 of Attachment 2 of this Agreement.

27

![U.S. Department of Transportation Federal Railroad Administration logo]

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1    Critical Infrastructure Security and Resilience**

(a)  Consistent with the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021) and the National Security Memorandum on Critical Infrastructure Security and Resilience (April 30, 2024), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1    Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 CFR parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 CFR § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.

**20.2    Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not

U.S. Department of Transportation
**Federal Railroad Administration**

impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d)  The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a)  FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b)  The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 CFR § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when assessing the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a)  The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)  The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

29

U.S. Department of Transportation
**Federal Railroad Administration**

**20.6**    **External Award Terms and Obligations**

(a)  In addition to this document and the contents described in Article 25 of this Attachment 1, this Agreement includes the following additional terms as integral parts:

(1)  Appendix A to 2 CFR part 25: System for Award Management and Universal Identifier Requirements;

(2)  Appendix A to 2 CFR part 170: Reporting Subawards and Executive Compensation;

(3)  2 CFR part 175: Award Term for Trafficking in Persons; and

(4)  Appendix XII to 2 CFR part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b)  The Recipient will comply with:

(1)  49 CFR part 20: New Restrictions on Lobbying;

(2)  49 CFR part 21: Nondiscrimination in Federally Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto;

(3)  49 CFR part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)  Subpart B of 49 CFR part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**20.7**    **Incorporated Certifications**

The Recipient makes the representations in the following certifications, which are incorporated by reference:

(a)  Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

## ARTICLE 21:  ASSIGNMENT

**21.1**    **Assignment Prohibited**

The Recipient will not transfer to any other entity any discretion granted under this Agreement, any right to satisfy a condition under this Agreement, any remedy under this Agreement, or any obligation imposed under this Agreement.

## ARTICLE 22:  WAIVER

**22.1**    **Waivers**

(a)  A waiver of a term of this Agreement authorized by law and granted by FRA will not be effective unless it is in writing and signed by an authorized representative of FRA.

30

**U.S. Department of Transportation**
**Federal Railroad Administration**

(b)  A waiver of a term of this Agreement granted by FRA on one occasion will not operate as a waiver on other occasions.

(c)  If FRA fails to require strict performance of a term of this Agreement, fails to exercise a remedy for a breach of this Agreement, or fails to reject a payment during a breach of this Agreement, that failure does not constitute a waiver of that term or breach.

## ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS

**23.1    Disclaimer of Federal Liability**

FRA will not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this Agreement.

**23.2    Environmental Review**

(a)  Except as authorized by law or under 23 CFR § 771.113(d)(4), the Recipient will not begin final design activities; acquire real property, construction materials, or equipment, including rolling stock; begin construction; or take other actions that would have an adverse environmental impact or limit the choice of reasonable alternatives for the Project unless and until FRA complies with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA), and any other applicable environmental laws and regulations. In addition, the Recipient will not begin project development that involves ground disturbing activity prior to FRA compliance with NEPA and any other applicable environmental laws and regulations.

(b)  The Recipient acknowledges that:

(1)  FRA's actions under Section 23.2(a) of this Attachment 1 may depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to FRA; and

(2)  applicable environmental statutes and regulations may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(c)  Consistent with 23 CFR § 771.105(a), to the maximum extent practicable and consistent with Federal law, the Recipient will coordinate all environmental investigations, reviews, and consultations as a single process.

(f)  The activities described in Article 4 of Attachment 2 of this Agreement and other information described in this Agreement may inform environmental decision-making processes, but the parties do not intend this Agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with Article 4 of Attachment 2 of this Agreement or other information in this Agreement, then FRA will either:

(1)  amend this Agreement under Section 15.1 of this Attachment 1 for consistency with the selected build alternative; or

31

**U.S. Department of Transportation**
**Federal Railroad Administration**

(2)  if FRA determines that the condition at Section 10.1(a)(5) of this Attachment 1 is satisfied, terminate this Agreement under Section 10.1(a)(5) of this Attachment 1; or

(3) take other action as deemed appropriate by FRA.

(g)  The Recipient will complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project. Article 4 of Attachment 2 of this Agreement identifies documents describing mitigation activities, but the absence of a document from that section does not relieve the Recipient of any compliance obligations.

**23.3    Project Maintenance Requirement**

The Recipient will ensure that any property and equipment funded within this Agreement is operated and maintained in good operating order and in accordance with 2 CFR §§ 200.310–200.316, 1201.313 and any guidelines, directives, or regulations that FRA may issue.

**23.4    Appropriations Act Requirements**

The Recipient will comply with applicable requirements of the appropriations act identified in Section 6.3 of Attachment 2 of this Agreement.

**23.5    Standards of Conduct**

The Recipient will comply with the following standards of conduct:

(a)  Standards of Conduct. The Recipient will maintain a written code or standards of conduct governing the performance of its officers, employees, board members, or agents engaged in the award and administration of contracts or agreements supported by the Federal contribution provided through this Agreement. The code or standards will provide that the Recipient's officers, employees, board members, or agents may neither solicit nor accept gratuities, favors, or anything of monetary value from present or potential Subrecipients or contractors. The Recipient may set minimum rules where the financial interest is not substantial, or the gift is an unsolicited item of nominal intrinsic value. As permitted by state or local law or regulations, such code or standards will provide for penalties, sanctions, or other disciplinary actions for violations by the Recipient's officers, employees, board members, or agents, or by Subrecipients or their agents.

(b)  Personal Conflict of Interest. The Recipient's code or standards must provide that no employee, officer, board member, or agent of the Recipient may participate in the selection, award, or administration of a contract supported by the Federal contribution if a real or apparent conflict of interest would be involved. Such a conflict of interest would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(c)  Organizational Conflicts of Interest. The Recipient's code or standards of conduct must include procedures for identifying and preventing real and apparent organizational conflicts of interests. An organizational conflict of interest exists when the nature of the work to be performed under a proposed contract, may, without some restrictions on future activities, result in an unfair competitive advantage to the contractor or impair the contractor's objectivity in performing the contract work.

(d)  Existing Codes or Standards. This Section does not require the Recipient to implement a new code or standards of conduct where a state statute, or written code or standards of conduct, already effectively covers all of the required elements.

(e)  Disclosure of Conflicts. The Recipient will disclose in writing any potential conflict of interest to FRA or pass-through entity.

### 23.6   Changed Conditions of Performance

The Recipient will notify FRA of any event that may affect its ability to perform the Project in accordance with the terms of this Agreement.

### 23.7   Litigation

The Recipient will notify FRA in writing of any decision pertaining to the Recipient's conduct of litigation that may affect FRA's interests in the Project or FRA's administration or enforcement of applicable Federal laws or regulations. The Recipient will inform FRA in writing before naming FRA as a party to any type of litigation for any reason in any forum.

### 23.8   [Reserved]

### 23.9   Equipment and Supplies

The Recipient will maintain written policies and procedures that address acquisition, classification, and management of all equipment and supplies acquired or used under this award.

### 23.10   Safety and Technology Data

The Recipient will ensure that FRA has access to safety and technology relevant data generated by the Recipient under the award, in a machine-readable format, where specified in Article 4 of Attachment 2 of this Agreement.

### 23.11   Intellectual Property

The Recipient agrees to the standard patent rights clauses issued by the Department of Commerce at 37 CFR part 401, as applicable.

### 23.12   Liquidation of Recipient Obligations

(a)  The Recipient will liquidate all obligations of award funds under this Agreement not later than 120 days after the end of the Period of Performance.

(b)  Liquidation of obligations and adjustment of costs under this Agreement follow the requirements of 2 CFR §§ 200.344–200.346.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 24:  CONSTRUCTION AND DEFINITIONS

**24.1    Agreement**

This Agreement consists of the following:

(a)  Agreement Cover Sheet

(b)  Attachment 1: General Terms and Conditions

(c)  Attachment 2: Project-Specific Terms and Conditions

(d)  Exhibit A: Applicable Federal Laws and Regulations

(e)  Exhibit B: Additional Standard Terms

(f)  Exhibit C: Quarterly Project Progress Reports and Recertifications

**24.2    Construction**

(a)  In these General Terms and Conditions, there are no references to articles or sections in project-specific portions of this Agreement that are not contained in Attachments or Exhibits listed in Section 24.1.

(b)  If a provision in these General Terms and Conditions or the Exhibits conflicts with a provision in the Project-Specific Terms and Conditions in Attachment 2 of this Agreement, then the relevant portion in Attachment 2 prevails. If a provision in the Exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

**24.3    Integration**

This Agreement constitutes the entire agreement of the parties relating to the Project and supersedes any previous agreements, oral or written, relating to the Project.

**24.4    Definitions**

This Section defines terms used in this Agreement. Additional definitions found in 2 CFR § 200.1 are incorporated by reference into this Agreement.

"Agreement Federal Funds" means the total amount of Federal funds obligated under this Agreement. This is the amount shown in Section 6.1 of Attachment 2 of this Agreement.

"Application" means the application identified in Article 3 of Attachment 2 of this Agreement, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

"Construction Substantial Completion" means the stage of the Project when all construction tasks are complete such that the Recipient can use the Project for its intended use and only closeout activities remain. Activity to address or complete closeout activities will not prevent or disrupt use of the Project.

34

**U.S. Department of Transportation**
**Federal Railroad Administration**

"Contingent Commitment" means the unobligated amounts of future available budget authority specified in law that FRA commits to obligate under the terms of this Agreement.

"Federal Share" means the sum of Agreement Federal Funds and Other Federal Funds. If there are no Other Federal Funds, the Federal Share is the same as the Agreement Federal Funds.

"General Terms and Conditions" means this Attachment 1.

"Other Federal Funds" means Federal funds that are part of the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement for the Project but are not obligated under this Agreement.

"Project" means the project proposed in the Application, as modified by the negotiated provisions of this Agreement, including Attachment 2 of this Agreement.

"Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 CFR § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

"Project Cost Savings" means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs.

"Rural Area" means any area that is not within an area designated as an urbanized area by the Bureau of the Census.

**24.5     Calendar Dates**

Unless otherwise specified, all dates and durations are in calendar days, calendar quarters, or calendar years, as appropriate.

**24.6     Communication in Writing**

Unless otherwise specified, all written communication may be provided by electronic mail.

**24.7     Severability**

If any provision of this Agreement is found to be invalid, illegal, or unenforceable, the validity, legality, or enforceability of the remaining provisions of this Agreement is not affected or impaired by such finding.  A provision held to be unenforceable as applied to any party or circumstance remains applicable to other parties and circumstances.

## ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE

**25.1     Counterparts**

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.


U.S. Department of Transportation
**Federal Railroad Administration**

**25.2    Effective Date**

The agreement will become effective when all parties have signed it. The date of this Agreement will be the date this Agreement is signed by the last party to sign it.

## ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES

**26.1    Interstate Rail Compacts Grant Program**

The Recipient agrees to comply with the clauses in Section 26.1 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.1 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Non-Federal Match. The Recipient will provide a Non-Federal match of not less than 50 percent of the eligible expenses under the grant.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1, the Recipient will comply with the following clauses, as applicable:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under Section 26.1 of this Attachment 1, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4)  for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.



**U.S. Department of Transportation**
**Federal Railroad Administration**

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.1(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at: https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Operator Limitation. Recipient's eligible expenses must be related to intercity passenger rail service to be operated by Amtrak.

(i)  Reporting. As requested by FRA, the Recipient will report on:

(1)  the status of the planning efforts and coordination funded by the grant award;

(2)  plans for continued implementation of the interstate rail compact;

(3)  the status of, and data regarding, any new, restored, or enhanced rail services initiated under the interstate rail compact; and

(4)  other data and information as requested by FRA.

**26.2    Railroad Crossing Elimination Program Clauses**

The Recipient agrees to comply with the clauses in Section 26.2 of this Attachment 1.

Consistent with 49 U.S.C. §§ 22905(e) & 22909(j), clauses (b), (c), (d), and (g) of Section 26.2 of this Agreement 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law. In addition, clause (f) does not apply to: 1) the Alaska Railroad or its contractors; or 2) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Agreement 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

38

**U.S. Department of Transportation**
**Federal Railroad Administration**

(3)  under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4)  for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.2(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Impacted Rail Carrier or Real Property Owner Approvals. In accordance with 49 U.S.C. § 22909(e)(2)(A), prior to proceeding with the construction of the Project funded by this Agreement, if applicable, Recipient will obtain necessary approvals to commence construction from any impacted rail carriers or real property owners. If the Project is a planning project, as described in 49 U.S.C. § 22909(d)(6), the Recipient agrees to work collaboratively with rail carriers and right-of-way owners.

(f)  Labor Protective Arrangements

39

U.S. Department of Transportation
**Federal Railroad Administration**

(1)  Notwithstanding 49 U.S.C. § 22905(e)(1), and in accordance with 49 U.S.C. § 22909(j)(3), any employee covered by the Railway Labor Act (45 U.S.C. § 151 et seq.) and the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.) who is adversely affected by actions taken in connection with the project financed in whole or in part by such grant shall be covered by employee protective arrangements required to be established under  49 U.S.C. § 22905(c)(2)(B). In accordance with 49 U.S.C. § 22905(c)(2)(B), the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404, as such protective arrangements are described in the final FRA guidance titled Equivalent Protections for Railroad Employees and effective December 28, 2022, included herein in Exhibit B.

(2)  In accordance with 49 U.S.C. § 22909(j)(3), Recipient, and any successors, assigns, and contractors of Recipient:

i.  shall be bound by the employee protective arrangements required under subparagraph (1); and

ii.  shall be responsible for the implementation of such arrangements and for the obligations under such arrangements, but may arrange for another entity to take initial responsibility for compliance with the conditions of such arrangement.

(3)  Labor protections required pursuant to Subsection (f) of Section 26.2 of this Attachment 1 shall be documented consistent with Article 18 of this Attachment 1.

(g)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(h)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.3 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.3 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49

40

**U.S. Department of Transportation**
**Federal Railroad Administration**

U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. §22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4)  for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes:

41

**U.S. Department of Transportation**
**Federal Railroad Administration**

compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.3(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at: https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.4    Restoration and Enhancement Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.4 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.4 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right-of -way and facilities under current law.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(a) Maximum Funding Limitation. A grant authorized by 49 U.S.C. § 22908 may not exceed:

> (1) 90 percent of the projected net operating costs for the first year of service;

> (2) 80 percent of the projected net operating costs for the second year of service;

> (3) 70 percent of the projected net operating costs for the third year of service;

> (4) 60 percent of the projected net operating costs for the fourth year of service;

> (5) 50 percent of the projected net operating costs for the fifth year of service; and

> (6) 30 percent of the projected net operating costs for the sixth year of service.

(b) Buy America. In lieu of Section 12.1 of this Agreement 1:

> (1) for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

> (2) for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

> (3) under Section 26.4 of this Attachment 1, "infrastructure project" has the definition provided in 2 CFR § 184.3.

> (4) for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c) Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the

**U.S. Department of Transportation**
**Federal Railroad Administration**

Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.4(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Route Reporting. The Recipient will provide similar information regarding the route performance, financial, and ridership projections, and capital and business plans that Amtrak is required to provide, and such other data and information as is required by Article 4 of Attachment 2 of this Agreement.

44

**U.S. Department of Transportation**
**Federal Railroad Administration**

(i)  Termination. In addition to the terms of this Attachment 1, FRA may terminate this Agreement upon the cessation of service, or the violation of any other term of this Agreement.

**26.5     Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses**

The Recipient agrees to comply with the clauses in Section 26.5 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.5 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4) for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable  and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. §

45



U.S. Department of Transportation
**Federal Railroad Administration**

10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.5(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**U.S. Department of Transportation**
**Federal Railroad Administration**

(h)  Northeast Corridor Cost Allocation. For projects located on the Northeast Corridor, as that term is defined in 49 U.S.C. § 24911(a)(4), Amtrak and the public authorities providing commuter rail passenger transportation at the Project location on the Northeast Corridor must remain in compliance with 49 U.S.C. § 24905(c)(2).

(i)  Interest and Financing Costs. Pursuant to 49 U.S.C. § 24911(g)(2), interest and other financing costs of efficiently carrying out a part of the Project within a reasonable time are a cost of carrying out the Project under a Phased Funding Agreement, except that eligible costs may not be more than the cost of the most favorable financing terms reasonably available for the Project at the time of borrowing. The Recipient will certify to FRA's satisfaction that the Recipient has shown reasonable diligence in seeking the most favorable financing terms.

###

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

## Attachment 2

# PROJECT-SPECIFIC
# TERMS AND CONDITIONS

Version Date: April 30, 2025

![U.S. Department of Transportation Federal Railroad Administration]

## Project-Specific Terms and Conditions
## Table of Contents

ARTICLE 1: PROJECT-SPECIFIC DESIGNATIONS .................................................................................... 4

  1.1      Recipient ......................................................................................................................... 4

  1.2      Project and Purpose ......................................................................................................... 4

  1.3      Program Designations ...................................................................................................... 4

ARTICLE 2: SPECIAL TERMS AND CONDITIONS ................................................................................ 4

ARTICLE 3: ADMINISTRATIVE INFORMATION ................................................................................... 4

  3.1      Application ....................................................................................................................... 4

  3.2      FRA Awarding Official ....................................................................................................... 5

  3.3      Federal Award Date ......................................................................................................... 5

  3.4      Program Name and Assistance Listings Number ............................................................. 5

  3.5      Recipient's Unique Entity Identifier ................................................................................. 5

  3.6      Federal Award Identification Number .............................................................................. 5

ARTICLE 4: STATEMENT OF WORK .................................................................................................... 5

  4.1      General Project Description .............................................................................................. 5

  4.2      Project Location ............................................................................................................... 5

  4.3      Project Scope ................................................................................................................... 7

  4.4      Implement Required Environmental Commitments ........................................................ 9

ARTICLE 5: AWARD DATES AND ESTIMATED PROJECT SCHEDULE ................................................ 10

  5.1      Award Dates .................................................................................................................. 10

  5.2      Estimated Project Schedule ........................................................................................... 10

ARTICLE 6: AWARD AND PROJECT FINANCIAL INFORMATION ...................................................... 10

  6.1      Award Amount ............................................................................................................... 10

  6.2      Federal Obligation Information ...................................................................................... 10

  6.3      Federal Authorization and Funding Source. .................................................................. 10

  6.4      Funding Availability ....................................................................................................... 10

  6.5      Approved Project Budget ............................................................................................... 10

  6.6      Pre-Award Costs ............................................................................................................ 11

  6.7      Phased Funding Agreement ........................................................................................... 11

ARTICLE 7: PERFORMANCE MEASUREMENT INFORMATION ......................................................... 12

2

**U.S. Department of Transportation**
**Federal Railroad Administration**

ARTICLE 8: ENVIRONMENTAL COMPLIANCE .................................................................................... 13

ARTICLE 9: LABOR AND WORK ...................................................................................................... 13

9.1      Efforts to Support Good-Paying Jobs and Strong Labor Standards .............................. 13

9.2      Supporting Narrative ...................................................................................................... 14

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 1: PROJECT-SPECIFIC DESIGNATIONS

**1.1     Recipient**

This Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the City of Atlanta (the Recipient).

**1.2     Project and Purpose**

The purpose of this award is to fund a Railroad Crossing Elimination Program grant for the City of Atlanta Safe Crossings Study (the Project), as described in Article 4 of this Attachment 2, to help achieve the goals identified in the Fiscal Year 23-24 Notice of Funding Opportunity that solicited applications for Federal financial assistance. FRA and the Recipient will accomplish that purpose by timely completing the Project and ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Application.

**1.3     Program Designations**

(a)  Research and Development. This award is not for research and development.

(b)  Project Size. This award is for a non-Major Project as that term is defined in FRA Guidance on Development and Implementation of Railroad Capital Projects, January 11, 2023 (Railroad Capital Projects Guidance).

(c)  Phased Funding. This award is not a phased funding agreement as further discussed in Section 6.7 of this Attachment 2.

(d)  Grant or Cooperative Agreement. This award is made as a Grant Agreement.

(e)  Security Risk. This award is for a Project that has a low security risk.

(f)  Rural Area. The information the Recipient provided to FRA, including in the Application, demonstrates this award is not for a Project in a Rural Area.

## ARTICLE 2: SPECIAL TERMS AND CONDITIONS

There are no special terms for this award.

## ARTICLE 3: ADMINISTRATIVE INFORMATION

**3.1     Application**

Application Title: City of Atlanta Safe Crossings Study

Application Date: September 23, 2024

4

U.S. Department of Transportation
**Federal Railroad Administration**

### 3.2    FRA Awarding Official

FRA Office of Railroad Development
Federal Railroad Administration
1200 New Jersey Ave, SE
Washington, DC 20590
FRA-Grants@dot.gov

### 3.3    Federal Award Date

The "Federal Award Date" is the effective date of this Agreement, as defined under Section 25.2 of Attachment 1 of this Agreement.

### 3.4    Program Name and Assistance Listings Number

For the Railroad Crossing Elimination program, the Assistance Listings Number is 20.327 and the Assistance Listings Title is Railroad Crossing Elimination.

### 3.5    Recipient's Unique Entity Identifier

The Recipient's Unique Entity Identifier, as defined at 2 C.F.R. § 25.415, is listed in Section 1B on the Agreement cover sheet.

### 3.6    Federal Award Identification Number

The Federal Award Identification Number is listed in Section 2 on the Agreement cover sheet as the "Agreement Number."

## ARTICLE 4: STATEMENT OF WORK

### 4.1    General Project Description

Following the Recipient's recent completion of its Vision Zero Action Plan, the Project will advance a citywide prioritization of safety, mobility, and connectivity improvements at at-grade rail crossings. Previous local planning efforts have identified the needs and mobility challenges facing a number of at-grade crossings across the City, including blocked and unsafe crossings that pose a greater risk to vulnerable roadway users. The initial task is to prioritize 23 at-grade crossings identified in the City's initial screening to determine which crossings should be prioritized for needed improvements. The subsequent task is to conduct a feasibility study for the prioritized locations to determine viable improvements at the top 3-5 locations, as determined through the initial prioritization task.

### 4.2    Project Location

The Project will evaluate 23 at-grade crossings in the City of Atlanta within Fulton County, Georgia. The table below identifies the crossing locations by crossing ID and coordinates.

**U.S. Department of Transportation**
**Federal Railroad Administration**

| Crossing ID | Primary RR | Other Operating RR | Street | Latitude | Longitude |
|---|---|---|---|---|---|
| 643045H | CSX | | BENJAMIN E MAYS DR | 33.73964 | -84.50850 |
| 638625N | CSX | | MELVIN DR | 33.70808 | -84.51820 |
| 638642E | CSX | | CHAPPELL RD | 33.75591 | -84.43360 |
| 718065F | NS | | SAWTELL AVE | 33.70993 | -84.37380 |
| 638635U | CSX | | LINKWOOD RD | 33.75481 | -84.48190 |
| 718082W | NS | CSX | SYLVAN RD | 33.72644 | -84.41810 |
| 638643L | CSX | | JOSEPH BOONE BLVD | 33.76353 | -84.43140 |
| 638619K | CSX | | OLD FAIRBURN RD | 33.66408 | -84.52280 |
| 718079N | NS | CSX | ALLENE AVE/LEE ST | 33.73202 | -84.41350 |
| 638644T | CSX | | MAYSON TURNER RD | 33.76468 | -84.43060 |
| 717987T | NS | | HENRY FORD II DR | 33.64862 | -84.39140 |
| 717962X | NS | | BROWNS MILL RD | 33.65620 | -84.39140 |
| 717958H | NS | | BROWNS MILL RD | 33.65619 | -84.39150 |
| 638631S | CSX | | BOULDER PARK DR | 33.74984 | -84.50140 |
| 718025H | NS | ATK | PARROTT AVE | 33.80812 | -84.48620 |
| 638632Y | CSX | ATK | BROWNLEE RD | 33.75075 | -84.49970 |
| 638639W | CSX | | FAIRFIELD PL | 33.75393 | -84.46300 |
| 718058V | NS | | MCDANIEL ST | 33.73497 | -84.40170 |
| 639812A | CSX | | LENOX RD | 33.81023 | -84.35170 |
| 638636B | CSX | | WESTLAND BLVD | 33.75445 | -84.47290 |
| 718060W | NS | | FORTRESS AVE | 33.72667 | -84.39440 |
| 718062K | NS | | HANK AARON DR | 33.72186 | -84.38830 |
| 718068B | NS | CSX | MCDANIEL ST | 33.74424 | -84.40440 |

Figure 1. Table of 23 identified at-grade crossings, including primary operator and summary of operations

![U.S. Department of Transportation Federal Railroad Administration]



Figure 2. Identified At-Grade Crossings

## 4.3    Project Scope

The Recipient will notify FRA in writing of any requested changes in Project Scope and will not proceed with the changed scope unless approved by FRA in writing. If approved, changes to Project Scope may require additional environmental review or an amendment to this Agreement.

**Task 1: Project Administration and Management**

Subtask 1.1:  Project Administration

7

**U.S. Department of Transportation**
**Federal Railroad Administration**

The Recipient will perform all tasks required for the Project through a coordinated process, which will involve affected railroad owners, operators, and funding partners, including:

- Georgia Department of Transportation-roadway owner
- CSX-Railroad operator
- Norfolk-Southern-Railroad operator
- FRA

The Recipient will facilitate the coordination of all activities necessary for implementation of the Project. The Recipient will:

- participate in a Project kickoff meeting with FRA following award;
- complete necessary steps to hire a qualified consultant/contractor to perform required Project work, as necessary;
- hold regularly scheduled Project meetings with FRA;
- inspect and approve work as it is completed; and
- participate in other coordination, as needed.

The Recipient will demonstrate to FRA that it is carrying out the project benefits in the most cost-efficient manner.

Subtask 1.2: Project Management Plan

The Recipient will prepare a Project Management Plan (PMP), that describes how the Project will be implemented and monitored to ensure effective, efficient, and safe delivery of the Project on time and within budget. The PMP will describe, in detail, the activities and steps necessary to complete the tasks outlined in this Statement of Work.

The PMP will include a Project Schedule and Project Budget for the work to be performed under this Agreement. The Project Schedule will be consistent with the Estimated Project Schedule in Section 5.2 of this Attachment 2, but provide a greater level of detail. Similarly, the Project Budget should be consistent with the Approved Project Budget in Section 6.5 of this Attachment 2, but provide a greater level of detail.

The Recipient will submit the PMP to FRA for review and approval. The Recipient will implement the Project as described in the approved PMP. The Recipient will not begin work on subsequent tasks until FRA has provided written approval of the PMP, unless FRA has provided pre-award authority for such work under Section 6.6 of this Attachment 2. FRA will not reimburse the Recipient for costs incurred in contravention of this requirement.

FRA may require the Recipient to update the PMP. The Recipient will submit any such updates to FRA for review and approval, and FRA will determine if updates to the PMP require an amendment to this Agreement.  The Project Budget and Project Schedule may be revised consistent with Article 5 of Attachment 1 of this Agreement without amending this Agreement.

8

U.S. Department of Transportation
**Federal Railroad Administration**

Subtask 1.3:  Project Closeout

The Recipient will submit a Final Performance Report as required by Section 7.2 of Attachment 1 of this Agreement, which should describe the cumulative activities of the Project, including a complete description of the Recipient's achievements with respect to the Project objectives and milestones.

**Task 1 Deliverables:**

| Deliverable ID | Subtask | Deliverable Name |
|---|---|---|
| 1.1 | 1.2 | Project Management Plan |
| 1.2 | 1.3 | Final Performance Report |

**Task 2: Project Planning**

The Recipient will not commence work on Task 2: Project Planning until FRA has approved the PMP deliverable described in Task 1: Project Administration and Management and provided written notification to proceed with Project Planning.

The Recipient will conduct technical analysis, stakeholder outreach, and other project planning activities, and prepare a Project Planning Package as detailed in the PMP. The Project Planning Package will be consistent with the objectives of the Project Planning Lifecycle Stage identified in the FRA Guidance on Development and Implementation of Railroad Capital Projects (January 11, 2023). The Project Planning Package will include all information described in the PMP. FRA will review the Planning Package for acceptance. Information and activities necessary to perform and complete the required Project Planning Package will be included in the approved PMP.

**Task 2 Deliverables:**

| Deliverable ID | Deliverable Name |
|---|---|
| 2 | Project Planning Package |

**4.4     Implement Required Environmental Commitments**

None.

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ARTICLE 5: AWARD DATES AND ESTIMATED PROJECT SCHEDULE

**5.1    Award Dates**

Budget Period End Date: January 31, 2028

Period of Performance End Date: January 31, 2028

**5.2    Estimated Project Schedule**

Milestones associated with this Agreement are identified in Table 5-A: Estimated Project Schedule. The Recipient will complete these milestones to FRA's satisfaction by the Schedule Date, subject to Article 5 of Attachment 1 of this Agreement. The Recipient will notify FRA in writing when it believes it has achieved the milestone.

**Table 5-A: Estimated Project Schedule**

| Milestone | Schedule Date |
|---|---|
| Project Management Plan Completion | October 31, 2025 |
| Project Planning Package | July 31, 2027 |

## ARTICLE 6: AWARD AND PROJECT FINANCIAL INFORMATION

**6.1    Award Amount**

Agreement Federal Funds:  $1,200,000

**6.2    Federal Obligation Information**

Federal Obligation Type: Single

**6.3    Federal Authorization and Funding Source.**

Authorizing Statute: Sections 22104 and 22305 of the Infrastructure Investment and Jobs Act, Public Law 117-58 (November 15, 2021); 49 U.S.C. 22909

Appropriation:  Infrastructure Investment and Jobs Act, Division J, Title VIII (Public Law 117-58 (2021))

**6.4    Funding Availability**

Program funding that is obligated under this Agreement remains available until expended.

**6.5    Approved Project Budget**

The estimated total Project cost under this Agreement is $1,500,000.

FRA will contribute a maximum of 80% percent of the total Project cost, not to exceed the Agreement Federal Funds in Section 6.1 of this Attachment 2. FRA will fund the Project at the lesser amount of the Agreement Federal Funds or the FRA maximum contribution percentage of total Project costs.

**U.S. Department of Transportation**
**Federal Railroad Administration**

The Recipient will contribute $300,000 in Agreement Non-Federal Funds. Recipient's Agreement Non-Federal Funds are comprised of cash contributions in the amount of $300,000.

The Recipient will complete the Project to FRA's satisfaction within the Approved Project Budget, subject to Article 5 of Attachment 1 of this Agreement.

**Table 6-A: Approved Project Budget by Task**

| Task # | Task Title | Agreement Federal Funds | Agreement Non-Federal Funds | Total |
|--------|-----------|------------------------|-----------------------------|-------|
| 1 | Project Administration and Management | $ 60,000 | $ 15,000 | $ 75,000 |
| 2 | Project Planning | $ 1,140,000 | $ 285,000 | $ 1,425,000 |
| | **Total** | **$ 1,200,000** | **$ 300,000** | **Total Project Cost: $1,500,000** |

**Table 6-B: Approved Project Budget by Source**

| Funding Source | Total Amount | Percentage of Total Project Cost |
|----------------|-------------|----------------------------------|
| **Federal Share** | **$1,200,000** | **80.00%** |
| Agreement Federal Funds | $1,200,000 | 80.00% |
| FRA RCE | $1,200,000 | 80.00% |
| **Non-Federal Share** | **$300,000** | **20.00%** |
| Agreement Non-Federal Funds | $300,000 | 20.00% |
| Atlanta Beltline Tax Allocation District: City of Atlanta Dept. of Transportation | $300,000 | 20.00% |
| **Total Project Cost** | **$1,500,000** | **100%** |

## 6.6     Pre-Award Costs

None. Consistent with 2 C.F.R. part 200, costs incurred before the date of this Agreement are not allowable costs under this award. FRA will neither reimburse those costs under this award nor consider them as a non-Federal cost-sharing contribution to this award.

## 6.7     Phased Funding Agreement

Not applicable.

11

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 7: PERFORMANCE MEASUREMENT INFORMATION

Table 7-A: Performance Measurement Table identifies the performance measures that this Project is expected to achieve. These performance measures will enable FRA to assess the Recipient's progress in achieving grant program goals and objectives. The Recipient will report on these performance measures in accordance with the frequency and duration specified in Table 7-A.

Upon Project completion, the Recipient will submit reports comparing the actual Project performance of the new and or improved asset(s) against the pre-Project (baseline) performance and expected post-Project performance as described in Table 7-A. The Recipient will submit the performance measures report to the Project Manager in accordance with Table 7-A.

**Table 7-A: Performance Measurement Table**

| Goal | Objective | Performance Measure | Description of Measure | Measurement | Reporting |
|---|---|---|---|---|---|
| ***Eliminating Crossing(s) and/or making corridor-wide improvements*** | To create a feasible plan to allow for safety improvements at one or multiple at grade crossings, which will reduce rail incidents. | Establish crossing safety improvement alternatives | Prioritization or Preferred Option for crossing safety improvement(s) | **Pre-Project (Baseline) Performance as of January 1, 2022:** No existing plan for the Corridor | **Frequency:** One-Time |
| | | | | **Expected Post-Project Performance:** Preferred Option for each crossing. | **Duration:** At Project Completion |
| | | | | **Expected Post-Project Performance:** Yes; document/ | **Duration:** One time |

12



| | | | | deliverables completed | |
|---|---|---|---|---|---|
| | | | | | |

## ARTICLE 8: ENVIRONMENTAL COMPLIANCE

In accordance with the National Environmental Policy Act (NEPA; 42 U.S.C. § 4321 et seq.), other environmental statutes, and related regulatory requirements, on April 16, 2025, FRA determined that the actions funded under this Agreement as described in this Attachment 2, Section 4.3 are categorically excluded from detailed environmental review pursuant to 23 C.F.R. § 771.116(c)(3). In accordance with Section 106 of the National Historic Preservation Act (54 U.S.C. § 306108; 36 C.F.R. part 800), FRA has also determined that the actions funded under this Agreement have no potential to cause effects to historic properties. The actions do not require the use of property protected by Section 4(f) of the Department of Transportation Act (49 U.S.C. § 303; 23 C.F.R. part 774).

Categorical exclusion (CE) means a category of actions that a Federal agency has determined normally do not have a significant impact on the quality of the human environment and therefore do not require either an environmental assessment (EA) or environmental impact statement (EIS). 42 U.S.C. § 4336e(1). In analyzing the applicability of a CE, FRA also considered whether unusual circumstances are present that would warrant a more detailed environmental review through the preparation of an EA or EIS. In accordance with 23 C.F.R. § 771.116 (a) and (b), FRA further concluded that no unusual circumstances exist with respect to development of the activities funded under this grant that might trigger the need for a more detailed environmental review.

Should conditions or the scope of the action change, the Recipient must notify FRA and receive written response and notice to proceed before proceeding. FRA will evaluate whether this determination remains applicable or if additional environmental review is necessary.

## ARTICLE 9: LABOR AND WORK

**9.1    Efforts to Support Good-Paying Jobs and Strong Labor Standards**

This Section identifies the Recipient's efforts to support good-paying jobs and strong labor standards related to the Project. The Recipient certifies that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| | The Recipient or a project partner promotes robust job creation by supporting good-paying jobs directly related to the project with free and fair choice to join a union. (Describe robust job creation and identify the good-paying jobs in the supporting narrative below.) |



| | |
|---|---|
| | The Recipient or a project partner will invest in high-quality workforce training programs such as registered apprenticeship programs to recruit, train, and retain skilled workers, and implement policies such as targeted hiring preferences. (Describe the training programs in the supporting narrative below.) |
| | The Recipient or a project partner will partner with high-quality workforce development programs with supportive services to help train, place, and retain workers in good-paying jobs or registered apprenticeships including through the use of local and economic hiring preferences, linkage agreements with workforce programs, and proactive plans to prevent harassment. (Describe the supportive services provided to trainees and employees, preferences, and policies in the supporting narrative below.) |
| | The Recipient or a project partner will partner with communities or community groups to develop workforce strategies. (Describe the partnership and workforce strategies in the supporting narrative below.) |
| | The Recipient or a project partner has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. (Describe those actions in the supporting narrative below.) |
| | The Recipient or a project partner has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described below. (Identify the relevant actions in the supporting narrative below.) |
| X | The Recipient or a project partner has not taken actions related to the Project to improve good-paying jobs and strong labor standards and will not take those actions under this award. |

**9.2    Supporting Narrative**

N/A

###

14

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF



U.S. Department of Transportation
**Federal Railroad Administration**

# Exhibits

Revision Date: April 30, 2025

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF



## Table of Contents

EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS..................................................................3

    GENERAL FEDERAL LEGISLATION ......................................................................................................3

    EXECUTIVE ORDERS............................................................................................................................4

    GENERAL FEDERAL REGULATIONS ...................................................................................................4

EXHIBIT B: ADDITIONAL STANDARD TERMS ......................................................................................6

    EXHIBIT B.1: TITLE VI ASSURANCES .................................................................................................7

    EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS – PRIMARY COVERED TRANSACTIONS ................................................................................16

    EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW.............................................................................................................20

    EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING .........................................22

    EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B) ..............................24

EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS........................................33



**U.S. Department of Transportation**
**Federal Railroad Administration**

## EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this Agreement, the Recipient assures and certifies, with respect to this award, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this Agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this Agreement include, but are not limited to, the following:

**GENERAL FEDERAL LEGISLATION**
  a. Davis-Bacon Act – 40 U.S.C. § 3141 et seq.
  b. Federal Fair Labor Standards Act – 29 U.S.C. § 201 et seq.
  c. Hatch Act – 5 U.S.C. § 1501 et seq.
  d. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. § 4601 et seq.
  e. National Historic Preservation Act of 1966 (Section 106) – 54 U.S.C. § 306108
  f. Archeological and Historic Preservation Act of 1974 – 54 U.S.C. §§ 312501-312508
  g. Native American Graves Protection and Repatriation Act – 25 U.S.C. § 3001 et seq.
  h. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. § 7401 et seq.
  i. Clean Water Act, as amended – 33 U.S.C. § 1251 et seq.
  j. Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. § 1536 et seq.
  k. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. § 1451 et seq.
  l. Flood Disaster Protection Act of 1973, Section 102(a) – 42 U.S.C. § 4012a
  m. Age Discrimination Act of 1975 – 42 U.S.C. § 6101 et seq.
  n. American Indian Religious Freedom Act, as amended – P.L. 95-341
  o. Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. §§ 290dd–290dd-2
  p. Architectural Barriers Act of 1968 – 42 U.S.C. § 4151 et seq.
  q. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42, Section 403 – 42 U.S.C. § 8373
  r. Contract Work Hours and Safety Standards Act – 40 U.S.C. § 3701 et seq.
  s. Copeland Anti-kickback Act, as amended – 18 U.S.C. § 874 and 40 U.S.C. § 3145
  t. National Environmental Policy Act of 1969 – 42 U.S.C. § 4321 et seq.
  u. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. § 1271 et seq.
  v. Single Audit Act of 1984 – 31 U.S.C. § 7501 et seq.
  w. Americans with Disabilities Act of 1990 – 42 U.S.C. § 12101 et seq.
  x. Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. §§ 1681–1683 and §§ 1685–1687
  y. Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. § 794
  z. Title VI of the Civil Rights Act of 1964 – 42 U.S.C. § 2000d et seq.
  aa. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
  bb. Freedom of Information Act, as amended – 5 U.S.C. § 552
  cc. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. § 1801 et seq.
  dd. Farmland Protection Policy Act of 1981 – 7 U.S.C. § 4201 et seq.
  ee. Noise Control Act of 1972 – 42 U.S.C. § 4901 et seq.
  ff. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. § 661 et seq.
  gg. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. §§ 401 and

**U.S. Department of Transportation**
**Federal Railroad Administration**

525

hh.   Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303
ii.    Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. §§ 9601–9657
jj.    Safe Drinking Water Act – 42 U.S.C. §§ 300f–300j-26
kk.   The Wilderness Act – 16 U.S.C. §§ 1131–1136
ll.    Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. § 6901 et seq.
mm. Migratory Bird Treaty Act – 16 U.S.C. § 703 et seq.
nn.   The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109-282, as amended by Section 6202 of Public Law 110-252)
oo.   Cargo Preference Act of 1954 – 46 U.S.C. § 55305
pp.   Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232
qq.   Efficient Environmental Reviews – 23 U.S.C. § 139
rr.    Grant Conditions – 49 U.S.C. § 22905
ss.   Build America, Buy America Act – Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298
tt.    Bringing In and Harboring Certain Aliens – 8 U.S.C. § 1324
uu.   Aiding or Assisting Certain Aliens to Enter – 8 U.S.C. § 1327

**EXECUTIVE ORDERS**
a.   Executive Order 11990 – Protection of Wetlands
b.   Executive Order 11988 – Floodplain Management
c.   Executive Order 12372 – Intergovernmental Review of Federal Programs
d.   Executive Order 12549 – Debarment and Suspension
e.   Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers
f.   Executive Order 14025 – Worker Organizing and Empowerment
g.   Executive Order 14149 – Restoring Freedom of Speech and Ending Federal Censorship
h.   Executive Order 14154 – Unleashing American Energy
i.   Executive Order 14168 – Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
j.   Executive Order 14173 – Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**GENERAL FEDERAL REGULATIONS**
a.   Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201
b.   Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200
c.   Investigative and Enforcement Procedures – 14 CFR Part 13
d.   Procedures for predetermination of wage rates – 29 CFR Part 1
e.   Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 CFR Part 3
f.   Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 CFR Part 5
g.   Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60 et seq.

**U.S. Department of Transportation**
**Federal Railroad Administration**

h.  New Restrictions on Lobbying – 49 CFR Part 20
i.  Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto
j.  Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 CFR Part 24
k.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25
l.  Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27
m.  DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 CFR Part 35
n.  Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28
o.  Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 CFR Part 30
p.  Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32
q.  DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38
r.  Environmental Impact and Related Procedures – 23 CFR Part 771
s.  Procedures Implementing Section 4(f) of the Department of Transportation Act – 23 CFR Part 774

Specific assurances required to be included in the Agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

EXHIBIT B: ADDITIONAL STANDARD TERMS

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.1: TITLE VI ASSURANCES**

### TITLE VI ASSURANCE
### Implementing Title VI of the Civil Rights Act of 1964, as amended

### ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 CFR Parts 21, 25, 27, 37 and 38

### The United States Department of Transportation (USDOT)

### Standard Title VI/Non-Discrimination Assurances

### DOT Order No. 1050.2A

By signing and submitting the Application and by entering into this Agreement, the Recipient **HEREBY AGREES THAT**, as a condition to receiving Federal financial assistance from the Federal Railroad Administration (FRA), it is subject to and will comply with the following:

### Statutory/Regulatory Authorities

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 CFR Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 CFR Section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

### General Assurances

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity,"* for which the Recipient receives Federal financial assistance from DOT, including FRA.

7



U.S. Department of Transportation
**Federal Railroad Administration**

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**U.S. Department of Transportation**
**Federal Railroad Administration**

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

   a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and
   b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

   a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or
   b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing FRA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by FRA. You must keep records, reports, and submit the material for review upon request to FRA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the FRA under this Agreement. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the program or project funded under this Agreement.



U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally assisted programs of the U.S. Department of Transportation, Federal Railroad Administration (FRA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or FRA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or FRA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or FRA may determine to be appropriate, including, but not limited to:

    a. withholding payments to the contractor under the contract until the contractor complies; and/or
    b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**U.S. Department of Transportation**
**Federal Railroad Administration**

contractor will take action with respect to any subcontract or procurement as the Recipient or FRA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

11


U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), 23 U.S.C. § 117 and the policies and procedures prescribed by the Federal Railroad Administration (FRA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

12



U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX C**

**CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM**

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.  The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.  With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.  With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)



U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX E**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 et seq.), (prohibits discrimination on the basis of sex) (as applicable);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 et seq.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 et seq.), (prohibits discrimination on the basis of age);
- The Civil Rights Restoration Act of 1987, (P.L. 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131–12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq.).

15

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS – PRIMARY COVERED TRANSACTIONS**

**2 CFR Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FRA approval or that is estimated to cost $25,000 or more—as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Application and by entering into this Agreement, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

16

**U.S. Department of Transportation**
**Federal Railroad Administration**

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust

17

**U.S. Department of Transportation**
**Federal Railroad Administration**

statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**2. Instructions for Certification – Lower Tier Participants:**

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FRA approval or estimated to cost $25,000 or more – 2 CFR Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

18


U.S. Department of Transportation
**Federal Railroad Administration**

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

![U.S. Department of Transportation — Federal Railroad Administration logo]

**EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by Sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

20

**U.S. Department of Transportation**
**Federal Railroad Administration**

(1) Certify whether the entity has a Tax Delinquency; and

(2) Certify whether the entity has a Felony Conviction.

4    **Prohibition.** If

(1) the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

(2) an entity provides an affirmative response to either certification in section 3; or

(3) an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5.    **Mandatory Notice to the USDOT.**

(a) If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

(b) If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

(c) If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6.    **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

(1) require the SAM check in section 2;

(2) require the certifications in section 3;

(3) include the prohibition in section 4; and

(4) require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

21


**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
 (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
  (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
  (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
 (2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—
  (i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and
  (ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.



U.S. Department of Transportation
**Federal Railroad Administration**

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B)**

This Exhibit provides guidance on the protective arrangements equivalent to the protective arrangements established under Section 504 of the Railroad Revitalization Reform Act of 1976, with respect to employees affected by actions taken in connection with a Project financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B). Fluctuations and changes in volume or character of employment brought about solely by other causes are not within the scope of this Exhibit.

    **1.**     **Definitions.** Whenever used in this Exhibit, capitalized terms shall have the meanings below:

    (a)     "Average Monthly Compensation" means the total compensation received by a Displaced Employee or a Dismissed Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement or dismissal, divided by twelve (12). The Average Monthly Compensation shall be adjusted to reflect subsequent general wage increases.

    (b)     "Average Monthly Time" means the total number of hours worked by a Displaced Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement, divided by twelve (12).

    (c)     "Day" means one 24-hour calendar day (including holidays and weekends) for purposes of calculating deadlines and other timeframes in this Exhibit.

    (d)     "Displaced Employee" means a Protected Employee who remains employed by a Railroad but, as a result of a Project, is placed in a worse position with respect to compensation and rules governing working conditions. A Protected Employee's status as a Displaced Employee begins on the date said employee is harmed.

    (e)     "Dismissed Employee" means a Protected Employee who: (1) as a result of a Project, is deprived of employment with the Railroad because (i) the Railroad eliminates the Protected Employee's position, or (ii) the Railroad eliminates another employee's position (and that employee's exercise of seniority rights results in the Protected Employee's inability to secure another position by the exercise of the Protected Employee's seniority rights); and (2) is unable to secure another position by exercise of their seniority rights A Protected Employee's status as a Dismissed Employee begins on the date said employee is deprived of employment.

    (f)     "Project" means any action financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B).

    (g)     "Protected Employee" means an employee of a Railroad who is affected by actions taken pursuant to a Project, whether the Project is initiated by a Railroad or a Recipient. If a Railroad rearranges or adjusts its forces in anticipation of a Project with the purpose or effect of depriving an employee of benefits to which they otherwise would have become entitled under this Exhibit, then that employee is a Protected Employee under this Exhibit. An employee's status as a Protected Employee shall continue for the duration of the applicable Protective Period. An employee who solely benefitted as a result of a Project shall not be a Protected Employee under this Exhibit.

    (h)     "Protective Period" means that period during which a Displaced Employee or a Dismissed Employee is provided the protections described in this Exhibit. The Protective Period begins

24

**U.S. Department of Transportation**
**Federal Railroad Administration**

on the date an employee of a Railroad is displaced or dismissed and ends after six (6) years. However, the Protective Period for any particular employee shall not continue longer than the period of time the Railroad employed the employee prior to the date of their displacement or dismissal. For purposes of this Exhibit, an employee's length of service shall be determined in accordance with the provisions of Section 7(b) of the Washington Job Protection Agreement of May 1936, as amended.

(i)    "Recipient" means any person or entity receiving financial assistance subject to the requirements of 49 U.S.C. § 22905(c), including grantees, subrecipients, contractors, and subcontractors.

(j)    "Railroad" means (1) a railroad carrier as defined in 49 U.S.C. § 20102(3), or (2) any person deemed a rail carrier pursuant to 49 U.S.C. § 22905(b).

**2.    Flow Down.**

(a)    In accepting financial assistance for a Project, the Recipient is responsible for ensuring the compliance with the protections provided in this Exhibit. The Recipient shall make the acceptance of this Exhibit a condition of any new contract (or incorporate its terms into any existing contract by amendment) that uses funds subject to the requirements of 49 U.S.C. § 22905(c). These conditions shall apply to a Recipient, any Railroad and any contractor of any tier with which the Recipient contracts using funds subject to the requirements of 49 U.S.C. § 22905(c).

(b)    The Recipient shall require in an agreement (either in a new agreement or as an amendment to an existing agreement) with a Railroad owning the right-of-way to be improved by a Project that the Railroad notify its employees (or their representatives) of the Project being funded with financial assistance subject to 49 U.S.C. § 22905(c) and the applicability of these protections.

(c)    Any Railroad employee (or their representatives) may notify a Recipient of a dispute or controversy relating to the requirements of this Exhibit to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

**3.    Collective Bargaining Agreements.**

(a)    **Existing Agreements**. The rates of pay, rules, working conditions, and all collective bargaining and other rights, privileges, and benefits (including continuation of pension rights and benefits) of a Railroad's employees under applicable laws, regulations, and/or existing collective bargaining agreements shall be preserved and remain applicable unless changed by future collective bargaining agreements or applicable statutes or regulations. As applied to the regulation of subcontracting by the Railroads of a Project, the provisions of this section shall mean that a determination of whether or not such work validly may be subcontracted by a Railroad shall not be affected by the fact that the work is being financed by funds subject to the requirements of 49 U.S.C. § 22905(c)(2)(B). Nothing in this Exhibit shall be construed as depriving any Railroad employee of any rights or benefits or eliminating any obligations that such employee may have under any existing contractual or statutory arrangement, including job security agreements, protective conditions, or arrangements.

(b)    **Election by Protected Employee**. Where a Protected Employee is eligible for protections under both this Exhibit and another contractual or statutory arrangement, the Protected Employee shall elect between the protection under this Exhibit and protection under such other arrangement. After

25


**U.S. Department of Transportation**
**Federal Railroad Administration**

such an election, the Protected Employee shall be protected only by the arrangement that they elect. The Protected Employee shall not be entitled to any protection or benefit (regardless of whether such benefit is duplicative) under the arrangement that they do not elect. However, if the elected protection expires pursuant to the terms of the arrangement that governs the elected protection, the Protected Employee is entitled to protection under the arrangement not originally elected for the remainder, if any, of the Protective Period.

**4.** **Change in Operations, Services, Facilities, or Equipment.**

(a)     **Notice**. When a Railroad contemplates a change or changes in its operations, services, facilities, or equipment as a result of a Project, which may cause the dismissal or displacement of Protected Employees or rearrangement of forces involving such employees, it shall give at least sixty (60) days' written notice of such intended changes to both Protected Employees and their duly authorized representatives (if applicable). Such notice shall contain a full and adequate description of the proposed changes, including an estimate of the number of Protected Employees of each class affected by the intended changes.

(b)     **Negotiations**.

(i)     Initiation of Negotiation. Within sixty (60) days after the Railroad issues a notice under Section 4(a) of this Exhibit, the Railroad or the Protected Employees (or their representatives) may, by written notice to the other party, request a meeting and opportunity to negotiate an agreement with respect to the application of the terms and conditions of this Exhibit. These negotiations shall commence within fourteen (14) days from the receipt of such request.

(ii)     Subject of Negotiations. Each change to rail operations, services, facilities, infrastructure, or equipment (including rights-of-way, track, and signal and crossing systems) that may result in dismissal or displacement of Protected Employees or rearrangement of forces involving such employees shall be subject to review and negotiation by the parties, but only to the extent necessary to ensure compliance with this Exhibit. For any contemplated rearrangement of rail forces, the Railroad and the representative(s) of the Protected Employees shall agree on the method of selection of employees to be moved, and the assignment of those employees to new roles.

(c)     **Arbitration**. If the Railroad and the representative(s) of the Protected Employees fail to agree within forty-five (45) days from the initial meeting and opportunity to negotiate, either party may submit the dispute for arbitration in accordance with the following procedures:

(i)     Notice & Selection of Arbitrator. Within ten (10) days after either party has notified the other in writing of their desire to submit the dispute for arbitration, the parties shall select a neutral arbitrator. If the parties cannot agree upon the selection of said arbitrator, then the parties shall submit a request to the National Mediation Board to appoint an arbitrator. In either case, a hearing shall be scheduled no later than thirty (30) days after an arbitrator has been appointed.



U.S. Department of Transportation
**Federal Railroad Administration**

(ii)     Binding Decision. The decision of the arbitrator shall be final, binding, and conclusive and shall be rendered within thirty (30) days from the date of the commencement of the hearing of the dispute.

(iii)     Expenses. The salary and expenses of the arbitrator shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them.

(d)     **Implementation**. If a notice is issued under Section 4(a), the Railroad shall not implement such a change or changes until: (i) sixty (60) days after the notice in accordance with Section 4(a), if no party requests a meeting and opportunity to negotiate; (ii) the parties reach agreement pursuant to Section 4(b), if a party requests a meeting and opportunity to negotiate; or (iii) a referee has rendered a decision pursuant to Section 4(c).

**5.     Protections for Displaced Employees**

(a)     **Displacement Allowances**.

(i)     In General. If a Displaced Employee is unable, in the normal exercise of such employee's seniority rights under existing agreements, rules and practices, to obtain a position that is compensated equal to or exceeding the compensation the Displaced Employee received in the position from which such employee was displaced, then the Displaced Employee shall, during the Protective Period, be paid a monthly displacement allowance equal to the difference between the monthly compensation received by the Displaced Employee in the position in which such employee is retained and the Average Monthly Compensation received by the Displaced Employee in the position from which such employee was displaced (the "Displacement Allowance").

(ii)     Application of Displacement Allowance. If a Displaced Employee's compensation in that employee's retained position is less in any month in which such employee performs work than the Average Monthly Compensation, then the Displaced Employee shall be paid the difference between the current compensation and the Average Monthly Compensation. However, the Displacement Allowance shall be reduced by the Displaced Employee's time lost as a result of voluntary absences, to the extent that the Displaced Employee is not available for service equivalent to the Displaced Employee's Average Monthly Time. If, on the other hand, the Displaced Employee, in such employee's retained position, works in excess of the Average Monthly Time in any given month, then the Displaced Employee shall be additionally compensated for such excess time at the rate of pay of the employee's retained position. If a Displaced Employee fails to exercise their seniority rights to secure another position available to the employee which does not require a change in such employee's place of residence, to which the employee is entitled under the working agreement, and which carries a rate of pay and compensation exceeding those of the position that the employee elects to retain, then the Displaced Employee shall thereafter be treated for the purposes of this section as occupying the position such employee elects to decline.

(iii)     Early Expiration. The Displacement Allowance shall cease prior to the expiration of the Protective Period in the event of the Displaced Employee's resignation, death, retirement, or dismissal for justifiable cause.

27



U.S. Department of Transportation
**Federal Railroad Administration**

(b)      **Moving Expenses**. Any Protected Employee retained in the service of a Railroad, or who is later restored to service after being entitled to receive a Dismissal Allowance, and is required to change the point of such employee's employment as a result of the Project, and within the employee's Protective Period is required to move the employee's place of residence, shall be reimbursed for all expenses of moving the employee's household and other personal effects, including travel expenses, temporary living expenses, and any actual wage loss during the time necessary to make the move, and for a reasonable time thereafter, not to exceed five (5) days.

(i)      Prior Agreement. The exact extent of the responsibility of a Railroad under this Section and the ways and means of transportation shall be agreed upon in advance by the Railroad and the Protected Employee or their representatives.

(ii)      Exception. Changes in residence that are not a result of a Project, which are made after the initial change and that grow out of the normal exercise of seniority rights, are not within the purview of this Section.

(iii)      Furloughed Employees. The Railroad shall, to the same extent provided above, assume the moving expenses outlined in Section 5(b) for an employee furloughed within three (3) years after changing such employee's point of employment as a result of a Project, who elects to move their place of residence back to their original point of employment.

(iv)      Reimbursement. A claim for reimbursement shall be paid under the provisions of this Section within sixty (60) days after it is submitted, unless disputed by the Railroad, but no claim shall be paid if presented to the Railroad more than ninety (90) days after the date on which the expenses were incurred.

(c)      **Losses from Home Sale or Contract Termination**. Any Displaced Employee who is retained in the service of a Railroad (or who is later restored to service after being entitled to receive a dismissal allowance), and who is required to change the point of such employee's employment during the Protective Period as a result of a Project, is entitled to the following:

(i)      Home Sale for Less Than Fair Market Value. If the Displaced Employee owns their place of residence in the locality from which such employee is required to move, then at the Displaced Employee's option, the Railroad shall reimburse the Displaced Employee for the difference between the actual sale price and the fair market value of the employee's place of residence. The Railroad shall pay such difference within sixty (60) days after the Displaced Employee has filed a claim for such loss in accordance with Section 5(c)(vi), unless a controversy arises as to which Section 5(c)(vii) applies. In each case, the fair market value of the home in question shall be determined without consideration of the Project. The Railroad shall in each instance be afforded an opportunity to purchase the home at such fair market value before it is sold by the Displaced Employee to any other person.

(ii)      Election to Receive Closing Costs. The Displaced Employee may elect to waive the provisions of Section 5(c)(i) and to receive, in lieu thereof, an amount equal to the closing costs that are customarily paid for and assumed by a seller of real estate in the jurisdiction in which the employee's residence is located. Such costs shall include customary fees paid to a licensed realtor (not to exceed six percent (6%) of the final sale price) and any prepayment penalty required by any mortgagor or beneficiary of a deed of trust. Such costs shall not include

28

**U.S. Department of Transportation**
**Federal Railroad Administration**

the payment of any mortgage discount points or similar interest discount fees by the Displaced Employee.

(iii)    Pending Contract to Purchase. If a Displaced Employee has entered into a contract to purchase a place of residence, but due to a Project must cancel that contract, the Railroad shall indemnify the Displaced Employee against any losses due to such cancellation, and shall relieve the Displaced Employee from any further obligation under the contract.

(iv)    Unexpired Lease. If the Displaced Employee holds an unexpired lease of a dwelling as the employee's primary place of residence, and the Displaced Employee must cancel the lease due to a Project, the Railroad shall indemnify the Displaced Employee from all costs and liability arising from said cancellation.

(v)    Exclusions. Any change in residence that is not due to or caused by a Project, or that resulted from the normal exercise of a Protected Employee's seniority rights, shall not be within the purview of this Section.

(vi)    Notification of Claims. A Displaced Employee shall notify, in writing, the Railroad of such employee's claim arising from this Section 5(c) within one (1) year of the date the Displaced Employee's claim accrues.

(vii)    Home Value Disagreements. In the event of disagreement between a Railroad and a Displaced Employee as to the value of a Displaced Employee's claim, either party (or their representatives) may request, in writing, a joint conference to resolve the disagreement.

A.    Real Estate Appraisers. If the parties are unable to resolve the disagreement, either party may refer the disagreement to two licensed real estate appraisers, one of whom shall be selected by the Displaced Employee (or such employee's representatives), and one of whom shall be selected by the Railroad. If the two selected real estate appraisers are unable to agree on a valuation within thirty (30) days, the selected real estate appraisers shall designate (or agree to a method by which to select) a third licensed real estate appraiser within ten (10) days. If unable to agree on a selection, either party may request the National Mediation Board to designate within twenty (20) days a third licensed real estate appraiser. A decision by two of the three licensed real estate appraisers shall be required to determine the value in dispute. Said decision shall be final and conclusive.

B.    Payment of Expenses. The salary and expenses of the third or neutral appraiser shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the compensation of the appraiser selected by such party.

(d)    **Failure to Exercise Seniority Rights**. If a Displaced Employee is able but does not exercise such employee's seniority rights to secure another position that does not require a change in the employee's primary place of residence, the Displaced Employee shall not be entitled to moving expenses or protections due to the sale of a home outlined in Sections 5(b)&(c).

29



U.S. Department of Transportation
**Federal Railroad Administration**

   **6.      Protections for Dismissed Employees.**

   (a)      **Dismissal Allowance**. A Dismissed Employee shall be paid a monthly dismissal allowance from the date they are deprived of employment through the Protective Period.

      (i)      Monthly Dismissal Allowance Calculation. The monthly dismissal allowance shall be equivalent to the Average Monthly Compensation received by the Dismissed Employee in the last twelve (12) months of employment prior to the employee's dismissal.

      (ii)      Submission of Claim. A claim for the initial month of a dismissal allowance shall be paid within ninety (90) days and a claim for a subsequent month shall be paid within sixty (60) days after the claim is filed by the Dismissed Employee, unless the claim is disputed by the Railroad pursuant to Section 8 of this Exhibit.

      (iii)      Reduction or Suspension of Dismissal Allowance. If a Dismissed Employee accepts new employment (or reemployment by the dismissing Railroad) during the Protective Period, the dismissal allowance shall be reduced such that the accepted monthly compensation at the then-current position (including any unemployment insurance compensation received) plus the dismissal allowance is equivalent to the Dismissed Employee's Average Monthly Compensation. If the compensation of the Dismissed Employee's then-current employment is greater than the dismissal allowance, the dismissal allowance shall be suspended. Such reduction or suspension shall continue for the duration of the Protective Period, unless and until the Dismissed Employee's then-current compensation is reduced or eliminated. Prior to dismissal, such Dismissed Employee (or their representative) and the dismissing Railroad shall agree upon a procedure by which such Railroad shall be informed of the earnings and benefits of such Dismissed Employee in their new position of employment.

      (iv)      Early Termination. The dismissal allowance shall cease prior to the expiration of the Protective Period in the event of the Dismissed Employee's resignation, death, retirement, dismissal for justifiable cause under existing agreements, failure without good cause to return to service after being notified in accordance with an applicable working agreement, or failure without good cause to accept a comparable position that does not require a change of residence, for which the Dismissed Employee is qualified and eligible with the Railroad from which such employee was dismissed after being notified, if the employee's return does not infringe upon employment rights of other employees under a working agreement.

   (b)      **Separation Allowance**. A Dismissed Employee may, at such employee's option, within seven (7) days of dismissal or an arbitration award establishing the employee's status as a Dismissed Employee, resign and (in lieu of all other benefits and protections provided in this Exhibit) accept a lump sum payment computed in accordance with Section 9 of the Washington Job Protection Agreement of May 1936, as amended.

   (c)      **Priority of Employment or Re-Employment**. Any Protected Employee whose employment is terminated or who is furloughed as a result of a Project shall, if they so request, be granted priority of employment or re-employment to fill a position comparable to that which they held on the Railroad (even if in a different craft or class), so long as they are qualified, or by training or retraining can become physically and mentally qualified, for the position. However, such priority of

30


U.S. Department of Transportation
**Federal Railroad Administration**

employment or re-employment must not be in contravention of any relevant collective bargaining agreements.

(i)     **Training or Re-Training**. In the event such training or retraining is requested by a Protected Employee pursuant to Section 6(c), the Railroad shall provide such training or retraining at no cost to the Protected Employee.

(ii)     **Waiver of Protections**. If a Protected Employee who has made a request under Section 6(c) fails without good cause within ten (10) days to accept an offer of a comparable position for which such employee has satisfactorily completed such training, the Protected Employee shall, upon the expiration of such ten (10) day period, forfeit all rights and benefits under this Exhibit.

**7.     Fringe Benefits.** No Protected Employee shall be deprived during the Protective Period of any (non-salary) rights, privileges, or benefits attached to such employee's previous employment under the terms and conditions of an existing employment agreement (including, but not limited to, free transportation, hospitalization, pensions, insurance, or vacation benefits), so long as such rights, privileges, or benefits continue to be accorded to other employees of the Railroad, in active service or on furlough as the case may be, to the extent that such rights, privileges, or benefits can be so maintained under present authority of law, corporate action, or through future authorization.

**8.     Arbitration of Disputes.**

(a)     **Scope**. Any dispute under these conditions not settled by the relevant parties will be resolved in arbitration as provided herein. In the event a Railroad and the Protected Employee(s) (or their representatives) cannot settle a dispute or controversy with respect to the interpretation, application, or enforcement of any provision of this Exhibit (other than those Sections of this Exhibit that provide for another means of dispute resolution) within thirty (30) days after the dispute arises, either party may refer the dispute to an arbitration committee. The affected Protected Employee(s) (or their representatives) may notify a Recipient of a dispute or controversy under this Section 8 to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

(b)     **Notice**. The party referring the dispute to an arbitration committee shall notify the other party in writing of its intent to refer a dispute or controversy to an arbitration committee.

(c)     **Selection of Members**. Within ten (10) days of receipt of the written notice, each party to the arbitration shall select one (1) member of the committee, and the members thus chosen shall select an additional, neutral member to serve as chairman. If any party fails to select its member of the arbitration committee within the prescribed time limit, the general chairman of the involved labor organization or a senior officer designated by the Railroad or the Recipient, as the case may be, shall be deemed the selected member. Should the members be unable to agree upon the appointment of the neutral member within ten (10) days, the parties shall then within an additional ten (10) days agree to a method by which a neutral member shall be appointed; failing such agreement, either party may request the National Mediation Board to designate within twenty (20) days the neutral member whose designation will be binding upon the parties.

(d)     **Multiple Representatives**. In the event a dispute involves more than one labor organization, each will be entitled to a representative on the arbitration committee, in which event the Railroad or Recipient may appoint additional representatives equivalent to the number of labor

31



**U.S. Department of Transportation**
**Federal Railroad Administration**

organization representatives; provided, however, that the decision in such case shall be made by the neutral member.

(e)    **Decisions Binding**. The decision, by majority vote except as provided otherwise in paragraph (d) of this Section, of the arbitration committee shall be final, binding, conclusive, and rendered within forty-five (45) days after the hearing of the dispute or controversy has been concluded and the record closed.

(f)    **Expenses**. The salaries and expenses of the neutral member shall be borne equally by the parties to the proceeding, and all other expenses shall be paid by the party incurring them.

**9.    Classification of a Protected Employee.** In the event an employee (or their representatives) cannot settle a dispute or controversy with the Railroad or the Recipient as to whether or not a particular employee would be affected by a Project, either party may refer the dispute to an arbitration committee within thirty (30) days after the dispute arises pursuant to the arbitration procedures in Section 8. For any such dispute, the employee of a Railroad shall have the burden to identify, with reasonable specificity, the Project that allegedly affected them, and to specify the pertinent facts of that Project, including the change or changes resulting from the Project that allegedly affected them. The burden shall then shift to the Railroad or Recipient to show that factors other than a change resulting from the Project affected the employee. The employee shall prevail on this issue if it is established that the Project had an effect upon the employee, even if other factors also may have affected the employee.

**10.    Resolution of Disputes for Non-Bargaining Unit Protected Employees.** Any Protected Employee who is not represented by a labor organization shall be afforded substantially the same levels of protection as are afforded to members of labor organizations under this Exhibit. In the event any dispute arises between a Railroad and an employee not represented by a labor organization with respect to the interpretation, application, or enforcement of any provision of this Exhibit that cannot be settled by the parties within thirty (30) days after the dispute arises, either party may, as an alternative to the dispute resolution procedures outlined in this Exhibit, refer the dispute within ninety (90) days after the dispute arises to the Secretary of Labor for determination. The determination of the Secretary of Labor, or their designated representative, shall be final and binding on the parties.

**11.    Severability.** In the event any provision of this Exhibit is held to be invalid or otherwise unenforceable under applicable law, the remaining provisions of this Exhibit shall not be affected.


**U.S. Department of Transportation**
**Federal Railroad Administration**

## EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS

Quarterly Project Progress Reports and Recertifications are available at:
https://railroads.dot.gov/grant-administration/reporting-requirements/fra-report

# EXHIBIT F

# DOT

# FTA

**U.S. Department of Transportation**

**Federal Transit Administration**

# Application

| Federal Award Identification Number (FAIN) | N/A |
|---|---|
| Application Number | 2879-2022-1 |
| Temporary Application Number | 2879-2022-1 |
| Award Name | 5307 Lee Street Trail - Pedestrian Mobility Improvements STBG Urban - City of Atlanta |
| Application Status | In-Progress |
| Budget Revisions | 0 |

| Period of Performance Start Date | N/A | | |
|---|---|---|---|
| Original Period of Performance End Date | 3/30/2033 | | |
| Current Period of Performance End Date | 3/30/2033 | Revision #: 0 | Approved?: No |

## Part 1: Recipient Information

### Name: ATLANTA, CITY OF

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
|---|---|---|---|---|
| 2879 | City | CITY OF ATLANTA | HAAWKXL2PLE3 | 065372500 |

| Location Type | Address | City | State | Zip |
|---|---|---|---|---|
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

## Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
|---|---|
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |

| State | Georgia |
|---|---|
| Zipcode | 30302 |
| Contact Name | Gina Pagnotta |
| Telephone | 678-414-8982 |
| Fax | |
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Application Information

**Title: 5307 Lee Street Trail - Pedestrian Mobility Improvements STBG Urban - City of Atlanta**

| Application Number | Application Status | Award Type | Application Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| 2879-2022-1 | In-Progress | Grant | Region 4 | 3/31/2022 | 3/31/2022 | No |

**Application Executive Summary**

This application requests the obligation of $6,517,040.00 in federal funds from the Transportation Alternatives Program and Surface Transportation Block Grant Program (STBG) Urban > 200k through the Atlanta Regional Commission (ARC) authorized in May 2017; Federal funding in the amount of $ 264,00 has been flexed from the Transportation Alternatives( Section 133 (h)) - Urban > 200K (Federal) to the Federal Transit Administration Region IV Offices for the project to be administered under the Urbanized Area Formula Program (5307) . An additional $6,253,040 in STBG funds are also included. Both FHWA approval forms are included in Application Documents. Local Matching funds in the amount of $1,679,260.00 is being provided by the City of Atlanta. The proposed project is included in the adopted FY 2018-20233 Atlanta Regions Transportation Improvement Plan (AT-299) and the Georgia Department of Transportation (GDOT) FY16 Statewide Transportation Improvement Program (PI-004997) by reference. Activities to be performed are design, engineering and construction activities of a multi-use trail between rail station along Lee Street in Atlanta, GA. Further detail can be found in the NEPA Checklist attached with this application.

In addition to FTAs Buy America Act, which requires that the steel, iron, and manufactured goods used in an FTA-funded project are produced in the United States (49 U.S.C. 5323(j)(1)), the Build America, Buy America Act (BABA) (Public Law 117-58, div. G 70914(a)) now requires that construction materials used in infrastructure projects are also produced in the United States. Refer to terms and conditions in FTAs Master Agreement Section 15. The BABA requirement applies to this grant, in addition to the Buy America Act, except to the extent a waiver of either requirements may apply.

The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.

The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance).

**Frequency of Milestone Progress Reports (MPR)**
No Selection Made

**Frequency of Federal Financial Reports (FFR)**
No Selection Made

**Does this application include funds for research and/or development activities?**
This award does not include research and development activities.

**Pre-Award Authority**
This award is not using Pre-Award Authority.

**Does this application include suballocation funds?**
Recipient organization is directly allocated these funds and is eligible to apply for and receive these funds directly.

**Will this Grant be using Lapsing Funds?**
No Selection Made

**Will indirect costs be applied to this application?**
This award does not include an indirect cost rate.

*Indirect Rate Details*: N/A

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
The purpose of this project is to create safe access to transit for pedestrians and cyclists by constructing a protected two-way multi-use trail along the east and west side of Lee Street, between the West End MARTA rail station and the Lakewood/Ft. McPherson Marta rail station.

**Activities to be performed:**
Construction of bicycle and pedestrian facilities, functional landscaping, intersection improvements at each street crossing, resurfacing, and restriping. GDOT coordination will also be necessary.

**Expected outcomes:**
The proposed Lee Street trail would connect the West End and the Atlanta Beltline Corridor to the Oakland City and Lakewood-Fort McPherson MARTA Rapid Rail Stations. This trail would promote increased bicycle use, and promote health by adding opportunity for walking to and from transportation facilities.

**Intended beneficiaries:**
The populace of the West End Marta Rapid Rail Station, the Lakewood-Fort McPherson Marta Rapid Rail Station, the Southwest corridor of the Atlanta Beltline and local area commuters.

**Subrecipient Activities:**
None

## Application Point of Contact Information

| First Name | Last Name | Title | E-mail Address | Phone |
|---|---|---|---|---|
| | john.crocker@dot.gov | Community Planner | | |
| | gabrielle.gusmerotti@dot.gov | General Engineer | | |
| Michele | Wynn | Director, Program Delivery | mwynn@atlantaga.gov | (678) 794-8879 |

## Application Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| FHWA Transfer to 5307 Urbanized Area Formula Grants | 5307-3 | 20507 | $6,517,040 |
| Local | | | $1,602,260 |
| Local/In-Kind | | | $1,127,101 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$9,246,401** |

## Application Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| 2879-2022-1-P1 | 119-00 (119-) | Bus Associated Transit Improvements | $6,517,040.00 | $2,729,361.00 | $9,246,401.00 | 2 |
| 2879-2022-1-P1 | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | $264,000.00 | $316,000.00 | $580,000.00 | 1 |
| 2879-2022-1-P1 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $6,253,040.00 | $2,413,361.00 | $8,666,401.00 | 1 |

## Discretionary Allocations

This application does not contain discretionary allocations.

# Part 3: Project Information

## Project Title: 5307 Lee Street Trail- Pedestrian Mobility Improvements STBG Urban

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| 2879-2022-1-P1 | 2879-2022-1-P1 | 5/31/2022 | 2/16/2026 | 5/21/2028 |

**Project Description**

The proposed trail will run along the east side of Lee Street and reconfigure Lee Street from five to four travel lanes with turn lanes at signalized intersections. The trail cross sections will vary based upon available right-of-way and agreements with CSX, and Norfolk Southern railroads and MARTA. The ideal trail width is 12 feet wide and where space permits, include a landscaped buffer protecting trail users from vehicle lanes.

**Project Benefits**
The expected benefits of this project is to create safe access to transit for pedestrians and cyclists by constructing a protected two-way multi-use trail along the east and west sides of Lee Street, between the West End MARTA rail station and the Lakewood /Ft. McPherson MARTA rail station

**Additional Information**
The proposed project is within a 2.60 -mile long segment of Lee Street between the West End MARTA station and the Lakewood-Fort McPherson MARTA station.

**Location Description**
The proposed project is within a 2.60-mile-long segment of Lee Street between the West End MARTA station and the Lakewood-Fort McPherson MARTA station.

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
| --- | --- |
| 130000 | Georgia |
| 130200 | Atlanta, GA |

## Congressional District Information

| District | State |
| --- | --- |
| 5 | Georgia |

## Program Plan Information

**STIP/TIP**
Date: Not Provided
Description: FY 2018-2023 Transportation Improvement Program (TIP) - Sorted b ARC Project Number. Page 137 of 293.

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
| --- | --- | --- | --- |

| FHWA Transfer to 5307 Urbanized Area Formula Grants | 5307-3 | 20507 | $6,517,040 |
|---|---|---|---|
| Local | | | $1,602,260 |
| Local/In-Kind | | | $1,127,101 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$9,246,401** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| 2879-2022-1-P1 | 119-00 (119-) | Bus Associated Transit Improvements | $6,517,040.00 | $2,729,361.00 | $9,246,401.00 | 2 |
| 2879-2022-1-P1 | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | $264,000.00 | $316,000.00 | $580,000.00 | 1 |
| 2879-2022-1-P1 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $6,253,040.00 | $2,413,361.00 | $8,666,401.00 | 1 |

## Project Budget Activity Line Items

| Budget Activity Line Item: 11.91.05 - ENG/DESIGN PED ACCESS / WALKWAYS | | | | |
|---|---|---|---|---|
| **Scope Name / Code** | **Line Item #** | **Line Item Name** | **Activity** | **Quantity** |
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | ENGINEERING/DESIGN (TRANSIT ENHANCEMENTS) | 1 |

**Extended Budget Description**
This Activity Line Item (ALI) and budget will fund Professional Engineering Services to design improvements to create safe access to transit for pedestrians and cyclists by constructing a protected two-way multi-use trail along the east and west side of Lee Street, between the West End MARTA rail station and the Lakewood/Ft. McPherson Marta rail station.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| FHWA Transfer to 5307 Urbanized Area Formula Grants | 5307-3 | 20507 | $264,000 |
| Local | | | $66,000 |
| Local/In-Kind | | | $250,000 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$580,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Design Procurement | 2/16/2026 | Negotiate Task Order Scope and Price |
| Design | 8/16/2027 | Concept Design, COA Approves Concept Preliminary Design, Preliminary Field Plans Review, Value Engineering, Final Design, Final Field Plan Review, Construction Plans Ready for Bid. |
| Permitting / Environmental | 10/1/2027 | GDOT Encroachment permits, Site Development Review, Signals Permitting, Greenway Permit (Dept. of Watershed), Historic Design Review, Commission Review, NPDES, 404 & Tree Permits, |
| Utility Relocations | 11/19/2027 | Agreements as applicable, 1st submittal, 2nd submittal, Final Utility Design, Agreements/Legislation Execution |
| ROW Acquisitions | 12/2/2027 | Legislative Approval, Parcels Identified, Parcels/ Easement Acquisition. |

**Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCTION | 1 |

**Extended Budget Description**
This Activity Line Item (ALI) and budget will fund the costs required for project construction as outline in the NEPA Checklist Application attached with this application. The City of Atlanta expects the useful life of the trail to be 20 years.
List of actions will include the following.
Installation of curb and landscaped median in existing roadway
Demolition of existing roadways, curb and gutter, and minor grading of adjacent right-of-way
Construction of concrete trail

Installation of Pedestrian Hybrid Beacon
Replacement of existing pedestrian push buttons and signal heads.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| FHWA Transfer to 5307 Urbanized Area Formula Grants | 5307-3 | 20507 | $6,253,040 |
| Local | | | $1,536,260 |
| Local/In-Kind | | | $877,101 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$8,666,401** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Construction Procurement | 11/19/2026 | Bid advertisement, Bid evaluations, bid award, negotiations, contract execution. |
| Construction | 11/19/2027 | Notice to Proceed (NTP), Construction, Substantial completion. |
| Project Closeout | 5/21/2028 | Contractor Punchlist, Final Acceptance, Closeout Documentation, Final Payment, Project Finish. |

# Project Environmental Findings

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**
Class II(c) consists of projects that do not have a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. FTA requires a sufficient project description to support a CE determination. The project may require additional documentation to comply with other environmental laws.

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 4/15/2025 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | 1 | $264,000.00 | $580,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**

Class II(c) consists of projects that do not have a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. FTA requires a sufficient project description to support a CE determination. The project may require additional documentation to comply with other environmental laws.

**Categorical Exclusion Description**

Type 05: Activities, including repairs, replacements, and rehabilitations, designed to promote transportation safety, security, accessibility and effective communication within or adjacent to existing right-of-way, such as: the deployment of Intelligent Transportation Systems and components; installation and improvement of safety and communications equipment, including hazard elimination and mitigation; installation of passenger amenities and traffic signals; and retrofitting existing transportation vehicles, facilities or structures, or upgrading to current standards.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 4/15/2025 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | 1 | $6,253,040.00 | $8,666,401.00 |

# Part 4: Fleet Details

No fleet data exists for this application.

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 4/12/2023 |
| Comment | Please see initial comments:<br><br>Executive Summary<br>o The ES summary states Federal funding in the amount of $264,00 has been flexed |

however the actual budget is $6,517,040. Please correct the text.
o The budget indicates that there is local in-kind funding in the amount of $1,127,101 but this is not referenced in the Executive Summary. Please include this amount and source in the Executive Summary
o The Paragraph begging Purpose can be eliminated
o Please add the following language to the end of the ES:
In addition to FTAs Buy America Act, which requires that the steel, iron, and manufactured goods used in an FTA-funded project are produced in the United States ( 49 U.S.C. 5323(j)(1)),  the Build America, Buy America Act (BABA) (Public Law 117-58, div. G 70914(a)) now requires that construction materials used in infrastructure projects are also produced in the United States. Refer to terms and conditions in FTAs Master Agreement Section 15. The BABA requirement applies to this grant, in addition to the Buy America Act, except to the extent a waiver of either requirements may apply

Part 3 Project Information Project Description Section: Please indicate that coordination with GDOT is also necessary

ALI 11.93.05 Construct Ped Access/Walkways
o Please fix the spacing issue in the Extended Budget Description
o Will 3rd Party contractors be used? is checked No but the milestones indicate that this project will go out to bid. Please change this to Yes

Application Documents:
o Please include the TIP Page from the most recent ARC TIP. If it is not in the most recent, please contact ARC (Patrick Bradshaw) to have it added back in
o Please attach the FHWA form 1575C Form showing that FHWA has approved the Flex of the funds
o Please attach FTA Concurrence with the use of in-kind funds

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 9/19/2024 |
| Comment | Please see the following technical comments and reminders from office of Civil Rights:<br>- Award name: please include agency somewhere in the award name<br>- Period of performance: should be set to the next march 30th that is at least 5 years beyond the latest milestone date in application - 2033<br>- Executive summary: Please include what the project is - i.e. brief description of activities, scope of work, etc.<br>- Executive summary: please include - 1. The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance).<br>2. The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.<br>- ALI 11.91.05: please clarify this EBD more - is this engineering and design for the new full trail portion?<br>- ALI 11.91.05: please confirm that the final milestone would be utility relocation?<br>- ALI 11.92.05: is it possible to provide more detailed breakdown in this EBD of the items?<br><br>Office of Civil Rights reminders:<br>Recipient must comply with all applicable Federal laws and regulations related to this project, including the ADA Standards for Transportation Facilities, based on the U.S. |

Access Boards ADA Accessibility Guidelines found here: http://www.access-board.gov/guidelines-and-standards/transportation/facilities/ada-standards-for-transportation-facilities. The following is a non-exhaustive list of ADA standards that Recipient must comply with. The information provided below is intended as technical assistance and applies only to the project as described. Should the project scope change or new information on the project be provided, FTA may require a re-evaluation of the project information as it relates to ADA and require additional information. This confirmation is not an express or implied promise of project compliance with the ADA.

As required under DOT ADA Standard 206.4.1, Recipient must ensure that 60 percent of all public entrances to the facility will be accessible. If a station has only two entrances, then both must be accessible.

As required under DOT ADA Standard 810.10, for rail projects, Recipient must ensure that no flange way gap can be greater than 2.5 where passenger circulation paths cross tracks at grade (i.e. a street-level pedestrian crossing over streetcar tracks).

As required under DOT ADA Standard 206.3, Recipient must ensure that accessible routes coincide with or are located in the same area as general circulation paths, and elements such as ramps, elevators, and fare vending and collection areas are placed to minimize the distance that wheelchair users and other persons who cannot climb steps must travel in comparison to the general public.

As required under DOT ADA Standard 406.8, Recipient must ensure that curb ramps will have detectable warnings.

As required under DOT ADA Standard 810.2, Recipient must ensure that bus boarding and alighting areas are in compliance with the ADA-ABA Guidelines (Section 810.2), which address surfaces (sturdy); dimensions (96 long x 60 wide); connection to sidewalks, streets, and pedestrian paths; slope (not steeper than 1:48); signs; and public address systems.

| Comment By | John Crocker |
| --- | --- |
| Comment Type | Pre-Award Manager Returns Application |
| Date | 2/11/2025 |
| Comment | Please see the following technical comments:<br>- Award name: please include agency somewhere in the award name<br>- Period of performance: should be set to the next march 30th that is at least 5 years beyond the latest milestone date in application - 2033<br>- Executive summary: Please include what the project is - i.e. brief description of activities, scope of work, etc.<br>- Executive summary: please include<br>- 1. The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance).<br>- 2. The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.<br>- ALI 11.91.05: please clarify this EBD more - is this engineering and design for the new full trail portion?<br>- ALI 11.91.05: please confirm that the final milestone would be utility relocation?<br>- ALI 11.93.05: is it possible to provide more detailed breakdown in this EBD of the items in the initial description or reference the NEPA Checklist in Application documents for more detail? |

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 2/26/2025 |
| Comment | Please see the following technical comments: <br> - Period of performance: Milestones have changed so please update this - The Period of Performance end date should be set to the next March 30 a minimum of 5 years beyond the latest milestone date in the application. For example, identify final milestone in the application (e.g., 06/25/2022), add five years (e.g., 06/25/2027). If that milestone falls after March 30 of that year, extend end date to March 30 of the following year (e.g., 03/30/2028). <br> - ALI 11.91.05: last milestone is listed as utility relocations in 2028 - is this truly 2028 as the project closeout is listed in 2027 in the next ALI? <br> - ALI 11.93.05: Would recommend including The agency [Name] does not anticipate the purchase of items over $10,000 in value at this time. Any items with value over $10,000 identified during the execution of the activities under this ALI will be included via budget revision (actual value and useful life). <br> - ALI 11.93.05: Project closeout milestone is listed as 11/29/2027, but the prior ALI (11.91.05) lists utility relocations finishing in 2028? |

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 5/28/2025 |
| Comment | Returning application until confirmation if Recipient's participation in a TAM Plan and completion of FFY25 Certs and Assurances. |

# Application Review Comments

| Comment By | Eboni Younger-Riehl |
|---|---|
| Comment Type | Application Details |
| Date | 9/17/2024 |
| Comment | FOR NEW CONSTRUCTION: <br><br> Recipient must comply with all applicable Federal laws and regulations related to this project, including the ADA Standards for Transportation Facilities, based on the U.S. Access Boards ADA Accessibility Guidelines found here: http://www.access-board.gov/guidelines-and-standards/transportation/facilities/ada-standards-for-transportation-facilities. The following is a non-exhaustive list of ADA standards that Recipient must comply with. The information provided below is intended as technical assistance and applies only to the project as described. Should the project scope change or new information on the project be provided, FTA may require a re-evaluation of the project information as it relates to ADA and require additional information. This confirmation is not an express or implied promise of project compliance with the ADA. |

As required under DOT ADA Standard 206.4.1, Recipient must ensure that 60 percent of all public entrances to the facility will be accessible. If a station has only two entrances, then both must be accessible.

As required under DOT ADA Standard 810.10, for rail projects, Recipient must ensure that no flange way gap can be greater than 2.5 where passenger circulation paths cross tracks at grade (i.e. a street-level pedestrian crossing over streetcar tracks).

As required under DOT ADA Standard 206.3, Recipient must ensure that accessible routes coincide with or are located in the same area as general circulation paths, and elements such as ramps, elevators, and fare vending and collection areas are placed to minimize the distance that wheelchair users and other persons who cannot climb steps must travel in comparison to the general public.

As required under DOT ADA Standard 406.8, Recipient must ensure that curb ramps will have detectable warnings.

As required under DOT ADA Standard 810.2, Recipient must ensure that bus boarding and alighting areas are in compliance with the ADA-ABA Guidelines (Section 810.2), which address surfaces (sturdy); dimensions (96 long x 60 wide); connection to sidewalks, streets, and pedestrian paths; slope (not steeper than 1:48); signs; and public address systems.

As required by DOT ADA Standard 810.5.3, Recipient must ensure that station platforms must be coordinated with the vehicle floor height.

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | Application Details |
| Date | 9/18/2024 |
| Comment | - Award name: please include agency somewhere in the award name<br>- Period of performance: should be set to the next march 30th that is at least 5 years beyond the latest milestone date in application - 2033<br>- Executive summary: Please include what the project is - i.e. brief description of activities, scope of work, etc.<br>- Executive summary: please include - 1. The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance).<br>2. The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.<br>- ALI 11.91.05: please clarify this EBD more - is this engineering and design for the new full trail portion?<br>- ALI 11.91.05: please confirm that the final milestone would be utility relocation?<br>- ALI 11.92.05: is it possible to provide more detailed breakdown in this EBD of the items? |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | Application Details |
| Date | 2/26/2025 |

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

| | |
|---|---|
| Comment | - Period of performance: Milestones have changed so please update this - The Period of Performance end date should be set to the next March 30 a minimum of 5 years beyond the latest milestone date in the application. For example, identify final milestone in the application (e.g., 06/25/2022), add five years (e.g., 06/25/2027). If that milestone falls after March 30 of that year, extend end date to March 30 of the following year (e.g., 03/30/2028).<br>- ALI 11.91.05: last milestone is listed as utility relocations in 2028 - is this truly 2028 as the project closeout is listed in 2027 in the next ALI?<br>- ALI 11.93.05: Would recommend including The agency [Name] does not anticipate the purchase of items over $10,000 in value at this time. Any items with value over $10,000 identified during the execution of the activities under this ALI will be included via budget revision (actual value and useful life).<br>- ALI 11.93.05: Project closeout milestone is listed as 11/29/2027, but the prior ALI (11.91.05) lists utility relocations finishing in 2028? |

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

# EXHIBIT G

# DOT

# FTA

**U.S. Department of Transportation**

**Federal Transit Administration**

# Application

| | |
|---|---|
| **Federal Award Identification Number (FAIN)** | N/A |
| **Application Number** | 2879-2018-1 |
| **Temporary Application Number** | 2879-2018-1 |
| **Award Name** | City of Atlanta Pedestrian Accessibility Improvements - FFY 2015 & 2016 Transportation Alternatives (Section 133(h)) Urban |
| **Application Status** | In-Progress |
| **Budget Revisions** | 0 |

| | | | |
|---|---|---|---|
| **Period of Performance Start Date** | N/A | | |
| **Original Period of Performance End Date** | 3/30/2030 | | |
| **Current Period of Performance End Date** | 3/30/2030 | Revision #: 0 | Approved?: No |

# Part 1: Recipient Information

### Name: Atlanta, City Of

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
|---|---|---|---|---|
| 2879 | City | CITY OF ATLANTA | | 065372500 |

| Location Type | Address | City | State | Zip |
|---|---|---|---|---|
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

## Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
|---|---|
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |
| State | Georgia |

| Zipcode | 30302 |
|---|---|
| Contact Name | Gina Pagnotta |
| Telephone | 678-414-8982 |
| Fax | |
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Application Information

### Title: City of Atlanta Pedestrian Accessibility Improvements - FFY 2015 & 2016 Transportation Alternatives (Section 133(h)) Urban

| Application Number | Application Status | Award Type | Application Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| 2879-2018-1 | In-Progress | Grant | Region 4 | 12/1/2017 | 12/1/2017 | No |

**Application Executive Summary**

This grant application requests the obligation of FY 2015 and FY 2016 flexible funding transferred to and administered under the FTA Section 5307 Program for the City of Atlanta Pedestrian Accessibility Improvements.

Federal funding from the Transportation Alternatives Section 133 Urban >200K (Federal) has been flexed to the Federal Transit Administration for this project to be administered under the Urbanized Area Formula Program (5307). The anticipated funding amount for this project is $5,880,000 in federal funds and $1,470,000 in local funding to be provided by the City of Atlanta. The improvement locations were identified in the Atlanta Regional Commission (ARC) Transportation Improvement Plan AT-284, City of Atlanta Pedestrian Accessibility Improvements, and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012872).

In addition to FTAs Buy America Act, which requires that the steel, iron, and manufactured goods used in an FTA-funded project are produced in the United States (49 U.S.C. 5323(j)(1)), the Build America, Buy America Act (BABA) (Public Law 117-58, div. G 70914(a)) now requires that construction materials used in infrastructure projects are also produced in the United States. Refer to terms and conditions in FTAs Master Agreement Section 15. The BABA requirement applies to this grant, in addition to the Buy America Act, except to the extent a waiver of either requirements may apply.

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance).

The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.

**Frequency of Milestone Progress Reports (MPR)**
No Selection Made

**Frequency of Federal Financial Reports (FFR)**
No Selection Made

**Does this application include funds for research and/or development activities?**
This award does not include research and development activities.

**Pre-Award Authority**
This award is using Pre-Award Authority.

**Does this application include suballocation funds?**
Recipient organization is directly allocated these funds and is eligible to apply for and receive these funds directly.

**Will this Grant be using Lapsing Funds?**
No Selection Made

**Will indirect costs be applied to this application?**
This award does not include an indirect cost rate.

*Indirect Rate Details*: N/A

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
This project will improve pedestrian accessibility by the installation of rectangular rapid flashing beacons (RRFBs), pedestrian hybrid beacons (PHB)/HAWK signals, signal upgrades, pedestrian refuge islands, curb extensions, construction of spot upgrades, ADA improvements and sidewalks where appropriate across the City of Atlanta. Specific locations are provided in the detailed location descriptions.

**Activities to be performed:**
Installation of rectangular rapid flashing beacons (RRFBs), pedestrian hybrid beacons (PHB)/HAWK signals, signal upgrades, pedestrian refuge islands, curb extensions, construction of spot upgrades, ADA improvements and sidewalks where appropriate.

**Expected outcomes:**
This project will enhance pedestrian connectivity to transit at thirtyone (31) locations around the City of Atlanta and will include ADA improvements, sidewalk installations and drainage structure adjustments and wayfinding signage to benefit the citizens of the City of Atlanta.

**Intended beneficiaries:**
The intended beneficiaries of this project are the pedestrians and citizens of the City of Atlanta.

**Subrecipient Activities:**
None.

# Application Point of Contact Information

| First Name | Last Name | Title | E-mail Address | Phone |
|---|---|---|---|---|
| | john.crocker@dot.gov | Community Planner | | |
| | gabrielle.gusmerotti@dot.gov | General Engineer | | |
| Michele | Wynn | Director, Program Delivery | mwynn@atlantaga.gov | (678) 794-8879 |

# Application Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 5307 - Urbanized Area Formula Grants (2013 and forward) | 5307-2A | 20507 | $5,880,000 |
| Local | | | $1,470,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$7,350,000** |

## Application Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| 2879-2018-1-P1 | 119-00 (119-) | Bus Associated Transit Improvements | $5,880,000.00 | $1,470,000.00 | $7,350,000.00 | 1 |
| 2879-2018-1-P1 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $5,880,000.00 | $1,470,000.00 | $7,350,000.00 | 1 |

## Discretionary Allocations

This application does not contain discretionary allocations.

# Part 3: Project Information

## Project Title: City of Atlanta Pedestrian Accessibility Improvements

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| 2879-2018-1-P1 | 2879-2018-1-P1 | 12/1/2017 | 12/2/2022 | 2/6/2024 |

**Project Description**

This project will improve pedestrian accessibility by the installation of rectangular rapid flashing beacons (RRFBs), pedestrian hybrid beacons (PHB)/HAWK signals, signal upgrades, pedestrian refuge islands, and curb extensions, where appropriate across the City of Atlanta. Proposed project enhancements also include construction of spot upgrades and ADA improvements at numerous locations around the City of Atlanta. Specific locations are provided in the detailed location descriptions.

In addition to FTAs Buy America Act, which requires that the steel, iron, and manufactured goods used in an FTA-funded project are produced in the United States (49 U.S.C. 5323(j)(1)), the Build America, Buy America Act (BABA) (Public Law 117-58, div. G 70914(a)) now requires that construction materials used in infrastructure projects are also produced in the United States. Refer to terms and conditions in

FTAs Master Agreement Section 15. The BABA requirement applies to this grant, in addition to the Buy America Act, except to the extent a waiver of either requirements may apply.

**Project Benefits**

This project will enhance pedestrian connectivity to transit at thirty?two (32) locations around the City of Atlanta and will include ADA improvements, sidewalk installations and drainage structure adjustments and wayfinding signage to benefit the citizens of the City of Atlanta.

**Additional Information**

*None provided.*

**Location Description**

This project is anticipated to be implemented in the following twenty-two (32) locations, final locations will be determined by the final design:

• Location One (1): Garnett MARTA Transit Station at Forsyth Street and Brotherton Street
• Location Two (2): Art Center Station: Arts Center Way and 15th Street
• Location Three (3): Ashby Station at Mayson Turner Road NW and Carter Road /Lena Street Intersection
• Location Four (4): Bankhead Station at Donald Lee Hollowell (US 78/278) and Gary Avenue/ Stiff Street
Location Five (5): East Lake Station at Winter Avenue, Leland Terrace and Park Place
• Location Six (6): Edgewood Candler Station Iverson Street and Oakdale Road
• Location Seven (7): Georgia State Station at Jesse Hill Drive and Martin Luther King Jr. Drive & Decatur Street
• Location Eight (8): H.E. Holmes Station at Martin Luther King Jr. Drive and Stonehurst Place & Burton Road
• Location Nine (9): West Lake Station at Browning Road and Anderson Avenue
• Location Ten (10): Inman Park/Reynoldstown Station at Seaboard Avenue/MARTA Bus loading zone
• Location Eleven (11): King Memorial Station at Decatur Street and Jackson & Decatur Street and WH Borders
• Location Twelve (12): Lenox Station at East Paces Ferry
• Location Thirteen (13): Oakland City Station: Campbellton Road and Oakland Drive
• Location Fourteen (14): West End Station at Lee Street and York Avenue/Beecher
• Location Fifteen (15): Vine City Transit Station Carter/Maple Intersection
• Location Sixteen (16): Columbia Heritage Senior Residences at 1900 Perry Blvd. NW
• Location Seventeen (17): Marietta Road Highrise at 2295 Marietta Road NW
• Location Eighteen (18): Jonnie B. Moore Senior Facility at 2451 Donald Lee Hollowell Parkway
• Location Nineteen (19): Avalon Park at 2798 Peek Road NW
• Location Twenty (20): The Manor at Scotts Crossing at 1671 James Jackson Parkway
• Location twenty-one (21): Friendship Tower Senior Center at 35 Northside Drive
• Location twenty-two (22): Silvertree Seniors of Atlanta at 359 West Lake Avenue
• Location twenty-three (23): Ashton Browns Mill at 500 Cleveland Avenue
• Location twenty-four (24): Betmar Village at 345 Ashwood Avenue
• Location twenty-five (25): Columbia High Point at 220 Bowen Circle
• Location twenty-six (26): Lakewood Christian Manor at 2141 Springdale Road
• Location twenty-seven(27): Trinity Towers at 2611 Springdale Road
• Location twenty-eight (28): Renaissance at Park Place at 240 Amal Drive
• Location twenty-nine (20): Golf Vista at 445 Cleveland Avenue
• Location thirty (30): Lillie R. Campbell House at 1830 Campbellton Road
• Location thirty-one (31): Heritage Station at 765 McDaniel Street

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
| --- | --- |

| 130200 | Atlanta, GA |
|---|---|

## Congressional District Information

| District | State |
|---|---|
| 4 | Georgia |
| 6 | Georgia |
| 5 | Georgia |
| 2 | Georgia |

## Program Plan Information

**STIP/TIP**
Date: Not Provided
Description: Page 146 of The Atlanta Region Plan FY 2018-2023 Transportation Improvement Program AT-284

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 5307 - Urbanized Area Formula Grants (2013 and forward) | 5307-2A | 20507 | $5,880,000 |
| Local | | | $1,470,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$7,350,000** |

## Project Budget

| Project Number | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|

| 2879-2018-1-P1 | 119-00 (119-) | Bus Associated Transit Improvements | $5,880,000.00 | $1,470,000.00 | $7,350,000.00 | 1 |
| 2879-2018-1-P1 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $5,880,000.00 | $1,470,000.00 | $7,350,000.00 | 1 |

## Project Budget Activity Line Items

**Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCTION | 1 |

**Extended Budget Description**

This Activity Line Item (ALI) will fund the installation of rectangular rapid flashing beacons (RRFBs), pedestrian hybrid beacons (PHB)/HAWK signals, signal upgrades, pedestrian refuge islands, curb extensions, construction of spot upgrades, ADA improvements and sidewalks installations and improvements where appropriate across the City of Atlanta. The useful life of the thermoplastic pavement markings is five (5) years. The useful life of flexible delineator post, separators, and reflectors is four (4) years.

• Curb Bulb Outs which have and estimated useful life of 25 years, depending on location and volume of traffic in the area.
• Rapid Rectangular Flashing Beacons, which have an estimated useful life of 15 Years.
• Pedestrian Hybrid Beacon Crossing, which have an estimated useful life of 15 Years.
• Pedestrian Lights, which have an estimated useful life of 10 Years, and
• ADA sidewalk ramps which have an estimated useful life of 15 Years, depending on volume of traffic and usage.
• Restriping and pavement markings which have an estimated useful life of 5 years (thermoplastic).

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 5307 - Urbanized Area Formula Grants (2013 and forward) | 5307-2A | 20507 | $5,880,000 |
| Local | | | $1,470,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$7,350,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Construction Procurement ITB | 12/2/2022 | This milestone includes all the elements required for construction procurement to include bid advertisement, bid evaluation and award, legislative approval, contract execution and issuance of purchase order for progress payments. |
| Construction | 12/5/2023 | This milestone includes overall construction activities from notice to proceed (NTP) through substantial completion |
| Project Closeout | 2/6/2024 | This milestone includes each of the project activities involved in the project closeout to include, contractor punch-list, final acceptance, closeout documentation, final payment, and project finish. |

## Project Environmental Findings

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects that do not have a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. FTA requires a sufficient project description to support a CE determination. The project may require additional documentation to comply with other environmental laws.

**Categorical Exclusion Description**

Type 05: Activities, including repairs, replacements, and rehabilitations, designed to promote transportation safety, security, accessibility and effective communication within or adjacent to existing right-of-way, such as: the deployment of Intelligent Transportation Systems and components; installation and improvement of safety and communications equipment, including hazard elimination and mitigation; installation of passenger amenities and traffic signals; and retrofitting existing transportation vehicles, facilities or structures, or upgrading to current standards.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 11/9/2022 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | 1 | $5,880,000.00 | $7,350,000.00 |

# Part 4: Fleet Details

No fleet data exists for this application.

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 12/13/2023 |
| Comment | Please see the following initial comments: Please add the following language to the Executive Summary: In addition to FTAs Buy America Act, which requires that the steel, iron, and manufactured goods used in an FTA-funded project are produced in the United States (49 U.S.C. 5323(j)(1)), the Build America, Buy America Act (BABA) (Public Law 117-58, div. G 70914(a)) now requires that construction materials used in infrastructure projects are also produced in the United States. Refer to terms and conditions in FTAs Master Agreement Section 15. The BABA requirement applies to this grant, in addition to the Buy America Act, except to the extent a waiver of either requirements may apply. The Five Points Station ADA was not cleared (pending more information) due to potential segmentation with the MARTA Five Points Station project, so please remove Five Points from the list of locations in the Project Description. |

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 2/9/2024 |
| Comment | Please see the following comments: Technical Comments: In executive summary please add: 1. The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance). 2. The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list. In project benefits thirty two is written as 'thirty?two'. In extended budget descriptions: 1. The recipient should identify the method used to determine the minimum useful life. Please provide where useful life data came from (i.e. industry standards?) 2. Additionally, please remove the 'estimated'. Civil Rights Comments: The Title VI and DBE Goals have expired. Please work with FTA's Office of Civil Rights (TCR) to update them for review. |

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 2/11/2025 |
| Comment | Please see the following comments: Technical Comments: In executive summary please add: 1. The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement |

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

policies as defined in C4220.1F (Third Party Contracting Guidance).
2. The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.

In project benefits thirty two is written as 'thirty?two'.

In extended budget descriptions:
1. The recipient should identify the method used to determine the minimum useful life. Please provide where useful life data came from (i.e. industry standards?)
2. Additionally, please remove the 'estimated'.

| Comment By | John Crocker |
|---|---|
| Comment Type | Pre-Award Manager Returns Application |
| Date | 2/14/2025 |
| Comment | Please create a new application that addresses the Technical comments:<br>In executive summary please add:<br>o 1. The Recipient or Sub-recipient (when applicable) will follow all 3rd party procurement policies as defined in C4220.1F (Third Party Contracting Guidance).<br>o 2. The Recipient or Sub-recipient (when applicable) will ensure contractors procured will not be on the FTA Suspension and Debarment list.<br>In project benefits thirty two is written as 'thirty?two'.<br>In extended budget descriptions:<br>o 1. The recipient should identify the method used to determine the minimum useful life. Please provide where useful life data came from (i.e. industry standards?)<br>o 2. Additionally, please remove the 'estimated'. |

# EXHIBIT H

# DOT

# FTA

**U.S. Department of Transportation**

**Federal Transit Administration**

# Award

| Federal Award Identification Number (FAIN) | GA-2017-027 |
| --- | --- |
| Award with Amendment Number | GA-2017-027-00 |
| Temporary Application Number | 2879-2016-3 |
| Award Name | City of Atlanta Bike-Ped Mobility Improvements Program - FFY 2014 & 2015 Surface Transportation Program (STP) Urban |
| Award Status | Active (Executed) |
| Budget Revisions | 3 |

| Period of Performance Start Date | N/A | | |
| --- | --- | --- | --- |
| Original Period of Performance End Date | N/A | | |
| Current Period of Performance End Date | N/A | Revision #: 0 | Approved?: Yes |

# Part 1: Recipient Information

| Name: Atlanta, City Of |
| --- |

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
| --- | --- | --- | --- | --- |
| 2879 | City | CITY OF ATLANTA | | 065372500 |

| Location Type | Address | City | State | Zip |
| --- | --- | --- | --- | --- |
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

# Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
| --- | --- |
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |

| State | Georgia |
|---|---|
| Zipcode | 30302 |
| Contact Name | Gina Pagnotta |
| Telephone | 678-414-8982 |
| Fax | |
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Award Information

**Title: City of Atlanta Bike-Ped Mobility Improvements Program - FFY 2014 & 2015 Surface Transportation Program (STP) Urban**

| Award with Amendment Number | Award Status | Award Type | Award Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| GA-2017-027-00 | Active (Executed) | Grant | Region 4 | 8/23/2016 | 8/23/2016 | No |

**Award Executive Summary**
Budget Revision Request #1 is for a period of performance extension to 03/30/2027.

_____
_____
_____
_____

This grant application request the obligation of $4,000,000 (federal share) of FY 2014 and FY 2015 flexible funding transferred to and administered under the FTA Section 5307 Program for the City of Atlantas (CoA) Mobility Improvements, which includes essential components of the CoAs overall multi-modal transportation network. These funds are programmed from the following sources: Cycle Atlanta Phase 1.0 - Bicycle Mobility Improvements: $360,000 (federal share) in FY 2014 and $1,640,000 ( federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-277) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012593); Campbellton Road Pedestrian Mobility Improvements: $120,000 (federal share) in FY 2014 and $880,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-275) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012591); and Cleveland Avenue Pedestrian Mobility Improvements: $120,000 (federal share) in FY 2014 and $880,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-274) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012590).

Cycle Atlanta: Phase 1.0 - Bicycle Mobility Improvements: This project will improve safe access and connectivity for bicyclists to transit by implementing and constructing dedicated and protected bicycle lanes and potentially multi-use paths. This project will provide improved bicycle access to six (6) MARTA Rail stations and twenty-one (21) MARTA bus routes throughout the project corridor.

Campbellton Road - Pedestrian Mobility Improvements: This project will improve safe access to transit for pedestrians by constructing mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, optimizing right of way, and other pedestrian mobility and safety improvements. The project will provide safe access and connectivity for pedestrians and bicyclist to MARTA bus route #83, one of the busiest in the MARTA system, as well as bus routes #66, #81, #162, and #183.

Cleveland Avenue - Pedestrian Mobility Improvements: This project will improve safe access to transit for pedestrians by constructing mid-block crosswalks, rectangular rapid flashing beacons, pedestrian refuge islands and other pedestrian mobility and safety improvements along Cleveland Avenue.This project will help improve pedestrian mobility and access to MARTA bus route #78 and #95, two of the busiest in the system, as well as routes #178, and #193 and help increase pedestrian activity throughout the project area.

The projects listed above are eligible activities under the The Surface Transportation Block Grant ( STBG) Program, formally known as Surface Transportation Program (STP) under MAP-21. Under the Fast Act, the STBG Program provides flexible funding that may be used by States and localities for projects to preserve and improve the conditions and performance on any Federal-aid highway, bridge and tunnel projects on any public road, pedestrian and bicycle infrastructure, and transit capital projects, including intercity bus terminals.

Award Start Date: The award start date will be the same date this grant is awarded in TrAMS.
Award End Date: March 30, 2027

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funding identified above is consistent with the TIP pages and Flex Confirmation email attached with this application.

The projects included in this grant application have received an Environmental Classification of a Listed Categorical Exclusion from FTA Region IV Staff (see attached email confirmations).

**Frequency of Milestone Progress Reports (MPR)**
Quarterly

**Frequency of Federal Financial Reports (FFR)**
Quarterly

**Pre-Award Authority**
This award is using Pre-Award Authority.

**Will this Grant be using Lapsing Funds?**
No, this Grant does not use Lapsing Funds.

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
To improve safe access and connectivity for bicyclists to transit by implementing and constructing dedicated and protected bicycle lanes.
Improve safe access to transit for pedestrians by constructing mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, optimizing right of way, and other pedestrian mobility and safety improvements.
Improve pedestrian mobility and access to MARTA bus routes.

**Activities to be performed:**
Constructing mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, optimizing right of way, and other pedestrian mobility and safety improvements

**Expected outcomes:**

Increased safe access and connectivity for bicyclists and increased pedestrian activity throughout the project area.

**Intended beneficiaries:**
City of Atlanta pedestrians and bicyclists

**Subrecipient Activities:**
None

## Award Point of Contact Information

| First Name | Last Name | Title | E-mail Address | Phone |
|---|---|---|---|---|
| | | gabrielle.gusmerotti@dot.gov  General Engineer | | |
| Jacqueline | Chester | Grants Manager | jchester@atlantaga.gov | (470) 889-9568 |
| | | richelle.gosman@dot.gov  Lead Transportation Program Specialist | | |

## Award Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $4,000,000 |
| Local | | | $1,000,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$5,000,000** |

## Award Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2017-027-01-00 | 119-00 (119-A2) | Bus Associated Transit Improvements | $2,000,000.00 | $500,000.00 | $2,500,000.00 | 0 |
| GA-2017-027-01-00 | 11.91.06 | ENG/DESIGN BICYCLE ACCESS, FACIL & | $400,000.00 | $100,000.00 | $500,000.00 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| GA-2017-027-01-00 | | 11.93.06 | EQUIP ON BUSES<br><br>CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES | $1,600,000.00 | $400,000.00 | $2,000,000.00 | 0 |
| GA-2017-027-02-00 | 119-00 (119-A3) | Bus Associated Transit Improvements | $1,000,000.00 | $250,000.00 | $1,250,000.00 | 0 |
| GA-2017-027-02-00 | | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | $200,000.00 | $50,000.00 | $250,000.00 | 0 |
| GA-2017-027-02-00 | | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $800,000.00 | $200,000.00 | $1,000,000.00 | 0 |
| GA-2017-027-03-00 | 119-00 (119-A1) | Bus Associated Transit Improvements | $1,000,000.00 | $250,000.00 | $1,250,000.00 | 0 |
| GA-2017-027-03-00 | | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | $200,000.00 | $50,000.00 | $250,000.00 | 0 |
| GA-2017-027-03-00 | | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $800,000.00 | $200,000.00 | $1,000,000.00 | 0 |

## Discretionary Allocations

This application does not contain discretionary allocations.

## Sources of Federal Financial Assistance

| PO Number | Project Number | Scope Name | Scope Number | Scope Suffix | UZA Code | Area Name | Account Class Code | FPC | Description | Amendment Amount | Cumulative Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GA-95-X 044 | GA-2017 -027-01- 00 | Bus Asso ciated Tr ansit Imp rovement s | 119-00 ( 119) | A2 | 1302 00 | Atlant a, GA | 2015.45.9 5.SX.2 | 00 | FHWA flex trf to 5307 - ST P | $2,000,000 | $2,000,000 |
| GA-95-X 044 | GA-2017 -027-02- 00 | Bus Asso ciated Tr ansit Imp rovement s | 119-00 ( 119) | A3 | 1302 00 | Atlant a, GA | 2015.45.9 5.SX.2 | 00 | FHWA flex trf to 5307 - ST P | $1,000,000 | $1,000,000 |

| GA-95-X 044 | GA-2017 -027-03- 00 | Bus Asso ciated Tr ansit Imp rovement s | 119-00 ( 119) | A1 | 1302 00 | Atlant a, GA | 2015.45.9 5.SX.2 | 00 | FHWA flex trf to 5307 - ST P | $1,000,000 | $1,000,000 |

# Part 3: Project Information

## Project Title: Cycle Atlanta: Phase 1.0 - Bicycle Mobility Improvements

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-2017-027-01-00 | 2879-2016-3-P1 | 8/23/2016 | 8/11/2017 | 1/28/2020 |

**Project Description**
This project will provide safe access to transit for bicyclist by implementing protected bicycle lanes along Courtland Street, Gilmer Street, and Ralph McGill Boulevard; and potentially multiuse paths on 10th Street and 8th Street. Additionally, bicycle lanes will be constructed and improved along Brady Ave, Ivan Allen Jr. Boulevard and Ralph McGill Blvd. Enhancements will also be made in the form of contra-flow bicycle lanes along Porter Place and Walton Street. This project is identified in the City of Atlanta's Cycle Atlanta Phase 1.0 Study, an appendix to the 2008 Connect Atlanta Plan.

**Project Benefits**
This project will fill numerous gaps in the City's existing bicycle infrastructure and reduce stressful and unsafe conditions for people seeking a safe route to transit. This project will provide improved bicycle access to six (6) MARTA Rail stations and twenty-one (21) MARTA bus routes throughout the project corridor (see Transit Nexus Map).

**Additional Information**
*None provided.*

**Location Description**
This project will be implemented in the following nine (9) locations:

• Location One (1): Courtland Street (Ralph McGill Blvd to Ponce de Leon): This section of the project will begin at Ponce de Leon Avenue and terminate at Ralph McGill Boulevard.

• Location Two (2): Courtland Street/Washington Street (Gilmer Street to Memorial Drive): This section of the project will begin at Gilmer Street and terminate at Memorial Drive.

• Location Three (3): Gilmer Street (Peachtree Center Avenue to Jesse Hill Jr Drive): This section of the project will begin at Peachtree Center Avenue and terminate at Jesse Hill Jr. Drive.

• Location Four (4): Peachtree Street and Ralph McGill Boulevard (Peachtree Center Avenue to Courtland Street): This section of the project will begin at Peachtree Center Avenue and terminate at Courtland Street.

• Location Five (5): Porter Place (West Peachtree Street to Peachtree Street): This section of the project will begin at West Peachtree Street and terminate at Peachtree Street

• Location Six (6): Walton Street (Peachtree Street to Centennial Olympic Park Drive): This section of the project will begin at Peachtree Street and terminate at Centennial Olympic Park Drive.

• Location Seven (7): 8th Street (Brady Street to Hemphill): This section of the project will begin at Brady Street and terminate at Hemphill Avenue.

• Location Eight (8): 10th Street (Atlantic Drive and Howell Mill Road): This section of the project will

begin at Atlantic Drive and terminate at Howell Mill Road.

• Location Nine (9): Brady Avenue (Howell Mill Road to West Marietta Street): This section of the project will begin at Howell Mill Road and terminate at West Marietta Street.

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

## Congressional District Information

| District | State |
|---|---|
| 5 | Georgia |

## Program Plan Information

**STIP/TIP**
Date: N/A
Description: N/A

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $2,000,000 |
| Local | | | $500,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,500,000** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2017-027-01-00 | 119-00 (119-A2) | Bus Associated Transit Improvements | $2,000,000.00 | $500,000.00 | $2,500,000.00 | 0 |
| GA-2017-027-01-00 | 11.91.06 | ENG/DESIGN BICYCLE ACCESS, FACIL & EQUIP ON BUSES | $400,000.00 | $100,000.00 | $500,000.00 | 0 |
| GA-2017-027-01-00 | 11.93.06 | CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES | $1,600,000.00 | $400,000.00 | $2,000,000.00 | 0 |

## Project Budget Activity Line Items

**Budget Activity Line Item: 11.91.06 - ENG/DESIGN BICYCLE ACCESS, FACIL & EQUIP ON BUSES**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.06 | ENG/DESIGN BICYCLE ACCESS, FACIL & EQUIP ON BUSES | ENGINEERING/DESIGN (TRANSIT ENHANCEMENTS) | 0 |

**Extended Budget Description**

This Activity Line Item (ALI) and budget will fund outside Professional Engineering Services to design new protected bicycle lanes, improvements to existing bicycle lanes where warranted, and enhancements in the form of contra-flow bicycle lanes.

**Will 3rd Party contractors be used to fulfill this activity line item?**

Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $400,000 |
| Local | | | $100,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |

| | | | |
|---|---|---|---|
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$500,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 8/11/2017 | Advertise Request for Proposal for Professional Engineering. |
| PE Contract Award | 10/6/2017 | Award contract to Professional Engineering firm. |
| Final Project Design | 10/5/2018 | Project design complete. |

**Budget Activity Line Item: 11.93.06 - CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.06 | CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES | CONSTRUCTION | 0 |

**Extended Budget Description**

This Activity Line Item (ALI) will fund the construction of new protected bicycle lanes (flexible delineator posts, thermoplastic pavement markings, separators, reflectors), improvements to existing bicycle lanes where warranted (flexible delineator posts, thermoplastic pavement markings, separators, and reflectors), and enhancements in the form of contra-flow bicycle lanes ( thermoplastic pavement markings, separators, reflectors) . The useful life of the thermoplastic pavement markings is five (5) years. The useful life of flexible delineator post, separators, and reflectors is four (4) years.

**Will 3rd Party contractors be used to fulfill this activity line item?**

Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,600,000 |
| Local | | | $400,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,000,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 11/28/2018 | RFP advertisement for construction. |

| Contract Award Date | 6/20/2019 | Award of contract for construction. |
|---|---|---|
| End Date | 1/28/2020 | Project completion date. |

## Project Environmental Findings

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 05: Activities, including repairs, replacements, and rehabilitations, designed to promote transportation safety, security, accessibility and effective communication within or adjacent to existing right-of-way, such as: the deployment of Intelligent Transportation Systems and components; installation and improvement of safety and communications equipment, including hazard elimination and mitigation; installation of passenger amenities and traffic signals; and retrofitting existing transportation vehicles, facilities or structures, or upgrading to current standards.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 4/4/2017 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.06 | CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES | 0 | $1,600,000.00 | $2,000,000.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 4/4/2017 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|

| Bus Associated Transit Improvements (119-00) | 11.91.06 | ENG/DESIGN BICYCLE ACCESS, FACIL & EQUIP ON BUSES | 0 | $400,000.00 | $500,000.00 |
|---|---|---|---|---|---|

## Project Title: Campbellton Road - Pedestrian Mobility Improvements

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-2017-027-02-00 | 2879-2016-3-P3 | 8/23/2016 | 8/7/2017 | 2/25/2021 |

### Project Description

This project involves constructing mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, Right-of-Way (ROW) optimization, and other pedestrian mobility and safety improvements along the two (2) five lane sections of Campbellton Road between Greenbriar Parkway and Dodson Drive and between Wells Drive and Pinehurst Drive.

### Project Benefits

The project will provide safe access and connectivity for pedestrians and bicyclist to MARTA bus route # 83, one of the busiest in the MARTA system, as well as bus routes #66, #81, #162, and #183. This project is within a defined Equitable Target Area and will improve access and connectivity for individuals to employment and commercial centers, schools and other major origins and destinations throughout the project corridor. This project will also increase bicyclist and pedestrian activity within the project area.

### Additional Information

As a result of this resurfacing, all current crosswalks and pedestrian crossing ramps will be restriped and/or replaced to ensure ADA compliance. Additionally, Campbellton Road is one of the Transportation Communications Corridors (TCC) which will optimize signal operations and the communications network. The proposed Pedestrian Hybrid Beacons (PHB) listed below will seamlessly tie-in to the upgraded TCC network to reduce vehicular delay while also providing safe and convenient midblock crossings

### Location Description

This project will be implemented in the following twelve (12) locations:

o Location One (1): This section of the project will begin at Campbellton Road SW and terminate at Star Mist Drive SW.

o Location Two (2): This section of the project will begin at Campbellton Road SW and terminate at Childress Street SW.

o Location Three (3): This section of the project will begin at Campbellton Road SW and terminate at Maxwell Street SW.

o Location Four (4): This section of the project will begin at Campbellton Road SW and terminate west of Fire Station No. 5.

o Location Five (5): This section of the project will begin at Campbellton Road SW and terminate at Harbin Road SW.

o Location Six (6): This section of the project will be located on Campbellton Road SW, west of Willis Mill Road and east of Wells Drive.

o Location Seven (7): This section of the project will begin at Campbellton Road SW and terminate at Bent Creek Way.

o Location Eight (8): This section of the project will begin at Campbellton Road SW and terminate at Willis Mill Road.

o Location Nine (9): This section of the project will begin at and terminate at 2231 Campbellton Road SW (Adams Park Library) Crossing.

o Location Ten (10): This section of the project will begin at Campbellton Road SW and terminate at Delowe Drive.

o Location Eleven (11): This section of the project will begin at Campbellton Road SW and terminate at Centra Villa Drive.

o Location Twelve (12): This section of the project will begin at Campbellton Road SW and terminate at Honeysuckle Lane.

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

## Congressional District Information

| District | State |
|---|---|
| 5 | Georgia |

## Program Plan Information

**STIP/TIP**
Date: N/A
Description: N/A

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $250,000 |

| | | |
|---|---|---|
| Local/In-Kind | | $0 |
| State | | $0 |
| State/In-Kind | | $0 |
| Other Federal | | $0 |
| Transportation Development Credit | | $0 |
| Adjustment | | $0 |
| **Total Eligible Cost** | | **$1,250,000** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2017-027-02-00 | 119-00 (119-A3) | Bus Associated Transit Improvements | $1,000,000.00 | $250,000.00 | $1,250,000.00 | 0 |
| GA-2017-027-02-00 | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | $200,000.00 | $50,000.00 | $250,000.00 | 0 |
| GA-2017-027-02-00 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $800,000.00 | $200,000.00 | $1,000,000.00 | 0 |

## Project Budget Activity Line Items

| Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS |
|---|

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCTION | 0 |

**Extended Budget Description**

This Activity Line Item (ALI) will fund the construction of mid-block crosswalks, pedestrian refuge islands, sidewalk extensions, ADA ramps, pedestrian hybrid beacons, signal heads and push buttons. The useful life of the mid-block crosswalks (thermoplastic) is five (5) years. The useful life of the pedestrian hybrid beacons and rapid flashing beacons, pedestrian push buttons and signal heads is ten (10) years. The useful life of the pedestrian refuge islands is fifteen (15) years. The useful life of the sidewalk extensions and ADA ramps (concrete) is 20 years.

**Will 3rd Party contractors be used to fulfill this activity line item?**

Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $800,000 |
| Local | | | $200,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,000,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 6/28/2019 | This is the proposed RFP advertisement date to solicit Construction Services for the implementation of the Campbellton Road Pedestrian Mobility Improvements project. . |
| Contract Award | 12/30/2019 | This is the proposed contract award date for construction of the Campbellton Road Pedestrian Mobility Improvements project. |
| Substantial Completion | 2/25/2021 | This is the proposed substantial completion of project construction for the Campbellton Road Pedestrian Mobility Improvements project. |

**Budget Activity Line Item: 11.91.05 - ENG/DESIGN PED ACCESS / WALKWAYS**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | ENGINEERING/DESIGN (TRANSIT ENHANCEMENTS) | 0 |

**Extended Budget Description**

This Activity Line Item (ALI) will fund the design of mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, right-of-way optimization and other pedestrian mobility and safety improvements.

**Will 3rd Party contractors be used to fulfill this activity line item?**

Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $200,000 |
| Local | | | $50,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |

| Other Federal | | | $0 |
|---|---|---|---|
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$250,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 8/7/2017 | This is the proposed advertisement date to solicit Request for Proposals for outside Professional Engineering Services to design the Campbellton Road Pedestrian Mobility Improvements project |
| Contract Award Date | 11/7/2017 | Contract award date for outside Professional Engineering Services and the notice to proceed to begin design of the Campbellton Road Pedestrian Mobility Improvements project. |
| Design Completion | 10/1/2018 | Proposed date for completion of the design plans for the Campbellton Road Pedestrian Mobility Improvements project. |

## Project Environmental Findings

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 3/29/2016 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | 0 | $200,000.00 | $250,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment

and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

### Categorical Exclusion Description

Type 05: Activities, including repairs, replacements, and rehabilitations, designed to promote transportation safety, security, accessibility and effective communication within or adjacent to existing right-of-way, such as: the deployment of Intelligent Transportation Systems and components; installation and improvement of safety and communications equipment, including hazard elimination and mitigation; installation of passenger amenities and traffic signals; and retrofitting existing transportation vehicles, facilities or structures, or upgrading to current standards.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 3/29/2016 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | 0 | $800,000.00 | $1,000,000.00 |

## Project Title: Cleveland Avenue - Pedestrian Mobility Improvements

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-2017-027-03-00 | 2879-2016-3-P4 | 8/23/2016 | 8/11/2017 | 12/31/2020 |

### Project Description
This project involves constructing mid-block crosswalks, rectangular rapid flashing beacons, pedestrian refuge islands and other pedestrian mobility and safety improvements along Cleveland Avenue between US 19/41 (Metropolitan Parkway) and Jonesboro Road. Improvements will include pedestrian safety enhancements along Cleveland Avenue from US Hwy 41/SR 3 (Metropolitan Parkway) to Jonesboro Road..

### Project Benefits
This project will help improve pedestrian mobility and access to MARTA bus route #78 and #95, two of the busiest in the system, as well as routes #178, and #193 and help increase pedestrian activity throughout the project area. This project is within a defined Equitable Target Area and will improve access and connectivity for individuals to employment and commercial centers, schools and other major origins and destinations throughout the project corridor.

### Additional Information
*None provided.*

### Location Description
This project is anticipated to be implemented in the following fourteen (14) locations, final locations will be determined by the final design:

• Location One (1): This section of the project is at the intersection of Cleveland Avenue and Metropolitan Parkway (US-19/41).

• Location Two (2): This section of the project is at the intersection of Cleveland Avenue and Dearwood Drive.

• Location Three (3): This section of the project is at the intersection of Cleveland Avenue and Third

Avenue.

• Location Four (4): This section of the project is at the intersection of Cleveland Avenue and Beeler Drive.

• Location Five (5): This section of the project is at the intersection of Cleveland Avenue and Forrest Hills Drive.

• Location Six (6): This section of the project is at the intersection of Cleveland Avenue and (I-75 Northbound Entrance and Exit Ramps).

• Location Seven (7): This section of the project is at the intersection of Cleveland Avenue and Steele Avenue (refuge island, bulb-out, crosswalk, stop bars, striping).

• Location Eight (8): This section of the project will begin and terminate at 199 Cleveland Avenue and Steele Avenue (sidewalk,reset concrete curb).

• Location Nine (9): This section of the project is at the intersection of Cleveland Avenue and Old Hapeville Road.

• Location Ten (10): This section of the project is at the intersection of Cleveland Avenue and Macon Drive.

• Location Eleven (11): This section of the project is at the intersection of Cleveland Avenue and Lois Street.

• Location Twelve (12): This section of the project is at the intersection of Cleveland Avenue and Browns Mill Road.

• Location Thirteen (13): This section of the project is at the intersection of Cleveland Avenue and Altaview Drive.

• Location Fourteen (14): This section of the project is at the intersection of Cleveland Avenue and Southtowne Trail (250' east of Fairlane Drive).

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

## Congressional District Information

| District | State |
|---|---|
| 5 | Georgia |

## Program Plan Information

**STIP/TIP**
Date: N/A
Description: N/A

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $250,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,250,000** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2017-027-03-00 | 119-00 (119-A1) | Bus Associated Transit Improvements | $1,000,000.00 | $250,000.00 | $1,250,000.00 | 0 |
| GA-2017-027-03-00 | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | $200,000.00 | $50,000.00 | $250,000.00 | 0 |
| GA-2017-027-03-00 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $800,000.00 | $200,000.00 | $1,000,000.00 | 0 |

## Project Budget Activity Line Items

| Budget Activity Line Item: 11.91.05 - ENG/DESIGN PED ACCESS / WALKWAYS |
|---|

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|

| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | ENGINEERING/DESIGN (TRANSIT ENHANCEMENTS) | 0 |

### Extended Budget Description

This Activity Line Item (ALI) will fund outside Professional Engineering Services to design the mid-block crosswalks, rectangular rapid flashing beacons, pedestrian refuge islands and other pedestrian mobility and safety improvements for this project.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $200,000 |
| Local | | | $50,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$250,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 8/11/2017 | Advertise Request for Proposal for Professional Engineering Services to design the Boulevard Pedestrian Mobility Improvements. |
| PE Contract Award | 10/2/2018 | Award contract to Professional Engineering firm and the notice to proceed with the design of the Boulevard Pedestrian Mobility Improvements. |
| Project Design Final | 4/1/2019 | Project Design Complete. |

### Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCTION | 0 |

### Extended Budget Description

This Activity Line Item (ALI) will fund the construction of mid-block crosswalks, pedestrian refuge islands, bulb-outs, hybrid beacons, rapid flashing beacons, pedestrian push buttons and pedestrian signal heads for this project. The useful life of the mid-block crosswalks (thermoplastic) is five (5) years. The useful life of the pedestrian hybrid beacons and rapid flashing beacons, pedestrian push buttons and signal heads is ten (10) years. The useful life of the pedestrian refuge islands and bulb-outs is fifteen (15) years.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $800,000 |
| Local | | | $200,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,000,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 4/2/2019 | Advertise Request for Proposal for Construction Services to implement the Boulevard Pedestrian Mobility Improvements project. |
| Construction Contract Award | 7/1/2019 | Award contract and give contractor the notice to proceed with the construction of the Boulevard Pedestrian Mobility Improvements. |
| Substantial Completion | 10/30/2020 | Substantial completion of the project, conduct inspection and walk through of the project site. |
| End Date | 12/31/2020 | Confirm project completion and begin project and grant closeout activities. |

## Project Environmental Findings

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 05: Activities, including repairs, replacements, and rehabilitations, designed to promote transportation safety, security, accessibility and effective communication within or adjacent to existing right-of-way, such as: the deployment of Intelligent Transportation Systems and components; installation and improvement of safety and communications equipment, including hazard elimination and mitigation; installation of passenger amenities and traffic signals; and retrofitting existing transportation vehicles, facilities or structures, or upgrading to current standards.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 4/11/2017 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | 0 | $800,000.00 | $1,000,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 4/11/2017 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | 0 | $200,000.00 | $250,000.00 |

# Part 4: Fleet Details

No fleet data exists for this application.

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 6/26/2017 |
| Comment | 1. Application.<br>a. Attach Form 1579.<br>b. Include total funding number included in this application in first sentence of App Exec Summary.<br>c. Reference attached CE confirmation emails from FTA EPS in App Exec Summary<br>2. Project 1. Environmental Findings. 11.91.06. Construction phase of this project will fall under C05. Eng/Design should be assigned C04.<br>3. Project 2. Environmental Findings. 11.91.05. Construction phase of this project will fall under C05. Eng/Design should be assigned C04. |

4. Project 2. Environmental Findings. 11.93.05. Construction phase of this project will fall under C05. Eng/Design should be assigned C04.

## Application Review Comments

| Comment By | Kenyata Smiley |
|---|---|
| Comment Type | Application Details |
| Date | 6/26/2017 |
| Comment | 1. Application<br><br>a. Attach Form 1579. FHWA Region IV and GDOT does not provide the Grantee with a copy of the Form 1579.<br><br>b. Include total funding number included in this application in first sentence of App Exec Summary. The App Exec Summary has been updated to reflect the total funding number in the first sentence.<br><br>c. Reference attached CE confirmation emails from FTA EPS in App Exec Summary. The CE confirmation emails have been referenced.<br><br>2. Project 1. Environmental Findings. 11.91.06. Construction phase of this project will fall under C05. Eng/Design should be assigned C04. This Environmental Finding item has been updated to reflect C04.<br>3. Project 2. Environmental Findings. 11.91.05. Construction phase of this project will fall under C05. Eng/Design should be assigned C04. This Environmental Finding item has been updated to reflect C04.<br><br>4. Project 2. Environmental Findings. 11.93.05. Construction phase of this project will fall under C05. Eng/Design should be assigned C04. This Environmental Finding item has been updated to reflect C04. |

## Application Review Comments

| Comment By | Kenyata Smiley |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 3/24/2020 |
| Comment | This budget revision is to request that the period of performance for this grant be extended to December 29, 2023. |

| Comment By | Patrick Winders |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 3/26/2020 |
| Comment | |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 8/7/2023 |
| Comment | This budget revision is to request consideration that the period of performance for this grant be extended from December 29, 2023 to March 30, 2026. |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 8/15/2023 |
| Comment | |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/24/2025 |
| Comment | Budget Revision Request #3 is for a period of performance extension to 03/30/2027. |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 6/25/2025 |
| Comment | PoP extension request. |

# Part 6: Agreement

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**GRANT AGREEMENT**
**(FTA G-23, October 1, 2016)**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Grant Agreement, FTA has obligated and awarded federal assistance as provided below. Upon execution of this Grant Agreement by the Recipient named below, the Recipient affirms this FTA Award, enters into this Grant Agreement with FTA, and binds its compliance with the terms of this Grant Agreement.

The following documents are incorporated by reference and made part of this Grant Agreement:
(1) "Federal Transit Administration Master Agreement," FTA MA(23), October 1, 2016,
http://www.fta.dot.gov,
(2) The Certifications and Assurances applicable to the FTA Award that the Recipient has selected and

provided to FTA, and

(3) Any Award notification containing special conditions or requirements, if issued.

WHEN THE TERM "FTA AWARD" OR "AWARD" IS USED, EITHER IN THIS GRANT AGREEMENT OR THE APPLICABLE MASTER AGREEMENT, "AWARD" ALSO INCLUDES ALL TERMS AND CONDITIONS SET FORTH IN THIS GRANT AGREEMENT.

FTA OR THE FEDERAL GOVERNMENT MAY WITHDRAW ITS OBLIGATION TO PROVIDE FEDERAL ASSISTANCE IF THE RECIPIENT DOES NOT EXECUTE THIS GRANT AGREEMENT WITHIN 90 DAYS FOLLOWING FTA's AWARD DATE SET FORTH HEREIN.

## FTA AWARD

Federal Transit Administration (FTA) hereby awards a Federal grant as follows:

### Recipient Information

Recipient Name:  Atlanta, City Of

Recipient ID:  2879

UEI:

DUNS:  065372500

### Award Information

Federal Award Identification Number (FAIN):  GA-2017-027

Award with Amendment Number:  GA-2017-027-00

Award Name:  City of Atlanta Bike-Ped Mobility Improvements Program - FFY 2014 & 2015 Surface Transportation Program (STP) Urban

Award Executive Summary:  Budget Revision Request #1 is for a period of performance extension to 03/30/2027.
_____
_____
_____

This grant application request the obligation of $4,000,000 (federal share) of FY 2014 and FY 2015 flexible funding transferred to and administered under the FTA Section 5307 Program for the City of Atlantas (CoA) Mobility Improvements, which includes essential components of the CoAs overall multi-modal transportation network. These funds are programmed from the following sources: Cycle Atlanta Phase 1.0 - Bicycle Mobility Improvements: $360,000 (federal share) in FY 2014 and $1,640,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-277) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012593); Campbellton Road Pedestrian Mobility Improvements: $120,000 (federal share) in FY 2014 and $880,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-275) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012591); and Cleveland Avenue Pedestrian Mobility Improvements: $120,000 (federal share) in FY 2014 and $880,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-274) and incorporated by reference in the approved State Transportation Improvement Program (STIP)

(#0012590).

Cycle Atlanta: Phase 1.0 - Bicycle Mobility Improvements: This project will improve safe access and connectivity for bicyclists to transit by implementing and constructing dedicated and protected bicycle lanes and potentially multi-use paths. This project will provide improved bicycle access to six (6) MARTA Rail stations and twenty-one (21) MARTA bus routes throughout the project corridor.

Campbellton Road - Pedestrian Mobility Improvements: This project will improve safe access to transit for pedestrians by constructing mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, optimizing right of way, and other pedestrian mobility and safety improvements. The project will provide safe access and connectivity for pedestrians and bicyclist to MARTA bus route #83, one of the busiest in the MARTA system, as well as bus routes #66, #81, #162, and #183.

Cleveland Avenue - Pedestrian Mobility Improvements: This project will improve safe access to transit for pedestrians by constructing mid-block crosswalks, rectangular rapid flashing beacons, pedestrian refuge islands and other pedestrian mobility and safety improvements along Cleveland Avenue.This project will help improve pedestrian mobility and access to MARTA bus route #78 and #95, two of the busiest in the system, as well as routes #178, and #193 and help increase pedestrian activity throughout the project area.

The projects listed above are eligible activities under the The Surface Transportation Block Grant (STBG) Program, formally known as Surface Transportation Program (STP) under MAP-21. Under the Fast Act, the STBG Program provides flexible funding that may be used by States and localities for projects to preserve and improve the conditions and performance on any Federal-aid highway, bridge and tunnel projects on any public road, pedestrian and bicycle infrastructure, and transit capital projects, including intercity bus terminals.

Award Start Date: The award start date will be the same date this grant is awarded in TrAMS.
Award End Date: March 30, 2027

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funding identified above is consistent with the TIP pages and Flex Confirmation email attached with this application.

The projects included in this grant application have received an Environmental Classification of a Listed Categorical Exclusion from FTA Region IV Staff (see attached email confirmations).

Total Award Budget:  $5,000,000.00

Amount of Federal Assistance Obligated for This FTA Action (in U.S. Dollars):  $0.00

Amount of Non-Federal Funds Committed to This FTA Action (in U.S. Dollars):  $0.00

Total FTA Amount Awarded and Obligated (in U.S. Dollars):  $4,000,000.00

Total Non-Federal Funds Committed to the Overall Award (in U.S. Dollars):  $1,000,000.00

**Award Budget Control Totals**

(The Budget includes the individual Project Budgets (Scopes and Activity Line Items) or as attached)

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $4,000,000 |
| Local | | | $1,000,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$5,000,000** |

(The Transportation Development Credits are not added to the amount of the Total Award Budget.)

**Project Information**

| Project Number | Project Title | Project Description |
|---|---|---|
| GA-2017-027-01-00 | Cycle Atlanta: Phase 1.0 - Bicycle Mobility Improvements | This project will provide safe access to transit for bicyclist by implementing protected bicycle lanes along Courtland Street, Gilmer Street, and Ralph McGill Boulevard; and potentially multiuse paths on 10th Street and 8th Street. Additionally, bicycle lanes will be constructed and improved along Brady Ave, Ivan Allen Jr. Boulevard and Ralph McGill Blvd. Enhancements will also be made in the form of contra-flow bicycle lanes along Porter Place and Walton Street. This project is identified in the City of Atlanta's Cycle Atlanta Phase 1.0 Study, an appendix to the 2008 Connect Atlanta Plan. |

**Project Funding Summary**

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $2,000,000 |
| Local | | | $500,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,500,000** |

| Project Number | Project Title | Project Description |
|---|---|---|
| GA-2017-027-02-00 | Campbellton Road - Pedestrian Mobility Improvements | This project involves constructing mid-block crosswalks, pedestrian refuge islands, short sidewalk connections, ADA ramps, Right-of-Way (ROW) optimization, and other pedestrian mobility and safety improvements along the two (2) five lane sections of Campbellton Road between Greenbriar Parkway and Dodson Drive and between Wells Drive and Pinehurst Drive. |

## Project Funding Summary

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $250,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,250,000** |

| Project Number | Project Title | Project Description |
|---|---|---|
| GA-2017-027-03-00 | Cleveland Avenue - Pedestrian Mobility Improvements | This project involves constructing mid-block crosswalks, rectangular rapid flashing beacons, pedestrian refuge islands and other pedestrian mobility and safety improvements along Cleveland Avenue between US 19/41 (Metropolitan Parkway) and Jonesboro Road. Improvements will include pedestrian safety enhancements along Cleveland Avenue from US Hwy 41/SR 3 (Metropolitan Parkway) to Jonesboro Road.. |

## Project Funding Summary

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $250,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |

| Adjustment | | | $0 |
|---|---|---|---|
| **Total Eligible Cost** | | | **$1,250,000** |

**U.S. Department of Labor Certification of Public Transportation Employee Protective Arrangements:**

Original Certification Date:   08/08/2017

**TERMS AND CONDITIONS**

**Special Conditions**

There are no special conditions.

Awarded By:
Yvette Taylor
Regional Administrator
FEDERAL TRANSIT ADMINISTRATION
U.S. DEPARTMENT OF TRANSPORTATION
Contact Info: yvette.taylor@dot.gov
Award Date: 8/8/2017 9:37 PM GMT+00:00

## EXECUTION OF THE GRANT AGREEMENT

Upon full execution of this Grant Agreement by the Recipient, the Effective Date will be the date FTA or the Federal Government awarded Federal assistance for this Grant Agreement.

By executing this Grant Agreement, the Recipient intends to enter into a legally binding agreement in which the Recipient:
(1)  Affirms this FTA Award,
(2)  Adopts and ratifies all of the following information it has submitted to FTA:
    (a)  Statements,
    (b)  Representations,
    (c)  Warranties,
    (d)  Covenants, and
    (e)  Materials,
(3)  Consents to comply with the requirements of this FTA Award, and
(4)  Agrees to all terms and conditions set forth in this Grant Agreement.

Executed By:
*Kenyata Smiley*
*Project Manager Sr*
*Atlanta, City Of*
*8/9/2017 10:12 PM GMT+00:00*

# EXHIBIT I

# DOT

# FTA

**U.S. Department of Transportation**

**Federal Transit Administration**

# Award

| | |
|---|---|
| **Federal Award Identification Number (FAIN)** | GA-2017-007 |
| **Award with Amendment Number** | GA-2017-007-00 |
| **Temporary Application Number** | 2879-2016-1 |
| **Award Name** | MOORES MILL RD MULTI MODAL IMPROVEMENTS AND TRANSIT LAYOVER FACILITY |
| **Award Status** | Active (Executed) |
| **Budget Revisions** | 1 |

# Part 1: Recipient Information

## Name: Atlanta, City Of

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
|---|---|---|---|---|
| 2879 | City | CITY OF ATLANTA | | 065372500 |

| Location Type | Address | City | State | Zip |
|---|---|---|---|---|
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

## Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
|---|---|
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |
| State | Georgia |
| Zipcode | 30302 |
| Contact Name | Gina Pagnotta |
| Telephone | 678-414-8982 |

| Fax | |
|---|---|
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Award Information

**Title: MOORES MILL RD MULTI MODAL IMPROVEMENTS AND TRANSIT LAYOVER FACILITY**

| Award with Amendment Number | Award Status | Award Type | Award Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| GA-2017-007-00 | Active (Executed) | Grant | Region 4 | 6/8/2016 | 6/8/2016 | No |

**Award Executive Summary**

This grant application requests the obligation of Federal FY 2015 flexible funding transferred to and administered under the FTA Section 5307 Program for the Moores Mill Road Multimodal Roadway Extension and Transit Layover Facility. These funds are programmed from the following source: $1, 640,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-273) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (# 0012589).

This project scope will include the following elements associated with constructing a Busway Layover Facility, multimodal access, operations and pedestrian safety improvements between the Bolton/Adams Crossing neighborhood, transit bus stops, and businesses in the Marietta Boulevard area. The proposed project consist of the addition of a bus layover facility to accommodate up to three (3) 40 foot buses with Bulb-outs, bus shelters, signage, and striping on the north side of Marietta Boulevard. This project will also provide access and connectivity to a MARTA bus layover/passenger amenity area and PATH trail connection between the Whetstone Creek Trail and the Marietta Boulevard bridge multi-use path.

This application does not include research and development activities. Indirect costs will not be applied to this application and its scope of work.

Award Date: 02/14/2017
End Date: 3/28/2024

**Commented [JC1]:** This award has a grant amendment in progress. The requested period of performance end date is 8/2/2028

**Frequency of Milestone Progress Reports (MPR)**
Quarterly

**Frequency of Federal Financial Reports (FFR)**
Quarterly

**Pre-Award Authority**
This award is using Pre-Award Authority.

**Will this Grant be using Lapsing Funds?**
No, this Grant does not use Lapsing Funds.

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
*None provided.*

**Activities to be performed:**
*None provided.*

**Expected outcomes:**
*None provided.*

**Intended beneficiaries:**
*None provided.*

**Subrecipient Activities:**
*None provided.*

## Award Point of Contact Information

| First Name | Last Name | Title | E-mail Address | Phone |
|---|---|---|---|---|
| | gabrielle.gusmerotti@dot.gov | General Engineer | | |
| Kenyata | Smiley | Project Manager Sr | kdsmiley@atlantaga.gov | 404-330-6240 |
| | richelle.gosman@dot.gov | Lead Transportation Program Specialist | | |

## Award Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,640,000 |
| Local | | | $410,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,050,000** |

## Award Budget

| Project Number | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| GA-2017-007-01-00 | 112-00 (112-A3) | BUS TRANSITWAYS/LINES | $48,000.00 | $12,000.00 | $60,000.00 | 1 |
| GA-2017-007-01-00 | 11.23.01 | CONSTRUCT - BUSWAY | $48,000.00 | $12,000.00 | $60,000.00 | 1 |
| GA-2017-007-01-00 | 117-00 (117-A2) | OTHER CAPITAL ITEMS (BUS) | $468,800.00 | $117,200.00 | $586,000.00 | 2 |
| GA-2017-007-01-00 | 11.75.91 | RIGHT-OF-WAY ACQUISITION | $468,800.00 | $117,200.00 | $586,000.00 | 2 |
| GA-2017-007-01-00 | 119-00 (119-A1) | Bus Associated Transit Improvements | $1,003,200.00 | $250,800.00 | $1,254,000.00 | 2 |
| GA-2017-007-01-00 | 11.93.02 | CONSTRUCTION - BUS SHELTERS | $8,000.00 | $2,000.00 | $10,000.00 | 2 |
| GA-2017-007-01-00 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $995,200.00 | $248,800.00 | $1,244,000.00 | 0 |
| GA-2017-007-01-00 | 571-00 (571-A4) | SAFETY | $120,000.00 | $30,000.00 | $150,000.00 | 15 |
| GA-2017-007-01-00 | 57.10.10 | OTHER | $120,000.00 | $30,000.00 | $150,000.00 | 15 |

## Discretionary Allocations

This application does not contain discretionary allocations.

## Sources of Federal Financial Assistance

| PO Number | Project Number | Scope Name | Scope Number | Scope Suffix | UZA Code | Area Name | Account Class Code | FPC | Description | Amendment Amount | Cumulative Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GA-95-X039 | GA-2017-007-01-00 | BUS TRANSITWAYS/LINES | 112-00 (112) | A3 | 130200 | Atlanta, GA | 2015.45.95.SX.2 | 00 | FHWA flex trf to 5307 - STP | $48,000 | $48,000 |
| GA-95-X039 | GA-2017-007-01-00 | OTHER CAPITAL ITEMS (BUS) | 117-00 (117) | A2 | 130200 | Atlanta, GA | 2015.45.95.SX.2 | 00 | FHWA flex trf to 5307 - STP | $468,800 | $468,800 |
| GA-95-X039 | GA-2017-007-01-00 | Bus Associated Transit Improvements | 119-00 (119) | A1 | 130200 | Atlanta, GA | 2015.45.95.SX.2 | 00 | FHWA flex trf to 5307 - STP | $1,003,200 | $1,003,200 |

| GA-95-X 039 | GA-2017-007-01-00 | SAFETY | 571-00 (571) | A4 | 1302 00 | Atlanta, GA | 2015.45.95.SX.2 | 00 | FHWA flex trf to 5307 - STP | $120,000 | $120,000 |

# Part 3: Project Information

**Project Title: MOORES MILL RD MULTIMODAL ROADWAY EXTENSION AND TRANSIT LAYOVER FACILITY**

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-2017-007-01-00 | 2879-2016-1-P1 | 6/10/2016 | 1/27/2017 | 12/19/2019 |

**Project Description**

This project will improve multimodal access, mobility, operations and safety between the Bolton/Adams Crossing neighborhood, transit bus stops, and businesses in the Marietta Boulevard area and accommodate all users - pedestrians, bicyclists, transit, and vehicles. This project includes the addition of a bus layover facility to accommodate up to three (3) 40 foot buses with Bulb-outs, shelters, signage, and striping on the north side of Marietta Boulevard. This project also includes extending Moores Mill Road from its current terminus at Bolton Road to Adams Drive in order to provide better safer connectivity and access for all users in the area.

Construction improvements will include:

• A busway layover facility on the north side of Marietta Boulevard. This busway layover facility will accommodate up to three (3) 40 foot buses along the frontage of the new development just south of the new Moores Mill Road extension. Two (2) new bus shelters and replacing the sidewalk to accommodate the busway layover facility will improve the access, safety, and experience for transit users of the three (3) MARTA bus routes served here. The design also includes bulb-outs to prevent through traffic from using the busway layover facility as a travel lane.

• Pedestrian lighting will be installed on the extension of Moores Mill Road from Bolton Road to Marietta Boulevard as shown on the Project Location Map and will be constructed by a third party contractor. (The roadway is being constructed by a private party and will include 11' lanes, 5' bike lanes, and 5' sidewalks with a 2' buffer zone.)

• Extension of Adams Drive from Marietta Boulevard to Adams Drive to align with the Moores Mill Road Extension. This section will include 9.5' lanes with bicycle sharrows, 5' sidewalk on the south side of the street, and a 2' pedestrian buffer zone in the section east of the PATH Whetstone Creek multi-use trail connection. Bicycle and pedestrian connections to the PATH Whetstone Creek multi-use trail are provided.

• The existing entrance to Adams Drive at Marietta Boulevard will be closed and replaced with a landscaped area.

• A new signalized intersection at Marietta Boulevard and Moores Mill Road Extension/Adams Drive. This new intersection will include ADA ramps, upgrades, and crosswalks for bicycle and pedestrian access. The signal will include pedestrian actuation.

The Moores Mill Multi-Modal Roadway Extension & Busway (Transit) Layover Facility is included in both the Atlanta Regional Transportation Plan (Project ID: AT-237) and the City's adopted Bolton-Moores Mill Livable Communities Initiative (LCI) plan. The project is also identified as PS-NS-001 in the City's Connect Atlanta Plan.

No existing overhead utilities will be buried during construction. There may be a need to reposition two ( 2) existing overhead utility poles adjacent to the new bus layover facility.

**Project Benefits**

This project will improve and expand transit access. The new intersection of Moores Mill Road and Marietta Boulevard will be signalized and provide a much needed safe crossing for bicyclists and pedestrians to access transit routes and bus stops on the north side of Marietta Boulevard. All of the existing bus stops along Marietta Boulevard are on the north side of the road. The new busway layover facility on the north side of the road will accommodate up to three (3) 40 foot buses at a time and will provide a safe and sheltered place for users to access the transit stops and transfer between buses. The busway layover facility will also provide a safer environment for buses as they layover at the end of their routes. Those buses currently layover in the outer through travel lane with no designated bus area. The new roadway extension will include bicycle and pedestrian facilities to safely and directly connect the Bolton/Adams Crossing neighborhood to the transit stops. MARTA currently operates three bus routes (Routes #1, #37 and #60) in the immediate area, as shown on the Transit Nexus Map. The existing bicycle and pedestrian access to the transit stops in the area is poor and the block lengths are long with limited safe crossings. The Bolton/ Adams Crossing neighborhood currently has no pedestrian or bicycle access to the transit stops. This project will provide new safe access to transit from the neighborhood and along the corridor through sidewalks, a signalized intersection with crosswalks, and bicycle sharrows.

**Additional Information**

Public Involvement:

Extensive public involvement was completed through the Bolton/Moores Mill LCI. The City of Atlanta led the process by creating a stakeholders group representative of the areas neighborhoods, property owners, business owners and public leaders. This task force was involved in a detailed and in-depth series of public meetings designed to garner support for the direction of the plan. This facilitated the creation of meaningful input because citizens gained a thorough understanding of the issues, options and consequently, the difficult choices facing them. By communicating their concerns and desires to the project team, citizens helped educate the project team staff on issues connected to the study.

Specifically, the public involvement in the Bolton/Moores Mill LCI included several stakeholder meetings, a public design workshop and a marketing strategy workshop. The public design workshop was the cornerstone of the public involvement effort. The workshop employed a hands-on approach that resulted in key elements of the plan. The key elements are the corridor master plan, the Marietta Boulevard shopping center plan, the transportation improvement plan and a green space plan. All public meetings were well attended and provided a wealth of information to the study team.

**Location Description**

No significant historic or environmental resources will be negatively impacted directly by this project. As shown on the Environmental and Historic Resources Map, the project does not abut any National Register Districts. It is highly unlikely there are archaeological resources within the areas of the project that will require digging based on previous land disturbance from existing roadways, commercial development, and utility lines. There are some potentially historic homes in the area of the project, however these resources would not be impacted by the construction of the new road. Directly adjacent to the project are commercial and industrial uses. Given that the project does not encroach any publicly?owned parks, recreational areas, or wildlife/waterfowl refuges, no detailed 4(f) documentation was completed.

The area of potential effect for this project includes private property owners (tract 8 and a portion of parking from tract 5) as well as the existing right-of-way. A retaining wall will be necessary on the south side of the new Adams Drive roadway as shown in the Project Plan Layout. There is roughly and 8'-9' elevation difference between tract 5 and tract 8 (Tract 8 is the Westside Pizza Restaurant) at the back property line of tract 5. Therefore, the slope of the roadway adjacent to the building in tract 5 would extend out an additional 16'-18' using a 2:1 side slope. Without using a retaining wall, the tract 5

building would require a taking. Reducing the lane width and moving the sidewalk to the north side of the road would not be enough to keep the roadway slope off the tract 5 building. The retaining wall and proposed alignment also allows for the roadway extension to have no impact to tract 7 (emissions testing/car wash). There is no practical way to avoid impacting the parking on tract 5. Additionally, temporary construction easements will be required in order to accommodate construction.

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

## Congressional District Information

| District | State |
|---|---|
| 4 | Georgia |

## Program Plan Information

### STIP/TIP
Date: 5/16/2014
Description: Attached is page 82 of 201 of the FY 2014 - 2019 Transportation Improvement Program - sorted by ARC Project Number. It's the third project on the uploaded page.

### UPWP
Date: N/A
Description: N/A

### Long Range Plan
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,640,000 |
| Local | | | $410,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,050,000** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2017-007-01-00 | 112-00 (112-A3) | BUS TRANSITWAYS/LINES | $48,000.00 | $12,000.00 | $60,000.00 | 1 |
| GA-2017-007-01-00 | 11.23.01 | CONSTRUCT - BUSWAY | $48,000.00 | $12,000.00 | $60,000.00 | 1 |
| GA-2017-007-01-00 | 117-00 (117-A2) | OTHER CAPITAL ITEMS (BUS) | $468,800.00 | $117,200.00 | $586,000.00 | 2 |
| GA-2017-007-01-00 | 11.75.91 | RIGHT-OF-WAY ACQUISITION | $468,800.00 | $117,200.00 | $586,000.00 | 2 |
| GA-2017-007-01-00 | 119-00 (119-A1) | Bus Associated Transit Improvements | $1,003,200.00 | $250,800.00 | $1,254,000.00 | 2 |
| GA-2017-007-01-00 | 11.93.02 | CONSTRUCTION - BUS SHELTERS | $8,000.00 | $2,000.00 | $10,000.00 | 2 |
| GA-2017-007-01-00 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $995,200.00 | $248,800.00 | $1,244,000.00 | 0 |
| GA-2017-007-01-00 | 571-00 (571-A4) | SAFETY | $120,000.00 | $30,000.00 | $150,000.00 | 15 |
| GA-2017-007-01-00 | 57.10.10 | OTHER | $120,000.00 | $30,000.00 | $150,000.00 | 15 |

## Project Budget Activity Line Items

**Budget Activity Line Item: 57.10.10 - OTHER**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| SAFETY (571-00) | 57.10.10 | OTHER | SAFETY | 15 |

**Extended Budget Description**

This activity line item will fund the construction and installation of fifteen (15) pedestrian (safety) lights. The pedestrian (safety) lights will be installed on both the North and South side of the Moores Mills extension from Bolton Road to Adams Drive. Pedestrian (Safety) Lights have a useful life of seven (7) years.

**Will 3rd Party contractors be used to fulfill this activity line item?**

Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $120,000 |
| Local | | | $30,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$150,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 6/14/2018 | Request for Proposals advertisement for construction services. |
| Contract Award | 12/18/2018 | Construction kick-off meeting and issue of notice to proceed to contractor. |
| Project Complete | 12/18/2019 | 30 day burn complete and lighting accepted by the City. |

**Budget Activity Line Item: 11.23.01 - CONSTRUCT - BUSWAY**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| BUS TRANSITWAYS/LINES (112-00) | 11.23.01 | CONSTRUCT - BUSWAY | CONSTRUCT BUS TRANSITWAYS/LINES | 1 |

**Extended Budget Description**
This activity line item will fund the construction of a Busway Layover Facility to include striping which will accommodate up to three (3) transit buses. The useful life of the Busway Layover Facility is twenty (20) years and the useful life of the striping is five (5) years.

The Busway Layover Facility will be located on Marietta Boulevard just south of Moores Mill Road and on the east side of the road adjacent to the 2 Bus Shelters curb.

Third Party Contractors will be used for this line item.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $48,000 |

| | | |
|---|---|---|
| Local | | $12,000 |
| Local/In-Kind | | $0 |
| State | | $0 |
| State/In-Kind | | $0 |
| Other Federal | | $0 |
| Transportation Development Credit | | $0 |
| Adjustment | | $0 |
| **Total Eligible Cost** | | **$60,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 6/14/2018 | Request for Proposal advertisement for construction services. |
| Award Construction Contract | 12/18/2018 | Award construction contract and notice to proceed. |
| Substantial Completion | 8/12/2019 | Ready for punch list walk - thru. |
| Project Complete | 12/18/2019 | Project complete and ready for public use |

**Budget Activity Line Item: 11.93.02 - CONSTRUCTION - BUS SHELTERS**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.02 | CONSTRUCTION - BUS SHELTERS | CONSTRUCTION | 2 |

**Extended Budget Description**

This activity line item will fund the construction and installation of two (2) bus shelters. The bus shelters will be located on Marietta Boulevard just south of Moores Mill Road and on the east side of the road adjacent to the Busway. The useful life of the bus shelters is five (5) years.

Third Party Contractors will be used for this line item.

**Will 3rd Party contractors be used to fulfill this activity line item?**

Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $8,000 |
| Local | | | $2,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |

| Total Eligible Cost | | $10,000 |
|---|---|---|

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 6/14/2018 | Request for Proposal advertisement for construction services. |
| Construction Contract Award | 12/18/2018 | Construction kick-off meeting and notice to proceed |
| Substantial Completion | 8/20/2019 | Project substantially complete, conduct punch list walk-through. |
| Project Complete | 12/19/2019 | Project complete and ready for public use. |

**Budget Activity Line Item: 11.75.91 - RIGHT-OF-WAY ACQUISITION**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| OTHER CAPITAL ITEMS (BUS) (117-00) | 11.75.91 | RIGHT-OF-WAY ACQUISITION | REAL ESTATE (RIGHT-OF-WAY) | 2 |

**Extended Budget Description**
This activity line item will fund the Right-of-Way acquisition of two(2) parcels needed to implement this project.The Right of Way remnants 0f two (2)parcels will be acquired, one (1) at the intersection of Moores Mill Road Extension./Marietta Boulevard and the other property immediately adjacent.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $468,800 |
| Local | | | $117,200 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$586,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 1/27/2017 | Request for Proposals advertisement for Right-of-Way Acquisition. |
| Contract Award | 7/17/2017 | Award contract for Right-of-Way Acquisition services. |
| Preliminary plan review. | 1/29/2018 | Established Right of way requirements on plans. |

| Start Negotiations | 2/20/2018 | Meet with property owners to negotiate for required easements and/or property acquisition. |
| Complete Right of Way Acquisition | 8/22/2018 | Required Easements and/or property in City's possession. |

**Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCTION | 0 |

**Extended Budget Description**
This activity line item will fund the construction of sidewalks on the northeast side of the Moores Mill road extension from Marietta Boulevard to Bolton Road and on the west side from Marietta Boulevard to Adams Drive. The Sidewalks will have a useful life of twenty (20) years.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $995,200 |
| Local | | | $248,800 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,244,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP | 6/14/2018 | Request for Proposals for construction services. |
| Contract Award | 12/18/2018 | Construction kick-off meeting and notice to proceed. |
| Substantial Completion | 8/12/2019 | Project ready for punch list walk thru. |
| Project Complete | 12/18/2019 | Project complete and ready for public use. |

# Project Environmental Findings

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment

and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 09: Assembly or construction of facilities that is consistent with existing land use and zoning requirements (including floodplain regulations) and uses primarily land disturbed for transportation use, such as: buildings and associated structures; bus transfer stations or intermodal centers; busways and streetcar lines or other transit investments within areas of the right-of-way occupied by the physical footprint of the existing facility or otherwise maintained or used for transportation operations; and parking facilities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | 0 | $995,200.00 | $1,244,000.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 09: Assembly or construction of facilities that is consistent with existing land use and zoning requirements (including floodplain regulations) and uses primarily land disturbed for transportation use, such as: buildings and associated structures; bus transfer stations or intermodal centers; busways and streetcar lines or other transit investments within areas of the right-of-way occupied by the physical footprint of the existing facility or otherwise maintained or used for transportation operations; and parking facilities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.02 | CONSTRUCTION - BUS SHELTERS | 2 | $8,000.00 | $10,000.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 06: Acquisition or transfer of an interest in real property that is not within or adjacent to recognized environmentally sensitive areas (e.g., wetlands, non-urban parks, wildlife management areas) and does not result in a substantial change in the functional use of the property or in substantial displacements, such as: acquisition for scenic easements or historic sites for the purpose of preserving the site. This CE extends only to acquisitions and transfers that will not limit the evaluation of alternatives for future FTA-assisted projects that make use of the acquired or transferred property.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| OTHER CAPITAL ITEMS (BUS) (117-00) | 11.75.91 | RIGHT-OF-WAY ACQUISITION | 2 | $468,800.00 | $586,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 09: Assembly or construction of facilities that is consistent with existing land use and zoning requirements (including floodplain regulations) and uses primarily land disturbed for transportation use, such as: buildings and associated structures; bus transfer stations or intermodal centers; busways and streetcar lines or other transit investments within areas of the right-of-way occupied by the physical footprint of the existing facility or otherwise maintained or used for transportation operations; and parking facilities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| BUS TRANSITWAYS/LINES (112-00) | 11.23.01 | CONSTRUCT - BUSWAY | 1 | $48,000.00 | $60,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 09: Assembly or construction of facilities that is consistent with existing land use and zoning requirements (including floodplain regulations) and uses primarily land disturbed for transportation use, such as: buildings and associated structures; bus transfer stations or intermodal centers; busways and streetcar lines or other transit investments within areas of the right-of-way occupied by the physical footprint of the existing facility or otherwise maintained or used for transportation operations; and parking facilities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| SAFETY (571-00) | 57.10.10 | OTHER | 15 | $120,000.00 | $150,000.00 |

# Part 4: Fleet Details

No fleet data exists for this application.

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | Application Details |
| Date | 7/28/2016 |
| Comment | 1. Recipient. C&As have not been pinned in TrAMS. Please ensure that step is complete ASAP.<br>2. Application<br>a. In all applications, first sentence of App Exec Summary should read: "This is an FY XXXX Section XXXX application in the amount of $XXXX."<br>b. Include status as a Direct Recipient in App Exec Summary.<br>c. Include statement RE source of local match in App Exec Summary.<br>3. 11.93.05. Third party contracting selected. All ALIs involving 3rd party contractors require at least 3 milestone dates (RFP date, Contract Awarded, and Contract Complete).<br>4. 11.91.05. Third party contracting selected. All ALIs involving 3rd party contractors require at least 3 milestone dates (RFP date, Contract Awarded, and Contract Complete).<br>5. Environmental Findings. Choose option in module that allows you to assign a separate CE to each ALI. 11.91.05 should be assigned to C04. |

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | Application Details |
| Date | 8/10/2016 |

| | |
|---|---|
| Comment | Additional comments:<br>1. Identify source of local match in App Exec Summary<br>2. 11.93.05. Will any capital expenditures exceed $5,000? If so, include useful life. If not, explicitly state such. |

| Comment By | Doretha Foster |
|---|---|
| Comment Type | Application Details |
| Date | 11/21/2016 |
| Comment | Civil Rights Concurrence with Comments:<br>City of Atlanta must comply with all applicable Federal laws and regulations related to this project, including the ADA Standards for Transportation Facilities, based on the U. S. Access Board's ADA Accessibility Guidelines. Found here: http://www.access-board.gov/guidelines-and-standards/transportation/facilities/ada-standards-for-transportation-facilities<br><br>• As required under DOT ADA Standard 206.4.1, City of Atlanta must ensure that 60 percent of all public entrances to the facility will be accessible. If a station has only two entrances, then both must be accessible.<br>• As required under DOT ADA Standard 206.3, City of Atlanta must ensure that accessible routes coincide with or are located in the same area as general circulation paths, and elements such as ramps, elevators, and fare vending and collection areas are placed to minimize the distance that wheelchair users and other persons who cannot climb steps must travel in comparison to the general public.<br>• As required under DOT ADA Standard 406.8, City of Atlanta must ensure that curb ramps will have detectable warnings.<br>• As required under DOT ADA Standard 810.2, City of Atlanta must ensure that bus boarding and alighting areas are in compliance with the ADA-ABA Guidelines (Section 810.2), which address surfaces (sturdy); dimensions (96" long x 60" wide); connection to sidewalks, streets, and pedestrian paths; slope (not steeper than 1:48); signs; and public address systems.<br>• As required by DOT ADA Standard 810.5.3, City of Atlanta must ensure that station platforms must be coordinated with the vehicle floor height.<br>• As required under DOT ADA Standard 201 and DOT ADA Regulation 49 C.F.R. 37.43(a)(1), City of Atlanta must ensure that altered or added portions of the facility must be made accessible.<br>• As required by DOT ADA Regulation 49 C.F.R. 37.43(a)(2) and DOT ADA Standard 202.3, City of Atlanta must ensure that the path of travel to the altered or added portion of the facility must be made accessible, to the maximum extent feasible.<br>• As required by DOT ADA Standard 202.4 and DOT ADA Regulation 49 C.F.R. 37.43(e)(1), if the path of travel cannot be made accessible, City of Atlanta must submit to FTA an analysis demonstrating that the cost of making the path of travel accessible is disproportionate to (i.e., > 20%) the cost of the alterations or additions to the primary function area.<br>• As required by DOT ADA Standard 202.4 and DOT ADA Regulation 49 C.F.R. 37.43(b), if the path of travel cannot be made accessible, City of Atlanta must submit to FTA an analysis demonstrating that site-specific conditions prevent you from making the path of travel accessible. Include relevant diagrams and maps.<br><br>The information provided above is intended as technical assistance and applies only to the project as described. Should the project scope change or new information on the project be provided, FTA may require a re-evaluation of the project information as it |

relates to ADA and require additional information. This confirmation is not an express or implied promise of project compliance with the ADA.

| Comment By | Lauren Pessoa |
|---|---|
| Comment Type | Application Details |
| Date | 12/28/2016 |
| Comment | Comment 1: budget amounts for 11.91.05 is not 80/20 split; budget amounts for 11.93.05 is not 80/20 split<br>Comment 2: Project description says that pedestrian lighting will be installed by private party, please replace with "3rd party contractor" to be consistent with other parts of the application including the milestone description of this ALI<br>Comment 3: 15 year useful life for shelter construction on shelters that cost less than $10k may be excessive. Generally shelters that cost less than $5k have a useful life of 5-7 years and those between $5k and $15k have useful life of 7-10 years. What type of construction warrants longer useful life?<br><br>Easley comments have been cleared |

| Comment By | Lauren Pessoa |
|---|---|
| Comment Type | Application Details |
| Date | 1/6/2017 |
| Comment | Comment 1 - 11.91.05 was eliminated and budget for 11.93.05 was revised. CLEARED<br>Comment 2- language fixed to say 3rd party operator CLEARED<br>Comment 3- useful life of shelters was revised CLEARED |

## Application Review Comments

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 8/18/2016 |
| Comment | Technical Comments:<br><br>1. Remove useful life from engineering ALI and state that "No Capital items over $5,000 will be purchased with this ALI"<br><br>2. Separate acquisition/construction of shelters, facilities, bicycle access, and roadway work into unique ALIs. The FTA ALI tree will be helpful in identifying proper ALIs: https://www.transit.dot.gov/funding/grantee-resources/teamtrams/scope-activity-line-item-tree<br><br>3. List all the capital items over $5,000 in bullet form<br><br>* pedestrian crosswalks: avoid using ranges; reference as Useful Life instead of "life expectancy"; is the crosswalk just striping? If so, useful life may be just 5 years, if these |

crosswalks are something else, please indicate what you are using to determine useful life

* sidewalks: useful life is 20 years according to FTA SSC workbooks (found here: https://www.transit.dot.gov/research-innovation/scc-workbook-rev-14-excel)

* road extension: SSC workbook indicates 20 year useful life for roadways

* bicycle and pedestrian multi-use trail connections: if paved/hard surface, useful life is 20 years

* signalized intersection: SSC workbook has 30 year useful life

* bus layover facility bus shelters: separate into unique ALIs for facility, bus shelters; be very clear as to what you are purchasing/building under these ALIs, clearly assign a useful life to each expenditure, and indicate what you are using to determine these useful life(s).

5. A review of C9030.1E has brought into question whether roadway extension and traffic signalization are eligible expenses for the STP Flex program. Please share the excerpt from the Circular that supports your inclusion of these activities (or documentation of prior FTA approval).

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 11/21/2016 |
| Comment | 11.93.02 - CONSTRUCTION - BUS SHELTERS<br>Please identify a quantity for the ALI and in the extended budget description<br>Please enter an extended budget description, currently it is blank.<br>For the milestones, please add an RFP date for the contract<br>Please enter a useful life of the bus shelters.<br>Please identify where the bus shelters are going in general...new Moores Mill Road extension, and list where else if there are other locations<br><br>11.23.01 - CONSTRUCT - BUSWAY<br>Please identify where the busway lines will be implemented.<br>There are milestones for award Construction contract, but the question about third party contracts, was answered, "No, 3rd Party Contractors will not be used for this line item."<br>Please list useful life for stripping; I'd imagine something between 3-5 years, you might want to check with vendors<br>If there is a contract, please add an RFP advertise milestone<br><br>11.75.91 - RIGHT-OF-WAY ACQUISITION<br>In the extended budget description, please enter information about where the right of way will be acquired<br>Whenever a contract is used, must have minimum of 3 Milestone dates: "RFP Issue Date", "Contract Award", "Contract Complete"<br><br>11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS<br>Please add information into the extended budget description, include information about where the ped/walkways will be installed |

57.10.10 – OTHER
Please enter information about 'other' and what that includes in the extended budget description
If there are capital items over $5,000 please list them and enter a useful life extended budget description
If there aren't going to be items purchased that are over $5,000, then please capture that in the extended budget description
There are milestones for award Construction contract, but the question about third party contracts, was answered, "No, 3rd Party Contractors will not be used for this line item." Please correct. Whenever a contract is used, must have minimum of 3 Milestones: "RFP Issue Date, Contract Award, Contract Complete"

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 12/29/2016 |
| Comment | FTA Technical Review Comments for Grantee:<br><br>Comment 1: budget amounts for 11.91.05 is not 80/20 split; budget amounts for 11.93.05 is not 80/20 split<br>Comment 2: Project description says that pedestrian lighting will be installed by private party, please replace with "3rd party contractor" to be consistent with other parts of the application including the milestone description of this ALI<br>Comment 3: 15 year useful life for shelter construction on shelters that cost less than $10k may be excessive. Generally shelters that cost less than $5k have a useful life of 5-7 years and those between $5k and $15k have useful life of 7-10 years. What type of construction warrants longer useful life?<br><br>Easley comments have been cleared |

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 1/17/2017 |
| Comment | Returned at applicant's request. |

## Application Review Comments

| Comment By | Kenyata Smiley |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 2/28/2020 |
| Comment | This project has been significantly delayed due to the City's procurement process. The City is currently in the signature execution process to award a contract for outside professional Architectural and Engineering Services to the most qualified proponent CDM Smith to design this project. A fully executed contracted is anticipated for April |

2020. There is no cost for design included in this grant, only Right-of-Way Acquisition ( ROW) and Construction. The City anticipates the design to take approximately one year. Construction is currently estimated to be completes in December 2023, and therefore this budget revision is being requested to extend the period of performance to March 28, 2024.

| Comment By | Patrick Winders |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 3/5/2020 |
| Comment | |

# Part 6: Agreement

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**GRANT AGREEMENT**
**(FTA G-23, October 1, 2016)**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Grant Agreement, FTA has obligated and awarded federal assistance as provided below. Upon execution of this Grant Agreement by the Recipient named below, the Recipient affirms this FTA Award, enters into this Grant Agreement with FTA, and binds its compliance with the terms of this Grant Agreement.

The following documents are incorporated by reference and made part of this Grant Agreement:
(1) "Federal Transit Administration Master Agreement," FTA MA(23), October 1, 2016, http://www.fta.dot.gov,
(2) The Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA, and
(3) Any Award notification containing special conditions or requirements, if issued.

WHEN THE TERM "FTA AWARD" OR "AWARD" IS USED, EITHER IN THIS GRANT AGREEMENT OR THE APPLICABLE MASTER AGREEMENT, "AWARD" ALSO INCLUDES ALL TERMS AND CONDITIONS SET FORTH IN THIS GRANT AGREEMENT.

FTA OR THE FEDERAL GOVERNMENT MAY WITHDRAW ITS OBLIGATION TO PROVIDE FEDERAL ASSISTANCE IF THE RECIPIENT DOES NOT EXECUTE THIS GRANT AGREEMENT WITHIN 90 DAYS FOLLOWING FTA's AWARD DATE SET FORTH HEREIN.

**FTA AWARD**

Federal Transit Administration (FTA) hereby awards a Federal grant as follows:

**Recipient Information**

 Recipient Name:  Atlanta, City Of

Recipient ID:  2879

UEI:

DUNS:  065372500

**Award Information**

Federal Award Identification Number (FAIN):  GA-2017-007

Award with Amendment Number:  GA-2017-007-00

Award Name:  MOORES MILL RD MULTI MODAL IMPROVEMENTS AND TRANSIT LAYOVER FACILITY

Award Executive Summary:  This grant application requests the obligation of Federal FY 2015 flexible funding transferred to and administered under the FTA Section 5307 Program for the Moores Mill Road Multimodal Roadway Extension and Transit Layover Facility. These funds are programmed from the following source: $1,640,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-273) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (# 0012589).

This project scope will include the following elements associated with constructing a Busway Layover Facility, multimodal access, operations and pedestrian safety improvements between the Bolton/Adams Crossing neighborhood, transit bus stops, and businesses in the Marietta Boulevard area. The proposed project consist of the addition of a bus layover facility to accommodate up to three (3) 40 foot buses with Bulb-outs, bus shelters, signage, and striping on the north side of Marietta Boulevard. This project will also provide access and connectivity to a MARTA bus layover/passenger amenity area and PATH trail connection between the Whetstone Creek Trail and the Marietta Boulevard bridge multi-use path.

This application does not include research and development activities. Indirect costs will not be applied to this application and its scope of work.

Award Date: 02/14/2017
End Date: 3/28/2024

Total Award Budget:  $2,050,000.00

Amount of Federal Assistance Obligated for This FTA Action (in U.S. Dollars):  $0.00

Amount of Non-Federal Funds Committed to This FTA Action (in U.S. Dollars):  $0.00

Total FTA Amount Awarded and Obligated (in U.S. Dollars):  $1,640,000.00

Total Non-Federal Funds Committed to the Overall Award (in U.S. Dollars):  $410,000.00

**Award Budget Control Totals**

(The Budget includes the individual Project Budgets (Scopes and Activity Line Items) or as attached)

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,640,000 |
| Local | | | $410,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,050,000** |

(The Transportation Development Credits are not added to the amount of the Total Award Budget.)

**Project Information**

| Project Number | Project Title | Project Description |
|---|---|---|
| GA-2017-007-01-00 | MOORES MILL RD MULTIMODAL ROADWAY EXTENSION AND TRANSIT LAYOVER FACILITY | This project will improve multimodal access, mobility, operations and safety between the Bolton/Adams Crossing neighborhood, transit bus stops, and businesses in the Marietta Boulevard area and accommodate all users - pedestrians, bicyclists, transit, and vehicles. This project includes the addition of a bus layover facility to accommodate up to three (3) 40 foot buses with Bulb-outs, shelters, signage, and striping on the north side of Marietta Boulevard. This project also includes extending Moores Mill Road from its current terminus at Bolton Road to Adams Drive in order to provide better safer connectivity and access for all users in the area. Construction improvements will include: • A busway layover facility on the north side of Marietta Boulevard. This busway layover facility will accommodate up to three (3) 40 foot buses along the frontage of the new development just south of the new Moores Mill Road extension. Two (2) new bus shelters and replacing the sidewalk to accommodate the busway layover facility will improve the access, safety, and experience for transit users of the three (3) MARTA bus routes served here. The design also includes bulb-outs to prevent through traffic from using the busway layover facility as a travel lane. • Pedestrian lighting will be installed on the extension of Moores Mill Road from Bolton Road to Marietta Boulevard as shown on the Project Location Map and will be constructed by a third party contractor. (The roadway is being constructed by a private party and will include 11' lanes, 5' bike lanes, and 5' sidewalks with a 2' buffer zone.) • Extension of Adams Drive from Marietta Boulevard to Adams Drive to align with the Moores Mill Road Extension. This section will include 9.5' lanes with bicycle sharrows, 5' sidewalk on the south side of the street, and a 2' pedestrian buffer zone in the section east of the PATH Whetstone Creek multi-use trail connection. Bicycle and pedestrian connections to the PATH Whetstone Creek multi-use trail are provided. • The existing |

entrance to Adams Drive at Marietta Boulevard will be closed and replaced with a landscaped area. • A new signalized intersection at Marietta Boulevard and Moores Mill Road Extension/Adams Drive. This new intersection will include ADA ramps, upgrades, and crosswalks for bicycle and pedestrian access. The signal will include pedestrian actuation. The Moores Mill Multi-Modal Roadway Extension & Busway (Transit) Layover Facility is included in both the Atlanta Regional Transportation Plan (Project ID: AT-237) and the City's adopted Bolton-Moores Mill Livable Communities Initiative (LCI) plan. The project is also identified as PS-NS-001 in the City's Connect Atlanta Plan. No existing overhead utilities will be buried during construction. There may be a need to reposition two (2) existing overhead utility poles adjacent to the new bus layover facility.

**Project Funding Summary**

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,640,000 |
| Local | | | $410,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$2,050,000** |

**U.S. Department of Labor Certification of Public Transportation Employee Protective Arrangements:**

Original Certification Date:

**TERMS AND CONDITIONS**

**Special Conditions**

There are no special conditions.

Awarded By:

Yvette Taylor
Supervisor
FEDERAL TRANSIT ADMINISTRATION
U.S. DEPARTMENT OF TRANSPORTATION
Contact Info: yvette.taylor@dot.gov
Award Date: 2/8/2017 10:32 PM GMT+00:00

**EXECUTION OF THE GRANT AGREEMENT**

Upon full execution of this Grant Agreement by the Recipient, the Effective Date will be the date FTA or the Federal Government awarded Federal assistance for this Grant Agreement.

By executing this Grant Agreement, the Recipient intends to enter into a legally binding agreement in which the Recipient:
(1)  Affirms this FTA Award,
(2)  Adopts and ratifies all of the following information it has submitted to FTA:
     (a)  Statements,
     (b)  Representations,
     (c)  Warranties,
     (d)  Covenants, and
     (e)  Materials,
(3)  Consents to comply with the requirements of this FTA Award, and
(4)  Agrees to all terms and conditions set forth in this Grant Agreement.


Executed By:
*Kenyata Smiley*
*Project Manager Sr*
*Atlanta, City Of*
*2/9/2017 4:02 PM GMT+00:00*

# EXHIBIT J

# DOT                                          FTA

**U.S. Department of Transportation**          **Federal Transit Administration**

# Award

| Federal Award Identification Number (FAIN) | GA-2018-004 |
|---|---|
| Award with Amendment Number | GA-2018-004-00 |
| Temporary Application Number | 2879-2017-4 |
| Award Name | Atlanta Streetcar Downtown Crosstown Extension - FFY 2016 Surface Transportation Block Grant (STBG) Program Urban |
| Award Status | Active (Executed) |
| Budget Revisions | 3 |

| | | | |
|---|---|---|---|
| Period of Performance Start Date | N/A | | |
| Original Period of Performance End Date | N/A | | |
| Current Period of Performance End Date | N/A | Revision #: 0 | Approved?: Yes |

# Part 1: Recipient Information

## Name: Atlanta, City Of

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
|---|---|---|---|---|
| 2879 | City | CITY OF ATLANTA | | 065372500 |

| Location Type | Address | City | State | Zip |
|---|---|---|---|---|
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

## Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
|---|---|
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |

| State | Georgia |
|---|---|
| Zipcode | 30302 |
| Contact Name | Gina Pagnotta |
| Telephone | 678-414-8982 |
| Fax | |
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Award Information

**Title: Atlanta Streetcar Downtown Crosstown Extension - FFY 2016 Surface Transportation Block Grant (STBG) Program Urban**

| Award with Amendment Number | Award Status | Award Type | Award Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| GA-2018-004-00 | Active (Executed) | Grant | Region 4 | 4/7/2017 | 4/7/2017 | No |

**Award Executive Summary**
BR is for period of performance extension to 03/30/2026
_____
_____
_____
____

This grant application requests the obligation of FY 2016, Surface Transportation Block Grant (STBG) Program - Urban (>200K) (ARC) flexible funding in the amount of $2,800,000 (federal share), to be transferred and administered under the FTA Section 5307 Program; for the City of Atlantas (CoA) National Environmental Policy Act (NEPA) Clearance and Initial Engineering Investigation for the Atlanta Streetcar Downtown Crosstown Extension. The NEPA and Engineering Investigation will be conducted from the Atlanta Beltline West at Westview to Atlanta Beltline East at Ponce De Leon Avenue. These funds are programmed from the following source: $2,800,000 (federal share) in FY 2016 Surface Transportation Block Grant (STBG) - Urban (>200K) funds and $700,000 (local match) funds, included in the Atlanta Regional Transportation Improvement Program (TIP) (#AR-490A) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (# 0014991).

This project will include advance data collection on the corridor to support detailed design of an eastern extension of the existing Atlanta Streetcar system, as well as provide more detailed information to establish more accurate construction cost estimates. General coordination between an extension and future expansion of the streetcar system will also be explored during this process. As well as, utility investigations and coordination, topographic and boundary survey work, geotechnical investigations, traffic studies, and establishing baseline criteria for traction power substations.

This project will fund the NEPA planning work for a western expansion of the existing Atlanta Streetcar System. This crosstown corridor will make vital connections between downtown Atlanta job centers, Georgia State campus, the Atlanta University Center, and the Atlanta BeltLine Westside corridor.

Award Start Date: The Award Start Date for this grant will be the same as the date of award in TrAMS. Award End Date: March 30, 2026.

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funding information identified above is consistent with the TIP pages and Flex Letter/Confirmation email attached with this application.

**Frequency of Milestone Progress Reports (MPR)**
Quarterly

**Frequency of Federal Financial Reports (FFR)**
Quarterly

**Pre-Award Authority**
This award is using Pre-Award Authority.

**Will this Grant be using Lapsing Funds?**
No, this Grant does not use Lapsing Funds.

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
To advance a feasibility study to determine a preferred corridor for the transit infrastructure through the northwest quadrant of the BeltLine loop.

**Activities to be performed:**
Conduct an alternatives analysis and feasibility study for BeltLine light-rail/streetcar (LRT/SC) transit corridors through the northwest quadrant of the BeltLine loop, generally between MARTA Lindbergh station and MARTA Bankhead station (about 5.4 miles). Investigations shall include alignment alternatives within the CSX and Norfolk Southern freight rail corridors, alignment alternatives adjacent to these freight rail corridors, and alignment alternatives separate from these freight rail corridors.

**Expected outcomes:**
To establish a preferred alignment, along with generalized platform locations, potential traction power substation locations, vehicle maintenance and storage facility locations, and access points to the public ROW. It will also establish a series of spur trail connections to the transit corridor at planned transit stop locations, linking BeltLine mainline trail and other local/regional trails with transit.

**Intended beneficiaries:**
City of Atlanta pedestrians.

**Subrecipient Activities:**
None

## Award Point of Contact Information

| First Name | Last Name | Title | E-mail Address | Phone |
|---|---|---|---|---|
| | | gabrielle.gusmerotti@dot.gov General Engineer | | |
| Jacqueline | Chester | Grants Manager | jchester@atlantaga.gov | (470) 889-9568 |

| richelle.gosman@dot.gov | Lead Transportation Program Specialist |
|---|---|

## Award Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $2,800,000 |
| Local | | | $700,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$3,500,000** |

## Award Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2018-004-01-00 | 122-00 (122-A1) | RAIL TRANSITWAY LINES | $1,200,000.00 | $500,000.00 | $1,700,000.00 | 0 |
| GA-2018-004-01-00 | 12.21.03 | ENG/DESIGN - LINE EQUIP/ STRUCTURES | $1,200,000.00 | $500,000.00 | $1,700,000.00 | 0 |
| GA-2018-004-01-00 | 442-00 (442-A2) | METROPOLITAN PLANNING | $1,600,000.00 | $200,000.00 | $1,800,000.00 | 1 |
| GA-2018-004-01-00 | 44.24.00 | SHORT RANGE TRANSIT PLANNING | $1,600,000.00 | $200,000.00 | $1,800,000.00 | 1 |

## Discretionary Allocations

This application does not contain discretionary allocations.

## Sources of Federal Financial Assistance

| PO Number | Project Number | Scope Name | Scope Number | Scope Suffix | UZA Code | Area Name | Account Class Code | FPC | Description | Amendment Amount | Cumulative Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GA-95-X 048 | GA-2018 -004-01- 00 | RAIL TR ANSITW AY LINE S | 122-00 ( 122) | A1 | 1302 00 | Atlant a, GA | 2016.45.9 5.SX.2 | 00 | FHWA flex trf to 5307 - STP | $1,200,000 | $1,200,000 |
| GA-95-X 048 | GA-2018 -004-01- 00 | METRO POLITA N PLAN NING | 442-00 ( 442) | A2 | 1302 00 | Atlant a, GA | 2016.45.9 5.SX.2 | 02 | FHWA flex trf to 5307 - STP | $1,600,000 | $1,600,000 |

# Part 3: Project Information

## Project Title: Atlanta Streetcar Downtown Crosstown Extension - FFY 2016 Surface Transportation Block Grant (STBG) Program Urban

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-2018-004-01-00 | 2879-2017-4-P1 | 7/10/2017 | 3/25/2013 | 4/30/2025 |

**Project Description**
"Revision One (1)"
1. To reallocate funding among existing line items to reflect ENG/DESIGN $1,200,000; and METROPOLITAN PLANNING $1,600,000.
2. Rename the project as "BELTLINE NORTHWEST CORRIDOR FEASIBILITY STUDY".
3. Update project activities to include a corridor analysis to establish a preferred alignment for the Belt Line trail from the Bankhead Rail Station to the Lindbergh Rail Station.
4. Extend the period of performance end date to March 30, 2026.
_____
_____
_____
This project will include advance data collection on the corridor to support detailed design of an eastern extension of the existing Atlanta Streetcar system, as well as provide more detailed information to establish more accurate construction cost estimates. General coordination between an extension and future expansion of the streetcar system will also be considered during the process. In addition, this project will fund NEPA planning work for a western expansion of the existing Atlanta Streetcar System. This crosstown corridor will make vital connections between downtown Atlanta job centers, Georgia State campus, the Atlanta University Center, and the Atlanta BeltLine Westside corridor.

**Project Benefits**
"Revision One (1)"
This project will support corridor analysis to establish a preferred alignment for the BeltLine rail transit corridor (a part of the Atlanta Streetcar System) and the BeltLine trail from the Bankhead Rail Station to the Lindbergh Rail Station. The project will include exploring the feasibility of shared right of way between the BeltLine rail transit and the freight railroad companies (Norfolk Southern and CSX). It will also establish a preferred alignment for the BeltLine trail corridor within the same extent, as well as spur trail connections to the transit corridor at planned transit station locations.

_____
_____
_____
Data Collection: will support detailed design of an eastern extension of the existing Atlanta Streetcar system, as well as provide more detailed information to establish more accurate construction cost

estimates. NEPA Evaluation: will make vital connections between downtown Atlanta job centers, Georgia State campus, the Atlanta University Center, and the Atlanta BeltLine Westside corridor.

**Additional Information**
"Revision One (1)"
For the selected transit and trail alignments advance data collection will be conducted to provide advanced information to establish construction cost estimates, as well as utility investigations and coordination, topographic and boundary survey work, geotechnical investigations, and traffic studies. Pre-NEPA level planning work to evaluate potential impacts of the project will also be evaluated. This effort will move the project toward a Tier 2 NEPA analysis as required by the Tier 1 EIS Record of Decision.

**Location Description**
This project is located from Atlanta Beltline west at Westview to Atlanta Beltline east at Ponce De Leon Avenue.

# Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

# Congressional District Information

| District | State |
|---|---|
| 4 | Georgia |
| 6 | Georgia |
| 5 | Georgia |
| 2 | Georgia |

# Program Plan Information

**STIP/TIP**
Date: N/A
Description: N/A

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

# Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $2,800,000 |
| Local | | | $700,000 |

| Local/In-Kind | | $0 |
|---|---|---|
| State | | $0 |
| State/In-Kind | | $0 |
| Other Federal | | $0 |
| Transportation Development Credit | | $0 |
| Adjustment | | $0 |
| **Total Eligible Cost** | | **$3,500,000** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2018-004-01-00 | 122-00 (122-A1) | RAIL TRANSITWAY LINES | $1,200,000.00 | $500,000.00 | $1,700,000.00 | 0 |
| GA-2018-004-01-00 | 12.21.03 | ENG/DESIGN - LINE EQUIP/ STRUCTURES | $1,200,000.00 | $500,000.00 | $1,700,000.00 | 0 |
| GA-2018-004-01-00 | 442-00 (442-A2) | METROPOLITAN PLANNING | $1,600,000.00 | $200,000.00 | $1,800,000.00 | 1 |
| GA-2018-004-01-00 | 44.24.00 | SHORT RANGE TRANSIT PLANNING | $1,600,000.00 | $200,000.00 | $1,800,000.00 | 1 |

## Project Budget Activity Line Items

| Budget Activity Line Item: 44.24.00 - SHORT RANGE TRANSIT PLANNING | | | | |
|---|---|---|---|---|
| **Scope Name / Code** | **Line Item #** | **Line Item Name** | **Activity** | **Quantity** |
| METROPOLITAN PLANNING (442-00) | 44.24.00 | SHORT RANGE TRANSIT PLANNING | METROPOLITAN PLANNING | 1 |

**Extended Budget Description**
Revision #1
This activity line item (ALI) will fund planning activities, including public and stakeholder meetings and outreach, review of existing and future plans, coordination with other regional projects, data evaluation, etc. This will assist in reaching a consensus on the preferred alignment for the BeltLine rail infrastructure within the study area.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,600,000 |
| Local | | | $200,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,800,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP Advertised | 3/25/2013 | This milestone is the advertisement date of the RFP. |
| Contract Award | 10/31/2013 | This milestone is the initial contract award date. |
| Project Start Date | 9/15/2016 | This milestone is the start date of the project. |
| Contract Amendment | 10/13/2016 | This milestone is the contract amendment date to incorporate the advance NEPA planning work in the project budget. |
| Project Completion Date | 12/31/2018 | This is the anticipated completion date of the NEPA evaluation work. |
| Final Documentation | 4/30/2025 | This milestone is the Final Documentation date for the planning study. |

**Budget Activity Line Item: 12.21.03 - ENG/DESIGN - LINE EQUIP/STRUCTURES**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| RAIL TRANSITWAY LINES (122-00) | 12.21.03 | ENG/DESIGN - LINE EQUIP/STRUCTURES | ENGINEERING & DESIGN | 0 |

**Extended Budget Description**
Revision #1
This Activity Line Item (ALI) will fund data collection and corridor characterization to support planning level design and analysis to establish the geography, impacts, and costs of different BeltLine rail alignment concepts within the study area. It will include some utility investigations and coordination, topographic and boundary survey work, geotechnical investigations, traffic studies, and alternative evaluation of different conceptual alignments so as to arrive at a preferred BeltLine alignment. The cost estimates for the alignments will be determined inclusive of planned stations, trail connections, and other necessary rail appurtenances.

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,200,000 |
| Local | | | $500,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,700,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP Advertised | 5/17/2018 | This milestone is the anticipated advertisement date of the RFP. |
| Contract Award | 7/1/2018 | This milestone is the anticipated contract award date for outside Professional Engineering Services. |
| Project start date | 8/30/2018 | This milestone is the anticipated start date of the project. |
| Project completion date | 8/1/2019 | This milestone is the anticipated substantial completion date of the project. |
| Alternatives Analysis Completion | 10/1/2024 | This milestone is the anticipated alternatives analysis completion date. |

## Project Environmental Findings

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| RAIL TRANSITWAY LINES (122-00) | 12.21.03 | ENG/DESIGN - LINE EQUIP/STRUCTURES | 0 | $1,200,000.00 | $1,700,000.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| METROPOLITAN PLANNING (442-00) | 44.24.00 | SHORT RANGE TRANSIT PLANNING | 1 | $1,600,000.00 | $1,800,000.00 |

# Part 4: Fleet Details

No fleet data exists for this application.

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 8/22/2017 |
| Comment | Separate activities into 2 ALIs. |

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 3/8/2018 |
| Comment | 1. Please have Official and Attorney PIN FY2018 C&As in TrAMS. 2. Please attach page(s) of UPWP on which STBG funding for the Downtown Crosstown Extension has been programmed. 3. NEW POLICY: In Application Details, Application End Date should be set to the date |

of March 30 at least 2 years after last milestone date in the application (3/30/2022, in this case).

## Application Review Comments

| | |
|---|---|
| **Comment By** | **Kenyata Smiley** |
| Comment Type | Application Details |
| Date | 3/9/2018 |
| Comment | 1. The FFY 2018 Certifications and Assurances have been pinned in TrAMS by both the Official and Attorney. The signature pages has also been attached in the recipient documents.<br><br>2. As discussed, the STBG funding for this project is not being reflected in Appendix 5 of the Atlanta Region's UPWP, because it is not an actual planning study, the funding is being used for NEPA Clearance and PE.<br><br>3. In the Application Details, the Application End Date, per the new policy has been updated to reflect March 30, 2022, which is at least 2 years after last milestone date in the application. |

## Application Review Comments

| | |
|---|---|
| **Comment By** | **Jacqueline Chester** |
| Comment Type | Recipient Budget Revision |
| Date | 6/3/2021 |
| Comment | This request is to consider "Revision One (1) to FTA Grant No. GA-2018-004-00 for the purposes;<br>1. To reallocate funding among existing line items to reflect ENG/DESIGN $1,200,000; and METROPOLITAN PLANNING $1,600,000.<br>2. Rename the project as "BELTLINE NORTHWEST CORRIDOR FEASIBILITY STUDY".<br>3. Update project activities to include a corridor analysis to establish a preferred alignment for the Belt Line trail from the Bankhead Rail Station to the Lindbergh Rail Station.<br>4. Extend the period of performance end date to June 20, 2024. |

| | |
|---|---|
| **Comment By** | **Patrick Winders** |
| Comment Type | FTA Budget Revision |
| Date | 6/10/2021 |
| Comment | 1. Please move the funding in the activity line items. I do not see any financial transactions recorded.<br>2. Please update the period of performance in the application details<br>3. Please update the executive summary to reflect the updated project<br>4. Please update the budget narratives in the ALIs to reflect the updated project |

For the updated descriptions please identify them with something like "Budget Revision #1" before the update

Thanks!

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/25/2021 |
| Comment | This request is to consider "Revision One (1) to FTA Grant No. GA-2018-004-00 for the purposes; 1. To reallocate funding among existing line items to reflect ENG/DESIGN $1,200,000; and METROPOLITAN PLANNING $1,600,000. 2. Rename the project as "BELTLINE NORTHWEST CORRIDOR FEASIBILITY STUDY". 3. Update project activities to include a corridor analysis to establish a preferred alignment for the Belt Line trail from the Bankhead Rail Station to the Lindbergh Rail Station. 4. Extend the period of performance end date to June 20, 2024. |

| Comment By | Patrick Winders |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 7/7/2021 |
| Comment | Please make the period of performance end date March 30th two years following the latest milestone |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 7/7/2021 |
| Comment | The period of performance end date has been revised to reflect March 30, 2026 per regional conventions for grant end dates. |

| Comment By | Patrick Winders |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 7/7/2021 |
| Comment | |

| Comment By | Jacqueline Chester |
|---|---|

| Comment Type | Recipient Budget Revision |
|---|---|
| Date | 11/7/2022 |
| Comment | This request is to consider "Revision Two" (2) to FTA Grant GA-2018-004-00 for the purposes of:<br>1. To expand the geography of the study along the Atlanta Belt Line corridor, from the Lindbergh Rail Station anti-clockwise to Glenwood Avenue Rail Station.<br>2. The technical scope of work would remain constant.<br>3. The overall budget and ALI budget allocations would remain constant.<br>4. Intermediate milestones dates will be updated.<br>5. The March 2026 end date should remain constant |

| Comment By | Nelson Delgado-Rivera |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 12/2/2022 |
| Comment | Budget revision #2 proposes expanding the geography of the study along the Atlanta Belt Line corridor, from the Lindbergh Rail Station anti-clockwise to Glenwood Avenue Rail Station. From Budget Revision #1, the study was updated to include a corridor analysis to establish a preferred alignment for the Belt Line trail from the Bankhead Rail Station to the Lindbergh Rail Station. There are no changes to the award budget. The current Period of Performance end date is March 30, 2026.<br><br>According to additional information by the City of Atlanta:<br>• The City expects to work with the Atlanta Beltline (ABI) as an implementation partner for this grant.<br>• ABI will procure the services of a Third-Party Contractor to perform the work in the grant.<br>• The City will perform the grant management and oversight functions.<br>• The City will only reimburse ABI for the expenses incurred by the Third-Party Contractor in delivering the contracted scope. ABI expenses (e.g., administrative, staff, etc.) will not be charged to this grant.<br>• As of 11/15/2022, ABI was in the process of procuring the Third-Party Contractor in accordance with FTA procurement requirements. No contract had been executed.<br>• The RFQ identified a base contract scope matching the scope of the existing grant, as well as the additional scope/geography associated with this budget revision request. |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/18/2025 |
| Comment | |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 6/18/2025 |

| Comment | Please provide clear comment/addition in executive summary that states the BR # X is for a period of performance extension to XX/XX/XXXX.<br><br>Thanks. |
|---|---|

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/18/2025 |
| Comment | Budget Revision request #3<br>Budget Revision request #3 is for a period of performance extension to 03/30/2026. |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 6/23/2025 |
| Comment | Please state in executive summary that BR is for period of performance extension to 03/30/2026 so there is documentation of the change. |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/24/2025 |
| Comment | Budget Revision request #3 is for a period of performance extension to 03/30/2026. |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 6/25/2025 |
| Comment | |

# Part 6: Agreement

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**GRANT AGREEMENT**
**(FTA G-24, October 1, 2017)**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Grant Agreement, FTA has obligated and awarded federal assistance as provided below. Upon execution of this Grant Agreement by the Recipient named below, the Recipient affirms this

FTA Award, enters into this Grant Agreement with FTA, and binds its compliance with the terms of this Grant Agreement.

The following documents are incorporated by reference and made part of this Grant Agreement:
(1) "Federal Transit Administration Master Agreement," FTA MA(24), October 1, 2017, http://www.transit.dot.gov,
(2) The Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA, and
(3) Any Award notification containing special conditions or requirements, if issued.

WHEN THE TERM "FTA AWARD" OR "AWARD" IS USED, EITHER IN THIS GRANT AGREEMENT OR THE APPLICABLE MASTER AGREEMENT, "AWARD" ALSO INCLUDES ALL TERMS AND CONDITIONS SET FORTH IN THIS GRANT AGREEMENT.

FTA OR THE FEDERAL GOVERNMENT MAY WITHDRAW ITS OBLIGATION TO PROVIDE FEDERAL ASSISTANCE IF THE RECIPIENT DOES NOT EXECUTE THIS GRANT AGREEMENT WITHIN 90 DAYS FOLLOWING FTA's AWARD DATE SET FORTH HEREIN.

## FTA AWARD

Federal Transit Administration (FTA) hereby awards a Federal Grant as follows:

## Recipient Information

Recipient Name:  Atlanta, City Of

Recipient ID:  2879

UEI:

DUNS:  065372500

## Award Information

Federal Award Identification Number (FAIN):  GA-2018-004

Award with Amendment Number:  GA-2018-004-00

Award Name:  Atlanta Streetcar Downtown Crosstown Extension - FFY 2016 Surface Transportation Block Grant (STBG) Program Urban

Award Executive Summary:  BR is for period of performance extension to 03/30/2026
_____
_____
_____
This grant application requests the obligation of FY 2016, Surface Transportation Block Grant (STBG) Program - Urban (>200K) (ARC) flexible funding in the amount of $2,800,000 (federal share), to be transferred and administered under the FTA Section 5307 Program; for the City of Atlantas (CoA) National Environmental Policy Act (NEPA) Clearance and Initial Engineering Investigation for the Atlanta Streetcar Downtown Crosstown Extension. The NEPA and Engineering Investigation will be conducted from the Atlanta Beltline West at Westview to Atlanta Beltline East at Ponce De Leon Avenue. These funds are programmed from the following source: $2,800,000 (federal share) in FY 2016 Surface Transportation Block Grant (STBG) - Urban (>200K) funds and $700,000 (local match) funds, included in the Atlanta Regional Transportation Improvement Program (TIP) (#AR-490A) and incorporated by

reference in the approved State Transportation Improvement Program (STIP) (#0014991).

This project will include advance data collection on the corridor to support detailed design of an eastern extension of the existing Atlanta Streetcar system, as well as provide more detailed information to establish more accurate construction cost estimates. General coordination between an extension and future expansion of the streetcar system will also be explored during this process. As well as, utility investigations and coordination, topographic and boundary survey work, geotechnical investigations, traffic studies, and establishing baseline criteria for traction power substations.

This project will fund the NEPA planning work for a western expansion of the existing Atlanta Streetcar System. This crosstown corridor will make vital connections between downtown Atlanta job centers, Georgia State campus, the Atlanta University Center, and the Atlanta BeltLine Westside corridor.

Award Start Date: The Award Start Date for this grant will be the same as the date of award in TrAMS. Award End Date: March 30, 2026.

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funding information identified above is consistent with the TIP pages and Flex Letter/Confirmation email attached with this application.

## Award Budget

Total Award Budget:  $3,500,000.00

Amount of Federal Assistance Obligated for This FTA Action (in U.S. Dollars):  $0.00

Amount of Non-Federal Funds Committed to This FTA Action (in U.S. Dollars):  $0.00

Total FTA Amount Awarded and Obligated (in U.S. Dollars):  $2,800,000.00

Total Non-Federal Funds Committed to the Overall Award (in U.S. Dollars):  $700,000.00

## Award Budget Control Totals

(The Budget includes the individual Project Budgets (Scopes and Activity Line Items) or as attached)

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $2,800,000 |
| Local | | | $700,000 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |

| Transportation Development Credit | | | $0 |
|---|---|---|---|
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$3,500,000** |

(The Transportation Development Credits are not added to the amount of the Total Award Budget.)

**U.S. Department of Labor Certification of Public Transportation Employee Protective Arrangements:**

DOL Decision:  DOL Concurs - Certified
DOL Review Date:  4/30/2018
DOL Certification Date: N/A

**Special Conditions**

There are no special conditions.

**FINDINGS AND DETERMINATIONS**

By signing this Award on behalf of FTA, I am making all the determinations and findings required by federal law and regulations before this Award may be made.

**FTA AWARD OF THE GRANT AGREEMENT**

Awarded By:
Yvette Taylor
Regional Administrator
FEDERAL TRANSIT ADMINISTRATION
U.S. DEPARTMENT OF TRANSPORTATION
Contact Info: yvette.taylor@dot.gov
Award Date: 5/3/2018

## EXECUTION OF THE GRANT AGREEMENT

Upon full execution of this Grant Agreement by the Recipient, the Effective Date will be the date FTA or the Federal Government awarded Federal assistance for this Grant Agreement.

By executing this Grant Agreement, the Recipient intends to enter into a legally binding agreement in which the Recipient:
(1)  Affirms this FTA Award,
(2)  Adopts and ratifies all of the following information it has submitted to FTA:
    (a)  Statements,
    (b)  Representations,
    (c)  Warranties,
    (d)  Covenants, and
    (e)  Materials,
(3)  Consents to comply with the requirements of this FTA Award, and
(4)  Agrees to all terms and conditions set forth in this Grant Agreement.

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

Executed By:
*Kenyata Smiley*
*Project Manager Sr*
*Atlanta, City Of*
*5/3/2018*

# EXHIBIT K

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB4DEEDA05CF

# DOT                                                                  FTA

**U.S. Department of Transportation**                    **Federal Transit Administration**

# Award

| Federal Award Identification Number (FAIN) | GA-95-X035 |
|---|---|
| Award with Amendment Number | GA-95-X035-01 |
| Temporary Application Number | GA-95-X035-00 |
| Award Name | Transit Access & Mobility Improvements |
| Award Status | Active (Executed) |
| Budget Revisions | 3 |

| Period of Performance Start Date | N/A | | |
|---|---|---|---|
| Original Period of Performance End Date | 6/30/2019 | | |
| Current Period of Performance End Date | N/A | Revision #: 1 | Approved?: Yes |

# Part 1: Recipient Information

| Name: CITY OF ATLANTA |
|---|

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
|---|---|---|---|---|
| 2879 | City | CITY OF ATLANTA | | 065372500 |

| Location Type | Address | City | State | Zip |
|---|---|---|---|---|
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

# Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
|---|---|
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |
| State | Georgia |
| Zipcode | 30302 |
| Contact Name | Gina Pagnotta |

| | |
|---|---|
| Telephone | 678-414-8982 |
| Fax | |
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Award Information

## Title: Transit Access & Mobility Improvements

| Award with Amendment Number | Award Status | Award Type | Award Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| GA-95-X035-01 | Active (Executed) | Grant | Region 4 | 4/17/2017 | 4/17/2017 | Yes |

**Award Executive Summary**

Budget Revision #3 is for a period of performance extension until 03/30/2027
----------------------------------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------
Application Executive Summary "Amendment One (1)" for FTA Grant No. GA-95-X035-00:
This grant application is to request 'Amendment 1' to FTA Grant No. GA-95-X035-00 for the purposes of updating the Activity Line Items to reflect the accurate 80% (federal) and 20% (local) match requirement and 90% (federal) and 10% (local) match; and to move $208,588.00 (federal) from Activity Line Item (ALI) No. 11.91.05 Eng/Design Ped Access/Walkways - M.L. King Jr. Drive to ALI No. 11.93. 05 Construct Ped Access/Walkways - M.L. King Jr. Drive; and to move $21,600.00 (federal) from ALI No. 11.91.05 Eng/Design Ped Acess/Walkways - Midtown Activity Center to ALI No. 11.93.05 Construct Ped Access/Walkways - Midtown Activity Center.

Project Description "Amendment One (1)":

MLK Jr. Drive Project: The Martin Luther King (MLK) Junior (Jr.) Drive project will provide mobility improvements and improved access (from Northside Drive to Ollie Street) to an existing transit corridor for pedestrians along M. L. K. Jr. Drive and provide connectivity to MARTA bus stops and rail stations in the MLK corridor.

Juniper Street Project: The Juniper Street project will provide improved access, safety, and connectivity to transit for pedestrians and bicyclist along Juniper Street from 14th Street to Ponce de Leon Avenue.

Midtown Activity Center Project: The Midtown Activity Center project will provide improved access, safety, and connectivity to transit for pedestrians and bicyclist within the Midtown Activity Center to the Arts Center, Midtown, and North Ave MARTA Rail Stations and various bus stops within the district.

Spring Street Project: The Spring Street project will provide improved access, safety, and connectivity to transit for pedestrians and bicyclist along Spring Street between US 19 (Peachtree Street) and 17th Street.

Award Start Date (Amendment One): The award start date for 'Amendment 1" will be the same date this grant amendment is awarded in TrAMS.
Award End Date (Amendment One): January 31, 2023

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funding requested in 'Amendment 1' is consistent with the approved TIP pages and flex information attached with this application.

Project Start Date (Amendment One)
June 01, 2017
Project End Date (Amendment One)
October 28, 2022

_____
_____

Original Application: This grant application uses STP FLEX funds to support the design and construction of bicycle and pedestrian safety projects that improve mobility and access to existing bus and rail stops and stations within the City of Atlanta. ADA accessibility, ramps and pedestrian signalization will also be improved. Three projects are within the Midtown Community Improvement District (MCID), Juniper St. from 14th ST to Ponce de Leon Ave, Spring St. from 17th St. to Peachtree St., and select pedestrian safety and crossing improvements at several Intersections within the MCID. A fourth project is along MLK Jr. Dr. from Ollie St. to Northside Dr. The Midtown projects seek to improve transit access for pedestrians and bicyclists within the Midtown Activity Center to the Arts Center, Midtown, and North Ave MARTA Rail Stations and various bus stops within the district. Improved access, safety and connectivity to existing MARTA bus and rail stations will be the result. The MLK Jr. Dr. project seeks to provide mobility improvements and improved access to an existing transit corridor for pedestrians along M. L. King Jr. Drive and MARTA bus and rail stations in the MLK corridor. The projects are substantially within existing public transportation rights of way. No property acquisitions are anticipated (although temporary construction easements may be needed). Please see attachments in TEAM from ARC and the City of Atlanta on project description, transit nexus, eligibility for lower local match, typical sections, FLEX transfer and other info. The City of Atlanta will manage/ implement the MLK Jr. Dr. project; Midtown Alliance will provide construction management for the Midtown projects. The City of Atlanta will be responsible for maintenance of these projects throughout the useful life of each project.

NOTE: There are no unions involved in the implementation of these projects.

**Frequency of Milestone Progress Reports (MPR)**
Quarterly

**Frequency of Federal Financial Reports (FFR)**
Quarterly

**Pre-Award Authority**
This award is using Pre-Award Authority.

**Will this Grant be using Lapsing Funds?**
No, this Grant does not use Lapsing Funds.

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
Design and construct bicycle and pedestrian safety projects that improve the mobility and access to existing bus and rail stops and stations within the City of Atlanta.

**Activities to be performed:**
Improved access for pedestrians and bicyclists within Midtown Activity Center to Arts Center, Midtown and North Ave MARTA Rail Stations and various bus stops within the district.
Mobility improvements and improved access to an existing transit corridor for pedestrians along M.L.

King Jr. Drive and MARTA bus and rail stations in the MLK corridor
Improve mobility and access to existing bus and rail stops and stations within the City of Atlanta

**Expected outcomes:**
Improved mobility and access to existing bus and rail stops and stations within the City of Atlanta

**Intended beneficiaries:**
City of Atlanta pedestrians.

**Subrecipient Activities:**
None

# Award Point of Contact Information

| | |
|---|---|
| **FTA Point of Contact** | RG/-M. Sandberg 404-865-5634 |
| **Recipient Point of Contact** | William Jones, 404-865-8965 |

# Award Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $7,843,177 |
| Local | | | $2,256,875 |
| State | | | $0 |
| Other Federal | | | $0 |
| **Total Eligible Cost** | | | **$10,100,052** |
| Adjustment Amount | | | $0 |
| **Gross Award Cost** | | | **$10,100,052** |

# Award Budget

| Budget Item | | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|
| 119-00 | Bus Associated Transit Improvements | $7,843,177.00 | $2,256,875.00 | $10,100,052.00 | 0 |
| 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS - M. L. King Dr | $0.00 | $0.00 | $0.00 | 0 |
| 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS- Midtown Activity Center | $0.00 | $0.00 | $0.00 | 0 |
| 11.91.05 | ENG/DESIGN PED ACCESS / | $188,000.00 | $47,000.00 | $235,000.00 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| | | WALKWAYS - Spring St | | | |
| 11.93.05 | | CONSTRUCT PED ACCESS / WALKWAYS - Juniper St | $1,338,880.00 | $909,734.00 | $2,248,614.00 | 0 |
| 11.93.05 | | CONSTRUCT PED ACCESS / WALKWAYS- M. L. King Jr Drive | $1,126,377.00 | $281,594.00 | $1,407,971.00 | 0 |
| 11.93.05 | | CONSTRUCT PED ACCESS / WALKWAYS - Midtown Activity Center | $1,421,600.00 | $355,400.00 | $1,777,000.00 | 0 |
| 11.93.05 | | CONSTRUCT PED ACCESS / WALKWAYS - Sping St | $1,760,000.00 | $440,000.00 | $2,200,000.00 | 0 |
| 11.93.06 | | CONSTRUCT BICYCLE ACCESS, FACILITY - Juniper St | $2,008,320.00 | $223,147.00 | $2,231,467.00 | 0 |

## Discretionary Allocations

This application does not contain discretionary allocations.

## Sources of Federal Financial Assistance

| UZA Code | Area Name | Account Class Code | FPC | Description | Amendment Amount | Cumulative Amount |
|---|---|---|---|---|---|---|
| 130200 | Atlanta, GA | 2015.45.95.SX.2 | 00 | FHWA flex trf to 5307 - STP | $0 | $7,843,177 |

# Part 3: Project Information

## Project Title: Transit Access & Mobility Improvements

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-95-X035-01 | N/A | 4/17/2017 | 12/1/2015 | 6/30/2017 |

## Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

## Congressional District Information

| District | State |
|----------|-------|
| 4 | Georgia |

## Project Budget Activity Line Items

### Budget Activity Line Item: 11.91.05 - ENG/DESIGN PED ACCESS / WALKWAYS - M. L. King Dr

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|-------------------|-------------|----------------|----------|----------|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | ENG/DESIGN PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

This Activity Line Item (ALI) is being zeroed out because the design of this project has been 100% locally funded and therefore, no design cost will be accrued/charged to this grant. It is being requested in "Amendment 1," that the $208,588.00 (federal) currently programmed from this Activity Line Item (ALI) No. 11.91.05 Eng/Design Ped Access/Walkways - M.L. King Jr. Drive, be moved to ALI No. 11.93.05 Construct Ped Access/Walkways - M.L. King Jr. Drive.

| Funding Source | Section of Statute | CFDA Number | Amount |
|----------------|--------------------|-----------|--------|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $0 |
| Non-FTA Amount | | | $0 |
| **Total Eligible Cost** | | | **$0** |

| Milestone Name | Est. Completion Date | Description |
|----------------|----------------------|-------------|
| Contract Award | 1/1/2016 | |
| Contract Complete | 3/1/2016 | |
| Utility Review | 9/30/2016 | Utility companies to respond design plan and notification memo. |

### Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS - Juniper St

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|-------------------|-------------|----------------|----------|----------|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCT PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

"Amendment 1" - This Activity Line Item (ALI) is being updated to reflect the correct $334,720.00 (20% local match) required amount. The milestone dates for this Activity Line Item will be updated in the next Milestone Progress Report.

This Activity Line Item (ALI) will fund the construction and implementation of new or improved

sidewalks, ADA upgrades, pedestrian lighting, crosswalks, curb extensions/bulb outs, and pedestrian signals where needed at intersections along Juniper St. Useful Life is estimated to be 20 years for the concrete items. Pedestrian signals/countdown timers are estimated to have a useful life of 20 years. Roadway lighting is estimated to have a useful life of 20 years.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,338,880 |
| Non-FTA Amount | | | $909,734 |
| **Total Eligible Cost** | | | **$2,248,614** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP Solicited | 12/1/2015 | |
| Contract Award | 3/1/2016 | |
| Contract Completed | 12/31/2016 | |

**Budget Activity Line Item: 11.93.06 - CONSTRUCT BICYCLE ACCESS, FACILITY - Juniper St**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.06 | CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES | CONSTRUCT BICYCLE ACCESS, FACIL & EQUIP ON BUSES | 0 |

**Extended Budget Description**

"Amendment 1" - This Activity Line Item (ALI) is being updated to reflect the correct $223,147.00 (10% local match) required amount. The milestone dates for this Activity Line Item will be updated in the next Milestone Progress Report.

This Activity Line Item (ALI) will fund the construction and installation of new buffered bike lanes, striping of bike lane/bus stop zone delineators and related facilities along Juniper Street between 14th Street and Ponce de Leon Avenue. Useful Life is estimated to be five (5) to seven (7) years for bicycle lanes striping and painting, 20 years for resurfacing of roadway, and 20 years for pedestrian signals and lighting.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $2,008,320 |
| Non-FTA Amount | | | $223,147 |
| **Total Eligible Cost** | | | **$2,231,467** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP Solicited | 12/1/2015 | |
| Contract Award | 4/1/2016 | |
| Contract Completed | 12/31/2016 | |

**Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS- M. L. King Jr Drive**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCT PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

"Amendment 1" - This Activity Line Item (ALI) is being updated to include the requested amount of $ 208,588.00 (federal) currently programmed for Activity Line Item (ALI) No. 11.91.05 Eng/Design Ped Access/Walkways - M.L. King Jr. Drive. As part of "Amendment 1" it is being requested that the $208, 588.00 (federal) be move to this ALI No. 11.93.05 Construct Ped Access/Walkways - M.L. King Jr. Drive.

This ALI is also being updated to reflect the correct $281,594.00 (20% local match) required amount. The milestone dates for this Activity Line Item will be updated in the next Milestone Progress Report.

This Activity Line Item (ALI will fund the construction and installation of raised medians and pedestrian crossing islands, pedestrian crosswalks, filling gaps in existing sidewalks, ADA ramp upgrades, and pedestrian amenities along the M. L. King Jr. Drive corridor. The useful life of concrete sidewalks, raised medians, and pedestrian crossing islands and ADA ramps is 20 years and lane striping is five (5) to seven (7) years. Pedestrian signals and lighting is estimated to have a useful life of 20 years.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,126,377 |
| Non-FTA Amount | | | $281,594 |
| **Total Eligible Cost** | | | **$1,407,971** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Contract Solicitations Issued | 4/1/2016 | |
| Contract Award | 7/15/2016 | |
| Contract Completed | 4/1/2017 | |

**Budget Activity Line Item: 11.91.05 - ENG/DESIGN PED ACCESS / WALKWAYS-Midtown Activity Center**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | ENG/DESIGN PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

This Activity Line Item (ALI) is being zeroed out because the design of this project has been 100% locally funded by Midtown Alliance and therefore, no design cost will be accrued/charged to this grant. It is being requested in "Amendment 1, that the $21,600.00 (federal) currently programmed for ALI No. 11.91.05 Eng/Design Ped Acess/Walkways - Midtown Activity Center, be moved to ALI No. 11.93.05 Construct Ped Access/Walkways - Midtown Activity Center.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $0 |
| Non-FTA Amount | | | $0 |
| **Total Eligible Cost** | | | **$0** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Contract Award | MM/dd/yyyy | Milestone Zeroed out on 1/17/2017. |
| Contract Completed | MM/dd/yyyy | Milestone Zeroed out on 1/17/2017. |

**Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS - Midtown Activity Center**

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCT PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

"Amendment 1" - This Activity Line Item (ALI) is being updated to include the requested amount of $21,600.00 (federal) from ALI No. 11.91.05 Eng/Design Ped Acess/Walkways - Midtown Activity Center. As part of "Amendment 1" it is being requested that the $21,600.00 (federal) be moved from ALI No. 11.91.05 Eng/Design Ped Acess/Walkways - Midtown Activity Center to ALI No. 11.93.05 Construct Ped Access/Walkways - Midtown Activity Center.

This ALI is being updated to reflect the correct $355,400.00 (20% local match) required amount.

This Activity Line Item (ALI) will fund the construction and installation of new and/or upgraded pedestrian crosswalks, ADA ramps, and pedestrian amenities at several intersections linking connections to existing MARTA bus stops, MARTA rail stations, and Regional Express Bus Stops within Midtown between North Avenue and 17th Street. Useful Life is estimated to be 20 years for the concrete items. Pedestrian signals and countdown timers are estimated to have a useful life of 20 years.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,421,600 |
| Non-FTA Amount | | | $355,400 |
| **Total Eligible Cost** | | | **$1,777,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP Solicited | 10/1/2016 | |
| Contract Award | 1/1/2017 | |
| Contract Completed | 6/30/2017 | |

| Budget Activity Line Item: 11.91.05 - ENG/DESIGN PED ACCESS / WALKWAYS - Spring St |
|---|

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS | ENG/DESIGN PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

"Amendment 1" - This Activity Line Item (ALI) is being updated to reflect the correct $47,000 (20% local match) required amount. The milestone dates for this Activity Line Item will be updated in the next Milestone Progress Report.

This Activity Line Item (ALI) will fund the engineering and design for widening sidewalks and installing new street and pedestrian lighting and significant traffic calming and bicycle and pedestrian safety improvements between US 19 (Peachtree Street) and 17th Street along Spring Street. Currently, this section of US 19 (Spring Street) has narrow sidewalks in poor condition with four travel lanes, in which car speeds are excessive and unsafe for an urban area. The work will be contained within the City`s right-of-way (ROW) which is approximately 60 feet from back of sidewalk to back of sidewalk.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $188,000 |
| Non-FTA Amount | | | $47,000 |
| **Total Eligible Cost** | | | **$235,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Contract Award | 2/1/2016 | |
| Contract Complete | 8/1/2016 | |
| RFQ | 2/7/2017 | This milestone is the Request for Qualifications (RFQ) for professional engineering services for the design of the Spring Street Pedestrian Access and Walkways. The RFQ is scheduled for advertisement on February 07, 2017. |

| Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS - Sping St |
|---|

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCT PED ACCESS / WALKWAYS | 0 |

**Extended Budget Description**

"Amendment 1" - This Activity Line Item (ALI) is being updated to reflect the correct $440,000 (20% local match) required amount.

This Activity Line Item (ALI) will fund the construction and installation of new and/or upgraded sidewalks, new street and pedestrian lighting, and pedestrian crosswalks along Spring St. between US 19 (Peachtree Street) and 17th Street. Useful Life is estimated to be 20 years for the concrete items. Pedestrian signals/countdown timers and pedestrian lighting are estimated to have a useful life of 20 years. Striping for pedestrian crosswalks are estimated to have a useful life of five 95) to seven (7) years.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,760,000 |
| Non-FTA Amount | | | $440,000 |
| **Total Eligible Cost** | | | **$2,200,000** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| RFP Solicited | 9/1/2016 | |
| Contract Award | 1/1/2017 | |
| Contact Completed | 6/30/2017 | |

## Project Environmental Findings

| **Finding: Class 2C** |
|---|

**Class Level Description**

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS - M. L. King Dr | 0 | $0.00 | $0.00 |

| **Finding: Class 2C** |
|---|

**Class Level Description**

**Categorical Exclusion Description**

Type 04: Planning and administrative activities which do not involve or lead directly to construction, such as: training, technical assistance and research; promulgation of rules, regulations, directives, or program guidance; approval of project concepts; engineering; and operating assistance to transit authorities to continue existing service or increase service to meet routine demand.

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS- Midtown Activity Center | 0 | $0.00 | $0.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 02: Acquisition, construction, maintenance, rehabilitation, and improvement or limited expansion of stand-alone recreation, pedestrian, or bicycle facilities, such as: a multiuse pathway, lane, trail, or pedestrian bridge; and transit plaza amenities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS - Juniper St | 0 | $1,338,880.00 | $2,248,614.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 02: Acquisition, construction, maintenance, rehabilitation, and improvement or limited expansion of stand-alone recreation, pedestrian, or bicycle facilities, such as: a multiuse pathway, lane, trail, or pedestrian bridge; and transit plaza amenities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.06 | CONSTRUCT BICYCLE ACCESS, FACILITY - Juniper St | 0 | $2,008,320.00 | $2,231,467.00 |

| Finding: Class II(c) - Categorical Exclusions (C-List) |
|---|

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 02: Acquisition, construction, maintenance, rehabilitation, and improvement or limited expansion of stand-alone recreation, pedestrian, or bicycle facilities, such as: a multiuse pathway, lane, trail, or pedestrian bridge; and transit plaza amenities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS- M. L. King Jr Drive | 0 | $1,126,377.00 | $1,407,971.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 02: Acquisition, construction, maintenance, rehabilitation, and improvement or limited expansion of stand-alone recreation, pedestrian, or bicycle facilities, such as: a multiuse pathway, lane, trail, or pedestrian bridge; and transit plaza amenities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS - Midtown Activity Center | 0 | $1,421,600.00 | $1,777,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 02: Acquisition, construction, maintenance, rehabilitation, and improvement or limited expansion of stand-alone recreation, pedestrian, or bicycle facilities, such as: a multiuse pathway, lane, trail, or pedestrian bridge; and transit plaza amenities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.91.05 | ENG/DESIGN PED ACCESS / WALKWAYS - Spring St | 0 | $188,000.00 | $235,000.00 |

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**

Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 02: Acquisition, construction, maintenance, rehabilitation, and improvement or limited expansion of stand-alone recreation, pedestrian, or bicycle facilities, such as: a multiuse pathway, lane, trail, or pedestrian bridge; and transit plaza amenities.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS - Sping St | 0 | $1,760,000.00 | $2,200,000.00 |

# Part 4: Fleet Details

**Fleet Type:** Fixed Route

**Fleet Comments**
No vehicles in this application

| | | Current Value |
|---|---|---|
| I. | **Active Fleet** | |
| | A. Peak Requirement | 0 |
| | B. Spares | 0 |
| | C. Total (A+B) | 0 |
| | D. Spare Ratio (B/A) | 0% |
| II. | **Inactive Fleet** | |

| | | |
|---|---|---|
| | A. Other | 0 |
| | B. Pending Disposal | 0 |
| | C. Total (A+B) | 0 |
| III. | **Total (I.C and II.C)** | 0 |

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 4/17/2017 |
| Comment | 1. Please update App Exec Summary to add in language requested here: https://www.transit.dot.gov/funding/grantee-resources/teamtrams/required-application-information. Be sure that End Date in App Exec Summary allows plenty of time after your last milestone for reconciliation and drawdowns. 2. Please label App Exec Summary, Project Description, and EBDs with an " Amendment 1" label and explain what funds are being added/removed to the application and why. Separate from existing language with an "Original Application" label. 3.Be sure that you are explaining/justifying the two "zeroed out" ALIs as well. 4.11.93.05 CONSTRUCT PED ACCESS/WALKWAYs - Overmatch reflected in budget. Please explain and/or correct. Remember that any local match reflected here may only be used toward this project and application. 5. Please acknowledge in EBD of ALIs with outdated milestones, that the milestone dates will be updated in the next MPR (please keep these new dates in mind when setting a new End date in the App Exec Summary). |

| Comment By | Richelle Gosman |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 5/9/2017 |
| Comment | Returned to address match ratios. |

## Application Review Comments

| Comment By | Kenyata Smiley |
|---|---|
| Comment Type | Environmental Findings |
| Date | 4/24/2017 |
| Project Title | Transit Access & Mobility Improvements |
| Project Number | GA-95-X035-01 |

| Comment | The NEPA Class of Action for each Activity Line Item is the same as classified in the original grant application. There has been no changes in the scope of the four (4) projects included in this grant. |

## Application Review Comments

| Comment By | Kenyata Smiley |
| --- | --- |
| Comment Type | Recipient Budget Revision |
| Date | 3/11/2020 |
| Comment | This budget revision is being submitted to request FTA's consideration in extending the period of performance for Amendment #1 of this grant from December 30, 2019 to January 31, 2023.<br><br>-The construction of the MLK Jr. Drive Project is 90% complete and anticipated to be fully completed by September 2020.<br><br>- The City has obtained approval of the traffic study from GDOT for the US 19 Spring Street Project and the 30% design has now resumed. The design for this project is anticipated to be completed in April of 2021. The advertisement for an invitation to bid on the construction services is anticipated for July 2021.<br><br>-The MOA for the Juniper Street Project has been executed between SHPO, the City, and FTA. The advertisement for an invitation to bid on the construction services is anticipated for J June 2020.<br><br>-The advertisement for an invitation to bid on the construction services for the Last Mile Regional Activity Center Project was released on February 21, 2020 and is scheduled to close on March 25, 2020. |

| Comment By | Patrick Winders |
| --- | --- |
| Comment Type | FTA Budget Revision |
| Date | 3/16/2020 |
| Comment | |

| Comment By | Jacqueline Chester |
| --- | --- |
| Comment Type | Recipient Budget Revision |
| Date | 11/14/2022 |
| Comment | Budget Revision Two(2)<br>This request is to consider "Revision Two (2) to FTA Grant GA-95-X035-00 due to significant coordination delays with the City of Atlanta Department of Procurement, The Georgia Department of Transportation (GDOT) and the State Historic Preservation Office (SHPO) for the purposes:<br>1. Extend the period of performance end date to March 30, 2026. |

2. Extend the project end date to December 30, 2024, for the Juniper Street Project.
3. Extend the project end date to September 30, 2024, for the Midtown Activity Center Project.
4. Extend the project end date to September 30, 2024, for the Spring Street Project.

| Comment By | Nelson Delgado-Rivera |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 11/21/2022 |
| Comment | Budget Revision #2 requests extending the period of performance end date to March 30, 2026. |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/18/2025 |
| Comment | |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 6/23/2025 |
| Comment | Please review - recommend including a statement in executive summary that states BR is for a period of performance extension until XX/XX/XXXX (not needed for the individual ALIs). |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 6/24/2025 |
| Comment | Budget Revision Request #3 is for a period of performance extension to 03/30/2027. |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 6/24/2025 |
| Comment | PoP extension request. |

# Part 6: Agreement

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION**

**GRANT AGREEMENT
(FTA G-23, October 1, 2016)**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Grant Agreement, FTA has obligated and awarded federal assistance as provided below. Upon execution of this Grant Agreement by the Recipient named below, the Recipient affirms this FTA Award, enters into this Grant Agreement with FTA, and binds its compliance with the terms of this Grant Agreement.

The following documents are incorporated by reference and made part of this Grant Agreement:
(1) "Federal Transit Administration Master Agreement," FTA MA(23), October 1, 2016, http://www.fta.dot.gov,
(2) The Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA, and
(3) Any Award notification containing special conditions or requirements, if issued.

WHEN THE TERM "FTA AWARD" OR "AWARD" IS USED, EITHER IN THIS GRANT AGREEMENT OR THE APPLICABLE MASTER AGREEMENT, "AWARD" ALSO INCLUDES ALL TERMS AND CONDITIONS SET FORTH IN THIS GRANT AGREEMENT.

FTA OR THE FEDERAL GOVERNMENT MAY WITHDRAW ITS OBLIGATION TO PROVIDE FEDERAL ASSISTANCE IF THE RECIPIENT DOES NOT EXECUTE THIS GRANT AGREEMENT WITHIN 90 DAYS FOLLOWING FTA's AWARD DATE SET FORTH HEREIN.

**FTA AWARD**

Federal Transit Administration (FTA) hereby awards a Federal grant as follows:

**Recipient Information**

Recipient Name:  CITY OF ATLANTA

Recipient ID:  2879

UEI:

DUNS:  065372500

**Award Information**

Federal Award Identification Number (FAIN):  GA-95-X035

Award with Amendment Number:  GA-95-X035-01

Award Name:  Transit Access & Mobility Improvements

Award Executive Summary:
Budget Revision #3 is for a period of performance extension until 03/30/2027

-------------------------------------------------------------------------------------------------------------------------------
-------------------------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------

Application Executive Summary "Amendment One (1)" for FTA Grant No. GA-95-X035-00:
This grant application is to request 'Amendment 1' to FTA Grant No. GA-95-X035-00 for the purposes of updating the Activity Line Items to reflect the accurate 80% (federal) and 20% (local) match requirement and 90% (federal) and 10% (local) match; and to move $208,588.00 (federal) from Activity Line Item (ALI) No. 11.91.05 Eng/Design Ped Access/Walkways - M.L. King Jr. Drive to ALI No. 11.93.05 Construct Ped Access/Walkways - M.L. King Jr. Drive; and to move $21,600.00 (federal) from ALI No. 11.91.05 Eng/Design Ped Acess/Walkways - Midtown Activity Center to ALI No. 11.93.05 Construct Ped Access/Walkways - Midtown Activity Center.

Project Description "Amendment One (1)":

MLK Jr. Drive Project: The Martin Luther King (MLK) Junior (Jr.) Drive project will provide mobility improvements and improved access (from Northside Drive to Ollie Street) to an existing transit corridor for pedestrians along M. L. K. Jr. Drive and provide connectivity to MARTA bus stops and rail stations in the MLK corridor.

Juniper Street Project: The Juniper Street project will provide improved access, safety, and connectivity to transit for pedestrians and bicyclist along Juniper Street from 14th Street to Ponce de Leon Avenue.

Midtown Activity Center Project: The Midtown Activity Center project will provide improved access, safety, and connectivity to transit for pedestrians and bicyclist within the Midtown Activity Center to the Arts Center, Midtown, and North Ave MARTA Rail Stations and various bus stops within the district.

Spring Street Project: The Spring Street project will provide improved access, safety, and connectivity to transit for pedestrians and bicyclist along Spring Street between US 19 (Peachtree Street) and 17th Street.

Award Start Date (Amendment One): The award start date for 'Amendment 1" will be the same date this grant amendment is awarded in TrAMS.
Award End Date (Amendment One): January 31, 2023

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funding requested in 'Amendment 1' is consistent with the approved TIP pages and flex information attached with this application.

Project Start Date (Amendment One)
June 01, 2017
Project End Date (Amendment One)
October 28, 2022

_____
_____

Original Application: This grant application uses STP FLEX funds to support the design and construction of bicycle and pedestrian safety projects that improve mobility and access to existing bus and rail stops and stations within the City of Atlanta. ADA accessibility, ramps and pedestrian signalization will also be improved. Three projects are within the Midtown Community Improvement District (MCID), Juniper St. from 14th ST to Ponce de Leon Ave, Spring St. from 17th St. to Peachtree St., and select pedestrian safety and crossing improvements at several Intersections within the MCID. A fourth project is along MLK Jr. Dr. from Ollie St. to Northside Dr. The Midtown projects seek to improve transit access for pedestrians and bicyclists within the Midtown Activity Center to the Arts Center, Midtown, and North Ave MARTA Rail Stations and various bus stops within the district. Improved access, safety and connectivity to existing MARTA bus and rail stations will be the result. The MLK Jr. Dr. project seeks to provide mobility improvements and improved access to an existing transit corridor for pedestrians along M. L. King Jr.

Drive and MARTA bus and rail stations in the MLK corridor. The projects are substantially within existing public transportation rights of way. No property acquisitions are anticipated (although temporary construction easements may be needed). Please see attachments in TEAM from ARC and the City of Atlanta on project description, transit nexus, eligibility for lower local match, typical sections, FLEX transfer and other info. The City of Atlanta will manage/implement the MLK Jr. Dr. project; Midtown Alliance will provide construction management for the Midtown projects. The City of Atlanta will be responsible for maintenance of these projects throughout the useful life of each project.

NOTE: There are no unions involved in the implementation of these projects.

Total Award Budget:  $10,100,052.00

Amount of Federal Assistance Obligated for This FTA Action (in U.S. Dollars):  $0.00

Amount of Non-Federal Funds Committed to This FTA Action (in U.S. Dollars):  $0.00

Total FTA Amount Awarded and Obligated (in U.S. Dollars):  $7,843,177.00

Total Non-Federal Funds Committed to the Overall Award (in U.S. Dollars):  $2,256,875.00

**Award Budget Control Totals**

(The Budget includes the individual Project Budgets (Scopes and Activity Line Items) or as attached)

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $7,843,177 |
| Local | | | $2,256,875 |
| State | | | $0 |
| Other Federal | | | $0 |
| **Total Eligible Cost** | | | **$10,100,052** |
| Adjustment Amount | | | $0 |
| **Gross Award Cost** | | | **$10,100,052** |

**U.S. Department of Labor Certification of Public Transportation Employee Protective Arrangements:**

Original Certification Date:

**TERMS AND CONDITIONS**

**Special Conditions**

There are no special conditions.

Awarded By:

Dudley Whyte
Deputy Regional Administrator
FEDERAL TRANSIT ADMINISTRATION
U.S. DEPARTMENT OF TRANSPORTATION
Contact Info: dudley.whyte@dot.gov
Award Date: 5/17/2017 3:45 PM GMT+00:00

## EXECUTION OF THE GRANT AGREEMENT

Upon full execution of this Grant Agreement by the Recipient, the Effective Date will be the date FTA or the Federal Government awarded Federal assistance for this Grant Agreement.

By executing this Grant Agreement, the Recipient intends to enter into a legally binding agreement in which the Recipient:
(1)  Affirms this FTA Award,
(2)  Adopts and ratifies all of the following information it has submitted to FTA:
    (a)  Statements,
    (b)  Representations,
    (c)  Warranties,
    (d)  Covenants, and
    (e)  Materials,
(3)  Consents to comply with the requirements of this FTA Award, and
(4)  Agrees to all terms and conditions set forth in this Grant Agreement.


Executed By:
*Kenyata Smiley*
*Project Manager Sr*
*CITY OF ATLANTA*
*5/17/2017 3:58 PM GMT+00:00*

# EXHIBIT L

# DOT                                                                    FTA

**U.S. Department of Transportation**                    **Federal Transit Administration**

# Award

| Federal Award Identification Number (FAIN) | GA-2020-023 |
|---|---|
| **Award with Amendment Number** | GA-2020-023-00 |
| **Temporary Application Number** | 2879-2017-5 |
| **Award Name** | FLEX to 5307; Boulevard Pedestrian Mobility Improvements - STP Urban; City of Atlanta, GA |
| **Award Status** | Active (Executed) |
| **Budget Revisions** | 1 |

| Period of Performance Start Date | N/A | | |
|---|---|---|---|
| **Original Period of Performance End Date** | N/A | | |
| **Current Period of Performance End Date** | N/A | Revision #: 0 | Approved?: Yes |

## Part 1: Recipient Information

### Name: Atlanta, City Of

| Recipient ID | Recipient OST Type | Recipient Alias | UEI | DUNS |
|---|---|---|---|---|
| 2879 | City | CITY OF ATLANTA | | 065372500 |

| Location Type | Address | City | State | Zip |
|---|---|---|---|---|
| Mailing Address | CITY OF ATLANTA 55 TRINITY AVENUE | ATLANTA | GA | 30303 |
| Physical Address | 55 TRINITY AVE | ATLANTA | GA | 30303 |

## Union Information

| Union Name | Professional Association of City Employees (P.A.C.E. Atlanta) |
|---|---|
| Address 1 | P.O. Box 4023 |
| Address 2 | |
| City | Atlanta |
| State | Georgia |

| Zipcode | 30302 |
|---|---|
| Contact Name | Gina Pagnotta |
| Telephone | 678-414-8982 |
| Fax | |
| E-mail | GPagnotta@AtlantaGa.Gov |
| Website | |

# Part 2: Award Information

## Title: FLEX to 5307; Boulevard Pedestrian Mobility Improvements - STP Urban; City of Atlanta, GA

| Award with Amendment Number | Award Status | Award Type | Award Cost Center | Date Created | Last Updated Date | From TEAM? |
|---|---|---|---|---|---|---|
| GA-2020-023-00 | Active (Executed) | Grant | Region 4 | 4/14/2017 | 4/14/2017 | No |

### Award Executive Summary

This grant application request the obligation of FY 2014 and FY 2015 Surface Transportation Program ( STP) Urban flexible funding transferred to and administered under the FTA Section 5307 Program for the City of Atlanta's (CoA) Mobility Improvements, which includes essential components of the CoA's overall multi-modal transportation network. These funds are programmed from the following sources: Boulevard Pedestrian Improvements: $120,000 (federal share) in FY 2014 Surface Transportation Program (M230) and $880,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-276) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (# 0012592).

The Boulevard Pedestrian Mobility Improvements project will improve safe access to transit for pedestrians by installing curb bulb outs along Boulevard between Wabash Avenue and Boulevard Place, and constructing mid-block crosswalks, pedestrian refuge islands, a short sidewalk widening, ADA ramps, optimizing Right-of-Way (ROW), and other pedestrian mobility and safety improvements at signalized intersections between US 78/278 (Ponce de Leon Avenue) and Woodward Avenue. This project is included in the locally-adopted Cycle Atlanta, Phase 1.0 Study and the 2008 Old Fourth Ward Master Plan.

Award Start Date: The award start date will be the same date this grant is awarded in TrAMS.
Award End Date: March 30, 2026.

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funds requested above is consistent with the Flex Funding Request Letter attached with this application.

### Frequency of Milestone Progress Reports (MPR)
Annual

### Frequency of Federal Financial Reports (FFR)
Annual

### Pre-Award Authority

This award is using Pre-Award Authority.

**Will this Grant be using Lapsing Funds?**
No, this Grant does not use Lapsing Funds.

**Requires E.O. 12372 Review**
No, this application does not require E.O. 12372 Review.

**Delinquent Federal Debt**
No, my organization does not have delinquent federal debt.

# Award Description

**Purpose**
The Boulevard Pedestrian Mobility Improvements project will improve safe access to transit for pedestrians by installing curb bulb outs along Boulevard between Wabash Avenue and Boulevard Place.

**Activities to be performed:**
The project would consist of installing curb bulb-outs and optimizing right-of-way (ROW) along Boulevard between Highland Avenue and Boulevard Place NE. It would also include constructing mid-block crosswalks, flashing beacons, pedestrian refuge islands, a short sidewalk widening, ADA ramps, and other pedestrian mobility and safety improvements at signalized intersections. This project is included in the locally-adopted Cycle Atlanta, Phase 1.0 Study, and the 2008 Old Fourth Ward Master Plan.

**Expected outcomes:**
This project will help improve pedestrian mobility, safety, and access to transit including the MARTA Blue and Green Rail Lines and MARTA Bus Routes #2, #3, #16, #21, and #99.

**Intended beneficiaries:**
This project will improve safe access to transit for pedestrians.

**Subrecipient Activities:**
None

# Award Point of Contact Information

| First Name | Last Name | Title | E-mail Address | Phone |
|---|---|---|---|---|
| | | john.crocker@dot.gov | Community Planner | |
| | | gabrielle.gusmerotti@dot.gov | General Engineer | |
| Michele | Wynn | Director, Program Delivery | mwynn@atlantaga.gov | (678) 794-8879 |

# Award Budget Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $668,913 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |

| | | | $0 |
|---|---|---|---|
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,668,913** |

## Award Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2020-023-01-00 | 119-00 (119-A1) | Bus Associated Transit Improvements | $1,000,000.00 | $668,913.00 | $1,668,913.00 | 0 |
| GA-2020-023-01-00 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $1,000,000.00 | $668,913.00 | $1,668,913.00 | 0 |

## Discretionary Allocations

This application does not contain discretionary allocations.

## Sources of Federal Financial Assistance

| PO Number | Project Number | Scope Name | Scope Number | Scope Suffix | UZA Code | Area Name | Account Class Code | FPC | Description | Amendment Amount | Cumulative Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GA-95-X 061 | GA-2020-023-01-00 | Bus Associated Transit Improvements | 119-00 (119) | A1 | 1302 00 | Atlanta, GA | 2015.45.9 5.SX.2 | 00 | FHWA flex trf to 5307 - STP | $1,000,000 | $1,000,000 |

# Part 3: Project Information

## Project Title: Boulevard - Pedestrian Mobility Improvements

| Project Number | Temporary Project Number | Date Created | Start Date | End Date |
|---|---|---|---|---|
| GA-2020-023-01-00 | 2879-2017-5-P1 | 4/14/2017 | 6/2/2020 | 11/28/2023 |

**Project Description**
This project will improve safe access to transit for pedestrians by installing curb bulb-outs and optimizing right-of-way (ROW) along Boulevard between Highland Avenue and Boulevard Place NE. The project would consist of installing curb bulb-outs and optimizing right-of-way (ROW) along Boulevard between Highland Avenue and Boulevard Place NE. It would also include constructing mid-block crosswalks, flashing beacons, pedestrian refuge islands, a short sidewalk widening, ADA ramps, and other pedestrian mobility and safety improvements at signalized intersections. This project is included in the locally-adopted Cycle Atlanta, Phase 1.0 Study, and the 2008 Old Fourth Ward Master Plan.

**Project Benefits**
This project will help improve pedestrian mobility, safety, and access to transit including the MARTA Blue and Green Rail Lines and MARTA Bus Routes #2, #3, #16, #21, and #99. Portions of this project are located within a defined Equitable Target Area and will provide pedestrians with improved safe access and connectivity to employment and commercial centers, schools and other major destinations throughout the project corridor.

**Additional Information**
None.

**Location Description**
This project is located between Highland Avenue NE and Boulevard Place NE along Boulevard Avenue within Atlanta, Georgia City Limits in Fulton County. The project will include installing curb bulb-outs along Boulevard Avenue between Wabash Avenue and Boulevard Place NE, and constructing mid-block crosswalks, pedestrian refuge islands, a short sidewalk widening, ADA ramps, optimizing right-of-way (ROW) and, other pedestrian mobility and safety improvements at signalized intersections.
Boulevard NE at Wabash Avenue NE - Installation of 2 (two) curb bulb-outs.
Boulevard at Angier Avenue NE - Installation of 4 (four) curb bulb-outs.
Boulevard at Rankin Street NE - Installation of 2 (two) curb bulb-outs.
Boulevard at Pine Street NE - Installation of 2 (two) curb bulb-outs.
Boulevard at Winton Terrace NE - Installation of 1 (one) curb bulb out.
Boulevard at Morgan Street NE - Installation of 1 (one) curb bulb out.
Winton Terrace NE to Morgan Street NE - Installation of an RRFB and crosswalk mid-block, an extension of the sidewalk, and curb bulb-outs.
Boulevard at Boulevard Place NE - Installation of 2 (two) curb bulb-outs.
Medical Center on Boulevard NE - Installation of 1 (one) pedestrian hybrid beacon and mid-block crosswalk.

# Project Location (Urbanized Areas)

| UZA Code | Area Name |
|---|---|
| 130200 | Atlanta, GA |

# Congressional District Information

| District | State |
|---|---|
| 5 | Georgia |

# Program Plan Information

**STIP/TIP**
Date: 4/14/2017
Description: Page 161 of 363 in The Atlanta Region's Plan - Regional Transportation Plan / FY 2018-2023 Transportation Improvement Program.

**UPWP**
Date: N/A
Description: N/A

**Long Range Plan**
Date: N/A
Description: N/A

## Project Control Totals

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $668,913 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,668,913** |

## Project Budget

| Project Number | | Budget Item | FTA Amount | Non-FTA Amount | Total Eligible Amount | Quantity |
|---|---|---|---|---|---|---|
| GA-2020-023-01-00 | 119-00 (119-A1) | Bus Associated Transit Improvements | $1,000,000.00 | $668,913.00 | $1,668,913.00 | 0 |
| GA-2020-023-01-00 | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | $1,000,000.00 | $668,913.00 | $1,668,913.00 | 0 |

## Project Budget Activity Line Items

| Budget Activity Line Item: 11.93.05 - CONSTRUCT PED ACCESS / WALKWAYS |
|---|

| Scope Name / Code | Line Item # | Line Item Name | Activity | Quantity |
|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | CONSTRUCTION | 0 |

**Extended Budget Description**
This Activity Line Item (ALI) and budget will fund outside Construction Services to construct pedestrian mobility and safety improvements and enhancements in the form of pedestrian refuge islands, mid-block crosswalks, curb bulb-outs, pedestrian hybrid beacons, rectangular rapid flashing beacons (RRFB's), sidewalk widenings, and ADA ramp installations. There will be a reduction of curb bulb-outs at Boulevard NE & Wabash NE from 4 (four) to 2 (two).
This Activity Line Item (ALI) will fund the construction of new;
Curb Bulb Outs which have an estimated life expectancy of 20 years, depending on location and volume of traffic in the area.

Rapid Rectangular Flashing Beacons, which have an estimated life expectancy of 10 Years.
A Pedestrian Hybrid Beacon Crossing, which has an estimated life expectancy of 10 Years.
Pedestrian Lights, which have an estimated life expectancy of 10 Years, and
ADA sidewalk ramps which have an estimated life expectancy of 10 Years, depending on the volume of traffic and usage.
Restriping and pavement markings that have an estimated useful life of 20 years (thermoplastic).

**Will 3rd Party contractors be used to fulfill this activity line item?**
Yes, 3rd Party Contractors will be used for this line item.

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $668,913 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,668,913** |

| Milestone Name | Est. Completion Date | Description |
|---|---|---|
| Contract Award | 6/2/2020 | Award of the contract for construction. |
| Construction ITB | 1/28/2022 | ITB Advertisement for construction. |
| Contract Execution Date | 8/1/2022 | Execution of the contract for construction. |
| Kick-Off and NTP | 11/29/2022 | Notice to Proceed and Contract Kick-Off meeting date. |
| Construction Substantial Compeletion | 11/28/2023 | The target date for substantial completion of project activities. |

# Project Environmental Findings

**Finding: Class II(c) - Categorical Exclusions (C-List)**

**Class Level Description**
Class II(c) consists of projects called categorical exclusions (CEs) which are known not to have, either individually or cumulatively, a significant environmental impact on the human or natural environment and are therefore categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement. Class II(c) does not require documentation.

**Categorical Exclusion Description**

Type 05: Activities, including repairs, replacements, and rehabilitations, designed to promote transportation safety, security, accessibility and effective communication within or adjacent to existing right-of-way, such as: the deployment of Intelligent Transportation Systems and components; installation and improvement of safety and communications equipment, including hazard elimination

and mitigation; installation of passenger amenities and traffic signals; and retrofitting existing transportation vehicles, facilities or structures, or upgrading to current standards.

| Date Description | Date |
|---|---|
| Class IIc CE Approved | 6/13/2019 |

| Scope Name / Code | Line Item Number | Line Item Name | Quantity | FTA Amount | Total Eligible Cost |
|---|---|---|---|---|---|
| Bus Associated Transit Improvements (119-00) | 11.93.05 | CONSTRUCT PED ACCESS / WALKWAYS | 0 | $1,000,000.00 | $1,668,913.00 |

# Part 4: Fleet Details

No fleet data exists for this application.

# Part 5: FTA Review Comments

## Application Review Comments

| Comment By | John Crocker |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 5/21/2020 |
| Comment | Please see the following comments:<br>* ALI 11.93.05 - Please add the useful life of the improvements<br>* ALI 11.91.05 - Why is this ALI included in the application if no funding is associated with this activity? |

| Comment By | John Crocker |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 5/27/2020 |
| Comment | Returned at request of recipient. |

| Comment By | John Crocker |
|---|---|
| Comment Type | FTA Post Review Comments for Grantee |
| Date | 6/22/2020 |
| Comment | Please see the following technical comment and retransmit:<br>The end date should be March 30th two years after the last milestone date. i.e. 3/30/26 |

## Application Review Comments

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Application Details |
| Date | 5/21/2020 |
| Comment | *ALI 11.93.05 - The useful life of the improvements have been added.<br>*ALI 11.91.05 - The ALI has been removed. |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Application Details |
| Date | 6/3/2020 |
| Comment | *ALI 11.91.05 - A final decision has been made to remove *ALI 11.91.05 from the application. |

## Application Review Comments

| Comment By | Boyd Melton |
|---|---|
| Comment Type | Application Details |
| Date | 6/26/2020 |
| Comment | NOTE -- As the TA has selected PAA a Task will be generated in TrAMS after Award for an Initial FFR to be entered by the TA prior to execution of the grant. |

## Application Review Comments

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 11/12/2024 |
| Comment | |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 11/13/2024 |
| Comment | 1. The Period of Performance should be set to March 30, 20XX. Normally, two years past the last milestone date.<br>2. It is stated that additional funding in the amount of $22,120.84 is requested. That is not a request that can be made. Budget revisions cannot be used for adding federal funding. If additional funding is necessary, a new grant application should be considered.<br>a. Budget revisions are for any change of budget allocations within the award and the overall award budget that has minor impact on the budget allocations of the original award. I.e. you could move funding around between existing scopes in the award. |

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 11/20/2024 |
| Comment | This budget revision is to request permission for the following<br>Updated Period of Performance End Date: March 30th, 2027<br>Boulevard NE at Wabash Avenue NE – Installation of 2 (two) curb bulb-outs instead of 4 |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 11/21/2024 |
| Comment | Returned to adjust the language in the extended budget descriptions and for period of performance. |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 12/3/2024 |
| Comment | |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 12/16/2024 |
| Comment | Please resubmit with the extended budget description changed reflecting the new number of bulb outs. You can select the existing line item, then revise the line item details (specifically the extended budget description) and then save. |

| Comment By | Jacqueline Chester |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 4/14/2025 |
| Comment | |

| Comment By | Gabrielle Gusmerotti |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 4/22/2025 |

| Comment | Please confirm the language was changed in the line item of the application regarding the bulb outs. |
|---|---|

| **Comment By** | **Jacqueline Chester** |
|---|---|
| Comment Type | Recipient Budget Revision |
| Date | 4/22/2025 |
| Comment | Updated the language in the line item of the application to reflect the revised bulb out amounts for Boulevard NE at Wabash Avenue NE |

| **Comment By** | **Gabrielle Gusmerotti** |
|---|---|
| Comment Type | FTA Budget Revision |
| Date | 4/24/2025 |
| Comment | |

# Part 6: Agreement

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**GRANT AGREEMENT**
**(FTA G-26, October 1, 2019)**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Grant Agreement, FTA has obligated and awarded federal assistance as provided below. Upon execution of this Grant Agreement by the Recipient named below, the Recipient affirms this FTA Award, enters into this Grant Agreement with FTA, and binds its compliance with the terms of this Grant Agreement.

The following documents are incorporated by reference and made part of this Grant Agreement:
(1) "Federal Transit Administration Master Agreement," FTA MA(26), October 1, 2019, http://www.transit.dot.gov,
(2) The Certifications and Assurances applicable to the FTA Award that the Recipient has selected and provided to FTA, and
(3) Any Award notification containing special conditions or requirements, if issued.

WHEN THE TERM "FTA AWARD" OR "AWARD" IS USED, EITHER IN THIS GRANT AGREEMENT OR THE APPLICABLE MASTER AGREEMENT, "AWARD" ALSO INCLUDES ALL TERMS AND CONDITIONS SET FORTH IN THIS GRANT AGREEMENT.

FTA OR THE FEDERAL GOVERNMENT MAY WITHDRAW ITS OBLIGATION TO PROVIDE FEDERAL ASSISTANCE IF THE RECIPIENT DOES NOT EXECUTE THIS GRANT AGREEMENT WITHIN 90 DAYS FOLLOWING FTA's AWARD DATE SET FORTH HEREIN.

**FTA AWARD**

Federal Transit Administration (FTA) hereby awards a Federal Grant as follows:

**Recipient Information**

Recipient Name:  Atlanta, City Of

Recipient ID:  2879

UEI:

DUNS:  065372500

**Award Information**

Federal Award Identification Number (FAIN):  GA-2020-023

Award with Amendment Number:  GA-2020-023-00

Award Name:  FLEX to 5307; Boulevard Pedestrian Mobility Improvements - STP Urban; City of Atlanta, GA

Award Executive Summary:  This grant application request the obligation of FY 2014 and FY 2015 Surface Transportation Program (STP) Urban flexible funding transferred to and administered under the FTA Section 5307 Program for the City of Atlanta's (CoA) Mobility Improvements, which includes essential components of the CoA's overall multi-modal transportation network. These funds are programmed from the following sources: Boulevard Pedestrian Improvements: $120,000 (federal share) in FY 2014 Surface Transportation Program (M230) and $880,000 (federal share) in FY 2015 Surface Transportation Program (M230) funds included in the Atlanta Regional Transportation Improvement Program (TIP) (#AT-276) and incorporated by reference in the approved State Transportation Improvement Program (STIP) (#0012592).

The Boulevard Pedestrian Mobility Improvements project will improve safe access to transit for pedestrians by installing curb bulb outs along Boulevard between Wabash Avenue and Boulevard Place, and constructing mid-block crosswalks, pedestrian refuge islands, a short sidewalk widening, ADA ramps, optimizing Right-of-Way (ROW), and other pedestrian mobility and safety improvements at signalized intersections between US 78/278 (Ponce de Leon Avenue) and Woodward Avenue. This project is included in the locally-adopted Cycle Atlanta, Phase 1.0 Study and the 2008 Old Fourth Ward Master Plan.

Award Start Date: The award start date will be the same date this grant is awarded in TrAMS.
Award End Date: March 30, 2026.

This application does NOT include funds for Research and/or Development Activities.

Indirect Costs Will NOT be applied to this application and its scope of work.

The City of Atlanta is a Direct Recipient and the funds requested above is consistent with the Flex Funding Request Letter attached with this application.

**Award Budget**

Total Award Budget:  $1,668,913.00

Amount of Federal Assistance Obligated for This FTA Action (in U.S. Dollars):  $0.00

Amount of Non-Federal Funds Committed to This FTA Action (in U.S. Dollars):  $0.00

Total FTA Amount Awarded and Obligated (in U.S. Dollars):  $1,000,000.00

Total Non-Federal Funds Committed to the Overall Award (in U.S. Dollars):  $668,913.00

## Award Budget Control Totals

(The Budget includes the individual Project Budgets (Scopes and Activity Line Items) or as attached)

| Funding Source | Section of Statute | CFDA Number | Amount |
|---|---|---|---|
| 49 USC 5307 - Urbanized Area Formula (FHWA xfer FY 2007 fwd) | 5307-3 | 20507 | $1,000,000 |
| Local | | | $668,913 |
| Local/In-Kind | | | $0 |
| State | | | $0 |
| State/In-Kind | | | $0 |
| Other Federal | | | $0 |
| Transportation Development Credit | | | $0 |
| Adjustment | | | $0 |
| **Total Eligible Cost** | | | **$1,668,913** |

(The Transportation Development Credits are not added to the amount of the Total Award Budget.)

**U.S. Department of Labor Certification of Public Transportation Employee Protective Arrangements:**

DOL Decision:   DOL Concurs - Certified
DOL Review Date:  8/5/2020
DOL Certification Date: N/A

**Special Conditions**

There are no special conditions.

**FINDINGS AND DETERMINATIONS**

By signing this Award on behalf of FTA, I am making all the determinations and findings required by federal law and regulations before this Award may be made.

**FTA AWARD OF THE GRANT AGREEMENT**

Awarded By:
Yvette Taylor
Regional Administrator

FEDERAL TRANSIT ADMINISTRATION
U.S. DEPARTMENT OF TRANSPORTATION
Contact Info: yvette.taylor@dot.gov
Award Date: 8/7/2020

## EXECUTION OF THE GRANT AGREEMENT

Upon full execution of this Grant Agreement by the Recipient, the Effective Date will be the date FTA or the Federal Government awarded Federal assistance for this Grant Agreement.

By executing this Grant Agreement, the Recipient intends to enter into a legally binding agreement in which the Recipient:
(1)  Affirms this FTA Award,
(2)  Adopts and ratifies all of the following information it has submitted to FTA:
    (a)  Statements,
    (b)  Representations,
    (c)  Warranties,
    (d)  Covenants, and
    (e)  Materials,
(3)  Consents to comply with the requirements of this FTA Award, and
(4)  Agrees to all terms and conditions set forth in this Grant Agreement.

Executed By:
*Connie Taylor*
*Grants Compliance Director*
*Atlanta, City Of*
*8/20/2020*

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

# EXHIBIT M

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

| | | |
|---|---|---|
| 1. **Award No. RAIS-24-0030-GA** | 2. **Effective Date** <br> See No. 17 Below | 3. **Assistance Listings No.** <br> 20.933 |

4. **Award To**
City of Atlanta
Department of Transportation
55 Trinity Avenue, Suite 4400
Atlanta, GA 30303

Unique Entity Id.: HAAWKXL2PLE3
TIN No.: 58-6000511

5. **Sponsoring Office**
U.S. Department of Transportation
Federal Highway Administration
Office of Acquisition & Grants Management
1200 New Jersey Avenue, SE
HCFA-32, Mail Drop E62-204
Washington, DC 20590

6. **Period of Performance**
Effective Date of Award –
12/31/2032

7. **Total Amount**

| | |
|---|---|
| Federal Share: | $16,000,000 |
| Recipient Share: | $6,900,000 |
| Total: | $22,900,000 |

8. **Type of Agreement**
Grant - RAISE

9. **Authority**
49 U.S.C. 6702; Infrastructure Investment and Jobs Act (Pub. L. No. 117-58, div. J, Nov. 15, 2021); Consolidated Appropriations Act, 2024 (Pub. L. 118-42, March 8, 2024)

10. **Procurement Request No.**

11. **Federal Funds Obligated**
$1,603,000 (Preliminary Engineering and NEPA) with this executed agreement
$2,430,000 (Right of Way)
$11,967,000 (Construction and Utilities)

12. **Submit Payment Requests To**
See Article 18 of the General Terms and Conditions. USDOT Payment System: Delphi eInvoicing

13. **Payment Office**
See Article 18 of the General Terms and Conditions.

14. **Accounting and Appropriations Data**

15. **Description of Project**
15. The project will plan and construct multi-use paths, buffered cycle tracks, sidewalk improvements, ADA bus stop enhancements, lighting, and stormwater updates along Johnson Road, West Marietta Street, Joseph E. Lowery Boulevard, Brady Avenue and 10th Street.

| **RECIPIENT** | **FEDERAL HIGHWAY ADMINISTRATION** |
|---|---|
| 16. **Signature of Person Authorized to Sign** | 17. **Signature of Agreement Officer** |

1 of 20

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

_____          _____
Signature                          Date   Signature                          Date
Name: <u>Solomon Caviness IV</u>         Name:
Title:<u> Commissioner, Atlanta Department of</u>   Title: Agreement Officer
<u>Transportation</u>

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**U.S. DEPARTMENT OF TRANSPORTATION**

**GRANT AGREEMENT UNDER THE
FISCAL YEAR 2024 RAISE PROGRAM**

This agreement is between the United States Department of Transportation (the "**USDOT**") and the [insert full name of recipient]City of Atlanta (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive a RAISE Grant for the [insert project name from USDOT award letter] Westside Park Multimodal Access Project.

If schedule A to this agreement identifies a Designated Subrecipient, that Designated Subrecipient is also a party to this agreement, and the parties want the Designated Subrecipient to carry out the project with the Recipient's assistance and oversight.

The parties therefore agree to the following:

**ARTICLE 1
GENERAL TERMS AND CONDITIONS.**

1.1     **General Terms and Conditions.**

(a)  In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under the Fiscal Year 2024 RAISE Program: FHWA Projects," dated April 23, 2025, which is available at https://www.transportation.gov/BUILDgrants/grant-agreements. The General Terms and Conditions reference the information contained in the schedules to this agreement. The General Terms and Conditions are part of this agreement.

(b)  The Recipient states that it has knowledge of the General Terms and Conditions.

(c)  The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RAISE Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RAISE Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

**ARTICLE 2
SPECIAL TERMS AND CONDITIONS.**

[Choose the appropriate one of these two alternatives.]
[**Alternative #1:** If there are no special terms and conditions, then use the following:]

There are no special terms for this award.

3 of 20

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

[**Alternative #2:** If there are special terms and conditions, repeat and modify the following as needed:]

2.1      [Special Term Title].

[special term text]

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE A**
**ADMINISTRATIVE INFORMATION**

1.    **Application.**

> Application Title:      Westside Park Multimodal Access Project [insert full descriptive title from box 15 of the SF-424]

> Application Date:      2/28/2024 [insert the date in box 3 of the SF-424]

| Commented [USDOT1]: **Additional Information.** For additional context on how the here is used, see the definition of "Technical Application" in section 29.5 in the General Terms and Conditions and the use of the term "Technical Application" throughout the General Terms and Conditions. |

2.    **Recipient's Unique Entity Identifier.**

> See section 28.3 of the General Terms and Conditions. HAAWKXL2PLE3

3.    **Recipient Contact(s).**

| Commented [USDOT2]: **Additional Information.** For additional context on how Recipient Contacts are used and when the Recipient is required to update these contacts, see sections 20.2, 23.3, and 23.4 in the General Terms and Conditions. |

> Name: Stephen Adesanya
> Title: Project Manager II
> Agency: City of Atlanta, Department of Transportation
> Mailing Address: 55 Trinity Avenue SW, Suite 4400
> Phone Number: 470-542-9656
> Email Address: asadesanya@atlantaga.gov

> Name: Jacqueline Chester
> Title: Compliance Manager
> Agency: City of Atlanta, Department of Transportation
> Mailing Address: 55 Trinity Avenue SW, Suite 4400
> Email Address: jchester@atlantaga.gov

4.    **Recipient Key Personnel.**

| Name | Title or Position |
|------|-------------------|
| [Insert name]Lisa M. Glover | [insert title]Deputy Commissioner of Capital Delivery |

| Commented [USDOT3]: **Drafting Instruction:** Add rows to identify as many key personnel as necessary. See section 3.6 of the General Terms & Conditions. |

5.    **USDOT Project Contact(s).**

| Commented [USDOT4]: **Additional Information.** For additional context on how USDOT Project Contacts are used, see sections 6.1, 20.2, and 23.2 in the General Terms and Conditions. |

> [enter name]
> Agreement Officer (AO)
> Federal Highway Administration
> Office of Acquisition and Grants Management
> HCFA-32, Mail Stop E62-310
> 1200 New Jersey Avenue, S.E.
> Washington, DC 20590

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

[enter telephone]
[enter email address]

and

[enter name]
Agreement Specialist (AS)
Office of Acquisition and Grants Management
HCFA-32, Mail Stop E62-204
1200 New Jersey Avenue, S.E.
Washington, DC 20590
[enter telephone]
[enter email]

and

[enter name]Trevor Smart
Agreement Officer Representative (AOR)
[enter job title]Transportation Engineer
[enter office] Federal Highway Administration – Georgia Division
[enter address]75 Ted Turner Dr, Suite 1000
Atlanta, GA 30303
[enter telephone] (404) 562-4280
[email address]trevor.smart@dot.gov

and

[enter name]
[enter job title]
[enter office]
[enter address]
[enter telephone]
[email address]

6.      **Payment System.**

USDOT Payment System:      DELPHI eInvoicing

7.      **Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Office of Acquisition
and Grants Management

8.      **Federal Award Identification Number.**

See section 28.2 of the General Terms and Conditions. The Federal
Award Identification Number will be generated when the FHWA Division authorizes the

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

project in Delphi.  The Recipient acknowledges that it has access to Delphi and can retrieve the FAIN from Delphi.

9.     **Designated Subrecipient.**

Designated Subrecipient:     ~~None~~ Westside/Howell Mill Community Improvement District

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

## SCHEDULE B
## PROJECT ACTIVITIES

1.     **General Project Description.**

[Insert text from the USDOT award letter.]The project will plan and construct intersection improvements, buffered cycle tracks, sidewalk improvements, ADA enhancements, lighting, and stormwater updates along Johnson Road, West Marietta Street, Joseph E. Lowery Boulevard, Brady Avenue and 10th Street.

> **Commented [USDOT5]: Drafting Instruction:** This is OST's description of the project. This description is included in the USDOT selection memo (not necessarily the same as the fact sheet description).

2.     **Statement of Work.**

[Insert statement of work.]The Westside Park Multimodal Access Project, also known as Westside Thrive, is a project located on Atlanta's Westside that will implement transportation improvements that increase safety along five important commuter routes for people and freight. These 3.1 miles of transportation improvements include improving intersection geometry and efficiency for vehicles of all sizes, increasing lighting, creating safer access for families by separating bike and pedestrian facilities from vehicle lanes, and improving stormwater infrastructure to streamline access between Atlanta neighborhoods, major employment hubs, essential services, the Georgia Institute of Technology, and Atlanta's largest park.

> **Commented [USDOT6]: Drafting instructions:**
> This section is intended to supplement section 1 with more detail describing the project scope.
> The SOW should include, but is not limited to, quantitative information of project area/distance, detailed activity (e.g. paving, stormwater improvements, utility installation, adding a lane or path of certain width, etc.), and specification of materials to be used or equipment to be installed where relevant.
> If the project will be completed in segments or phases, describe each segment or phase. If the project has separate functional or geographic components, describe each component.

Project extents are:

- Johnson Road beginning at the Westside Park entrance until West Marietta Street
- West Marietta Street between Johnson Road and Brady Avenue
- Joseph E. Lowery Boulevard between West Marietta Street and Donald Lee Hollowell Parkway
- Brady Avenue between West Marietta Street and 10th Street
- 10th Street between Brady Avenue and Northside Drive
- Off-road facilities may be considered to reduce roadway reconfiguration impacts

RAISE funding for the Westside Park Multimodal Access Project will be used to assist with the following project phases*:

Phase 1: Preliminary Engineering and NEPA

- Complete land survey
- Complete NEPA analysis
- Complete preliminary engineering and determine necessary ROW acquisition
- Begin utility coordination
- Draft Engineer's estimate of probable construction cost

8 of 20

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

Phase 2: Right-of-Way

- Acquire Right-of-Way following the Uniform Act

Phase 3: Construction and Utilities

- Continue utility coordination & any utility relocation work
- Demolition of excess pavement and curbs where necessary
- Grading activities
- Project Construction

* Federal grant funds will not be used to reduce the number of active vehicular travel lanes.

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE C**
**AWARD DATES AND PROJECT SCHEDULE**

1.    **Award Dates.**

Budget Period End Date:[Choose the appropriate one of these two alternatives.]

[**Alternative #1:** If all funds are being obligated at once:]

Budget Period End Date: MM/DD/YYYY

[**Alternative #2**: If funds are to be obligated in multiple project phases:]

Base PhasePreliminary Engineering and NEPA Budget Period End Date: 06/30/2028MM/DD/YYYY
Option Phase 1Right of Way Budget Period End Date:  06/30/2030MM/DD/YYYY
Option Phase 2Construction and Utilities Budget Period End Date: 12/31/2032MM/DD/YYYY

> **Commented [EH7]:** We included some additional time beyond our project schedule for each phase's budget period to allow for finalizing of billing documentation for RAISE grant funds.

Period of Performance End Date:    See section 28.5 of the General Terms and Conditions

2.    **Estimated Project Schedule.**

[Choose the appropriate one of these two alternatives.]
[**Alternative #1:** if this designated a Capital project at section 2 of schedule F:]

| Milestone | Schedule Date |
|---|---|
| Preliminary Engineering and NEPA Completion Date: | 06/30/2027[insert date] |
| Right of Way Completion Date | 06/30/2029 |
| Planned Construction Substantial Completion and Open to Traffic Date | 12/31/2031 |

> **Commented [USDOT8]:** **Additional information.** See article 5 and section 17.1 of the General Terms and Conditions for context on how this schedule is used in the agreement and may affect the availability of RAISE funds for the project.

> **Commented [USDOT9]:** **Drafting Instruction:** If any of the dates in section 2 differ from the dates in the application, each difference must be described in schedule E.

> **Commented [USDOT10]:** **Drafting Instruction:** If this is a phased fund obligation grant agreement (i.e., schedule D section 2 sets the obligation type to "Multiple"), then there must be a completion milestone for each phase. Modify the table to include the applicable milestones for each phase (e.g. Planned Completion of Preliminary Design Date). **See Example Document.**

[**Alternative #2:** if this designated a Planning project at section 2 of schedule F:]

| Milestone | Schedule Date |
|---|---|
| Planned Project Completion Date: | [insert date] |

10 of 20

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

3.    **Special Milestone Deadlines.**

[Choose the appropriate one of these two alternatives.]
[**Alternative #1:** If the only critical dates are completion dates, then use the following:]

None.

[**Alternative #2:** If there are additional critical dates, use this table and insert a row for each date. The milestone must be described in enough detail that there is no ambiguity about when it is met. Each of these milestones is intended to establish a clear trigger for USDOT to terminate the award or amend the terms of this agreement.

If railroad coordination agreements need to be executed, add a milestone for each, prefixed with "Railroad Coordination Agreement: " See section 27.5 of the General Terms and Conditions.]

| Milestone | Deadline Date |
|---|---|
| [Insert milestone] | [insert date] |

11 of 20

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE D**
**AWARD AND PROJECT FINANCIAL INFORMATION**

1.     **Award Amount.**

RAISE Grant Amount:          $16,000,000[$XXX]

> **Commented [USDOT11]: Additional Information.** This section affects the size of the Federal obligation at the time this agreement is executed. For additional context, including how Federal obligations occur when the Federal Obligation Type is "Multiple," see section 4.3 of the General Terms and Conditions.

2.     **Federal Obligation Information.**

[Choose the appropriate one of these two alternatives.]
[**Alternative #1:** If all funds are being obligated at once:]

Federal Obligation Type:     Single

[**Alternative #2:** If funds are to be obligated in project phases or by component:]

> **Commented [USDOT12]: See Example Document.**

Federal Obligation Type:     Multiple

| Obligation Condition Table | | |
|---|---|---|
| **Portion of the Project** | **Portion of the RAISE Grant** | **Obligation Condition** |
| [insert name of first phase (*e.g.*, "Base phase") or component (*e.g.*, "Component 1")] Preliminary Engineering and NEPA | $1,603,000[$XXX] | |
| [insert name of second phase (*e.g.*, "Option phase 1") or component (*e.g.*, "Component 2")] Right-of-Way | $2,430,000[$XXX] | If the FHWA State Division Office confirms the Recipient has met all the applicable Federal, State, and local requirements. [USDOT will describe the conditions] |
| Construction and Utilities | $11,967,000 | If the FHWA State Division Office approves the PS&E for the Project and the Recipient has met all the applicable Federal, State, and local requirements. |

> **Commented [USDOT13]: Additional Information.** To understand how this table is used and affects the Federal obligation of funds, see section 4.3(c)–(h) in the General Terms and Conditions.

> **Commented [USDOT14]: Drafting Instruction:** This table should contain a row for each obligation, but not any other breakdown of the Project. *E.g.*, if the project consists of multiple components, but those are all being obligated together, do not break out the components here.

> **Commented [USDOT15]: Drafting Instruction:** If there are more than two phases or components, add a row for each phase.

12 of 20

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

3.      **Approved Project Budget,**

### Eligible Project Costs

| | [Component 1]Preliminary Engineering and NEPA | [Component 2]Right of Way | Construction and Utilities | Total |
|---|---|---|---|---|
| RAISE Funds: | $1,603,000[$XXX] | $2,430,000[$XXX] | $11,967,000 | $16,000,000[$XXX] |
| Other Federal Funds: | $0[$XXX] | $0[$XXX] | $0 | $0[$XXX] |
| Non-Federal Funds: | $670,000[$XXX] | 970,000[$XXX] | $5,260,000 | $6,900,000[$XXX] |
| Total: | $2,273,000[$XXX] | $3,400,000[$XXX] | $17,227,000 | $22,900,000[$XXX] |

> **Commented [USDOT16]:** **Drafting Instruction:** If any of the sources or amount of funds differ from the sources and amounts in the Application, each difference must be described in schedule E.

> **Commented [USDOT17]:** **Additional Information.** See also sections 1.1, 3.2, and 5.4 of the General Terms and Conditions for context on how this budget information is used in the agreement.

> **Commented [USDOT18]:** **Drafting Instruction:** If there is only a single component, use only the total column and remove other columns. If there are more than 2 components, add columns.

4.      **Cost Classification Table**

[If no costs are anticipated in a category, remove the row from the table.]

| Cost Classification | Total Costs | Non-RAISE Previously Incurred Costs | Eligible Costs |
|---|---|---|---|
| PE | $2,273,000 | $0 | **$2,273,000** |
| ROW | $3,400,000 | $0 | **$3,400,000** |
| UTL | $1,675,000 | $0 | **$1,675,000** |
| Construction | $12,700,000 | $0 | **$12,700,000** |
| Contingency | $2,852,000 | $0 | **$2,852,000** |
| **Project Total** | **22,900,000** | **$0** | **22,900,000** |
| Site work | | | |
| Demolition and removal | | | |
| Construction | | | |
| Equipment | | | |
| Miscellaneous | | | |
| Contingency | | | |
| **Project Total** | | | |

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION
*Revised 04-23-2025*

5.    **Approved Pre-award Costs**

[Choose the appropriate one of these two alternatives.]
[If FHWA did not approve pre-award costs:]

**None.** The USDOT has not approved under this award any pre-award costs under 2 CFR 200.458.

[If FHWA approved pre-award costs]

> **Commented [USDOT19]:** See Example Document.

On [insert date], [Recipient] sent a written request to the FHWA for pre-award approval under 2 CFR 200.458 for costs to [insert activity]. The pre-award approval request would allow the recipient to [describe the reason for pre-award authority]. [Recipient] requested pre-award approval for $XXX in RAISE Grant funds or non-Federal funds for match.

> **Commented [USDOT20]: Drafting Instruction:** Use whole dollars.

The FHWA Office of Acquisition and Grants Management determined that the pre-award costs were incurred directly pursuant to the negotiation and in anticipation of the Federal award and were necessary for efficient and timely performance of the scope of work. That office issued a notice to proceed with pre-award costs on [insert date].

14 of 20

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE E**
**CHANGES FROM APPLICATION**

**Scope**:

No changes. [ If the activities described in schedule B materially differ from the scope presented in the application, describe the changes here and explain the need for those changes. If there are no changes, state that there are no changes. ]

> **Commented [USDOT21]:** Additional Information. The purposes of this schedule E are (1) to clearly and accurately document the differences between the Project described in the application and the Project being funded, including, at minimum, the scope, schedule, and budget and (2) to establish the parties' knowledge and acceptance of those differences.
>
> To see how this information is used, see section 3.1 of the General Terms and Conditions.

**Schedule**:

The milestone dates for Preliminary Engineering and NEPA, Right-of-Way, and Planned Construction Substantial Completion and Open to Traffic Date in the RAISE application was based on a Grant Agreement being finalized in mid-2024. We need to adjust the project timeline to account for a later anticipated start date.
[ If any dates listed in sections 2–3 of schedule C differ from the estimated schedule presented in the application by more than six months, describe the changes here and provide an explanation of the cause of those changes. If there are no changes, state that there are no changes and remove the milestone table below. ]

The table below compares the Project milestone dates.

[Choose the appropriate one of these two alternatives.]
[**Alternative #1:** if this designated a Capital project at section 2 of schedule F:]

| Milestone | Application | Schedule C |
|---|---|---|
| Preliminary Engineering and NEPA | 06/30/2026 | 06/30/2027 |
| Right of Way | 06/30/2027 | 06/30/2029 |
| Planned Construction Substantial Completion and Open to Traffic Date: | [insert date]12/31/2030 | [insert date]12/31/2031 |

> **Commented [USDOT22]: Drafting Instruction:** If there are interim milestones that have shifted (*e.g.,* contract award or start of construction), and the explanation above references those interim milestones, add rows for those interim milestones. If there are multiple components, the text in the milestone column should be clear about which component is being referenced.

[**Alternative #2:** if this designated a Planning project at section 2 of schedule F:]

| Milestone | Application | Schedule C |
|---|---|---|
| Planned Project Completion Date: | [insert date] | [insert date] |

**Budget**:

No changes. [ If any amounts listed in sections 3–4 of schedule D differ from the budget presented in the application, describe the changes here and provide an explanation of the cause of those changes. If there are no changes, state that there are no changes and remove the budget table below. ]

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

The table below provides a summary comparison of the Project budget.

| Fund Source | Application $ | Application % | Schedule D $ | Schedule D % |
|---|---|---|---|---|
| **Previously Incurred Costs** | | | | |
| Federal Funds | | | | |
| Non-Federal Funds | | | | |
| Total Previously Incurred Costs | | | | |
| **Future Eligible Project Costs** | | | | |
| RAISE Funds | | | | |
| Other Federal Funds | | | | |
| Non-Federal Funds | | | | |
| Total Future Eligible Project Costs | | | | |
| Total Project Costs | | | | |

**Other:**

No other changes from the application.[ If there are notable changes in aspects of the Project other than scope, schedule, and budget (*e.g.,* recipient changes), then describe those changes here. If there are not, then state that there are no other notable changes from the application. ]

16 of 20

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE F**
**RAISE PROGRAM DESIGNATIONS**

1.  **Urban or Rural Designation.**

    Urban-Rural Designation:     [Urban] [Rural]

2.  **Capital or Planning Designation.**

    Capital-Planning Designation:     [Capital] [Planning]

3.  **Historically Disadvantaged Community/Area of Persistent Poverty Designation.**

    HDC/APP Designation:     [Yes] [No]

4.  **Funding Act.**

    Funding Act:  [IIJA] [FY2024]

5.  **Security Risk Designation.**

    Security Risk Designation:     [Low] [Elevated]

> **Commented [USDOT23]:** **Additional Information.** For additional context on how the urban-rural designation is used, see section 14.1 in the General Terms and Conditions.

> **Commented [USDOT24]:** **Additional Information.** For additional context on how the capital-planning designation is used, see article 8 in the General Terms and Conditions.

> **Commented [USDOT25]:** **Additional Information.** For additional context on how the HDC or APP designation is used, see section 14.2 in the General Terms and Conditions.

> **Commented [USDOT26]:** **Additional Information.** For additional context on how the funding act is used, see sections 4.2 and 19.2 in the General Terms and Conditions.

> **Commented [USDOT27]:** **Additional Information.** For additional context on how the Security Risk Designation is used, see section 13.1 in the General Terms and Conditions.

17 of 20

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE G**
**RAISE PERFORMANCE MEASUREMENT INFORMATION**

[Choose the appropriate one of these two alternatives.]
[Alternative #1, if this designated a Capital project at section 2 of schedule F:]

**Study Area:** Data will be collected along the following corridors located in census Tracts 6.01, 7, 10.02, 87.02, and 118. West Marietta Street, Johnson Road, Joseph E Lowery Blvd, 10th Street, and Brady Avenue.
[Insert description of area to be studied]

**Baseline Measurement Date:**          [insert date]03/25/2027

**Baseline Report Date:**          [insert date]05/31/2027

**Table 1: Performance Measure Table**

| Performance Measure | Unit Reported |
|---|---|
| [Insert the selected **Performance Measure**]Severe Crashes | [Insert the **Unit Reported** associated with the selected performance measure] Total Severe Crashes Per Year |
| [Insert the selected **Performance Measure**]Level of Traffic Stress | [Insert the **Unit Reported** associated with the selected performance measure] Bicycle or Pedestrian Level of Stress Rating |

[Alternative #2, if this designated a Planning project at section 2 of schedule F:]

**Reserved.**

> **Commented [USDOT28]:** **Additional Information.** See section 8.1 of the General Terms and Conditions for context on how the Baseline Measurement and Report dates are used to establish pre-construction reporting requirements.

> **Commented [USDOT29]:** **Drafting Instruction:** This Baseline Measurement date should be as current as possible before the project begins construction.

> **Commented [USDOT30]:** **Drafting Instruction:** This Baseline Report Date should be reported prior to construction.

> **Commented [USDOT31]:** **Additional Information.** See article 8 of the General Terms and Conditions for context on how this table is used to establish the data collection and reporting requirements.

> **Commented [USDOT32]:** **Drafting Instruction:** USDOT is looking for at least 2-4 performance measures.
>
> Please select from the performance measures listed in *Table 1: RAISE Performance Measures* of the RAISE Performance Measures Update- 2023.

> **Commented [USDOT33]:** **Additional information.** There is no performance report under Article 8 of the General Terms & Conditions for awards designated in section 2 of Schedule F as "Planning".

18 of 20

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

**SCHEDULE H**
**LABOR AND WORK**

1.    **Efforts to Support Good-Paying Jobs and Strong Labor Standards**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| | The Recipient or a project partner promotes robust job creation by supporting good-paying jobs directly related to the project with free and fair choice to join a union. *(Describe robust job creation and identify the good-paying jobs in the supporting narrative below.)* |
| | The Recipient or a project partner will invest in high-quality workforce training programs such as registered apprenticeship programs to recruit, train, and retain skilled workers, and implement policies such as targeted hiring preferences. *(Describe the training programs in the supporting narrative below.)* |
| | The Recipient or a project partner will partner with high-quality workforce development programs with supportive services to help train, place, and retain workers in good-paying jobs or registered apprenticeships including through the use of local and economic hiring preferences, linkage agreements with workforce programs, and proactive plans to prevent harassment. *(Describe the supportive services provided to trainees and employees, preferences, and policies in the supporting narrative below.)* |
| | The Recipient or a project partner will partner and engage with local unions or other worker-based organizations in the development and lifecycle of the project, including through evidence of project labor agreements and/or community benefit agreements. *(Describe the partnership or engagement with unions and/or other worker-based organizations and agreements in the supporting narrative below.)* |
| X | The Recipient or a project partner will partner with communities or community groups to develop workforce strategies. *(Describe the partnership and workforce strategies in the supporting narrative below.)* |
| | The Recipient or a project partner has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient or a project partner has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described in schedule B. *(Identify the relevant actions from schedule B in the supporting narrative below.)* |

19 of 20

**Commented [USDOT34]:** **Additional Information.** NOFO section F.2.b. require project to sufficiently consider job quality and labor rights, standards, and protections in their planning, as determined by the Department, before receiving funds for construction. The purpose of this schedule J is to document DOT's basis for determining the considerations were sufficient for this project. See also article 11 of the General Terms and Conditions.

**Commented [USDOT35]:** **Drafting Instruction:** Insert an "X" in the left column of one or more rows of this table. For each row marked, follow the relevant instructions describing what information should be placed in the supporting narrative at ¶ 2.

**Commented [USDOT36]:** **Drafting Instruction:** If this row is marked, schedule B must describe relevant activities that will be completed before construction begins. If it is the only row marked and this is a capital project, a critical milestone for completing those activities should be proposed at section 3 of schedule C.

**TEMPLATE; NOT INTENDED FOR EXECUTION WITHOUT MODIFICATION**
*Revised 04-23-2025*

| |
|---|
| The Recipient or a project partner has not taken actions related to the Project to improve good-paying jobs and strong labor standards and will not take those actions under this award. |

> **Commented [USDOT37]:** **Additional Information.** USDOT does not anticipate executing an agreement if this box is checked.

2.     **Supporting Narrative.**

[Insert supporting text, as described in the table above. ]

> **Commented [USDOT38]:** **Drafting Instruction:** For each row checked in the preceding table, add a heading here and, below that heading, add narrative text that is only as long as necessary to address the italicized prompt for that row.

Partner with Community Groups

The City of Atlanta and project designated subrecipient Westside/Howell Mill Community Improvement District will work alongside Westside Works (nestled under the Career Rise organization) to leverage their construction training program. Westside Works was founded in 2014 to train residents living in communities adjacent to the future Mercedes Benz Stadium project so they could address the high unemployment rate of these low-income neighborhoods. Over 700 residents have graduated from the program and have found full-time, living-wage jobs, and earned more the $20M in wages.

Westside Works is not only local to our Westside Thrive project area, but it has a decade of experience successfully recruiting and training local residents for construction projects throughout Atlanta. This project will lean on Westside Works' expertise in workforce training to include community members in the construction of Westside Thrive.

# EXHIBIT N

## U.S. DEPARTMENT OF TRANSPORTATION

### GRANT AGREEMENT UNDER THE
### FISCAL YEAR 2023 RAISE PROGRAM

This agreement is between the United States Department of Transportation (the "**USDOT**") and the Georgia Department of Transportation (the "**Recipient**").

This agreement reflects the selection of the Recipient to receive a RAISE Grant for the Trails to Transit: Reconnecting Atlanta Communities project.

If schedule A to this agreement identifies a Designated Subrecipient, that Designated Subrecipient is also a party to this agreement, and the parties want the Designated Subrecipient to carry out the project with the Recipient's assistance and oversight.

The parties therefore agree to the following:

### ARTICLE 1
### GENERAL TERMS AND CONDITIONS.

**1.1     General Terms and Conditions.**

(a)  In this agreement, "**General Terms and Conditions**" means the content of the document titled "General Terms and Conditions Under the Fiscal Year 2023 RAISE Program: FHWA Projects," dated April 23, 2025, which is available at https://www.transportation.gov/BUILDgrants/grant-agreements. The General Terms and Conditions reference the information contained in the schedules to this agreement. The General Terms and Conditions are part of this agreement.

(b)  The Recipient states that it has knowledge of the General Terms and Conditions.

(c)  The Recipient acknowledges that the General Terms and Conditions impose obligations on the Recipient and that the Recipient's non-compliance with the General Terms and Conditions may result in remedial action, terminating of the RAISE Grant, disallowing costs incurred for the Project, requiring the Recipient to refund to the USDOT the RAISE Grant, and reporting the non-compliance in the Federal-government-wide integrity and performance system.

### ARTICLE 2
### SPECIAL TERMS AND CONDITIONS.

There are no special terms for this award.

**SCHEDULE A**
**ADMINISTRATIVE INFORMATION**

1.     **Application.**

Application Title:     Trails to Transit – Reconnecting Atlanta Communities

Application Date:     02/20/2023

2.     **Recipient's Unique Entity Identifier.**

See section 28.3 of the General Terms and Conditions.

3.     **Recipient Contact(s).**

Bobby Johnson
Project Manager
Georgia Department of Transportation
600 West Peachtree Street, 25th Floor
Atlanta, GA 30308
(678) 812-9557
BoJohnson@dot.ga.gov

4.     **Recipient Key Personnel.**

None.

5.     **USDOT Project Contact(s).**

Sonya Ibeh
Transportation Engineer
FHWA Georgia Division
75 Ted Turner Dr SW Suite 1000
Atlanta, GA 30303
(404) 562-3654
sonya.ibeh@dot.gov

6.     **Payment System.**

USDOT Payment System:     FMIS

7.     **Office for Subaward and Contract Authorization.**

USDOT Office for Subaward and Contract Authorization:   FHWA Division

8.     **Federal Award Identification Number.**

See section 28.2 of the General Terms and Conditions.

**9.**      **Designated Subrecipient.**

Designated Subrecipient:      City of Atlanta

Designated Subrecipient Project Contacts:

Betty Smoot-Madison
Deputy Commissioner - Atlanta Department of Transportation
City of Atlanta Department of Transportation
55 Trinity Avenue SW, Suite 4400
Atlanta, GA 30303
(404) 330-6501
atldotgrantsvc@atlantaga.gov

William F. Brown, PMP
Project Manager III
City of Atlanta Department of Transportation
55 Trinity Avenue SW, Suite 4400
Atlanta, GA 30303
(770) 372-8670
wfbrown@atlantaga.gov

Jacqueline Chester, MS, PMP, LSSGB
Federal Grants Administrator
City of Atlanta Department of Transportation
55 Trinity Avenue SW, Suite 4400
Atlanta, GA 30303
(404) 546-1883
jchester@atlantaga.gov

**SCHEDULE B**
**PROJECT ACTIVITIES**

1.    **General Project Description.**

This project will construct Segment 3 and Connector Trails 1-4 of the Atlanta BeltLine Northeast Trail. Construction includes ADA-accessible ramps, crosswalks, signage, lights and security cameras, environmental remediation, utility relocations, stormwater infrastructure, retaining walls, new bridge structures, and landscaping.

2.    **Statement of Work.**

This project constructs Segment 3 of the mainline Atlanta BeltLine Northeast Trail and Connector Trails 1-4. The proposed project includes:

- Construct approximately 0.56-miles of concrete shared-use path on the Atlanta BeltLine Northeast Trail.
  - Atlanta Beltline Northeast Trail Segment 2 at Mayson St. to Atlanta Beltline Northwest Trail Segment 1 at Kinsey Ct. with a ramp to Armour Dr. (0.56-miles)
- Construct approximately 2.08-miles of concrete shared-use path on the Connector Trails 1-4.
  - Connector Trail 1 – Kinsey Ct. to Garson Dr. (0.77-miles)
  - Connector Trail 2 – Connector Trail 1 at Garson Dr. to MARTA Lindbergh Center Station (0.49-miles)
  - Connector Trail 3 – Connector Trail 1 to PATH400 Trail (0.21-miles)
  - Connector Trail 4 – Segment 3 at Armour Dr. to Ottley Dr (0.61-miles)
- Construct 16 retaining walls.
- Construct 5 bridges.
- Construct lighting, cameras, and landscaping.
- Construct ADA accessible ramps, crosswalks, signage, utility relocations, and stormwater infrastructure.

## SCHEDULE C
## AWARD DATES AND PROJECT SCHEDULE

1.  **Award Dates.**

Budget Period End Date:              12/31/2030

Period of Performance End Date:     See section 28.5 of the General Terms and
                                    Conditions

2.  **Estimated Project Schedule.**

| Milestone | Schedule Date |
|-----------|---------------|
| Planned Construction Substantial Completion and Open to Traffic Date: | 12/31/2029 |

3.  **Special Milestone Deadlines.**

None.

**SCHEDULE D**
**AWARD AND PROJECT FINANCIAL INFORMATION**

1.    **Award Amount.**

RAISE Grant Amount:        $25,000,000

2.    **Federal Obligation Information.**

Federal Obligation Type:    Single

3.    **Approved Project Budget.**

| Eligible Project Costs | |
|---|---|
| | **Total** |
| RAISE Funds: | $25,000,000.00 |
| Other Federal Funds: | $16,970,000.00 |
| Non-Federal Funds: | $23,389,477.92 |
| Total: | $65,359,477.92 |

4.    **Cost Classification Table.**

Reserved.

5.    **Approved Pre-award Costs.**

**None.** The USDOT has not approved under this award any costs incurred under an advanced construction authorization (23 U.S.C. 115), any costs incurred prior to authorization (23 CFR 1.9(b)), or any pre-award costs under 2 CFR 200.458.

**SCHEDULE E**
**CHANGES FROM APPLICATION**

**Scope**:          Connector Trail 4 has been added to the construction scope at an estimated cost of $4,524,485. The connector trail has always been in the design project but was previously excluded from the grant project construction scope because of budget constraints. As stated below, due to the project decreasing in cost, construction of Connector Trail 4 has been added to this project. The number of retaining walls was originally listed as approximately 17. The final number of retaining walls is 16 because GDOT reclassified a wall to a ramp and does not represent an actual change in scope. Signals have been removed from the scope and signage has been added in response to the results of a traffic study at Lindbergh Dr. that determined that adding a scramble phase would cause the intersection to fail. The scope has been updated from construct new and improved bridge structures to construct new bridge structures as the Recipient has determined that all bridges in the project scope will be new construction.

**Schedule**:     The anticipated construction completion date was March 2028 in the application. Planned completion has been shifted until December 31, 2029 due to several delays. The environmental review was longer than anticipated and completed four (4) months later than planned. Additional time was needed for significant design revisions to resolve crossing over Norfolk Southern Railway as well as through a conservation easement. The Plan, Specs, and Estimates (PS&E) package was submitted in March 2025. The final field plan review changed the estimated construction schedule from 36 to 42 months. Construction letting was delayed to GDOT FY26 pending the execution of the FY23 RAISE grant agreement.

The table below compares the Project milestone dates.

| Milestone | Application | Agreement |
|---|---|---|
| Planned Construction Substantial Completion and Open to Traffic Date: | 03/31/2028 | 12/31/2029 |

**Budget**:       The total project cost has decreased by $5 million from the time of application, including the addition of construction on Connector Trail 4. As stated in the application, the project budget included a 20 percent contingency because design was at 60 percent. The updated project budget does not include such a contingency. The cost estimate decreased during final design and reflected current market conditions for comparable projects. The Recipient has also elected to modify the source of funding, replacing other Federal funds with non-Federal funds, thereby increasing its non-Federal share.

The table below provides a summary comparison of the Project budget.

| Fund Source | Application $ | Application % | Schedule D $ | Schedule D % |
|---|---|---|---|---|
| **Previously Incurred Costs** | | | | |
| Federal Funds | 0 | --- | 0 | --- |
| Non-Federal Funds | 0 | --- | 0 | --- |
| Total Previously Incurred Costs | 0 | --- | 0 | --- |
| **Future Eligible Project Costs** | | | | |
| RAISE Funds | 25,000,000.00 | 35 | 25,000,000.00 | 38 |
| Other Federal Funds | 31,550,394.00 | 45 | 16,970,000.00 | 26 |
| Non-Federal Funds | 14,137,598.00 | 20 | 23,389,477.92 | 36 |
| Total Future Eligible Project Costs | 70,687,992.00 | 100 | 65,359,477.92 | 100 |
| Total Project Costs | 70,687,992.00 | --- | 65,359,477.92 | --- |

**Other:**       None.

**SCHEDULE F**
**RAISE PROGRAM DESIGNATIONS**

1.      **Urban or Rural Designation.**

Urban-Rural Designation:            Urban

2.      **Capital or Planning Designation.**

Capital-Planning Designation:      Capital

3.      **Historically Disadvantaged Community or Area of Persistent Poverty Designation.**

HDC or APP Designation:            Yes

4.      **Funding Act.**

Funding Act:                        FY2023

5.      **Security Risk Designation.**

Security Risk Designation:          Elevated

## SCHEDULE G
## RAISE PERFORMANCE MEASUREMENT INFORMATION

**Study Area:** Data will be collected on the Northeast Trail at a location north of Mayson St at the base of the ramp.

**Baseline Measurement Date:** 09/30/2025

**Baseline Report Date:** 11/30/2025

**Table 1: Performance Measure Table**

| Measure | Category and Description | Measurement Frequency |
|---|---|---|
| Bicycle and Pedestrian Volumes | Environmental Sustainability, Mobility and Community Connectivity, Quality of Life<br><br>Average Number of Bicycles or Pedestrians per Day | Annual |
| Level of Traffic Stress | Quality of Life, Mobility and Community Connectivity<br><br>Bicycle or Pedestrian Level of Traffic Stress Rating | Annual |

## SCHEDULE H
## LABOR AND WORK

1. **Efforts to Support Good-Paying Jobs and Strong Labor Standards**

The Recipient states that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Recipient or a project partner promotes robust job creation by supporting good-paying jobs directly related to the project with free and fair choice to join a union. *(Describe robust job creation and identify the good-paying jobs in the supporting narrative below.)* |
| | The Recipient or a project partner will invest in high-quality workforce training programs such as registered apprenticeship programs to recruit, train, and retain skilled workers, and implement policies such as targeted hiring preferences. *(Describe the training programs in the supporting narrative below.)* |
| | The Recipient or a project partner will partner with high-quality workforce development programs with supportive services to help train, place, and retain workers in good-paying jobs or registered apprenticeships including through the use of local and economic hiring preferences, linkage agreements with workforce programs, and proactive plans to prevent harassment. *(Describe the supportive services provided to trainees and employees, preferences, and policies in the supporting narrative below.)* |
| | The Recipient or a project partner will partner and engage with local unions or other worker-based organizations in the development and lifecycle of the project, including through evidence of project labor agreements and/or community benefit agreements. *(Describe the partnership or engagement with unions and/or other worker-based organizations and agreements in the supporting narrative below.)* |
| X | The Recipient or a project partner will partner with communities or community groups to develop workforce strategies. *(Describe the partnership and workforce strategies in the supporting narrative below.)* |
| | The Recipient or a project partner has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient or a project partner has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described in schedule B. *(Identify the relevant actions from schedule B in the supporting narrative below.)* |
| | The Recipient or a project partner has not taken actions related to the Project to improve good-paying jobs and strong labor standards and will not take those actions under this award. |

2.      **Supporting Narrative.**

**Job Creation**

The Atlanta Beltline as a whole is set to attract private investment of more than $10 billion and stimulate the creation of 48,000 construction jobs and 30,000 permanent jobs around the 22-mile loop. The Beltline helped to spur the creation of an estimated 24,200 new permanent jobs through 2019. Furthermore, an estimated $8.3 billion in private development has stimulated an estimated 58,100 construction jobs through the end of 2021, putting the project on track to meet programmatic objectives of job attraction and new private investment by 2030. This project, as a part of the Atlanta Beltline, supports good-paying jobs directly related to the project as well as advances overall job creation in the Beltline planning area.

**Develop Workforce Strategies**

Atlanta BeltLine, Inc. (ABI) will work with numerous public, private, nonprofit, and community-based partners to connect community residents to key partners that provide services and training to guide them through the workforce pipeline. In addition to current workforce strategies already underway, the ABI Economic Development team hired a consultant to help create a multi-layered workforce development strategy for Beltline communities.

## RECIPIENT SIGNATURE PAGE

The Recipient, intending to be legally bound, is signing this agreement on the date stated opposite that party's signature.

GEORGIA DEPARTMENT OF TRANSPORTATION

|                                          | By: |                                                    |
|------------------------------------------|-----|----------------------------------------------------|
| Date                                     |     | Signature of Recipient's Authorized Representative |

Russell R. McMurry

Name

Commissioner

Title

13 of 15

**DESIGNATED SUBRECIPIENT SIGNATURE PAGE**

The Designated Subrecipient, intending to be legally bound, is signing this agreement on the date stated opposite that party's signature.

CITY OF ATLANTA

_____By: _____
Date                                    Signature of Designated Subrecipient's Authorized
                                             Representative

                                        Andre Dickens
                                        _____
                                        Name

                                        Mayor
                                        _____
                                        Title

**USDOT SIGNATURE PAGE**

The USDOT, intending to be legally bound, is signing this agreement on the date stated opposite that party's signature.

UNITED STATES DEPARTMENT OF
TRANSPORTATION

By:

_____    _____
Date                                         Signature of USDOT's Authorized Representative

Sabrina David
_____
Name

FHWA Georgia Division Administrator
_____
Title

# EXHIBIT O

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

*Revised 11-04-2025*

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE
FISCAL YEAR 2025 BUILD PROGRAM:
FHWA PROJECTS**

Revision date: November 4, 2025

## **Table of Contents**

Article 1 Purpose..................................................................................................................... 6
   1.1    Purpose. ..................................................................................................................... 6
Article 2 USDOT Role............................................................................................................. 7
   2.1    Division of USDOT Responsibilities. ....................................................................... 7
   2.2    USDOT Program Contacts. ....................................................................................... 7
Article 3 Recipient Role........................................................................................................... 7
   3.1    Statements on the Project. ......................................................................................... 7
   3.2    Statements on Authority and Capacity. ..................................................................... 8
   3.3    USDOT Reliance........................................................................................................ 8
   3.4    Project Delivery......................................................................................................... 8
   3.5    Rights and Powers Affecting the Project. ................................................................. 8
   3.6    Notification of Changes to Key Personnel. ............................................................... 9
   3.7    Subaward to Designated Subrecipient........................................................................ 9
   3.8    Designated Subrecipient Statements and Responsibilities......................................... 9
   3.9    Title 23 Oversight Responsibilities for Subawards. .................................................. 9
Article 4 Award Amount and Federal Obligation.................................................................... 9
   4.1    Federal Award Amount.............................................................................................. 9
   4.2    Federal Funding Source. ........................................................................................... 9
   4.3    Federal Obligations. .................................................................................................. 10
Article 5 Statement of Work, Schedule, and Budget Changes ................................................ 11
   5.1    Change Notification Requirement.............................................................................. 11
   5.2    Scope and Statement of Work Changes. .................................................................... 11
   5.3    Schedule Changes. ..................................................................................................... 11
   5.4    Budget Changes.......................................................................................................... 12
   5.5    USDOT Acceptance of Changes................................................................................ 13
Article 6 General Reporting Terms.......................................................................................... 13
   6.1    Report Submission. .................................................................................................... 13
   6.2    Alternative Reporting Methods.................................................................................. 13
   6.3    Paperwork Reduction Act Information. ..................................................................... 13
Article 7 Progress and Financial Reporting ............................................................................ 13
   7.1    Quarterly Project Progress Reports and Recertifications........................................... 13
   7.2    Final Progress Reports and Financial Information..................................................... 14
Article 8 Performance Reporting ............................................................................................. 14
   8.1    Baseline Performance Measurement........................................................................... 14
   8.2    Post-construction Performance Measurement............................................................. 14
   8.3    Project Outcomes Narrative. ..................................................................................... 15
   8.4    Performance Reporting Survival. .............................................................................. 15
Article 9 reserved..................................................................................................................... 15
Article 10 reserved................................................................................................................... 15
Article 11 Labor and Work ...................................................................................................... 15
   11.1    Labor and Work. ...................................................................................................... 15
Article 12 Civil Rights and Title VI ........................................................................................ 15
   12.1    Civil Rights and Title VI. ........................................................................................ 15
   12.2    Legacy Infrastructure and Facilities......................................................................... 16

Article 13 Critical Infrastructure Security and Resilience ............................................................ 16
    13.1   Critical Infrastructure Security and Resilience. ......................................................... 16
Article 14 BUILD Program Designations....................................................................................... 17
    14.1   Effect of Urban or Rural Designation. ...................................................................... 17
    14.2   Effect of Historically Disadvantaged Community/Area of Persistent Poverty
           Designation. ............................................................................................................... 17
Article 15 Contracting and Subawards .......................................................................................... 17
    15.1   Minimum Wage Rates............................................................................................... 17
    15.2   Buy America. ............................................................................................................ 17
    15.3   Small and Disadvantaged Business Requirements..................................................... 19
    15.4   Engineering and Design Services............................................................................... 19
    15.5   Prohibition on Certain Telecommunications and Video Surveillance Services or
           Equipment. ................................................................................................................ 19
    15.6   Pass-through Entity Responsibilities.......................................................................... 19
    15.7   Subaward and Contract Authorization. ..................................................................... 19
Article 16 Noncompliance and Remedies........................................................................................ 20
    16.1   Noncompliance Determinations................................................................................. 20
    16.2   Remedies. .................................................................................................................. 20
    16.3   Other Oversight Entities............................................................................................ 21
Article 17 Agreement Termination ................................................................................................. 21
    17.1   USDOT Termination.................................................................................................. 21
    17.2   Closeout Termination................................................................................................. 22
    17.3   Post-Termination Adjustments................................................................................... 22
    17.4   Non-Terminating Events. ........................................................................................... 22
    17.5   Other Remedies. ........................................................................................................ 23
Article 18 Costs, Payments, and Unexpended Funds ..................................................................... 23
    18.1   Limitation of Federal Award Amount........................................................................ 23
    18.2   Projects Costs. ........................................................................................................... 23
    18.3   Timing of Project Costs.............................................................................................. 23
    18.4   Recipient Recovery of Federal Funds. ....................................................................... 23
    18.5   Unexpended Federal Funds........................................................................................ 23
    18.6   Timing of Payments to the Recipient......................................................................... 23
    18.7   Payment Method. ...................................................................................................... 24
    18.8   Information Supporting Expenditures......................................................................... 24
    18.9   Reimbursement Frequency......................................................................................... 24
Article 19 Liquidation, Adjustments, and Funds Availability ....................................................... 24
    19.1   Liquidation of Recipient Obligations......................................................................... 24
    19.2   Funds Cancellation.................................................................................................... 25
Article 20 Agreement Modifications .............................................................................................. 25
    20.1   Bilateral Modifications............................................................................................... 25
    20.2   Unilateral Contact Modifications............................................................................... 25
    20.3   USDOT Unilateral Modifications. ............................................................................. 25
    20.4   Other Modifications. ................................................................................................. 25
Article 21 Federal Financial Assistance, Administrative, and National Policy Requirements .... 26
    21.1   Uniform Administrative Requirements for Federal Awards........................................ 26
    21.2   Federal Law and Public Policy Requirements. ........................................................... 26

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF
Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 454 of 619

*Revised 11-04-2025*

21.3    Federal Freedom of Information Act. ............................................................ 26
21.4    History of Performance. .................................................................................. 26
21.5    Whistleblower Protection. .............................................................................. 26
21.6    External Award Terms and Obligations. ........................................................ 27
21.7    Incorporated Certifications. ........................................................................... 27
Article 22 Monitoring, Financial Management, Controls, and Records .......................... 27
22.1    Recipient Monitoring and Record Retention. ................................................ 27
22.2    Financial Records and Audits. ....................................................................... 28
22.3    Internal Controls. ........................................................................................... 28
22.4    USDOT Record Access. ................................................................................. 28
Article 23 Notices ......................................................................................................... 28
23.1    Form of Notice. .............................................................................................. 28
23.2    Method of Notice to USDOT. ........................................................................ 29
23.3    Method of Notice to Recipient. ...................................................................... 29
23.4    Recipient Contacts for Notice. ....................................................................... 29
23.5    Additional Mandatory Notices to USDOT. ................................................... 30
23.6    Scope of Notice Requirements. ...................................................................... 30
Article 24 Information Requests .................................................................................... 30
24.1    USDOT Information Requests. ....................................................................... 30
Article 25 Assignment ................................................................................................... 30
25.1    Assignment Prohibited. .................................................................................. 30
Article 26 Waiver .......................................................................................................... 31
26.1    Waivers. .......................................................................................................... 31
Article 27 Additional Terms and Conditions ................................................................. 31
27.1    Disclaimer of Federal Liability. .................................................................... 31
27.2    Relocation and Real Property Acquisition. ................................................... 31
27.3    Equipment Disposition. .................................................................................. 31
27.4    Environmental Review. .................................................................................. 32
27.5    Railroad Coordination. .................................................................................. 33
Article 28 Mandatory Award Information ...................................................................... 33
28.1    Information Contained in a Federal Award. ................................................... 33
28.2    Federal Award Identification Number. .......................................................... 33
28.3    Recipient's Unique Entity Identifier. ............................................................ 34
28.4    Budget Period. ................................................................................................ 34
28.5    Period of Performance. ................................................................................... 34
Article 29 Construction and Definitions ........................................................................ 34
29.1    Schedules. ....................................................................................................... 34
29.2    Exhibits. .......................................................................................................... 35
29.3    Construction. .................................................................................................. 35
29.4    Integration. ..................................................................................................... 35
29.5    Definitions. ..................................................................................................... 35
29.6    References to Times of Day. .......................................................................... 36
Article 30 Agreement Execution and Effective Date ..................................................... 36
30.1    Counterparts. .................................................................................................. 36
30.2    Effective Date. ................................................................................................ 36

## Index of Definitions

Administering Operating Administration ........................................................................ 7
BUILD Grant ................................................................................................................. 36
BUILD Program............................................................................................................. 6
Designated Subrecipient ...................................................................Schedule A, Section 9
Environmental Review Entity....................................................................................... 32
Federal Share ................................................................................................................ 13
FHWA............................................................................................................................. 7
General Terms and Conditions .................................................................................... 36
NOFO............................................................................................................................. 6
OMB .............................................................................................................................. 13
Program Statute............................................................................................................. 36
Project ........................................................................................................................... 36
Project Closeout............................................................................................................ 22
Project Cost Savings ..................................................................................................... 12
Recipient .............................................................................................Project-Specific Recitals
Technical Application.................................................................................................... 36
Title VI.......................................................................................................................... 16
USDOT .......................................................................................................................... 6

## GENERAL TERMS AND CONDITIONS

The Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), appropriated funds to the United States Department of Transportation (the "**USDOT**") for fiscal year 2025 under the heading "National Infrastructure Investments." The funds are available to carry out 49 U.S.C. 6702 by providing Federal financial assistance for surface transportation infrastructure projects that will have a significant local or regional impact. The USDOT program administering those funds is the Better Utilizing Infrastructure to Leverage Development (the "**BUILD Program**").

On November 1, 2024, the USDOT posted a funding opportunity at Grants.gov with funding opportunity title "FY 2025 National Infrastructure Investments" and funding opportunity number DTOS59-25-RA-RAISE. The notice of funding opportunity posted at Grants.gov (the "**NOFO**") solicited applications for Federal financial assistance under the fiscal year 2025 BUILD Program. On January 10, 2025, the USDOT announced application selections under the NOFO.

These general terms and conditions are incorporated by reference in a project-specific agreement under the fiscal year 2025 BUILD Program. The term "Recipient" is defined in the project-specific portion of the agreement. The project-specific portion of the agreement includes schedules A through H. The project-specific portion of the agreement may include special terms and conditions in project-specific articles.

## ARTICLE 1
## PURPOSE

**1.1    Purpose.**

The purpose of this award is to fund an eligible project that will have a significant local or regional impact and improve transportation infrastructure. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule D.

## ARTICLE 2
## USDOT ROLE

**2.1     Division of USDOT Responsibilities.**

(a)  The Office of the Secretary of Transportation is responsible for the USDOT's overall administration of the BUILD Program, the approval of this agreement, and any modifications to this agreement under section 20.1.

(b)  The Federal Highway Administration (the "**FHWA**") will administer this agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**2.2     USDOT Program Contacts.**

FHWA BUILD Program Manager
Federal Highway Administration
Office of Freight Management and Operations
1200 New Jersey Avenue SE
Room E84-429
Washington, DC 20590
(202) 366-2639 or (202) 366-1200
FHWA-TIGER.Reports@dot.gov

and

OST BUILD Grants Coordinator
United States Department of Transportation
Office of the Secretary
1200 New Jersey Avenue SE
Room W84-227
Washington, DC 20590
(202) 366-8914
BUILDGrants@dot.gov

## ARTICLE 3
## RECIPIENT ROLE

**3.1     Statements on the Project.** The Recipient states that:

(1)     all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)     schedule E documents all material changes in the information contained in that application.

**3.2    Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    not less than the difference between the total eligible project costs listed in section 3 of schedule D and the BUILD Grant Amount listed in section 1 of schedule D is committed to fund the Project;

(5)    it has sufficient funds available to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 3 and in section 21.7 on behalf of the Recipient.

**3.3    USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Technical Application to select the Project to receive this award;

(2)    the USDOT relied on statements of fact in both the Technical Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;

(3)    the USDOT relied on statements of fact in both the Technical Application and this agreement to establish the terms of this agreement; and

(4)    the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**3.4    Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to projects of the Administering Operating Administration.

**3.5    Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprive it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

*Revised 11-04-2025*

(b) The Recipient shall act promptly, in a manner acceptable to the USDOT, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**3.6    Notification of Changes to Key Personnel.** The Recipient shall notify USDOT within 30 calendar days of any change in key personnel who are identified in section 4 of schedule A.

**3.7    Subaward to Designated Subrecipient.** If section 9 of schedule A identifies a Designated Subrecipient:

(1)    the Recipient hereby awards a subaward to the Designated Subrecipient for the purpose described in section 1.1;

(2)    the Recipient and the Designated Subrecipient may enter into a separate agreement, to which the USDOT is not a party, assigning responsibilities, including administrative and oversight responsibilities, among the Recipient and the Designated Subrecipient; and

(3)    for the purpose of 2 CFR parts 200 and 1201, the Recipient is a pass-through entity.

**3.8    Designated Subrecipient Statements and Responsibilities.** If section 9 of schedule A identifies a Designated Subrecipient:

(1)    the Designated Subrecipient affirms all statements and acknowledgments that are attributed to the Recipient under sections 3.1 and 3.2; and

(2)    the Designated Subrecipient assumes the Recipient's reporting obligations under articles 7 and 8.

**3.9    Title 23 Oversight Responsibilities for Subawards.** If section 9 of schedule A identifies a Designated Subrecipient, then for the purpose of 23 U.S.C. 106(g), the Recipient shall act as if funds under this award are Federal funds under title 23, United States Code.

## ARTICLE 4
## AWARD AMOUNT AND FEDERAL OBLIGATION

**4.1    Federal Award Amount.** The USDOT hereby awards a BUILD Grant to the Recipient in the amount listed in section 1 of schedule D as the BUILD Grant Amount.

**4.2    Federal Funding Source.**

(a) If section 4 of schedule F identifies the Funding Act as "IIJA," then the BUILD Grant is from BUILD Program funding that was appropriated in division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021).

**4.3    Federal Obligations.**

(a) If the Federal Obligation Type identified in section 2 of schedule D is "Single," then this agreement obligates for the budget period the amount listed in section 1 of schedule D as the BUILD Grant Amount and sections 4.3(c)–4.3(h) do not apply to this agreement.

(b) If the Federal Obligation Type identified in section 2 of schedule D is "Multiple," then an amount up to the BUILD Grant Amount listed in section 1 of schedule D will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 4.3(c)–4.3(h).

(c) The Obligation Condition Table in section 2 of schedule D allocates the BUILD Grant among separate portions of the Project for the purpose of the Federal obligation of funds. The scope of each portion of the Project that is identified in that table is described in section 2 of schedule B.

(d) This agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2 of schedule D to portions of the Project for which that table does not list an obligation condition.

(e) This agreement does not obligate amounts allocated in the Obligation Condition Table in section 2 of schedule D to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only as described in section 4.3(f) or by modifying this agreement under article 20.

(f) For each portion of the Project for which the Obligation Condition Table in section 2 of schedule D lists an obligation condition, the amount allocated in that table to that portion of the Project is obligated if, not later than the statutory lapse date identified in the Project-Specific Agreement as applicable to the Grant Program, the parties execute an instrument, in the form provided in Exhibit D, documenting that:

(1)    the USDOT determines that the obligation condition listed in that table for that portion of the Project is satisfied;

(2)    the USDOT determines that all applicable Federal requirements for obligating the amount are satisfied; and

(3)    the Recipient states that it is not required to request a modification of this agreement under article 5.

(g) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2 of schedule D lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 4.3(f).

(h) BUILD Program funding that was appropriated in division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), lapses and is unavailable

for obligation, by statute, after September 30, 2029. Section 4.2 identifies the specific source or sources of funding for this award.

(i) The Recipient acknowledges that:

(1) the USDOT is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2 of schedule D lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 4.3(f);

(2) any portion of the BUILD Grant that is not obligated under this section 4.3 by the statutory lapse date identified in section 4.3(h) for those funds lapses on the day after that date and becomes unavailable for the Project; and

(3) the USDOT may consider the failure to obligate funds by the statutory lapse date identified in section 4.3(h) for those funds to be a basis for terminating this agreement under section 17.1.

## ARTICLE 5
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

5.1 **Change Notification Requirement.** The Recipient shall notify USDOT within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's capacity or intent to complete the Project in compliance with this agreement. In that notice, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. The notification requirement under this section 5.1 is separate from any requirements under this article 5 that the Recipient request modification of this agreement.

5.2 **Scope and Statement of Work Changes.** If the Project's activities differ from the activities described in schedule B, then the Recipient shall request a modification of this agreement to update schedule B.

5.3 **Schedule Changes.** If one or more of the following conditions are satisfied, then the Recipient shall request a modification of this agreement to update schedule C:

(1) a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 2 of schedule C;

(2) a schedule change would require the budget period to continue after the final budget period end date listed in section 1 of schedule C (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phases, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements); or

(3)     the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing" and a schedule change would require the period of performance to continue after the period of performance listed on page 1, line 6 of the project-specific agreement.

For other schedule changes, the Recipient shall follow the applicable procedures of the Administering Operating Administration and document the changes in writing.

## 5.4    Budget Changes.

(a) The Recipient acknowledges that if the cost of completing the Project increases:

(1)     that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

(2)     the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request a modification of this agreement to update schedule D if, in comparing the Project's budget to the amounts listed in section 3 of schedule D:

(1)     the total "Non-Federal Funds" amount decreases; or

(2)     the total eligible project costs amount decreases.

(c) For budget changes that are not identified in section 5.4(b), the Recipient shall follow the applicable procedures of the Administering Operating Administration and document the changes in writing.

(d) If there are Project Cost Savings, then the Recipient may propose to the USDOT, in writing consistent with the Administering Operating Administration's requirements, to include in the Project specific additional activities that are within the scope of this award, as defined in section 1.1 and schedule B, and that the Recipient could complete with the Project Cost Savings.

In this agreement, "**Project Cost Savings**" means the difference between the actual eligible project costs and the total eligible project costs that are listed in section 3 of schedule D, but only if the actual eligible project costs are less than the total eligible project costs that are listed in section 3 of schedule D. There are no Project Cost Savings if the actual eligible project costs are equal to or greater than the total eligible project costs that are listed in section 3 of schedule D.

(e) If there are Project Cost Savings and either the Recipient does not make a proposal under section 5.4(d) or the USDOT does not accept the Recipient's proposal under section 5.4(d), then:

(1)     in a request under section 5.4(b), the Recipient shall reduce the Federal Share by the Project Cost Savings; and

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB4DEEDA05CF    Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 463 of 619

*Revised 11-04-2025*

(2)     if that modification reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall refund to the USDOT the difference between the reimbursed costs and the revised award.

In this agreement, "**Federal Share**" means the sum of the total "BUILD Funds" and "Other Federal Funds" amounts that are listed in section 3 of schedule D.

(f)  The Recipient acknowledges that amounts that are required to be refunded under section 5.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims (31 CFR parts 901).

5.5     **USDOT Acceptance of Changes.** The USDOT may accept or reject modifications requested under this article 5, and in doing so may elect to consider only the interests of the BUILD Program and the USDOT. The Recipient acknowledges that requesting a modification under this article 5 does not amend, modify, or supplement this agreement unless the USDOT accepts that modification request and the parties modify this agreement under section 20.1.

## ARTICLE 6
## GENERAL REPORTING TERMS

6.1     **Report Submission.** The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 5 of schedule A and all USDOT contacts who are listed in section 2.2.

6.2     **Alternative Reporting Methods.** The Administering Operating Administration may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Administering Operating Administration informs the Recipient of those processes in writing, the Recipient shall use the processes identified by the Administering Operating Administration.

6.3     **Paperwork Reduction Act Information.** Under 5 CFR 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Collections of information conducted under this agreement are approved under OMB Control No. 2105-0563.

## ARTICLE 7
## PROGRESS AND FINANCIAL REPORTING

7.1     **Quarterly Project Progress Reports and Recertifications.** On or before the 20th day of the first month of each calendar year quarter and until the end of the budget period, the Recipient shall submit to the USDOT a Quarterly Project Progress Report and

Recertification in the format and with the content described in exhibit C. If the date of this agreement is in the final month of a calendar year quarter, then the Recipient shall submit the first Quarterly Project Progress Report and Recertification in the second calendar year quarter that begins after the date of this agreement.

**7.2**    **Final Progress Reports and Financial Information.** No later than 120 days after the end of the budget period, the Recipient shall submit

(1)    a Final Project Progress Report and Recertification in the format and with the content described in exhibit C for each Quarterly Project Progress Report and Recertification, including a final Federal Financial Report (SF-425); and

(2)    any other information required under the Administering Operating Administration's award closeout procedures.

## ARTICLE 8
## PERFORMANCE REPORTING

**8.1**    **Baseline Performance Measurement.** If the Capital-Planning Designation in section 2 of schedule F is "Capital," then:

(1)    the Recipient shall collect data for each performance measure that is identified in the Performance Measure Table in schedule G, accurate as of the Baseline Measurement Date that is identified in schedule G; and

(2)    on or before the Baseline Report Date that is stated in schedule G, the Recipient shall submit a Baseline Performance Measurement Report that contains the data collected under this section 8.1 and the information outlined in the *Baseline Report* section of the *Performance Measures Guidance- 2023 Update*.

**8.2**    **Post-construction Performance Measurement.** If the Capital-Planning Designation in section 2 of schedule F is "Capital," then:

(1)    for each performance measure identified in the Performance Measure Table in schedule G, the Recipient shall collect data for that performance measure as described in Table 1 of the *Performance Measures Guidance- 2023 Update*; and

(2)    the Recipient shall submit to the USDOT an annual Post-construction Performance Measurement Report by January 31 to report project performance for the prior calendar year. Post-construction reporting will begin one quarter after project substantial completion and continue for three years (12 quarters). All performance measures will be reported annually. The Post-construction Performance Measurement Report shall contain the data collected under this section 8.2 and the information outlined in the *Annual Post-construction Performance Reports* section of the *Performance Measures Guidance- 2023 Update*.

**8.3**    **Project Outcomes Narrative.** If the Capital-Planning Designation in section 2 of schedule F is "Capital," then the final Post-construction Performance Measurement Report must also include a project outcomes narrative. The project outcomes narrative should include an overview of the project's performance compared to the baseline and trend expectations. It should also include a discussion on the influence of external factors, if applicable.

**8.4**    **Performance Reporting Survival.** The data collection and reporting requirements in this article 8 survive the termination of this agreement.

**ARTICLE 9**
**RESERVED**


**ARTICLE 10**
**RESERVED**


**ARTICLE 11**
**LABOR AND WORK**

**11.1**    **Labor and Work.**

Schedule H documents the consideration of job quality and labor rights, standards, and protections related to the Project.

**ARTICLE 12**
**CIVIL RIGHTS AND TITLE VI**

**12.1**    **Civil Rights and Title VI.**

(a) The purpose of sections 12.1(b)–12.1(c) is to ensure that the Recipient has a plan to comply with civil rights obligations and nondiscrimination laws, including Title VI and 49 CFR part 21, including any amendments thereto.

(b) If the Recipient is an "Existing" Recipient then the Recipient shall submit to the USDOT either:

(1)    not later than one month after the date of this agreement, documentation showing that the Recipient has complied with all reporting requirements under the Administering Operating Administration's implementation of Title VI; or

(2)    not later than six months after the date of this agreement, both a Title VI Plan and a Community Participation Plan, as those plans are described in chapter II,

15 of 36

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 466 of 619

*Revised 11-04-2025*

sections 3–4 of DOT Order 1000.12C, including any amendments or updates thereto.

(c) If the Recipient is a "New" Recipient then the Administering Operating Administration completed a Title VI Assessment of the Recipient, as described in chapter II, section 2 of DOT Order 1000.12C, including any amendments or updates thereto

(d) In this section 12.1,

(1) "**Title VI**" means Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified at 42 U.S.C. 2000d to 2000d-4a).

(2) **"Existing"** means a prior recipient of DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

(3)  **"New"** means a recipient who has not received DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

**12.2**    **Legacy Infrastructure and Facilities.** In furtherance of the Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336 (codified at 42 U.S.C. 12101–12213), and Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 (codified at 29 U.S.C. 794), not later than one year after the date of this agreement, the Recipient shall develop a plan to address any legacy infrastructure or facilities that are not compliant with ADA standards and are involved in, or closely associated with, the Project.

## ARTICLE 13
## CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**13.1**    **Critical Infrastructure Security and Resilience.**

(a) Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021), the Recipient shall consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b) If the Security Risk Designation in section 5 of schedule F is "Elevated," then, not later than two years after the date of this agreement, the Recipient shall submit to the USDOT a report that:

(1)    identifies a cybersecurity Point of Contact for the transportation infrastructure being improved in the Project;

(2)    summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

*Revised 11-04-2025*

(3)    summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)    documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)    describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 14
## BUILD PROGRAM DESIGNATIONS

**14.1    Effect of Urban or Rural Designation.** Based on information that the Recipient provided to the USDOT, including the Technical Application, section 1 of schedule F designates this award as an urban award or a rural award, as defined in the NOFO. The Recipient shall comply with the requirements that accompany that designation on minimum award size, geographic location, and cost sharing.

**14.2    Effect of Historically Disadvantaged Community/Area of Persistent Poverty Designation.**

If section 3 of schedule F lists "Yes" for the "HDC/APP Designation," then based on information that the Recipient provided to the USDOT, including the Technical Application, the USDOT determined that the Project will be carried out in a historically disadvantaged community/area of persistent poverty, as defined in the NOFO. The Recipient shall incur a majority of the costs under this award in historically disadvantaged communities or areas of persistent poverty.

## ARTICLE 15
## CONTRACTING AND SUBAWARDS

**15.1    Minimum Wage Rates.** The Recipient shall include, in all contracts in excess of $2,000 for work on the Project that involves labor, provisions establishing minimum rates of wages, to be predetermined by the United States Secretary of Labor, in accordance with the Davis-Bacon Act, 40 U.S.C. 3141–3148, or 23 U.S.C. 113, as applicable, that contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

**15.2    Buy America.**

(a) Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as implemented by the Federal Highway Administration. The Recipient acknowledges that this agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C.

*Revised 11-04-2025*

313(b). The Recipient shall not use funds provided under this award for a project unless all iron and steel materials and all predominantly iron and steel products and components used in the project are produced in the United States – this means all manufacturing processes of the iron and steel materials and predominantly iron and steel products and components, including application of a coating, occurred in the United States. The requirements of this paragraph (a) apply to steel or iron materials and predominantly iron and steel products and components that are permanently incorporated into the project. The requirements of this paragraph also apply to iron and steel materials and predominantly iron and steel products and components procured under contracts eligible for assistance under Title 23, U.S.C., carried out within the scope of the applicable finding, determination, or decision under NEPA for this project, regardless of the funding source of such contracts. See 23 U.S.C. 313(h).

(b) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021), as implemented by OMB, USDOT, and FHWA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b). The Recipient shall not use funds under this award for an infrastructure project unless all construction materials are manufactured in the United States – this means that all manufacturing processes for the construction material occurred in the United States. *See* 2 CFR 184.6 for more information on the meaning of "all manufacturing processes" for specific construction materials. The requirements of this paragraph (b) only applies to articles, materials, and supplies that are consumed in, incorporated into, or apply to an infrastructure project.

For the purpose of this paragraph (b), "construction materials" means articles, materials, or supplies that consist of only one of the items listed in paragraph (1) of this definition, except as provided in paragraph (2) of this definition. To the extent one of the items listed in paragraph (1) contains as inputs other items listed in paragraph (1), it is nonetheless a construction material.

(1) The listed items are:

    (i) Non-ferrous metals;
    (ii) Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
    (iii) Glass (including optic glass);
    (iv) Fiber optic cable (including drop cable);
    (v) Optical fiber;
    (vi) Lumber;
    (vii) Engineered wood; and
    (viii) Drywall.

(2) Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF   Case 3.25-cv-07070-RS   Document 71-5   Filed 03/05/26   Page 469 of 619

*Revised 11-04-2025*

(c) Under 2 CFR 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The Recipient shall include the requirements of 2 CFR 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

**15.3    Small and Disadvantaged Business Requirements.**

(a) If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 CFR part 26, including any amendments thereto.

(b) If any funds under this award are not administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 2 CFR 200.321, including any amendments thereto.

**15.4    Engineering and Design Services.** As applicable, the Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under the Brooks Act, 40 U.S.C. 1101–1104 as implemented in 23 U.S.C. 112(b)(2), or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**15.5    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.** The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 CFR 200.216 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**15.6    Pass-through Entity Responsibilities.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 CFR parts 200 and 1201, including 2 CFR 200.331–200.333.

**15.7    Subaward and Contract Authorization.**

(a) If the USDOT Office for Subaward and Contract Authorization identified in section 7 of schedule A is "FHWA Division," then the Recipient shall comply with subaward and contract authorization requirements under 23 CFR chapter I, subchapter G.

(b) If the USDOT Office for Subaward and Contract Authorization identified in section 7 of schedule A is "FHWA Office of Acquisition and Grants Management," then the Recipient shall obtain prior written approval from the USDOT agreement officer pursuant to 2 CFR 200.308, 2 CFR 200.333, and 23 CFR part 172, as applicable, for the subaward or contracting out of any work under this agreement. Approvals under 2 CFR

*Revised 11-04-2025*

200.30(f)(6) do not apply to the acquisition of supplies, materials, equipment, or general support services.

## ARTICLE 16
## NONCOMPLIANCE AND REMEDIES

**16.1    Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For that notice to be effective, USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 16.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

   (1)    accept the remedy;

   (2)    acknowledge the noncompliance, but propose an alternative remedy; or

   (3)    dispute the noncompliance.

   To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

   (1)    after considering the Recipient's response under section 16.1(b); or

   (2)    if the Recipient fails to respond under section 16.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide to the Recipient a notice that states the bases for that determination.

**16.2    Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 16.1, the USDOT may impose a remedy, including:

   (1)    additional conditions on the award;

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 471 of 619

*Revised 11-04-2025*

    (2)     any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to the USDOT; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

    (3)     any other remedy legally available.

(b)  To impose a remedy, the USDOT must provide to the Recipient a notice that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c)  If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 16.2(a), before making a final determination of noncompliance under section 16.1. If it does so, then the notice provided under section 16.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d)  In imposing a remedy under this section 16.2 or making a public interest determination under section 16.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e)  The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 16.2 constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Standards for Administrative Collection of Claims (31 CFR parts 901).

**16.3**    **Other Oversight Entities.** Nothing in this article 16 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

**ARTICLE 17**
**AGREEMENT TERMINATION**

**17.1**    **USDOT Termination.**

(a)  The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

    (1)     the Recipient fails to obtain or provide any non-BUILD Grant contribution or alternatives approved by the USDOT as provided in this agreement and consistent with schedule D;

    (2)     a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient fails to meet that milestone by six months after the date listed in section 2 of schedule C;

21 of 36

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF
Case 3.25-cv-07070-RS     Document 71-5     Filed 03/05/26     Page 472 of 619

*Revised 11-04-2025*

    (3)        the Recipient fails to meet a milestone listed in section 3 of schedule C by the deadline date listed in that section for that milestone;

    (4)        the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the project schedule in schedule C even if it is beyond the reasonable control of the Recipient;

    (5)        circumstances cause changes to the Project that the USDOT determines are inconsistent with the USDOT's basis for selecting the Project to receive a BUILD Grant; or

    (6)        the USDOT determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 17.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 16.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 17.1.

**17.2    Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT informs the Recipient that the award is closed out. Under 2 CFR 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**17.3    Post-Termination Adjustments.** The Recipient acknowledges that under 2 CFR 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that the USDOT reimbursed before termination, and recover funds from the Recipient.

**17.4    Non-Terminating Events.**

(a) The end of the budget period described under section 28.5 28.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The end of the period of performance described under section 28.5 does not terminate this agreement or the Recipient's obligations under this agreement.

(c) The cancellation of funds under section 19.2 does not terminate this agreement or the Recipient's obligations under this agreement.

**17.5    Other Remedies.** The termination authority under this article 17 supplements and does not limit the USDOT's remedial authority under article 16 or 2 CFR part 200, including 2 CFR 200.339–200.340.

**ARTICLE 18**
**COSTS, PAYMENTS, AND UNEXPENDED FUNDS**

**18.1    Limitation of Federal Award Amount.** Under this award, the USDOT shall not provide funding greater than the amount obligated under section 4.3. The Recipient acknowledges that the USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

**18.2    Projects Costs.** This award is subject to the cost principles at 2 CFR 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

**18.3    Timing of Project Costs.**

(a) The Recipient shall not charge to this award costs that are incurred after the final budget period.

(b) The Recipient shall not charge to this award costs that were incurred before the date of this agreement unless those costs are identified in section 5 of schedule D and would have been allowable if incurred during the budget period. This limitation applies to costs incurred under an advance construction authorization (23 U.S.C. 115), costs incurred prior to authorization (23 CFR 1.9(b)), and pre-award costs under 2 CFR 200.458. This agreement hereby terminates and supersedes any previous USDOT approval for the Recipient to incur costs under this award for the Project. Section 5 of schedule D is the exclusive USDOT approval of costs incurred before the date of this agreement.

**18.4    Recipient Recovery of Federal Funds.** The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

**18.5    Unexpended Federal Funds.** Any Federal funds that are awarded at section 4.1 but not expended on allocable, allowable costs remain the property of the United States.

**18.6    Timing of Payments to the Recipient.**

(a) Reimbursement is the payment method for the BUILD Program, unless otherwise agreed upon by USDOT and the Recipient

23 of 36

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF
Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 474 of 619

*Revised 11-04-2025*

(b) The Recipient shall not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

## 18.7 Payment Method.

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the Recipient shall follow FMIS procedures to request and receive reimbursement payments under this award.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Recipient shall use the DELPHI eInvoicing System to request reimbursement under this award unless the USDOT agreement officer provides written approval for the Recipient to use a different request and payment method.

(c) The USDOT may deny a payment request that is not submitted using the method identified in this section 18.7.

## 18.8 Information Supporting Expenditures.

(a) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 271 (Outlay Report and Request for Reimbursement for Construction Programs), shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

## 18.9 Reimbursement Frequency. If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.

## ARTICLE 19
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

## 19.1 Liquidation of Recipient Obligations.

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than the earlier of (1) 120 days after the end of the period of performance or (2) the statutory funds cancellation date identified in section 19.2.

*Revised 11-04-2025*

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 CFR 200.344–200.346.

**19.2    Funds Cancellation.**

(a) BUILD Program funding that was appropriated in division J of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), is canceled by statute after September 30, 2034, and then unavailable for any purpose, including adjustments.

(b) Section 4.2 identifies the specific source or sources of funding for this award.

## ARTICLE 20
## AGREEMENT MODIFICATIONS

**20.1    Bilateral Modifications.** The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by notice to the other party.

**20.2    Unilateral Contact Modifications.**

(a) The Recipient may update the contacts who are listed in section 3 of schedule A by notice to USDOT.

(b) The USDOT may update the contacts who are listed in section 5 of schedule A and section 2.2 by notice to the Recipient.

**20.3    USDOT Unilateral Modifications.**

(a) The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b) To unilaterally modify this agreement under this section 20.3, the USDOT must provide to the Recipient a notice that includes a description of the modification and state the date that the modification is effective.

**20.4    Other Modifications.** The parties shall not amend, modify, or supplement this agreement except as permitted under sections 20.1, 20.2, or 20.3. If an amendment, modification, or supplement is not permitted under section 20.1, not permitted under section 20.2, and not permitted under section 20.3, it is void.

**ARTICLE 21**
**FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS**

**21.1** **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 CFR parts 200 and 1201.

**21.2** **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination.

(b) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**21.3** **Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**21.4** **History of Performance.** Under 2 CFR 200.206, any Federal agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**21.5** **Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**21.6  External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 29, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 CFR part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 CFR part 170: Reporting Subawards and Executive Compensation;

(3)    2 CFR part 175: Award Term for Trafficking in Persons; and

(4)    Appendix XII to 2 CFR part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)    49 CFR part 20: New Restrictions on Lobbying;

(2)    49 CFR part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto;

(3)    49 CFR part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)    Subpart B of 49 CFR part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**21.7  Incorporated Certifications.** The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)    Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

**ARTICLE 22**
**MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS**

**22.1  Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

(1)    that those activities comply with this agreement; and

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF    Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 478 of 619

*Revised 11-04-2025*

(2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 CFR 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 CFR 200.334.

**22.2    Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 22.2(a) in accordance with a financial management system that meets the requirements of 2 CFR 200.302–200.307, 2 CFR 200 subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal year 2025 BUILD grants program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

(1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 CFR 200 subpart F, including "FY 2025" in the program name; and

(2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2025" in column c ("Additional Award Identification").

**22.3    Internal Controls.** The Recipient shall establish and maintain internal controls as required under 2 CFR 200.303.

**22.4    USDOT Record Access.** The USDOT may access Recipient records related to this award under 2 CFR 200.337.

**ARTICLE 23**
**NOTICES**

**23.1    Form of Notice.**

(a) For a notice under this agreement to be valid, it must be in writing.

(b) For a notice to USDOT under this agreement to be valid, it must be signed and dated by an individual with authority to act on behalf of the Recipient.

28 of 36

**23.2**   **Method of Notice to USDOT.**

(a) For a notice to USDOT under this agreement to be valid, it must be sent by one or more of the following: (1) email; (2) a national transportation company with all fees prepaid and receipt of delivery; or (3) by registered or certified mail with return receipt requested and postage prepaid.

(b) For a notice to USDOT under this agreement to be valid, it must be addressed to all of the USDOT contacts who are listed in section 5 of schedule A and section 2.2.

(c) Except as specified in section 23.2(d), a valid notice to USDOT under this agreement will be deemed to have been received on the earliest of (1) when the email is received by USDOT, as recorded by USDOT's email systems, and (2) when indicated on the receipt of delivery by national transportation company or mail.

(d) If a valid notice or other communication to USDOT under this agreement is received after 5:00 p.m. on a business day, or on a day that is not a business day, then the notice will be deemed received at 9:00 a.m. on the next business day.

**23.3**   **Method of Notice to Recipient.**

(a) Except as specified in section 23.3(d), for a notice to the Recipient under this agreement to be valid, it must be sent by one or more of the following: (1) email; (2) a national transportation company with all fees prepaid and receipt of delivery; or (3) registered or certified mail with return receipt requested and postage prepaid.

(b) For a notice to the Recipient under this agreement to be valid, it must be addressed to all of the Recipient contacts who are listed in section 3 of schedule A.

(c) A valid notice to the Recipient under this agreement is effective when received by the Recipient. It will be deemed to have been received:

(1)   for email, on receipt; and, for other delivery, when indicated on the receipt of delivery by national transportation company or mail; or

(2)   if the Recipient rejects or otherwise refuses to accept it, or if it cannot be delivered because of a change in address or representatives for which no notice was given, then on that rejection, refusal, or inability to deliver.

(d) For a notice to the Recipient under article 16 to be valid, it must be sent by one or more of the following: (1) a national transportation company with all fees prepaid and receipt of delivery or (2) registered or certified mail with return receipt requested and postage prepaid.

**23.4**   **Recipient Contacts for Notice.** If a Recipient contact who is listed in section 3 of schedule A is unable to receive notices under this agreement on behalf of the Recipient, then the Recipient shall promptly identify one or more replacement contacts under section 20.2(a).

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF Case 3.25-cv-07070-RS Document 71-5 Filed 03/05/26 Page 480 of 619

*Revised 11-04-2025*

**23.5** **Additional Mandatory Notices to USDOT.** The Recipient shall notify the USDOT if any one of the following conditions is satisfied, not later than 5 business days after that condition is satisfied:

(1) the Recipient receives a communication related to this award or this agreement from the United States Comptroller General, a Federal Inspector General, or any other oversight entity; or

(2) the Recipient becomes aware of waste, fraud, abuse, or potentially criminal activity related to this agreement.

**23.6** **Scope of Notice Requirements.** The form and method requirements of this article 23, including sections 23.1, 23.2, and 23.3, apply only to communications for which this agreement expressly uses one or more of the following words: "notice"; "notification"; "notify"; or "notifying." This article 23 does not control or limit other communication between the parties about the Project or this agreement.

## ARTICLE 24
## INFORMATION REQUESTS

**24.1** **USDOT Information Requests.**

(a) By notice, the USDOT may request from the Recipient any information that the USDOT determines is necessary to fulfill its oversight responsibilities under the Program Statute or other Federal law.

(b) If the USDOT requests information from the Recipient under section 24.1(a), the Recipient shall respond in the form and at the time detailed in the notice requesting information.

(c) This section 24.1 does not limit the Recipient's obligations under section 22.4 or 2 CFR 200.337 to provide access to Recipient records.

## ARTICLE 25
## ASSIGNMENT

**25.1** **Assignment Prohibited.** The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

# ARTICLE 26
# WAIVER

**26.1    Waivers.**

(a) A waiver of a term of this agreement granted by the USDOT will not be effective unless it is in writing and signed by an authorized representative of the USDOT.

(b) A waiver of a term of this agreement granted by the USDOT on one occasion will not operate as a waiver on other occasions.

(c) If the USDOT fails to require strict performance of a term of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that term or breach.

# ARTICLE 27
# ADDITIONAL TERMS AND CONDITIONS

**27.1    Disclaimer of Federal Liability.** The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**27.2    Relocation and Real Property Acquisition.**

(a) To the greatest extent practicable under State law, the Recipient shall comply with the land acquisition policies in 49 CFR 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 CFR 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR 24 subparts D–E.

(c) The Recipient shall make available to displaced persons comparable replacement dwellings in accordance with 49 CFR 24.

**27.3    Equipment Disposition.**

(a) In accordance with 2 CFR 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project:

(1)    if the entity that acquired the equipment is a State, the State shall dispose of that equipment in accordance with State laws and procedures;

(2)    if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such

31 of 36

laws and procedures do not exist, Indian Tribes must follow the guidance in 2 CFR 200.313; and

(3)　　if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity shall request disposition instructions from the Administering Operating Administration.

(b) In accordance with 2 CFR 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR 200.310–200.316 and 2 CFR 1201.313.

(c) The Recipient shall ensure compliance with this section 27.3 for all tiers of subawards under this award.

## 27.4　　Environmental Review.

(a) In this section, "**Environmental Review Entity**" means:

(1)　　if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2)　　for all other cases, the FHWA.

(b) Except as authorized under section 27.4(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

(1)　　the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

(2)　　if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written communication stating that the environmental review process is complete.

(c) If the Recipient is using procedures for early acquisition of real property under 23 CFR 710.501 or hardship and protective acquisitions of real property 23 CFR 710.503, the Recipient shall comply with 23 CFR 771.113(d)(1).

(d) The Recipient acknowledges that:

(1)　　the Environmental Review Entity's actions under section 27.4(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF
Case 3:25-cv-07070-RS     Document 71-5     Filed 03/05/26     Page 483 of 619

*Revised 11-04-2025*

(2)      applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e)  Consistent with 23 CFR 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f)  The activities described in schedule B and other information described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with schedule B or other information in this agreement, then:

(1)      the parties may amend this agreement under section 20.1 for consistency with the selected build alternative; or

(2)      if the USDOT determines that the condition at section 17.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 17.1(a)(5).

(g)  The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**27.5**    **Railroad Coordination.** If section 3 of schedule C includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 CFR 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**ARTICLE 28**
**MANDATORY AWARD INFORMATION**

**28.1**    **Information Contained in a Federal Award.** For 2 CFR 200.211:

(1)      the "Federal Award Date" is the date of this agreement, as defined under section 30.2;

(2)      the "Assistance Listings Number" is 20.933 and the "Assistance Listings Title" is "National Infrastructure Investments"; and

(3)      this award is not for research and development.

**28.2**    **Federal Award Identification Number.**

(a)  If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the Federal Award Identification Number will be generated when the FHWA Division

33 of 36

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF Case 3.25-cv-07070-RS    Document 71-5    Filed 03/05/26    Page 484 of 619

*Revised 11-04-2025*

authorizes the project in FMIS. The Recipient acknowledges that it has access to FMIS and can retrieve the FAIN from FMIS.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Federal Award Identification Number is listed on page 1, line 1 of the project-specific agreement.

**28.3    Recipient's Unique Entity Identifier.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the Recipient's Unique Entity Identifier, as defined at 2 CFR 25.400, is available in FMIS. The Recipient acknowledges that it has access to FMIS and can retrieve the unique entity identifier from FMIS.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Recipient's Unique Entity Identifier, as defined at 2 CFR 25.400, is listed on page 1, line 4 of the project-specific agreement.

**28.4    Budget Period.** The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 1 of schedule C. In this agreement, "budget period" is used as defined at 2 CFR 200.1.

**28.5    Period of Performance.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the period of performance for this award begins on the date of this agreement and ends on project end date in FMIS.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the period of performance for this award is listed on page 1, line 6 of the project-specific agreement.

(c) In this agreement, "period of performance" is used as defined at 2 CFR 200.1.

## ARTICLE 29
## CONSTRUCTION AND DEFINITIONS

**29.1    Schedules.** This agreement includes the following schedules as integral parts:

| | |
|---|---|
| Schedule A | Administrative Information |
| Schedule B | Project Activities |
| Schedule C | Award Dates and Project Schedule |
| Schedule D | Award and Project Financial Information |
| Schedule E | Changes from Application |
| Schedule F | BUILD Program Designations |
| Schedule G | BUILD Performance Measurement Information |

Schedule H          Labor and Work

29.2    **Exhibits.** The following exhibits, which are located in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Year 2025 BUILD Program," dated November 4, 2025, and available at https://www.transportation.gov/BUILDgrants/grant-agreements, are part of this agreement.

Exhibit A     Applicable Federal Laws and Regulations
Exhibit B     Additional Standard Terms
Exhibit C     Quarterly Project Progress Reports and Recertifications: Format and Content
Exhibit D     Form for Subsequent Obligation of Funds

29.3    **Construction.**

(a) In these General Terms and Conditions:

(1)     unless expressly specified, a reference to a section or article refers to that section or article in these General Terms and Conditions;

(2)     a reference to a section or other subdivision of a schedule listed in section 29.1 will expressly identify the relevant schedule; and

(3)     there are no references to articles or sections in project-specific portions of the agreement that are not contained in schedules listed in section 29.1.

(b) If a provision in these General Terms and Conditions or the exhibits conflicts with a provision in the project-specific portion of the agreement, then the project-specific portion of the agreement prevails. If a provision in the exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

29.4    **Integration.** This agreement constitutes the entire agreement of the parties relating to the BUILD Program and awards under that program and supersedes any previous agreements, oral or written, relating to the BUILD Program and awards under that program.

29.5    **Definitions.** In this agreement, the following definitions apply:

"**General Terms and Conditions**" means this document, including articles 1–30.

"**Program Statute**" means the collective statutory text:

(1)     at 49 U.S.C. 6702;

(2)     under the heading "Department of Transportation—Office of the Secretary—National Infrastructure Investments" in title VIII of division J of the Infrastructure

Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), and all other provisions of that act that apply to amounts appropriated under that heading.

"**Project**" means the project proposed in the Technical Application, as modified by the negotiated provisions of this agreement, including schedules A–H.

"**BUILD Grant**" means an award of funds that were made available under the NOFO.

"**Technical Application**" means the application identified in section 1 of schedule A, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

29.6    **References to Times of Day.** All references to times of day in this agreement are deemed references to that time at the prevailing local time in Washington, DC.

## ARTICLE 30
## AGREEMENT EXECUTION AND EFFECTIVE DATE

30.1    **Counterparts.** This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

30.2    **Effective Date.** The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes a BUILD Grant when the USDOT's authorized representative signs it.

# EXHIBIT P

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

| **U.S. Department of Transportation** **Federal Railroad Administration** | **Grant Agreement** | | |
|---|---|---|---|

| 1. RECIPIENT NAME AND ADDRESS City of Atlanta 55 Trinity Ave SW Atlanta, GA 30303-3520 | 2. AGREEMENT NUMBER: 69A36525421580RCEGA | | 3. AMENDMENT NO. 0 |
|---|---|---|---|
| | 4. PROJECT PERFORMANCE PERIOD: FROM 05/01/2025 TO 01/31/2028 | | |
| | 5. FEDERAL FUNDING PERIOD: FROM 05/01/2025 TO 01/31/2028 | | |

| 1A. IRS/VENDOR NO. 586000511 | 6. PRE-AWARD AUTHORITY: No    6A. PRE-AWARD DATE: N/A | | |
|---|---|---|---|
| 1B. UEI. HAAWKXL2PLE3    1C. DUNS. 065372500 | 7. ACTION    New | | |
| 8. ASSISTANCE LISTING#: 20.327 | **TITLE** | **FEDERAL** | **NON-FEDERAL** | **TOTAL** |

| 9. PROJECT TITLE City of Atlanta Safe Crossings Study | **TITLE** | **FEDERAL** | **NON-FEDERAL** | **TOTAL** |
|---|---|---|---|---|
| | 10. PREVIOUS AGREEMENTS | 0.00 | 0.00 | 0.00 |
| | 11. THIS AGREEMENT | 1,200,000.00 | 300,000.00 | 1,500,000.00 |
| | 12. TOTAL AGREEMENT | 1,200,000.00 | 300,000.00 | 1,500,000.00 |

| 12A. OTHER FEDERAL FUNDING | 0.00 |
|---|---|

13. INCORPORATED ATTACHMENTS

THIS AGREEMENT INCLUDES THE FOLLOWING ATTACHMENTS, INCORPORATED HEREIN AND MADE A PART HEREOF:

General Terms and Conditions, Attachment 1; Project Specific Terms and Conditions, Attachment 2; Exhibits, Attachment 3

14. STATUTORY AUTHORITY FOR GRANT/ COOPERATIVE AGREEMENT

Sections 22104 and 22305 of the Infrastructure Investment and Jobs Act (IIJA), Public Law 117-58 (2021); 49 U.S.C. § 22909 / Advanced Appropriation in the IIJA, Division J, Title VIII, Public Law 117-58 (2021)

15. REMARKS

| **GRANTEE ACCEPTANCE** | **AGENCY APPROVAL** |
|---|---|
| 16. NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL | 18. NAME AND TITLE OF AUTHORIZED FRA OFFICIAL |

| 17. SIGNATURE OF AUTHORIZED GRANTEE OFFICIAL | 17A. DATE | 19. SIGNATURE OF AUTHORIZED FRA OFFICIAL | 19A. DATE |
|---|---|---|---|

| **AGENCY USE ONLY** | |
|---|---|
| 20. OBJECT CLASS CODE/EXPENDITURE TYPE: 41010 | 21. ORG. CODE/EXPENDITURE ORG. : 9000000000 |

22. ACCOUNTING CLASSIFICATION CODES

| DOCUMENT NUMBER | FUND/PROJECT | BY | BPAC/TASK | AMOUNT |
|---|---|---|---|---|
| 69A36525421580RCEGA | 27X0760724 | 2025 | 10030503AA | 1,200,000.00 |

# AWARD ATTACHMENTS

City of Atlanta                                                    69A36525421580RCEGA

1. General Terms and Conditions, Attachment 1

2. Project Specific Terms and Conditions, Attachment 2

3. Exhibits, Attachment 3

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**U.S. Department of Transportation**
**Federal Railroad Administration**

## Attachment 1

# GENERAL TERMS AND CONDITIONS

Revision Date: April 23, 2025

![U.S. Department of Transportation Federal Railroad Administration]

# General Terms and Conditions
## Table of Contents

ATTACHMENT 1 .................................................................................................................................7

ARTICLE 1:  TERMS AND CONDITIONS .............................................................................................7

    1.1       General Terms and Conditions........................................................................................7

    1.2       Project-Specific Terms and Conditions ..........................................................................7

    1.3       Program-Specific Clauses ................................................................................................7

    1.4       Exhibits ...........................................................................................................................8

ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES ..............................................................................8

    2.1       FRA Role ..........................................................................................................................8

    2.2       FRA Professional Staff ....................................................................................................8

ARTICLE 3:  RECIPIENT ROLE ..........................................................................................................9

    3.1       Representations and Acknowledgments on the Project ................................................9

    3.2       Representations on Authority and Capacity ..................................................................9

    The Recipient represents that: .................................................................................................9

    3.3       FRA Reliance..................................................................................................................10

    3.4       Project Delivery.............................................................................................................10

    3.5       Rights and Powers Affecting the Project ......................................................................10

    3.6       Notification of Changes to Key Personnel ...................................................................11

ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS................................................11

    4.1       Federal Award Amount.................................................................................................11

    4.2       Federal Obligations ......................................................................................................11

    4.3       Maximum Funding Amount ..........................................................................................11

    4.4       Budget Period ...............................................................................................................11

    4.5       Period of Performance..................................................................................................11

ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES....................................11

    5.1       Notification Requirement .............................................................................................11

    5.2       Scope and Statement of Work Changes .......................................................................12

    5.3       Schedule Changes .........................................................................................................12

    5.4       Budget Changes ............................................................................................................12

    5.5       Project Cost Savings ......................................................................................................13

    5.6       FRA Acceptance of Changes.........................................................................................13

![U.S. Department of Transportation Federal Railroad Administration]

ARTICLE 6:  GENERAL REPORTING TERMS .................................................................................................... 14

   6.1   Alternative Reporting Methods ............................................................................................ 14

   6.2   Paperwork Reduction Act Notice ......................................................................................... 14

ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING .................................................................................. 14

   7.1   Quarterly Project Progress Reports and Recertifications .................................................... 14

   7.2   Final Progress Reports and Financial Information ............................................................... 15

   7.3   Real Property Reporting ....................................................................................................... 15

ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING .................................................................. 15

   8.1   Baseline Performance Measurement ................................................................................... 15

   8.2   Post-Project Performance Measurement ............................................................................ 15

   8.3   Project Outcomes Report ..................................................................................................... 16

   8.4   General Performance Measurement Requirements ............................................................ 16

   8.5   Outcome Measurement and Reporting Survival ................................................................. 16

ARTICLE 9:  NONCOMPLIANCE AND REMEDIES .......................................................................................... 16

   9.1   Noncompliance Determinations .......................................................................................... 16

   9.2   Remedies .............................................................................................................................. 17

   9.3   Other Oversight Entities ....................................................................................................... 18

ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION ..................................................................... 18

   10.1   Suspension of Award Activities ............................................................................................ 18

   10.2   FRA Termination .................................................................................................................. 19

   10.3   Closeout Termination .......................................................................................................... 19

   10.4   Post-Termination Adjustments ........................................................................................... 19

   10.5   Non-Terminating Events ...................................................................................................... 19

ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS ............................. 20

   11.1   Recipient Monitoring and Record Retention ...................................................................... 20

   11.2   Financial Records and Audits ............................................................................................... 20

   11.3   Internal Controls .................................................................................................................. 21

   11.4   FRA Record Access .............................................................................................................. 21

   11.5   Site Visits .............................................................................................................................. 21

ARTICLE 12:  CONTRACTING AND SUBAWARDING ...................................................................................... 21

   12.1   Buy America ......................................................................................................................... 21

   12.2   Small and Disadvantaged Business Requirements .............................................................. 22

   12.3   Engineering and Design Services [Reserved] ...................................................................... 22

![U.S. Department of Transportation Federal Railroad Administration]

12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ...22

12.5    Pass-Through Entity Responsibilities ...................................................................................22

12.6    Local Hiring Preference for Construction Jobs....................................................................22

12.7    Procurement .......................................................................................................................22

ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS .................................................................23

13.1    Limitation of Federal Award Amount ................................................................................23

13.2    Project Costs .......................................................................................................................23

13.3    Timing of Project Costs .......................................................................................................23

13.4    Recipient Recovery of Federal Funds.................................................................................23

13.5    Unexpended Agreement Federal Funds .............................................................................23

13.6    Interest Earned ...................................................................................................................24

13.7    Timing of Payments to the Recipient..................................................................................24

13.8    Payment Method .................................................................................................................24

13.9    Information Supporting Expenditures .................................................................................24

13.10   Reimbursement Request Timing Frequency.......................................................................24

13.11   Program Income...................................................................................................................24

ARTICLE 14:  PROPERTY AND EQUIPMENT ...............................................................................................25

14.1    General Requirements........................................................................................................25

14.2    Relocation and Real Property Acquisition .........................................................................25

14.3    Use for Originally Authorized Purpose...............................................................................25

14.4    Maintenance .......................................................................................................................25

14.5    Real Property Disposition....................................................................................................26

14.6    Equipment Disposition........................................................................................................26

14.7    Recordkeeping ....................................................................................................................26

14.8    Encumbrance ......................................................................................................................26

ARTICLE 15:  AMENDMENTS ....................................................................................................................27

15.1    Bilateral Amendments .......................................................................................................27

15.2    FRA Unilateral Amendments..............................................................................................27

15.3    Other Amendments ............................................................................................................27

ARTICLE 16:  [RESERVED] ..........................................................................................................................27

ARTICLE 17:  [RESERVED] ..........................................................................................................................27

ARTICLE 18:  LABOR AND WORK ..............................................................................................................27

18.1    Labor and Work...................................................................................................................27

4

![U.S. Department of Transportation Federal Railroad Administration]

ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE .....................................................28

19.1    Critical Infrastructure Security and Resilience ................................................................28

ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE,  AND NATIONAL POLICY REQUIREMENTS .........................................................................................................................28

20.1    Uniform Administrative Requirements for Federal Awards .........................................28

20.2    Federal Law and Public Policy Requirements .............................................................28

20.3    Federal Freedom of Information Act ..........................................................................29

20.4    History of Performance .............................................................................................29

20.5    Whistleblower Protection ..........................................................................................29

20.6    External Award Terms and Obligations......................................................................30

20.7    Incorporated Certifications .......................................................................................30

ARTICLE 21:  ASSIGNMENT...........................................................................................................30

21.1    Assignment Prohibited ..............................................................................................30

ARTICLE 22:  WAIVER ...................................................................................................................30

22.1    Waivers .....................................................................................................................30

ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS .....................................................................31

23.1    Disclaimer of Federal Liability ...................................................................................31

23.2    Environmental Review ...............................................................................................31

23.3    Project Maintenance Requirement.............................................................................32

23.4    Appropriations Act Requirements .............................................................................32

23.5    Standards of Conduct................................................................................................32

23.6    Changed Conditions of Performance .........................................................................33

23.7    Litigation ...................................................................................................................33

23.8    [Reserved] .................................................................................................................33

23.9    Equipment and Supplies ...........................................................................................33

23.10  Safety and Technology Data ......................................................................................33

23.11  Intellectual Property .................................................................................................33

23.12  Liquidation of Recipient Obligations.........................................................................33

ARTICLE 24:  CONSTRUCTION AND DEFINITIONS ...........................................................................34

24.1    Agreement ................................................................................................................34

24.2    Construction..............................................................................................................34

24.3    Integration ................................................................................................................34

24.4    Definitions.................................................................................................................34

5

**U.S. Department of Transportation**
**Federal Railroad Administration**

24.5    Calendar Dates ....................................................................................................................35

24.6    Communication in Writing ..................................................................................................35

24.7    Severability ..........................................................................................................................35

ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE .................................................35

25.1    Counterparts .......................................................................................................................35

25.2    Effective Date ......................................................................................................................36

ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES ...........................................................................36

26.1    Interstate Rail Compacts Grant Program ............................................................................36

26.2    Railroad Crossing Elimination Program Clauses .................................................................38

26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses .....................40

26.4    Restoration and Enhancement Grants Clauses ...................................................................42

26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses ................................................................................................................45

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 CFR part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 CFR part 1201.

## ARTICLE 1:  TERMS AND CONDITIONS

**1.1     General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2     Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3     Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.

U.S. Department of Transportation
**Federal Railroad Administration**

(e)  For Projects funded under the Federal-State Partnership for Intercity Passenger Rail program (49 U.S.C. § 24911) and Federal-State Partnership for State of Good Repair (as authorized in Sections 11103 and 11302 of the Passenger Rail Reform and Investment Act of 2015 (Title XI of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94 (2015))), the Recipient will comply with the program-specific clauses in Article 26.5.

**1.4    Exhibits**

Exhibits A–C are part of the Agreement between FRA and the Recipient. The Recipient will comply with Exhibits A–C.

## ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES

**2.1    FRA Role**

(a)  FRA is responsible for funding disbursements to the Recipient under this Agreement. FRA will also conduct oversight and monitoring activities to assess Recipient progress against established performance goals and to assess compliance with terms and conditions, including the Statement of Work and other requirements of this Agreement.

(b)  If this award is made as a Cooperative Agreement, FRA will have substantial programmatic involvement. Substantial involvement means that, after award, technical, administrative, or programmatic staff will assist, guide, coordinate, or otherwise participate with the Recipient in Project activities.

(c)  If this award is made as a Grant, FRA will not have substantial programmatic involvement.

**2.2    FRA Professional Staff**

FRA may provide professional staff to review work in progress, completed products, and to provide or facilitate access to technical assistance when it is available, feasible, and appropriate. FRA professional staff may include the following:

(a)  Financial Analyst. The Financial Analyst will serve as the Recipient's point of contact for systems (e.g., GrantSolutions and the Delphi eInvoicing System) access and troubleshooting as well as for financial monitoring.

(b)  Grant Manager. The Grant Manager will serve as the Recipient's point of contact for grant administration and will oversee compliance with the terms and conditions in this Agreement. The Grant Manager reviews financial reports, performance reports, and works with the Project Manager to facilitate effective Project delivery.

(c)  Project Manager. The Project Manager will serve as the Recipient's point of contact for the technical aspects of Project delivery. The Project Manager coordinates Project deliverable review, provides technical assistance to the Recipient, and generally assesses Project progress and performance.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 3:  RECIPIENT ROLE

**3.1** **Representations and Acknowledgments on the Project**

(a)  The Recipient represents that:

(1)  all material statements of fact in the Application were accurate when the Application was submitted and now; and

(2)  the Recipient read and understands the terms and conditions in Attachment 1 and Attachment 2 of this Agreement, the applicable program-specific clauses in Article 26 of this Attachment 1, and the information and conditions in the Exhibits.

(b)  The Recipient acknowledges that:

(1)  the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to FRA, and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

(2)  The Recipient acknowledges that the requirements of this Agreement apply to the entire Project, including Project costs satisfied from sources other than Agreement Federal Funds.

(c)  By entering into this Agreement with FRA, the Recipient agrees to comply with the terms and conditions in Attachment 1 and Attachment 2, including applicable program-specific clauses in Article 26 of this Attachment 1, Exhibits A–C, and all applicable Federal laws and regulations, including those identified in this Agreement. The Recipient will ensure compliance with all terms of this Agreement and all of its parts for all tiers of subawards and contracts under this Agreement, as appropriate. The Recipient understands that the terms and conditions of this Agreement apply regardless of whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

**3.2** **Representations on Authority and Capacity**

The Recipient represents that:

(a)  it has the legal authority to receive Federal financial assistance under this Agreement;

(b)  it has the legal authority to complete the Project;

(c)  all representations and warranties made in the Federal System for Awards Management (SAM.gov) and in the Application are true and correct;

9

U.S. Department of Transportation
**Federal Railroad Administration**

(d)  it has the capacity, including legal, technical, institutional, managerial, and financial capacity, to comply with its obligations under this Agreement and complete the Project;

(e)  the Non-Federal Funds listed in Article 6 of Attachment 2 of this Agreement are committed to fund the Project;

(f)  it has sufficient funds available to ensure that equipment and infrastructure funded under this Agreement will be operated and maintained in compliance with this Agreement and applicable Federal law;

(g)  it has sufficient funds available to ensure that operations funded under this agreement are conducted in compliance with this Agreement and applicable Federal law; and

(h)  the individual executing this agreement on behalf of the Recipient has the legal authority to enter this Agreement and make the statements and certifications in this Agreement on behalf of the Recipient.

**3.3     FRA Reliance**

The Recipient acknowledges that:

(a)  FRA relied on statements of fact in the Application and SAM.gov to select the Project to receive this award;

(b)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient and the Project are eligible to receive financial assistance under this Agreement;

(c)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient has the legal authority to implement the Project; and

(d)  FRA relied on statements of fact in both the Application and this Agreement to establish the terms of this Agreement; and

(e)  FRA's selection of the Project to receive this award may have prevented awards to other eligible applicants.

**3.4     Project Delivery**

(a)  The Recipient will implement and complete the Project to FRA's satisfaction under the terms of this Agreement.

(b)  The Recipient will ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

**3.5     Rights and Powers Affecting the Project**

(a)  The Recipient will not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this Agreement without written approval of FRA.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(b)  The Recipient will act promptly, in a manner acceptable to FRA, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this Agreement.

**3.6      Notification of Changes to Key Personnel**

The Recipient will notify the FRA Grant Manager in writing within 30 days of any change in key personnel who are identified in the Application, which may require an amendment to this Agreement.

## ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**4.1      Federal Award Amount**

Under this Agreement, FRA awards a Grant to the Recipient in the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.2      Federal Obligations**

This Agreement obligates for the budget period the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.3      Maximum Funding Amount**

This Agreement funds the Project at the lesser amount of the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement, or the FRA maximum contribution percentage of the total Project cost identified in Article 6.5 of Attachment 2 of this Agreement.

**4.4      Budget Period**

The budget period for this award begins on the date of this Agreement and ends on the end date that is listed in Section 5 on the Agreement cover sheet. In this Agreement, "budget period" is used as defined at 2 CFR § 200.1.

**4.5      Period of Performance**

The Period of Performance for this award is listed in Section 4 on the Agreement cover sheet. In this Agreement, "Period of Performance" is used as defined at 2 CFR § 200.1.

## ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1      Notification Requirement**

The Recipient will notify the FRA Grant Manager and Project Manager by electronic correspondence within 30 days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project, including change in authority. In that notification, the Recipient will describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this Section 5.1 is separate from any requirements under this Article 5 that the Recipient request an amendment to this Agreement.

11

U.S. Department of Transportation
**Federal Railroad Administration**

**5.2     Scope and Statement of Work Changes**

If the Project's activities differ from the activities described in Article 4 of Attachment 2 of this Agreement, then the Recipient will notify FRA in writing of the change, which may require an amendment to this Agreement.

**5.3     Schedule Changes**

If one or more of the following conditions are satisfied, then the Recipient will request an amendment to this Agreement to update the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement:

(a)  a completion date for the Project or a component of the Project is listed in the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed;

(b)  a schedule change would require the budget period to continue after the end of the budget period defined in Section 4.4; or

(c)  a schedule change would require the Period of Performance to continue after the end of the Period of Performance defined in Section 4.5. The Recipient must submit requests to extend the Period of Performance not later than 90 days before the end of the Period of Performance.

For other schedule changes, the Recipient will notify the Grant Manager in writing.

**5.4     Budget Changes**

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)  that increase does not affect the Recipient's obligation under this Agreement to complete the Project;

(2)  any additional funds the Recipient contributes to complete the Project are subject to the requirements of this Agreement in the same manner as the Non-Federal Funds identified in Article 6.5 of Attachment 2 of this Agreement; and

(3)  FRA will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient will notify FRA in writing if the total Project cost, as described in Table 6-A of Attachment 2 of this Agreement, amount increases, which may result in an amendment to this Agreement.

(c)  The Recipient will notify FRA in writing if the Non-Federal Funds amount decreases, which may result in an amendment to this Agreement.

(d)  For all other budget changes, the Recipient will follow the applicable procedures and document the changes in writing.

U.S. Department of Transportation
**Federal Railroad Administration**

**5.5     Project Cost Savings**

(a)  If there are Project Cost Savings, then the Recipient may notify FRA in writing of its intent to include in the Project and complete with the Project Cost Savings the additional activities within the scope of this award that are specified in the Additional Task(s) in Article 4 of Attachment 2 of this Agreement. The Recipient will complete the Additional Task(s) after FRA provides a written approval. An amendment to this Agreement is not required to proceed with the Additional Task(s).

(b)  If there are Project Cost Savings, and there are not Additional Task(s) identified in Article 4 of Attachment 2 of this Agreement, then the Recipient may propose a new task that is within the scope of this award and request an amendment to add the new task to this Agreement and complete it with Project Cost Savings.

(c)  In this Agreement, **"Project Cost Savings"** means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs. There are no Project Cost Savings prior to completion of the Project or if the actual costs to complete the Project are equal to or greater than the total Project cost listed in Section 6.5 of Attachment 2 of this Agreement.

(d)  If there are Project Cost Savings and either the Recipient does not make a proposal or FRA does not accept the Recipient's proposal under (a) of this Section 5.5, then:

(1)  The Recipient will provide written notice to FRA and reduce the Federal Share by the Project Cost Savings, which may result in an amendment to this Agreement; and

(2)  If the reduced Federal Share reduces this award and the Recipient received reimbursed costs exceeding the appropriate amount under the reduced award, the Recipient will refund the difference between the reimbursed costs and the reduced award.

(e)  In this Agreement, "Federal Share" means the sum of the Agreement Federal Funds and Other Federal Funds amounts that are identified in the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement.

(f)  The Recipient acknowledges that amounts that are required to be refunded under this Section constitute a debt to the Federal Government that FRA may collect under 2 CFR § 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–999).

**5.6     FRA Acceptance of Changes**

FRA may accept or reject changes requested under this Article 5, and in doing so may elect to consider only the interests of the grant program and FRA. The Recipient acknowledges that any request under this Article 5 does not amend, modify, or supplement this Agreement unless FRA

13

**U.S. Department of Transportation**
**Federal Railroad Administration**

accepts the request and the parties amend this Agreement under Section 15.1 of this Attachment 1.

## ARTICLE 6:  GENERAL REPORTING TERMS

**6.1     Alternative Reporting Methods**

FRA may establish processes for the Recipient to submit reports required by this Agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient will use the processes required by FRA.

**6.2     Paperwork Reduction Act Notice**

Under 5 CFR § 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (OMB). Notwithstanding any other term of this Agreement, the due date for any information collections required under this Agreement, including the reporting requirements in Articles 7 and 8, is the later of (1) the due date stated with the requirement and (2) the 30th day after OMB approves that information collection.

## ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING

**7.1     Quarterly Project Progress Reports and Recertifications**

(a)  On or before the 30th day of the first month of each quarter and until the end of the Period of Performance, the Recipient will submit to FRA through GrantSolutions a complete FRA Form 34[1] Quarterly Project Progress Report and Recertification that contains, for the previous quarter:

      (1)  a certification that the Recipient is in compliance with 2 CFR § 200.303 (Internal Controls) and 2 CFR part 200, Subpart F (Audit Requirements);

      (2)  the certification required under 2 CFR § 200.415(a); and

      (3)  a certification that the Recipient is complying with any environmental mitigation commitments and Section 106 compliance obligations.

If the date of this Agreement is in the final month of a quarter, then the Recipient will submit the first Quarterly Project Progress Report and Recertification in the quarter that begins after the date of this Agreement.

(b)  On or before the 30th day of the first month of each quarter and until the end of the Period of Performance, the Recipient will submit to FRA through GrantSolutions a Federal Financial Report (SF-425) covering the previous quarter.

---

[1] FRA Form 34 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

**U.S. Department of Transportation**
**Federal Railroad Administration**

**7.2    Final Progress Reports and Financial Information**

No later than 120 days after the end of the Period of Performance, the Recipient will submit:

(a)  a final Quarterly Project Progress Report and Recertification in the format and with the content described in Section 7.1(a) of this Attachment 1 for each Quarterly Project Progress Report and Recertification;

(b)  a final SF-425 through GrantSolutions;

(c)  a Final Performance Report FRA Form 33 as provided by FRA[2] ; and

(d)  any other information required under FRA's award closeout procedures.

**7.3    Real Property Reporting**

The Recipient will comply with the reporting obligations in 2 CFR § 200.330, as directed by FRA.

## ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING

**8.1    Baseline Performance Measurement**

Within one year before the start of work on the Project, the Recipient will collect baseline data for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement. Within six months of the start of the Period of Performance, the Recipient will submit to FRA a Baseline Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure. The Recipient will also provide FRA access to the data collected in machine-readable format.

**8.2    Post-Project Performance Measurement**

For each performance measure that is listed in Article 7 of Attachment 2 of this Agreement, the Recipient will collect data and submit to FRA a Post-Project Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure, at the frequency and for the duration identified in Article 7 of Attachment 2 of this Agreement. The Recipient will also provide FRA access to the data collected in machine-readable format. If an external factor affects a performance measure, the Recipient will identify that external factor in the Post-Project Performance Measurement Report and discuss the external factor's influence on the performance measure. In the Post-Project Performance Report, the Recipient will compare the actual project performance against the pre-project (baseline) performance and expected post-project performance as described in Table 7-A of Attachment 2 of this Agreement.

---

[2]FRA Form 33 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

U.S. Department of Transportation
**Federal Railroad Administration**

**8.3**     **Project Outcomes Report**

Where indicated in Article 7 of Attachment 2 of this Agreement, the Recipient will submit to FRA, not later than January 31st of the year that follows the final year during which data were collected, a Project Outcomes Report that contains:

(a)  an analysis of the impacts of the Project, including a comparison of the baseline performance measurement data collected under Section 8.1 of this Attachment 1 with the post-project performance measurement data that the Recipient reported in the final Post-Project Performance Measurement Report required under Section 8.2 of this Attachment 1;

(b)  for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement, an analysis of the accuracy of the projected outcome; and

(c)  all data collected under Sections 8.1 and 8.2 of this Attachment 1;

(d)  additional information as directed.

**8.4**     **General Performance Measurement Requirements**

The Recipient will ensure that all data collection for each performance measure identified in Article 7 of Attachment 2 of this Agreement is completed in a manner consistent with the description, location, and other attributes associated with that performance measure.

**8.5**     **Outcome Measurement and Reporting Survival**

The data collection and reporting requirements in Article 8 of this Attachment 1 survive the termination of this Agreement. FRA may consider the Recipient's compliance with this requirement after closeout of the grant in its evaluation of future applications for Federal financial assistance.

## ARTICLE 9:  NONCOMPLIANCE AND REMEDIES

**9.1**     **Noncompliance Determinations**

(a)  Notice of Proposed Determination. If FRA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this Agreement, FRA will notify the Recipient of a proposed determination of noncompliance through a written notice that:

(1)  explains the noncompliance;

(2)  describes a proposed remedy that is consistent with Section 9.2 of this Attachment 1;

(3)  describes the process and form in which the Recipient may respond to the notice that is consistent with Section 9.1(b) of this Attachment 1; and

16

(4)  if applicable, provides the Recipient an opportunity to cure the noncompliance or take corrective action.

(b)  Response to Notice of Proposed Determination. The Recipient may, not later than 7 days after receiving the notice of proposed determination of noncompliance, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)  accept the proposed remedy;

(2)  acknowledge the noncompliance, but propose an alternative remedy;

(3)  acknowledge the noncompliance and agree to cure or take corrective action; or

(4)  dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response sufficient documentation or other information supporting the Recipient's compliance.

(c)  Notice of Final Determination. After considering the Recipient's response or failure to timely respond under Section 9.1(b) of this Attachment 1, FRA will make a final determination. To make a final determination, FRA must provide a written notice to the Recipient that:

(1) states what the final determination is (e.g., noncompliance or compliance);

(2) states the basis for the final determination; and

(3) describes the remedy that FRA is imposing, if applicable, or if FRA is not imposing a remedy, describes the resolution to the proposed determination of noncompliance, including whether the Recipient has cured or corrected the noncompliance.

(d) If FRA determines the noncompliance is one that cannot be addressed while work on the Project is ongoing, in the notice of proposed determination or in the notice of final determination, FRA will direct the Recipient to stop work. The Recipient will stop work and will direct any Subrecipients or contractors to stop work immediately upon receipt of a notice to stop work from FRA.

(e)  FRA may consider the public interest in making a determination of noncompliance and imposing a remedy.

**9.2    Remedies**

(a)  If FRA makes a final determination of noncompliance under Section 9.1(c) of this Attachment 1, FRA may impose a remedy, including:

(1)  additional conditions on the award;

(2)  requiring the Recipient to prepare and implement a corrective action plan;

17

**U.S. Department of Transportation**
**Federal Railroad Administration**

(3)  directing the Recipient to stop work;

(4)  any remedy permitted under 2 CFR §§ 200.339–200.340, including withholding of payments ; disallowance of previously reimbursed costs, requiring refunds from the Recipient to FRA; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

(5)  any other remedy legally available.

(b)  The Recipient acknowledges that any amounts FRA requires the Recipient to refund to FRA under this Section 9.2 constitute a debt to the Federal Government that FRA may collect under 2 CFR § 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–999).

(c)  Other Remedies. The termination authority under Article 10 of this Attachment 1 supplements and does not limit FRA's remedial authority under this Article 9 or 2 CFR part 200, including 2 CFR §§ 200.339-200.240.  FRA reserves the right to seek any appropriate remedy or otherwise enforce the terms and conditions of this Agreement as authorized by law.

### 9.3    Other Oversight Entities

Nothing in Article 9 of this Attachment 1 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION

### 10.1    Suspension of Award Activities

(a)  If FRA determines that the remedy for noncompliance imposed under Article 9 of this Agreement does not achieve the desired result or is unlikely to improve compliance or performance, FRA may suspend activities under this Agreement pending corrective action by the Recipient or termination.

(b)  If FRA suspends activities under this Agreement, FRA will notify the Recipient in writing of the following, which may be included in the determinations of non-compliance under Section 9.1 of this Attachment 1:

(1)  what project activities, if any, will take place during the period of suspension;

(2)  what costs FRA will reimburse if the suspension is lifted and the award resumed;

(3)  what corrective actions must occur during the suspension; and

(4)  FRA's intent to terminate the award under this Article 10 if the Recipient does not meet the conditions of the remedial action.

U.S. Department of Transportation
**Federal Railroad Administration**

(c)  The duration of the temporary suspension of activities under the Agreement should be commensurate with the corrective action needed, but should not exceed 120 days at the outset. If the Recipient is not making sufficient progress in correcting the noncompliance, FRA must consider both financial and programmatic requirements in determining the appropriate extension to avoid the need for termination.

**10.2     FRA Termination**

(a)  FRA may terminate this Agreement and all its obligations under this Agreement if any of the following occurs:

(1)  the Recipient fails to obtain or contribute the required Non-Federal Funds, or alternatives approved by FRA, as provided in this agreement and consistent with Article 6 of Attachment 2 of this Agreement;

(2)  the Recipient fails to meet a milestone by six months after the completion date listed in Article 5 of Attachment 2 of this Agreement and the Recipient fails to request an amendment to this Agreement pursuant to Section 5.3 of this Attachment 1;

(3)  the Recipient fails to comply with the terms and conditions of this Agreement;

(4)  there are changes to the Project that FRA determines are inconsistent with FRA's basis for selecting the Project to receive the award; or

(5)  FRA determines that termination of this Agreement is in the public interest.

(b)  The Recipient may request that FRA terminate the Agreement, which may result in FRA determining noncompliance and imposing remedies pursuant to Article 9 of this Attachment 1.

**10.3     Closeout Termination**

(a)  This Agreement terminates on Project Closeout.

(b)  In this Agreement, "Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 CFR § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

**10.4     Post-Termination Adjustments**

The Recipient acknowledges that under 2 CFR §§ 200.345–200.346, termination of this Agreement does not extinguish FRA's authority to disallow costs, including costs that FRA reimbursed before termination, and recover funds from the Recipient.

**10.5     Non-Terminating Events**

(a)  The end of the budget period described under Section 4.4 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

19

U.S. Department of Transportation
**Federal Railroad Administration**

(b)  The end of the Period of Performance described under Section 4.5 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

## ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**11.1     Recipient Monitoring and Record Retention**

(a)  The Recipient will monitor activities under this award, including activities under subawards and contracts, to ensure:

(1)  that those activities comply with this agreement; and

(2)  that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient will monitor the activities of the Subrecipient in compliance with 2 CFR §200.332(e).

(c)  The Recipient will retain and provide access to records relevant to the award during the course of the Project and for three years after closeout or longer, as required under 2 CFR § 200.334.

(d)  The Recipient will adhere to the recording and recordkeeping requirements set forth in 2 CFR §§ 200.334–200.338.  Project Closeout does not alter these requirements.

**11.2     Financial Records and Audits**

(a)  The Recipient will keep all Project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the Project.

(b)  The Recipient will keep accounts and records described under Section 11.2(a) of this Attachment 1 in accordance with a financial management system that meets the requirements of 2 CFR §§ 200.302–200.307 and 2 CFR part 200, subpart F and will facilitate an effective audit in accordance with 31 U.S.C. §§ 7501–7506.

(c)  The Recipient will separately identify expenditures under the award in financial records required for audits under 31 U.S.C. §§ 7501–7506. Specifically, the Recipient will:

(1)  list expenditures separately on the schedule of expenditures of Federal awards required under 2 CFR part 200, subpart F, including the fiscal year in the format "FY 202X" in the program name; and

(2)  list expenditures on a separate row under Part II, Item 1 (Federal Awards Expended During Fiscal Period) of Form SF-SAC, including "FY 202X" in Column C (Additional Award Identification).

20

U.S. Department of Transportation
**Federal Railroad Administration**

(d) If the Recipient expends $1,000,000 or more in Federal awards during the Recipient's fiscal year, a single or program audit will be conducted for that year, consistent with 2 CFR §§ 200.501(a) and 200.512(c).

**11.3    Internal Controls**

The Recipient will establish and maintain internal controls as required under 2 CFR § 200.303.

**11.4    FRA Record Access**

FRA may access Recipient records related to this award under 2 CFR § 200.337.

**11.5    Site Visits**

FRA may conduct site visits to review Project activities, accomplishments, and management control systems and to provide technical assistance to the Recipient. The Recipient will provide or ensure reasonable, safe, and convenient access to FRA for any such site visit. FRA will conduct all site visits in such a manner as will not unduly delay work conducted by the Recipient, Subrecipient, or contractor.

## ARTICLE 12:  CONTRACTING AND SUBAWARDING

**12.1    Buy America**

(a)  For infrastructure projects, steel, iron, manufactured goods, and construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act (Buy American Act), Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(b)  For all other projects, the Recipient's acquisition of steel, iron, and manufactured goods with funding provided through this Agreement is subject to the requirements set forth in the Buy American Act, 41 U.S.C. §§ 8301-8305. The Recipient also represents that it has never been convicted of violating the Buy American Act nor will it make funding received under this Agreement available to any person or entity who has been convicted of violating the Buy American Act.

(c)  Under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(d)  Under 2 CFR § 200.322, the Recipient should, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders f under this award.

21



U.S. Department of Transportation
**Federal Railroad Administration**

**12.2    Small and Disadvantaged Business Requirements**

The Recipient will expend all funds under this award in compliance with the requirements at 2 CFR § 200.321, including any amendments thereto.

**12.3    Engineering and Design Services [Reserved]**

**12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 CFR § 200.216 prohibit the Recipient and all Subrecipients from procuring or obtaining certain telecommunications and video surveillance equipment or services under this award.

**12.5    Pass-Through Entity Responsibilities**

(a)  If the Recipient makes a subaward under this award, the Recipient will comply with the requirements for pass-through entities under 2 CFR parts 200 and 1201, including 2 CFR §§ 200.331–200.333, regardless of whether the Recipient is also a Pass-Through Entity as defined in 2 CFR § 200.1.

(b)  The Recipient will report any subaward obligation of $30,000 or more in Federal funds in USASpending.gov consistent with the Federal Funding Accountability and Transparency Act, Pub. L. 109-282.

(c)  The Recipient is accountable for performance under this award, the appropriate expenditure of funds, and other requirements under this Agreement. The Recipient is responsible for any non-compliance under the award and for compliance with any remedies imposed.

**12.6    Local Hiring Preference for Construction Jobs**

Under Section 25019 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, div. B, tit. V (2021), a Recipient or Subrecipient may implement a local or other geographical or economic hiring preference relating to the use of labor for construction of a project funded by this grant if funded under title 49 or 23 United States Code, including prehire agreements, subject to any applicable State and local laws, policies, and procedures. The use of such a local or other geographical or economic hiring preference in any bid for a contract for the construction of a project funded by this grant shall not be considered to unduly limit competition. Project labor agreements should be consistent with the definition and standards outlined in Executive Order 13502. For additional information, see https://www.transportation.gov/sites/dot.gov/files/2023-05/Creating-Local-Construction-Workforce.pdf.

**12.7    Procurement**

The Recipient may acquire property, goods, or services in connection with the Project. If the Recipient is a State or Indian Tribe, then it will follow the same policies and procedures it uses for procurements with non-Federal funds in compliance with 2 CFR § 200.317. A Subrecipient of a State will follow the policies and procedures allowed by that State when procuring property and services under this award consistent with 2 CFR § 1201.317, notwithstanding 2 CFR §

22

![U.S. Department of Transportation Federal Railroad Administration logo]

200.317. An entity that is not a State or Indian Tribe, or Subrecipient of a State or Indian Tribe, will comply with 2 CFR §§ 200.318–200.327, and applicable supplementary USDOT or FRA directives and regulations. The Recipient will provide technical specifications and requirements to FRA for review upon request.

## ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**13.1    Limitation of Federal Award Amount**

Under this award, FRA will not provide funding in an amount greater than the Agreement Federal Funds. The Recipient acknowledges that FRA is not liable for payments exceeding that amount, and the Recipient will not request reimbursement of costs exceeding that amount.

**13.2    Project Costs**

This award is subject to the cost principles at 2 CFR part 200, subpart E, including provisions on determining allocable costs and determining allowable costs.

**13.3    Timing of Project Costs**

(a)  The Recipient will not charge to this award costs that are incurred after the budget period.

(b)  The Recipient will not charge to this award costs that were incurred before the date of this Agreement unless those costs are identified as approved pre-award costs in Section 6.6 of Attachment 2 of this Agreement and would have been allowable if incurred during the budget period. This limitation applies to pre-award costs under 2 CFR § 200.458. This agreement hereby terminates and supersedes any previous FRA approval for the Recipient to incur costs under this award for the Project. Section 6.6 of Attachment 2 of this Agreement is the exclusive FRA approval of costs incurred before the date of this Agreement.

(c)  The Recipient may request approval of pre-award costs in a written request that demonstrates the purpose and amount of the costs, compliance with 2 CFR § 200.458, and whether such costs would otherwise serve as Non-Federal Funds.

**13.4    Recipient Recovery of Federal Funds**

The Recipient will make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if FRA determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner. The Recipient will not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by FRA.

**13.5    Unexpended Agreement Federal Funds**

Any Agreement Federal Funds that are obligated but not expended on allocable, allowable costs remain the property of the United States.

U.S. Department of Transportation
**Federal Railroad Administration**

**13.6    Interest Earned**

Interest earned on advances of Agreement Federal Funds is not program income.

**13.7    Timing of Payments to the Recipient**

(a)  Reimbursement is the payment method, unless otherwise approved by FRA.

(b)  The Recipient will not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**13.8    Payment Method**

(a)  The Recipient will use the DELPHI e-Invoicing System (https://www.dot.gov/cfo/delphi-einvoicing-system.html) to request reimbursement under this award. FRA will provide access to that system upon request by the Recipient.

(b)  FRA may deny a payment request that is not submitted using the method identified in this Section.

**13.9    Information Supporting Expenditures**

(a)  When requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient will electronically submit the SF 270 (Request for Advance or Reimbursement) and will submit supporting cost detail to document clearly all costs incurred. As supporting cost detail, the Recipient will include a detailed breakout of all costs incurred and classify all costs by task and by Agreement Federal Funds and Agreement Non-Federal Funds.

(b)  Unless FRA and the Recipient agree otherwise in writing, the Recipient will ensure that the proportion of expenditure of Agreement Federal Funds to Agreement Non-Federal Funds is not more than the maximum percent of total Project cost FRA will contribute identified in Section 6.5 of Attachment 2 of this Agreement. The Recipient will ensure the proportional expenditure of funds is reflected in the detailed breakout of costs supporting the SF 270.

(c)  If the Recipient submits a request for reimbursement that FRA determines does not include or is not supported by sufficient detail, FRA may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.10    Reimbursement Request Timing Frequency**

The Recipient will request reimbursement as needed to maintain cash flow sufficient to timely complete the Project. The Recipient will not submit any single payment request exceeding $99,999,999.99. The Recipient will not submit a payment request exceeding $50,000,000.00 unless the Recipient notifies FRA six days before submitting the request.

**13.11    Program Income**

The Recipient is encouraged to earn income to defray Project costs, where appropriate, and will work with FRA to determine how income may be applied to the grant, in accordance with 2 CFR

24

U.S. Department of Transportation
**Federal Railroad Administration**

§ 200.307 and 2 CFR § 1201.80. Program income not deducted from total allowable costs may be used only for the purposes and under the terms and conditions established in this Agreement. The Recipient will maintain records of all program income.

## ARTICLE 14:  PROPERTY AND EQUIPMENT

**14.1    General Requirements**

The Recipient will comply with the property standards of 2 CFR §§ 200.310–200.316 and will ensure compliance with these standards for all tiers of subawards and contracts under this award.

**14.2    Relocation and Real Property Acquisition**

The Recipient will comply with the land acquisition policies and relocation requirements in 42 U.S.C. § 4601 et seq. and 49 CFR part 24, subparts A–F, as applicable. At a minimum, under this section, the Recipient will:

(a)  comply with the land acquisition policies in 49 CFR part 24, subpart B and will pay or reimburse property owners for necessary expenses as specified in that subpart;

(b)  provide a relocation assistance program offering the services described in 49 CFR part 24, subpart C and provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR part 24, subparts D–E; and

(c)  make available to displaced persons comparable replacement dwellings in accordance with 49 CFR part 24.

(d)  provide to FRA a real estate acquisition and management plan prior to beginning real property acquisition if the Project is designated a Major Project in Article 1 of Attachment 2 of this Agreement, or if the total Project cost in Section 6.5 of Attachment 2 of this Agreement is greater than $300 million and the Project is also receiving financial assistance from the Federal Transit Administration (FTA).

**14.3    Use for Originally Authorized Purpose**

The Recipient will ensure that property and equipment funded under this Agreement is used for the originally authorized purpose. If necessary to satisfy this obligation, the Recipient will enter into appropriate arrangements with the entity or entities using, or with the owner of right-of-way used by, the property and/or equipment funded under this Agreement.

**14.4    Maintenance**

The Recipient will ensure that any property, improvements to property, and any equipment funded under this Agreement are maintained in good working order and in accordance with FRA regulations, guidelines, and directives.

U.S. Department of Transportation
**Federal Railroad Administration**

**14.5    Real Property Disposition**

In accordance with 2 CFR § 200.311, when real property acquired or improved under this award is no longer used for its originally intended purpose, the Recipient will request disposition instructions from FRA.

**14.6    Equipment Disposition**

(a)  In accordance with 2 CFR §§ 200.313 and 1201.313, when equipment acquired under this award is no longer needed for the Project:

(1)  if the entity that acquired the equipment is a State or a Subrecipient of a State, that entity will dispose of that equipment in accordance with State laws and procedures;

(2) if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 CFR § 200.313; and

(3)  if the entity that acquired the equipment is neither a State nor an Indian Tribe, that entity will request disposition instructions from FRA. In accordance with 2 CFR § 200.313(f), FRA may permit the Recipient or Subrecipient to retain equipment.

(b)  In accordance with 2 CFR §200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR §§ 200.313–200.316 and 2 CFR § 1201.313.

**14.7    Recordkeeping**

The Recipient will keep records regarding the operation and maintenance of property, improvements to property, equipment, and supplies funded under this Agreement and will provide them to FRA upon request.

**14.8    Encumbrance**

The Recipient will not create an obligation, such as a transfer of title, lease, lien, mortgage, or encumbrance, that would dispose of or encumber the Recipient's title or other interest in property, improvements to property, equipment or supplies funded under this Agreement without prior written approval from FRA.

The Recipient will not take any action that would adversely affect FRA's interest or impair the Recipient's continuing control over the use of the property, improvements to property, equipment, or supplies funded under the Agreement without prior written approval from FRA.

![U.S. Department of Transportation Federal Railroad Administration logo]

## ARTICLE 15:  AMENDMENTS

**15.1    Bilateral Amendments**

The parties may amend, modify, or supplement this Agreement by mutual agreement in writing signed by FRA and the Recipient. Either party may request to amend, modify, or supplement this Agreement by written notice to the other party.

**15.2    FRA Unilateral Amendments**

(a)  FRA may unilaterally amend this Agreement for the following reasons:

(1)  to comply with Federal law;

(2)  at closeout or in anticipation of closeout; and

(3)  other non-substantive changes, such as to correct typographical errors, as deemed appropriate by FRA.

(b)  To unilaterally amend this Agreement under Section 15.3 of this Attachment 1, FRA will provide a written notice to the Recipient that includes the amendment and the date that the amendment is effective.

(c)  Except at closeout or in anticipation of closeout, FRA may not unilaterally amend the Statement of Work, this Agreement's monetary amount, the delivery schedule, the Period of Performance, or other terms or conditions of this Agreement.

**15.3    Other Amendments**

The parties will not amend, modify, or supplement this Agreement except as permitted under Sections 15.1, 15.2, or 15.3 of this Attachment 1. If an amendment, modification, or supplement is not permitted under Section 15.1, 15.2, or 15.3 of this Attachment 1, it is void.

## ARTICLE 16:  [RESERVED]

## ARTICLE 17:  [RESERVED]

## ARTICLE 18:  LABOR AND WORK

**18.1    Labor and Work**

The Recipient will document its consideration of job quality and labor standards related to the Project in Article 9 of Attachment 2 of this Agreement.

27

![U.S. Department of Transportation Federal Railroad Administration logo]

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1     Critical Infrastructure Security and Resilience**

(a)  Consistent with the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021) and the National Security Memorandum on Critical Infrastructure Security and Resilience (April 30, 2024), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1     Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 CFR parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 CFR § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.

**20.2     Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not

**U.S. Department of Transportation**
**Federal Railroad Administration**

impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d)  The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a)  FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b)  The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 CFR § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when assessing the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a)  The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)  The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**20.6    External Award Terms and Obligations**

(a)  In addition to this document and the contents described in Article 25 of this Attachment 1, this Agreement includes the following additional terms as integral parts:

(1)  Appendix A to 2 CFR part 25: System for Award Management and Universal Identifier Requirements;

(2)  Appendix A to 2 CFR part 170: Reporting Subawards and Executive Compensation;

(3)  2 CFR part 175: Award Term for Trafficking in Persons; and

(4)  Appendix XII to 2 CFR part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b)  The Recipient will comply with:

(1)  49 CFR part 20: New Restrictions on Lobbying;

(2)  49 CFR part 21: Nondiscrimination in Federally Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964, including any amendments thereto;

(3)  49 CFR part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)  Subpart B of 49 CFR part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**20.7    Incorporated Certifications**

The Recipient makes the representations in the following certifications, which are incorporated by reference:

(a)  Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

## ARTICLE 21:  ASSIGNMENT

**21.1    Assignment Prohibited**

The Recipient will not transfer to any other entity any discretion granted under this Agreement, any right to satisfy a condition under this Agreement, any remedy under this Agreement, or any obligation imposed under this Agreement.

## ARTICLE 22:  WAIVER

**22.1    Waivers**

(a)  A waiver of a term of this Agreement authorized by law and granted by FRA will not be effective unless it is in writing and signed by an authorized representative of FRA.

30

**U.S. Department of Transportation**
**Federal Railroad Administration**

(b)  A waiver of a term of this Agreement granted by FRA on one occasion will not operate as a waiver on other occasions.

(c)  If FRA fails to require strict performance of a term of this Agreement, fails to exercise a remedy for a breach of this Agreement, or fails to reject a payment during a breach of this Agreement, that failure does not constitute a waiver of that term or breach.

## ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS

**23.1    Disclaimer of Federal Liability**

FRA will not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this Agreement.

**23.2    Environmental Review**

(a)  Except as authorized by law or under 23 CFR § 771.113(d)(4), the Recipient will not begin final design activities; acquire real property, construction materials, or equipment, including rolling stock; begin construction; or take other actions that would have an adverse environmental impact or limit the choice of reasonable alternatives for the Project unless and until FRA complies with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA), and any other applicable environmental laws and regulations. In addition, the Recipient will not begin project development that involves ground disturbing activity prior to FRA compliance with NEPA and any other applicable environmental laws and regulations.

(b)  The Recipient acknowledges that:

(1)  FRA's actions under Section 23.2(a) of this Attachment 1 may depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to FRA; and

(2)  applicable environmental statutes and regulations may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(c)  Consistent with 23 CFR § 771.105(a), to the maximum extent practicable and consistent with Federal law, the Recipient will coordinate all environmental investigations, reviews, and consultations as a single process.

(f)  The activities described in Article 4 of Attachment 2 of this Agreement and other information described in this Agreement may inform environmental decision-making processes, but the parties do not intend this Agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with Article 4 of Attachment 2 of this Agreement or other information in this Agreement, then FRA will either:

(1)  amend this Agreement under Section 15.1 of this Attachment 1 for consistency with the selected build alternative; or

31

U.S. Department of Transportation
**Federal Railroad Administration**

(2) if FRA determines that the condition at Section 10.1(a)(5) of this Attachment 1 is satisfied, terminate this Agreement under Section 10.1(a)(5) of this Attachment 1; or

(3) take other action as deemed appropriate by FRA.

(g) The Recipient will complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project. Article 4 of Attachment 2 of this Agreement identifies documents describing mitigation activities, but the absence of a document from that section does not relieve the Recipient of any compliance obligations.

### 23.3    Project Maintenance Requirement

The Recipient will ensure that any property and equipment funded within this Agreement is operated and maintained in good operating order and in accordance with 2 CFR §§ 200.310–200.316, 1201.313 and any guidelines, directives, or regulations that FRA may issue.

### 23.4    Appropriations Act Requirements

The Recipient will comply with applicable requirements of the appropriations act identified in Section 6.3 of Attachment 2 of this Agreement.

### 23.5    Standards of Conduct

The Recipient will comply with the following standards of conduct:

(a) Standards of Conduct. The Recipient will maintain a written code or standards of conduct governing the performance of its officers, employees, board members, or agents engaged in the award and administration of contracts or agreements supported by the Federal contribution provided through this Agreement. The code or standards will provide that the Recipient's officers, employees, board members, or agents may neither solicit nor accept gratuities, favors, or anything of monetary value from present or potential Subrecipients or contractors. The Recipient may set minimum rules where the financial interest is not substantial, or the gift is an unsolicited item of nominal intrinsic value. As permitted by state or local law or regulations, such code or standards will provide for penalties, sanctions, or other disciplinary actions for violations by the Recipient's officers, employees, board members, or agents, or by Subrecipients or their agents.

(b) Personal Conflict of Interest. The Recipient's code or standards must provide that no employee, officer, board member, or agent of the Recipient may participate in the selection, award, or administration of a contract supported by the Federal contribution if a real or apparent conflict of interest would be involved. Such a conflict of interest would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

32

![U.S. Department of Transportation Federal Railroad Administration logo]

(c)  Organizational Conflicts of Interest. The Recipient's code or standards of conduct must include procedures for identifying and preventing real and apparent organizational conflicts of interests. An organizational conflict of interest exists when the nature of the work to be performed under a proposed contract, may, without some restrictions on future activities, result in an unfair competitive advantage to the contractor or impair the contractor's objectivity in performing the contract work.

(d)  Existing Codes or Standards. This Section does not require the Recipient to implement a new code or standards of conduct where a state statute, or written code or standards of conduct, already effectively covers all of the required elements.

(e)  Disclosure of Conflicts. The Recipient will disclose in writing any potential conflict of interest to FRA or pass-through entity.

**23.6   Changed Conditions of Performance**

The Recipient will notify FRA of any event that may affect its ability to perform the Project in accordance with the terms of this Agreement.

**23.7   Litigation**

The Recipient will notify FRA in writing of any decision pertaining to the Recipient's conduct of litigation that may affect FRA's interests in the Project or FRA's administration or enforcement of applicable Federal laws or regulations. The Recipient will inform FRA in writing before naming FRA as a party to any type of litigation for any reason in any forum.

**23.8   [Reserved]**

**23.9   Equipment and Supplies**

The Recipient will maintain written policies and procedures that address acquisition, classification, and management of all equipment and supplies acquired or used under this award.

**23.10   Safety and Technology Data**

The Recipient will ensure that FRA has access to safety and technology relevant data generated by the Recipient under the award, in a machine-readable format, where specified in Article 4 of Attachment 2 of this Agreement.

**23.11   Intellectual Property**

The Recipient agrees to the standard patent rights clauses issued by the Department of Commerce at 37 CFR part 401, as applicable.

**23.12   Liquidation of Recipient Obligations**

(a)  The Recipient will liquidate all obligations of award funds under this Agreement not later than 120 days after the end of the Period of Performance.

(b)  Liquidation of obligations and adjustment of costs under this Agreement follow the requirements of 2 CFR §§ 200.344–200.346.

33

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 24:  CONSTRUCTION AND DEFINITIONS

**24.1    Agreement**

This Agreement consists of the following:

(a)  Agreement Cover Sheet

(b)  Attachment 1: General Terms and Conditions

(c)  Attachment 2: Project-Specific Terms and Conditions

(d)  Exhibit A: Applicable Federal Laws and Regulations

(e)  Exhibit B: Additional Standard Terms

(f)  Exhibit C: Quarterly Project Progress Reports and Recertifications

**24.2    Construction**

(a)  In these General Terms and Conditions, there are no references to articles or sections in project-specific portions of this Agreement that are not contained in Attachments or Exhibits listed in Section 24.1.

(b)  If a provision in these General Terms and Conditions or the Exhibits conflicts with a provision in the Project-Specific Terms and Conditions in Attachment 2 of this Agreement, then the relevant portion in Attachment 2 prevails. If a provision in the Exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

**24.3    Integration**

This Agreement constitutes the entire agreement of the parties relating to the Project and supersedes any previous agreements, oral or written, relating to the Project.

**24.4    Definitions**

This Section defines terms used in this Agreement. Additional definitions found in 2 CFR § 200.1 are incorporated by reference into this Agreement.

"Agreement Federal Funds" means the total amount of Federal funds obligated under this Agreement. This is the amount shown in Section 6.1 of Attachment 2 of this Agreement.

"Application" means the application identified in Article 3 of Attachment 2 of this Agreement, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

"Construction Substantial Completion" means the stage of the Project when all construction tasks are complete such that the Recipient can use the Project for its intended use and only closeout activities remain. Activity to address or complete closeout activities will not prevent or disrupt use of the Project.

34

**U.S. Department of Transportation**
**Federal Railroad Administration**

"Contingent Commitment" means the unobligated amounts of future available budget authority specified in law that FRA commits to obligate under the terms of this Agreement.

"Federal Share" means the sum of Agreement Federal Funds and Other Federal Funds. If there are no Other Federal Funds, the Federal Share is the same as the Agreement Federal Funds.

"General Terms and Conditions" means this Attachment 1.

"Other Federal Funds" means Federal funds that are part of the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement for the Project but are not obligated under this Agreement.

"Project" means the project proposed in the Application, as modified by the negotiated provisions of this Agreement, including Attachment 2 of this Agreement.

"Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 CFR § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

"Project Cost Savings" means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs.

"Rural Area" means any area that is not within an area designated as an urbanized area by the Bureau of the Census.

**24.5    Calendar Dates**

Unless otherwise specified, all dates and durations are in calendar days, calendar quarters, or calendar years, as appropriate.

**24.6    Communication in Writing**

Unless otherwise specified, all written communication may be provided by electronic mail.

**24.7    Severability**

If any provision of this Agreement is found to be invalid, illegal, or unenforceable, the validity, legality, or enforceability of the remaining provisions of this Agreement is not affected or impaired by such finding.  A provision held to be unenforceable as applied to any party or circumstance remains applicable to other parties and circumstances.

## ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE

**25.1    Counterparts**

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

35

U.S. Department of Transportation
**Federal Railroad Administration**

**25.2    Effective Date**

The agreement will become effective when all parties have signed it. The date of this Agreement will be the date this Agreement is signed by the last party to sign it.

## ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES

**26.1    Interstate Rail Compacts Grant Program**

The Recipient agrees to comply with the clauses in Section 26.1 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.1 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Non-Federal Match. The Recipient will provide a Non-Federal match of not less than 50 percent of the eligible expenses under the grant.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1, the Recipient will comply with the following clauses, as applicable:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under Section 26.1 of this Attachment 1, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4)  for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

36

U.S. Department of Transportation
**Federal Railroad Administration**

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.1(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

37

**U.S. Department of Transportation**
**Federal Railroad Administration**

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Operator Limitation. Recipient's eligible expenses must be related to intercity passenger rail service to be operated by Amtrak.

(i)  Reporting. As requested by FRA, the Recipient will report on:

(1)  the status of the planning efforts and coordination funded by the grant award;

(2)  plans for continued implementation of the interstate rail compact;

(3)  the status of, and data regarding, any new, restored, or enhanced rail services initiated under the interstate rail compact; and

(4)  other data and information as requested by FRA.

**26.2   Railroad Crossing Elimination Program Clauses**

The Recipient agrees to comply with the clauses in Section 26.2 of this Attachment 1.

Consistent with 49 U.S.C. §§ 22905(e) & 22909(j), clauses (b), (c), (d), and (g) of Section 26.2 of this Agreement 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law. In addition, clause (f) does not apply to: 1) the Alaska Railroad or its contractors; or 2) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Agreement 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

38

**U.S. Department of Transportation**
**Federal Railroad Administration**

(3)  under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4)  for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.2(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Impacted Rail Carrier or Real Property Owner Approvals. In accordance with 49 U.S.C. § 22909(e)(2)(A), prior to proceeding with the construction of the Project funded by this Agreement, if applicable, Recipient will obtain necessary approvals to commence construction from any impacted rail carriers or real property owners. If the Project is a planning project, as described in 49 U.S.C. § 22909(d)(6), the Recipient agrees to work collaboratively with rail carriers and right-of-way owners.

(f)  Labor Protective Arrangements

39

**U.S. Department of Transportation**
**Federal Railroad Administration**

(1)  Notwithstanding 49 U.S.C. § 22905(e)(1), and in accordance with 49 U.S.C. § 22909(j)(3), any employee covered by the Railway Labor Act (45 U.S.C. § 151 et seq.) and the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.) who is adversely affected by actions taken in connection with the project financed in whole or in part by such grant shall be covered by employee protective arrangements required to be established under 49 U.S.C. § 22905(c)(2)(B). In accordance with 49 U.S.C. § 22905(c)(2)(B), the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404, as such protective arrangements are described in the final FRA guidance titled Equivalent Protections for Railroad Employees and effective December 28, 2022, included herein in Exhibit B.

(2)  In accordance with 49 U.S.C. § 22909(j)(3), Recipient, and any successors, assigns, and contractors of Recipient:

> i.    shall be bound by the employee protective arrangements required under subparagraph (1); and

> ii.   shall be responsible for the implementation of such arrangements and for the obligations under such arrangements, but may arrange for another entity to take initial responsibility for compliance with the conditions of such arrangement.

(3)  Labor protections required pursuant to Subsection (f) of Section 26.2 of this Attachment 1 shall be documented consistent with Article 18 of this Attachment 1.

(g)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(h)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.3 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.3 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49

**U.S. Department of Transportation**
**Federal Railroad Administration**

U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. §22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4)  for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes:

41

**U.S. Department of Transportation**
**Federal Railroad Administration**

compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.3(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.4    Restoration and Enhancement Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.4 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.4 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right-of -way and facilities under current law.

42

![U.S. Department of Transportation Federal Railroad Administration logo]

**U.S. Department of Transportation**
**Federal Railroad Administration**

(a) Maximum Funding Limitation. A grant authorized by 49 U.S.C. § 22908 may not exceed:

(1) 90 percent of the projected net operating costs for the first year of service;

(2) 80 percent of the projected net operating costs for the second year of service;

(3) 70 percent of the projected net operating costs for the third year of service;

(4) 60 percent of the projected net operating costs for the fourth year of service;

(5) 50 percent of the projected net operating costs for the fifth year of service; and

(6) 30 percent of the projected net operating costs for the sixth year of service.

(b) Buy America. In lieu of Section 12.1 of this Agreement 1:

(1) for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2) for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3) under Section 26.4 of this Attachment 1, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4) for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c) Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the

43

**U.S. Department of Transportation**
**Federal Railroad Administration**

Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.4(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at: https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Route Reporting. The Recipient will provide similar information regarding the route performance, financial, and ridership projections, and capital and business plans that Amtrak is required to provide, and such other data and information as is required by Article 4 of Attachment 2 of this Agreement.

44

**U.S. Department of Transportation**
**Federal Railroad Administration**

(i)  Termination. In addition to the terms of this Attachment 1, FRA may terminate this Agreement upon the cessation of service, or the violation of any other term of this Agreement.

## 26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses

The Recipient agrees to comply with the clauses in Section 26.5 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.5 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 CFR part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 CFR § 184.3.

(4) for all projects, the Recipient should under 2 CFR § 200.322, to the greatest extent practicable  and consistent with law, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 CFR § 200.322 in all subawards, contracts, and purchase orders under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. §

45

U.S. Department of Transportation
**Federal Railroad Administration**

10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.5(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**U.S. Department of Transportation**
**Federal Railroad Administration**

(h)  Northeast Corridor Cost Allocation. For projects located on the Northeast Corridor, as that term is defined in 49 U.S.C. § 24911(a)(4), Amtrak and the public authorities providing commuter rail passenger transportation at the Project location on the Northeast Corridor must remain in compliance with 49 U.S.C. § 24905(c)(2).

(i)  Interest and Financing Costs. Pursuant to 49 U.S.C. § 24911(g)(2), interest and other financing costs of efficiently carrying out a part of the Project within a reasonable time are a cost of carrying out the Project under a Phased Funding Agreement, except that eligible costs may not be more than the cost of the most favorable financing terms reasonably available for the Project at the time of borrowing. The Recipient will certify to FRA's satisfaction that the Recipient has shown reasonable diligence in seeking the most favorable financing terms.

###

## Attachment 2

# PROJECT-SPECIFIC
# TERMS AND CONDITIONS

Version Date: April 30, 2025

![U.S. Department of Transportation Federal Railroad Administration]

# Project-Specific Terms and Conditions
## Table of Contents

ARTICLE 1: PROJECT-SPECIFIC DESIGNATIONS.................................................................................4

1.1      Recipient .......................................................................................................................4

1.2      Project and Purpose......................................................................................................4

1.3      Program Designations ...................................................................................................4

ARTICLE 2: SPECIAL TERMS AND CONDITIONS ................................................................................4

ARTICLE 3: ADMINISTRATIVE INFORMATION ..................................................................................4

3.1      Application ....................................................................................................................4

3.2      FRA Awarding Official....................................................................................................5

3.3      Federal Award Date ......................................................................................................5

3.4      Program Name and Assistance Listings Number ..........................................................5

3.5      Recipient's Unique Entity Identifier .............................................................................5

3.6      Federal Award Identification Number ..........................................................................5

ARTICLE 4: STATEMENT OF WORK....................................................................................................5

4.1      General Project Description...........................................................................................5

4.2      Project Location ............................................................................................................5

4.3      Project Scope ................................................................................................................7

4.4      Implement Required Environmental Commitments.....................................................9

ARTICLE 5: AWARD DATES AND ESTIMATED PROJECT SCHEDULE .................................................10

5.1      Award Dates...............................................................................................................10

5.2      Estimated Project Schedule .......................................................................................10

ARTICLE 6: AWARD AND PROJECT FINANCIAL INFORMATION ......................................................10

6.1      Award Amount...........................................................................................................10

6.2      Federal Obligation Information ..................................................................................10

6.3      Federal Authorization and Funding Source. ..............................................................10

6.4      Funding Availability....................................................................................................10

6.5      Approved Project Budget............................................................................................10

6.6      Pre-Award Costs.........................................................................................................11

6.7      Phased Funding Agreement........................................................................................11

ARTICLE 7: PERFORMANCE MEASUREMENT INFORMATION ........................................................12

**U.S. Department of Transportation**
**Federal Railroad Administration**

ARTICLE 8: ENVIRONMENTAL COMPLIANCE.......................................................................................13

ARTICLE 9: LABOR AND WORK .........................................................................................................13

9.1    Efforts to Support Good-Paying Jobs and Strong Labor Standards ............................................13

9.2    Supporting Narrative.................................................................................................................14

**U.S. Department of Transportation**
**Federal Railroad Administration**

# ARTICLE 1: PROJECT-SPECIFIC DESIGNATIONS

**1.1     Recipient**

This Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the City of Atlanta (the Recipient).

**1.2     Project and Purpose**

The purpose of this award is to fund a Railroad Crossing Elimination Program grant for the City of Atlanta Safe Crossings Study (the Project), as described in Article 4 of this Attachment 2, to help achieve the goals identified in the Fiscal Year 23-24 Notice of Funding Opportunity that solicited applications for Federal financial assistance. FRA and the Recipient will accomplish that purpose by timely completing the Project and ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Application.

**1.3     Program Designations**

(a)  Research and Development. This award is not for research and development.

(b)  Project Size. This award is for a non-Major Project as that term is defined in FRA Guidance on Development and Implementation of Railroad Capital Projects, January 11, 2023 (Railroad Capital Projects Guidance).

(c)  Phased Funding. This award is not a phased funding agreement as further discussed in Section 6.7 of this Attachment 2.

(d)  Grant or Cooperative Agreement. This award is made as a Grant Agreement.

(e)  Security Risk. This award is for a Project that has a low security risk.

(f)  Rural Area. The information the Recipient provided to FRA, including in the Application, demonstrates this award is not for a Project in a Rural Area.

# ARTICLE 2: SPECIAL TERMS AND CONDITIONS

There are no special terms for this award.

# ARTICLE 3: ADMINISTRATIVE INFORMATION

**3.1     Application**

Application Title: City of Atlanta Safe Crossings Study

Application Date: September 23, 2024

4

**U.S. Department of Transportation**
**Federal Railroad Administration**

### 3.2    FRA Awarding Official

FRA Office of Railroad Development
Federal Railroad Administration
1200 New Jersey Ave, SE
Washington, DC 20590
FRA-Grants@dot.gov

### 3.3    Federal Award Date

The "Federal Award Date" is the effective date of this Agreement, as defined under Section 25.2 of Attachment 1 of this Agreement.

### 3.4    Program Name and Assistance Listings Number

For the Railroad Crossing Elimination program, the Assistance Listings Number is 20.327 and the Assistance Listings Title is Railroad Crossing Elimination.

### 3.5    Recipient's Unique Entity Identifier

The Recipient's Unique Entity Identifier, as defined at 2 C.F.R. § 25.415, is listed in Section 1B on the Agreement cover sheet.

### 3.6    Federal Award Identification Number

The Federal Award Identification Number is listed in Section 2 on the Agreement cover sheet as the "Agreement Number."

## ARTICLE 4: STATEMENT OF WORK

### 4.1    General Project Description

Following the Recipient's recent completion of its Vision Zero Action Plan, the Project will advance a citywide prioritization of safety, mobility, and connectivity improvements at at-grade rail crossings. Previous local planning efforts have identified the needs and mobility challenges facing a number of at-grade crossings across the City, including blocked and unsafe crossings that pose a greater risk to vulnerable roadway users. The initial task is to prioritize 23 at-grade crossings identified in the City's initial screening to determine which crossings should be prioritized for needed improvements. The subsequent task is to conduct a feasibility study for the prioritized locations to determine viable improvements at the top 3-5 locations, as determined through the initial prioritization task.

### 4.2    Project Location

The Project will evaluate 23 at-grade crossings in the City of Atlanta within Fulton County, Georgia. The table below identifies the crossing locations by crossing ID and coordinates.

**U.S. Department of Transportation**
**Federal Railroad Administration**

| Crossing ID | Primary RR | Other Operating RR | Street | Latitude | Longitude |
|---|---|---|---|---|---|
| 643045H | CSX | | BENJAMIN E MAYS DR | 33.73964 | -84.50850 |
| 638625N | CSX | | MELVIN DR | 33.70808 | -84.51820 |
| 638642E | CSX | | CHAPPELL RD | 33.75591 | -84.43360 |
| 718065F | NS | | SAWTELL AVE | 33.70993 | -84.37380 |
| 638635U | CSX | | LINKWOOD RD | 33.75481 | -84.48190 |
| 718082W | NS | CSX | SYLVAN RD | 33.72644 | -84.41810 |
| 638643L | CSX | | JOSEPH BOONE BLVD | 33.76353 | -84.43140 |
| 638619K | CSX | | OLD FAIRBURN RD | 33.66408 | -84.52280 |
| 718079N | NS | CSX | ALLENE AVE/LEE ST | 33.73202 | -84.41350 |
| 638644T | CSX | | MAYSON TURNER RD | 33.76468 | -84.43060 |
| 717987T | NS | | HENRY FORD II DR | 33.64862 | -84.39140 |
| 717962X | NS | | BROWNS MILL RD | 33.65620 | -84.39140 |
| 717958H | NS | | BROWNS MILL RD | 33.65619 | -84.39150 |
| 638631S | CSX | | BOULDER PARK DR | 33.74984 | -84.50140 |
| 718025H | NS | ATK | PARROTT AVE | 33.80812 | -84.48620 |
| 638632Y | CSX | ATK | BROWNLEE RD | 33.75075 | -84.49970 |
| 638639W | CSX | | FAIRFIELD PL | 33.75393 | -84.46300 |
| 718058V | NS | | MCDANIEL ST | 33.73497 | -84.40170 |
| 639812A | CSX | | LENOX RD | 33.81023 | -84.35170 |
| 638636B | CSX | | WESTLAND BLVD | 33.75445 | -84.47290 |
| 718060W | NS | | FORTRESS AVE | 33.72667 | -84.39440 |
| 718062K | NS | | HANK AARON DR | 33.72186 | -84.38830 |
| 718068B | NS | CSX | MCDANIEL ST | 33.74424 | -84.40440 |

Figure 1. Table of 23 identified at-grade crossings, including primary operator and summary of operations

6

![U.S. Department of Transportation Federal Railroad Administration]



Figure 2. Identified At-Grade Crossings

## 4.3    Project Scope

The Recipient will notify FRA in writing of any requested changes in Project Scope and will not proceed with the changed scope unless approved by FRA in writing. If approved, changes to Project Scope may require additional environmental review or an amendment to this Agreement.

**Task 1: Project Administration and Management**

Subtask 1.1:  Project Administration

7

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

![U.S. Department of Transportation Federal Railroad Administration logo]

The Recipient will perform all tasks required for the Project through a coordinated process, which will involve affected railroad owners, operators, and funding partners, including:

- Georgia Department of Transportation-roadway owner
- CSX-Railroad operator
- Norfolk-Southern-Railroad operator
- FRA

The Recipient will facilitate the coordination of all activities necessary for implementation of the Project. The Recipient will:

- participate in a Project kickoff meeting with FRA following award;
- complete necessary steps to hire a qualified consultant/contractor to perform required Project work, as necessary;
- hold regularly scheduled Project meetings with FRA;
- inspect and approve work as it is completed; and
- participate in other coordination, as needed.


The Recipient will demonstrate to FRA that it is carrying out the project benefits in the most cost-efficient manner.

Subtask 1.2: Project Management Plan

The Recipient will prepare a Project Management Plan (PMP), that describes how the Project will be implemented and monitored to ensure effective, efficient, and safe delivery of the Project on time and within budget. The PMP will describe, in detail, the activities and steps necessary to complete the tasks outlined in this Statement of Work.

The PMP will include a Project Schedule and Project Budget for the work to be performed under this Agreement. The Project Schedule will be consistent with the Estimated Project Schedule in Section 5.2 of this Attachment 2, but provide a greater level of detail. Similarly, the Project Budget should be consistent with the Approved Project Budget in Section 6.5 of this Attachment 2, but provide a greater level of detail.

The Recipient will submit the PMP to FRA for review and approval. The Recipient will implement the Project as described in the approved PMP. The Recipient will not begin work on subsequent tasks until FRA has provided written approval of the PMP, unless FRA has provided pre-award authority for such work under Section 6.6 of this Attachment 2. FRA will not reimburse the Recipient for costs incurred in contravention of this requirement.

FRA may require the Recipient to update the PMP. The Recipient will submit any such updates to FRA for review and approval, and FRA will determine if updates to the PMP require an amendment to this Agreement.  The Project Budget and Project Schedule may be revised consistent with Article 5 of Attachment 1 of this Agreement without amending this Agreement.

8

U.S. Department of Transportation
**Federal Railroad Administration**

Subtask 1.3:  Project Closeout

The Recipient will submit a Final Performance Report as required by Section 7.2 of Attachment 1 of this Agreement, which should describe the cumulative activities of the Project, including a complete description of the Recipient's achievements with respect to the Project objectives and milestones.

**Task 1 Deliverables:**

| Deliverable ID | Subtask | Deliverable Name |
|:---:|:---:|:---:|
| 1.1 | 1.2 | Project Management Plan |
| 1.2 | 1.3 | Final Performance Report |

**Task 2: Project Planning**

The Recipient will not commence work on Task 2: Project Planning until FRA has approved the PMP deliverable described in Task 1: Project Administration and Management and provided written notification to proceed with Project Planning.

The Recipient will conduct technical analysis, stakeholder outreach, and other project planning activities, and prepare a Project Planning Package as detailed in the PMP. The Project Planning Package will be consistent with the objectives of the Project Planning Lifecycle Stage identified in the FRA Guidance on Development and Implementation of Railroad Capital Projects (January 11, 2023). The Project Planning Package will include all information described in the PMP. FRA will review the Planning Package for acceptance. Information and activities necessary to perform and complete the required Project Planning Package will be included in the approved PMP.

**Task 2 Deliverables:**

| Deliverable ID | Deliverable Name |
|:---:|:---:|
| 2 | Project Planning Package |

**4.4     Implement Required Environmental Commitments**

None.

9

**U.S. Department of Transportation**
**Federal Railroad Administration**

## ARTICLE 5: AWARD DATES AND ESTIMATED PROJECT SCHEDULE

**5.1    Award Dates**

Budget Period End Date: January 31, 2028

Period of Performance End Date: January 31, 2028

**5.2    Estimated Project Schedule**

Milestones associated with this Agreement are identified in Table 5-A: Estimated Project Schedule. The Recipient will complete these milestones to FRA's satisfaction by the Schedule Date, subject to Article 5 of Attachment 1 of this Agreement. The Recipient will notify FRA in writing when it believes it has achieved the milestone.

**Table 5-A: Estimated Project Schedule**

| Milestone | Schedule Date |
|---|---|
| Project Management Plan Completion | October 31, 2025 |
| Project Planning Package | July 31, 2027 |

## ARTICLE 6: AWARD AND PROJECT FINANCIAL INFORMATION

**6.1    Award Amount**

Agreement Federal Funds:  $1,200,000

**6.2    Federal Obligation Information**

Federal Obligation Type: Single

**6.3    Federal Authorization and Funding Source.**

Authorizing Statute: Sections 22104 and 22305 of the Infrastructure Investment and Jobs Act, Public Law 117-58 (November 15, 2021); 49 U.S.C. 22909

Appropriation:  Infrastructure Investment and Jobs Act, Division J, Title VIII (Public Law 117-58 (2021))

**6.4    Funding Availability**

Program funding that is obligated under this Agreement remains available until expended.

**6.5    Approved Project Budget**

The estimated total Project cost under this Agreement is $1,500,000.

FRA will contribute a maximum of 80% percent of the total Project cost, not to exceed the Agreement Federal Funds in Section 6.1 of this Attachment 2. FRA will fund the Project at the lesser amount of the Agreement Federal Funds or the FRA maximum contribution percentage of total Project costs.

**U.S. Department of Transportation**
**Federal Railroad Administration**

The Recipient will contribute $300,000 in Agreement Non-Federal Funds. Recipient's Agreement Non-Federal Funds are comprised of cash contributions in the amount of $300,000.

The Recipient will complete the Project to FRA's satisfaction within the Approved Project Budget, subject to Article 5 of Attachment 1 of this Agreement.

**Table 6-A: Approved Project Budget by Task**

| Task # | Task Title | Agreement Federal Funds | Agreement Non-Federal Funds | Total |
|---|---|---|---|---|
| 1 | Project Administration and Management | $ 60,000 | $ 15,000 | $ 75,000 |
| 2 | Project Planning | $ 1,140,000 | $ 285,000 | $ 1,425,000 |
| | Total | $ 1,200,000 | $ 300,000 | Total Project Cost: $1,500,000 |

**Table 6-B: Approved Project Budget by Source**

| Funding Source | Total Amount | Percentage of Total Project Cost |
|---|---|---|
| **Federal Share** | **$1,200,000** | **80.00%** |
| Agreement Federal Funds | $1,200,000 | 80.00% |
| FRA RCE | $1,200,000 | 80.00% |
| **Non-Federal Share** | **$300,000** | **20.00%** |
| Agreement Non-Federal Funds | $300,000 | 20.00% |
| Atlanta Beltline Tax Allocation District: City of Atlanta Dept. of Transportation | $300,000 | 20.00% |
| **Total Project Cost** | **$1,500,000** | **100%** |

### 6.6    Pre-Award Costs

None. Consistent with 2 C.F.R. part 200, costs incurred before the date of this Agreement are not allowable costs under this award. FRA will neither reimburse those costs under this award nor consider them as a non-Federal cost-sharing contribution to this award.

### 6.7    Phased Funding Agreement

Not applicable.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 7: PERFORMANCE MEASUREMENT INFORMATION

Table 7-A: Performance Measurement Table identifies the performance measures that this Project is expected to achieve. These performance measures will enable FRA to assess the Recipient's progress in achieving grant program goals and objectives. The Recipient will report on these performance measures in accordance with the frequency and duration specified in Table 7-A.

Upon Project completion, the Recipient will submit reports comparing the actual Project performance of the new and or improved asset(s) against the pre-Project (baseline) performance and expected post-Project performance as described in Table 7-A. The Recipient will submit the performance measures report to the Project Manager in accordance with Table 7-A.

**Table 7-A: Performance Measurement Table**

| Goal | Objective | Performance Measure | Description of Measure | Measurement | Reporting |
|------|-----------|---------------------|------------------------|-------------|-----------|
| *Eliminating Crossing(s) and/or making corridor-wide improvements* | To create a feasible plan to allow for safety improvements at one or multiple at grade crossings, which will reduce rail incidents. | Establish crossing safety improvement alternatives | Prioritization or Preferred Option for crossing safety improvement(s) | **Pre-Project (Baseline) Performance as of January 1, 2022:** No existing plan for the Corridor | **Frequency:** One-Time |
| | | | | **Expected Post-Project Performance:** Preferred Option for each crossing. | **Duration:** At Project Completion |
| | | | | **Expected Post-Project Performance:** Yes; document/ | **Duration:** One time |

12

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF



U.S. Department of Transportation
**Federal Railroad Administration**

| | | | | deliverables completed | |
|---|---|---|---|---|---|
| | | | | | |

## ARTICLE 8: ENVIRONMENTAL COMPLIANCE

In accordance with the National Environmental Policy Act (NEPA; 42 U.S.C. § 4321 et seq.), other environmental statutes, and related regulatory requirements, on April 16, 2025, FRA determined that the actions funded under this Agreement as described in this Attachment 2, Section 4.3 are categorically excluded from detailed environmental review pursuant to 23 C.F.R. § 771.116(c)(3). In accordance with Section 106 of the National Historic Preservation Act (54 U.S.C. § 306108; 36 C.F.R. part 800), FRA has also determined that the actions funded under this Agreement have no potential to cause effects to historic properties. The actions do not require the use of property protected by Section 4(f) of the Department of Transportation Act (49 U.S.C. § 303; 23 C.F.R. part 774).

Categorical exclusion (CE) means a category of actions that a Federal agency has determined normally do not have a significant impact on the quality of the human environment and therefore do not require either an environmental assessment (EA) or environmental impact statement (EIS). 42 U.S.C. § 4336e(1). In analyzing the applicability of a CE, FRA also considered whether unusual circumstances are present that would warrant a more detailed environmental review through the preparation of an EA or EIS. In accordance with 23 C.F.R. § 771.116 (a) and (b), FRA further concluded that no unusual circumstances exist with respect to development of the activities funded under this grant that might trigger the need for a more detailed environmental review.

Should conditions or the scope of the action change, the Recipient must notify FRA and receive written response and notice to proceed before proceeding. FRA will evaluate whether this determination remains applicable or if additional environmental review is necessary.

## ARTICLE 9: LABOR AND WORK

**9.1    Efforts to Support Good-Paying Jobs and Strong Labor Standards**

This Section identifies the Recipient's efforts to support good-paying jobs and strong labor standards related to the Project. The Recipient certifies that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| | The Recipient or a project partner promotes robust job creation by supporting good-paying jobs directly related to the project with free and fair choice to join a union. (Describe robust job creation and identify the good-paying jobs in the supporting narrative below.) |


U.S. Department of Transportation
**Federal Railroad Administration**

|  | |
|---|---|
|  | The Recipient or a project partner will invest in high-quality workforce training programs such as registered apprenticeship programs to recruit, train, and retain skilled workers, and implement policies such as targeted hiring preferences. (Describe the training programs in the supporting narrative below.) |
|  | The Recipient or a project partner will partner with high-quality workforce development programs with supportive services to help train, place, and retain workers in good-paying jobs or registered apprenticeships including through the use of local and economic hiring preferences, linkage agreements with workforce programs, and proactive plans to prevent harassment. (Describe the supportive services provided to trainees and employees, preferences, and policies in the supporting narrative below.) |
|  | The Recipient or a project partner will partner with communities or community groups to develop workforce strategies. (Describe the partnership and workforce strategies in the supporting narrative below.) |
|  | The Recipient or a project partner has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. (Describe those actions in the supporting narrative below.) |
|  | The Recipient or a project partner has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take relevant actions described below. (Identify the relevant actions in the supporting narrative below.) |
| X | The Recipient or a project partner has not taken actions related to the Project to improve good-paying jobs and strong labor standards and will not take those actions under this award. |

## 9.2    Supporting Narrative

N/A

###

**U.S. Department of Transportation**
**Federal Railroad Administration**

---

# Exhibits

---

Revision Date: April 30, 2025



## Table of Contents

EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS.................................................................3

    GENERAL FEDERAL LEGISLATION ...............................................................................................3

    EXECUTIVE ORDERS.....................................................................................................................4

    GENERAL FEDERAL REGULATIONS .............................................................................................4

EXHIBIT B: ADDITIONAL STANDARD TERMS ........................................................................................6

    EXHIBIT B.1: TITLE VI ASSURANCES ..........................................................................................7

    EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS – PRIMARY COVERED TRANSACTIONS ...............................................................16

    EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW.........................................................................................................20

    EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING .........................22

    EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B) ..............24

EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS.........................33



## EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this Agreement, the Recipient assures and certifies, with respect to this award, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this Agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this Agreement include, but are not limited to, the following:

**GENERAL FEDERAL LEGISLATION**
a.  Davis-Bacon Act – 40 U.S.C. § 3141 et seq.
b.  Federal Fair Labor Standards Act – 29 U.S.C. § 201 et seq.
c.  Hatch Act – 5 U.S.C. § 1501 et seq.
d.  Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 – 42 U.S.C. § 4601 et seq.
e.  National Historic Preservation Act of 1966 (Section 106) – 54 U.S.C. § 306108
f.  Archeological and Historic Preservation Act of 1974 – 54 U.S.C. §§ 312501-312508
g.  Native American Graves Protection and Repatriation Act – 25 U.S.C. § 3001 et seq.
h.  Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. § 7401 et seq.
i.  Clean Water Act, as amended – 33 U.S.C. § 1251 et seq.
j.  Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. § 1536 et seq.
k.  Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. § 1451 et seq.
l.  Flood Disaster Protection Act of 1973, Section 102(a) – 42 U.S.C. § 4012a
m.  Age Discrimination Act of 1975 – 42 U.S.C. § 6101 et seq.
n.  American Indian Religious Freedom Act, as amended – P.L. 95-341
o.  Sections 523 and 527 of the Public Health Service Act of 1912, as amended – 42 U.S.C. §§ 290dd–290dd-2
p.  Architectural Barriers Act of 1968 – 42 U.S.C. § 4151 et seq.
q.  Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42, Section 403 – 42 U.S.C. § 8373
r.  Contract Work Hours and Safety Standards Act – 40 U.S.C. § 3701 et seq.
s.  Copeland Anti-kickback Act, as amended – 18 U.S.C. § 874 and 40 U.S.C. § 3145
t.  National Environmental Policy Act of 1969 – 42 U.S.C. § 4321 et seq.
u.  Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. § 1271 et seq.
v.  Single Audit Act of 1984 – 31 U.S.C. § 7501 et seq.
w.  Americans with Disabilities Act of 1990 – 42 U.S.C. § 12101 et seq.
x.  Title IX of the Education Amendments of 1972, as amended – 20 U.S.C. §§ 1681–1683 and §§ 1685–1687
y.  Section 504 of the Rehabilitation Act of 1973, as amended – 29 U.S.C. § 794
z.  Title VI of the Civil Rights Act of 1964 – 42 U.S.C. § 2000d et seq.
aa.  Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
bb.  Freedom of Information Act, as amended – 5 U.S.C. § 552
cc.  Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. § 1801 et seq.
dd.  Farmland Protection Policy Act of 1981 – 7 U.S.C. § 4201 et seq.
ee.  Noise Control Act of 1972 – 42 U.S.C. § 4901 et seq.
ff.  Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. § 661 et seq.
gg.  Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 – 33 U.S.C. §§ 401 and

3

![U.S. Department of Transportation Federal Railroad Administration logo]

525

    hh.   Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303

    ii.   Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. §§ 9601–9657

    jj.   Safe Drinking Water Act – 42 U.S.C. §§ 300f–300j-26

    kk.  The Wilderness Act – 16 U.S.C. §§ 1131–1136

    ll.   Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. § 6901 et seq.

   mm. Migratory Bird Treaty Act – 16 U.S.C. § 703 et seq.

    nn.  The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109-282, as amended by Section 6202 of Public Law 110-252)

    oo.  Cargo Preference Act of 1954 – 46 U.S.C. § 55305

    pp.  Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232

    qq.  Efficient Environmental Reviews – 23 U.S.C. § 139

    rr.   Grant Conditions – 49 U.S.C. § 22905

    ss.   Build America, Buy America Act – Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298

    tt.   Bringing In and Harboring Certain Aliens – 8 U.S.C. § 1324

    uu.  Aiding or Assisting Certain Aliens to Enter – 8 U.S.C. § 1327

**EXECUTIVE ORDERS**

    a.   Executive Order 11990 – Protection of Wetlands

    b.   Executive Order 11988 – Floodplain Management

    c.   Executive Order 12372 – Intergovernmental Review of Federal Programs

    d.   Executive Order 12549 – Debarment and Suspension

    e.   Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers

    f.   Executive Order 14025 – Worker Organizing and Empowerment

    g.   Executive Order 14149 – Restoring Freedom of Speech and Ending Federal Censorship

    h.   Executive Order 14154 – Unleashing American Energy

    i.   Executive Order 14168 – Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

    j.   Executive Order 14173 – Ending Illegal Discrimination and Restoring Merit-Based Opportunity

**GENERAL FEDERAL REGULATIONS**

    a.   Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 CFR Parts 200, 1201

    b.   Non-procurement Suspension and Debarment – 2 CFR Parts 180, 1200

    c.   Investigative and Enforcement Procedures – 14 CFR Part 13

    d.   Procedures for predetermination of wage rates – 29 CFR Part 1

    e.   Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 CFR Part 3

    f.   Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 CFR Part 5

    g.   Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements) – 41 CFR Parts 60 et seq.

**U.S. Department of Transportation**
**Federal Railroad Administration**

h. New Restrictions on Lobbying – 49 CFR Part 20

i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 CFR Part 21, including any amendments thereto

j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 CFR Part 24

k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 CFR Part 25

l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 CFR Part 27

m. DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 CFR Part 35

n. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 CFR Part 28

o. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 CFR Part 30

p. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 CFR Part 32

q. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 CFR Parts 37 and 38

r. Environmental Impact and Related Procedures – 23 CFR Part 771

s. Procedures Implementing Section 4(f) of the Department of Transportation Act – 23 CFR Part 774

Specific assurances required to be included in the Agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this Agreement.

**U.S. Department of Transportation**
**Federal Railroad Administration**

EXHIBIT B: ADDITIONAL STANDARD TERMS

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.1: TITLE VI ASSURANCES**

### TITLE VI ASSURANCE
### Implementing Title VI of the Civil Rights Act of 1964, as amended

### ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 CFR Parts 21, 25, 27, 37 and 38

### The United States Department of Transportation (USDOT)

### Standard Title VI/Non-Discrimination Assurances

### DOT Order No. 1050.2A

By signing and submitting the Application and by entering into this Agreement, the Recipient **HEREBY AGREES THAT**, as a condition to receiving Federal financial assistance from the Federal Railroad Administration (FRA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 CFR Part 21, including any amendments thereto (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 CFR Section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity," for which the Recipient receives Federal financial assistance from DOT, including FRA.*

7



**U.S. Department of Transportation**
**Federal Railroad Administration**

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR Part 21, including any amendments thereto, will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.



**Federal Railroad Administration**
U.S. Department of Transportation

7.  That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

    a.  for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and

    b.  for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8.  That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a.  the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or

    b.  the period during which the Recipient retains ownership or possession of the property.

9.  The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing FRA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by FRA. You must keep records, reports, and submit the material for review upon request to FRA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the FRA under this Agreement. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the program or project funded under this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1. **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally assisted programs of the U.S. Department of Transportation, Federal Railroad Administration (FRA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2. **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 CFR Part 21, including any amendments thereto.

3. **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4. **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or FRA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or FRA, as appropriate, and will set forth what efforts it has made to obtain the information.

5. **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or FRA may determine to be appropriate, including, but not limited to:

   a. withholding payments to the contractor under the contract until the contractor complies; and/or
   b. cancelling, terminating, or suspending a contract, in whole or in part.

6. **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The

10



U.S. Department of Transportation
**Federal Railroad Administration**

contractor will take action with respect to any subcontract or procurement as the Recipient or FRA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.



**APPENDIX B**

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), 23 U.S.C. § 117 and the policies and procedures prescribed by the Federal Railroad Administration (FRA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, including any amendments thereto, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)

12

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF   Case 3.25-cv-07070-RS   Document 71-5   Filed 03/05/26   Page 563 of 619



**U.S. Department of Transportation**
**Federal Railroad Administration**

**APPENDIX C**

**CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM**

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.   The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

1.  In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.   With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.   With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)


U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX E**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 Stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 CFR Part 21, including any amendments thereto.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 et seq.), (prohibits discrimination on the basis of sex) (as applicable);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 et seq.), as amended, (prohibits discrimination on the basis of disability); and 49 CFR Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 et seq.), (prohibits discrimination on the basis of age);
- The Civil Rights Restoration Act of 1987, (P.L. 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131–12189) as implemented by Department of Transportation regulations at 49 CFR Parts 37 and 38;
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq.).

15

![U.S. Department of Transportation Federal Railroad Administration logo]

**EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS – PRIMARY COVERED TRANSACTIONS**

**2 CFR Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FRA approval or that is estimated to cost $25,000 or more—as defined in 2 CFR Parts 180 and 1200.

By signing and submitting the Application and by entering into this Agreement, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

16

**U.S. Department of Transportation**
**Federal Railroad Administration**

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust

17

U.S. Department of Transportation
**Federal Railroad Administration**

statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**2. Instructions for Certification – Lower Tier Participants:**

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FRA approval or estimated to cost $25,000 or more – 2 CFR Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 CFR Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

18

Docusign Envelope ID: 50E87D3D-232A-4611-8C48-BB1DEEDA05CF

**U.S. Department of Transportation**
**Federal Railroad Administration**

f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – Lower Tier Participants:**

1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

19

![U.S. Department of Transportation — Federal Railroad Administration]

**EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by Sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

20

**U.S. Department of Transportation**
**Federal Railroad Administration**

(1)  Certify whether the entity has a Tax Delinquency; and

(2)  Certify whether the entity has a Felony Conviction.

4    **Prohibition.** If

(1)  the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

(2)  an entity provides an affirmative response to either certification in section 3; or

(3)  an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5.   **Mandatory Notice to the USDOT.**

(a)  If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

(b)  If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

(c)  If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6.   **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

(1)  require the SAM check in section 2;

(2)  require the certifications in section 3;

(3)  include the prohibition in section 4; and

(4)  require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

21



U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
    (1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
        (i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
        (ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
    (2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—
        (i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and
        (ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.



**U.S. Department of Transportation**
**Federal Railroad Administration**

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.



U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B)**

This Exhibit provides guidance on the protective arrangements equivalent to the protective arrangements established under Section 504 of the Railroad Revitalization Reform Act of 1976, with respect to employees affected by actions taken in connection with a Project financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B). Fluctuations and changes in volume or character of employment brought about solely by other causes are not within the scope of this Exhibit.

 1.      **Definitions.** Whenever used in this Exhibit, capitalized terms shall have the meanings below:

 (a)      "Average Monthly Compensation" means the total compensation received by a Displaced Employee or a Dismissed Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement or dismissal, divided by twelve (12). The Average Monthly Compensation shall be adjusted to reflect subsequent general wage increases.

 (b)      "Average Monthly Time" means the total number of hours worked by a Displaced Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement, divided by twelve (12).

 (c)      "Day" means one 24-hour calendar day (including holidays and weekends) for purposes of calculating deadlines and other timeframes in this Exhibit.

 (d)      "Displaced Employee" means a Protected Employee who remains employed by a Railroad but, as a result of a Project, is placed in a worse position with respect to compensation and rules governing working conditions. A Protected Employee's status as a Displaced Employee begins on the date said employee is harmed.

 (e)      "Dismissed Employee" means a Protected Employee who: (1) as a result of a Project, is deprived of employment with the Railroad because (i) the Railroad eliminates the Protected Employee's position, or (ii) the Railroad eliminates another employee's position (and that employee's exercise of seniority rights results in the Protected Employee's inability to secure another position by the exercise of the Protected Employee's seniority rights); and (2) is unable to secure another position by exercise of their seniority rights A Protected Employee's status as a Dismissed Employee begins on the date said employee is deprived of employment.

 (f)      "Project" means any action financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B).

 (g)      "Protected Employee" means an employee of a Railroad who is affected by actions taken pursuant to a Project, whether the Project is initiated by a Railroad or a Recipient. If a Railroad rearranges or adjusts its forces in anticipation of a Project with the purpose or effect of depriving an employee of benefits to which they otherwise would have become entitled under this Exhibit, then that employee is a Protected Employee under this Exhibit. An employee's status as a Protected Employee shall continue for the duration of the applicable Protective Period. An employee who solely benefitted as a result of a Project shall not be a Protected Employee under this Exhibit.

 (h)      "Protective Period" means that period during which a Displaced Employee or a Dismissed Employee is provided the protections described in this Exhibit. The Protective Period begins

24

**U.S. Department of Transportation**
**Federal Railroad Administration**

on the date an employee of a Railroad is displaced or dismissed and ends after six (6) years. However, the Protective Period for any particular employee shall not continue longer than the period of time the Railroad employed the employee prior to the date of their displacement or dismissal. For purposes of this Exhibit, an employee's length of service shall be determined in accordance with the provisions of Section 7(b) of the Washington Job Protection Agreement of May 1936, as amended.

(i)      "Recipient" means any person or entity receiving financial assistance subject to the requirements of 49 U.S.C. § 22905(c), including grantees, subrecipients, contractors, and subcontractors.

(j)      "Railroad" means (1) a railroad carrier as defined in 49 U.S.C. § 20102(3), or (2) any person deemed a rail carrier pursuant to 49 U.S.C. § 22905(b).

**2.      Flow Down.**

(a)      In accepting financial assistance for a Project, the Recipient is responsible for ensuring the compliance with the protections provided in this Exhibit. The Recipient shall make the acceptance of this Exhibit a condition of any new contract (or incorporate its terms into any existing contract by amendment) that uses funds subject to the requirements of 49 U.S.C. § 22905(c). These conditions shall apply to a Recipient, any Railroad and any contractor of any tier with which the Recipient contracts using funds subject to the requirements of 49 U.S.C. § 22905(c).

(b)      The Recipient shall require in an agreement (either in a new agreement or as an amendment to an existing agreement) with a Railroad owning the right-of-way to be improved by a Project that the Railroad notify its employees (or their representatives) of the Project being funded with financial assistance subject to 49 U.S.C. § 22905(c) and the applicability of these protections.

(c)      Any Railroad employee (or their representatives) may notify a Recipient of a dispute or controversy relating to the requirements of this Exhibit to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

**3.      Collective Bargaining Agreements.**

(a)      **Existing Agreements**. The rates of pay, rules, working conditions, and all collective bargaining and other rights, privileges, and benefits (including continuation of pension rights and benefits) of a Railroad's employees under applicable laws, regulations, and/or existing collective bargaining agreements shall be preserved and remain applicable unless changed by future collective bargaining agreements or applicable statutes or regulations. As applied to the regulation of subcontracting by the Railroads of a Project, the provisions of this section shall mean that a determination of whether or not such work validly may be subcontracted by a Railroad shall not be affected by the fact that the work is being financed by funds subject to the requirements of 49 U.S.C. § 22905(c)(2)(B). Nothing in this Exhibit shall be construed as depriving any Railroad employee of any rights or benefits or eliminating any obligations that such employee may have under any existing contractual or statutory arrangement, including job security agreements, protective conditions, or arrangements.

(b)      **Election by Protected Employee**. Where a Protected Employee is eligible for protections under both this Exhibit and another contractual or statutory arrangement, the Protected Employee shall elect between the protection under this Exhibit and protection under such other arrangement. After

25



U.S. Department of Transportation
**Federal Railroad Administration**

such an election, the Protected Employee shall be protected only by the arrangement that they elect. The Protected Employee shall not be entitled to any protection or benefit (regardless of whether such benefit is duplicative) under the arrangement that they do not elect. However, if the elected protection expires pursuant to the terms of the arrangement that governs the elected protection, the Protected Employee is entitled to protection under the arrangement not originally elected for the remainder, if any, of the Protective Period.

**4.        Change in Operations, Services, Facilities, or Equipment.**

(a)        **Notice**. When a Railroad contemplates a change or changes in its operations, services, facilities, or equipment as a result of a Project, which may cause the dismissal or displacement of Protected Employees or rearrangement of forces involving such employees, it shall give at least sixty (60) days' written notice of such intended changes to both Protected Employees and their duly authorized representatives (if applicable). Such notice shall contain a full and adequate description of the proposed changes, including an estimate of the number of Protected Employees of each class affected by the intended changes.

(b)        **Negotiations**.

(i)        Initiation of Negotiation. Within sixty (60) days after the Railroad issues a notice under Section 4(a) of this Exhibit, the Railroad or the Protected Employees (or their representatives) may, by written notice to the other party, request a meeting and opportunity to negotiate an agreement with respect to the application of the terms and conditions of this Exhibit. These negotiations shall commence within fourteen (14) days from the receipt of such request.

(ii)        Subject of Negotiations. Each change to rail operations, services, facilities, infrastructure, or equipment (including rights-of-way, track, and signal and crossing systems) that may result in dismissal or displacement of Protected Employees or rearrangement of forces involving such employees shall be subject to review and negotiation by the parties, but only to the extent necessary to ensure compliance with this Exhibit. For any contemplated rearrangement of rail forces, the Railroad and the representative(s) of the Protected Employees shall agree on the method of selection of employees to be moved, and the assignment of those employees to new roles.

(c)        **Arbitration**. If the Railroad and the representative(s) of the Protected Employees fail to agree within forty-five (45) days from the initial meeting and opportunity to negotiate, either party may submit the dispute for arbitration in accordance with the following procedures:

(i)        Notice & Selection of Arbitrator. Within ten (10) days after either party has notified the other in writing of their desire to submit the dispute for arbitration, the parties shall select a neutral arbitrator. If the parties cannot agree upon the selection of said arbitrator, then the parties shall submit a request to the National Mediation Board to appoint an arbitrator. In either case, a hearing shall be scheduled no later than thirty (30) days after an arbitrator has been appointed.

**U.S. Department of Transportation**
**Federal Railroad Administration**

    (ii)    <u>Binding Decision</u>. The decision of the arbitrator shall be final, binding, and conclusive and shall be rendered within thirty (30) days from the date of the commencement of the hearing of the dispute.

    (iii)    <u>Expenses</u>. The salary and expenses of the arbitrator shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them.

(d)    **Implementation**. If a notice is issued under Section 4(a), the Railroad shall not implement such a change or changes until: (i) sixty (60) days after the notice in accordance with Section 4(a), if no party requests a meeting and opportunity to negotiate; (ii) the parties reach agreement pursuant to Section 4(b), if a party requests a meeting and opportunity to negotiate; or (iii) a referee has rendered a decision pursuant to Section 4(c).

**5.**    **Protections for Displaced Employees**

(a)    **Displacement Allowances**.

    (i)    <u>In General</u>. If a Displaced Employee is unable, in the normal exercise of such employee's seniority rights under existing agreements, rules and practices, to obtain a position that is compensated equal to or exceeding the compensation the Displaced Employee received in the position from which such employee was displaced, then the Displaced Employee shall, during the Protective Period, be paid a monthly displacement allowance equal to the difference between the monthly compensation received by the Displaced Employee in the position in which such employee is retained and the Average Monthly Compensation received by the Displaced Employee in the position from which such employee was displaced (the "Displacement Allowance").

    (ii)    <u>Application of Displacement Allowance</u>. If a Displaced Employee's compensation in that employee's retained position is less in any month in which such employee performs work than the Average Monthly Compensation, then the Displaced Employee shall be paid the difference between the current compensation and the Average Monthly Compensation. However, the Displacement Allowance shall be reduced by the Displaced Employee's time lost as a result of voluntary absences, to the extent that the Displaced Employee is not available for service equivalent to the Displaced Employee's Average Monthly Time. If, on the other hand, the Displaced Employee, in such employee's retained position, works in excess of the Average Monthly Time in any given month, then the Displaced Employee shall be additionally compensated for such excess time at the rate of pay of the employee's retained position. If a Displaced Employee fails to exercise their seniority rights to secure another position available to the employee which does not require a change in such employee's place of residence, to which the employee is entitled under the working agreement, and which carries a rate of pay and compensation exceeding those of the position that the employee elects to retain, then the Displaced Employee shall thereafter be treated for the purposes of this section as occupying the position such employee elects to decline.

    (iii)    <u>Early Expiration</u>. The Displacement Allowance shall cease prior to the expiration of the Protective Period in the event of the Displaced Employee's resignation, death, retirement, or dismissal for justifiable cause.



**U.S. Department of Transportation**
**Federal Railroad Administration**

(b)      **Moving Expenses**. Any Protected Employee retained in the service of a Railroad, or who is later restored to service after being entitled to receive a Dismissal Allowance, and is required to change the point of such employee's employment as a result of the Project, and within the employee's Protective Period is required to move the employee's place of residence, shall be reimbursed for all expenses of moving the employee's household and other personal effects, including travel expenses, temporary living expenses, and any actual wage loss during the time necessary to make the move, and for a reasonable time thereafter, not to exceed five (5) days.

(i)      Prior Agreement. The exact extent of the responsibility of a Railroad under this Section and the ways and means of transportation shall be agreed upon in advance by the Railroad and the Protected Employee or their representatives.

(ii)      Exception. Changes in residence that are not a result of a Project, which are made after the initial change and that grow out of the normal exercise of seniority rights, are not within the purview of this Section.

(iii)      Furloughed Employees. The Railroad shall, to the same extent provided above, assume the moving expenses outlined in Section 5(b) for an employee furloughed within three (3) years after changing such employee's point of employment as a result of a Project, who elects to move their place of residence back to their original point of employment.

(iv)      Reimbursement. A claim for reimbursement shall be paid under the provisions of this Section within sixty (60) days after it is submitted, unless disputed by the Railroad, but no claim shall be paid if presented to the Railroad more than ninety (90) days after the date on which the expenses were incurred.

(c)      **Losses from Home Sale or Contract Termination**. Any Displaced Employee who is retained in the service of a Railroad (or who is later restored to service after being entitled to receive a dismissal allowance), and who is required to change the point of such employee's employment during the Protective Period as a result of a Project, is entitled to the following:

(i)      Home Sale for Less Than Fair Market Value. If the Displaced Employee owns their place of residence in the locality from which such employee is required to move, then at the Displaced Employee's option, the Railroad shall reimburse the Displaced Employee for the difference between the actual sale price and the fair market value of the employee's place of residence. The Railroad shall pay such difference within sixty (60) days after the Displaced Employee has filed a claim for such loss in accordance with Section 5(c)(vi), unless a controversy arises as to which Section 5(c)(vii) applies. In each case, the fair market value of the home in question shall be determined without consideration of the Project. The Railroad shall in each instance be afforded an opportunity to purchase the home at such fair market value before it is sold by the Displaced Employee to any other person.

(ii)      Election to Receive Closing Costs. The Displaced Employee may elect to waive the provisions of Section 5(c)(i) and to receive, in lieu thereof, an amount equal to the closing costs that are customarily paid for and assumed by a seller of real estate in the jurisdiction in which the employee's residence is located. Such costs shall include customary fees paid to a licensed realtor (not to exceed six percent (6%) of the final sale price) and any prepayment penalty required by any mortgagor or beneficiary of a deed of trust. Such costs shall not include

28

U.S. Department of Transportation
**Federal Railroad Administration**

the payment of any mortgage discount points or similar interest discount fees by the Displaced Employee.

(iii)     Pending Contract to Purchase. If a Displaced Employee has entered into a contract to purchase a place of residence, but due to a Project must cancel that contract, the Railroad shall indemnify the Displaced Employee against any losses due to such cancellation, and shall relieve the Displaced Employee from any further obligation under the contract.

(iv)     Unexpired Lease. If the Displaced Employee holds an unexpired lease of a dwelling as the employee's primary place of residence, and the Displaced Employee must cancel the lease due to a Project, the Railroad shall indemnify the Displaced Employee from all costs and liability arising from said cancellation.

(v)     Exclusions. Any change in residence that is not due to or caused by a Project, or that resulted from the normal exercise of a Protected Employee's seniority rights, shall not be within the purview of this Section.

(vi)     Notification of Claims. A Displaced Employee shall notify, in writing, the Railroad of such employee's claim arising from this Section 5(c) within one (1) year of the date the Displaced Employee's claim accrues.

(vii)     Home Value Disagreements. In the event of disagreement between a Railroad and a Displaced Employee as to the value of a Displaced Employee's claim, either party (or their representatives) may request, in writing, a joint conference to resolve the disagreement.

A.  Real Estate Appraisers. If the parties are unable to resolve the disagreement, either party may refer the disagreement to two licensed real estate appraisers, one of whom shall be selected by the Displaced Employee (or such employee's representatives), and one of whom shall be selected by the Railroad. If the two selected real estate appraisers are unable to agree on a valuation within thirty (30) days, the selected real estate appraisers shall designate (or agree to a method by which to select) a third licensed real estate appraiser within ten (10) days. If unable to agree on a selection, either party may request the National Mediation Board to designate within twenty (20) days a third licensed real estate appraiser. A decision by two of the three licensed real estate appraisers shall be required to determine the value in dispute. Said decision shall be final and conclusive.

B.  Payment of Expenses. The salary and expenses of the third or neutral appraiser shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the compensation of the appraiser selected by such party.

(d)     **Failure to Exercise Seniority Rights**. If a Displaced Employee is able but does not exercise such employee's seniority rights to secure another position that does not require a change in the employee's primary place of residence, the Displaced Employee shall not be entitled to moving expenses or protections due to the sale of a home outlined in Sections 5(b)&(c).

29



U.S. Department of Transportation
**Federal Railroad Administration**

**6.      Protections for Dismissed Employees.**

(a)      **Dismissal Allowance**. A Dismissed Employee shall be paid a monthly dismissal allowance from the date they are deprived of employment through the Protective Period.

(i)      Monthly Dismissal Allowance Calculation. The monthly dismissal allowance shall be equivalent to the Average Monthly Compensation received by the Dismissed Employee in the last twelve (12) months of employment prior to the employee's dismissal.

(ii)      Submission of Claim. A claim for the initial month of a dismissal allowance shall be paid within ninety (90) days and a claim for a subsequent month shall be paid within sixty (60) days after the claim is filed by the Dismissed Employee, unless the claim is disputed by the Railroad pursuant to Section 8 of this Exhibit.

(iii)      Reduction or Suspension of Dismissal Allowance. If a Dismissed Employee accepts new employment (or reemployment by the dismissing Railroad) during the Protective Period, the dismissal allowance shall be reduced such that the accepted monthly compensation at the then-current position (including any unemployment insurance compensation received) plus the dismissal allowance is equivalent to the Dismissed Employee's Average Monthly Compensation. If the compensation of the Dismissed Employee's then-current employment is greater than the dismissal allowance, the dismissal allowance shall be suspended. Such reduction or suspension shall continue for the duration of the Protective Period, unless and until the Dismissed Employee's then-current compensation is reduced or eliminated. Prior to dismissal, such Dismissed Employee (or their representative) and the dismissing Railroad shall agree upon a procedure by which such Railroad shall be informed of the earnings and benefits of such Dismissed Employee in their new position of employment.

(iv)      Early Termination. The dismissal allowance shall cease prior to the expiration of the Protective Period in the event of the Dismissed Employee's resignation, death, retirement, dismissal for justifiable cause under existing agreements, failure without good cause to return to service after being notified in accordance with an applicable working agreement, or failure without good cause to accept a comparable position that does not require a change of residence, for which the Dismissed Employee is qualified and eligible with the Railroad from which such employee was dismissed after being notified, if the employee's return does not infringe upon employment rights of other employees under a working agreement.

(b)      **Separation Allowance**. A Dismissed Employee may, at such employee's option, within seven (7) days of dismissal or an arbitration award establishing the employee's status as a Dismissed Employee, resign and (in lieu of all other benefits and protections provided in this Exhibit) accept a lump sum payment computed in accordance with Section 9 of the Washington Job Protection Agreement of May 1936, as amended.

(c)      **Priority of Employment or Re-Employment**. Any Protected Employee whose employment is terminated or who is furloughed as a result of a Project shall, if they so request, be granted priority of employment or re-employment to fill a position comparable to that which they held on the Railroad (even if in a different craft or class), so long as they are qualified, or by training or retraining can become physically and mentally qualified, for the position. However, such priority of

30



U.S. Department of Transportation
**Federal Railroad Administration**

employment or re-employment must not be in contravention of any relevant collective bargaining agreements.

(i)     **Training or Re-Training**. In the event such training or retraining is requested by a Protected Employee pursuant to Section 6(c), the Railroad shall provide such training or retraining at no cost to the Protected Employee.

(ii)    **Waiver of Protections**. If a Protected Employee who has made a request under Section 6(c) fails without good cause within ten (10) days to accept an offer of a comparable position for which such employee has satisfactorily completed such training, the Protected Employee shall, upon the expiration of such ten (10) day period, forfeit all rights and benefits under this Exhibit.

**7.     Fringe Benefits.** No Protected Employee shall be deprived during the Protective Period of any (non-salary) rights, privileges, or benefits attached to such employee's previous employment under the terms and conditions of an existing employment agreement (including, but not limited to, free transportation, hospitalization, pensions, insurance, or vacation benefits), so long as such rights, privileges, or benefits continue to be accorded to other employees of the Railroad, in active service or on furlough as the case may be, to the extent that such rights, privileges, or benefits can be so maintained under present authority of law, corporate action, or through future authorization.

**8.     Arbitration of Disputes.**

(a)     **Scope**. Any dispute under these conditions not settled by the relevant parties will be resolved in arbitration as provided herein. In the event a Railroad and the Protected Employee(s) (or their representatives) cannot settle a dispute or controversy with respect to the interpretation, application, or enforcement of any provision of this Exhibit (other than those Sections of this Exhibit that provide for another means of dispute resolution) within thirty (30) days after the dispute arises, either party may refer the dispute to an arbitration committee. The affected Protected Employee(s) (or their representatives) may notify a Recipient of a dispute or controversy under this Section 8 to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

(b)     **Notice**. The party referring the dispute to an arbitration committee shall notify the other party in writing of its intent to refer a dispute or controversy to an arbitration committee.

(c)     **Selection of Members**. Within ten (10) days of receipt of the written notice, each party to the arbitration shall select one (1) member of the committee, and the members thus chosen shall select an additional, neutral member to serve as chairman. If any party fails to select its member of the arbitration committee within the prescribed time limit, the general chairman of the involved labor organization or a senior officer designated by the Railroad or the Recipient, as the case may be, shall be deemed the selected member. Should the members be unable to agree upon the appointment of the neutral member within ten (10) days, the parties shall then within an additional ten (10) days agree to a method by which a neutral member shall be appointed; failing such agreement, either party may request the National Mediation Board to designate within twenty (20) days the neutral member whose designation will be binding upon the parties.

(d)     **Multiple Representatives**. In the event a dispute involves more than one labor organization, each will be entitled to a representative on the arbitration committee, in which event the Railroad or Recipient may appoint additional representatives equivalent to the number of labor

31



**U.S. Department of Transportation**
**Federal Railroad Administration**

organization representatives; provided, however, that the decision in such case shall be made by the neutral member.

(e)      **Decisions Binding**. The decision, by majority vote except as provided otherwise in paragraph (d) of this Section, of the arbitration committee shall be final, binding, conclusive, and rendered within forty-five (45) days after the hearing of the dispute or controversy has been concluded and the record closed.

(f)      **Expenses**. The salaries and expenses of the neutral member shall be borne equally by the parties to the proceeding, and all other expenses shall be paid by the party incurring them.

**9.      Classification of a Protected Employee.** In the event an employee (or their representatives) cannot settle a dispute or controversy with the Railroad or the Recipient as to whether or not a particular employee would be affected by a Project, either party may refer the dispute to an arbitration committee within thirty (30) days after the dispute arises pursuant to the arbitration procedures in Section 8. For any such dispute, the employee of a Railroad shall have the burden to identify, with reasonable specificity, the Project that allegedly affected them, and to specify the pertinent facts of that Project, including the change or changes resulting from the Project that allegedly affected them. The burden shall then shift to the Railroad or Recipient to show that factors other than a change resulting from the Project affected the employee. The employee shall prevail on this issue if it is established that the Project had an effect upon the employee, even if other factors also may have affected the employee.

**10.      Resolution of Disputes for Non-Bargaining Unit Protected Employees.** Any Protected Employee who is not represented by a labor organization shall be afforded substantially the same levels of protection as are afforded to members of labor organizations under this Exhibit. In the event any dispute arises between a Railroad and an employee not represented by a labor organization with respect to the interpretation, application, or enforcement of any provision of this Exhibit that cannot be settled by the parties within thirty (30) days after the dispute arises, either party may, as an alternative to the dispute resolution procedures outlined in this Exhibit, refer the dispute within ninety (90) days after the dispute arises to the Secretary of Labor for determination. The determination of the Secretary of Labor, or their designated representative, shall be final and binding on the parties.

**11.      Severability.** In the event any provision of this Exhibit is held to be invalid or otherwise unenforceable under applicable law, the remaining provisions of this Exhibit shall not be affected.



U.S. Department of Transportation
**Federal Railroad Administration**

## EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS

Quarterly Project Progress Reports and Recertifications are available at:
https://railroads.dot.gov/grant-administration/reporting-requirements/fra-report

# EXHIBIT Q

**U.S. DEPARTMENT OF TRANSPORTATION**

**GENERAL TERMS AND CONDITIONS UNDER THE FISCAL YEARS 2024 - 2026
RECONNECTING COMMUNITIES PILOT PROGRAM (RCP):
FHWA PROJECTS**

Revision date: July 22, 2025

## Table of Contents

1. Purpose ...............................................................................................................................6
   1.1.   Purpose.........................................................................................................................6
2. USDOT Role .......................................................................................................................7
   2.1.   Division of USDOT Responsibilities. ........................................................................7
   2.2.   USDOT Program Contacts. ........................................................................................7
3. Recipient Role ....................................................................................................................8
   3.1.   Statements on the Project. ..........................................................................................8
   3.2.   Statements on Authority and Capacity. ......................................................................8
   3.3.   USDOT Reliance. .......................................................................................................8
   3.4.   Project Delivery. .........................................................................................................9
   3.5.   Rights and Powers Affecting the Project. ..................................................................9
   3.6.   Notification of Changes to Key Personnel. ...............................................................9
   3.7.   Subaward to Designated Subrecipient. ......................................................................9
   3.8.   Designated Subrecipient Statements and Responsibilities. .....................................10
4. Award Amount, Obligation, and Time Periods...............................................................10
   4.1.   Federal Award Amount. ...........................................................................................10
   4.2.   Federal Funding Source. ...........................................................................................10
   4.3.   Federal Obligations...................................................................................................10
   4.4.   Budget Period. ..........................................................................................................11
   4.5.   Period of Performance. .............................................................................................12
5. Statement of Work, Schedule, and Budget Changes ......................................................12
   5.1.   Notification Requirement. .........................................................................................12
   5.2.   Scope and Statement of Work Changes.....................................................................12
   5.3.   Schedule Changes. ....................................................................................................12
   5.4.   Budget Changes. .......................................................................................................13
   5.5.   USDOT Acceptance of Changes. .............................................................................14
6. General Reporting Terms .................................................................................................14
   6.1.   Report Submission. ...................................................................................................14
   6.2.   Alternative Reporting Methods. ...............................................................................14
   6.3.   Paperwork Reduction Act Notice. ...........................................................................14
7. Progress and Financial Reporting....................................................................................14
   7.1.   Quarterly Project Progress Reports and Recertifications. ........................................14
   7.2.   Final Progress Reports and Financial Information. ...................................................15
8. Performance Measurement and Reporting .......................................................................15
   8.1.   Baseline Performance Measurement. ......................................................................15
   8.2.   Post-construction Performance Measurement. .........................................................15
   8.3   Project Outcomes Report. .........................................................................................16
   8.4   General Performance Measurement Requirements. ..................................................16
   8.5   Outcome Measurement and Reporting Survival.......................................................16
9. Noncompliance and Remedies .........................................................................................17
   9.1.   Noncompliance Determinations. ..............................................................................17
   9.2.   Remedies...................................................................................................................17
   9.3.   Other Oversight Entities. ..........................................................................................18
10. Agreement Termination..................................................................................................18
   10.1.  USDOT Termination. ...............................................................................................18

10.2.  Closeout Termination. ..............................................................................19
10.3.  Post-Termination Adjustments. ...............................................................19
10.4.  Non-Terminating Events. ..........................................................................19
10.5.  Other Remedies. ........................................................................................19
11. Monitoring, Financial Management, Controls, and Records ..............................20
11.1.  Recipient Monitoring and Record Retention. ..........................................20
11.2.  Financial Records and Audits. ..................................................................20
11.3.  Internal Controls. ......................................................................................20
11.4.  USDOT Record Access. ............................................................................20
11.5.  Oversight Responsibilities. .......................................................................21
12. Contracting and Subawards .................................................................................21
12.1.  Minimum Wage Rates. ..............................................................................21
12.2.  Buy America. .............................................................................................21
12.3.  Small and Disadvantaged Business Requirements. ..................................21
12.4.  Engineering and Design Services. ............................................................22
12.5.  Prohibition on Certain Telecommunications and Video Surveillance Services or
         Equipment. ................................................................................................22
12.6.  Pass-through Entity Responsibilities. .......................................................22
12.7.  Subaward and Contract Authorization. .....................................................22
13. Costs, Payments, and Unexpended Funds ............................................................22
13.1.  Limitation of Federal Award Amount. ......................................................22
13.2.  Projects Costs. ...........................................................................................23
13.3.  Timing of Project Costs. ...........................................................................23
13.4.  Recipient Recovery of Federal Funds. ......................................................23
13.5.  Unexpended Federal Funds. ......................................................................23
13.6.  Timing of Payments to the Recipient. .......................................................23
13.7.  Payment Method. .......................................................................................23
13.8.  Information Supporting Expenditures. .......................................................24
13.9.  Reimbursement Frequency. .......................................................................24
14. Liquidation, Adjustments, and Funds Availability ...............................................24
14.1.  Liquidation of Recipient Obligations. .......................................................24
14.2.  Funds Cancellation. ...................................................................................24
15. Agreement Modifications .....................................................................................24
15.1.  Bilateral Modifications. .............................................................................24
15.2.  Unilateral Contact Modifications. .............................................................25
15.3   USDOT Unilateral Modifications. .............................................................25
15.4   Other Modifications. ..................................................................................25
16. Civil Rights and Title VI ......................................................................................25
16.1.  Civil Rights and Title VI. ..........................................................................25
17. Reserved ...............................................................................................................26
18. Labor and Work ....................................................................................................26
18.1.  Labor and Work. ........................................................................................26
19. Critical Infrastructure Security and Resilience ....................................................26
19.1.  Critical Infrastructure Security and Resilience. ........................................26
20. Federal Financial Assistance, Administrative, and National Policy Requirements ...............27
20.1.  Uniform Administrative Requirements for Federal Awards. .....................27

20.2.   Federal Law and Public Policy Requirements. ...................................................................27
20.3.   Federal Freedom of Information Act. ..............................................................................28
20.4.   History of Performance. ....................................................................................................28
20.5.   Whistleblower Protection. ................................................................................................28
20.6.   External Award Terms and Obligations. ........................................................................28
20.7.   Incorporated Certifications. .............................................................................................29
21. Assignment ......................................................................................................................................29
21.1.   Assignment Prohibited. ....................................................................................................29
22. Waiver ..............................................................................................................................................29
22.1.   Waivers. .............................................................................................................................29
23. Additional Terms and Conditions ................................................................................................30
23.1.   Effect of Economically Disadvantaged Community Designation. ...............................30
23.2.   Disclaimer of Federal Liability. .......................................................................................30
23.3.   Relocation and Real Property Acquisition. .....................................................................30
23.4.   Equipment Disposition. ....................................................................................................30
23.5.   Environmental Review. ....................................................................................................31
23.6.   Railroad Coordination. .....................................................................................................32
24. Mandatory Award Information .....................................................................................................32
24.1.   Information Contained in a Federal Award. ...................................................................32
24.2.   Federal Award Identification Number. ...........................................................................32
24.3.   Recipient's Unique Entity Identifier. ..............................................................................33
25. Construction and Definitions ........................................................................................................33
25.1.   Schedules. ..........................................................................................................................33
25.2.   Exhibits. .............................................................................................................................33
25.3.   Construction. .....................................................................................................................34
25.4.   Integration. ........................................................................................................................34
25.5.   Definitions. ........................................................................................................................34
26. Agreement Execution and Effective Date ...................................................................................35
26.1.   Counterparts. .....................................................................................................................35
26.2.   Effective Date. ...................................................................................................................35

## Index of Definitions

Administering Operating Administration ............................................................................7
Designated Subrecipient ................................................................ Schedule A, Section 9
Environmental Review Entity ............................................................................29
Federal Share ............................................................................13
FHWA ............................................................................7
General Terms and Conditions ............................................................................32
IIJA ............................................................................6
NOFO ............................................................................6
OMB ............................................................................14
Program Statute ............................................................................33
Project ............................................................................33
Project Closeout ............................................................................19
Project Cost Savings ............................................................................13
RCP Grant ............................................................................33
RCP Program ............................................................................6
Recipient ................................................................ Project-Specific Recitals
Technical Application ............................................................................33
USDOT ............................................................................6

**GENERAL TERMS AND CONDITIONS**

The Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021) (the "**IIJA**") made funds available to the United States Department of Transportation (the "**USDOT**") for fiscal years 2024, 2025, and 2026 to carry out IIJA div. A § 11509, Reconnecting Communities Pilot (RCP) Program, by providing Federal financial assistance to projects that restore community connectivity by: studying the feasibility and impacts of removing, retrofitting, or mitigating transportation facilities that create barriers to community connectivity due to design factors; conducting planning activities necessary to design projects to remove, retrofit, or mitigate those facilities; and conducting construction activities necessary to carry out projects to remove, retrofit, or mitigate those facilities.

On July 2, 2024, the USDOT posted a funding opportunity at Grants.gov with funding opportunity title "Reconnecting Communities Pilot Discretionary Grant Program" and funding opportunity number DOT-RCP-FY24-01. The notice of funding opportunity posted at Grants.gov on July 2, 2024, (the "**NOFO**") solicited applications for Federal financial assistance under the fiscal years 2024, 2025, and 2026 RCP Program. On January 10, 2025, the USDOT announced application selections under the NOFO.

These general terms and conditions are incorporated by reference in a project-specific agreement under the fiscal years 2024, 2025, and 2026 RCP Program. The term "Recipient" is defined in the project-specific portion of the agreement. The project-specific portion of the agreement includes schedules A through H. The project-specific portion of the agreement may include special terms and conditions in project-specific articles.

## 1.
## PURPOSE

1.1.  **Purpose.** The purpose of this award is to fund an eligible project to restore community connectivity by: studying the feasibility and impacts of removing, retrofitting, or mitigating an existing eligible facility; conducting planning activities necessary to design a project to remove, retrofit, or mitigate an existing eligible facility; or conducting construction activities necessary to carry out a project to remove, retrofit, or mitigate an existing eligible facility. The parties will accomplish that purpose by achieving the following objectives:

(1)    timely completing the Project; and

(2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule D.

In this section, the term "eligible facility," is used as defined at IIJA div. A § 11509(a)(1).

6 of 35

## 2.
## USDOT ROLE

**2.1.    Division of USDOT Responsibilities.**

(a)    The Office of the Secretary of Transportation is responsible for the USDOT's overall administration of the RCP Program, the approval of this agreement, and any modifications to this agreement under section 15.1.

(b)    The Federal Highway Administration (the "**FHWA**") will administer this agreement on behalf of the USDOT. In this agreement, the "**Administering Operating Administration**" means the FHWA.

**2.2.    USDOT Program Contacts.**

If the Capital-Planning Designation in section 1 of schedule F is "Planning":

FHWA RCP Program Manager—Planning Grants
Kenneth Petty
Federal Highway Administration
Office of Planning, Environment, and Realty
1200 New Jersey Avenue SE
Room E72-330
Washington, DC 20590
(202) 366-6654
Kenneth.Petty@dot.gov

If the Capital-Planning Designation in section 1 of schedule F is "Capital Construction":

FHWA RCP Program Manager—Capital Construction Grants

Damaris Santiago
Federal Highway Administration
Office of Planning, Environment, and Realty
1200 New Jersey Avenue SE
Room E76-326
Washington, DC 20590
(202) 366-9482
Damaris.Santiago@dot.gov

And for all awards under the RCP Program:

OST RCP Program Manager
United States Department of Transportation
Office of Infrastructure Deployment (OST P-40)
1200 New Jersey Avenue SE
Washington, DC 20590
ReconnectingCommunities@dot.gov

## 3.
## RECIPIENT ROLE

**3.1.**    **Statements on the Project.** The Recipient states that:

(1)    all material statements of fact in the Technical Application were accurate when that application was submitted; and

(2)    schedule E documents all material changes from the information contained in that application.

**3.2.**    **Statements on Authority and Capacity.** The Recipient states that:

(1)    it has the authority to receive Federal financial assistance under this agreement;

(2)    it has the legal authority to complete the Project;

(3)    it has the capacity, including institutional, managerial, and financial capacity, to comply with its obligations under this agreement;

(4)    it and any project partners have committed the non-RCP Funds listed in section 3 of schedule D to fund the Project or otherwise account for the required cost share;

(5)    it has sufficient funds available to ensure that infrastructure completed or improved under this agreement will be operated and maintained in compliance with this agreement and applicable Federal law; and

(6)    the individual executing this agreement on behalf of the Recipient has authority to enter this agreement and make the statements in this article 3 and in section 0 on behalf of the Recipient.

**3.3.**    **USDOT Reliance.** The Recipient acknowledges that:

(1)    the USDOT relied on statements of fact in the Technical Application to select the Project to receive this award;

8 of 35

> (2) the USDOT relied on statements of fact in both the Technical Application and this agreement to determine that the Recipient and the Project are eligible under the terms of the NOFO;
>
> (3) the USDOT relied on statements of fact in both the Technical Application and this agreement to establish the terms of this agreement; and
>
> (4) the USDOT's selection of the Project to receive this award prevented awards under the NOFO to other eligible applicants.

**3.4.    Project Delivery.**

(a) The Recipient shall complete the Project under the terms of this agreement.

(b) The Recipient shall ensure that the Project is financed, constructed, operated, and maintained in accordance with all Federal laws, regulations, and policies that are applicable to projects of the Administering Operating Administration.

**3.5.    Rights and Powers Affecting the Project.**

(a) The Recipient shall not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this agreement without written approval of the USDOT.

(b) The Recipient shall act promptly, in a manner acceptable to the USDOT, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this agreement.

**3.6.    Notification of Changes to Key Personnel.** The Recipient shall notify all USDOT representatives who are identified in section 5 of schedule A in writing within 30 calendar days of any change in key personnel who are identified in section 4 of schedule A.

**3.7.    Subaward to Designated Subrecipient.** If section 9 of schedule A identifies a Designated Subrecipient:

> (1) the Recipient hereby awards a subaward to the Designated Subrecipient for the purpose described in section 1.1;
>
> (2) the Recipient and the Designated Subrecipient may enter into a separate agreement, to which the USDOT is not a party, assigning responsibilities, including administrative and oversight responsibilities, among the Recipient and the Designated Subrecipient; and
>
> (3) for the purpose of 2 CFR parts 200 and 1201, the Recipient is a pass-through entity.

**3.8.** **Designated Subrecipient Statements and Responsibilities.** If section 9 of schedule A identifies a Designated Subrecipient:

(1)    the Designated Subrecipient affirms all statements and acknowledgments that are attributed to the Recipient under sections 3.1 and 3.2; and

(2)    the Designated Subrecipient assumes the Recipient's reporting obligations under article 7.

**4.**
**AWARD AMOUNT, OBLIGATION, AND TIME PERIODS**

**4.1.** **Federal Award Amount.**    The USDOT hereby awards an RCP Grant to the Recipient in the amount listed in section 1 of schedule D as the RCP Grant Amount.

**4.2.** **Federal Funding Source.**

(a) If section 3 of schedule F identifies the Funding Source as "Trust Fund," then the RCP Grant is from RCP Program funding that was made available for fiscal years 2024, 2025, and/or 2026 RCP at IIJA div. A § 11101(d)(3).

(b) If section 3 of schedule F identifies the Funding Source as "General Fund," then the RCP Grant is from RCP Program funding that was appropriated for fiscal years 2024, 2025, and/or 2026 RCP in IIJA div. J, tit. VIII, at paragraph 7 under the heading "Department of Transportation—Federal Highway Administration—Highway Infrastructure Programs."

(c) If section 3 of schedule F contains a table that lists separate amounts for "Trust Fund" and "General Fund," then the amount listed for "Trust Fund" is from RCP Program funding that was made available for fiscal years 2024, 2025, and/or 2026 RCP at IIJA div. A § 11101(d)(3) and the amount listed for "General Fund" is from RCP Program funding that was appropriated for fiscal years 2024, 2025, and/or 2026 RCP in IIJA div. J, tit. VIII, at paragraph 7 under the heading "Department of Transportation—Federal Highway Administration—Highway Infrastructure Programs."

**4.3.** **Federal Obligations.**

(a) If the Federal Obligation Type identified in section 2 of schedule D is "Single," then this agreement obligates for the budget period the amount listed in section 1 of schedule D as the RCP Grant Amount and sections 4.3(c)–4.3(h) do not apply to this agreement.

(b) If the Federal Obligation Type identified in section 2 of schedule D is "Multiple," then an amount up to the RCP Grant Amount listed in section 1 of schedule D will be obligated with one initial obligation and one or more subsequent, optional obligations, as described in sections 4.3(c)–4.3(h).

(c) The Obligation Condition Table in section 2 of schedule D allocates the RCP Grant among separate portions of the Project for the purpose of the Federal obligation of funds. The scope of each portion of the Project that is identified in that table is described in section 2 of schedule B.

(d) This agreement obligates for the budget period only the amounts allocated in the Obligation Condition Table in section 2 of schedule D to portions of the Project for which that table does not list an obligation condition.

(e) This agreement does not obligate amounts allocated in the Obligation Condition Table in section 2 of schedule D to portions of the Project for which that table lists an obligation condition. The parties may obligate the amounts allocated to those portions of the Project only as described in section 4.3(f) or by modifying this agreement under article 15.

(f) For each portion of the Project for which the Obligation Condition Table in section 2 of schedule D lists an obligation condition, the amount allocated in that table to that portion of the Project is obligated if the parties execute an instrument, in the form provided in Exhibit D, documenting that:

(1) the USDOT determines that the obligation condition listed in that table for that portion of the Project is satisfied;

(2) the USDOT determines that all applicable Federal requirements for obligating the amount are satisfied; and

(3) the Recipient states that it is not required to request a modification of this agreement under article 5.

(g) The Recipient shall not request reimbursement of costs for a portion of the Project for which the Obligation Condition Table in section 2 of schedule D lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 4.3(f).

(h) The Recipient acknowledges that the USDOT is not liable for payments for a portion of the Project for which the Obligation Condition Table in section 2 of schedule D lists an obligation condition, unless the amount allocated in that table to that portion of the Project is obligated under section 4.3(f).

**4.4.    Budget Period.**

The budget period for this award begins on the date of this agreement and ends on the budget period end date that is listed in section 1 of schedule C. In this agreement, "budget period" is used as defined at 2 CFR 200.1.

**4.5.    Period of Performance.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the period of performance for this award begins on the date of this agreement and ends on project end date in FMIS.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the period of performance for this award is listed on page 1, line 6 of the project-specific agreement.

(c) In this agreement, "period of performance" is used as defined at 2 CFR 200.1.

## 5.
## STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1.    Notification Requirement.**   The Recipient shall notify all USDOT representatives who are identified in section 5 of schedule A in writing within 30 calendar days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project. In that notification, the Recipient shall describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this section 5.1 is separate from any requirements under this article 5 that the Recipient request modification of this agreement.

**5.2.    Scope and Statement of Work Changes.**    If the Project's activities differ from the activities described in schedule B, then the Recipient shall request a modification of this agreement to update schedule B.

**5.3.    Schedule Changes.**   If one or more of the following conditions are satisfied, then the Recipient shall request a modification of this agreement to update schedule C:

(1)    a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed in section 2 of schedule C;

(2)    a schedule change would require the final budget period of the project to continue after the final budget period end date listed in section 1 of schedule C (i.e., for projects with multiple phases, changes to the base phase budget period end date for projects with two phase, or changes to base or secondary phase budget period end dates for projects with three phases, etc., will not trigger notification/modification requirements); or

(3)    the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing" and a schedule change would require the period of performance to continue after the period of performance listed on page 1, line 6 of the project-specific agreement.

12 of 35

For other schedule changes, the Recipient shall follow the applicable procedures of the Administering Operating Administration and document the changes in writing.

**5.4.    Budget Changes.**

(a) The Recipient acknowledges that if the cost of completing the Project increases:

  (1)    that increase does not affect the Recipient's obligation under this agreement to complete the Project; and

  (2)    the USDOT will not increase the amount of this award to address any funding shortfall.

(b) The Recipient shall request a modification of this agreement to update schedule D if, in comparing the Project's budget to the amounts listed in section 3 of schedule D:

  (1)    the total "Non-Federal Funds" amount decreases; or

  (2)    the total eligible project costs amount decreases.

(c) For budget changes that are not identified in section 5.4(b), the Recipient shall follow the applicable procedures of the Administering Operating Administration and document the changes in writing.

(d) If there are Project Cost Savings, then the Recipient may propose to the USDOT, in writing consistent with the Administering Operating Administration's requirements, to include in the Project specific additional activities that are within the scope of this award, as defined in section 1.1 and schedule B, and that the Recipient could complete with the Project Cost Savings.

In this agreement, "**Project Cost Savings**" means the difference between the actual eligible project costs and the total eligible project costs that are listed in section 3 of schedule D, but only if the actual eligible project costs are less than the total eligible project costs that are listed in section 3 of schedule D. There are no Project Cost Savings if the actual eligible project costs are equal to or greater than the total eligible project costs that are listed in section 3 of schedule D.

(e) If there are Project Cost Savings and either the Recipient does not make a proposal under section 5.4(d) or the USDOT does not accept the Recipient's proposal under section 5.4(d), then:

  (1)    in a request under section 5.4(b), the Recipient shall reduce the Federal Share by the Project Cost Savings; and

  (2)    if that modification reduces this award and the USDOT had reimbursed costs exceeding the revised award, the Recipient shall refund to the USDOT the difference between the reimbursed costs and the revised award.

In this agreement, "**Federal Share**" means the sum of the total "RCP Funds" and "Other Federal Funds" amounts that are listed in section 3 of schedule D.

(f)   The Recipient acknowledges that amounts that are required to be refunded under section 5.4(e)(2) constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Federal Claims Collection Standards (31 CFR parts 901).

5.5.   **USDOT Acceptance of Changes.** The USDOT may accept or reject modifications requested under this article 5, and in doing so may elect to consider only the interests of the RCP Program and the USDOT. The Recipient acknowledges that requesting a modification under this article 5 does not amend, modify, or supplement this agreement unless the USDOT accepts that modification request and the parties modify this agreement under section 15.1.

# 6.
# GENERAL REPORTING TERMS

6.1.   **Report Submission.**   The Recipient shall send all reports required by this agreement to all USDOT contacts who are listed in section 5 of schedule A and the USDOT contacts who are listed in section 2.2.

6.2.   **Alternative Reporting Methods.** The Administering Operating Administration may establish processes for the Recipient to submit reports required by this agreement, including electronic submission processes. If the Recipient is notified of those processes in writing, the Recipient shall use the processes required by the Administering Operating Administration.

6.3.   **Paperwork Reduction Act Notice.**   Under 5 CFR 1320.6, the Recipient is not required to respond to a collection of information that does not display a currently valid control number issued by the Office of Management and Budget (the "**OMB**"). Notwithstanding any other term of this agreement, the due date for any information collections required under this agreement, including the reporting requirements in articles 7 and 8, is the later of (1) the due date stated with the requirement and (2) the 30th day after OMB approves that information collection.

# 7.
# PROGRESS AND FINANCIAL REPORTING

7.1.   **Quarterly Project Progress Reports and Recertifications.**        On or before the 20th day of the first month of each calendar year quarter and until the end of the period of performance, the Recipient shall submit to the USDOT a Quarterly Project Progress Report and Recertification in the format and with the content described in exhibit C. If the date of this agreement is in the final month of a calendar year quarter, then the

Recipient shall submit the first Quarterly Project Progress Report and Recertification in the second calendar year quarter that begins after the date of this agreement.

**7.2.    Final Progress Reports and Financial Information.**    No later than 120 days after the end of the period of performance, the Recipient shall submit:

(1)    a Final Project Progress Report and Recertification in the format and with the content described in exhibit C for each Quarterly Project Progress Report and Recertification, including a final Federal Financial Report (SF-425); and

(2)    any other information required under the Administering Operating Administration's award closeout procedures.

**8.**

**PERFORMANCE MEASUREMENT AND REPORTING**

**8.1.    Baseline Performance Measurement.**    If the Capital-Planning Designation in section 1 of schedule F is "Capital Construction," then:

(1)    before the start of construction on the Project but not earlier than one year before the start of construction on the Project, the Recipient shall collect baseline data for each performance measure that is enumerated in schedule G; and

(2)    not later than January 31 of the calendar year that begins after the Recipient collects baseline data under section 8.1(a), the Recipient shall submit a Baseline Performance Measurement Report containing the data collected under section 8.1(a), stating the dates when the data was collected, and describing, in detail, the data sources, assumptions, variability, and estimated levels of precision for each performance measure that is enumerated in schedule G.

**8.2.    Post-construction Performance Measurement.**

(a) If the Capital-Planning Designation in section 1 of schedule F is "Capital Construction," then:

(1)    for each performance measure that is enumerated in schedule G and has a quarterly measurement frequency, for each of 19 consecutive calendar quarters, beginning with the first calendar quarter that begins after the Project substantial completion date, at least once during the quarter, the Recipient shall collect data for that performance measure; and

(2)    for each performance measure that is enumerated in schedule G and has an annual measurement frequency, the Recipient shall collect data for that performance measure on at least five separate occasions: (i) once during the three consecutive calendar quarters that begin after the Project substantial completion date; (ii) once during the fourth calendar quarter after the first collection; (iii) once during the

eighth calendar quarter after the first collection; (iv) once during the twelfth calendar quarter after the first collection; and (v) once during the sixteenth calendar quarter after the first collection.

(b) Not later than January 31 of each year that follows a calendar year during which data was collected under section 8.2(a), the Recipient shall submit to the USDOT a Post-construction Performance Measurement Report containing the data collected under section 8.2(a) in the previous calendar year and stating the dates when the data was collected.

(c) If an external factor significantly affects the value of a performance measure collected under section 8.2(a), then the Recipient shall identify that external factor in the Post-construction Performance Measurement Report described in section 8.2(b) and discuss the external factor's influence on the performance measure.

**8.3    Project Outcomes Report.**

If the Capital-Planning Designation in section 1 of schedule F is "Capital Construction," then the Recipient shall submit to the USDOT, not later than January 31 of the year that follows the final calendar year during which data was collected under section 8.2(a), a Project Outcomes Report that contains:

(1)    an analysis of the impacts of the project, including a comparison of the baseline performance measurement data collected under section 8.1 with the post-construction performance measurement data that the Recipient reported in the final Post-construction Performance Measurement Report required under section 8.2(b);

(2)    for each performance measure that is enumerated in schedule G, an analysis of the accuracy of the projected outcome listed in schedule G; and

(3)    all data collected under sections 8.1 and 8.2(a).

**8.4    General Performance Measurement Requirements.**

For each performance measure that is enumerated in schedule G, the Recipient shall ensure that all data collections under this article 8 are completed in a manner consistent with the description, location, and other attributes associated with that performance measure in schedule G.

**8.5    Outcome Measurement and Reporting Survival.**

The data collection and reporting requirements in this article 8 survive the termination of this agreement.

# 9.
## NONCOMPLIANCE AND REMEDIES

### 9.1.  Noncompliance Determinations.

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For the notice to be effective, it must be written and the USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 9.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

   (1)    accept the remedy;

   (2)    acknowledge the noncompliance, but propose an alternative remedy; or

   (3)    dispute the noncompliance.

   To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

   (1)    after considering the Recipient's response under section 9.1(b); or

   (2)    if the Recipient fails to respond under section 9.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide a notice to the Recipient that states the bases for that determination.

### 9.2.  Remedies.

(a) If the USDOT makes a final determination of noncompliance under section 9.1, the USDOT may impose a remedy, including:

   (1)    additional conditions on the award;

   (2)    any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to the USDOT; suspension or termination of the award; or suspension and disbarment under 2 CFR part 180; or

17 of 35

(3)     any other remedy legally available.

(b) To impose a remedy, the USDOT must provide a written notice to the Recipient that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 9.2(a), before making a final determination of noncompliance under section 9.1. If it does so, then the notice provided under section 9.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 9.2 or making a public interest determination under section 9.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 9.2 constitute a debt to the Federal Government that the USDOT may collect under 2 CFR 200.346 and the Federal Claims Collection Standards (31 CFR parts 901).

    **9.3.**    **Other Oversight Entities.**   Nothing in this article 9 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## 10.
## AGREEMENT TERMINATION

**10.1.**  **USDOT Termination.**

(a) The USDOT may terminate this agreement and all of its obligations under this agreement if any of the following occurs:

(1)     the Recipient fails to obtain or provide any non- RCP Grant contribution or alternatives approved by the USDOT as provided in this agreement and consistent with schedule D;

(2)     a completion date for the Project or a component of the Project is listed in section 2 of schedule C and the Recipient fails to meet that milestone by six months after the date listed in section 2 of schedule C;

(3)     the Recipient fails to meet a milestone listed in section 3 of schedule C by the deadline date listed in that section for that milestone;

(4)     the Recipient fails to comply with the terms and conditions of this agreement, including a material failure to comply with the project schedule in schedule C even if it is beyond the reasonable control of the Recipient;

    (5)     circumstances cause changes to the Project that the USDOT determines are inconsistent with the USDOT's basis for selecting the Project to receive an RCP Grant; or

    (6)     the USDOT determines that termination of this agreement is in the public interest.

(b) In terminating this agreement under this section, the USDOT may elect to consider only the interests of the USDOT.

(c) This section 10.1 does not limit the USDOT's ability to terminate this agreement as a remedy under section 9.2.

(d) The Recipient may request that the USDOT terminate the agreement under this section 10.1.

**10.2.   Closeout Termination.**

(a) This agreement terminates on Project Closeout.

(b) In this agreement, "**Project Closeout**" means the date that the USDOT notifies the Recipient that the award is closed out. Under 2 CFR 200.344, Project Closeout should occur no later than one year after the end of the period of performance.

**10.3.   Post-Termination Adjustments.**    The Recipient acknowledges that under 2 CFR 200.345–200.346, termination of the agreement does not extinguish the USDOT's authority to disallow costs, including costs that the USDOT reimbursed before termination, and recover funds from the Recipient.

**10.4.   Non-Terminating Events.**

(a) The end of the budget period described under section 4.4 does not terminate this agreement or the Recipient's obligations under this agreement.

(b) The end of the period of performance described under section 4.5 does not terminate this agreement or the Recipient's obligations under this agreement.

(c) The cancellation of funds under section 14.2 does not terminate this agreement or the Recipient's obligations under this agreement.

**10.5.   Other Remedies.** The termination authority under this article 10 supplements and does not limit the USDOT's remedial authority under article 9 or 2 CFR part 200, including 2 CFR 200.339–200.340.

# 11.
# MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**11.1.   Recipient Monitoring and Record Retention.**

(a) The Recipient shall monitor activities under this award, including activities under subawards and contracts, to ensure:

    (1)    that those activities comply with this agreement; and

    (2)    that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient shall monitor the activities of the subrecipient in compliance with 2 CFR 200.332(e).

(c) The Recipient shall retain records relevant to the award as required under 2 CFR 200.334.

**11.2.   Financial Records and Audits.**

(a) The Recipient shall keep all project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the project.

(b) The Recipient shall keep accounts and records described under section 11.2(a) in accordance with a financial management system that meets the requirements of 2 CFR 200.301–200.303, 2 CFR 200 subpart F, and title 23, United States Code, and will facilitate an effective audit in accordance with 31 U.S.C. 7501–7506.

(c) The Recipient shall separately identify expenditures under the fiscal years 2024, 2025, and/or 2026 RCP Program in financial records required for audits under 31 U.S.C. 7501–7506. Specifically, the Recipient shall:

    (1)    list expenditures under that program separately on the schedule of expenditures of Federal awards required under 2 CFR 200 subpart F, including "FY 2024, 2025, and/or 2026" in the program name; and

    (2)    list expenditures under that program on a separate row under Part II, Item 1 ("Federal Awards Expended During Fiscal Period") of Form SF-SAC, including "FY 2024, 2025, and/or 2026" in column c ("Additional Award Identification").

**11.3.   Internal Controls.**

The Recipient shall establish and maintain internal controls as required under 2 CFR 200.303.

**11.4.   USDOT Record Access.**

The USDOT may access Recipient records related to this award under 2 CFR 200.337.

## 11.5.   Oversight Responsibilities.

This award is subject to the oversight requirements of title 23, United States Code.

## 12.
## CONTRACTING AND SUBAWARDS

## 12.1.   Minimum Wage Rates.

The Recipient shall include, in all contracts in excess of $2,000 for work on the Project that involves labor, provisions establishing minimum rates of wages, to be predetermined by the United States Secretary of Labor, in accordance with 23 U.S.C. 113, that contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

## 12.2.   Buy America.

(a) Steel, iron, and manufactured products used in the Project are subject to 23 U.S.C. 313, as implemented by the Federal Highway Administration. The Recipient acknowledges that this agreement is neither a waiver of 23 U.S.C. 313(a) nor a finding under 23 U.S.C. 313(b).

(b) Construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtitle. A, 135 Stat. 429, 1298 (2021), as implemented by OMB, USDOT, and FHWA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(c) Under 2 CFR 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). The Recipient shall include the requirements of 2 CFR 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

## 12.3.   Small and Disadvantaged Business Requirements.

(a) If any funds under this award are administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 49 CFR part 26, including any amendments thereto.

(b) If any funds under this award are not administered by or through a State Department of Transportation, the Recipient shall expend those funds in compliance with the requirements at 2 CFR 200.321, including any amendments thereto.

**12.4.  Engineering and Design Services.**

As applicable, the Recipient shall award each contract or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, or related services with respect to the project in the same manner that a contract for architectural and engineering services is negotiated under the Brooks Act, 40 U.S.C. 1101-1104 as implemented in 23 U.S.C. 112(b)(2), or an equivalent qualifications-based requirement prescribed for or by the Recipient and approved in writing by the USDOT.

**12.5.  Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.**   The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 CFR 200.216 prohibit the Recipient and all subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**12.6.  Pass-through Entity Responsibilities.** If the Recipient makes a subaward under this award, the Recipient shall comply with the requirements on pass-through entities under 2 CFR parts 200 and 1201, including 2 CFR 200.331–200.333.

**12.7.  Subaward and Contract Authorization.**

(a) If the USDOT Office for Subaward and Contract Authorization identified in section 7 of schedule A is "FHWA Division," then the Recipient shall comply with subaward and contract authorization requirements under 23 C.F.R chapter I.

(b) If the USDOT Office for Subaward and Contract Authorization identified in section 7 of schedule A is "FHWA Office of Acquisition and Grants Management," then the Recipient must follow the requirements in 2 CFR 200.308, 2 CFR 200.333, and 23 CFR 172, as applicable. Approvals under 2 CFR 200.308(f)(6) do not apply to the procurement of goods and services.

.

**13.**
**COSTS, PAYMENTS, AND UNEXPENDED FUNDS**

**13.1.  Limitation of Federal Award Amount.**    Under this award, the USDOT shall not provide funding greater than the amount obligated under section 4.3. The Recipient

acknowledges that the USDOT is not liable for payments exceeding that amount, and the Recipient shall not request reimbursement of costs exceeding that amount.

13.2.   **Projects Costs.** This award is subject to the cost principles at 2 CFR 200 subpart E, including provisions on determining allocable costs and determining allowable costs.

13.3.   **Timing of Project Costs.**

(a) The Recipient shall not charge to this award costs that are incurred after the budget period.

(b) The Recipient shall not charge to this award costs that were incurred before the date of this agreement unless those costs are identified in section 5 of schedule D and would have been allowable if incurred during the budget period. This limitation applies to costs incurred under an advance construction authorization (23 U.S.C. 115), costs incurred prior to authorization (23 CFR 1.9(b)), and pre-award costs under 2 CFR 200.458. This agreement hereby terminates and supersedes any previous USDOT approval for the Recipient to incur costs under this award for the Project. Section 5 of schedule D is the exclusive USDOT approval of costs incurred before the date of this agreement.

13.4.   **Recipient Recovery of Federal Funds.**     The Recipient shall make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if the USDOT determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner under this award. The Recipient shall not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by the USDOT.

13.5.   **Unexpended Federal Funds.** Any Federal funds that are awarded at section 4.1 but not expended on allocable, allowable costs remain the property of the United States.

13.6.   **Timing of Payments to the Recipient.**

(a) Reimbursement is the payment method for the RCP Program.

(b) The Recipient shall not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

13.7.   **Payment Method.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the Recipient shall follow FMIS procedures to request and receive reimbursement payments under this award.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Recipient shall use the DELPHI eInvoicing System to request reimbursement under this award unless the USDOT agreement officer provides written approval for the Recipient to use a different request and payment method.

(c) The USDOT may deny a payment request that is not submitted using the method identified in this section 13.7.

**13.8.  Information Supporting Expenditures.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then when requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient shall electronically submit the SF 271 (Outlay Report and Request for Reimbursement for Construction Programs) or the SF 270 (Request for Advance or Reimbursement), as applicable, shall identify the Federal share and the Recipient's share of costs, and shall submit supporting cost detail to clearly document all costs incurred. As supporting cost detail, the Recipient shall include a detailed breakout of all costs incurred, including direct labor, indirect costs, other direct costs, and travel.

(b) If the Recipient submits a request for reimbursement that the USDOT determines does not include or is not supported by sufficient detail, the USDOT may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.9.  Reimbursement Frequency.** If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Recipient shall not request reimbursement more frequently than monthly.

## 14.
## LIQUIDATION, ADJUSTMENTS, AND FUNDS AVAILABILITY

**14.1.  Liquidation of Recipient Obligations.**

(a) The Recipient shall liquidate all obligations of award funds under this agreement not later than 120 days after the end of the period of performance.

(b) Liquidation of obligations and adjustment of costs under this agreement follow the requirements of 2 CFR 200.344–200.346.

**14.2.  Funds Cancellation.**  RCP Program funding that is obligated for this award under section 4.3 remains available until expended.

## 15.
## AGREEMENT MODIFICATIONS

**15.1.  Bilateral Modifications.**     The parties may amend, modify, or supplement this agreement by mutual agreement in writing signed by the USDOT and the Recipient. Either party may request to amend, modify, or supplement this agreement by written notice to the other party.

**15.2.  Unilateral Contact Modifications.**

(a) The Recipient may update the contacts who are listed in section 3 of schedule A by written notice to the USDOT contacts who are listed in section 5 of schedule A and section 2.2.

(b) The USDOT may update the contacts who are listed in section 5 of schedule A and section 2.2 by written notice to all of the Recipient contacts who are listed in section 3 of schedule A.

**15.3   USDOT Unilateral Modifications.**

(a) The USDOT may unilaterally modify this agreement to comply with Federal law, including the Program Statute.

(b) To unilaterally modify this agreement under this section 0, the USDOT must provide a notice to the Recipient that includes a description of the modification and state the date that the modification is effective.

**15.4   Other Modifications.**

The parties shall not amend, modify, or supplement this agreement except as permitted under sections 15.1, 15.2, or 0. If an amendment, modification, or supplement is not permitted under section 15.1, not permitted under section 15.2, and not permitted under section 0, it is void.

**16.**
**CIVIL RIGHTS AND TITLE VI**

**16.1.   Civil Rights and Title VI.**

(a)  The purpose of sections 16.1(b)–16.1(c) is to ensure that the Recipient has a plan to comply with civil rights obligations and nondiscrimination laws, including Title VI and 49 CFR part 21, including any amendments thereto.

(b) If the Recipient is an "Existing" Recipient, then the Recipient shall submit to the USDOT either:

(1)   not later than one month after the date of this agreement, documentation showing that the Recipient has complied with all reporting requirements under the Administering Operating Administration's implementation of Title VI; or

(2)   not later than six months after the date of this agreement, both a Title VI Plan and a Community Participation Plan, as those plans are described in chapter

25 of 35

II, sections 3–4 of DOT Order 1000.12C, including any amendments or updates thereto.

(c) If the Recipient is a "New" Recipient, then the Administering Operating Administration completed a Title VI Assessment of the Recipient, as described in chapter II, section 2 of DOT Order 1000.12C, including any amendments or updates thereto.

(d) In this section 16.1,

    (1)    "Title VI" means Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified at 42 U.S.C. 2000d to 2000d-4a).

    (2)    "Existing" means a prior recipient of DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

    (3)    "New" means a recipient who has not received DOT federal financial assistance since the publication of DOT Order 1000.12C on June 11, 2021.

## 17. RESERVED

## 18. LABOR AND WORK

### 18.1.  Labor and Work.

Consistent with Executive Order 14025, "Worker Organizing and Empowerment" (Apr. 26, 2021), schedule H documents the consideration of job quality and labor rights, standards, and protections related to the Project.

## 19.
## CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

### 19.1.  Critical Infrastructure Security and Resilience.

(a) Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021), the Recipient shall consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b) If the Security Risk Designation in section 4 of schedule F is "Elevated," then, not later that than two years after the date of this agreement, the Recipient shall submit to the USDOT a report that:

(1)    identifies a cybersecurity Point of Contact for the transportation infrastructure being improved in the Project;

(2)    summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)    summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)    documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)    describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## 20.
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1.** **Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 CFR parts 200 and 1201.

**20.2.** **Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of Department of Homeland Security in the enforcement of Federal immigration law.

(b) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination And Restoring Merit-Based Opportunity*, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d) The failure of this agreement to expressly identify Federal law applicable to the Recipient or activities under this agreement does not make that law inapplicable.

**20.3.    Federal Freedom of Information Act.**

(a) The USDOT is subject to the Freedom of Information Act, 5 U.S.C. 552.

(b) The Recipient acknowledges that the Technical Application and materials submitted to the USDOT by the Recipient related to this agreement may become USDOT records subject to public release under 5 U.S.C. 552.

**20.4.    History of Performance.**

Under 2 C.F.R 200.206, any Federal awarding agency may consider the Recipient's performance under this agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**20.5.    Whistleblower Protection.**

(a) The Recipient acknowledges that it is a "grantee" within the scope of 41 U.S.C. 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b) The Recipient shall inform its employees in writing of the rights and remedies provided under 41 U.S.C. 4712, in the predominant native language of the workforce.

**20.6.    External Award Terms and Obligations.**

(a) In addition to this document and the contents described in article 25, this agreement includes the following additional terms as integral parts:

(1)    Appendix A to 2 CFR part 25: System for Award Management and Universal Identifier Requirements;

(2)    Appendix A to 2 CFR part 170: Reporting Subawards and Executive Compensation;

(3)    2 CFR 175: Trafficking in Persons; and

(4)    Appendix XII to 2 CFR part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b) The Recipient shall comply with:

(1)    49 CFR part 20: New Restrictions on Lobbying;

(2)     49 CFR part 21: Nondiscrimination in Federally-Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)     49 CFR part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)     Subpart B of 49 CFR part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

## 20.7.  Incorporated Certifications.

The Recipient makes the statements in the following certifications, which are incorporated by reference:

(1)     Appendix A to 49 CFR part 20 (Certification Regarding Lobbying).

# 21.
# ASSIGNMENT

**21.1.   Assignment Prohibited.**     The Recipient shall not transfer to any other entity any discretion granted under this agreement, any right to satisfy a condition under this agreement, any remedy under this agreement, or any obligation imposed under this agreement.

# 22.
# WAIVER

**22.1.   Waivers.**

(a) A waiver of a term of this agreement granted by the USDOT will not be effective unless it is in writing and signed by an authorized representative of the USDOT.

(b) A waiver of a term of this agreement granted by the USDOT on one occasion will not operate as a waiver on other occasions.

(c) If the USDOT fails to require strict performance of a term of this agreement, fails to exercise a remedy for a breach of this agreement, or fails to reject a payment during a breach of this agreement, that failure does not constitute a waiver of that term or breach.

29 of 35

## 23.
## ADDITIONAL TERMS AND CONDITIONS

**23.1.  Effect of Economically Disadvantaged Community Designation.**

If section 2 of schedule F lists "Yes" for the "Economically Disadvantaged Community Designation," then based on information that the Recipient provided to the USDOT, including the Technical Application, the USDOT determined that the Project will benefit an economically disadvantaged community, as defined in section H.1 of the NOFO.

**23.2.  Disclaimer of Federal Liability.**

The USDOT shall not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this agreement.

**23.3.  Relocation and Real Property Acquisition.**

(a) To the greatest extent practicable under State law, the Recipient shall comply with the land acquisition policies in 49 CFR 24 subpart B and shall pay or reimburse property owners for necessary expenses as specified in that subpart.

(b) The Recipient shall provide a relocation assistance program offering the services described in 49 CFR 24 subpart C and shall provide reasonable relocation payments and assistance to displaced persons as required in 49 CFR 24 subparts D–E.

(c) The Recipient shall make available to displaced persons, within a reasonable period of time prior to displacement, comparable replacement dwellings in accordance with 49 CFR 24 subpart E.

**23.4.  Equipment Disposition.**

(a) In accordance with 2 CFR 200.313 and 1201.313, if the Recipient or a subrecipient acquires equipment under this award, then when that equipment is no longer needed for the Project:

    (1)  if the entity that acquired the equipment is a State or a subrecipient of a State, that entity shall dispose of that equipment in accordance with State laws and procedures;

    (2)  if the entity that acquired the equipment is an Indian Tribe, the Indian Tribe shall dispose of that equipment in accordance with tribal laws and procedures. If such laws and procedures do not exist, Indian Tribes must follow the guidance in 2 CFR 200.313; and

(3)  if the entity that acquired the equipment is neither a State nor a subrecipient of a State, that entity shall request disposition instructions from the Administering Operating Administration.

(b)  In accordance with 2 CFR 200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 CFR 200.313–200.316 and 2 CFR 1201.313.

(c)  The Recipient shall ensure compliance with this section 0 for all tiers of subawards under this award.

**23.5.  Environmental Review.**

(a)  In this section, "**Environmental Review Entity**" means:

(1)  if the Project is located in a State that has assumed responsibilities for environmental review activities under 23 U.S.C. 326 or 23 U.S.C. 327 and the Project is within the scope of the assumed responsibilities, the State; and

(2)  for all other cases, the FHWA.

(b)  Except as authorized under section 0(c), the Recipient shall not begin final design; acquire real property, construction materials, or equipment; begin construction; or take other actions that represent an irretrievable commitment of resources for the Project unless and until:

(1)  the Environmental Review Entity complies with the National Environmental Policy Act, 42 U.S.C. 4321 to 4370m-12, and any other applicable environmental laws and regulations; and

(2)  if the Environmental Review Entity is not the Recipient, the Environmental Review Entity provides the Recipient with written notice that the environmental review process is complete.

(c)  If the Recipient is using procedures for early acquisition of real property under 23 CFR 710.501 or hardship and protective acquisitions of real property 23 CFR 710.503, the Recipient shall comply with 23 CFR 771.113(d)(1).

(d)  The Recipient acknowledges that:

(1)  the Environmental Review Entity's actions under section 0(a) depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to the Environmental Review Entity; and

(2)  applicable environmental statutes and regulation may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(e) Consistent with 23 CFR 771.105(a), to the extent practicable and consistent with Federal law, the Recipient shall coordinate all environmental investigations, reviews, and consultations as a single process.

(f) The activities described in schedule B and other information described in this agreement may inform environmental decision-making processes, but the parties do not intend this agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with schedule B or other information in this agreement, then:

(1)    the parties may amend this agreement under section 15.1 for consistency with the selected build alternative; or

(2)    if the USDOT determines that the condition at section 10.1(a)(5) is satisfied, the USDOT may terminate this agreement under section 10.1(a)(5).

(g) The Recipient shall complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project.

**23.6.   Railroad Coordination.**

 If section 3 of schedule C includes one or more milestones identified as a "Railroad Coordination Agreement," then for each of those milestones, the Recipient shall enter a standard written railroad coordination agreement, consistent with 23 CFR 646.216(d), no later than the deadline date identified for that milestone, with the identified railroad for work and operation within that railroad's right-of-way.

**24.**
**MANDATORY AWARD INFORMATION**

**24.1.   Information Contained in a Federal Award.** For 2 CFR 200.211:

(1)    the "Federal Award Date" is the date of this agreement, as defined under section 26.2;

(2)    the "Assistance Listings Number" is 20.940 and the "Assistance Listings Title" is "Reconnecting Communities Pilot (RCP) Discretionary Grant Program"; and

(3)    this award is not for research and development.

**24.2.   Federal Award Identification Number.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the Federal Award Identification Number will be generated when the FHWA Division

32 of 35

authorizes the project in FMIS. The Recipient acknowledges that it has access to FMIS and can retrieve the FAIN from FMIS.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Federal Award Identification Number is listed on page 1, line 1 of the project-specific agreement.

**24.3.   Recipient's Unique Entity Identifier.**

(a) If the USDOT Payment System identified in section 6 of schedule A is "FMIS," then the Recipient's Unique Entity Identifier, as defined at 2 CFR 25.415, is available in FMIS. The Recipient acknowledges that it has access to FMIS and can retrieve the unique entity identifier from FMIS.

(b) If the USDOT Payment System identified in section 6 of schedule A is "DELPHI eInvoicing," then the Recipient's Unique Entity Identifier, as defined at 2 CFR 25.415, is listed on page 1, line 4 of the project-specific agreement.

**25.**
**CONSTRUCTION AND DEFINITIONS**

**25.1.   Schedules.** This agreement includes the following schedules as integral parts:

| | |
|---|---|
| Schedule A | Administrative Information |
| Schedule B | Project Activities |
| Schedule C | Award Dates and Project Schedule |
| Schedule D | Award and Project Financial Information |
| Schedule E | Changes from Application |
| Schedule F | RCP Program Designations |
| Schedule G | RCP Performance Measurement Information |
| Schedule H | Labor and Work |

**25.2.   Exhibits.**    The following exhibits, which are located in the document titled "Exhibits to FHWA Grant Agreements Under the Fiscal Years 2024 - 2026 Reconnecting Communities Pilot Program," dated July 22, 2025, and available at https://www.transportation.gov/grants/reconnecting-communities/reconnecting-communities-grant-agreements, are part of this agreement.

| | |
|---|---|
| Exhibit A | Applicable Federal Laws and Regulations |
| Exhibit B | Additional Standard Terms |
| Exhibit C | Quarterly Project Progress Reports and Recertifications: Format and Content |
| Exhibit D | Form for Subsequent Obligation of Funds |

**25.3.    Construction.**

(a)  In these General Terms and Conditions:

(1)      unless expressly specified, a reference to a section or article refers to that section or article in these General Terms and Conditions;

(2)      a reference to a section or other subdivision of a schedule listed in section 25.1 will expressly identify the relevant schedule; and

(3)      there are no references to articles or sections in project-specific portions of the agreement that are not contained in schedules listed in section 25.1.

(b)  If a provision in these General Terms and Conditions or the Exhibits conflicts with a provision in the project-specific portion of the agreement, then the project-specific portion of the agreement prevails. If a provision in the Exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

**25.4.    Integration.**

This agreement constitutes the entire agreement of the parties relating to the RCP Program and awards under that program for the Project and supersedes any previous agreements, oral or written, relating to the RCP Program and awards under that program for the Project.

**25.5.    Definitions.**

In this agreement, the following definitions apply:

**"Capital Construction Grant"** means this project will remove, retrofit, mitigate, or replace an existing eligible dividing transportation facility with a new facility that reconnects communities; mitigates a burdening transportation facility that is a source of air pollution, noise, stormwater, heat, or other burdens; or implements a strategy to reduce environmental harm and/or improve access through transportation improvements.

"**Community Planning Grant**" means this project will conduct planning activities for future construction projects and allow for innovative community planning to address localized transportation challenges.

"**General Terms and Conditions**" means this document, including articles 1–266.

"**Program Statute**" means the collective statutory text:

(1)      at IIJA div. A § 11509; and

(2)      at paragraph 7 under the heading "Department of Transportation—Federal Highway Administration—Highway Infrastructure Programs" in IIJA div. J, tit.

VIII, and all other provisions of that act that apply to amounts appropriated under that paragraph.

"**Project**" means the project proposed in the Technical Application, as modified by the negotiated provisions of this agreement, including schedules A–H.

"**RCP Grant**" refers to an award of funds made available via the Reconnecting Communities Pilot Program funded by Sections 11101(d)(3) and 11509 of Division A of the Infrastructure Investment and Jobs Act (Pub. L. 117-58, November 15, 2021).

"**Technical Application**" means the application identified in section 1 of schedule A, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

## 26.
## AGREEMENT EXECUTION AND EFFECTIVE DATE

26.1.   **Counterparts.**   This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

26.2.   **Effective Date.**   The agreement will become effective when all parties have signed it. The date of this agreement will be the date this agreement is signed by the last party to sign it. This instrument constitutes an RCP Grant when the USDOT's authorized representative signs it.