them in services, but their strategies and the resources that they can offer may not relate well to the needs and preferences of people living in encampment settings. Research is needed to determine best practices for outreach specifically for encampment populations. Also, given the high number of people in encampment settings struggling with substance use, a stronger emphasis on connections to substance use treatment programs may be needed, as well as more effective outreach strategies, such as treatment on demand, for motivating engagement in substance use recovery or "harm reduction" mitigation of the consequences of abuse.

Cities are working to connect people living in encampments with housing assistance; however, the four study cities face a shortage of housing assistance for people leaving encampment settings. Without meaningful connections to housing assistance, outreach workers may not be able to convince people to leave an encampment. As a result of that shortage, some cities are developing or expanding low-barrier, service-rich shelters sometimes known as navigation centers as part of their efforts to respond to encampments. Efforts are needed to document this new type of emergency shelter, describe its logic model, and determine whether the existing programs are following this model. Research must then measure the outcomes of people exiting navigation centers and ultimately compare their outcomes to people placed in other types of emergency shelter or in affordable permanent housing. Housing assistance must be a key component of city responses to homeless encampments.

In all four cities, outreach workers administer assessments to enter encampment residents in the CoC coordinated entry system; however, the demand for housing assistance is high, and people in encampments may not be able to receive immediate assistance based on their prioritization. As CoCs continue to implement and refine coordinated entry to homeless assistance programs, cities and CoCs must determine how people living in encampments fit into the coordinated entry prioritization strategy. Cities and CoCs have difficult decisions to make about balancing the need for permanent housing as the solution to the homelessness of encampment residents and the need for additional shelter beds to give encampment residents an immediate place to go. Assessing that tradeoff will require cost-benefit analyses beyond the scope of the cost analysis in this study.

### Cities shoulder the financial burden of encampment responses

Finally, the study provides cost estimates for the encampment response approaches of four cities. In 2019, cities spent significant amounts—between $3,393,000 and $8,557,000 annually—on encampment-related activities.[13] Those expenditures include costs related to outreach, clearance, and prevention activities, as well as emergency shelter costs and—in one city—permanent supportive housing. In all four cities, the largest funder of encampment response activities is city government.

Typically, cities are able to access very limited federal or state funding to respond to encampments because the HUD funds available for homelessness assistance through the local CoC are already dedicated to other programs or are not designated to assist people experiencing unsheltered homelessness. As a result, cities are funding many activities using their own resources. Using city funding for encampment responses may divert some funding from other, more traditional activities of city departments (e.g., trash collection, park maintenance). It also may divert city support for other types of homelessness assistance, including longer term investments in expanding permanent housing opportunities for people who experience unsheltered homelessness. To support future encampment response efforts as well as assistance for people experiencing unsheltered homelessness overall, some cities are exploring and identifying other ways to fund their activities (e.g., special assessments and taxes).

---

[13] It is important to remember that this cost analysis is not a cost-benefit or cost-effectiveness analysis but a documentation of the different types and amounts of spending by cities related to encampments.

## Appendix A: Study Methodology

This appendix presents the research questions and methodology for the data collection and analysis that formed the basis for this report.

### Research questions

The study's research questions address three areas of interest: understanding encampments, community responses to encampments, and costs associated with those responses.

| Research Questions | Literature Review | Telephone Interviews | Site Visits |
|---|---|---|---|
| ***Understanding Encampments*** | | | |
| Factors driving the increase in unsheltered homelessness and encampments specifically? | ✔ | ✔ | |
| What infrastructure or state/local ordinances or policy establish or govern encampments? | ✔ | ✔ | ✔ |
| Who stays in encampments? What are common subpopulations or characteristics? Are there differences between encampments and the unsheltered population generally? | ✔ | ✔ | ✔ |
| How large are encampments? Do their characteristics vary by size? | ✔ | ✔ | |
| What type of social structures characterize encampments? | ✔ | | |
| ***City Efforts to Address Encampments*** | | | |
| What steps are cities taking to prevent the establishment of encampments (e.g., ordinances and regulations, infrastructure, strengthening of the social safety net)? | | ✔ | ✔ |
| How are communities responding to encampments? What are the major activities, and which stakeholders are engaged? | | ✔ | ✔ |
| Can approaches to encampments be categorized—for example, as sanctioning, clearing, or relocating? | ✔ | ✔ | ✔ |
| How do responses to encampments relate to the broader homeless services system? | ✔ | ✔ | ✔ |
| How do responses to encampments differ across different types of communities? | ✔ | ✔ | ✔ |
| In what ways do those efforts differ from efforts to serve the unsheltered population not living in encampments? | ✔ | ✔ | ✔ |
| ***Costs Associated with Encampments*** | | | |
| What are the direct costs incurred by cities in their efforts to address encampments? | | | ✔ |
| How do costs differ depending on different city approaches (e.g., sanctioning, clearing, or relocating encampments)? | | | ✔ |
| What health and safety issues have communities encountered with people sleeping in encampments? | ✔ | ✔ | ✔ |

### Literature review

The study began with a literature review to determine what was known about encampments as of the fall of 2018 and to provide preliminary answers to the research questions, focused on understanding encampments and documenting city responses. A formal examination of the peer-reviewed literature and grey literature was augmented by nine interviews with scholars and practitioners who have knowledge of encampments. The interviewees were asked about ongoing research projects focused on the recent growth in unsheltered homelessness and encampments; the characteristics of people in encampments and the factors that lead them to congregate there; and responses of communities, including costs and effectiveness. Each interviewee was asked targeted questions about specific research projects or programs.

A synthesis of the literature review and expert interviews was published in early 2019 (Cohen, Yetvin, and Khadduri 2019). The synthesis set forth a preliminary typology of responses to encampments, with

four categories: clearance with little or no support; clearance and closure with support; tolerance; and formal sanctioning.

The literature review informed the selection of sites for the study's primary data collection and the data collection protocols.

### Telephone discussions with stakeholders from nine sites

In consultation with HHS, HUD, and the U.S. Interagency Council on Homelessness (USICH), the research team selected nine cities to participate in telephone discussions to explore the responses to homeless encampments by those cities. The nine cities were Chicago, Illinois; Fresno, California; Houston, Texas; Las Vegas, Nevada; Minneapolis, Minnesota, Philadelphia, Pennsylvania; Portland, Oregon; San Jose, California; and Tacoma, Washington. In selecting those cities, the research team considered factors that could affect the presence, growth, and responses to encampments: geography/climate, city population, housing market affordability, trends in the number of people experiencing unsheltered homelessness, and the broader overall response to homelessness by the city.

The research team conducted 39 telephone discussions, interviewing three to six stakeholders in each city. Interviewees included representatives from public agencies, homeless services providers, law enforcement, outreach teams, and other organizations involved with the community response. The interviewers used semi-structured interview guides to elicit the information needed to answer the study's research questions, with a focus on trends in encampments, the characteristics of encampment residents, and the evolution of local approaches to responding to encampments. The interviews also focused on identifying the various organizations participating in the response by the city. Respondents were asked about the availability of cost data and the willingness of the city to participate in the next phase of the study.

The study team synthesized the results of those interviews, creating descriptions of encampments in each of the nine cities and the response strategies of each city, as well as common themes across the nine cities. That synthesis formed the basis for selecting four cities for the site visits and collection of cost data.

### Site Visits and Cost Data Collection at Four Cities

In consultation with HHS and HUD, the study team selected Chicago, Illinois; Houston, Texas; San Jose, California; and Tacoma, Washington. Criteria for selection of those cities included geographic diversity, varying levels of housing affordability, a variety of approaches to encampments, and potential for findings that could be helpful for other communities across the country that are responding to encampments.

While on site in each city, two members of the study team—

- Met with fiscal staff at government and other organizations involved in responding to encampments to review their expenditures related to encampment responses. The site visitors inventoried the activities that contributed to encampment costs for each city, with each implementing partner and collected data costs associated with each activity.
- Conducted in-person interviews with key implementation partners working to address homeless encampments. Discussion topics included the drivers of unsheltered homelessness in the city; details of the response strategy and its implementation; and the way in which the strategy related to local ordinances, litigation, and public reactions to encampments.
- Observed local encampments and interviewed two people with lived experiences in encampment settings. The study team accompanied outreach workers to encampment locations, where outreach workers identified people willing to be interviewed for 15 to 20 minutes. Interviewers asked individuals a range of questions relating to their decision to stay in the encampment location,

interactions with other encampment residents, and availability and interest in services provided to encampment residents.

### Analysis and reporting

The study team used the results of the interviews with nine cities and the site visits to four cities to produce five reports: this overall final report summarizing the findings of the study and four community reports, one covering each of the four cities that were the major focus of the study: Chicago, Houston, San Jose, and Tacoma.[14] To produce each report, the study team reviewed the information collected through interviews and supporting documents and synthesized that information, using a common topical structure for each of the community reports. In many cases, the study team had to ask interviewees followup questions to fill in missing information. The study team then produced this summary report, synthesizing the information on the four focus cities and, in some cases, adding observations about the other five cities for which telephone interviews were conducted.

#### *Estimating the cost of encampment responses*

Each of the community reports and this final report includes a section providing estimates of the costs of city responses to encampments.

Because the cost data came from a number of different sources with varying formats and levels of detail, the study team used a combination of three different approaches to analyzing the data: (1) a budget approach, (2) a full-time equivalent (FTE) approach, and (3) an activity-based approach. Whenever possible, the analysis was based on implementation partners' budgets (or a line item in the budget) or a financial report for the encampment-related activity. If the cost data covered a different period than FY 2019 (such as calendar year 2019), then the analysis prorated or extrapolated the budget data to create an estimate for FY 2019.

In a number of cases, implementer budgets combined activities related to encampment residents and homelessness generally. In those cases, implementers were asked to estimate the share of the cost specifically relating to homeless people residing in encampments. For example, a homeless outreach team may work primarily with people in encampments but also provide services to homeless people staying elsewhere.

#### *Alternatives to the budget approach*

The financial records provided by implementation partners sometimes were not useful for the analysis because the budget for encampment response activities did not appear in specific budget line items. For example, city departments providing trash removal services for encampment residents did not have specific budgets that separated the costs of this service from other trash removal services. In those cases, the study team conducted interviews with department or organization leadership and asked them to describe all of the encampment-related activities they conduct in as much detail as possible. Based on that information, the study team then used either the FTE or activity-based costing approach to analyze the data.

**FTE approach**

An FTE approach was feasible when the implementation partner could report how many FTEs are used to conduct an encampment-related activity (for example, if one maintenance crew member spends one-half of his or her time cleaning encampments, then .5 FTE is dedicated to that activity). In addition to the number of FTEs, the study team gathered data on the salary and benefits of each FTE involved to calculate a total cost.

---

[14] See Chicago, Illinois; Houston, Texas; San Jose, California; and Tacoma, Washington Community Encampment Reports.

#### Activity-based costing approach

When no reliable budget information was available or when the implementation partner could not estimate FTEs, the study team gathered details about the encampment-related activities and constructed a cost estimate. Using this activity-based costing approach required a detailed understanding of the activities being conducted by each implementation partner. Information that implementation partners were asked to provide included—

- Staff performing the activity.
- Annual FTE salary and fringe benefits of staff performing the activity.
- Staff hours needed per unit of activity (e.g., 2 hours per trash pickup at encampment).
- Time period over which activities occurred (e.g., calendar year 2019).
- Number of times the activity occurred during the time period (e.g., once a week).
- Any direct costs of conducting the activity (e.g., cost of trash bags).

### *Consider overhead in cost estimates*

In general, overhead costs (other than fringe benefits of staff conducting the activities) were not included in the cost estimates. For many of the departments or organizations that implemented encampment activities, those activities represent a small portion of their work. For those implementation partners with a limited role in responding to encampments, the analysis was based on a ***marginal cost approach***. The assumption was that the encampment-related activities had no measurable effect on overhead costs such as accounting, human resources, equipment, or the cost of office space.

In two notable exceptions, the study team did not use a marginal cost approach. The cost of office space was included if it was used specifically to support encampment activities, such as providing storage for the belongings of encampment residents. In addition, some city contracts with implementing partners specifically allowed those partners to include overhead costs in their contracts for encampment-related work. In those instances, because the costs were directly incurred as a result of responding to encampments (by the city, if not by the implementing partner), overhead costs were included in the cost estimates.

### *Analyze funding source of activities for each stakeholder*

In addition to analyzing the costs of encampment-related activities, the study team collected data on the funding source for each activity. That information permitted the analysis to identify which organization was bearing the costs of encampment-related activities in each city. It also was needed to ensure that costs were not being double counted by multiple stakeholders. For example, if a local nonprofit is responsible for conducting outreach to encampment residents but that activity is being funded by a city contract, the cost sometimes appeared in financial reports for both the city and the nonprofit.

### *Analyze costs of encampment response*

To analyze costs of the encampment response for each site, the study team first prorated or extrapolated the cost data as needed to estimate costs for FY 2019. Then the team categorized the cost data by—

- Stakeholder type: police department, other city department, homeless services provider, independent authority, and others.
- Activity type: outreach and housing navigation; homeless outreach team; substance use program; medical assistance; financial assistance; encampment clearance; encampment prevention; shelter; permanent supportive housing; and other.

- Funding source: city government, federal government, in-kind donation, private, independent authority, and other.
- Cost type: labor and nonlabor.
- Funding type: cash and in-kind.

With costs standardized and organized within and across sites, the study team could compare costs across cities in this final report and report them in detail in the community reports.

## Appendix B: Approaches for Estimating Encampment Costs

This appendix offers communities a general approach for collecting and analyzing costs related to their local encampment response. This approach is based on the methodology used by the authors for estimating costs of encampments in Chicago, Houston, San Jose, and Tacoma (outlined in Appendix A). This appendix provides a guide for how to conceptualize the analysis to meet the needs of your community, as well as instructions for collecting the data from different departments and organizations who are helping to respond to encampments. For example, it outlines the steps in the process for estimating the costs of encampments, outlines a series of questions to help communities clearly define the scope of their analysis, and provides tools and steps for collecting and analyzing cost data.

### *Process for estimating cost of encampments*

Estimate the costs of homeless encampments requires several steps:

- Define the scope of the cost estimate.
- Inventory the activities involved in responding to encampments.
- List the stakeholders involved in responding to encampments and their activities.
- Gather the costs of activities from each stakeholder.
- Analyze the cost data.

Although the process is laid out in steps, it likely will involve revisiting some steps. For example, you may learn while going through the process of identifying the activities being conducted by each stakeholder that the original list of activities was incomplete or that stakeholders have been left off the list.



### Define the purpose and scope of the cost estimate

The first step in planning a cost estimate is to delineate the purpose the estimate is intended to serve, how it will be used, and who will use it. Answering those questions will help to define the cost estimate and ensure that it serves the purposes for which it is intended.

These questions include—

- What is an encampment in your community?
- Who will use the cost estimate in your community?
- What will it be used for?
- What costs are relevant? Which should be ignored?
- What time period should costs cover?
- What geography is most relevant (e.g., within city or county boundaries? including an entire metropolitan area?)?

Those questions and their implications are discussed in the remainder of this section.

#### *Establish a shared definition of encampment*

An important component of the scope of the analysis is a clear definition of what constitutes an *encampment*. The use of the word varies from place to place. For example, in some places, it refers to even a single temporary occupied structure; in others, it refers only to groups of structures; in others still, it may include people sleeping in vehicles. The definition itself is not as important for the purposes of the analysis as that the definition is shared by all the stakeholders within the community so that the term is understood consistently.

#### *Use the purpose of the cost estimate to define the relevant geography and funding sources*

In estimating costs of encampments, it is important to clearly define the audience and the purpose for the cost estimate. This information will help determine the scope of the exercise. For example, if the cost estimate is primarily for use in determining how to most effectively use city resources, then costs counted should exclude those spent outside city limits. Some stakeholders and contracts may cover geographic areas outside the city; in those cases, the share of costs spent outside the city should not be included. Likewise, the cost data collection should focus primarily on city resources. Although understanding federal, state, and county costs and how those affect the use of city resources may be helpful, those costs are not central to the estimate.

If the cost estimate is intended to broadly capture all costs related to responding to encampments—perhaps so that costs can be compared with other homeless service approaches, such as rapid rehousing or permanent supportive housing—then costs to all entities should be included.

In estimating the costs of responding to encampments, it is also important to select an appropriate time period from which to collect cost data. If the purpose of the analysis is to understand all spending on encampments over the previous 5 years, then that entire period is relevant, and cost data should be collected for that entire period. On the other hand, if the analysis is intended to provide a representative annual cost of responding to encampments, then costs from several years ago may not accurately depict the current level of response for the city. Also worth noting is that the older cost data are, the harder they may be to obtain. Cost information often is lost or is difficult to access, and people who understand and can explain the data often have moved on to other positions.

### Inventory activities involved in responding to encampments

The types of activities involved in responding to encampments vary from place to place; however, on the basis of experience with encampments in several cities, the study team has outlined some typical costs of encampments in Exhibit B-1. The categories of costs involved include cleanup/sanitation and encampment prevention, services provided to sanctioned encampments, emergency responders to encampments, response coordination, social services (provided at the encampment), and other community services and supports specifically for or related to encampment residents.

**Exhibit B-1. Typical costs of responding to encampments**

| Encampment costs | |
|---|---|
| ***Clean-up/sanitation/prevention*** | ***Sanctioning through formal policies with support for residents*** |
| • Trash removal<br>• Hazardous waste removal<br>• Dumpsters<br>• Transportation (resident relocation)<br>• Other cleanup efforts<br>• GIS applications/technology<br>• Encampment prevention, such as fence construction and repair<br>• Temporary shelters erected for encampment residents | • Structure/tents<br>• Permitting<br>• Supportive services<br>• Transportation<br>• Operation/utilities<br>• Hygiene facilities<br>• Food |
| ***Emergency responders (to calls from encampments)*** | ***Response coordination*** |
| • Fire<br>• Police<br>• EMT<br>• Public health officials<br>• Park rangers | • Staff time for encampment response meetings<br>• Developing ordinances/response to lawsuits<br>• Declaration of public emergencies<br>• Hotline/311/website |
| ***Social services (at the encampment)*** | ***Other community services/supports available (specifically for or related to encampment residents)*** |
| • Outreach<br>• Case management<br>• Medical (planned, not emergency)<br>• Mental health<br>• Substance use treatment<br>• Housing navigation<br>• Other social services | • Tents/sleeping pods<br>• Information kiosks<br>• Hotline<br>• Storage of personal belongings<br>• Toilets/showers<br>• Transportation<br>• Other services/supports |

***Ongoing and one-time costs of encampments***

Most of the costs listed in Exhibit B-1 are ***ongoing costs*** of responding to encampments. In addition to those routine costs, which typically persist over multiple years, communities may also incur unusual or ***one-time costs*** in responding to encampments, including the following:

- Creating a low-barrier shelter specifically for encampment residents (but not operating the shelter, which is an ongoing cost).
- Passing an encampment-related ordinance.
- Implementing an emergency declaration related to encampments.

- Conducting a large-scale, one-time encampment clearance.

- Responding to a lawsuit related to encampments (unless the litigation process is lengthy, covering a period of several years, in which case it may be considered an ongoing cost).

- Designing sanctioned encampments.

The reason for distinguishing between one-time and ongoing costs is to properly account for the costs of responding to encampments. For example, if part of the purpose of the cost estimate is to project the resources needed to respond to encampments in the future, then a large, one-time cost should not be included in those projections (because it is not likely to be repeated). On the other hand, if the purpose is to understand what the full costs of responding to encampments in the city has been over the past 1 or more years, then one-time costs should be included.

***Excluding costs not specific to encampments***

A key challenge in estimating the costs of encampments is differentiating them from the costs of providing services to people experiencing homelessness more generally. Although the broader cost of homelessness is an important topic, this analysis will be of most use if it clearly identifies costs related to encampments. In the cost analysis, include the costs of services if they are offered to people ***because they are in encampments*** and not simply because they are experiencing homelessness. Similarly, if people use a service more frequently or with more intensity ***because they reside in encampments***, the cost of those services should be included in the analysis.

Exhibit B-2 displays examples of cost categories for the homelessness service system and other public systems with which people experiencing homelessness may interact on a regular basis. Those costs should generally ***not*** be included in the cost of encampments. For example, the costs of long-established emergency shelters are attributable to homelessness, not to encampments specifically; however, if a new shelter opened in response to a recent increase in encampments in a community or if an existing shelter expanded capacity for the same reason, then those costs would be attributed to the rise of encampments and included in the cost estimate.

**Exhibit B-2. Costs related to homelessness generally**

| Homeless service system costs: Housing intervention and supportive services<br>*Examples of costs related to homelessness* | Costs of public systems that interact with the homeless service system<br>*Examples of costs related to homelessness* |
|---|---|
| • Coordinated entry<br>• Emergency shelter<br>• Bridge/interim housing<br>• Transitional housing<br>• Rapid rehousing<br>• Permanent supportive housing<br>• Group housing<br>• Stabilization rooms<br>• Prevention<br>• Case management<br>• Linkages to other supportive/community services | ***Health Care***<br>• Mental health<br>• Emergency room visits<br>• Rehabilitation services<br>• Recuperative care<br>• Inpatient services<br><br>***Criminal Justice***<br>• Arrests<br>• Incarceration<br>• Other criminal justice system costs |

Likewise, costs of other public systems—such as health care and criminal justice—should be included only when there is reason to believe that those living in encampments make more extensive use of those systems than do unsheltered homeless people overall.

Even with that distinction in mind, separating the costs of homelessness and the costs of encampments is likely to be challenging. Stakeholders may serve both encampment residents and people experiencing sheltered or unsheltered homelessness, and their budgets or financial reports may not indicate the specific population being served. Helping those stakeholders understand that distinction—and to estimate as closely as possible how much of their work is specific to assisting people living in encampment settings—will be important.

Exhibit B-3 presents a template for inventorying the activities involved in responding to encampments. As a first step, you should complete the table, identifying the stakeholders involved in each encampment activity (enter "N/A" if the activity is not part of the city response to encampments), and list a primary contact for each stakeholder. The table should be periodically revised during the cost data collection process to update it with any additional information collected.

**Exhibit B-3: Inventory of ongoing activities**

| Activity | Stakeholders Involved in Activity *(List all. Indicate N/A if the activity is not part of your city's response to encampments)* | Primary Contact for Each Stakeholder |
|---|---|---|
| **Emergency response to encampments** | | |
| Fire | | |
| Law enforcement | | |
| Emergency medical (EMT) | | |
| Public health incidents | | |
| Other (specify) | | |
| **Cleanup/sanitation/prevention** | | |
| Trash removal | | |
| Hazardous waste removal | | |
| Dumpsters | | |
| Property storage | | |
| Transportation (for resident relocation) | | |
| GIS applications/technology | | |
| Other cleanup efforts (specify) | | |
| Encampment prevention | | |
| Temporary shelters erected for encampment residents (e.g., low-barrier shelters) | | |
| **Social services (provided at encampments)** | | |
| Outreach | | |
| Medical services (planned, not emergency) | | |
| Mental health services | | |
| Substance use treatment | | |
| Housing navigation | | |
| Case management | | |
| Crisis response | | |
| Other (specify) | | |
| **Other community services/supports available** | | |
| Storage of personal belongings | | |
| Information kiosks | | |
| Toilets/showers | | |
| Tents/sleeping pods | | |
| Transportation from encampment to other services | | |
| Other available support (specify) | | |
| **Encampment coordination** | | |
| Park/public land management | | |
| Staff time for task force meetings | | |
| Developing ordinances/response to lawsuits | | |
| Hotline/311 | | |
| Other (specify) | | |

### *List the stakeholders involved in your city's response to encampments*

Responding to encampments involves a variety of stakeholders, including a number of city agencies, homeless services providers, and other community organizations. A thorough estimate of the costs involved in responding to encampments requires a comprehensive list of the stakeholders active in your community. Those stakeholders may include the following:

- ***City officials and departments***, which could include a mayor's office liaison, the fire department, police department, neighborhood services, environmental services, public works, parks department, and others
  - Mayor's office liaison
  - Fire department
  - Police department
  - Human services department
  - Sanitation department
  - Neighborhood services
  - Environmental services
  - Public works
  - Parks and recreation department
- ***Other government or quasi-governmental agencies*** within the scope of your cost estimate, such as county officials or departments, public utilities, and the state Department of Transportation
- ***Nonprofit agencies,*** such as homeless services providers or general social service organizations
- The local ***Continuum of Care (CoC)***
- ***Businesses or business associations***
- ***Neighborhood or resident groups***
- ***Faith-based groups,*** such as churches and faith-based coalitions
- ***Other***

Exhibit B-4 presents a template for surveying the stakeholders involved in responding to encampments. This table will assist in understanding the relevant stakeholder activities. Note that there is some overlap between Exhibits B-3 and B-4. Exhibit B-3 should be used as a starting point for identifying which stakeholders are involved in which activities. The survey in Exhibit B-4 should be distributed to each stakeholder identified previously to verify the activities in which each is involved. This process will

ensure that you have a complete list of activities and stakeholders involved in your city's response to encampments.

**Exhibit B-4: Survey of stakeholders**

| **Stakeholder Name and Contact Information:** | |
|---|---|
| **Activity** | **Is Your Organization Involved in the Activity? (Y/N)** |
| **Emergency responses** | |
| Fire | |
| Law enforcement | |
| Emergency medical | |
| Public health incidents | |
| Other types of crisis (please specify) | |
| **Cleanup/sanitation/prevention** | |
| Trash removal | |
| Hazardous waste removal | |
| Dumpsters—providing and emptying | |
| Property storage | |
| Transportation (for resident relocation) | |
| GIS applications/technology | |
| Other cleanup efforts (specify) | |
| Encampment prevention | |
| Temporary shelters erected for encampment residents (e.g., low-barrier shelters) | |
| **Social services (provided at encampments)** | |
| Outreach | |
| Medical services (planned, not emergency) | |
| Mental health services | |
| Substance use treatment | |
| Case management | |
| Housing navigation support | |
| Crisis response | |
| Other (specify) | |
| **Other community services/supports available** | |
| Lockers/day storage | |
| Information kiosks | |
| Toilets/showers | |
| Tents/sleeping pods | |
| Transportation from encampment to other services | |
| Other available support (specify) | |
| **Encampment coordination** | |
| Park/public land management | |
| Staff time for task force meetings | |
| Hotline/311 | |
| Other (specify) | |

### *Gather costs of activities from each stakeholder*

Unless your city's response to encampments is highly centralized and cost information is well documented and organized, it is likely that you will need to gather the costs of activities related to encampments from each stakeholder. There are three approaches to collect this data depending on the type of cost information available: (1) a budget approach, (2) a full-time equivalent (FTE) approach, or (3) an activity-based costing approach. The budget approach is preferable; the FTE approach and the activity-based costing approach are alternatives to this approach if budget or financial information is not available. This section describes each of these approaches.

***Budget approach***

Some stakeholders will have a budget (or a line item in the budget) or a financial report for the encampment-related activities in which they are involved. In those cases, this information is typically the best source for understanding the costs of their activities. Whether or not a stakeholder has readily available financial information will most likely depend on how focused the overall organization is on encampments. For example, a police department may have a homeless outreach team that dedicates a significant share of its efforts to those living in encampments. A budget or financial report that provides the needed cost information is likely available for the team.

On the other hand, a public works department that collects trash as needed from encampments most likely does not have a specialized team or resources specifically for encampments. One of the other cost data collection and analysis approaches is most likely needed.

Exhibits B-5 and B-6 provide a template for the budget approach to gathering cost data. Each stakeholder should have a separate spreadsheet that includes the name of the stakeholder, the name and contact information of the person providing the cost information, the source of the information (e.g., FY 2018 budget), and the dates covered by the cost information recorded. The budget or financial report may include both staff costs and the cost of materials in a single line item, in which case all costs should be reported using the template in Exhibit B-5. If the costs of materials are reported separately, then use Exhibit B-6 to capture those costs.

Using the financial information available, fill out the table, including a description of the activity, the total encampment-related spending, and the time period over which the spending occurred. Use the "total cost" column to make any needed adjustments to project or interpolate costs to cover the entire time period of the analysis. For example, if the public utility has only costs available for the past 6 months, then a reasonable estimate of costs for the entire year would probably be double that amount. As discussed above, be sure to identify during interviews whether the spending reported is typical and ongoing or whether it is a one-time or unusual cost. Any projections for future spending or necessary assumptions about past spending should be based on expenditures considered typical and ongoing.

The funding source column is needed to ensure that costs are not being double counted. For example, if a local nonprofit is responsible for outreach to residents of encampments but that activity is being funded with a contract with the city, the cost may appear in the financial reports of both the city's and the nonprofit's financial reports. It is important to count each cost only once.

The "share of activity relating to homeless residing in encampments" column is important when financial information includes other activities as well. For example, a homeless outreach team may primarily work with people in encampments but also provide services to homeless people residing elsewhere. In those cases, ask the point of contact to provide an estimate of the share of the work that is specifically related to homeless encampments.

An example entry for the budget approach is in italics in the first line of each exhibit.

**Exhibit B-5: Budget Approach to Cost Data—Labor Costs**

**Name of Program/Stakeholder:**

**Program Point of Contact (Name, Phone, Email):**

**Source of Data (e.g., FY 2018 Budget):**

**Date of Costs (e.g., FY 2018):**

**Labor Costs**

| Activity | Detailed Description of Activity | Total Encampment-Related Budget or Spending | Time Period Over Which Activities Occurred | Total Cost, Date (e.g., 2018) | Funding Source(s) | Percentage of Activity Related to Homeless Residing in Encampments | Notes |
|---|---|---|---|---|---|---|---|
| *Clearing encampments* | *Identifying, reporting, coordinating encampment response on public utility property* | *$10,000* | *2018* | *$10,000* | *Public utility* | *100%* | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | **Total** | | | **$10,000** | | | |

**Exhibit B-6: Budget Approach to Cost Data—Cost of Materials**

**Cost of Materials**

| Item | Total Expenditures | Total Cost, Date | Funding Source(s) | Notes |
|---|---|---|---|---|
| *Fencing* | *$8,000* | *$ 8,000* | *Public utility* | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | **Totals** | **$8,000** | | |

***Alternatives to the budget approach***

For stakeholders focused primarily on work unrelated to encampments, financial records such as budgets or expenditures may not be particularly informative, unless the budget for activities related to encampments appear in specific line items. As noted above, a public works department's budget is unlikely to specify costs of trash collection from encampments. In these cases, interviews with department leadership and staff members may provide the most accurate information on encampment-related costs. This information will be used with the FTE or activity-based costing approach.

### *FTE approach*

When collecting cost data for analysis using the FTE approach or the activity-based costing approach, ask stakeholders to describe all of the encampment-related activities they conduct in as much detail as possible.

The FTE approach should be used when the stakeholder knows how many FTEs are used to conduct encampment-related activities. For example, if one maintenance crew member spends half of his or her time cleaning encampments, then there are .5 FTEs dedicated to that activity. In addition to the number of FTEs, you will need to gather data on the salary and benefits of the FTEs involved. To get the total cost annual of each activity, multiply the number of FTEs by the hourly wages and benefits by 2,080 (the number of working hours in a year, assuming that activities occurred over an entire year).

Exhibit B-7 provides a template for collecting FTE-based cost data. An example entry for the FTE approach is in italics in the first line of the exhibit.

**Exhibit B-7: FTE Approach to Cost Data – Labor Costs**

**Name of Program/Stakeholder:**

**Program Point of Contact (Name, Phone, Email):**

**Date of Costs (e.g., FY 2018):**

**Labor Costs**

| Activity | Detailed Description of Activity | # FTEs | Staff Performing Activity (Name/Initials/ Staff Title) | Hourly Salary and Fringe Benefits | Time Period Over Which Activities Occurred (in years) | Total Cost, Date (# FTEs*hrly cost*time period)*2080 | Funding Source(s) | Share of Activity Related Encampments | Notes |
|---|---|---|---|---|---|---|---|---|---|
| *Clearing encampments* | *Identifying, reporting, coordinating encampment response on public utility property* | *0.1* | *Maintenance crews* | *$ 60* | *1* | *$12,480* | *Public utility* | *100%* | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | **Totals** | | | | | **$12,480** | | | |

### *Activity-based costing approach*

Using the activity-based costing approach requires a very detailed understanding of the activities being conducted by each stakeholder. In-depth interviews with each stakeholder are necessary to gather data that are as accurate as possible. This approach should be used when there is no reliable budget or other financial information available, and when the stakeholder cannot estimate the share of an FTE needed to conduct activities. As suggested by the name, this approach involves gathering details about the activities being conducted and building up a cost estimate based on those details.

Begin by asking stakeholders to describe all of the encampment-related activities they conduct in as much detail as possible. Ask stakeholders to be specific, and ask probing questions to be sure the information they report covers all of the following information:

Then, for each activity (e.g., response to encampment), ask them to estimate how often the activity occurs and what the cost is.

For example:

- Any direct costs (e.g., trash bags)
- Units of activity provided per period (e.g., two trash collections)
- Period (e.g., weekly, monthly) (e.g., two emergency responses per week)
- Staff hours needed per unit of activity (e.g., 2 hours per trash collection)
- Staff performing activity (names or initials)
- Annual FTE salary and fringe benefits of staff performing activity
- Time period over which activities occurred (e.g., calendar year 2018)

Exhibits B-8 and B-9 provide a template for collecting FTE-based cost data (labor cost in Exhibit B-8; cost of materials in Exhibit B-9). An example entry for the activity-based costing approach is in italics in the first line of the exhibits.

**Exhibit B-8: Activity-Based Costing Approach to Cost Data—Labor Costs**

**Labor Costs**

| Activity | Detailed Description of Activity | Period (e.g., weekly, monthly) | Units of Activity Provided per Period | Staff Hours Needed per Unit of Activity | Staff Performing Activity (Name/ Initials/ Staff Title) | Hourly Salary and Fringe Benefits | Time Period Over Which Activities Occurred | Total Hours (units x hrs/unit x # periods in year) | Total Cost (total hours x hrly costs) | Funding Source(s) | Share of Activity Related to Homeless Residing in Encampments | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Clearing encampments* | *Identifying, reporting, coordinating encampment response on public utility property* | *Monthly* | *1* | *10* | *Maintenance crews* | *$ 60* | *One year* | *120* | *$7,200* | *Public utility* | *100%* | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | **Total** | | | | | | | | **$7,200** | | | |

**Exhibit B-9: Activity-Based Costing Approach to Cost Data—Cost of Materials**

**Cost of Materials**

| Item | Number of Items Purchased Over the Period | Cost per Item | Period (e.g., per month, per week) | Time Period Over Which Expenditures Occurred | Total Cost, Date | Funding Source(s) | Notes |
|---|---|---|---|---|---|---|---|
| *Fencing* | *1,000 feet of fencing* | *$8/foot* | *Per year* | *2018* | *$ 8,000* | *Public utility* | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | **Total** | | | | **$8,000** | | |

### Analyze costs

With cost data collected, the final steps are to analyze the costs of your encampment response. This activity primarily involves organizing, categorizing the cost information, and determining how to present it based on the purpose of the analysis. Analysis involves the following steps:

- ***Ensure that costs cover a consistent period of time.*** Although data that cover an identical time period are preferable, stakeholders may have provided data from varying time periods. If time periods vary, cost data must be prorated or extrapolated as needed to estimate costs for the selected time period.

- ***Identify useful dimensions of analysis.*** The methods used to categorize and present the data will depend on the questions the analysis is intended to answer. If the question is only about the total amount that stakeholders in the city spent during the selected period, then analysis simply involves adding up costs from each of the stakeholders. More likely, you will also want to answer questions about how much was spent on each type of activity, who the funders were, and how much was spent by each stakeholder or type of stakeholder within the city, among other questions.

- ***Categorize costs appropriately to answer the questions the analysis is intended to address.*** Sorting costs into the appropriate category is more art than science and can be the most challenging aspect of the analysis. Categories should be defined carefully but should also be flexible enough to encapsulate multiple activities and stakeholders. A very fine-grained analysis—such as one that reports on 15 or more categories of activities—can overwhelm consumers of the information with too much detail to be absorbed. At least for an initial analysis, information should be aggregated into no more than about 10 categories.

As noted above, you may want to categorize costs in a number of different ways:

- Costs by type of implementer (e.g., police department, other city department, homeless services provider, independent authority, other).

- Costs by activity (e.g., outreach and housing navigation; homeless outreach team; substance use program; medical assistance; financial assistance; encampment clearance; encampment prevention; shelter; permanent supportive housing; other).

- Costs by funding source (e.g., city government, federal government, in-kind donation, private, independent authority, other).

- Costs by type (e.g., labor and nonlabor).

- Funding by type (e.g., cash and in-kind).

With costs organized into categories, the information can be presented to answer the questions of interest. Bar charts, pie charts, and other graphical displays can present the information in ways that consumers can easily grasp and absorb. Presentations can include total costs, costs by activity type, costs by implementing partner, funding sources for costs, and types of costs.

## References

Burnes, D., and C. Brown. *An Assessment of Adams County's Efforts to Address Homelessness.* Denver, CO: University of Denver, 2016.

Chamard, S. *Homeless Encampments*. Problem-Oriented Guides for Police. Problem-Specific Guides Series No. 56. Washington, DC: U.S. Department of Justice, Office of Community Oriented Policing Services, 2010.

City of San Francisco, Office of the Controller. "Encampment Homelessness in San Francisco: Lessons Learned at the Navigation Center," in *Perspectives from the Navigation Center,* Report No. 2, 2. San Francisco, CA: City of San Francisco, 2015. http://hsh.sfgov.org/wp-content/uploads/2016/06/Perspectives-from-the-Navigation-Center-Report-2.pdf.

Cohen, R., W. Yetvin, and J. Khadduri. *Understanding Encampments of People Experiencing Homelessness and Community Responses: Emerging Evidence as of Late 2018.* Washington, DC: U.S. Department of Housing and Urban Development (HUD), January 2019.

Donley, A., and J. Wright. "Safer Outside: A Qualitative Exploration of Homeless People's Resistance to Homeless Shelters." *Journal of Forensic Psychology Practice* 12, no. 4 (2012): 288–306. doi:10.1080/15228932.2012.695645.

Herring, C., and M. Lutz. The Roots and Implications of the USA's Homeless Tent Cities. *City* 19, no. 5 (2015): 689–701. doi:10.1080/13604813.2015.1071114.

Lutz, M. "Uncommon Claims to the Commons: Homeless Tent Cities in the US." In *Urban Commons: Moving Beyond State and Market,* edited by M. Dellenbaugh, M. Kip, M. Bieniok, A. Müller, and M. Schwegmann, 101–116. Basel, Switzerland: Birkhäuser, 2015. doi:10.1515/9783038214953.

Metraux, S., M. Cusack, F. Graham, D. Metzger, and D. Culhane. *An Evaluation of the City of Philadelphia's Kensington Encampment Resolution Pilot.* Philadelphia: City of Philadelphia, 2019. https://www.phila.gov/documents/an-evaluation-of-the-citys-kensington-encampment-resolution-pilot/.

National Academies of Sciences, Engineering, and Medicine. *Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness*. Washington, DC: National Academy of Sciences, 2018. https://doi.org/10.17226/25133.

National Coalition for the Homeless. *Swept Away: Reporting on the Encampment Closure Crisis.* Washington, DC: Author, 2016.

National Law Center on Homelessness and Poverty. *Welcome Home: The Rise of Tent Cities in the United States.* Washington, DC: Author, 2014.

Shinn, M., and J. Khadduri. *In the Midst of Plenty: Homelessness and What To Do About It.* Wiley Contemporary Social Issues Series. Hoboken, NJ: John Wiley and Sons, 2020.

Sparks, T. Citizens Without Property: Informality and Political Agency in a Seattle, Washington Homeless Encampment. *Environment and Planning* 49, no. 1 (2017): 86–103. doi:10.1177/0308518X16665360.

Speer, J. "'It's Not Like Your Home': Homeless Encampments, Housing Projects, and the Struggle over Domestic Space." *Antipode* 49, no. 2 (2017): 517–35. doi:10.1111/anti.12275.

———. The Rise of the Tent Ward: Homeless Camps in the Era of Mass Incarceration. *Political Geography* 62 (2018): 160–69. doi:10.1016/j.polgeo.2017.11.005.

U.S. Department of Housing and Urban Development
Office of Policy Development and Research
Washington, DC 20410-6000

January 2021









# Family Options Study

## 3-Year Impacts of Housing and Services Interventions for Homeless Families

PD&R

U.S. Department of Housing and Urban Development | Office of Policy Development and Research

# Family Options Study

## 3-Year Impacts of Housing and Services Interventions for Homeless Families

*Prepared for*
U.S. Department of Housing and Urban Development
Office of Policy Development and Research

*Prepared by*
Daniel Gubits
Marybeth Shinn
Michelle Wood
Stephen Bell
Samuel Dastrup
Claudia D. Solari
Scott R. Brown
Debi McInnis
Tom McCall
Utsav Kattel

*Project quality advisors*
Jill Khadduri
Jacob Klerman

Abt Associates, Inc.
*In partnership with*
Vanderbilt University

October 2016

# ACKNOWLEDGMENTS

The authors of this report gratefully acknowledge the efforts of many individuals who have assisted in carrying out the Family Options Study since it began in 2008. They particularly thank the Government Technical Representative (GTR), Anne Fletcher, for her unwavering guidance and support throughout all phases of the research. Other staff members at the U.S. Department of Housing and Urban Development (HUD), Office of Policy Development and Research (PD&R) have provided valuable guidance and technical oversight for the study. In particular, the authors thank Paul Dornan, the study's former GTR, for his substantial input into the study's design and specification of study interventions. HUD's Office of Special Needs Assistance Programs has been an active partner in the design and implementation of the Family Options Study, and the study team is grateful for that office's guidance and support in developing the study design and implementation plan. In addition, the authors thank Lynn Rodgers of PD&R for her assistance with acquiring HUD Public and Indian Housing Information Center (PIC) and Tenant Rental Assistance Certification System (TRACS) data.

The authors also give special thanks to the families participating in the Family Options Study, who have continued to share their experiences and open their lives to the study team.

The Family Options Study has benefited from the contributions of a number of technical experts. The study design reflects guidance from experts in random assignment methodology and from subject matter experts knowledgeable about and close to the operational realities of the homeless assistance services delivery system. The authors are especially grateful to Ellen Bassuk (Center for Social Innovation), Martha Burt (independent consultant), Dennis Culhane (University of Pennsylvania), Larry Orr (Johns Hopkins University), and Beth Weitzman (New York University) for their help in designing the study interventions and the research approach.

Stephen Bell (Abt Associates) and Marybeth Shinn (Vanderbilt University) are the study's Co-Principal Investigators, Michelle Wood (Abt Associates) is the Project Director, and Daniel Gubits (Abt Associates) is the study's Director of Analysis.

Implementing the study design required the efforts of a large team to recruit sites, develop site-specific implementation plans, and conduct random assignment. Brooke Spellman (Abt Associates) led the site recruitment and implementation activities, with contributions from site research liaisons Burt, Culhane, Shinn, Donald Chamberlin (independent consultant), Wendy Vaulton (formerly with the Center for Social Innovation), Matt White (Abt Associates), and Suzanne Zerger (formerly with the Center for Social Innovation). Satyendra Patrabansh (formerly with Abt Associates) designed the complex random assignment algorithm used to assign families, and Sage Computing developed the randomization software. Scott Brown (Vanderbilt University), Lauren Dunton, Nichole Fiore, and Meghan Henry (Abt Associates) monitored random assignment, collecting updates about the availability of intervention slots and the status of families enrolled in each intervention.

The Family Options Study involved an extensive field data-collection effort to collect information directly from study participants at several junctures. Abt SRBI led the participant data-collection activities under the direction of Ricki Jarmon and Brenda Rodriquez, the study's survey director. Ashley Bradbury and Brianna Roche (Abt SRBI) and Debi McInnis (Abt Associates) also played key roles in coordinating and monitoring data-collection activities. Kathy Gill and Lynn Reneau (Abt SRBI) served as survey field managers and oversaw the 17 field interviewers working in the study sites.

Samuel Dastrup (Abt Associates) led the cost data-collection efforts, assisted by Scott Brown, Burt, Dunton, Fiore, Katherine Buck (Abt Associates), and Galen Savidge (Abt Associates). Dunton and Claudia Solari (Abt Associates) managed the collection and analysis of Homeless Management Information System (HMIS) data from the 12 study sites, and Steven Brown (formerly with Abt Associates) coordinated analysis of HUD administrative data from PIC and TRACS.

Under the direction of Gubits, Scott Brown (Vanderbilt University), Tom McCall, Utsav Kattel, Nancy McGarry, and Don Laliberty (Abt Associates) played key roles in estimating impacts using survey and administrative data.

The study's Co-Project Quality Advisors, Jill Khadduri and Jacob Klerman (Abt Associates), provided technical guidance throughout all phases of the project and thoughtful and constructive comments on this report. Missy Robinson (Abt Associates) did an excellent job producing this complex document.

The study would not be possible without the enthusiasm and dedication of local service providers, Continuum of Care (CoC) leaders, and public housing agencies in the 12 participating communities: (1) Alameda County, California; (2) Atlanta, Georgia; (3) Baltimore, Maryland; (4) Boston, Massachusetts; (5) the New Haven and Bridgeport regions of Connecticut; (6) Denver, Colorado; (7) Honolulu, Hawaii; (8) Kansas City, Missouri; (9) Louisville, Kentucky; (10) Minneapolis, Minnesota; (11) Phoenix, Arizona; and (12) Salt Lake City, Utah. The study team is grateful for their many contributions and continued commitment to the study. The study team also thanks the HMIS administrators in each of the CoCs for providing HMIS data for participating families.

A grant to Vanderbilt University by the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development supported child data collection and analysis for this study.

## DISCLAIMER

The contents of this report are the views of the contractor and do not necessarily reflect the views or policies of the U.S. Department of Housing and Urban Development or the U.S. government.

# FOREWORD

The 2010 release of *Opening Doors: Federal Strategic Plan To Prevent and End Homelessness* established an ambitious goal to end homelessness among children, families, and youth by 2020. Until now, the U.S. Department of Housing and Urban Development (HUD) has had little empirical evidence to guide its policy and program decisions toward achieving this goal.

This report is the culmination of an 8-year research effort. Launched in 2008, HUD's Family Options Study represents, to date, the most rigorously designed experimental study to determine the effectiveness and relative costs of different interventions that communities may implement to assist families experiencing homelessness—long term housing subsidy, project-based transitional housing, community-based rapid re-housing, and usual care. More than 2,200 homeless families, including more than 5,000 children, in 12 communities were randomly assigned to one of these four interventions. The families were tracked for 3 years and were extensively interviewed at baseline, 20 months after random assignment, and again at 37 months after random assignment to assess outcomes related to housing stability, family preservation, adult well-being, child well-being, and self-sufficiency.

HUD released the short-term outcomes report in July 2015, documenting the outcomes of families 20 months after random assignment and presenting striking evidence of the power of offering a long-term subsidy, such as a voucher, to a homeless family in domains that extended far beyond housing stability. This current report, which documents outcomes of families 37 months after random assignment, amplifies the remarkable short-term findings, demonstrating once again the power of a long-term housing subsidy in conveying significantly improved housing outcomes to formerly homeless families. We also continue to see the radiating benefits to families of stable housing that were observed in the short-term outcomes, such as reductions in adult psychological distress, experiences of intimate partner violence, school mobility among children, food insecurity, and sleep and behavior problems in children. Offering a homeless family a voucher cost roughly $4,000 more than leaving families to find their own way out of shelter over the full 3-year followup period—a modest investment to achieve substantially better outcomes for both parents and children. Among the crisis interventions studied- including rapid re-housing, transitional housing, and emergency shelter—housing stability and other outcomes for families were relatively similar, but, as it was in the short-term study findings, rapid re-housing was the least costly intervention for communities to implement over the full 3-year followup period.

The study findings, in both the short and long terms, provide clear evidence that, when long-term housing assistance is offered to families experiencing homelessness, families are able to both obtain and sustain stable housing and that this housing assistance can have a powerful impact on improving the lives of poor families and children.

Katherine O'Regan

Katherine M. O'Regan
*Assistant Secretary for Policy Development & Research*
*U.S. Department of Housing and Urban Development*

# TABLE OF CONTENTS

List of Abbreviations and Acronyms ............................... xv

Executive Summary ....................................................... xvi

- Study Interventions ................................................ xvi
- Random Assignment Design .................................. xvii
- Meaning of Intention-to-Treat (ITT) Impact Estimates ....................................................... xviii
- Data Sources ........................................................... xix
- Hypothesized Effects of the Interventions ................. xx
  - Conceptual Framework for the SUB and CBRR Interventions ............................................. xx
  - Hypotheses for Comparisons Involving the SUB and CBRR Interventions and Usual Care ........................................................... xx
  - Conceptual Framework for the PBTH Intervention ............................................... xxi
  - Hypotheses for Comparisons Involving the PBTH Intervention .................................... xxi
- Baseline Characteristics of the Study Sample .......... xxii
- Intervention Eligibility Screening and Family Decisions ........................................................ xxii
- Study Findings Over the 3-Year Followup Period .... xxii
  - Usual Care Group During the Followup Period ..................................................... xxiii
  - Program Use for Pairwise Comparisons ........... xxiv
  - Impact Estimates for Pairwise Comparisons .... xxvii
  - Do Certain Interventions Work Better When Offered to Families Facing Greater Difficulties? .............................................. xxx
  - Intervention Costs .......................................... xxx
- Conclusions ......................................................... xxxiii

Chapter 1. Introduction .................................................... 1

- 1.1. The Research Sample ......................................... 1
- 1.2. Interventions Studied and Rationales .................. 3
- 1.3. Evaluation Design ............................................... 4
- 1.4. Findings From the Enrollment Phase ................... 6
- 1.5. Short-Term Findings (20 Months After Enrollment) .6
- 1.6. Questions for the 3-Year Analysis ....................... 7
- 1.7. Organization of the Report .................................. 8

Chapter 2. Description of Usual Care (UC) and Outcomes Measured in the Study. ............................... 9

- 2.1. The Emergency Shelter Experience of Usual Care (UC) Families ............................................ 9
  - 2.1.1. Length of Time UC Families Spent in Emergency Shelters ................................ 9
- 2.2. Use of Other Homeless and Housing Assistance Programs by Usual Care (UC) Families...... 11
- 2.3. Outcomes for Families Randomly Assigned to Usual Care (UC) ............................................... 13
  - 2.3.1. Measures of Housing Stability ............... 13
  - 2.3.2. Housing Stability of the UC Group ....... 14
  - 2.3.3. Measures of Family Preservation ........... 16
  - 2.3.4. Family Preservation in the UC Group .... 17
  - 2.3.5. Measures of Adult Well-Being ................ 18
  - 2.3.6. Adult Well-Being in the UC Group ........ 18
  - 2.3.7. Measures of Child Well-Being .............. 19
  - 2.3.8. Characteristics of Focal Children in the UC Group ....................................... 21
  - 2.3.9. Characteristics of Focal Children by Age-Specific Outcomes in the UC Group .. 23
  - 2.3.10. Measures of Self-Sufficiency ................. 25
  - 2.3.11. Self-Sufficiency Indicators for the UC Group .................................................. 27
- 2.4. Summary ........................................................... 29

Chapter 3. Impacts of Permanent Housing Subsidy (SUB) Compared With Usual Care (UC) ................... 30

- 3.1. Permanent Housing Subsidy (SUB) Intervention .. 30
- 3.2. Program Use by Families in the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison ............................................... 31
- 3.3. Impacts on Housing Stability in the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison ............................................... 35
- 3.4. Impacts on Family Preservation in the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison ........................... 39
- 3.5. Impacts on Adult Well-Being in the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison ............................................... 40

3.6. Impacts on Child Well-Being in the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison ... 40
3.7. Impacts on Self-Sufficiency in the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison ... 41
3.8. Summary of the Permanent Housing Subsidy (SUB) Versus Usual Care (UC) Comparison Across Domains ... 45

Chapter 4. Impacts of Community-Based Rapid Re-Housing (CBRR) Compared With Usual Care (UC) ... 47
4.1. Community-Based Rapid Re-Housing (CBRR) Intervention ... 47
4.2. Program Use by Families in the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison ... 48
4.3. Impacts on Housing Stability in the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison ... 52
4.4. Impacts on Family Preservation in the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison ... 54
4.5. Impacts on Adult Well-Being in the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison ... 55
4.6. Impacts on Child Well-Being in the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison ... 56
4.7. Impacts on Self-Sufficiency in the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison ... 56
4.8. Summary of the Community-Based Rapid Re-Housing (CBRR) Versus Usual Care (UC) Comparison Across Domains ... 59

Chapter 5. Impacts of Project-Based Transitional Housing (PBTH) Compared With Usual Care (UC) ... 60
5.1. Project-Based Transitional Housing (PBTH) Intervention ... 60
5.2. Program Use by Families in the Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison ... 61
5.3. Impacts on Housing Stability in the Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison ... 65
5.4. Impacts on Family Preservation in the Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison ... 66
5.5. Impacts on Adult Well-Being in the Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison ... 68
5.6. Impacts on Child Well-Being in the Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison ... 69
5.7. Impacts on Self-Sufficiency in the Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison ... 69
5.8. Summary of Project-Based Transitional Housing (PBTH) Versus Usual Care (UC) Comparison Across Domains ... 72

Chapter 6. Impacts of Permanent Housing Subsidy (SUB) Compared With Community-Based Rapid Re-Housing (CBRR), SUB Compared With Project-Based Transitional Housing (PBTH), and CBRR Compared With PBTH ... 73
6.1. Analysis Samples for Pairwise Comparisons ... 73
6.2. The Permanent Housing Subsidy (SUB) Versus Community-Based Rapid Re-Housing (CBRR) Comparison ... 74
6.2.1. Program Use by Families in the SUB-Versus-CBRR Comparison ... 74
6.2.2. Impacts of the SUB Intervention Compared With the CBRR Intervention ... 75
6.3. The Permanent Housing Subsidy (SUB) Versus Project-Based Transitional Housing (PBTH) Comparison ... 82
6.3.1. Program Use by Families in the SUB-Versus-PBTH Comparison ... 82
6.3.2. Impacts of the SUB Intervention Compared With the PBTH Intervention ... 83
6.4. The Community-Based Rapid Re-Housing (CBRR) Versus Project-Based Transitional Housing (PBTH) Comparison ... 90
6.4.1. Program Use by Families in the CBRR-Versus-PBTH Comparison ... 91
6.4.2. Impacts of the CBRR Intervention Compared With the PBTH Intervention ... 92

Chapter 7. Impacts of Pooled Comparisons ... 98

Chapter 8. Do Certain Interventions Work Better When Offered to Families Who Face Greater Difficulties? .... 99
8.1. Descriptive Results for Psychosocial Challenges and Housing Barriers .... 100
8.2. Differential Impacts Depending on Psychosocial Challenges .... 101
8.2.1. SUB Versus UC .... 101
8.2.2. CBRR Versus UC .... 101
8.2.3. PBTH Versus UC .... 101
8.2.4. SUB Versus CBRR .... 101
8.2.5. SUB Versus PBTH .... 103
8.2.6. CBRR Versus PBTH .... 103
8.3. Differential Impacts Depending on Housing Barriers .... 104
8.3.1. SUB Versus UC .... 104
8.3.2. CBRR Versus UC .... 104
8.3.3. PBTH Versus UC .... 104
8.3.4. SUB Versus CBRR .... 104
8.3.5. SUB Versus PBTH .... 104
8.3.6. CBRR Versus PBTH .... 106
8.4. Summary .... 106

Chapter 9. Intervention Costs .... 107
9.1. Introduction and Review of Methodology .... 107
9.1.1. Cost Data-Collection and Analysis Methodology .... 109
9.2. Per-Family Monthly Costs .... 111
9.3. Cost of All Program Use During the Followup Period by Families Assigned to Each Intervention .... 113
9.4. Monthly Cost of All Program Use at the Time of the Followup Survey by Families Assigned to Each Intervention .... 115

Chapter 10. Conclusions .... 118
10.1. Questions Addressed in the 3-Year Analysis .... 118
10.2. Meaning of Intention-to-Treat Impact Estimates .... 119
10.3. Usual Care (UC) .... 121
10.4. Permanent Housing Subsidy (SUB) .... 122
10.5. Community-Based Rapid Re-housing (CBRR) .... 123
10.6. Project-Based Transitional Housing (PBTH) .... 124
10.7. Impacts by Level of Family Challenge .... 125
10.8. Implications for Theory .... 125
10.9. Summary of Findings and Implications for Policy .... 125

Chapter 11. References .... 127

Chapter 12. Additional reading .... 130

Appendix A. Data Sources and Data Set Construction .... A1
A.1. Random Assignment Data .... A2
Family Options Study Sample .... A2
Eligibility Determination .... A3
A.2. Baseline Data Collection .... A3
A.3. Enrollment Verification Data .... A4
A.4. 6-, 12-, and 27-Month Tracking Surveys .... A4
A.5. 20- and 37-Month Followup Adult Surveys .... A4
A.6. Focal Child Selection .... A5
Focal Child Selection .... A5
Focal Children Sample Sizes .... A6
Parent-on-Child Module in the 37-Month Adult Survey .... A9
A.7. 20- and 37-Month Followup Child Surveys .... A9
A.8. 20- and 37-Month Followup Child Assessments .... A9
A.9. 20- and 37-Month Followup HOME Inventories .... A9
A.10. Qualitative Surveys .... A10
A.11. Additional Details About Surveys and Data Collection .... A10
Implementation of 37-Month Data Collection .... A10
Efforts To Improve Response Rates .... A11
Incentives .... A11
Completion Rates .... A11
A.12. Administrative Data .... A13
HMIS Data .... A13
PIC and TRACS Data Files .... A14
NDNH Data .... A15
Child Welfare Agency Administrative Data .... A16
A.13. Program Usage Data File .... A16

Appendix B. Construction of Outcomes .... B1
B.1. Measures of Housing Stability .... B1
B.2. Measures of Family Preservation .... B2

B.3. Measures of Adult Well-Being .......................... B3
B.4. Measures of Child Well-Being .......................... B6
Child Outcomes Across All Age Groups ............ B6
Behavioral Strengths and Challenges ................. B6
Child Outcomes for Specific Age Groups........... B8
B.5. Measures of Self-Sufficiency .......................... B12
B.6. Measures of Earnings and Employment From NDNH Data..................................................... B15
Data Cleaning and Processing.......................... B15
Defining Outcomes.......................................... B15
B.7. Measures of Formal Child Separations From Child Welfare Agency Records ....................... B16
B.8. Program Use Outcomes.................................. B16

Appendix C. Analysis Methods........................................ C1
C.1. Methodology.................................................... C1
Pooled Comparisons ........................................ C1
Impact Estimation Model for Family and Adult Outcomes ................................................ C2
Impact Estimation Model for Child Well-Being Outcomes ................................................ C3
Impact Estimation Model for Moderator Analysis ................................................ C3
C.2. Covariates ........................................................ C3
Continuous Variables....................................... C4
Binary Variables............................................... C4
Binary Variables for Child Outcomes Only ....... C5
Additional Covariates for Pooled Comparisons and Selected Outcomes ............................ C5
C.3. Missing Data and Imputations.......................... C5
C.4. Family/Adult Weights ...................................... C5
C.5. Child Weights.................................................. C6
C.6. Partial Paired *t*-Test for Differences in Means Between Followup Waves................................ C7
C.7. Multiple Comparisons Adjustment for Confirmatory Hypothesis Tests.................................. C7
Statement of the Problem ................................. C7
Study Response to the Problem ........................ C8
Implementing the Multiple Comparisons Procedure ................................................ C8

Appendix D. Analysis of 37-Month Survey Nonresponse ... D1
D.1. Introduction ................................................... D1
Balance in Impact Comparison Groups After Nonresponse ............................................ D1
Respondents Versus Nonrespondents .............. D1
Overview of Findings...................................... D1
D.2. Balance in Impact Comparison Groups After Nonresponse ................................................ D2
Survey Nonresponse........................................ D2
Equivalence at Baseline of Analysis Sample by Impact Comparison .................................. D2
D.3. Respondents Versus Nonrespondents ............ D14
Do Respondents Differ From Nonrespondents on Baseline Characteristics? ..................... D14
Unweighted Impact Estimates........................ D29

Appendix E. Impacts on Use of Transitional Housing ....... E1

Appendix F. Impact Estimates for Pooled Comparisons ... F1

Appendix G. Intervention Costs—Methodology, Sites, and Programs ......................................................... G1
G.1. Programs in the Cost Study ............................ G1
G.2. Elements of Program-Level per-Family Monthly Program Cost................................................. G2
In-Kind and Partner Costs .............................. G3
Capital Costs ................................................. G4
Participant Contributions ............................... G4
G.3. Costs of SUB Intervention ............................... G5
G.4. Calculating Costs ............................................ G5
Per-Family Monthly Program Cost.................. G6
Cost of All Program Use During the Followup Period........................................................ G6
Cost of All Program Use at the Time of the Followup Survey ....................................... G6

Appendix H. Supplemental Analyses ............................. H1

Appendix I. Length of Baseline Stay in Emergency Shelter... I1

## List of Exhibits

Exhibit ES-1. Six Pairwise Comparisons Among the Four Interventions .... xvii
Exhibit ES-2. Total Number of Families Assigned to Each Intervention and Number of Followup Survey Respondents .... xviii
Exhibit ES-3. Data Sources Used in the Analysis of 3-Year Impacts .... xix
Exhibit ES-4. Program Use of UC Families for 32 Months After RA .... xxiii
Exhibit ES-5. SUB, CBRR, and PBTH: Program Use for 32 Months After RA .... xxiv
Exhibit ES-6. Program Use Since RA for All Pairwise Impact Comparisons .... xxvi
Exhibit ES-7. Summary of Impacts for Six Policy Comparisons .... xxviii
Exhibit ES-8. Cost of Program Use Since RA for Each Intervention Contrast .... xxxii
Exhibit 1-1. Location of Study Sites .... 2
Exhibit 1-2. Family Characteristics .... 3
Exhibit 1-3. Six Pairwise Comparisons Among the Four Interventions .... 5
Exhibit 2-1. Length of Time Spent in Emergency Shelters by UC Families .... 10
Exhibit 2-2. Percent of UC Families With at Least 1-Night Stay in Emergency Shelter During Month, by Number of Months After RA .... 10
Exhibit 2-3. Program Use Since RA for UC Families .... 11
Exhibit 2-4. Program Use of UC Families for 32 Months After RA .... 12
Exhibit 2-5. Housing Stability Outcomes for UC Families .... 15
Exhibit 2-6. Homeless, Doubled Up, and Living in Own Place in the UC Group at 20 and 37 Months After RA .... 16
Exhibit 2-7. Family Preservation Outcomes in the UC Group .... 17
Exhibit 2-8. Child Welfare Outcomes in the UC Group .... 18
Exhibit 2-9. Adult Well-Being Outcomes in the UC Group .... 19
Exhibit 2-10. Child Well-Being Outcomes in the UC Group Measured for Children Across Age Groups .... 21
Exhibit 2-11. Child Well-Being Developmental Outcomes in the UC Group for Children in Specific Age Groups .... 24
Exhibit 2-12. Self-Sufficiency Outcomes in the UC Group .... 28
Exhibit 2-13. Work for Pay at 20 and 37 Months After RA in the UC Group .... 29
Exhibit 2-14. Earnings and Employment in the UC Group .... 29
Exhibit 3-1. Subsidy Type Provided by Site .... 31
Exhibit 3-2. SUB Versus UC: Program Use Since RA .... 32
Exhibit 3-3. Number of Months of Subsidy Receipt During Followup Period by SUB Families Who Ever Used Offered Permanent Subsidy .... 33
Exhibit 3-4. SUB Versus UC: Program Use in Each Month of Followup Period .... 34
Exhibit 3-5. SUB Versus UC: Impacts on Housing Stability at 37 Months .... 36
Exhibit 3-6. SUB Versus UC: Percent of Families With Any Stay in Emergency Shelter and Any Permanent Housing Subsidy During Month, by Month After RA .... 38
Exhibit 3-7. SUB Versus UC: Impacts on Family Preservation at 37 Months .... 39
Exhibit 3-8. SUB Versus UC: Impacts on Child Welfare Outcomes .... 39
Exhibit 3-9. SUB Versus UC: Impacts on Adult Well-Being at 37 Months .... 40
Exhibit 3-10. SUB Versus UC: Impacts on Child Well-Being Across Age Groups at 37 Months .... 41
Exhibit 3-11. SUB Versus UC: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .... 42
Exhibit 3-12. SUB Versus UC: Impacts on Self-Sufficiency at 37 Months .... 43
Exhibit 3-13. SUB Versus UC: Earnings and Employment .... 44

Exhibit 4-1. CBRR Versus UC: Program Use Since RA ........49
Exhibit 4-2. Number of Months of Rapid Re-Housing Receipt During Followup Period by CBRR Families Who Ever Used Rapid Re-housing.....50
Exhibit 4-3. CBRR Versus UC: Program Use in Each Month of Followup Period ..............................51
Exhibit 4-4. CBRR Versus UC: Impacts on Housing Stability at 37 Months ......................................52
Exhibit 4-5. CBRR Versus UC: Percent of Families With Any Stay in Emergency Shelter and Any Permanent Housing Subsidy During Month, by Number of Months After RA.......................53
Exhibit 4-6. CBRR Versus UC: Impacts on Family Preservation at 37 Months ..............................54
Exhibit 4-7. CBRR Versus UC: Impacts on Child Welfare Outcomes.........................................................54
Exhibit 4-8. CBRR Versus UC: Impacts on Adult Well-Being at 37 Months.................................55
Exhibit 4-9. CBRR Versus UC: Impacts on Child Well-Being Across Age Groups at 37 Months ..56
Exhibit 4-10. CBRR Versus UC: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .................................57
Exhibit 4-11. CBRR Versus UC: Impacts on Self-Sufficiency at 37 Months...................................................58
Exhibit 4-12. CBRR Versus UC: Earnings and Employment ..58
Exhibit 5-1. PBTH Versus UC: Program Use Since RA ........62
Exhibit 5-2. Number of Months of Transitional Housing Receipt During Followup Period by PBTH Families Who Ever Used TH ..........................63
Exhibit 5-3. PBTH Versus UC: Program Use in Each Month of Followup Period .............................64
Exhibit 5-4. PBTH Versus UC: Impacts on Housing Stability at 37 Months ....................................66
Exhibit 5-5. PBTH Versus UC: Percent of Families With Any Stay in Emergency Shelter and Any Permanent Housing Subsidy During Month, by Number of Months after RA.......................67
Exhibit 5-6. PBTH Versus UC: Impacts on Family Preservation at 37 Months .............................67
Exhibit 5-7. PBTH Versus UC: Impacts on Child Welfare Outcomes.........................................................68
Exhibit 5-8. PBTH Versus UC: Impacts on Adult Well-Being at 37 Months.................................68
Exhibit 5-9. PBTH Versus UC: Impacts on Child Well-Being Across Age Groups at 37 Months ..69
Exhibit 5-10. PBTH Versus UC: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .................................70
Exhibit 5-11. PBTH Versus UC: Impacts on Self-Sufficiency at 37 Months ..................................................71
Exhibit 5-12. PBTH Versus UC: Earnings and Employment ..71
Exhibit 6-1. Sample Sizes in the Six Pairwise Comparisons...74
Exhibit 6-2. SUB Versus CBRR: Program Use Since RA .......75
Exhibit 6-3. SUB Versus CBRR: Impacts on Housing Stability at 37 Months ....................................76
Exhibit 6-4. SUB Versus CBRR: Impacts on Family Preservation at 37 Months ...............................77
Exhibit 6-5. SUB Versus CBRR: Impacts on Child Welfare Outcomes..........................................77
Exhibit 6-6. SUB Versus CBRR: Impacts on Adult Well-Being at 37 Months.................................78
Exhibit 6-7. SUB Versus CBRR: Impacts on Child Well-Being Across Age Groups at 37 Months ..79
Exhibit 6-8. SUB Versus CBRR: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 months ................................80
Exhibit 6-9. SUB Versus CBRR: Impacts on Self-Sufficiency at 37 Months ................................81
Exhibit 6-10. SUB Versus CBRR: Earnings and Employment ..81
Exhibit 6-11. SUB Versus PBTH: Program Use Since RA .......83
Exhibit 6-12. SUB Versus PBTH: Impacts on Housing Stability at 37 Months ....................................84
Exhibit 6-13. SUB Versus PBTH: Impacts on Family Preservation at 37 Months ...............................85
Exhibit 6-14. SUB Versus PBTH: Impacts on Child Welfare Outcomes..........................................86
Exhibit 6-15. SUB Versus PBTH: Impacts on Adult Well-Being 37 Months....................................86
Exhibit 6-16. SUB Versus PBTH: Impacts on Child Well-Being Across Age Groups at 37 Months ..87

Exhibit 6-17. SUB Versus PBTH: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months ....88

Exhibit 6-18. SUB Versus PBTH: Impacts on Self-Sufficiency at 37 Months ....89

Exhibit 6-19. SUB Versus PBTH: Earnings and Employment ..89

Exhibit 6-20. CBRR Versus PBTH: Program Use Since RA.....91

Exhibit 6-21. CBRR Versus PBTH: Impacts on Housing Stability at 37 Months ....92

Exhibit 6-22. CBRR Versus PBTH: Impacts on Family Preservation at 37 Months ....93

Exhibit 6-23. CBRR Versus PBTH: Impacts on Child Welfare Outcomes....93

Exhibit 6-24. CBRR Versus PBTH: Impacts on Adult Well-Being at 37 Months....94

Exhibit 6-25. CBRR Versus PBTH: Impacts on Child Well-Being Across Age Groups at 37 Months ..95

Exhibit 6-26. CBRR Versus PBTH: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months ....96

Exhibit 6-27. CBRR Versus PBTH: Impacts on Self-Sufficiency at 37 Months ....97

Exhibit 6-28. CBRR Versus PBTH: Earnings and Employment....97

Exhibit 7-1. Sample Sizes in the Four Pooled Comparisons..98

Exhibit 8-1. Percentage of Adult Respondents Reporting Psychosocial Challenges at the Time of Study Enrollment (for families interviewed at 37 months)....100

Exhibit 8-2. Percentage of Adult Respondents Reporting That a Condition Was a Big or Small Problem in Finding a Place To Live at the Time of Study Enrollment (for families interviewed at 37 months)....100

Exhibit 8-3. Impacts at 37 Months Moderated by Baseline Psychosocial Challenges Index.........102

Exhibit 8-4. Impacts at 37 Months Moderated by Baseline Housing Barriers Index ....105

Exhibit 9-1. Programs Included in the Estimates of Monthly Costs....109

Exhibit 9-2. Average Per-Family Monthly Cost of Supportive Services and Housing or Shelter Across Program Types....111

Exhibit 9-3. Summary Statistics of Per-Family Monthly Program Cost by Program Type....112

Exhibit 9-4. Comparison of Cost Summary Statistics Across Program Types....113

Exhibit 9-5. Cost of Program Use Since RA for Each Intervention Contrast ....114

Exhibit 9-6. Average Per-Family Monthly Costs for Program Use at Time of the Followup Survey, by Comparison ....116

Exhibit 10-1. Summary of Statistically Significant Impact Results by Policy Comparison: Executive Summary Outcomes 37 Months After RA ......120

Exhibit A-1. Data Sources Used in the Study ....A1

Exhibit A-2. Sample Enrollment Period and Number of Families Enrolled by Intervention and Site ......A3

Exhibit A-3. Length of Time From Random Assignment to the 37-Month Followup Survey....A5

Exhibit A-4. Focal Child Sample Distribution, by Site and Intervention Group at 37 Months....A7

Exhibit A-5. Overall Family Options Study Survey Completion Rates ....A12

Exhibit A-6. Survey Response Status for Family Options Study Baseline and Followup Surveys....A12

Exhibit A-7. Total Number of Families Assigned to Each Intervention and Number of Followup Survey Respondents ....A12

Exhibit A-8. Survey Response Status for Family Options Study Baseline, Followup, and Tracking Surveys....A13

Exhibit A-9. HMIS Participation Rates for Emergency Shelter and Transitional Housing Providers in the Study Sites, 2011....A14

Exhibit A-10. HMIS Match Rates With the Family Options Sample by Site Through 37 Months....A14

Exhibit A-11. Sample Families in PIC/TRACS Data and Those Assigned to the SUB Intervention in PIC/TRACS Data by Site Through 37 Months...A15

Exhibit A-12. Program Types and Their Data Sources in the Program Usage Data ....A17

Exhibit A-13. Data Source Reliability by Program Use Data Item....A17

Exhibit B-1. Children's Completion Rates at 37 Months for WJ III Letter-Word Identification and Applied Problems Tests .......... B9

Exhibit C-1. Confirmatory Hypothesis Tests in 37-Month Analysis .......... C9

Exhibit D-1. Survey Nonresponse Incidence by Impact Comparison—37-Month Adult Survey .......... D2

Exhibit D-2. Characteristics Examined in Baseline Equivalency Testing .......... D3

Exhibit D-3. Summary of Equivalence Testing in Impact Comparisons, 37-Month Adult Survey .......... D3

Exhibit D-4. Equivalence at Baseline of Analysis Sample for SUB Versus UC Impact Comparison, 37-Month Adult Survey .......... D4

Exhibit D-5. Equivalence at Baseline of Analysis Sample for CBRR Versus UC Impact Comparison, 37-Month Adult Survey .......... D5

Exhibit D-6. Equivalence at Baseline of Analysis Sample for PBTH Versus UC Impact Comparison, 37-Month Adult Survey .......... D6

Exhibit D-7. Equivalence at Baseline of Analysis Sample for SUB Versus CBRR Impact Comparison, 37-Month Adult Survey .......... D7

Exhibit D-8. Equivalence at Baseline of Analysis Sample for SUB Versus PBTH Impact Comparison, 37-Month Adult Survey .......... D8

Exhibit D-9. Equivalence at Baseline of Analysis Sample for CBRR Versus PBTH Impact Comparison, 37-Month Adult Survey .......... D9

Exhibit D-10. Equivalence at Baseline of Analysis Sample for SUB + CBRR + PBTH Versus UC Impact Comparison, 37-Month Adult Survey .......... D10

Exhibit D-11. Equivalence at Baseline of Analysis Sample for SUB + PBTH Versus CBRR Impact Comparison, 37-Month Adult Survey .......... D11

Exhibit D-12. Equivalence at Baseline of Analysis Sample for SUB + CBRR Versus PBTH Impact Comparison, 37-Month Adult Survey .......... D12

Exhibit D-13. Equivalence at Baseline of Analysis Sample for CBRR + PBTH Versus SUB Impact Comparison, 37-Month Adult Survey .......... D13

Exhibit D-14. Summary of Equivalence Testing of 37-Month Respondents Versus Non-respondents, by Assigned Intervention .......... D14

Exhibit D-15. Summary of Baseline Equivalence Testing of 37-Month Respondents Versus Non-respondents, by Impact Comparison .......... D14

Exhibit D-16. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB, 37-Month Adult Survey .......... D15

Exhibit D-17. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for CBRR, 37-Month Adult Survey .......... D16

Exhibit D-18. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for PBTH, 37-Month Adult Survey .......... D17

Exhibit D-19. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for UC, 37-Month Adult Survey .......... D18

Exhibit D-20. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB Versus UC Impact Comparison, 37-Month Adult Survey .......... D19

Exhibit D-21. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for CBRR Versus UC Impact Comparison, 37-Month Adult Survey .......... D20

Exhibit D-22. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for PBTH Versus UC Impact Comparison, 37-Month Adult Survey .......... D21

Exhibit D-23. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB Versus CBRR Impact Comparison, 37-Month Adult Survey .......... D22

Exhibit D-24. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB Versus PBTH Impact Comparison, 37-Month Adult Survey .......... D23

Exhibit D-25. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for CBRR Versus PBTH Impact Comparison, 37-Month Adult Survey .......... D24

Exhibit D-26. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB + CBRR + PBTH Versus UC Impact Comparison, 37-Month Adult Survey .......... D25

Exhibit D-27. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB + PBTH Versus CBRR Impact Comparison, 37-Month Adult Survey .......... D26

Exhibit D-28. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for SUB + CBRR Versus PBTH Impact Comparison, 37-Month Adult Survey .......... D27

Exhibit D-29. Equivalence at Baseline of Analysis Sample for Respondents Versus Nonrespondents for PBTH + CBRR Versus SUB Impact Comparison, 37-Month Adult Survey .......... D28

Exhibit D-30. Executive Summary Impact Estimates, Estimated Without Nonresponse Weights .... D29

Exhibit E-1. SUB Versus UC: Impacts on Use of ES and TH in Months 0 to 32 After RA .......... E2

Exhibit E-2. CBRR Versus UC: Impacts on Use of ES and TH in Months 0 to 32 After RA .......... E2

Exhibit E-3. PBTH Versus UC: Impacts on Use of ES and TH in Months 0 to 32 After RA .......... E3

Exhibit E-4. SUB Versus CBRR: Impacts on Use of ES and TH in Months 0 to 32 After RA .......... E3

Exhibit E-5. SUB Versus PBTH: Impacts on Use of ES and TH in Months 0 to 32 After RA .......... E4

Exhibit E-6. CBRR Versus PBTH: Impacts on Use of ES and TH in Months 0 to 32 After RA .......... E4

Exhibit F-1. SUB+CBRR+PBTH Versus UC: Impacts on Housing Stability at 37 Months .......... F2

Exhibit F-2. SUB+CBRR+PBTH Versus UC: Impacts on Family Preservation at 37 Months .......... F2

Exhibit F-3. SUB+CBRR+PBTH Versus UC: Impacts on Adult Well-Being at 37 Months .......... F3

Exhibit F-4. SUB+CBRR+PBTH Versus UC: Impacts on Child Well-Being Across Age Groups at 37 Months .......... F3

Exhibit F-5. SUB+CBRR+PBTH Versus UC: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .......... F4

Exhibit F-6. SUB+CBRR+PBTH Versus UC: Impacts on Self-Sufficiency at 37 Months .......... F5

Exhibit F-7. SUB+CBRR Versus PBTH: Impacts on Housing Stability at 37 Months .......... F6

Exhibit F-8. SUB+CBRR Versus PBTH: Impacts on Family Preservation at 37 Months .......... F6

Exhibit F-9. SUB+CBRR Versus PBTH: Impacts on Adult Well-Being at 37 Months .......... F7

Exhibit F-10. SUB+CBRR Versus PBTH: Impacts on Child Well-Being Across Age Groups at 37 Months .. F7

Exhibit F-11. SUB+CBRR Versus PBTH: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .......... F8

Exhibit F-12. SUB+CBRR Versus PBTH: Impacts on Self-Sufficiency at 37 Months .......... F9

Exhibit F-13. SUB+PBTH Versus CBRR: Impacts on Housing Stability at 37 Months .......... F10

Exhibit F-14. SUB+PBTH Versus CBRR: Impacts on Family Preservation at 37 Months .......... F10

Exhibit F-15. SUB+PBTH Versus CBRR: Impacts on Adult Well-Being at 37 Months .......... F11

Exhibit F-16. SUB+PBTH Versus CBRR: Impacts on Child Well-Being Across Age Groups at 37 Months... F11

Exhibit F-17. SUB+PBTH Versus CBRR: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .......... F12

Exhibit F-18. SUB+PBTH Versus CBRR: Impacts on Self-Sufficiency at 37 Months .......... F13

Exhibit F-19. CBRR+PBTH Versus SUB: Impacts on Housing Stability at 37 Months .......... F14

Exhibit F-20. CBRR+PBTH Versus SUB: Impacts on Family Preservation at 37 Months .......... F14

Exhibit F-21. CBRR+PBTH Versus SUB: Impacts on Adult Well-Being at 37 Monthss .......... F15

Exhibit F-22. CBRR+PBTH Versus SUB: Impacts on Child Well-Being Across Age Groups at 37 Months... F15

Exhibit F-23. CBRR+PBTH Versus SUB: Impacts on Child Well-Being Developmental Outcomes by Age Group at 37 Months .......... F16

Exhibit F-24. CBRR+PBTH Versus SUB: Impacts on Self-Sufficiency at 37 Months .......... F17

Exhibit G-1. Number of Programs From Which Cost Data Were Collected and Presence of SUB Intervention by Study Site .......... G2
Exhibit G-2. Cost Data Collection Categories and Associated Item Prompts .......... G2
Exhibit G-3. Determining Inclusion of External Services .... G3
Exhibit G-4. Valuing In-Kind Services .......... G4
Exhibit G-5. Program Level Average per Family Cost Calculations .......... G5
Exhibit H-1. SUB Versus UC: Program Use From 19th Month After RA Until 37-Month Survey Response Month .......... H1
Exhibit H-2. CBRR Versus UC: Program Use From 19th Month After RA Until 37-Month Survey Response Month .......... H2
Exhibit H-3. PBTH Versus UC: Program Use From 19th Month After RA Until 37-Month Survey Response Month .......... H2
Exhibit H-4. SUB Versus CBRR: Program Use From 19th Month After RA Until 37-Month Survey Response Month .......... H3
Exhibit H-5. SUB Versus PBTH: Program Use From 19th Month After RA Until 37-Month Survey Response Month .......... H3
Exhibit H-6. CBRR Versus PBTH: Program Use From 19th Month After RA Until 37-Month Survey Response Month .......... H4
Exhibit H-7. Housing Stability Outcomes for the SUB RA Group by Use of the Offered Permanent Subsidy .......... H4
Exhibit H-8. Housing Stability Outcomes for the CBRR RA Group by Use of Rapid Re-Housing .......... H5
Exhibit H-9. Housing Stability Outcomes for the PBTH RA Group by Use of Transitional Housing...... H5
Exhibit I-1. Impacts on Length of Baseline Stay in Emergency Shelter .......... I1

# LIST OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| **AFCARS** | Adoption and Foster Care Analysis and Reporting System |
| **CBRR** | priority access to community-based rapid re-housing |
| **CoC** | Continuum of Care (program); continuum of care (generic) |
| **FMR** | Fair Market Rent |
| **HAP** | Housing Assistance Payment |
| **HCV** | Housing Choice Voucher program |
| **HMIS** | Homeless Management Information System |
| **HPRP** | Homelessness Prevention and Rapid Re-Housing Program |
| **HTKS** | Head, Toes, Knees, Shoulders |
| **ITT** | intention-to-treat |
| **PBTH** | priority access to project-based transitional housing |
| **PHA** | public housing agency |
| **PIC** | Public and Indian Housing Information Center |
| **PTSD** | post-traumatic stress disorder |
| **RA** | random assignment |
| **SHP** | Supportive Housing Program |
| **SNAP** | Supplemental Nutrition Assistance Program |
| **SUB** | priority access to permanent housing subsidy |
| **TANF** | Temporary Assistance for Needy Families |
| **TRACS** | Tenant Rental Assistance Certification System |
| **UC** | usual care |
| **WIC** | Special Supplemental Nutrition Program for Women, Infants, and Children |

# EXECUTIVE SUMMARY

The U.S. Department of Housing and Urban Development undertook the Family Options Study to gather evidence about which types of housing and services programs work best for homeless families. The study examines the effects of three types of programs—permanent housing subsidies, community-based rapid re-housing, and project-based transitional housing—compared with one another and with the usual care available to homeless families. The three types of programs are distinguished from one another by the duration of housing assistance and the type and intensity of social services provided to families. Usual care consists of emergency shelter and housing or services that families can access without immediate referral to a program that would provide them with a place to live.

From September 2010 through January 2012, 2,282 families enrolled in the Family Options Study across 12 communities[1] after spending at least 7 days in emergency shelter. After providing informed consent and completing a baseline survey, the families were randomly assigned to one of four groups: (1) SUB, in which families have priority access to a permanent housing subsidy; (2) CBRR, in which families have priority access to community-based rapid re-housing; (3) PBTH, in which families have priority access to project-based transitional housing; or (4) UC, in which families have access to usual care homeless and housing assistance but do not have priority access to any particular program. Random assignment yielded groups of families with no systematic differences in baseline characteristics. Families were free to take up the program to which they were offered priority access or to make other arrangements, so each group used a mix of programs. Nonetheless, patterns of program use among the groups of families contrasted substantially. The study therefore provides a strong basis for conclusions about the relative impacts of the interventions on several aspects of family well-being.[2]

At 20 months after random assignment, the Family Options Study produced important and, in some cases, surprising findings (see *Family Options Study: Short-Term Impacts of Housing and Services Interventions for Homeless Families*; hereafter, the *Short-Term Impacts* report; Gubits et al., 2015); however, 20 months is not a long enough period to evaluate the effects of temporary programs that can last up to 18 months (as with CBRR programs) or 24 months (as with PBTH programs). Some families may not have received a full dose of the temporary assistance by the time of the short-term analysis at 20 months, so different findings may emerge during a longer period. In addition, some families were still in these temporary programs at 20 months, so they may have different outcomes after leaving.

This report presents the analysis of the 3-year impacts of the three interventions in five domains related to family well-being: (1) housing stability, (2) family preservation, (3) adult well-being, (4) child well-being, and (5) self-sufficiency. The report also describes the relative costs of the interventions based on program use during the 3-year followup period.

The 3-year analysis addresses three primary questions.

1. What programs do families who experience homelessness use during a 3-year period, and how does assignment to an intervention that offers priority access to a particular kind of program affect this program use?
2. At 3 years after random assignment, what are the relative effects of the three active interventions compared with usual care and of the active interventions compared with each other?
3. What are the cumulative costs of the interventions during the 3 years following random assignment?

## Study Interventions

The study examines four interventions, to which families are randomly assigned:

1. The ***SUB*** intervention offers families a permanent housing subsidy, usually a housing choice voucher, which could include assistance to find housing but no other supportive services.

[1] The 12 communities participating in the study are Alameda County, California; Atlanta, Georgia; Baltimore, Maryland; Boston, Massachusetts; Bridgeport and New Haven, Connecticut; Denver, Colorado; Honolulu, Hawaii; Kansas City, Missouri; Louisville, Kentucky; Minneapolis, Minnesota; Phoenix, Arizona; and Salt Lake City, Utah.

[2] Two previous reports provide information about the Family Options Study: the *Interim Report: Family Options Study* (Gubits et al., 2013), which documented study implementation findings and baseline characteristics of the research sample, and the *Family Options Study: Short-Term Impacts of Housing and Services Interventions for Homeless Families* (Gubits et al., 2015), which presents findings from the 20-month impact analysis.

2. The ***CBRR*** intervention offers families temporary rental assistance, potentially renewable for up to 18 months, paired with limited, housing-focused services to help families find and rent conventional, private-market housing.

3. The ***PBTH*** intervention offers families temporary housing for up to 24 months in agency-controlled buildings or apartment units, paired with intensive supportive services.

4. The ***UC*** intervention did not offer priority access to any type of homeless or housing assistance. Families assigned to the UC intervention could use any housing or services in the community that a family could access in the absence of immediate referral to the other interventions. The UC intervention typically included at least some additional stay in the emergency shelter from which families were enrolled.

The study team analyzed all six possible contrasts among these four interventions, as shown in Exhibit ES-1. The order of the presentation of findings for the pairwise comparisons is reflected in the alphabetic ordering of the arrows (for example, discussion begins with "Contrast A" between the SUB intervention and the UC intervention).

## Random Assignment Design

To be eligible for the study, families had to include at least one child age 15 or younger and had to have resided in emergency shelter for 7 or more days. The study team excluded families who left shelter in fewer than 7 days because the three interventions examined may not be necessary for families who can resolve a housing crisis quickly. As soon as was feasible after the 7-day mark, the study team randomly assigned families to the SUB, CBRR, PBTH, or UC group.

In the original random assignment design, each family was to have had a chance of being assigned to all four groups (SUB, CBRR, PBTH, and UC). A number of factors prevented the study from being implemented exactly as planned. First, all four interventions were offered in only nine sites. Two sites (Atlanta and Baltimore) did not offer the SUB intervention and one site (Boston) did not offer the PBTH intervention. Second, interventions were available to families only in cases in which at least one provider of the intervention type had an available slot. Third, some service providers had unique eligibility requirements for families. Before random assignment, the study team screened families for eligibility for the providers that had

**Exhibit ES-1.** Six Pairwise Comparisons Among the Four Interventions



available slots using criteria specified by the providers. The purpose of this screening was to minimize the likelihood of assigning families to interventions they would not be eligible to receive. As a result, for an intervention option to be available to a family undergoing random assignment, at least one slot had to be open at an intervention provider for which the family met provider-specific eligibility requirements. All families were eligible for usual care by definition.

These factors cumulatively led to situations in which most study families did not have all four options available to them at the time of random assignment. Of the 2,282 families enrolled in the study, 264 families had two randomization options, 1,544 families had three randomization options, and 474 had all four randomization options available. All analyses were conducted pairwise, contrasting an active intervention with another active intervention or with the usual care. Only families who were eligible for both interventions in a pairwise comparison (for example, the SUB and CBRR interventions) and were randomized to one of them were included in each comparison. Hence, each comparison can be thought of as an experiment between two well-matched groups that differ only in the intervention to which they were assigned.

Exhibit ES-2 shows the total number of families assigned to each intervention. The exhibit also shows the number of families who responded to the followup survey conducted a median of 37 months after random assignment; this set of families is included in the impact analyses in this report.[3] Altogether, 1,621 families (71 percent of the sample) completed both the 20- and 37-month surveys.[4]

## Meaning of Intention-to-Treat (ITT) Impact Estimates

The inherent strength of the experimental research design employed in the Family Options Study is the assurance that the groups that are created through the random assignment process will be similar to each other in all respects except for their priority access to a particular type of homeless or housing assistance program. This assurance means that that subsequent differences in outcomes (beyond the bounds of chance sampling variability) reflect the relative impact of those interventions.

The Family Options Study tests for the impacts of three different potential emphases in federal or local assistance policy to homeless families: (1) What impact would priority access to project-based transitional housing (offered to the PBTH group) have on families in shelter who are not able to resolve their episodes of homelessness quickly? (2) How does this policy compare with providing access to community-based rapid re-housing (offered to the CBRR group)? (3) How does it compare to permanent housing subsidies (offered to the SUB group)? In each case, the corresponding policy question is, "What impact would this policy emphasis have on the outcomes of families in shelter relative to usual care or another policy emphasis?"

The 3-year followup data for study participants tell what would happen if each of these ways of targeting offers and access were pursued as federal or local policy—for the families actually studied in the target communities. The pairwise comparisons between active interventions show the impact of offering families priority access to one type of program rather than another. The data also allow for the comparison of each option with the mix of programs that the homeless assistance systems provided at the time of the study (that is, the programs available to the UC group). The pairwise comparisons between active interventions and usual care show the impact of referring a family to a specific type of program compared with the impact of letting families pursue any available assistance on their own.

The analysis in this report measures the impact of having been offered a particular type of program regardless of whether the family involved actually received the program assistance. The findings reflect the real way in which the homeless assistance system interacts with families, in that families are offered

**Exhibit ES-2.** Total Number of Families Assigned to Each Intervention and Number of Followup Survey Respondents

| Intervention | Families Assigned | Families Responding to the 37-Month Followup Survey | Response Rate (%) |
|---|---|---|---|
| Permanent housing subsidy (SUB) | 599 | 501 | 83.6 |
| Community-based rapid re-housing (CBRR) | 569 | 434 | 76.3 |
| Project-based transitional housing (PBTH) | 368 | 293 | 79.6 |
| Usual care (UC) | 746 | 556 | 74.5 |
| **Total** | **2,282** | **1,784** | **78.2** |

Sources: Random assignment records; Family Options Study 37-month followup survey

[3] The median time from random assignment to the followup survey was 37 months. The minimum time was 32 months and the maximum was 50 months.

[4] Gubits et al. (2015) analyzed short-term impacts of the interventions. The study team attempted to contact families for the study's first followup survey beginning in the 18th month after random assignment. The median time from random assignment to the followup survey was 20 months. The followup period reported in Gubits et al. (2015) is thus 20 months, but the followup survey is sometimes referred to as the 18-month survey.

assistance rather than mandated to accept the assistance being offered. Whether families participate in a program to which they have gained priority access through their randomly assigned intervention reflects the relative desirability and accessibility of the programs for families within the context of the other options they may choose to pursue on their own.

As the report shows, in the 3 years after random assignment, a substantial number of families did not use the program to which they were given priority access, and some used other programs. The full experimental sample for a given intervention collectively shows how different forms of housing assistance are used when families are given priority access to one particular program type while simultaneously having the freedom to use other forms of assistance available in their communities. Including all the families randomly assigned to the UC group similarly reveals the range of programs used when no priority access is provided. The programs (including the programs offered by the interventions examined in this study) that UC families used exist in communities and would each continue to exist even with a stronger federal or local push for only one of them. Thus, the full-sample comparisons between randomly assigned interventions—known as "intention to treat," or ITT, impact estimates—provide the best guide to policymakers in a messy, complex world and are reported here as the main study findings.

## Data Sources

The bulk of the impact findings documented in this report is drawn from the 1,784 families who responded to the 37-month followup survey and is based on data from several sources described in Exhibit ES-3.[5]

**Exhibit ES-3.** Data Sources Used in the Analysis of 3-Year Impacts

| | |
|---|---|
| **Study implementation records** | |
| Random assignment enrollment data | Random assignment enrollment data contain identifiers for enrolled families, responses to eligibility screening questions, information about intervention availability at the time of random assignment, and random assignment result. |
| **Study families** | |
| Baseline survey | The baseline survey conducted immediately before random assignment provides information about the adult respondent and the family. The study team defined covariates from these data and included them in impact models to improve the precision of impacts estimates. |
| Tracking surveys | Tracking surveys conducted 6, 12, and 27 months after random assignment contain updated contact information and details about family composition and housing status. |
| 20- and 37-month followup surveys | The 20- and 37-month followup surveys with adult respondents measure family outcomes. Adults reported on themselves and up to two children, called focal children, who were part of the family at the time of study enrollment. Focal children were randomly selected within specified age groups. |
| 37-month child assessments | Child assessments, which were conducted with focal children ages 3 years, 6 months to 7 years, 11 months in conjunction with the adult followup survey, measure child well-being outcomes. |
| 37-month child survey | The child survey, conducted with focal children ages 8 to 17 years in conjunction with the adult followup survey, measures child well-being outcomes. |
| **Study intervention providers** | |
| Enrollment verification data | Enrollment verification data collected from program providers measure use of the assigned intervention for each family. |
| Program information | Program information about the housing and services offered during the study period collected from intervention providers describes the interventions. |
| Cost information | Cost information collected from intervention providers measures costs of overhead, rental assistance, facility operations, supportive services, and capital costs. |
| **Administrative data systems** | |
| HMIS records | Homeless Management Information System (HMIS) records, collected from the communities where families enrolled, provide indicators of study families' participation in homeless assistance programs. |
| HUD's PIC records | HUD's Public and Indian Housing Information Center (PIC) records measure receipt of housing assistance from the Housing Choice Voucher program, public housing programs, and project-based voucher programs. |
| HUD's TRACS records | HUD's Tenant Rental Assistance Certification System (TRACS) records measure receipt of housing assistance through project-based Section 8 programs. |
| Child welfare records | State and local child welfare agency records (using Adoption and Foster Care Analysis and Reporting System [AFCARS] reporting definitions) on formal foster care placements and adoptions measure family separations and unifications. |
| Quarterly wage records | National Directory of New Hires data on quarterly wages measure employment and earnings. |

[5] Impact findings from administrative earnings records are drawn from the full study sample of 2,282 families. Impact findings from administrative child welfare records are drawn from the full study samples of 5 of the 12 sites (951 families).

## Hypothesized Effects of the Interventions

The study team developed hypotheses about the potential effects of the interventions based on the conceptual framework underlying the SUB, CBRR, and PBTH interventions. Chapter 3 of the *Short-Term Impacts* report (Gubits et al., 2015) discusses the theoretical framework in detail. The interventions reflect different implicit theories about the nature of family homelessness and the approaches best suited to address the problem. These implicit theories arise from different understandings of the origins of homelessness, the needs of homeless families, the effect of family challenges on achieving residential stability, and the appropriate role of the homeless assistance system.

Some theories posit that household challenges—for example, trauma, substance use problems, mental health issues, lack of job skills—must be addressed first for families to succeed in housing. Others posit that progress on these issues is likely to be achieved only after families are stabilized in permanent housing.

These different theories and different perceptions of the homeless assistance system's role result in different emphases among three central goals of interventions for homeless families: (1) ending the immediate episode of homelessness and preventing returns to shelter; (2) fostering longer-term residential stability; and (3) promoting nonhousing outcomes, including self-sufficiency, family preservation, and adult and child well-being.

### Conceptual Framework for the SUB and CBRR Interventions

It is appropriate to consider the conceptual rationales for the SUB and CBRR interventions together because proponents of both permanent housing subsidies and community-based rapid re-housing believe that the key goal of homeless interventions should be ending homelessness swiftly, reducing the number of families who return to shelter, and restoring families to housing stability. This position follows from the view that family homelessness is largely a consequence of housing costs that outstrip the incomes of poor families, a problem that housing subsidies can solve. Subsidies—whether the permanent housing subsidies of the SUB intervention or the temporary housing subsidies of the CBRR intervention—can help families obtain and maintain stable housing.

Permanent housing subsidies were not created as a response to homelessness. Instead, they already existed as an element of the broader social safety net at the time the homeless assistance system began to expand into its current configuration in the late 1980s. Resource constraints mean that, outside the context of this study, a permanent housing subsidy is rarely accessible by families at the outset of an episode of homelessness unless they already have a place near the top of a waiting list. By contrast, community-based rapid re-housing was developed specifically as a response to homelessness. Unless resources devoted to permanent housing subsidies are vastly increased, this assistance is unlikely to become widely available to families at the time they are experiencing homelessness. Thus, proponents of rapid re-housing argue that limited resources dedicated to homelessness could be stretched to create the best outcomes for the most people by making subsidies temporary (Culhane, Metraux, and Byrne, 2011).

Proponents of rapid re-housing emphasize restoring families to conventional housing as swiftly as possible (the "rapid" in rapid re-housing), thereby reducing time staying in shelter and on the street, which they see as harmful. In addition, they focus on preventing returns to homelessness. Proponents of permanent housing subsidies focus more on long-term stability and question whether the short-term subsidies that rapid re-housing provides are sufficient to foster such stability. Proponents of rapid re-housing argue that a temporary subsidy may induce families to strive to become economically self-sufficient sooner. Unlike permanent housing subsidies, rapid re-housing offers some services focused on housing and self-sufficiency.

Advocates of both types of subsidies acknowledge that homeless families, like other poor families, must contend with a variety of challenges, but these advocates believe that such challenges are better addressed by mainstream community agencies rather than by specialized homeless services. Proponents of both types of subsidies argue that stable housing provides a platform from which families can address other problems on their own using community resources, if they need to and choose to do so, while reserving scarce housing dollars for housing. Thus, the stability that either a short-term or permanent housing subsidy provides may have radiating effects on other aspects of family well-being.

For comparisons involving the SUB and CBRR interventions and usual care, the study team developed four hypotheses that derive from this conceptual framework.

### Hypotheses for Comparisons Involving the SUB and CBRR Interventions and Usual Care

#### SUB Versus UC

Relative to the UC intervention, the SUB intervention will reduce shelter use and improve housing stability and may improve family preservation, adult well-being, and child well-being.

### CBRR Versus UC

Relative to the UC intervention, the CBRR intervention will reduce shelter use and may improve housing stability, employment and earnings, family preservation, adult well-being, and child well-being. It will reduce the length of the shelter stay at the time of study entry and may be less costly.

### SUB Versus CBRR

Relative to the CBRR intervention, the SUB intervention will reduce shelter use and improve housing stability and may improve family preservation and adult and child well-being.

Relative to the SUB intervention, the CBRR intervention will reduce the length of the shelter stay at the time of study entry and will be less costly. It may improve employment and earnings.

## Conceptual Framework for the PBTH Intervention

Proponents of transitional housing have a different understanding of the origins of family homelessness and the appropriate role of the homeless assistance system than do proponents of permanent housing subsidies and rapid re-housing. Although the housing market is difficult for poor families, most families do not experience homelessness. Proponents of transitional housing emphasize that many families who do become homeless have barriers in addition to poverty that make it difficult for them to secure and maintain housing. Thus, housing subsidies alone may be insufficient to ensure housing stability and other desirable outcomes, particularly for families who have been in shelter for at least 7 days (for example, Bassuk and Geller, 2006). Family needs may arise from poverty, health, disability, or other problems that led to homelessness to begin with or from the disruptive effects of homelessness on parents and children.

The premise for project-based transitional housing is that, by addressing these barriers and needs in a supervised residential setting, PBTH programs lay the best foundation for ongoing stability. Basing their work on family needs, case managers coordinate the services (on site or by referral) to lay the essential groundwork for later independence.

Different PBTH programs focus on different issues, but all provide supportive services designed to reduce barriers to housing, enhance adults' well-being, and bolster adults' ability to manage in ordinary housing after they leave programs (Burt, 2010). Practitioners' goals for project-based transitional housing, as documented in the literature (for example, Burt, 2006), thus extend beyond housing stability to adult well-being and aspects of family self-sufficiency. Although some PBTH programs provide services directly to children, family preservation and child outcomes are usually seen as more distal outcomes. Given this conceptual framework for project-based transitional housing, the study team defined five hypotheses about the potential effects of the PBTH intervention when compared with usual care and with the SUB and CBRR interventions.

## Hypotheses for Comparisons Involving the PBTH Intervention

### PBTH Versus UC

Relative to the UC intervention, the PBTH intervention will reduce shelter use and improve housing stability, employment, earnings, education, and adult well-being and may improve family preservation and child well-being.

### PBTH Versus SUB

From the perspective of transitional housing proponents: Relative to the SUB intervention, the PBTH intervention will improve employment, earnings, education, and adult well-being and may improve long-term housing stability, family preservation, and child well-being.

From the perspective of permanent housing subsidy proponents: Relative to the PBTH intervention, the SUB intervention will reduce shelter use and improve housing stability and may improve family preservation, adult well-being, and child well-being.

### PBTH Versus CBRR

From the perspective of transitional housing proponents: Relative to the CBRR intervention, the PBTH intervention will improve employment, earnings, education, and adult well-being and may improve long-term stability, family preservation, and child well-being.

From the perspective of rapid re-housing proponents: Relative to the PBTH intervention, the CBRR intervention will reduce shelter use and may improve housing stability, family preservation, adult well-being, child well-being, employment, and earnings. It will reduce the length of time families spend in places not meant for human habitation and in shelters, which are costly.

Even if the longer housing subsidies of the SUB intervention or the more extensive social services of the PBTH intervention are important for some families, an important question is whether all families need such intensive involvement in the homeless assistance system. Thus, the study team also developed hypotheses that the more intensive interventions would have larger effects on outcomes for families who faced more psychosocial challenges and housing barriers.

## Baseline Characteristics of the Study Sample

At the time of random assignment, characteristics of the 2,282 families who enrolled in the Family Options Study were similar to characteristics of families who experience homelessness nationwide. This observation is true even though the sites were not a randomly selected sample of communities.

The typical family in the study consisted of an adult woman, a median of 29 years old, living with one or two of her children in an emergency shelter. At baseline, 30 percent of families had more than one adult present. Nearly all families who had two adults present were headed by couples, and 10 percent of families had a partner living elsewhere. As in other studies of homelessness among families, members of minority groups were overrepresented, even in proportion to the poverty population.

A plurality of families (43 percent) had only one child with them in the shelter, and one-half of the families were with a child younger than age 3. Most families in the study (79 percent) were not homeless immediately before entering the shelter from which they were recruited into the study. About 63 percent of family heads in the study, however, had experienced homelessness at some other point in their lifetime, with 16 percent of adult respondents having experienced homelessness as a child. An even greater proportion (85 percent) indicated they lived doubled up at some point as an adult, defined in the survey as "staying with family or friends because you couldn't find or afford a place of your own."

Most family heads were not working at the time of random assignment (83 percent), and more than one-half had not worked for pay in the previous 6 months. The median annual household income of all families in the study at baseline was $7,410. Many reported they either had a poor rental history (26 percent had been evicted) or had never been a leaseholder (35 percent). Nearly one in three reported either post-traumatic stress disorder or serious psychological distress, and 21 percent reported a disability that prevents or limits work.

## Intervention Eligibility Screening and Family Decisions

The *Interim Report: Family Options Study* (hereafter the *Interim Report*; Gubits et al., 2013) examined intervention availability and family eligibility at randomization for the 2,282 families in the Family Options Study. Both availability of interventions and family eligibility, according to screening before random assignment, were most constrained for the PBTH intervention. The CBRR intervention was more available than the SUB intervention but had slightly more restrictive eligibility requirements. Thus, it was more difficult for families to meet the eligibility criteria of the programs that are ordinarily part of the homeless assistance system (PBTH and CBRR) than for the programs that are not (SUB programs).

For a family to use the type of program offered to the group to which it had been assigned, it had to (1) pass an eligibility determination conducted by the specific program to which it was referred and (2) choose to take up the program. The *Interim Report* (Gubits et al., 2013) found that some of the families who passed the initial screening by the study were later deemed ineligible by the programs to which they were referred and thus were denied services in the program to which they were given priority access. Other fully eligible families chose not to take up the program to which they were given priority access. Compared with the CBRR and SUB interventions, the PBTH intervention had both the highest proportion of families found ineligible after random assignment and the highest proportion of families who chose not to take up the program to which they were given priority access. Considering both initial screening by the study and later eligibility screening by programs, the SUB intervention was the most accessible to families and the PBTH intervention was the least accessible.

The *Interim Report* (Gubits et al., 2013) concluded that homeless assistance programs in the study communities imposed eligibility criteria that hampered their ability to serve families in shelter who needed the assistance. Even when programs had space available, the programs often screened out families in shelter based on eligibility criteria such as insufficient income, substance abuse, criminal histories, and other factors that presumably contributed to the families' homelessness. Moreover, families who are homeless do not always pursue the programs offered to them, which suggests that some programs deliver assistance that some families perceive as less valuable to them than other alternatives available in their communities.

## Study Findings Over the 3-Year Followup Period

The *Short-Term Impacts* report (Gubits et al., 2015) presented findings about the study families and impacts of the interventions at 20 months after random assignment. The body of the current report presents findings about the families and interventions 17 months later, at 37 months after random assignment. The results from both time points are important. Some impacts that were detected at 20 months are not detected in the 37-month analysis. Other impacts are detected at 37 months but were not apparent at the earlier point. Impacts found at either point in time hold importance when considering the relative benefits of the interventions during 3 years of study.

## Usual Care Group During the Followup Period

### Program Use of the Usual Care Group

Inasmuch as the experiences of families in the 12 study communities reflect families' experiences in the nation more broadly, the experiences of families assigned to the UC group inform policymakers about what typically happens to families who have been in shelter for at least 7 days and who do not receive priority access to any type of designated assistance. On average, families assigned to the UC group spent 4 months in emergency shelter during the 37-month followup period. Exhibit ES-4 shows the proportions of UC families who used different types of programs in each month during the first 32 months after random assignment (the longest period for which the study team has data for all families). It breaks out four categories: (1) any permanent housing subsidy, including mainstream housing programs and permanent supportive housing; (2) rapid re-housing rental assistance; (3) transitional housing; and (4) emergency shelter.

For some families assigned to the UC group, the emergency shelter stay was the only interaction with the homeless or housing assistance systems. As Exhibit ES-4 shows, however, most UC families ultimately found their way to other types of assistance. Of the UC families who responded to the 3-month followup survey, 20 percent received rapid re-housing and 30 percent received transitional housing at some time during the 3-year followup period. Considering all forms of permanent subsidy (housing choice vouchers, public housing, permanent supportive housing, a project-based voucher, or assistance in a Section 8 project), even without priority access, 37 percent of UC families used some form of permanent subsidy for an average of 19 months at some point during the 3-year followup period.[6]

**Exhibit ES-4.** Program Use of UC Families for 32 Months After RA




UC = usual care.
RA = random assignment.
Notes: This exhibit shows program use for all families assigned to UC who responded to the 37-month survey. Complete Program Usage Data for 37-month respondent families are available only through month 32 after random assignment. Families who have more than one type of program use in a calendar month are counted fractionally in each type.
Source: Family Options Study Program Usage Data

[6] In the entire study, 746 families were randomly assigned to the UC group. Of these families, 556 responded to the followup survey and are the families shown in Exhibit ES-4. Different subsets of these 556 families form the comparison groups for SUB, CBRR, and PBTH.

This percentage continued to grow over time, whereas use of other housing programs declined. By the time of the followup survey (not shown in Exhibit ES-4) more than one-half of the UC families (60 percent) were not using any type of assistance measured, nearly one-third (30 percent) were using some type of permanent housing, and the remainder were using emergency shelter, rapid re-housing, or transitional housing.

### Outcomes of the Usual Care Group

UC families were not faring well 20 months after enrollment in the study. One-half had spent at least 1 night homeless or doubled up in the 6 months before the 20-month survey or had been in shelter in the past 12 months. In the 6 months before the survey, 15 percent of families had been separated from a child who was with the family in shelter at study outset, and one-fourth of these separated children were in foster care. At the time of the survey, 32 percent of family heads reported fair or poor health, 15 percent reported alcohol dependence or substance abuse, and 12 percent had experienced intimate partner violence in the past 6 months. Less than one-third of UC family heads (31 percent) were working for pay and previous-year total family income was only about $9,000 per year—much less than what is needed to rent market-rate housing for a family in most communities.

At 37 months after random assignment, UC families still faced substantial challenges, although, on average, their circumstances had improved somewhat since the 20-month survey. Of the whole group, 39 percent had spent at least 1 night homeless or doubled up in the 6 months before the 37-month survey or had been in shelter in the past 12 months, 18 percent reported being homeless in the 6 months before the 37-month survey, and 5 percent were in emergency shelter in the survey month. A little more than two-thirds (69 percent) of families were living in their own house or apartment (up from 58 percent at 20 months). Physical health, substance use, and intimate partner violence were at levels similar to those at 20 months. Only 37 percent of family heads were working for pay in the week before the survey. Median annual cash income from all sources for the previous calendar year was about $12,000, and nearly one-half of the families (47 percent) were food insecure.

## Program Use for Pairwise Comparisons

The three panels of Exhibit ES-5 show the use of programs by the SUB, CBRR, and PBTH groups in each of the first 32 months of the followup period (the period for which complete data are available). Program use for each group is initially dominated by the program to which families were offered priority access. The SUB group was offered permanent assistance, and most families were still using the permanent subsidy they were offered by the end of the followup period. The CBRR and PBTH groups were offered temporary assistance, and, by the end of the followup period, most families had ceased using the temporary assistance they were offered (earlier for the CBRR group than for the PBTH group, as expected, because of typical program lengths). In both the CBRR and PBTH groups, the proportions of families using permanent housing subsidies grew steadily during the followup period.

**Exhibit ES-5.** SUB, CBRR, and PBTH: Program Use for 32 Months After RA



**Exhibit ES-5.** SUB, CBRR, and PBTH: Program Use for 32 Months After RA (continued)







CBRR = priority access to community-based rapid re-housing. PBTH = priority access to project-based transitional housing. SUB = priority access to permanent housing subsidy. RA = random assignment

Notes: This exhibit shows program use for all SUB, CBRR, and PBTH families who responded to the 37-month survey. Complete Program Usage Data for 37-month respondent families are available only through month 32 after random assignment. Families who have more than one type of program use in a calendar month are counted fractionally in each type.

Source: Family Options Study Program Usage Data

Exhibit ES-6 documents the program use of the study families who responded to the 37-month followup survey—the sample for the longer-term impact analysis (and same sample shown in Exhibit ES-5). The exhibit shows the percentages of families who ever participated in several types of housing assistance programs between random assignment and the followup survey response. The columns in Exhibit ES-6 are organized by pairwise comparison. The exhibit displays the number of families included in each comparison (see row 10) and details their program use during the followup period (see rows 1 to 9). It accounts for eight types of programs:

1. Permanent housing subsidies offered to the SUB group (housing choice vouchers, public housing in Honolulu, and project-based vouchers in Bridgeport).
2. Rapid re-housing (that is, the temporary subsidies offered to the CBRR group).
3. Transitional housing.[7]
4. Permanent supportive housing.
5. Public housing in places other than Honolulu.
6. Project-based vouchers and units in Section 8 projects in places other than Bridgeport.
7. Any permanent subsidy (that is, any of the programs that comprise the SUB intervention in this study, permanent supportive housing, public housing, or project-based vouchers and units in Section 8 projects).
8. Emergency shelter.

The experimental contrasts in use of these programs are depicted in the exhibit. The exhibit also shows (see row nine) the proportion of families who used no homeless or housing assistance and no emergency shelter after the first 6 months after random assignment.

Exhibit ES-6 shows that the intervention assignments created substantial contrasts in program use, particularly in the use of programs that reflect the intended contrast (the shaded boxes). For example, in the SUB-versus-UC comparison, 83 percent of families assigned to the SUB intervention used the permanent housing subsidies they were offered, whereas only 13 percent of families assigned to the UC group used these permanent

**Exhibit ES-6.** Program Use Since RA for All Pairwise Impact Comparisons

| Type of Homeless or Housing Assistance | Percent of Families Who Ever Used Program Type From RA to 37-Month Followup Survey[a] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SUB | UC | CBRR | UC | PBTH | UC | SUB | CBRR | SUB | PBTH | CBRR | PBTH |
| Permanent housing subsidies offered to the SUB group[b] | 83.2 | 12.7 | 9.8 | 12.2 | 9.6 | 10.6 | 82.3 | 9.8 | 82.3 | 7.2 | 6.7 | 8.7 |
| Rapid re-housing[c] | 11.4 | 22.9 | 58.5 | 22.5 | 13.7 | 17.8 | 14.7 | 60.5 | 5.7 | 12.0 | 54.6 | 15.8 |
| Transitional housing[d] | 7.4 | 28.9 | 23.2 | 27.5 | 53.2 | 34.6 | 7.4 | 19.8 | 9.4 | 49.5 | 30.7 | 53.4 |
| Permanent supportive housing | 3.0 | 10.7 | 9.8 | 11.7 | 11.0 | 11.6 | 3.9 | 11.6 | 2.1 | 11.6 | 9.2 | 10.7 |
| Public housing | 1.6 | 10.3 | 10.7 | 9.8 | 8.3 | 8.5 | 1.1 | 10.9 | 1.6 | 8.2 | 11.5 | 9.1 |
| Project-based vouchers/Section 8 projects | 1.5 | 6.1 | 5.6 | 6.3 | 6.2 | 7.2 | 1.1 | 7.0 | 1.7 | 7.2 | 4.8 | 6.1 |
| Any permanent housing subsidy[e] | 88.4 | 37.9 | 35.4 | 37.9 | 33.0 | 34.7 | 87.4 | 38.4 | 86.6 | 30.9 | 32.3 | 33.3 |
| Emergency shelter[f] | 84.4 | 89.5 | 90.7 | 90.0 | 83.6 | 89.7 | 84.9 | 90.4 | 87.9 | 83.0 | 88.1 | 86.5 |
| No use of homeless or housing programs[g] | 5.1 | 24.3 | 9.2 | 24.4 | 18.1 | 26.9 | 4.5 | 9.5 | 7.1 | 20.5 | 14.3 | 16.8 |
| N | 501 | 395 | 434 | 434 | 293 | 259 | 362 | 290 | 215 | 201 | 180 | 184 |

CBRR = priority access to community-based rapid re-housing. PBTH = priority access to project-based transitional housing. SUB = priority access to permanent housing subsidy. UC = usual care.
RA = random assignment.
[a] Percentage of families who ever used a type of assistance program during the period from the month of RA to the month of 37-month followup survey response (median period duration: 38 calendar months). Percentages do not add to 100 because some families used more than one program type during the followup period.
[b] Subsidies offered to the SUB group are housing choice vouchers plus site-specific programs offered to families assigned to the SUB group in Bridgeport, Connecticut, and Honolulu, Hawaii.
[c] Temporary subsidies offered to the CBRR group.
[d] All types of transitional housing, including those offered to the PBTH group.
[e] Includes the types of permanent subsidy offered to the SUB group plus permanent supportive housing, public housing, and project-based vouchers/Section 8 projects.
[f] All families were in emergency shelter at RA. Percentages less than 100 percent for ever used emergency shelter are because of missing data on shelter use.
[g] Indicates no use of the first six program types in this table during any of the followup period and no use of emergency shelter after the first 6 months after RA. No use in the month of followup survey response indicates no use of any of these seven program types.
Source: Family Options Study Program Usage Data

[7] Some transitional housing programs are based in projects or facilities that families leave after exiting the program. These programs are studied here, hence the term project-based transitional housing. Other transitional housing programs use residential units in the community so that families can "transition in place" to unassisted housing without having to move after supports are no longer needed. Transition-in-place programs of this sort share many of the same characteristics of CBRR programs, so they were not included as programs to which PBTH families could be directed after random assignment. The team made this decision to provide a stronger contrast between the PBTH and CBRR interventions studied. Some PBTH programs to which families were offered priority access provided units in the community (called "scattered-site" units) without the opportunity to transition in place. The Homeless Management Information System records, an important data source for observing program use, unfortunately do not distinguish between project-based and transition-in-place transitional housing. Therefore, some of the transitional housing use shown in Exhibit ES-6 may have been in transition-in-place units.

housing subsidies. The durations of assistance were also longer for the assigned interventions (not shown in the exhibit). In the SUB-versus-UC comparison, families assigned to the SUB intervention who used the offered permanent housing subsidies did so for an average of 31 months, whereas UC families who used these subsidies without priority access used them for only 21 months, on average. These findings generally reflect the longer time it took UC families to obtain access to permanent housing subsidies, if they did so at all. Considering all forms of permanent subsidy, Exhibit ES-6 shows that 38 percent of UC families in the SUB-versus-UC comparison used any form of permanent subsidy during the followup period compared with 88 percent of families assigned to the SUB intervention.

In the CBRR-versus-UC comparison, the contrast in use of rapid re-housing rental assistance is smaller than for the SUB-versus-UC comparison. Of families assigned to the CBRR group, 59 percent used the offered assistance during the followup period compared with 23 percent of their counterparts in the UC group for this comparison. Families assigned to the CBRR group who used rapid re-housing programs did so for an average of 8 months, the same length of time that UC families without priority access to CBRR used rapid re-housing programs. Similar proportions of CBRR and UC families used any form of permanent subsidy (35 and 38 percent, respectively).

In the PBTH-versus-UC comparison, 53 percent of families assigned to the PBTH group used transitional housing during the followup period and 35 percent of UC families also used transitional housing. PBTH families who used transitional housing of any kind did so for an average of 15 months, whereas the UC families who used transitional housing without priority access did so for 11 months, on average. Altogether, 33 percent of families assigned to the PBTH group used any form of permanent subsidy compared with 35 percent of UC families in the PBTH-versus-UC comparison.

## Impact Estimates for Pairwise Comparisons

Before seeing the results of the impact analysis, the study team prespecified impacts on 18 key outcomes in the six pairwise comparisons to present in this executive summary. That step was taken to prevent the selective presentation of statistically significant results in the executive summary from among the 84 outcomes examined for each comparison in the body of the report (534 impact estimates). The outcomes deemed most central to the study and those anticipated a priori to be most likely to be affected by the interventions were selected for this executive summary presentation. Impacts on the full set of outcomes are presented in Chapters 3 through 6 of the report.

Exhibit ES-7 reports estimated 3-year impacts for the 18 prespecified outcomes for each pairwise comparison. The exhibit rows are organized into five panels corresponding to each outcome domain. The exhibit columns show the mean value of each outcome for the entire UC group, followed by impact estimates for each outcome in each of the six pairwise comparisons. Asterisks to the right of the impact estimates denote the statistical significance of the differences between the two groups being compared, with more asterisks indicating higher levels of statistical significance.

Within each domain, Exhibit ES-7 presents impacts on three or four outcomes. For the first four outcome domains (housing stability, family preservation, adult well-being, and child well-being), the outcomes are specified so that lower values indicate improvements. That is, for these domains, impact estimates with negative values indicate reductions in unfavorable outcomes or improvements for families. For the self-sufficiency domain, the goals of the interventions are to achieve higher values for each outcome. Thus, positive values for self-sufficiency impact estimates indicate improvements. Detailed definitions for the full set of outcomes appear in Chapter 2 and Appendix B of the report.

The results of the pairwise comparisons appear in the following sections.

### SUB Versus UC

The most notable effect of the SUB intervention relative to the UC intervention was its reduction in homelessness and doubling up. Assignment to the SUB intervention reduced the proportion of families who had a shelter stay in months 7 to 18 by almost one-half and in months 21 to 32 by more than three-fourths. At both the 20-month and 37-month followup points, assignment to the SUB intervention reduced by more than one-half the proportion of families who reported having spent at least 1 night in shelter or in places not meant for human habitation in the past 6 months, increased the proportion of families living in their own place by 15 percentage points, and reduced the number of places the families lived in the past 6 months.

Additional effects occurred for some family preservation and child and adult well-being indicators. At 20 months, assignment to the SUB intervention reduced the proportion of families separated from a child present at baseline (10 percent in SUB families compared with 17 percent in UC families). This effect was not detected in the 3-year analysis. At 37 months (but not found earlier), assignment to the SUB intervention increased separations from the spouse or partner present at baseline (48 percent in SUB families compared with 34 percent in UC families). Assignment to the SUB intervention also improved some of the measures of adult well-being preselected for the executive summary presentation. At 20 months, assignment to the SUB group reduced psychological distress, reduced



HUD-AR-02697

**Exhibit ES-7.** Summary of Impacts for Six Policy Comparisons

| Outcome | Mean | ITT Impact Estimates | | | | | |
|---|---|---|---|---|---|---|---|
| | All UC Group | SUB vs. UC | CBRR vs. UC | PBTH vs. UC | SUB vs. CBRR | SUB vs. PBTH | CBRR vs. PBTH |
| **Housing stability (intervention goal: lower values)** | | | | | | | |
| At least 1 night homeless[a] or doubled up in past 6 months or in shelter in past 12 months[b] (%) **[confirmatory]** | 38.6 | −21.1*** | 1.9 | 0.3 | −20.4*** | −24.4*** | −3.1 |
| At least 1 night homeless[a] or doubled up in past 6 months (%) | 34.9 | −18.2*** | 1.8 | 0.2 | −15.5*** | −22.1*** | −2.8 |
| Number of places lived in past 6 months | 1.59 | −0.25*** | 0.03 | −0.03 | −0.14** | −0.31*** | 0.09 |
| Any stay in emergency shelter in months 7 to 18 after RA (%) | 17.3 | −14.3*** | −2.5 | −6.0** | −12.8*** | −5.5** | 1.6 |
| **Family preservation (intervention goal: lower values)** | | | | | | | |
| Family has at least one child separated in past 6 months[c] (%) | 16.7 | −3.3 | −0.5 | 2.0 | −2.2 | −8.1** | −3.2 |
| Spouse/partner separated in past 6 months, of those with spouse/partner present at RA[d] (%) **[limited base]** | 38.1 | 13.4** | 8.6 | 11.7 | −6.6 | 0.3 | 0.5 |
| Family has no child reunified, of those families with at least one child absent at RA[e] (%) **[limited base]** | 66.3 | −6.8 | −3.4 | 4.1 | −9.8 | −21.0 | −0.1 |
| **Adult well-being (intervention goal: lower values)** | | | | | | | |
| Health in past 30 days was poor or fair (%) | 31.4 | 3.1 | 1.3 | −0.7 | 0.1 | −2.2 | −1.0 |
| Psychological distress[f] | 0.00 | −0.11* | −0.02 | −0.01 | 0.01 | −0.11 | −0.20** |
| Alcohol dependence or drug abuse in past 6 months[g] (%) | 11.3 | −2.1 | −1.7 | 2.8 | 1.8 | −0.6 | −7.1** |
| Experienced intimate partner violence in past 6 months (%) | 10.5 | −4.0* | −1.6 | −1.1 | −1.8 | −1.2 | 0.2 |
| **Child well-being (intervention goal: lower values)** | | | | | | | |
| Number of schools attended since RA[h] | 2.10 | −0.15** | 0.02 | 0.06 | −0.26*** | −0.22* | 0.01 |
| School absences in past month (ages 5 to 17 years)[i] | 1.06 | −0.08 | −0.19 | −0.19 | 0.09 | −0.15 | −0.17 |
| Poor or fair health (%) | 5.9 | 2.0 | −0.6 | −0.0 | 1.0 | −2.9 | −2.2 |
| Behavior problems[j] | 0.59 | −0.23** | −0.20** | −0.06 | 0.06 | −0.25* | −0.23* |
| **Self-sufficiency (intervention goal: higher values)** | | | | | | | |
| Work for pay in week before survey (%) | 37.0 | −0.9 | 0.5 | 0.6 | −0.6 | −2.0 | −3.8 |
| Total family income ($) | 12,099 | −883 | −505 | −191 | −901 | −1,230 | −1,745 |
| Household is food secure (%) | 53.2 | 9.6*** | 4.2 | 1.9 | 2.6 | 12.8*** | 11.6** |
| **Number of families** | 556 | 895 | 868 | 551 | 652 | 414 | 363 |

CBRR = priority access to community-based rapid re-housing. PBTH = priority access to project-based transitional housing. SUB = priority access to permanent housing subsidy. UC = usual care.

ITT = intention-to-treat. RA = random assignment.

*/**/*** Impact estimate is significantly different from 0 at the .10/.05/.01 levels, respectively, using a two-tailed *t*-test (not adjusted for multiple comparisons).

[a] The definition of "homeless" in this report includes stays in emergency shelters and places not meant for human habitation. It excludes transitional housing. Additional impacts on the use of transitional housing are provided in Appendix E.

[b] After adjustment for multiple comparisons, the impact on the confirmatory outcome is statistically significant at the .01 level for the SUB-versus-UC, SUB-versus-CBRR, and SUB-versus-PBTH comparisons.

[c] Percentage of families in which a child who was with the family at baseline became separated from the family in the 6 months before the 37-month survey.

[d] Percentage of families in which a spouse or partner who was with the family at baseline became separated from the family in the 6 months before the 37-month survey.

[e] Percentage of families in which at least one child was separated from the family at baseline where no child was reunited with the family at the time of the 37-month survey.

[f] Psychological distress is measured with the Kessler Psychological Distress Scale (K6) and ranges from 0 to 24, with higher scores indicating greater distress. Impacts shown as standardized effect sizes. Effect sizes were standardized by dividing impacts by standard deviation for the UC group.

[g] Measures evidence of alcohol dependence or drug abuse using responses to the Rapid Alcohol Problems Screen (RAPS-4) and six items from the Drug Abuse Screening Test (DAST-10).

[h] Number of schools outcome is topcoded at 4 or more schools.

[i] Absences outcome is defined as 0 = no absences in past month; 1 = one to two absences; 2 = three to five absences; 3 = six or more absences. This parent-reported outcome was collected from only the first 38 percent of parents surveyed due to an error in data collection.

[j] Behavior problems outcome is measured as the standardized Total Difficulties score from the Strengths and Difficulties Questionnaire, or SDQ.

Notes: Impact estimates are regression adjusted for baseline characteristics and are weighted to adjust for survey nonresponse. See Appendix B for outcome definitions.

Sources: Family Options Study 37-month followup survey; Program Usage Data

evidence of alcohol and drug problems, and halved intimate partner violence compared with usual care. In the 3-year analysis, reductions in psychological distress and intimate partner violence were still evident.

Assignment to the SUB group also caused improvements in a few of the child well-being measures shown in Exhibit ES-7. Relative to usual care, assignment to the SUB intervention reduced the number of schools that children attended since random assignment (evident at both time points). Assignment to the SUB group also reduced the number of school absences (at 20 months only) and reduced the number of behavior problems reported by parents (at 37 months only).

At 20 months after random assignment, assignment to the SUB group, when compared with usual care, reduced the proportion of family heads working in the week before the survey by 6 percentage points. This result is consistent with

economic theory, given that housing subsidies lessened the need for disposable income. A reduction was not evident at the time of the 37-month survey, although reports of work activity between the followup points showed that the proportion of family heads with any work effort between the surveys was reduced by 6 percentage points (not shown in the exhibit).

Assignment to the SUB intervention caused improvements in food security, increasing the percentage of households classified as food secure by 10 percentage points relative to usual care at both followup points.

### CBRR Versus UC

Almost no evidence of assignment to the CBRR intervention differentially affecting outcomes compared with assignment to the UC intervention appears at either 20 or 37 months of the followup period across the domains of housing stability, family preservation, and adult and child well-being. It is most striking that, relative to usual care, priority access to the temporary rental assistance offered in the CBRR intervention does not show impacts on subsequent stays in shelter or places not meant for human habitation during the 3-year followup period. Indications about consequences for children are limited, with assignment to the CBRR intervention leading to a reduction in school or childcare absences compared with usual care (at 20 months only) and in parent-reported behavior problems (at 37 months only).

At 20 months, relative to usual care, assignment to the CBRR intervention improved food security and family income (with previous-year income for CBRR families about $1,100 more than for UC families). Neither of these effects was evident at 37 months.

### PBTH Versus UC

Compared with the UC intervention, assignment to the PBTH intervention improved housing stability but showed no evidence of impact in other domains. Assignment to the PBTH intervention reduced the proportion of families who had a stay in emergency shelter in months 7 to 18 after random assignment from 27 to 19 percent (a much smaller impact than that of assignment to the SUB intervention relative to usual care). Assignment to the PBTH intervention also reduced the proportion of families who had any stay in emergency shelter in months 21 to 32 after random assignment. This time period corresponds to the last full year observed for all sample members but overlaps a portion of the 24-month period that families could have stayed in transitional housing. For outcomes occurring further along in the followup period, no evidence indicates that assignment to the PBTH intervention is superior to usual care regarding housing stability. Besides housing stability, the study yields no evidence of effects of assignment to the PBTH intervention relative to usual care in other domains at either point in time.

The lack of impacts on adult well-being and family self-sufficiency are particularly noteworthy here, given the emphasis placed by PBTH programs on delivering supportive services in these areas. None of the eight indicators examined for results in these domains showed any impact from assignment to the PBTH intervention compared with usual care, nor did assignment to the PBTH intervention provide better family preservation or child well-being outcomes than usual care. Overall, 3 years after assignment, the study did not find evidence that the goals of this distinctive approach to assisting families facing unstable housing situations were achieved relative to leaving families to find their way out of shelter without priority access to any program.

### SUB Versus CBRR

The most noteworthy effect of assignment to the SUB group relative to assignment to the CBRR group was improved housing stability. Relative to assignment to the CBRR intervention, assignment to the SUB intervention reduced the proportion of families who had a shelter stay or an experience of homelessness or doubling up—producing effects, at both followup points, nearly as large as those from the SUB-versus-UC comparison covered previously. By the time of the 37-month survey, the improvement in housing stability seems largely driven by a reduction in doubling up, rather than in shelter stays or in places not meant for human habitation (not shown in the exhibit). At both followup points, the greater stability afforded by assignment to the SUB intervention was also evidenced in a reduction in the number of places families lived in the past 6 months relative to assignment to the CBRR intervention.

At 20 months, other scattered effects shown in the SUB-versus-CBRR comparison mostly suggest more favorable outcomes for families assigned to the SUB intervention. In particular, assignment to the SUB intervention relative to assignment to the CBRR group reduced separations of spouses and partners, intimate partner violence, and the number of schools attended by children; however, it also reduced total prior-year income for the family.

At the later followup point, the study found few statistically significant differences outside the housing stability domain. Of the impacts detected at 20 months in this comparison, only the reduction in the number of schools attended was evident at 37 months.

### SUB Versus PBTH

In most respects, the measured effects of assignment to the SUB intervention compared with assignment to the PBTH intervention mirror those found in the previous SUB-versus-UC comparison. At both of the study's followup points, the most noteworthy effect of assignment to the SUB intervention relative to the PBTH intervention is its greater prevention of

stays in shelter or places not meant for human habitation in each 6-month window before the followup surveys and in its reduction in doubled-up housing situations. The greater stability afforded by assignment to the SUB intervention was evidenced in a reduction in the number of places families lived in the past 6 months compared with assignment to the PBTH intervention.

At 20 months, the SUB-versus-PBTH comparison showed effects on family preservation, adult well-being, and child well-being. The most notable effects of assignment to the SUB group relative to assignment to the PBTH group were a reduction in the proportion of families who had a child separation in the past 6 months, a decrease in the psychological distress reported by family heads, and a reduction in the number of schools that children attended since random assignment. The 3-year analysis found two of these three effects: (1) reductions in child separation and in the number of schools attended and (2) an additional reduction in child behavior problems. No effects on adult well-being were found at the later followup point.

In the self-sufficiency domain at 20 months, the study found that assignment to the SUB group relative to assignment to the PBTH group caused a reduction in work effort. Assignment to the SUB intervention reduced the proportion of family heads who worked at 20 months (from 36 to 25 percent) and reduced average prior-year income from $10,500 to $9,000. These effects were not found at 37 months. At both followup points, the additional resources represented by the permanent housing subsidy served to increase food security relative to assignment to the PBTH intervention.

### CBRR Versus PBTH

The CBRR-versus-PBTH comparison does not yield a strong pattern of effects across the study domains. In particular, no evidence indicates an effect on housing stability or family preservation. The CBRR-versus-PBTH comparison, however, yields statistically significant effects for four of the outcomes selected for the executive summary presentation in the adult well-being, child well-being, and self-sufficiency domains. All these significant results favored assignment to the CBRR intervention. In the adult well-being domain, at both followup points, assignment to the CBRR intervention reduced the proportion of adult respondents reporting alcohol dependence or drug abuse in the past 6 months and lowered the amount of psychological distress for family heads relative to assignment to the PBTH intervention. Assignment to the CBRR intervention also reduced the proportion of family heads reporting poor or fair health (at 20 months only), reduced parent-reported child behavior problems (at 37 months only), and reduced the proportion of families who are food insecure (at both followup points).

## Do Certain Interventions Work Better When Offered to Families Facing Greater Difficulties?

A central question motivating the Family Options Study is whether some interventions work better than other interventions for families who had particular characteristics. The previously described study findings show that, on average, the SUB intervention had substantial impacts relative to the other interventions, not only for housing stability but also for outcomes in other domains. Do all families who experience homelessness need a deep permanent housing subsidy, however, or might some do as well on their own, in usual care, or with the shorter and often shallower subsidies of offered in the CBRR intervention? Conversely, although, on average, assignment to the PBTH intervention had few impacts relative to other interventions, might some families who face more challenges benefit more from its intensive social services? The more general form of these questions is whether the relative benefits of the longer term or more intensive interventions (SUB and PBTH) might increase as families' reported difficulties increase. Because of the number of family characteristics that could lead to differential effects of interventions, the study team confined analyses of impact variations to two broad categories of family characteristics, summarized in indices of psychosocial challenges and barriers to housing. The study team examined whether the impact of the interventions relative to each other and to usual care increased as families' scores on these indices increase.

It is clear that families in this study experience high levels of both psychosocial challenges and barriers to housing, which was by design: the study enrolled families only after they had spent at least 7 days in shelter. The examination of these potential moderator effects at 20 and 37 months does not provide appreciable evidence that any of the interventions studied work comparatively better for families who have more psychosocial challenges or housing barriers than for families who face fewer difficulties. As a result, the study's clearest guidance for policy for *all* types of families at the 3-year followup point consists of the main study results on overall impacts.

## Intervention Costs

The Family Options Study interventions were intended to vary in both intensity and duration. The permanent housing subsidies offered to the SUB group provided a deep rental subsidy, limiting families' contributions to rent and utilities to about 30 percent of monthly adjusted income. SUB programs did not provide supportive services, but the rental subsidy was for an indefinite duration. PBTH programs provided intensive housing and services support for a relatively long duration. CBRR programs provided a short-term rental subsidy with more limited

supportive services, while emergency shelter programs often offered intensive supportive services and housing for a limited time. The study team compared the costs of the interventions using two measures of cost:

1. Per-family monthly cost of using a particular type of program (for example, permanent housing subsidies of the type offered to SUB families).
2. Per-family cost of all programs used by those assigned to an intervention (that is, the SUB, CBRR, PBTH, and UC interventions) during the 3-year followup period.

The first measure provides information about the relative costs of funding different types of programs. The second measure provides context for interpreting the impacts of the contrasting results of random assignment—that is, the impact of assignment to a particular intervention presented in the pairwise comparisons in Chapters 3 through 6. This latter measure reflects the combined cost of all homeless and housing assistance program types that families in each pairwise comparison used during the 3-year followup period, those offered by the study and other types as well.

### Per-Family Monthly Program Cost

Emergency shelter programs had the highest ***average per-family monthly program cost***—about $4,800—of all the types of programs examined. Supportive services made up 63 percent of emergency shelter costs, the highest share among the four program types considered. PBTH programs had an average cost per family per month of participation of about $2,700, with supportive services constituting, on average, 42 percent of those costs. Permanent subsidy programs cost, on average, about $1,200 per month per participating family. The cost of SUB programs consisted wholly of the cost of housing, because permanent subsidy programs do not provide supportive services. CBRR programs had the lowest per-family per-month cost, averaging about $900. Housing costs made up, on average, 72 percent of CBRR program costs.

Costs of the individual local programs that made up these averages varied considerably. PBTH programs and emergency shelters had the greatest variation, driven largely by variation in supportive services costs across local providers but also by variation in capital costs and administrative expenses. For the 24 PBTH programs examined in the cost analysis, average per-family monthly program cost ranged from $1,300 to $6,300. Average per-family monthly program cost for the 45 emergency shelter programs examined ranged from $1,900 to $9,200.

Variation in rapid re-housing and permanent subsidy costs from one local program to another was driven largely by housing costs. For the 12 CBRR programs in the cost analysis, the average per-family monthly program cost ranged from $550 to $1,400. Across the 10 sites where permanent housing subsidies were offered to families assigned to the SUB group, the average per-family per-month cost of subsidy program participation ranged from $770 to $2,100, largely reflecting differences in the local cost of rental housing.

### Total Costs of Programs Used During the 3-Year Followup Period

Exhibits ES-4, ES-5, and ES-6 show how families assigned to the four interventions used different mixes of homeless and housing assistance programs during the 3 years studied. The study team combined information about program use with per-family monthly program costs to estimate the total costs of programs used by families in each intervention group in each of the six pairwise comparisons.

At 20 months after random assignment, the study found that the per-family cost of all program use by families assigned usual care was about $30,000. The cost of all program use of all types for families assigned to the SUB intervention was about the same as that for families assigned to usual care, slightly more than that for families assigned to the CBRR intervention, and clearly less than that for PBTH families. The near-equivalent cost of program use for families assigned to the SUB intervention compared with usual care at the 20-month followup survey resulted from the higher use of permanent housing subsidies being offset by the decreased use of relatively expensive emergency shelter and transitional housing programs by families assigned to the SUB intervention. In a similar way, the costs of total program use for families assigned to the SUB and CBRR interventions were nearly equivalent, because the greater use of permanent subsidy programs by SUB families was offset by the greater use of transitional housing, emergency shelter, and other programs by CBRR families. At 20 months after random assignment, the cost of all program use for families assigned to the CBRR intervention was clearly less than that for families in either the UC group or the PBTH group.

Cost results at 37 months after random assignment appear in Exhibit ES-8. The exhibit shows that total program use cost about $41,000 for families assigned to usual care. The cost of all program use during 37 months for families assigned to the SUB intervention was about $3,800 (9 percent) more than for comparable families assigned usual care. This difference arises out of a growing differential between the average monthly costs of all program use in the SUB and UC groups. At the time of the 20-month survey, this monthly differential was only $20 (the difference between $1,086 for the SUB group and $1,066 for the UC group). At the time of the 37-month survey, the monthly differential had reached $136 ($978 for the SUB group compared with $842 for the UC group). In other comparisons involving the SUB intervention, families assigned to the SUB

**Exhibit ES-8.** Cost of Program Use Since RA for Each Intervention Contrast




CBRR = priority access to community-based rapid re-housing. ES = emergency shelter. PBTH = priority access to project-based transitional housing. SUB = priority access to permanent housing subsidy. UC = usual care.

RA = random assignment.

Notes: Averages are for all 37-month survey respondents in each pairwise comparison and are weighted for survey nonresponse to represent full comparison sample. Cost estimates assume a site-specific average cost per month based on the Family Options Study cost data and HUD administrative data. The *other* category refers to other permanent housing subsidies and includes permanent supportive housing, public housing, and project-based assistance (project-based vouchers or Section 8 projects).

Sources: Family Options Study cost data; U.S. Department of Housing and Urban Development, Public and Indian Housing Information Center, Tenant Rental Assistance Certification System, and Financial Data Schedule records (SUB); Family Options Study Program Usage Data

group have about 9 percent higher average costs during the first 37 months than families assigned to the CBRR group and 10 percent higher than families assigned to the PBTH group.

In other comparisons involving the PBTH group, the high monthly cost of transitional housing programs results in a higher average cost of all programs used for families assigned to the PBTH

group compared with families assigned to either the UC or CBRR group. On the other hand, in each of the three comparisons involving the CBRR intervention, families assigned to the CBRR group have the lowest average cost for all programs used. The largest difference is for the CBRR group compared with the PBTH group, in which the high monthly cost and greater use of transitional housing programs for the latter group results in a nearly $10,000 difference in average cost of all program use for comparable families. For CBRR-versus-UC and SUB-versus-CBRR, CBRR families have an average cost of all programs used that is $4,000 (roughly 10 percent) less than the cost of program use for those assigned to the other interventions.

## Conclusions

The Family Options Study's random assignment design for measuring intervention impacts is a stronger design than that of other studies of programs for homeless families. Evidence from the study's 3-year analysis provides important new information about what happens to families who experience homelessness in the absence of any special offers of assistance. It also provides information about the impact of assignment to three active interventions: SUB, CBRR, and PBTH.

A clear finding from the study is that homelessness is expensive for families and communities. Even without priority access to assistance, families in 12 communities used housing and services programs costing about $41,000, on average, during a period of a little more than 3 years. Despite this considerable public (and in some cases private) investment, many families who had been in shelter for at least a week at the outset of the study were still not faring well 3 years later. Well over one-third had been homeless or doubled up recently, nearly one-half were food insecure, and incomes averaged less than two-thirds of the poverty threshold. The high cost of homeless services suggests that prevention efforts with low per-family costs—if they were effective—would not need to be tightly targeted to just the families who would otherwise experience homelessness in order to save resources.

The longer-term evidence from the Family Options Study indicates that having priority access to deep permanent housing subsidies produces substantial benefits for families. More than one-third of families assigned to any intervention found their way to permanent housing subsidies, but families given priority access to that assistance obtained subsidies sooner. Providing priority access to permanent housing subsidies cost 9 percent more than not giving families any priority offer during a 3-year followup period, and it suppressed work effort by about 6 percentage points during the second half of that period; however, it had substantial benefits. Assignment to the SUB intervention group more than halved most forms of residential instability, improved multiple measures of adult and child well-being, and reduced food insecurity.

The 3-year evidence shows that families randomly assigned to the CBRR group do about as well as families assigned to the UC group but at substantially lower cost, mainly because assignment to the CBRR group lowers the rate at which families use costly transitional housing programs. Assignment to the PBTH group has few advantages over other types of assistance. In addition, the study does not provide appreciable evidence that intervention impacts differ according to families' psychosocial challenges or housing barriers at baseline, whatever form of active assistance is prioritized.

The 3-year findings lend support for the underlying theoretical model for permanent housing subsidies. The striking impacts of assignment to the SUB group in reducing subsequent stays in shelter and places not meant for human habitation provide support for the view that, for most families, homelessness is a housing affordability problem that can be remedied with permanent housing subsidies without specialized homeless-specific psychosocial services. The findings also provide support for the more tentative theoretical proposition that resolving homelessness would have a radiating impact, given the short-term impacts found for assignment to the SUB intervention on family preservation, adult well-being, and school stability compared with the impacts of usual care and the continuing effects on adult and child well-being and self-sufficiency after 3 years.

The short-term findings provided less support for the theoretical model underlying the PBTH intervention. PBTH programs are intended to address the root causes of homelessness by providing social services packaged with housing assistance. The short-term analysis did not provide evidence that assignment to the PBTH intervention achieved that goal. Assignment to the PBTH intervention led to modest reductions in homelessness when compared with usual care during the period that some families were still in transitional housing, but effects on housing stability did not last until 3 years, and assignment to the PBTH intervention did not produce effects in other aspects of family well-being during the longer term.

The Family Options Study suggests that families who experience homelessness can successfully use and retain housing vouchers, and that having priority access to deep permanent housing subsidies has considerable benefits at some additional cost. The homeless assistance system does not currently provide immediate access to such subsidies for most families in shelter, although more than one-third of families without priority access nevertheless obtained permanent housing subsidies during a 3-year followup period.

# CHAPTER 1. INTRODUCTION

As part of its mission, the U.S. Department of Housing and Urban Development (HUD) has supported a range of programs to provide shelter and services for families experiencing homelessness. The Department has also engaged in partnerships with other federal agencies to focus resources on eradicating homelessness. *Opening Doors: Federal Strategic Plan to Prevent and End Homelessness*, released in 2010 by the U.S. Interagency Council on Homelessness, articulates this collective commitment and lists four goals, one of which is to "prevent and end homelessness for families, youth, and children by 2020" (USICH, 2010, 2015).

During a 12-month period ending September 2015, nearly 155,000 families with children in the United States (502,521 people) stayed in emergency shelters or transitional housing programs (HUD, 2015).[8] Although most homeless individuals are single men, about one-third (34 percent) of the sheltered homeless population are members of families (12-month estimate).

To develop evidence on which to base policy decisions, HUD launched the Family Options Study in 2008, awarding a contract to Abt Associates, Vanderbilt University, and several other partners. The Department intends the results of this study to support its efforts to help families leave homelessness and to create housing stability and other positive outcomes for families who have experienced homelessness, including family preservation, adult well-being, child well-being, and self-sufficiency.

The Family Options Study examines the effects of three types of programs—permanent housing subsidies, community-based rapid re-housing, and project-based transitional housing—compared with one another and with the usual care available to homeless families. The three types of programs are distinguished from one another by the duration of housing assistance and the type and intensity of social services provided to families. Usual care consists of emergency shelter and housing or services that families can access without immediate referral to a program that would provide them with a place to live.

To be specific, the study randomly assigned a sample of 2,282 families in 12 sites to one of three active interventions or to usual care. The *Family Options Study: Short-Term Impacts of Housing and Services Interventions for Homeless Families* (hereafter, the *Short-Term Impacts* report; Gubits et al., 2015) presented 20-month impact estimates, documenting how families were faring roughly 1 1/2 years after random assignment. This report presents estimates of longer-term impacts at the point of 3 years after random assignment to the interventions studied.[9] This report also presents information about the relative costs of the three active interventions and emergency shelter. The analysis presented in this report uses survey and administrative data for the sample of 1,784 families and 2,665 children from the 12 sites who responded to a followup survey approximately 37 months after random assignment (henceforth referred to as the 37-month followup survey).

The balance of this chapter characterizes study families and interventions, describes the design of the study, summarizes findings from the enrollment phase, and recaps the short-term impacts of the interventions for families in the first 20 months after random assignment. The chapter closes with a discussion of the questions that motivate this longer-term analysis.

## 1.1. The Research Sample

The study team recruited 12 sites (displayed in Exhibit 1-1) to conduct the study. The 12 study sites represent a diverse range of geographic locations, size, population, and housing and labor market characteristics. Although not a randomly selected sample of communities, the sites are varied in geography and conditions that are related to homelessness. The sites are located in all four of the Census Bureau-designated regions in the country.[10]

At study entry, characteristics of the 2,282 families who enrolled in the Family Options Study were similar to characteristics of families who experience homelessness nationwide. This

[8] AHAR 2015 Part 2, 2015.

[9] Gubits et al. (2015) report the short-term impacts of the Family Options Study in *Family Options Study: Short-Term Impacts of Housing and Services Interventions for Homeless Families* (Gubits et al., 2015). Two other reports provide information about the Family Options Study: the *Revised Data Collection and Analysis Plan: Family Options Study* (Gubits et al., 2012), which describes the research design and analysis plan, and the *Interim Report: Family Options Study* (Gubits et al., 2013), which documents study implementation findings and baseline characteristics of the research sample.

[10] For more detail on the study sites and baseline characteristics of the research sample, see the *Interim Report: Family Options Study* (Gubits et al., 2013).

**Exhibit 1-1.** Location of Study Sites




observation is true even though the sites were not a randomly selected sample of communities. This section briefly summarizes the study sample (Exhibit 1-2). Additional details about the baseline characteristics of the research sample are provided in the *Interim Report: Family Options Study* (hereafter, the *Interim Report*; Gubits et al., 2013) and the *Short-Term Impacts* report (Gubits et al., 2015).

The typical family in the study consisted of an adult woman, who was a median of 29 years old and lived with one or two of her children in an emergency shelter. In about one-fourth of the families at least one child was separated from the family at the time of enrollment and was living with other relatives, with friends, or in foster care. At baseline, 30 percent of families had more than one adult present. Nearly all families who had two adults present were headed by couples, and 10 percent of families had a partner living elsewhere. As in other studies of homelessness among families, members of minority groups were overrepresented, even in proportion to the poverty population.

A plurality of families (43 percent) had only one child with them in the shelter, and one-half of the families were with a child younger than age 3. Most families in the study (79 percent) were not homeless immediately before entering the shelter from which they were recruited into the study. About 63 percent of family heads in the study, however, had experienced homelessness at some other point in their lifetime, with 16 percent of adult respondents having experienced homelessness as a child. An even greater proportion (85 percent) indicated they lived doubled up at some point as an adult, defined in the survey as "staying with family or friends because you couldn't find or afford a place of your own."

Most family heads were not working at the time of random assignment (83 percent), and more than one-half had not worked for pay in the previous 6 months. The median annual household income of all families in the study at baseline was $7,410. Many reported they either had a poor rental history (26 percent had been evicted) or had never been a leaseholder (35 percent). Nearly one in three reported either post-traumatic stress disorder or serious psychological distress.

**Exhibit 1-2.** Family Characteristics

| Family Characteristic | Percent of Adult Respondents/ Percent of Families/Years |
|---|---|
| **Family composition** | |
| **Adults** | |
| Adult respondent is female | 91.8 |
| Median age of adult respondent | 29.0 years |
| **Children** | |
| 1 child present in shelter | 43.2 |
| 2 children present in shelter | 30.2 |
| 3 children present in shelter | 15.3 |
| 4 or more children present in shelter | 11.2 |
| At least 1 child present in shelter younger than age 3 | 50.4 |
| Mother is pregnant | 9.8 |
| At least 1 child not present in shelter | 23.9 |
| **Housing instability and history of homelessness** | |
| **Homelessness history** | |
| Previous episode of homelessness | 62.9 |
| Total homelessness in life | Median: 6 months |
| **Doubled up history** | |
| Ever doubled up as adult because could not pay rent | 84.7 |
| Time doubled up in past 5 years[a] | Median: 1 year |
| **Income stability and disability** | |
| **Employment history of adult respondents[b]** | |
| No work past 1 week | 82.9 |
| No work past 6 months | 57.1 |
| No work past 1 year | 45.0 |
| No work past 2 years | 30.3 |
| **Family income during the past year** | |
| 20th percentile | $2,880 |
| 50th percentile (median) | $7,410 |
| 80th percentile | $15,000 |
| **Barriers to increasing income or finding housing** | |
| **Exposure to violence and mental health** | |
| Domestic violence by spouse or partner as an adult | 49.0 |
| PTSD symptoms | 21.6 |
| Psychological distress | 22.1 |
| **Previous housing history—problems finding housing** | |
| History of eviction[c] | 25.9 big or small problem |
| Never a leaseholder[c] | 34.8 big or small problem |

PTSD = post-traumatic stress disorder.
[a] Time doubled up in past 5 years or time doubled up since age 18 for respondents ages 18 to 22 years.
[b] Rows are not mutually exclusive.
[c] Information was collected on history of eviction and never having been a leaseholder only if the respondent thought these factors presented a problem in finding a place to live.
Note: Sample size = 2,282.
Source: Family Options Study baseline survey

## 1.2. Interventions Studied and Rationales

The Family Options Study compares three active interventions with one another and with usual care in the communities where families were recruited:

1. ***Assignment to the SUB intervention*** provided priority access to a permanent housing subsidy, usually a housing choice voucher that paid the difference between 30 percent of families' incomes and their housing costs in conventional private market housing. Families did not receive any other dedicated services but were free to obtain whatever social services might be available in their communities. The rationale for permanent housing subsidies is that homelessness is an economic problem that subsidies can address. Once stabilized in housing, families can address other nonhousing needs, such as employment services or connections to benefits, with community-based providers. Families could continue receiving housing assistance as long as they remained eligible and followed program rules, such as paying their share of

the rent and living in housing that passes a housing-quality inspection. Families in homeless shelters do not ordinarily have immediate access to housing choice vouchers, which are not typically part of the homeless assistance system.

2. ***Assignment to the CBRR intervention*** provided priority access to temporary rental assistance to help families find and rent conventional, private-market housing, paired with limited services focused on housing and self-sufficiency. Rental assistance, which had to be renewed every 3 months and could last up to 18 months (median stay for study families was 8 months), was structured differently in different communities. All programs assessed family needs at the outset and developed formal services plans focused on housing and self-sufficiency. Case managers adjusted these services plans based on quarterly reassessments conducted to determine whether to renew the rental assistance. Case management ratios varied, but averaged 36 families per case manager, with most families meeting with the case manager monthly. Although rapid re-housing was an emerging practice at the time families enrolled in the study, the programs studied were consistent with the core components in guidelines HUD issued in 2012.[11] The rationale for community-based rapid re-housing is that, although homelessness is largely an economic problem, the role of the homeless assistance system should be to get families into conventional housing as rapidly as possible with the minimum intervention necessary to prevent returns to shelter.

3. ***Assignment to the PBTH intervention*** provided priority access to temporary housing for up to 24 months (the median stay for study families lasted 13 months), coupled with more intensive social services in supervised programs.[12] The rationale for project-based transitional housing is that families who experience homelessness have a variety of additional challenges (mental health or substance issues, lack of job experience or skills, domestic violence, parenting challenges) that must be addressed before families can succeed in independent housing. Families received comprehensive assessments at the outset of the program and most programs provided housing placement assistance, self-sufficiency services, employment or training assistance, life skills, mental and physical health care, parenting, child advocacy and substance abuse services, as needed. Most services were provided by case managers (with an average ratio of 20 families to each case manager, almost twice the intensity of community-based rapid re-housing), but services could also be provided by other agency staff or through dedicated linkages with other agencies.

4. ***Assignment to the UC intervention*** provided no priority access to programs but consisted of whatever housing or services a family accessed in the absence of immediate referral to the programs offered to families assigned to the other interventions. Because all families were recruited from emergency shelter, usual care typically consisted of continued stays in the emergency shelter from which families were enrolled, until families were able to make other arrangements on their own or with the assistance of service providers. Families in shelters also received case management and services similar to those received by families in the PBTH group (with an average ratio of 16 families per case manager, although this varied considerably from shelter to shelter). Families in the UC group found their way into a variety of housing and services programs (see Chapter 2).

For more information about the interventions studied in the Family Options Study see Chapter 2 and Appendix B in the *Interim Report* (Gubits et al., 2013), Chapters 6 to 8 in the *Short-Term Impacts* report (Gubits et al., 2015), and short papers on the SUB and CBRR interventions.[13]

## 1.3. Evaluation Design

In each study site, the study team recruited families who had stayed in emergency homeless shelters for at least 7 days. The study team excluded families who left shelter in fewer than 7 days, because the more intensive interventions considered in this study may not be necessary for families who can resolve a housing crisis quickly.

In the original design of the study, each family was to have a chance of being assigned to all four groups (SUB, CBRR, PBTH, and UC). A number of factors prevented the study from being implemented as planned. First, all four intervention were offered in only nine sites. Two sites (Atlanta and Baltimore) did not offer the SUB intervention, and one site (Boston) did not offer the PBTH intervention. Second, interventions were available to families only in cases when at least one provider of the intervention type had an available slot. Third, some service providers had unique eligibility requirements for families.

[11] See http://usich.gov/population/families/core-components-rrh/. See also Wood (forthcoming).

[12] To distinguish transitional housing from community-based rapid re-housing, the Family Options Study examined project-based transitional housing (PBTH), rather than scattered-site transitional housing programs that sometimes allow families to assume the lease or "transition in place" at the end of the program. Some PBTH programs included in the study provided units in the community (called "scattered site" units) without the opportunity to transition in place when assistance ended.

[13] Solari and Khadduri (forthcoming), Wood (forthcoming).

Case 3:25-cv-07070-RS Document 110-21 Filed 08/17/26 Page 63 of 65
PageID #: 11573


Before random assignment, the study team screened families for eligibility for the providers that had available slots based on criteria specified by the providers. The purpose of this screening was to minimize the likelihood of assigning families to interventions they would not be eligible to receive.[14] As a result, for an intervention option to be available to a family undergoing random assignment, at least one slot had to be open at an intervention provider for which the family met provider-specific eligibility requirements. All families were eligible for usual care by definition.

Families were randomly assigned among available interventions and all analyses compare families who were eligible for both interventions in a comparison and randomized to one of them. Thus, for example, all families who had no PBTH program available at the time of random assignment in their site or who were ineligible for all available PBTH programs were excluded from comparisons involving the PBTH intervention and either usual care or one of the other interventions. This random assignment design assures that comparisons of interventions involve well-matched groups and that any (statistically significant) observed differences in outcomes can be attributed to the differential assignment families received and not to any preexisting differences among the families. Following random assignment, the study team analyzed the baseline characteristics of the sample to confirm that the different sets of families assigned to each intervention were indeed equivalent. The *Interim Report* (Gubits et al., 2013) describes these analyses.

Assignment to an intervention meant that families were given priority access to specific programs that had a place reserved for them and expected them to enroll. Families were not required to enroll in the programs. If families did not take up the offered program, they stayed at the shelter from which they were enrolled until they were able to make other arrangements, either on their own or with the assistance of social service providers at the shelter or elsewhere. Families assigned to each intervention actually used a variety of programs, but they were more likely to use a program when they got a priority offer to it than when they did not, as described in the analysis of the pairwise comparisons in Chapters 3 through 6. Exhibit 1-3 illustrates the six pairwise comparisons. To investigate the impact of offers of priority access to programs, the impact analysis includes all families who received priority offers, regardless of whether they used them.[15]

**Exhibit 1-3.** Six Pairwise Comparisons Among the Four Interventions




[14] See the *Interim Report* (Gubits et al., 2013) for a detailed description of the eligibility screening conducted before random assignment.

[15] See Appendix C for details of the methods used to estimate impacts.



HUD-AR-02708

## 1.4. Findings From the Enrollment Phase

The *Interim Report* (Gubits et al., 2013) concluded that homeless assistance programs in the study communities imposed eligibility criteria that hampered their ability to serve families in shelter who needed the assistance. Even when programs had space available, the programs often screened out families in shelter based on eligibility criteria such as insufficient income, substance abuse, criminal histories, and other factors that presumably contributed to the families' homelessness. Screening out was most common for PBTH programs and least common for SUB programs. Moreover, families who are homeless do not always choose to pursue the programs offered to them, which suggests that some programs deliver assistance that some families perceive as less valuable to them than other alternatives available in their communities.

## 1.5. Short-Term Findings (20 Months After Enrollment)

The *Short-Term Impacts* report (Gubits et al., 2015) examined 20-month impacts of intervention assignment for 73 outcomes in five domains: (1) housing stability, (2) family preservation, (3) adult well-being, (4) child well-being, and (5) self-sufficiency.

In the absence of priority access to a specific program, families assigned to the UC group were not faring well 20 months after enrollment in the study. One-half had spent at least 1 night homeless or doubled up in the 6 months before the 20-month survey[16] or had been in shelter in the past 12 months. In the 6 months before the survey, 15 percent of families had been separated from a child who was with the family in shelter at study outset, and 4 percent had children in foster care. At the time of the survey, 15 percent reported alcohol dependence or substance abuse, and 12 percent had experienced intimate partner violence in the past 6 months. Children had attended two schools, on average, in the past 20 months and were absent, on average, about 1 day per month. Less than one-third of UC families (31 percent) were working for pay, and total family income was only $9,067 per year—much less than what is needed to rent market-rate housing for a family in most communities.

Relative to assignment to the UC group, assignment to the SUB group caused striking improvements in families' outcomes in the first 20 months after random assignment. Having priority access to permanent housing subsidies—compared with priority access to community-based rapid re-housing and project-based transitional housing and with usual care reduced homelessness, doubling up, and residential mobility across multiple measures. Impacts of assignment to the SUB intervention radiated beyond housing. Compared with assignment to the UC group, assignment to the SUB group reduced the number of separations of children from parents and adult drug abuse, psychological distress, and domestic violence, and it improved food security. Assignment to the SUB group also reduced the number of schools children attended and their absences from school, although effects on other child outcomes were more sparse. The salutary effects of assignment to the SUB intervention extended across all five of the outcome domains when compared with assignment to the UC group; however, heads of these families exerted less work effort compared with families assigned to the UC group. In the week before the 20-month survey, 30 percent of UC families were working for pay compared with 24 percent of families assigned to the SUB group.

The striking impacts of assignment to the SUB intervention in reducing subsequent stays in shelter and places not meant for human habitation provided support for the view that, for most families, homelessness is a housing affordability problem that can be remedied with permanent housing subsidies without specialized homeless-specific psychosocial services. The findings also provided support for the theoretical proposition that resolving homelessness would have a radiating impact, given the short-term impacts found for assignment to the SUB intervention on family preservation, adult well-being, school stability, and food security compared with usual care.

Considering costs through 20 months (all that was possible as of that analysis), the benefits of having priority access to permanent housing subsidies were achieved at comparable cost with that of usual care, slightly higher costs than priority access to community-based rapid re-housing, and at substantially lower cost than priority access to project-based transitional housing.

CBRR families had housing outcomes similar to those of families assigned to the UC group. Relative to families assigned to the UC group, however, the cost of all program use for families assigned to the CBRR group was lower than for families assigned to the UC group, mainly because assignment to the CBRR intervention lowered the rate at which families used costly transitional housing programs in the first 20 months after random assignment. At the time of the short-term analysis, the three major advantages of assignment to the CBRR intervention over other interventions were (1) the comparatively low cost of the CBRR intervention, (2) the greater income observed among

[16] Gubits et al. (2015) analyzed short-term impacts of the interventions. The study team attempted to contact families for the study's first followup survey beginning in the 18th month after random assignment. The median time from random assignment to the followup survey was 20 months. The followup period reported in Gubits et al. (2015) is thus 20 months, but the followup survey is sometimes referred to as the 18-month survey.

families assigned to the CBRR group compared with income among families assigned to the UC group, and (3) greater work effort compared with families assigned to the SUB group.[17]

Assignment to the PBTH group led to modest reductions in homelessness when compared with assignment to the UC group (during a period when many families were still in the PBTH programs to which they received priority access), but it did not produce effects in other aspects of family well-being. The short-term findings provided little support for the theoretical model that project-based transitional housing would produce better results by addressing families' psychosocial issues in supervised settings. Finally, although the statistical power for these tests was low, the short-term results showed no evidence that intervention impacts differed according to families' psychosocial challenges or housing barriers whatever type of programs were offered to families. Overall, considering the cost of all program use in the first 20 months for families assigned to the PBTH group, the PBTH intervention was more costly and, at the 20-month followup point, had few advantages over other programs.

## 1.6. Questions for the 3-Year Analysis

The 3-year analysis addresses one primary question about program use and two primary questions about impacts:

1. What programs do families who experience homelessness use during a 3-year period, and how does assignment to an intervention that offers priority access to a particular kind of program affect this program use?

2. At 3 years after random assignment, what are the relative effects of the three active interventions compared with usual care and of the active interventions compared with each other?

3. What are the cumulative costs of the interventions during the 3 years following random assignment?

Longer-term followup is often desirable in assessing the effects of social policy interventions and is especially so in the case of the Family Options Study. To evaluate the effects of temporary assistance that can last up to 18 months (CBRR programs) or 24 months (PBTH programs), 20 months is not a long enough period. Some families may not have received a full dose of a temporary intervention by the time of the 20-month followup analysis, and anxieties about the impending end of a program or disruption from having recently moved at the time of the 20-month survey could have depressed families' outcomes in the CBRR and PBTH interventions. To the extent that assignment to interventions strengthen families or set the foundation for later success, as theorized by proponents of project-based transitional housing, new findings may emerge at 3 years. In a similar way, increases in incomes observed at 20 months for CBRR families may set families on a positive trajectory of sustained benefit from that intervention. On the other hand, to the extent that the reduction in homelessness seen for PBTH families at 20 months was a temporary consequence of still being in PBTH programs at that time, impacts may fade. This 3-year analysis enables the study team to examine outcomes well after families reach the time limits for these temporary programs. Longer-term analysis is also important to measure impacts that may take longer than 20 months to emerge, such as those on child well-being outcomes.

The *Short-Term Impacts* report (Gubits et al., 2015) found that families assigned to all interventions used a variety of programs. The 3-year analysis updates information about the ways that having priority access to particular interventions affected patterns of use. In the case of permanent housing subsidies, which can last as long as families comply with program requirements, it was not clear at 20 months whether families would successfully renew leases and sustain tenancies. The 3-year analysis addresses whether families assigned to the SUB group are able to retain the assistance. Emergency shelters, transitional housing programs, and rapid re-housing programs frequently attempt to enroll their families on waiting lists for permanent housing. Longer-term followup can also show whether these programs serve as way stations to more permanent housing subsidies.

Finally, the *Short-Term Impacts* report (Gubits et al., 2015) found that that, after 20 months, the cost of all the programs used by families assigned to the SUB group was about the same as for families assigned to the UC group. Because the subsidies tested in the SUB intervention are permanent, whereas the CBRR and PBTH interventions are time limited, there is good reason to expect that the relative costs of interventions may change when analyzed over a longer followup period. The current report examines these costs cumulatively for a full 3 years after random assignment.

[17] The *Short-Term Impacts* report (Gubits et al., 2015) also presented results showing that assignment to the CBRR group led to more rapid departures from emergency shelter than assignment to the UC group by about 2 weeks, but those departures were not more rapid than for families assigned to the SUB group or to the PBTH group. Revised analysis using updated Program Usage Data on length of emergency shelter stays, however, has resulted in changes to the findings about length of initial shelter stay. For the full study sample (not limited to 20-month survey respondents), families assigned to the CBRR group left shelter, on average, 1 week faster than families assigned to the UC group. This difference is not statistically significant. The results of the revised analysis are in Appendix I.