ANDREW JANZ (SBN 287672)
Fresno City Attorney
andrew.janz@fresno.gov
CITY OF FRESNO
2600 Fresno Street
Fresno, CA 93721
Telephone: (559) 621-7500
Facsimile: (559) 457-1084

*Attorney for Plaintiff*
CITY OF FRESNO

KELSEY MCELVEEN (MN BN 0396744)*
Assistant City Attorney
Kelsey.McElveen@ci.stpaul.mn.us
AARON WINTER (MN BN 0390914)*
Assistant City Attorney
aaron.winter@ci.stpaul.mn.us
SAINT PAUL CITY ATTORNEY'S OFFICE
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Telephone: (651) 266-8710
Facsimile: (651) 298-5619

*Attorneys for Plaintiff*
CITY OF SAINT PAUL
* *Appearing pro hac vice*

MELISSA C. ALLISON (MA BN 657470)*
mallison@andersonkreiger.com
CHRISTINA S. MARSHALL
(MA BN 688348)*
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, Floor 21
Boston, MA 02109
Telephone: (617) 621-6500

*Attorneys for Plaintiffs*
COUNTY OF MONROE
MONROE COUNTY AIRPORT AUTHORITY
* *Appearing pro hac vice*

JONATHAN V. HOLTZMAN (SBN 99795)
jholtzman@publiclawgroup.com
JAMES R. ROSS (SBN 149199)
jross@publiclawgroup.com
RYAN P. McGINLEY-STEMPEL (SBN 296182)
rmcginleystempel@publiclawgroup.com
MAXWELL S. PELTZ (SBN 183662)
mpeltz@publiclawgroup.com
JAKE D. FREITAS (SBN 341837)
jfreitas@publiclawgroup.com
MARIBEL LOPEZ (SBN 340907)
mlopez@publiclawgroup.com
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, California 94104
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Attorneys for Plaintiffs*
CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH LAKE TAHOE; COUNTY OF SACRAMENTO; COUNTY OF MONROE; MONROE COUNTY AIRPORT AUTHORITY; COUNTY OF SAN DIEGO; COUNTY OF MARIN; CITY OF ALAMEDA; CITY OF REDWOOD CITY; CITY OF ATLANTA; CITY OF BEAVERTON; CITY OF CORVALLIS; CITY OF HILLSBORO; CITY OF MOUNTAIN VIEW; CITY OF SALEM; CITY OF SAN MATEO; CITY OF SANTA CLARA; CITY OF SANTA CRUZ; CITY OF SUNNYVALE; CITY OF VACAVILLE; COUNTY OF LOS ANGELES; COUNTY OF SANTA BARBARA

BRANDON W. HALTER (SBN 289687)
Marin County Counsel
KATE K. STANFORD (SBN 302825)
Deputy County Counsel
kate.stanford@marincounty.gov
EDWARD F. SEARS (SBN 297775)
Deputy County Counsel
ned.sears@marincounty.gov
OFFICE OF THE COUNTY COUNSEL
COUNTY OF MARIN
3501 Civic Center Drive, Room 275
San Rafael, CA 94903
Telephone: (415) 473-6117
Facsimile: (415) 473-3796

*Attorneys for Plaintiff*
COUNTY OF MARIN

ALLEGRA J. LAWRENCE
(GA BN 439797)*
lawrence@khlawfirm.com
MICHELLE McCLAFFERTY
(ASB-0880-N10I)*
McClafferty@khlawfirm.com
KREVOLIN & HORST, LLC
1201 West Peachtree St., Suite 3500
Atlanta, GA 30309
Telephone: (404) 400-3350

*Attorneys for Plaintiff*
CITY OF ATLANTA
* *Appearing pro hac vice*

DANIEL J. TURNER (SBN 336499)
Deputy City Attorney
dturner@alamedaca.gov
2263 Santa Clara Avenue, Rm 280
Alameda, CA 94501
Telephone: (510) 747-4750

*Attorneys for Plaintiff*
CITY OF ALAMEDA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CITY OF FRESNO et al.,

Plaintiffs,

v.

SCOTT TURNER in his official capacity as Secretary of the U.S. Department of Housing and Urban Development, et al.,

Defendants.

Case No. 3:25-cv-07070-RS

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Judge: Hon. Richard Seeborg
Hearing Date: April 1, 2027
Hearing Time: 1:30 p.m.
Location: 450 Golden Gate Avenue
San Francisco, CA 94102
Courtroom 12, 19th Floor

Complaint Filed: August 20, 2025
FAC Filed: September 8, 2025
SAC Filed: February 9, 2026

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .......... i
TABLE OF AUTHORITIES .......... iii
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: .......... ix
STATEMENT OF ISSUES TO BE DECIDED .......... xi
MEMORANDUM OF POINTS AND AUTHORITIES .......... 1
I. INTRODUCTION .......... 1
II. STATEMENT OF FACTS .......... 1
A. Defendants Unilaterally Impose New Conditions on Federal Grant Funds .......... 1
1. HUD Conditions .......... 2
2. DOT Conditions .......... 5
a. FTA .......... 6
b. FHWA .......... 7
c. FAA .......... 8
d. FRA .......... 9
e. NHTSA .......... 10
3. HHS Conditions .......... 10
4. EPA Conditions .......... 12
B. Plaintiffs Obtain Preliminary Injunctive Relief Enjoining the Imposition and Enforcement of the Challenged Conditions Against Each Defendant Except for EPA .......... 12
C. The Ninth Circuit's Decision in *King County* Rebuffs the Administration's Efforts to Impose Conditions Without Statutory Authority .......... 13
III. LEGAL STANDARD .......... 13
IV. ARGUMENT .......... 14
A. The Challenged Conditions Violate the APA .......... 14
1. The Challenged Conditions Exceed Defendants' Statutory Authority .......... 14
a. Congress has not authorized the FCA materiality condition. .......... 15





RENNE PUBLIC LAW GROUP

**TABLE OF CONTENTS: (continued)** **Page**


b. Congress has not authorized the HUD Grant Conditions. ........................15

c. Congress has not authorized the DOT Grant Conditions..........................18

d. Congress has not authorized the HHS Grant Conditions...........................20

e. Congress has not authorized the EPA Grant Conditions. ..........................21

f. *King County* Does Not Preclude Summary Judgment on the Anti-Discrimination Conditions Because Those Conditions Are Plainly Unlawful and the Administration's Interpretation of Those Conditions Exceeds Title VI's Lawful Parameters..................................22

2. The Challenged Conditions Are Arbitrary and Capricious..................................26

3. The Challenged Conditions Are Contrary to the Constitution.............................29

B. The Challenged Conditions Violate the Constitution .....................................................29

1. The Challenged Conditions Violate the Separation of Powers.............................29

2. The Challenged Conditions Are Unconstitutionally Vague ................................31

a. The EO Conditions ....................................................................................32

b. DEI and Discrimination Conditions.........................................................33

c. Gender Ideology Conditions ......................................................................35

d. Elective Abortion Conditions ....................................................................35

e. Immigration Enforcement Conditions ......................................................35

3. The Challenged Conditions Violate the Spending Clause ..................................36

C. The Court Should Vacate the New Conditions and Permanently Enjoin Defendants from Re-Imposing or Otherwise Implementing Them ....................................................38

1. The Court Should Set Aside the New Conditions Under the APA.......................38

2. The Court Should Permanently Enjoin Defendants from Implementing or Enforcing the Challenged Conditions Against Plaintiffs.....................................38

a. Plaintiffs Have Demonstrated Actual Success on the Merits and Irreparable Harm From Defendants' Restrictions on Hundreds of Millions of Dollars in Funding ..............................................................39

b. Vacatur Is an Inadequate Remedy to Protect Plaintiffs Fully from Defendants' Reimposition of Substantially Similar Conditions................42

c. The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor ..........................................................................................................44

V. CONCLUSION..................................................................................................................45


RENNE PUBLIC LAW GROUP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ....................21

*Al Otro Lado, Inc. v. Mayorkas*,
619 F. Supp. 3d 1029 (S.D. Cal. 2022)....................43

*Am. Acad. of HIV Med. v. Health Res. & Servs. Admin.*,
No. CV 26-12638-WGY, 2026 WL 3562895 (D. Mass. Nov. 19, 2026)....................43

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
155 F.4th 1082 (9th Cir. 2025) ....................14

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D. Md. 2025)....................34

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ....................39

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
480 U.S. 531 (1987)....................39

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)....................36

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) ....................14

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020)....................21

*California by & through Becerra v. United States Dep't of the Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019) ....................25

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020) ....................27

*California v. Env't Prot. Agency*,
72 F.4th 308 (D.C. Cir. 2023)....................27

*California v. United States Dep't of Transportation*,
808 F. Supp. 3d 291 (D.R.I. 2025)....................42

*Chamber of Com. of U.S. v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023)....................42

*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ....................29, 30, 45

*City of Los Angeles v. Barr*,
941 F.3d 931 (9th Cir. 2019) ....................29

RENNE PUBLIC LAW GROUP

**TABLE OF AUTHORITIES: (continued)** **Page(s)**


*City of Salem v. Mullin*,
839 F. Supp. 3d 1320 (D. Or. 2026) ....................34

*Cnty. of Santa Clara v. Noem*,
815 F. Supp. 3d 979 (N.D. Cal. 2025) ....................34

*Cnty of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ....................32, 37, 40

*Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*,
802 F.3d 413 (2d Cir. 2015)....................17

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023) ....................23

*County of King v. Turner*,
189 F.4th 819 (9th Cir. 2026) .................... *passim*

*Diemert v. City of Seattle*,
776 F. Supp. 3d 922 (W.D. Wash. 2025), *aff'd in part, rev'd in part and remanded*,
192 F.4th 1143 (9th Cir. 2026) ....................28

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................39

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................26

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....................31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ....................21

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ....................40

*Housing Authority of the City & County of San Francisco v. Turner*,
Case No. 25-cv-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025)....................24, 25, 30

*Humane Soc. of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ....................25

*Hunt v. City of Los Angeles*,
638 F.3d 703 (9th Cir. 2011) ....................32

*Illinois v. Fed. Emergency Mgmt. Agency*,
801 F. Supp. 3d 75 (D.R.I. 2025) ....................38, 42, 43

*Illinois v. Fed. Emergency Mgmt. Agency*,
No. 1:25-CV-00206-MSM-RLA, 2026 WL 3390545 (D.R.I. Nov. 9, 2026)....................43, 44

*Illinois v. Fed. Emergency Mgmt. Agency*,
No. 25-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025)....................43, 44

**TABLE OF AUTHORITIES: (continued)** **Page(s)**


*Illinois v. Noem*, 813 F. Supp. 3d 282 (D.R.I. 2025) .... 42

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024 (9th Cir. 2013) .... 38

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657 (9th Cir. 2023) .... 26

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) .... 29

*Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025) .... 22

*Martin Luther King, Jr. County v. Turner et al.*, 9th Cir. Case No. 25-3664 (2025) .... *passim*

*Massachusetts v. U.S. Dep't of Agric.*, CV 26-11396-MJJ, 2026 WL 1815807 (D. Mass. June 24, 2026) .... 34

*McCrary v. Guitierrez*, No. C-08-015292 RMW, 2010 WL 520762 (N.D. Cal. Feb. 8, 2010) .... 14

*Michigan v. Noem*, 819 F. Supp. 3d 1163 (D. Or. 2025) .... 42

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .... 42

*Mont. Wildlife Fed'n v, Halland*, 127 F.4th 1 (9th Cir. 2025) .... 25, 38

*Moranski v. Gen. Motors Corp.*, 433 F.3d 537 (7th Cir. 2005) .... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .... 26, 27, 28

*Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53 (D.D.C. 2025) .... 34

*Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025) .... 34

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'r*s, 145 F.3d 1399 (D.C. Cir. 1998) .... 38

*Newsom v. Trump*, --- F.4th ---, 2026 WL 3180273 (9th Cir. Oct. 23, 2026) .... 29

*Ohio v. Env't Prot. Agency*, 603 U.S. 279 (2024) .... 26

*Pablo Sequen v. Albarran*, 835 F. Supp. 3d 1061 (N.D. Cal. 2026) .... 25

**TABLE OF AUTHORITIES: (continued)** **Page(s)**

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ....................36

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
800 F. Supp. 3d 351 (D.R.I. 2025) ....................42

*Rhode Island Coal. Against Domestic Violence v. Bondi*,
794 F. Supp. 3d 58 (D.R.I. 2025) ....................29

*Rhode Island Coal. Against Domestic Violence v. Kennedy*,
812 F. Supp. 3d 180 (D.R.I. 2025) ....................34

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) ....................21

*San Francisco A.I.D.S. Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025) ....................30, 32, 34, 45

*San Francisco Unified Sch. Dist. v. AmeriCorps*,
789 F. Supp. 3d 716 (N.D. Cal. 2025) ....................36

*Scholl v. Mnuchin*,
494 F. Supp. 3d 661 (N.D. Cal. 2020) ....................42

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) ....................14

*South Dakota v. Dole*,
483 U.S. 203 (1987) ....................37

*Texas v. Cardona*,
743 F. Supp. 3d 824 (N.D. Tex. 2024) ....................42

*Texas v. United States*,
No.18-CV-00068, 2021 WL 3022434 (S.D. Tex. July 16, 2021) ....................42

*United States v. Jae Gab Kim*,
449 F.3d 933 (9th Cir. 2006) ....................31

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) (Thomas, J., concurring) ....................23

*Washington v. United States Dep't of Educ.*,
813 F. Supp. 3d 1222 (W.D. Wash. 2025) ....................42

**Statutes**

5 U.S.C.
§ 706 ....................14
§ 706(2) ....................38
§ 706(2)(B) ....................29

**TABLE OF AUTHORITIES: (continued)** **Page(s)**

8 U.S.C.
§§ 1601-1646 ....5
§ 1324....7, 9
§ 1327....7, 9
§ 1642(b) ....18

15 U.S.C. § 637(d)(3)(C)(ii) ....20

20 U.S.C. §§ 1681 et seq....11

23 U.S.C.
§ 119....19
§ 124....19
§ 133....19
§ 148....19
§ 149....19
§ 167....19
§ 175....19
§ 176....19
§ 177(e)(2) ....19
§ 402....19
§ 405....19
§ 503(c)(4) ....19
§ 611....18

31 U.S.C.
§ 3729(b)(4) ....4

42 U.S.C.
§ 247c....20
§§ 247c(b)–(c)....20
§§ 247c(e)(3)....20
§§ 247c(e)(5)....20
§ 1320b-7 ....18
§§ 2000, et. seq. ....3
§§ 5303–5304....16
§ 5304(a)(3) ....16
§ 5304(b)....16
§ 5307(b)(2) ....16
§§ 9604(k)(2)–(6)....21
§ 11301....17
§ 11381....17
§ 11386....17
§ 11386(b)....17
§ 11386a....17
§ 12711....17

49 U.S.C.
§ 6703....19
§ 22909....19
§§ 47101 et seq. ....19
§ 47102(26)....8
§ 47106....19
§ 47107....19
§ 47113....19
§ 47113(a)(2) ....19

**Other Authorities**

24 C.F.R. § 5.106(b)-(c) ....... 27

62 Fed. Reg. 61348–49 (Nov. 17, 1997) ....... 18

AIDS Housing Opportunity Act of 1990, Pub. L. 101-625 ....... 16

Brownfields and Land Revitalization Program through the Small Business Liability Relief and Brownfields Revitalization Act of 2002, Pub. L. No. 107-118, 115 Stat. 2356 (2002) ....... 21

Cranston Gonzalez National Affordable Housing Act of 1990, Pub. L. 101-625, 10 Stat. 4079 ....... 16

Fed. R. Civ. P. 56(a) ....... 14

HEARTH Act of 2009, Pub. L. 111-22, 12 Stat. 1663 ....... 16

Housing and Community Development Act of 1974, Pub. L. 93-383, 8 Stat. 633 ....... 15

Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429 ....... 19

Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997) ....... 18

Stewart B. McKinney Homeless Assistance Act of 1987, Pub. L. 100-77, 10 Stat 482 ....... 16

United States Constitution, First Amendment ....... 31, 32

United States Constitution, Fifth Amendment ....... 1, 31, 39

Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) ....... 18

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**
**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Please take note that on April 1, 2027 at 1:30 p.m. in San Francisco Courthouse, Courtroom 12 – 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs City of Fresno; City of Eureka; City of South Lake Tahoe; City of Saint Paul; County of Sacramento; County of Monroe; Monroe County Airport Authority; County of San Diego; County of Marin; City of Alameda; City of Redwood City; City of Atlanta; City of Beaverton; City of Corvallis; City of Hillsboro; City of Mountain View; City of Salem; City of San Mateo; City of Santa Clara; City of Santa Cruz; City of Sunnyvale; City of Vacaville; County of Los Angeles; County of Santa Barbara ("Plaintiffs") will, and hereby do, move for summary judgment on the claims in their Second Amended Complaint, pursuant to Federal Rule of Civil Procedure 56.[1]

Plaintiffs request that the Court: (1) declare unlawful, vacate, and set aside the unlawful and unauthorized grant conditions (collectively, the "Challenged Conditions") and Defendants' policies of imposing those conditions; (2) permanently enjoin Defendants and anyone acting in concert or participation with them from attempting to enforce any Challenged Condition in any agreement that a Plaintiff already signed or from otherwise treating any such Challenged Condition as effective; and (3) permanently enjoin Defendants and anyone acting in concert or participation with them from imposing or enforcing the Challenged Conditions or any substantially similar conditions against Plaintiffs via any new agency action.

Plaintiffs' Motion is based on the supporting Memorandum of Points and Authorities ("MPA"), the Request for Judicial Notice filed concurrently herewith, declarations and exhibits in support of the MPA, the Administrative Record, all pleadings and papers on file in this action, and any argument and evidence presented at the hearing of this motion.

[1] Plaintiffs do not move for summary judgment on their claim for relief under the Tenth Amendment.



RENNE PUBLIC LAW GROUP

Dated: November 23, 2026

RENNE PUBLIC LAW GROUP

By: */s/ Ryan P. McGinley-Stempel*
RYAN P. MCGINLEY-STEMPEL

Attorneys for Plaintiffs
CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH LAKE TAHOE; COUNTY OF SACRAMENTO; COUNTY OF MONROE; MONROE COUNTY AIRPORT AUTHORITY; COUNTY OF SAN DIEGO, COUNTY OF MARIN; CITY OF ALAMEDA; CITY OF REDWOOD CITY; CITY OF ATLANTA; CITY OF BEAVERTON; CITY OF CORVALLIS; CITY OF HILLSBORO; CITY OF MOUNTAIN VIEW; CITY OF SALEM; CITY OF SAN MATEO; CITY OF SANTA CLARA; CITY OF SANTA CRUZ; CITY OF SUNNYVALE; CITY OF VACAVILLE; COUNTY OF LOS ANGELES; COUNTY OF SANTA BARBARA

Dated: November 23, 2026

SAINT PAUL CITY ATTORNEY'S OFFICE

By: */s/ Aaron Winter*
*AARON WINTER
* *Appearing pro hac vice*

Attorneys for Plaintiff
CITY OF SAINT PAUL

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Challenged Conditions that Defendants have imposed on Plaintiffs' federal grants exceed Defendants' statutory authority, in violation of the Administrative Procedure Act.

2. Whether the Challenged Conditions are arbitrary and capricious, in violation of the Administrative Procedure Act.

3. Whether the Challenged Conditions are contrary to the Constitution, because they (a) are unconstitutionally vague under the Due Process Clause, (b) violate the Spending Clause, and (c) violate the separation of powers.

4. Whether the Court should vacate and set aside the Challenged Conditions, and Defendants' policies of imposing them, under the Administrative Procedure Act.

5. Whether the Court should permanently enjoin Defendants from enforcing the Challenged Conditions and from imposing or enforcing the Challenged Conditions, or substantially similar conditions, against Plaintiffs through additional agency action.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Separation of Powers is a foundational principle of our constitutional system. The Constitution assigns Congress the authority to determine how federal funds are spent, including the purposes they are intended to serve and the conditions attached. Federal agencies are charged with administering the programs Congress creates. Without congressional authorization, the Executive may not repurpose federal funds for its own unrelated goals. Yet that is exactly what Defendants have done. Acting on a series of executive orders, the Department of Housing and Urban Development ("HUD"), the Department of Transportation ("DOT") and its operating administrations, the Department of Health and Human Services ("HHS"), and the Environmental Protection Agency ("EPA") have attached new conditions to congressionally authorized federal funds. Those conditions concern diversity, equity, and inclusion, "gender ideology," immigration enforcement, and elective abortion. Plaintiffs, a coalition of local government entities, must now accept policy mandates Congress never enacted or give up federal funding that provides for housing, transit, public health, and other essential services in their communities. The Administrative Procedure Act ("APA"), Separation of Powers, the Fifth Amendment, and the Spending Clause do not permit this blatantly arbitrary and capricious overreach. The Court should grant summary judgment, vacate the Challenged Conditions, and permanently enjoin Defendants from enforcing or re-imposing them against Plaintiffs.

## II. STATEMENT OF FACTS

### A. Defendants Unilaterally Impose New Conditions on Federal Grant Funds

Following the 2025 inauguration, President Trump issued a series of executive orders ("EOs") directing executive agencies to impose new conditions on federal grants. These EOs include EO No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing); EO No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (Defending Women from Gender Ideology Extremism); EO No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); EO No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) (Enforcing the Hyde Amendment); EO No. 14218, 90 Fed. Reg. 10581 (Feb. 19, 2025) (Ending Taxpayer Subsidization of Open Borders); EO No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) (Protecting



RENNE PUBLIC LAW GROUP

American Communities From Criminal Aliens); and EO No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) (Improving Oversight of Federal Grantmaking).[2] Pursuant to these EOs and other policy directives, Defendants have incorporated new conditions into grant programs' terms and conditions and agreements.

### 1. HUD Conditions

In or around April 2025, HUD revised its General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs ("General HUD Terms") to require recipients of HUD grant funding to comply with all existing and future EOs, including those enumerated above. *See* Dkt. 110-11, HUD-AR-01932–42. The General HUD Terms require that "[r]ecipients of Federal Awards must comply with applicable existing and future Executive Orders, as advised by the Department, including but not limited to" a "non-exhaustive list" of nine executive orders, including the EOs related to DEI, gender ideology, immigration, and elective abortions. *Id.* at HUD-AR-01940 (the "HUD EO Condition"). The General HUD Terms also provide, "[n]o state or unit of general local government that receives HUD funding under [sic] may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." *Id.* at HUD-AR-01933 (the "HUD Immigration Enforcement Condition").

HUD's revised General Terms were followed by public statements affirming the agency's commitment to the President's agenda. On or about May 15, 2025, Defendant Turner stated that "HUD is carrying out President Trump's EOs, mission, and agenda," by "[a]lign[ing] all programs, trainings, and grant agreements with the President's EOs, removing diversity, equity, inclusion (DEI)." Dkt. 36-24, Ex. B, Press Release No. 25-059, at 4.[3] HUD also revised its HUD-424B Assurances and Certifications form—which applicants and recipients of various HUD grants must sign under penalty of perjury—to require recipients to certify that they "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws." *See* Dkt. 36-24, Ex. C at 1; Dkt. 110-32, HUD-AR-3418 (the "HUD-424B

[2] *See* Dkt. 110-11, HUD-AR-01952; Dkt. 111-1, DOT-AR-00001; Dkt. 112-1, EPA-AR-00087; Dkt.113-1, HHS-AR-00001–23.

[3] This Court previously granted Plaintiffs' request for judicial notice. *See* Dkt. 45 at 5 n.3.



RENNE PUBLIC LAW GROUP

DEI Certification Condition”).

In March 2025, HUD began circulating new Continuum of Care (“CoC”) grant agreements that included additional grant conditions not included in the FYs 2024 & 2025 Notices of Funding Opportunities (“NOFOs”). *See e.g.* Dkt. 36-6 (Warhuus Decl.), Ex. A. The CoC grant agreements state that “[t]his Agreement, the Recipient’s use of funds provided under this Agreement … , and the Recipient’s operation of projects assisted with Grant Funds” are “governed by … all current Executive Orders.” *Id*. at 1 (the “CoC EO Condition”).

The CoC agreements also provide that the recipient:

- “shall not use grant funds to promote “gender ideology” as defined in E.O. 14168…” (the “CoC Gender Ideology Condition”);
- “shall not use any Grant Funds to fund or promote elective abortions, as required by E.O. 14182…” (the “CoC Elective Abortion Condition”);
- “certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964” and “agrees that its compliance in all respects with applicable Federal anti-discrimination laws is material to the U.S. Government’s payment decisions for purposes of [the FCA]. (the “CoC Discrimination Condition”);

Dkt. 36-6 (Warhuus Decl.), Ex. A at 3.

The CoC agreements further contain a CoC Immigration Enforcement Condition identical to the HUD Immigration Enforcement Condition, as well as an additional condition requiring the recipient to “administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services [sic] may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.” Dkt. 36-3 (Warhuus Decl.), Ex. A at 3. The CoC agreements further require that “[s]ubject to the exceptions provided by PRWORA, the recipient must use [Systematic Alien Verification for Entitlements (SAVE)], or an equivalent verification system approved by the Federal



RENNE PUBLIC LAW GROUP

government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States." *Id.* (the "CoC PRWORA Verification Condition").

On June 5, 2025, HUD's Office of Community Planning and Development ("CPD") General Deputy Assistant Secretary Claudette Fernandez issued a letter, "[o]n behalf of Secretary Scott Turner," to the executive directors of two organizations representing states and local jurisdictions that administer CPD grant programs, which include the Community Development Block Grant ("CDBG"), HOME Investment Partnerships Program ("HOME"), the Emergency Solutions Grants ("ESG") program, and the "Housing Opportunities for Persons with AIDS" ("HOPWA") program. *See* Dkt. 36-24, Ex. Q ("Fernandez Letter"). The Fernandez Letter "encouraged" grantees "to review the White House Executive Orders as they develop their consolidated plan and annual action plans" to ensure "conformity with applicable Administration priorities and executive orders." *Id.* at 2.

The Fernandez Letter provided that "[u]nder the FY 2025 grant agreement, conformity means that a grantee …":

- "shall not use grant funds to promote 'gender ideology,' as defined in [the Gender Ideology EO]" (the "CPD Gender Ideology Condition");
- "agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code" and "certifies that it does not operate any programs that violate any applicable Federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964" (the "CPD Discrimination Conditions");
- "shall not use any grant funds to fund or promote elective abortions, as required by E.O. 14182" (the "CPD Elective Abortion Condition");
- may not use the "funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation" (the "CPD Immigration Enforcement Condition"); and
- "must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title



RENNE PUBLIC LAW GROUP

> IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws" and "must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States" (the "CPD PRWORA Verification Condition").

Dkt. 36-24, Ex. Q at 2; *see also* HUD-AR-3414-3418 (ESG agreement); HUD-AR-3421-3425 (HOME agreement); HUD-AR-3429-3433 (HOPWA agreement); HUD-AR-3444-3448 (CDBG agreement).

**2. DOT Conditions**

Similarly, DOT revised its grant agreements and assurances. The Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), Federal Aviation Administration ("FAA"), Federal Railroad Administration ("FRA"), and National Highway Traffic Safety Administration ("NHTSA") have all incorporated language into grant conditions requiring compliance with the EOs. On April 24, 2025, Secretary Duffy sent a letter to transportation agencies nationwide announcing DOT's new policy governing the terms of all DOT-funded grants. *See* Dkt. 111-1, DOT-AR-00265–68 ("April Duffy Letter"). The letter stated that it was DOT's "policy" to impose immigration enforcement and anti-DEI conditions as requirements for receiving funding and explained that DOT interprets federal nondiscrimination law to presumptively prohibit "any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called [DEI] goals." *Id.* The Duffy letter further declared that recipients' "legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id.* To underscore the seriousness of these new conditions, the letter warned that DOT would "vigorous[ly] enforce[]" compliance, including through "comprehensive audits, claw-back of grant funds, and termination of grant awards," as well as potential "enforcement actions and loss of any future federal



RENNE PUBLIC LAW GROUP

funding from DOT." *Id.*

DOT has incorporated these conditions into its grant agreements. For example, on May 7, 2025, Plaintiff City of Saint Paul received an Innovative Finance and Asset Concession ("IFAC") grant program Cooperative Agreement from DOT. *See* Dkt. 36-22 (Bacher Decl.), ¶¶ 28-31, Ex. 8. The IFAC agreement requires recipients to "cooperate with Federal officials in the enforcement of federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." *Id.*, Ex. 8 (the "DOT Immigration Enforcement Condition"). The IFAC agreement also requires that the recipient include certain clauses in all subcontracting contracts or agreements, including a requirement that the subcontractor "comply" with several EOs, including those regarding gender ideology and DEI. *Id.*, Ex. 8, Appendix E (the "DOT EO Condition"). The agreement specifically provides:

> pursuant to Section (3)(b)(iv)(A) [of the DEI EO], the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA]; and pursuant to Section (3)(b)(iv)(B) [of the DEI EO], by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

*Id.* (the "DOT DEI Condition").

The DOT's operating administrations have also included the unlawful conditions in their agreements and terms and conditions.

**a. FTA**

On March 26, 2025, the FTA issued an updated Master Agreement applicable to all funding awards authorized under specified federal statutes. Dkt. 111-1, DOT-AR-00080–185. The March 26 Master Agreement provides:

> (1) Pursuant to section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal antidiscrimination laws is material to the government's payment decisions for purposes of [the FCA].



RENNE PUBLIC LAW GROUP

> (2) Pursuant to section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

DOT-AR-00140 (the "FTA DEI Condition"). It also requires recipients to "comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow *federal guidance prohibiting discrimination*." *Id*. (emphasis added). Federal guidance, such as the April Duffy Letter, as well as Defendants' actual enforcement of the DEI Conditions establish that these new conditions are broader than existing nondiscrimination law. These conditions have also been incorporated into FTA's FY 2025 Certifications and Assurances, which require grant recipients to "comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing the program under which it is applying for assistance." *See* Dkt. 36-19 (Darrow Decl.), Ex. A at 4 (the "FTA EO Condition").

**b. FHWA**

The FHWA has incorporated similar conditions into its terms and grant agreements. On April 22, 2025, the FHWA issued updated Competitive Grant Program General Terms and Conditions applicable to all FHWA competitive grants. DOT-AR-00186–217. These General Terms imposed new conditions on all FHWA competitive grants, including the BIP, Culvert AOP Program, and ATTAIN programs utilized by Plaintiffs. The FHWA General Terms include an FHWA DEI Condition identical to the DOT DEI Condition discussed above. *Id*. at 210. The FHWA General Terms also contain an FHWA Immigration Enforcement Condition identical to the DOT Immigration Enforcement Condition. *Id*.

The Exhibits to the 2025 FHWA General Terms, dated April 30, 2025, further require the recipient to assure and certify that it will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project." Dkt. 36-24, Ex. E at 34. The Exhibits, imposing a condition similar to the DOT EO Condition discussed above, list President Trump's EOs regarding DEI and gender ideology (among other recent Trump Administration EOs), as well as two criminal immigration statutes (8 U.S.C. § 1324 and 8 U.S.C. § 1327), as "provisions" purportedly "applicable" to FHWA competitive grant agreements, with no explanation of how those EOs or statutes relate to highway grants or even apply to local governments. *Id*. (the "FHWA EO Condition"). FHWA has included identical or similar



RENNE PUBLIC LAW GROUP

conditions in additional program terms and conditions, such as the FY 2024 Safe Streets and Roads for All ("SS4A") General Terms and Conditions. *See* DOT-AR-00047–79. FHWA also retroactively revised the SS4A General Terms and Conditions for 2022 and 2023 to include the same unlawful conditions. *See* DOT-AR-00016–46 (FY 2023); Dkt. 36-24, Ex. T (FY 2022).

**c. FAA**

Implementing the April Duffy Letter and the EOs, on April 25, 2025, the FAA issued a proposal labeled "Notice of modification of Airport Improvement Program grant assurances; opportunity to comment," providing notice and soliciting public comment, for a 14-day period, on modifications to the Grant Assurances. *See* DOT-AR-00377–95. In its notice, the FAA stated that the 2025 FAA Grant Assurances would take effect immediately, notwithstanding the expedited comment period. The 2025 FAA Grant Assurances are included with all FAA grants and require sponsors[4] to assure and certify that they will "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Grant," specifically incorporating the EOs related to DEI and gender ideology as "provisions" purportedly "applicable" to grant agreements. DOT-AR-00378–79 (the "FAA EO Condition").

On May 6, 2025, FAA posted on its website a revised grant agreement template for 2025 Airport Infrastructure Grants ("AIG") with added terms and conditions that did not appear in prior iterations of FAA grant agreements. *See* Dkt. 36-24, Ex. F. The FY 2025 FAA AIG Grant Template imposes a new condition on all AIG grants implementing the directives of the April Duffy Letter. The FY 2025 FAA AIG Grant Template contains conditions substantively identical to the DOT DEI Condition (*id*. at 10–11) and the DOT Immigration Enforcement Condition (*id*. at 11), although the language varies slightly. For example, the FAA agreements provide:

> Pursuant to Section (3)b)(iv), Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the sponsor:
>
> a. Agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of 31 U.S.C. 3729(b)(4); and

[4] The FAA refers to grant recipients under its Airport Improvement Program and related funding statutes as "sponsors." *See, e.g.*, 49 U.S.C. § 47102(26) (defining "sponsor" to mean, in relevant part, a public agency or private owner that submits an application for financial assistance under the Act).



RENNE PUBLIC LAW GROUP

> b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

*Id*. at 10–11 (the "FAA DEI Condition"). The agreements also include a condition identical to the DOT Immigration Enforcement Condition, as well as a requirement that sponsors agree to "follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter" ("the "FAA Immigration Condition"). *Id*. at 11. These conditions have been implemented across both AIG and Airport Improvement Program ("AIP") grant agreements. *See, e.g.*, Dkt. 36-17 (Moore Decl.), Exs. A (FY 2025 AIP), C (FY 2025 AIG).

**d. FRA**

On March 28, 2025, DOT and FRA issued revised General Terms and Conditions applicable to FRA discretionary grants (the "FRA General Terms and Conditions"). *See* DOT-AR-00218-64. The revised terms, which became part of FRA's new grant agreement framework effective April 23, 2025, imposed new conditions implementing President Trump's directives. This revision added the following FRA DEI Condition:

> (b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the FCA].
>
> (c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

DOT-AR-00245–46.

FRA subsequently retained these requirements in its November 19, 2025 revision to its Standard Terms and Conditions. DOT-AR-00490–91. FRA also incorporated substantially similar requirements into subsequent funding opportunities. Thus, the challenged requirements are not limited to the initial April 2025 revision but have continued to appear in FRA's discretionary grant requirements.

The FRA General Terms and Conditions contain an additional condition requiring recipients to cooperate with federal immigration enforcement efforts (the "FRA Immigration Enforcement



RENNE PUBLIC LAW GROUP

Condition"). The FRA Immigration Enforcement Condition amends a pre-existing provision addressing free speech and religious liberty to provide, "the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." DOT-AR-00245–46. This provision was subsequently removed in the November 19, 2025 revision. DOT-AR-00490–91.

**e. NHTSA**

The NHTSA also imposed new conditions implementing President Trump's directives. For example, the General Terms and Conditions under the Fiscal Year 2025 SSFA Grant Program contains a NHTSA DEI Condition identical to the FRA DEI Condition. Request for Judicial Notice, Ex. A.

**3. HHS Conditions**

Similarly, HHS and its operating divisions and agencies have attached unlawful grant conditions across the expansive portfolio of HHS grants established by Congress, including grants from the Health Resources and Services Administration ("HRSA"), Substance Abuse and Mental Health Services Administration ("SAMHSA"), and Centers for Disease Control and Prevention ("CDC").

On April 16, 2025, HHS issued an updated HHS Grants Policy Statement ("April 2025 HHS GPS") that "is incorporated by reference in the official Notice of Award (NoA) as a standard term and condition" and applicable to discretionary grants. Dkt. 113-1, HHS-AR-00032. The April 2025 HHS GPS applies to "awards and award modifications that add funding made on or after April 16, 2025." *Id.* The April 2025 HHS GPS states that "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws . . . ." HHS-AR-00048. The April HHS GPS defines DEI to mean "diversity, equity, and inclusion," DEIA to mean "diversity, equity, inclusion, and accessibility," and provides that "[d]iscriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025." *Id.* (the "April HHS GPS DEI Condition").

In July 2025, HHS released a revised 2025 GPS removing all mention of DEI. *See* Dkt. 113-1 & 113-2, HHS-AR-00139–243. Instead, the updated July GPS simply stated, "By applying for or accepting

RENNE PUBLIC LAW GROUP

federal funds . . . recipients certify compliance with all federal antidiscrimination laws and that complying with those laws is a material condition." HHS-AR-00157 ("July 2025 HHS GPS Discrimination Condition"). HHS again revised its GPS, effective on October 1, 2025, as follows:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipient certifies as follows:
>
> - Recipient is compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including requirements set forth in Presidential Executive Order 14168 titled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., and recipient will remain compliant for the duration of the Agreement.
> - The above requirements are conditions of payment that go [sic] the essence of the Agreement are therefore material terms of the Agreement.

HHS-AR-00267–68 ("October HHS GPS Gender Ideology and Discrimination Condition"). The time at which a specific grant award was issued determines which HHS GPS applies.

In addition to these department-wide conditions, agencies have issued their own requirements. In July 2025, CDC updated its General Terms and Conditions for both research and non-research awards. The general terms and conditions require grant recipients to "comply with…grants policy contained in applicable HHS Grants Policy Statements…[and] applicable Executive Orders" without designating which EOs are applicable. *See* Dkt. 113-7, HHS-AR-00603 (Research Grants); HHS-AR-00623 (Non-Research Grants) (the "CDC EO Condition"). Both CDC General Terms and Conditions also include identical provisions that provide:

> By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply.

*Id.* (the "CDC Discrimination Condition").

In April 2025, SAMHSA updated its Notice of Funding Opportunity (NOFO) Application Guide to state that "[a]ll activities proposed in your application and budget narrative must be in alignment with the current Executive Orders" (the "SAMHSA EO Condition") and that "[f]unds cannot be used to support or provide services, either directly or indirectly, to removable or illegal aliens." Dkt. 113-8, HHS-AR-01165 (the "SAMHSA Immigration Condition").



RENNE PUBLIC LAW GROUP

On July 25, 2025, HRSA issued updated general terms and conditions applicable to "all active awards." Dkt. 113-8, HHS-AR-00857. The revised HRSA terms and conditions incorporate the HHS GPS and include an HRSA Discrimination Condition identical to the CDC Discrimination Condition described above. The General Terms and individual HRSA grant agreements also contain a condition identical to the October HHS GPS Gender Ideology Condition. HHS-AR-00860 (the "HRSA Gender Ideology Condition"); *see also* Dkt. 36-21 (Lutz Decl.), Exs. A-B, D, F– I; Lutz Supp. Decl. at 5.

**4. EPA Conditions**

The EPA has incorporated similar DEI Conditions into its General Terms and Conditions applicable to all EPA grants. Internal emails reveal that just days after President Trump's inauguration, EPA was "directed" to "immediately" include language in "'every contract or grant award'" requiring the grant recipient to "'agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of'" the False Claims Act and "'to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.'" Dkt. 112-2, EPA-AR-00093. On April 3, 2025, EPA updated its General Terms and Conditions to incorporate this new language. *See* Dkt. 36-24, Ex. K. In August 2025, EPA removed the reference to "Diversity, Equity and Inclusion" but retained the False Claims Act materiality certification and the anti-discrimination law certification as follows:

> By accepting this EPA financial assistance agreement, (A) the recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and (B) the recipient certifies that it does not operate any programs violating any applicable Federal anti-discrimination law or promoting any such violation.

EPA-AR-00086 (the "EPA Discrimination Condition"). Identical language appears in the updated General Terms and Conditions issued in October 2025. EPA-AR-00095, 00137.

**B. Plaintiffs Obtain Preliminary Injunctive Relief Enjoining the Imposition and Enforcement of the Challenged Conditions Against Each Defendant Except for EPA**

This Court issued a temporary restraining order on August 27, 2025 and a preliminary injunction on September 23, 2025. Dkt. 28, 45. On February 9, 2026, Plaintiffs filed their Second Amended Complaint adding plaintiffs and FRA and NHTSA as defendants. Dkt. 68. On April 28, 2026, the Court



RENNE PUBLIC LAW GROUP

denied Defendants' motion to dismiss and issued an amended preliminary injunction restraining all Defendants except for the EPA from implementing or enforcing the challenged conditions. Dkt. 89.

Defendants appealed from both preliminary injunctions (Dkt. 60, 107) and moved to stay this action pending the Ninth Circuit's decision in *Martin Luther King, Jr. County v. Turner et al.*, 9th Cir. Case No. 25-3664. Dkt. 93. Plaintiffs agreed to stay appellate briefing on the injunctions until after the Ninth Circuit issues its mandate in *King County* but opposed Defendants' motion to stay the trial court proceedings. Dkt. 102. On June 3, 2026, this Court denied the motion to stay. Dkt. 106.

### C. The Ninth Circuit's Decision in *King County* Rebuffs the Administration's Efforts to Impose Conditions Without Statutory Authority

On August 25, 2026, the Ninth Circuit issued its decision in *King County*, largely affirming the first of three preliminary injunctions involving similar funding conditions imposed by HUD and the DOT on federal grants to thirty-one cities, counties, and local agencies. *See County of King v. Turner*, 189 F.4th 819, 825–28, 830–38 (9th Cir. 2026). Specifically, the Ninth Circuit concluded that the local government plaintiffs were likely to succeed on the merits of their APA claim that these conditions exceeded HUD's and DOT's statutory authority. *Id.* at 838. "The majority of the conditions far exceed the limited authority set out by Congress and superimpose onerous requirements well after the government already awarded grant funds." *Id*. at 826.

The Court concluded with respect to the antidiscrimination conditions that they "exceed the limits imposed by Congress because they apply not just to the programs receiving grant funding from HUD and DOT, but to 'any programs' operated by the Local Governments." *Id*. at 830. But the Court noted that its conclusion was "narrower than the district court's in one respect." *Id*. at 838. "The Local Governments are . . . likely to succeed only as to the portion of the antidiscrimination conditions that exceed Title VI's lawful parameters, meaning that efforts to extend to 'all programs' goes well beyond the mandate of Title VI." *Id.* at 830. The Ninth Circuit did not address the local governments' additional APA and constitutional claims. *Id.* at 838.

## III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Sierra Club v. Bosworth*, 510 F.3d



RENNE PUBLIC LAW GROUP

1016, 1022 (9th Cir. 2007). Where a plaintiff has challenged a final agency action under the APA, the case on review is a question of law. *McCrary v. Guitierrez*, No. C-08-015292 RMW, 2010 WL 520762, at *2 (N.D. Cal. Feb. 8, 2010) (citing *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)) (explaining that "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did"). "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts it did." *McCrary*, 2010 WL 520762, at *2 (quoting *Occidental Eng'g Co.*, 753 F.2d at 770). Judicial review under the APA is generally limited to "the whole [administrative] record or those parts of it cited by a party[.]" 5 U.S.C. § 706; *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). But "[r]eview of an ultra vires challenge [is not] limited to an administrative record." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 155 F.4th 1082, 1093 (9th Cir. 2025).

## IV. ARGUMENT

### A. The Challenged Conditions Violate the APA

The Challenged Conditions must be set aside under the APA[5] because they exceed Defendants' statutory authority, are arbitrary and capricious, and are contrary to the Constitution.

#### 1. The Challenged Conditions Exceed Defendants' Statutory Authority

As this Court concluded, "the relevant authorizing statutes do not authorize the Defendants to condition funding on requirements to prohibit the promotion of DEI, gender ideology, or elective abortion or to cooperate with federal immigration enforcement and that in some cases the statutes even contradict the conditions." Dkt. 45 at 18; *see also King County*, 189 F.4th at 829 ("[T]he federal agencies exceeded the bounds of their statutory remit."). "The APA directs reviewing courts to set aside agency actions that are 'in excess of statutory jurisdiction [or] authority.'" *King County*, 189 F.4th at 828 (quoting 5 U.S.C. § 706(2)(C)). "That inquiry controls here because the challenged conditions can only be creatures of statute. … [T]he power to 'attach conditions on the receipt of federal funds' is 'incident to the spending power,' which is exclusively committed to Congress." *Id.* (quoting *City & County of San*

[5] As this Court already held at the preliminary injunction stage, the Challenged Conditions are reviewable under the APA—they are final agency action and not committed to agency discretion by law, and the Tucker Act does not preclude review. *See* Dkt. 45 at 8–14; Dkt. 89 at 13.



RENNE PUBLIC LAW GROUP

*Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("*CCSF*")). Defendants "thus cannot impose the challenged conditions '[a]bsent congressional authorization.'" *Id.* (quoting *CCSF*, 897 F.3d at 1235).

**a. Congress has not authorized the FCA materiality condition.**

Each Defendant requires grant recipients to agree that their compliance with the Challenged Conditions or "applicable Federal anti-discrimination laws" is material to the U.S. Government's payment decisions for purposes of the FCA. *See e.g.*, DOT-AR-00140; DOT-AR-00245–46; EPA-AR-00086; Dkt. 36-22 (Bacher Decl.), ¶¶ 28-31, Ex. 8; Dkt. 36-6 (Warhuus Decl.), Ex. A at 3.[6] The Ninth Circuit recently recognized "the impermissibility of this proviso." *King County*, 189 F.4th at 831. For starters, "[n]othing in the text of Title VI's enforcement provision expressly contemplates the assurances that the government seeks to impose" and "context suggests that such assurances cannot be fairly implied as a means of 'effectuat[ing]' Title VI's mandate." *Id.* Moreover, "the conditions are in tension with the FCA itself" since they "define what is 'material' for purposes of FCA liability" when Congress did not delegate to the agency the authority to give meaning to that statutory term and instead chose to "define[] 'material' to require an objective inquiry into what has a 'tendency to influence' the government, not what the government 'deem[s]' important." *Id.* at 831-32 ("[I]t is for Congress, not the Executive, to amend that statutory definition. . . . By purporting to impose its own definition of what is 'material,' the government attempts an end run around" the constitutional spheres of Congress and the courts 'into an area in which it has no jurisdiction.'" (quoting *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990))).

**b. Congress has not authorized the HUD Grant Conditions.**

Congress has established various grant programs administered by HUD through CPD, but "[t]he congressional acts authorizing these programs do not give HUD authority to condition its grants on the Grant Conditions." *See* Dkt. 45 at 19. Several of these programs are codified in title 42 of the U.S. Code and were created (or later reauthorized) by the Housing and Community Development Act of 1974, Pub. L. 93-383, 88 Stat. 633; the Cranston Gonzalez National Affordable Housing Act of 1990, Pub. L. 101-

[6] The current HHS Discrimination Condition does not explicitly reference the FCA but does still provide that the Conditions go to "the essence of the Agreement and are therefore material terms of the Agreement." *See* Dkt. 113-2 at 93, HHS-AR-00268. Further, various awards to Plaintiffs include certification requirements and warnings of potential False Claims Act and criminal liability for knowingly false certifications. *See e.g.*, HHS-AR-01313; Lutz Supp. Decl. at 7–8.



RENNE PUBLIC LAW GROUP

625, 104 Stat. 4079; the Stewart B. McKinney Homeless Assistance Act of 1987, Pub. L. 100-77, 101 Stat. 482, as amended by the HEARTH Act of 2009, Pub. L. 111-22, 123 Stat. 1663; and the AIDS Housing Opportunity Act of 1990, Pub. L. 101-625. *See* 42 U.S.C. §§ 5303–5304 (CDBG program), 11372 (ESG program), 12741 (HOME program), 12903 (HOPWA program).

Congress has enumerated various certifications and requirements that CPD grant recipients must adhere to as a condition of receiving funds. Such certifications include that the recipient will develop and follow a citizen participation plan, comply with statutory transparency requirements, ensure funds align with statutory objectives, and administer programs in conformity with nondiscrimination laws. 42 U.S.C. § 5304(a)(3), (b); *see also id.* § 11375(c). None of these statutes authorize HUD to impose the Challenged Conditions. The Ninth Circuit recently observed, "[t]he President's authority to instruct HUD to impose the funding conditions must flow from either the Constitution or a congressional enactment." *See King County*, 189 F.4th at 837 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Such constitutional or statutory basis is plainly lacking here.

Far from barring diversity-related "inclusion," Congress *requires* consideration of diversity when allocating HUD funds. For instance, the HUD Secretary is required to set aside CDBG funds for "[s]pecial purpose grants," including grants to "historically Black colleges." 42 U.S.C. § 5307(b)(2); *see also id.* § 5307(c) (requiring CDBG funds be allocated to provide "assistance to economically disadvantaged and minority students"). And in authorizing the HOME and HOPWA programs, Congress acted to "improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis." *Id.* § 12702(3). Congress also requires HOME recipients "to establish and oversee a minority outreach program ... to ensure the inclusion, to the maximum extent possible, of minorities and women, and entities owned by minorities and women...in all contracts[ ] entered into by the participating jurisdiction." *Id.* § 12831(a). As this Court noted, "the HUD DEI Grant Conditions run afoul of express congressional directives for CDBG, HOME, and HOPWA funds" (Dkt. 45 at 19), and, as a whole, the HUD Grant Conditions "pose a real risk of curtailing programs that would not be found violative." *Id.* at 20; *see also King County*, 189 F.4th at 834 (noting that HUD Conditions purport to prescribe activities "even where Congress has either expressly authorized or declined to prohibit the activity at issue.").

Moreover, Defendants' ability to impose the Challenged Conditions on the CPD grants is further constrained by 42 U.S.C. § 12711, which prohibits HUD from "denying funds made available under [HUD] programs...based on the adoption, continuation, or discontinuation" of any lawful local policies. Stated differently, "HUD may not … condition funding on changes to local policies." *Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015).

HUD also administers the CoC grant program enacted by Congress pursuant to the McKinney-Vento Homeless Assistance Act (the "Homeless Assistance Act"). 42 U.S.C. §§ 11301, 11381. The Homeless Assistance Act directs the HUD Secretary to award CoC grants on a competitive basis using statutorily prescribed selection criteria. *Id*. §11382(a). Section 427 of the Homeless Assistance Act, 42 U.S.C. § 11386a, provides for the HUD Secretary to establish selection criteria to evaluate grant applications and sets forth specific criteria the HUD Secretary must use. These required criteria include factors such as the recipient's previous performance in addressing homelessness, whether the recipient has demonstrated coordination with other public and private entities serving homeless individuals, and the need for homeless services within the geographic area. *Id*. (b)(1)-(2). Section 426 of the Homeless Assistance Act, 42 U.S.C. § 11386, sets forth "[r]equired agreements" to which grant recipients must adhere. Recipients must agree to, among other things, "monitor and report to the [HUD] Secretary the progress of the project," "take the educational needs of children into account when families are placed in emergency or transitional shelter," "place families with children as close as possible to their school of origin," and obtain various certifications from direct service providers. *Id*. § 11386(b). The Homeless Assistance Act does not establish any statutory requirements that: prohibit DEI initiatives, promoting "gender ideology" or "elective abortions";[7] mandate local participation in the enforcement of federal immigration laws; or authorize the President or the HUD Secretary to impose such conditions. "These conditions are contrary to the plain terms of the CoC statute." *King County*, 189 F.4th at 833. "Congress authorized funds for these activities subject to only a few '[u]se restrictions,' none of which relates to the promotion of immigration, abortion, or gender ideology." *Id*.

Additionally, PRWORA does not authorize the CoC PRWORA Verification Condition.

[7] *See also King County*, 189 F.4th at 837 (noting that "Congress has not attached a Hyde Amendment-like restriction to the HUD appropriations at issue here").



RENNE PUBLIC LAW GROUP

PRWORA explicitly does not require states to have an immigration status verification system until twenty-four months after the Attorney General promulgates certain final regulations. 8 U.S.C. § 1642(b). Those regulations must, among other things, establish procedures by which states and local governments may verify eligibility and procedures for applicants to prove citizenship "in a fair and nondiscriminatory manner." *Id.* § 1642(a)(2). The Attorney General has issued interim guidance and a proposed verification rule but has not implemented a final rule. *See* Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997); Verification of Eligibility for Public Benefits, 63 Fed. Reg. 41662 (Aug. 4, 1998) (proposed rule). *See also King County*, 189 F.4th at 837 (noting that "no Attorney General has ever finalized a verification rule"); *accord* Dkt. 45 at 20. This failure to promulgate a final regulation left in place DOJ's Interim Guidance, which requires only the examination of identity and immigration documentation. 62 Fed. Reg. 61348–49 (Nov. 17, 1997). Absent implementing regulations, Plaintiffs are not required to verify participants' immigration status using SAVE or an equivalent verification system. *See* 42 U.S.C. § 1320b-7. Requiring recipients to do so "exceeds the authority delegated by Congress to require verification." *See King County*, 189 F.4th at 837.

**c. Congress has not authorized the DOT Grant Conditions.**

The purposes of each DOT grant program, including the conditions required for participation, are described in the programs' authorizing statutes, which "do not give DOT authority to condition its grants on the DOT Grant Conditions." *See* Dkt. 45 at 21.

For example, for the IFAC grant program, codified in 23 U.S.C. § 611, the statutory requirements relate to conducting, evaluating, publishing, and implementing asset concessions and infrastructure development. For FTA programs codified in 49 U.S.C. ch. 53—including urbanized area formula grants (§ 5307), fixed guideway capital investment grants (§ 5309), state-of-good-repair grants (§ 5337), and bus and bus facility grants (§ 5339)—the statutory requirements relate to eligible transit purposes, operational capacity, long-term asset maintenance, and project performance. FHWA grant programs likewise are created and governed by specific statutory authorizations, including the SS4A program (§ 24112 of the Infrastructure Investment and Jobs Act ("IIJA")), the Federal-Aid Highway Program (23



RENNE PUBLIC LAW GROUP

U.S.C. §§ 119, 133, 148, 149, 167, 175, 176), as well as specialized programs like the BIP program (23 U.S.C. § 124), the Culvert AOP Program (49 U.S.C. § 6703), and the ATTAIN program (23 U.S.C. § 503(c)(4)). FRA programs provide federal funds to public agencies for rail infrastructure projects, including, but not limited to, programs codified in title 49 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429; *see, e.g.*, 49 U.S.C. § 22909. NHTSA programs provide federal funds to state and local governments for highway safety and traffic enforcement projects, including, but not limited to, programs codified in title 23 of the U.S. Code, as well as the Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat. 429; *see, e.g.*, 23 U.S.C. §§ 402, 405.

FAA airport grant programs, including the AIP program and the AIG program under IIJA (49 U.S.C. §§ 47101 et seq.), also include statutorily defined conditions and assurances related to safety, capacity, environmental compliance, and nondiscriminatory public use. *See* 49 U.S.C. § 47107. The statutorily based conditions and assurances include requiring consistency with plans for development of the surrounding area, financial capacity, ability to complete the project "without unreasonable delay," and requiring sponsors to make certain written assurances based on the type of grant at issue, such as "the airport will be available for public use on reasonable conditions and without unjust discrimination" and "the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions." 49 U.S.C. §§ 47106, 47107.

There are no statutory restrictions on DEI-related activities, gender ideology, or mandates to facilitate immigration enforcement in any of these programs' authorizing statutes. Furthermore, many FTA, FHWA, and FAA grant programs that provide federal financial assistance for airport, transit, or highway infrastructure projects require participation in the Disadvantaged Business Enterprise ("DBE") Program. *See, e.g.,* 23 U.S.C. § 177(e)(2); 49 U.S.C. § 47113. The DBE Program is Congressionally mandated and requires recipients of federal aviation, highway, and transit funds to set participation goals for small businesses owned and controlled by socially and economically disadvantaged individuals, including minority- and women-owned firms. *See* 49 U.S.C. § 47113(a)(2) (defines a socially and economically disadvantaged individual and expressly provides "except that women are presumed to be socially and economically disadvantaged"); 15 U.S.C. § 637(d)(3)(C)(ii) ("The contractor shall presume

that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act"); Pub. L. No. 115-254, div. B, tit. I, § 157(a) (Congress expressly discussing minority and women-owned businesses in the legislative findings accompanying the airport DBE program in the FAA Reauthorization Act of 2018). The program's purpose is to remedy the effects of discrimination in transportation contracting and ensure disadvantaged businesses have a fair opportunity to compete. The DOT Conditions seek to discourage or prohibit race- and gender-conscious contracting measures, directly undermining the statutory goals of the DBE Program.

Congress has carefully defined the purposes and conditions governing DOT funding. Those requirements are comprehensive, specific, and tied to each program's statutory objectives. The Executive Branch may not impose additional conditions that Congress has not authorized.

**d. Congress has not authorized the HHS Grant Conditions.**

Congress established the HHS grant programs by statute. *See* 42 U.S.C. §§ 247c(b)–(c) (High-Impact HIV Prevention and Surveillance Program), 254b (HCP program), 290dd et seq. (SAMHSA programs); 300ff et seq. (RWHA program). These statutes provide specific eligibility and criteria requirements. For example, 42 U.S.C. § 247c establishes requirements for the High-Impact HIV Prevention and Surveillance Programs grant, including recordkeeping requirements and patient confidentiality mandates. 42 U.S.C. §§ 247c(e)(3), (5). "Congress has not authorized HHS to condition its grants on compliance with all EOs, precluding the promotion of DEI or gender ideology, or cooperation with federal immigration enforcement." Dkt. 45 at 22.

The HHS Gender Ideology Conditions (the October HHS GPS Gender Ideology Condition and the HRSA Gender Ideology Condition) invoke Title IX of the Education Amendments Act of 1972 as a supposed statutory basis for the incorporation of EO 14168. This contention is unsupportable because the Gender Ideology Conditions directly contravene Title IX. EO 14168 mandates that "[f]ederal funds shall not be used to promote gender ideology" and requires grant recipients to "recognize two sexes, male and female" and that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." But nothing in Title IX mandates such understandings. To the contrary, courts



RENNE PUBLIC LAW GROUP

have concluded that failure to recognize an individual's transgender status constitutes discrimination under Title IX. *See e.g.*, *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616– 17 (4th Cir. 2020); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *see also Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020) (recognizing transgender as a protected category under Title VII). Contrary to enforcing Title IX, HHS's Gender Ideology Conditions seek to graft contradictory requirements into the statute.

Defendants' HHS Conditions have no basis in statute, and their imposition on the grant programs at issue exceeds their statutory authority.

**e. Congress has not authorized the EPA Grant Conditions.**

Congress authorized the Brownfields and Land Revitalization Program through the Small Business Liability Relief and Brownfields Revitalization Act of 2002, Pub. L. No. 107-118, 115 Stat. 2356 (2002). The Act authorizes the EPA to award Brownfields assessment grants, cleanup grants, revolving loan fund ("RLF") grants, and job training grants. *See* 42 U.S.C. §§ 9604(k)(2)–(6). The RLF program (§ 9604(k)(3)) funds loans for brownfield cleanup, with Congress specifying eligible activities, prohibited uses, and recipient obligations, including compliance with applicable federal and state laws and a 20% non-federal match (subject to hardship waiver). *Id.* § 9604(k)(5)(B), (10)(B). The Act does not prohibit consideration of diversity or equity. To the contrary, statutory ranking criteria require consideration of community involvement and equity, including meaningful participation in cleanup and reuse decisions and the extent to which projects address threats to sensitive populations, such as children, pregnant women, and minority or low-income communities. *Id.* § 9604(k)(6)(C)(x).

Recently, the Ninth Circuit recognized that extending conditions "to 'all programs' goes well beyond the mandate of Title VI" and thus "exceed[s] Title VI's lawful parameters." *King County*, 189 F.4th at 830. Although this Court did not extend the preliminary injunction to the EPA Discrimination Condition, under the Ninth Circuit's decision in *King County*, it exceeds congressional authorization because it requires recipients to certify that they do not operate *any programs* that violate applicable anti-discrimination law and conflicts with the FCA.



RENNE PUBLIC LAW GROUP

### f. *King County* Does Not Preclude Summary Judgment on the Anti-Discrimination Conditions Because Those Conditions Are Plainly Unlawful and the Administration's Interpretation of Those Conditions Exceeds Title VI's Lawful Parameters

In *King County*, the Ninth Circuit recognized that the anti-discrimination conditions in HUD CoC and DOT grants are likely "unlawful to the extent they cover programs or activities that do *not* receive federal financial assistance." *King County*, 189 F.4th at 830. Defendants may nevertheless point to the fact that the Ninth Circuit narrowed an injunction against these conditions after "conclud[ing] that Title VI permits agencies to condition grant funds on a commitment not to discriminate in administering federally funded programs." *Id.* at 838. But the Ninth Circuit confirmed that "to the extent the antidiscrimination conditions exceed that directive" or "Title VI's lawful parameters" in a manner that is not "consistent with Title VI," they would exceed HUD's and DOT's statutory authority. *Id.* at 830, 838. That ruling is entirely consistent with this Court's preliminary injunction, which "covers the Grant Conditions only to the extent they make requirements of Plaintiffs beyond what is required by current federal law." Dkt. 45 at 35-36.

The critical question is thus whether the Conditions "exceed Title VI's lawful parameters," *see King County*, 189 F.4th at 830, by "mak[ing] requirements of Plaintiffs beyond what is required by current federal law," Dkt. 45 at 36. The Ninth Circuit recognized that extending the anti-discrimination condition "to 'all programs' goes well beyond the mandate of Title VI." *King County*, 189 F.4th at 830. But the Court had no occasion to consider how various documents—such as then-Attorney General Pamela Bondi's July 2025 "Memorandum for All Federal Agencies" providing "Guidance for Recipients of Federal Funds regarding Unlawful Discrimination" (Dkt. 110-10, HUD-AR-01919) and the DEI-related and grantmaking executive orders—show that the Administration's interpretation of federal anti-discrimination law "exceed[s] Title VI's lawful parameters" and is not "consistent with Title VI."

First, the *King County* appeal stemmed from a preliminary injunction that was issued on June 3, 2025—nearly two months before the Bondi Memo was issued on July 29, 2025. *See Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025). That distinction is critical, since the Bondi Memo is addressed to all federal agencies and purports to "clarif[y] the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including





RENNE PUBLIC LAW GROUP

those labeled as Diversity, Equity, and Inclusion ('DEI') programs." Dkt. 110-10, HUD-AR-01919. Among other "clarifications," the Bondi Memo states that the use of "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." HUD-AR-01920.

This "clarification," however, is inconsistent with Supreme Court precedent that has "consistently declined to find constitutionally suspect" the adoption of race-neutral criteria "out of a desire ... to improve racial diversity and inclusion"—even where the decision-maker was "well aware" the race-neutral criteria "correlated with race." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 885–86 (4th Cir. 2023) (internal quotation and citation omitted) (citing, *inter alia*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015)). Nor does Supreme Court precedent prohibit the use of diversity statements for the purpose of advancing racial diversity goals; to the contrary, in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, the Court described these goals as "commendable" and "worthy" (though insufficient to justify race-based admissions). 600 U.S. 181, 214-15, 230 (2023) ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise."); *United States v. Skrmetti*, 145 S. Ct. 1816, 1854 (2025) (Thomas, J., concurring) (suggesting strict scrutiny does not apply to "a university's decision to credit 'an applicant's discussion of how race affected his or her life'" simply because it is "inextricably bound up with" the applicant's race) (cleaned up). Similarly, while the Ninth Circuit briefly mentioned one portion of the April Duffy Letter, it did not discuss the portion of the letter explaining that "Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called 'diversity, equity, and inclusion,' or 'DEI,' goals, presumptively violates Federal law." Dkt. 111-1, DOT-AR-00266; *see also* DOT-AR-00267 (April Duffy Letter to federal funding recipients "provid[ing] notice of the Department's existing interpretation of Federal law"); *cf. King County*, 189 F.4th at 830.

Second, perhaps because the government "forfeited any challenge" to the merits of the provision of the grant agreements stating that the recipients' use of funds and operation of projects with grant funds

are "governed by" "all current executive orders," 189 F.4th at 832 n.4, the court simply did not address the ways in which the DEI-related executive orders inform the meaning of the anti-discrimination conditions. The administrative record, however, reveals that Defendants promulgated the anti-discrimination conditions in direct response to President Trump's executive orders. *See infra*, §IV(A)(2). And since the preliminary injunction under review was entered in June 2025, the Ninth Circuit had no occasion to consider President Trump's August 2025 Executive Order on "Improving Oversight of Federal Grantmaking," which instructs senior agency appointees and their designees to ensure that "[d]iscretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate: (A) racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation." Dkt. 113-1, HHS-AR-00019–23 (EO No. 14332); *see also* Dkt. 113-2, HHS-AR-00244 (correspondence regarding implementation of this EO); Dkt. 113-3, HHS-AR-00427 (similar).

Accordingly, as this Court previously recognized, "the conditions' references to federal law act as announcements of policies rather than as limits to the scope of the new conditions" and "make clear that their interpretation is undergoing significant change." Dkt. 45 at 16; *see also id*. at 20 (noting that HUD conditions "go beyond prohibiting violations of federal law as it is currently understood and pose a real risk of curtailing programs that would not be found violative"); *see* Dkt. 113-8 at HHS-AR-871 (internal HHS correspondence describing "Hot action!" after the Office of Grants released the new required language regarding anti-discrimination laws and materiality in late July 2025). Indeed, as another court explained, "the DEI-related EOs and the Bondi memos described above strongly suggest that these new 'discrimination' conditions are intended to discourage recipients from adopting any policies or programs that the current Administration might label as 'DEI.'" *Housing Authority of the City & County of San Francisco v. Turner*, Case No. 25-cv-08859-JST, 2025 WL 3187761, at *4 (N.D. Cal. Nov. 14, 2025); *see also id.* at *14 ("the Trump Administration's guidance concerning DEI, captured in the Bondi Memos described above, is inconsistent with Supreme Court precedent that has 'consistently declined to find constitutionally suspect' the adoption of race-neutral criteria—even where the decision-maker was 'well aware' the race-neutral criteria 'correlated with race.'"). "Plaintiffs, caught between the statutes promulgated by Congress and interpreted by the Courts, and the Administration's attempts to overwrite

those interpretations by fiat, are left in an impossible position." *Id.* at *14.

Finally, at summary judgment in an APA case, it is not this Court's job to revise the government's condition, which on its face "exceed[s] Title VI's lawful parameters." *See King County*, 189 F.4th at 830. Rather, the Court's role is to evaluate the legality of the condition as framed by the government. While in the context of a preliminary injunction it may be appropriate to narrow the condition, there is no such thing as a vacatur that re-frames an agency condition. "When Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke[,]'" i.e., to vacate.". *Pablo Sequen v. Albarran*, 835 F. Supp. 3d 1061, 1126 (N.D. Cal. 2026) (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys*., 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring)). "Rewriting a deficient policy is the agency's role, not the Court's." *Pablo Sequen,* 835 F. Supp. 3d at 1129 (citing *Rose v. Becerra*, No. 19-CV-2848, 2024 WL 3202342, at *29 (D.D.C. June 27, 2024) (explaining that the APA ordinarily does not authorize a reviewing court "to judicially re-write what the agency did"), *appeal dismissed sub nom. Rose v. Kennedy*, 169 F.4th 294 (D.C. Cir. 2026); *see also California by & through Becerra v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1165 (N.D. Cal. 2019) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. ("State Farm")*, 463 U.S. 29, 43 (1983)).[8]

In sum, the Ninth Circuit's instruction to narrow the first preliminary injunction in *King County* with respect to the antidiscrimination conditions does not preclude summary judgment in favor of Plaintiffs here because: the Ninth Circuit did not analyze the impact of the Executive Orders or the Attorney General's guidance to determine whether the Administration's interpretation of federal anti-discrimination law "exceed[s] Title VI's lawful parameters"; did not analyze HUD's statutory authority regarding non-CoC grants or HHS and EPA's statutory authority regarding the grants at issue here; did

[8] On "rare" occasions, a court may remand without vacatur "while the agency corrects its errors." *See Mont. Wildlife Fed'n v, Halland*, 127 F.4th 1, 50 (9th Cir. 2025); *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). This may be appropriate when, for example, the "agency may be able readily to cure a defect in its explanation of a decision." *Id.* (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009)). But that is not the circumstance here. Nor are the challenged agency actions subject to correction through severance. *See Pablo Sequen*, 835 F. Supp. 3d at 1129 n.127 (concluding that agency action was not severable without inserting new language).

not address whether the effort to impose the conditions were arbitrary and capricious; and did not address the local governments' constitutional claims. *See* 189 F.4th at 832, 836, 838 & nn.4, 8.

**2. The Challenged Conditions Are Arbitrary and Capricious**

The Challenged Conditions are arbitrary and capricious because they fail the basic requirement that agency action be "reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (cleaned up). To satisfy this requirement, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor simply ignore "an important aspect of the problem . . . ." *State Farm*, 463 U.S. at 43. While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When assessing reliance interests, an agency must "'determine whether they were significant, and weigh any such interests against competing policy concerns.'" Dkt. 45 at 15 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)) (noting that it is "arbitrary and capricious to ignore such matters"). Here, Defendants have not satisfied any of these requirements.

First, "an agency must defend its actions based on the reasons it gave when it acted, not with post hoc rationalizations." *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) (cleaned up). Here, Defendants neither followed notice-and-comment procedures nor contemporaneously articulated reasons for imposing the new Challenged Conditions. As this Court found, Defendants "have provided no substantive reasons justifying their radical change of course other than rote recitation of the need to implement the Executive Orders." Dkt. 45 at 16 (cleaned up).

The Administrative Record reveals little beyond a reflexive effort to implement the EOs. *See* Dkt. 110-39 at HUD-AR-03955 (email correspondence noting that HUD was "modifying the grant template agreement to align with the Administration's executive orders and requirements"); HUD-AR-03865 (email attachment labeled "Questions on the Implementation of Executive Order 14151" asking "How many contracts and grants have you identified that used tax dollars to pay for DEI activities?" and "What are the most egregious stories of wasteful DEI contracts and grants that you have terminated?"); Dkt. 111-1, DOT-AR-00012 (memo regarding implementation of executive orders); Dkt. 113-1, HHS-



RENNE PUBLIC LAW GROUP

AR-00027-29 (April 2025 HHS internal email explaining that Action Transmittal 2025-02 "requires agencies to add a new term and condition language in Notice of Awards **effective immediately for new awards** regarding compliance with non-discrimination laws as it relates to … DEI/DEIA/Discriminatory equity ideology" and "certification via acceptance of the grant award that the recipient does not engage in such discriminatory behavior"), HHS-AR-00644 (May 2025 email discussing recission of Action Transmittal 2025-02 while "awaiting further Federal-wide guidance prior to updating the Grants Policy Statement"), HHS-AR-00425 (July 30, 2025 email just one day after the Bondi Memo discussing new anti-discrimination condition that removed "language on DEI"); Dkt. 112-2, EPA-AR-93 (email explaining that EPA was "being directed to" "immediately" "[p]repare a term and condition that addresses" section 3(b)(iv) of the "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" Executive Order and "[i]dentify and remove any reference to DEIA in grants policy/Terms and Conditions"). Regarding the immigration-related conditions, HUD Secretary Turner stated that it is the Secretary's "responsibility to effectively implement" EO 14218 and promised senior leadership review to "ensure that HUD programs are compliant" with that order. *See* RJN, Ex. B, U.S. Dep't of Hous. & Urban Dev., Letter to Grantees and Stakeholders (Apr. 4, 2025), https://www.hud.gov/sites/dfiles/PA/documents/2025-04-04-HUD-Grantee-and-Stakeholder-Letter.pdf. However, "an executive order is not 'law,'" *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023), and such an order does not exempt an agency from the APA's requirements of "reasoning, deliberation, and process," nor permit "flip-flop[s]" "on the whims of each new administration." *California v. Bernhardt*, 472 F. Supp. 3d 573, 600–01 (N.D. Cal. 2020). Invoking a presidential directive does not relieve an agency of its duty to grapple with "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including defining critical terms, assessing statutory authority, addressing programmatic impacts, and considering reliance interests. The Turner Letter does none of this.

Similarly, HUD's Gender Ideology condition is unexplained in light of the Department's own binding regulations, which mandate "[e]qual access" to covered programs according to participants' self-identified gender. 24 C.F.R. § 5.106(b)–(c). Neither the Turner Letter nor HUD's April 2025 press release addresses this conflict or offers a policy justification for discarding the prior interpretation.

Secretary Duffy's communications fare no better. His April 24 letter asserts that policies



RENNE PUBLIC LAW GROUP

"designed to achieve so-called [DEI] goals[] presumptively violate[] Federal law" and that DOT "must ensure that discrimination based on [protected status] does not exist" in funded programs. Dkt. 111-1, DOT-AR-00266. As this Court explained, the Duffy Letter provided "no record evidence that DOT considered reliance interests, possible waste or loss to the public, alternatives, or other important factors." Dkt. 45 at 17-18. It is not a reasoned explanation for what the Challenged Conditions actually impose—that recipients certify they do not operate any DEI program that DOT deems impermissible (federally funded or not). The Duffy Letter also does not acknowledge, much less explain, its departure from several court decisions holding that affinity groups and other DEI programs premised on racial, gender, or other classifications and open to all comply with equal protection and federal nondiscrimination law. *See, e.g.*, *Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 950 (W.D. Wash. 2025) (affinity groups "open to any City employee" did not violate equal protection), *aff'd in part, rev'd in part and remanded*, 192 F.4th 1143, 1168 (9th Cir. 2026) (plaintiff lacked standing where "there [was] no credible evidence that the City either required employees to join affinity groups associated with their race[,] . . . prohibited employees from joining affinity groups aligned with a different race . . . [, or] prohibited [employees] from establishing a racially diverse or non-racially aligned affinity group"); *cf. Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540–41 (7th Cir. 2005) (recognizing affinity groups based on common social identity did not violate Title VII). Nor have HHS or EPA offered any reasoned explanation for imposing these new conditions on their respective grant programs.

Defendants cannot show they "considered the relevant factors" or "articulated a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43; *see also Dep't of Com.*, 588 U.S. at 785 (requiring reasoned decision making ensures agencies provide genuine justifications subject to scrutiny; accepting contrived reasons would render judicial review an "empty ritual"). Instead, they reflect bare assertions of presidential direction or political preference, untethered to statutory authority or the agencies' missions, and are therefore arbitrary and capricious.

As this Court found, Defendants fail to "make the requisite showing under the APA that Defendants considered the significant reliance interests of Plaintiffs and grantees like them who apply for, spend, and/or seek reimbursement via millions of dollars of federal funding on an ongoing and additive, or even nearly-automatic, basis." Dkt. 45 at 17. Nor did Defendants' announcements of the



RENNE PUBLIC LAW GROUP

conditions—accompanied by no explanation other than rote references to the EOs— "show that the Defendant agencies considered the hundreds of millions of taxpayer dollars already spent or allocated to projects which may be jeopardized by the new grant conditions and resulting budgeting uncertainty, delays, and cancellations or alternatives to the new conditions such as proscribing grantee conduct with more particularity." *Id*.

Plaintiffs have established that attaching the Challenged Conditions exceeded the agencies' statutory jurisdiction, violated the Constitution, and was arbitrary and capricious in violation of the APA. *See Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 71 (D.R.I. 2025).

#### 3. The Challenged Conditions Are Contrary to the Constitution

The Challenged Conditions also must be set aside because they are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). For the reasons explained in Section IV.B below, the Challenged Conditions violate separation-of-powers provisions, the Fifth Amendment's Due Process Clause, and the Spending Clause. That warrants relief under the APA.

### B. The Challenged Conditions Violate the Constitution

#### 1. The Challenged Conditions Violate the Separation of Powers

The Constitution "exclusively grants the power of the purse to Congress, not the President." *CCSF*, 897 F.3d at 1231. Accordingly, there is no inherent executive authority to place conditions on the receipt of federal funds—any such authority must be given to the executive by the legislature. *See City of Los Angeles v. Barr*, 941 F.3d 931, 945 (9th Cir. 2019) (agency grant conditions imposed without statutory authority were "ultra vires"). Absent an express delegation of congressional authority, the President's power to impose conditions on grants "is at its lowest ebb." *CCSF*, 897 F.3d at 1233 (cleaned up). Similarly, "unless and until Congress confers power on" them, agencies have "literally . . . no power to act . . . ." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).[9]

Here, no statute gives Defendants the power to impose conditions on federal grants remotely

[9] This Court previously questioned "whether the private right of action arises for the non-APA claims." Dkt. 28 at 9 n.3. As the Ninth Circuit recently confirmed, "the Supreme Court has repeatedly recognized claims brought by plaintiffs invoking an 'implied private right of action directly under the Constitution to challenge governmental action under … separation-of-powers principles.'" *Newsom v. Trump*, --- F.4th ---, 2026 WL 3180273, at *17 (9th Cir. Oct. 23, 2026) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)).



RENNE PUBLIC LAW GROUP

approaching those at issue. The various DEI and Discrimination Conditions attempt to prohibit the use of funds for undefined categories of "DEI mandates" or "equity ideology" even though Congress has never enacted legislation barring grantees from supporting such initiatives. *See Housing Auth. of City & Cnty. of San Francisco*, 2025 WL 3187761 at *11. And by requiring grantees to certify materiality under the FCA, these conditions "hand[] the government a liability-based cudgel to wield whenever violations are alleged" even though "[n]othing in the text of Title VI's enforcement provision expressly contemplates the assurances that the government seeks to impose" and "nothing in the FCA [] support[s] that exercise of authority." *King County*, 189 F.4th at 831–832.

The HUD and CoC Gender Ideology Conditions, as well as the HHS GPS Gender Ideology Conditions, similarly attempt to bind recipients to the policy dictates of Executive Order 14168, yet Congress has never authorized the Executive to use Title IX or Title VI as vehicles for prohibiting "gender ideology." In fact, the Gender Ideology Conditions facially discriminate based on transgender status, violating the Separation of Powers by contravening antidiscrimination laws. *See Housing Auth. of City & Cnty. of San Francisco*, 2025 WL 3187761, at *11.

The HUD, CoC, and DOT Immigration Enforcement Conditions purport to require cooperation with federal immigration enforcement and prohibit policies that "facilitate" or "promote" "illegal immigration," even though Congress has repeatedly declined to enact legislation cutting off federal funds for so-called "sanctuary jurisdictions." *See San Francisco I*, 897 F.3d at 1231 (holding that Executive Branch may not withhold federal grants from sanctuary cities without congressional authorization).

The HUD and CoC Elective Abortion Conditions purport to "enforce" the Hyde Amendment, but they go far beyond what that statute actually requires. *See Housing Auth. of City & Cnty. of San Francisco*, 2025 WL 3187761, at *12. The Hyde Amendment, enacted as an annual appropriations rider, prohibits the use of federal funds to pay for abortions except in cases of rape, incest, or where the life of the mother is at risk. *See* Pub. L. No. 118-47, § 810, 138 Stat. 591 (2024). In contrast, the Elective Abortion Conditions prohibit grantees from using federal funds to "fund or promote elective abortions" in all contexts, extending the restriction beyond the prohibitions of the Hyde Amendment, imposing obligations on recipients not contemplated by Congress. And as the Ninth Circuit recently recognized, "[w]hatever effect the 'Enforcing the Hyde Amendment' executive order may have on other agencies

RENNE PUBLIC LAW GROUP

subject to the Hyde Amendment or similar restrictions, it cannot direct HUD to impose conditions that bar the 'use [of] any Grant Funds to fund or promote elective abortions' in the absence of statutory authorization." *King County*, 189 F.4th at 837.

These Conditions effectively rewrite the terms of numerous longstanding grant programs without any statutory basis. By converting funds appropriated by Congress into leverage for the Executive to pursue policy goals that Congress has either declined to enact into law or chosen to address differently, Defendants usurp Congress's "power of the purse" and violate bedrock separation of powers principles.

**2. The Challenged Conditions Are Unconstitutionally Vague**

The Challenged Conditions violate the Fifth Amendment's vagueness doctrine by imposing opaque prohibitions that leave Plaintiffs without fair notice of their legal obligations and give Defendants unbridled enforcement discretion. A government-imposed requirement is unconstitutionally vague under the Fifth Amendment if it either (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or (2) fails to "provide explicit standards for those who apply" the requirement, thereby encouraging "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see also United States v. Jae Gab Kim*, 449 F.3d 933, 941–42 (9th Cir. 2006) (quoting *Grayned*). The Challenged Conditions fail on both counts.

Here, the vague and ambiguous Challenged Conditions leave Plaintiffs guessing whether previously permissible activities—such as hosting community workshops, providing space for local affinity groups' programs and events, or even just using words like "diversity" or "equity"—violate the conditions and thereby force self-censorship. As this Court found, the conditions thus "threaten to inhibit the exercise of constitutionally protected First Amendment rights." Dkt. 45 at 26 (cleaned up) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)) ("[W]hether [a law] threatens to inhibit the exercise of constitutionally protected rights" such as First Amendment rights is "perhaps the most important factor affecting the clarity that the Constitution demands."). The uncertainty of the Challenged Conditions' prescriptions implicates Plaintiffs' constitutional right not to be deprived of liberty and property without due process of law, particularly in light of the exposure to potentially severe penalties under the False Claims Act. *See* Dkt. 45 at 26 (noting that the Grant Conditions "create the risk—based in some cases on Plaintiffs' mere use of already awarded funds—of

severe penalties under the FCA and perhaps even criminal prosecution"); *see also Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) ("[W]here criminal sanctions are involved and/or the law implicates First Amendment rights such as here, a more demanding standard of scrutiny applies.").

**a. The EO Conditions**

Defendants have imposed various EO Conditions that ambiguously incorporate the President's EOs and require recipients to "comply" with them. Some of the EO Conditions provide a "non-exhaustive list" of specific EOs, such as the HUD EO Condition and the DOT EO Condition, while others simply refer to "all current Executive Orders" generally, such as the CoC EO Condition. However, none of the EOs at issue directly impose requirements on grant recipients; rather, they direct the heads of executive agencies to impose conditions on federal funding. Accordingly, it is nonsensical to require Plaintiffs to "comply" with the EOs when it is unclear what requirements they impose on Plaintiffs. For these reasons, this Court concluded that the EO Conditions "are impermissibly vague because they incorporate the equally vague language of the EOs themselves and because in some cases they do not specify which EOs are applicable to grantees and in all cases they do not explain how the EOs are applicable to grantees." Dkt. 45 at 28 (cleaned up).

This uncertainty renders the EO Conditions unconstitutionally vague and ambiguous under both the Due Process Clause and the Spending Clause. First, due process requires that laws and conditions on federal funding be set forth with sufficient clarity to give ordinary recipients fair notice of what is required or prohibited. *See Cnty of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017) (citing *Grayned*, 408 U.S. at 108–09); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1222–23 (N.D. Cal. 2025). A condition that simply directs compliance with "all current Executive Orders" provides no meaningful guidance as to what conduct is expected, tolerated, or prohibited. Executive orders vary in scope and subject matter, are subject to change at any time, and are addressed exclusively to executive branch actors. A local government recipient is left to guess whether, and how, a particular EO applies to its conduct and risks loss of critical federal funding and FCA liability if it guesses incorrectly. As this Court observed, "[I]t is not clear what compliance with the EOs requires of *Plaintiffs*." Dkt. 45 at 29 (emphasis in original).

Second, the EO Conditions invite arbitrary and discriminatory enforcement. By incorporating



RENNE PUBLIC LAW GROUP

executive orders in sweeping, undefined terms, the Conditions vest federal officials with unfettered discretion to determine whether a recipient is "in compliance" without reference to any objective standards. This discretion enables the administration to wield grant funding as a tool of coercion, selectively enforcing vague obligations against disfavored recipients while overlooking the same conduct by others. The ambiguity of the EO Conditions thus makes them ripe for use as a mechanism of retaliation against entities that express viewpoints or pursue policies disfavored by the current administration. The absence of clear guidelines transforms the grant process into a tool of political leverage, where recipients must conform to shifting executive priorities or risk losing essential funding, and "encourage[s] arbitrary and discriminatory enforcement." *See* Dkt. 45 at 29 (quoting *Jae Gab Kim*, 449 F.3d at 941–42; *Grayned*, 408 U.S. at 108).

Third, Plaintiffs cannot knowingly agree to comply with "all current Executive Orders" because that phrase does not inform them of what specific obligations they are undertaking, much less what obligations might be imposed in the future. The "non-exhaustive list" approach fares no better, since it signals that the government may enforce additional, unspecified EOs against recipients at its discretion. A condition that operates as a moving target—changing with each new Executive Order—is unconstitutionally vague.

**b. DEI and Discrimination Conditions**

The Conditions implementing the President's DEI Executive Orders (EO 14151, EO 14173, EO 14332) are unconstitutionally vague. None of the Defendants' policies or agreements define the terms "diversity," "equity," or "inclusion," nor do they explain what it means for a program to "promote" DEI. *See* Dkt. 45 at 30 (noting definitional lacunae). It is unclear whether routine housing equity programs, cultural competency and implicit bias training, or public health programs aimed at reducing racial disparities in health outcomes may be seen as "promoting DEI" and result in the loss of funding or FCA liability. Such vagueness not only provides insufficient notice of what grantees must do and undermines their ability to comply with the terms and conditions of their grant agreements, but also creates a substantial risk of arbitrary or discriminatory enforcement—including "severe penalties under the FCA and perhaps even criminal prosecution." *See* Dkt. 45 at 26, 31.

Several courts, including this one, have recently held that analogous anti-DEI and anti-equity



RENNE PUBLIC LAW GROUP

conditions related to or derived from President Trump's EOs are "highly ambiguous" and therefore likely impermissibly vague. *See* Dkt. 45 at 30; *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1222–27; *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149, 188–89 (D.N.H. 2025); *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53, 66–67 (D.D.C. 2025); *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979 (N.D. Cal. 2025); *City of Salem v. Mullin*, 839 F. Supp. 3d 1320 (D. Or. 2026); *Massachusetts v. U.S. Dep't of Agric.*, CV 26-11396-MJJ, 2026 WL 1815807 (D. Mass. June 24, 2026); *Rhode Island Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180 (D.R.I. 2025); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66 (D. Md. 2025).

Defendants' removal of explicit references to DEI from some conditions does not cure these constitutional defects. To the contrary, the memorandum issued by then-Attorney General Bondi (which has not been revised or withdrawn) compounds the ambiguity by advancing an expansive and uncertain interpretation of federal antidiscrimination laws that blurs the line between unlawful discrimination and lawful, race-neutral programs and activities. The July 29, 2025 memorandum to all federal agencies warns that facially neutral criteria—including "cultural competence," "lived experience," and geographic targeting—may constitute unlawful proxies for protected characteristics. Dkt. 110-10, HUD-AR-1919–1920, 1923. It further identifies targeting geographic areas or institutions based on their racial composition, considering socioeconomic status or first-generation status, and using criteria such as "geographic diversity" as potentially unlawful. HUD-AR-1926. The memorandum also cautions that training programs that classify individuals based on protected characteristics may be unlawful. HUD-AR-1925–1927. This administration's guidance conflates its anti-DEI policies with federal anti-discrimination law, further confusing what the Discrimination Conditions require.

Additionally, the conditions also introduce the undefined concept of "promoting" a violation of the law. It is unclear what it means for a program that itself complies with antidiscrimination law to nonetheless be deemed to "promote" a violation. Such phrasing leaves recipients to speculate whether ordinary activities—such as public statements or campaigns affirming DEI principles, employee resource groups or affinity networks, or inclusive curriculum or educational programming—might be construed as violations. By replacing explicit references to "DEI" with equally indeterminate prohibitions, the revised Discrimination Conditions perpetuate the same vagueness problems, depriving grantees of clear notice



RENNE PUBLIC LAW GROUP

and enabling arbitrary enforcement.

**c. Gender Ideology Conditions**

The Gender Ideology Conditions imposed across HUD, CoC, HHS, and HRSA grants are unconstitutionally vague and ambiguous because they fail to provide clear, enforceable standards, thereby inviting arbitrary enforcement. Although EO 14168 contains a definition of "gender ideology," that definition is itself sweeping, subjective, and infused with ideological judgments. Terms such as "ever-shifting," "false claim," and "vast spectrum" provide no objective criteria for determining when a recipient's conduct "promotes" gender ideology. *See* Dkt. 45 at 32 (noting lack of clarity regarding what constitutes impermissible "promot[ion]" by Plaintiffs). A grantee cannot reasonably discern whether inclusive nondiscrimination policies, recognition of transgender individuals, provision of gender-affirming care, or even simply using the term "genders" constitutes a violation. The conditions' impermissible vagueness is compounded by their failure to specify "what is required of Plaintiffs"—given that the Gender Ideology EOs are directed at agency heads. *See* Dkt. 45 at 32. This lack of clarity leaves recipients guessing at the scope of their obligations under threat of severe funding consequences and FCA liability. Such open-ended and ideologically charged conditions cannot satisfy constitutional requirements.

**d. Elective Abortion Conditions**

The HUD and CoC Elective Abortion Conditions are also unconstitutionally vague and ambiguous. While the Conditions reference EO 14182, neither the EO nor the grant terms define what constitutes an "elective" abortion or what it means to "promote" one. *See* Dkt. 45 at 33 (noting ambiguities of "elective" and "promote"). It is unclear whether "promotion" encompasses counseling, referrals, provision of information, or advocacy by subgrantees, or whether "elective" excludes cases of rape, incest, and where the life of the mother is at risk as well as procedures performed for health, fetal anomaly, or other non-life-threatening medical reasons. Such indeterminate and malleable terms do not put grantees on notice and invite selective enforcement.

**e. Immigration Enforcement Conditions**

The HUD and DOT Immigration Enforcement Conditions are likewise unconstitutionally vague and ambiguous. The HUD Condition prohibits the use of funds in a manner that "facilitates the





RENNE PUBLIC LAW GROUP

subsidization or promotion of illegal immigration" or "abets policies that seek to shield illegal aliens from deportation," but offers no definition of what constitutes "facilitates," "subsidization," or "promotion." *See* HUD-AR-01933. Likewise, the DOT Condition requires recipients to "cooperate with Federal officials" and refrain from "impeding" immigration enforcement, yet does not define "cooperate" or "impeding." *See* Dkt. 36-22 (Bacher Decl.), Ex. 8; Dkt. 36-24, Ex. E at 25.

These open-ended terms leave recipients without fair notice of what conduct is prohibited. It is unclear, for example, whether providing housing assistance to mixed-status families, adopting confidentiality policies to encourage crime reporting, or limiting local law enforcement's role in federal immigration enforcement constitutes a violation. The ambiguity of these terms forces recipients to guess at their obligations while allowing federal officials to decide after the fact what conduct is prohibited. As this Court concluded, the ambiguity and lack of notice to Plaintiffs render the Immigration Enforcement Conditions impermissibly vague. *See* Dkt. 45 at 34.

### 3. The Challenged Conditions Violate the Spending Clause

The Challenged Conditions are especially problematic because they exceed even Congress' power to condition federal funds under the Spending Clause. First, under the Spending Clause, "if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). When determining the ambiguity of conditions on federal grants, the Court evaluates "whether [a recipient]…would clearly understand…the obligations of the [conditions]." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *cf. King County*, 189 F.4th at 836 (explaining that under "the dissent's theory, facially valid policy reasoning would be enough to authorize all manner of ambiguously-worded terms 'unrelated to the federal interest' in the program, even though we have long understood such conditions to violate the Spending Clause"). For the same reasons that the Challenged Conditions are unconstitutionally vague, they are likewise too ambiguous to satisfy the Spending Clause. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also supra*, § IV(B)(2); *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 749 (N.D. Cal. 2025) (collected cases involving findings that DEI- and equity-related conditions were impermissibly ambiguous under Spending-Clause analysis).

RENNE PUBLIC LAW GROUP

Second, the Spending Clause only permits Congress to impose "reasonable conditions relevant to federal interest in the project and to the over-all objectives thereof." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (cleaned up). Accordingly, any federal grant conditions must have some "nexus" with the purpose of the grant funds at issue. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 532. The same nexus requirement applies to Executive Branch-imposed conditions. *Id.* There is no nexus whatsoever between the Challenged Conditions and the federal interest in the grant funds at issue here.

The DEI-related condition prohibits recipients from using funds to "promote" diversity, equity, and inclusion mandates, policies, or programs. However, HUD's CPD and CoC programs are designed to fund affordable housing, prevent homelessness, provide community infrastructure, and deliver services to vulnerable populations—activities that frequently require outreach to historically underserved communities. The DEI condition is untethered to these statutory purposes and invites enforcement based on ideological disagreement rather than project compliance. Likewise, FTA's fixed guideway capital investment, urbanized area formula, state-of-good-repair, and bus facility grants, which support infrastructure projects, vehicle purchases, and system maintenance, have no connection to limitations on DEI. The same is true for FHWA's roadway safety, bridge repair, aquatic ecosystem restoration, transportation technology programs, FAA's airport improvement and infrastructure grants, and DOT IFAC grants. The DEI restriction bears no relationship to engineering, safety, environmental, transit development, or aviation objectives. Similarly, the HHS grants, which are intended to support public health programs and services, and the EPA grants, which are intended to fund environmental protection and remediation efforts, have no nexus to the DEI conditions.

The Immigration Enforcement Conditions are equally unrelated to HUD and DOT grant programs. The HUD programs have no statutory mandate to enforce immigration laws, and immigration policy has no bearing on community development, affordable housing, or homelessness. The absence of any nexus is even more apparent with DOT, FTA, FHWA, FAA, NHTSA, and FRA grants, whose purposes are to construct, maintain, and improve transit, highway, and aviation systems. As *Cnty. of Santa Clara v. Trump* held, immigration enforcement has no connection to programs focused on transportation, health, or housing. *See* 250 F. Supp. 3d at 532.

The HUD, DOT, and HHS Gender Ideology Conditions are also unrelated to the grants at issue.

HUD's housing programs are tasked with meeting fair housing obligations, preventing homelessness, and addressing community needs; this ideological restriction has nothing to do with the provision of shelter or compliance with the Fair Housing Act. Transportation and aviation programs are concerned with building and maintaining infrastructure, not regulating gender identity. Similarly, the prohibition on using grant funds to fund or promote "elective abortions," as set out in E.O. 14182, is entirely unrelated to the purposes of the federal grant programs at issue. Across all programs, the Challenged Conditions are unconnected to the purposes of the federal programs and instead impose broad social policy restrictions divorced from the statutory objectives Congress enacted. Their enforcement would exceed even Congress's conditional spending authority, let alone the Executive's.

### C. The Court Should Vacate the New Conditions and Permanently Enjoin Defendants from Re-Imposing or Otherwise Implementing Them

#### 1. The Court Should Set Aside the New Conditions Under the APA

Under the APA, a court "shall . . . hold unlawful and set aside agency action[s]" that violate the statute. 5 U.S.C. § 706(2). "[V]acatur and remand is the default remedy under the APA[.]" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). Because Plaintiffs have shown multiple ways in which the Challenged Conditions violate the APA, they should be vacated in their entirety.

#### 2. The Court Should Permanently Enjoin Defendants from Implementing or Enforcing the Challenged Conditions Against Plaintiffs

To obtain a permanent injunction, a plaintiff must demonstrate: (i) actual success on the merits; (ii) that it has suffered an irreparable injury; (iii) that remedies available at law are inadequate; (iv) that the balance of hardships justifies an equitable remedy; and (v) that the public interest would not be disserved by a permanent injunction. *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013); *see also Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) ("In the context of analyzing claims under the APA, some courts have held that 'once the court reache[s] the conclusion that the rule was indeed illegal . . . there [is] no separate need to show irreparable injury . . . .'" (quoting *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'r*s, 145 F.3d 1399, 1409 (D.C. Cir. 1998))).

The primary differences between the test for a preliminary injunction, which this Court has



RENNE PUBLIC LAW GROUP

already determined Plaintiffs satisfied, and permanent injunctive relief are that Plaintiffs must now additionally show actual success on the merits and the inadequacy of legal remedies. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Because Plaintiffs have done so, permanent injunctive relief is warranted.

**a. Plaintiffs Have Demonstrated Actual Success on the Merits and Irreparable Harm From Defendants' Restrictions on Hundreds of Millions of Dollars in Funding**

For the reasons argued above, Plaintiffs have demonstrated actual success on the merits.

This Court already found that Plaintiffs faced a threat of irreparable harm. *See* Dkt. 89 at 16 ("[T]he loss or threat of lost funding based on grant conditions that likely violate separation of powers, the Fifth Amendment, and the APA unquestionably constitutes irreparable injury.") (cleaned up); Dkt. 45 at 34. The Challenged Conditions have become no less unlawful since the Court's preliminary injunction order, and this particular irreparable harm persists. Defendants have put Plaintiffs in the position of having to choose between attempting compliance with unlawful conditions or refusing and thereby risking the loss of hundreds of millions of dollars in key federal grant funding, including funding that they have already budgeted and are committed to spending. *See King County*, 189 F.4th at 839 (noting that whether "comply or refuse, the Local Governments face the 'imminent harm' of a 'very real penalty') (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009)).

The *King County* court described the "classic Hobson's choice" that the plaintiff local governments must confront: "sustain unrecoverable losses to comply with the government's conditions, or refuse to submit, and risk losing the grant funds in their entirety."

> On the one hand, if they accede to the conditions, which are likely unlawful, the Local Governments "will be forced to incur large costs" that "will disrupt and change" their services due to delay and financial uncertainty arising from confusion about the conditions' scope and applicability. Those costs flow from the mitigating steps that the Local Governments must take to come into compliance with conditions that are likely unlawful, and that cannot be recovered as damages. On the other hand, the Local Governments can refuse to agree to the conditions and lose the entirety of the grant funds, including funds that they have already budgeted and are committed to spending. We and our sister circuits have routinely held that this double bind constitutes irreparable harm.

*Id.* (cleaned up) (citing cases); *see also* Dkt. 45 at 34 (explaining how this choice causes irreparable harm); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–59 (9th Cir. 2009)



RENNE PUBLIC LAW GROUP

(describing "Hobson's choice" of having to sign "likely unconstitutional Concession agreements").

Additionally, as shown above, the Challenged Conditions violate Separation of Powers, due process, and the Spending Clause. Accordingly, Plaintiffs have also made a sufficient showing of irreparable harm that would result from enforcement of those provisions, as it is "well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quotation omitted); *see also* Dkt. 45 at 34 (concluding that the choice between comply or refuse "causes irreparable harm because the Grant Conditions likely violate Separation of Powers as in excess of statutory authority and Due Process as impermissibly vague, and "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Hernandez*)).

Even if Plaintiffs tried to comply with the vague and unlawful conditions, the uncertainty in their application could easily result in withdrawal, blockage, and denial of reimbursement, in violation of the Due Process and Spending Clauses and subjecting Plaintiffs to liability under the False Claims Act. "This uncertainty as to whether the Defendant agencies will consider conditions satisfied creates irreparable injury not just in the form of constitutional injury." Dkt. 45 34:17-19. For example, Corvallis reports that funding insecurity paused its Home Repair Loan Program and that uncertainty concerning new funding requirements continues to affect rental-assistance planning and has delayed assistance to low-income renters. *See* Shepard Supp. Decl. at 6–7; *see also* Varner Supp. Decl. at 6–9. As this Court noted, "'The []uncertainty [also] interferes with [Plaintiffs'] ability to budget, plan for the future, and properly serve their residents' and requires 'placing funds in reserve and making cuts to services' which constitutes irreparable harm." *See* Dkt. 89 at 16 (quoting *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 537). "This disruption cannot be remedied down the line with money alone as Defendants contend because by then projects on which millions of taxpayer dollars have already been spent, and which require years to complete and coordination across many parties, will have been compromised." Dkt. 45 at 34; *see e.g.*, Dkt. 36-15 at 6; Dkt. 71-25 at 7; Dkt. 71-36 at 3–4.

Moreover, Plaintiffs have submitted substantive and detailed evidence through declarations illustrating how a loss of the federal grant funds would be devastating and irreparable. *See, e.g.*, Dkt. 36-21 at 10–11; Dkt. 36-15 at 6; Dkt. 71-33 at 5; Dkt. 71-36 at 3–4; Lutz Supp. Decl. at 4, 5, 15, 27, 35, 37–

40; Shepard Supp. Decl. at 4–7. The loss of those funds would cause immediate, irreparable, and reverberating harms to Plaintiffs—including upending their budgets, pausing crucial infrastructure projects, and terminating essential public services. *See, e.g.*, Dkt. 36-21 at 9–11; Dkt. 36-15 at 6; Dkt. 71-25 at 7; Dkt. 71-33 at 5; Lutz Supp. Decl. at 5, 15, 27, 35, 37–40. Transportation projects in particular require years of planning and, often, years to complete. Without injunctive relief, Plaintiffs will need to divert resources from other projects to compensate or plan around the uncertainty of whether they can accept federal funds, straining their resources and putting other projects in jeopardy. *See, e.g.*, Supp. Smith Decl. ¶¶ 5(a), (d), (e), (g); Dkt. 71-25 at 7; Dkt. 71-33 at 5; Dkt. 71-36 at 3–4. Without these funds, planned projects may become too expensive to undertake, requiring them to be modified or canceled. *See, e.g.*, Dkt. 71-25 at 7; Dkt. 71-33 at 5; Dkt. 36-15 at 6; Ng Supp. Decl. at 11; Darrow Supp. Decl. at 17. As a result of potential loss and uncertainty surrounding these grants, Plaintiffs will face dire consequences for their transportation infrastructure and resident safety. *See* Supp. Caviness Decl. ¶ 20 (detailing consequences of reductions in federal funding, including impact on economic development in surrounding areas); Shepard Supp. Decl. at 4–7. As in *King County*, Plaintiffs here "have established that they likely are bearing and will continue to bear heavy financial costs that are not recoverable and arise from the challenged conditions" and that without injunctive relief "they would suffer 'harm for which there is no adequate legal remedy, such as an award of damages.'" *See King County*, 189 F.4th at 838-39 (citing, inter alia, 5 U.S.C. § 702 (providing for relief "other than monetary damages")).

Further, even where Plaintiffs currently have access to allocated funds, they face ongoing uncertainty as to whether Defendants consider the conditions applicable to those funds or whether Defendants will require Plaintiffs to submit a "recertification" incorporating those conditions during the grant period. *See, e.g.*, Dkt. 81-5 at 4; Dkt. 36-21 at 11; Chen Supp. Decl. at 11; Skei Supp. Decl. at 7–10. The lack of future funding certainty is causing harm now, including where Plaintiffs are facing structural budget deficits and are deeply reliant on federal funds, or where Plaintiffs have to make choices now to terminate/delay programs or to pay for them from local funds without knowing if the federal government will reimburse. *See, e.g.*, Dkt. 71-25 at 7; Dkt. 71-33 at 5; Dkt. 71-36 at 3–4; Skei Supp. Decl. at 7–10; Marcus Decl. at 4–9.

**b. Vacatur Is an Inadequate Remedy to Protect Plaintiffs Fully from Defendants' Reimposition of Substantially Similar Conditions**

Injunctive relief in addition to vacatur is warranted where setting aside an agency action alone is not "sufficient to redress [the plaintiffs'] injury," *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010), or to protect against reimposition of unlawful agency action. *See Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024) (concluding that an injunction was warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief."). In such circumstances, injunctive relief can appropriately "restrain agency officials from . . . conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs). Indeed, courts often award both. *See, e.g.*, *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 692 (N.D. Cal. 2020); *see also R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 374–75 (D.R.I. 2025); *Texas v. United States*, No.18-CV-00068, 2021 WL 3022434, at *2-3 (S.D. Tex. July 16, 2021); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) (conditions on federal grants); *California v. United States Dep't of Transportation*, 808 F. Supp. 3d 291, 312 (D.R.I. 2025) (same); *Michigan v. Noem*, 819 F. Supp. 3d 1163, 1183 (D. Or. 2025) (same); *Washington v. United States Dep't of Educ*., 813 F. Supp. 3d 1222, 1248 (W.D. Wash. 2025) (same); *Illinois v. Noem*, 813 F. Supp. 3d 282, 311 (D.R.I. 2025) (same).

Here, vacatur alone is inadequate to protect Plaintiffs because it "does not restrain the enjoined defendants from pursuing other courses of action to reach the same or a similar result as the vacated agency action." *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022), *aff'd in part, vacated in part sub nom. Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606 (9th Cir. 2024), *and aff'd in part, vacated in part sub nom. Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102 (9th Cir. 2025). The same Administration remains in power and the EOs maligning DEI and directing federal agencies to impose the President's whims on grantees—as well as the July 2025 Bondi Memo, the May 2025 Civil Rights Fraud Initiative Memo, and the April 2025 Duffy Letter—have not been

withdrawn or revised. These dynamics underscore Plaintiffs' need for complete relief. *See Am. Acad. of HIV Med. v. Health Res. & Servs. Admin.*, No. CV 26-12638-WGY, 2026 WL 3562895, at *59 (D. Mass. Nov. 19, 2026) ("As is clear from the animus displayed by the Challenged Conditions and other litigation involving Trump Administration officials, there is a sufficient basis for belief that the Agency and Public Official Defendants may try otherwise to impose similar conditions on the Associational and Provider Plaintiffs once these Challenged Conditions are vacated").

A recent case involving previously vacated immigration-related conditions that DHS and FEMA sought to re-impose demonstrates that a vacatur alone would not be sufficient; Plaintiffs must have the protections of a permanent injunction that they can enforce against Defendants' continued attempts to impose unlawful grant conditions. In that case, the district court vacated the immigration-related grant conditions and permanently enjoined the defendants "from enforcing the contested conditions against Plaintiff States." *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d at 98. Nevertheless, DHS and FEMA violated the permanent injunction twice, requiring the court to enter two separate orders enforcing the injunction. The first violation occurred in 2025, when DHS and FEMA inserted enjoined grant conditions "into award letters to the Plaintiff States, along with statements promising that, should the injunction be paused or dissolved, the conditions would become effective immediately." *Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-CV-00206-MSM-RLA, 2026 WL 3390545 at *1 (D.R.I. Nov. 9, 2026). The Court granted plaintiffs' first motion to enforce the injunction, determining that DHS's and FEMA's actions "plainly violated the terms of the permanent injunction" and had "done precisely what the Memorandum and Order forbids, which is requiring Plaintiff States to agree to assist in federal immigration enforcement or else forgo the award of DHS grants." *Illinois v. Federal Emergency Management Agency*, No. 25-206, 2025 WL 2908807 at *1 (D.R.I. Oct. 14, 2025). The court concluded that Defendants' new condition was "not a good faith effort to comply with the order; it [was] a ham-handed attempt to bully the states into making promises they are not obligated to make at the risk of losing critical disaster and other funding already appropriated by Congress." *Id.*

This year, DHS imposed eight "new immigration-related conditions . . . on grant funding," of which seven were "either identical or nearly identical to the 'contested conditions'" that the court had previously vacated and enjoined. Earlier this month, the court granted the Plaintiff States' second motion



RENNE PUBLIC LAW GROUP

to enforce the permanent injunction, declaring that DHS and FEMA had violated the previous injunction. *Illinois v. Fed. Emergency Mgmt. Agency*, 2026 WL 3390545 at *2. Without the protections of a permanent injunction and the ability to return to court to stop violations, the State Plaintiffs there would have had little protection or recourse against the Administration's unrelenting attempts to re-impose unlawful conditions—as will be the case here if a permanent injunction is not granted.[10]

HUD has already shown that it is willing to impose similar spring-back conditions on Plaintiffs here notwithstanding this Court's preliminary injunction. HUD's Fiscal Year 2026 agreements for CPD grants included a provision purporting to re-impose the Challenged Conditions in the event this Court's preliminary injunction were "stayed, dissolved, or reversed":

> In the event the enjoinment of such provisions is stayed, dissolved, or reversed, the full terms of this Agreement, including such provisions, will automatically become effective. This clause is self-executing and will become effective, binding, and enforceable automatically upon execution of this Agreement.

*See* Ross Decl. at 5 & Ex. A. After meet and confer under threat of a motion to enforce the preliminary injunction, HUD eventually relented and agreed that the Plaintiffs could strike through this spring-back provision. *See id.* at 5–9 & Exs. B–G. Plaintiffs fear that they will not be so fortunate in opposing substantially similar conditions if this Court were to vacate Defendants' unlawful actions but decline to issue permanent injunctive relief.

#### c. The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor

The equities and public interest, which merge when the government is a party, tip sharply in favor of a permanent injunction. *See King County*, 189 F.4th at 840. In the absence of such relief, Plaintiffs will continue to face immediate and irreparable harm from the enforcement of grant conditions that threaten vital funding for public programs and services. *See id.* ("the balance of equities tips sharply in the Local Governments' favor given the findings of irreparable harm"). By contrast, the federal government has no interest in imposing conditions that have been determined to be unlawful. Preserving

[10] For example, DOT removed the Immigration Enforcement Condition after that condition was vacated and permanently enjoined. *See California v. U.S. Dep't of Transp.*, 808 F. Supp.3d 291, 314 (D.R.I. 2025); Supp. Caviness Decl. ¶ 10 & Ex. A at 13–14, § 6.5.





RENNE PUBLIC LAW GROUP

Plaintiffs' constitutional rights and preventing the government from enforcing unlawful conditions clearly serves the public interest. *See* Dkt. 89 at 18 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation omitted)); *King County*, 189 F.4th at 840 ("[A]gency action taken in excess of statutory authority runs counter to the public interest, which is served by compliance with the APA.").

Further, the public not only has an interest in preventing Defendants from engaging in unconstitutional and unlawful behavior, but also directly benefits from the programs funded by the Plaintiffs' Grant Awards. *See San Francisco I*, 897 F.3d at 1244 ("[T]he public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services"); Dkt. 45 at 35 ("[T]he public interest is served by giving Plaintiffs the budgetary clarity needed to deliver key public services to their constituents."). Accordingly, the balance of equities and the public interest decisively support permanent injunctive relief here.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and, under 5 U.S.C. § 706(2), vacate the Challenged Conditions. Plaintiffs also respectfully request that this Court permanently enjoin Defendants (and their officers, agents, employees, attorneys, and any person acting in concert with them or at their behest) from (i) imposing or enforcing any or all of the Challenged Conditions in any agreement that a Plaintiff already signed or from otherwise treating any such Challenged Condition as effective and (ii) imposing or enforcing any or all of the Challenged Conditions or any substantially similar conditions against Plaintiffs via any new agency action.

Dated: November 23, 2026

RENNE PUBLIC LAW GROUP

By: *__/s/ Ryan P. McGinley-Stempel__*
RYAN P. MCGINLEY-STEMPEL

Attorneys for Plaintiffs
CITY OF FRESNO; CITY OF EUREKA; CITY OF SOUTH LAKE TAHOE; COUNTY OF SACRAMENTO; COUNTY OF MONROE; MONROE COUNTY AIRPORT AUTHORITY; COUNTY OF SAN DIEGO, COUNTY OF MARIN; CITY OF ALAMEDA; CITY OF REDWOOD CITY; CITY OF ATLANTA; CITY OF BEAVERTON; CITY OF CORVALLIS; CITY OF HILLSBORO; CITY OF MOUNTAIN VIEW; CITY OF SALEM; CITY OF SAN MATEO; CITY OF SANTA CLARA; CITY OF SANTA CRUZ; CITY OF SUNNYVALE; CITY OF VACAVILLE; COUNTY OF LOS ANGELES; COUNTY OF SANTA BARBARA

Dated: November 23, 2026

SAINT PAUL CITY ATTORNEY'S OFFICE

By: *__/s/ Aaron Winter__*
AARON WINTER*
* *Appearing pro hac vice*

Attorneys for Plaintiff
CITY OF SAINT PAUL

**ECF ATTESTATION**

I, RYAN P. MCGINLEY-STEMPEL, am the ECF user whose identification and password are being used to file PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

Dated: November 23, 2026

RENNE PUBLIC LAW GROUP

By: *\/s/ Ryan P. McGinley-Stempel*
RYAN P. MCGINLEY-STEMPEL